# EXHIBIT A

**HOME**  **INDEX**  **SEARCH**  **U.S. ATTORNEYS**

U.S. Attorneys » Resources » U.S. Attorneys' Manual » Criminal Resource Manual » CRM 2000 - 2500 » Criminal Resource Manual 2001-2099

## 2062. Foreign Agents Registration Act Enforcement

The Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.* (FARA or the Act) is a disclosure statute aimed at "agents of foreign principals" (agents) as defined, who are engaged in covered activities, on behalf of their foreign principal(s), unless exempt. The Department's enforcement policies and procedures are closely tied to the legislative history of this little known statute.

From its passage in 1938 until the 1966 amendments, FARA was focused on propagandists. The original Act included a fairly broad definition of the term agent, and a single felony penalty for the most serious transgressions. It was used in the World War II era to successfully prosecute some 23 criminal cases. After administration of the Act was transferred from the Department of State to the Department of Justice in 1942, the Department developed the practice of attempting to achieve compliance with the statute in instances which did not on their face warrant prosecution by sending letters advising prospective agents of the existence of FARA and their possible obligations thereunder. The practice was not without its enforcement significance, since receipt of the letter could sometimes be used to help prove the willfulness of the failure to register, as, for example, in *United States v. John Joseph Frank*, (D.D.C. 1959).

In 1966, FARA was significantly amended to focus on the integrity of the United States Government decision-making process, and to emphasize agents seeking economic or political advantage for their clients. The amendments were prompted by the excesses of lobbyists struggling over their share of the "sugar quotas" legislatively determined after trade with Cuba, the principal sugar producer, was prohibited. It required any person engaged in "political activities", as defined, as an agent on behalf of a foreign principal, to register. This is substantially narrower than the original act, which did not require that the activities be "for or on behalf of" the foreign principal.

This increase in the Government's burden of proof, along with the addition of a civil injunctive remedy similar to that in the securities laws (See Section 8(f) of the Act), and the "Rule 2" advisory opinion mechanism, wherein the Department provides statements of its enforcement intentions regarding proposed activities which may require registration under the Act (See 28 C.F.R. § 5.2), drastically reduced the incidence of criminal FARA prosecutions and increased civil and administrative resolution of FARA questions. Since 1966 there have been no successful criminal prosecutions under FARA and only 3 indictments returned or informations filed charging FARA violations. The three criminal cases post 1966 were: *United States v. Park Tong-Sun* (D.D.C. 1977), which was dismissed as part of a plea bargain; *United States v. John P. McGoff* (D.D.C. 1986), which the Department lost because of a statute of limitations problem; and *United States v. Sam H. Zakhem, et al.* (D. Colo. 1992), which was dismissed by

the Government after the principal AUSA responsible for the case resigned. In addition, there have been 2 other grand jury investigations that did not result in criminal charges. One was a grand jury investigation in Chicago in the late 1970's into Government of Iran funding of massive pro-Shah demonstrations at the time of his state visit to then President Carter. At the conclusion of the investigation, a recommendation was made to proceed with an injunctive action, but that recommendation was rejected by the Assistant Attorney General. In the second, a grand jury in Connecticut developed information that became the basis for a civil consent decree against the advertising firm Young and Rubicam in 1992 for failing to report a fee splitting agreement with a Jamaican firm associated with a Jamaican Government official. By way of contrast, there have been 17 civil cases in that period, of which 10 were successfully litigated and 7 ended by consent decree. The number of administrative resolutions is much greater.

The threshold for a criminal investigation is the presence of reason to believe that a significant FARA offense has been committed and that sufficient evidence should be available to prove this. The common threads of the last four FARA criminal investigations were: millions of dollars in receipts or expenditures by the prospective defendants; "core" violations of FARA with jury appeal; and evidence of willfulness. The Tong-Sun Park case involved several million dollars of "Food for Peace" monies, some of which were diverted to bribes and lobbying expenses; the unindicted Government of Iran sponsored "Pro-Shah" demonstrations involved some $11,000,000 in expenditures for the 3 day visit; the McGoff case involved some $11,000,000.00 of South African Government money; and the Zakhem case involved some $7,700,000 in Kuwait Government expenditures for a $2,000,000 plus public relations and lobbying campaign. *Tong Sun Park* involved bribery; the *Pro-Shah demonstrations* a massive propaganda display; *McGoff* an attempt to purchase *The Washington Star* as a South African propaganda organ; and *Zakhem* war and peace. FARA criminal prosecutions must be approved by the Criminal Division or higher authority under the United States Attorney's Manual, and in practice must first be approved by the appropriate United States Attorney's office.

The threshold for a civil action is sufficient credible evidence of a significant violation for which the civil injunctive remedy is judged appropriate in light of all the circumstances because time is of the essence or for some other reason. Civil actions often result from "Section 5" inspections of the books and records of registered agents. Section 5 of the Act, 22 U.S.C. § 615, allows the Attorney General to conduct inspections of the books and records of registered agents, which shall be "open at all reasonable times to the inspection of any official charged with the enforcement of this Act." Less often, they are proposed after criminal declinations as in *Attorney General v. Young & Rubicam*, (D.D.C. 1991), and sometimes they are filed after a person either refuses to answer a routine administrative inquiry, or answers one falsely, as, for example in *Attorney General v. William A. "Billy" Carter* (D.D.C. 1980). The Department has never asked the FBI to develop a strictly civil FARA case. Civil cases are always submitted to the Assistant Attorney General, Criminal Division for approval before filing.

