UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : Criminal Case No. 1:18-CR-457 (AJT) |
| | : |
| BIJAN RAFIEKIAN, et al. | : |

**DEFENDANT BIJAN RAFIEKIAN'S OPPOSITION TO NON-PARTY
MOTIONS TO QUASH SUBPOENA**

Defendant Bijan Rafiekian hereby submits this Memorandum of Law in opposition to the motions of Covington & Burling LLP ("Covington") and Kristen Verderame ("Verderame") to quash the Rule 17(c) subpoenas (the "Subpoenas") issued on the motion of Defendant Rafiekian and served on or about March 5, 2019.

## BACKGROUND

Flynn Intel Group, Inc. ("FIG") is a closely held corporation organized under Delaware law in January 2015. From and after November 6, 2016, and at all relevant times, there were only two principal shareholders of the corporation: Michael Flynn, who owned 350,000 of the 1,000,000 authorized shares, and defendant Bijan Rafiekian, who owned 300,000 shares.[1] From and after the same date, the corporation had only two directors: Mr. Flynn and Mr. Rafiekian.[2]

With the election of Donald Trump on November 8, 2016, and the appointment of Michael Flynn as National Security Advisor designate for the incoming administration, FIG discontinued

---

[1] *See* WAIVER OF NOTICE AND RESOLUTION OF THE BOARD OF DIRECTORS, FLYNN INTEL GROUP (Nov. 6, 2016).

[2] *See id.*

operations.³  As a result of an inquiry from the Department of Justice unit responsible for enforcing the Foreign Agents Registration Act ("FARA") Mr. Flynn, on behalf of FIG, contacted Kristen Verderame and later Covington in late December 2016 for legal representation in responding to that inquiry.  On January 9, 2017, Covington issued an engagement letter undertaking to "provide Foreign Agents Registration Act Advice" to FIG, which engagement letter was countersigned on behalf of FIG.⁴  Beginning in January 2017, Ms. Verderame and Covington reviewed FIG's corporate records and interviewed FIG employees to determine whether it was appropriate to file under FARA for the work they had performed over a three-month period in the fall of 2016 for Inovo, BV ("Inovo")—a Dutch company owned by defendant Ekim Alptekin.  In January and February 2017, Mr. Rafiekian contributed a total of $55,000 of his personal funds to pay for FIG's ongoing expenses, including for Covington's (and presumably Ms. Verderame's) legal fees.

On March 7, 2017, after conducting its investigation, Covington filed retroactive FARA registration forms for FIG for the work performed pursuant to FIG's Advisory Services Agreement with Inovo.  Importantly, when filing the FARA registration for FIG, Covington *did not* say that the reason for the registration was a determination that FIG was acting as an agent for a foreign government.  Instead, Covington explained that FIG's work with Inovo, a private entity, "could be construed to have principally benefitted the Republic of Turkey."  If that were true, the FARA exemption that otherwise would have applied when FIG registered under the Lobbying Disclosure Act ("LDA") would not have been available under the applicable regulations.⁵  For that reason,

---

³ *See* Letter from Robert K. Kelner (Partner, Covington & Burling LLP) to Heather Hunt (Chief, Foreign Agent Registration Act Unit) (Mar. 7, 2017) (filed with FIG's retroactive FARA registration) ("Flynn Intel Group shut down operations in November 2016.").

⁴ Letter from Robert K. Kelner (Partner, Covington & Burling LLP) to Michael T. Flynn (Jan. 9, 2017) (the "Covington Engagement Letter").

⁵ In September 2016, acting on advice of counsel, FIG registered under the LDA.  FARA exempts from its registration requirements foreign agents who are lobbying and who have

Covington determined that the safer course—"[t]o eliminate any potential doubt"—was to register under FARA, in lieu of FIG's prior LDA registration.[6]

When Covington and Ms. Verderame were engaged at the end of December 2016 or early January 2017, they undertook to represent both the corporation (FIG) and Michael Flynn, individually. Undersigned counsel, Robert Trout, was engaged on or about April 13, 2017, to represent Mr. Rafiekian individually. Whatever common interest the two FIG directors—Mr. Flynn and Mr. Rafiekian—may have had in March 2017 when FIG's FARA registration was filed, by November 2017 their interests had sharply diverged. On December 1, 2017, Mr. Flynn pleaded guilty to lying to the FBI about his contacts with Russian officials and agreed to cooperate with the government in its ongoing investigations.

