1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                 )
 4              Plaintiff,       )
                                 )
 5       v.                      )  Alexandria, Virginia
                                 )  March 29, 2019
 6  BIJAN RAFIEKIAN,             )  9:02 a.m.
                                 )
 7              Defendant.       )
    _____)  Pages 1 - 44
 8

 9                    TRANSCRIPT OF

10   NON-PARTY COVINGTON & BURLING LLP'S MOTION TO QUASH

11                        AND

12      NON-PARTY KRISTEN VERDERAME'S MOTION TO QUASH

13        BEFORE THE HONORABLE ANTHONY J. TRENGA

14          UNITED STATES DISTRICT COURT JUDGE

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1   APPEARANCES:

2   FOR DEFENDANT BIJAN RAFIEKIAN:

3          ROBERT P. TROUT, ESQUIRE
           TROUT, CACHERIS & SOLOMON, PLLC
4          1627 I Street, N.W., Suite 1130
           Washington, D.C.  20006
5          (202) 464-3300

6          MARK J. MACDOUGALL, ESQUIRE, *PRO HAC VICE*
           JOHN C. MURPHY, ESQUIRE, *PRO HAC VICE*
7          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
           Robert S. Strauss Building
8          1333 New Hampshire Avenue, N.W.
           Washington, D.C.  20036-1564
9          (202) 887-4000

10  FOR NON-PARTY COVINGTON & BURLING LLP:

11         DANIEL E. JOHNSON, ESQUIRE
           ROBERT K. KELNER, ESQUIRE
12         COVINGTON & BURLING LLP
           850 Tenth Street, N.W.
13         Washington, D.C.  20001
           (202) 662-6000

14

15  FOR NON-PARTY KRISTEN VERDERAME:

           ROBERT L. WALKER, ESQUIRE, *PRO HAC VICE*
16         BRANDON J. MOSS, ESQUIRE
           WILEY REIN, LLP
17         1776 K Street, N.W.
           Washington, D.C.  20006
18         (202) 719-7000

19

20

21

22

23

24

25

1            THE CLERK:  Criminal Case 1:18-cr-457, *United*
2  *States v. Bijan Rafiekian*.

3            Counsel, will you please note your
4  appearances for the record.

5            MR. JOHNSON:  Good morning, Your Honor.  Dan
6  Johnson for movant non-party Covington & Burling LLP.
7  With me at counsel's table is my partner, Robert
8  Kelner.

9            THE COURT:  All right.  Welcome.

10            MR. WALKER:  Good morning, Your Honor.
11  Robert Walker for non-party Kristen Verderame with
12  Brandon Moss at the table with me.

13            THE COURT:  All right.  Welcome.

14            MR. MACDOUGALL:  Good morning, Your Honor.
15  Mark MacDougall with Akin Gump.  With me is Robert
16  Trout and also Jack Murphy, whose admission/petition
17  *pro hac vice* is pending from the Southern District of
18  New York, on behalf of the defendant in this case,
19  Bijan Rafiekian, who has, again, waived his right to
20  appear.

21            THE COURT:  Has he submitted a written
22  waiver?

23            MR. TROUT:  I will get it done, Your Honor.

24            THE COURT:  All right.

25            MR. MACDOUGALL:  Thank you, Your Honor.

1          THE COURT:  We're here on the non-parties'

2     motion to quash the subpoena.  I've reviewed the

3     briefing.

4          Let me first ask Mr. MacDougall or Mr. Trout:

5     Am I correct that the only item that's at issue here is

6     category 8 of the subpoena, Mr. MacDougall?

7          MR. MACDOUGALL:  Your Honor, with --

8          THE COURT:  Yes, please.

9          MR. MACDOUGALL:  With respect to Covington,

10    we did receive a production of those documents.  We

11    also received this week a 67,000-page production that

12    we have not digested yet that they can explain in

13    greater detail to the Court.  Evidently, it relates to

14    what was produced to the government as a subset.

15         We have not received any production from

16    Ms. Verderame.

17         THE COURT:  All right.

18         MR. MACDOUGALL:  Thank you.

19         THE COURT:  Let me hear from the non-party

20    Covington.

21         I take it Covington has produced everything

22    in the first seven categories.

23         MR. JOHNSON:  Yes, Your Honor.

24         THE COURT:  All right.

25         MR. JOHNSON:  And with respect to

1  category 8 --

2          THE COURT:  Yes.

3          MR. JOHNSON:   -- we've produced all documents

4  from Covington's files that Covington had provided to

5  the U.S. government on behalf of Flynn Intel Group,

6  which I will call FIG.  Those are the documents that

7  Mr. MacDougall was referring to.  We produced those on

8  Monday.

9          With respect to the remainder of category 8,

10 the Court should quash the subpoena for three reasons:

11         First, the defendant has not met his burden

12 of showing the three factors under *Nixon*.

13         Second, the remainder of the subpoena, the

14 part we have not yet produced and object to, seeks

15 privileged and work product documents from our files

16 that the firm is ethically bound not to produce.

17         Third, the remaining part of the subpoena is

18 unduly burdensome.  The portion we have not provided

19 from our FIG files are thousands of e-mails, notes, and

20 other work product that the firm generated over 27

21 months of representation of FIG and of General Flynn.

22 The vast majority of those documents have nothing to do

23 with any of the issues that are alleged in the

24 indictment.

25         So, first, with respect to the *Nixon* factors,

1 the defendant has the burden of showing specificity,

2 relevance, and admissibility, and he can't meet any of

3 those and has not met any of those factors.  With

4 respect to specificity --

5          THE COURT:  Let's first talk about relevance.

6          MR. JOHNSON:  Certainly.

7          THE COURT:  Here the allegation and the core

8 of the indictment is that Mr. Rafiekian caused

9 Covington to file a false FARA filing.  Given that core

10 allegation, why isn't anything pertaining to what

11 Covington received, what information it received, what

12 questions it asked, and why it did what it did

13 relevant?

14          MR. JOHNSON:  Some of those documents -- as

15 we say in our papers, some of those documents may be

16 relevant, but those documents would not be admissible.

