IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:18-CR-457-AJT |
| BIJAN RAFIEKIAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S RESPONSE TO
<u>DEFENDANT'S MOTION TO PRECLUDE USE OF "KICKBACK"</u>

For the reasons that follow, the United States respectfully requests that the Court deny in

part the Defendant's Motion To Preclude Use of "Kickback" and Synonymous Terms.

INTRODUCTION

On August 10, 2016, co-defendant Ekim Alptekin wrote an email reporting that he had

met with [Turkish Minister #1] and "explained our proposed approach.  He is receptive and

indicated he would like to meet with us during his upcoming visit to DC.  As soon as the visit

dates are scheduled and confirmed, I will inform you and we can strategize how best to approach

the meeting."  Later that evening, Alptekin wrote to the defendant saying, "I had a long meeting

with [Turkish Minister #2] upon the referral of [Turkish Minister #1].  I explained what we can

offer.  He agreed to discuss in general lines at the council of ministers today and subsequently

with [Senior Turkish Leader #2] in more detail."

Also on August 10, 2016, Alptekin wrote an email to the defendant:

I just finished in Ankara after several meetings today with [Turkish Minister #2]
and [Turkish Minister #1].  I have a green light to discuss confidentiality, budget
and the scope of the contract.  I am flying to LA tomorrow at the request of
[Turkish Minister #1] . . . .  Can we talk some time early evening EDT tomorrow?

The next day, the defendant wrote to Alptekin:

> MF and I spent some time on the campaign design and end product as well as resource allocation.  We have decided to press the cost down . . . .  *I did not touch the advisory support we discussed at 20%.* (Emphasis added)

On September 3, 2016, however, the defendant sent Alptekin an email enclosing an "Independent Advisory Services Agreement" showing Alptekin's company, Inovo, as the "client" – not the Turkish government who had just given the "green light" – and FIG as the "advisor."  Curiouser, the defendant later drafted a similar "Independent Advisory Services Agreement" – but with the roles reversed: Inovo was now the "*advisor*" and FIG was now the "*client*."  Upon the execution of the agreement in which *FIG* was the "advisor," Inovo was to pay FIG $200,000 for "[c]ompensation for advisor's professional services."  Not coincidentally, upon the execution of the agreement in which *Inovo* was the "advisor," FIG was to pay Inovo $40,000 – also for "[c]ompensation for advisor's professional services."

Thus, on September 9, 2016, Alptekin wired $200,000 to FIG, and on September 12, 2016, Rafiekian wrote to Flynn's son, "We need to wire $40K to Mr. Ekim Alptekin.  He is our outside advisor on the [Turkey] Project."  A $40,000 wire to Inovo went out the next day.  Similar interlocking payments were made in October.

Whatever one might call them, these reciprocal payments for "advisory" services – with FIG and Inovo each acting as *both* "client" and "advisor" to the other on the *same* project – are of great probative value in establishing the conspiracy and the means by which it was accomplished.  Of course, for this reason they are included in the overt acts alleged in paragraphs 31 to 38 of the indictment.  As discussed below, there would be nothing improper in arguing in closing that the payments back to Alptekin were for facilitating FIG's work for the true client, the Government of Turkey.  In other words, these payments could properly be described as kickbacks.

ARGUMENT

The defendant asks the Court to "preclude the government from characterizing FIG's payments to Inovo as 'kickbacks' or any similar pejorative term." The cases the defendant relies upon, however, do not support such an expansive prohibition. The United States does not plan to ask any question in its case-in-chief that would be intended to elicit testimony involving the term "kickback." Nor does it plan to use the term in its opening statement, as this would be argumentative. However, it would be perfectly appropriate to use the term "kickback" in closing argument because it perfectly describes what the evidence will show was the intent and purpose of the same-time payments from Inovo to FIG and from FIG to Inovo.

As defined by the Oxford English Dictionary, a "kickback" is "A refund, a rebate; the return of money, goods, etc.; a payment (usually illegal) made to a person who has made possible or facilitated a transaction, appointment, etc."[1] None of the defendant's cases suggest that the use of this term in this fashion would be improper.

In *United States v. Hedgepeth*, 418 F.3d 411 (4th Cir. 2005), a government witness testified that he told a government informant that he believed that the defendant, a city council member, "might be in the kickback business." *Id.*, at 417. The court certainly suggested that the witness's testimony was improper, but ultimately found it to be harmless. In any case, the government does not plan to elicit the term "kickback" in any direct testimony.

