# In the Matter of:

---

# Proceedings

## May 17, 2019

---



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     Alexandria Division

 4

 5    -----------------------------------:

 6    UNITED STATES OF AMERICA,          :

 7              Plaintiff,               :

 8    vs.                                : Case No.

 9    BIJAN RAFIEKIAN,                   : 1:18-cr-00457

10              Defendant.               :

11    -----------------------------------:

12                             Alexandria, Virginia

13                             Friday, May 17, 2019

14

15         The above-entitled matter came on to be

16    heard before the HONORABLE ANTHONY J. TRENGA, Judge in

17    and for the United States District Court for the

18    Eastern District of Virginia, located at 401 Courthouse

19    Square, Alexandria, Virginia, commencing at 9:45 a.m.,

20    when were present on behalf of the respective parties:

21

22
```

```
 1              A P P E A R A N C E S

 2

 3   On behalf of Plaintiff:

 4       JAMES P. GILLIS, ESQUIRE

 5       JOHN T. GIBBS, ESQUIRE

 6       Assistant U.S. Attorneys

 7       United States Attorney's Office,

 8       Eastern District of Virginia

 9       2100 Jamieson Avenue

10       Alexandria, Virginia 22314

11

12       EVAN N. TURGEON, ESQUIRE

13       Trial Attorney

14       Counterintelligence and Export Control Section

15       National Security Division

16       U.S. Department of Justice

17       950 Pennsylvania Avenue, Northwest

18       Washington, D.C. 20530

19

20

21

22
```

```
 1                    A P P E A R A N C E S

 2                         (Continued)

 3

 4    On behalf of Defendant:

 5        ROBERT TROUT, ESQUIRE

 6        Trout, Cacheris & Solomon, PLLC

 7        1627 Eye Street, Northwest, Suite 1130

 8        Washington, D.C. 20006

 9

10        MARK J. MACDOUGALL, ESQUIRE

11        STACEY H. MITCHELL, ESQUIRE

12        Akin, Gump, Strauss, Hauer & Feld, LLP

13        Robert S. Strauss Tower

14        2001 K Street, Northwest

15        Washington, D.C. 20006-1037

16

17        JOHN CULLEN MURPHY, ESQUIRE

18        Akin, Gump, Strauss, Hauer & Feld, LLP

19        One Bryant Park

20        Bank of America Tower

21        New York, New York 10036-6745

22                        *   *   *   *   *
```

 1                P R O C E E D I N G S

 2            THE CLERK:  Criminal Number 2018-457,

 3    United States of America versus Bijan Rafiekian.

 4            MR. GILLIS:  Good morning.  Jim Gillis,

 5    John Gibbs and Evan Turgeon for the United States.

 6            THE COURT:  Good morning.

 7            MR. TROUT:  Good morning, Your Honor.

 8    Robert Trout, Stacey Mitchell, Mark MacDougall and

 9    Jack Murphy on behalf of the defendant.

10            Your Honor, I will be the one arguing the

11    motion with respect to the motion to compel, and

12    Mr. Murphy will be arguing the motion on the

13    kickbacks issue.

14            THE COURT:  All right.  I reviewed the

15    briefing.  Let me please hear from counsel.

16            MR. TROUT:  Thank you, Your Honor.  On the

17    motion to compel, we have a very specific request.

18    It is that we -- that the government produced

19    evidence that would demonstrate that the senior

20    officials in the Turkish government, President

21    Erodgan and his senior subordinates, would object to,

22    would find anathema any comparison of the Muslim

1   Brotherhood to terrorists, any designation of the

2   Muslim Brotherhood to a terrorist organization or any

3   comparison to the Gulenists, whom these Turkish

4   officials view as terrorists.

5           We believe, Your Honor, that when you look

6   at what the issue is in this case, which is whether

7   the defendant agreed to operate in the United States

8   under the direction and control of the government of

9   Turkey or Turkish officials, that this evidence is

10  highly relevant.  You will recall that the op-ed --

11  that the Flynn op-ed from January -- excuse me, from

12  November 8, 2016, clearly compared at great length

13  the Muslim Brotherhood to the Gulenists as a way of

14  demonizing the Gulenists --

15          THE COURT:  Before the American public.

16          MR. TROUT:  Before the American public.

17          -- and the information that we're looking

18  for, Your Honor, is clearly that Turkey and the

19  Turkish government would never have sanctioned such a

20  comparison, especially to the American public.

21          We have -- in the reply brief, Your Honor,

22  we included some material, including a reference to

