IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) No. 1:18- CR-457 (AJT) |
| | ) |
| | ) COUNT ONE: |
| | )   Conspiracy To Act as an Agent of a |
| v. | )   Foreign Government and To Make False |
| | )   Statements and Willful Omissions in a |
| | )   FARA Filing |
| BIJAN RAFIEKIAN, | )   (18 U.S.C. § 371) |
| a/k/a "Bijan Kian," | ) |
| (Counts 1 and 2) | ) COUNT TWO: |
| | )   Acting in the United States as an Agent |
| | )   of a Foreign Government |
| and | )   (18 U.S.C. § 951) |
| | ) |
| | ) COUNTS THREE THROUGH SIX: |
| KAMIL EKIM ALPTEKIN, | )   False Statements |
| (Counts 1 through 6) | )   (18 U.S.C. § 1001) |
| | ) |
| Defendants | ) |

FILED
IN OPEN COURT

MAY 23

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

SUPERSEDING INDICTMENT

May 2019 Term – At Alexandria

THE GRAND JURY CHARGES THAT:

At all times material to this Indictment:

GENERAL ALLEGATIONS

1.       Defendant Bijan RAFIEKIAN, a/k/a "Bijan Kian," ("RAFIEKIAN") and "Person A" were the founders of "Company A," a U.S. company based in Alexandria, Virginia, that offered various services to its clients based upon Person A's national security expertise. RAFIEKIAN served as Company A's Vice-Chairman, Director, Secretary, and Treasurer. Person A served as Company A's Chairman and Chief Executive Officer.

2.     Defendant Kamil Ekim ALPTEKIN ("ALPTEKIN") is a dual Turkish-Dutch citizen residing in Istanbul, Turkey. ALPTEKIN owned and controlled "Company B," a company formed by ALPTEKIN in the Netherlands. ALPTEKIN had close ties to the highest levels of the Government of Turkey.

3.     As discussed below, RAFIEKIAN and ALPTEKIN conspired covertly and unlawfully to influence U.S. politicians and public opinion concerning a Turkish citizen living in the United States whose extradition was then being sought by the Government of Turkey. The defendants sought to discredit and delegitimize the Turkish citizen in the eyes of politicians and the public, and ultimately to secure the Turkish citizen's extradition. Although the Government of Turkey directed the work through ALPTEKIN, the defendants sought to conceal Turkey's involvement in the efforts to discredit the Turkish citizen. As part of this concealment, the defendants used ALPTEKIN's company, Company B, rather than the Government of Turkey, to serve as Company A's "client." Company B was also to pay Company A's fee, although it is clear that Turkish government officials approved the budget for, and received regular updates on, the progress of Company A's work.

*The Government of Turkey and the Turkish Citizen*

4.     The Turkish citizen is an imam, writer, and political figure. The Turkish citizen heads an organization that runs a network of schools and charitable organizations in Turkey and in other countries. The Turkish citizen lives in the United States.

5.     In 2013, a senior Turkish leader ("Senior Turkish Leader #1") accused the Turkish citizen of being behind investigations that were alleged to have been conducted by prosecutors and members of law enforcement in Turkey associated with the Turkish citizen. In December 2014, the Turkish government accused the Turkish citizen of plotting to overthrow the

2

Turkish government and of leading an armed terrorist group. The Turkish citizen has denied the allegations.

6.     Since at least in or around early 2016, officials of the Government of Turkey have communicated with the U.S. Department of Justice to demand the Turkish citizen's extradition to Turkey. These efforts intensified after a failed attempt at a coup d'état in Turkey on July 15, 2016. The Turkish government maintained that the Turkish citizen had orchestrated the failed coup. The Turkish citizen has denied the allegations.

7.     On July 19, 2016, Turkey submitted to the United States a request to arrest the Turkish citizen, and on July 23, 2016, Turkey formally submitted extradition requests. After reviewing the requests, the U.S. Department of Justice informed the Turkish Ministry of Justice that the requests had not yet met the legal standards for extradition required by the U.S./Turkey extradition treaty and U.S. law. Accordingly, the U.S. Department of Justice noted, extradition could not go forward, absent additional evidence substantiating the allegations.

