**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | **:** | |
| **BIJAN RAFIEKIAN, et al.** | **:** | |

**DEFENDANT BIJAN RAFIEKIAN'S MOTION TO DISMISS THE INDICTMENT**
**AND EXCLUDE AND SUPPRESS PRIVILEGED INFORMATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND ................................................................................................3
    I.      FLYNN INTEL GROUP..................................................................3
    II.    THE FARA FILING .....................................................................5
    III.   MICHAEL FLYNN'S GUILTY PLEA AND COOPERATION WITH
           THE GOVERNMENT ..................................................................7

ARGUMENT.....................................................................................................16
    I.      "FACTUAL INFORMATION" PROVIDED TO THE GOVERNMENT
           BY FIG, FLYNN, AND/OR COVINGTON WAS PRIVILEGED .......16
    II.    MR. FLYNN'S WAIVER OF PRIVILEGE IS NOT BINDING ON MR.
           RAFIEKIAN ..............................................................................17
    III.   THE GOVERNMENT'S INVASION OF FIG'S ATTORNEY-CLIENT
           PRIVILEGE VIOLATED MR. RAFIEKIAN'S DUE PROCESS RIGHTS.........21
    IV.   THE GOVERNMENT OBTAINED PRIVILEGED INFORMATION
           THROUGH AN ILLEGAL SEARCH AND SEIZURE .......................26
    V.    EVIDENCE RELATING TO MR. RAFIEKIAN'S ALLEGED FALSE
           STATEMENTS TO HIS ATTORNEYS SHOULD BE EXCLUDED
           UNDER FEDERAL RULES OF EVIDENCE 401 AND 403..............30

CONCLUSION...................................................................................................31

# TABLE OF AUTHORITIES

C̲A̲S̲E̲S̲:

*Blackburn v. Alabama*,
    361 U.S. 199 (1960)............................................................................21

*Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*,
    745 F.3d 703 (4th Cir. 2014) ...........................................................31

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018).....................................................................26

*DeMassa v. Nunez*,
    770 F.2d 1505 (9th Cir. 1985) .........................................................26

*In re Allen*,
    106 F.3d 582 (4th Cir. 1997) ...........................................................17

*In re Grand Jury Subpoena*,
    599 F.2d 504 (2d Cir. 1979)..............................................................17

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007).............................................................18

*Interfaith Hous. Del., Inc. v. Town of Georgetown*,
    841 F. Supp. 1393 (D. Del. 1994).............................................18, 19

*Kalisman v. Friedman*,
    2013 WL 1668205 (Del. Ch. Apr. 17, 2013) ..................................18

*Kirby v. Kirby*,
    1987 WL 14862 (Del. Ch. July 29, 1987)........................................18

*Riley v. California*,
    573 U.S. 373 (2014)........................................................................29

*Tenneco Auto. Inc. v. El Paso Corp.*,
    No. CIV.A. 18810-NC, 2001 WL 1456487 (Del. Ch. Nov. 7, 2001)....................................18

*United States v. Bauer*,
    132 F.3d 504 (9th Cir. 1997) ...........................................................19

*United States v. David*,
    943 F. Supp. 1403 (E.D. Va. 1996) .................................................28

*United States v. Hastings*,
    461 U.S. 499 (1983)........................................................................20

*United States v. Haynes*,
216 F.3d 789 (9th Cir. 2000) ...........................................................................19, 24

*United States v. Jarrett*,
338 F.3d 339 (4th Cir. 2003) ............................................................................26, 27

*United States v. Marshank*,
777 F. Supp. 1507 (N.D. Cal. 1991) ......................................................................24

*United States v. Newton*,
510 F.2d 1149 (7th Cir. 1975) ..............................................................................26

*United States v. Nieves*,
No. Cr. 97-46-1, 1997 WL 447992 (E.D. Pa. July 24, 1997) .................................21

*United States v. Rafiekian*,
No. 18-CR-457 (E.D.V.A. Mar. 15, 2019) .................................................9, 22, 24

*United States v. Schell*,
775 F.2d 559 (4th Cir. 1985) ...........................................................................24, 25

*United States v. Segal*,
313 F. Supp. 2d 774 (N.D. Ill. 2004) .....................................................................20

*United States v. Sindona*,
636 F.2d 792 (2d Cir. 1980).................................................................................19

*United States v. (Under Seal)*,
748 F.2d 871 (4th Cir. 1984) ................................................................................17

*United States v. Voigt*,
89 F.3d 1050 (3rd Cir. 1996) ................................................................................21

*United States v. Walther*,
652 F.2d 788 (9th Cir. 1981) ................................................................................26

*Upjohn Co. v. United States*,
449 U.S. 383 (1981).............................................................................................17

<u>STATUTES</u>:

2 U.S.C.
§ 1603................................................................................................................ 5

18 U.S.C.
§ 951................................................................................................................5, 14
§ 1001................................................................................................................1

22 U.S.C.
   § 612...................................................................................................................5
   § 613(h)............................................................................................................5

DEL. CODE ANN. tit. 8 § 275 ....................................................................................4

## OTHER AUTHORITIES:

28 C.F.R. § 5.307 ....................................................................................................5

28 C.F.R. § 73.3(e) ..................................................................................................5

Fed. R. Evid. 401 ...............................................................................................30, 31

Federal Rule of Evidence 403................................................................................31

Defendant Bijan Rafiekian respectfully submits this Memorandum of Law in support of his motion to (1) dismiss sub-paragraph (b) of Count One of the indictment on the grounds of the government's violation of Mr. Rafiekian's Fourth and Fifth Amendment rights, or alternatively (2) exclude and suppress privileged information belonging to Flynn Intel Group, Inc. ("FIG") and Mr. Rafiekian in his capacity as a director of FIG. If the Court determines that factual issues preclude resolution of this motion on the current record, Mr. Rafiekian respectfully requests that the Court hold an evidentiary hearing in order to take testimony and otherwise establish the facts and evidence relevant to this motion.

## PRELIMINARY STATEMENT

Sub-paragraph (b) of Count One of the indictment charges that Mr. Rafiekian conspired to file false documents pursuant to the Foreign Agents Registration Act ("FARA"). The retroactive FARA registration filed by Flynn Intel Group ("FIG") on March 7, 2017 (the "FARA Filing"), however, was prepared entirely by attorneys with the law firm Covington & Burling ("Covington"), who represented FIG. To overcome this obstacle to its goal of indicting Mr. Rafiekian, the government needed to develop evidence that Mr. Rafiekian gave inaccurate information to Covington in connection with the FARA Filing. The problem facing the government in this effort, however, was that all of Mr. Rafiekian's communications with Covington were subject to the attorney-client privilege.

The government found its solution in Michael Flynn. Mr. Rafiekian and Mr. Flynn comprised the entire board of directors of FIG, were the only two corporate officers, and together owned substantially all of the stock of the company. Mr. Flynn had, by that time, pled guilty to a violation of 18 U.S.C. § 1001 and entered into a plea agreement that required his cooperation

with the government.  Mr. Flynn's defense lawyers were also the same Covington lawyers who had advised Mr. Rafiekian in connection with the FARA Filing.

So in June 2018, as part of his agreement to cooperate with the government, Mr. Flynn purported to cause FIG to waive the attorney-client privilege for several categories of information relevant to the government's investigation.  Two months before, in April 2018, Mr. Flynn executed a declaration to the Delaware Secretary of State that falsely stated that the board of directors and the shareholders of FIG had met and acted to dissolve FIG as required by Delaware law.  No such corporate proceedings ever took place.  Mr. Rafiekian was never informed about the request for a waiver of the privilege by FIG and never consented to the waiver.

