IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:18-CR-457-AJT |
| BIJAN RAFIEKIAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT AND EXCLUDE AND SUPPRESS PRIVILEGED INFORMATION

**INTRODUCTION**

The defendant seeks to suppress evidence concerning false statements that he made, as an officer of Flynn Intel Group ("FIG"), to FIG's attorney, knowing that the false statements would be included in FIG's submissions to the Department of Justice ("DOJ") in accordance with the Foreign Agents Registration Act ("FARA").  He seeks to suppress the statements on the grounds that the communications are subject to attorney-client privilege.

The defendant's argument lacks merit, and should be rejected for five separate reasons. First, under binding Fourth Circuit law, the communications were never privileged because they were made so that the law firm Covington & Burling LLP, FIG's counsel, could convey the information to the government on FIG's behalf.  Second, any privilege was waived when Covington submitted the false statements to the government.  Third, because the defendant provided the false statements to Covington in his capacity as an officer and director of FIG, any privilege belonged to FIG and not to the defendant personally.  As such it could be validly waived by FIG's chairman and chief executive officer, General Michael Flynn.  Fourth, any

privilege would be vitiated by the crime-fraud exception because the government has established a prima facie case that defendant used Covington to perpetrate a criminal scheme—namely,  the filing of a false FARA submission with DOJ.  And, finally, suppression is unwarranted because government investigators acted in good faith.

## BACKGROUND

Contrary to the defendant's representations, it was the government's interactions with Rafiekian's defense counsel, rather than General Flynn's desire to cooperate with the government, that prompted the government to seek information from Covington concerning the origins of the false statements in FIG's March 2017 Foreign Agents Registration Act filing. Moreover, as detailed below, the government only sought and obtained information that was not privileged.

A. The Preparation of FIG's FARA Filing

On November 30, 2016, the Department of Justice's FARA Registration Unit sent a letter to General Flynn requesting information that would allow DOJ to determine whether General Flynn or FIG had an obligation to register under FARA in connection with FIG's work relating to Turkey.  In response to this letter, FIG retained Covington in approximately late December 2016 to conduct an inquiry regarding FIG's obligation to register and to respond to DOJ. Covington's engagement letter with FIG specified that Covington only represented FIG as a corporation, and did not represent other affiliates or related parties except General Flynn personally.  Declaration of Stephen P. Anthony ¶ 4 (attached hereto as Exhibit 1).  The defendant did not retain Covington, and Covington did not agree to represent him in any capacity.

Between approximately late December 2016 and early March 2017, Covington conducted an investigation to determine whether FIG needed to register under FARA for its work relating

to Turkey.  As part of its investigation, Covington attorneys interviewed the defendant on at least two occasions.  Anthony Decl. ¶ 6.  At the beginning of the first interview, Covington provided the defendant an *Upjohn* warning, advising the defendant that Covington represented FIG's corporate entity and did not represent him.  *Id.*  Covington also informed the defendant that Covington separately represented General Flynn personally, and that the facts Covington was gathering were to be included in a FARA registration to be submitted to the U.S. Department of Justice.  *Id.*  In addition to providing information to Covington during the interviews, the defendant provided information to Covington through attorney Kristen Verderame, who concurrently represented FIG's corporate entity and separately represented General Flynn personally.

On January 11, 2017, FIG sent DOJ a letter summarizing its findings as of that time.[1] The letter informed DOJ that Covington had preliminarily determined that the subject matter of FIG's work "may have called for registration under FARA," and therefore that Covington anticipated that General Flynn and FIG likely would file a FARA registration statement. Covington further noted that it had "not yet reached a final determination as to the foreign principal(s) to be listed in the FARA registration."  Based on its investigation, Covington prepared a FARA filing for FIG.  The defendant reviewed the draft filing and provided edits to Covington.  Covington submitted the FARA filing to DOJ on March 7, 2017.[2]  One of the documents in the FARA registration was signed electronically by the defendant.

---

[1] Upon request, the government will provide the Court copies of this letter or any other document cited in this pleading.

[2] The government has uncovered evidence suggesting that the defendant partially reimbursed General Flynn for Covington's fees for conducting its inquiry and drafting and filing FIG's FARA registration.  As detailed in the attached declaration, however, Covington had no knowledge of this arrangement or the defendant's payment to General Flynn.  Anthony Decl. ¶ 5.

