## DECLARATION OF STEPHEN P. ANTHONY

I, Stephen P. Anthony, declare as follows:

1. I am a partner in the law firm of Covington & Burling LLP ("Covington"). I have personal knowledge of the matters stated herein.

2. Beginning in late December 2016, Covington was engaged by Flynn Intel Group Inc. ("FIG") and by FIG's Chief Executive Officer, Lt. Gen. (Ret.) Michael T. Flynn, in his personal capacity, to represent them jointly in connection with an inquiry by the U.S. Department of Justice concerning their compliance with the Foreign Agents Registration Act ("FARA"). Subsequently, Covington represented both clients in investigations by the U.S. Attorney's Office for the Eastern District of Virginia and the Special Counsel's Office. I was personally involved in these representations from mid-February 2017 until the representations were terminated on June 6, 2019.

3. In the course of the FIG engagement, when we communicated with corporate constituents of FIG other than General Flynn, such as current or former directors or shareholders, I and the other Covington lawyers had a practice of stating clearly that our clients were only (a) General Flynn as an individual and (b) the corporate entity FIG, and that the other FIG corporate constituents with whom we were communicating were not our clients. This practice, which is routine in engagements in which counsel represent a corporate entity in a government investigation, was intended to meet our ethical obligations and to safeguard against a non-client's later falsely asserting that he believed himself to be a client of the firm.

4. On January 9, 2017, Covington and Flynn Intel Group Inc. executed an engagement letter. The engagement letter, addressed to Michael T. Flynn and countersigned by him on behalf of FIG, states that Covington "will represent the Flynn Intel Group, Inc., to

provide Foreign Agents Registration Act advice." It states that "the Flynn Intel Group, Inc. will be our client in this representation and not any other affiliates or related parties, except that, as described below, we will also represent you [referring to Michael T. Flynn] personally in this matter."

5. Covington's accounting records show that Covington received two payments in connection with providing FARA advice to FIG: (1) a check dated January 2, 2017 from Michael T. Flynn for $10,000; and (2) a check dated May 1, 2017 from Flynn Intel Group Inc. for $64,979 signed by Michael T. Flynn. Neither check bears any reference to Bijan Rafiekian or any other indication of the source of the funds including whether they may have come from Mr. Rafiekian. To my knowledge, Covington did not know Mr. Rafiekian was a source of these funds, as he now claims.

6. I am informed and believe that Covington attorneys Robert Kelner and Brian Smith interviewed Mr. Rafiekian on January 5, 2017, and that Mr. Kelner interviewed Mr. Rafiekian a second time on January 16, 2017. At the beginning of the January 5, 2017 interview, Mr. Kelner provided Mr. Rafiekian with an oral *Upjohn* warning, stating that Covington represented the recipients of the inquiry letter referred to in paragraph 2 above – FIG and General Flynn – and that Covington did not represent Mr. Rafiekian personally. (The phrase *Upjohn* warning, derived from *Upjohn v. United States*, 449 U.S. 383 (1981), is a shorthand term for a warning given by an attorney representing a corporation, explaining at the beginning of a conversation with an officer, director, employee, or other corporate constituent that the lawyer represents the corporation and not the person to whom the lawyer is speaking.) This *Upjohn* warning was noted at the top of the first page of Mr. Smith's contemporaneous notes, which Covington produced to Mr. Rafiekian's counsel on April 20, 2019, pursuant to the Rule 17(c)

subpoena and the Court's April 9, 2019 order. Further, the Covington attorneys who interviewed Mr. Rafiekian in January 2017 told him the facts they were gathering were to be included in a FARA registration to be submitted to the U.S. Department of Justice.

7. On March 7, 2017 Covington filed the FARA registration on behalf of FIG.

8. On March 28, 2017, Covington attorney Robert Kelner and I met in person with Mr. Rafiekian in Covington's offices. Mr. Rafiekian had asked for the meeting, indicating he wanted to provide certain information to us. Mr. Kelner began the meeting by reminding Mr. Rafiekian that our firm's clients were FIG and General Flynn only, and not Mr. Rafiekian. Mr. Rafiekian acknowledged that he understood.

