IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.

BIJAN RAFIEKIAN, *et.al.*

Defendants.

Case No. 1:18-CR-457-AJT

GOVERNMENT'S OPPOSITION TO MEMORANDUM OF LAW AND MOTION
*IN LIMINE* TO EXCLUDE OUT-OF-COURT STATEMENTS OF CO-CONSPIRATORS

The United States of America, by and through its undersigned counsel, hereby files this response in opposition to the defense Motion *in Limine* to Exclude Out-of-Court Statements of Co-Conspirators.   (Docket Nos. 154 & 155).   For the following reasons, and as set forth more fully below, the defense's motion should be denied.   First, as the defense readily acknowledges, the government need only show by a *preponderance of evidence* the existence of the conspiracy, that the defendant and the declarant were members of the same conspiracy, and that the statements offered by the government were made during and in furtherance of the conspiracy. There is ample evidence to meet this lower threshold.   Second, the defense is simply wrong in contending that, absent the hearsay statements, there is no evidence of the involvement of the Turkish government in the charged conspiracy.   Third, the defense is equally wrong in contending that defendant Alptekin was not part of a conspiracy to misrepresent facts in the filing that FIG was to make under FARA.   And finally, no *James* hearing is required in this case, as the defense freely acknowledges in pointing out that this is discretionary with the Court.

1

**A. The Predictive Nature of the Communications Between the Defendant and His Co-Conspirator Alptekin Was Sufficient to Establish the Existence of the Conspiracy and to Justify the Admission of the Statements Against the Defendant**

Federal Rule of Evidence 801(d)(2)(E) contains a co-conspirator exception to the hearsay rule.   To admit evidence under this exception, a court must conclude: "(i) the defendant and the declarant were involved in a conspiracy with each other at the time the statement was made; and (ii) that the statement was made in furtherance of that conspiracy." *United States v. Shores,* 33 F.3d 438, 442 (4th Cir. 1994). The government must establish these elements by only a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

When evaluating the existence of the above elements, "the court may consider all evidence before it, whether admissible at trial or not, including the co-conspirator statements sought to be admitted." *Shores*, 33 F.3d at 442. During this evaluation, "a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." *Bourjaily*, 483 U.S. at 180. Specifically, the out-of-court statements themselves can demonstrate their probative value when they correctly predict subsequent events.[1] *See, Bourjaily*, 483 U.S. at

---

[1] The Supreme Court and the Fourth Circuit have expressly *avoided* deciding whether the prosecution can establish a conspiracy solely based on the out-of-court statements themselves. *Bourjaily*, 483 U.S. at 181 (reserving the question whether finding that conspiracy existed based solely on the co-conspirator statement sought to be admitted); *Shores*, 33 F.3d at 443 ("Prior to *Bourjaily*, the law in this circuit was that the existence of a conspiracy between the defendant and the declarant must be proved…[with] evidence independent of the co-conspirator statement sought to be admitted…Whether that rule survives *Bourjaily* 's holding…is an open question in this circuit... and we do not decide it here.").   Yet in this case, there is ample evidence of the existence of the conspiracy beyond the statements themselves.   This evidence includes the money transfers between the defendants, the meetings about this project with senior Turkish officials, the defendant's efforts to lobby members of Congress, the publication of the Op-Ed about Fethullah Gulen, as well as the other materials that the defendant helped to produce to cast Gulen in a negative light in this country, including a 60 Minutes-style documentary that the defendant helped to produce about Gulen.

180–81; *Shores,* 33 F.3d at 442–43.

In *Bourjaily*, the defendant appealed his conviction for conspiring to distribute cocaine. 483 U.S. at 171. On appeal, the defendant challenged the admissibility of his co-conspirator's out-of-court telephone statements—recorded by government agents—regarding a "friend" [the defendant] and his participation in the transaction. *Id.* The Court rejected the defendant's contention that because "co-conspirators' out-of-court statements are deemed unreliable…they should not form any part of the basis for establishing a conspiracy." *Id.* at 179. The Court explained the defendant's theory "ignores two simple facts of evidentiary life. First, out-of-court statements are only presumed unreliable. The presumption may be rebutted by appropriate proof...Second, individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Id.* at 179-80.

The Court found the predictive nature of the co-conspirator's out-of-court statements was sufficient proof to rebut the presumption of unreliability. *Id.* at 180. Specifically, the out-of-court statements indicated the co-conspirator's "friend" would be at a particular hotel parking lot, and would accept the cocaine from the government informant. *Id.* When the defendant "showed up at the prearranged spot at the prearranged time" and picked up the cocaine—as predicted by the out-of-court statements—the Court found this demonstrated a "paradigm" of a co-conspirator's out-of-court statements establishing "the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id*. at 180-81.

