IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:18-CR-457-AJT |
| BIJAN RAFIEKIAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S SUPPLEMENTAL RESPONSE TO
DEFENDANT'S MOTION TO EXCLUDE CO-CONSPIRATOR STATEMENTS

The United States presents this additional argument in opposition to the defendant Rafiekian's motion to exclude co-conspirator statements. Because Rafiekian clearly manifested a belief in and otherwise adopted the statements by Alptekin and the Turkish ministers, which he now seeks to exclude, those statements are not covered by the hearsay rule. In fact, the statements are admissible regardless of whether they were made in furtherance of any conspiracy.[1]

According to Federal Rule of Evidence 801, a statement is not hearsay if "[t]he statement is offered against an opposing party and is one the party manifested that it adopted or believed to be true." FED. R. EVID. 801(d)(2)(B). According to the accompanying commentary:

> Under established principles an admission may be made by adopting or acquiescing in the statement of another. . . . Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue. The decision in each case calls for an evaluation in terms of probable human behavior.

---

[1] *United States v. Townsley*, 843 F.2d 1070, 1084 (8th Cir. 1988) (taped statements that were made in the presence of the defendant would be "admissible as adoptive admissions under Rule 801(d)(2)(B), entirely apart from the particular requirements of 801(d)(2)(E)").

FED. R. EVID. 801 advisory committee note.

Here, with every email he received from Alptekin – those discussing the Turkey project generally, and those discussing the statements made by the Turkish officials in particular – Rafiekian manifested that he believed Alptekin's and the Turkish official's assertions to be true. In no instance did the defendant challenge Alptekin's assertions, including those about the Turkish officials, which, "in terms of probable human behavior," Rafiekian would have refuted or at least challenged if he did not believe that Alptekin was discussing the Turkey project at the highest levels of the Turkish government. Instead, he responded to the emails positively, clearly showing that he received them and that he believed them. He also told some of those working on the Turkey project that Alptekin had connections at the highest levels of the Turkish government, as demonstrated in the emails that the defendant received from Alptekin.

"A party may manifest adoption of a statement in any number of ways, including through words, conduct, or silence." *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001) (internal edit omitted). *See also United States v. Higgs*, 353 F.3d 281, 310 (4th Cir. 2003) (same); *United States v. Basic Const.,* 711 F.2d 570, 573 (4th Cir. 1983) (sufficient to show that the defendant "heard, understood, and acquiesced" in the declarant's assertion); *United States v. Ward*, 377 F.3d 671, 675–76 (7th Cir. 2004) ("A defendant may also demonstrate his cognizance of a conversation by his statements and conduct during or after the conversation."); *Marshall v. Young*, 833 F.2d 709, 716 n.3 (7th Cir. 1987) ("Adoption can be manifested by any appropriate means, such as language, conduct or silence."); *United States v. Beckham*, 968 F.2d 47, 52 (D.C. Cir. 1992) ("Beckham must have understood and unambiguously assented to Monroe's statement, but his understanding and assent may be established through conduct as well as through words.") (citations and internal edits omitted).

Rafiekian did not need to know whether the assertions by Alptekin or the Turkish ministers were true. As explained by the commentary to the rule:

> No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of truthworthiness . . . , and from the restrictive influences of . . . the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

FED. R. EVID. 801 advisory committee note

"[T]he only foundation required for 801(d)(2)(B) adoptive admissions is a showing that they were made or adopted by the opposing party . . .; there is no personal-knowledge requirement." *United States v. STABL, Inc.*, 800 F.3d 476, 484 (8th Cir. 2015). *See also Pillsbury Co. v. Cleaver-Brooks*, 646 F.2d 1216, 1218 n.2 (8th Cir. 1981) ("personal knowledge is not a prerequisite for the adoption of another's statement pursuant to Rule 801(d)(2)(B)"); *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) ("evidence of the party's belief in the truth of the statements is all that is required for a finding of adoptive admission").

In the present case, the defendant manifested a belief in the truth of the assertions by Alptekin in virtually every email communication from him, including the following:

1. In GEX 8, the defendant demonstrated that he found Alptekin trustworthy in general. Although Alptekin's own communication to the defendant was encrypted, the defendant responded that in reliance upon it, he had "had a detailed discussion with [General Flynn]" and that the defendant was "ready to engage on what needs to be done." The defendant's reference to Senior Turkish Leader #1 suggests that Alptekin's communication concerning "what needs to be done" mentioned that individual. The defendant added that he was "[l]ooking forward to working together again" with Alptekin, again demonstrating a general belief in the truthfulness of Alptekin's statements that they would be working on the Turkey project.

-3-

2.      In GEX 9, Alptekin wrote to the defendant on July 29, 2016, saying, "I met with [Foreign Minister #1] and explained.  They are likely to travel to DC next week.  He is interested in exploring this seriously and it is likely he'll want to meet with you and [General Flynn].  We agreed to meet again before he leaves for DC and he asked me to formulate what kind of output we can generate on the short term and mid-term as well as an indicative budget. . . . Needles [sic] to tell you but he asked me not to read in anyone else for the time being and keep this confidential."

