IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:18-CR-457-AJT |
| BIJAN RAFIEKIAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S AMENDED OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant Bijan Rafiekian seeks dismissal of Count One and Count Two of the Superseding Indictment. Contrary to the Defendant's arguments (*see* Defendant Bijan Rafiekan's Memorandum of Law in Support of Motion to Dismiss the Indictment ("Mem.")), the Superseding Indictment sets forth all essential elements of the alleged offenses and fairly informs him of the charges against which he must defend. The Defendant's motion to dismiss must therefore be denied.

## BACKGROUND

The Superseding Indictment alleges a coordinated course of conduct involving the Defendant, his co-defendant Kamil Ekim Alptekin, a Turkish national with close ties to the highest levels of the Government of Turkey, and others. *See* Superseding Indictment ("Ind.") ¶¶ 2-3. The object of the scheme was to "covertly and unlawfully . . . influence U.S. politicians and public opinion" concerning Fethullah Gulen (referred to as the "Turkish Citizen" in the Superseding Indictment), whose extradition request by the Government of Turkey was meeting resistance at the Department of Justice. *See id.* ¶ 3. In furtherance of this goal, the Defendant

and others worked to delegitimize Gulen in the eyes of politicians and the public, and ultimately to secure Gulen's extradition. *Id.* Although the Government of Turkey, through Alptekin, directed the work, an integral part of the scheme was to conceal the Turkish government's involvement in the efforts to discredit Gulen. *Id.* ¶ 3. The Defendant and the other participants in the scheme held out Inovo BV (referred to as "Company B" in the Superseding Indictment), a Dutch company owned by Alptekin, as the ostensible "client" of the Defendant's firm, the Flynn Intel Group or "FIG" (referred to as "Company A" in the Superseding Indictment). *Id.* ¶¶ 1, 3. Inovo was purportedly to pay FIG's fee, but it is clear that Turkish government officials approved the budget for the project, and, through Alptekin, received regular updates on, and ultimately directed and controlled, FIG's work. *Id.* ¶¶ 3, 17, 18, 22.

When discussions about the project began, it was called the "Truth Campaign" and was to be funded by the Turkish government. Ind. ¶¶ 9, 10, 16. For his part, Alptekin was to receive twenty percent of the contract amount. *Id.* ¶¶ 10, 17, 18, 19. Indeed, immediately upon the first two payments from Alptekin to FIG, FIG wired back 20% to Alptekin, supposedly for his "consultancy fees." *Id.* ¶ 32, 35. From the start, the Defendant made clear that knowledge of the project was to be very tightly controlled and limited to the Defendant, his partner Michael T. Flynn (referred to as "Person A" in the Superseding Indictment), and Alptekin. *Id.* ¶¶ 8, 9, 10, 11. On August 10, 2016, in emails to the Defendant and Flynn, Alptekin told them that he had met with two named Turkish ministers and that he had their permission to discuss "confidentiality, budget and the scope of the contract." *Id.* ¶ 16.

However, in an email the following day, on August 11, 2016, the Defendant changed the name of the project from the "Truth Campaign" to "Project Confidence." Ind. ¶ 18. Nonetheless, the evidence shows that the focus of the "new" project did not change in any way

from the "Truth Campaign" and remained focused throughout on discrediting Gulen and painting Gulen as a fraud and a terrorist; the change from the "Truth Campaign" to "Project" or "Operation Confidence" was a change in name only. *See id.*

The work culminated in an op-ed piece supposedly written by Flynn himself, but in fact ghost-written by the Defendant in response to Alptekin's demand that FIG produce more work product. *See* Ind. ¶¶ 41-50. Alptekin told the Defendant that he had been directed by a Turkish government official, through an intermediary, to get such an op-ed published. *Id.* ¶ 41. Alptekin reviewed, provided feedback on, and approved the draft op-ed. *Id.* ¶¶ 41-50. The op-ed was highly critical of Gulen—portraying him as the Turkish equivalent of Ayatollah Khomeini—and parroted the Turkish government's position that Gulen was a radical Islamist who should not be given safe haven in the United States. *Id.* ¶ 50.

After the publication of the op-ed, the Foreign Agents Registration Act ("FARA") Unit at the U.S. Department of Justice questioned FIG about the article and whether it had been written on behalf of the Turkish government, which would require FIG to register under FARA as a foreign agent. Ind. ¶ 51. In response to this inquiry, FIG retained outside attorneys. *See id.* ¶ 52. The outside attorneys conducted an investigation that included multiple interviews of the Defendant, during which the Defendant made numerous false factual representations and omitted numerous material facts. *See id.* ¶¶ 52-53. Through his own attorneys, Alptekin also made false factual representations to FIG's outside lawyers. *Id.* ¶ 54.

Ultimately, FIG's outside attorneys drafted and filed a FARA registration for FIG, which the Defendant reviewed in advance of filing. Ind. ¶ 55. Due to the Defendant's, Flynn's, and Alptekin's lies to the attorneys, the FARA filing contained a number of misrepresentations. *See id.* ¶¶ 52-55. For example, FIG's FARA filing falsely claimed that Flynn's op-ed was written

3

"on his own initiative" and that "[n]either Inovo BV, nor any other person requested or directed publication of the op-ed." *See id.* ¶ 57.

