# In the Matter of:

---

# US v. Rafiekian

## June 28, 2019

---



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                  (Alexandria Division)

 4    -----------------------------------

 5   UNITED STATES OF AMERICA,

 6         Plaintiff,

 7      v.                         No. 1:18-CR-457 (AJT)

 8   BIJAN RAFIEKIAN,

 9         a/k/a "Bijan Kian,"

10      and

11   KAMIL EKIM ALPTEKIN,

12         Defendants.

13    -----------------------------------

14                                    June 28, 2019

15

16          The above-entitled matter came on to be

17   heard before the HONORABLE ANTHONY J. TRENGA, Judge

18   in and for the United States District Court for the

19   Eastern District of Virginia, located at 401

20   Courthouse Square, Alexandria, Virginia, commencing

21   at 10:31 a.m., before Rebecca Monroe, RPR, when were

22   present on behalf of the respective parties:
```

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | ON BEHALF OF THE PLAINTIFF: |
| 4 | JAMES PHILIP GILLIS, ESQUIRE |
| 5 | EVAN N. TURGEON, ESQUIRE |
| 6 | JOHN T. GIBBS, ESQUIRE |
| 7 | KATIE SWEETEN, ESQUIRE |
| 8 | United States Attorney's Office |
| 9 | Eastern District of Virginia |
| 10 | 2100 Jamieson Avenue |
| 11 | Alexandria, Virginia  22314 |
| 12 | (703) 299-3700 |
| 13 | |
| 14 | ON BEHALF OF THE DEFENDANT BIJAN RAFIEKIAN: |
| 15 | STACEY H. MITCHELL, ESQUIRE |
| 16 | JAMES TYSEE, ESQUIRE |
| 17 | ADAM A. BERESTON, ESQUIRE |
| 18 | SAMANTHA J. BLOCKS, ESQUIRE |
| 19 | Akin, Gump, Strauss, Hauer & Feld, LLP |
| 20 | 1333 New Hampshire Avenue, Northwest |
| 21 | Washington, D.C.  20036 |
| 22 | (202) 887-4510 |

```
 1                P R O C E E D I N G S

 2                - - - - - - - - - - -

 3           THE CLERK:  Criminal Case Number

 4   1:18-cr-457.  United States versus Bijan Rafiekian.

 5   Counsel, will you please note your appearances for

 6   the record.

 7           MR. GILLIS:  Good morning, Your Honor.  Jim

 8   Gillis, Evan Turgeon, John Gibbs, and Katie Sweeten

 9   for the United States.

10           THE COURT:  Welcome.

11           MS. MITCHELL:  Good morning, Your Honor.

12   Stacey Mitchell.  James Tysse is joining me this

13   morning for the first time appearing in this matter,

14   as well as Adam Bereston and Samantha Block.

15   Mr. MacDougall and Trout had previously scheduled

16   plans and are not going to join us today.

17           THE COURT:  All right.  We are here on the

18   defendant's motion to dismiss -- dismiss the

19   indictment which I've -- which I've reviewed.  I'd

20   be pleased to hear further -- further from counsel.

21           MR. TYSSE:  Good morning, Your Honor.

22           THE COURT:  Good morning.
```

 1         MR. TYSSE:  My name is James Tysse, I'm

 2  appearing on behalf of the defendant.  The

 3  government's indictment against my client is

 4  defective and should be dismissed.  With respect to

 5  Count 2, my client's position is that the legal

 6  commercial transaction language is part of the

 7  offense because it's what separates the illegal --

 8         THE COURT:  Isn't there a distinction

 9  between whether it's a -- needs to be pled as a

10  separate element and whether or not it be -- it's

11  part of the Government's substantive burden of

12  proof?

13         MR. TYSSE:  There is a distinction between

14  that, Your Honor.

15         THE COURT:  Right.

16         MR. TYSSE:  There is some defenses.

17         THE COURT:  You're claiming that it really

18  is both.  You're saying that not only does the

19  Government have the burden of proving that the

20  defendant was engaged in something other than a

21  lawfully commercial transaction, that has to be pled

22  as a separate -- a separate element --

```
 1              MR. TYSSE:  That's --

 2              THE COURT:  -- and that simply alleging

 3    that he acted as an agent, which is a defined term,

 4    isn't a sufficient pleading.

 5              MS. MITCHELL:  That's right, Your Honor.

 6    There is a distinction between that.  In fact, some

 7    affirmative defenses will require the Government to

 8    still bear that burden, but our point is that it is

 9    actually part of the offense.  It's what separates

10    the illegal from the innocent conduct.

11              And the Government's position is the

12    opposite, that Section 951 makes it presumptively

13    illegal to act on behalf of a foreign government

14    without registering in all circumstances and that

15    the burden then shifts to us to essentially prove

16    that the conduct was legal.  And we haven't gotten

17    to what that burden necessarily would be, but that

18    is their position, they have not denied that.

19              And I want to make two principle points

20    about why they can't be right.  And the first is

21    that can't be squared with the way that the statute

22    is actually written.  And I want to be very precise
```

1    about why we think our position on the statutory

2    text is right and not the Government's.  And it's at

3    Section 951(A), if you read it carefully, prescribes

4    not acting at the direction or control of a foreign

5    government but, rather, acting as an unregistered

6    agent of a foreign government; and that is a defined

7    term.

8              It's defined in Subsection D.  And

9    Subsection D defines that term in the same sentence

10   as having relevant here -- relevant here in two

11   different components.  The first one is that you had

12   to have agreed to operate under a foreign

13   government's direction or control.  And, two, that

14   you could not have engaged in a mere commercial

15   transaction.  There are other elements as well, but

16   those are the -- those are the key ones we're

17   focusing on.

18             And that's a crucial element because it's

19   actually defining part of the definitional sentence

20   that's embedded in 951(A).  It is not a situation

21   where 951(A) says anyone who acts in the direction

22   or control of a foreign government is liable for up

1   to ten years imprisonment and subsection D says the

2   following people are exempt from this provision.  It

3   doesn't do that.  It says agents of a foreign

4   government are -- who are guilty under the statute

5   and then it defines it to specifically exclude

6   anyone engaged in a legal commercial transaction.

7   So the Government therefore must allege both and

8   prove both ultimately at trial.

9          That's the first point.  The other -- or

10  second point is that, you know -- and I think Your

11  Honor's question earlier alluded to this point to

12  some extent, but, you know, we feel strongly that

13  this is the Government's burden to actually allege

14  and prove this point and, in fact, it should not be,

15  we don't think, a difficult burden or especially

16  onerous one for Government to explain what the

17  illegal noncommercial activity they think is the

18  crux of the offense is.

19          But, regardless, the Government still in

20  this case, in our view, has not alleged any actions

21  taken at Turkey's direction and control that are

22  inconsistent with that legal commercial transaction

 1    language.  And, in fact, the Government appears to

 2    concede that the core agency allegations, the scope

 3    of the activity that my client was allegedly doing

 4    on behalf of Turkey -- he denies that, but that's

 5    the allegation in the complaint we take as true,

 6    specifically the lobbying activities and the

 7    publication of the op-ed.  The Government does

 8    not -- appears to concede by not disputing that

 9    those are, in fact, both legal activities protected

10    by the First Amendment and that they're commercial

11    ones.

12           So in that respect, my client has no notice

13    of what he has done on behalf -- allegedly on behalf

14    of Turkey that is not a legal commercial transaction

15    and, as importantly, would have no way of proving or

16    putting evidence on trial that, in fact, his

17    activities were legal, if he doesn't even understand

18    what the Government's allegations are regarding what

19    makes those illegal.

20           And, you know, I just think that is not the

21    way this is supposed to work, Your Honor, in a

22    situation where part of the offense element asks

1    whether -- or, you know, specifies that there's no

2    crime if we were just engaged in a mere legal

3    commercial transaction.  It should be incumbent upon

4    the Government in the first instance to come forward

5    and explain exactly what makes it illegal.

6            And I can point you, Your Honor -- I think

7    this is helpful -- point you to the language of the

8    Department of Justice's own regulation, which is in

9    28 CFR 73.1(f), and it does not define legal

10   commercial transaction in a particularly narrow way.

11   I think, on the contrary, it is exceedingly

12   expansive language.

13           It says for the 951(D)(4), the provision

14   we're talking about, legal commercial transaction

15   means any exchange, transfer, purchase, or sale of

16   any commodity, service, or property of any kind --

17   that's three anys so far -- including information or

18   intellectual property not prohibited by federal or

19   state legislation or implementing regulations.

20           Now, again, it seems to me, Your Honor,

21   that in a situation where the Government is putting

22   my client on trial, facing up to ten years

1    imprisonment, and the Government acknowledges

2    there's no notification requirement if we're engaged

3    in any sort of legal transaction, again, those three

4    anys, and the -- whether it's legal or not is

5    whether it's prohibited by federal or state

6    legislation or regulation.

7            Seems like it's not a hard burden for the

8    Government to come forward and say here's what you

9    did that violates a particular federal legislation,

10   here's what you did that violates some state

11   legislation, here's what you did that violates some

12   implemented regulations.

13           Because, otherwise, we're going to go to

14   trial in this case and the Government says it's our

15   burden to come forward with evidence and potentially

16   prove by a preponderance of the evidence -- again,

17   we have not established that yet, but potentially

18   prove by a preponderance of the evidence that we did

19   not engage -- we did not commit any illegal acts, we

20   didn't commit any acts that were not, you know, in

21   violation of federal or state legislation or

22   regulations, I just think that inverts the typical,

1    you know, burden that you find in a case like this.

2           And for that reason it should be the

3    Government's burden and not ours to come forward

4    with that sort of evidence.

5           THE COURT:  All right.

6           MR. TYSSE:  Now, I'm happy to answer any

7    particular questions the Government or Your Honor

8    has, excuse me, but otherwise I was -- you know, I

9    would like to make a few more points about just this

10   general -- this general scheme and why we think --

11          THE COURT:  All right.

12          MR. TYSSE:  -- our position is right.

13          Okay.  Great.  So -- and, again, I think

14   I've already explained the statutory interpretation

15   point and why we don't think this is -- why we think

16   this must be an offense element, unlike the cases

17   the Government sites for the most part.  They are

18   all defining or they're all describing sort of

19   defenses that excuse liability, and here there's not

20   a question of excusing liability.

21          Again, we're not an agent of a foreign

22   government at all unless we're not engaged in merely

1    commercial transactions.  I think the Royal case

2    that the Government cites, I think, even -- even

3    alludes to this point that uses a situation -- or in

4    that case, the Government made clear -- or, excuse

5    me, the Fourth Circuit made clear that when a linked

6    definitional provision is linked to the offense

7    conduct itself, you're supposed to import that --

8    that linked definitional sentence into the offense

9    conduct.

10          So in that case it was -- you had -- the

11   Government had to allege and ultimately prove at

12   trial that it was in -- the ammunition was designed

13   for use in any firearm.  That was in a separate

14   provision, but the Fourth Circuit said we import

15   that in because you're importing in the definitional

16   sentence because it's part and parcel of the offense

17   itself.  And it's the same -- same principle here.

18          I already talked about how it's not a

19   narrow exception.  Also I think the purpose in

20   history, which I don't think is -- is seriously in

21   dispute in this case, was that Congress wanted to

22   significantly narrow the offense.  It used to be

1    quite broad, it used the common law definition of

2    agency and that's what the Fourth Circuit said in

3    the 1980 case.  I can't quite pronounce it, so I'm

4    not going to try to, but the 1980 case talking about

5    Section 951, it actually said, you know, that used

6    the common law definition of agency and the Court

7    said everyone knows what an agent is.

8            But Congress in 1983 said that's too broad,

9    it's potentially vague, the State Department doesn't

10   like it, DOJ doesn't like it, some courts have asked

11   questions about it, so let's narrow it and have

12   fewer people register.  Let's exclude those people

13   from the obligation to register in the first place.

14           And so in that circumstance, then the

15   question becomes was Congress doing that to say

16   everyone is still guilty but you can prove at trial

17   that you didn't have to register as an affirmative

18   defense or was it simply excluding from the -- the

19   offense all together; and I think it -- it must be

20   the latter.

21           Also, on the history point, I don't think

22   the facts are in the possession of my client.

 1   Again, for the same reason I just mentioned, the

 2   facts of what regulation or state or federal

 3   implementing law that we might have violated are not

 4   in our possession.  They're at least -- they're in

 5   the Government's possession.  They're the ones

 6   alleging that we did not engage in a legal

 7   commercial transaction.

 8          So I don't -- I don't think that factor, in

 9   terms of the balance of what's an affirmative

10   defense versus what's an element, really weighs in

11   the Government's favor at all.

12          Finally, since, you know, the question

13   about this or confusion, I think the Constitution

14   avoidance canon would support requiring the

15   Government to allege this as an element in this

16   case.  And, you know, I think we've alleged a

17   number -- or pointed out a number of different

18   Constitutional provisions that are implicated in

19   this case and the Government has not really disputed

20   them.

21          The First -- First Amendment.  We've

22   mentioned how this implicates the First Amendment in

1    several ways.  The core activities alleged, the

2    agency allegations are writing an op-ed and lobbying

3    the Government, those things are written in the

4    First Amendment.

5           The -- and there's also Fifth Amendment

6    concerns with making sure a grand jury has -- is

7    actually charging a crime, seeing all the elements

8    of a crime.  And the Sixth Amendment, just getting

9    notice of what the crime is.  They're all

10   implicated.  So I think to the extent there's any

11   doubt about what the Congress must have intended, it

12   would be wise for the statute to be read as actually

13   requiring this as an element.

14          And I want to make one other point too,

15   Your Honor, which is that Government mentions or

16   alludes to the idea that this is somehow a technical

17   defense that we're making.  And I want to be very

18   clear about this because I do think it is a

19   technical defect in the sense that they should have

20   to actually allege, you know, potentially in haec

21   verba that this was not a legal commercial

22   transaction, just to make sure you're following the

 1  statutory language.

 2          I don't actually think this is a technical

 3  argument at all because ultimately what is going on

 4  here is the Government is saying that we engaged in

 5  a number of activities that were not legal and

 6  commercial in nature and their evidence that they

 7  were not legal and commercial in nature is that --

 8  basically three -- three points.

 9          They say -- first, they use the word

10  "unlawful" in the indictment; but, obviously, just

11  saying something is unlawful does not make it so.

12  You can't say -- you know, it's an oxymoron to

13  describe something as unlawful First Amendment

14  protected activity.  Okay.

15          So what's the second category.  The second

16  category, they say we concealed the -- Turkey's

17  involvement, my client concealed Turkey's

18  involvement as part of the conspiracy.  Now, again,

19  if it was -- if he'd engaged in legal commercial

20  activities at all times, there's nothing to conceal.

21  I mean, there's nothing wrong with concealing.

22  There's no obligation for him to tell the

1    Government, he could have concealed all he wanted

2    because there was no crime.

3           It's bootstrapping to say the illegal

4    activity here was not actually notifying the

5    Government under Section 951 because, again, that

6    would just be bootstrapping and it would eliminate

7    the legal commercial transaction language from the

8    statute because even -- even the roofer on the --

9    you know, the roof contracting -- Embassy Roof would

10   still have to register in that case because,

11   otherwise, the Government could say, well, you

12   failed to register and that's presumptively illegal.

13   So that can't be right either.

14          So the third thing is the FARA registration

15   form itself and the false statements they allege.

16   And, again, I don't think they specifically allege

17   anywhere that those statements were actually done on

18   behalf of Turkey.  And so, therefore -- and I think

19   if you look at the indictment as a whole, the crux

20   of the allegations are that we engaged in writing

21   op-eds, we engaged in lobbying activity, and we're

22   doing all those things on behalf of Turkey.

1          The false statements on the FARA forms was

2    what happened at the very end when the -- after FIG

3    had dissolved, essentially, after the election and

4    Michael Flynn had become a member of the Trump

5    administration and -- and the FARA unit started

6    asking questions and they filled out these forms.

7          So, you know, if the Government is right

8    that that is the non-legal commercial activity that

9    gets us within the statute, it basically means that

10   the -- the activity that my client did at the very

11   end in order to actually, you know, inform the -- to

12   actually notify the Government was what made him an

13   agent all along which, again, I just don't think

14   makes a lot of sense in terms of it.

15          And it also doesn't make sense in terms of

16   the structure of the indictment.  There's two

17   counts.  The second count is a substantive count of

18   acting as an agent, which presumably encompasses all

19   of the lobbying and commercial -- or lobbying and

20   other op-ed activity.

21          And then Count 1 has the conspiracy with

22   two criminal objects.  One of them is that same

1   agency activity.  The other one is the false

2   statements which, again, suggest to me that, you

3   know, if they really want to go after the illegal

4   activity as the FARA filing at the very end, you

5   know, what they're really just saying is that there

6   was a conspiracy to make false statements on a FARA

7   form.  So at a minimum everything should go except

8   for -- except for that count.

9           I'm happy to talk about anything else Your

10  Honor wants, but I think otherwise --

11          THE COURT:  All right.  Let me hear from

12  the Government.

13          MR. TYSSE:  -- I think those are my main

14  points.

15          MR. TURGEON:  Thank you, Your Honor.

16          THE COURT:  Good morning.

17          MR. TURGEON:  Good morning.  We would

18  concede that we don't -- that we need to prove the

19  definition of agent in this case, of course, and we

20  need to prove that that's satisfied, but we don't

21  need to prove the absence of exceptions to that

22  definition.

