FILED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT
### Alexandria Division

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Case No. 1:18-cr-00457** |
| | **FILE UNDER SEAL** |
| **BIJAN RAFIEKIAN, *et al.,*** | |
| **Defendants.** | |

## MEMORANDUM OPPOSING COCONSPIRATOR DESIGNATION OF NON-PARTY WITNESS MICHAEL T. FLYNN, ENFORCE THE GOVERNMENT'S JUDICIAL ADMISSION AND VACATE THE NON-DISCLOSURE ORDER

Non-party witness Michael Flynn hereby requests relief from the order issued July 3, 2019, upon *ex parte* application of the government.[1] The government, which is "not an ordinary party to a controversy,"[2] should be bound by the judicial admissions it made in open court on June 13, 2019, in direct response to this Court's questions: that Mr. Flynn is not a co-conspirator in the case before the Court. This is not a mere "Correction to the Record."

Moreover, designating Mr. Flynn as an unindicted co-conspirator and requesting such a finding by this Court by a preponderance of the evidence is unnecessary even according to the government's response, which, due to an oversight by the government, new counsel received at 9:03 pm last night, Sunday July 7, 2019. The government itself concedes that the one document it seeks to admit per that designation is "*otherwise admissible.*"

---

[1]  Non-party witness Flynn has requested any and all filings the government made to obtain the *ex parte* order on July 3. Mr. Flynn's rights are directly implicated by the government's filing and this resulting order, yet this counsel does not know what has been filed against him. Given more time, counsel will gladly provide the Court any additional information we find on these issues.

[2]  *Berger v. United States*, 295 U.S. 78, 88 (1935).

Once the government's "correction" has been denied, this Court's Temporary Nondisclosure Order, entered on the same day under seal, would have served its purpose of preserving the status quo until this hearing could be held, and it should be vacated.[3] In the alternative, if there is reason for it to remain, it should be significantly narrowed to comply with the First Amendment.

## 1. The Government Should Be Legally Bound by Its Judicial Admissions and Repeated Representations to Counsel.

While Mr. Flynn does not dispute the government's right to decide how to present its case and which witnesses to call, the government's sudden decision to reverse its long-stated position that Mr. Flynn is *its* cooperating witness, and to turn him into an unindicted coconspirator, is extremely prejudicial to Mr. Flynn.

Given recent events, which Mr. Flynn describes *infra*, the government's reversal also sounds an alarm of possible retaliation and may have ramifications for Mr. Flynn beyond this trial. Mr. Flynn is still willing to cooperate with the government and provide testimony consistent with his grand jury testimony and prior interviews. Indeed, Mr. Flynn is cooperating now by providing more information and further waiving the attorney-client privilege and work-product protections specific to material in this filing. And, in the last two weeks, he and his new counsel have scoured the record of his interactions with others and with his former counsel to demonstrate the soundness of his testimony regarding the facts of the underlying events and transactions.

Not only did the prosecutors advise the Court on the record that Mr. Flynn is not a

---

[3] By its terms, the Nondisclosure Order applied to prevent "[disclosure] to anyone the existence of this Order or the Government's Notice of Correction to the Record, to be filed, unless otherwise ordered by the Court." The Order then concluded by setting a hearing "on *whether* this Order and the Government's Notice of Correction of the Record shall remain under seal" (emphasis supplied).

coconspirator, AUSA Gillis has stated repeatedly in interviews of Mr. Flynn and representations to counsel that Mr. Flynn was not implicated in the charged conspiracy.[4] The government's "about-face" is not a "correction" of the record. There is no misstatement or typographical error which can simply be "corrected." The prosecutors made deliberate and affirmative admissions to counsel and this Court.

The government's representations and clear statements constituted a judicial admission and are binding. A judicial admission or stipulation is "an 'express waiver made . . . by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 9 J. Wigmore, Evidence § 2588, p. 821). Although a judicial admission comes most often as 'a formal concession in the pleadings or stipulations           by            a           party          or           counsel], ' *Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474, 476 (5th Cir. 2001) (citation omitted), it can be made orally in the course of litigation. The determination centers on the knowledge and intent of the party making the admission, thus "'[a] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 98 v. Prince George's County, MD*, 608 F.3d 183, 190 (4th Cir. 2010)).

