# EXHIBIT 11

**COVINGTON & BURLING LLP**


*DRAFT*                                                            May 29, 2019

## Memorandum

To:    Flynn File

From:  Roger Polack

**Re:    May 29, 2019 Kelner EDVA Interview**


On May 29, 2019 Robert Kelner ("R") participated in an interview with prosecutors from the Eastern District of Virginia ("EDVA") at 850 10th Street, NW, Washington, DC from approximately 2:00p.m. to 4:30p.m. Bruce Baird ("BB") and Roger Polack represented Kelner during the interview. Jim Gillis ("JG") of the United States Attorney for the Eastern District of Virginia's Office ("EDVA"), Evan Turgeon ("ET") of the National Security Division of the Department of Justice ("NSD") and Bryan Alfredo of the Federal Bureau of Investigations conducted the interview.  This memorandum summarizes the discussion at that meeting.

ET: First in a few meetings; preliminary questions, may have discussed in less detail previously; rough outline of direct and go through that.  BB as emailed, we are subject to the same agreement as last time.

ET: Ever testified before?

R: With exception of Administrative procedure when Sch. C employee at Housing Dept. and there was a labor dispute.

ET: Want to learn more about who did what in investigation between you and Brian Smith. Who was more involved in collection of docs?

R: Brian and associate Alex Langton.

ET: How many times was Bijan Kian ("BK") formally interviewed by Covington ("Cov")?

R: Believe it was two formal interviews.  But there were other conversations.

BB: Before FARA filing?

ET: Yes.

R: Recall a few phone calls that were to him to addressed specific issues; and then other conversations that that were through Kristen Verderame ("KV").

**COVINGTON & BURLING LLP**

May 29, 2019
Page 2

ET: Who was principle POC with Bijan?  R: I was.

ET: And with Matthew Nolan?  R: That was Brian Smith.

ET: Cov still represenetes General Flynn ("MF") and FIG?  R: Correct.

ET: When did engagement start?  Initially engaged at very end of Dec 2016, sometime between Christmas and Jan 1.  Engagements were formalized via engagement letters in early Jan.  So while engagement letters may be early Jan, engagement practically began between Christmas and New Year's 2016.

ET: And KV also rep'd both FIG and MF?  R: My general understanding, yes, but would have to ask her for specifics.

ET: Did her engagement precede Cov?  R: Yes.

ET: Did your engagement overlap?  R: Yes, there was a substantial period of overlap.

ET: And BK was not client of Cov?  R: Correct.

ET: Was he client of KV?  R: Not that I'm aware of.


Mock direct examination:

ET: How employed?  R: Partner at C&B LLP.

ET: What kind of biz is Cov?  R: Law firm.

ET: How long been at Cov?  R: Almost 21 years.

ET: Is Brian Smith also a partner at C&B?  R: Yes.

ET: Relative to this case who do you rep currently?  R: MF and FIG.

ET: When did you begin rep'ing FIG?  R: At the same time we began rep'ing MF, just after Christmas 2016.

ET: Who at FIG hired you?

R: We were hired initially by KV, who was the outside general counsel for MF and for FIG.  But that engagement was formalized in engagement letters that were signed by MF.

R: Stepping back from mock; KV engaged us but ultimately MF formalized it.

ET: Do you still rep FIG?  R: Yes.

ET: What work did you perform for FIG between late December 2016 - March 2017?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 3

R: We were retained to review a letter they had received from DOJ concerning FARA and to advise whether they had any obligations under FARA, which was focus of letter received from DOJ.

ET: Apx when did FIG received the letter?

R: It was first noticed by FIG around Christmas

ET: actually not going to ask you that.  Will just show you the letter.

  1.  Exhibit 90

ET: Showing gov exhibit #90.  Letter from FARA unit.  Seen letter before?  R: Yes.

ET: What is letter?

R: This is letter DOJ sent FIG about possible obligation to register under FARA.

ET: What did Cov do in response to the letter?

R: Doesn't look like I actually saw this letter; this looks like a version from the government that I wouldn't have seen.  Saw a letter substantially similar to this document without the marking on the bottom.

ET: What did Cov do for FIG in response to this letter?

R: We began to gather information; we met with Bijan Kian, as we understood him to be called.

BB: do you want him to flow on?

ET: That'll depend.

