UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BIJAN RAFIEKIAN | ) | Case Number 1:18-cr-457-AJT-1& 2 |
| | ) | |
| and | ) | |
| | ) | |
| KAMIL EKIM ALPTEKIN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the Court are the following Motions:

(1) Defendant Bijan Rafiekian's Motion to Dismiss the Indictment [Doc. No. 190] (the "Motion to Dismiss");

(2) Defendant Bijan Rafiekian's Motion *In Limine* to Exclude Out-Of-Court Statements by Co-Conspirators [Doc. No. 154] (the "Motion to Exclude Co-Conspirator Statements");

(3) Defendant Bijan Rafiekian's Motion to Dismiss the Indictment and Exclude and Suppress Privileged Information [Doc. No. 163] (the "Motion to Exclude Privileged Information");

(4) the Government's Motions to Establish the Crime-Fraud Exception as to Defendants Rafiekian [Doc. No. 173] and Alptekin [Doc. No. 182] (collectively, the "Motions to Establish Crime-Fraud Exception");

(5) Defendant Bijan Rafiekian's Motion for an Evidentiary Hearing [Doc. No. 186] (the "Motion for Evidentiary Hearing");

(6) Defendant Bijan Rafiekian's Motion *In Limine* to Preclude the Government From Arguing that Turkey Funded FIG's Work for Inovo [Doc. No. 165] (the "Motion to Preclude Argument on Turkey Funding"); and

(7) Defendant Bijan Rafiekian's Motion for Additional Peremptory Challenges and a Jury Questionnaire [Doc. Nos. 150 and 152] (the "Motion for Additional Peremptory Challenges and Jury Questionnaire").

The Court held hearings on these motions on June 13 and June 28, 2019, following which it took the Motions under advisement. For the reason stated below, the Court rules as follows with respect to the issues raised in these motions:

(1) In order to prove a violation of 18 U.S.C. § 951, an essential element of the offense is that the defendant engaged in conduct that was not an excluded legal commercial transaction. However, the Superseding Indictment sufficiently alleges in substance the essential elements and the Motion to Dismiss [Doc. No. 190] is DENIED.

(2) The United States at this point has not presented or proffered evidence sufficient to establish by a preponderance of the evidence a conspiracy for the purposes of admitting against the Defendant the hearsay statements of alleged co-conspirators pursuant to Fed. R. Evid. 801(d)(2)(E); and the Motion to Exclude Co-Conspirator Statements [Doc. No. 154] is GRANTED to that extent, without prejudice to admitting communications to Rafiekian for the limited purpose of establishing what he was told or knew about a relevant issue, or the proffer of additional evidence at trial with respect to admissibility under Fed. R. Evid. 801(b)(2)(E), and is otherwise DENIED.

(3) Pending further order by the Court, the United States may not argue or state to the jury that Turkey, in fact, funded the work by Flynn Intel Group, Inc. ("FIG") under the

contractual arrangement between FIG and Inovo, BV ("Inovo"); and the Motion to Preclude Argument on Turkey Funding is GRANTED, provided, however, the jury may be told in opening statement what the evidence will show concerning what Rafiekian was told about Turkey's involvement.

(4) The Defendant shall have 15 peremptory challenges, and the United States 10 peremptory challenges; and the Motion for Additional Peremptory Challenges and Jury Questionnaire [Doc. Nos. 150 and 152] is GRANTED to that extent and is otherwise DENIED.

(5) With respect to the attorney-client privilege issues presented in the pending motions [Doc. Nos. 163, 173, 182, and 186]:

(a) Defendant Rafiekian's statements to the law firm of Covington & Burling LLP ("Covington") are not privileged to the extent made for the purposes of the public disclosures contained in the March 7, 2017 filing by Covington on behalf of FIG pursuant to the Foreign Agents Registration Act ("FARA");

(b) Covington's opinion work product pertaining to the FARA filing, including the information it received, its assessment of that information, the judgments it made, and what caused it to include the allegedly false statements, is not protected opinion work product. However, any other opinion work product cannot be disclosed based on the crime-fraud exception;

(c) The attorney-client privilege attaching to communications from Rafiekian personally, as opposed to communications conveyed in his capacity as a representative of FIG, has not been waived, including as to any such statements by Rafiekian to Covington in August 2016 in connection with his potential retention of Covington; and

(d) Given the Court's ruling as to the non-privileged nature of communications to Covington for the purposes of the FARA filing, and the prospect that the United States will offer into evidence only non-privileged communications to Covington, the Court defers ruling on the remaining privilege issues, which present substantial unresolved legal and factual issues, including whether there was a valid waiver of the attorney-client privilege by Michael Flynn on behalf of FIG at the government's request as part of his duty of cooperation pursuant to the resolution of criminal charges against him and after he caused FIG's dissolution based on allegedly false representations; and if that waiver was invalid, the legal consequences of that conduct.

## I. BACKGROUND

### A. Charges Against Rafiekian

The Superseding Indictment [Doc. No. 141], returned on May 23, 2019, contains two counts against Rafiekian. Count One charges Rafiekian under 18 U.S.C. § 371 with conspiring with Co-Defendant Kamil Ekim Alptekin[1] and others to (1) act as an agent of the Turkish government without prior notification to the Attorney General in violation of 18 U.S.C. § 951 and (2) file a materially false FARA filing in violation of 22 U.S.C. § 618(a)(2). Count Two charges Rafiekian under 18 U.S.C. § 951 with knowingly acting and causing others to act in the United States as agents of the Turkish government without prior notification to the Attorney General, as required by law. Although Rafiekian is charged with conspiring to file a materially false FARA filing, he has not been charged with an underlying FARA offense, including under

---

[1] The Superseding Indictment charges Alptekin with the same counts as Rafiekian, as well as four additional counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). Alptekin, a dual Turkish-Dutch citizen residing in Turkey, Superseding Indictment ¶ 2, has not appeared in this case except for the limited purpose of opposing the Government's Motion to Establish the Crime-Fraud Exception as to him. *See* [Doc. Nos. 188, 216].

either 22 U.S.C. § 618(a)(1) for failing to register as a foreign agent under 22 U.S.C. § 612, or under 22 U.S.C. § 618(a)(2) for a false FARA filing.

## B. The Superseding Indictment

In support of these charges, the Superseding Indictment alleges the following:[2]

### (1) Flynn Intel Group and its Involvement in the Alleged Conspiracy

The Defendant and others participated in a conspiracy that began in July 2016 and continued through March 2017 pertaining to work relating to Turkey performed by FIG, which was co-founded and co-owned by Rafiekian (FIG's Vice-Chairman, Director, Secretary, and Treasurer) and former National Security Adviser Michael Flynn (FIG's Chairman and Chief Executive Officer). Superseding Indictment ¶ 1. To perform this work, FIG was engaged by, and signed a contract with, Inovo, a company formed by Alptekin in the Netherlands. *Id.* ¶¶ 2, 22. The engagement was formalized in a written contract between FIG and Inovo on or about September 3, 2016, though FIG had begun work on the project, which was initially known as the Truth Campaign and later became known as Operation/Project Confidence, in late July. *See id.* ¶ 22. Under the terms of the contract, the parties entered into a 90-day engagement for which FIG was to receive a total of $600,000 broken into three $200,000 payments from Inovo, of which Alptekin received twenty percent for his "advisory support." *Id.* ¶¶ 17–18, 22.

Pursuant to its contract with Inovo, FIG was expected to "deliver findings and results including but not limited to making criminal referrals" related to Fethullah Gulen, a Turkish imam, writer, and political figure residing in the United States. *Id.* ¶¶ 3–4, 22. Specifically, the project was supposed to result in "[a] 60 minutes video productions documenting the

[2] The allegations in the Superseding Indictment, which are taken as true at this stage of the proceedings for the purposes of the Motion to Dismiss, are supplemented in this section by other facts in the record, particularly from the pending motions and the exhibits thereto.

investigations" into Gulen. GEX 23B. The purpose of this work was to "discredit and delegitimize [Gulen] in the eyes of politicians and the public, and ultimately to secure [his] extradition." Superseding Indictment ¶ 3. This goal is in line with the interests of the Turkish government, which has "accused [Gulen] of plotting to overthrow the Turkish government," of "being behind" certain politically motivated investigations in Turkey, and of "leading an armed terrorist group," and has formally and openly sought his extradition from the United States government, particularly after a failed July 2016 coup d'état attempt in Turkey, which the Turkish government maintained he had orchestrated. *Id.* ¶¶ 5–7.