If the Department receives credible information establishing a *prima facie* registration obligation, where evidence of intent is lacking, the Department usually sends a letter advising the person of the existence of FARA and the possible obligations thereunder. FARA, after all, is a *malum prohibitum* enactment not well known outside the legal/lobbying community. The letter usually cites or provides the information prompting the inquiry. In the Department's experience, the vast majority of persons approached with an inquiry letter based on public source information respond within a reasonable amount of time and either register or convincingly explain their lack of agency status or the availability of an exemption.

If this administrative route is chosen, and there is no response to the letter, or a seemingly false response, the only alternatives are to refer the matter to the FBI, which has the responsibility for FARA investigations, or to close the matter pending receipt of sufficient evidence to warrant some other action.

The letter in that event will have served its purpose of putting the person on notice of the existence and reach of the Act.The Department has asked for authority to issue civil investigative demands (CID) to more effectively gather evidence in these situations. In the meantime, letters have been used as stated above.

*Enforcement Issues under the Foreign Agents Registration Act of 1938, as amended 22 U.S.C. § 611 et seq.*

The oft-amended Foreign Agents Registration Act of 1938, as amended, is the foundation for requiring the registration of, and disclosures by, "agents of foreign principals," as defined, who are engaged in "political activities" as defined, or other defined activities of a quasi-political nature, and who are not exempt. It covers most lobbying, advertising, public relations, and fundraising for "foreign principals" as defined, that is not of a commercial nature, or performed by Embassy officials. The Act requires agents to make periodic public disclosure of their identities, agency, activities, receipts and disbursements. Disclosure of the required information facilitates evaluation by the government and the American people of the statements and activities of such persons in light of their status as foreign agents. The news media are the greatest users of the information filed under the Act, and give it further publicity, usually without attribution. Other agents, commercial firms, students and academics, in that order, are also major visitors to the Department's public office.

FARA does not exhaust the federal government's response to perceived problems in this area. There are numerous other federal statutes aimed at persons loosely called foreign agents (*See, e.g.*, 18 U.S.C. § 951; Public Law 893, 50 U.S.C. §§ 851-857; and 18 U.S.C. § 2386 (the Voorhis Act)). Restricting the discussion to foreign agents engaged in political activities covered by the Act, there are both federal statutes which authorize the exemption of otherwise covered agents (*See, e.g.*, the Taiwan Relations Act, 22 U.S.C. § 3301 *et seq.*, and Section 105(f)(2) of the Compact of Free Association Act (with the Federated States of Micronesia and the Marshall Islands), 48 U.S.C. § 1681 note) and statutes and regulations which prohibit certain agents from engaging in activities otherwise covered by the Act. The Palestine Liberation Organization office in Washington, DC, for example, registered from 1976 to 1981, but was closed in 1981 as a result of the passage of federal legislation. In addition, E.O. 12947 (1995), prohibits fundraising within the United States on behalf of groups opposed to the peace process, and Section 401 of the Comprehensive Terrorism Prevention Act of 1995, prohibits, among other things, fundraising on behalf of designated foreign terrorist organizations, activities which otherwise would require registration and disclosure.

The cornerstone of the Registration Unit's enforcement efforts is encouraging voluntary compliance. This includes the essentially administrative function of providing registration forms, with copies of the Act, Rules, Regulations, and guidelines for responses to the firms and individuals registered under the Act, as well as the members of the public, press and bar who write or call to request them. It also includes the more proactive outreach to the primarily professional communities (law, advertising, political and public relations) from which the majority of agents are drawn, as well as informing and educating prosecutors, and interested Departments and Agencies regarding the Act.

Encouraging voluntary compliance and providing information on the identities of those registered generates "Rule 2" advisory opinion requests, 28 C.F.R. § 5.2, regarding the applicability of the Act to certain specific circumstances from agents and their attorneys interested in complying with the Act. It also prompts registrants and others to alert the Unit to other persons similarly situated who are not yet registered, a service the Unit's contacts in the various Departments, Agencies and Committees of Congress also provide.

At another level, the Unit has established a number of routine enforcement initiatives, from reviewing a wide range of publications for indications of activities by unregistered agents to reviewing the filings of registered agents and conducting audits or inspections of their books and records. Almost all of the Unit's civil enforcement actions, including the so-called "Canadian films cases," *Meese v. Keene*, 481 U.S. 465 (1987), and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir.), *cert. den.* 478 U.S. 1021, *reh. den.* 481 U.S 1043 (1987), were developed in this fashion. The Unit also works closely with the law enforcement and intelligence community components who provide reports on potential violations of the Act. The Unit's less frequent criminal prosecutions have primarily come from this source--most recently an IRS investigation in Denver (the Zakhem-Kennedy-Stanley case) and previously, a South African Government investigation of internal corruption (the McGoff case).

The Department has fared well in the Courts in its enforcement efforts, with the exception of the decision in *United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987). This case shortened the statute of limitations for agents who refuse to register, contrary to the express language in Section 8(e) of the Act.

For advice/information concerning FARA, and related statutes, please contact Heather H. Hunt, Chief, and Clifford I. Rones and Robert E. Wallace, Senior Trial Attorneys, Registration Unit, Counterintelligence and Export Control Section, National Security Division at (202) 233-0776.

[cited in USAM 9-90.700; USAM 9-90.710]

‹ 2061. Registration And Lobbying Provisions     up     2063. Foreign Agents Registration Act -- Cases And Material ›