Because FIG had "shut down its operations in November 2016," as relevant to this motion, whatever actions Mr. Flynn and his lawyers took purportedly in the name of FIG after December 2017 were done solely to serve Michael Flynn's personal interests—not the interests of FIG. Covington's pending motion essentially concedes this point, as it describes the actions that Covington took purportedly on behalf of FIG in response to requests by the government pursuant to Mr. Flynn's plea agreement in which he committed to cooperate with the government in the hope of receiving a more favorable sentence.[7] As Michael Flynn's personal counsel at

---

registered under the LDA. *See* 22 USC § 613(h). However, under a separate regulation, this exemption is not available if a foreign government or political party is the "principal beneficiary" of the foreign agent's work. *See* 28 C.F.R. § 5.307.

[6] *See* Letter from Robert K. Kelner (Partner, Covington & Burling LLP) to Heather Hunt (Chief, Foreign Agent Registration Act Unit) (Mar. 7, 2017).

[7] *See* Decl. of Robert K. Kelner in Support of Covington & Burling LLP's Mot. to Quash Subpoena in Part ¶¶ 4–11, Mar. 15, 2019, No. 77.

Covington—who is also FIG's counsel[8]—made clear at Flynn's aborted sentencing hearing this past December, Mr. Flynn's ability to get the full measure of cooperation credit depends on his testimony for the government and against Mr. Rafiekian at the upcoming trial.[9] In short, a conviction of Mr. Rafiekian will be good for Mr. Flynn personally. The pending motions to quash, which seek to block Mr. Rafiekian's access to documents in FIG's file, should be understood in that context and assessed in that light.

The pending motions are simply the most recent instance of FIG and its lawyers taking actions that were intended to create a personal benefit for one of FIG's directors (Mr. Flynn) to the direct and unequivocal harm of the other director (Mr. Rafiekian). With one exception, none of the actions taken in the name of FIG after December 2017 was done with the knowledge or consent of Mr. Rafiekian.[10] Here are the actions that FIG purported to take in its own name, without notice

---

[8] The Covington Engagement Letter provides, in pertinent part, "You acknowledge on behalf of Flynn Intel Group, Inc. that we will also be representing [Michael Flynn] personally concerning the Foreign Agents Registration Act matter. While we perceive no current adversity between [Michael Flynn] and Flynn Intel Group, Inc., if such adversity were to arise later, we would terminate our representation of Flynn Intel Group, Inc., but would continue to represent [Michael Flynn] personally." This provision of the Covington engagement letter notwithstanding, Covington continues to purport to represent FIG in moving to quash the instant Rule 17(c) subpoena.

[9] See Tr. of Sentencing Proceedings at 46, *United States v. Flynn*, No. 17-232 (EGS) (D.D.C. Dec. 18, 2018).

[10] Shortly after FIG was engaged by Inovo in September 2016, Mr. Rafiekian received a white paper prepared by Covington for its clients about FARA. This alerted Mr. Rafiekian to FARA's obligations, so he sought legal advice. He went to Robert Kelley, a reputable and experienced attorney who became FIG's general counsel, and asked for his help in registering under FARA. Upon being informed that FIG's contract was with a private entity, Mr. Kelley explained that FIG should not file under FARA but should instead file under the LDA, which Mr. Kelley did. When the government first raised questions about whether FIG had knowingly and intentionally sought to avoid filing under FARA, the advice of counsel was clearly a defense. Prior to Mr. Flynn's decision to plead guilty, Covington, on behalf of FIG, obtained a sworn declaration from the lawyer detailing his communications with Mr. Rafiekian about the decision to register under LDA rather than FARA. Mr. Kelley's declaration makes clear that when Mr. Rafiekian came to him for advice, Mr. Rafiekian was clear that he intended for FIG to register under FARA, but it was Mr. Kelley who advised otherwise. By January 2018, the government was aware that Mr.

to (much less consent by) Mr. Rafiekian, who at all relevant times embodied half of the Board of Directors of FIG and held in excess of 45% of the issued and outstanding shares of the corporation:

1. On March 25, 2018, Ms. Verderame apparently prepared and Mr. Flynn evidently attested to and signed a certificate of dissolution to end the corporate life of FIG. The certificate falsely represented that the dissolution was "duly authorized by the Board of Directors and Stockholders in accordance with subsections (a) and (b) of Section 275 or by unanimous consent of Shareholders in accordance with section (c) of Section 275" of Delaware's General Corporation code.[11] Contrary to Mr. Flynn's attestation, there was no notice to the directors or to the shareholders and there was no action by the board of directors or stockholders to dissolve the corporation.