17 Because what I understand the defendant is looking for

18 and what we have in our files are -- principally, the

19 documents that would be relevant would be our notes of

20 interviews, work product notes of interviews which --

21          THE COURT:  Right.  Which would reflect what

22 Covington obtained and how Covington assessed that

23 information and presumably relate to what caused

24 Covington to compose the FARA application as it did,

25 correct?

1          MR. JOHNSON:  Some of that -- correct, some

2    of that would be fact work product, Your Honor.  But

3    intermingled within that is opinion work product, and

4    then we simultaneously represented General Flynn.  So

5    there are General Flynn's information in there.

6          THE COURT:  Putting aside Flynn for a moment

7    if we can distinguish.  I'm not sure if you can with

8    respect to the FARA application.  But why wouldn't

9    Covington's opinions, its thought processes and

10   statements as far as its assessment of the information

11   it received and why and how that information made

12   appropriate what it said in the application all be

13   relevant to the prosecution against Rafiekian, which is

14   that he knowingly caused Covington to make false

15   applications?  Wouldn't Covington's assessment of the

16   information it received from Rafiekian and others go to

17   what caused Covington to do what it did?

18         MR. JOHNSON:  I don't think so, Your Honor.

19   The fact work product, the facts of what Mr. Rafiekian

20   said to the firm could be relevant, but our impressions

21   of that, in my view, would not be relevant.  In any

22   event, that would be opinion work product which the

23   Fourth Circuit has found is not discoverable under

24   these circumstances.

25         THE COURT:  Well, you say under these

1   circumstances.  I'm not sure there's a comparable

2   circumstance, at least that I've found, that would

3   address this.  Is there?  Is there a case that really

4   has comparable circumstances?

5            MR. JOHNSON:  Well, what I know -- I can't

6   cite a specific case, Your Honor, that's on point.

7   What I know is that the guidance that the Fourth

8   Circuit has issued, which is that opinion work product

9   is virtually never discoverable and because there's no

10  purpose to be served by the defendant in a criminal

11  context getting access to our impressions about what

12  our thoughts were regarding the case, the merits of the

13  case, the legal issues, the assessment of the strategy

14  for the clients at the time.

15           The fact work product is different.  What was

16  said by Rafiekian, that would be fact work product, and

17  we concede that that could be relevant in this case.

18  But to sift that out of what we have in the files would

19  be burdensome.

20           THE COURT:  That's a different issue.

21           But you don't think that what Covington's

22  thought process was that caused it to answer the

23  questions in the fashion that it did is relevant to the

24  government's claim that Rafiekian caused Covington to

25  file a false FARA application?

1              MR. JOHNSON:  I think the facts that

2   Mr. Rafiekian provided would be relevant.  There could

3   be an argument certainly, Your Honor, that our --

4              THE COURT:  Well, how about other facts that

5   Covington had available to it that it used in its

6   assessment of how to answer that question?

7              MR. JOHNSON:  Yes.  That would also be fact

8   work product, Your Honor, that would be of the type of

9   what Mr. Rafiekian said.  But our assessment would --

10  in my view, would not be relevant and, in any event,

11  would not be admissible.  So even if the defendant gets

12  over the relevance hurdle, he can't get over the

13  admissibility hurdle because whatever Covington thought

14  couldn't be used.

15              They say they want the information to be able

16  to impeach General Flynn if and when he testifies in

17  Mr. Rafiekian's case.  As we point out in the Second

18  Circuit case in *Almonte*, that would not be admissible

19  to impeach General Flynn's testimony or anybody else's

20  testimony.  What Mr. Kelner or anybody else thought

21  when they received information, those notes couldn't be

22  used because they're inadmissible hearsay.

23              THE COURT:  All right.

24              MR. JOHNSON:  With respect to the other

25  factor of *Nixon* which we haven't yet addressed, Your

1  Honor, with respect to specificity, as Judge Cacheris

2  wrote in a case we cited in our papers, this type of

3  request for the entire file is a paradigm of a

4  nonspecific request that under *Nixon* can't survive.

5  Therefore, a subpoena that lacks specificity must be

6  quashed.

7          They're seeking information from the

8  beginning of our representation, which began in

9  December 2016, up until the present.

10          THE COURT:  Insofar as it relates to the FARA

11  filing.

12          MR. JOHNSON:  Well, that is, in my view, the

13  best reading of the subpoena, but I understand in

14  conversations that Mr. MacDougall and Mr. Trout have

15  had with Ms. Verderame's counsel that they're seeking

16  the entire file.

17          THE COURT:  I understand, but the subpoena

18  makes it pretty clear it's the file relating to the

19  FARA filing.

20          MR. JOHNSON:  So with the file, there's no

21  separate folder just for the FARA filing.

22          THE COURT:  Right.

23          MR. JOHNSON:  Within the folder are documents

24  relating to our representation of FIG and Flynn with

25  respect to the FARA filing, and then, of course, there

1    are other documents in there because the representation

2    has continued on other issues for FIG.  And with

3    respect to General Flynn, other and separate issues

4    than FIG.  So asking us to produce the entire file

5    would be completely overbroad, but going back and

6    trying to select particular documents would be

7    burdensome.

8              It, frankly, would be easier, Your Honor, as

9    we point out in our papers -- not easy but easier if

10   the subpoena were limited to documents preceding the

11   March 7, 2017, FARA filing.  If that were the specific

12   request that they ask, particular documents preceding

13   that date, then there would be some specificity.  As it

14   is, they're just asking for the entire file.

15             Even in a civil context, Your Honor, that

16   would not be sufficient.  Here in a criminal context,

17   under *Nixon*, they have to be specific.

18             Moreover, even if they satisfied the *Nixon*

19   factors, the documents that they're seeking are

20   privileged and work product documents.  These are

21   lawyer files generated over 27 months during the

22   representation of two different clients.  There's no

23   balancing test that can be done for the privileged

24   documents.  The Supreme Court has made that clear in

25   *Swidler*.  The defendant's interest in discovery must

1  yield to that attorney-client privilege.

2           FIG has a continuing interest because they

3  are still subject to investigations.  There is a

4  congressional investigation that's been ongoing.  So

5  FIG has an interest in preserving its privilege and the

6  work product because of these ongoing matters.