In the unreported, wrongful-discharge action of *Evans v. Quintiles Transnational Corp.*, the court excluded reference to certain hotel commissions and rebates – which were wholly irrelevant to the plaintiff's termination – as kickbacks. In its one-paragraph reasoning, the court

---

[1] "kick-back | kickback, n.". OED Online. March 2019. Oxford University Press. http://www.oed.com/view/Entry/103268?result=2&rskey=iBOYuw& (accessed May 07, 2019).

precluded use of the term "kickback" because it "implies illegality."  No. 4:13-cv-987, 2015 WL

9455580, *7 (D.S.C. Dec. 23, 2015).  Exactly.  In a criminal case, terms like "conspiring,"

"acting as a foreign agent," "making false statements," and "guilty" also imply illegality, but no

one would say that they may not be used in a closing argument.

In *United States v. Walters*, 226 F. Supp. 3d 821 (E.D. Ky 2016), the district court was

not the least concerned about the use of the term "kickback."  Indeed, the court *itself* used it to

refer to payments that the court hypothesized "might violate the Anti–Kickback Statute."  *Id.* at

824.  Because those kickbacks were not relevant to the health care fraud charged in the

indictment, the court excluded them on 404(b) grounds.  Here, however, the reciprocal payments

are intrinsic to the conspiracy.  The nature and timing of the payments strongly suggest that

neither Alptekin nor Inovo was FIG's real client.  The matching payments are highly probative

of whether the funds in fact came from Inovo – as opposed to, say, the Government of Turkey.

If Inovo were truly FIG's client, there would be no reason for Inovo to pay FIG $200,000 for

"consulting services" only to have FIG immediately pay Inovo back $40,000, also for

"consulting services."

In the defendant's last case, *Dunn v. United States*, 307 F.2d 883 (5th Cir. 1962), the

court reversed because of a string of improper arguments to the jury, including that "in the

prosecutor's opinion the case was the most flagrant he had ever tried."  *Id.* at 885.  The court

never took issue with the word "kickback."  Rather, the court properly reversed because the

prosecutor had argued to the jury "to the effect that all politicians *take* kickbacks."  *Id.* at 886

(emphasis supplied).

Accordingly, the United States would have no objection to a proposed order prohibiting

the government from using the term "kickback" in its opening statement and from intentionally

eliciting the term in the testimony of its witnesses.  It has never planned to do so.  In its closing

argument, however, it would not be improper to use the term "kickback" to refer to the payments

FIG made to Alptekin (via Inovo).  The evidence will show that they fall within the definition of

the term: "a payment (usually illegal) made to a person who has made possible or facilitated a

transaction."  The government will certainly be arguing that the defendants engaged in illegal

conduct constituting, among other things, the conspiracy charged in the indictment.  The

payments to Inovo are among the overt acts of that conspiracy.  Moreover, the evidence will

show that those payments to Alptekin via Inovo "made possible or facilitated" the arrangement

that resulted in the co-conspirators acting as undeclared foreign agents of the Government of

Turkey.  In other words, the evidence will show that the payments were kickbacks.

CONCLUSION

For these reasons, the United States respectfully requests that the Court deny the

defendant's motion to the extent that it would preclude the government from using the term

"kickback" in its closing argument.  Further, because the order proposed by the defendant

contains the undefined and amorphous phrase "similar pejorative terms," the United States

requests that the Court reject it.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY


|  |  |
|---|---|
| _____/s/_____ | By: _____/s/_____ |
| Evan N. Turgeon | James P. Gillis |
| Trial Attorney | Virginia Bar No. 65055 |
| Counterintelligence | John T. Gibbs |
|   and Export Control Section | Virginia Bar No. 40380 |
| National Security Division | Assistant United States Attorneys |
| United States Department of Justice | The Justin W. Williams |
| 950 Pennsylvania Ave., NW |   United States Attorney's Office |
| Washington, DC 20530 | 2100 Jamieson Avenue |
| (202) 353-0176 | Alexandria, VA 22314 |
| Evan.Turgeon@usdoj.gov | (703) 299-3700 |
|  | (703) 299-3982 (fax) |
|  | James.P.Gillis@usdoj.gov |
|  | John.Gibbs@usdoj.gov |

CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2019, I electronically filed the foregoing using the

CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,


_____/s/_____
James P. Gillis
Assistant United States Attorney