```
 1    testimony from Secretary Tillerson before the House

 2    Foreign Affairs Committee.  Secretary Tillerson made

 3    it very clear that condemning the Muslim Brotherhood

 4    as a terrorist organization would present problems,

 5    specifically for Turkey.  Your Honor, we do not

 6    believe that Secretary Tillerson was winging it.  We

 7    think that he was basing his testimony on the basis

 8    of agreed wisdom developed in the Department of

 9    State, briefing books that would essentially

10    substantiate exactly the point that we're trying to

11    make.  And especially to an American audience,

12    President Erodgan would clearly not want this sort of

13    comparison of the Muslim Brotherhood to be made to

14    terrorists, and I think the point that we make about

15    Secretary Tillerson's testimony to the Foreign

16    Affairs Committee is precisely the point.  They do

17    not want this government to condemn the Muslim

18    Brotherhood.  It will complicate the relationship.

19              And so it seems to us, very clear, that

20    this is highly exculpatory because it would

21    demonstrate that the Turkish government was in no way

22    involved in the development of this op-ed piece.
```

```
 1   There is actually no evidence that we have seen that

 2   the Turkish government or anyone in Turkey -- in the

 3   Turkish government and any official had an advance

 4   copy of the op-ed piece.  We have seen no evidence

 5   that the Turkish government itself or any Turkish

 6   official himself or herself actually reacted after

 7   the fact to the piece.

 8            The government, in its response, has

 9   essentially made a jury argument that, well,

10   Alptekin, in Turkey, expressed appreciation for the

11   op-ed.  They would argue he embraced the op-ed.  And

12   in that regard, Your Honor, I would like to refer the

13   Court to one of the exhibits that was actually

14   attached to the government's brief.  You will recall

15   Attachment A is an e-mail from November 2nd.  This is

16   the e-mail -- the first e-mail that our client,

17   Mr. Rafiekian sent to Mr. Alptekin attaching for the

18   first time a draft of the op-ed for comment.  This

19   was in response --

20            THE COURT:  Right.  I remember the e-mail.

21            MR. TROUT:  So that was on November 4th.

22   And if you go to Attachment B, which is going to be
```

1   Government Exhibit 48-A, you see that there was a

2   telephone -- there was a conversation between

3   Mr. Alptekin and Mr. Rafiekian, and Mr. Rafiekian now

4   sends a further draft.  There's not a dime's worth of

5   difference between the two drafts in any material

6   way, but here's what he said:  Ekim, I just left

7   M.F., Michael Flynn.  The arrow has left the bow.

8   The attached article will be published on Monday.

9   Attaches the revised draft, and, again, there is no

10  difference.  This is a very high-profile exposure one

11  day before the election.  I -- and this is an

12  important sentence.  I told M.F. about your advice

13  and concern.  He wants you to know that he

14  appreciates your professional and valuable advice on

15  a personal level.  I can tell you, from working

16  together closely for over a decade, that he places a

17  significant value on this type of insight in the best

18  military traditions.  Your Honor, that amounts to

19  politesse.  It is diplomatic speak for thanks for

20  your comments, noted, rejected.

21          So there is evidence in the record that

22  actually contradicts the point that the government

1   would make, and the reality is that these are just

2   jury arguments.  We'll have an opportunity to make

3   this argument to the jury just as the government will

4   make its argument.

5           THE COURT:  Right.

6           MR. TROUT:  We point that out, we give the

7   government a preview of what we might be talking

8   about because we have nothing to hide.  We want the

9   Court to be fully informed.  And the more informed

10  the Court is on these issues, the better from our

11  perspective.

12          That is a reminder to us -- to me, Your

13  Honor.  We were surprised, shocked, in fact, to read

14  that the government is taking the position that

15  Turkey paid for the op-ed, that Turkey paid Flynn --

16  the fees to Flynn Intel Group.  We see no evidence of

17  that.  If it exists, it's well hidden.  And we would

18  ask the Court to insist either that they acknowledge

19  that there is no such evidence or to tell us without

20  further delay exactly what that evidence is, Bates

21  numbers, so that we know where to go find it because

22  right now, we have seen no evidence that Turkey

 1  funded this work by Flynn Intel Group.

 2          THE COURT:  Well, that will be their

 3  obligation at trial.  So...

 4          MR. TROUT:  Right.  Your Honor, just last

 5  issue on this.  The government is making available to

 6  us a lot of information from the Department of State.

 7  It relates to the extradition efforts for Mr. Gulen.

 8  So the fact that they are willing to go to the State

 9  Department to look for information is useful, but

10  what we need is the information from the State

11  Department specifically that we have identified.

12  It's a specific request under Brady.  We've told them

13  where to look, and we think there's no excuse for

14  them not going through that trouble.

15          THE COURT:  All right.

16          MR. TROUT:  Thank you.

17          MR. GIBBS:  Your Honor, I think at one

18  point in Mr. Trout's argument, he sort of made a

19  distinction between evidence and argument.  I think

20  that's really the issue here is the defense has asked

21  the government two months -- less than two months

22  before trial now to provide information from the