### The "Truth Campaign"

8.     On or about July 27, 2016, RAFIEKIAN replied to an email from ALPTEKIN saying that he had had a "detailed discussion" with Person A the previous night. RAFIEKIAN informed ALPTEKIN that, "We are ready to engage on what needs to be done." RAFIEKIAN added, "At the right time, I will include our partners in the communications."

9.     On or about July 29, 2016, ALPTEKIN emailed RAFIEKIAN, saying that he had met with a Turkish government minister ("Turkish Minister #1") and that, "He is interested in exploring this seriously and it is likely he'll want to meet with you and [Person A]. . . . [H]e asked me to formulate what kind of output we can generate on the short and mid-term as well as

3

an indicative budget." ALPTEKIN further told RAFIEKIAN, "Needles [sic] to tell you but he

asked me not to read in anyone else for the time being and keep this confidential."

      10.    On or about July 30, 2016, RAFIEKIAN sent ALPTEKIN an email with the

subject line "Truth," copying Person A, saying that he and Person A had discussed a ninety-day

"Truth Campaign" and listing nine bullet points, which he referred to as "Phase Zero," that he

claimed were essential to the project:

- To secure your [ALPTEKIN's] active participation in the project.
- Define the opposing force.
- Develop an accurate, objective and reliable account of "Where we are now". (undesired state)
- A clear path to "where we would like to be" (desired state)
- Define dependencies, uncertainties, expected and unexpected consequences.
- Define options from "narrow" and "extremely tactical" to "broad" and "strategic" with a clear cost/benefit matrix (Net Assessment)
- Apply the "Expected Value Analysis" model to options.
- Define "possibilities" as distinct from "probabilities" of success and failure.
- Measure second and third order effects on both "possibilities" and "probabilities".

RAFIEKIAN noted, "At this time, this conversation shall remain limited to you, [Person A] and

myself."

      11.    On or about August 2, 2016, RAFIEKIAN emailed ALPTEKIN, saying, "Waiting

to hear from you. You, [Person A] and I are the only cleared entities on this at this time."

      12.    On or about August 4, 2016, Person A sent an email with the subject "Truth" to

RAFIEKIAN and ALPTEKIN in response to an email from ALPTEKIN saying, "I'll get with

[RAFIEKIAN] today on your question regarding [the then U.S. Secretary of State]'s staff."

      13.    On or about August 4, 2016, RAFIEKIAN sent an email with the subject "Truth"

to ALPTEKIN and Person A stressing the need to begin work on the Truth Campaign. Referring

to Iran's Ayatollah Khomeini, RAFIEKIAN said:

Let me give you a real life experience: 1978: A soft spoken cleric sitting under an apple tree in Neauphle-le-Chateau in France looked so harmless. Spoke of equality and spirituality, declared that if he were to gain power, he would go to a religious shrine and will not get into politics and governance. Sound familiar? Well, the world neglected to take the layers off the ink blot in 1978. One year later, from the place under the apple tree, The soft spoken spiritual man led the Islamic Revolution in Iran . . . .

14.     On or about August 8, 2016, ALPTEKIN sent an email with the subject "Truth" to RAFIEKIAN and Person A, saying "I had a long meeting with [a Turkish government minister ("Turkish Minister #2")] upon the referral of [Turkish Minister #1]. I explained what we can offer. He agreed to discuss in general lines at the council of ministers today and subsequently with [a senior Turkish leader ("Senior Turkish Leader #2")] in more detail."

15.     On or about August 10, 2016, ALPTEKIN sent an email with the subject "Truth" to RAFIEKIAN and Person A, saying, "I met with [Turkish Minister #1] and explained our proposed approach. He is receptive and indicated he would like to meet with us during his upcoming visit to DC. . . . I will inform you and we can strategize how best to approach the meeting." ALPTEKIN again inquired about the then U.S. Secretary of State, asking, "Do we know anyone on his team?"