Mr. Rafiekian has an equal right to assert the corporate attorney-client privilege and never waived that privilege.  Accordingly, he may continue to assert the privilege with respect to his communications with Covington and that privileged information should be excluded from presentation by the government at trial.  In addition, because the waiver of privilege was wrongfully obtained, the Court should suppress all evidence derived from the wrongful waiver.

Resolution of this motion requires a straightforward application of the attorney-client privilege in the context of joint clients.  In its April 9, 2018 order denying Covington's and Kristen Verderame's motions to quash, the Court held that Mr. Flynn and Mr. Rafiekian, in their capacities as directors of FIG, were joint clients of Covington.  The Court therefore held that Mr. Flynn and FIG could not assert the attorney-client privilege to exclude Mr. Rafiekian from accessing privileged documents in Covington's possession belonging to FIG.

This motion presents the companion question:  Whether a waiver of privilege by one joint client operates as a waiver of privilege with respect to another joint client who did not consent to

the waiver.  Under Delaware law (the jurisdiction in which FIG was incorporated), the answer is no.  Mr. Flynn's secret waiver of privilege on behalf of FIG, in response to the government's solicitation of that waiver for the specific purpose of pursuing its case against Mr. Rafiekian, does not strip Mr. Rafiekian of his legal rights.  While this wrong cannot be made right, Mr. Rafiekian may properly assert the privilege and preserve the confidentiality of his written and oral communications with Covington in connection with trial in this case.

The government's use of privileged information at trial would also be a grave violation of Mr. Rafiekian's Fifth Amendment due process right and Fourth Amendment right to be free from unreasonable searches and seizures.  By leveraging threats of prosecution and jail time over Mr. Flynn, memorialized in his cooperation agreement, the government deliberately invaded FIG's attorney-client privilege with the hope of using privileged information in its case against Mr. Rafiekian.  Moreover, Mr. Flynn effected the waiver *at the government's request and for the express purpose of aiding the government*—acting in every respect as an agent of the government in connection with the waiver.

The attorney-client privilege is vital to the observance of law and administration of justice and cannot be so casually tossed aside by government prosecutors in collaboration with clearly conflicted defense lawyers.  Under well-settled evidentiary and constitutional principles, this evidence must be excluded and/or suppressed.  The deliberate nature of the government's conduct, moreover, requires dismissal of sub-paragraph (b) of Count One of the indictment.

## BACKGROUND

### I.  FLYNN INTEL GROUP

FIG was a closely held corporation organized under Delaware law in June 2015.  From and after November 6, 2016, and at all relevant times, Mr. Flynn and Mr. Rafiekian were the sole

directors of FIG. Mr. Flynn also served as FIG's Chief Executive Officer, while Mr. Rafiekian served as its President, Secretary, and Treasurer. Mr. Flynn and Mr. Rafiekian were the two principal shareholders and were, in effect, co-owners of the business.

With the election of Donald Trump on November 8, 2016 and the appointment of Mr. Flynn as National Security Advisor designate for the incoming administration, FIG discontinued operations. In April 2018, Mr. Flynn effected the dissolution of FIG through a fraudulent declaration and certificate of dissolution prepared by Kristen Verderame, another lawyer representing FIG who at all times worked in close collaboration with Covington. In that declaration and certificate of dissolution, which was filed with the Delaware Secretary of State, Mr. Flynn falsely attested that the dissolution was "duly authorized by the Board of Directors and Stockholders in accordance with subsections (a) and (b) of Section 275 or by unanimous consent of Shareholders in accordance with section (c) of Section 275" of Delaware's General Corporation code.[1] Contrary to Mr. Flynn's attestation, there was no action by the board of

---

[1] Ex. A, FIG Certificate of Dissolution. The relevant subsections of Section 275 are as follows:

(a) If it should be deemed advisable in the judgment of the board of directors of any corporation that it should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution to be mailed to each stockholder entitled to vote thereon as of the record date for determining the stockholders entitled to notice of the meeting.

(b) At the meeting a vote shall be taken upon the proposed dissolution. If a majority of the outstanding stock of the corporation entitled to vote thereon shall vote for the proposed dissolution, a certification of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.

(c) Dissolution of a corporation may also be authorized without action of the directors if all the stockholders entitled to vote thereon shall consent in writing and a certificate of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.

DEL. CODE ANN. tit. 8 § 275.

directors or stockholders to dissolve the corporation.  Neither FIG nor Mr. Flynn gave any notice to Mr. Rafiekian or any other officer or shareholder of this proposed action.

## II.     THE FARA FILING

In September 2016, acting on advice of a prior counsel, FIG filed a registration under the Lobbying Disclosure Act ("LDA"), which requires certain lobbyists to register with the Secretary of the Senate and Clerk of the House of Representatives.  *See* 2. U.S.C. § 1603.  A related statute, the Foreign Agents Registration Act ("FARA"), also requires that persons acting as agents of a foreign government register with the Attorney General under certain circumstances.  *See* 22 U.S.C. § 612.  FARA exempts from its registration requirements foreign agents who are lobbying and who have registered under the LDA.  *See* 22 U.S.C. § 613(h).  This exemption is not available, however, if a foreign government or political party is the "principal beneficiary" of the foreign agent's work.  *See* 28 C.F.R. § 5.307.  Relying on advice of Robert Kelley, an attorney experienced with the LDA and FARA who would become FIG's general counsel, FIG determined that registration under the LDA rather than under FARA was proper.[2]

In December 2016, shortly after the publication of an op-ed under Mr. Flynn's name, the Department of Justice unit responsible for enforcing FARA requested information to determine whether FIG had an obligation to register under FARA.  Mr. Flynn, on behalf of FIG and at the recommendation of Ms. Verderame, contacted attorneys at Covington in late December 2016 for legal representation in responding to the inquiry.  On January 9, 2017, Covington issued an

---

[2] Mr. Rafiekian is charged for failing to give notice to the Attorney General under 18 U.S.C. § 951 and has not been charged for failing to register under FARA.  However, a filing under FARA constitutes sufficient notice under Section 951.  28 C.F.R. § 73.3(e)  ("Notification under 18 U.S.C. § 951 shall be effective only if it has been done in compliance with this section, or if the agent has filed a registration under the Foreign Agents Registration Act . . . .").

engagement letter undertaking to "provide Foreign Agents Registration Act Advice" to FIG, which was countersigned by Mr. Flynn on behalf of FIG.[3]

At the same time, Mr. Flynn also engaged Covington in his *personal* capacity in connection with the FARA matter. Covington has continued to represent Mr. Flynn personally through the entirety of the Special Counsel's investigation, negotiated his plea agreement, appeared as his counsel at his first sentencing hearing, and evidently continues to represent Mr. Flynn as criminal defense counsel to this day. ████████████████████

████████████████ :

████████████████████████████████
███████████████████████████████
███████████████████████████████
████████████████████████████████████
███████████████████████████████████
███████████████████████

████████

Beginning in January 2017, Covington reviewed FIG's corporate records and interviewed FIG officers and employees—including Mr. Rafiekian. The objective of this work was to determine whether FIG was required register under FARA for work performed by the company over a three-month period in the fall of 2016 for Inovo, BV ("Inovo"), a Dutch company owned by co-defendant Ekim Alptekin, a private Turkish citizen. At the request of Mr. Flynn, in January and February 2017, Mr. Rafiekian contributed a total of $55,000 of his personal funds to pay for FIG's ongoing expenses, including for Covington's legal fees.