B.  Defendant Retained Separate Counsel Only After the FARA Filing

On April 5, 2017, the U.S. Attorney's Office for the Eastern District of Virginia served a grand jury subpoena on FIG, requesting, among other things, documents related to FIG's work relating to Turkey.  Because Covington represented only FIG and General Flynn, not the defendant, Covington assisted the defendant in finding personal counsel to represent him in connection with the criminal investigation.  Anthony Decl. ¶ 10.  On April 12, 2017, Covington contacted Robert P. Trout ("Mr. Trout"), whom the defendant subsequently retained as his counsel.  *Id.*  In April 2017, Covington and Mr. Trout entered into an oral joint defense agreement ("JDA"), which remained in effect until the end of October 2017.  *Id.* at ¶ 11.  The government understands that Covington is obligated to keep any JDA communications confidential in perpetuity (absent a court order or express permission from the defendant), and, to date, has not disclosed to the government anything covered by the JDA.  From April 2017 through January 2019, Mr. Trout never indicated or implied that the defendant had ever been a client (or joint client) of Covington.  *Id.* at ¶ 16.

C.  General Flynn's Cooperation Agreement with the Government

In November 2017, General Flynn began cooperating with the Special Counsel's Office ("SCO") investigation.  As soon as General Flynn began to cooperate, Covington withdrew from its JDA with the defendant.  Anthony Decl. ¶ 18.  General Flynn signed a plea agreement with the SCO on November 30, 2017.  *See* Flynn Plea Agreement, *United States v. Flynn*, 1:17-CR-232, Dkt. 3 (D.D.C. Dec. 1, 2017) (attached hereto as Exhibit 2).  The following day, he entered a guilty plea to a one-count information, and signed a Statement of Offense in which he admitted that he made materially false statements and omissions on FIG's March 7, 2017 FARA filing, including "omitting that officials from the Republic of Turkey provided supervision and

4

direction over the Turkey project."  Flynn Statement of Offense, 1:17-CR-232, Dkt. 4 at ¶ 5

(attached hereto as Exhibit 3).  He is awaiting sentencing.

General Flynn's plea agreement requires that he be truthful with the government, as well

as "at any and all trials of cases or other court proceedings."  *See* Flynn Plea Agreement, 1:17-

CR-232, Dkt. 3 at 5.  Lying to the government or fabricating a story would constitute a breach of

the plea agreement.  *Id*. at 5-6.  If General Flynn failed to tell the government the truth, the

government would be permitted to bring new charges against him, including making false

statements in FIG's FARA filing, violating 18 U.S.C. § 951, and obstructing justice for lying to

the government.

As reflected in his plea agreement, the government did not require General Flynn to

waive attorney-client privilege on his own behalf or on behalf of FIG.  Moreover, neither the

SCO, the U.S. Attorney's Office, nor the National Security Division has asked General Flynn to

waive his attorney-client privilege as a condition of cooperation with the government.

D.  The Government's Interactions with Defendant's Counsel

On December 21, 2017, prosecutors in the SCO gave Mr. Trout a presentation of their

evidence concerning the defendant's potential criminal liability in connection with FIG's work

relating to Turkey.  On January 8, 2018, Mr. Trout sent the SCO a letter maintaining his client's

innocence.  Mr. Trout invoked an advice-of-counsel defense, arguing that "[t]he evidence will

show that [defendant] Kian intended and expected that FIG would register under FARA, but on

the advice of counsel, the decision was made to file under LDA instead."[3]  With respect to the

---

[3] It is "established that if a party interjects the 'advice of counsel' as an essential element of a claim or defense, then that party waives the privilege as to all advice received concerning the same subject matter."  1 McCormick on Evid. § 93 (7th ed.).  Accordingly, the defendant makes no claim that materials related to Mr. Kelley's advice are privileged.  *See* Mot. 14.

false statements in FIG's March 2017 FARA filing, Mr. Trout again blamed counsel.  He

maintained, among other things:

> If there are any shortcomings in the drafting of FIG's FARA filings, the
> government's complaint should be with Covington, not Kian.  In fact,
> Covington was careful, and the representations in FIG's FARA filings were
> accurate and appropriate.

*Id.* at 5.