9. On April 5, 2017, FIG received a grand jury subpoena relating to its March 7, 2017 FARA registration.

10. On April 12, 2017, I contacted attorney Robert Trout to inquire about his potentially representing Mr. Rafiekian. Within several days, Mr. Rafiekian engaged Mr. Trout as his counsel.

11. From April 20, 2017 through the end of October 2017, Covington provided information to Mr. Trout on numerous occasions, orally or in writing, specifying that such information was covered by the joint defense/common-interest privilege between Covington's clients, FIG and General Flynn, on the one hand, and his client, Mr. Rafiekian, on the other hand. Mr. Trout did not challenge that characterization, and on multiple occasions he expressly acknowledged he was receiving information understanding it to be covered by a joint defense/common interest privilege.

12. In one such communication, on October 28, 2017, Covington asserted in an email that it was asserting and maintaining the attorney-client privilege of "Flynn Intel Group Inc."

over a particular document, and that we were prepared to share the FIG-privileged document with Mr. Trout under common-interest privilege, on condition that Mr. Trout agree to keep it confidential as such, and that it was for his and his colleague Gloria Solomon's eyes only. Mr. Trout agreed in writing to these understandings before I sent the document to him. The document was the declaration of FIG's former General Counsel, Robert Kelley ("Kelley Declaration"), which is referred to in Mr. Rafiekian's Motion to Dismiss, at 13.

13. On February 7, 2019, Covington received a letter from Mark MacDougall, indicating that his firm had joined in the representation of Mr. Rafiekian in the criminal case in the Eastern District of Virginia.

14. From April 2017 through January 2019, Mr. Trout never indicated or implied that Mr. Rafiekian had ever been a client (or joint client) of Covington.

15. From April 2017 through January 2019, Mr. Trout did not question Covington's repeated assertions that Covington was speaking for its client FIG regarding FIG's asserting, maintaining, and/or waiving FIG's privileges. He did not assert that General Flynn, FIG's Chief Executive Officer and majority shareholder, lacked the power to make such decisions regarding FIG's privileges, nor did he suggest Mr. Rafiekian was entitled to play a role in any such decisions.

16. From April 2017 through January 2019, Mr. Trout did not state that Mr. Rafiekian was entitled to any or all of Covington's files pertaining to FIG.

17. During the duration of a joint defense/common interest agreement between April and October 2017, Mr. Trout did not challenge the ability of Covington as FIG's counsel to choose which materials to share with him, expressly pursuant to a joint defense/common interest

privilege. He did not suggest Covington owed any duties to Mr. Rafiekian, nor did he indicate that he considered Mr. Rafiekian to be a former Covington client.

18. In late November 2017, Covington informed Mr. Trout that Covington had determined that it could no longer share information with him under a joint defense/common interest privilege. Mr. Trout acknowledged this development.

19. On April 25, 2018, Mr. Trout and his colleague, Ms. Solomon, called me. At the start of the discussion, I pointed out that the discussion was not protected by any applicable privilege, which Mr. Trout acknowledged. Mr. Trout inquired whether and to what extent he could disclose to the U.S. Attorney's Office for the Eastern District of Virginia the matters reflected in the Kelley Declaration, given that we had provided it to him in October 2017 under a joint defense/common interest privilege. I told him we would get back to him.

20. On May 16, 2018, I told Mr. Trout that Covington as counsel for General Flynn and FIG was prepared to furnish the Kelley Declaration to federal prosecutors, and thereafter he would be free to discuss with the prosecutors the matters contained in the Kelley Declaration. He indicated that was the outcome he had hoped for.

21. On November 30, 2018, Mr. Trout sent me an email asking me to confirm that the attorney-client/common-interest privilege that had initially restricted his use of the Kelley Declaration no longer applied, and that Mr. Rafiekian's counsel were free to use the declaration. I confirmed that was the case, stating that FIG and General Flynn no longer maintain a privilege claim over the Kelley Declaration. In his response, Mr. Trout did not raise any question about Covington's authority to state FIG's position regarding the assertion, maintenance, or waiver of FIG's privileges. He stated that he just wanted to "square the corners" regarding the status of the Kelley Declaration.