The Fourth Circuit has also found the subsequent occurrence of a co-conspirator's out-of-court prediction as sufficiently corroborative to justify admitting the statements under Rule 801(d)(2)(E). In *Shores*, the defendant was already incarcerated for murder when he was

convicted for a separate murder-for-hire conspiracy that he coordinated from his prison cell with another inmate. 33 F.3d at 439. The government learned of the conspiracy when their hitman began cooperating with federal agents. *Id.* On appeal, the defendant challenged the admission of the hitman-informant's incriminating conversation with the non-testifying codefendant about the conspiracy. *Id.* at 442. The codefendant's out-of-court admissions included (i) their scheme to subpoena at least five other inmates to testify falsely that the plan was to rob—not murder—the intended victim, and (ii) a plot to escape from jail with the assistance of those inmates. *Id.* at 440.

In affirming the district court's decision to admit these out-of-court statements under Rule 801(d)(2)(E), the Fourth Circuit highlighted the eventual occurrence of the events as corroborating the existence of the conspiracy. As predicted by the informant, (i) the defendant did present testimony from his fellow inmates that the plan was to rob, but not kill, the victim, and (ii) the prisoners did in fact try to escape "just as [the informant] had told the FBI that [the codefendant] said they would." *Id.* at 443. Like *Bourjaily*, the Fourth Circuit found the predicative nature of the out-of-court comments was "substantial independent evidence corroborating…the existence of the conspiracy." *Id.* at 443.

Here, like in *Bourjaily* and *Shores*, the predictive nature of Alptekin's out-of-court statements is sufficiently independent evidence to corroborate the existence of a conspiracy. As just a single example, on or about August 10, 2016, Alptekin emailed Rafiekian and General Flynn, "I just finished in Ankara after several meetings today with [Turkish Minister #2] and [Turkish Minister #1].   I have a green light to discuss confidentiality, budget and the scope of the contract." Indictment ¶ 16. Rafiekian responded to Alptekin saying that he and Flynn had discussed the "campaign design" and "resource allocation," and Rafiekian "did not touch the

advisory support we discussed at 20%." *Id.* When Alptekin subsequently wired $200,000 to

Company A, Indictment ¶ 25, he sent an invoice from Company B for a $40,000 "Consultancy

Fee," which Rafiekian approved the following day. Indictment ¶ 35. This $40,000 kickback

corresponds exactly to the 20% "advisory support" predicted by the out-of-court statements, and

is sufficient to corroborate the existence of the conspiracy.   Further, immediately after receiving

the "green light" from the Turkish government, Rafiekian informed others at FIG of the new

contract – albeit concealing that government's involvement in the scheme by claiming that the

"client" was a Dutch company.   GEX 18A.2

The Court should find that the predictive nature of these statements is sufficiently

independent evidence to establish (i) that there was a conspiracy involving Rafiekian and

Alptekin, and (ii) that the statements at issue were made during the course of and in furtherance

of that conspiracy.

### B.  There was Ample Evidence to Establish the Existence of the Conspiracy Even Beyond the Predictive Nature of the Communications

The defense is simply incorrect in claiming that the "bald reality is that absent reference

to these hearsay statements, there is no evidence of any involvement of the Turkish government."

Defendant's Motion *in Limine* at p. 4. In fact, the evidence related to the involvement of the

Turkish government occurred early in the conspiracy.   As early as September 8, 2016, Alptekin

told the defendant in a Skype message, "will send the agreement.[3] Just left [Senior Turkish

---

[2]  The government's exhibits were submitted with its motion to establish the crime-fraud
exception.

[3]   This was the written agreement which ultimately listed FIG as the advisor and INOVO as the
client.   It was still a work in progress as of September 8th 2016, and soon thereafter, a second
agreement was produced which listed Alptekin as the advisor and FIG as the client. This allowed
the defendant to return 20% of the fee that he received from Alptekin back to him within days of

Leader # 2's] office." Soon after telling the defendant that he had just left Senior Turkish Leader # 2's office, Alptekin wired $200,000 from a Turkish bank account in his name to FIG's U.S. bank account.   Indictment ¶ 31.   This was a provable fact, not a hearsay statement.

As for Turkish Minister # 1, his role was not simply limited to approving confidentiality, budget and the scope of the contract.   He also met in person with the defendant and Alptekin and others to discuss this project in New York City on September 19th 2016.[4]   In fact, the defendant described this as a "high level meeting," (Indictment ¶ 24A), and he also characterized it as a meeting with "high level audience (Cabinet + level) related to Confidence." Indictment ¶ 24B.   Ultimately, this meeting did occur, and attendees included the defendant, Alptekin, Turkish Minister # 1 and Turkish Minister # 3   The fact that Turkish Minister # 1 attended such a meeting, after Alptekin had identified him as one of the people from the Turkish government who was involved in discussions about budget, confidentiality and the scope of the contract strongly corroborates the existence of this conspiracy and the participation of senior elements of the Turkish government in that conspiracy.   Under a preponderance standard, this is more than sufficient evidence to establish the conspiracy.