3.      In GEX 10, the very next day the defendant told Alptekin that "[i]t was my pleasure continuing our conversation today."  He responded to Alptekin providing precisely the information Alptekin had requested in GEX 9.  After listing the "broad contours of the 'truth' campaign," the defendant told Alptekin that they needed to discuss the execution of the "Truth" campaign "at a managed cost and time frame."  The defendant assured Alptekin that "[a]t this time, this conversation shall remain limited to you, General Flynn and myself."  The defendant obviously manifested a belief in the truthfulness of Alptekin's assertions by providing the outline of the project – he would hardly have done so if he did not believe that Alptekin had indeed discussed the project with Turkish Minister #1, that the minister was interested in pursuing it, and that the minister had asked for their discussions to remain closely held.

4.      In GEX 14, Alptekin wrote to the defendant on August 8, 2016, saying that he had "had a long meeting with [Turkish Minister #2] upon the referral of "Turkish Minister #1].  I explained what we can offer.  He agreed to discuss in general lines at the council of ministers today and subsequently with [Senior Turkish Leader #2] in more detail."  The defendant's initial email to Alptekin was encrypted, but both his email and Alptekin's response bore the subject "Truth."  As discussed below, the defendant's responses to Alptekin's emails in the days that

followed manifested the defendant's clear belief that the Turkish officials were going to approve the project.

5.      In GEX 15, on August 10, 2016, Alptekin again wrote to the defendant under the subject "Truth" and told him that he was "thrilled at the prospect of working together." Alptekin went on to say that that he had again "met with [Turkish Minister #1] and explained our approach.  He is receptive and indicated he would like to meet with us during his upcoming visit to DC. . . . I will inform you and we can strategize how best to approach the meeting."

6.      In GEX 16, the same day, Alptekin wrote to the defendant to tell him that he had "just finished in Ankara after several meetings today with [Turkish Minister #2] and [Turkish Minister #1].  I have a green light to discuss confidentiality, budget and the scope of the contract.  I am flying to LA tomorrow at the request of [Turkish Minister #1] . . . ." Alptekin did in fact fly to Los Angeles the following day.  As was commonplace in their communications, the defendant's initial email to Alptekin was encrypted, but both his email and Alptekin's response bore the subject "Truth."

7.      In GEX 17, the next day, the defendant plainly manifested a belief in the truth of what Alptekin had just told him by responding that he and Flynn "spent some time on the campaign design and end product . . . .  We have decided to press the cost down through the design of an effective 'end product' that is portable, durable and easily distributed through the net. . . . I can go over the details with you. . . . I did not touch the advisory support we discussed at 20%." Obviously, the defendant believed what Alptekin had been telling him up until now and specifically, in GEX 16, that he and Alptekin "had a green light to discuss confidentiality, budget and the scope of the contract."  Again, the defendant would not have taken the time to discuss the project with Flynn and to establish a budget for the project if he did not believe that

they had been given the "green light" after Alptekin had had "several meetings today with [Turkish Minister #2] and [Turkish Minister #1]." As to the need for "confidentiality," this is the point at which the defendant began referring to the project as the "Confidence" campaign.

8.  In GEX 18A, also the day after the "green light" from the Turkish ministers, the defendant wrote to Flynn, and now for the first time included two other members of FIG, saying that they had been "engaged by a Dutch client" for the project he now referred to as the "Confidence" campaign. He also prepared a budget for the project, which he would not have done if he did not believe what Alptekin had been telling him about receiving the "green light." Fulfilling his promise in GEX 17 to "not touch" Alptekin's twenty-percent cut, Rafiekian included this as the first line item in his budget. Rafiekian also described the "end product" for the project in the same terms that he had used in the earlier email, GEX 17, which was itself in response to the "green light" email, GEX 16, which Alptekin had sent while the project was still being called "Truth."

All of these interlocking communications and the others that the United States has provided to the Court manifest the defendant's complete belief in the truth of all that Alptekin had been telling him, and would be telling him, throughout the Turkey project. Rafiekian did this not only in his verbal responses to the emails themselves, but also in what he then communicated to others on the Turkey project. As in *Ward*, Rafiekian's belief in the truth of Alptekin's statements is clear from Rafiekian's "statements and conduct during or after the conversation." 377 F.3d at 675–76.

Accordingly, FED. R. EVID. 801(d)(2)(B) provides an additional basis, entirely separate from the co-conspirator exception of FED. R. EVID. 801(d)(2)(E), to admit the statements made by Alptekin and the Turkish officials. For these reasons, the United States respectfully requests

that the Court deny the defendant's motion to exclude statements by the defendant's co-conspirators.

                                              Respectfully submitted,

                                              G. ZACHARY TERWILLIGER
                                              UNITED STATES ATTORNEY

| /s/ | By: /s/ |
|---|---|
| Evan N. Turgeon | James P. Gillis |
| Trial Attorney | Virginia Bar No. 65055 |
| Counterintelligence | John T. Gibbs |
|    and Export Control Section | Virginia Bar No. 40380 |
| National Security Division | Assistant United States Attorneys |
| United States Department of Justice | The Justin W. Williams |
| 950 Pennsylvania Ave., NW |    United States Attorney's Office |
| Washington, DC 20530 | 2100 Jamieson Avenue |
| (202) 353-0176 | Alexandria, VA 22314 |
| Evan.Turgeon@usdoj.gov | (703) 299-3700 |
| | (703) 299-3982 (fax) |
| | James.P.Gillis@usdoj.gov |
| | John.Gibbs@usdoj.gov |

CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2019, I electronically filed the foregoing using the CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,

/s/
James P. Gillis
Assistant United States Attorney