On May 23, 2019, the grand jury returned the Superseding Indictment, charging the Defendant and Alptekin with: (1) conspiring with each other and other persons, in violation of 18 U.S.C. § 371, (a) to act and cause others to act as an agent of a foreign government, the Government of Turkey, without prior notice to the Attorney General, in violation of 18 U.S.C. § 951, and (b) to willfully make false statements and omissions of material fact in FIG's filing with Attorney General under FARA, in violation of 22 U.S.C. § 618(a)(2) (Count One); and (2) knowingly acting and causing others to act in the United States as illegal agents of a foreign government, the Government of Turkey, without prior notification to the Attorney General, in violation of 18 U.S.C. § 951 (Count Two). The Superseding Indictment also charges Alptekin alone with making material false statements to investigators, in violation of 18 U.S.C. § 1001 (Counts Three through Six).

## ARGUMENT

### A.  The Legal Standard

An indictment must be "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). In most cases, "an indictment is sufficient if it alleges an offense in the words of the statute, assuming those words 'fully, directly, and expressly, without any uncertainty or ambiguity, set

forth all the elements necessary to constitute the offence.'" *United States v. Wicks*, 187 F.3d

426, 427 (4th Cir. 1999) (quoting *Hamling*, 418 U.S. at 117) (internal citation omitted)).

To warrant dismissal of a count of the indictment, a defendant must "demonstrate that the

allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d

194, 197 (4th Cir. 2004). "It is elementary that a motion to dismiss an indictment implicates

only the legal sufficiency of its allegations, not the proof offered by the Government." *United

States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring). The Fourth Circuit has

emphasized that

> [T]he sufficiency of an indictment should be determined by practical, as
> distinguished from purely technical, considerations. Does it, under all of the
> circumstances of the case, tell the defendant all that he needs to show for his
> defense, and does it so specify that with which he is charged that he will be in no
> danger of being a second time put in jeopardy? If so, it should be held good.

*United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (quoting *United States v. Missler*,

414 F.2d 1293, 1297 (4th Cir. 1969)). As established below, the Superseding Indictment plainly

satisfies these requirements.

## B. Count Two of the Indictment Is Sufficient

The Defendant contends (Mem. 6-21) that Count Two of the Superseding Indictment,

which charges him with "knowingly act[ing] and caus[ing] others to act in the United States as

an agent of a foreign government, that is, the Government of Turkey, without prior notification

to the Attorney General," in violation of 18 U.S.C. §§ 951 and 2, is defective in several respects.

As discussed below, each of the Defendant's challenges to Count Two lacks merit.

### 1. The Text of Section 951 and the Pertinent Implementing Regulation

Section 951 provides in pertinent part as follows:

(a) Whoever, other than a diplomatic or consular officer or attaché, acts in the
    United States as an agent of a foreign government without prior notification to

the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

(b) The Attorney General shall promulgate rules and regulations establishing requirements for notification.

(c) The Attorney General shall, upon receipt, promptly transmit one copy of each notification statement filed under this section to the Secretary of State for such comment and use as the Secretary of State may determine to be appropriate from the point of view of the foreign relations of the United States.  Failure of the Attorney General to do so shall not be a bar to prosecution under this section.

(d) For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include—

    (1) a duly accredited diplomatic or consular officer of a foreign government, who is so recognized by the Department of State;

    (2) any officially and publicly acknowledged and sponsored official or representative of a foreign government;

    (3) any officially and publicly acknowledged and sponsored member of the staff of, or employee of, an officer, official, or representative described in paragraph (1) or (2), who is not a United States citizen; or

    (4) any person engaged in a legal commercial transaction.

The Department of Justice has promulgated regulations providing guidance on compliance with the statute.  Among other things, the regulations define the term "legal commercial transaction," for the purpose of Section 951(d)(4), as "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f).

**2.   The Indictment Need Not Allege that the Defendant's Actions Went Beyond Mere "Legal Commercial Transactions"**

The Defendant claims (Mem. 6-15) that Count Two is deficient because it does not allege that his work on behalf of the Government of Turkey involved something other than a mere "legal commercial transaction" within the meaning of Section 951(d).  Because it is clear, however, that the "legal commercial transaction" language cited by the Defendant does not establish an element of the offense, and because the Superseding Indictment in any event alleges that the Defendant's activities under the direction or control of the Turkish government included more than mere legal commercial transactions, his challenge to Count Two lacks merit and must be rejected.

**a.   The "Legal Commercial Transaction" Exception Is Not an Offense Element**

Defining the elements of federal criminal offenses is entrusted to Congress.  Accordingly, determining what is an element and what is not is a matter of statutory interpretation.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *Staples v. United States*, 511 U.S. 600, 604 (1994).  Analysis must therefore begin with the language of the statute.