```
 1              And so the core premise that the defendant

 2     is focusing on in his reply and this morning is that

 3     the only Constitutional way to read Section 951 is

 4     that it covers only those who, as agents of a

 5     foreign Government, engage in acts that are

 6     inherently wrongful; but that's just not true.

 7              Courts have upheld a wide range of

 8     disclosure on registration requirements related to

 9     otherwise lawful conduct, even Constitutionally

10     protected conduct that the Government has a valid

11     interest in regulating or monitoring.

12              For example, possession of certain types of

13     firearms, selling securities, or even making

14     political campaign contributions.  And many of those

15     registration or disclosure requirements are

16     accompanied by penalty provisions.

17              So here there's no question the Government

18     has not only a valid interest, but a strong interest

19     in requiring public disclosure by a person who's

20     acting in the United States for foreign governments,

21     particularly where their activities are political in

22     nature.
```

1          Moreover, even if you were to assume, as

2     the defense does, that the legal commercial

3     transaction exception is necessary to distinguish

4     wrongful or innocent from wrongful conduct, it can

5     do that even if it operates as an affirmative

6     defense rather than an element.

7          And, finally, a practical common sense

8     reading of the indictment makes clear that the

9     defendants alleged conduct is not innocent but

10    includes acts that are self-evidently wrongful.

11          THE COURT:  What are those?

12          MR. TURGEON:  Those include acts of

13    concealment, including criminal acts of concealment.

14          THE COURT:  Which are?

15          MR. TURGEON:  Which are the defendants

16    causing false statements to --

17          THE COURT:  Right.  I understand that piece

18    of it.

19          MR. TURGEON:  -- the Department of Justice.

20          THE COURT:  I understand that piece of it.

21    But is it the Government's position that the

22    lobbying and the op-ed piece were unlawful and not

1   legal commercial -- not within the definition of

2   legal commercial transactions?

3           MR. TURGEON:  Your Honor, that brings me to

4   my next point, which is how we interpret the

5   definition of -- how we interpret commercial

6   transactions.

7           THE COURT:  Before -- before you explain

8   your answer, just -- if you could just answer

9   directly my question; and that is, is the Government

10  contending that the op-ed -- the activities

11  pertaining to the op-ed and the lobbying, without

12  reference to the FARA filing, were something other

13  than legal commercial transactions?

14          MR. TURGEON:  Yes, they were.  They

15  weren't -- they were in violation of FARA, for

16  example.

17          THE COURT:  How?

18          MR. TURGEON:  They were political

19  activities undertaken on behalf of a foreign

20  Government without disclosure to the United States.

21  That's in violation of FARA, for example.

22          THE COURT:  Well, are you contending that

 1  they're not legal commercial transactions?

 2          MR. TURGEON:  Yes, Your Honor, they are --

 3  they are not legal commercial transactions.

 4          THE COURT:  Again, that's what I'm having

 5  trouble understanding --

 6          MR. TURGEON:  Well --

 7          THE COURT:  -- is the theory.

 8          MR. TURGEON:  It's important to think about

 9  how -- what legal commercial transaction means, how

10  it's interpreted.

11          THE COURT:  Right.

12          MR. TURGEON:  I mean, the guiding principle

13  here is what Congress --

14          THE COURT:  It means any -- according to

15  the -- according to the regulations, it means any --

16  any service, including the exchange of information.

17          MR. TURGEON:  I mean, Your Honor, I think

18  another factor you need to look at in addition to

19  the regulations is the legislative history which

20  makes crystal clear.  I mean, it says -- and the

21  defense cites legislative history, of course, but

22  they selectively and misleadingly omit this section.

1           They say that Section 951 was intended to

2   focus only on those in whom the United States

3   Government has a necessary interest.  And that's

4   suggesting, of course, the defendant isn't one of

5   those people.  But in both filings, they omit the

6   sentence that comes immediately before that, which

7   says the proposed act is not intended to cover those

8   individuals engaged in routine commercial matters,

9   but is intended to cover individuals who represent

10  foreign governments in political activities that may

11  or may not come within the scope of a foreign agent

12  for --

13          THE COURT:  I understand that and I saw

14  that.  But the political activity reference doesn't

15  find its way into the statute, does it?  There's no

16  reference of political activities in the statute the

17  way the statute is structured.

18          MR. TURGEON:  The statute itself?

19          THE COURT:  Yes.

20          MR. TURGEON:  No, Your Honor.  No, and

21  that's why you need to look at -- need to look at

22  what Congress intended, and that's -- that's how --

```
 1  how the statute is -- I think -- I think a found- --

 2  something first we need to look at is whether legal

 3  commercial transaction is a defense or an element.

 4  And that's --

 5          THE COURT:  Right.

 6          MR. TURGEON:  That's the central question

 7  here, right, in determining whether the indictment

 8  was properly brought.

 9          I mean, the guiding principle is what

10  Congress intended, so you look --

11          THE COURT:  Well, it's a little more than

12  that, but let's proceed down that road.