United States Attorneys are fully empowered to bind the government, which authority is

---

[4] Mr. Gillis informed undersigned counsel and Mr. Flynn twice on June 6 alone that Mr. Flynn was not charged in this conspiracy, and they did not intend to charge him. This is one reason new counsel for Mr. Flynn understood that the government was only interested in and satisfied with Mr. Flynn's factual testimony as given repeatedly to date—which, as Mr. Gillis put it, "would allow the jury to infer supervision and control" of the project by the Government of Turkey—the ultimate question for the jury here—if it found the facts beyond a reasonable doubt. Dkt. 213: Hearing of 06/13/19; Tr. 65.

"incidental to [their] statutory authority to prosecute crimes." *Thomas v. I.N.S.*, 35 F.3d 1332, 1340 (9th Cir. 1994). The Fourth Circuit has held that in settling disputes between a defendant and the government over the latter's commitments, it relies heavily on commercial contract law, enhanced by two factors that favor the defendant. The first factor stems from the inherent rights of the defendant, which are "constitutionally based and therefore reflect[] concerns that differ fundamentally from and run wider than those of commercial contract law." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). The second concern, applicable to federal prosecutions, considers the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *Id.* These two factors— the "constitutional and supervisory concerns"—"require holding the [g]overnment to a greater degree of responsibility" for the representations it makes within the course of litigation. *Id.*

In this case, the colloquy between this Court and the government was very clear. Not only did the government, in response to a direct question, unequivocally state that Mr. Flynn was not a member of the conspiracy, but in the course of further questioning on the nature of the testimony Mr. Flynn would give, the government reiterated, "we do not contend that Mr. Flynn was a member of the conspiracy." Counsel could not have been more deliberate or clear. Nor was the question one that the government had not had time to consider, since Mr. Flynn's potential status as a co-conspirator must have been explored in considerable depth in the course of the last few months. The theory of estoppel generally is "intended to protect the integrity of the judicial system and to prevent a party from 'playing fast and loose' with the courts to suit the party's purposes." 6 Handbook of Fed. Evid. § 801:26 (8th ed.). Because counsel's clear representation to the court was knowing and wholly unambiguous, it should be binding.

In addition, Mr. Flynn was not required by his plea agreement or otherwise to cooperate

with the prosecution in this case. The Special Counsel Office released him and advised that he had fulfilled his cooperation prior to his scheduled sentencing and again thereafter.[5] Yet Mr. Flynn has continued to cooperate with the government for hours upon hours—at great expense of time and defense funds—as he did long before he was charged and would have continued to do even if he had never been charged.

Mr. Flynn delayed his sentencing before Judge Sullivan to continue his cooperation here, for whatever benefit—if any—that might have in his sentencing, but he could have chosen not to cooperate further, proceeded to sentencing, and be done with all of it. The government should not be allowed to place him in a worse position now and name him as a co-conspirator in this proceeding—for the feeding-frenzy of the press or for any future use it might contemplate.

## 2. The Government's "About-Face" Could Be Retaliation For Mr. Flynn's Truthful Testimony The Government Does Not Like.

As the Court knows, Mr. Flynn has new counsel. Virtually all of new counsel's intense work to date has been assisting him in cooperating with the prosecutors in this case. It amounts to hundreds of hours. Undersigned counsel are still working all hours to try to get up to speed on the case.

After participating in further trial prep sessions with the government, new counsel advised the prosecutors last week, as Mr. Flynn has said in prior interviews, his testimony of the underlying facts of the transactions remains consistent with his prior testimony and interviews. Unfortunately, the government was not satisfied with that. The prosecutors have been adamant Mr. Flynn testify that he authorized filing the FARA form knowing and intending that it contain false statements. Mr. Flynn cannot give that testimony because it is not true.

---

[5] *See* Ex. 1, Joint Status Report of 03/12/19.