R: We met with BK, we met with MF; asked to receive any docs that FIG could readily collect and provide that related to the work they performed for Inovo.  There was an initial set or sets of document that they sent us to review.  So did initial review of docs and initial interviews with BK and MF.  After initial review of docs, made rec to the client about how to respond to letter.  We interacted with DOJ; called them early on, around end of Dec or beginnig of Jan; let them know we received letter.  We made a submission to government in early Jan, providing an initial response to their letter.

ET: Who worked on initial response to the letter?

ET: It was myself, Brian Smith - who since made partner; and Alexandra Langton, a junior associate; other tech support; and possibly other attorneys that we consulted with in Cov.

ET: Who supervised?  R: I did.

**COVINGTON & BURLING** LLP

May 29, 2019
Page 4

ET: Did interviews include interview of defendant ("D")?

R: Yes, there were two, and other email and phone communications either directly or through KV.

ET: Were you present for both of those interviews? R: I was.

ET: Did you interview Ekim Altepkin ("EA")? R: No.

ET: Did you request an interview with him?

R: At some point became aware that he was rep'd by counsel; and therefore spoke with his counsel to obtain information. Under applicable bar rules when know that individual is rep'd, required to speak with counsel. As I sit here, I don't know if we spoke to him through his counsel, but I do know we spoke to his counsel.

ET: Were you able to obtain info from counsel? Yes.


2. Exhibit 93-A

ET: Exhibit 93-A. Have you seen this email before?

R: Believe saw email, but recall more clearly the letter attached.

ET: Can you describe?

R: This was an email from Ekim to Bijan letting him know that his lawyer had recommended an opinion on his firm vis-à-vis FARA and transmitting that opinion.

ET: Black box in 93-A; would be curious to know what is under the redaction. If we have a copy would like to see what is under there.

R: Definitely seen the email before.

Details: From Ekim to Bijan wed, Jan 18, 2017 at 2:45 Subj: Fwd: time sensitive.


3. Ex. 93-B.

ET: Have you seen, what is it?

R: This is the opinion letter from Ekim's lawyer.

ET: Did you review it? R: I did. ET: Who wrote it? was signed by Matthew Nolan; don't know who drafted it.

ET: To whom is it addressed? Ekim Alptekin

**COVINGTON & BURLING LLP**

May 29, 2019
Page 5

ET: What were circumstances in which you came into possession of letter?

R: I believe BK sent it to us or else he sent it to KV who sent it to us.

ET: did you see memorandum at time of investigation? R: Believe answer is yes, and believe saw it in close prox to the time it was dated.

ET: Ask to read third para of 93-B.

ET: When D provided copy of memo, what if anything did he tell you about the accuracy of the facts stated in the memo.

R: I don't recall him characterizing the memo or the accuracy of it.

ET: Do you recall him making any rep's about the memo?

R: Like I said, think it came from KV, which I think it did. If it came directly, may have just been forwarded. I don't recall as I sit here, BK characterizing the accuracy of the memo.

ET: Do you recall him asking about the accuracy about the memo?

R: I don't recall asking him about the memo, but did ask him about the topics in the memo; and he did review the draft filing that used the memo.

G: Did you have the letter before interviewing him?

R: Likely received the letter after the second interview; did not interview him about the content of the memo. During this period, KV was principal handling MF and BK; presumably you'll speak to her.

G: Sorry, said subject matter of the letter, you did question him about; can you say more?

R: The memo dealt in part with the relationship between Ekim and Inovo on the one hand and the Turkish gov on the other, or lack thereof. Parts of memo were ultimately quoted in FARA filing, and in our interviews of Bijan Kian we covered topics, some of which are covered in this memo. Including for example, nature of Ekim's firm Inovo and including the LDA and FARA registration, so overlap in subject matter in what is covered in memo and what we spoke with BK about.

ET: Over course of investigation, what did D tell you about involvement of Turkish gov officials in FIG's work?

R: BK told us that the work was not conducted on behalf of Turkey, but was on behalf of Inovo, Dutch based company owned by EA, and concerned improving biz climate between US and Turkey.

ET: What if anything did D tell you about contact between EA and Turksih gov offocials?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 6

R: We became aware that there was a meeting that took place on Sep 16, 2016 in NY, attended by BK, MF, and others from FIG, in which meeting with officials from Turkish government.

ET: How did you become aware of it?

R: May have learned from docs we saw versus BK telling us, but need to reconstruct that.

ET: Did you ask D about meeting in NY in Sep 2016? R: Yes.

ET: What did he tell you about?