Though FIG's contract for this work was with Inovo, which also paid its fees, the Turkish government directed FIG's work through Alptekin and approved the budget for, and received regular updates on, the progress of FIG's work. *Id.* ¶ 3. In that regard, several emails between Rafiekian, Alptekin, and Flynn prior to FIG's official engagement indicate that FIG and Inovo only entered into a formal engagement after receiving the approval of high-level Turkish government officials. *See id.* ¶¶ 8–9, 14–16. After FIG had been engaged by Inovo, Rafiekian, Alptekin, Flynn, and other members of the project met with high-level Turkish officials on September 19, 2016, where they discussed the Turkish government's efforts to convince the U.S. government to extradite Gulen to Turkey. *Id.* ¶ 28. Alptekin had weekly telephone calls with Rafiekian, Flynn, and other FIG team members as to FIG's progress on the project, which he then passed on to Turkish officials, and then relayed their feedback on the project to Rafiekian and Flynn. *Id.* ¶¶ 39–40.

As part of the project, FIG provided consulting and lobbying services to the Turkish government, *id.* ¶ 1, which were designed to "influence U.S. politicians and public opinion," *id.* ¶ 3. Specifically, Rafiekian and others involved in the project "visited with and lobbied a

member of Congress, a Congressional staffer, and a state government official in an attempt to depict [Gulen] as a threat who should be returned to Turkey and to persuade them to hold Congressional hearings regarding [Gulen]." *Id.* ¶ 30. Rafiekian, working with Alptekin and Flynn, also helped draft an op-ed concerning Gulen entitled *Our Ally Turkey Is In Crisis and Needs Our Support*, and then helped place it for publication in *The Hill* newspaper, where it was published on November 8, 2016 under Flynn's name. *Id.* ¶¶ 45–50. Rafiekian sent Alptekin his initial draft of the op-ed immediately after Alptekin complained to him that FIG had not publicized enough negative information about Gulen and asked that they find a "smoking gun." *Id.* ¶ 44.

### (2) The FARA Filing

In August 2016, Rafiekian contacted, but did not retain, Covington "to provide advice concerning FARA," *see* Ex. G to Mot. to Exclude Privileged Information, and in September 2016, Rafiekian consulted with Robert Kelley, an attorney who later became FIG's General Counsel, about whether FIG was required to register under FARA, *see* Ex. B to Opp'n to Mots. to Establish Crime-Fraud Exception. Based on Kelley's advice, FIG registered under the Lobbying Disclosure Act ("LDA") at that time. *See id.*

On November 8, 2016, the same day as the publication of the op-ed, Donald Trump won the Presidential election, leading to Flynn's appointment as National Security Advisor designate for the incoming administration, and FIG discontinued its operations soon after. [Doc. No. 164] at 9; *see also* Ex. A to Reply in Support of Mot. to Exclude Privileged Information. Nevertheless, the publication of the op-ed triggered a letter dated November 30, 2016 to Flynn and FIG from the FARA Registration Unit of the U.S. Department of Justice (the "FARA Unit") regarding whether FIG, Flynn, or any other individuals had an obligation to register as an agent of a

foreign government under FARA. Superseding Indictment ¶ 51; *see also* Ex. A to Reply in Support of Mot. to Exclude Privileged Information. In response to the FARA Unit's inquiry, FIG, through Flynn, hired Covington to assist with evaluating whether a FARA filing was required, and Flynn also retained Covington personally. Superseding Indictment ¶ 52; *see also* Ex. 1 to Opp'n to Mot. to Exclude Privileged Information. Concurrently, both FIG as a corporate entity and Flynn personally were also represented by Kristen Verderame. *See* [Doc. No. 196] at 3.

By letter dated January 11, 2017, Covington provided a written response to the FARA Unit's November 30, 2016 inquiry. *See* Ex. A to Reply in Support of Mot. to Exclude Privileged Information. In that letter, Covington advised that "the existence of [the FARA Unit's] letter was not known to General Flynn and FIG until approximately December 24, 2016, because FIG generally suspended its activities in mid-November, including the use of the office to which the letter was sent." *Id.* Covington further advised:

> [B]ased on currently available information, we anticipate that General Flynn and FIG likely will file a FARA registration statement and supplemental statement for FIG's representation of Inovo BV, in lieu of the Lobbying Disclosure Act ("LDA") filing that FIG filed on September 30, 2016. Although the LDA filing disclosed FIG's engagement by Inovo BV, in hindsight it seems likely that the subject matter of FIG's representation of Inovo BV may have called for registration under FARA rather than under the LDA . . . . [W]e have not yet reached a final determination as to the foreign principal(s) to be listed in a FARA registration. We are also continuing to assess the role of various consultants and employees who performed work for Inovo BV in order to determine whether any of them are required to file short-form FARA registrations.

*Id.* With respect to the op-ed authored by Flynn and published in *The Hill* newspaper on November 8, 2016, Covington advised:

> It is our current understanding that the op-ed was initiated by General Flynn himself, and that he intended the op-ed to summarize a number of his long-standing public statements and positions regarding issues relating to Turkey, Syria, and the Islamic State in Iraq and Syria. We also believe that the op-ed may

have been prepared in the context of FIG's representation of Inovo BV, as the draft op-ed was shared with a representative of Inovo BV prior to publication and the op-ed related to subject matters overlapping with FIG's representation of Inovo BV.

*Id.*

Based on the information that it obtained during its investigation, including from Flynn, Rafiekian, Alptekin, and others, Covington filed a retroactive FARA registration on FIG's behalf on March 7, 2017 (the "FARA filing"). Superseding Indictment ¶ 55. In its cover letter to the FARA Unit with respect to that filing, Covington stated that it was filing under FARA because FIG's work for Inovo "could be construed to have principally benefitted the Republic of Turkey." Ex. D to Mot. to Exclude Privileged Information.

The Superseding Indictment alleges that the FARA filing contains materially false information and that between January and March 2017, Rafiekian and Alptekin "knowingly provided false information to [Covington attorneys] in an effort to hide from the attorneys – and ultimately from the FARA Unit – the involvement of Turkish government officials in the project." Superseding Indictment ¶ 52. Specifically, the Superseding Indictment alleges that Rafiekian made the following false representations to Covington:

> a. The meeting with Turkish officials on or about September 19, 2016 in New York City had nothing to do with Project Confidence, and instead was in furtherance of an abandoned "Project Truth" that was distinct from Project Confidence;
> b. There were no other contacts with Turkish government officials regarding the project;
> c. The op-ed was [Flynn's] own idea, and he wrote it on his own behalf, and unrelated to the project;
> d. [Alptekin] did not want the op-ed to be published; and
> e. Payments from [FIG] to [Inovo] were refunds for lobbying and public relations work that [FIG] did not perform.

*Id.* ¶ 53.

The Superseding Indictment further alleges that based on the misrepresentations of Rafiekian, Alptekin, and others to Covington, the FARA filing contained the following false statements or omissions:

- Paragraph 7: "List every foreign principal for whom the registrant is acting or has agreed to act."

  Response: "[Inovo]" *Id.* ¶ 56.

- Paragraph 8: "[W]ill you engage or are you engaging now in activity on your own behalf which benefits any . . . of your foreign principals?"

  Response: "[D]uring the course of the engagement and thereafter, [FIG] officials (particularly [Flynn], in his capacity as a public figure separate from [FIG]) frequently wrote, spoke, or provided interviews relating to national security. Although not undertaken at the direction of any foreign principal, including but not limited to [Inovo], it is possible that such activities may have had an indirect benefit to [Inovo]." *Id.* ¶ 57.