---

Rafiekian had a reliance on counsel defense to the very charge that the government has now brought against him. The government later sought the details of that defense, and as a result, undersigned counsel, Robert Trout, asked Covington to make available to the government a copy of Mr. Kelley's declaration. While Mr. Rafiekian, through his counsel, approved the waiver of FIG's privilege with respect to disclosing the declaration, it was only later that Mr. Rafiekian or his lawyer learned that FIG had actually waived the privilege with respect to Mr. Kelley's legal advice that FIG should register under LDA, not FARA.

[11] The relevant subsections of Section 275 are as follows:

(a) If it should be deemed advisable in the judgment of the board of directors of any corporation that it should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution to be mailed to each stockholder entitled to vote thereon as of the record date for determining the stockholders entitled to notice of the meeting.

(b) At the meeting a vote shall be taken upon the proposed dissolution. If a majority of the outstanding stock of the corporation entitled to vote thereon shall vote for the proposed dissolution, a certification of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.

(c) Dissolution of a corporation may also be authorized without action of the directors if all the stockholders entitled to vote thereon shall consent in writing and a certificate of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.

2. On April 10, 2018, a certificate of dissolution, purportedly executed by Mr. Flynn, was filed with the Delaware Secretary of State by Ms. Verderame who also paid the required fee.

3. On June 13, 2018, explicitly to satisfy the government's request and to serve the personal interests of Mr. Flynn who had agreed to cooperate with the government, Covington wrote to the government and waived FIG's attorney-client and attorney work product privileges relating to information Covington received from employees of FIG, including Mr. Rafiekian. This waiver of FIG's attorney-client privilege, in order to advance the personal interests of one director to the harm of the other, was issued over two months after FIG was formally dissolved pursuant to the certification filed by Mr. Flynn and Ms. Verderame on April 10, 2018.

As a result of the privilege waiver that it secured from FIG in June 2018, the government obtained evidence from FIG's lawyers that led to allegations in the indictment that Mr. Rafiekian had lied to the lawyers who were deciding whether to register under FARA and what any such FARA registration would include. *See* Indictment ¶ 52–53.

## ARGUMENT

The arguments raised by Covington and Ms. Verderame in support of their motions to quash essentially boil down to three points: (1) the attorney-client privilege, (2) the *Nixon* standards, and (3) undue burden. As an initial matter, privilege claims are no bar to production under the subpoena. The attorney-client privilege has already been waived, at least in part. More to the point, Mr. Rafekian has as much legal right to privileged FIG documents as does Mr. Flynn. With regard to *Nixon*, the indictment puts the lawyers' involvement in the March 7, 2017 FARA filing squarely at issue in this case. Moreover, the entirety of Covington and Ms. Verderame's FIG client files are made relevant by the corporate manipulations undertaken by Mr. Flynn and his counsel in connection with their advancement of Mr. Flynn's personal interests at the expense of

Mr. Rafekian—who, like Mr. Flynn, is also a corporate director, officer, and principal shareholder of FIG. Covington and Ms. Verderame's undue burden arguments are not factually supported and, as suggested in Ms. Verderame's memorandum, can be obviated by a Rule 502(d) order. Accordingly, the motions to quash should be denied.

**I.     FIG HAS WAIVED PRIVILEGE**

As Covington's submission makes clear, FIG has already waived the attorney-client privilege for communications relating to the March 7, 2017 FARA filing. Covington's June 13, 2018 letter to the prosecutors expressly waives privilege on the following topics:

- The "declaration obtained from [FIG's] former General Counsel, Robert Kelley," and "advice that Robert Kelley provided to FIG concerning whether or not it was required to register under FARA."

- As to Robert Kelley and his deputy Thomas Spencer, "any legal advice they provided to FIG concerning registration under FARA and/or LDA."