7           THE COURT:  How is Rafiekian's relationship

8  to the privilege any different than Flynn's?

9           MR. JOHNSON:  The difference is the purpose

10 for which they are asserting them.

11          THE COURT:  Right.  How is it different?

12          MR. JOHNSON:  With respect to General

13 Flynn -- we're speaking of FIG as opposed to General

14 Flynn's privilege.

15          THE COURT:  Right.

16          MR. JOHNSON:  With respect to FIG, General

17 Flynn is the chairman and CEO of the corporation.  He

18 made a decision to waive the privilege with respect to

19 a narrow area, which I'll address.  But to answer your

20 question directly, he did that in the interest of FIG

21 because FIG was subject to prosecution at the time.

22 And in his estimation, it made sense for FIG to

23 cooperate with the government by waiving the privilege

24 with respect to the narrow area in which it was waived.

25          Mr. Rafiekian -- that was for a corporate

1    purpose.  Mr. Rafiekian, on the other hand, is seeking

2    documents purely for his personal purpose, not for a

3    FIG purpose.

4              THE COURT:  Well, the purposes conflate,

5    don't they?  By getting himself cleared, he is clearing

6    FIG, just as by Flynn trying to clear himself, he was

7    clearing FIG, correct?

8              MR. JOHNSON:  That's not the way -- it wasn't

9    Flynn trying to clear himself to clear FIG.  It was

10   Flynn acting on behalf of FIG to clear FIG to cooperate

11   with the government.

12             THE COURT:  Right.  In order to establish

13   that, it would include, among other things,

14   establishing that the officers and directors had not

15   acted improperly, correct?  That they were not false

16   statements made by its officers or directors since that

17   conduct can be attributed to the corporation for

18   liability purposes; isn't that correct?

19             MR. JOHNSON:  Their conduct could be

20   attributed to the corporation.

21             THE COURT:  Right.  So if Rafiekian clears

22   himself, he's effectively serving the corporate purpose

23   of clearing the corporation; isn't he?

24             MR. JOHNSON:  I don't see any alignment of

25   the interest between Rafiekian and FIG in this instance

1   because by seeking the documents, he's effectively

2   waiving FIG's privilege beyond any -- the narrow waiver

3   that FIG has already agreed to with respect to the

4   prior advice -- pre-Covington advice of Mr. Kelly and

5   Mr. Spencer, the compliance advice that preceded

6   Covington's engagement.

7           That information was provided both to the

8   government at defendant's request and to Mr. Rafiekian.

9   So he has those documents that FIG in the FIG corporate

10  conclusion provided to the government and did engage in

11  the narrow waiver of the privilege.

12          Mr. Rafiekian's point or his goal on the

13  other hand is to get all the FIG documents which could

14  affect a waiver of FIG's privilege with respect to

15  these other matters, and that's completely contrary to

16  FIG's interest.

17          THE COURT:  Is Flynn, in your view, in a

18  position to have access to all the documents that

19  Rafiekian is seeking?

20          MR. JOHNSON:  As the chairman and CEO, he

21  would have access to those documents if he's doing so

22  in the corporate interest, yes.

23          THE COURT:  And Rafiekian is the vice

24  chairman and president, secretary, and treasurer and a

25  major shareholder, as Flynn, neither of which, as I

1    understand it, are majority shareholders.  Is that

2    right?

3              MR. JOHNSON:  I'm sorry?  I didn't hear the

4    last part.

5              THE COURT:  Neither Flynn or Rafiekian are

6    majority shareholders, but they're both principal

7    shareholders of the company; is that right?

8              MR. JOHNSON:  Mr. Flynn holds more shares,

9    and he has a superior office to Mr. Rafiekian within

10   FIG.  So, therefore, he has the authority to make these

11   decisions, and Mr. Rafiekian does not.

12             But the key is the purpose for which --

13             THE COURT:  And Rafiekian, as I understand

14   the defendant's filing, contributed to the payment of

15   Covington's fees for representation.  Is that right?

16             MR. JOHNSON:  FIG paid those fees.  Whether

17   he contributed to FIG, I don't know the answer to that,

18   Your Honor.  I see what's in their papers, and I don't

19   know the answer.

20             THE COURT:  Covington sought Rafiekian's

21   consent to the limited waiver that was given to the

22   government --

23             MR. JOHNSON:  It was actually at the

24   suggestion of defendant's counsel.

25             THE COURT:  Okay.  All right.

1          MR. JOHNSON:  But the difference here is the

2    purpose, Your Honor, and the effect.  If you were to

3    allow them to have access to all of these documents,

4    it's Mr. Rafiekian's purpose, which is not consistent

5    with FIG's purpose as decided by the --

6          THE COURT:  Why isn't it?  How is it adverse?

7    How is Rafiekian's effort to clear himself adverse to

8    FIG?

9          MR. JOHNSON:  Because of what he's trying to

10   do with the documents, and the effect of having access

11   to those documents is that the privilege would be

12   waived.  That is adverse to FIG's interest clearly.

13   FIG -- one could --

14         THE COURT:  But you think that if Flynn had

15   been prosecuted for this, he would have access to what

16   Rafiekian is seeking?

17         MR. JOHNSON:  I think that as the chairman

18   and CEO, he could have access to that.  The difference

19   is he is the superior officer, Your Honor.  As a matter

20   of corporate law, it is his decision to make.  It's not

21   Mr. Rafiekian's decision to make in the first instance.

22   Second, the purpose for which they're seeking is

23   different.  Then, third, the effect of enforcing the

24   subpoena and allowing Mr. Rafiekian and his counsel to

25   have access to the data is that it affects a waiver of

1  the FIG privilege, which is clearly contrary to FIG's

2  interest.

3         So whether Mr. Rafiekian and Mr. Flynn

4  individually may have similar -- or interest in their

5  personal capacity, once Mr. Rafiekian tries to get

6  these documents to waive FIG's privilege, he is clearly

7  acting contrary to the interest of the corporation

8  which is still under investigation and whose CEO and

9  chairman has decided --

10         THE COURT:  Do you see crime fraud exception

11  implicated in any of this?