```
 1    State Department and intelligence agencies, which

 2    undoubtedly would include CIA, NSA and probably DIA,

 3    about a foreign head of state and a foreign

 4    government and sort of what our government's

 5    assessment of that government is and sort of what

 6    their interests are.

 7              You know, the request starts off as asking

 8    about President Erodgan and whether he's ever been a

 9    member of or affiliated with or sympathetic to the

10    Muslim Brotherhood.  It's an incredibly expansive

11    request.  The problem is at the end of it, they just

12    want to be able to make an argument.  They want to be

13    able to say because President Erodgan or the

14    government of Turkey was sympathetic to the Muslim

15    Brotherhood, this notion that they would have an

16    agency relationship with someone who would criticize

17    the Muslim Brotherhood is anathema, it's something

18    they would be opposed to.  That's an argument.

19              There's not going to be evidence of -- even

20    if there's evidence of Erodgan being sympathetic to

21    or a member of the Muslim Brotherhood, the defense

22    already has that.  They attached at least three
```

1    articles that talked about -- that they talked about

2    Rex Tillerson. That evidence was out there. If they

3    want to present that evidence, they could put on an

4    expert who would say that. But the argument that

5    they want to attach to that evidence that there's no

6    way that this agency relationship could exist because

7    it's so anathema, that's an argument they can make,

8    and then we can obviously make our own

9    counterargument. But to ask the government to go and

10   search what would undoubtedly be highly classified

11   evidence on this wild goose chase -- because even if

12   there was evidence -- you know, even if there was

13   information that said -- you know, from some analyst

14   at CIA that said President Erodgan is sympathetic to

15   the Muslim Brotherhood, they're not going to say, and

16   that sympathy is so great that if he ever entered

17   into an agency relationship, he wouldn't be able to

18   maintain it with someone who criticized the Muslim

19   brotherhood.

20          So, you know, this is just a case where

21   this request is so broad, so unreasonable, especially

22   in light of the op-ed itself. I mean, defense

1    focused exclusively on the Muslim Brotherhood, but if

2    the Court -- I know the Court has read the article,

3    the op-ed.  It's focused on Gulen.  It's not focused

4    on the Muslim Brotherhood.  Does it mention the

5    Muslim Brotherhood?  Absolutely.  And as Your Honor

6    pointed out, the op-ed was aimed at the American

7    people.  For many people in this country, the Muslim

8    Brotherhood is not seen in a positive light.  So we

9    have an op-ed about Gulen that talks about the Muslim

10   Brotherhood and then Osama bin Laden and Ayatollah

11   Khomeini.  The thrust of it is clearly discrediting

12   Fethullah Gulen.

13           And finally, Your Honor, the crux of the

14   951 charge is to hide the hand of Turkey in trying to

15   influence the American people.  So in an incredibly

16   clever way, the fact that there's some information in

17   there about the Muslim Brotherhood could well be some

18   sort of misdirection.  Because anyone who is

19   sophisticated in these matters could look at that and

20   say, well, they said something negative about the

21   Muslim Brotherhood.  Turkey probably isn't behind

22   this because they like the Muslim Brotherhood.