16.     On or about August 10, 2016, ALPTEKIN sent an email with the subject "Truth" to RAFIEKIAN and Person A, saying, "I just finished in Ankara after several meetings today with [Turkish Minister #2] and [Turkish Minister #1]. I have a green light to discuss confidentiality, budget and the scope of the contract."

> ### The Involvement of the Turkish Government Is Disguised, and the "Truth Campaign" Is Renamed "Operation Confidence"

17.     On or about August 11, 2016, the day after ALPTEKIN emailed RAFIEKIAN to say that he had a "green light" from Turkish Minister #2 and Turkish Minister #1, RAFIEKIAN emailed ALPTEKIN saying that RAFIEKIAN and Person A had discussed the "campaign

design" and "resource allocation." RAFIEKIAN reassured ALPTEKIN, "I did not touch the advisory support we discussed at 20%."

18.     On the very same day, RAFIEKIAN changed the name of the project from the "Truth Campaign" to "Project Confidence." Concurrently, for the first time, the source of funding was changed from the Government of Turkey to a company in the Netherlands that was wholly owned and controlled by ALPTEKIN. This was the first mention of a company owned by ALPTEKIN in connection with the project and the first time that RAFIEKIAN made others at Company A aware of the project. The email contained the same nine-step plan for the "Truth" project that RAFIEKIAN emailed to ALPTEKIN on or about July 30, 2016, as mentioned in paragraph 10, above. It contained the same ninety-day timeframe and the same description as "Phase Zero":

- To secure active participation of SENIOR ADVISOR [that is, ALPTEKIN]. COGS refers to this cost.
- Define the opposing force.
- Develop an accurate, objective and reliable account of "Where we are now". (undesired state)
- A clear path to "where we would like to be" (desired state)
- Define dependencies, uncertainties, expected and unexpected consequences.
- Define options from "narrow" and "extremely tactical" to "broad" and "strategic" with a clear cost/benefit matrix (Net Assessment)
- Apply the "Expected Value Analysis" model to options.
- Define "possibilities" as distinct from "probabilities" of success and failure.
- Measure second and third order effects on both "possibilities" and "probabilities".

The email attached a budget that included ALPTEKIN's twenty-percent cut for the project.

19.     On or about August 25, 2016, RAFIEKIAN emailed ALPTEKIN, copying Person A, thanking ALPTEKIN for his decision to engage Company A on "Operation Confidence," and noting that ALPTEKIN would receive twenty percent of the money Company A received for the

6

project. RAFIEKIAN promised to send ALPTEKIN a contract, but noted that it "will not entail operational details for obvious reasons."

20.     On or about August 26, 2016, ALPTEKIN told RAFIEKIAN via Skype, "We are confirmed to go." ALPTEKIN also told RAFIEKIAN, "I think im [sic] meeting [Turkish Minister #1]'s boss . . . not direct boss but u know who."

21.     On or about September 1, 2016, ALPTEKIN told RAFIEKIAN via Skype, "We are also schedulting [sic] a meet with [Person A] and [Turkish Minister #1] and perhaps even [Senior Turkish Leader #1] in third week of NY."

22.     On or about September 3, 2016, RAFIEKIAN sent ALPTEKIN an email enclosing a contract between Company B and Company A. In the email, RAFIEKIAN said, "We have been at work on this engagement since July 31st" – that is, when it was still called the "Truth" campaign – "However, we decided to set the start date as August 15, 2016" – after RAFIEKIAN and ALPTEKIN had changed the name to "Operation Confidence" and substituted ALPTEKIN's company, Company B, for the Government of Turkey as the source of the funding for the project. Under the terms of the contract, Company A was to receive a total of $600,000, broken into three $200,000 payments. The contract noted that Company B expected Company A to "deliver findings and results including but not limited to making criminal referrals" against the Turkish citizen. This contract contained the first mention of Company B in connection with the project.