On March 7, 2017, after conducting its investigation, Covington filed retroactive FARA registration forms for FIG for the work performed on behalf of Inovo. When preparing and filing

---

█ ███████████████████████████████████████
██████████████████████████████

the FARA registration for FIG, Covington *did not* say that the reason for the registration was a determination that FIG was acting as an agent for a foreign government. Instead, Covington explained that FIG's work with Inovo, a private entity, "could be construed to have principally benefitted the Republic of Turkey." If true, the FARA exemption that otherwise would have applied when FIG registered under the LDA would not have been available. For that reason, Covington determined that the safer course—"[t]o eliminate any potential doubt"—was to register under FARA, in lieu of FIG's prior LDA registration.[4]

## III. MICHAEL FLYNN'S GUILTY PLEA AND COOPERATION WITH THE GOVERNMENT

On December 1, 2017, Mr. Flynn pled guilty to lying to the FBI about his contacts with Russian officials. Covington served as his sole defense counsel in the negotiation of his plea agreement and entry of this guilty plea. The cooperation and plea agreement signed by Mr. Flynn (the "Cooperation Agreement")[5] mandates his cooperation with the government in its ongoing investigations and prosecutions, including the present matter. The scope of Mr. Flynn's required cooperation is broad and is described at length in the Cooperation Agreement:

- "[Mr. Flynn] *shall cooperate fully*, truthfully, completely, and forthrightly with this Office and other Federal, state, and local law enforcement authorities identified by this Office in any and all matters as to which this Office deems the cooperation relevant." Cooperation Agreement ¶ 8(a) (emphasis added).

- "[Mr. Flynn] shall promptly turn over to this Office, or other law enforcement authorities, or direct such law enforcement authorities to, *any and all evidence of crimes about which your client is aware*." Cooperation Agreement ¶ 8(b) (emphasis added).

- "[Mr. Flynn] acknowledges and understands that, during the course of the cooperation outlined in this Agreement, your client will be interviewed by law

---

[4] *See* Ex. D, Letter from Robert K. Kelner (Partner, Covington & Burling LLP) to Heather Hunt (Chief, Foreign Agent Registration Act Unit) (Mar. 7, 2017).

[5] Ex. E (Cooperation Agreement).

enforcement agents and/or Government attorneys."  Cooperation Agreement
¶ 8(d).

- "[Mr. Flynn] shall testify fully, completely and truthfully before any and all Grand
  Juries in the District of Columbia and elsewhere, and at any and all trials of cases
  or other court proceedings in the District of Columbia and elsewhere, at which
  your client's testimony may be deemed relevant by the Government."
  Cooperation Agreement ¶ 8(e).

Mr. Flynn is entitled to significant benefits if he fully complies with the Cooperation Agreement.

The agreement requires the government to consent to the suitability of a reduced sentence and to

move for a further downward departure in Mr. Flynn's sentence if he gives substantial assistance

to the government and otherwise complies with the agreement:

- "The Government agrees that a 2-level reduction will be appropriate, pursuant to
  U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of
  responsibility, to the satisfaction of the Government, *through your client's
  allocution, adherence to every provision of this Agreement, and conduct between
  entry of the plea and imposition of sentence*."  Cooperation Agreement ¶ 4(B)
  (emphasis added).

- "The Government will bring to the Court's attention at the time of sentencing the
  nature and extent of your client's cooperation or lack of cooperation.  The
  Government will evaluate the full nature and extent of your client's cooperation to
  determine whether your client has provided substantial assistance in the
  investigation or prosecution of another person who has committed an offense.  If
  the Government determines that your client has provided such substantial
  assistance, *this Office shall file a departure motion pursuant to Section 5K1.1 of
  the Sentencing Guidelines, which would afford your client an opportunity to
  persuade the Court that your client should be sentenced to a lesser period of
  incarceration and/or fine than indicated by the Sentencing Guidelines*."
  Cooperation Agreement ¶ 12.

At the same time, the Cooperation Agreement imposes serious penalties for Mr. Flynn if he fails

to cooperate "completely" with the government, including additional criminal charges or jail

time:

- "Any refusal by your client to cooperate fully, truthfully, completely, and
  forthrightly as directed by this Office and other Federal, state, and local law
  enforcement authorities identified by this Office in any and all matters in which
  this Office deems your client's assistance relevant will constitute a breach of this
  Agreement by your client, and will relieve this Office of its obligations under this

Agreement, *including, but not limited to, its obligation to inform this Court of any assistance your client has provided*." Cooperation Agreement ¶ 8(a) (emphasis added).

- "Your client understands and agrees that, if after entering this Agreement, your client *fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement* . . . , your client will have breached this Agreement. In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Agreement . . . ." Cooperation Agreement ¶ 11.

The Cooperation Agreement thus provides both a carrot and stick to ensure Mr. Flynn's complete cooperation with the government's investigation and now prosecution of Mr. Rafiekian. And cooperate he did, as his Covington lawyers candidly acknowledged in their earlier motion to quash the subpoena issued to that law firm for documents relating to the FIG and the FARA filings.[6]

Mr. Flynn's guilty plea was entirely unrelated to FIG or Mr. Rafiekian—rather, he pled guilty to lying to the FBI about his contacts with Russian officials in December 2016. There was nothing about this charge that put him in conflict with FIG or with Mr. Rafiekian. The government, however, was not satisfied and insisted that Mr. Flynn also attest, in connection with his guilty plea, that FIG had made false statements in the FARA Filing.

By the time Covington negotiated the terms of Mr. Flynn's plea agreement in November 2017, Mr. Flynn's personal legal interests sharply deviated from FIG's interests. The Covington

---

[6] Non-Party Covington & Burling's Motion to Quash in Part ("Covington MTQ Br.") at 2, *United States v. Rafiekian*, No. 18-CR-457 (E.D.V.A. Mar. 15, 2019) [ECF No. 76]("[Flynn] cooperated extensively with the Special Counsel's Office, and, pursuant to his plea agreement, he continues to cooperate with the U.S. Attorney's Office in connection with this criminal case.")

lawyers—representing both FIG and Mr. Flynn—faced the most fundamental conflict of interest. Covington's engagement letter anticipated these circumstances and stated that if a conflict between FIG and Mr. Flynn arose, Covington would terminate its relationship with FIG in order to continue to represent Mr. Flynn. That never happened. Instead, Covington continued simultaneously to represent both FIG and Mr. Flynn personally—dual roles that the law firm continues to play to this date.

Rather than push back and insist that the government's version of facts was inaccurate (which it was), Mr. Flynn gratuitously accepted the government's version of facts relating to the FARA Filing and executed a Statement of Offense stating that the FARA Filing contained several false statements.[7] Whatever benefits accepting the government's version of events may have had for Mr. Flynn personally, that narrative unquestionably was adverse to FIG's interests. In other words, for the benefit of one client (Mr. Flynn), Covington negotiated and presumably urged Mr. Flynn to embrace and attest to a statement of facts sufficient to convict another client (FIG) of a serious crime. Yet because Mr. Flynn himself was not being charged with making these false

---

[7] Flynn's Statement of Offense, filed at the time of his guilty plea on December 1, 2017, includes the following allegations in the final paragraph:

> *Other False Statements Regarding FLYNN's Contacts with Foreign Governments*
>
> 5. On March 7, 2017 FLYNN filed multiple documents with the Department of Justice pursuant to the Foreign Agents Registration Act ("FARA") pertaining to a project performed by him and his company, the Flynn Intel Group, Inc. ("FIG"), for the principal benefit of the Republic of Turkey ("Turkey project"). In the FARA filings, Flynn made materially false statements and omissions, including by falsely stating that (a) FIG did not know whether or the extent to which the Republic of Turkey was involved in the Turkey project, (b) the Turkey project was focused on improving U.S. business organizations' confidence regarding doing business in Turkey, and (c) an op-ed by Flynn published in *The Hill* on November 8, 2016 was written at his own initiative; and by omitting that officials from the Republic of Turkey provided supervision and direction over the Turkey project.