In addition, Mr. Trout expressly disclaimed the defendant's responsibility for two of the

false statements in the FARA filing.  In reference to General Flynn's November 8, 2016 op-ed in

*The Hill*, Mr. Trout stated that "the language that is in the FARA filings is Covington's, and Kian

has no reason to question their choice of words or the accuracy of the information conveyed in

the Supplemental Statement about the Flynn op-ed."  *Id.* at 6.  Mr. Trout also suggested that his

client provided Covington truthful information concerning the purpose of the two $40,000

payments from FIG to Inovo, stating "Covington was in possession of all the documents, and the

lawyers had information from Kian and presumably from Flynn before filing the FARA

documents."  *Id.* at 6-7.

In the spring of 2018, the investigation of the defendant was transferred from the SCO to

the U.S. Attorney's Office and the National Security Division.  Based on Mr. Trout's invocation

of an advice-of-counsel defense and suggestion that the false statements in the FARA filing

originated from sources other than the defendant, including Covington, the government reached

out to Mr. Trout in April 2018 to seek a waiver of attorney-client privilege as to both the

September 2016 decision not to register under FARA and the March 2017 false statements in the

FARA filing.  The government explained to Mr. Trout that the only way to assess his claims was

to understand the attorney-client communications at issue.  On May 24, 2018, the government

sent Mr. Trout a draft privilege waiver covering both the 2016 communications between the

defendant and attorney Robert Kelley and the 2017 communications between the defendant and Covington.  *See* 5/24 email at 3:28 p.m.  The same day, Mr. Trout rejected this waiver, stating, in relevant part that the defendant was willing to waive privilege as to his communications with Kelley, but did not believe he had the authority to waive privilege as to FIG:

> [O]ur advice of counsel defense responds to the allegation that FIG filed under LDA with the willful intent to avoid filing under FARA.  As to Robert Kelly, on whose advice our client relied for the decision to file under LDA and not FARA, we will recommend to our client that he waive, to the extent of his authority, as to that advice.  As we view it, Kian's defense to the accuracy of the March 7, 2017 FARA filing is not an advice of counsel defense; rather it is that the government cannot show there is anything false in the FARA filing. . . .  **In any event, our understanding is that Covington represents both FIG and Michael Flynn individually, so our client plainly does not have any authority to waive privilege as to Covington**.

*See* 5/24 email at 7:25 p.m. (emphasis added).  On May 29, 2018, the government sent Mr. Trout an email stating, in relevant part:

> Thanks for your email and clarification.  Attached is a revised waiver that omits references to the March 7, 2017, FARA filing in light of your representation that Mr. Kian will not be pursuing an advice-of-counsel defense as to that filing.

*See* 5/29 email.  The following week, Mr. Trout sent the government a revised proposed waiver covering only the September 2016 communications, which, according to Mr. Trout, "simply makes clear that to the extent Mr. Kian does have authority to waive FIG's privilege, he is willing to do so" as to those communications.  *See* 6/6 email.  However, Mr. Trout also suggested that he might raise an advice-of-counsel defense to the FARA false statement allegations in the future:

> I also want to clarify our position with regard to the March 7, 2017 FARA filing.  Your May 29 email states that we made a "representation that Mr. Kian will not be pursuing an advice-of-counsel defense as to that filing." In fact, we have not said that Mr. Kian will never pursue such a defense, and we have not waived, and do not waive, Mr. Kian's right to raise such a

> defense, or any other defense.  Instead, as I said in my email, it is our view that the arguments set out in our January 8, 2018 letter regarding the FARA filing did not rely on an advice of counsel defense, and therefore no privilege waiver relating to the FARA filing is necessary or appropriate for our discussions with you at this point.

*Id.*

In recognition of the fact that the defendant was neither raising nor foreclosing an advice-of-counsel defense as to the false statements in the March 2017 FARA filing, and did not believe he had "any authority to waive privilege as to Covington," *see* 5/24 email at 7:25 p.m., the government sought to obtain non-privileged information from Covington concerning the March 2017 FARA filing to help establish either the defendant's culpability or innocence as to the false statements therein.