22. On January 7, 2019, Mr. Trout called me on behalf of his client, Mr. Rafiekian. I stated that our conversation was not covered by any applicable privilege. Mr. Trout agreed and stated that he wanted to talk to me "off the record" about merely procedural matters. I said I would need to think about whether my engaging in such a discussion would be in my clients' interests. He stated that he was planning to move for a continuance of the then-scheduled February 11 trial date in Mr. Rafiekian's case, that he anticipated a large volume of document discovery, and that he wanted to get a sense from Covington about the volume of FIG's documents that the government had. He further stated that he anticipated moving for a Rule 17(c) subpoena to Covington seeking production of documents in advance of trial. I repeated that I needed to think about whether the conversation he sought would be in my clients' interests, and I said I would call him back. Shortly afterward, I called Mr. Trout and said Covington would not engage in such a discussion.

23. In the January 7, 2019 telephone conversations referred to in paragraph 22, Mr. Trout did not assert that Mr. Rafiekian was a former Covington client, joint or otherwise. He did not ask Covington to give him any client file(s) pertaining to FIG or Mr. Rafiekian. He did not suggest or imply that Covington owed any duty to provide documents to Mr. Rafiekian as a former firm client. I expect that, if he had believed that Covington owed such a duty, he would have said so. Instead, he said he planned to seek documents by means of a Rule 17(c) subpoena.

24. To my knowledge, the first time counsel for Mr. Rafiekian began to express any question about the authorization of Covington to state FIG's positions regarding the assertion, maintenance, or waiver of FIG's privilege was when Mr. MacDougall wrote a letter to Covington on February 7, 2019.

25. To my knowledge, the first time counsel for Mr. Rafiekian asserted that Mr. Rafiekian was entitled to "Covington's FIG client file" was when his counsel filed a motion for issuance of a Rule 17(c) subpoena to Covington on March 1, 2019.

26. The memorandum in support of Mr. Rafiekian's March 1, 2019 Rule 17(c) motion stated that the requested documents "will allow the defense to develop at trial whether FIG's outside counsel (i) gathered from Mr. Rafiekian information that he believed was privileged and (ii) used that otherwise privileged information that was obtained from one shareholder (Mr. Rafiekian) for the exclusive benefit of another shareholder (Mr. Flynn)…"

27. To my knowledge, prior to the filing of the March 1, 2019 motion referred to in paragraphs 25 and 26, Mr. Trout had not stated or suggested that Covington's communications with Mr. Rafiekian prior to Mr. Trout's becoming his counsel in April 2017 were the subject of any privilege held or controlled by Mr. Rafiekian.

28. From April 2017 through January 2019, including after Mr. Rafiekian was charged in December 2018 in an indictment that makes specific allegations about information Mr. Rafiekian provided between January and March 2017 to the law firm that prepared the FARA filing (Indictment ¶¶ 52, 53, 55), Mr. Trout never indicated or implied that Covington owed any duties of confidentiality to Mr. Rafiekian other than those attaching to joint defense/common interest communications with Mr. Trout and his colleagues between April and October 2017.

29. The Motion to Dismiss filed by Mr. Rafiekian's counsel on May 29, 2019, asserts that Mr. Rafiekian was a joint client of Covington, who had "a legitimate right to expect that his communications with Covington were privileged and that the privilege would be respected by Covington."

30. Contrary to the assertion referenced in paragraph 29, it was evident to me that Mr. Rafiekian understood in 2017 that he did not have an attorney-client relationship with Covington. The assertion that is now being advanced by his counsel – that in the period from January through March 2017, Mr. Rafiekian expected his communications with Covington to be covered by a privilege held or controlled by him – cannot be reconciled with my interactions with him at the time and my extensive subsequent interactions with his counsel from April 2017 through January 2019, including those described in this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 10th day of June 2019.

Stephen P. Anthony