---

payment.   Indictment ¶ 25.   But the drafting of this second agreement was no accident.   On September 9, 2016, the date of the first $200,000 payment to FIG, Alptekin told the defendant in a Skype message, "Since I had to wire from my personal account I suggest we alter the agreement to an agreement between fig and my person while Inovo invoices for services provided to fig. What do you think?"   Ultimately the agreement was altered, and Alptekin did get reimbursed for what were characterized as "consultancy fees." Indictment ¶ 25A.
4  During the planning for this meeting, Alptekin told the defendant at one point when it appeared that the meeting might not occur, "Pls make sure MF does not communicate the meeting denial is motivated by me or anyone inside the Government of Turkey."   This certainly corroborates yet again the notion that individuals "inside the Government of Turkey," were involved in planning and participating in this meeting.

### C.  There is Evidence of a Conspiracy to Misrepresent Facts to the U.S. Department of Justice

The defense is also incorrect in asserting that there is no evidence of a conspiracy to misrepresent facts in a FARA filing.   In fact, the defendant and Alptekin consistently caused false statements and omissions to be made on a host of issues related to this project.   For example, as noted previously, the defendant described the meeting in New York in emails as a meeting with a "high level audience (Cabinet + level) related to Confidence." Indictment ¶ 24B. Yet for purposes of the FARA filing, he falsely told his attorneys that the meeting had "nothing to do with Project Confidence."   Indictment ¶ 53, a.

Similarly, with regard to the op-ed that was ultimately published by Flynn on November 8, 2016, Alptekin claimed through his attorneys that "he had not been consulted on the op-ed and that he would have opposed it if he had been consulted."   Indictment ¶ 54(a).   Yet the evidence will show that drafts of the op-ed were sent to Alptekin by the defendant on November 2nd, and November 4th and the defendant told Alptekin that the plan was to publish it on Monday. Indictment ¶ 45, 48; GEX 45A & B, GEX 48A & B.   Far from opposing it, on November 5th, Alptekin responded to the defendant's emails by correcting some spelling mistakes in the document, but otherwise he was plainly supportive of publishing it, because he told the defendant, Flynn is right on target."   Indictment ¶ 49; GEX 49.   These false statements by both defendants were consistent with the aims of the conspiracy, that is, to conceal their activities on behalf of the Turkish government.

### D.  No *James* Hearing is Required

As the defense correctly notes, a *James* hearing is not required in this case as it is discretionary

under Fourth Circuit precedent.   *See, United States v. Graham*, 711, F.3d 445, 453 (4th Cir.

2013). ("a trial court is not required to hold a hearing to determine whether a conspiracy exists

before admitting statements under the rule, and the court need not explain the reasoning behind

the evidentiary ruling");   s*ee, also*,   *United States v. Blevins*, 960 F.2s 1252, 1256 (4th Cir.

1992)("This circuit has rejected the formalistic requirement that there must be a hearing to

determine the existence of a conspiracy before statements can be admitted under Rule

801(d)(2)(E). *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir.1983). Instead, we allow a

trial court to conditionally admit co-conspirators' statements subject to the subsequent

satisfaction of the requirements for their admission. I̲d. Moreover, we do not believe that a trial

judge is required to set out on the record his reasons for making this evidentiary ruling.").   The

same result should hold true in this case, there is no basis for a *James* hearing given the evidence

to support the existence of the conspiracy.

## **CONCLUSION**

For the reasons stated above, the Motion should be denied.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

_____/s/_____                     By:_____/s/_____
Evan N. Turgeon                                    John T. Gibbs
Trial Attorney                                     Virginia Bar No.40380
Counterintelligence                                James P. Gillis
    and Export Control Section             Virginia Bar No. 65055
National Security Division                         Assistant United States Attorneys
United States Department of Justice                Katie Sweeten
950 Pennsylvania Ave., NW                          Special Assistant United States Attorney
Washington, DC 20530                               The Justin W. Williams
(202) 353-0176                                        United States Attorney's Office
Evan.Turgeon@usdoj.gov                             2100 Jamieson Avenue
                                                   Alexandria, VA 22314
                                                   (703) 299-3700
                                                   (703) 299-3982 (fax)
                                                   James.P.Gillis@usdoj.gov
                                                   John.Gibbs@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2019, I electronically filed the foregoing using the

CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,

_____/s/_____
John T. Gibbs
Assistant United States Attorney

9