Like many federal criminal statutes, Section 951 does not explicitly label the elements of the offense it defines.  Nevertheless, an examination of the language and structure of the statute leaves no doubt that the "legal commercial transaction" language cited by the Defendant is not an offense element.  Section 951(a) defines the basic offense, providing, in pertinent part, that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . .  shall be fined under this title or imprisoned not more than ten years, or both."  Section 951(d), in turn,

defines the term "agent of a foreign government" and enumerates four exceptions to that definition, including the exception relied upon by the Defendant here.

The Supreme Court has made clear that exceptions like those set forth in Section 951(d), which are set out in distinct clauses or provisions of criminal statutes, do not define offense elements.  As the Court explained nearly a century ago, "it has come to be a settled rule . . . that an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it."  *McKelvey v. United States*, 260 U.S. 353, 357 (1922) (citing cases).  A statutory exception generally establishes an offense element only when it is set forth as part of the language defining the prohibited conduct and is "so incorporated with th[at] language . . . that the ingredients of the offence cannot be accurately and clearly described if [the exceptions are] omitted."  *United States v. Cook*, 84 U.S. 168, 173 (1872).

Applying that settled rule of construction, the Court in *McKelvey* rejected the argument that an indictment alleging violations of a statute making it a crime to obstruct free passage over unoccupied public lands was deficient because it did not allege that the defendants fell outside a statutory proviso excepting persons who had in good faith occupied and claimed title to such lands.  260 U.S. at 356-57.  The statute at issue in *McKelvey* provided:

> That no person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon or establishing a settlement or residence on any tract of public land . . . or shall prevent or obstruct free passage or transit over or through the public lands:  *Provided, this section shall not be held to affect the right or title of persons, who have gone upon, improved or occupied said lands under the land laws of the United States, claiming title thereto, in good faith.*

260 U.S. at 356 (emphasis added).

In *Scher v. United States*, 305 U.S. 251 (1938), the Supreme Court applied the same principle in holding that an exception to a statute generally making it a crime to transport distilled spirits in containers lacking the requisite revenue stamps "afford[ed] matter for affirmative defense." *Id.* at 254. The language at issue in *Scher* was set out as part of a list of exceptions in distinct subsections following the language describing the prohibited conduct. It provided in pertinent part that:

> No person shall * * * transport, possess, buy, sell, or transfer any distilled spirits, unless the immediate container thereof has affixed thereto a stamp denoting the quantity of distilled spirits contained therein and evidencing payment of all internal-revenue taxes imposed on such spirits. *The provisions of this title (this section and sections 1152b to 1152g) shall not apply to—*
> * * * * * *
> *(f) Distilled spirits not intended for sale or for use in the manufacture or production of any article intended for sale*; * * *.

*Id.* at 252 n.1 (emphasis added) (citations omitted) (asterisks in original).

More recently, in *Dixon v. United States*, 548 U.S. 1 (2006), the Supreme Court reaffirmed "the rule applied in *McKelvey*," which the Court explained is so well established that "we can safely assume" that Congress is familiar with it and "would have expected federal courts to apply [it]" in construing statutes defining crimes. *Id.* at 13-14. The Court rejected a defendant's contention that Congress intended to require the government to disprove her duress defense to an indictment charging her with receiving a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and making false statements in connection with the acquisition of a firearm in violation of § 922(a)(6). *See id.* at 17.

Still more recently, the Fourth Circuit invoked *McKelvey* in interpreting a statute similar in structure to Section 951. In *United States v. Royal*, 731 F.3d 333 (4th Cir. 2013), the Fourth Circuit affirmed the defendant's conviction for unlawfully possessing ammunition as a convicted

felon, in violation of 18 U.S.C. § 922(g)(1), rejecting his claim that the government failed to
prove that the rounds at issue fell within the applicable statutory definition of "ammunition."
731 F.3d at 338-39.  Under that definition, which is set out in a separate section, the term
"ammunition" includes "ammunition . . . designed for use in any firearm."  18 U.S.C.
§ 921(a)(17)(A).  Another provision defines the term "firearm" as "any weapon . . . which will or
is designed to or may readily be converted to expel a projectile by the action of an explosive."
*Id.* § 921(a)(3).  But that provision also states that the term "firearm" "does not include an
antique firearm," *id.,* which is defined in yet another provision as one "manufactured in or before
1898," *id.* § (a)(16)(A).  Citing *McKelvey*, the Fourth Circuit explained that "since § 921(a)(3)
clearly sets apart the antique firearm exception as a distinct proviso to the general definition of
'firearm,' . . . the burden [is] on defendants to raise it as an affirmative defense."  *Royal*, 731
F.3d at 33.

     The same established principle applies here.  Section 951(a) defines the offense and sets
out the prohibited conduct.  The "legal commercial transaction" language relied upon by the
Defendant does not appear in Section 951(a).  Rather, like the language at issue in *Royal*, the
exception for "legal commercial transaction[s]" is separately set out in Section 951(d) as a
distinct exception to the definition of a statutory term used in the provision describing the
prohibited conduct.  Accordingly, it must likewise be treated as giving rise to an affirmative
defense.