13          MR. TURGEON:  Well, if you look at the

14  statute, if you look at the words and structure of

15  the statute, Your Honor --

16          THE COURT:  Right.  And that's -- that's

17  what I'm doing.  It's a convoluted statute because

18  what -- what hasn't been mentioned, really, is

19  paragraph E, which affirmatively includes people

20  engaged in legal commercial transactions under

21  certain circumstances.  And so you have a statute

22  with a defined term, "agent," and then you have both
```

1    in an exception and an affirmative clause what it

2    means.

3            And everyone seems to agree that the

4    controlling principle was the one announced in the

5    Cook case, which is that it's an element when the

6    language defined in the prohibited conduct is so

7    incorporated with language that the ingredients of

8    the offense cannot be accurately and clearly

9    described if the exceptions are omitted.  Here you

10   have a very convoluted statute with -- with a number

11   of points, all of which go to the scope of the

12   statute, which is who is an agent.

13           Only agents are -- only agents are covered

14   by the statute.  It's not as if all persons are

15   covered and then you have exceptions.  You have a

16   defined term, agent.  It could -- it could have

17   called it, you know, Xs or Ys.  And so the question

18   is what does the Government have to prove that the

19   person being prosecuted is a -- as an X is an X.

20           MR. TURGEON:  Your Honor, as you point out,

21   Subsection E is an exception to the exception.

22           THE COURT:  Yeah, but it's an affirmative

1    statement.  It says any person engaged in legal

2    commercial transaction shall be considered an agent

3    under certain circumstances.  And I don't think the

4    Government's contending that that -- that applies

5    here.

6              MR. TURGEON:  No, Your Honor.

7              THE COURT:  Correct.

8              MR. GILLIS:  No, we -- we don't believe

9    that's an issue at all.  I mean, I don't think that

10   changes the analysis -- the analysis under both Cook

11   and McKelvey as to whether the legal commercial

12   transaction exception is a defense or an element.  I

13   mean, and those two cases compel -- compel finding

14   that it is not an element of the offense.

15             I mean, in Cook and McKelvey the Supreme

16   Court said that there are two factors for a Court to

17   consider to determine whether language refers to an

18   element or a defense, and both of those factors here

19   support the Government's position.

20             The first factor is the placement of the

21   language.  This is from McKelvey, is it separate or

22   set off with commas.  Here the exception is set off

1    in another subsection entirely, it's part of the

2    definition of agent.  And that supports the

3    conclusion that it's a defense, not an element.

4            And second -- the second factor is how the

5    statute reads if you omit that language, as Your

6    Honor pointed out.  Here, that factor compels the

7    finding that it's a defense.  It's not even in

8    Subsection A.

9            In the nearly 100 years since McKelvey was

10   decided, this two-factor test, Cook and McKelvey,

11   has been the well settled rule on the element versus

12   defense question.  And Congress knew when it enacted

13   Section 951 in 1948 and when it amended it in 1984

14   that this was how the Courts would interpret their

15   statutory language.

16           And so Mr. Tysse brought up Royal and,

17   aside from Duran which is directly on point, I think

18   Royal is the most analogous case to ours because it

19   similarly defines exceptions to a definition.

20           THE COURT:  Tell me again, let me try one

21   more time, why what's been alleged as to the op-ed

22   and the -- and the lobbying is -- is not within the

 1    definition or within the regulations definition of a

 2    legal commercial transaction.

 3            MR. TURGEON:  Your Honor, I don't -- I

 4    don't think we even need to --

 5            THE COURT:  You may not need to.

 6            MR. TURGEON:  -- reach that.

 7            THE COURT:  But why don't you just tell me.

 8            MR. TURGEON:  Why is not a legal commercial

 9    transaction?

10            THE COURT:  Why is it not within the

11    definition of a legal commercial transaction as set

12    forth in the regulations?

13            MR. TURGEON:  Well, it wasn't legal because

14    it wasn't -- it wasn't disclosed either under 951 or

15    FARA.

16            THE COURT:  Well -- but doesn't -- isn't

17    that circular, that it only needs to be disclosed if

18    it's --

19            MR. TURGEON:  It needs to be --

20            THE COURT:  -- on behalf of -- if it's

21    within the definition of what's prohibited?

22            MR. TURGEON:  Right.  And it is prohibited,

1  not by this statute, by -- by FARA, a different

2  statute, Your Honor.  This is -- and that's -- and

3  that's the distinction.  That's why I brought up the

4  legislative history, that was what Congress was

5  trying to explain.

6           THE COURT:  That's the -- that's the

7  obligation to disclose within the filing.  All

8  right.  But outside of that context, let's assume

9  they never -- let's assume they never filed the FARA

10  statement.  So you would not be -- they would not be

11  prosecuted for false filings?

12          MR. TURGEON:  Well, at the time of the

13  offense, they hadn't actually filed a FARA

14  statement.

15          THE COURT:  Okay.  So --

16          MR. TURGEON:  So they were in violation of

17  FARA when the 951 conspiracy was underway.

18          THE COURT:  All right.  But whether you

19  call -- whether you call it a defense or an element,

20  someone that's engaged in a legal commercial

21  transaction is not violating this provision, this

22  951, correct?

```
 1              MR. TURGEON:  That's -- yes, Your Honor, if

 2    someone qualifies under legal commercial

 3    transaction --

 4              THE COURT:  Right.

 5              MR. TURGEON:  -- that's --

 6              THE COURT:  And that's my question.

 7              MR. TURGEON:  That is a defense to the

 8    statute.

 9              THE COURT:  Okay.  Whether you call it a

10    defense or an element, explain to me why the

11    activities pertaining to the op-ed and the lobbying,

12    separate and apart from the FARA filing itself, is

13    not within the definition of a legal commercial

14    transaction as that term is defined in the

15    regulations.

16              MR. TURGEON:  I mean -- may I take a

17    moment, Your Honor?

18              THE COURT:  Yeah.

19              MR. TURGEON:  Your Honor, I just want to

20    clarify is Your Honor asking whether an op-ed in

21    general --

22              THE COURT:  No, what's alleged --
```

 1            MR. TURGEON:  -- is a commercial

 2    transaction --

 3            THE COURT:  No, what's alleged in the

 4    indictment as far as the activities of the

 5    conspiracy and of Mr. Rafiekian with respect to the

 6    publication of the op-ed and the lobbying

 7    activities.  And my question is explain to me why

 8    those descriptions of what was done with respect to

 9    the op-ed and -- and the lobbying activity don't

10    follow within the definition of a legal commercial

11    transaction, as that term has been defined in the

12    regulations.

13            MR. TURGEON:  Well, Your Honor, because

14    it's not, first of all -- because, as I said, it's

15    not legal because it's in violation of FARA.  And

16    second --

17            THE COURT:  But it's --

18            MR. TURGEON:  This is a -- this is a

19    registration statute, Your Honor.  And, you know, I

20    think we're -- I want to make sure, you know, Your

21    Honor, the defense's focus is whether conduct is

22    inherently wrongful or not.  And, as I explained,

 1    that is not -- that is not the operative test as to

 2    whether the legal commercial transaction exception

 3    is a defense.  It does not need to be alleged in the

 4    indictment or an element which does.

 5              I mean, had someone engaged -- written an

 6    op-ed for a foreign government and disclosed it,

 7    that would not be in violation.

 8              THE COURT:  Okay.  Let me ask you this

 9    question, without suggesting the Court's made a

10    decision.  Let's assume the Court were to conclude

11    that it is an element of the offense.  What's your

12    position as to the sufficiency of the indictment as

13    to 951?

14              MR. TURGEON:  It's our position that the

15    efforts and obfuscation that included making --

16    causing false statements to be made --

17              THE COURT:  In the FARA filing?

18              MR. TURGEON:  In the FARA filing.

19              THE COURT:  But that's not the 951 charge,

20    correct?

21              MR. TURGEON:  That is -- that is conduct in

22    furtherance of that 951 charge, Your Honor.

 1          THE COURT:  That's part of your conspiracy

 2   claim, that's not -- that's not part of the 951

 3   substantive offense, is it?

 4          MR. TURGEON:  Your Honor, the -- the

 5   efforts of obfuscation continued throughout the

 6   conspiracy and up through the FARA filing.  I mean,

 7   they were hiding what -- what they were doing and

 8   for whom they were doing it from -- from day 1 up

 9   until the FARA filing.  I mean, those are all

10   acts --

11          THE COURT:  But if what they were doing was

12   not a violation of the statute, it doesn't matter

13   whether they were concealing it or not, does it?

14          MR. TURGEON:  That would be true, Your

15   Honor, if that -- if that were the case, but here it

16   is a violation of FARA, which is not the same

17   statute as 951.

18          THE COURT:  But you're saying it was a

19   violation of the statute for them to engage in the

20   publication of the op-ed or the -- or the lobbying

21   without disclosing their status as an agent for the

22   Turkish Government, correct?

1        MR. TURGEON:  Yes, Your Honor, that's --

2   that's --

3        THE COURT:  But if the activity itself

4   didn't trigger that obligation, then how -- how is

5   there -- how is there a 951 violation?

6        MR. TURGEON:  The -- Your Honor, the -- the

7   unlawfulness is not triggered by 951 itself.  I

8   understand the bootstrapping argument, that's what

9   Your Honor is asking about, I believe.  It's not --

10  the 951 viol- -- I understand what Your Honor is

11  saying, it's not a violation of 951 that makes it

12  unlawful because that would be circular, it's a

13  violation of FARA that makes it unlawful and it's

14  a -- it's an act in furtherance of the conspiracy to

15  violate both 951 and FARA.

16       THE COURT:  That required the actual filing

17  of FARA, correct?  I guess that's what I'm trying to

18  understand.  If -- absent the filing of the FARA

19  statement, in which I understand you -- I understand

20  the Government's theory that there were false

21  statements and there were false statements whether

22  or not there was obligation to file in the first

1   place, but in the absence of the FARA filing, let's

2   assume it was never -- let's assume that when the

3   DOJ got in touch with Covington and said, you know,

4   think about whether you need to do a FARA filing and

5   Covington decided we looked at this, we don't think

6   there's -- we don't think we need to file and he

7   never filed.

8           And the question then is under those

9   circumstances, how would you have a 951 violation

10  if -- if you -- based on the op-ed and the lobbying

11  and nothing else.

12          MR. TURGEON:  Yes, Your Honor.

13          Your Honor, the conspiracy and the

14  substantive 951 violation are separate.  I mean --

15          THE COURT:  I understand that.

16          MR. TURGEON:  The conspiracy still stands.

17          THE COURT:  I understand that point, but

18  stay with 95 -- 951.

19          MR. TURGEON:  But with regard to the op-ed,

20  Your Honor, I mean, I have to focus again, this is a

21  registration statute.  I mean, the conduct itself is

22  not the issue, it's the lack of registration when

```
 1    engaging in conduct is the issue.  I -- I don't know
 2    what else to say on that.
 3              THE COURT:  But it's -- but it's the --
 4              MR. TURGEON:  Your Honor --
 5              THE COURT:  It's the covered activity that
 6    triggered the filing obligation, correct?
 7              MR. TURGEON:  Yes.
 8              THE COURT:  Right.  So then isn't it proper
 9    for the Court to focus on whether the indictment
10    alleges conduct that triggers the filing obligation?
11              MR. TURGEON:  If Your Honor --
12              THE COURT:  Under 9 -- notification
13    requirement under 951.  And if the Court were to
14    conclude that, based on the allegations, the
15    activity that is alleged required notification under
16    951 in fact was not conduct that required
17    notification, then why should the 951 count go
18    forward?
19              MR. TURGEON:  Your Honor, the Court would
20    be incorrect in so concluding because we have here
21    both conspiracy to violate FARA and we have
22    substantive FARA violations.
```

```
 1            THE COURT:  I understand.  I understand.

 2            MR. TURGEON:  That are -- that are conduct

 3    illegal --

 4            THE COURT:  I understand there's a --

 5            MR. TURGEON:  And are not lawful.

 6            THE COURT:  I understand there's a

 7    conspiracy count that's separate and apart from 951.

 8    And I understand, theoretically, you can have a

 9    conspiracy to violate a law that, in fact, your

10    conduct never violated.  I understand all that.

11            MR. TURGEON:  Right.

12            THE COURT:  I'm just focused on the 951

13    charge now, Count 2.

14            MR. TURGEON:  The substantive 951 charge,

15    Your Honor, the conduct alleged in the indictment

16    is -- does not qualify as being a commercial

17    transaction.