Mr. Flynn advised the government, as Mr. Flynn has said before, that much of what he understands is with the benefit of hindsight. When Mr. Flynn agreed in his "Statement of Offense" in Judge Sullivan's court that certain information in the FARA filing was false, he was doing so with some hindsight. Undersigned counsel advised the prosecutors that Mr. Flynn did not know and did not authorize signing the FARA form believing there was anything wrong in it. He honestly answered the questions his former counsel posed to him to the best of his recollection, and some with the benefit of hindsight. He authorized and paid for their extensive independent investigation to the tune of approximately $170,000.

Mr. Flynn trusted his former counsel who held themselves out as experts in this area of law. They had the facts, interviewed multiple people, and reviewed many documents and emails while he was incoming and then-serving National Security Advisor, then in the uproar attending his departure. In addition, former counsel had to decide what to file under extreme and unprecedented pressure from and extensive interactions with the National Security Division—including then-NSD head, David Laufman.[6] Admittedly, former counsel had to make difficult judgment calls, and they did so with input from the NSD itself.[7] As for the final filing, Mr. Flynn recalls only reading the cover letter. Regardless of what he read, he did not intend to or knowingly make any false statements, and this is a complex area of law about which he knew nothing.

After counsel advised the prosecutors that Mr. Flynn could not testify that he authorized the filing of the FARA registration knowing that it contained any false statements, the government

---

[6] Mr. Laufman suddenly resigned "for personal reasons" on February 8, 2017, amid the Inspector General investigation of irregularities in the Clinton email investigation and the National Security Division. However, he remained in the Department long enough to pressure Mr. Flynn's FARA filing.

[7] Ex.4, Kelner email of February 20, 2017 to Kristen Verderame in preparation for meeting with Department of Justice. This email is quoted in more detail, *infra*.

cancelled and rescheduled an interview of Mr. Flynn and encouraged us to reconsider our position. The prosecutors requested new counsel review hundreds of pages of notes from prior counsel (many of them handwritten) and both plea colloquies.

In the process of reviewing that material, and in the spirit of full cooperation to provide truthful testimony pursuant to his agreement with the government, Mr. Flynn partially waived attorney-client privilege on June 27 to provide the government with contemporaneous notes by former counsel of conversations with Mr. Flynn prior to the FARA filing—after the government advised us of two specific issues with respect to which they claimed Mr. Flynn was not fulsome with prior counsel. Those conversations were of an interview of Mr. Flynn on January 2, 2107, and a phone conference on February 14, 2017.[8] In a meeting with the prosecutors on June 27, undersigned counsel walked the prosecutors through the notes which rebutted—if not flat out belied—the government's misunderstanding of Mr. Flynn's statements to his own counsel on issues the government raised. This prompted a heated exchange with Mr. Van Grack who participated via speakerphone. After new counsel left, Mr. Van Grack and his team seemed to double-down. They have apparently put former counsel in a direct conflict with Mr. Flynn.

They scheduled an interview by the FBI with Mr. Kelner at Covington and Burling for July 3, which they later canceled in favor of moving his preparation session from Tuesday July 2 to July 3. Also July 3, an FBI Agent also called the younger Michael Flynn directly to question him despite knowing that he was represented by counsel. The Agent persisted in trying to speak with him even after he said to call his attorney.

New counsel were informed the government would question Mr. Kelner in his July 3 interview about the notes counsel had provided, but Mr. Turgeon did not do so. Instead, Mr.

---

[8] Exs 2 and 3 provided to the government on June 27; see Ex. 3-A for transcription.

Turgeon carefully worded his questions to elicit responses from former counsel that the notes by Covington's notetaker and partner Brian Smith actually *contradict*.

Within minutes of concluding the interview of Mr. Kelner, AUSA Gillis called us only to notify us that he would not be calling Mr. Flynn as a witness, and that counsel would be receiving a gag order that prohibited us from disclosing that fact. He did not even mention that the government had made the remarkable decision to re-cast Mr. Flynn as a co-conspirator—contrary to many prior representations—and that they would seek a ruling from this Court finding him to be a coconspirator by a preponderance of the evidence in this high-profile proceeding in which he cannot defend himself.