R: Said not related to Inovo contract; rather it was to talk about radical Islam and to have an exchange of views with Turkish officials and the problem of radical Islamic terrorism. Then saw emails that characterized the meeting as being related to the work that FIG was performing for Inovo. We went back and asked him about that and he said that he wasn't sure why he used that phrasing, but he reiterated again that these were two separate things; meeting was about rad Islam and Muslim brotherhood and not to talk about Inovo and work being done on behalf of Inovo.

ET: Was there a term that was used to refer to the meeting about radical Islam?

R: He may have said it was a meet and greet.

R: Is there a term you're looking for?

ET: Project Truth; did he use that?

R: He did not use those with us, but he did discuss whether there was just one project. He discussed an initial project that was discussed with Turkish gov officials that Turkish gov ultimately backed out; but don't think he used Project Truth. He then talked about a different project, with Inovo, that was different than the one with the Turkish Government. But he did not use Truth with me; that was in emails we saw.

ET: Did he give an explanation of why Turkey backed out?

R: Don't believe he gave a reason.

ET: Back to 93-B. Top of page 3. Point to couple sections. "Inovo rep'ing Ratio . . . 50 percent share in Israel; export gas into Turkey . . . " Bottom of page 14, 4 lines from bottom: "hired Inovo to assist in work providing to Ratio to assist with Turkish relations." Did you discuss these representations with the D?

R: This is where my memory is getting challenging.

G: Something that would be in Alex's notes?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 7

R: Will double check her notes. But don't think I discussed this in the interview; may have passed question through KV, or asked him on the phone. My recollection is he did not have an awareness of Israeli company. Have a vague recollection that we bounced it off him and he didn't know about it, but don't have a crisp recollection of whether was phone or interview.

ET: Exihibit 50: Op-Ed; Seen this op-ed? Yes. Author? MF. When published: Nov 8, 2016.

ET: in conducting investigation with D, did you discuss with D?

R: Yes. He said it was something MF wanted to do, and would be helpful to campaign as well; something wanted to do.

ET: What did D say about op-eds relation to Inovo?

R: He said it was unrelated to Inovo. He did say he had run it by Ekim to get Ekim's reaction from client-relations POV; said that Ekim was unhappy with it; thought it would be not well-liked b/c of reference to Muslim Brotherhood and Ekim wanted him to change it so it did not address Muslim Brotherhood.

4. Exhibit 43-A

ET: Seen this email?

R: Yes, have a vague recollection of seeing it. It's an email from Mike Boston, who was described as day-to-day project manager of Inovo contract. From MB to Bijan believe it is an update on progress in getting the project for Inovo up and running. Dates Oct 13,2016.

ET: First sentence? R: "Please see all attached docs for tomorrow's call; boss in the air; MG have call scheduled?"

5. Exhibit 43-B: Attachment to 43-A email

R: Think it is TPs for one of weekly calls or regular calls with EA.

ET: have you seen these TPs before?

R: Been a while, but yes have seen.

ET: See page 7: Please read seventh bullet:

R: "We will attempt to have an op-ed written that links funding of subject with mullahs and imams."

ET: Do you have an understanding who subject is?

R: my understanding is Gulen.

ET: What is that based on?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 8

R: Essentially everything they did related to Gulen; when speak of reasearch, op-ed, etc. related to Gulen.

ET: Did you speak to D about this document?

R: Not sure; it would have depended on when we obtained this doc.  Even if had it before, did not necessarily go through every doc; were trying to capture high-level info of who client was and nature of work.

ET: Do you recall showing him some docs? R:  Yes.

ET: Recall specific ones?

R: Some, but not all.  Showed him early exchanges of emails in which Ekim discussed project with Turkish gov, specifically Green Light email; and emails and docs related to Sep 19 NYC meeting; remember showing emails and docs related to contracts with Inovo and with Ekim Alp.

G: These were during the formal interviews?

R: Yes.  And during these we made clear we do not represent him personally.

ET: Anything else remember?

R: Let me go to one point early on.  Start out by asking for internal investigation -- that's a bit of a term of art.  At that point helping a client respond to an inquiry; internal investigation implies looking for wrong doing.

G: We get it; understand.

   6.  Exhibit 48-A

ET: Have you seen this email before?

R: Yes.  This is an email from BK to Ekim Alp letting him know that the op-ed about Turkey was about to be published.

ET: Any attachments to email?

R: Appears to indicate that there was an attachment.