- Exhibit A to FIG's FARA Registration Statement falsely stated that "[FIG] does not know whether or the extent to which the Republic of Turkey was involved with its retention by [Inovo] for the three-month project." *Id.* ¶ 58.

- Paragraph 8(b) of Exhibit A to FIG's FARA Registration Statement falsely stated that the named foreign principal, Inovo, was not supervised or directed by a foreign government or other foreign principal. *Id.* ¶¶ 59–60.

- Paragraph 13 of FIG's FARA Supplemental Statement: "In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits your foreign principal?"

Response: "Because of its expertise, [FIG] officials write, speak, and give interviews relating to national security. Although not undertaken at the direction or control of a foreign principal, it is possible that such activities may have an indirect benefit to a principal. On his own initiative, [Flynn] published an op-ed in The Hill on November 8, 2016, that related to the same subject matters as [FIG's] work for [Inovo]. Neither [Inovo], nor any other person requested or directed publication of the op-ed." *Id.* ¶ 61

- The Attachment to FIG's FARA Supplemental Statement falsely stated that "[FIG] understood the engagement to be focused on improving U.S. business organizations' confidence regarding doing business in Turkey, particularly with respect to the stability of Turkey and its suitability as a venue for investment and commercial activity." *Id.* ¶ 62.

- The Attachment to FIG's FARA Supplemental Statement also falsely stated that the September 19, 2016 meeting in New York with Turkish government officials was "for the purpose of understanding better the political climate in Turkey at the time, as background for the project." *Id.* ¶ 63.

Although it appears that Flynn and not Rafiekian signed the FARA filing, *see* Ex. D to Mot. to Exclude Privileged Information at 8, 11, 15, the government alleges that Rafiekian reviewed the FARA filing and provided comments to Covington before it was submitted, but did not request that any of the alleged false statements therein, which he and Alptekin "caused to be made" based on their false representations, be changed, leading to the filing of a materially false FARA registration statement on FIG's behalf, Superseding Indictment ¶ 55.[3]

## C. Flynn's Guilty Plea and Cooperation with the Government

---

[3] The government does not allege that Covington or Verderame acted improperly with regard to the FARA filing, or that they were aware of any false statements or omissions therein.

On December 1, 2017, Flynn, represented in his individual capacity by Covington, which also continued to represent FIG, pled guilty to lying to the FBI about his contacts with Russian officials. *See* Ex. E to Mot. to Exclude Privileged Information. Though Flynn pled guilty to charges completely unrelated to FIG, the FARA filing, and Rafiekian, Flynn admitted in the Statement of Offense he executed in connection with that resolution that he had made the following materially false statements and omissions in the FARA filing:

> 5. On March 7, 2017 FLYNN filed multiple documents with the Department of Justice pursuant to the Foreign Agents Registration Act ("FARA") pertaining to a project performed by him and his company, the Flynn Intel Group, Inc. ("FIG"), for the principal benefit of the Republic of Turkey ("Turkey project"). In the FARA filings, Flynn made materially false statements and omissions, including by falsely stating that (a) FIG did not know whether or the extent to which the Republic of Turkey was involved in the Turkey project, (b) the Turkey project was focused on improving U.S. business organizations' confidence regarding doing business in Turkey, and (c) an op-ed by Flynn published in *The Hill* on November 8, 2016 was written at his own initiative; and by omitting that officials from the Republic of Turkey provided supervision and direction over the Turkey project.

Ex. C to Mot. to Exclude Privileged Information.

In connection with his guilty plea, Flynn also entered into a cooperation and plea agreement that mandates his cooperation with the government in its ongoing investigations and prosecutions, including in this prosecution. *See* Ex. E to Mot. to Exclude Privileged Information. Among his duties of cooperation is his obligation to "turn over to [law enforcement] . . . any and all evidence of crimes about which [he] is aware." *Id*. at 5. Flynn's former Covington lawyers[4] have represented to the Court that "[Flynn] cooperated extensively with the Special Counsel's Office, and, pursuant to his plea agreement, he continues to cooperate with the U.S. Attorney's Office in connection with this criminal case." [Doc. No. 76] at 2.[5]

---

[4] Flynn is no longer represented by Covington and has obtained new counsel in this matter. *See* [Doc. Nos. 210–11].
[5] Pursuant to his cooperation and plea agreement, Flynn was initially expected to testify at trial as a government witness in this case. *See* Tr. of June 13, 2019 Mot. Hrg., 65:18-19. However, the government has since notified the

As part of his cooperation, Flynn, in his capacity as CEO and Chairman of FIG's Board of Directors, (1) authorized Covington to share with the U.S. Attorney's Office certain information concerning the preparation of the FARA filing; (2) authorized FIG's former in-house General Counsel to be interviewed regarding the legal advice he provided to FIG before Covington's retention regarding FIG's obligation to file under FARA; (3) submitted to interviews by the U.S. Attorney's Office about the FARA submission and the factual information he and others shared or did not share with Covington lawyers who were working on preparing the FARA filing; and (4) authorized Covington to disclose to the U.S. Attorney's Office the factual representations made to them by FIG personnel in connection with the FARA filing; the source of those factual representations; information concerning who reviewed drafts of the FARA filing and their comments, corrections, or questions thereto; and how they received communications from FIG personnel concerning the contents of the FARA filing. *See* Ex. G to Mot. to Exclude Privileged Information.

Rafiekian was indicted on December 12, 2018, [Doc. No. 1], with a Superseding Indictment issued on May 23, 2019, [Doc. No. 141].

## II. ANALYSIS

### A. Motion to Dismiss the Superseding Indictment

Count One of the Superseding Indictment alleges a conspiracy to violate 18 U.S.C. § 951 and also to cause the filing of a false FARA statement in violation of 22 U.S.C § 618(a)(2). Count Two charges that Rafiekian, in violation of 18 U.S.C. § 951, knowingly acted and caused others to act as agents of the Turkish government without prior notification to the Attorney

---

Court that it does not plan to call Flynn as a witness in its case-in-chief. [Doc. No. 261]. Flynn maintains that he "is still willing to cooperate with the government," and that he in fact continues to do so in connection with this case. [Doc. No. 270] at 2.

General. Rafiekian first moves to dismiss Count Two on the grounds that the indictment fails to allege conduct constituting an essential element of Section 951, namely, that Rafiekian engaged in conduct that did not constitute an exempted "legal commercial transaction." He also seeks the dismissal of Count One on the grounds that because the Superseding Indictment fails to adequately charge an offense under Section 951, the conspiracy to violate Section 951 also fails; and the conspiracy to violate Section 618(a)(2) fails to adequately allege an agreement to cause the filing of a false FARA statement.

An indictment must be "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "[It] must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763–64 (1962)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including "a defect in the indictment" such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(1), (3)(B). Pretrial challenges to the sufficiency of the indictment subject the alleged deficiency to a higher standard of review than post-verdict challenges to the sufficiency of the indictment. *See United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009); *United States v. Hooker*, 841 F.2d 1225, 1229 (4th Cir. 1988) (*en banc*).

To challenge the sufficiency of an indictment, a defendant must "demonstrate that the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). Where, even taking all the allegations in the indictment as true, the government fails to allege all essential elements of an offense, courts have dismissed the

indictment and vacated any conviction thereunder. *See, e.g.*, *United States v. Spruill*, 118 F.3d 221, 227 (4th Cir. 1997) (vacating conviction where count failed to charge essential element of offense); *Daniels*, 973 F.2d at 275–76 (reversing conviction and remanding with instructions to dismiss count that was "fatally defective because it failed to specifically include every essential element of the charged offense").