- "With respect to FIG's January 13, 2017 letter to the FARA Registration Unit and its March 7, 2017 FARA filing, [the government] could ask questions to General Flynn concerning the contents of those submissions and factual information he or others shared or did not share with Covington & Burling lawyers who were working on preparation of the letter and subsequent filing."

- With regard to Covington & Burling, "factual representations made to counsel, in connection with preparation of FIG's FARA filing"; "the sources of such factual representations"; "factual information concerning who (other than counsel) reviewed drafts of the FARA filing"; "factual information concerning any comments or corrections or questions made by people who reviewed drafts of the FARA filing (other than counsel) concerning the filing"; and "[w]hen, how, and in what form counsel received communications from FIG personnel concerning the content of the FARA filing."

- Bijan Kian's August 2016 contact with "Covington & Burling to explore whether to retain Covington to provide advice concerning FARA."

Covington Memorandum, Exhibit B, at 1–2. The letter also states that "[t]he parties also agree that there are no restrictions on the use of any information provided pursuant to this letter." *Id.* at 2.

7

By waiving the privilege as to all of this information, FIG has also waived it as to all related documents in the possession of any of its lawyers. *See* Fed. R. Evid. 502(a) (A party waives its privilege related to disclosed information and undisclosed information that "concern[s] the same subject matter."); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."). Further, FIG cannot waive the privilege in order to provide information to the government for Mr. Flynn's benefit but then insist to this Court that the privilege precludes disclosure to Mr. Rafiekian pursuant to the Rule 17(c) subpoenas.[12] *See In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984) ("[A party] cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoice the privilege as to communications whose confidentiality he has already compromised for his own benefit . . . .").

## II. AS A DIRECTOR, OFFICER, AND SHAREHOLDER OF FIG, MR. RAFIEKIAN IS ENTITLED TO FIG'S PRIVILEGED DOCUMENTS

Even if privilege had not been waived, Mr. Rafekian is entitled to FIG's documents—including privileged documents of FIG's lawyers—because of his position as a director of FIG. This alone is sufficient to compel production of the lawyers' entire FIG client files.

---

[12] Courts have held that a waiver of privilege may be implied in circumstances where it is called for in the interests of fairness. *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). "Fairness considerations arise when the party attempts to use the privilege both as a shield and a sword." *Id.* (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)) (internal quotations omitted). "In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party." *Id.* (emphasis in original).

FIG is a Delaware corporation, and under Delaware law, all directors are considered "joint clients" of company counsel and are entitled to communications protected by the company's privileges so long as the communications were made while they were directors. *See Kirby v. Kirby*, No. 8604, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987) ("The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the 'joint client' when legal advice is rendered to the corporation through one of its officers or directors."); *Newsome v. Lawson*, 2017 WL 6334979 (D. Del. Dec. 12, 2017) (granting a joint client's motion to compel the production of privileged communications from a joint attorney). As a result, former directors are entitled to "legal advice furnished to the board during the director's tenure." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1996 WL 307444, at *4 (Del. Ch. June 4, 1996); *see also AOC Ltd. P'ship v. Horsham Corp.*, No. CIV. A. 12480, 1992 WL 97220, at *1 (Del. Ch. May 5, 1992).

Clients have a property interest in the client files held by their attorneys. *See In re Touch Am. Holdings, Inc.*, No. 03-11915KJC, 2009 WL 1393078, at *2 (Bankr. D. Del. May 14, 2009) (citing *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P.*, 91 N.Y.2d 30, 37 (1997)) ("[T]he client should be entitled to inspect and copy work product materials created during the course of the attorneys' representation."); *Sage Realty Corp.*, 91 N.Y.2d at 35-36 ("An attorney is obligated to deliver to the client, not later than promptly after representation ends, such originals and copies of other documents possessed by the lawyer relating to the representation as the . . . former client reasonably needs.") (internal quotation omitted). The client file "includes copies of internal notes and memoranda reflecting the views, thoughts and strategies of the lawyer." D.C. Bar Ethics Opinion No. 333.