12         MR. JOHNSON:  No, Your Honor, and the

13  defendant has not alleged that.

14         THE COURT:  Well, given that the government

15  is claiming that the services of counsel were used for

16  the purposes of perpetrating a fraud, why wouldn't it

17  be implicated in some fashion?

18         MR. JOHNSON:  The indictment, as I understand

19  it, is that Mr. Rafiekian misled the government.

20         THE COURT:  Right, for the purposes of

21  avoiding disclosures that were required.

22         MR. JOHNSON:  Correct.  Neither the

23  government, nor the defendant has suggested that the

24  crime fraud exception applies.  There's --

25         THE COURT:  I understand that, but I'm asking

1  why it wouldn't be implicated.

2           MR. JOHNSON:  I understand.  There's no

3  suggestion that Covington participated in any crime or

4  fraud.

5           THE COURT:  No.  I'm not suggesting that, and

6  that's not required for the crime fraud exception.

7  It's whether the client has used the relationship for

8  the purposes of perpetrating a fraud.

9           MR. JOHNSON:  And our position, Your Honor,

10 is that there is no crime fraud exception applicable

11 here.

12          THE COURT:  All right.

13          MR. JOHNSON:  Whether he misled us, I think

14 they also have to show that Covington was somehow a

15 participant or knew that -- or had reason to know that

16 there was some crime or fraud being perpetrated in the

17 course of their representation, and there is no

18 evidence whatsoever of that, Your Honor.

19          THE COURT:  All right.

20          MR. JOHNSON:  With respect to the -- if I may

21 get back to the issue of the privilege --

22          THE COURT:  Yes.

23          MR. JOHNSON:  -- and the waiver.  As I

24 mentioned, under *Swidler*, there's no balancing to be

25 done.  The attorney-client information, the privileged

1   information is not subject to production.

2           Under the Fourth Circuit test, the opinion

3   work product also is not subject to production.

4           Fact work product is potentially different.

5   There is a balancing test.  But again, even if it's

6   relevant, it's not admissible as previously pointed

7   out.  So there would be no point in them getting access

8   to the data.

9           Much of the briefing is focused on whether

10  there was a waiver and the extent of the waiver of the

11  privilege.  There was no waiver beyond the documents

12  that the defendant already has, and FIG is not picking

13  or choosing doing a sword or a shield here.  FIG did

14  waive at defendant's request the attorney-client

15  privilege regarding the compliance advice that

16  Messrs. Kelly and Spencer had provided in the fall of

17  2017 regarding LDA and FARA compliance.

18          At defendant's request, we provided the Kelly

19  declaration to the government, and then naturally, as a

20  result of providing that declaration, that caused a

21  narrow waiver of the privilege with respect to

22  Mr. Kelly and Mr. Spencer's advice.  Defendant has all

23  of those documents already.  So with respect to the

24  narrow area of the waiver, they've already got them.

25          Our representation, Covington's

1  representation of FIG and of Flynn involved different

2  subject matters.  It started later after Kelly and

3  Spencer advice and after FIG had decided not to make a

4  FARA filing.

5          THE COURT:  Covington was retained in

6  December 2017?

7          MR. JOHNSON:  December 2016, Your Honor.

8          THE COURT:  '16.  The filing was in March of

9  the following year?

10          MR. JOHNSON:  Yes.  That came -- and the

11  reason we were retained was DOJ had launched an

12  investigation of FIG regarding the fact that they had

13  not filed under FARA, different subject matters.

14  Client's advice by Kelly and Spencer, the investigation

15  by Covington.

16          THE COURT:  Right.

17          MR. JOHNSON:  Only then was Covington engaged

18  and only for the investigation.  Now, as a result of

19  that, we did make a FARA filing, as Your Honor is

20  aware, on March 7, 2017.  It's the events leading up to

21  that FARA filing specific to that filing that are at

22  issue in the indictment, and in our view, those are the

23  only documents that could be relevant.

24          Defendant also contends that there was some

25  waiver when Covington attorneys at FIG's direction

1  agreed to be interviewed by the government with respect

2  to the events -- the facts preceding -- certain facts

3  preceding that March 7, 2017, FARA filing.  The

4  interviews were focused solely on those facts.  Those

5  facts were not privileged because facts are not

6  privileged.  Therefore, those interviews did not affect

7  any waiver whatsoever.

8         The interviews addressed only that topic, not

9  any other subject matters, did not get into any opinion

10 work product or other work product of Covington.  In

11 fact, we -- the government did not ask, and we did not

12 produce documents as part of that process.

13        So there was no waiver of any subject matters

14 of Covington's representation of FIG or of Flynn.  The

15 only narrow waiver had to do with the Kelly and Spencer

16 compliance advice.

17        With respect to the burden, Your Honor, as I

18 pointed out, there are thousands of e-mails.  A part of

19 the subpoena to which we have not responded and to

20 which we object, a portion of category 8, thousands of

21 e-mails, notes, and other work product and

22 communications with the client that Covington has had

23 and has generated over 27 months -- it's been two years

24 since the FARA filing, and we have continued to

25 represent FIG in matters that are ongoing today, and we

 1  have continued to represent Mr. Flynn in separate

 2  matters.

 3          These involve many subjects that are

 4  unrelated to the March 7, 2017, FARA filing, and they

 5  include not just FIG but Flynn personally, General

 6  Flynn personally.  To require us to sift through that

 7  to extract, say, fact work product on an unrelated

 8  subject or for the representation of General Flynn

 9  personally would be an extreme burden and would take

10  many weeks.

11          If, on the other hand, the Court were to

12  order that we provide the fact work product for the

13  pre-FARA filing, that, as I pointed out, would be

14  easier to digest.  Even though it was a very intense

15  period -- December, January, February, early March -- a

16  little over three months of work versus the 24 months

17  of work that had been very intensive, as I'm sure

18  anybody who has read the press -- and I'm sure Your

19  Honor is familiar.  It's been a very intensive

20  representation and generated many, many, many documents

21  during that period.  Sifting through those would be

22  extremely burdensome.