```
 1              But, Your Honor, again, I think the

 2   ultimate point comes down to the fact that the

 3   defense requested this information in January.  They

 4   waited three months to file the motion to compel.

 5   We're now two months out from trial.  They're asking

 6   us to conduct this expansive wild goose chase

 7   throughout a number of intelligence agencies,

 8   throughout the State Department for information that

 9   undoubtedly will be highly classified to get

10   ultimately information that they already have, that

11   Erodgan and the Turkish government are sympathetic to

12   the Muslim Brotherhood, so they can make an argument

13   and build upon that.  But that argument is not going

14   to be in any of those places, and it's inappropriate

15   to send the government off on that wild goose chase.

16   Thank you, Your Honor.

17              THE COURT:  All right.  Mr. Trout.

18              MR. TROUT:  Thank you, Your Honor.  Well,

19   of course, we're going to be making arguments, but

20   we're going to be making those arguments on the basis

21   of evidence and that's what we're looking for, Your

22   Honor.  We don't have the resources to hire and
```

1  Mr. Rafiekian does not have the resources to hire an

2  expert.  And if there are experts out there who agree

3  with --

4          THE COURT:  Well, it sounds like you

5  already have the information you need to make the

6  argument.

7          MR. TROUT:  Well, we do want to make sure

8  that we have evidence.  We do believe that if we --

9  for example, if we did have an expert, we can expect

10  that the government would try to impeach that expert,

11  try to argue bias, try to maybe show that the expert

12  was some hack.  And what we believe is that they --

13  all of that would be done in the face of the reality

14  that the government's own experts agree with the

15  point and that's wrong.

16          And so, Your Honor, what we -- if you want

17  to narrow the scope, that's fine but as I say, I

18  don't believe that Secretary Tillerson was making it

19  up on the fly.  I think that there would have been

20  briefing books and there would be, you know, kind of

21  an agreed wisdom within the State Department that,

22  yes, this is going to be a complication for our

1    relationship with Turkey and, yes, it was intended

2    for a U.S. audience, which is exactly why Erodgan

3    would have objected most vociferously.

4            The question here is -- and this will be

5    argument, but the question is, did Mr. Rafiekian

6    agree to operate under the direction and control of

7    Turkey?  And I can't imagine what could be more

8    exculpatory than an op-ed piece that includes

9    significant elements that Turkey clearly would have

10   found anathema.  And for that reason, Your Honor, we

11   believe that even a narrow search will yield the

12   information that we're looking for --

13           THE COURT:  All right.

14           MR. TROUT:  -- that we could perhaps use

15   that as an admission by a party, and it would be

16   evidence in that sense.

17           THE COURT:  All right.

18           MR. TROUT:  Thank you.

19           THE COURT:  Thank you.  Let me hear the

20   second motion as well.  Mr. MacDougall.

21           Oh, I'm sorry.  Yes, sir.  I think the

22   government has essentially agreed to your position.

1          MR. MURPHY:  Good morning, Your Honor.

2     Yes, in part.  The government has acknowledged that

3     it won't be using the term "kickback" in connection

4     with its opening statement or in connection with its

5     questioning of witnesses --

6          THE COURT:  Right.

7          MR. MURPHY:  -- but it does wish to use

8     that term in its closing argument.

9          THE COURT:  Right.

10         MR. MURPHY:  The issue here is pretty

11    straightforward that the government admits that the

12    term "kickback" implies illegality.  And they don't

13    claim that these payments themselves were actually

14    illegal.  Mr. Rafiekian has not been charged with any

15    crime arising from these payments.  He has been

16    charged with failing to register as a foreign agent

17    and with making false statements in a FARA filing.

18    Now, none of the false statements in that FARA filing

19    actually have anything to do with the payments at

20    issue.

21         So under those circumstances, it would be

22    highly prejudicial for the government to refer to

1   those payments as kickbacks or to otherwise suggest

2   that they were illegal.  It's basically a backdoor

3   way, Your Honor, for the government to suggest to the

4   jury that the defendant has committed other crimes

5   for which he has not been charged.  If the government

6   were allowed to use the term, the jury might conclude

7   incorrectly that the payments themselves were illegal

8   and might, therefore, reason that Mr. Rafiekian is

9   more likely to be guilty of the crimes for which he

10  has been charged.  There's no reason to allow the

11  possibility for that prejudice or confusion into this

12  trial.

13          So for these reasons, we would request that

14  even in the closing argument, the government be

15  precluded from using the term "kickback."

16          THE COURT:  All right.

17          MR. MURPHY:  Thank you.

18          THE COURT:  Yes.

19          MR. GILLIS:  Your Honor, there would be

20  nothing unduly prejudicial or unfair in our using

21  that argument in our closing.  It doesn't even meet

22  the standard that the defense has set forth in page

1    three.  It does not constitute unfair prejudice to

2    call a spade a spade in closing argument.  It would

3    not confuse or mislead the jury because it is

4    integral to the conspiracy that we have charged that

5    there was a payment immediately back to Alptekin as

6    soon as Alptekin paid FIG.  So there would be no

7    economic reason for that to take place.  And, indeed,

8    as the evidence will infer and show to the jury or

9    the jury would be permitted to infer that this was

10   simply an extension of what was agreed to when the

11   government of Turkey was giving the green light for

12   the budget in this case and when the involvement of

13   the Turkish officials was plainly controlling the

14   direction of this project.

15           So, Your Honor, it is perfectly appropriate

16   to argue these things.  It does not meet any of the

17   standards for finding argument improper.  First, the

18   evidence will certainly permit the jury to make that

19   inference that this was a payment back to Alptekin

20   for an illicit purpose.  That is one of the standards

21   that the defense itself mentions on page five of

22   their arguments, that it need not be simply illegal