23.     On or about September 5, 2016, RAFIEKIAN sent Person A a draft "playbook" for the project. The playbook referred to the Turkish citizen as "X" and referred to Turkey as "Country X." It also noted that a public registration for the project would claim that a Dutch entity was the client. The playbook explained that the project would compare the Turkish citizen

7

to Khomeini. RAFIEKIAN used the same "apple tree" description of Khomeini that he had used when the project was still called the "Truth campaign," as mentioned in paragraph 13, above.

24.     On or about September 6, 2016, RAFIEKIAN emailed Person A, saying, "Client is seeking a high level meeting in NYC on September 19th or 20th." On or about September 9, 2016, RAFIEKIAN emailed Person A, saying, "the meeting is with high level audience (Cabinet+ level) related to 'CONFIDENCE.'"

25.     On or about September 9, 2016, ALPTEKIN wired $200,000 to Company A. On or about September 12, 2016, RAFIEKIAN emailed an employee of Company A, saying that Company A needed to wire $40,000 back to ALPTEKIN. RAFIEKIAN claimed that ALPTEKIN was Company A's "outside advisor on the Confidence Project." On or about the same day, RAFIEKIAN emailed Person A a draft agreement between Company A and ALPTEKIN that also claimed that ALPTEKIN was Company A's advisor, saying, "We need this to create an audit trail on properly documenting the relationship."

*The "High Level" Meeting with Turkish Ministers*

26.     On or about September 18, 2016, in preparation for the meeting with the Turkish officials, RAFIEKIAN sent ALPTEKIN a document entitled "Background and Talking Points," which contained approximately twenty talking points for the meeting, all of which concerned the Turkish citizen, the Turkish citizen's movement, or the Turkish citizen's charter schools in the United States.

27.     RAFIEKIAN's "Background and Talking Points" contained the same "apple tree" comparison of Khomeini and the Turkish citizen that RAFIEKIAN had used in his email to ALPTEKIN (paragraph 13) when the project was still called the "Truth campaign" and in the "playbook" (paragraph 23) when RAFIEKIAN referred to the Turkish citizen as "X."

8

28.   On or about the evening of September 19, 2016, Person A, RAFIEKIAN,

ALPTEKIN, and other members of the project met in New York City with Turkish Minister #1

and another Turkish minister ("Turkish Minister #3").  The conversation centered on the Turkish

citizen and the Turkish government's efforts to convince the U.S. government to extradite the

Turkish citizen to Turkey.

29.   On September 21, 2016, RAFIEKIAN emailed Person A that he had met with

ALPTEKIN that day and that "the feedback from the late evening meeting was positive."

30.   In or about September and October 2016, RAFIEKIAN and others involved in the

project visited with and lobbied a member of Congress, a Congressional staffer, and a state

government official in an attempt to depict the Turkish citizen as a threat who should be returned

to Turkey and to persuade them to hold Congressional hearings concerning the Turkish citizen.

*Money Transfers from ALPTEKIN to Company A*
*and Kickbacks from Company A to ALPTEKIN*

31.   On or about September 9, 2016, ALPTEKIN caused $200,000 to be wire

transferred from a Turkish bank account in ALPTEKIN's name to Company A's U.S. bank

account.

32.   On or about September 13, 2016, RAFIEKIAN caused $40,000 to be wire

transferred from Company A's U.S. bank account to Company B's bank account in the

Netherlands.

33.   On or about October 7, 2016, RAFIEKIAN sent ALPTEKIN Company A's

invoice for $200,000.  On or about October 11, 2016, RAFIEKIAN sent an email to an employee

of Company A asking him to send a wire transfer to Company B "as soon as Mr. Alptekin sends

us an invoice for consulting services that he is providing to [Company A] on the Confidence

project."

9

34.     On or about October 11, 2016, ALPTEKIN caused $185,000 to be wire transferred from a Turkish bank account in ALPTEKIN's name to Company A's U.S. bank account.