Ex. C.

statements, he had no incentive to ensure that the government's version of events was even accurate.

The evidence will show that the government's version of the facts as set forth in the Statement of Offense, which Mr. Flynn adopted, is plainly a concoction. In the Statement of Offense, the government and Mr. Flynn represented that the FARA filings states that "FIG did not know whether or the extent to which the Republic of Turkey was involved *in the Turkey project*." Nowhere in FIG's FARA filings will the court find such a statement. Instead, the FARA Filing states that "Flynn Intel Group does not know whether or the extent to which the Republic of Turkey was involved *with its retention by Inovo for the three month project.*"[8] Because FIG was retained by Inovo by September 8, 2016, and the so-called "Turkey project" continued until after November 8, 2016, this difference is significant and material. The assertion by the government and Mr. Flynn as a "fact" of something that is so demonstrably false shows (a) the government's determination to build a criminal case against Mr. Rafiekian without particular reference to the evidence, (b) Mr. Flynn's willingness to agree to whatever narrative the government wanted in order to save his own skin, and (c) Covington's open and willing participation in fostering a criminal case implicating one client (FIG) in a serious crime for the benefit to another client (Mr. Flynn).

Some six months after Mr. Flynn's guilty plea, the government requested that Mr. Flynn waive FIG's attorney-client privilege so that it could pursue its investigation targeting Mr. Rafiekian. By this time, Mr. Rafiekian had engaged his own counsel, Robert Trout, and Mr.

---

[8] Ex. D, FARA Filing, at Ex. A at 3. FIG's FARA Filing goes on to add: "Flynn Intel Group is aware that Mr. Alptekin consulted with officials of the Republic of Turkey regarding potential work by Flynn Intel Group, and Mr. Alptekin introduced officials of the Republic of Turkey to Flynn Intel Group officials at a meeting on September 19, 2016 in New York." *Id.*.

Trout was in contact with government attorneys in connection with their investigation of Mr. Rafiekian.  Yet neither Mr. Rafiekian nor Mr. Trout were ever contact by the government in connection with this sought-after waiver.



Here again, a clear conflict was presented between Covington's representation of Mr. Flynn and the law firm's representation of FIG, which at all relevant times was controlled not solely by Mr. Flynn but jointly by Mr. Flynn and Mr. Rafiekian, as FIG's only two directors.[10]

In a letter of June 13, 2018 to the government ("Waiver Letter"), Covington conveyed the decision of Mr. Flynn, on behalf of FIG, to waive FIG's attorney-client privilege with respect to the areas of inquiry of interest to the government.[11]  FIG had not been operational since

---

[9] ████████████████████████████

[10] As noted, by this time, FIG had filed a certificate of dissolution fraudulently attesting that the board of directors or shareholders of FIG had met and acted to dissolve the company in accordance with Delaware law.  Even if this fraudulent dissolution was effective, it was nevertheless wrongful, and any subsequent waiver of privilege was also wrongful.  If the dissolution was ineffective, then the company should be deemed to continue, in which case Mr. Flynn was fundamentally conflicted from participating in any waiver of privilege that benefited him personally.

[11] Ex. G, Letter from R. Kelner to J. Gillis dated June 13, 2018 ("Waiver Letter").

November 2016, and by April 2018, FIG was formally (if fraudulently) dissolved. Covington's Waiver Letter made clear that the decision to waive privilege was rooted entirely in the government's request for Mr. Flynn's "cooperation pursuant to his plea and cooperation agreement with the Special Counsel's Office."[12] Nowhere in that letter is there any suggestion that Mr. Flynn or his counsel considered the best interests of the (fraudulently) dissolved FIG. Under the circumstances, one cannot take seriously Covington's recent claim that Mr. Flynn waived FIG's attorney-client privilege "in the interest of FIG because FIG was subject to prosecution at the time."[13]

As set forth in the Waiver Letter, FIG agreed to waive privilege with respect to the following categories of information:

1. A "declaration obtained from [FIG's] former General Counsel, Robert Kelley" regarding FIG's decision to file under the LDA rather than FARA in September 2016 and "advice that Robert Kelley provided to FIG concerning whether or not it was required to register under FARA."

2. As to Robert Kelley and his deputy, Thomas Spencer, "any legal advice they provided to FIG concerning registration under FARA and/or LDA."

3. "With respect to FIG's January 13, 2017 letter to the FARA Registration Unit and its March 7, 2017 FARA filing, [the government] could ask questions to General Flynn concerning the contents of those submissions and factual information he or others shared or did not share with Covington & Burling lawyers who were working on preparation of the letter and subsequent filing."

4. With regard to Covington, the waiver encompassed "factual representations made to counsel, in connection with preparation of FIG's FARA filing"; "the sources of such factual representations"; "factual information concerning who (other than counsel) reviewed drafts of the FARA filing"; "factual information concerning any comments or corrections or questions made by people who reviewed drafts of the FARA filing (other than counsel) concerning the filing"; and "[w]hen, how, and in what form counsel received communications from FIG personnel concerning the content of the FARA filing."

---

[12] *Id*. at 1.
[13] Hearing Tr. Mar. 29, 2019, at 12:19-21.

5. Bijan Kian's August 2016 contact with "Covington & Burling to explore whether to retain Covington to provide advice concerning FARA."[14]

Although Mr. Rafiekian had previously agreed to waive the privilege with respect to advice from Robert Kelley, he knew nothing about the government's request for a waiver with regard to Covington, and he never consented to any such waiver. Following the waiver, the government interviewed Covington attorneys at length on the privileged topics. Now, the government hopes to use evidence obtained from those interviews with the active participation of Covington as trial evidence against Mr. Rafiekian.

## IV.    THE INDICTMENT

On December 18, 2018, the government indicted Mr. Rafiekian. Count One of the Indictment alleges that Mr. Rafiekian conspired (a) to act as an agent of Turkey without prior notification to the Attorney General and (b) to willfully make false statements in, and omissions of material fact from, the FARA Filing. Indictment at 17-18. Count 2 alleges that Mr. Rafiekian acted as an agent of Turkey without prior notification to the Attorney General in violation of 18 U.S.C. § 951. Indictment at 19.

This motion concerns the allegedly false statements at issue in sub-paragraph (b) of Count One. The government contends that Mr. Rafiekian caused these false statements by "knowingly provid[ing] false information to [FIG's] attorneys in an effort to hide from the attorneys—and ultimately from the FARA Unit—the involvement of Turkish government officials in the project." Indictment ¶ 52. In particular, the Indictment at ¶ 53 alleges that Mr. Rafiekian falsely told FIG's attorneys that:

a. "[A] meeting on or about September 19, 2016 in New York City [between members of FIG and the Turkish government] had nothing to do with

---

[14] Waiver Letter at 1-2.

Project Confidence, and instead was in furtherance of an abandoned 'Project Truth' that was distinct from Project Confidence";

b. "There were no other contacts with Turkish government officials regarding the project";

c. "The op-ed was [Mr. Flynn's] own idea, and he wrote it on his own behalf, and unrelated to the project";

d. "ALPTEKIN did not want the op-ed to be published"; and

e. "Payments from Company A to Company B were refunds for lobbying and public relations work that Company A did not perform."