### E. Covington's Agreement to Provide Limited Categories of Non-Privileged Information About Factual Statements in FIG's FARA Filing

On June 13, 2018, the government and Covington signed a letter delineating the terms under which the government could obtain information from Covington.  *See* Letter from Covington dated June 13, 2018 (attached hereto as Exhibit 4).  The agreement permitted the government to interview Covington attorneys and General Flynn relating to FIG's March 7, 2017 FARA filing.  Importantly, the agreement only allowed the government to obtain information that Covington had determined was not privileged, consistent with the analysis in a similar case involving false statements made by Paul Manafort in a FARA filing.  *See In re Grand Jury Investigation*, Misc. Action No. 17-2336, 2017 WL 4898143 (D.D.C. Oct. 2, 2017).[4]  In that

---

[4] In its motion, the defense does not contend that Covington acted improperly in disclosing or the government acted improperly in obtaining information concerning the defendant's September 2016 consultation with Kelley.  *See* Mot. 14 (conceding that "Rafiekian had previously agreed to waive the privilege with respect to advice from Robert Kelley").  In fact, in the spring of 2018, Rafiekian's defense counsel wanted to disclose the Kelley declaration to the government, and sought Covington's permission before doing so.  Anthony Decl. ¶¶ 19-21.

case, the district judge identified several categories of non-privileged information concerning false statements in a FARA filing that could be obtained by the government; Covington's agreement with the government is limited to these categories of information.

Specifically, the agreement between Covington and the government states:

> With respect to FIG's January 13, 2017 [sic][5] letter to the FARA Registration Unit and its March 7, 2017 FARA filing, you could ask questions to General Flynn concerning the contents of those submissions and factual information he or others shared or did not share with Covington & Burling lawyers who were working on preparation of the letter and subsequent filing.  You agree that, to the extent we take the position that such purely factual communications in connection with preparation of the FARA filing were not privileged, **you will not assert that any waiver of privilege resulted from General Flynn's answering those questions**.
>
> With respect to FIG's counsel at Covington & Burling LLP, you agree to limit the scope of questioning of counsel to questions regarding:
>
> - factual representations made to counsel, in connection with preparation of FIG's FARA filing;
>
> - the sources of such factual representations;
>
> - factual information concerning who (other than counsel) reviewed drafts of the FARA filing;
>
> - factual information concerning any comments or corrections or questions made by people who reviewed drafts of the FARA filing (other than counsel) concerning the filing; and
>
> - When, how, and in what form counsel received communications from FIG personnel concerning the content of the FARA filing.

*See* Letter from Covington dated June 13, 2018 (emphasis added).

Notably, these categories omit privileged information in Covington's possession.  For example, the government did not have access to attorney notes or mental impressions, written communications between FIG personnel and Covington, or documents (other than the Kelley

---

[5] The letter was actually dated January 11, 2017.

declaration that was provided to the government at defense counsel's request).  The government

has not attempted to obtain such information from Covington or General Flynn.

## **ARGUMENT**

As the Fourth Circuit has explained, "the attorney-client privilege is to be narrowly

construed and recognized only to the very limited extent that excluding relevant evidence has a

public good transcending the normally predominant principle of utilizing all rational means for

ascertaining truth." *In re Grand Jury Subpoena*, 204 F.3d 516, 519 (4th Cir. 2000) (quotation

marks and ellipsis omitted).  And, "the burden is on the proponent of the attorney-client

privilege"—in this case, Defendant Rafiekian—"to demonstrate applicability." *Id.* at 520

(quotation marks and alteration omitted).  Thus, "[t]he proponent of the privilege must establish

not only that an attorney-client relationship existed, but also that the specific communications at

issue are privileged and that the privilege was not waived." *Zeus Enterprises, Inc. v. Alphin

Aircraft, Inc.*, 190 F.3d 238, 244 (4th Cir. 1999).

The defendant fails on all counts.  First, the communications at issue are not privileged

because they were made to FIG's counsel (Covington) in order for Covington to convey those

communications to the government in response to its FARA inquiry.  Second, any privilege was

waived when the information was in fact conveyed to the government.  Third, any privilege

belonged to FIG and not to the defendant (who was never personally represented by Covington)

and was waived by General Flynn in his capacity as chairman and chief executive officer of FIG.

Fourth, as detailed in the government's pending motions, the crime-fraud doctrine vitiates any

privilege because the government has made a prima facie case that the defendant was using

Covington to perpetrate a criminal scheme.  *See* Dkt. 173, Dkt. 182.  And, fifth, suppression

would be unwarranted in any event because the government acted in good faith.  Thus, for at

least five independent reasons, the defendant's argument that the information at issue is privileged fails, and his motion to suppress must be denied.