     The history of Section 951 reinforces that conclusion.  The language of Section 951(a)
was on the books for decades before Congress added Section 951(d), including the definition of
"agent of a foreign government" and the exceptions thereto, in 1984.  *See* Act of June 25, 1948,
Pub. L. No. 80-772, ch. 645, § 951, 62 Stat. 683, 743 (original language); Comprehensive Crime

Control Act of 1984, Pub. L. No. 98-473, Title II, § 1209, 98 Stat. 1976, 2164 (adding subsections (b) through (d)).  Notably, the Fourth Circuit had no difficulty determining the "ingredients of the offence," *see Cook*, 84 U.S. at 173, in affirming convictions under the earlier version of Section 951, which provided no definition for the term "agent of a foreign government."  *See United States v. Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (rejecting vagueness and overbreadth challenges focused on the then-undefined term "agent"). Moreover, it is "safe[] [to] assume" that when Congress chose to add the definition of "agent of a foreign government" and the exceptions thereto in a separate subsection,  it was "familiar with . . . the rule applied in *McKelvey* and . . . would have expected federal courts to apply a similar approach" in interpreting the amended statute.  *Dixon*, 548 U.S. at 13-14.  Under "the rule of *McKelvey*," the "legal commercial transaction" exception relied upon by the Defendant is not an essential element of the offense that must be alleged in the indictment.  Instead, the Defendant must raise it as an affirmative defense.

In light of the foregoing, it is hardly surprising that the only court to have addressed the issue rejected the argument that the exceptions set forth in Section 951(d)—including the exception for "any person engaged in a legal commercial transaction"— establish offense elements, instead holding that the exceptions "must be raised and proven by a defendant as affirmative defenses to the crime described in Section 951(a)."  *United States v. Duran*, No. 07-20999-CR, 2008 WL 11333989, *2 (S.D. Fla. Oct. 10, 2008) ("*Duran I*"), *aff'd* 596 F.3d 1283 (11th Cir. 2010) (*"Duran II"*).[1]  Examining the statutory language, the court in *Duran I*

---

[1] The defendant in *Duran I* does not appear to have challenged this holding on appeal from his conviction.  Accordingly, the Eleventh Circuit had no occasion to address the issue.  *See Duran II*, 596 F.3d at 1290-1300 (rejecting Duran's other challenges, including his claim that Section 951 is unconstitutionally vague).

11

explained that "Section 951(a) sets forth the offense itself, and by its terms, also provides the elements of the offense." *Id.* at *2. Section 951(d), on the other hand, "sets forth four types of persons who do not constitute an 'agent of a foreign government'" using "the terms 'except' and 'does not include.'" *Id.* "Such language," the court concluded, "is an unambiguous indication that Section 951(d) describes exceptions to, rather than additional elements of, the offense described in Section 951(a)." *Id.* The court further explained that "the separated structure of Section 951—in which the general statutory offense is set forth in Section 951(a) only—makes clear that the exceptions set forth in Section 951(d) are not additional elements that the [g]overnment need negate in order to establish . . . liability under Section 951(a)." *Id.* Finally, the Court correctly noted that a defendant is "in the better position to prove that the acts he engaged in within the United States as charged by the [g]overnment were merely 'legal commercial transactions,' further supporting treatment of this exception as an affirmative defense which [the defendant] must present and prove." *Id.* (citation and internal quotation marks omitted); *see also Dixon*, 548 U.S. at 9 (relying on the doctrine that "where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue" in adhering to the general rule that a defendant has the burden of proving duress).[2]

---

[2] Defendant claims in a footnote (Mem. 8 n.3) that Count Two is also deficient for failing to explicitly allege that he was not at any relevant time "a diplomatic or consular officer, or attaché." But the language on which the Defendant bases that claim does not establish an element of the Section 951 offense, despite the fact that it appears as part of subsection (a). As discussed above, even when an exception appears adjacent to or within the language defining the prohibited conduct, the government need not negate the exception in the indictment or at trial unless the exception is so inseparable from the language defining the offense that its essential elements cannot accurately be described if the exception is omitted. *See Cook*, 84 U.S. at 173. The language at issue here appears in a distinct clause that is clearly separated by commas from the rest of Section 951(a), and its applicability focuses on the status of a narrow class of potential defendants who are virtually certain to have knowledge of that status. It therefore is not an offense element. *See, e.g., United States v. Wise*, 221 F.3d 140, 148-49 (5th Cir. 2000) (addressing statute providing that "[a] person who, without lawful authority, uses, threatens, or

### b.  The Defendant's Arguments To the Contrary Lack Merit

The Defendant's arguments to the contrary are unavailing.