18            THE COURT:  Why?

19            MR. TURGEON:  Because it was illegal under

20    FARA, which is a different statute.

21            THE COURT:  Okay.  So it was illegal under

22    FARA?
```

 1              MR. TURGEON:  Yes, Your Honor.

 2              THE COURT:  For them to engage in conduct

 3      relative to the op-ed and the lobbying?

 4              MR. TURGEON:  Without registering, Your

 5      Honor, yes.  And that's exactly what Congress

 6      intended in the legislative --

 7              THE COURT:  What -- what provision of FARA

 8      are you talking about there?

 9              MR. TURGEON:  Your Honor, they were acting

10      as agents of foreign government without -- without

11      disclosing -- I mean, FARA --

12              THE COURT:  You're talking about 6 -- is it

13      651, right?

14              MR. TURGEON:  612, Your Honor.

15              THE COURT:  612?

16              MR. TURGEON:  Yes.

17              THE COURT:  So their -- so their lobbying

18      activity and publishing with op-ed, under the

19      Government's theory, was a violation of Section 612

20      absent registration?

21              MR. TURGEON:  Yes, Your Honor.

22              THE COURT:  Okay.

1          MR. TURGEON:  And that is completely

2   consistent with the legislative history of 951 that

3   says activities that violate FARA don't qualify for

4   this exception.

5          And I have that legislative history if Your

6   Honor would like -- would like to see that

7   provision.  And it's cited --

8          THE COURT:  Right.

9          MR. TURGEON:  -- in our brief.

10          THE COURT:  But it violated FARA only if

11   they were acting as an agent of the foreign

12   government, correct?

13          MR. TURGEON:  As defined by FARA, yes, Your

14   Honor.  Yes.

15          THE COURT:  All right.  It seems to me

16   we're back to the same issue.

17          MR. TURGEON:  Your Honor, there -- there

18   are different statutes, there -- there is some

19   overlap, but there are different statutes.

20          THE COURT:  So you're suggesting that

21   the -- the -- the definition of agent that's in 951

22   is a different definition than the definition of

1    agent under 612?

2            MR. TURGEON:  It is, Your Honor.  Yes, it

3    is.

4            THE COURT:  All right.

5            MR. TURGEON:  And, as Your Honor can see,

6    those definitions are markedly different.

7            THE COURT:  All right.

8            MR. TURGEON:  Another point I wanted to

9    raise, Your Honor, is -- so Truong, the defense's

10   arguing vagueness and they're pointing out this is

11   an as-applied challenge and that's -- they're saying

12   it's not a facial vagueness challenge, and they cite

13   that as a basis to ignore the two holdings in this

14   case or two holdings relevant here that they don't

15   like, versus Truong, which the Fourth Circuit held

16   in 951 was not vague or overbroad even when it had

17   no limitations --

18           THE COURT:  Right.  I understand that

19   argument.

20           MR. TURGEON:  -- not the limitations we're

21   talking about.  And Duran, which when faced with the

22   exact same question that we are here debating, found

1    that the legal commercial transaction exception is

2    an affirmative defense that doesn't need to be pled

3    in the indictment, it's not an element.

4              THE COURT:  Although Duran, you're talking

5    about District Court opinion in Duran?

6              MR. TURGEON:  Yes, Your Honor.

7              THE COURT:  Yeah.  The facts are really

8    quite different than here, weren't they?  They

9    had -- they relied on extortion and bribery

10   activities that just simply aren't here.

11             MR. TURGEON:  They -- they -- Your Honor,

12   they did not -- the facts are different, but the

13   Court did not rely on those different facts --

14             THE COURT:  I understand.

15             MR. TURGEON:  -- in reaching its opinion.

16   The Court analyzed the statute under Cook and

17   McKelvey, which is what this Court should do now.

18             THE COURT:  All right.

19             MR. TURGEON:  Thank you.

20             THE COURT:  All right.  Counsel, what about

21   this point that the definition of agent is different

22   for purposes of FARA registration than for 951?

 1          MR. TYSSE:  I welcome that point, Your

 2   Honor, because I think that is a concession that

 3   this indictment is therefore defective.  I make a

 4   couple points with it.  First of all, they did not

 5   actually allege in their brief that we violated

 6   FARA, the substantive count of FARA, and therefore

 7   it's not been briefed.  Okay.  I'll just put that

 8   out to begin with.

 9          THE COURT:  Right.  But it was a -- it was

10   an object of the conspiracy.

11          MR. TYSSE:  Well, actually, I just took a

12   look at that, Your Honor.  The object of the

13   conspiracy is that we conspired to willfully make a

14   false statement on a FARA form under 618(A)(2).

15          THE COURT:  Right.

16          MR. TYSSE:  618(A)(1) is the provision that

17   says it's a crime to violate any other provision of

18   FARA.  And so they have not alleged that we have

19   that as an object of the conspiracy.  I think at a

20   minimum they would have to fix it on that.

21          But more broadly, Your Honor, they haven't

22   actually alleged anywhere in the indictment that we

1    violated the substantive elements of FARA.  This is

2    a lawyer argument that is coming today for the first

3    time in this courtroom that we should have -- we

4    should have registered under FARA.

5            Now, they didn't bring a charge against us

6    and I can only speculate why my client was not

7    charged for the substantive FARA violation, but, you

8    know, I -- I can offer some speculation perhaps

9    because it's a -- it's a lower crime, it's only a

10   five-year term versus a ten-year, or perhaps because

11   it requires a willful violation of FARA versus this

12   statute which the Government contends only requires

13   general intent.

14           So perhaps the Government realized that it

15   would be much harder to charge under FARA because my

16   client spoke with multiple lawyers, three different

17   sets of lawyers during the course of this alleged

18   conspiracy about his FARA filing obligations.  So

19   I -- I have a feeling that might be one of the

20   reasons why they have not alleged it.

21           So not only have they not charged us with a

22   substantive violation of FARA, there is nothing in

1    the indictment that even refers to the fact that

2    that is what -- that that was the conduct that --

3    you know, that violated any federal or state law.

4    So at a bare -- so at a bare minimum, it seems like

5    they should have to go back.  Go back to the grand

6    jury, get a new indictment that actually either

7    charges us with a substantive FARA violation or at

8    least spells out to give my client notice.

9            And, again, the whole point of the Fifth

10   and Sixth Amendment rights, the basis of our motion

11   to dismiss is that my client needs notice of how to

12   put on a defense; and right now all the indictment

13   says is that we committed unlawful acts by operating

14   an op-ed and engaging in lobbying activity and then

15   also conspired to file false forms at the very tail

16   end of that -- under that core agency activity.

17           My client is not on notice of how he should

18   put on a good defense of the charge that we somehow

19   were acting in a non-legal commercial manner.  I

20   mean, they concede that it was First Amendment

21   activity and that it was commercial in nature, he

22   got paid for it.

1          I mean, and -- and we -- the FIG company

2     sold services to the general public.  This is not a

3     situation where it was an employee of a foreign

4     government.

5          So I think at a bare minimum the

6     Government's argument admits that this indictment

7     can't survive regardless of whether some other

8     indictment that they want to try to charge next will

9     survive.

10         Beyond that, just a small point, the

11    Government says it several times that we were

12    misleading and it was quoted -- on page 13 of our

13    brief we quote the legislative history that says

14    individuals who represent foreign governments in

15    political activities.  I don't know why they've

16    accused us a couple times of being misleading.

17         The second point I want to make, Your

18    Honor -- and I'm only going to make three points

19    total, so please bear with me if you don't mind.

20    But the notification statute I think Your Honor is

21    asking about, I think that's actually real key to

22    interpreting this statute in what is exactly covered

1    because, again, the question is this statute is not

2    a statute that says everybody must register, but if

3    you were a roof contractor and you failed to

4    register, you have an affirmative defense and you

5    will get prosecuted for it, that's not what it says.

6            This is a notification statute.  It says

7    these people, the following people, essentially,

8    must note -- must register or -- you know, must

9    register as agents of a foreign government.  And so

10   by failing, you know, and -- and only agents of a

11   foreign government, as so defined, must register.

12           Okay.  I think finally, by focusing on what

13   the actual agency activity was that the Government

14   actually alleges we engaged in that was not legally

15   commercial, I think Your Honor really hit it on the

16   head because even if this was not an element, and we

17   think it strongly is and for purposes of the

18   constitutional avoidance and otherwise, we think

19   it's the best reading.

20           But even if it's not, many cases have held

21   and the Government does not dispute that if you find

22   there's no factual dispute that they haven't

1    actually alleged any underlying non-legal,

2    noncommercial activity, then that -- that's still a

3    basis for dismissing this indictment.  And they

4    would have to come back and try again with one that

5    actually properly construed the elements.

6            I'm going to make one -- I'm sorry, one

7    final small point.

8            THE COURT:  All right.

9            MR. TYSSE:  On the Duran case, you're

10   right, not only is it an unpublished decision from a

11   different circuit that applies a different standard,

12   but the -- the Court specifically said I can't find

13   any relevant legislative history.  I don't think the

14   Court grappled with the idea that the defendant

15   would have to, you know, affirmatively prove his own

16   innocence, and if -- if that interpretation was

17   correct.

18           And I think there's one other really

19   notable -- notable aspect of the Duran case, Your

20   Honor, which is that -- that that district court in

21   the Southern District of Florida actually found that

22   it was the Government's burden to prove that an

1   alleged agent was not acting as a diplomatic or

2   consular or officer or attaché.  That Court actually

3   found that was an element of the offense.  So the

4   Government was really only taking part of the

5   analysis, it's picking and choosing which parts of

6   that it likes because it denies that that part is

7   actually an affirmative element of defense, which I

8   again -- or an element of offense which, again, I

9   think, goes to show that, you know, we -- we need

10  not -- it was not accepted by the 11th Circuit, it

11  was not addressed by the 11th Circuit, as everyone

12  agrees.  So I don't think that that should be overly

13  controlling in this circumstance.

14          THE COURT:  All right.  Thank you.

15          MR. TYSSE:  Thank you.

16          THE COURT:  Go ahead, Mr. Turgeon.

17          MR. TURGEON:  May I respond briefly?

18          THE COURT:  Yes.

19          MR. TURGEON:  Your Honor -- Your Honor, we

20  have alleged in the indictment that the conduct was

21  unlawful and there is --

22          THE COURT:  I understand, but that's not --

```
1    you don't -- you don't have to say that.

2              MR. TURGEON:  There's no need in the

3    indictment, Your Honor, to say what statute it was

4    in violation of.

5              THE COURT:  Right.

6              MR. TURGEON:  And this would only be the

7    case as well, of course, if this were found to be an

8    element rather than a defense.

9              I want to point out, Your Honor, that in

10   addition to the definition of agent, 951 in FARA

11   defer in the scope of conduct covered, 951 is

12   broader than FARA.  And, in this case, the

13   defendants' conduct was, we believe, broader than --

14   than mere violations of FARA, although it included

15   those.

16             And I just wanted to point out too, Your

17   Honor, under their definition, any -- or under their

18   interpretation, any conduct is okay as long as

19   there's a contract.  And that's -- that's also just

20   not -- that's not how 951 works.  I mean, taking

21   pictures is lawful activity, but conducting

22   surveillance for a foreign government without
```

 1   registering is unlawful under 951.

 2          And I could respond to their argument on

 3   diplomatic officer exception, Your Honor, which

 4   they -- which they raised in their footnote.  So we

 5   didn't analyze it extensively in our opposition, but

 6   there I would suggest the Court conduct the same

 7   analysis mandated by Cook and McKelvey.

 8          And when you look at the placement of the

 9   language, here it is set off by commas, how does the

10   statute read without that language.  It reads fine.

11   Whoever acts in the United States as an agent of a

12   foreign government without prior notification to the

13   attorney general, et cetera, et cetera.  I mean, the

14   statute makes perfect sense without that diplomatic

15   officer language.

16          And I can -- I can refer to the legislative

17   history for that exception as well.  I mean, in 1984

18   Congress amended the statute to add all of the

19   exceptions in Subsection D.  And when Congress did

20   so, it added an overlapping diplomatic officer

21   defense in Subsection D, but it didn't take that

22   language out of Subsection A.  And so the addition

1    of the language in D shows that Congress intended

2    that language to be defense.  Had they thought that

3    the language in A was an element, they wouldn't have

4    needed to add it as a defense in Subsection D.

5          THE COURT:  All right.  I'll give you the

6    last word since it's your motion if you want to add

7    anything to that.

8          MR. TYSSE:  I promise I'll be very brief.

9          THE COURT:  All right.

10         MR. TYSSE:  Just a few -- a few small

11   points on that one.  The first is that, Your Honor,

12   it's not enough to simply say unlawful, as we

13   pointed out before.  I'll point you to the U.S. v.

14   Daniels case, which was actually --

15         THE COURT:  Right.

16         MR. TYSSE:  -- very similar to this.  That

17   case, the indictment was actually dismissed post

18   trial, conviction was thrown out because they had

19   failed to allege a specific -- it said, you know,

20   any violation of this chapter shall be violated --

21   and they didn't list a specific section, you know,

22   criminal provision in the indictment.  And so even

1    post trial the verdict was tossed out because they

2    forgot to do it.

3          It's even worse here because they don't

4    even say that we violated FARA, they say we

5    conspired to, you know, make false statements, but

6    they don't make any allegation.  There's no

7    reference whatsoever to the -- to the FARA violation

8    itself.

9          The second point is the set off by commas

10   point.  I mean, the reason, Your Honor -- and I

11   think this is a really important point.  The reason

12   why -- first of all, the set off by commas, we cited

13   some language from the Fourth Circuit and the

14   Supreme Court, unlike the Fifth Circuit case that

15   they cite, which uses -- looks at the exact same

16   phrase without lawful authority set off by commas

17   and says that is an affirmative element of the

18   defense.

19         The only case that's actually analyzed is

20   the Duran case that they cite did find it was an

21   affirmative defense.  I think we have a pretty good

22   argument that it is, plus it's in Subsection A which

1    they say is the most crucial factor.  But I think --

2    I think it actually brings up a really important

3    point, Your Honor, which is that we're not here

4    making a hypertechnical argument about why, you

5    know, the Government's indictment needs to be

6    dismissed because they forgot to say we're not a

7    diplomatic consular, officer, or attaché.  We do

8    think that's a defect in the indictment, but

9    presumably it's something they could easily fix with

10   a quick superseding indictment.  They'll be able to

11   prove it at trial, that's not why we're here.

12          We're here because we have a substantive

13   practical objection to what the Government has done

14   and it has put our client on trial for up to ten

15   years imprisonment, and it's done so without ever

16   specifying the actual unlawful activity it alleges

17   we engaged in.

18          THE COURT:  All right.  I understand.

19          MR. TYSSE:  Thank you.

20          THE COURT:  All right.  I'm going to take

21   it under advisement.  I'll get a decision shortly --

22   excuse me -- on this as well as the other pending

```
 1    motions.