In the spirit of full transparency and cooperation, Mr. Flynn hereby adds to his earlier production to the government the notes counsel have reviewed and transcribed since then, and pertinent emails new counsel has found—still prior to the FARA filing—and Mr. Flynn also hereby agrees to waive his own protections of the work-product doctrine and attorney-client privilege associated specifically with these notes and emails.

In these notes and emails, attached hereto as exhibits, it is clear Mr. Flynn's former counsel were aware before the FARA filing was made:

1. The Government of Turkey was involved in the project and likely the principal beneficiary, rendering the previously filed LDA insufficient.[9]

2. Ms. Verderame, personal counsel for Mr. Flynn, advised from the first meeting with former counsel that "Ekim – emails show Turkey. Mike copied on many of the emails." "August *4?* Money from ministry. . . Government behind it, and Mike copied."[10] [Note, no money was ever traced to Turkey to our knowledge.]

---

[9] Ex. 5, 02/22/2017 handwritten notes of Brian Smith of extensive meeting with FARA unit of DOJ.

[10] Ex.2, 01/02/2017 handwritten notes of Brian Smith of interview with Mr. Flynn, Ms. Verderame, and Mr. Kelner.

3. Mr. Alptekin set up meeting in September. Flynn "met 2 ministers – Transportation and Foreign." [11]

4. "[T]he GOT [government of Turkey] had role of some kind." "Meeting in NY – Ekim and ministers." "No argument that Gulen focus was for commercial purpose." [12]

5. It was apparent Ekim Alptekin had a relationship with Erdogan's son-in-law. They brought up Gulen.[13]

6. Counsel had the "Green light [email authorization from Alptekin by Turkish officials to go ahead with the project] and 2 emails on NY/Confidence"[14]

7. FIG was to do "research into Gulen." "Project Confidence" is detailed in a "75 pp report re Gulen" about which Mr. Flynn and his personal and FIG counsel Kristen Verderame told his former lawyers in their first meeting. "Plan for "disseminating what they found, based on the report."[15]

8. That 75-page document, which prior counsel possessed, is all about Gulen and as reflected in counsel's notes, was used as the basis for the op-ed.[16] Flynn correctly told his counsel Bijan Kian did the first draft of the op-ed.[17]

9. Mr. Flynn pointed former counsel to the "other emails that show details." Former counsel recognized that "op-ed and sleeper networks, plus criminal referrals changes context."[18]

10. Former counsel: "Documents – Gulen, op research, not commercial."[19]

11. The focus of the project quickly narrowed to Gulen.[20]

---

[11] Ex.2, 01/02/2017 notes of Brian Smith in interview of Mr. Flynn with Mr. Kelner and Ms. Verderame.

[12] Ex. 6, 1/26/2017 notes of Brian Smith in phone conference with Mr. Kelner and Ms. Verderame.

[13] Ex. 2.

[14] Ex. 6.

[15] Ex. 2.

[16] Ex. 2, 01/02/2017 notes of Brian Smith with Mr. Flynn, Mr. Kelner, Ms. Verderame, and Ex. 7, the Project Confidence report itself.

[17] Ex. 2 at 8.

[18] Ex. 2; *see also*, Ex. 3.

[19] *Id.* at 9.

[20] Handwritten notes of 2/22/2017 meeting with Mr. Flynn were transcribed a year later and omit the crucial fact that Mr. Flynn told counsel the "business activities" reason that originated the project quickly "crystalized" down to "Gulen" which the raw notes show with a V diagram. The later transcription also omits or misinterprets the fact that the op-ed was *pushed* at the time for

12. "[T]he focus on Gulen."[21]

13. Former counsel notes: "Emails, docs, interviews -- little evidence of business/commercial."[22]

14. [there was] "little evidence of commercial" [purposes][23] "No argument that Gulen focus was for commercial purpose. No evidence of commercial except conclusory statement."[24]