ET: Is this an email you remember discussing with BK?

R: I don't know; may have, but don't recall.  Certainly discussed the topic, but don't recall two years later whether we discussed the specific email.

G: What was topic?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 9

R: Nature and origin of op-ed published in the Hill.  One of my challenges is remembering which emails we had and saw when; so don't recall whether had this at the time of interview; even if did have, don't know if had shown.

G: was there something preventing you from going back to him after receiving initial emails?

R: Sort of; will discuss with Bruce.

G: Tell us later.

R: Key point is not impeded from consulting with him things we needed to consult about.  Let's find out if we showed it to him this "the arrow has left the bow" email.

ET: Did you discuss. .. what of anything did D tell you about why he sent EA the op-ed?

R: He said, well, here is how it came up, we were questioning him about who wrote op-ed, how it was written and  how it came up.  He was trying to assure us that Ekim did not write it, did not have input, just had some typographical input.  Then he told us that Ekim did have concerns about MB and how that might play in Turkey.

ET: So D said would send for typographical edits?

G: Tried to assure you of what?

R: That EA just sent typographical edits, and believe we confirmed that through emails.  Don't recall BK explaining why he sent the op-ed to EA. This came up organically in our conversation who wrote the op-ed.

R: Suggest a question: if question is what did he say about the origins of op-ed; answer is this was MF's idea and not an idea that came from Ekim or the Turkish government at all.

G: Did he say anything about what his role was?

R: What Bijan's role was?  Yes, he arranged for a copy-editor, to edit the op-ed.  And it was Bijan who helped place the op-ed; which he did through Sphere, a PR firm that happened to be under contract in relation to Inovo contract; BK described this as something that Sphere was doing as a favor and not part of Inovo project.  Recall BK saying this was all coming together very quickly and that's why needed Sphere's help in placing it.

G: Did he say why it needed to be placed?  Why was there a rush to get the op-ed placed?  FOLLOW UP ON THIS. Want to be certain who told you what you remember.

G: Did Bijan say anything about who did the initial draft?

R: I recall his telling us that MF wrote it, with editing assitance from Hank Cox.  Think he also told us that he, BK, had some input, commenting on the draft/reacting to it.

**COVINGTON & BURLING** LLP

May 29, 2019
Page 10

    7.  Exhibit 49

ET:  Seen this email before?  Who is to and from?

R: From EA to BK.  ET:  What is date, Nov 5, 2016.  ET: Read?  R: Hi Bijan, the General is right on target; misspelling of Erdogan and Fatullah is best written with one L.

ET: Did you discuss this email with D?

R: Don't recall if discussed this specific email, but do recall that D said EA made some typographical edits and this would be an example of this.

ET: Back to Arent Fox memo.

ET: Page 3, final paragraph. R: "General independently expressed concern with rad Islam .. . never consulted EA on opinion; would have strongly advised against publishing article in The Hill."

ET: Do you remember discussing this info from the memo with him?

R: I don't, but Brian Smith was principally dealing with Matthew Nolan; he may have discussed with KV; but I don't recall speaking with BK about this paragraph.

ET: What if anything did D tell you about how Turkey project was being funded?

R: His understanding was Ekim was paying for it; Ekim may have had support from others in Turkish biz community; but not sure of even that.  Adament that no payment by Turkish government.

ET: What did else did he tell you about who in biz community?

R: Don't recall him saying anything about that.

ET: Did you ask?

R: Yes and we asked others and no one had information about who the business community was, but that payment was coming from Inovo.

ET: You don't recall Bijan saying anything about other members of biz community funding project?

R: No, and that really wasn't a focus; we were focused on whether it was Turkish government or not.

ET: And what did he say about that?  R: Absolutely not.

G: And he said, there may have been funding from others in the Turkish business community, but he did not know?

**COVINGTON & BURLING** LLP

May 29, 2019
Page 11

R: To the best of my recollection. Like I said, we asked others about it as well, e.g., Mike Boston, and he said there were others, but I don't recall what the foundation was for his saying that.

    8. Exhibit 16.

ET: Seen this email?  R: Yes.  ET: To/From?  R: From Ekim Alp to Bijan and MF.

ET: Read first three paras..

R: "Just finished meeting with [Turkish officials] can discuss contract; flying to LA can discuss.. ."

ET: Did you discuss this email with EA?