18 U.S.C. § 951(a) provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . . shall be fined under this title or imprisoned not more than ten years, or both." Subsection (d) defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include . . . any person engaged in a *legal commercial transaction*." 18 U.S.C. § 951(d)(4) (emphasis added). Under applicable Department of Justice regulations, a "legal commercial transaction" for the purposes of 18 U.S.C. § 951(d)(4) is "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations." [6] 28 C.F.R. § 73.1(f). Further infused into the statute is subsection (e), which provides that "[n]otwithstanding paragraph [§ 951](d)(4), any person engaged in a legal commercial transaction shall be considered to be an agent of a foreign government, for the purposes of this section if . . . such person agrees to operate within the United States subject to the direction or control of a foreign government or official; and such

---

[6] This definition appears to have been promulgated pursuant to 18 U.S.C. § 951(b), which provides that "[t]he Attorney General shall promulgate rules and regulations establishing the requirements for notification." Although not made specifically applicable to the definition of "legal commercial transaction" in Section 951(e), there does not appear to be any reason not to apply it to that subsection as well.

person" is an agent of certain specified countries[7] or has been convicted of, or entered a plea of nolo contendere with respect to, certain offenses. 18 U.S.C. § 951(e).

Neither the Supreme Court nor the Fourth Circuit has decided whether proof of conduct other than an excluded "legal commercial transaction" is a necessary element of an offense under 18 U.S.C. § 951 and therefore must be alleged and proven by the United States in order to establish a violation of Section 951, or whether the absence of such proof is an affirmative defense, and therefore does not need to be alleged or proven in order to establish a violation of Section 951.[8] Based on Section 951's text, structure, and legislative history, the Court concludes that the legal commercial transaction limitation on Section 951's coverage constitutes a substantive offense element rather than an affirmative defense.

An element of an offense is "one whose specification . . . is necessary to establish the very illegality of the behavior." *Hooker*, 841 F.2d at 1231 (internal citation and quotation marks omitted). An affirmative defense, on the other hand, "operate[s] to excuse criminal liability"; that is, it "does not negate an element of a crime" but instead "excuses punishment for a crime the elements of which have been established and admitted.'" *United States v. Thompson*, 554 F.3d 450, 452 n.2 (4th Cir. 2009) (quoting *Smart v. Leake*, 873 F.2d 1558, 1575 n.22 (4th Cir. 1989)) (internal quotation marks omitted).

---

[7] The government does not contend that this list of specified countries includes Turkey, the foreign government alleged to be involved here.

[8] In an unpublished opinion, one district court has concluded that 18 U.S.C. § 951(a) sets forth all of the elements of a Section 951 charge, and that the exceptions stated in 18 U.S.C. § 951(d) must be raised and proven as affirmative defenses by the defendant. *United States v. Duran*, 2008 WL 11333989, *2 (S.D. Fla. Oct. 10, 2008), *aff'd on other grounds*, 596 F.3d 1283 (11th Cir. 2010). In reaching that decision, the *Duran* court relied in part on the definition of an affirmative defense adopted by the Eleventh Circuit. Although the Eleventh Circuit appears to have a narrower definition of affirmative defenses than the Fourth Circuit, *see United States v. Jackson*, 926 F. Supp. 2d 691, 716 (E.D.N.C. 2013), and *Duran* can be distinguished on that basis, the Court more fundamentally reaches a different conclusion than *Duran* for the reasons stated herein.

In *McKelvey v. United States*, 260 U.S. 353, 357 (1922), the Supreme Court explained with regard to exceptions in statutory schemes that "it has come to be a settled rule . . . that an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it." But the Supreme Court has also acknowledged that there are some cases where

> the exception, though in a subsequent clause or section, or even in a subsequent statute . . . is so incorporated as an amendment with the words antecedently employed to define the offence, that it would be impossible to frame the actual statutory charge . . . without an allegation showing that the accused was not within the exception contained in the subsequent clause, section, or statute. Obviously such an exception must be pleaded, as otherwise the indictment would not present the actual statutory accusation, and would also be defective for the want of clearness and certainty.

*United States v. Cook*, 84 U.S. 168, 175 (1872). Under these circumstances, what could, on the face of the statute, look like an exception, and therefore an affirmative defense, rather than an element, may be so embedded and integral to the statutory charge that it is in fact an offense element that must be pled.

Section 951 is such a statute. It imposes criminal liability on "[w]hoever . . . acts . . . as an agent of a foreign government . . . ." 18 U.S.C. § 951(a). In subsection (d), an "agent" is defined as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government of official," but "does not include — any person engaged in a legal commercial transaction." 18 U.S.C. § 951(d)(4). Section 951 therefore defines "agent" so as to exclude an exceptionally broad category of potential defendants — namely, "any person engaged in a legal commercial transaction." Under this statute, a person engaged in a legal commercial transaction cannot be "an agent," and therefore subject to the statute, even if that

17

person has "agree[d] to operate within the United States subject to the direction or control of a foreign government of official." By defining "agent" in this fashion, the statute does not excuse an established criminal act, as an affirmative defense would; instead, it has "render[ed] the underlying conduct noncriminal." *See Smith v. United States*, 568 U.S. 106, 111–12 (2013). Accordingly, to establish that a person is covered under the statute in the first instance, there must be proof that the person engaged in some conduct other than an excluded legal commercial transaction when acting at the control or direction of a foreign government or official. Such proof is therefore a "specification . . . necessary to establish the very illegality of the behavior." *Hooker*, 841 F.2d at 1231 (citation and quotation marks omitted). For these reasons, Section 951 is fundamentally different in structure than a statute that imposes liability on any person who agrees to operate subject to the direction or control of a foreign government or official, but nevertheless excuses that liability because the conduct that subjected that person to liability was excluded conduct.[9]

The government argues that *McKelvey* establishes a mechanical distinction between affirmative defenses "set out in distinct clauses or provisions," versus language set forth in the "general provision defining the elements of an offense," and that because "Section 951(a) defines the offense and sets out the prohibited conduct," and because "[t]he 'legal commercial transaction' language relied upon by [Rafiekian] does not appear in Section 951(a)" but is instead set out in subsection (d), it must "be treated as giving rise to an affirmative defense." [Doc. No. 228] at 8, 10. But under the pronouncements in *Cook*, the distinction between an

---

[9] FARA imposes liability precisely in this fashion. *See* 22 U.S.C. § 612(a). Under Section 612(a), not charged in this case, criminal liability is imposed on "every person who becomes an agent of a foreign principal." "Agent of a foreign principal" is defined extremely broadly to include "any person" who engages in virtually any activity that benefits a foreign principal other than "bona fide news or journalistic activities," s*ee* 22 U.S.C. § 611(c), (d), or any conduct exempted under 22 U.S.C. § 613.

offense element and an affirmative defense is a *substantive* distinction, not a mechanistic

distinction that turns on the placement of statutory clauses. *See also United States v. Prentiss*,

256 F.3d 971, 979–80 (10th Cir. 2001) (*en banc*) ("*McKelvey's* general provision/proviso

dichotomy is only one interpretative aid among several that should be applied in parsing statutes

that define offenses"). To get out from under this analysis, the United States relies heavily on

*United States v. Royal*, 731 F.3d 333 (4th Cir. 2013). However, the statute at issue in that case is

structured fundamentally differently than Section 951 and the Fourth Circuit's analysis in *Royal*

is easily squared with the principles articulated in *Cook*.

 *Royal* involved a prosecution under 18 U.S.C. § 922(g), which prohibits certain persons

from knowingly possessing "any firearm or ammunition" in interstate commerce. "Ammunition"

and "firearm" are defined terms, whose definitions are set out in separate subsections of a

different section. *See* 18 U.S.C. §§ 921(a)(17)(A) (defining ammunition), (a)(3) (defining

firearm). In pertinent part, the definition of "ammunition" includes any projectile "designed for

use in any firearm." The definition of "firearm" excludes an "antique firearm," which is defined

in another subsection, 18 U.S.C. § 921(a)(16). The defendant contended that the government was

required to prove as part of its case in chief that the ammunition he possessed was not

ammunition that was designed for use only in an antique firearm. The Court rejected that reading

of the statutory scheme and held that whether a covered person possessed ammunition that was

usable only in an antique firearm was an affirmative defense, not an element of the offense.