9

Moreover, although "[w]ork product 'immunity' . . . may shield attorney work product from discovery by *opposing* counsel," "it does not shield that same attorney work product from the attorney's own client." *Id.* In other words, a client is entitled to attorney work product contained within the client file. Covington and Ms. Verderame, therefore, have an ethical obligation to comply with Mr. Rafiekian's request for access to FIG's *entire client file*. *See* D.C. Bar R. 1.8 cmt. 17 ("[I]f the client has paid for the work product, the client is entitled to receive it."); D.C. Bar Ethics Opinion 333 ("Upon the termination of representation, an attorney is required to surrender to a client, to the client's legal representative, or to a successor in interest *the entire 'file'* . . . includ[ing] copies of internal notes and memoranda reflecting the views, thoughts and strategies of the lawyer." (emphasis added)).

Here, Mr. Rafekian, in his position as a director of FIG, cooperated with FIG's counsel as they gathered information for the FARA filing. He is just as entitled as Mr. Flynn to access all of the information in the files of FIG's company counsel.

### III.  THE SUBPOENAS SATISFY THE *NIXON* STANDARD

Even if Mr. Rafiekian were not otherwise entitled to the client files based on his capacity as director of FIG, he would nevertheless be entitled to them because the subpoenas satisfy the requirements of *United States v. Nixon*. *Nixon* requires a showing of (1) relevancy, (2) admissibility, and (3) specificity, for enforcement of the Rule 17(c) subpoena. *Nixon*, 418 U.S. at 700. Each of these elements are met here.[13]

---

[13] As stated in Mr. Rafiekian's memorandum in support of his motion for a Rule 17(c) subpoena, the *Nixon* standard should not apply when, as here, the third party subpoena is from the defendant rather than the government. *See United States v. Nachamie*, 91 F. Supp. 2d 552, 562–63 (S.D.N.Y. 2000). In *Nachamie,* the court explained, "[u]nlike the Government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena. Because the Rule states only that a court may quash a subpoena if compliance would be unreasonable or oppressive, the judicial gloss that the material sought must be evidentiary—defined as relevant, admissible and specific—may be inappropriate in the context of a defense subpoena of documents

### A. The Documents Sought by the Subpoenas are Relevant

Documents relating to the FARA filing (Requests 1-7) are plainly relevant to the issues in this case. The Indictment asserts that "[f]rom approximately January 2017 through approximately March 2017, outside attorneys for [FIG] gathered information to determine whether [FIG] or any of its employees had an obligation to register under FARA." Indictment ¶ 52. The Indictment further alleges that Mr. Rafiekian provided false information to FIG's attorneys. *Id.* ¶ 53. All documents reflecting information collected for the filing and decisions about what would or would not be included in the filing bear on these issues. This includes not only interview memoranda but also such things as time records and invoices, which will show who the lawyers spoke to, when, and for how long—all of which are relevant to the issue of whether it was Mr. Rafiekian or others who provided information that is now challenged as false.

Documents in the client file relating to matters other than the FARA filing are also relevant to Mr. Rafiekian's defense. Since FIG registered under FARA in March 2017, Mr. Flynn and his counsel took a variety of questionable actions to advance the interests of Mr. Flynn at the expense of Mr. Rafiekian, including (a) evidently dissolving FIG by filing a certificate of dissolution containing false representations and (b) causing FIG to waive the attorney-client privilege so that the government could gain access to privileged information that it has used in its prosecution of Mr. Rafiekian. As such, the client file likely contains powerful evidence of Mr. Flynn's bias and lack of trustworthiness that can be used to impeach his credibility as a witness.

---

from third parties." *Id.* at 63 (internal quotation and citation omitted). Accordingly, the test for obtaining the requested documents is whether the subpoena is: "(1) reasonable, construed using the general discovery notion of 'material to the defense;' and (2) not unduly oppressive for the producing party to respond." *Id.* (citing *United States v. Tomison*, 969 F. Supp. 587, 593 n.14 (E.D. Cal. 1997)).

### B. The Documents Sought by the Subpoenas are Admissible

The requested documents relating to the FARA filing are also admissible. As an initial matter, the documents are unquestionably relevant. The subpoenas request material generated during FIG's FARA filing, which is at the center of the Government's allegations in this case. *See United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (Because "it will often be difficult at the pretrial stage to determine with precision the admissibility of certain documents," courts have held that "if a document is arguably relevant and admissible under the Rules of Evidence, the *Nixon* 'evidentiary' requirement is likely satisfied."). In addition, FIG's files contain a combination of exculpatory material related to accusations against Mr. Rafiekian and impeachment material related to the government's key witness—Mr. Flynn. *See United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000) ("Exculpatory evidence in the possession of third parties is subject to a subpoena duces tecum.").