23          Given the tangential relevance of any

24  documents in the Covington file, the admissibility

25  concerns, and the attorney-client and work product

1    issues, we submit that the Court should quash all of

2    category 8 beyond those documents that we've already

3    provided.  As we point out in the papers,

4    alternatively, if the Court believes that the defendant

5    has gotten over the *Nixon* factors, including the

6    relevancy, then the limited production should be of the

7    fact work product that preceded the March 7, 2017, FARA

8    filing and that relate to that filing.

9                THE COURT:  All right.

10               MR. JOHNSON:  Thank you, Your Honor.

11               THE COURT:  Thank you.

12               I'll hear from counsel for the other

13   non-party.

14               MR. WALKER:  Thank you, Your Honor.

15               There are two principal concerns with respect

16   to the subpoena for our client, Kristen Verderame:

17               One, with respect primarily to No. 8 but --

18   well, with respect primarily to No. 8, is --

19               THE COURT:  Are there documents within

20   category 8 that your client has?

21               MR. WALKER:  My understanding is, yes, Your

22   Honor, there are documents within category 8.

23               THE COURT:  All right.

24               MR. WALKER:  And to a large extent, the

25   concerns that counsel on behalf of Covington expressed

1  are Ms. Verderame's concerns with respect to the

2  overbreadth of the subpoena, the lack of specificity

3  with which documents sought have been identified or, in

4  fact, not really identified at all other than the kind

5  of indiscriminate produce the whole file approach.

6  That clearly seems to be a violation of the exacting

7  specificity standard in *Nixon*.

8          Not just with respect to No. 8 but with

9  respect to all of the requests, there is as well,

10 particularly with respect to 1 through 7, I would say

11 substantial relevancy concerns.  They seek documents to

12 the extent that they exist at all, which it seems

13 fairly plainly would be for the purpose of impeachment

14 use of extrinsic evidence for purposes collateral to

15 the facts that would be at issue at the trial.

16         THE COURT:  So there are documents within one

17 1 through 7 that have not yet been produced?

18         MR. WALKER:  Your Honor, with respect to

19 several of those categories, my understanding is that a

20 good faith production would not include documents with

21 respect to some of those categories, but with respect

22 to others, particularly with respect to No. 4 and

23 No. 7, there would be at least a limited extent of

24 documents.

25         THE COURT:  All right.

1          MR. WALKER:  With respect to No. 8, it's a

2    much different matter.  I understood Your Honor to say

3    that the Court is reading request No. 8 to specifically

4    be seeking documents that are relevant to the FARA

5    filings.

6          THE COURT:  Pertain to the relevant FARA

7    filing.

8          MR. WALKER:  Yeah.  I will second the point

9    made by Covington's counsel that to that extent and to

10   the extent that there are any documents relevant to the

11   FARA filings, that a cutoff date for relevancy would

12   appear to be March 2017 when the FARA filing was made.

13         Let me move to our client's other substantial

14   concern, Your Honor, which is with respect to the

15   privileged nature of many of the documents being sought

16   in request No. 8.  To a certain extent, Ms. Verderame

17   is kind of caught in the middle on this privilege

18   issue.  She was not a party and was not involved, to my

19   understanding, in any limited waiver of a privilege

20   which may have occurred previously in this matter.

21         Her concern is that by handing over documents

22   in response to this subpoena, particularly in response

23   to No. 8, without some clarification and resolution of

24   the issue of whether those documents may be or are

25   attorney-client privilege or subject to work product

1   protection, our client could be and would be in

2   violation of her ethical obligation under the D.C. Bar

3   rules to which she is subject.

4         If it were clear and if this Court were to

5   make clear that it views a waiver of privilege has

6   occurred to the extent that any documents would be

7   produced or, in the alternative, if the Court orders a

8   production of privileged documents, our client would be

9   in a different position and would be willing to produce

10  those documents.

11        As it now stands, Your Honor, there are

12  substantial concerns about our client's ethical

13  obligations with respect to turning over documents that

14  are privileged or with respect to which the issue of

15  privilege and work product protection has not been

16  appropriately resolved.

17             THE COURT:  All right.

18             MR. WALKER:  Thank you.

19             THE COURT:  Thank you.

20             Counsel, Mr. MacDougall.

21             MR. MACDOUGALL:  Thank you, Your Honor.

22             You know, Your Honor, the Court, as most of

23  us have, has lived around Washington for a long time --

24  most of my adult life.  When you're in this

25  environment, you often here from people involved in

1  politics.  There are certain methods that are used.

2  One is if you don't like your answer, change the

3  question.  I think that's what we're dealing with here,

4  Your Honor, today.

5       Mr. Rafiekian is not seeking third-party

6  documents from some stranger, trying to extract them

7  using a Rule 17(c) subpoena.  Mr. Rafiekian is only

8  seeking what he's entitled to as a director and

9  principal officer and shareholder of the corporation.

10       The Court is quite correct.  Mr. Rafiekian's

11  interest in clearing his name and in resolving this

12  matter are identical to FIG's.  It shouldn't be an

13  issue or objectionable to Mr. Flynn except to the

14  extent Mr. Flynn is seeking to use his cooperation to

15  reduce his risk of a custodial sentence.

16       Covington and Ms. Verderame are resisting the

17  subpoena ostensibly to protect the corporation, but the

18  truth, Your Honor, is that the corporation is now a

19  fiction.  It is a rumor.  It was dissolved, and I'll

20  speak more about that in a second.

21       Mr. Rafiekian is in the same posture as

22  Mr. Flynn, and all he asks the Court for, as counsel

23  conceded, is the same access as Mr. Flynn has.

24  Mr. Rafiekian was the incorporator and sole organizer

25  and initial director.  He was at all times one of two

1  directors, essentially half of the board.

2           THE COURT:  Wasn't there a third director at

3  one point?

4           MR. MACDOUGALL:  There was, Your Honor, and

5  he resigned in 2016.  His name was Philip Oakley.  So

6  there was a third director for a period of time.

7           THE COURT:  Before the Lobbying Disclosure

8  Act filing?

9           MR. MACDOUGALL:  I believe so, Your Honor.

10  You'll have to check me on that, but I believe that's

11  correct.

12           THE COURT:  All right.  Was Rafiekian

13  originally named chairman in the bylaws?