```
 1   but this payment was certainly illicit as part and

 2   parcel of this conspiracy as we have charged.  It is

 3   a 20 percent payment back immediately after the

 4   payment was made.  It strongly infers that the

 5   initial payment from Alptekin to FIG came from

 6   somewhere else, that is, the government of Turkey, if

 7   FIG is immediately kicking back 40 percent -- or

 8   rather 20 percent in the form of $40,000.

 9           So it does not result in a -- the evidence

10   will permit the jury to make that inference.  It will

11   not mislead the jury.  This is an integral part of

12   our case against the defendant.  It is not unfairly

13   prejudicial because it falls within the definition of

14   what a kickback is.  It's not as if we're using some

15   pejorative slang term to refer to the defendant.  We

16   are using what is a dictionary definition of the term

17   "kickback."  And it also would not introduce

18   prejudicial extraneous matters that would confuse or

19   mislead the jury.  The evidence will be ample on this

20   point, Your Honor, and so it would be perfectly

21   appropriate to allow us to refer to it.

22           At the very least, Your Honor, we submit
```

 1   that this -- at least this aspect of the defendant's

 2   motion is premature.  The Court should first see what

 3   the evidence has been and what inferences that

 4   evidence would permit and what then would be

 5   appropriate arguments to the jury.  But if the Court

 6   is inclined to rule now, we certainly believe that

 7   it's perfectly appropriate for us to do that.  Thank

 8   you, Your Honor.

 9          THE COURT:  All right.  Thank you.

10          Counsel, I'll give you the last word on

11   this.  Why shouldn't the Court wait and see what the

12   evidence is?

13          MR. MURPHY:  Your Honor, that's certainly a

14   possibility, but, frankly, respectfully, the Court

15   has all the information now that it needs to make

16   this decision now.  The government does not allege in

17   its indictment that the payments themselves were

18   illegal or even illicit.  And you just heard from

19   Mr. Gillis, and he didn't argue that the payments

20   themselves were illegal.  Now, he used the term

21   "illicit," but what he's really saying is that the

22   payments were part of a broader what he calls an

```
 1   illegal scheme but that's not the right way to look

 2   at it.  The point -- first of all, that actually

 3   presumes that Mr. Rafiekian is guilty of the crimes

 4   for which he's being charged.  But second, the issue

 5   isn't whether the payments were part of some broader

 6   illegal scheme.  The issue is whether the payments

 7   themselves, independent of the crimes being charged,

 8   were illegal.  Now, in the government's brief, they

 9   concede that the term "kickback" implies illegality,

10   but, again, they have not said that those payments

11   themselves were actually illegal.  So it is

12   appropriate for resolution now.