35.     On or about October 14, ALPTEKIN sent RAFIEKIAN an invoice to Company A from Company B for $40,000 for "Consultancy Fee Confidence Project," which RAFIEKIAN approved the following day.

36.     On or about October 17, 2016, RAFIEKIAN caused $40,000 to be wire transferred from Company A's U.S. bank account to Company B's bank account in the Netherlands.

37.     On or about November 10, 2016, RAFIEKIAN sent ALPTEKIN an invoice for $200,000 for its third payment under the agreement. In the enclosing email, RAFIEKIAN wrote, "We will process a wire transfer to [Company B] for research and consultation services provided by [Company B] immediately after receipt of the payment for the attached invoice."

38.     On or about November 14, 2016, ALPTEKIN caused $145,000 to be wire transferred from a Turkish bank account in ALPTEKIN's name to Company A's U.S. bank account.

*The Turkish Government's Continuing*
*Direction and Control of "Operation Confidence"*

39.     On approximately a weekly basis during the project, RAFIEKIAN, Person A, and other Company A team members had telephone conference calls with ALPTEKIN to update ALPTEKIN on the progress of the project. ALPTEKIN relayed this information to Turkish officials and informed RAFIEKIAN and Person A whether the Turkish officials were satisfied with the work Company A was performing.

40.     On or about October 22, 2016, Person A sent a text message to the project team, including RAFIEKIAN, saying, "I walked [ALPTEKIN] through the social media analysis which he found very interesting and worth talking to [Turkish Minister #1] about as well as all the other talking points."

### Person A's Op-Ed Urging the
### United States Government To Extradite the Turkish Citizen

41.     On or about September 15, 2016, ALPTEKIN sent RAFIEKIAN a Skype message saying, "[Turkish Minister #1]'s guy in Turkey who is read into project confidence advised me to include an oped that [Company A] would get published under my name."

42.     During a weekly conference call on or about October 7, 2016, in which RAFIEKIAN and ALPTEKIN participated, one or more participants discussed publishing an op-ed concerning the funding for the Turkish citizen's private schools.

43.     On or about October 13, 2016, a Company A employee prepared talking points for Person A to use in discussing the project with ALPTEKIN on a weekly conference call scheduled for the following day.  One talking point said, "We will attempt to have an Op Ed written that links funding, Islamists and the subject et al as Mullahs/Imams."

44.     On or about November 2, 2016, ALPTEKIN complained to RAFIEKIAN that Company A had not publicized enough negative information about the Turkish citizen. ALPTEKIN asked for a "smoking gun," and said that he wanted recorded conversations with unhappy teachers, media coverage of the Turkish citizen, private investigative work targeting the Turkish citizen's supporters, and Congressional hearings about the Turkish citizen and his charter schools.

45.     On or about the same day, November 2, 2016, RAFIEKIAN sent an email to ALPTEKIN enclosing a draft of an op-ed piece that RAFIEKIAN had written urging the Turkish citizen's extradition. In the email, RAFIEKIAN said, "A promise made is a promise kept."

46.     RAFIEKIAN's draft op-ed contained the same "apple tree" comparison of Khomeini and the Turkish citizen that RAFIEKIAN had used in his email to ALPTEKIN when the project was still called the "Truth campaign" (paragraph 13); and in the "playbook" when RAFIEKIAN referred to the Turkish citizen as "X" (paragraph 23); and in the "Background and Talking Points" that RAFIEKIAN prepared for ALPTEKIN and others just before the "high level" meeting in New York with the Turkish cabinet members (paragraph 27).

47.     On or about November 3, 2016, RAFIEKIAN wrote to Person A, "I asked [the editor] to review and edit my 1000 word draft to make sure it is tight before I send it out to you. The plan is to go out with the piece on Monday."

48.     On or about November 4, 2016, RAFIEKIAN emailed ALPTEKIN about the op-ed, saying, "I just left [Person A]. The arrow has left the bow! . . . This is a very high profile exposure one day before the election." Attached to the email was a draft of the op-ed, which argued that the United States should not provide "safe haven" to the Turkish citizen.