These allegations could only have been derived from FIG's improper waiver of privilege and the government's interviews of FIG's attorneys at Covington.

The government apparently hopes to use Mr. Rafiekian's statements to FIG's attorneys as evidence of intent to cause false statements in the FARA Filings. Critically, however, Mr. Rafiekian's alleged statements to his attorneys bear little (if any) relation to the purportedly false statements in the FARA Filing, set forth below:

56. Paragraph 7: "List every foreign principal for whom the registrant is acting or has agreed to act."

Response: "[Inovo]"

57. Paragraph 8: "[W]ill you engage or are you engaging now in activity on your own behalf which benefits any . . . of your foreign principals?"

Response: "[D]uring the course of the engagement and thereafter, [FIG] officials (particularly [Mr. Flynn], in his capacity as a public figure separate from [FIG]) frequently wrote, spoke, or provided interviews relating to national security. Although not undertaken at the direction of any foreign principal, including but not limited to [Inovo], it is possible that such activities may have had an indirect benefit to [Inovo]."

58. Exhibit A to [FIG's] FARA Registration Statement falsely stated that "[FIG] does not know whether or the extent to which the Republic of Turkey was involved with its retention by [Inovo] for the three-month project."

59. Paragraph 8(b) of Exhibit A to [FIG's] FARA Registration Statement falsely stated that the named foreign principal, Company B, was not supervised by a foreign government or other foreign principal.

60. Paragraph 8(b) of Exhibit A to Company A's FARA Registration Statement falsely stated that the named foreign principal, Company B, was not directed by a foreign government or other foreign principal.

61. Paragraph 13: "In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits your foreign principal?"

    Response: "Because of its expertise, [FIG] officials write, speak, and give interviews relating to national security. Although not undertaken at the direction or control of a foreign principal, it is possible that such activities may have an indirect benefit to a principal. On his own initiative, [Mr. Flynn] published an op-ed in The Hill on November 8, 2016, that related to the same subject matters as [FIG's] work for [Inovo]. Neither [Inovo], nor any other person requested or directed publication of the op-ed."

62. The Attachment to Company A's FARA Supplemental Statement falsely stated that "[FIG] understood the engagement to be focused on improving U.S. business organizations' confidence regarding doing business in Turkey, particularly with respect to the stability of Turkey and its suitability as a venue for investment and commercial activity."

63. The Attachment to Company A's FARA Supplemental Statement falsely stated that the September 19, 2016, meeting in New York with Turkish government officials was "for the purpose of understanding better the political climate in Turkey at the time, as background for the project."

For the reasons discussed below, privileged information obtained by the Government pursuant to the Waiver Letter should at a minimum be excluded or suppressed. Moreover, given the government's deliberate scheme to invade Mr. Rafiekian's privileged communications with FIG's attorneys, sub-paragraph (b) of Count One of the Indictment should be dismissed.

## ARGUMENT

## I. "FACTUAL INFORMATION" PROVIDED TO THE GOVERNMENT BY FIG, FLYNN, AND/OR COVINGTON WAS PRIVILEGED

There can be no dispute that the Waiver Letter effected breached the attorney-client privilege, notwithstanding the fact that the letter purported to limit certain facets of the waiver to "factual" information. It is axiomatic that the attorney-client privilege extends beyond mere legal advice. The purpose of the privilege is "to encourage full and frank communication

between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). For this reason, the privilege protects not just a lawyer's legal analysis, but also "*the substance of communications made in confidence by a client to his attorney*." *United States v. (Under Seal)*, 748 F.2d 871, 874 (4th Cir. 1984) (emphasis added); *see also Upjohn*, 449 U.S. at 390 (noting that the privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); *In re Allen*, 106 F.3d 582, 603 (4th Cir. 1997) ("*Upjohn* made clear that fact finding which pertains to legal advice counts as professional legal services.") (internal quotation marks omitted) (citing *In re Grand Jury Subpoena*, 599 F.2d 504, 510 (2d Cir. 1979) (investigation by Covington, retained to investigate and provide legal advice based on that investigation, "trigger[s] the attorney-client privilege")) (alteration in original). Any communications between Mr. Rafiekian and Covington relating to FARA—including any so-called "factual" representations made by Mr. Rafiekian in that context—are squarely within the scope of the privilege.

## II. MR. FLYNN'S WAIVER OF PRIVILEGE IS NOT BINDING ON MR. RAFIEKIAN

This Court has already held that FIG, Mr. Flynn, and Mr. Rafiekian were joint clients of Covington, and therefore Mr. Flynn and FIG could not assert the attorney-client privilege to bar Mr. Rafiekian from viewing privileged information belonging to FIG. Order Denying Motion to Quash ("MTQ Order") at 7, *United States v. Rafiekian* (Apr. 9, 2019) [ECF No. 101] ("[C]ourts have viewed the directors of a corporation, in this case, Rafiekian and Flynn, as the joint clients of the corporation's lawyers, together with the corporate entity itself."); *id.* at 8 ("Flynn's positions as a director or officer do not confer upon him the ability to preclude Rafiekian, FIG's

only other director, access to the same documents he has access to."). This motion presents the

corollary question: Does a waiver of privilege by one joint client operate as a waiver of privilege

by a second joint client who did not consent to the waiver? For reasons similar to those

underlying this Court's denial of Covington's motion to quash, the answer is no.

As joint clients, Mr. Flynn, FIG, and Mr. Rafiekian have "equal rights to the protection of

the privilege." MTQ Order 8 (quoting *Kalisman v. Friedman*, 2013 WL 1668205, at *4 (Del. Ch.

Apr. 17, 2013)). Thus, just as one joint client may not exclude another joint client from

accessing privileged documents, it is well settled that one joint client may not waive privilege on

behalf of the other. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("[A]

client . . . may not . . . unilaterally waive the privilege as to any of the other joint clients'

communications or as to any of its communications that relate to other joint clients.") (applying

Delaware law); *Interfaith Hous. Del., Inc. v. Town of Georgetown*, 841 F. Supp. 1393, 1402 (D.

Del. 1994) ("[W]hen one of two or more clients with common interests waives the attorney-

client privilege in a dispute with a third party, that one individual's waiver does not effect a

waiver as to the others' attorney-client privilege.") (collecting cases); *Tenneco Auto. Inc. v. El

Paso Corp.*, No. CIV.A. 18810-NC, 2001 WL 1456487, at *2 (Del. Ch. Nov. 7, 2001) (holding

that one client could not waive attorney-client privilege on its own as to communication

addressing a common interest shared by both clients); *cf. Kirby v. Kirby*, 1987 WL 14862, at *7

(Del. Ch. July 29, 1987) (holding that with respect to a closely held corporation, the privilege

belonged to both the corporate client and its directors because the directors, collectively, were the

client).

Applying this rule, the result is clear: While Mr. Flynn's breach of FIG's attorney-client

privilege may operate as a waiver with respect to Mr. Flynn himself, it does not limit of Mr.