The defendant's arguments based on the Due Process Clause and the Fourth Amendment are entirely dependent on his flawed privilege argument and thus fail for the same reasons. As detailed below, the relevant information was not privileged for multiple reasons, and to the extent any privilege ever existed, it belonged to FIG and not to the defendant personally. Thus, the government has not obtained any information that the defendant had any right to keep confidential.

## I.   The Information at Issue Was Not Privileged Because It Was Provided to Covington for Covington To Disclose in the FARA Filing

As described above, the information that the government was authorized to receive from Covington consisted solely of factual information and representations related to FIG's public FARA filing. Of this information, the defendant argues that "[a]ny communications between [the defendant] and Covington related to FARA—including any so-called 'factual' representations made by [the defendant] in that context" were privileged.[6] Mot. 17.

Binding circuit precedent says otherwise. The Fourth Circuit has held repeatedly "that if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as the details underlying the data which was to be published will not enjoy the [attorney-client] privilege." *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988) (quotation marks omitted); *accord In re Sealed Case*, 877 F.2d

_____

[6] The defendant sets forth five categories of information over which he claims FIG waived privilege. Mot. 13-14. But only the third and fourth categories, which include factual information and representations that are not privileged and were provided to Covington for inclusion in the FARA letter and filing, are at issue here. The defendant concedes that he agreed to waive privilege over the first two categories of information—those relating to Robert Kelley. *Id.* at 14. And no information from the fifth category of information, concerning defendant's August 2016 contact with Covington, is relevant to this prosecution.

11

976, 979 n.4 (D.C. Cir. 1989) ("data that Company intends to report [to the IRS] is never privileged in the first place"); *F.T.C. v. Reckitt Benchiser Pharmaceuticals, Inc.*, 2015 WL 1062062, at *4 (E.D. Va. Mar. 10, 2015) (Payne, J.) (unpublished) ("If the client has solicited the attorney's services to facilitate the production of a public document, the Fourth Circuit has held that the attorney-client privilege does not extend to the published data and the details underlying it.  That, of course, could include any of the documents that [defendant] has labeled 'legal advice,' if the 'legal advice' qualifies as a detail underlying the published data.").  The privilege does not protect "communications relating" to the information provided for publication.  *United States v. (Under Seal)*, 748 F.2d 871, 875 (1984).  In applying this rule, the "relevant inquiry is not whether the client merely funneled unaltered information through an attorney to the public, but whether, at the time the attorney and client were working together, the client had enlisted the attorney's services in order to prepare a document that would eventually be released to the public."  *Reckitt*, 2015 WL 1062062, at *4.

Likewise, where a company retained attorneys to prepare a report to the Food and Drug Administration, communications with those attorneys concerning the content of the report were not privileged.  *F.T.C. v. Indivior, Inc.*, 2016 WL 4157319, at *4-5 (E.D. Va. Aug. 1, 2016) (Payne, J.) (unpublished).  There was no privilege for any communication that "relates to the preparation of a document that the client in fact does intend to publish."  *Id.* at *4; *see also id.* at *5 (noting that the issue is whether there is "an intent to publish the facts communicated" not whether there is an "intent to publish the communication itself").  Similarly, as another court in this circuit has held, although they are prepared within an attorney-client relationship, "real estate closing files and related documents . . . are virtually never protected by the attorney client

privilege because such documents are prepared for the purpose of disclosure." *In re: Grand Jury Subpoena*, 201 F. Supp. 3d 767, 774 (M.D.N.C. 2016).

The same is true of the FARA documents that Covington prepared on behalf of FIG. They were prepared for purposes of disclosure to DOJ.  Because materials that "reveal communications on matters which were intended to be made public" are not privileged, *(Under Seal)*, 748 F.2d at 876, the communications from the defendant to Covington in conjunction with the preparation of the FARA filings are not privileged, and never were.

## II.     Any Privilege Was Vitiated by the Public Filing of the Material

Even if privilege existed in the first place (and it did not), "any disclosure of a confidential communication outside a privileged relationship will waive the privilege as to all information related to the same subject matter." *Martin Marietta*, 856 F.2d at 623; *see also In re Grand Jury Subpoena*, 341 F.3d 331, 336 (4th Cir. 2003) ("As a general rule, implied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege.  Such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege.").  Waiver is not limited to the precise information disclosed but includes "all materials on the same subject as those provided [to] the government." *Martin Marietta*, 856 F.2d at 623; *accord In re Qwest Commc'ns Int'l, Inc.*, 450 F.3d 1179, 1186-88 (10th Cir. 2006); *In re Grand Jury Investigation*, 2017 WL 4898143, at *11 (D.D.C. Oct. 2, 2017) (unpublished) (discussing cases).