#### i.   The "legal commercial transaction" exception does not negate an element of the offense

As an initial matter, the Defendant is wrong that the "legal commercial transaction" exception set forth in Section 951(d)(4) cannot be treated as an affirmative defense because, he asserts (Mem. 9), it negates an element of the offense rather than simply excusing punishment for a conduct that would otherwise be covered by the statute.  Facts demonstrating that a defendant engaged in a mere "legal commercial transaction" on behalf of a foreign government do not establish the absence of an "agree[ment] to operate within the United States subject to the direction or control of a foreign government or official" within the meaning of Section 951. Rather, such facts merely excuse the defendant from punishment when his conduct is limited to a particular type of agreement to act under the direction or control of a foreign government.[3]

---

attempts or conspires to use, a weapon of mass destruction [for specified purposes]" is guilty of a crime, and holding that phrase "without lawful authority" constituted an affirmative defense); *Dixon*, 548 U.S. at 9 (noting, in discussing duress defense, that the party with knowledge of facts concerning an issue generally has the burden of proving the issue).  That conclusion is reinforced by Congress's decision in 1984 to add separate but overlapping exceptions for persons with diplomatic or other like status in subsection (d), along with the "legal commercial transaction" exception. *See Dixon*, 548 U.S. 13-14.

[3] Defendant cites *United States v. Thompson*, 554 F.3d 450, 452 n.2 (4th Cir. 2009), for the proposition that a defense that negates an element of the offense does not constitute an affirmative defense. *See* Mem. 9.  In a later decision, however, the Supreme Court described as "affirmative defenses" both those that "negate an element of the crime" and those that "excuse[] conduct that would otherwise be punishable." *Smith v. United States*, 568 U.S. 106, 110 (2013) (reaffirming that the government is "foreclosed from shifting the burden of proof to the defendant only when an affirmative defense does negate an element of the crime") (citations and internal quotation marks omitted).  In any event, the nomenclature is of no moment in this case because, as established above, the "legal commercial transaction" exception at issue here does not negate an element of the Section 951 offense but merely excuses one form of conduct that otherwise would be punishable as an agreement to act under the direction or control of a foreign government.  It therefore constitutes an "affirmative defense" even under Defendant's rubric.

Moreover, even if the "legal commercial transaction" exception had the effect of negating an offense element—which, again, it does not—it would not follow that the absence of facts supporting that defense must be alleged in the indictment.  Indeed, the law is to the contrary. There is no requirement, for example, that the absence of insanity, intoxication, or other mental impairment must be specifically charged in an indictment that otherwise alleges that the defendant had the intent necessary to commit the charged crime, even when proof of such impairment would negate that element of the offense.  *See* Fed. R. Crim. P. 12.2; *Dixon*, 548 U.S. at 12 (discussing insanity defense).

> ### ii.     The Fourth Circuit's Decision in United States v. Daniel *Does Not Support the Defendant's Proposed Deviation from the Settled Rule of Construction Discussed Above*

Contrary to Defendant's contention (Mem. 9-10), *United States v. Daniel*, 3 F.3d 775 (4th Cir. 1993), fails to support his claim that the "legal commercial transaction" exception establishes an element of the offense charged in Count Two.  *Daniel* involved a physician's alleged violation of 21 U.S.C. § 841(a), which provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to . . . distribute . . .  a controlled substance."  3 F.3d at 778.  The Fourth Circuit has held that a violation of Section 841(a)(1) "generally" has only two elements: "(1) the defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law."  *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2006).  But in *Daniel* and other cases involving the prosecution of doctors or pharmacists, the Fourth Circuit has applied an "enhanced analysis" under which the government must prove that such a professional lacked a legitimate medical purpose for distributing a controlled substance, in addition to the two

generally applicable elements. *Alerre*, 430 F.3d at 689; *Daniel*, 3 F.3d at 778. The court's special rule is based on the rationale that doctors and pharmacists are generally permitted to dispense controlled substances under other provisions of the subchapter in which Section 841(a) appears. *See Alerre*, 430 F.3d at 689. *Daniel*'s application of Section 841(a) to doctors and pharmacists reflects narrow concerns about prosecutions involving that "select group of professionals," who are generally permitted to engage in the conduct that is unlawful if engaged in by others. *United States v. Laroque*, No. 4:12-CR-88-1H, 2015 WL 306977, at *2 (E.D.N.C. Jan. 21, 2015). The rule therefore applies "only . . . if the defendant [is] a doctor or a pharmacist." *Id.*; *accord Alerre*, 430 F.3d at 689.

Accordingly, contrary to Defendant's suggestion, *Daniel* did not purport to announce a broadly applicable rule for determining whether statutory exceptions establish offense elements or affirmative defenses. Rather, the rationale for the special exception in *Daniel* is consistent with the "longstanding principle," applicable here, that an "'indictment . . . founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause.'" *Royal*, 731 F.3d at 338 (quoting *McKelvey*, 260 U.S. at 357). It is the exception that proves the rule: in cases under Section 841(a) that do not involve doctors or pharmacists, the government must only allege and prove that a defendant knowingly and intentionally distributed a controlled substance. *See Alerre*, 430 F.3d at 689.[4]

### iii.    The Canon of Constitutional Avoidance Does Not Apply

Equally unpersuasive is Defendant's claim (Mem. 11) that the doctrine of constitutional avoidance supports treating the "legal commercial transaction" exception as an element of the

---

[4] Notably, a number of other circuits have held that whether a defendant's actions were for a legitimate medical purpose is not an element of a Section 841(a)(1) charge against a doctor. *See United States v. Hurwitz*, 459 F.3d 463, 475 n.7 (4th Cir. 2006) (noting circuit split and citing cases).

offense.  For at least three reasons, the doctrine of constitutional avoidance has no application here.