 2            In that respect, there's a motion --

 3    pending motion to compel that the Government

 4    hasn't -- hasn't responded to yet pertaining to

 5    Mr. Rafiekian's statements.  What's -- what's the

 6    status of the Government's response?

 7            MR. TURGEON:  Your Honor, could we approach

 8    for a brief side bar?

 9            THE COURT:  Yes.

10            (Whereupon, matters were taken up at the

11    bench under seal.)

12            THE COURT:  All right.  Thank you, counsel

13    is excused.  Is there -- is there something else?

14            MR. GILLIS:  Your Honor, you had asked for

15    briefing on the -- on the work product issue.

16            THE COURT:  Yes, yes.

17            MR. GILLIS:  And -- and we also submitted a

18    memorandum having to do with the coconspirator

19    statements and the --

20            THE COURT:  Right.  Right.  Would you like

21    to have further argument on that?

22            MR. GILLIS:  Well, on the work product --
```

```
 1              THE COURT:  All right.  I'll hear you.

 2              MR. GILLIS:  It's not that necessarily I --

 3   well, we haven't argued that part yet, Your Honor.

 4              THE COURT:  All right.  All right.

 5              MR. GILLIS:  So, Your Honor, with respect

 6   to the opinion work product argument, there are

 7   several points at which the Court can stop without

 8   needing to proceed any further.  First, with respect

 9   to the basic premise on whether this -- these

10   documents were prepared in anticipation of

11   litigation.

12              THE COURT:  Right.

13              MR. GILLIS:  The fundamental question, it

14   is their burden to establish the work product

15   privilege, which they have not even attempted to do.

16   There's no declarations from the attorneys,

17   there's -- neither from Covington nor from

18   Verderame.  There's no declaration from the

19   defendant nor anyone else, nor any evidence provided

20   to the Court to suggest that any of this was

21   prepared because of litigation, which is the

22   standard.  And because --
```

1            THE COURT:  Well, not all of it was

2    prepared following in response to the DOJ inquiry.

3            MR. GILLIS:  Well, as a matter of fact,

4    Your Honor --

5            THE COURT:  Isn't that right?

6            MR. GILLIS:  I'm sorry?

7            THE COURT:  Isn't that correct?

8            MR. GILLIS:  The question is whether it was

9    prepared subsequent to the DOJ inquiry?

10           THE COURT:  Correct.

11           MR. GILLIS:  I believe it was, Your Honor.

12           THE COURT:  Right.

13           MR. GILLIS:  Yes, that the conversations

14   between -- among -- well, between Covington and the

15   clients began after the -- the inquiry by the

16   Department of Justice.

17           THE COURT:  Right.

18           MR. GILLIS:  As we've argued, however, Your

19   Honor, that does not automatically mean that it is

20   created in anticipation or because of litigation.

21   And, in fact, it's still their burden to establish

22   that that, under -- under the Fourth Circuit law

 1    that we have -- that we have provided in our briefs,

 2    if I may point the Court to --

 3              THE COURT:  Let me -- let me ask you one

 4    question.

 5              MR. GILLIS:  Yes, sir.

 6              THE COURT:  The specific statements that

 7    you want in really haven't been identified, but just

 8    as a general proposition, are you -- are you trying

 9    to get in statements that were made to Covington

10    other than statements that you contend were made to

11    Covington for the purposes of the FARA public

12    filing?

13              MR. GILLIS:  Certainly, Your Honor, yes.

14              THE COURT:  All right.

15              MR. GILLIS:  We definitely are.

16              THE COURT:  All right.

17              MR. GILLIS:  Because those statements

18    reflect an effort to conceal the involvement of the

19    government of Turkey and to misrepresent the

20    significance of certain documents that were created

21    before the FARA inquiry and that predated the

22    opinion piece that ultimately resulted in the

 1   FARA --

 2          THE COURT:  All right.

 3          MR. GILLIS:  -- inquiry.

 4          THE COURT:  All right.

 5          MR. GILLIS:  So absolutely, Your Honor, we

 6   are -- and, in fact, we contend that none of it is

 7   privileged at least on work product grounds because

 8   they have not met the burden, they have -- as I've

 9   already said.

10          If I could, Your Honor, point the Court's

11   attention to Government's Exhibit 90.  I don't know

12   if you have it available, handy.  If not, I can hand

13   up my copy.

14          THE COURT:  Which -- what is it?

15          MR. GILLIS:  It's the initial letter from

16   the FARA unit on November 30, 2016.  And does the

17   Court have it, Your Honor?

18          THE COURT:  I don't -- not immediately.  If

19   you have an extra copy.

20          MR. GILLIS:  I don't have an extra one, but

21   I can try to remember what it says, Your Honor, if

22   you -- if you'll take mine.  Unfortunately it has my

 1    notes on it.

 2           THE COURT:  That's all right.  Was it

 3    attached to your motion for a supplemental filing?

 4           MR. GILLIS:  It was attached to the

 5    original motion to establish the crime fraud

 6    exception --

 7           THE COURT:  All right.

 8           MR. GILLIS:  -- in connection with this --

 9    with which this supplemental filing --

10           THE COURT:  I should have it.

11           MR. GILLIS:  -- is being made.

12           THE COURT:  Hold on.  Number 90?

13           MR. GILLIS:  Yes, sir.  Is it not there,

14    Your Honor?

15           THE COURT:  I'm not finding it immediately.

16    Why don't you --

17           MR. GILLIS:  If I may, Your Honor, then --

18           THE COURT:  Yeah.

19           MR. GILLIS:  -- point the Court's attention

20    to the two parts that I have circled or underlined

21    there, Your Honor.  In the second paragraph, the

22    FARA unit expressly states that they routinely make

 1   these inquiries.  There's no threat of litigation or

 2   there's no implication that they've committed any

 3   sort of crime, there's no implication yet that

 4   they've even violated FARA.  They're merely making

 5   an inquiry whether the defendant has -- well,

 6   whether FIG had an obligation to file, and that

 7   the -- the last paragraph of the -- of the letter

 8   also is in a perfectly conversational tone that does

 9   not in any way suggest that there's anything wrong

10   that have -- had been done.  There's no reason at

11   that point -- certainly they've offered no reason to

12   suggest that simply because the receipt of that

13   letter, they were suddenly in anticipation of

14   litigation.

15         So that this -- that anything that they

16   produce -- what they're basically contending is that

17   anything that happened after that letter, anything

18   that took place within Covington, Verderame,

19   anything at all is covered by in anticipation of

20   litigation; and that just flies in the teeth of any

21   number of Fourth Circuit precedent, Your Honor.

22         If I also may direct the Court's attention

 1   then to Covington's reply to that letter, which I

 2   have provided to the Court.  It's the one dated

 3   January 11, 2017.

 4            THE COURT:  I have that one.

 5            MR. GILLIS:  Thank you, Your Honor.

 6            THE COURT:  That is in the third paragraph,

 7   there among other things, again, no threat of -- or

 8   no suggestion that there's been a violation, none

 9   whatsoever.  And then Covington in response states

10   in that third paragraph based on currently available

11   information we have -- anticipate that General Flynn

12   and FIG likely will file a FARA registration

13   statement in lieu of the Lobbying Disclosure Act

14   filing that FIG filed earlier.

15            Again, if they're suggesting -- if they're

16   contemplating the filing of a FARA statement, that

17   certainly suggests that they're not contemplating

18   litigation over existence of a FARA violation.

19   They're simply saying there we anticipate filing

20   FARA registration.  Again, it completely undercuts

21   the notion that anything was prepared because of --

22   which is what the Fourth Circuit requires -- because

1   of anticipated litigation.  And, again, it's their

2   burden to come forward with that.  They have failed

3   to do so in any way whatsoever.

4           And then, again, Your Honor, you have with

5   you the March 3rd letter, again from Covington to

6   the FARA unit; and in the -- at the end of the

7   fourth paragraph -- and, again, this is antic- --

8   this is actually providing FARA filing to eliminate

9   any potential doubt.  The Flynn Intel Group,

10  therefore, is electing to file a registration under

11  FARA in lieu of its prior LDA registration.

12          There's nothing that takes place between

13  Covington's initial letter saying we anticipate

14  filing the FARA and this letter saying that they are

15  filing the FARA --

16          THE COURT:  Okay.

17          MR. GILLIS:  -- to -- to suggest that they

18  were contemplating any litigation, and certainly not

19  that all the documents -- all the statements made to

20  the attorneys and anything that they wrote down was

21  done in anticipation of litigation.

22          THE COURT:  Okay.

 1          MR. GILLIS:  Nor, Your Honor --

 2          THE COURT:  So if your position is correct

 3    then, all of the Coving- -- all of what we're

 4    calling work product on the part of Covington would

 5    be reachable once you made the crime fraud exception

 6    showing?

 7          MR. GILLIS:  Yes, Your Honor.  Actually,

 8    what -- our contention is that it's not work product

 9    to begin with.  To be clear, Your Honor, if -- if

10    the client comes in and discloses all sorts of --

11    all sorts of manner of financial documents, it

12    discloses everything to the attorney in connection

13    with the filing of an IRS form or the filing of,

14    let's say, for that matter a FARA filing.

15          If they come in and disgorge all of that

16    information to the attorney, leaving -- where

17    there's no anticipation of litigation, all of that

18    information could be provided upon establishing the

19    attorney -- the exception of the attorney-client

20    privilege.

21          THE COURT:  Well, that was my question.

22    Because under those circumstances, it wouldn't be

```
 1    privileged in the first instance.

 2             MR. GILLIS:  That's what I'm saying, Your

 3    Honor.  I'm saying --

 4             THE COURT:  And that was my question

 5    initially, whether you're trying to get in

 6    statements made other than statements that wouldn't

 7    be privileged in the first instance because they

 8    were provided for the purposes of a public filing.

 9             MR. GILLIS:  That is correct, Your Honor.

10    We are -- we are seeking -- I beg your pardon if I

11    misunderstood the -- whether, as a basis of the

12    attorney-client privilege, it's being officiated by

13    the crime fraud exception.

14             THE COURT:  Right.  Separate and apart from

15    whether it was privileged in the first place.