15. Former counsel: "And we have bad facts. No commercial facts."[25]

16. The "Op-ed on same topic → Gulen" and "paid through the contract."[26]

17. Unknown at the time to Mr. Flynn, Mr. Kian sent Ekim Alptekin a copy of the op-ed. Alptekin wanted changes made to it, and Mr. Flynn did not make them.[27]

18. They were still trying to decide even if they had to file the FARA registration on February 14, 2017. That call to Mr. Flynn was prompted by a call on February 13, 2017, from then-resigning head of the NSD at DOJ, David Laufman himself. This was the day Mr. Flynn had to resign as National Security Advisor. Mr. Laufman and others called Mr. Flynn's former counsel and pressured them to file the FARA. In counsel's call with Mr. Flynn, in which they advised him where they stood, he said very little, but authorized his former counsel to file it and "Be precise."[28]

19. This level of involvement, interest and pressure from the FARA division was unprecedented in Mr. Kelner's significant experience.[29]

---

campaign reasons (in addition to for the Inovo project). Compare Ex. 8 with Ex. 9. *See* Ex. 8-A, transcription of handwritten notes.

[21] Ex. 3, 02/14/17 handwritten notes of Brian Smith of phone conference of Kelner informing Mr. Flynn of status.

[22] *Id.*

[23] *Id.*

[24] Ex. 6, 01/26/2017 notes of Brian Smith in call with Mr. Kelner and Ms. Verderame.

[25] *Id.*

[26] Ex. 3, 02/14/2017 notes of Brian Smith of call with Kelner, Kristen Verderame, Mr. and Mrs. Flynn.

[27] Ex. 8, 02/22/17 Flynn interview notes; Ex.13.

[28] Ex. 3, 02/14/2017 notes of Brian Smith.

[29] Ex. 10, 2/09/2017 email of Robert Kelner noting: "Heather Hunt [of FARA unit] has been all over us. She emailed and then left a voicemail yesterday afternoon asking for a call this weekend." * * * "We've never seen her this engaged in any matter (ever)." There is substantially more evidence of unprecedented pressure from the FARA section that we could provide the Court with more time.

20. Former counsel told the General to take time with the draft-- "high level—don't have the detail."[30]

21. Former counsel advised the government in pre-trial preparation on May 29, 2019, the legal team preparing the FARA registration "did not necessarily go through every doc; were trying to capture the high-level info of who the client was and nature of the work."[31]

22. Current counsel for Mr. Flynn will hereby waive both the attorney-client privilege and the application of the work-product doctrine specifically as to the notes and information provided herein regarding the FARA filing and its preparation.

23. One of the statements in the FARA filing the government alleges as false came directly from information provided to former counsel for Mr. Flynn by counsel for Ekim Alptekin at Arent Fox and was inserted in the filing despite former counsel's concerns with the Arent Fox submission.[32]

24. Significantly, former counsel's email of February 20, 2017[33] in preparation for meeting with the Department of Justice recognizes it was all a judgment call made in extensive communication with the NSD:

    a. "At the same time, we recognize that Gulen is a major focus for the Turkish government, and extradition of Gulen was probably the primary focus of the Turkish government in its dealings with the United States during the period in which FIG was performing work for Inovo."

    b. "Arguably, the work [by FIG] could be viewed as principally benefitting the Turkish government."

    c. "But we don't view this meeting [that Alptekin arranged between General Flynn and two Turkish ministers] by itself as resulting in agency on behalf of the government, and there is no indication that the meeting or any other contacts involved the Turkish government *directing* FIG's activities." (Emphasis supplied.)

    d. "So FIG had a commercial client with commercial objectives, and no *known* foreign government client. This left us [the lawyers] somewhat straining to determine whether registration could be required solely on the basis that the work performed could be construed as principally benefitting the Turkish

---

[30] 02/14/2017 handwritten notes of Brian Smith of Kelner, Verderame, Flynn phone conference.

[31] Ex. 11, 05/29/2019 typed notes of Kelner interview with EDVA at page 8.