R: Yes, he told us there were discussions with Turkish government that this related to (and the green light email related to) but that subsequent to this email, the Turkish government backed out and it never went forward.

ET: Recall anything else?

R: Recall that we, Cov, dwelled on this email with BK and others.

ET: Why did you dwell on it?

BB: That's probably not okay.

BB: What did you say to him and what did he say to you?

R: Think we asked more than once whether this could be related to Inovo contract and asked for a description of what the earlier project was that he was describing. My main recollection is that he reiterated several times is that this was totally unrelated to Inovo contract; there were earlier discussions about radical Islam and that is what the Green Light email related to; and when the gov backed out, Ekim stepped in on his own and did a different project.

G: Do you recall whether the subject was different between the two?

R: My recollection is that BK described the subject matter as different. He described the project that didn't go forward as relating to radical islam and the one that did go forward as improvising the business climate between Turkey and the US.

G: Was there some connection, or do you recall discussing with BK whether there was a connection between the Turkish gov pulling out .. . did EA intervene in some way or was it coincidence in timing?

R: He described the projects as distinct, but he said when Turkish government backed out EA decided to go forward with this different project anyways.

**COVINGTON & BURLING** LLP

May 29, 2019
Page 12

ET: What financial transactions did you examine in the course of your inquiry?

R: The team analyzed various documents, including accounting documents; team would have brought any transactions to my attention that were significant.

ET: Were there any financial transactions you thought were significant?

BB: Hesitant about that questions.

R: If you ask me, did you look at financial transactions between FIG and Inovo, answer is yes.

BB: Which ones?

R: We looked for transactions between EA and FIG and there were transactions between FIG and EA.

ET: Describe those.

R: There were several payments made for $40k between FIG and EA and a last one of a different amount, can't recall.

ET: Where were EA's account located?

R: Believe in Turkey.

ET: FIG's account?

R: In the US.

ET: Inovo's?

R: Believe in The Netherlands.


9. Bank of America statement

ET: What does second entry show?

R: $200k payment ...

BB: What are we doing here?

ET: Did you look at this document during your review?

R: To be honest don't know.

ET: To your knowledge, what account would FIG use to receive money for the contract?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 13

R: Don't remember, think I knew at some point, but don't remember.

ET: Payments from FIG to Inovo . . . how did D describe those payments?

R: He described those as refunds b/c there was certain lobbying and PR work that EA was expecting FIG to do, which it hadn't done and EA insisted on a refund b/c not done.

ET: Did you review FIG's accounting records about these?  R: Yes.

ET: How listed?  R: As consulting fees.

ET: Did you ask D about this?

R: Yes, did not know why recorded that way; he did not put them that way, but that was inaccurate as they were in fact refunds for services not rendered.

    10. Exhibit 17

ET: Seen this email before?  R: Yes.

ET: Recall asking D about this email?

R: I don't recall whether we showed this email or asked about it; but did describe the topic of advisory support and 20 percent figure ref'd in large paragraph of email.  BK said there had been some discussion about having EA serve as a consultant, but those discussions did not reach fruition and EA did not end up serving as a consultant.

ET: In that large para. "so our costs will not improve PR."  What's your understanding about PR?

R: Public relations.

ET: What is your understanding about project not including PR, but refund being for PR?

R: Would like to go back and refresh recollection whether discussed this email, but we dwelled on this topic b/c had engaged Sphere, a PR firm, and PR services were performed.  "August 11, 2016 email, Re: Welcome back!"  See if did ask about this specific email.

ET: What did he say about that?

R: He just kept repeating that EA wanted his money back b/c PR and lobbying services were not performd.

ET: Do you recall pointing out that PR was performed?

R: I do recall that lobbying and PR was performed.

ET: And his response was the same?  R: Correct.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 14

11. Exhibit 19

ET: Seen? R: Yes. "Thank you for engaging us on Project Confidence." "MF and I have allocated 20 percent for advisory and support costs."

ET: Recall discussing this particular email with D.

R: Don't recall, but we can check.

R: My recollection is when we questioned him about payments made to Ekim and draft consulting contract with Ekim, we had some emails, but I just don't recall which ones. I would add.

BB: Not sure that our notes are sufficiently specific to determine which documents were used in that interview.

12. Exhibit 33-A

ET: Recall seeing this email / attachment?

R: recall seeing invoice for $200k, may have been more than one for $200k, but did see an invoice substantially similar to this, yes.