 In reaching that conclusion, the Fourth Circuit specifically distinguished between an

aspect of a statutory scheme, such as the exclusion of an antique firearm from the definition of

"firearm," which "stands alone as a separate sentence untethered to the general definition of

'firearm,'" and the "designed for use in any firearm" portion of the definition of "ammunition,"

which it deemed "part and parcel of the definitional sentence." *Royal*, 731 F.3d at 338–339. "Consequently, it is the government's initial burden to prove as an element of the [Section 922(g)(1)] offense that the rounds were 'designed for use in any firearm,'" but it is the defendant's burden to prove as an affirmative defense that the ammunition at issue was usable only in an antique firearm, and therefore not ammunition usable in "any firearm" covered by the statute. *See id.* at 339. Significant to the Court was that Section 922(g) criminalized a broad range of behavior—a felon's possession of all manner of "firearms"—but in a separate section carved out a narrow exception for "antique firearm[s]," i.e., those manufactured before 1898. 18 U.S.C. § 921(a)(3).

Here, unlike in *Royal*, the "legal commercial transaction" language of Section 951 is "part and parcel of the definitional sentence" of "agent," just as "designed for use in any firearm" is part and parcel of the definition of "ammunition." Also unlike the narrow antique firearms exception in the statute in *Royal*, Section 951(d), even in light of the inclusions set forth in 951(e), references conduct so broad as to encompass and exempt virtually all legal commerce from the statute's notice requirement.

The Court's conclusion as to Section 951 is also consistent with the Fourth Circuit's analysis in *United States v. Daniel*, 3 F.3d 775 (4th Cir. 1993). *Daniel* involved the prosecution of a medical doctor under 21 U.S.C. § 841, which provides in relevant part that, "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally — to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). A separate section, 21 U.S.C. § 822(b), "authorizes distribution and dispensation by registrants," usually medical doctors, "'to the extent authorized by their registration and in conformity with the other provisions of this subchapter.'"

*Daniel*, 3 F.3d at 778 (quoting 21 U.S.C. § 822(b)). The Fourth Circuit read those two sections together, finding that the government was required to allege as an element of the offense that the distribution was done "in a way not authorized by this subchapter," a requirement satisfied by "[t]he indictment's allegations that the attempted distributions or dispensations were not for a legitimate medical purpose." *Id.* (internal quotation marks and alterations omitted). Similarly, Sections 951(a) and 951(d) can and should be read together to require the government to allege that the person has "act[ed] in the United States as an agent of a foreign government without prior notification to the Attorney General," and that the relevant "acts" are not "legal commercial transaction[s]." 18 U.S.C. § 951(a), (d)(4).

The Court's construction of Section 951 also finds support in the statute's legislative history. After the statute was amended in 1948, it penalized anyone "other than a diplomatic or consular officer or attaché" who "acts in the United States as an agent of a foreign government without prior notification to the Secretary of State," without further qualification. Pub. L. No. 80-772, § 951, 62 Stat. 683, 743 (1948); *see United States v. Duran*, 596 F.3d 1283, 1295 n.7 (11th Cir. 2010). But at a congressional hearing in 1982, the Department of Justice warned Congress that at least one federal court had expressed concerns as to the vagueness of the statute. *See* Communist Bloc Intelligence Gathering Activities on Capitol Hill: Hearing on S. 1959 and S. 1963 Before the S. Comm. on Security and Terrorism, 97th Cong. 37 (1982) (statement of Mark Richard, Deputy Assistant Att'y Gen., Criminal Division, Department of Justice ) ("[T]he Department does believe that the Congress should define the term 'agent of a foreign government' . . . narrowly to avoid the problems presented in [a] recent . . . case in Philadelphia, in which the judge indicated that in the absence of clarifying regulations Section 951 was too

vague to adequately warn defendants that their conduct was proscribed."). The State Department agreed and also urged a narrower definition of the term "agent of a foreign government":

> We share the Department of Justice's concern that the absence of a definition of "agent of a foreign government" may cause problems. . . . We also believe that certain legitimate activities in this country on behalf of foreign governments should be exempt from the statute. I have in mind American attorneys who represent foreign governments in American courts and individuals involved in legitimate business activities on behalf of a foreign client.

*Id.* at 27–28 (statement of Jeffrey H. Smith, State Department); *see also id.* at 31 (among individuals who "need not, in our view, register with the Attorney General" are "people engaged in legitimate representation of foreign governments in commercial activities"). Congress added subsection (d) to Section 951 in 1984 in response to these executive and judicial branch constitutional concerns about an overbroad definition of the word "agent." *See* Pub. L. No. 98-473, § 1209, 98 Stat 1837, 2164 (1984); S. REP. NO. 98-225, at 415 (1983) (stating that the amendment was designed to "limit[] the coverage of the statute by focusing only on those in whom the United States government has a necessary interest" by narrowing the statute's reach to, among other things, no longer "cover those individuals engaged in routine commercial matters"). Requiring that the government prove that the defendant engaged in some conduct other than an excluded legal commercial transaction is therefore in accordance with Congressional intent.[10]

Because the text, structure, and history of Section 951 support the conclusion that the legal commercial transaction provision in subsection (d) establishes an offense element rather than an affirmative defense, the question becomes whether the Superseding Indictment

---

[10] The government finds it "notable" that the Fourth Circuit easily ascertained the elements of the "earlier version of Section 951, which provided no definition for the term 'agent of a foreign government.'" [Doc. No. 228] at 11 (citing *United States v. Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980)). But the Fourth Circuit's interpretation of Section 951 before the addition of subsection (d) sheds little light on how that newly added provision should be treated for the purposes of allocating the burdens of proof.

sufficiently alleges that Rafiekian engaged in activity other than an excluded legal commercial transaction. "[W]hen an indictment fails to include an essential element of the offense charged, it thereby fails to charge any federal offense," and the proper recourse is dismissal. *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988) ("We have uniformly dismissed on objection before verdict indictments for failure to include an essential statutory element despite the inclusion of a citation to the statute itself in the indictment."). Because "[t]he Fifth Amendment requires a grand jury to examine and find sufficient evidence of every element of the offense listed in the indictment," *United States v. Darby*, 37 F.3d 1059, 1064 n.3 (4th Cir, 1994), "mere reference to the applicable statute does not cure the defect," *id.* at 1063. For the same reason, "a jury instruction cannot cure the omission from the indictment of an essential element of the offense." *Id.* at 1064 n.3.

The Superseding Indictment does not specifically allege that Rafiekian engaged in conduct other than an excluded legal commercial transaction. It does, however, allege the specific conduct that subjects Rafiekian to criminal liability. Summarized generally, Rafiekian is alleged to have engaged in a scheme to "covertly and unlawfully . . . influence U.S. politicians and public opinion" about Fethullah Gulen. Superseding Indictment ¶ 3. As part of this scheme, he is alleged to have (1) "visited with and lobbed a member of Congress, a Congressional staffer, and a state government official" in support of Gulen's extradition, *id.* ¶ 30; (2) helped draft and place for publication an op-ed concerning Gulen under Flynn's name, *id.* ¶¶ 45-50; and (3) made misrepresentations to Covington regarding Turkey's involvement in the project in connection with FIG's FARA filing, *see id.* ¶ 53.

Rafiekian's lobbying and op-ed activities fall well within the definition of legal commercial transactions unless "prohibited by federal or state legislation or implementing

regulations." 28 C.F.R. § 73.1(f). Although Rafiekian is not charged with a FARA violation under 22 U.S.C. 612(a), these activities would violate FARA, and therefore be illegal, if they are covered activities[11] and Rafiekian willfully engaged in them as an agent[12] of the Turkish government and without a proper FARA registration. *See* 22 U.S.C. § 618(a). Although the Superseding Indictment does not explicitly allege that Rafiekian was acting as "an agent of a foreign principal" when he willfully engaged in covered lobbying or public relations activities without the required FARA filing, it does allege that the FARA statement that was filed failed to disclose, as required, that Rafiekian had acted on behalf of the Turkish government. *See, e.g.,* Superseding Indictment, ¶¶ 56, 57. Although a close issue, given the standards against which the sufficiency of an indictment is to be determined,[13] the Court cannot conclude that the indictment is fatally defective with respect to Count Two based on these allegations.[14]

Rafiekian also contends that Count One, charging a conspiracy to violate Section 951, must also be dismissed. This contention is based on his claim that the Superseding Indictment

---

[11] Under FARA, covered activities include "political activities for or in the interests of [a] foreign principal" as well as acting as "public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of [a] foreign principal." 22 U.S.C. § 611(c)(1)(i), (ii).