The only arguments regarding admissibility advanced in the motions to quash are that the documents would be privileged, would likely be hearsay, and are only being sought for impeachment purposes. None of these arguments have any merit.

For the reasons set forth above, the privilege has already been waived with respect to documents relating to the March 2017 FARA filing. Although Ms. Verderame argues that Mr. Rafiekian cannot waive any privilege that may exist, neither movant even attempts to explain why Mr. Flynn apparently has the power to waive FIG's privileges while his co-director, co-officer, and co-shareholder does not.

Although Ms. Verderame makes much of the fact that counsel for Mr. Rafiekian has stated that one of the purposes of the documents demanded by the subpoenas is impeachment, there is nothing disqualifying about that statement. First, as discussed above, the documents sought have

12

evidentiary value beyond impeachment. Moreover, impeachment material is clearly reachable by a Rule 17(c) subpoena. *See United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980) ("[R]ule 17(c) permits a party to subpoena materials that may be used for impeaching a witness called by the opposing party, including prior statements of the witness."). While impeachment materials "generally are not subject to production and inspection by the moving party prior to trial," this timing rule is not absolute. *Id.* In *Nixon*, the Supreme Court upheld an order for advance production of the White House tapes, which could be admitted for impeachment purposes and also had other "potential" evidentiary uses:

> Recorded conversations may also be admissible for the limited purpose of impeaching the credibility of any defendant who testifies or any other coconspirator who testifies. Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial. . . . Here, however, there are other valid potential evidentiary uses for the same material, and the analysis and possible transcription of the tapes may take a significant period of time.

418 U.S. at 701–02.

Even where the evidence has *only* impeachment value, the admissibility determination can be made before trial (and the statements properly considered evidentiary) when it is known with certainty before trial that the witness will be called to testify. *See King*, 194 F.R.D. at 574. As the court in *King* correctly noted:

> [D]ecisions that articulate an absolute prohibition against use of Rule 17(c) to secure impeachment material before trial ignore the plain language of Rule 17(c) and are at odds with the "chief innovation [of Rule 17(c) which] was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." Furthermore, a broad brush prohibition against requiring pretrial production of impeachment materials runs counter to the fundamental notion . . . that the material is essential for a proper preparation of trial.

*King*, 194 F.R.D. at 574 n.5 (internal citations omitted). Because it is a certainty that Flynn will testify as a government witness at trial,[14] and the requested documents relating to the March 2017 FARA filing are sought for valid evidentiary uses as well as for impeachment purposes, they should be produced in advance of trial.

### C. The Subpoena Seeks Specific Documents

Contrary to Covington's and Ms. Verderame's claims, the subpoenas seek specific categories of identifiable documents and are not a mere "fishing expedition." The subpoenas seek the lawyers' FIG client files (Request 8)—a discrete and identifiable set of documents which, assuming the lawyers have kept appropriately organized records, should be readily identifiable and straightforward to collect. *See In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988) (finding that a request for results of an internal audit, interview notes, transcripts, electronic recordings, and correspondence related to a settlement agreement were described with sufficient specificity). In addition, Mr. Rafiekian has made even more specific requests for discrete portions of those files relating to well-defined issues plainly relevant to this case, such as the FARA filing (Requests 1-7). Again, if the lawyers have kept appropriately organized records, it should be a straightforward matter to identify and produce documents responsive to these requests. Indeed, Covington reports that it has already done so.

Contrary to the lawyers' suggestion, Mr. Rafiekian need not describe the *exact* contents of the FIG files to meet the relevancy standard. Such a requirement would place an impossible burden on Mr. Rafiekian here, since he has no way of knowing the identities or descriptions of documents that he did not create or receive (but for which he clearly made payment). *See Nixon*, 418 U.S. at

---

[14] *See* Tr. of Sentencing Proceedings at 27, *United States v. Flynn*, No. 17-232 (EGS) (D.D.C. Dec. 18, 2018) (noting Mr. Flynn's "substantial assistance" in securing Mr. Rafiekian's indictment).

700 (finding a "sufficient likelihood that [the requested evidence] contain[ed] conversations relevant to the offenses charged in the indictment" even though the exact contents of the requested evidence could not be fully described by the movant). Because he is unable to identify precise documents in Covington's and Ms. Verderame's possession that relate to his defense, Mr. Rafiekian has done the next best thing: request a discrete set of readily identifiable materials that should be easily collectible by his lawyers.