14           MR. MACDOUGALL:  Yes, Your Honor, I believe

15  that's right.

16           THE COURT:  When did that change happen?

17           MR. MACDOUGALL:  Sometime in 2016, but again,

18  I would have to check the documents to give you those

19  dates.

20           THE COURT:  All right.

21           MR. MACDOUGALL:  And the Court touched upon

22  this.  Mr. Rafiekian did, in fact, pay personally, on

23  the request of Ms. Verderame and on a request

24  ostensibly conveyed from Covington, the legal fees,

25  $55,000 in two payments, January and February 1917

1  [sic], on urgent request from Mr. Flynn personally,

2  from Mr. Flynn's son, and from Ms. Verderame.

3          THE COURT:  Who was that paid to?

4          MR. MACDOUGALL:  That was paid to FIG.  It

5  was deposited into FIG's account for the purpose of --

6  and as the e-mails will clearly demonstrate, for the

7  purpose of paying legal fees.

8          THE COURT:  For both firms?

9          MR. MACDOUGALL:  Yes, Your Honor.  Well, in

10  some instances, it references payments to counsel, and

11  in others, it was specific to Covington.

12          THE COURT:  All right.

13          MR. MACDOUGALL:  Covington and Ms. Verderame

14  say the corporation is dissolved, so Mr. Flynn gets to

15  make all the decisions.  He's the CEO and the chairman,

16  so he gets to decide that he can use the files for his

17  purposes, but Mr. Rafiekian can't even see them.

18  Mr. Flynn ostensibly instructs counsel to resist the

19  subpoena and keep Mr. Rafiekian from the file.

20          Here's the thing, Your Honor.  Here's what

21  counsel didn't talk about.  Here's what wasn't

22  responded to anywhere in the pleading, so I take it as

23  conceded.  Mr. Flynn signed a false declaration that

24  was submitted to the Delaware secretary of state in

25  April 2018 dissolving the corporation.  It was false

1   because it recites, as required under the Delaware

2   General Corporation Law, that you have a shareholder's

3   meeting which would have required notice to

4   Mr. Rafiekian and notice to Mr. Trout and a board

5   meeting, which would have required notice.  Those did

6   not happen.

7            We raised that in our motion for the

8   subpoenas.  We raised it in the pleading here.  Counsel

9   for Ms. Verderame and counsel for Covington have never

10  responded to that.  That, Your Honor, is the pivot

11  point at which Mr. Flynn and his counsel say:  Now I

12  have all the power.

13           They have all the power because they filed a

14  false declaration, dissolved the corporation, kept the

15  information from Mr. Rafiekian and his counsel at the

16  time, and now they say:  And now we win.

17           That, Your Honor, to me and to Mr. Rafiekian

18  is a shocking set of circumstances.  I can't address

19  questions to counsel in court obviously, but the Court

20  can.  To the extent the argument is that Mr. Flynn is

21  now a solo superior officer, the only reason he has

22  that power is because of that false declaration that's

23  never been addressed.

24           Now, both counsel for Ms. Verderame and

25  counsel for Covington rely upon what I would

1    characterize as --

2              THE COURT:  How do you view the consequence

3    of that dissolution based on that affidavit?

4              MR. MACDOUGALL:  Well, Your Honor, I

5    believe --

6              THE COURT:  How does that impact on the

7    enforceability or lack of enforceability of the

8    privilege or anything else that we're dealing with?

9              MR. MACDOUGALL:  Well, if the corporation had

10   not been dissolved, Mr. Rafiekian would have equal

11   rights as one of two directors to Mr. Flynn.  He could

12   call a board meeting.  At that board meeting, he could

13   say, "Here are my reasons," just as we're trying to

14   articulate to the Court today, "for wanting access to

15   the file."

16             Your Honor, I've had lots of corporations

17   dissolved in my career.  A former director calls up and

18   says, I'd like to see the file.

19             Okay.  We'll get a conference room for you.

20   Here it is.

21             This is not an issue that ought to be

22   confronting Mr. Rafiekian as he tries to defend himself

23   in this case.  So he would have equal access had that

24   not happened, but it did happen.  It happened, and it

25   was wrong.  No one has explained it.  Now, Covington

1   and Ms. Verderame seek to take advantage of that, and

2   that is really just not right, Your Honor.

3          They do seek to rely on what I think is a

4   gross misinterpretation of Section 278 of the Delaware

5   General Corporation Law.  It's captioned Continuation

6   of Corporation After Dissolution for Purposes of Suit

7   and Winding Up Affairs.

8          What they've embarked on is an entirely new

9   campaign of cooperation to benefit Mr. Flynn.  They're

10  not winding up some lingering lawsuit or selling off

11  some office furniture.  They're involved in an

12  aggressive campaign as reflected in the June 13, 2018,

13  letter to the U.S. Attorney of the agreement to seek to

14  provide Mr. Flynn with a vehicle to enhance his

15  cooperation.  That's all that's happening here.  This

16  is not about dissolution or winding up.

17         Covington and counsel in his remarks to the

18  Court acted as if the corporation is still alive.

19  Well, it's not, Your Honor, and it's very clear in the

20  Delaware General Corporation Law that when that

21  certificate of dissolution, false though it may be, is

22  certified by the secretary of state, the corporation is

23  dissolved.  This is not cleanup activity.  This is

24  entirely new effort.

25         Your Honor, Covington will testify in this

1   case.  There's no question about that.  As the Court

2   pointed out, starting in paragraph 53 of the

3   indictment, there are frequent references to

4   Mr. Rafiekian made a false statement.  There's an

5   entire caption:  Mr. Rafiekian made a false statement.

6   Covington will be asked about their thought processes

7   at the trial.

8           In their letter of June 13, 2018, they wrote:

9   We understand that you, the government, are seeking his

10  cooperation pursuant to his plea and cooperation

11  agreement with the special counsel's office.

12          The "he" and the "his" is Mr. Flynn.

13          Months after the corporation was dissolved,

14  Covington certified -- wrote to the government with his

15  detailed waiver.  For the government, this is all in

16  furtherance of his cooperation.