13           THE COURT:  All right.  Thank you.

14           MR. MURPHY:  Thank you.

15           THE COURT:  Let me first deal with the

16   motion to preclude any reference to kickback.  The

17   Court, at this time, is going to grant the motion to

18   the extent that the reference to a kickback will not

19   be mentioned during the course of the trial itself,

20   either in opening or during the presentation of the

21   evidence.  And the Court is going to reserve on that

22   issue with respect to closing argument based on the
```

1    evidence that the Court hears.

2            Let me speak also to the motion to compel

3    records.  In that motion, the defendant asked the

4    Court to compel the United States to produce two

5    categories of documents.  The first is all

6    information within the United States government's

7    possession, including the State Department and the

8    intelligence agencies, that indicates that President

9    Erodgan has ever been a member of or otherwise

10   affiliated with or sympathetic to the Muslim

11   Brotherhood.  And secondly, all information within

12   the United States government's possession, including

13   the State Department, that tends to show that the

14   Turkish government officials, including President

15   Erodgan, would disagree or disapprove of any

16   comparison between Fethullah Gulen or his followers

17   and the Muslim Brotherhood.

18           The motion obviously needs to be considered

19   against the backdrop of the indictment that was

20   returned in this case.  That indictment charges the

21   defendant with conspiracy to act as an agent of a

22   foreign government and to make false statements and

1   omissions in a FARA filing and acting in the United

2   States as an agent of a foreign government,

3   specifically Turkey.  In that regard, the indictment,

4   in large part, focuses on the publication of an op-ed

5   entitled, "Our Ally Turkey is in Crisis and Needs Our

6   Support," which was published in The Hill Newspaper

7   on November 8, 2016.  The op-ed, which listed Michael

8   Flynn as its author, blamed Gulen for an attempted

9   coup in Turkey and included an unflattering

10  comparison of Gulen to members of the Muslim

11  Brotherhood.  Some news articles indicate that

12  Erodgan, the Turkish president, is an ally of and

13  sympathetic to the Muslim Brotherhood, and the

14  defendant now seeks to compel the government to

15  produce any documents probative of Erodgan's

16  connection to the Muslim Brotherhood based on the

17  government's obligations under Brady versus Maryland.

18          The indictment also describes several wire

19  transfers between FIG, Inovo and the defendant

20  Alptekin from September to November 2016.  These

21  payments relate to various advisory services.

22          The issue is everyone seems to agree that

1    the -- it's going to be -- there's an argument to be

2    made based on the relationship or attitudes of the

3    Turkish government or President Erodgan and the

4    Muslim Brotherhood.  But the issue is whether this

5    information is required under Brady versus Maryland.

6    In that case, the Supreme Court held that the

7    suppression by the government of evidence favorable

8    to an accused violates due process where the evidence

9    is material either to guilt or punishment

10   irrespective of the good faith or bad faith of the

11   prosecution.  Under Brady and also under Giglio, the

12   government is required to produce and disclose not

13   only evidence favorable to the accused when it's

14   material -- is only required to disclose evidence

15   favorable to the accused when it's material such that

16   prejudice would ensue from its suppression.  And with

17   respect to materiality regarding the inquiry is

18   whether the favorable information could reasonably be

19   taken to put the whole case in such a different light

20   as to undermine confidence in the verdict.

21          Here the Court has reviewed the detailed

22   filings and has reflected on the probative value of

1    what the defendant seeks, and the Court concludes

2    that the documents the defendant seeks to compel are

3    simply too attenuated to qualify as material under

4    Brady or Giglio.  The defendant's broad document

5    request extend to any government documents indicative

6    of ties between Erodgan and the Turkish government

7    and the Muslim Brotherhood, and this request is

8    premised on the argument that because of President

9    Erodgan and his government's ties to the Muslim

10   Brotherhood, they would not have signed off on the

11   publication of an op-ed that includes one sentence

12   unfavorably equating Gulen to members of the Muslim

13   Brotherhood.  And in making this argument, the

14   defendant, in substance, contends that a conspiracy

15   to act as an agent of Turkey, as the defendant is

16   charged with doing, is simply less likely if his

17   goals and those of the Turkish government diverged in

18   any way.  However, the conspiracy alleged in the

19   indictment was for the specific purpose of

20   discrediting Gulen.  Such a conspiracy could have

21   existed even if the defendant's interests and those

22   of the Turkish government only converged with respect

1    to one particular issue.  And the documents that

2    Rafiekian seeks are not plausibly probative of

3    whether Erodgan and the Turkish government would have

4    signed off on an op-ed that included a line critical

5    of the Muslim Brotherhood.

6            So for these reasons, the Court concludes

7    that the plaintiff (sic) has not demonstrated

8    materiality or prejudice with respect to his

9    inability to access the documents he seeks, and the

10   Court is going to deny that request.

11           Mr. Trout, with respect to your other

12   request, there's really nothing before the Court.  If

13   you want the Court to rule on anything along the

14   lines that you're requesting, you should file a

15   motion.

16           MR. TROUT:  All right.  Very well, Your

17   Honor.  Thank you.

18           THE COURT:  All right.  Anything further?

19   I assume everything is on tract otherwise?

20           MR. GILLIS:  Perfectly on track, Your

21   Honor.

22           THE COURT:  All right.  Good.