49.     On or about November 5, 2016, ALPTEKIN emailed RAFIEKIAN, saying, "[Person A] is right on target."

50.     On or about November 8, 2016, an op-ed titled *Our Ally Turkey Is in Crisis and Needs Our Support* was published in the newspaper *The Hill* and on its website. Person A was listed as the op-ed's author. The op-ed blamed the Turkish citizen for the July 15, 2016, attempted coup and urged the U.S. government to deny the Turkish citizen refuge in the United

States. The op-ed contained the same "apple tree" comparison of Khomeini and the Turkish citizen that RAFIEKIAN had used before:

| Rafiekian's Email August 4, 2016 | Talking Points September 18, 2016 | Rafiekian Draft Op-Ed November 2, 2016 | Person A's Op-Ed November 8, 2016 |
|---|---|---|---|
| A soft spoken cleric sitting under an apple tree in Neauphle-le-Chateau in France looked so harmless. Spoke of equality and spirituality . . . . | In 1978, a soft-spoken, gray beard elderly Shia cleric sat under an apple tree in Neauphle-Le-Chateau near Paris. He claimed that he was a man of God, set out to topple a dictator. . . . Washington believed the Ayatollah. | We all remember another quiet bearded cleric who sat under an apple tree in Neauphle-Le-Chateau in the suburbs of Paris in 1978. He claimed to be a man of God who wanted to topple a dictator . . . . Washington believed him. | We all remember another quiet, bearded, elder cleric who sat under an apple tree in Neauphle-Le-Chateau in the suburbs of Paris in 1978. He claimed to be a man of God who wanted to topple a dictator . . . . Washington believed him. |

*False Statements and Omissions by RAFIEKIAN and ALPTEKIN to Company A's Attorneys*

51.　　Following Person A's op-ed, the FARA Registration Unit of the U.S. Department of Justice (the "FARA Unit") sent a letter to Person A requesting additional information to determine whether Person A, Company A, and/or other individuals had an obligation to register as an agent of a foreign government under the Foreign Agents Registration Act ("FARA").

52.　　From approximately January 2017 through approximately March 2017, outside attorneys for Company A gathered information to determine whether Company A or any of its employees had an obligation to register under FARA based upon Company A's work on "Operation Confidence." During this process, RAFIEKIAN and ALPTEKIN knowingly provided false information to Company A's attorneys in an effort to hide from the attorneys – and ultimately from the FARA Unit – the involvement of Turkish government officials in the project.

53.　　Among other things, RAFIEKIAN falsely told Company A's attorneys that:

13

    a.     The meeting on or about September 19, 2016 in New York City had nothing to do with Project Confidence, and instead was in furtherance of an abandoned "Project Truth" that was distinct from Project Confidence;

    b.     There were no other contacts with Turkish government officials regarding the project;

    c.     The op-ed was Person A's own idea, and he wrote it on his own behalf, and unrelated to the project;

    d.     ALPTEKIN did not want the op-ed to be published; and

    e.     Payments from Company A to Company B were refunds for lobbying and public relations work that Company A did not perform.

54.    Attorneys for Company A also solicited information from ALPTEKIN for use in the FARA filings. Through his own attorneys, ALPTEKIN falsely told Company A's attorneys that:

    a.     ALPTEKIN had not been consulted on the op-ed, and that he would have opposed it if he had been consulted; and

    b.     The project was done on behalf of an Israeli company that owned a share in a natural gas consortium seeking to do business in Turkey.

55.    On or about March 7, 2017, RAFIEKIAN and ALPTEKIN caused to be made the following false statements of material fact in documents filed with and furnished to the Attorney General under the provisions of FARA, and omitted the following material facts necessary to make the statements therein not misleading. RAFIEKIAN reviewed the filings and provided comments to Company A's attorneys before the filings were submitted, but did not request that any of these false statements be changed.