Rafiekian's right to continue to assert the privilege in his own right. Mr. Rafiekian has an equal right to the privilege and cannot be "forced unwillingly into a waiver" of the privilege based on another client's decision to waive it. *Interfaith Housing*, 841 F. Supp. at 1400. Mr. Rafiekian was never consulted regarding Mr. Flynn's decision with regard to the Waiver Letter and has never waived privilege with respect to those issues. He may continue to assert the privilege and emphatically does so. As a joint client, Mr. Rafiekian had a legitimate right to expect that his communications with Covington were privileged and that the privilege would be respected by Covington. The fact that Covington orchestrated the breach of that privilege—for the benefit of a second client (Mr. Flynn) who had become a government agent and at the behest of government lawyers—does not change this fundamental truth.[15]

As described in detail, *infra*, the government acted improperly and violated Mr. Rafiekian's constitutional rights by deliberately seeking to extract FIG's privileged information and use it to prosecute Mr. Rafiekian. Even in the absence of such misconduct, however, exclusion of privileged information from trial is the appropriate remedy under the Federal Rules of Evidence and common law. *See United States v. Haynes*, 216 F.3d 789, 798 (9th Cir. 2000) (holding that exclusion of privileged information was an appropriate remedy even though the government was vigilant about the privilege and established safeguards to protect privileged information, and government's actions did not constitute a denial of due process); *United States v. Bauer*, 132 F.3d 504, 512 (9th Cir. 1997) (reversing conviction where Defendant's attorney-client privilege was violated when district court allowed his attorney to testify against him at trial); *United States v. Sindona*, 636 F.2d 792, 805 (2d Cir. 1980) (affirming district court's ruling precluding cross-examination of witness based on material obtained from witness's attorney,

---

[15] Mr. Rafiekian's expectation of confidentiality is reinforced by the fact that he paid $55,000 out of his own pocket to cover FIG's legal fees.

notwithstanding absence of official misconduct); *United States v. Segal*, 313 F. Supp. 2d 774, 782 (N.D. Ill. 2004) ("Defendants are entitled to the suppression of all disclosed privileged communications that they can prove are attorney-client privileged," even though "the Government's actions, both independently and when considered on the whole, did not violate Defendants' due process rights").

Exclusion or suppression of privileged evidence is also appropriate pursuant to this Court's inherent supervisory powers. "[G]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hastings*, 461 U.S. 499, 505 (1983) (alteration in original) (citation omitted). "The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct." *Id.* (internal quotation marks omitted).

At the most fundamental level, exclusion of privileged evidence is warranted in the interest of justice. Mr. Rafiekian, as a director of FIG, has a recognized right to assert privilege with respect to his conversations with the Covington lawyers who were serving as counsel to FIG, which would be violated if such conversations were introduced into evidence at trial. The integrity of the judicial system would also be eroded if the government is permitted to introduce transparently privileged information—taken through an orchestrated breach of the client's rights—in its case against Mr. Rafiekian. Lastly, exclusion of the privileged information would deter the government's overzealous and deliberate intrusion into attorney-client privilege. *See*

*United States v. Nieves*, No. Cr. 97-46-1, 1997 WL 447992, at *7 (E.D. Pa. July 24, 1997)

(suppressing privileged evidence under the court's inherent supervisory power).

## III.     THE GOVERNMENT'S INVASION OF FIG'S ATTORNEY-CLIENT PRIVILEGE VIOLATED MR. RAFIEKIAN'S DUE PROCESS RIGHTS

Due process "forbids fundamental unfairness in the use of evidence." *See Blackburn v.*

*Alabama*, 361 U.S. 199, 206 (1960). Courts consider the following factors to determine whether

a Fifth Amendment violation has occurred in connection with the government's intrusion of

attorney-client privilege: "(1) the government's objective awareness of an ongoing, personal

attorney-client relationship between its informant (the attorney) and the defendant; (2) deliberate

intrusion [by the government] into that relationship; and (3) actual and substantial prejudice [to

the defendant]." *United States v. Voigt*, 89 F.3d 1050, 1067 (3rd Cir. 1996). Each element is

present in this case. The government deliberately sought and obtained FIG's confidential

privileged information for the purpose of building a case against Mr. Rafiekian. The methods

included the use of a cooperating convict (Mr. Flynn) seeking to reduce his sentence to authorize

the breach of the privilege and the collaboration of clearly conflicted lawyers purporting to

represent both the cooperator and the principal corporate actor in the investigation. The

introduction and admission of such wrongfully obtained evidence in Mr. Rafiekian's trial would

be fundamentally unfair and a denial of Mr. Rafiekian's due process rights.

First, the government knew that Covington and FIG had an ongoing attorney-client

relationship. If there could be any doubt, the Waiver Letter, which expressly refers to FIG as a

"client" of Covington, confirms it. Waiver Letter at 1 ("The U.S. Attorney's Office . . . has

requested to interview our client, Lt. Gen. (Ret.) Michael T. Flynn, in connection with an

investigation by the USAO regarding the registration by *our client the Flynn Intel Group, Inc.*

("FIG") under the [FARA]." (emphasis added)). The government also cannot deny knowledge

that Mr. Rafiekian, as a director of FIG, was a joint client of Covington in connection with the FARA Filing. To the extent the government claims it lacked knowledge of this fact, it should not be permitted to hide behind its own ignorance of well-settled law holding that directors are joint clients with the corporate entity. *See infra* Part II.

Second, the Waiver Letter also confirms that the government's invasion of FIG's privilege was deliberate, not inadvertent. The Waiver Letter explains that Mr. Flynn caused FIG to waive privilege *at the request of the government*. Waiver Letter at 1 ("In connection with that interview [of Mr. Flynn], and his subsequent testimony before an EDVA grand jury, *you have requested information that raises questions of privilege*."). The Waiver Letter was a direct response to the government's request and appears to have followed a period of active negotiations between the government and FIG concerning the scope of the waiver. *See* Waiver Letter at 1 ("This letter reflects the understanding that we have reached with your office concerning the scope and terms of providing a voluntary and limited waiver *in response to that request*.") (emphasis added).

Underscoring the deliberate nature of the intrusion, the government was able to secure the waiver only by leveraging Mr. Flynn's status as a cooperator. The Cooperation Agreement required Mr. Flynn to "cooperate fully"—*including by producing documents in connection with the government's investigation of Mr. Rafiekian*. Faced with the prospect of significant penalties if he failed to cooperate, Mr. Flynn had no choice but to cause FIG to waive privilege when the government asked. The Waiver Letter thus makes clear that Mr. Flynn agreed to waiver the privilege *pursuant to the Cooperation Agreement*. Waiver Letter at 1 ("We understand that you are seeking [Mr. Flynn's] cooperation, *pursuant to his plea and cooperation agreement* with the Special Counsel's Office.") (emphasis added).

The government's deliberate invasion of FIG's privilege did not end with the Waiver Letter. Rather, after the execution of the letter, the government conducted extensive interviews of Covington lawyers regarding, among other things, privileged communications between Covington and Mr. Rafiekian. Mr. Rafiekian is aware of no safeguards employed by the government to ensure that FIG's privileged information was protected. To the contrary, obtaining FIG's privileged information was whole point.