The facts here are materially indistinguishable from those in *In re Grand Jury Investigations*.  The factual allegations here are similar to the ones surrounding Paul Manafort's false FARA filing, and the agreement between the government and Covington precisely tracked the categories of information that the court in *In re Grand Jury Investigations* had found to be no

longer privileged.  In that case, the SCO uncovered evidence that two targets believed to have concealed from the government the extent of their lobbying actions on behalf of a foreign government and foreign officials, in violation of federal criminal laws, submitted two letters containing false and misleading information to the FARA Unit of DOJ through their former counsel.  *In re Grand Jury Investigation*, 2017 WL 4898143, at *1.  SCO sought to compel the former counsel to testify before a grand jury regarding limited aspects of her legal representation of the targets, which testimony the SCO asserted would reveal whether the targets intentionally misled the FARA Unit about the targets' work on behalf of the foreign government and foreign officials.  The former counsel refused to testify unless directed by a court order because the targets had invoked their attorney-client and work-product privileges.  In resolving this dispute, Chief Judge Howell identified several categories of information that were not privileged under these circumstances.  The categories listed in Judge Howell's order align precisely with the categories listed in Covington's agreement with the government.  In fact, Covington specifically drafted the agreement to conform to Judge Howell's order.

The holding in that case is thus precisely applicable here:  The sending of the FARA submissions to DOJ "waived, through voluntary disclosure, any attorney-client privilege in their contents."  *Id.* at *11.  And this waiver extends to communications with counsel "to the extent that these communications related to the FARA Submissions' contents."  *Id.*; *see also In re Martin Marietta Corp.*, 856 F.2d 619, 623–24 (4th Cir. 1988) (holding that submission of a position paper by counsel on behalf of the client urging the U.S. Attorney not to indict waived the privilege as to "audit papers" and "witness statements" from which factual statements in the position paper "were derived").

Thus, even if FIG had a privilege in the communications relating to the contents and preparation of the FARA letter and filing, it waived that privilege when it, through its authorized agents, provided the letter and filing to the government.

## III.   Any Privilege Belonged Solely to FIG and Could Be Waived by FIG's Chairman and Chief Executive Officer

The defendant's motion lacks merit for the additional reason that, contrary to the defendant's argument, General Flynn, as chairman and chief executive officer of FIG, had authority to authorize Covington to share information with the government, even if that involved waiving any privilege that FIG may have had in the information at issue.  "After all, the law is settled that a corporation's attorney-client privilege may be waived by current management."  *In re Grand Jury Subpoena*, 274 F.3d 564, 571 (1st Cir. 2001); *accord CFTC v. Weintraub*, 471 U.S. 343, 356 (1985) (outside of bankruptcy, "the agent that controls the corporate attorney-client privilege is the corporation's management"); *In re Grand Jury Subpoenas 89-3 & 89-4*, 902 F.2d 244, 248 (4th Cir. 1990) ("the power to waive the corporate attorney-client privilege rests with the corporation's management").  Clearly, a company's CEO is one of the managers vested with the authority to waive the privilege.  *See Velsicol Chem. Corp. v. Parsons*, 561 F.2d 671, 675 (7th Cir. 1977) (because "a corporation acts through its officers," a corporate vice president and house counsel was an agent of the corporation "with authority to waive the attorney-client privilege").

Moreover, FIG had authority to waive privilege over the defendant's communications with Covington because "a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity."  *Grand Jury Subpoena*, 274 F.3d at 573.  This is true even where the communications are made to an attorney who represents both the officer and the corporation.  *Id.*  Here, however, the defendant's

15

argument is far weaker because it is clear that Covington represented FIG and did *not* represent the defendant personally.  *See* Anthony Decl. ¶¶ 4, 6, 11, 12, 16, 17, 19-23; *cf. Grand Jury Subpoena*, 274 F.3d at 571 ("The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption.").