First, "[i]n the absence of more than one plausible construction, the canon [of constitutional avoidance] simply has no application."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (internal quotation marks omitted).  The language and structure of Section 951, viewed in light of the settled rule of construction discussed above, clearly establish that the "legal commercial transaction" exception in subsection (d)(4) is not an element of the offense.

Second, contrary to Defendant's contention (Mem. 12), interpreting Section 951(d)(4) as creating an affirmative defense rather than an offense element raises no constitutional "overbreadth" concern.  In *Truong*, the Fourth Circuit held that the version of Section 951 in effect before Congress added subsection (d) was not unconstitutionally overbroad with respect to the then-undefined term "agent."  629 F.2d at 920.  The current version of the statute is substantially narrower.  It now defines the term "agent of a foreign government," and it provides four exceptions, including one for "legal commercial transaction[s]."  And the implementing regulations define "legal commercial transaction" as "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations."  28 C.F.R. § 73.1(f).  Even as an affirmative defense, the "legal commercial transaction" exception and implementing regulation serve to narrow the reach of Section 951.  *See, e.g., Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1084-85 (4th Cir. 2006) (rejecting First Amendment overbreadth challenge to statutory prohibition based on exception set forth in separate subsection).  In light of that

narrowing, the Defendant's overbreadth claim is thus substantially weaker than the claim

rejected by the Fourth Circuit in *Truong*, which remains controlling.[5]

Third, for the reasons separately set forth below, the Defendant's vagueness challenge

also lacks merit and provides no basis for applying the canon of constitutional avoidance.

### c. The Indictment In Fact Alleges that Defendant's Conduct Included Acts Beyond Mere "Legal Commercial Transactions"

Finally, even assuming, contrary to the settled law discussed above, that the "legal

commercial transaction" exception defines an element of the offense under Section 951,

dismissal of Count Two would still not be warranted.  That is because, contrary to the

Defendant's assertion (Mem. 15-17), the Superseding Indictment alleges that Defendant's work

in the United States under the direction or control of the Government of Turkey went well

beyond mere "legal commercial transaction[s]."

---

[5]  Under the First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits "a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008).  To ensure that invalidation for overbreadth is not "casually employed," *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999), the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.  The Court has thus stated that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications."  *New York v. Ferber*, 458 U.S. 747, 771 (1982).

Section 951 does not even remotely approach this degree of overbreadth, if it is overbroad at all.  Indeed, Section 951 has been applied for decades without any court holding that it runs afoul of the First Amendment.  And courts have had little difficulty in disposing of First Amendment challenges to similar registration and disclosure requirements aimed at regulating foreign influence or otherwise implicating foreign relations.  *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 471-87 (1987) (upholding provision of FARA requiring labeling of foreign "political propaganda" as such); *Attorney General v. Irish Northern Aid Comm.*, 346 F. Supp. 1384, 1390 (S.D.N.Y.), *aff'd without opinion* 465 F.2d 1405 (2d Cir. 1972) (upholding application of provisions requiring production of books and records to officials charged with enforcing FARA).

The Superseding Indictment alleges that the object of the scheme was to "covertly and *unlawfully* . . . influence U.S. politicians and public opinion" about Gulen.  Ind. ¶ 3 (emphasis added).  It further alleges that an integral part of the scheme was to conceal the Turkish government's involvement in the efforts to discredit Gulen.  *See id.*  And it alleges that the Defendant's acts of concealment in support of the scheme included, among other things, making and causing to be made a number of materially false and misleading statements to the FARA Unit.  *Id.* ¶¶ 52-63.  Those same false statements are alleged to be a criminal object of the conspiracy charged in Count Two.   It is self-evident that the Defendant's alleged acts of deception, which are integral to both Count One and Count Two, constitute something other than "legal commercial transaction[s]."  *See, e.g., Duran I*, 2008 WL 11333989, at *3 (finding that Duran's acts of concealment, including his presentation of falsified documents to the United States government, were acts that "did not constitute 'legal commercial transactions' as used in Section 951(d)").  Defendant's claims (Mem. 20-21) that his activities were "completely innocent" and "legal and commercial on their face" amount to nothing more than a premature challenge to the government's proof.[6]

---

[6] A passage from legislative history for the 1984 amendment to Section 951 that the Defendant selectively quotes in his brief (*see* Mem. 12-13) undercuts his argument that his alleged conduct falls within the "legal commercial transaction" exception simply because it involved "lobbying."  *See* S. Rep. No. 98-225, at 415 (1983) ("The proposed Act is not intended to cover those individuals engaged in routine commercial matters *but is intended to cover individuals who represent foreign governments in political activities that may or may not come within the scope of the Foreign Agent[s] Registration Act*.  By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States Government has a necessary interest.") (emphasis added).