16             MR. GILLIS:  Exactly, Your Honor.

17             THE COURT:  Right.

18             MR. GILLIS:  I mean, it's vitiated, but the

19    crime fraud exception, I submit we've established in

20    spades.  I think that -- I submit that that -- that

21    overcomes anything else -- everything else except

22    that for which they have established, as they must,
```

1    the existence of that privilege.

2          THE COURT:  But getting back to my

3    question, are there statements that you want to get

4    in that in your view would not be covered by the

5    proposition that they weren't privileged in the

6    first place because they were provided for the

7    purpose of public filing and you have to rely on

8    some exception to the attorney-client privilege,

9    because they are privileged?

10          MR. GILLIS:  Well, as to that, Your Honor,

11   we have -- we have filed those cases in our brief

12   and I don't need to argue that again.  Our point is

13   that -- that -- to be clear, there are certain

14   documents that, yes, all of it we submit is --

15   let's -- let's assume for argument that it's all

16   covered by the attorney-client privilege.

17          THE COURT:  So if the Court were to rule

18   that --

19          MR. GILLIS:  Yes.

20          THE COURT:  -- the crime fraud exception

21   doesn't apply, all right, to any privileged

22   information, you're telling me that doesn't matter

1  because you still can get everything you want to get

2  in under the -- under the principle that it wasn't

3  privileged in the first instance because it was

4  provided for the purposes of public filing?

5          MR. GILLIS:  Well, I believe that we could

6  not take that -- well, Your Honor, I think we have

7  to -- again, I believe it would be their

8  responsibility -- I'm trying to -- I'm not trying to

9  thread the needle here, Your Honor.  I'm just trying

10 to understand -- make sure that I've made my point

11 clear.

12          There would be certainly a universe of

13 documents and statements made to the attorney that

14 were made for the purpose of a public filing and

15 it's not limited exclusively to what's in that

16 public filing.

17          THE COURT:  I understand.  That goes to the

18 scope of the -- the scope of what's not privileged.

19          MR. GILLIS:  Yes, Your Honor.

20          THE COURT:  Right.

21          MR. GILLIS:  And so at this point we don't

22 necessarily know all of which was intended to be

1   disclosed and that which might not have been

2   intended to be disclosed.  But the bulk of what --

3   well, I should say basically everything we plan to

4   rely upon would also fall under that exception

5   because it was either intended to be disclosed or it

6   was provided in anticipation of the preparation of a

7   document that would disclose the substance of what

8   was discussed between the attorney and the client.

9   And to the extent that that's our argument -- and to

10  that -- to the extent that it -- I completely lost

11  my way there, Your Honor.

12            THE COURT:  That's all right.

13            MR. GILLIS:  I beg your pardon.

14            THE COURT:  That's all right.  I'm sure

15  you'll get back on track here in a second.

16            MR. GILLIS:  It's not a guarantee, Your

17  Honor.  I -- if I may, our position would be that

18  what is -- what was discussed is -- would

19  certainly -- now I'm back to where I was.  So all

20  that we plan to introduce basically, Your Honor, was

21  part of what would fall within that exception,

22  because it was all within the ambit of the

 1    preparation of this FARA --

 2              THE COURT:  All right.

 3              MR. GILLIS:  -- filing.  And so to that

 4    extent, we rely on our -- on our papers with respect

 5    to the public disclosure --

 6              THE COURT:  Right.

 7              MR. GILLIS:  -- question.  That, we rely on

 8    our papers.

 9              THE COURT:  Right.

10              MR. GILLIS:  If I may continue though --

11              THE COURT:  Sure.

12              MR. GILLIS:  -- with respect to the work

13    product document.  So I've already --

14              THE COURT:  If you're correct, you don't --

15    you don't even -- all the other issues are

16    irrelevant.  It doesn't matter whether it's work

17    product, it doesn't matter -- it doesn't matter if

18    it's work product, it doesn't matter if it's crime

19    fraud because they -- they don't pertain unless

20    you're dealing with nonprivileged information in the

21    first instance.

22              MR. GILLIS:  Exactly, Your Honor.

 1            THE COURT:  Right.

 2            MR. GILLIS:  Now, with respect to the -- in

 3    addition to having to prove the anticipation of --

 4    because of litigation harm -- pardon me, Your

 5    Honor -- they also have to identify with specificity

 6    exactly what it is that they contend is covered by

 7    the punitive privilege.  And that is clear from the

 8    cases that we've cited, they've not even made an

 9    effort to distinguish those cases.

10            THE COURT:  Well, of course, all of this is

11    within the context of not knowing what specific

12    statements or documents you're talking about.

13            MR. GILLIS:  Well, Your Honor --

14            THE COURT:  Right?

15            MR. GILLIS:  No, well -- what specific

16    statements I submit, Your Honor, that the Fourth

17    Circuit makes clear, that it's the other way around,

18    that they are the ones asserting the privilege with

19    respect to conversations and documents between their

20    client and -- and -- and Covington.

21            THE COURT:  I understand that, but whether

22    you -- with regards to whose burden it is with

 1   respect to making any particular showing, you

 2   haven't identified, at least in court, specifically

 3   what -- what statements or what documents and

 4   statements you want admitted, correct?

 5             MR. GILLIS:  Well, actually, Your Honor, we

 6   have allowed them to review at length the 302s that

 7   we had of --

 8             THE COURT:  No, I understand.  But have

 9   you -- I mean, but you haven't identified specific

10   statements that you're going to put a witness on the

11   stand and try to get in.

12             MR. GILLIS:  I don't believe any Court has

13   required that, Your Honor.

14             THE COURT:  I understand.

15             MR. GILLIS:  Okay.

16             THE COURT:  Okay.

17             MR. GILLIS:  I'm sorry, Your Honor.

18             THE COURT:  All right.

19             MR. GILLIS:  All right.  So what you're

20   asking is have we identified the specific

21   statements --

22             THE COURT:  Right.

1           MR. GILLIS:  -- that we plan to introduce?

2           THE COURT:  And the answer is no, correct?

3           MR. GILLIS:  I think the answer is that --

4    that we have not identified each and every

5    statement.

6           THE COURT:  Right.

7           MR. GILLIS:  We have -- however, we have

8    provided the 302s that were written of the

9    interviews.  And if I may say, Your Honor, basically

10   all of that, I would say everything in those 302s,

11   we plan to introduce.  Because everything that's in

12   302s has some relevance to this case.

13          THE COURT:  All right.

14          MR. GILLIS:  So I submit that we have

15   sufficiently identified with considerable detail

16   exactly what we plan to introduce.  And to the

17   extent that -- that it's not explicitly stated in

18   the -- in the 302 itself, it's certainly clear from

19   the interfuse of what's there that -- that we plan

20   to cover that particular subject.

21          THE COURT:  All right.

22          MR. GILLIS:  So with respect to that

1    subject matter, they're certainly able to do that

2    and any documents related to that.  And actually

3    with respect to the documents, as I said, we have --

4    well, first we have identified them in the

5    indictment; and as to those allegations, we have

6    provided them with the specific exhibit numbers.

7    And the Court has some of those, but we -- as I

8    said, we produced that basically on the -- at the

9    arraignment, we produced those documents.

10            THE COURT:  I understand.  All right.

11            MR. GILLIS:  So if I may proceed now with

12   the specificity --

13            THE COURT:  Yes.

14            MR. GILLIS:  -- question.

15            So the Fourth Circuit has been explicit

16   that the party asserting the privilege must

17   establish the privilege as to each document over

18   which they assert the privilege.  And, as I said,

19   they have not tried to distinguish those cases in

20   which the Fourth Circuit has made that abundantly

21   clear.  And as -- as we cited in our -- in our

22   brief, the -- the Court in Solace, the Fourth