[32] Ex.12, 01/21/17, Kelner email; Rafiekian indictment paragraph 58.

[33] Ex. 4, Kelner email of February 20, 2017 to Kristen Verderame and Covington lawyers regarding meeting with Department of Justice.

government rather than Inovo or business interests generally. *We welcome your input on that judgment call.*" (Last emphasis in original.)

### 3. The Non-Disclosure Order Must Be Vacated as Overbroad and Unconstitutional or Revised and Narrowed.

If any non-disclosure order proves to be needed, it must be narrowed. The order the government obtained on July 3 contravenes the First Amendment. Gag orders are disfavored because they are prior restraints on speech and are content-based speech restrictions. *In re: Murphy-Brown, LLC,* 907 F.3d 788, 796-97 (4th Cir. 2018). Consequently, such an order must survive strict scrutiny. *Id.*

To survive strict scrutiny, the gag order must serve a compelling public interest and, if such an interest exists, the government must show the order uses the least restrictive means. *Id.* at 797-800. A fair trial can be a compelling government interest, if the government was able to show that there was a reasonable likelihood that a party would be denied a fair trial without the order. *Id.* at 797. (citing *In re: Russell,* 726 F.2d, 1007, 1010 (4th Cir. 1984). The government has failed to lay such a foundation here.

More important, the government cannot show that the order uses the least restrictive means. The order goes far beyond the order struck down in *Murphy-Brown,* which limited the order to extra-judicial statements that could reasonably reach "public communications media." Here the order prohibits Flynn and his lawyers from discussing the matter with anyone, including Mrs. Flynn, government officials, or even other courts. The order is far too broad. Mr. Flynn and his attorneys have no intention of discussing this matter with the press, but any restriction that goes beyond that fails a strict scrutiny analysis. If there is any reason for a non-disclosure order to remain, it should be rewritten to exclude Mr. Flynn and substantially limited so that it complies

with the First Amendment.[34]

## CONCLUSION

In sum, the Government should not be permitted to abandon its prior judicial admissions and designate Michael Flynn as a co-conspirator in this case. As even a cursory reading of the Government's July 5, 2019 Response reveals, to do so would be totally gratuitous—not to mention outrageously prejudicial to Mr. Flynn and unwarranted by the evidence.

The Government has now represented to both the defendant and to this Court—another judicial admission, and even later in the game—that it proposes to deploy Federal Rule of Evidence 801(d)(2)(E) to introduce only a single document. Furthermore, it concedes the document would be admissible *without using Mr. Flynn as the declarant*.

Under these circumstances, this Court's path seems clear. If the Government's request to designate Michael Flynn as a co-conspirator for purposes of this case is denied, *no* stakeholder's interest is harmed. The Government can introduce its exhibit, the defendant will have to contend with an exhibit that he would have faced in any event, and Mr. Flynn would not gratuitously have his reputation tarnished—or worse.

Regardless of the reasons behind the Government's request to "correct" its earlier judicial admissions and representations, it is enough to say that its remarkable reversal is unnecessary to present its case and introduce the designated document—according to the government's own Response. Accordingly, the government's request to name Mr. Flynn as an unindicted co-

---

[34] To the extent the government is relying upon its *ex parte* motion as a basis for showing a compelling government interest, Flynn is obviously unaware of what such arguments might be. This raises the curious question of why the government chose to file the motion *ex parte* instead of simply under seal. Should the Court rely upon the reasons in the *ex parte* motion as a basis for a compelling public interest, then the motion should be provided to Flynn with further opportunity to respond.

conspirator should be denied and the order of July 3, 2019, vacated in its entirety.

Dated: July 8, 2019             Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB No. 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnalll@harveybinnall.com

/s/ Sidney Powell
Sidney Powell
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (352) 630-5788
sidney@federalappeals.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

*Counsel for Non-Party Michael T. Flynn*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2019, I filed the foregoing in the office of the Clerk and I

will email copies to counsel for the government and the defendant.

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com

*Counsel for Non-Party Michael T. Flynn*