13. Exhibit 33-C

ET: Seen this email? R: Yes. ET: Read first para. R: Michael please initiate payment for $40k as soon as EA sends invoice for his consulting.

ET: Who is that email to/from. R: From BK to MG, cc'ing Ekim and MF.

ET: Recall asking D about this email?

R: Almost certain we did. Look back at records, think about it further.

ET: Recall anything about that?

R: Recall him being asked about the topic; he said the $40k was a refund; there was a separate discussion about a consulting contract that never came together and that EA never actually became a consultant; and the $40k was for a refund, notwithstanding what was in the email and draft contract.

BB: It's a sense of well, maybe the answers didn't make sense, but they were what they were and the FARA filing ultimately used language to deal with.

R: Currently constrained by terms of engagement, but if there is a court order, that could open up this discussion more.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 15

ET: Did you ask why payments were going to Inovo in Netherlands, and not EA's account in Turkey.

R: Don't recall asking about that, but do think I recall why the question was not asked.

ET: At conclusion of its fact gathering, what did Covington do?

R: There were a couple milestones.  1) sending letter to DOJ in January based on preliminary findings.  At that point we had reached a conclusion as we told DOJ that FARA filing was required, but we had not reached a conclusion on who foreign principal was.

R: we then entered a second phase of fact gathering, looking at additional facts and filings; that led to filing of FARA Statement on March 7, 2017.

G: That was after initial letter of response.  What was sequence of events?

R: There was an initial period of intensive fact gathering that reflected our initial findings; told DOJ that a FARA filing was likely, but not sure who foreign principal was.  After that we did initial fact gathering to focus on preparing the FARA filing.

ET: Can you give an explanation of FARA?

R: FARA is a law enacted by Congress in 1938, requires registration of individuals who are acting within US as an agent of foreign government or entity, in certain circumstances.

   14. Ex. 56 - to the end (each exhibit related to a specific paragraph of the filing)

ET: Please ID the files?

R: These are what we call collectively "the FARA filing."

ET: Who drafted the FARA filing?

R: A number of people; lawyers at Cov, principaly Brian Smith and Alex, with participation from me and KV.  Steve Anthony also had input into the draft though may not have literally typed words, but he did have input.

ET: Who on behalf of FIG reviewed the filing before it was submitted?

R: Principally reviewed by KV; also reviewed by BK.  Reviewed by MF as well.  Think that is it.

ET: Receive feedback from D?

G: How do you know BK reviewed the draft?

R: I remember receiving comments from him; I can't recall how we transmitted them to him, but I recall his reactions to him,  I also recall that during that drafting process we posed questions to him on specific points through KV and he responded either through KV or directly.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 16

G: You don't recall if in some cases were from him and which were from him?

R: They were in some cases from him and her; even when he responded KV was on copy.

G: As an aside; don't think those were produced, right?  R: Correct.

G: Do you expect to be within the scope of the judges order requiring to produce stuff.  Who is handling our response?

R: Me, Steve Anthony, and Dan Johnson.  We have already complied fully with judges order to produce docs to Refikien and internal communications from FIG employees to counsel to the extent responsive, would have been responsive to subpoena.

G: Initially had discussed given those to us.

R: Our reading of judges order is that they are still privileged.

BB: he's a director.

ET: What were D's reaction to the draft?  [BB: confirmed within scope of waiver].

R: Will share what can recollect.  he was very upset that we were showing payments to Ekim as they were recorded in FIG's books.  He was very exercised that those should be changed to refunds.  In addition, he was very upset that the word "kickback" appeared in the FARA filing.  Those are the only comments I recall him making.  We also had back and forth about his political contributions and recall him providing his political contributions.  We also needed his help clarifying which US gov officials had been contracted.  Otherwise our understanding was that he had no objection with the filing.

G: Where did you get that understanding from?  R: That's in the negative/  G: So he gave you no other comments.

ET: Give EA or lawyer a draft?

R: No.  Receive feedback from EA or his lawyer.  No.  Take that back.  Do recall BK telling us that EA was unhappy that we were going to be filing under FARA and that this had been conveyed to BK.  Have a vague recollection that perhaps Matt Nolan at Arent Fox had questioned the need to file at all.  Talk to Brian about that; it's not first hand.

ET: Did D tell you he discussed characterization of the return payments to EA?

R: As I sit here today I don't recall that.