[12] An "agent" under FARA is defined much more broadly than under 18 U.S.C. § 951: FARA defines an "agent of a foreign principal" as "any person who acts . . . at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal." 22 U.S.C. § 611(c)(1).

[13] For this reason, the Court does not at this time assess the substance of the allegations in light of the substantial evidence that has been submitted in connection with the other pending motions, which raise substantial factual issues as to the Superseding Indictment's allegations pertaining to falsity, materiality, scienter, and agency.

[14] The same cannot be said with respect to the allegations concerning Rafiekian's alleged misrepresentations to Covington. While the Superseding Indictment alleges that Rafiekian's lobbying activities and involvement with the op-ed were conducted under the direction and control of the Turkish government, it does not allege that Rafiekian was acting under the direction and control of the Turkish government when he made the alleged false statements to Covington. That is, the government claims that Turkey directed FIG's work between August and November 2016 (culminating in the publication of the op-ed), but it does not allege any direction or control by the Turkish government in connection with the March 7, 2017 FARA filing itself. Nor can one draw from the Superseding Indictment any such inference. The FARA filing was first contemplated only after FIG and Flynn retained Covington in December 2016, and Rafiekian's alleged misrepresentations to Covington were made between January and March 2017, by which time FIG's 90-day contract with Inovo had expired, FIG had ceased doing business, and Flynn had become the National Security Advisor designate for the Trump administration. As such, the alleged false statements are not a sufficient basis for a Section 951 charge that Rafiekian acted as a foreign agent with respect to some activity other than a legal commercial transaction.

fails to adequately allege a violation of Section 951, which the Court has rejected; but regardless of the adequacy of Count Two, the actual commission of a substantive offense is not a required element of a conspiracy to commit that offense, and dismissal of a conspiracy count is therefore not required whenever a substantive count is found to be deficient. See *Wong Tai v. United States*, 273 U.S. 77, 81 (1927) ("It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy[.]") (citations and internal quotation marks omitted). To charge a conspiracy, "all that is necessary in the indictment is that the object of the conspiracy be set forth sufficiently to identify the offense which the defendant is charged with conspiring to commit." *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)). The allegations in the Superseding Indictment are sufficient to satisfy this standard.

Finally, Rafiekian contends that the charged conspiracy to violate Section 618(a)(2) in Count One must be dismissed since the Superseding Indictment does not sufficiently allege an agreement to violate that statute by making a materially false FARA filing. At this stage, however, the Superseding Indictment sufficiently alleges that Rafiekian and Alptekin, "together with others known and unknown, knowingly and intentionally conspired" to "willfully" make false statements and omissions of material fact in a FARA filing, in violation of 22 U.S.C. § 618(a)(2). The Superseding Indictment also alleges the timeframe during which the conspiracy took place, the object of the conspiracy, and the offense which Rafiekian is charged with conspiring to commit. *See Matzkin*, 14 F.3d at 1019 (requiring only that the object of the

conspiracy be set forth sufficiently to identify the object of the charged conspiracy).[15] Accordingly, Count I of the Superseding Indictment will not be dismissed.

### B. Motion to Exclude Co-Conspirator Statements

The Superseding Indictment charges Rafiekian with conspiring with Alptekin and senior Turkish government officials to violate two different criminal statutes: 18 U.S.C. § 951, which prohibits acting as an agent of a foreign government without prior notification to the Attorney General; and 22 USC § 618(a)(2), which prohibits willfully making false or misleading statements in a FARA registration statement. The United States seeks to admit the statements of alleged co-conspirators based on the exception to the hearsay rule set forth in Fed. R. Evid. 801(d)(2)(E), which provides that a statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Rafiekian has moved to exclude these out-of-court co-conspirator statements.[16]

Fed. R. Evid. 801(d)(2)(E) reflects the Supreme Court's holding in *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) that, in deciding whether otherwise hearsay statements of an alleged co-conspirator are admissible, courts should consider the contents of the statement in determining the existence of the conspiracy, the participation therein of the declarant and the party against whom the statement is offered, and that the statement was made "during the course of and in furtherance of the conspiracy." These preliminary questions are to be considered under Rule 104(a), which provides in relevant part that "[t]he court must decide any preliminary

---

[15] Rafiekian contends that the Superseding Indictment simply alleges separate or parallel conduct on the part of Rafiekian and the alleged co-conspirators rather than an actual conspiracy, but this contention is in effect a challenge to the sufficiency of the government's evidence, which is premature at this stage. *See, e.g., United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.").

[16] Specifically, Rafiekian moves to exclude the out-of-court statements referenced in paragraphs 5, 6, 7, 9, 14, 15, 16, 20, 21, 28, 39, 40, 41, 42, 44, 49, and 54 of the Superseding Indictment, as well as any additional out-of-court statements by any co-conspirator. [Doc. No. 155] at 2.

question about whether . . . evidence is admissible" and that "[i]n so deciding, the court is not bound by evidence rules[.]" "[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." *Bourjaily*, 483 U.S. at 176. *Bourjaily's* holding was codified and extended by the 1997 amendments to Rule 801(d)(2)(E), which provide that while the contents of the offered statement must be considered, it cannot by itself establish the existence of a conspiracy or the defendant's and declarant's participation therein. Rather, "[t]he court must consider in addition the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question." Fed. R. Evid. 801(d)(2)(E), Comments to 1997 Amendments.

A conspiracy is an agreement between two or more persons to accomplish an unlawful objective or a lawful objective through an unlawful act. For the purposes of Fed. R. Evid. 801(d)(2)(E), the Court is not limited to those conspiracies alleged in the indictment, but may admit, subject to relevancy considerations, any statements of any co-conspirators involved in any conspiracy in which the defendant knowingly participated. *Cf. United States v. Frol*, 518 F.2d 1134, 1136 (8th Cir. 1975) (citing *United States v. Nixon*, 418 U.S. 683 (1974)) (finding co-conspirator statements properly admissible against all conspirators, even when no conspiracy was actually charged). For this reason, the Court has considered not only whether the United States has made the requisite showing with respect to the conspiracy alleged in Count One, but also any other conspiracy, whether charged or not.

In its opposition to the Motion to Exclude Co-Conspirator Statements [Doc. No. 198], the United States does not attach any documents as exhibits to the Motion, but instead references the Superseding Indictment and documents attached as exhibits to other pending motions; and in

assessing whether the government has presented sufficient evidence of a conspiracy for the purposes of Rule 801(d)(2)(E), the Court has considered all of the documents and information presented in connection with the pending motions, including the Government's Motions to Establish Crime-Fraud Exception [Doc. Nos. 173 and 182].[17] Notably absent from the government's proffer is any evidence from Michael Flynn, who, as discussed above, has admitted that he made certain false statements in the FARA filing that was the object of one prong of the charged conspiracy and has entered into a cooperation agreement with the United States that extends to this prosecution. *See* Tr. of June 13, 2019 Mot. Hrg., 65:9-22.

Based on the evidence presented pertaining to the contents, circumstances, and context of the alleged co-conspirator statements, including subsequent events and other evidence pertaining to the conduct of the Defendant and other alleged co-conspirators, the Court concludes at this point that the government has not established under Rule 104 the existence of a conspiracy in which Rafiekian was a participant by a preponderance of the evidence for the purposes of admitting otherwise hearsay statements pursuant to Rule 801(d)(2)(E).