## IV.  THE SUBPOENAS DO NOT POSE AN UNDUE BURDEN

The Fourth Circuit has found that a subpoena is too burdensome if it is "abusive or harassing; overly vague; or excessively broad." *United States v. Rand*, 835 F.3d 451, 463 (4th Cir. 2016) (internal quotation and citation omitted). Both movants make generalized arguments about the burdens that will be involved in production, but neither provide any detailed factual support for these arguments. Both movants also state a concern regarding inadvertent production of privileged documents of clients other than FIG, but they also recognize that this could be alleviated by an order under Rule 502(d) of the Federal Rules of Evidence. None of the arguments about burden justify quashing the subpoenas.[15]

Covington and Ms. Verderame claim that the subpoena requires that they separate FIG and Mr. Flynn's files, which would impose an "undue burden." To the extent this imposes a burden,

---

[15] Each movant has suggested, as an alternative to quashing the subpoenas, that the Court substantially narrow them. Covington suggests that the Court should limit production to "the factual portions of interview notes predating the March 7, 2017 FARA filing, redacted to remove any attorney opinion work product and remove material that is solely relevant to the individual representation of General Flynn." Covington Memo, at 8. Ms. Verderame suggests that her response should be limited to "materials created between July 2016 and March 2017 containing Defendant's statements, summaries of Defendant's statements, or others' statements about the Defendant related to the FARA filing." Verderame Memo, at 14. Neither of these suggestions provides the defense with the material it is entitled to under Rule 17(c) relating to the FARA filing, let alone with regard to the FIG client files.

15

the responsibility lies with Covington and Ms. Verderame. Both counsel could have easily avoided this problem altogether by keeping separate files for separate clients, Mr. Flynn and FIG, rather than comingling their files and communications. Mr. Rafiekian should not be prejudiced merely because Covington and Ms. Verderame failed to keep their respective clients' files separate. *See Meier v. Travelers Home & Marine Ins. Co.*, No. C15-0022RSL, 2016 WL 4447050, at *2 (W.D. Wash. Aug. 24, 2016) (holding no attorney-client privilege over a single file containing two clients' documents). Moreover, Mr. Rafiekian's document request is strictly limited to Covington's and Ms. Verderame's representation of FIG, which spanned no more than three years and did not involve complex matters such as large-scale commercial transactions, litigation, or the registration and issuance of securities. It is also difficult to see how Ms. Verderame would be burdened by simply reproducing a file that she already compiled and handed over to Covington.[16]

## CONCLUSION

For the foregoing reasons, Mr. Rafiekian respectfully requests that this Court deny the motions filed by Covington and Ms. Verderame to quash the Rule 17(c) subpoenas and order that compliance with the subject subpoenas take place forthwith.

Dated: March 25, 2019

Respectfully submitted,

/s/
Mark J. MacDougall (*Pro Hac Vice*)
Stacey H. Mitchell (*Pro Hac Vice*)
*Counsel for Bijan Rafiekian*
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com
shmitchell@akingump.com

---

[16] *See* Email from Kristen Verderame to Mark MacDougall (Jan. 30, 2019).

16

/s/
Robert P. Trout (VA Bar # 13642)
*Counsel for Bijan Rafiekian*
Trout Cacheris & Solomon PLLC
1627 Eye Street, NW
Suite 1130
Washington, DC 20006
Telephone: (202) 464-3311
Fax: (202) 463-3319
E-mail: rtrout@troutcahceris.com

**CERTIFICATE OF SERVICE**

      I hereby certify that, on the 25th day of March 2019, true and genuine copies of Defendant Rafiekian's Opposition to Non-Party Motions to Quash Subpoena were sent via electronic mail by the Court's CM/ECF system to the following:

James P. Gillis  
John T. Gibbs  
Evan N. Turgeon  
U.S. Attorney's Office (Alexandria-NA)  
2100 Jamieson Avenue  
Alexandria, VA 22314  
Telephone:  (703) 299-3700  
Email:  james.p.gillis@usdoj.gov  
        john.gibbs@usdoj.gov  
        evan.turgeon@usdoj.gov

 

/s/  
Robert P. Trout (VA Bar # 13642)