17          Now, there's no issue with regard to

18  privilege regarding the Flynn Intel Group, we would

19  submit to the Court.  The client is just seeking access

20  to a legal file that he has a lawful right to.  Once he

21  has access, if there are privilege issues, those can be

22  worked out with counsel or, if necessary, with the

23  Court's assistance.  The Court can deal with the

24  question of showing the prosecutors the file with a

25  protective order.

1            There is no request -- and this is important

2     from our perspective, Your Honor.  There is no request

3     for Mr. Flynn's personal records.  We assume that

4     Covington and Ms. Verderame, to the extent she was

5     involved, did the appropriate, as required by the Code

6     of Professional Responsibility, steps to segregate out

7     those two files.

8            The suggestion that Mr. Flynn waived to

9     protect the corporation after he had dissolved the

10    corporation is unbelievable, Your Honor.  There is no

11    question he waived because he was a government

12    cooperator.  He waived because the government wanted

13    his evidence.  He waived because he did not want to go

14    to jail.

15           The corporation had been illegally dissolved.

16    It had no assets, no business, and Mr. Flynn contends

17    that his was a proper business purpose and

18    Mr. Rafiekian's is not.  This is all about Mr. Flynn's

19    personal interest.

20           The lawyers say Mr. Rafiekian cannot have the

21    same access because it's not a business purpose, and

22    that is just, Your Honor, unbelievable.  If there's any

23    doubt about that, Mr. Kelner in Covington's remarks on

24    December 18, 2018, at Mr. Flynn's first sentencing

25    hearing made that clear where he specifically asked

1   Judge Sullivan for an extension.  I can quote for the

2   Court's record.  He asked Judge Sullivan for an

3   extension so that Mr. Flynn can testify in his case,

4   ostensibly help the government obtain a conviction, and

5   thereby get credit for it.

6           With respect -- Your Honor, I'll address

7   briefly; although, I don't think Your Honor has to

8   reach the three-part test in *U.S. v. Nixon*.  These

9   documents are extremely relevant.  The Court need only

10  look at the indictment starting on page 13 to see just

11  how relevant they are.  Mr. Rafiekian is accused of

12  making false statements to the company's lawyers.

13          With respect to admissibility, there are many

14  avenues for which these documents are admissible.

15  We're not talking about extrinsic evidence to be used

16  in impeachment.  There are time and billing records.

17  Those are clearly business records.  There may well be

18  party admissions with respect to statements of the

19  government.  There may be, as the Court noted, the

20  information that reflects the lawyers' statement of

21  mind when they contend to the government -- and as they

22  will presumably testify at trial -- they were lied to.

23          The third prong, Your Honor, of specificity,

24  this is not a fishing expedition.  This is nothing like

25  *Rand*.  What's contained in a legal file is extremely

1  specific, called for under the Code of Professional

2  Responsibility.  All we have here is a client who wants

3  access to a legal file to which he's entitled and to

4  which the law of Delaware, the state of incorporation,

5  treats him as an equal director.

6          My question, Your Honor, in closing is what

7  equities is Covington and what equities is

8  Ms. Verderame trying to protect?

9          Are they trying to protect the corporate

10 integrity of the Flynn Intel Group?  The corporation

11 was unlawfully dissolved, Your Honor.  There is nothing

12 there to protect.

13         Are they trying to protect General Flynn

14 himself?  He's an immunized cooperator.  He's really

15 not at risk.  What he's trying to do is improve his

16 prospects at sentencing.  I don't blame him for that,

17 but to use the vehicle of trying to deny evidence to

18 Mr. Rafiekian is entirely improper.

19         Are the lawyers trying to protect themselves?

20 That's a possibility, and I leave that to the Court to

21 consider.  The unexplained, unlawful certification, I

22 think, raises that question in a very serious way.

23         Covington had Flynn Intel Group sign an

24 engagement letter.  Presumably, so did Ms. Verderame.

25 Under that engagement letter, if a conflict arises, as

1  these letters typically say, Covington says:  We get to

2  keep General Flynn.

3           But then what happened?  What happened was

4  General Flynn was indicted.  General Flynn pled.  I'm

5  sorry.  I'll correct that.  General Flynn was never

6  indicted.  He pled by information.  He pled and became

7  a cooperator.  Through this entire process which reeks

8  of conflict, Covington remained counsel to Flynn Intel

9  Group, continued to do that work, and at no time

10 asserted that the conflict was so severe that they had

11 to get new counsel for Flynn Intel Group.  I would

12 submit that if there were different counsel, we'd be

13 having a different discussion today.

14          Lastly, Your Honor, I would ask the Court to

15 note on page 8, footnote 12, of our opposition the

16 reference to cases that call for fairness.  This Court

17 will, of course, always be fair.  All we're asking here

18 is that the Court protect this citizen from the lawyers

19 who have his file and provide him with the opportunity

20 and his counsel to look at that file and to deal with

21 its consequences.

22          Thank you, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Counsel, let me ask a couple of questions.

25          MR. JOHNSON:  Certainly.

1            THE COURT:  How do you view the significance

2   of the corporation's dissolution?  How do you see that

3   as bearing on these issues?

4            MR. JOHNSON:  I don't think it has any

5   bearing, Your Honor.  The defendant wants to have it

6   both ways.  As I heard defendant's counsel say, well,

7   it was dissolved, but maybe it wasn't dissolved

8   legally.  So, therefore, maybe it didn't have any

9   effect.  It has no effect under Delaware law because

10  under Delaware law, as we pointed out -- and the

11  defendant has not refuted this or challenged it.  Under

12  Delaware law, a corporation continues for a period of

13  three years after it is dissolved for purposes of being

14  sued, which would include the ability to assert

15  privilege under these circumstances.

16           THE COURT:  So who has authorized or directed

17  FIG's position with respect to this subpoena?

18           MR. JOHNSON:  That would be the CEO and

19  chairman and majority shareholder General Flynn.

20           THE COURT:  So he has directed to resist the

21  subpoena?

22           MR. JOHNSON:  Correct.

23           THE COURT:  All right.

24           MR. JOHNSON:  With respect to the equities,

25  which is where counsel left off, the question really

1   here is not one of equities.  The question is one of

2   ethics.  Are we ethically bound not to produce this

3   data?  The answer is yes.  Does Mr. Rafiekian have a

4   right to that?  The answer is no.