```
 1              MR. GILLIS:  If I may -- if I could confer
 2    with counsel for one moment.
 3              THE COURT:  Yes.
 4              (Discussion between counsel out of
 5    hearing.)
 6              MR. GILLIS:  Excuse me.  Pardon me, Your
 7    Honor.  One matter that I would like clarified is to
 8    have the defense confirm that they will not be
 9    offering any classified information.  They received
10    class -- they received security clearances in order
11    to speak with the defendant, who may have had
12    classified information that they may have found to be
13    relevant in this case.
14              THE COURT:  Right.
15              MR. GILLIS:  There was a deadline for
16    filing a CIPA Section 5 notice that has come and
17    passed.
18              With respect to our motion to continue a
19    portion of our responsibilities to produce classified
20    information, we've been able to present or will be
21    able to present that in an unclassified form.  So
22    there's no additional classified discovery that we
```

```
1    expect at this time.  So I would like to confirm that

2    that -- that there will be --

3              THE COURT:  Have you presented that

4    unclassified form to the defendants?

5              MR. GILLIS:  We have presented them with a

6    protective order that would be necessary, and we hope

7    to have that agreed upon.  And then we will produce

8    the remaining documents.  They are only arguably

9    relevant, Your Honor.  And so out of an abundance of

10   caution, we plan to produce it to them.  If we're

11   unable to reach an agreement on the protective order,

12   we'll go back to our principals and get some further

13   instructions on that.

14             THE COURT:  All right.

15             MR. GILLIS:  We have -- just to inform the

16   Court, we have, at this point, just 50 pages or so

17   remaining in what we will produce upon agreement upon

18   this protective order.  And apart from that, we are

19   done with producing our discovery.

20             THE COURT:  All right.  Mr. MacDougall.

21             MR. MACDOUGALL:  Your Honor, if I may

22   address the CIPA 5 issue first.  And if we had
```

 1    misread the Court's prior direction, we apologize.

 2    Certainly we had relied upon the colloquy the Court

 3    had with Ms. Mitchell on April 19th to have all of

 4    the CIPA notices and other notices filed seven days

 5    after the government completed its production of

 6    classified information.

 7            Now, I understand the Court entered an

 8    order on May 7th that was issued pursuant to a motion

 9    filed in a SCIF by the government I believe that day.

10    I was out of the country until that Friday.

11    Mr. Trout and I was the only member of the defense

12    team cleared.  Mr. Trout was not cleared until the

13    9th.  We both went in on the 10th and looked at it

14    and realized that the order had already been filed.

15            We want to take the opportunity while we're

16    before the Court to ask the Court's indulgence that

17    if we do -- and we haven't decided whether we need to

18    or not -- wait until the government, which as I

19    understand, Monday will complete its classified

20    information production, and then we would file a CIPA

21    5 notice if one were necessary by the 28th, the 27th,

22    Monday, being Memorial Day.