*False Statements and Omissions by RAFIEKIAN and ALPTEKIN*
*in Company A's FARA Registration Statement*

56.     Paragraph 7:   "List every foreign principal for whom the registrant is acting or

has agreed to act."

        Response:     "[Company B]"

This response falsely stated a material fact, omitted a material fact required to be stated in the

Registration Statement, and omitted a material fact necessary to make the statements in the

Registration Statement not misleading, in that it failed to list the Government of Turkey, Senior

Turkish Leader #1, Senior Turkish Leader #2, Turkish Minister #1, Turkish Minister #2, or

Turkish Minister #3.

57.     Paragraph 8:   "[W]ill you engage or are you engaging now in activity on your

own behalf which benefits any . . . of your foreign principals?"

        Response:     "[D]uring the course of the engagement and thereafter, [Company
                      A] officials (particularly [Person A], in his capacity as a public
                      figure separate from [Company A]) frequently wrote, spoke, or
                      provided interviews relating to national security. Although not
                      undertaken at the direction of any foreign principal, including but
                      not limited to [Company B], it is possible that such activities may
                      have had an indirect benefit to [Company B]."

This response falsely stated a material fact, omitted a material fact required to be stated in the

Registration Statement, and omitted a material fact necessary to make the statements in the

Registration Statement not misleading, in that:

        a.      It failed to list as foreign principals the Government of Turkey,

        Senior Turkish Leader #1, Senior Turkish Leader #2, Turkish Minister #1,

        Turkish Minister #2, or Turkish Minister #3.

        b.      It stated that Person A's activities were undertaken as a public

        figure separate from Company A, when in fact they were undertaken as part of

15

Company A's agreement with Company B and on behalf of the Government of Turkey or the Turkish officials listed above.

    c.    It stated that Person A's activities were not undertaken at the direction of any foreign principal, when in fact they were undertaken at the direction of the Government of Turkey or the Turkish officials listed above.

    d.    It stated that Person A's activities were not undertaken at the direction of Company B, when in fact they were undertaken at the direction Company B, as well as the Government of Turkey or the Turkish officials listed above.

    e.    It implied that Person A's activities had only an indirect benefit to Company B, when in fact they were undertaken as part of Company A's agreement with Company B and on behalf of the Government of Turkey or the Turkish officials listed above.

58.    Exhibit A to Company A's FARA Registration Statement falsely stated that "[Company A] does not know whether or the extent to which the Republic of Turkey was involved with its retention by [Company B] for the three-month project."

59.    Paragraph 8(b) of Exhibit A to Company A's FARA Registration Statement falsely stated that the named foreign principal, Company B, was not supervised by a foreign government or other foreign principal.

60.    Paragraph 8(b) of Exhibit A to Company A's FARA Registration Statement falsely stated that the named foreign principal, Company B, was not directed by a foreign government or other foreign principal.

16

*False Statements and Omissions by RAFIEKIAN and ALPTEKIN*
*in Company A's FARA Supplemental Statement*

61.    Paragraph 13: "In addition to the above described activities, if any, have you

engaged in activity on your own behalf which benefits your foreign principal?"

> Response:    "Because of its expertise, [Company A] officials write, speak, and
> give interviews relating to national security. Although not
> undertaken at the direction or control of a foreign principal, it is
> possible that such activities may have an indirect benefit to a
> principal. On his own initiative, [Person A] published an op-ed in
> The Hill on November 8, 2016, that related to the same subject
> matters as [Company A] work for [Company B]. Neither
> [Company B], nor any other person requested or directed
> publication of the op-ed."

*False Statements and Omissions by RAFIEKIAN and ALPTEKIN*
*in the Attachment to Company A's FARA Supplemental Statement*

62.    The Attachment to Company A's FARA Supplemental Statement falsely stated

that "[Company A] understood the engagement to be focused on improving U.S. business

organizations' confidence regarding doing business in Turkey, particularly with respect to the

stability of Turkey and its suitability as a venue for investment and commercial activity."