Moreover, the government was aware by this time that Mr. Rafiekian had engaged his own counsel in connection with this matter but never contacted Mr. Rafiekian's counsel about the waiver. The government had a clear purpose in failing to give such notice to Mr. Rafiekian or his counsel. If Mr. Rafiekian had known the government was seeking a waiver, he could have demanded a board meeting or shareholder meeting and correctly insisted that Mr. Flynn be recused from any decision regarding the investigation in light of his obvious conflict of interest and sought appropriate judicial relief before the purported waiver was effected.[16]

Third, Mr. Rafiekian has been prejudiced by the government's deliberate intrusion into FIG's attorney-client privilege. The Court need look no further than the Indictment itself for confirmation of this fact. Although Mr. Rafiekian has not committed any crimes, the government apparently believes that Mr. Rafiekian's communications with Covington provide evidence of guilt and intends to rely heavily on them at trial Moreover, the Indictment expressly relies on information apparently obtained as a direct result of the waiver. *See* Indictment ¶¶ 52-53 (alleging purportedly false statements made by Mr. Rafiekian to Covington attorneys). The government clearly intends to rely heavily on privileged evidence to prove its case against Mr. Rafiekian. But for this unlawful intrusion into Mr. Rafiekian's legal rights, it is unlikely that he

---

[16] Likewise, if Mr. Rafiekian had been informed that Mr. Flynn was attempting to dissolve FIG by fraudulent means, he could have sought judicial relief to prevent that as well.

would even have been charged.  *See United States v. Marshank*, 777 F. Supp. 1507, 1521 (N.D. Cal. 1991) (finding the defendant was prejudiced because "absent the government's improper interference with the relationship between [attorney] and his clients, there would not have been any indictments against [the defendant]").

Allowing the government to rely on this privileged information would be particularly prejudicial and unfair because Mr. Flynn's interests diverged sharply from the interests of both FIG and Mr. Rafiekian when he effected the waiver.  Mr. Flynn caused FIG to waive privilege *for the express purpose of aiding the government's case against Mr. Rafiekian.*  Nor could Mr. Flynn reasonably be deemed to be acting in the best interest of FIG in effecting the waiver because FIG had already (albeit unlawfully) been dissolved.  If Mr. Rafiekian had been consulted (and he was not), he would never have agreed to the waiver.

Accordingly, at a minimum, privileged information derived from Mr. Flynn's waiver of FIG's attorney-client privilege should be suppressed.  *See Haynes*, 216 F.3d at 797.  The government's misconduct, moreover, warrants dismissal of sub-paragraph (b) of Count One of the Indictment.  *See Marshank*, 777 F. Supp. at 1524 (dismissing indictment where government agents actively collaborated with a lawyer to build a case against the lawyer's client, the lawyer participated in the government's investigation, and the government knowingly assisted the lawyer in violating the attorney-client privilege).

*United States v. Schell*, 775 F.2d 559 (4th Cir. 1985) further supports dismissal of sub-paragraph (b) of Count One (or, at a minimum, suppression of privileged information).  In *Schell*, a defense attorney who represented certain defendants in connection with grand jury proceedings later switched sides and joined the United States Attorney's Office that was prosecuting the same defendants.  In his capacity as an Assistant United States Attorney, the attorney then appeared

before the same grand jury. The government apparently took pains to avoid a conflict of interest and ensure that the attorney did not directly participate in the prosecution of his former clients, and it claimed that the attorney did not possess any confidential information relating to the defendants. The effectiveness of these efforts was "questionable," however, and the attorney ultimately elicited certain testimony regarding his former clients in connection with the grand jury proceedings.

The Fourth Circuit held that "due process is violated when an attorney represents a client and then *participates in the prosecution of that client with respect to the same matter*" and dismissed the indictment against the attorney's former clients. *Id.* at 566 (emphasis added). The court reasoned that "[s]uch switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances." *Id.* at 565.

Although Covington would be participating in this trial as a witness, not a prosecutor, the same logic requires dismissal of sub-paragraph (b) of Count One (or at a minimum suppression of the privileged information). If anything, the rationale for dismissal is even stronger here because Covington's participation at trial would be far more unfair and prejudicial than what transpired in *Schell*. In both cases, the attorneys represented the defendant in connection with the matter being prosecuted. But whereas the attorney in *Schell* apparently did not possess any confidential information relating to the defendants, the same cannot be said of Covington. If the government's allegations are to be believed, Covington had privileged communications with Mr. Rafiekian that go to the heart of this case. *See* Indictment ¶¶ 52-53.

Moreover, whereas the attorney in *Schell* sought to insulate himself from the prosecution of his former clients, (a) the government in this case must call Covington representatives as key

witnesses at trial, (b) the same Covington lawyers will surely participate in the trial preparation of Mr. Flynn—acknowledged by the government as its key witness, and (c) these same lawyers orchestrated the breach of the privilege for the benefit of Mr. Flynn under the terms of his plea agreement. Mr. Rafiekian has never waived privileged with respect to Covington's involvement in the FARA Filing, and allowing the government to present such privileged evidence at trial would eviscerate the protections of the privilege and deprive Mr. Rafiekian of a fair trial.

## IV.   THE GOVERNMENT OBTAINED PRIVILEGED INFORMATION THROUGH AN ILLEGAL SEARCH AND SEIZURE

As an alternative, the introduction of privileged information should be suppressed, and sub-paragraph (b) of Count One-(b) should also be dismissed, because the subject evidence was obtained through an illegal search and seizure. "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable . . . , official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citation and internal quotation marks omitted). As a director of FIG, Mr. Rafiekian had a reasonable expectation of privacy with respect to Covington's privileged FIG client files, and thus the government's intrusion into that privilege was a "search." *See DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985) (holding that an attorney's clients have a "legitimate expectation of privacy in their client files").

Production of information by a cooperating witness may constitute a search and seizure if the cooperator is acting as an instrument or agent of the government. *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003); *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981); *United States v. Newton*, 510 F.2d 1149 (7th Cir. 1975). The Fourth Circuit has identified two primary factors bearing on whether a search conducted by private person (*e.g.*, Mr. Flynn) constitutes a

government search triggering Fourth Amendment protections: "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." *Jarrett*, 338 F.3d at 344. In *Jarrett*, the Fourth Circuit distilled "three major lessons" from the case law to guide the application of these principles:

> First, courts should look to the facts and circumstances of each case in determining when a private search is in fact a Government search. Second, before a court will deem a private search a Government search, a defendant must demonstrate that the Government knew of and acquiesced in the private search and that the private individual intended to assist law enforcement authorities. Finally, simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough.

*Id.* at 345-46. Mr. Flynn's waiver of FIG's attorney-client privilege—made at the government's request and for the purpose of aiding the government's investigation and prosecution of Mr. Rafiekian—is a textbook example of private search and seizure that triggers Fourth Amendment protections.

First, the government plainly knew of, acquiesced to, participated in, and affirmatively encouraged Mr. Flynn's waiver of privilege on behalf of FIG. As discussed in Part III above, the government was no mere passive participant in the waiver. Rather, as set forth in the Waiver Letter, the government *specifically requested* that Mr. Flynn cause FIG to waive privilege. Waiver Letter at 1. Moreover, after the Waiver Letter was executed, the government continued to participate actively in the illegal search and seizure by interviewing Covington attorneys about privileged topics. This is not a case where a private actor conducts a search on his own accord and the government passively accepts the result. The government here initiated the search and was involved at every step. Without the government's active involvement and encouragement,

FIG never would have waived privilege in the first place.  *See United States v. David*, 943 F. Supp. 1403, 1412 (E.D. Va. 1996) (noting that a significant factor is whether the private actor would have conducted the search had the government not been involved).