The rule that an officer of a corporation may waive the corporation's privileges in communications and other information is consistent with this Court's April 9, 2019 ruling that defendant, as a director of FIG, had a right to access FIG's privileged documents in order "to prepare his defense in the criminal case against him."  Dkt. 101 at 8; *see also id.* at 5 (recognizing the "general proposition that corporate directors have unfettered access to corporate information, including corporate information in the files of its lawyers").  Just as General Flynn had "pursu[ed] a corporate purpose when he waived the privilege in order to cooperate with the government and avoid prosecution of himself and FIG," the Court found that "Rafiekian's access to the [corporation's] documents would serve the same corporate purpose of aiding Rafiekian in his defense, and through that defense, avoiding criminal responsibility for both Rafiekian and FIG."  *Id.* at 9.

That the defendant had a right to access privileged corporate documents to use in his defense implies that the defendant would have the power to use and disclose in court (and thereby waive FIG's privileges) documents that would aid his defense.  Indeed, the Court's ruling that General Flynn could not veto defendant's access to FIG's privileged documents would serve little purpose if General Flynn could veto the defendant's use and disclosure of said documents in his criminal defense.  And if the defendant, as vice-chairman, director, secretary, and treasurer of FIG, has the authority to waive FIG's privileges, then it follows that General

Flynn, the chairman and chief executive officer of FIG, has that same authority.  *See* Order 5

("the Court concludes that Flynn and Rafiekian are comparably situated as to FIG"); *cf. Kirby v.*

*Kirby*, 1987 WL 14862, at *7 (July 29, 1987) (unpublished) (holding that former directors of a

non-stock charitable corporation could access privileged corporate documents for potential use in

a lawsuit against a current director).  In other words, any corporate officer with sufficient

authority may waive the corporation's privilege, *e.g.*, *Parsons*, 561 F.2d 671, 675, and Flynn, as

CEO, had sufficient authority.  His decision as CEO that FIG would cooperate with the

government served the corporate purpose of avoiding the prosecution of FIG.

The cases relied on by the defendant, Mot. 18, are inapposite.  They address the separate

issue of "the community-of-interest privilege [that] allows attorneys representing different clients

with similar legal interests to share information without having to disclose it to others."  *In re*

*Teleglobe Commc'ns. Corp.*, 493 F.3d 345, 364 (3d Cir. 2007); *see also Interfaith Hous. Del.,*

*Inc. v. Town of Georgetown*, 841 F. Supp. 1393, 1402 (D. Del. 1994) (common interest rule

applied to various members of town council); *Tenneco Automotive Inc. v. El Paso Corp.*, 2001

WL 1456487, at *2 (Del. Ch. Nov. 7, 2001) (unpublished) (transmittal of privileged documents

from one corporation to another did not waive privilege because there was "a community of

interest between" the two companies).  Even where the common interest privilege applies (and it

does not apply here because the communications at issue predate the joint defense agreement

between the defendant and FIG), it does not prevent a corporation from disclosing its own

communications, and the communications of an officer acting in that capacity are

communications of the corporation.  *Grand Jury Subpoena*, 274 F.3d at 572-73.  A corporate

officer or director acting in that capacity, as the defendant was when he made the relevant

communications to Covington, is not an "independent actor[]," but is rather an agent of the

corporation.  *Id.* at 573.  He thus "always run[s] the risk" that the corporation may waive the attorney-client privilege with respect to his communications with corporate counsel on the corporation's behalf.  *CFTC*, 471 U.S. at 1995.

## IV.   Any Privilege Is Vitiated by the Crime-Fraud Exception

For the reasons set forth in the government's pending motions, no attorney-client privilege exists because the defendant used the attorney-client relationship to further a criminal scheme, namely violations of 18 U.S.C. § 951 and false reporting to the government.  *See* Dkt. 173, Dkt. 182.

As detailed in those motions—and as cited by Judge Howell as an alternative basis for her ruling in the Manafort case—attorney-client privilege is lost "when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud."  *See In re Grand Jury Proceedings #5*, 401 F.3d 247, 251 (4th Cir. 2005); *In re Grand Jury Investigation*, 2017 WL 4898143, at *9.  To establish the crime-fraud exception, the government must only make a prima facie showing that: (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the statements containing the privileged information bear a close relationship to the client's existing or future scheme to commit a crime or fraud.  *In re Grand Jury Proceedings #5*, 401 F.3d at 251.