### 3.   Section 951 Is Not Unconstitutionally Vague

Defendant contends in the alternative that Section 951 is impermissibly vague under the Due Process Clause of the Fifth Amendment.  That contention lacks merit.

A law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) ("*HLP*") (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  As the Defendant acknowledges (Mem. 18), courts "consider whether a statute is vague as applied to the particular facts at issue," and "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *HLP*, 561 U.S. at 18-19 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

As the Defendant notes (Mem. 18), the Supreme Court has said that "when a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *HLP*, 561 U.S. at 19 (quoting *Hoffman Estates*, 455 U.S. at 499).  But "even to the extent a heightened vagueness standard applies," a defendant raising a vagueness challenge cannot base that challenge on the First Amendment interests of others. *HLP*, 561 U.S. at 20. Moreover, both the Supreme Court and the Fourth Circuit have made clear that "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *HLP*, 561 U.S. at 19 (quoting *Williams*, 553 U.S. at 304) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)); *accord Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 n.4 (4th Cir. 2013).

In *Truong*, the Fourth Circuit rejected a vagueness challenge to Section 951 that focused on the term "agent," which was undefined at the time. *See* 629 F.2d at 920. The court held that "'[a]gent' as used in this context . . . is a readily understandable term which provides adequate notice of the conduct proscribed by the statute." *Id.* Section 951 now defines the term "agent" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official," and it enumerates four exceptions to the definition, including the one at issue here for "any person engaged in a legal commercial transaction." 18 U.S.C. § 951(d); *see also* 28 C.F.R. § 73.1(a) (defining "agent" as "all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official"). In light of the additional guidance and narrowing provided by the definition (which expressly requires "direction or control" by the foreign government) and the statutory exceptions thereto (which exempt certain forms of conduct that would otherwise be covered), Section 951 is now substantially clearer than it was at the time of *Truong*. *See HLP*, 561 U.S. at 35-36 (rejecting a vagueness challenge to the statute that criminalizes providing material support to foreign terrorist groups, 18 U.S.C. § 2339B, and emphasizing the "added clarity" provided by similar definitions and exceptions). Thus, it is unsurprising that each court to have considered a vagueness challenge to Section 951 since the enactment of subsection (d) has rejected that challenge. *See, e.g., Duran II*, 596 F.3d at 1291 (holding that "§ 951 plainly and concretely identifies the conduct" that violates the statute and that "the statute's language is clear and unambiguous") (citations omitted); *United States v. Lindauer*, No. 03-CR-807, 2004 WL 2813168, *4 (S.D.N.Y. Dec. 6 , 2004) (citing *Truong* and noting that vagueness challenge to Section 951 "d[id] not require extensive discussion").

The Defendant nevertheless claims (Mem. 18-19 & n.4) that the term "legal commercial transaction" is unconstitutionally vague as applied to someone engaging in paid lobbying activity.  That claim cannot withstand scrutiny.  If the term "legal commercial transaction" were not unambiguous enough on its face, the implementing regulation provides additional clarity: "The term legal commercial transaction, for the purpose of 18 U.S.C. [§] 951(d)(4), means any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations."  28 C.F.R. § 73.1(f).  And it is clear in this case that the Defendant's alleged conduct included activities other than mere "legal commercial transactions."  The Superseding Indictment alleges that the Defendant engaged in a scheme involving efforts to "covertly and *unlawfully* . . . influence U.S. politicians and public opinion" about Gulen.  Ind. ¶ 3 (emphasis added).  It further alleges that an integral part of the scheme was to conceal the Turkish government's involvement in those efforts.  *See id.*  And it alleges that the Defendant's acts of concealment in support of the scheme included, among other things, making and causing to be made a number of materially false and misleading statements to the Department of Justice. *Id.* ¶¶ 52-63.  Those same false statements are alleged to be a criminal object of the conspiracy charged in Count One.  In light of the plainly unlawful nature of the Defendant's alleged conduct, he cannot credibly complain about a lack of fair notice or an undue risk of arbitrary enforcement.[7]

---

[7] In support of his argument that Section 951 invites arbitrary enforcement, the Defendant claims (Mem. 19) that prosecutions under Section 951 often involve "espionage-related" activities.  But Section 951 is not by its terms limited to espionage or like activities.  *Duran II*, 596 F.3d at 1295-96 ("Section 951 covers any and all affirmative conduct taken on behalf of a foreign government, and is not limited to espionage or subversive activities.").  And it has been applied in cases involving other forms of conduct, including *Duran II* and at least one of the Section 951 cases cited by the Defendant.  *See United States v. Turner*, 836 F.3d 849, 855 (7th

### C.  Count One, Which Charges the Defendant with Conspiring to Violate Section 951 and to Make False Statements and Omissions of Material Fact in Filings under FARA, Is Plainly Sufficient

The Defendant also urges (Mem. 21-24) the Court to dismiss Count One, which charges him with conspiring to knowingly act and cause others to act in the United States as an agent of a foreign government, in violation of Section 951, and to willfully make materially false and misleading statements in documents furnished to the Attorney General under FARA, in violation of 22 U.S.C. § 618(a)(2).  Contrary to the Defendant's contention, Count One of the Superseding Indictment is not deficient, and his motion to dismiss that count should be denied.