```
 1    Circuit in Solace made clear that because the party
 2    asserting the privilege in that case had failed to
 3    provide privilege logs or identify the litigation
 4    for which the specific documents were prepared, we
 5    see no reason to even reach the issue beyond that.
 6    And as they said, explicitly, the party claiming the
 7    privilege bears the burden of demonstrating the
 8    applicability of the privilege to specific
 9    documents.  And, again, in National Union, the
10    Fourth Circuit said determining the driving force
11    behind the preparation of each requested document is
12    therefore required in resolving the work product
13    immunity question.
14            There -- I -- also, Your Honor, there
15    are -- there are -- oh, my colleague has also
16    pointed out, Your Honor, that with respect to
17    Kristen Verderame, we have no idea what she's going
18    to say because she's waiting to -- well, she has not
19    agreed to talk to us pending a decision from this
20    Court on that question.
21            THE COURT:  All right.
22            MR. GILLIS:  So we have no idea what
```

 1    Ms. Verderame may say.

 2            THE COURT:  All right.

 3            MR. GILLIS:  Or what documents, for that

 4    matter, she may --

 5            THE COURT:  Okay.

 6            MR. GILLIS:  -- she may have.

 7            THE COURT:  All right.  Anything more on

 8    that?

 9            MR. GILLIS:  It sounds as if the Court has

10    heard enough on that.  If I --

11            THE COURT:  Do you want to argue the --

12    there's more than happy to be further heard on the

13    coconspirator elements.

14            MR. GILLIS:  Actually, Your Honor, I would

15    like to get to the -- pardon me, our third argument

16    there, which is that the opinion work product, even

17    if it applied, is vitiated in these circumstances,

18    that the defendant has no right to assert it in

19    these circumstances.

20            The only two circuits to have expressly

21    considered the issue or, for that matter, considered

22    the issue at all, the Fifth and the Sixth

1    Amendment -- the Sixth -- Fifth and Sixth Circuits

2    rather, as we cited in our brief, have specifically

3    held that even with respect to opinion work product,

4    where you have a willing attorney to provide that

5    opinion work product, the client who has been found

6    by a prima facie showing to have engaged in criminal

7    activity is not permitted to assert the opinion work

8    product.

9            And that only makes sense, Your Honor,

10   because what -- what essentially their position

11   would be and any rule to the contrary would be that

12   an attorney could be -- that if I -- well, to begin

13   with, first, the most sacred right in this context

14   being the attorney-client privilege and those

15   communications that take place between the two,

16   could be vitiated, and yet this particular

17   subsection of information could be precluded by a

18   guilty client from being revealed in -- which was

19   created in connection with corrupt litigation that

20   he instigated because he gave false information to

21   the innocent attorney.

22           And so that -- that -- the mere fortuity of

1    there being litigation does not then give the

2    defendant a right to prevent -- to close the mouth

3    of a willing attorney when he's -- he's committed a

4    crime of fraud and he's waived or vitiated or

5    forfeited his attorney-client privilege, which is

6    more sacred than the work product privilege, and

7    that in those circumstances he's still allowed to

8    assert the opinion work product.  And it can't be

9    that, Your Honor, because if the attorney is

10   willing, it's -- it's a privilege that's -- that at

11   least in the first instance is -- belongs to the

12   attorney and the client; but as to whatever interest

13   the client has in that opinion work product, it is

14   vitiated by the existence of the crime of fraud that

15   he has --

16           THE COURT:  All right.

17           MR. GILLIS:  -- has instigated that

18   resulted in the very work product we're talking

19   about.

20           THE COURT:  All right.  I understand.  I

21   understand your position.

22           MR. GILLIS:  Okay.  If I may have one

 1   moment, Your Honor.

 2            THE COURT:  Yes.

 3            MR. GILLIS:  Thank you for your patience,

 4   Your Honor.

 5            THE COURT:  All right.  Did you want to be

 6   heard on the coconspirator statute any further?

 7            MR. GILLIS:  My colleague is going to argue

 8   that, Your Honor, if you --

 9            THE COURT:  All right.  Let me -- let me

10   hear from Mr. Gibbs.

11            MR. GIBBS:  Thank you, Judge.

12            THE COURT:  And then we'll have defense

13   respond to both of them.

14            MR. GIBBS:  Sure.  That's fine.

15            Judge, I think most of this is covered in

16   the moving papers.

17            THE COURT:  Right.

18            MR. GIBBS:  But I think the key point that

19   I want to get across here is, as the Court obviously

20   knows, the conspiracy has two objectives.  It's

21   conspiring to conceal the fact that defendant

22   Rafiekian and Alptekin were conspiring together to

1   hide the fact that they were acting as agents of the

2   government of Turkey.

3           THE COURT:  Right.

4           MR. GIBBS:  And they were conspiring to

5   make false statements related to that.

6           So that's our conspiracy, those are the

7   objectives of it.  And throughout, whether they call

8   it the Gulen project or the Turkey project or Truth

9   or Confidence, the objective here was to demonize

10  Fethullah Gulen and to convince the United States

11  Government, without anyone knowing they were working

12  for Turkey, that he should be extradited back to

13  Turkey or charged with crimes of some sort.

14          THE COURT:  Right.

15          MR. GIBBS:  So that's our conspiracy and

16  the statements that the defense is attempting to

17  suppress go squarely to that.  These are not

18  tangential.  This is the defendant Rafiekian

19  communicating in e-mails and Skype messages --

20          THE COURT:  You're talking about statements

21  that you want to get admitted under 801(d)(2)(e)?

22          MR. GIBBS:  Exactly.

1          THE COURT:  All right.

2          MR. GIBBS:  Right.  I mean, this goes

3   squarely to the crime charged here.  And, you know,

4   again, as I said, they were during the time of the

5   conspiracy, they're clearly in furtherance of the

6   conspiracy we've alleged.  And essentially the

7   defense argument is we haven't proved the existence

8   of a conspiracy here.  Well, we've certainly laid

9   out in very detailed terms in the indictment a

10  conspiracy, and, as the Court knows, it's a very

11  favorable standard for the Government.  We just have

12  to prove that existence by a preponderance.  And our

13  position is we very, very clearly have laid out and

14  have proved that, the existence of that conspiracy

15  by a preponderance, but ultimately the people who

16  will have to decide that are the jury.

17          They need to be -- for us to be able to put

18  on evidence of this conspiracy, we need to be able

19  to put on the coconspirator statements that were

20  made during any furtherance of that conspiracy.

21          THE COURT:  Are you trying to get in

22  statements, other than those statements that are

1   reflected in these -- in these exhibits that you

2   attached to your -- to your motion?

3           MR. GIBBS:  We are, Judge.  Those are some

4   of the statements and we alleged a number of them in

5   the indictment and alleged that they were overt acts

6   in furtherance of the conspiracy.  We certainly

7   intend to get all those in, but we didn't list every

8   single statement between, you know, every single

9   coconspirator statement in here, but obviously the

10  defense will have our exhibits at the time --

11          THE COURT:  Well, coconspirators consist of

12  Rafiekian and Alptekin, correct?

13          MR. GIBBS:  Well -- but we also --

14  remember, Judge, we had the Bill of particulars

15  where we went through the Turkish ministers.

16          THE COURT:  Okay.

17          MR. GILLIS:  And there were some questions

18  about that.

19          THE COURT:  All right.  But, yes, I mean,

20  in terms of the statements themselves, we do -- the

21  defense will have our exhibits, we will present

22  witnesses to get various statements in.  If there's

1    an objection that an individual statement is not

2    during the furtherance of the conspiracy, which I --

3    I don't think they'll -- the defense will be able to

4    make a persuasive argument to that, but if there is,

5    the appropriate time to deal with that is at the

6    trial when the evidence is offered.  It's not

7    wholesale to say -- to make an argument which would

8    effectively result in the dismissal of Count 1.

9         THE COURT:  Right.  Well, it seems to me

10   there are a couple of issues that are pretty --

11   pretty closely tied together.  One is whether

12   there's been a sufficient showing for the purposes

13   of 801(d)(2)(e) to get the -- what would otherwise

14   be hearsay statements in a coconspirator -- alleged

15   coconspirator as substantive evidence admissible for

16   the truth of the statement.

17        The other is whether these -- these e-mails

18   that have passed between Rafiekian and Alptekin can

19   be admitted for some purpose separate and apart from

20   the truth of their content, and it seems to me those

21   are very separate issues that irrespective of

22   whether they -- the substantive statements in those

1  documents can come in without a hearsay problem is

2  separate and apart from whether those documents can

3  come in is simply information -- the fact of a

4  transmittal, the fact of receipt, the fact of

5  information, irrespective of whether it's true or

6  not, that is conveyed to Rafiekian.

7          And your motion really relies solely --

8  your motion goes simply to the 801(d)(2) --

9  801(d)(2)(e) point, correct?

10         MR. GIBBS:  It does, Judge, although as the

11  Court knows, we also filed a supplement.  I think as

12  with lots of evidence, there are multiple theories

13  under the rule of evidence to get it in.  The

14  Court -- Your Honor just mentioned one about sort of

15  not necessarily offered for the truth, the effect on

16  the listener --

17         THE COURT:  The fact that he had this

18  information.

19         MR. GIBBS:  Right.  And really I think in

20  terms of the particular evidence we're talking about

21  here -- and this -- this is primarily communications

22  between the two main actors in this case, the two

1   coconspirators, Alptekin and Rafiekian.  As to those

2   communications, we agree that they probably -- the

3   strongest argument for this admission is

4   801(d)(2)(e) that they were coconspirator statements

5   made during, they clearly were during the time of

6   the conspiracy, and in furtherance of that

7   conspiracy to work on this Gulen project on behalf

8   of the government of Turkey.

9           We would also submit that --

10          THE COURT:  They come in anyway even if --

11  even if you don't get them under that exception.

12          MR. GIBBS:  I would certainly hope so,

13  Judge.  And, again, on our supplement we also

14  identified adoptive admissions as another theory

15  under which they should come into evidence.

16          THE COURT:  Again, that comes -- that's a

17  theory that gets them in for the truth.

18          MR. GIBBS:  Correct.

19          THE COURT:  Right.

20          MR. GIBBS:  But, yeah, I would argue that,

21  again, 801(d)(2)(e) is a hearsay exception, they

22  come in as not hearsay.  We would also offer them

1    for the truth of what's said in the communications.

2            THE COURT:  Right.

3            MR. GIBBS:  I mean -- and the jury has to

4    consider that.

5            THE COURT:  Right.  Okay.

6            MR. GIBBS:  So unless there are -- I think

7    this was pretty well briefed.

8            THE COURT:  It was.

9            MR. GIBBS:  Thank you.

10           THE COURT:  Ms. Mitchell.

11           MS. MITCHELL:  Thank you, Your Honor.  And

12   I will address the crime fraud, and Mr. Bereston

13   will address the --

14           THE COURT:  Yeah.

15           MS. MITCHELL:  -- coconspirator statements.

16           THE COURT:  All right.

17           MS. MITCHELL:  With the Court's indulgence.

18           It will probably not surprise you to hear I

19   have a different read of all of this than

20   Mr. Gillis.  With respect to the question about

21   whether this was in anticipation of litigation, the

22   hypothetical that Mr. Gillis proposes, which is that

1    the client went in and spoke to his attorney about

2    filing a FARA form, without any sort of -- in

3    advance, you know, if we were going to buy into the

4    Government's theory here if they had done that in

5    September, I think the discussion we would be having

6    today is different.

7          But even if in the context of their

8    engagement of Covington, that our client provided

9    information to Covington, that's mixed in and is

10   absolutely layered on the fact that they have

11   received a letter from the Department of Justice.

12         And whether or not the Department of

13   Justice routinely looks at op-eds and decides to

14   send notes to various and sundry op-ed writers, that

15   does not make it routine to receive a letter from

16   the Department of Justice.  And it's not just a

17   simple, Gee, can you tell us letter.  It's got six

18   very specific questions.  And clearly this is a very

19   strident inquiry by the Justice Department.

20         Number 2, Your Honor, the fact that -- with

21   respect to this FARA filing -- and I made this

22   point, but it was not as they cite in their -- in

 1   their brief, made in sort of the ordinary course of

 2   business.  The second point I wanted to make with

 3   respect to the FARA filing and the engagement of

 4   Covington is attached to our reply -- our sur-reply

 5   is the -- the alert that Covington -- Rob Kelner,

 6   the very attorney who's involved in this situation

 7   writes in August.  And, actually, this becomes

 8   relevant in the facts of this case, but we're going

 9   to put those aside for a moment.

10           But in August the attorney involved here

11   says -- writes a client alert, Have we reached a

12   FARA tipping point in which that author says the

13   tipping point is increased enforcement.  So there

14   can be no question that, as an attorney, Mr. Kelner

15   and others are thinking, they have received a letter

16   from FARA -- from the Department of Justice, this is

17   a potential investigation.  I don't think there can

18   be any question that this was a potential

19   investigation.  And the -- the case that the

20   Government cites, National Union, for the notion

21   that FARA filed in the ordinary course of -- you

22   know, documents filed in the ordinary course of

1    business.

2              THE COURT:  Right.

3              MS. MITCHELL:  They -- they leave part of

4    that quote out and namely it's the -- that case also

5    finds that if it's prepared because of the prospect

6    of litigation when the preparer faces an actual

7    claim or potential claim following an event that

8    could reasonably result in litigation, that's the

9    standard here.

10             THE COURT:  Right.

11             MS. MITCHELL:  In Textron those -- those

12   documents are very different than what we have here.

13   Those are tax records that were, in fact, before the

14   investigation.  They are -- they are tax records in

15   preparation and notes made to file for an audit.

16   Very different, I think, and I would posit to the

17   Court, than if the Department of Justice said --

18   wrote back and said we're auditing you.  I don't

19   think anyone would think that the --

20             THE COURT:  Right.

21             MS. MITCHELL:  -- the attorney's notes

22   thereafter would be not in anticipation of

 1   litigation.

 2          THE COURT:  How -- from your perspective,

 3   does the Court square the work product issue?  And

 4   let's assume that -- for the moment that the context

 5   would confer work product protections.  How do you

 6   square that position with the proposition that the

 7   information provided to Covington for the purposes

 8   of a filing wouldn't be privileged in the first

 9   instance?

10          MS. MITCHELL:  It's complicated, Your

11   Honor.  I think -- I think the answer is it's

12   complicated and in this instance, because -- because

13   it is in anticipation of litigation and because it

14   wasn't done simply in the regular course of

15   business, I think it is protected.

16          THE COURT:  Even if it were provided -- and

17   I know there's a debate about the scope of what that

18   would be, but let's assume that the information that

19   would otherwise be protected by the work product

20   privilege is also information that was not

21   privileged in the first instance because it was

22   given to Covington for the purposes of a public

1    filing.

2             MS. MITCHELL:  And so what I would suggest

3    is, again, I think that would be very difficult to

4    pull apart.  And because I think if it -- if it were

5    truly just to make a public filing, there might have

6    been a much more cursory inquiry by Covington, but

7    because the attorneys in their -- in their opinion

8    work product realized that this was going to be far

9    more expansive, undoubtedly they asked more

10   questions, they asked more broad questions.  They

11   sought more information than they might otherwise,

12   had they been doing something before there was the

13   contemplation of a potential litigation.

14            And so while -- so I just think the

15   situation here makes it such that unless such

16   information was, in fact, disclosed to the

17   Government which, of course, we would not contest

18   that that's protected, but unless it was disclosed

19   to the Government at some point, we think all of

20   that squarely fits within the opinion work product.

21            THE COURT:  All right.

22            MS. MITCHELL:  And, Your Honor, just very