ET: Run through several statements in FARA filing and on what Cov/FIG based the rep.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 17

Ex. 56 para 7, pg. 3.  "List every foreign principal: Inovo BV"  That was based on full-scope of review of facts; spent considerable time reviewing the facts; great deal of information fed into that response.  Can try to catalogue the principal pieces of information.

ET: Was that consistent with the information provided to you by D?

R: Yes.

ET: Don't think we need full itemization.

ET: para. 8: Will you engage or have you engaged in activity benefitting foreign principal.  MF spoke, provided interview... not at the direction of any foreign principal."  What did you base that statement on?

R: That response is based on information that we gathered principally from BK and MF.

G: Was that information consistent with what each of them told you?  R: Yes.

  15.  Ex. 58

ET: third page, final para.

R: "Flynn Intel Group does not know whether or extent to which Turkey was involved with its retention by Inovo for the three-month project."

ET: What based that statement on?

R: That is based on essentially all of our interviews with FIG personnel.  And our review of FIG documents.

ET: Is that consistent with information provided by the D?

R:  Yes, though would add that BK was adamant that the government of Turkey played no role.  So strike my response.  Not quite consistent b/c BK's view was the gov of Turkey played no role whatsoever; no not consistent with what government told us.

BB:  What was information based on?

R: Based on fact that contract was with Inovo and not Gov of Turkey; didn't see any payments from Gov of Turkey.  But at the same time, there was some discussion with Turkish officials, including a very significant meeting with Turkish officials on Sep 19 meeting.

G: So apart from the two or three comments we already talked about, did BK reiterate an objection to this point?

B: He did not reiterate an objection to this point by then, to my recollection.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 18

G: Taking line by line. "FIG doesn't know the extent to which Turkey was involved in retention of project." Consistent or inconsistent with what BK told you? Or did he tell you anything that was inconsistent with that?

R: He told us that the Gov of Turkey played no role ICW retention of Inovo for the three month project.

G: So he did not talk to you about this particular statement, but his statement to you was a more emphatic statement that gov of Turkey was not involved.

R: Much more.

G: Second line: "FIG is aware that EA consulted with GOT regarding work that FIG might do." He was not inconsistent/ did not take issue on this point, right?

E: Correct.

G: Third, EA introduced to Turkish gov officials in meeting . . . Not inconsistent/did not take issue on that.

R: Correct.

G: So only the first is inconsistent/or something he might take issue with.

R: I'd state it differently: He emphatically stated that the Gov of Turkey had nothing to do with the retention of FIG by Inovo.

G: Do you recall versions that were passed back and forth in which he may have commented on and he proposed revision and were sent back, etc.?

R: There wasn't a lot of that, but have to caveat, KV was principally involved with him. My recollection is that we sent a draft and he gave limited comments, and a part from those comments, well, I'll leave it at that.

ET: Preceding page 8b. "Foreign principal was not supervised by foreign government, foreign political party, etc.": What did you base that on?

R: Important to note that says see attachment; that attachment applies to A and B; it then refers to the attachment we were just discussing.

ET: So it's your position that when it says see attachment it applies to both?

R: Yes, might not be best position of it, but that was the intent.

16. Exhibit 61

ET: Paragraph 13, page 4

**COVINGTON & BURLING LLP**

May 29, 2019
Page 19

R: "neither Inovo or any other person directed the op-ed and in gerneal such activities not taken under control of foreign principal"; what did you base that on?

R: Interviews with BK and MF and our review of available emails and documents.

G: Were those interview with MF and BK consistent with one another and what is in this paragraph?

R: Yes and yes.

ET: Attachment to this; read it to you: "FIG understood the engagement to be focused on confidence regarding biz relations, etc."  mid-way through first para.  What was basis for that statement?

R: Several FIG personnel told us that, including BK, MF, Boston, perhaps others.

ET: Bottom of page; Sep 19 2016 meeting; purpose was to get background for project.  What was the basis for that statement?

R: Will have to go back and check; not sure precisely; might be question that Brian might be better placed, but will need to go back and refresh my recollection.  Bates 356; first sentence of last paragraph.

G: This paragraph; Sep 2016 meeting, is that something that BK took issue with in the final draft?

R: No, not that I recall.

G: Based on what he had told you, his position was that it had absolutely nothing to do with the Inovo project?

R: That is correct.

G: So, where did then that particular paragraph . . .

R: That's what I need to go back and reconstruct, but you correctly note that it is different than what he told us.

ET: Did FARA unit review a draft of the filing?

R: Yes, they did.

ENDS