The proffered evidence reflects discussions between Alptekin and Rafiekian concerning the retention of FIG's and Flynn's consulting services, none of which on their face reflect or suggest any agreement to have Rafiekian operate as an undisclosed Turkish agent or cause the filing of a false FARA statement. The evidence does reflect the interest and involvement of the

---

[17] Summarized generally, these documents and evidence include (1) a series of e-mails between July 27, 2016 and November 2, 2016, some with attached documents, between Rafiekian, Alptekin, and/or Flynn, some of which contain the statements of other alleged co-conspirators sought to be admitted, principally statements attributed by Alptekin to Turkish government officials; (2) documents relating to the nature of FIG's work on behalf of Inovo; (3) evidence regarding the September 19, 2016 meeting in New York City between Rafiekian, Alptekin, Flynn, and high level Turkish officials regarding the project; (4) evidence of the structure of the payments between FIG, Inovo, and Alptekin, and in particular the twenty percent share of FIG's fees that Alptekin received as "consultancy fees"; and (5) the allegedly false statements in the FARA registration statement filed by Covington on FIG's behalf on March 7, 2017.

Turkish government in the project, including discussions between Alptekin and Turkish officials concerning setting a budget for FIG's contemplated work, *see* GEX 9, 16, and approving Alptekin's/Inovo's retention of FIG and/or Flynn, *see* GEX 14, 15, and, when viewed in its entirety, it sufficiently establishes under Rule 104 for the purposes of Rule 801(d)(2)(E) that Alptekin/Inovo was acting on behalf of the Turkish government; that the actual contract between Inovo and FIG was entered into by Inovo on behalf of and at the direction of the Turkish government; and that FIG was acting at the direction and under the control of Inovo. But one cannot sufficiently infer from this evidence that *Rafiekian* was conspiring to act as an undisclosed Turkish agent or to cause the filing of a false FARA statement. There is some mention of "confidentiality" and limiting the number of people privy to the discussions concerning the retention of FIG in communications between Alptekin and Rafiekian, but those references are in the context of Alptekin's then on-going, preliminary, formative business discussions with FIG. *See* GEX 9. Moreover, any inference of an agreement by Rafiekian to act as an undisclosed Turkish agent is substantially undercut by his contemporaneous conduct, which included seeking out legal advice concerning his FARA disclosure obligations in August 2016 (from Covington) and again in September 2016 (from Kelley), and subsequently filing an LDA disclosure statement pursuant to Kelley's advice.

Similarly, the FARA statement and related filings do not reflect the existence of the alleged conspiracy to act as undisclosed Turkish agents or to cause the filing of a false FARA statement, or Rafiekian's knowing participation in any such conspiracy. The government contends that the FARA statement contains materially false statements, attributable to Rafiekian. But what was disclosed in the FARA statement is not sufficient to allow any inference of the alleged conspiracies. Those disclosures include that (1) Turkey could be viewed as the primary

beneficiary of FIG's work; (2) FIG worked at the direction of and under the control of Inovo, a

foreign principal; (3) FIG was aware that Alptekin and Inovo consulted with Turkish officials

regarding potential work by FIG, and Alptekin introduced FIG officials to Turkish officials at a

meeting on September 19, 2016,[18] but Inovo had represented to FIG, through Inovo's counsel,

that no part of its fees paid to FIG was provided by any foreign government; (4) FIG's work for

Inovo pertained to both the business climate in Turkey and to Gulen;[19] (5) Rafiekian and others

participated in the drafting of the op-ed; [20] and (6) Alptekin, through counsel, made

representations concerning the retention of FIG that were not endorsed by FIG or its principals.[21]

---

[18] The FARA filing described the September 19, 2016 meeting between FIG officials and Turkish officials as "for the purpose of understanding better the political climate in Turkey at the time, as background for the project." GEX 61 at 10–11.

[19] As reflected in the government's exhibits submitted in connection with the Motions, FIG's work pertaining to both Gulen and the business climate in Turkey was discussed internally under the name Project/Operation Confidence. *Compare* GEX 23B (discussing promoting Turkey's business climate as part of "Operation Confidence") *with* GEX 43B (discussing work pertaining to Gulen as part of "Project Confidence"). But whether this representation was accurate or not, the fact of disclosure, particularly given the other FARA disclosures concerning Turkish involvement in the project and FIG's and Flynn's activities pertaining to Gulen, minimizes the probative value of any allegedly inaccurate descriptions of the work FIG performed for Inovo for the purposes of determining whether a conspiracy existed to act as an undisclosed Turkish agent for the purposes of Rule 801(d)(2)(E).

[20] The allegedly false FARA statement concerning the op-ed is the following:

> In late October and early November 2016, Gen. Flynn of Flynn Intel group developed an op-ed article based, in part, on the research conducted by Flynn Intel group under the Inovo engagement. The op-ed was not written or published at the request of, or under the direction or control of, Inovo, the Republic of Turkey, or any other party. No compensation was received for the publication of the op-ed. In addition to Gen. Flynn, Bijan Rafiekian and an editor, Hank Cox, participated in the drafting. Inovo, Mr. Alptekin, and the Republic of Turkey did not participate in the drafting. Nonetheless, the op-ed addresses the subject matter related to the research that Flynn Intel Group conducted for Inovo, and a draft of the op-ed was shared with Inovo in advance of publication. No changes, other than technical edits, were made in the op-ed based on feedback from Inovo. To the best of our knowledge, Inovo did not communicate with the Republic of Turkey regarding the op-ed or provide the draft op-ed to the government.

GEX 61 at 11.

[21] Specifically, Alptekin's counsel represented:

> At the time Inovo hired Flynn Intel Group, Inovo represented a private sector company in Israel that sought to export natural gas to Turkey, and it was for support of its consulting work for this client that Inovo engaged Flynn Intel Group, specifically to understand the tumultuous political climate at the time between the United States and Turkey so that Inovo could advise its client regarding its business opportunities and investment in Turkey.

GEX 58 at 3.

*See generally* GEX 58, 61. In this regard, there is no contention, or evidence proffered, that Covington (who was concededly not part of any conspiracy) wrote and filed the FARA disclosures without the benefit of the e-mails and other documents the government contends reflects the alleged conspiracy.[22]

The government also relies centrally on the aspect of the consulting agreement between FIG and Inovo that provides for Alptekin to receive twenty percent of the fees paid to FIG from Inovo. Whatever inferences can be reasonably drawn from that arrangement, one cannot reasonably infer an agreement or understanding that Rafiekian would act as an undisclosed Turkish agent or cause the filing of a false FARA statement.

The government also contends, in the alternative, that the emails should be admitted as "adoptive admissions" pursuant to Fed. R. Evid. 801(d)(2)(E). Rule 801(d)(2)(e) provides that a statement is not hearsay if it is offered against an opposing party and "is one the party manifested that it adopted or believed to be true." The Court has examined that contention in light of the applicable considerations, including the substance of the statements and the circumstances under which they were received, and finds that they do not satisfy the requirements for "adoptive admissions."

For the above reasons, Defendant's Motion to Exclude Co-Conspirator Statements is granted to the extent set forth above. This ruling is without prejudice to the government's presenting additional evidence at trial to establish the necessary foundation for the admission of evidence pursuant to Rule 801(d)(2)(E), or with proper foundation and a limiting instruction, the

---

[22] After FIG waived any privilege with respect to information provided to Covington, Covington lawyers were interviewed by the government with respect to "factual representations made to counsel, in connection with preparation of FIG's FARA filing; the sources of such factual representations; . . . and [w]hen, how, and in what form counsel received communications from FIG personnel concerning the content of the FARA filing." Ex. 4 to Opp. to Mot. to Exclude Privileged Information at 2.

admission of e-mails or other communications to Rafiekian as evidence of what information he was provided concerning Turkish involvement in the project or any other relevant issue.

### C. Privilege Issues

FIG, acting through Flynn, retained Covington and Verderame for the purposes of determining whether a FARA filing was required and if so, to prepare and file that FARA disclosure. For that purpose, Flynn and Rafiekian provided information to Covington and Verderame in connection with the FARA filing. Covington also obtained information from Flynn and Alptekin through his counsel.