5          You asked, Your Honor:  Why does Rafiekian

6   not have the same corporate purpose that General Flynn

7   has?  And the answer is as FIG, and when his defense

8   helped FIG, the answer is no because FIG has not been

9   charged.

10          As a result of FIG's decision through its CEO

11   and chairman to cooperate with the government, FIG has

12   not been charged in the same matters that Mr. Rafiekian

13   is subject to.  As a result of that cooperation,

14   there's no charge.  Therefore, the interests are not

15   the same.  What he's doing is trying to seek them --

16   seek these documents for his personal purposes.

17          I have never seen anything that defendants

18   have said in either their papers, nor have I heard

19   anything this morning indicating that Mr. Rafiekian is

20   seeking them for any corporate purpose.  He contends,

21   well, he's a codirector and that he can call a board

22   meeting.  The plain fact -- and they don't dispute

23   this -- is that Mr. Rafiekian has fewer shares than

24   Mr. Flynn.  He would get outvoted.  This is what

25   happens in a corporation.  Somebody is elected.

1  Mr. Flynn was not elected contrary to counsel's

2  suggestion.

3           THE COURT:  There are other shareholders;

4  aren't there?

5           MR. JOHNSON:  Excuse me?

6           THE COURT:  There are other shareholders?

7           MR. JOHNSON:  Actually, Your Honor, it's my

8  understanding that at some point in 2016, the third

9  shareholder cashed out.  So there are only the two, and

10 General Flynn has the majority of the shares.

11          THE COURT:  That's 350, and Rafiekian has

12 300.

13          MR. JOHNSON:  Correct.

14          So because of the way they set up the company

15 and before dissolution and before these events

16 occurred, as counsel conceded, Mr. Flynn, General Flynn

17 was appointed -- elected as the CEO and as the

18 chairman.  Mr. Rafiekian gave him that power at the

19 time.  He said, General Flynn, you have the authority

20 to make these types of decisions.

21          He gave that authority, and under corporate

22 law, he has the authority that the corporation acts --

23 exercises or waives the privilege through its executive

24 officers.  If Mr. Rafiekian thinks that he has some

25 corporate right, then this is not the place to litigate

1  that.  He can file some action under Delaware law to

2  try to assert his rights.

3          The reason he hasn't done that is because in

4  order to do so, he would have to allege that he wants

5  the documents for a corporate purpose.  He doesn't have

6  a corporate purpose.  He has a personal interest in

7  trying to defend himself, but he's not seeking these

8  documents for any corporate purpose.  The dissolution

9  has nothing to do with it.  He just doesn't have the

10 votes under Delaware law to get access to these

11 documents.

12         Your Honor raised the crime fraud exception,

13 and Mr. Kelner points something out to me that I would

14 like to share with the Court.  The government hasn't

15 contended that.  I'm not sure that the Court can *sua*

16 *sponte* suggest that there's a crime fraud exception.

17 Certainly, the reason the defendant hasn't asserted it

18 is that for him to assert it, he'd be essentially

19 admitting guilt.  So crime fraud here is not an issue.

20         THE COURT:  I understand.

21         MR. JOHNSON:  Instead, the question is

22 whether he has a right to these documents.  The answer

23 is no.  Has he been specific?  The answer is no.  Can

24 he get access to privileged documents or opinion work

25 product?  The answer is no and no.  There is one area

1   of potential relevance as I concede, Your Honor, which

2   is the fact work product prior to March 7, 2017, that

3   Covington has in its files.  Anything else would be

4   burdensome and privileged.  It would be work product,

5   and it is not subject to the subpoena.

6           THE COURT:  All right.  Thank you.

7           Counsel, I will give you the last word.

8           MR. WALKER:  Thank you, Your Honor.  I just

9   want to make one point briefly, and that is in response

10  to a remark from Mr. MacDougall.  Nothing in the

11  filings in this matter or in the record before the

12  Court in this matter should be taken as a concession on

13  the part of or on behalf of Ms. Verderame that the

14  corporate dissolution certification was false.  Really,

15  I just want to emphasize that point for the record.

16          I also do want to point out, Your Honor --

17          THE COURT:  As I understand it, it was simply

18  a misstatement that it was authorized by all the

19  directors or all the shareholders.

20          MR. WALKER:  Your Honor, I am only in a

21  position to say that no concession has been made here.

22  I'm not in a position and I don't have facts that I can

23  put before the Court either directly or indirectly.  I

24  just want to make clear that there's been no concession

25  at that point, which is a factual point.

 1            THE COURT:  All right.

 2            MR. WALKER:  The other thing, Your Honor, is

 3  to stress on behalf of Ms. Verderame that, again, she

 4  is willing and wanting to cooperate to the extent of

 5  providing relevant and admissible material in response

 6  to the subpoena provided it could be done consistent

 7  with her ethical obligations which are paramount for an

 8  attorney to follow.  It's not a minor issue, and it's

 9  not an issue that should be taken as indicating hiding

10  anything.  It's a paramount obligation on behalf of

11  Ms. Verderame.

12            Thank you.

13            THE COURT:  Thank you.

14            The Court is going to direct that counsel

15  produce fact work product documents prefiling, that is

16  on or before the March 7 FARA filing.  So the motion to

17  quash is denied to that extent.

18            The Court is going to take under advisement

19  the balance of the motion, and I'll get a decision to

20  you shortly.

21            I would suggest to counsel that they -- and

22  I'm not suggesting that I've ruled on this.  But given

23  the trial date, that counsel begin the process of

24  segregating its file pertaining to the FARA filing both

25  before and after the filing and the file as it relates

1  to other extraneous matters.  I will try to get a

2  decision to you shortly.

3           All right.

4           MR. JOHNSON:  Thank you, Your Honor.

5           MR. MACDOUGALL:  Thank you, Your Honor.

6           THE COURT:  All right.

7           ----------------------------------
                    Time:  9:56 a.m.
8

9

10

11

12

13

14

15

16

17

18

19

20

21
       I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                              _____
                                    /s/
25                            Rhonda F. Montgomery, CCR, RPR