```
 1              THE COURT:  All right.  I'll allow you to

 2   do that.

 3              MR. MACDOUGALL:  Thank you, Your Honor.

 4              THE COURT:  All right.

 5              MR. MACDOUGALL:  With regard to that date

 6   of May 28th, again, just because of some of the shift

 7   in dates, we want to be certain that we were in line

 8   with the Court's view and the government's that our

 9   remaining pretrial motions are also due on May 28th,

10   which will be seven days after the last production.

11              THE COURT:  I think that's right.

12              MR. MACDOUGALL:  Thank you, Your Honor.

13              THE COURT:  Do you want to be heard on this

14   at all, Mr. --

15              MR. GILLIS:  No, Your Honor.

16              THE COURT:  Okay.  The 28th is fine.

17              MR. GILLIS:  Pardon me.  I just neglected

18   to say one thing.  We do -- may we approach about

19   this, Your Honor?

20              THE COURT:  Yes.  Let me let Mr. MacDougall

21   finish --

22              MR. GILLIS:  Okay.  I beg your pardon.
```

1          MR. MACDOUGALL:  So the 28th would be,

2    again, based upon our reading of the record, the day

3    that all of our pretrial motions are due.

4          THE COURT:  Right.

5          MR. MACDOUGALL:  Two other matters very

6    briefly, Your Honor.  With regard to Covington, we

7    would anticipate filing a motion, which we'll serve

8    on Covington.  There's a very large production that

9    they've made.  There are 32 documents we've

10   identified.  They're heavily redacted.  In our

11   inquiries to Covington, they've told us that they are

12   not producing a privilege log.  So those documents

13   are redacted for whatever reasons they're redacted,

14   and we propose to submit those to the Court for

15   in-camera review.

16         THE COURT:  All right.

17         MR. MACDOUGALL:  And we'll file that --

18         THE COURT:  All right.  And the Court knows

19   it has under advisement the competing protective

20   orders on that with respect to the use of those at

21   trial, and I'll issue something shortly if -- I'm

22   assuming that's not holding up anything that's

 1  between --

 2          MR. MACDOUGALL:  No, Your Honor.  That was

 3  my other question.  Thank you, Your Honor.

 4          THE COURT:  All right.  I'll see counsel at

 5  the bench.

 6          (Whereupon, the following bench conference

 7  was had:)

 8          MR. GILLIS:  I just wanted to inform the

 9  Court that I told defense counsel we are going to be

10  filing a superseding indictment.  If I may, Your

11  Honor, we're filing a superseding indictment but

12  solely to correct one statement in the indictment,

13  and then we also are going to incorporate our bill of

14  particulars into that but that we -- no substantive

15  changes whatsoever --

16          THE COURT:  When are you going to issue it?

17          MR. GILLIS:  I expect to present it next

18  week, Your Honor.

19          THE COURT:  All right.

20          MR. GILLIS:  But it's a purely technical

21  correction, Your Honor.

22          THE COURT:  All right.  Well, let's get it

1    filed as soon as possible.

2             MR. GILLIS:  Absolutely, Your Honor.

3             THE COURT:  Thank you.

4             (Whereupon, the bench conference

5    concluded.)

6             THE COURT:  All right.  Counsel is excused.

7             MR. GILLIS:  Thank you, Your Honor.

8             (Whereupon, at 10:25 a.m., the

9             proceedings concluded.)

10

11                          *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

```
 1          COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2          I, LAQUICIA THOMAS, Court Reporter and Notary

 3   Public in and for the Commonwealth of Virginia at

 4   Large, and whose commission expires February 28, 2022,

 5   do certify that the foregoing is a true, correct, and

 6   full transcript of the proceedings.

 7          I further certify that I am neither related to

 8   or associated with any counsel or party to the

 9   proceedings; nor otherwise interested in the event

10   thereof.

11

12

13                    _____

14                    LaQuicia Thomas

15                    Notary Public

16                    Commonwealth of Virginia at Large

17                    Notary No. 7363169

18

19

20

21

22
```