63.    The Attachment to Company A's FARA Supplemental Statement falsely stated

that the September 19, 2016, meeting in New York with Turkish government officials was "for

the purpose of understanding better the political climate in Turkey at the time, as background for

the project."

COUNT ONE

*Conspiracy – 18 U.S.C. § 371*

THE GRAND JURY FURTHER CHARGES THAT:

1.     The allegations contained in the General Allegations of this Indictment are incorporated here by reference.

2.     From at least July 2016, through at least March 2017, in the Eastern District of Virginia and elsewhere, the defendants,

BIJAN RAFIEKIAN, a/k/a "Bijan Kian"

and

KAMIL EKIM ALPTEKIN,

together with others known and unknown, knowingly and intentionally conspired:

    (a)    To knowingly act and cause others to act in the United States as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951; and

    (b)    To willfully make in a document filed with or furnished to the Attorney General under the provisions of the Foreign Agents Registration Act a false statement of a material fact, and to willfully omit from the document a material fact required to be stated therein, and to willfully omit from the document a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading, in violation of 22 U.S.C. § 618(a)(2).

3.     In furtherance of the conspiracy, the defendants and their co-conspirators performed an act to effect the unlawful object of the conspiracy, that is, the acts and omissions

described in paragraphs 8 through 50 and paragraphs 52 through 63 of the General Allegations of this Indictment.

(In violation of Title 18, United States Code, Section 371)

COUNT TWO

*Acting as an Unregistered Agent of a Foreign Government – 18 U.S.C. § 951*

THE GRAND JURY FURTHER CHARGES THAT:

1.     The allegations contained in the General Allegations of this Indictment are incorporated here by reference.

2.     From approximately July 2016 through approximately March 2017, in the Eastern District of Virginia and elsewhere, the defendants,

BIJAN RAFIEKIAN, a/k/a "Bijan Kian"

and

KAMIL EKIM ALPTEKIN,

knowingly acted and caused others to act in the United States as an agent of a foreign government, that is, the Government of Turkey, without prior notification to the Attorney General, as required by law.

(In violation of Title 18, United States Code, Sections 951 and 2)

COUNTS THREE THROUGH SIX

*False Statements – 18 U.S.C. § 1001(a)(2)*

THE GRAND JURY FURTHER CHARGES THAT:

1.    The allegations contained in the General Allegations of this Indictment are

incorporated here by reference.

2.    On or about May 24, 2017, in the Eastern District of Virginia, defendant KAMIL

EKIM ALPTEKIN, in a matter within the jurisdiction of the executive branch of the Government

of the United States, knowingly and willfully made materially false, fictitious, and fraudulent

statements and representations. In particular, in an interview with the FBI, ALPTEKIN made the

following false statements, each representing a separate count of this Indictment:

COUNT THREE:

> ALPTEKIN falsely stated that Company B retained Company A because another of
> Company B's clients wanted to know what the atmosphere was in Turkey, if Turkey
> would stay aligned with the West, and if the situation between Israel and Turkey would
> get better.

COUNT FOUR:

> After ALPTEKIN told the FBI that he had spoken to Turkish Minister #1 about the need
> for someone to do research and to explain to American policymakers the issues
> concerning the Turkish citizen, ALPTEKIN falsely stated that, although Turkish Minister
> #1 said that he would do something about it, he did not and Turkey dropped the ball.

COUNT FIVE:

> ALPTEKIN falsely stated that after the Turkey government dropped the ball, ALPTEKIN
> decided to retain Company A himself.

COUNT SIX:

> ALPTEKIN falsely stated that the $40,000 payments to Company B from Company A
> were refunds for lobbying and public relations work that were contemplated under the
> contract, but that Company A did not perform.

(In violation of Title 18, United States Code, Section 1001(a)(2))

A TRUE BILL:

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

_____
FOREPERSON OF THE GRAND JURY


G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: _____
James P. Gillis
John T. Gibbs
Assistant United States Attorneys

_____
Evan N. Turgeon
Trial Attorney
Counterintelligence and Export Control Section
National Security Division, U.S. Department of Justice

22