Second, Mr. Flynn caused FIG to violate the privilege for the specific purpose of assisting law enforcement in its investigation and prosecution of Mr. Rafiekian.  The Court need look no further than the Waiver Letter signed by the government, which makes clear that the government's request for the waiver and Mr. Flynn's agreement thereto were made "pursuant to [Mr. Flynn's] plea and cooperation agreement with the Special Counsel's Office."  Waiver Letter at 1; *see also* Covington MTQ Br. 3 ("*During the course of his cooperation*, General Flynn, as CEO of FIG, authorized Covington, as counsel to FIG, to enter into an agreement under which Covington would share with the U.S. Attorney's Office certain factual information concerning the March 7, 2017 FARA filing . . . .") (emphasis added); ███████████████████

████████████████████████████████████████████████

The terms of Mr. Flynn's Cooperation Agreement further confirm that when Mr. Flynn caused FIG to waive privilege, he did so as an instrument or agent of the government.  The Cooperation Agreement required Mr. Flynn to "cooperate fully" with "Federal, state, and local law enforcement authorities identified by this Office in any and all matters as to which this Office deems the cooperation relevant"—a broad definition that plainly encompasses the government's investigation and prosecution of Mr. Rafiekian.  Cooperation Agreement ¶ 8(a). The agreement also required Mr. Flynn to produce to the government "any and all evidence of crimes about which your client is aware."  Cooperation Agreement ¶ 8(b).  Although Mr. Rafiekian has committed no crimes, the government plainly disagrees and certainly would have

considered the production of FIG's privileged information to fall within the scope of this requirement.

The consequences for Mr. Flynn of failing to "cooperate fully" with the government and abide by the other terms of the plea would be life changing. By cooperating completely with the government, Mr. Flynn stands to benefit by receiving a reduced sentence and potentially no jail time at all.[17] But if he breaches the agreement, he faces the prospect of significant jail time as well as prosecution for additional crimes. Thus, after signing the Cooperation Agreement, Mr. Flynn for all practical purposes had no choice but to do as the government directed.

As with all cases involving illegal search and seizure, the principle touchstone is reasonableness. *Riley v. California*, 573 U.S. 373, 381 (2014). The government's actions here fall well outside the boundaries of reasonableness. In sum, by leveraging the threat of prosecution and jail time, the government knowingly caused Covington and Mr. Flynn to orchestrate a waiver of privilege by one client with the hope of using that privileged information against a second Covington client—who was never consulted about the waiver and did not consent to it. Allowing such tactics would make a mockery of the attorney-client privilege by permitting the government to circumvent the privilege in any case of joint representation. Where two or more defendants are jointly represented, each defendant would be incentivized to waive the privilege first to curry favor with the government—while exposing his or her co-defendant to the use of privileged information at trial. The Court should not allow the attorney-client privilege to be so eroded and impaired under these particularly sordid circumstances.

---

[17] *See* Ex. H, Hearing Transcript, *United States v. Flynn*, No. 17-232 (Dec. 18, 2018) (Covington: "[I]t's likely, I would think, that General Flynn may be asked to testify in th[e] case" against Mr. Rafiekian).

**V.      EVIDENCE RELATING TO MR. RAFIEKIAN'S ALLEGED FALSE STATEMENTS TO HIS ATTORNEYS SHOULD BE EXCLUDED UNDER FEDERAL RULES OF EVIDENCE 401 AND 403.**

Evidence pertaining to Mr. Rafiekian's allegedly false statements to his attorneys is also irrelevant and prejudicial and therefore inadmissible under Federal Rules of Evidence 401 and 403.  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Here, the substance of Mr. Rafiekian's allegedly false statements to his attorneys bears no relation to the alleged false statements in the FARA Filing, and as a result, they are of no consequence to the charges against him.

The government asserts that Mr. Rafiekian falsely told FIG's attorneys, among other things, that:

a.   "[A] meeting on or about September 19, 2016 in New York City [between members of FIG and the Turkish government] had nothing to do with Project Confidence, and instead was in furtherance of an abandoned 'Project Truth' that was distinct from Project Confidence."  Yet the FARA Filing contains no statements regarding whether this meeting related to Project Truth or Project Confidence (or neither, or both), and the government does not allege that the FARA Filing contained any false statements pertaining to the September 19 meeting.

b.   "There were no other contacts [besides the September 19 meeting] with Turkish government officials regarding the project."  Yet the government does not allege that the FARA Filing contained any misrepresentation regarding the number of contacts between FIG and Turkish government officials, nor does the government allege any other direct contacts between them.

c.   "ALPTEKIN did not want the op-ed to be published."  Yet the FARA Filing contains no statement—let alone any statement alleged to be false— regarding whether Alptekin wanted the op-ed to be published.

d.   "Payments from Company A to Company B were refunds for lobbying and public relations work that Company A did not perform."  Yet the government again does not allege that the FARA Filing contains any false statements pertaining to these payments.

Indictment ¶ 53.

Even if Mr. Rafiekian's statements were relevant to the charges against him (and they are not), such statements must still be excluded under Federal Rule of Evidence 403 because they are unduly prejudicial and may confuse or mislead the jury. A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[U]nfair prejudice" refers to "an undue tendency of evidence to influence a jury to make a decision for reasons unrelated to the probative value of the evidence." *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014).

Admission of alleged untrue statements made by Mr. Rafiekian to his attorneys would be severely prejudicial to his defense, and such statements should be excluded under Rule 403 given their minimal (at best) relevance to the charges against him. If the jury is allowed to hear evidence of alleged false statements made by the Defendant, it could negatively impact their perception of his character and cause them to reach the wrong verdict for the wrong reasons. Evidence of such alleged false statements would also confuse and mislead the jury because the purported statements made by Mr. Rafiekian to his attorneys bear little or no relation to the supposedly false statements that the government claims were made in the FARA Filing.

## CONCLUSION

For the foregoing reasons, Mr. Rafiekian respectfully requests that this Court (1) dismiss sub-paragraph (b) of Count One of the indictment, and (2) exclude and suppress all privileged information belonging to FIG that the government procured through FIG's improper waiver of

the attorney-client privilege.  If the Court determines that factual issues preclude resolution of this motion on the current record, Mr. Rafiekian respectfully requests that the Court hold an evidentiary hearing in order to take testimony and otherwise establish the facts and evidence relevant to this motion.

Dated May 28, 2019                                    Respectfully submitted,

                                    /s/_____
                                    James E. Tysse (VA Bar # 73490)
                                    Mark J. MacDougall (Pro Hac Vice)
                                    Stacey H. Mitchell (Pro Hac Vice)
                                    John C. Murphy (Pro Hac Vice)
                                    Adam A. Bereston (Pro Hac Vice)
                                    Samantha J. Block (Pro Hac Vice)
                                    Counsel for Bijan Rafiekian
                                    Akin Gump Strauss Hauer & Feld LLP
                                    2001 K Street, NW
                                    Washington, DC 20006
                                    Telephone:  (202) 887-4000
                                    Fax:  (202) 887-4288
                                    E-mail:   mmacdougall@akingump.com
                                              shmitchell@akingump.com

                                    /s/_____
                                    Robert P. Trout (VA Bar # 13642)
                                    *Counsel for Bijan Rafiekian*
                                    Trout Cacheris & Solomon PLLC
                                    1627 Eye Street, NW
                                    Suite 1130
                                    Washington, DC 20006
                                    Telephone:  (202) 464-3311
                                    Fax:  (202) 463-3319
                                    E-mail:   rtrout@troutcahceris.com

## CERTIFICATE OF SERVICE

I hereby certify that, on the 28th day of May 2019, true and genuine copies of Defendant

Rafiekian's Motion to Dismiss the Indictment and Exclude and Suppress Privileged Information

was sent via electronic mail by the Court's CM/ECF system to the following:

James P. Gillis
John T. Gibbs
Evan N. Turgeon
U.S. Attorney's Office (Alexandria-NA)
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3700
Email:  james.p.gillis@usdoj.gov
        john.gibbs@usdoj.gov
        evan.turgeon@usdoj.gov

/s/_____
Robert P. Trout (VA Bar # 13642)