Based on the evidence submitted in support of the government's crime-fraud motions, the government has made such a showing.  *See* Dkt. 173-1 through 173-8, Dkt. 182-1 through 182-9. If the Court were to find that the crime-fraud exception applies, as it should (and as Judge Howell did),[7] that would provide an additional reason for denying the defendant's motion to suppress.

---

[7] *See In re Grand Jury Investigation*, 2017 WL 4898143, at *9 ("Through its *ex parte* production of evidence, the SCO has clearly met its burden of making a *prima facie* showing that the crime-fraud

## V.      Suppression Is Unwarranted in Any Event

Even where, unlike here, the government has obtained information unlawfully, there is no automatic right to suppression.  *See Herring v. United States*, 555 U.S. 135, 141 (2009).  Instead, because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" and "offends basic concepts of the criminal justice system" by "letting guilty . . . defendants go free," a court must also find that "the benefits of deterrence . . . outweigh the costs," which are heavy.  *Id.* (quotation marks omitted); *accord Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998) (the exclusionary rule's cost "presents a high obstacle for those urging [its] application").  It is well established that when investigators "act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way."  *Davis v. United States*, 564 U.S. 229, 238 (2011).

The government inarguably acted in good faith.  It did not demand privileged material or information; it worked with FIG's chairman and chief executive officer; it made an agreement with FIG's counsel, Covington, that included only categories of information that Chief Judge Howell had found, in an analogous case, to be unprivileged; and it received only that information that Covington had determined to be unprivileged.  The government acted lawfully, and government investigators most certainly possessed a "good-faith believe that their conduct [wa]s lawful," making exclusion unwarranted.  *Id.*

---

exception applies by showing that the Targets were engaged in or planning a criminal or fraudulent scheme when they sought the advice of counsel to further the scheme.  . . .  This evidence establishes that Target 1 and Target 2 likely violated federal law by making, or conspiring to make, materially false statements and misleading omissions in their FARA Submissions, which may constitute violations of, *inter alia*, 22 U.S.C. § 618(a)(2) (false or misleading statements and omissions "in any ... document filed with or furnished to the Attorney General" under FARA); 18 U.S.C. § 1001(a) (false statements to the executive branch); and 18 U.S.C. § 371 (conspiracy to commit any offense against the United States or to defraud the United States).") (citations and quotations omitted).

**VI.     Defendant's Arguments Concerning Federal Rules of Evidence 401 and 403 Are Meritless**

Defendant's conclusory argument (Mot. 30-31) that his false statements should be suppressed based on grounds of relevance and prejudice under the Federal Rules of Evidence is frivolous.  Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see also Huddleston v. United States*, 485 U.S. 681, 687 (1988).  As this Court observed in its April 9, 2019 order, at the heart of this case are the government's allegations that defendant "knowingly provided false information to Covington in an effort to hide from Covington and ultimately the Department of Justice FARA unit the involvement of the Turkish government in what was initially called the Truth Campaign and later became known as Operation Confidence."  Dkt. 101 at 3.  The statements that the defendant seeks to suppress go the core of the government's case.

And this relevance is not "substantially outweighed by a danger" of unfair prejudice. Fed. R. Evid. 403.  That the jury may conclude that the defendant lied to Covington concerning FIG's Turkish work is not unfair; it is the misconduct at issue in the case.

## <u>CONCLUSION</u>

For the reasons stated above, the defendant's motion should be denied.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY


_____/s/_____      By: _____/s/_____
Evan N. Turgeon                   James P. Gillis
Trial Attorney                     Virginia Bar No. 65055
Counterintelligence           John T. Gibbs
  and Export Control Section     Virginia Bar No. 40380
National Security Division       Assistant United States Attorneys
United States Department of Justice  The Justin W. Williams
950 Pennsylvania Avenue, NW     United States Attorney's Office
Washington, DC 20530         2100 Jamieson Avenue
(202) 353-0176                 Alexandria, VA 22314
Evan.Turgeon@usdoj.gov      (703) 299-3700
                            (703) 299-3982 (fax)
                            James.P.Gillis@usdoj.gov
                            John.Gibbs@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2019, I electronically filed the foregoing using the

CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,

_____/s/_____

Evan N. Turgeon
Trial Attorney
U.S. Department of Justice