With respect to the portion of Count One charging the Defendant with conspiring to act or cause others to act as an agent of a foreign government, in violation of Section 951, the Defendant contends (Mem. 24) that "for all the reasons that . . . Count Two[] should be dismissed,  . . . the related conspiracy charge should go, too."  That contention fails to support dismissal because, as established above, Count Two is not deficient.  Moreover, the completion of a substantive offense is not required to prove a conspiracy to commit that offense; thus, dismissal of a conspiracy count is not required whenever a substantive count is found to be deficient.  *See Wong Tai v. United States*, 273 U.S. 77, 81 (1927) (explaining that "[i]t is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy"; instead, "certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary") (citations and internal quotation marks omitted); *accord United States v.*

Cir. 2016) (describing conduct as "lobbying U.S. officials to remove . . . sanctions" on a foreign government).  Finally, as the Eleventh Circuit concluded in *Duran II*, the breadth of Section 951 does not render it unconstitutionally vague, particularly in a case in which the Defendant's alleged conduct includes unlawful acts.  *Duran II*, 596 F.3d at 1295-96 & n.9.

*Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (reaffirming that to charge a conspiracy, "all that is necessary in the indictment is that the object of the conspiracy be set forth sufficiently to identify the offense which the defendant is charged with conspiring to commit").

Accordingly, even if the Court were to find, contrary to law and fact, that Count Two fails to allege an essential element of the Section 951 offense, the portion of Count One charging the Defendant with conspiring to violate Section 951 would survive because it alleges that the Defendant "knowingly and intentionally conspired . . . to knowingly act and cause others to act in the United States as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951," and identifies the approximate time frame of the conspiracy. Beyond those basic facts, which are typically sufficient to state a conspiracy charge, the Superseding Indictment also sets forth a detailed description of the manner and means of the conspiracy. The Defendant's challenge to the portion of Count 1 alleging a conspiracy to violate Section 951 must be rejected.

Equally lacking in merit is the Defendant's claim (Mem. 21-23) that the second prong of Count One is deficient. Contrary to that claim, this portion of Count One does not merely allege that the Defendant and his coconspirators engaged in "separate[]" or "parallel" conduct. *See* Mem. 22-23. Rather, it specifically alleges that the Defendant and Alptekin, "together with others known and unknown, knowingly and intentionally conspired" to "willfully" make false statements and omissions of material fact in FARA filings, in violation of 22 U.S.C. § 618(a)(2). Like the other prong of the conspiracy charge, this portion of Count One clearly identifies the offense that was the object of the conspiracy and provides its approximate time frame. Although that information alone would be sufficient to allege a conspiracy, *see Wong Tai*, 273 U.S. at 81, the Superseding Indictment also details the manner and means by which the Defendant and his

23

coconspirators sought to further the goals of the conspiracy.  Among other things, it describes numerous communications and other interactions between and among the Defendant and others concerning their joint efforts to delegitimize Gulen in the eyes of U.S. politicians and the public and to conceal the fact that they were doing so for and on behalf of the Government of Turkey. *See* Ind. ¶¶ 8-16, 17-25, 26-30, 35, 37, 39-40, 41-50.  It further describes the subsequent false statements and omissions of material fact that the Defendant and Alptekin caused to be made in FARA filings with the Department of Justice, *see* Ind. ¶¶ 52-63, which a jury could readily find were willfully made as an integral part of the alleged agreement between and among the Defendant and the other conspirators to discredit Gulen and to conceal the fact that they were doing so for and on behalf of the Government of Turkey.  The Defendant's contrary contention represents nothing more than a premature challenge to the government's evidence.  *See, e.g., United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.").

## CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss Count One and Count Two must be denied.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

_____/s/_____                          By: _____/s/_____
Evan N. Turgeon                                    James P. Gillis
Trial Attorney                                     Virginia Bar No. 65055
Counterintelligence                                John T. Gibbs
   and Export Control Section        Virginia Bar No. 40380
National Security Division                         Assistant United States Attorneys
United States Department of Justice                The Justin W. Williams
950 Pennsylvania Ave., NW                             United States Attorney's Office
Washington, DC 20530                               2100 Jamieson Avenue
(202) 353-0176                                     Alexandria, VA 22314
Evan.Turgeon@usdoj.gov                             (703) 299-3700
                                                (703) 299-3982 (fax)
                                                James.P.Gillis@usdoj.gov
                                                John.Gibbs@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, I electronically filed the foregoing using the

CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,


_____/s/_____
Evan N. Turgeon
Trial Attorney
U.S. Department of Justice