 1   briefly if I may with respect to the opinion work

 2   product very quickly.  Mr. Gillis would love to be

 3   in the Fifth or Sixth Circuit --

 4            THE COURT:  I understand.

 5            MS. MITCHELL:  -- but he's not, he's in the

 6   Fourth Circuit.  So we strongly believe that absent

 7   a showing that the attorneys here were complicit or

 8   knew of the crime --

 9            THE COURT:  Right.  And there's no

10   contention of that.

11            MS. MITCHELL:  Correct.  And then the last

12   point I do want to make is the suggestion -- and I'm

13   not going to try and reargue the point that

14   Mr. MacDougall argued last time, but the notion that

15   we had a willing attorney waive this -- any portion

16   of this is -- is galling to me for the reasons that

17   Mr. MacDougall pointed out.

18            And so Mr. Gillis sort of falls back on,

19   Oh, we had a -- we had a willing attorney who now --

20   recognizing it's ineffaceable here, but it just --

21   it --

22            THE COURT:  I understand.

1          MS. MITCHELL:  It causes me to address the

2    fact that I don't think we had a willing attorney

3    here.  We had -- we had another -- a -- another

4    principal of FIG, in the context of his cooperation

5    agreement and under the threat of potential further

6    enforcement, make a determination that was in his

7    best interest and not in the best interest of the

8    corporation.

9          THE COURT:  All right.

10          MS. MITCHELL:  Thank you very much.

11          THE COURT:  All right.  Counsel.  No, we

12    have one more.

13          MR. GILLIS:  Oh, I beg your pardon, Your

14    Honor.  Thank you.

15          MR. BERESTON:  Your Honor, we argued the --

16    with respect to the 801(d)(2)(e), we argued that at

17    the last hearing and so I won't beat a dead horse

18    and sort of repeat those arguments, but I just will

19    address one point that the Government raised, and

20    that's, you know, because the Government's alleged a

21    conspiracy here, that it's for the jury to decide

22    the existence of that conspiracy, but that's not the

 1    standard to admit out-of-court statements.

 2              THE COURT:  Right.  I understand.

 3              MR. BERESTON:  It's, you know, as Your

 4    Honor knows, preliminary evidentiary matters are for

 5    the Court to decide, and so the burden is on the

 6    Government to show the existence of the conspiracy

 7    and that those statements were made during and in

 8    furtherance of the conspiracy, and that's what we've

 9    argued in our briefing.

10              With respect to the Government's sur-reply

11    on the adoptive admission issue, I'll just say as an

12    initial matter, we don't believe the Court should

13    consider the Government's supplemental response on

14    that issue because -- simply because the Court

15    didn't grant leave for them to address the

16    coconspirator issue.  The Court only granted leave

17    for them to brief -- further brief the opinion work

18    product issue.

19              But if Your Honor is inclined to consider

20    any of that, I'm prepared to address the merits of

21    that.

22              THE COURT:  You should address it.

1          MR. BERESTON:  First of all, Your Honor, to

2   admit a statement as an adoptive admission, the

3   Government must show two things:  First, that an

4   innocent defendant would normally be induced to

5   respond to that statement.

6          THE COURT:  Right.

7          MR. BERESTON:  And, second, whether there

8   exists sufficient foundational facts for a jury to

9   conclude that the defendant heard, understood, and

10  acquiesced in that statement.

11         Now, with regard to the first prong, a

12  defendant would only normally be induced to respond

13  to a statement that's accusatory.  And none of the

14  statements offered by the Government here are

15  accusatory.  In other words, they're not the types

16  of statements that are contemplated by Rule 801.

17  When we compare the statements put forth by the

18  Government with some of the accusatory statements

19  found in other cases, the distinction becomes clear.

20         For example, Your Honor, in United States

21  versus Williams, the Fourth Circuit offered a

22  helpful example, and if I may just quote from that

1    case, If someone says in the defendant's presence

2    that this is the money the defendant got when he

3    robbed a bank, it's logical for the jury to conclude

4    that the defendant would have spoken up if he had,

5    in fact, not robbed a bank.

6            So the important point here is in Williams,

7    the statement clearly suggests the defendant was

8    involved in criminal conduct, it was a bank robbery.

9    When we compare that with statements offered here by

10   the Government, and I'll just -- if I may quote from

11   Government Exhibit 15 as an example, Mr. Rafiekian

12   wrote -- excuse me, Mr. Alptekin wrote to

13   Mr. Rafiekian and told him he was thrilled at the

14   prospect of working together.

15           Mr. Alptekin went on to say he met with

16   Turkey minister Number 1 and explained our approach.

17   He's receptive and indicated he would like to meet

18   with us during his upcoming visit to D.C.  I will

19   inform you and we can strategize how best to

20   approach the meeting.

21           MR. BERESTON:  This statement is not

22   accusatory.  It's nothing like the example in

1    Williams where one would expect Mr. Rafiekian to

2    speak up.  It's a completely innocuous statement

3    about legal conduct.  It doesn't come close to

4    suggesting that Mr. Rafiekian was involved in

5    illegal conduct.

6             Now, Mr. Rafiekian disputes this

7    allegation, but even if Turkey was directing

8    Alptekin's actions, there's nothing illegal about

9    that and that's certainly not the crime that's been

10   charged here.  The crimes the Government alleges are

11   a failure to give notice under Section 951 and

12   making false statements in a FARA filing.  And no

13   out-of-court statements at issue in this motion

14   relate either to those acts or any other crime.

15            Another important point is that

16   Mr. Rafiekian had no personal knowledge of any

17   conversation that Mr. Alptekin purportedly had with

18   Turkish officials.

19            THE COURT:  I have one question.

20            MR. BERESTON:  Sure.

21            THE COURT:  And I'll ask Mr. Gillis when he

22   stands up again, but -- and it was mentioned

1    previously that the statute seems to adopt the

2    common law definition of -- of agent within the

3    context of the definitions.  Does that mean that

4    the -- that it also recognizes the agent independent

5    contractor distinction -- common law distinction?

6             MR. BERESTON:  With respect to -- I'm

7    sorry, I'm not sure I quite understood your

8    question.

9             THE COURT:  Well, you have -- you have

10   under the Government's theory -- well, under the

11   facts whether -- putting aside how you characterize

12   it, you have -- you have Inovo entering in a

13   relationship with FIG.  And the issue is whether

14   FIG -- whether FIG was acting and the principals of

15   FIG were acting as the agents of the Turkish

16   Government or whether they were the agents of Inovo.

17            And the question is -- in those kinds of

18   arrangements you oftentimes will have people acting

19   with respect to overall objectives that are other

20   than agents that are acting as what the law refers

21   to as independent contractors where the overall

22   object is agreed to, but the details and the control

 1    is left to the individual contractor.  I mean, is

 2    that a distinction that plays any role in -- in this

 3    analysis?

 4              MR. BERESTON:  I don't know that that plays

 5    a role here because there was -- there was no

 6    agreement between FIG and the Turkish Government to

 7    do anything.  And there was no agreement between FIG

 8    and -- and, excuse me, Inovo --

 9              THE COURT:  Well, there was.

10              MR. BERESTON:  -- to deprive the Attorney

11    General of -- of notice.

12              THE COURT:  Right.

13              MR. BERESTON:  Which is the crime that has

14    been charged here.  And so regardless of -- of how

15    that comes out, we don't think that the Government's

16    shown an agreement here, which is what they need to

17    show.

18              THE COURT:  Well -- but their theory is

19    that FIG was operating at the direction and under

20    the control of Alptekin who was nothing more than a

21    cutout for the -- for the Turkish Government.

22              MR. BERESTON:  Right.  And that's the

1   Government's theory.

2          THE COURT:  That's the Government's theory.

3          MR. BERESTON:  Which we obviously -- we

4   obviously dispute that.

5          THE COURT:  So the relationship between FIG

6   and Inovo or between FIG and Alptekin seems to me to

7   be pretty critical.

8          MR. BERESTON:  Yes, Your Honor.  I mean,

9   ultimately FIG engaged with Inovo, which was

10  Mr. Alptekin's company.

11         THE COURT:  Right.

12         MR. BERESTON:  And they were obviously

13  communicating with Mr. Alptekin.

14         THE COURT:  Right.

15         MR. BERESTON:  Unless Your Honor has

16  further questions about that.

17         THE COURT:  Okay.  All right.  There may be

18  a point that doesn't go anywhere, but it seems to me

19  that there's a difference between characterizing the

20  relationship between Inovo -- Inovo or Alptekin and

21  FIG as an agency relationship as opposed to an

22  independent contractor relationship.

1            MR. BERESTON:  There may be, Your Honor.

2            THE COURT:  All right.

3            MR. BERESTON:  And if we can further brief

4     that, we're happy to do so.

5            THE COURT:  No, it's...

6            MR. BERESTON:  Just to get back to the

7     adoptive admissions issue, and I just want to

8     address quickly the second prong of that test.  And

9     that's that the Government's failed to show

10    Mr. Rafiekian acquiesce to the out-of-court

11    statements.

12           First of all, there's no direct evidence

13    that Mr. Rafiekian acquiesced to any of those

14    statements.  The Government instead relies on a

15    series of unsupportable inferences to show

16    Mr. Rafiekian wouldn't have taken various steps to

17    get the FIG project off the ground if Turkey hadn't

18    green --

19           THE COURT:  Right.

20           MR. BERESTON:  -- greenlighted the project.

21    But the statements put forth by the Government tell

22    a different story.  For a number of those

1    statements, Mr. Rafiekian's initial e-mail out is

2    encrypted, so the Government can only guess as to

3    what that statement says.

4         But for the other remaining statements by

5    Mr. Rafiekian, they don't contain any mention of

6    Turkish officials at all.  They don't suggest he was

7    providing information about the project because he

8    believed the Turkish officials were intending to

9    pursue it, and several of the Government's own

10   exhibits support this fact.

11        And if I can just offer an example, in

12   Government's 18-A, after all the other back and

13   forth between Mr. Rafiekian and Mr. Alptekin,

14   Mr. Rafiekian writes to Michael Flynn and, I

15   believe, Phillip Oakley and says, they have been,

16   quote, engaged by a Dutch client for the project,

17   not by Turkey.

18        If Mr. Rafiekian believed Alptekin's

19   statements about the Turkish officials to be true,

20   why did he tell Flynn that they were being engaged

21   by Inovo, which is Mr. Alptekin's company.  The

22   Government doesn't have an explanation for this.

1              So the Government hasn't shown

2   Mr. Alptekin's statements would induce a response by

3   Mr. Rafiekian's or that Mr. Rafiekian acquiesced in

4   those statements.  And we'd respectfully ask,

5   therefore, that the Court grant Mr. Rafiekian's

6   motion to exclude these out-of-court statements.

7              THE COURT:  All right.  Thank you.

8              MR. BERESTON:  Thank you, Your Honor.

9              THE COURT:  Mr. Gillis, I'll let you

10  respond briefly.

11             MR. GILLIS:  Thank you, Your Honor.  With

12  respect to Your Honor's question about the agency

13  versus --

14             THE COURT:  Yeah.

15             MR. GILLIS:  We're not relying upon that as

16  a basis for allowing these statements in as

17  evidence.

18             THE COURT:  No, I understand.

19             MR. GILLIS:  Oh.

20             THE COURT:  That's -- okay.  But you're not

21  relying on the agency exception.

22             MR. GILLIS:  We're not, Your Honor.

 1              THE COURT:  Right.  Right.

 2              MR. GILLIS:  We're relying upon

 3    coconspirator and --

 4              THE COURT:  801, coconspirator statements.

 5              MR. GILLIS:  -- and adoptive admissions and

 6    then perhaps the effect on the listener.  I can

 7    speak to any of those if you --

 8              THE COURT:  No.

 9              MR. GILLIS:  -- like.

10              THE COURT:  It's not necessary.

11              MR. GILLIS:  Okay.  With respect to the

12    Fourth Circuit, the assertion that the Fourth

13    Circuit has decided this question already, Your

14    Honor, that is not the case.  The only case that

15    they cite for the proposition that -- that this --

16    the question decided by the Fifth and Sixth Circuit

17    is that it has not -- has been decided in the Fourth

18    but not in the Fifth and Sixth, is this in re grand

19    jury proceeding Number 5, Your Honor.

20              I would -- that -- that appeal, first of

21    all, involved multiple grounds for reversal,

22    including that the District Court failed to

1     undertake an in-camera review of attorney-client

2     documents, fact work product documents, as well as

3     opinion work product documents.

4            And as to at least two of those privileges,

5     the client clearly had standing to be on appeal.

6     The Court had no cause to examine the question of

7     whether as to the specific opinion work product at

8     issue, it had no occasion to get to that point

9     because it found that the Court below had not done

10    an adequate job of reviewing the documents in-camera

11    as it was required to do.  So that is a key

12    distinction.

13           Also in that case, the attorney did appeal

14    and did assert his own opinion work product.  And,

15    in fact, the Court took note of that in footnote 9

16    of its -- of its opinion and clearly it therefore

17    regarded that as significant.

18           And so the Fourth Circuit there found that

19    the District Court could not have established a

20    relationship between the documents and the crime

21    without an in-camera review of the documents, which

22    it did not do.  Therefore, it remanded for that

1    purpose, Your Honor, for the District Court to

2    examine the documents and determine whether each

3    individually was subject either to the

4    attorney-client privilege or to the fact work

5    product privilege or to the opinion work product

6    documents.  And so it -- it really had no occasion

7    to get that far in any reported holdings that --

8    that they claimed exist, simply did not come to pass

9    in that -- in that case.

10           And, in fact, I believe in that case,

11   the -- the Court strongly suggested that this

12   opinion work product in this case would not apply,

13   that they would follow the Fifth and Sixth -- the

14   Fifth and Sixth Circuits.

15           The entire opinion work product doctrine,

16   Your Honor, derives from the attorney's own mental

17   impressions and opinions and it is based entirely

18   upon that.  And when a guilty client seeks to take

19   advantage of that, it just makes utterly no sense

20   and the Fourth Circuit has not come close to holding

21   that.

22           In fact, what they said was while the

1    attorney along with the client holds the fact work

2    product privilege, the discovery of facts furnished

3    to an attorney does not implicate the same concerns

4    as does invading the necessary privacy of an

5    attorney's opinion work product.  It is -- all of

6    this, beginning with Hickman, is focused on the

7    attorney's right to her own impressions -- mental

8    impressions and opinions and to allow that to be

9    applied by the guilty client, where he's not allowed

10   to apply it in the attorney-client context, in a

11   more sacred context, as I've said.

12            THE COURT:  I understand.

13            MR. GILLIS:  Thank you, Your Honor.  I'm

14   sure you do.  Thank you very much.

15            THE COURT:  Counsel, I'll give you the

16   last -- do you have anything else to say about

17   the --

18            MR. GIBBS:  No, Judge.

19            THE COURT:  All right.

20            MR. GIBBS:  Just out of efficiency,

21   Mr. Gillis handled both of them.

22            THE COURT:  All right.  Great.  I'll take

1    these under advisement again, get decisions on all

2    of these here just as soon as I can, which I hope

3    will be shortly.  All right.  And we'll see

4    everybody Monday at 2:00.

5              MR. GILLIS:  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.

7              MR. GIBBS:  Thank you, Judge.

8              MS. MITCHELL:  Thank you, Your Honor.

9              MR. TYSSE:  Thank you, Your Honor.

10             (Whereupon, the proceedings at 12:12 p.m.

11   were concluded.)

12

13

14

15

16

17

18

19

20

21

22

```
 1         COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2              I, REBECCA MONROE, Court Reporter and

 3    Notary Public in and for the Commonwealth of

 4    Virginia at Large, and whose commission expires

 5    August 31, 2021, do certify that the foregoing is a

 6    true, correct, and full transcript of the

 7    proceedings.

 8              I further certify that I am neither related

 9    to nor associated with any counsel or party to the

10    proceedings; nor otherwise interested in the event

11    thereof.

12

13

14

15

16              Rebecca Monroe

17              Notary Public

18              Commonwealth of Virginia at Large

19              Notary No. 7243327

20

21

22
```