The United States seeks to admit Rafiekian's statements to Covington based on their non-privileged nature, and also, in the alternative, under the crime-fraud exception. Rafiekian seeks to exclude his statements to Covington on the grounds that (1) they were privileged and not made for the purposes of committing any crime; (2) the crime-fraud exception would not extend in any event to opinion work product statements from Covington lawyers concerning their recollection of statements made by Rafiekian; and (3) any relied upon waiver of the attorney-client privilege made by Flynn on behalf of FIG is invalid. These issues present complicated issues of law and fact arising out of whether the communications by Rafiekian to Covington were made by Rafiekian personally, or as a representative of FIG; and whether Covington's opinion work product with respect to those communications is protected. These issues, in turn, raise questions concerning the scope and nature of Covington's representation as to FIG and Rafiekian at any particular point in the representation; and the validity and effect of Flynn's waiver of FIG's privilege in light of FIG's dissolution, the basis upon which it was dissolved, and Flynn's purposes in dissolving FIG and waiving privilege.

Covington's retention was formally between Covington and FIG pertaining to FARA and separately between Covington and Flynn personally. Rafiekian does not appear to have personally retained Covington. Nevertheless, as the Court has previously ruled, under the particular circumstances of this case, and given the nature and structure of FIG, Rafiekian, as a principal officer, shareholder and one of two directors, was, like Flynn, a "client" of Covington for the purpose of access to Covington's files. A separate issue, however, is whether Rafiekian can waive any privilege on behalf of FIG.

Information provided to a lawyer for the purposes of a public filing is not privileged. *Martin Marietta*, 856 F.2d at 623 ("[I]f a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as the details underlying the data which was to be published will not enjoy the [attorney-client] privilege." (internal quotation marks omitted)). While even in those circumstances certain information remains privileged if for purposes other than disclosure in a public filing, the nonprivileged nature of the information provided is not limited to the information actually disclosed in the public filing but includes all information provided for the purpose of determining what should be disclosed. *See F.T.C. v. Reckitt Benchiser Pharms., Inc.*, 2015 WL 1062062, at *4 (E.D. Va. Mar. 10, 2015).

Given that it would appear at this point, without formally ruling, that the statements the government seeks to admit from Rafiekian would likely be nonprivileged statements made to Covington for the purposes of its FARA filing, the Court sees no need at this time to rule on all of these issues and will postpone those rulings that appear unnecessary at this time. For that reason, the Court makes the following limited rulings and pronouncements to guide the parties during the trial.

1. The information FIG, acting through Flynn and Rafiekian, and Alptekin, acting through its counsel, provided to Covington and Verderame for the purposes of the public disclosures in the FARA filing is not privileged attorney-client information; and such information may be disclosed without any waiver of privilege by FIG, Flynn, Rafiekian or Alptekin. To the extent that Rafiekian contends that specific statements from him to Covington or Verderame remain privileged because they are not sufficiently related to the FARA filing and the privilege has not been validly waived, the Court will consider those specific statements as the government proffers them before their admission.

2. Rafiekian's statements to Covington, obtained only after the DOJ inquiry concerning FIG's and Flynn's FARA obligations, were within a context and under circumstances sufficiently associated with an adversarial process and the prospect of litigation that Covington's recollections of those statements, including its memorialization of those statements, constitute opinion work product. *In re Grand Jury Subpoena*, 870 F.3d 312, 317–18 (4th Cir. 2017). Application of the crime-fraud exception to such work product therefore requires a *prima facie* showing that the attorneys involved were aware of or knowing participants in the criminal conduct or scheme, *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 252 (4th Cir. 2005), a contention the government has repeatedly and explicitly rejected in this case, *see, e.g.*, [Doc. No. 173] at 1–2. Accordingly, to the extent that Rafiekian's statements to Covington in connection with the FARA filing were otherwise privileged, the crime-fraud exception, if it applied under the facts of this case, would not extend to that work product.

3. Notwithstanding the near absolute immunity enjoyed by attorney opinion work product, where that work product relates centrally to the actions or conduct of a lawyer at issue in a case, such that consideration of the attorney's opinion work product, including their

recollections and impressions, are essential to a just and fair resolution, opinion work product protections otherwise applicable do not apply. *See, e.g., In re John Doe,* 662 F.2d 1073, 1080 (4th Cir. 1981) (finding no opinion work product protection where attorney's prior representation was a target of the grand jury investigation); *Sec. Exch. Comm'n v. Nat'l Student Mktg. Corp.,* 1974 WL 415, *3–4 (D.D.C. June 25, 1974) (finding no opinion work product protection where at issue was what a law firm did and did not know). Here, while there is no contention that Covington or Verderame committed any crime, what they did and why is central to this case as their actions are claimed to have resulted in a crime attributable to Rafiekian. For these reasons, any opinion work product by Covington or Verderame that pertains to the FARA filing is not protected.

### D. Motion to Preclude Argument on Turkey Funding

Rafiekian has also moved to preclude the government from (1) claiming in its opening statement that evidence exists that the government of Turkey funded FIG's work for Inovo; and (2) arguing in closing that the government of Turkey funded the project. Upon consideration of the Motion, the Court grants the Motion to the extent that the Government may not state in opening statement, or until such time as the Court rules otherwise, that Turkey funded FIG's work for Inovo. It may, however, in opening statement say what the evidence will show concerning what Rafiekian was told about any funding by Turkey.

### E. Motion for Additional Peremptory Challenges and Jury Questionnaire

Rafiekian requests that instead of the ten peremptory challenges typically granted to a criminal defendant he be granted sixteen. Upon consideration of the Motion, the Court will increase Defendant's peremptory challenges from ten to fifteen and the government's peremptory challenges from six to ten.

Rafiekian also requests that the jury *voir dire* panel be required to complete a questionnaire on the grounds that the high-profile public nature of this prosecution requires more in-depth information than obtainable through the usual *voir dire* process. Upon consideration of that Motion, the Court concludes that adequate inquiry can be made during the *voir dire* process without a separate jury questionnaire, and the Motion will therefore be denied. Pursuant to Local Rule 51, the parties should submit their proposed *voir dire* questions on or before July 8, 2019.

### III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant Bijan Rafiekian's Motion to Dismiss the Indictment [Doc. No. 190] be, and the same hereby is, DENIED; and it is further

ORDERED that Defendant Bijan Rafiekian's Motion *In Limine* to Exclude Out-Of-Court Statements by Co-Conspirators [Doc. No. 154] be, and the same hereby is GRANTED in part and DENIED in part; the Motion is GRANTED to the extent that the proffered co-conspirator statements are excluded on the basis that the United States has not presented sufficient evidence of a conspiracy to establish the co-conspirator statements hearsay exception under Fed. R. Evid. 801(d)(2)(E), without prejudice to the presentation at trial of additional evidence concerning the existence of the alleged conspiracy; and the Motion is otherwise DENIED; and it is further

ORDERED that Defendant Bijan Rafiekian's Motion to Dismiss the Indictment and Exclude and Suppress Privileged Information [Doc. No. 163]; the Government's Motions to Establish the Crime-Fraud Exception as to Defendants Rafiekian [Doc. No. 173] and Alptekin [Doc. No. 182]; and Defendant Bijan Rafiekian's Motion for an Evidentiary Hearing [Doc. No. 186] be, and the same hereby are, DEFERRED, pending the presentation of evidence during trial; and it is further

ORDERED that Defendant Bijan Rafiekian's Motion *In Limine* to Preclude the Government From Arguing that Turkey Funded FIG's Work for Inovo [Doc. No. 165] be, and the same hereby is GRANTED, pending further order of the Court; and it is further

ORDERED that Defendant Bijan Rafiekian's Motion for Additional Peremptory Challenges and a Jury Questionnaire [Doc. Nos. 150 and 152] be, and the same hereby is GRANTED in part and DENIED in part; the Motion is GRANTED to the extent that the Defendant shall have 15 preemptory challenges and the United States shall have 10 preemptory challenges; and it is otherwise DENIED.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 9, 2019