1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2                ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                 )
4              Plaintiff,        )
                                 )
5        v.                      )  Alexandria, Virginia
                                 )  July 15, 209
6   BIJAN RAFIEKIAN,             )  9:09 a.m.
                                 )
7              Defendant.        )  Day 1
    _____)  Pages 1 - 77
8

9                 TRANSCRIPT OF TRIAL

10      BEFORE THE HONORABLE ANTHONY J. TRENGA

11        UNITED STATES DISTRICT COURT JUDGE

12                 AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES


Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

1   APPEARANCES:

2   FOR THE UNITED STATES OF AMERICA:

3        JAMES P. GILLIS, ESQUIRE
         EVAN N. TURGEON, ESQUIRE
4        JOHN T. GIBBS, ESQUIRE
         S. KATE SWEETEN, ESQUIRE
5        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
6        Alexandria, Virginia  22314
         (703) 299-3700

7

    FOR BIJAN RAFIEKIAN:
8
         ROBERT P. TROUT, ESQUIRE
9        TROUT, CACHERIS & SOLOMON, PLLC
         1627 I Street, N.W., Suite 1130
10       Washington, D.C.  20006
         (202) 464-3300

11
         MARK J. MACDOUGALL, ESQUIRE, *PRO HAC VICE*
12       STACEY H. MITCHELL, ESQUIRE, *PRO HAC VICE*
         JOHN C. MURPHY, ESQUIRE, *PRO HAC VICE*
13       JAMES E. TYSSE, ESQUIRE
         AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
14       Robert S. Strauss Building
         1333 New Hampshire Avenue, N.W.
15       Washington, D.C.  20036-1564
         (202) 887-4000

16

    FOR MICHAEL T. FLYNN:
17
         JESSE R. BINNALL, ESQUIRE
18       HARVEY & BINNALL, PLLC
         717 King Street, Suite 300
19       Alexandria, Virginia  22314
         (703) 888-1943

20

    FOR FLYNN INTEL GROUP:
21
         DAVID A. WARRINGTON, ESQUIRE
22       KUTAK ROCK, LLP
         1625 Eye Street, N.W.
23       Washington, D.C.  20006-4061
         (202)828-2400

24

    THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
25

1                              **I N D E X**

2                                                        <u>PAGE</u>

3  Opening Statement by Mr. Gibbs                       30

4  Opening Statement by Mr. Trout                       58

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE CLERK:  Criminal Case 1:18-cr-457, *United*

2  *States v. Bijan Rafiekian.*

3            Counsel, will you please note your

4  appearances for the record.

5            MR. GILLIS:  Good morning, Your Honor.  Jim

6  Gillis, Evan Turgeon, John Gibbs, and Special Agent

7  Bryan Alfredo for the government.

8            THE COURT:  Good morning.

9            MR. GILLIS:  If I may, we may have another

10 agent joining us today, Jessica Taylor.

11           THE COURT:  All right.  Very good.

12           MR. MACDOUGALL:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. MACDOUGALL:  The defendant, Bijan

15 Rafiekian, is present.  Mark MacDougall, Robert Trout,

16 and Stacey Mitchell for the defense.

17           THE COURT:  All right.  Welcome to everyone.

18 I can tell from the filings everyone had a nice

19 leisurely weekend.  We have a couple of matters.

20           Mr. Gillis, I see you filed a motion to

21 compel.  Is that right?

22           MR. GILLIS:  We did, Your Honor, yesterday.

23           THE COURT:  All right.  Anything else that

24 you want to raise preliminarily?

25           MR. GILLIS:  Yes, Your Honor.  First, we ask

1  that the Court preclude the defense from referencing

2  any -- at least in terms of the opening statements.  We

3  can discuss later.  In general, we think it would apply

4  to the entire trial.  But at least for the opening

5  statements, we ask that the judge preclude the defense

6  from referring to any charges against Flynn or his

7  sentence or the sentence that may result as a

8  consequence of the charges against the defendant.

9           We also ask that the Court prevent the

10  defense counsel from mentioning in opening that the

11  government would not be calling General Flynn.

12           MR. TROUT:  It's moot, Your Honor.

13           THE COURT:  All right.  Very good.

14           MR. GILLIS:  Thank you.

15           THE COURT:  Any other preliminary matters you

16  want the Court to raise?

17           MR. GILLIS:  None, other than the ones we

18  filed, Your Honor.

19           THE COURT:  All right.  Mr. MacDougall, any

20  issues you want the Court to address right now?

21           MR. MACDOUGALL:  Just a couple of

22  administrative things, Your Honor.

23           THE COURT:  Yes.

24           MR. MACDOUGALL:  Mr. Trout has been doing

25  this slightly longer than I have.  When he told me, I

1   remembered that there is a tradition that if the

2   defense introduces an exhibit or any other evidence in

3   the course of the government's case, the defense is

4   waiving Rule 29; although, I understand that may be

5   archaic and no longer applicable.  I wanted to inquire

6   as to the Court's view on that.

7           THE COURT:  No.  The Court doesn't adhere to

8   that rule.

9           MR. MACDOUGALL:  Your Honor, at least I have

10  not tried a case in this court before.  I know

11  Ms. Mitchell hasn't either.  What's your preference

12  with regard to objections?  Speaking objections or at

13  the bench?

14          THE COURT:  No.  At the bench, if it's at all

15  substantive.

16          MR. MACDOUGALL:  Thank you, Your Honor.

17          THE COURT:  Have you-all worked out the

18  possible issues with your witnesses, Mr. MacDougall, in

19  terms of having them testify out of order, if

20  necessary?

21          MR. MACDOUGALL:  We have not yet.  Just in

22  anticipation of the defense case, if it goes forward

23  being on Thursday, we will be okay if it goes forward.

24  We will just stay in touch with Mr. Gillis if that

25  happens, Your Honor.

1          THE COURT:  All right.  I've reviewed the
2  motion to compel.  Mr. Gillis, do you want to be heard
3  further on that or Mr. Gibbs or Mr. Turgeon?
4          MR. TURGEON:  Yes.  Good morning, Your Honor.
5          Just briefly, I just wanted to draw Your
6  Honor's attention to one thing in particular that the
7  government does not have, and those are e-mails from
8  the defendants to Covington or Kristen Verderame.
9          THE COURT:  I guess the question I have is,
10  how is it appropriate for the Court to enforce a grand
11  jury subpoena at this point?  That's what I understand
12  this is within the context of.  Correct?
13          MR. TURGEON:  Yes, Your Honor.  This is two
14  grand jury subpoenas after Your Honor's order.
15          THE COURT:  Right.  So how is it appropriate
16  for the Court to, even if the Court were to give some
17  relief, enforce a grand jury subpoena at this point?
18          MR. TURGEON:  Your Honor, Mr. Gillis informs
19  me that there is case law stating that a grand jury
20  subpoena remains in effect even after the grand jury
21  has been dismissed.  So that would be the case here.
22          THE COURT:  Obviously, the issue is
23  timeliness.  This has been percolating for months now.
24          MR. TURGEON:  Yes, Your Honor, but it was
25  only last Tuesday that Your Honor essentially gave us

1  permission to explore these issues.

2          THE COURT:  Have you discussed this with the

3  Covington lawyers?

4          MR. TURGEON:  We have, Your Honor.  They

5  referred us to FIG lawyers, who I believe are now

6  present in court --

7          THE COURT:  All right.

8          MR. TURGEON:  -- to determine whether or not

9  to release these materials.

10          However, I would note that the materials

11  we're seeking we believe are in the possession of

12  Covington and not part of the materials from FIG

13  servers or anything like that.

14          THE COURT:  All right.  Are the lawyers

15  representing FIG here?

16          Yes.

17          MR. WARRINGTON:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. WARRINGTON:  David Warrington on behalf

20  of Flynn Intel Group or FIG.

21          THE COURT:  Yes.

22          MR. WARRINGTON:  We have talked to the

23  government about that.  As you've seen in our papers,

24  they brought this to our attention Friday afternoon and

25  then yesterday.  Obviously, you've seen our filing.  We

1  would argue that it is a matter of timeliness,

2  especially in light of the fact that the government has

3  had Covington lawyers cooperating with them for over a

4  year.  They've specifically been dealing with the

5  topics that are within -- what I would argue, within

6  the scope of the Court's order from July 9, vis-a-vis

7  the topic matters of the subpoenas which are much

8  broader than what would be allowable under the Court's

9  order.  So at this late date, I think the government

10 has had access to all of that stuff.

11         From a practical standpoint, being new

12 counsel in this, I don't even have all the Covington

13 files yet.  That's been requested.  I don't have it.

14 It's a rather large amount of data that we're still

15 trying to process and put in a platform for review.

16         So at this late date, I would ask the Court

17 to quash the subpoena.

18         THE COURT:  All right.  Mr. Turgeon, anything

19 further on this?

20         MR. TURGEON:  No, Your Honor.  Essentially,

21 the e-mails that we're seeking is a very small subset.

22 It's communications from the defendant to Covington or

23 Verderame -- or rather communications between the

24 defendant and Covington and Verderame.

25         THE COURT:  All right.  The Court is not

1   going to enforce the grand jury subpoena.  I think this

2   comes too late.  I think these are issues that should

3   have been dealt with and worked through.  As I

4   understand it, there's been a lot of exchange of

5   information already in the government's possession.  So

6   the Court is going to deny the motion.

7           Anything else?

8           MR. WARRINGTON:  Thank you, Your Honor.

9           THE COURT:  All right.  We are scheduled to

10  be in Judge Ellis' courtroom for the *voir dire*.  We'll

11  work through that in a way that makes the most sense

12  depending on what kind of answers we get to various

13  questions and what individual follow-up needs to be

14  had.  It may be at some point we'll simply adjourn to

15  chambers and bring the jurors in individually if I deem

16  that appropriate.  Otherwise, we'll proceed as

17  efficiently as we can through that process.

18          I think that's about it.

19          Anything else?

20          Yes.

21          MR. BINNALL:  Your Honor, may I approach?

22          THE COURT:  Yes.

23          MR. BINNALL:  Jesse Binnall on behalf of

24  General Flynn, Your Honor.

25          Just a quick logistical issue.  We understand

1   that -- the Court's order of July 9 regarding privilege

2   and work product.  That being said, there's still going

3   to be several witnesses on the stand that used to

4   represent General Flynn and FIG.  To the extent that

5   it's necessary -- although, it may be very -- I'm

6   hoping it won't come to this -- that we have to assert

7   any privilege that we would be outside the Court's

8   July 9 order while those witnesses are on the witness

9   stand, logistically, how would the Court like us to do

10  that, and where would the Court like us to sit?

11          THE COURT:  I'll think about it.  These would

12  come within the context of either the Covington lawyers

13  or Ms. Verderame's testimony?

14          MR. BINNALL:  Yes, Your Honor.

15          THE COURT:  All right.  Well, I think the

16  scope of the Court's ruling was fairly clear, and

17  certainly, Covington lawyers or Ms. Verderame in the

18  first instance would be aware of what would spill over

19  into the possible privilege area.  I would expect them

20  to alert the Court as those issues arise.

21          I understand your interest.  We'll just think

22  about the logistics.  We'll review it before those

23  witnesses take the stand.

24          MR. BINNALL:  Thank you very much.

25          THE COURT:  All right.  Anything else?

1          MR. MACDOUGALL:  Nothing from the defense,

2   Your Honor.

3          THE COURT:  All right.  Let me ask this:  The

4   Court typically, once we impanel a jury, tries to

5   outline the elements of the offenses for them so they

6   can follow the evidence.  I know there's some basic

7   disputes between the parties about what those elements

8   should be and what ultimately the jury should be told

9   by way of an instruction.

10          The Court's purpose in the beginning of the

11  case is not so much to give them a detailed instruction

12  but to simply alert them and give them some orientation

13  as to the legal issues.  What I'd like for you-all to

14  do is if you could confer among yourselves and see if

15  you couldn't come up with an articulation, in very

16  brief summary form, which would be presented to the

17  jury as a very brief summary form of what the elements

18  of the conspiracy and Count 2 would be.

19          I think you could do that.  I could fashion

20  it myself, but I would rather you-all try to do it

21  yourselves.  I think you can do it fairly quickly.

22  Just talking about the basic elements of that without

23  necessarily getting into the substance of what some of

24  those elements would be, which would be the subject of

25  the final instructions.

1           MR. GILLIS:  Your Honor, did you say that you

2 have fashioned one already?

3           THE COURT:  I can and I started, but I'd like

4 for you-all to see if you can't just agree on a summary

5 of what the elements would be as to Count 1 and

6 Count 2 --

7           MR. GILLIS:  Yes, sir.

8           THE COURT:  -- sufficient to give them some

9 orientation as to the significance of the evidence that

10 they're going to hear.

11           MR. GILLIS:  Yes, Your Honor.  We'll do our

12 best.

13           THE COURT:  All right.

14           MR. TROUT:  Your Honor, it's been a couple of

15 years.

16           THE COURT:  Yes.

17           MR. TROUT:  Could the Court give a little

18 refresher on the logistics of actually picking the

19 jury?

20           THE COURT:  Yes.  What we'll do is after the

21 Court decides any for cause strikes and the parties

22 exercises their for cause strikes, we'll then put 12

23 people into the jury box.  Then everybody will have an

24 opportunity to exercise their peremptory challenges.

25           There are no back strikes, which means that

1  both sides get one crack at each juror.  So if you

2  don't strike a juror for the first time that the juror

3  is called, you can't in a subsequent round of strikes

4  strike that juror.  So everybody gets one crack at a

5  juror.

6       Then once somebody is stricken, there will be

7  another name called to fill up the box to 12.  Then

8  we'll have another round of peremptory challenges,

9  which will be limited to the new jurors that have been

10 added to the panel.

11      Then we're going to have two alternates.

12 After we get 12, then we'll call four individuals, and

13 each side gets one strike as to the alternates.

14      All right.  Any questions about that?

15    (No response.)

16      THE COURT:  All right.  Great.  Let's

17 reconvene at 10:00 in Courtroom 900.

18      All right.  The Court stands recessed.

19    (Recess from 9:20 a.m. until 10:17 a.m.)

20    (*Voir dire*.)

21    (The jury panel exits at 1:35 p.m.)

22      THE COURT:  Have you-all had a chance to talk

23 about the elements issue I raised?

24      MR. GIBBS:  Judge, we did.  I think we've

25 come to an agreement.  Counsel was putting together the

1   edits we made.

2            THE COURT:  Okay.  Great.

3            How long for opening statement do you want?

4            MR. GIBBS:  Judge, I'll be doing the opening.

5   I think I timed it out to about 35, 40 minutes maybe.

6            THE COURT:  I'll give both sides 35, 40

7   minutes.

8            MR. GIBBS:  That's fine, Judge.

9            THE COURT:  All right.  I'll stand in recess

10  until 2:15.

11       (Recess from 1:35 p.m. until 2:34 p.m.)

12       (A jury is duly impaneled and sworn.)

13            THE COURT:  Please be seated.

14            Ladies and gentlemen, for those of you who

15  have not been selected, you're excused with the thanks

16  of the Court.  You may leave the courtroom.

17       (People exit.)

18            THE COURT:  Ladies and gentlemen, we're going

19  to take a short recess in a moment, but before we do, I

20  want to give you some idea how we're going to proceed.

21  After the recess, we're going to reconvene in another

22  courtroom.  We are going to be in my regular courtroom,

23  which is 701.  Mr. Burns will escort you down there

24  where we will try the case.

25            The case will proceed from day to day.  We

1  will end each day, depending on where the evidence is,

2  around 5:30 or 6:00.  It will be my intention not to go

3  past 6:00 unless absolutely necessary.  In the morning,

4  we'll begin at 9:30.  You should make whatever efforts

5  you need to in order to get to the courthouse around

6  9:15.  We'll take a morning break around 11:15, 11:30.

7  We'll recess for lunch at 1:00 for an hour reconvening

8  at 2:00.  We'll take a break in the afternoon around

9  3:30.

10          If any of you need a break at any other time,

11  just raise your hand, and I will try to accommodate you

12  as best as I can.

13          You will see in the jury room a telephone

14  that you could use just to let your employer or your

15  family know that you will be occupied for a few days.

16  It is not to be used for any other purpose, not to

17  conduct any other type of business or any social

18  conversations.

19          When we come back and reconvene, I'll give

20  you some preliminary instructions about the case.  Then

21  we'll begin with opening statement first by the United

22  States and then by Mr. Rafiekian's counsel.

23          So with those very limited instructions,

24  you're excused.  Let me say now for the first time what

25  I'll say every time we take a recess.  That is, even

1  though you know very little about this case, do not

2  begin to discuss it.  Don't talk among yourselves about

3  what the case may or may not be.  Don't speculate about

4  what the evidence is.  You are not to discuss this case

5  among yourselves until you've heard all the evidence

6  and you've been instructed as to the law and you've

7  begun your formal deliberations.

8           So with that, you're excused.

9      (The jury exits at 3:30 p.m.)

10          THE COURT:  All right.  We'll take a

11  20-minute recess and reconvene in Courtroom 701.

12      (Recess from 3:31 p.m. until 3:55 p.m.)

13      (The jury is not present.)

14          THE COURT:  Are we ready to proceed?

15          MR. GIBBS:  We are, Your Honor.

16          MR. TROUT:  Yes, Your Honor.

17          THE COURT:  All right.  Let's bring the jury

18  out.

19      (The jury enters at 3:55 p.m.)

20          THE COURT:  You should take the seats that

21  you had up in the other courtroom.

22           All right.  Please be seated.

23          THE COURT SECURITY OFFICER:  Too many in the

24  front row and not enough in the back.

25          THE COURT:  All right.  Well, this is fine

1  for now.  In the morning, we'll do seven and seven.

2  All right.

3           Ladies and gentlemen, as I indicated to you,

4  I am going to give you now some very preliminary

5  instructions to guide you in your participation of the

6  trial.  What I say now is intended to serve only as an

7  introduction to the trial.  It's not a substitute for

8  the detailed instructions that I will give you at the

9  end of the case on the law.

10          It will be your duty to find from the

11  evidence what the facts are.  You and you alone will be

12  the judges of the facts.  You will then have to apply

13  those facts of the law as the Court will give it to

14  you.  You must follow that law whether you agree with

15  it or not.  Nothing the Court may say or do during the

16  course of the trial is intended to indicate or should

17  be taken by you as indicating what your verdict should

18  be.

19          The evidence from which you will find the

20  facts will consist of the testimony of witnesses,

21  documents, and other things received into the record as

22  exhibits and any facts that the lawyers agree to or

23  stipulate to or that the Court may instruct you to

24  find.

25          There are certain things that are not

1 evidence and must not be considered by you, and I will

2 list them for you now:

3 First, the statements, arguments, questions

4 by the lawyers are not evidence.

5 Objections to questions are not evidence.

6 Lawyers have an obligation to their client to make

7 objections when they believe evidence being offered is

8 improper under the rules. You should not assume that a

9 lawyer making the objection is improperly trying to

10 keep some pertinent information from you, and you

11 should not hold it against the lawyer who makes an

12 objection.

13 You also should not be influenced by the

14 objection or by the Court's ruling on it. If the

15 objection is sustained, that is if the Court agrees

16 with the objection, you must not consider the question,

17 any partial answer to the question, or the exhibit

18 which was objected to. If the objection is overruled,

19 that is if the Court disagrees with the objection,

20 you'll treat the answer or exhibit like any other. If

21 you are instructed that some item of evidence is

22 received for a limited purpose only, you must follow

23 that instruction.

24 Next, the testimony that the Court has

25 excluded or told you to disregard is not evidence and

1  must be not considered by you.

2        Anything you may have seen or heard outside

3  the courtroom is not evidence and must be disregarded.

4  You are to decide this case solely on the evidence

5  presented here in the courtroom.

6        In that regard, there are two kinds of

7  evidence.  There is direct evidence and circumstantial

8  evidence.  Direct evidence is direct proof of a fact,

9  such as the testimony of an eyewitness.  Circumstantial

10  evidence is proof of facts from which you may infer or

11  conclude that other facts exist.  I will give you

12  further instructions on this as well at the end of the

13  case, but keep in mind that you may consider both kinds

14  of evidence.

15        In considering this case, you will have to

16  make judgments about the believability of witnesses'

17  testimony.  It will be up to you to decide which

18  witnesses to believe, which witnesses not to believe,

19  how much of any witness' testimony to accept or reject.

20  In considering the weight and value of the testimony of

21  any witness, you may take into account, first, the

22  appearance, attitude, and behavior of a witness, the

23  interest that witness may have in the outcome of the

24  trial, the relationship of the witness to any party in

25  the case, the inclination of the witness to speak

1  truthfully or not as you determine that to be, the

2  probability or improbability of the witness' statement,

3  and all other facts and circumstances in evidence.

4  Thus, you may give the testimony of any witness such

5  weight and value as you may determine the testimony of

6  such witness is entitled to receive.

7          Please pay careful attention to the testimony

8  of witnesses because, contrary to what you may have

9  seen on television or in the movies, witnesses will not

10 be called back to testify, and you won't be provided

11 transcripts of their testimony during your

12 deliberation.

13         As you know, this is a criminal case, and

14 there are three basic rules about a criminal case that

15 you must keep in mind:

16         The first is that the defendant,

17 Mr. Rafiekian, is presumed innocent until proven

18 guilty.  The indictment brought by the government

19 against Mr. Rafiekian is only an accusation.  It's

20 nothing more.  It's not proof of guilt or anything

21 else.  Mr. Rafiekian, therefore, starts out with a

22 completely clean slate.

23         Second, the burden of proof is on the

24 government until the very end of the case.  A defendant

25 has no burden to prove his innocence or to present any

1   evidence or to testify.  Since a defendant has the

2   right to remain silent, the law prohibits you from

3   arriving at your verdict by considering that a

4   defendant may not have testified.

5          Third, as I indicated earlier, the government

6   must prove a defendant's guilt beyond a reasonable

7   doubt.  I will give you further instructions on this

8   point later, but bear in mind that in this respect, a

9   criminal case is different from a civil case.

10          I also want to now give you some very brief

11  descriptions of the applicable law.  I will give you

12  detailed instructions on the law at the end of the

13  case, and those instructions will control your

14  deliberations and decision.  In order to help you

15  follow the evidence, I will now give you a brief

16  summary of the elements of the offenses that the

17  government must prove in order to make its case.

18          Mr. Rafiekian is charged with a conspiracy to

19  act as an agent of a foreign government, that is the

20  government of Turkey, and to make false statements and

21  willful omissions in a filing under what's called the

22  Foreign Agents Registration Act, which you will

23  probably hear referred to as FARA, F-A-R-A.

24          Count 1 of the indictment charges that

25  conspiracy, and the elements of that conspiracy:  To

1  act as an agent of a foreign government and to make

2  false statements and willful omissions in a FARA filing

3  are, first, that a conspiracy, agreement, or

4  understanding to act as an agent of a foreign

5  government except --

6        Let me start again:  The first element is

7  that there was a conspiracy, agreement, or

8  understanding to act as an agent of a foreign

9  government except as engaged in a legal commercial

10 transaction without prior notification to the attorney

11 general and to make false statements and willful

12 omissions in a FARA filing, as described in the

13 indictment, and that conspiracy was formed, reached, or

14 entered into by two or more persons.

15        So a conspiracy is nothing more than an

16 agreement to do what has been alleged here.

17        The second element is that some time during

18 the existence or life of the conspiracy, agreement, or

19 understanding, the defendant knew the purposes of the

20 agreement.

21        Third, with knowledge of the purposes of the

22 conspiracy, agreement, or understanding, the defendant

23 then deliberately joined the conspiracy, agreement, or

24 understanding, and at some time during the existence or

25 life of the conspiracy, agreement, or understanding,

1   one of its alleged members knowingly performed one of

2   the overt acts charged in the indictment and did so in

3   order to further advance the purposes of the agreement.

4          The indictment also charges in Count 2 the

5   offense of knowingly acting in the United States as an

6   agent of a foreign government without prior

7   notification to the attorney general.

8          The elements of that offense are, one, that

9   the defendant acted in the United States as an agent of

10  a foreign government, except to the extent he was

11  engaged in a legal commercial transaction; two, the

12  defendant failed to notify the attorney general of the

13  United States that he would be acting in the United

14  States as an agent of the foreign government prior to

15  so acting; three, that the defendant acted knowingly;

16  and fourth, that the defendant acted, at least in part,

17  as an agent for a foreign government in the Eastern

18  District of Virginia during the time period alleged in

19  the indictment.

20         Let me now say a few words about your conduct

21  as jurors:

22         First, I instruct you that during the trial,

23  you're not to discuss this case with anyone or permit

24  anyone to discuss it with you.  Until you retire to the

25  jury room at the end of the case to deliberate on your

1    verdict, you are simply not to talk about this case.

2              Second, do not read or listen to anything

3    touching upon this case in any way.  If anyone tries to

4    talk to you about it, bring it to the Court's attention

5    immediately.

6              Third, I know many of you use cell phones and

7    other Internet tools of technology.  You must not use

8    these tools to communicate electronically with anyone

9    about this case.  That includes your family and

10   friends.  You may not communicate with anyone about the

11   case on your cell phones or through e-mail or

12   Blackberry, iPhones, text messaging, Twitter, through

13   any of the blogs or websites, through any Internet chat

14   rooms, or by way of any other social networking

15   websites, such as Facebook, LinkedIn, Instagram, or

16   YouTube.

17             Also, you are not to conduct any research

18   during the evening recesses about anything you may have

19   heard in court or anything that may have gotten your

20   interest.  Don't conduct any research on your own about

21   anything you may have heard during the course of the

22   trial.

23             Finally, do not form any opinion until all

24   the evidence is in.  Keep an open mind until you start

25   your deliberations at the end of the case.

1              Each of you either has or will be provided a

2    notebook.  If you want to take notes during the course

3    of the trial, you may do so, but please appreciate that

4    it's sometimes difficult to take detailed notes and pay

5    attention to what the witnesses are saying at the same

6    time.  So if you do take notes, be sure that your

7    note-taking doesn't interfere with your listening

8    attentively to the evidence in the case.

9              Also, if you do take notes, do not discuss

10   your notes with anyone before you begin your

11   deliberations.

12             Do not take your notes with you at the end of

13   the day.  Leave them in the jury room where they'll be

14   secured.

15             Also, if you do take notes, please understand

16   that your notes are not evidence and should not take

17   precedence over your independent recollections of the

18   evidence.

19             Also, remember that it's your own individual

20   responsibility to listen carefully to all the evidence.

21   So if you do not take notes, you cannot give this

22   responsibility to anyone who is taking notes.  We

23   depend on the judgment of each of you to listen to all

24   of the evidence.  Each of you must remember all of the

25   evidence in this case.

1          During the trial and beginning with these

2    preliminary instructions, you will hear me use a few

3    terms, some of which you have heard before, some you

4    may not have.  You will sometimes hear me refer to

5    counsel.  Counsel is simply another way of referring to

6    the lawyers or the attorneys.  I will sometimes refer

7    to myself as the Court.  The prosecution and defendant

8    are called the parties to the case.

9          When we say "admitted into evidence" or

10   "received into evidence," that simply means that a

11   particular exhibit or piece of testimony is now a part

12   of the trial and may be considered by you when making

13   the decisions you must make in the case.

14         The terms "burden of proof" and "sustaining

15   its burden of proof" means the obligations of proving

16   its case.  In this trial, the government's obligation

17   is to produce proof beyond a reasonable doubt.

18         Let me now explain to you how the trial will

19   proceed.  Once I complete these preliminary

20   instructions, the government will make an opening

21   statement, which is simply an outline to help you

22   understand the evidence as it comes in.  Next,

23   Mr. Rafiekian's attorneys may make an opening

24   statement.  Opening statements are neither argument,

25   nor evidence.

1          Once the opening statements are done, then

2    the United States, the government, may then present its

3    witnesses, and counsel for Mr. Rafiekian may

4    cross-examine them.  Following the government's case,

5    the defense may present witnesses whom the government

6    may cross-examine.

7          After all the evidence is in, the Court will

8    instruct you on the law, and then the attorneys will

9    present their closing arguments to you to summarize and

10   interpret the evidence for you, following which you'll

11   retire and deliberate on your verdict.

12         It's important for you to understand that no

13   statement, ruling, remark, or comment which I may make

14   during the course of this trial is intended to indicate

15   my opinion as to how you should decide this case or is

16   intended to influence you in any way in your

17   determination of the facts.

18         At times during the trial, I will need to

19   privately confer with the lawyers about evidentiary and

20   procedural issues.  During these conferences, both here

21   at the side of the bench and out of your presence while

22   you're in the jury room, it is not our intention to

23   hide anything from you but simply to determine how

24   certain issues are to be handled.  So please be

25   patient.  We are only trying to ensure that the case is

1  being conducted fairly.

2          It is important to me that your time be used

3  efficiently and that you not spend a significant amount

4  of time outside of the courtroom during the trial, but

5  there may be developments that require matters to be

6  heard outside of your presence.  I will certainly do

7  everything I can to keep that time to a minimum and

8  move this case along smoothly.

9          The attorneys and the parties will not speak

10  with you.  If you happen to run into the lawyers or any

11  of the parties in the courthouse or approaching the

12  courthouse and when they see you, they make a sharp

13  turn and walk the other way to avoid you, don't hold it

14  against them.  Don't think they're being discourteous.

15  They're simply following my instructions not to

16  interact with you during the course of this trial.  It

17  simply does not look appropriate for one side or the

18  other to be speaking with any of you no matter how

19  innocent or trivial those conversations may be.

20          Until this case is submitted to you to begin

21  deliberations, you must, again, not discuss it with

22  anyone at all, even your fellow jurors.  After it's

23  submitted, you must discuss this case only in the jury

24  room with your fellow jurors.

25          It's important that you keep an open mind and

1   not decide any issue in this case until the entire case

2   has been submitted to you, you've heard all the

3   evidence, and you've received the final instructions

4   regarding the law you must apply to the evidence.

5           Again, please keep in mind that your job is

6   to decide all the factual information in the case, like

7   who should be believed and who should not be believed.

8   You are the judges of the facts.

9           I will decide all the legal questions in this

10  case, like what testimony or exhibits are to be

11  received into evidence and which are not.  Please do

12  not concern yourself with the legal questions that the

13  Court will decide.

14          At the close of the evidence, as I indicated

15  to you, I will give you your complete and final

16  instructions, which will be much more detailed than

17  these preliminary instructions, which you must use to

18  guide you in reaching your decisions.

19          You can now proceed with opening statement.

20          MR. GIBBS:  Thank you, Your Honor.

21          THE COURT:  Mr. Gibbs.

22             OPENING STATEMENT BY MR. GIBBS

23          MR. GIBBS:  As a nation, we value

24  transparency.  Today we are beginning a very public

25  criminal trial.  Our legislators meet in public.  There

 1  are laws and regulations requiring public access to

 2  various government records and proceedings.

 3          By the same token, we require transparency

 4  from foreign governments when they engage in activities

 5  here in this country.  In particular, when a foreign

 6  government task its agents to engage in conduct on its

 7  behalf in the United States, we require these agents to

 8  identify themselves to the Department of Justice and to

 9  reveal what they are doing.  Failure to do so is a

10  crime.

11          In the summer and fall of 2016, the

12  defendant, Bijan Rafiekian, acted as an agent of the

13  government of Turkey to advance one of Turkey's most

14  important foreign policy goals, the extradition from

15  the United States of an individual living in the United

16  States.  But Mr. Rafiekian and his associates never

17  notified the Department of Justice of what they were

18  doing.

19          And once their activities came to light and

20  the Department of Justice began to make inquiries,

21  Mr. Rafiekian and his colleagues lied.  They did not

22  disclose that they were acting on behalf of the

23  government of Turkey, and they did not disclose that

24  they were aiding Turkey in its efforts to get custody

25  of this person.

1          Instead, they falsely asserted that they were

2   acting on behalf of a Dutch corporation and that their

3   purpose was merely to research and build confidence in

4   the business climate in Turkey.  That conduct is why we

5   are here today.

6          Three years ago today, on July 15, 2016, the

7   nation of Turkey erupted in chaos and violence.  Media

8   reports indicated that hundreds were killed, thousands

9   were wounded, and for a time, the government struggled

10  to maintain control.

11         Once order was restored, the Turkish

12  government publicly proclaimed that the violence was

13  the result of an attempted coup and that it was the

14  handiwork of one man, Fethullah Gulen.

15         Who is Fethullah Gulen?  As you will hear in

16  the course of this trial, he is a Turkish citizen, an

17  imam, a writer, and a political figure.  He is the

18  leader of an organization that runs a network of

19  schools and charitable organizations in Turkey.  His

20  organization runs a number of charter schools here in

21  the United States.

22         And for the past two decades, Fethullah Gulen

23  has lived in this country.  And for Turkey, this has

24  not sat well.  For years, it has accused Gulen for

25  plotting the overthrow of the government of Turkey and

1  leading an armed terrorist group, the so-called

2  Gulenist Movement.  While Gulen has denied the

3  allegations, the Turkish government has repeatedly

4  asked the United States to extradite him back to

5  Turkey.

6         Now, following the events of July 15, the

7  Turkish government redoubled those efforts.  By

8  July 23, they had submitted a formal request asking for

9  Gulen's extradition.  But after reviewing that request,

10  the U.S. Department of Justice determined that it had

11  not met the legal standard for extradition, and absent

12  more compelling evidence, it would not be approved.

13         Now we turn to the defendant, Bijan

14  Rafiekian, sitting right over here.  In 2016, the

15  defendant held the positions of vice-chairman,

16  director, secretary, and treasurer of the Flynn Intel

17  Group or FIG.  FIG was a company headquartered here in

18  Alexandria, Virginia, that offered services to its

19  clients based on its national security expertise.

20  Former General Michael Flynn was FIG's chairman and

21  CEO.

22         Now, at the same time that the Turkish

23  government was very openly seeking to convince the

24  United States to extradite Gulen back to Turkey, the

25  defendant was also focused on Gulen but in a much less

1  public way.  On July 27, 2016, 12 days after the failed

2  coup, he sent an e-mail to an individual named Ekim

3  Alptekin.  As you will hear, Ekim Alptekin and the

4  defendant are both charged in the indictment in this

5  case.  Alptekin is a dual Turkish-Dutch citizen who

6  lives in Istanbul, Turkey, and who is the sole owner of

7  a company in the Netherlands called Inovo.

8           The defendant's e-mail to Alptekin on July 27

9  was captioned All Good To Go.  In the e-mail, he told

10  Alptekin:  We are ready to engage on what needs to be

11  done.  Turkey's security and stability is extremely

12  important to world security.

13           Now, as you will hear, during the course of

14  this trial, Turkey's president is named Recep Tayyip

15  Erdogan, RTE.

16           In his e-mail on July 27, the defendant told

17  Alptekin:  RTE can lead the campaign against radical

18  Islam to protect the image of Islam.  No other leader

19  in the world of Islam has the power to lead this

20  campaign.  After telling Alptekin that we are all on

21  the same page, he concluded:  Looking forward to

22  working together again.  At the right time, I will

23  include our partners in the communications.

24           Alptekin responded two days later.  He told

25  the defendant:  Finally on my way back to Istanbul.  I

1  met with MC and explained.  They are likely to travel

2  to D.C. next week.  He is interested in exploring this

3  seriously, and it is likely he will want to meet with

4  you and MF.  We agreed to meet again before he leaves

5  for D.C., and he asked me to formulate what kind of

6  output we can generate on the short and midterm, as

7  well as an indicative budget.

8        Now, we'll come back to MC in a little bit,

9  but in that e-mail, after asking the defendant if he

10 could do a Skype call the next day, Alptekin concluded:

11 Needless to tell you, but he asked me not to read

12 anyone else for the time being and keep this

13 confidential.

14        As you will hear, Alptekin and the defendant

15 were true to their words.  They worked hard to keep

16 this confidential.  They only discussed Turkey's

17 involvement in the project with a limited number of

18 people, and they used various types of encryption to

19 ensure that they could communicate securely about

20 Gulen.

21        Now, the next day, July 30, the defendant

22 sent Alptekin an e-mail with the subject line Truth:  I

23 told him it was my pleasure continuing our conversation

24 today.  General Flynn and I have discussed the broad

25 contours of the Truth campaign.

1          The defendant then set out nine bullet points

2    for what he termed Phase Zero.  He assured Alptekin:

3    At this time, the conversation shall be limited to you,

4    General Flynn, and myself.  These are extremely

5    critical times, and our key motivation is to make sure

6    that we do what we can to secure a better future for

7    our grandchildren.

8          The following day, Alptekin sent the

9    defendant an article which he described as a must read.

10   The article is entitled *Is The U.S. Behind Fethullah*

11   *Gulen?*

12         On August 2, the defendant e-mailed Alptekin

13   to tell him that we have high confidence on the

14   direction of the work and that you, MF, and I are the

15   only cleared entities on this at this time.

16         Two days later the defendant sent Alptekin

17   another e-mail, also with the subject line Truth.  He

18   said that precision investigative work takes off the

19   mask layer by layer until the real picture can emerge.

20         He then offered what he described as a real

21   word analogy which he would repeat throughout this

22   project.  The analogy was a description of a

23   soft-spoken cleric sitting under an apple tree near a

24   chateau in France in 1978 who claimed that he was a man

25   of peace.  The defendant told Alptekin that in reality,

1  this was Iatola Humani, the man who had lead the

2  Islamic revolution in Iran in 1979.

3          He told Alptekin:  37 years later, truth is

4  being revealed page by page, story by story of what and

5  who helped out the monster dressed as the soft-spoken

6  spiritual man.

7          The defendant concluded, Looking forward to

8  working together again on this important engagement.

9          Now, Alptekin sent the defendant and Michael

10  Flynn another e-mail with the subject line Truth on

11  August 8.  Now, before I talk about that e-mail, I want

12  to remind you of the abbreviation that Alptekin used

13  with the defendant in that e-mail back on July 29, MC.

14          As you will hear during the course of this

15  trial, the Turkish minister of foreign affairs is an

16  individual named Mevlut Cavusoglu, MC.

17          On August 8, Alptekin told the defendant:  I

18  had a long meeting with the minister of economy upon

19  the referral of MFA Cavusoglu.  I explained what we can

20  offer.  He agreed to discuss in general lines at the

21  council of ministers today and subsequently with PM in

22  more detail.

23          Approximately two hours later, the defendant

24  e-mailed:  Thank you, Ekim, for the kind update.  This

25  is an important engagement, and we will give it

1    priority on our side.

2            On August 10, less than a month after the

3    attempted coup, Alptekin sent the defendant and Michael

4    Flynn another e-mail.  The subject, Truth.  He told the

5    defendant that he was thrilled at the prospect of

6    working together.

7            He then advised:  I met with the MFA and

8    explained our proposed approach.  He is receptive and

9    indicated he would like to meet with us during his

10   upcoming visit to D.C.

11           Alptekin also attached a *New York Times*

12   editorial about Gulen that was critical of the Turkish

13   government with a message that said:  This article

14   shows the depth of the crisis that we are facing.

15           Then Alptekin sent the defendant and Flynn a

16   second e-mail on August 10.  It also had the subject

17   Truth.  It also dealt with the MFA.  Alptekin told them

18   in that e-mail:  Gentlemen, I just finished in Ankara

19   after several meetings today with Minister of Economy

20   Zeybekci and MFA Cavosoglu.  I have a green light to

21   discuss confidentiality, budget, and the scope of the

22   contract.  I am flying to L.A. tomorrow at the request

23   of MFA.  Can we talk sometime early evening?

24           Now, one day after receiving that e-mail from

25   Alptekin saying he had just met with the Minister

1   Zeybekci and MFA Cavusoglu, and I have a green light to

2   discuss confidentiality, budget, and the scope of the

3   contract, the defendant sent his response.  He told

4   Alptekin that he and Michael Flynn had been working on

5   the campaign design and end product.  He said that I

6   did not touch the advisory support we discussed at

7   20 percent.

8          He then wrote engagement purpose:  The

9   business community is engaging FIG to restore, quote,

10  confidence through clarity in the trade and investment

11  climate.  The defendant bolded those words, confidence

12  through clarity.

13         Now, remember that e-mail I told you about

14  earlier from the defendant on August 2 where he told

15  Alptekin that you, MF, and I are the only cleared

16  entities on this at this time?  Less than an hour after

17  responding to Alptekin's green light e-mail, that all

18  changed.  The defendant sent another e-mail that

19  included, for the first time, not just Michael Flynn

20  but a second FIG employee who had not been privy to any

21  of those earlier communications involving Alptekin, the

22  defendant, and Flynn about Fethullah Gulen.

23         In his e-mail, the defendant didn't mention

24  Alptekin.  He didn't mention the Turkish ministers, and

25  he didn't mention receiving the green light.  Instead,

1  he claimed that we are about to be engaged by a Dutch

2  client for the above campaign.  He called it Operation

3  Confidence.  He said that FIG would produce a video.

4  He set out nine bullet points for what he termed Phase

5  Zero.  Those nine bullet points were virtually

6  identical to the ones defendant had sent to Alptekin

7  back on July 30 when he was describing the broad

8  contours of the Truth campaign.

9       In fact, from that point forward, the

10  defendant no longer referred to this as the Truth

11  campaign.  He referred to it as Operation Confidence.

12  From this point forward, he made no mention of Turkey's

13  role in this project.  Instead, he claimed that

14  Operation Confidence had been undertaken for a Dutch

15  client.

16       Now, defendant also attached a revenue sheet

17  to this e-mail, and the revenue sheet said that the

18  business community is interested in bringing back

19  business confidence.  The initial figures for the

20  project, which would subsequently go up, reflected that

21  FIG would receive $450,000 from what was described as a

22  Dutch business consulting firm with 20 percent of that

23  amount subtracted for, quote, COGS, which, as you will

24  hear, stands for cost of goods sold.

25       As the evidence will also show, the defendant

1  moved quickly on this project.  On August 16, he met

2  with representatives of Sphere Consulting Group, a

3  media firm here in Washington, D.C.  He told them that

4  he wanted them to help produce and promote a

5  documentary style video to highlight the Fethullah

6  Gulen's network of loyalists and his influence over

7  them.  He told them this effort will be funded directly

8  by private businesses seeking to improve investment and

9  business to drive a stronger economy in Turkey.

10          Even though he had been notified six days

11  earlier that he had received -- or that they had

12  received a green light from the Turkish ministers, he

13  said nothing about that in the meeting with Sphere.

14          The next day he sent a message to Alptekin

15  where he told him:  We have now formed the dream team

16  and ready to engage.

17          On August 25, the defendant sent Alptekin an

18  e-mail where he told him he would send an engagement

19  letter between your company in the Netherlands and

20  Flynn Intel Group for the engagement.  The defendant

21  advised he had allocated 20 percent per month as the

22  advisory support cost provided by your firm.

23          Ladies and gentlemen, you will hear about

24  these 20 percent payments throughout this trial.  The

25  defendant and FIG did, in fact, send 20 percent of the

money that they were paid for this project back to
Alptekin even thorough it was Alptekin's company,
Inovo, that was purportedly paying for FIG's work.

Now, Alptekin and the defendant also had a
Skype exchange on August 25 where Alptekin advised:  We
are confirmed to go.  Meeting him tomorrow for details.

The defendant responded:  All good to go.

Then Alptekin said:  I think I'm meeting MC's
boss, not direct boss, but you know who.  My assumption
based on MC's request to come to third bridge opening
tomorrow for final instructions.  Either way, he said
we are a full go.

In response, the defendant told Alptekin:  We
are very pleased to see that RTE is taking a decisive
stance in fighting radical Islam.  We firmly believe
that RTE is uniquely qualified to take this global
leadership role.

Alptekin also asked the defendant to send him
a detailed CV of the general within the next 12 hours
that included his functions during the Iraqi war up to
now, and when the defendant asked about just sending a
profile, Alptekin told him he needed a full CV.

The reason he needed it was, as you told the
defendant, they asked for a full CV.

Now, several days later on September 3, the

1  defendant sent Alptekin an e-mail with the subject line

2  Confidence.  He told Alptekin that General Flynn and I

3  look forward to launching this engagement.  This work

4  is critical on the global scale as it relates to

5  international security at the most sensitive and

6  critical levels.

7          Attached to this e-mail was a written

8  agreement.  It listed Inovo, Alptekin's company, in the

9  Netherlands as the client, and it listed FIG as the

10 advisor.  The term of work was for 90 days, and the

11 compensation was listed at $600,000 broken into three

12 $200,000 payments.  There was no mention of the

13 government of Turkey in this agreement.

14         In his e-mail to Alptekin, the defendant told

15 him, quote, We've been at work on this engagement since

16 July 31.

17         Now, as you will recall, it was actually on

18 July 30 that the defendant sent Alptekin that e-mail

19 with the subject line Truth, which contained the nine

20 bullet points for Phase Zero.  That was prior to the

21 name change from Truth to Confidence.  It was prior to

22 the point in time that the defendant disclosed the

23 project to anyone beyond Alptekin and Flynn.

24         As the evidence will show, whether the

25 project was called Truth in July or Confidence after

1   that point, it was always the same project, a project

2   focused on discrediting Fethullah Gulen in the eyes of

3   the American public.

4          Now, ladies and gentlemen, I want to pause

5   for just a few moments to talk about the charges in the

6   case. Now, the judge advised you about the law

7   preliminarily before we started opening, and he walked

8   you through the elements of the two offenses,

9   conspiracy and acting as an agent of a foreign

10  government, which is Title 18, United States Code,

11  Section 951.

12         Now, as you heard the judge tell you,

13  conspiracy is a partnership in crime. In this case,

14  the defendant is charged with conspiring with Alptekin

15  and others to do two particular things as part of this

16  conspiracy, which are themselves crimes: First, to act

17  as an agent of a foreign government, which I've already

18  talked about and the judge talked about; and second, to

19  make false statements and willful omissions to the

20  government.

21         Because as I'll talk about in a bit, there

22  came a point in time that the federal government,

23  specifically the FARA Unit at the U.S. Department of

24  Justice, posed questions to the defendant and Alptekin

25  about whether they were, in fact, required to register

1   because they were acting as agents of the government of

2   Turkey without notifying the attorney general.

3            As you will hear, the FARA Unit is charged

4   with helping to enforce the Foreign Agent Registration

5   Act or FARA.  FARA prohibits a person from acting as an

6   agent of a foreign principal without first registering

7   with DOJ.

8            The defendant is charged in this case with

9   conspiring to make and causing others to make false

10  statements and answer to questions on the forms that

11  must be filed with the FARA unit.  I'll talk about some

12  of those false statements in a bit.

13           Now, with regards to the FARA requirements,

14  as you will likely hear during this trial, in late

15  September, the defendant filed a notice under what's

16  known as the Lobbying Disclosure Act or the LDA.  Now,

17  that is a different statute than FARA, and you cannot

18  file under the LDA instead of FARA if the work that

19  you're performing is done on behalf of a foreign

20  government or for the principal benefit of a

21  government.

22           In the defendant's LDA filing in September,

23  he did not mention the government of Turkey or the

24  country of Turkey or Gulen or Alptekin or anything

25  about the green light e-mail he had received following

1 the meeting Alptekin had with the Turkish ministers.

2 Instead, his filing stated only that the client was

3 Inovo, a Dutch company.

4        But let's get back to Fethullah Gulen and the

5 Confidence campaign.  Over the next several months, the

6 defendant and Alptekin and a number of other

7 individuals hired by FIG or who were employed by FIG

8 worked on this project.  You will hear evidence that

9 they were laser focused on Gulen.

10        There were weekly conference calls with

11 Alptekin.  They investigated Gulen's charter schools

12 here in the United States.  They tried to determine if

13 there was any evidence to support a criminal referral.

14 They sought to lobby members of Congress.  In fact, as

15 part if that lobbying effort, they even put together a

16 board game that looked like Monopoly but was called

17 Gulenopoly.  Instead of squares saying things like

18 community chest and boardwalk, the game said things

19 like extradition and chance.  You attempt a coup in

20 Turkey killing 265 people.

21        They shot a *60 Minutes* style documentary

22 about Gulen where they interviewed senior Turkish

23 figures, which was never completed.  They argued that

24 Gulen was behind the July 15 coup and that he should be

25 extradited back to Turkey.  The defendant repeatedly

1  compared Gulen to that soft-spoken cleric sitting under

2  that apple tree near a chateau in France in 1978 just

3  as he had first done in that e-mail to Alptekin back on

4  August 2.

5          Now, FIG's Gulen campaign really did last for

6  about 90 days.  Now, I won't go through all of the

7  evidence right now, but I want to talk to you about

8  three final things, payment, the New York meeting, and

9  the op-ed.

10          So let's start with the payments.  As you

11  heard earlier, the total contract for this project was

12  $600,000 over three months.

13          On August 30, Alptekin sent the defendant a

14  message where he told him:  I will be depositing the

15  total 200K on the FIG account.

16          The next day, the defendant asked him:  Can

17  you please send me the name and address of your company

18  who will be our client?

19          Alptekin told him it was Inovo BV at an

20  address in the Netherlands.

21          Now, at this point, the written agreement for

22  the Gulen project was still a work in progress.  On

23  September 8, Alptekin sent the defendant a message

24  where he told him:  We'll send the agreement.  Just

25  left PM's office.

1           The next day Alptekin told the defendant:   I

2   have the money but need to deposit it ASAP before the

3   banks close.

4           That was September 9.   That same day,

5   Alptekin sent the defendant another message where he

6   told him:   Since I had to wire from my personal

7   account, I suggest we alter the agreement to an

8   agreement between FIG and my person while Inovo

9   invoices for services provided to FIG.   What do you

10  think?

11           In fact, the evidence will show that on

12  September 9, $200,000 was wired from Ekim Alptekin in

13  Turkey to FIG's bank account here in the United States.

14           But what about Alptekin's statements about

15  invoices for services provided to FIG?   As you'll see

16  during the trial, the first written agreement listed

17  Inovo as the client and FIG as the advisor, which

18  indicated that FIG was the one providing services to

19  Inovo, the client.

20           But three days after that $200,000 was wired

21  to FIG from Turkey, the defendant sent Michael Flynn's

22  son two e-mails.   In the first, he told him:   We need

23  to wire 40K to Mr. Ekim Alptekin.   He is our outside

24  advisor on the Confidence project.

25           In the second, he told him:   Please find a

1  general scope advisory agreement for Ekim Alptekin. We

2  need this to create an audit trail on properly

3  documenting this relationship.

4        Attached to this e-mail was a second written

5  agreement. Even though it was very similar to the

6  first, this one now listed Alptekin as the advisor and

7  FIG as the client. In a period of ten days, the roles

8  had been reversed. FIG had gone from being an advisor

9  to a client. Who were they supposed to be the client

10 for now? Ekim Alptekin.

11       Now, this brings me back to the allegation

12 that the defendant and Alptekin conspired to make false

13 statements in the FARA filing. The defendant is

14 charged with conspiring to have the FARA filings say

15 that the payments from FIG to Inovo were refunds for

16 lobbying the public relations work that FIG did not do.

17 As you will see, if these were payments for lobbying

18 work that was not performed, the defendant and Alptekin

19 didn't allow much time to perform the work.

20       The time between the wires into FIG and the

21 wires back out to Alptekin were really short. How

22 short? FIG received that first $200,000 payment on

23 September 9, and they wired $40,000 back to Alptekin in

24 the Netherlands four days later. In that wire, they

25 listed the purpose not as a refund but as a consultancy

1   fee.

2          Not only that, but two days after receiving

3   the $40,000 that was supposedly for lobbying work not

4   performed, Alptekin contacted the defendant and asked

5   him to do what?  You guessed it.  Lobbying.  He

6   enclosed a new story about congressional hearings

7   regarding the coup attempt in Turkey.  He said that,

8   quote, our embassy lobbyist had told him that

9   Congressman Rohrabacher in California thought President

10  Erdogan orchestrated the coup and he didn't think that

11  Gulen was dangerous.

12          Alptekin asked the defendant if he could

13  contact Rohrabacher or perhaps his boss, Ed Royce.  The

14  defendant promptly responded that he had called

15  Rohrabacher and we are on it.

16          He said he had a meeting scheduled with him

17  and that, quote, it is important for him to 0know the

18  full story.

19          But back to the money.  In October, Alptekin

20  wired the second payment.  This time it was $180,000

21  into FIG's account on the f11th, and FIG wired $40,000

22  back to Alptekin on the 17th.  This time the purpose

23  was listed in the wire not as a refund but as

24  consultancy fee, Project Confidence.

25          For the third payment, there was no lag time

1  at all between the wire in and the wire out.  Instead,

2  on November 10, the defendant e-mailed Alptekin to say,

3  I do recognize that this month's service from Inovo to

4  FIG amounts to $55,000.

5       This time he told Alptekin that the money was

6  for, quote, research and consultation services.

7       Four days later Alptekin simply wired to

8  FIG's account an amount that represented $200,000 minus

9  that $55,000.  But as you'll see from the evidence in

10  this case, while the defendant and Alptekin

11  communicated frequently about money, there were no

12  communications between the defendant and Alptekin where

13  they described those payments as refunds for lobbying

14  work that was not performed.  There were no written

15  agreements between them in which they agreed to refund

16  money for lobbying work that was not done.

17       As you heard before, lobbying Congress about

18  Gulen was one of the things that the defendant actually

19  did.  He tried to convince members of Congress that

20  Gulen was a terrorist, that he was responsible for the

21  coup in July, and that he should be extradited to

22  Turkey.

23       Those were the payments.  Now let's talk

24  about the New York meeting.  As early as August 30,

25  Alptekin told the defendant:  We are also scheduling to

1   meet with MF and MC and perhaps even RTE in third week

2   of New York.  We'll keep you posted.

3           On September 6, the defendant e-mailed Flynn:

4   Client is seeking a high-level meeting in NYC on

5   September 19 or 20.

6           However, by the 11th of September, it

7   appeared that the meeting might not occur.  In a Skype

8   communication, Alptekin told the defendant:  Please

9   make sure MF does not communicate the meeting denial as

10  motivated by me or anyone inside the government of

11  Turkey.

12          The next day, though, Alptekin told the

13  defendant:  Just spoke to MC.  There is a chance the

14  meeting might be a little earlier on the 19th.

15          Ultimately, that meeting did take place.  The

16  day before the defendant e-mailed talking points to

17  Flynn with a message that read:  I have limited

18  distribution to you and Ekim at this time.

19          The talking points focused on Gulen, and they

20  included that familiar apple tree analogy.

21          As the evidence will show, the defendant was

22  correct when he described the meeting as high-level.

23  While Turkish President Erdogan did not attend, Turkish

24  minister of foreign affairs, Mevlut Cavusoglu, MC, and

25  Turkish minister of energy and natural sources, Berat

1  Albayrak, Erdogan's son in-law, were both at that

2  meeting.

3          Now, this brings me back to two of the false

4  statements from the indictment.  The defendant and

5  Alptekin are charged with conspiring to provide false

6  information in the FARA filing about that New York

7  meeting.  Specifically, the defendant conspired to

8  falsely state in the FARA filing that meeting had

9  nothing to do with Project Confidence and was instead

10 in furtherance of an abandoned project, Truth, that was

11 distinct from Project Confidence.

12         But in an e-mail the defendant sent to

13 Michael Flynn ten days before that heating, he told him

14 that the meeting would be with a, quote, high-level

15 audience, cabinet-plus level related to Confidence.

16         Alptekin for his part claimed in the FARA

17 filing that the meeting in New York was for the purpose

18 of understanding better the political climate in Turkey

19 at the time as background for the project.  The

20 defendant also repeated that same claim to the

21 government for purposes of the FARA filing.

22         But two days after the meeting, the defendant

23 sent Michael Flynn an e-mail with the subject

24 CONFIDENCE all capitalized.  In the e-mail, he said

25 that the feedback from Alptekin following the meeting

1  was generally positive, but the defendant had some

2  concerns about expectations that he characterized as

3  unreasonable.

4          The defendant told Flynn:  I will find out

5  more precisely what has caused this elevated

6  expectation on their side tomorrow.

7          Despite the defendant's comment about

8  elevated expectations on their side and how he would

9  try to find out what had caused it, after the New York

10 meeting, nothing changed.  The focus remained on

11 discrediting Fethullah Gulen.

12         Finally, let's talk about the op-ed.  As you

13 will hear, one of the only items FIG produced for this

14 project was an op-ed that was published in *The Hill*

15 newspaper about Gulen.  While it didn't get published

16 until early November, it was a topic that was

17 frequently discussed throughout the projects.  In fact,

18 on September 15, four days before that meeting in New

19 York, Alptekin sent the defendant a message where he

20 told him:  MC's guy who was read into Project

21 Confidence advised me to include an op-ed that FIG

22 would get published under my name, but I didn't raise

23 it as this advise aims to help me score points in

24 Turkey more than anything else.

25         But despite that, as they went forward, the

1    op-ed continued to be a point of discussion.   It was

2    discussed in the weekly calls with Alptekin.   It was

3    mentioned in materials prepared by FIG to be used in

4    those calls.   Finally, in early November, the defendant

5    began to circulate a draft of the op-ed that would be

6    published under Michael Flynn's name.

7              On November 2, immediately after a

8    face-to-face meeting with Alptekin where he complained

9    bitterly that FIG had not produced anything to dirty up

10   Gulen, the defendant sent Alptekin a draft and told

11   him:   A promise made is a promise kept.

12             He also asked Alptekin for his feedback.

13             Two days later the defendant sent a second

14   draft of the op-ed to Alptekin saying that it would be

15   published on Monday.

16             The defendant Alptekin that the United States

17   needs to show Turkey serious support.

18             Now, that brings me back to another false

19   statement alleged in the indictment.   As part of the

20   conspiracy to make a false statement, the defendant is

21   charged with falsely stating in the FARA filing that

22   Alptekin did not want the op-ed published.   As for

23   Alptekin, he's charged with falsely stating that he had

24   not been consulted on the op-ed and that he would have

25   opposed it if he had been consulted.

1          However, the day after the defendant sent the

2    article to Alptekin and told him it would be published

3    on Monday, Alptekin responded:  The general is right on

4    target.

5          In fact, the only issue he took with the

6    op-ed was to point out two spelling mistakes where the

7    names President Erdogan and Gulen were misspelled.

8          Now, the defendant and Alptekin talked about

9    the op-ed in the FARA filing.  They were charged with

10   falsely stating that on his own initiative, Michael T.

11   Flynn published an op-ed in *The Hill* on November 8,

12   2016, that related to the same subject matters as the

13   Flynn Intel Group work for Inovo BV.  Neither Inovo BV

14   nor any other person requested or directed publication

15   of the op-ed.

16         However, on November 3, the defendant sent

17   Michael Flynn a draft of the op-ed where he told him,

18   quote, Hank Cox cleaned up my draft and added about 150

19   words.

20         While the defendant asked for him to make any

21   changes he saw necessary, the version that the

22   defendant described as my draft on November 3 was very

23   similar to the one that was ultimately published.

24         On November 8, 2016, Election Day, an op-ed

25   was published in *The Hill* newspaper under Michael

1  Flynn's name entitled *Our Ally Turkey is in Crisis and*

2  *Needs Our Support*.

3          The same apple tree analogy that the

4  defendant first used with Alptekin in August was

5  included.  The article characterized Gulen as a shady

6  Islamic mullah who should not be given safe haven in

7  this country.

8          Ladies and gentlemen, you will see that

9  op-ed.  You'll see that it never said that it was

10  published on behalf of Turkey or even Inovo.  You will

11  hear testimony that it was not included in the

12  defendant or FIG's FARA filing as is required by law.

13  A promise made is a promise kept.

14          Now, ladies and gentlemen, as the judge told

15  you, opening statement is an opportunity for both sides

16  to provide a preview of some of the evidence in the

17  case.  I have attempted to give you that preview this

18  afternoon.  But to repeat what the judge just said,

19  anything I tell you is not evidence.  What the defense

20  will tell you in their opening is not evidence.  You

21  will see more documents and more exhibits than I've

22  described, and you will hear from a number of

23  witnesses.  That is the evidence in this case that you

24  will have to weigh and consider.

25          At the end of all of that evidence, my

1  colleague, Mr. Gillis, will stand here before you and

2  make the government's closing argument.  At that time,

3  he will ask that you find the defendant guilty of the

4  two charges in the indictment, conspiracy and acting in

5  the United States as an agent of a foreign government

6  because at that time, the government will have proven

7  his guilt beyond a reasonable doubt.

8          That brings me to your role in all of this.

9  You are the finders of fact in this case.  You will

10 ultimately determine the defendant's guilt or innocence

11 after hearing all of the evidence in this case.  The

12 duty that you-all have accepted is incredibly important

13 and is a powerful part of our criminal justice system.

14 So on behalf of my colleagues and the United States

15 government, I want to thank you on behalf of us for

16 your time and your attention and for the hard work that

17 you will put in on this case.

18          Thank you very much, ladies and gentlemen.

19          THE COURT:  Thank you, Mr. Gibbs.

20          Mr. Trout.

21            OPENING STATEMENT BY MR. TROUT

22          MR. TROUT:  Thank you, Your Honor.  It's not

23 a convenient time to have lost my voice.

24          He went to a lawyer.  He asked the lawyer:

25 Can you help us file under FARA?  We need to file under

1  FARA.

2          After the lawyer asked a couple of questions,

3  the lawyer said:  You shouldn't file under FARA.  You

4  should file under the Lobbying Disclosure Act instead,

5  which the lawyer then did.

6          Now, the government made no mention of this.

7  So let me say that again.  He went to a lawyer

8  specifically for help to do the very thing that the

9  government said he was hell-bent not to do.  And the

10  only reason he didn't file under FARA, which is what he

11  had gone to the lawyer for help on, is that the lawyer

12  told him he shouldn't do that, that he should file

13  under the Lobbying Disclosure Act.

14          Now, the "he" that I'm referring to is Bijan

15  Rafiekian, the defendant in this case.  That's the name

16  that he was charged with by the government.  That's his

17  formal name, but to most of the people who know him --

18  and you will see documents that refer to him in this

19  way -- he is known as Bijan Kian.  I will probably

20  refer to him simply as Bijan for simplicity.

21          Good afternoon, ladies and gentlemen of the

22  jury.  My name is Bob Trout.  I am here with my

23  colleagues, Stacey Mitchell and Mark MacDougall.  We

24  represent Bijan Kian.

25          Bijan never conspired with anyone to violate

1  the laws of this country.  He never sought to avoid

2  registering under FARA.  He never conspired with anyone

3  to act as a foreign agent without giving proper notice

4  to our government, and he never conspired with anyone

5  to give false information on the FARA forms that

6  Michael Flynn signed and filed on behalf of Flynn Intel

7  Group.

8         Now, let me tell you a little bit of

9  something about Mr. Kian, Bijan.  He's

10 Iranian-American, born and raised in Teheran.  He came

11 to this country a short time before the 1979 Iranian

12 revolution when Ayatollah Khomeini, an Islamist, came

13 to power and turned the Iranian society upside down.

14 He became a U.S. citizen, worked hard to integrate

15 himself into the life, and the culture and the society

16 of America.

17        He threw himself into public service in

18 California, met some important republicans along the

19 way, and eventually, he was appointed by President

20 George W. Bush and confirmed by the senate to be one of

21 five independent directors of the Export-Import Bank of

22 the United States.

23        Bijan dearly loves this country.  He has some

24 very strongly held views about the Islamists who came

25 to power in Iran in 1979 and about the Ayatollah

1   Khomeini and about others whom he believes are cut out

2   of the same cloth.

3           Now, in his strongly held views about the

4   national security threat imposed by Islamists, he

5   shares common ground with a person who had become his

6   business partner, Michael Flynn.  General Flynn was a

7   retired three-star general.  He was a -- well, he was a

8   three-star general.  He was the director of the Defense

9   Intelligence Agency at the Pentagon.  He was a very

10  senior leader in the Pentagon.

11          He retired in 2014, and in 2015 -- this was

12  well before General Flynn became famous for his "lock

13  her up" warm-up act during the Trump candidacy.  Flynn

14  and Bijan joined forces and formed the consulting

15  company of Flynn Intel Group.

16          They actually -- neither of them had

17  experience really or knowledge about the day-to-day

18  management of a successful business.  They knew

19  important people, and they expected to be successful

20  because of the connections that they had.

21          One of Bijan's connections was a Turkish

22  national living in Turkey by the name of Ekim Alptekin.

23  Mr. Alptekin was a very successful businessman.  He was

24  actually a dual citizen of Turkey and Holland.  He was

25  a very successful businessman there, and he was a

1  leader in Turkey of what was the equivalent of the

2  Turkish chamber of commerce.

3          As you have heard, there was a coup in July

4  2016 in Turkey.  A short time thereafter, Bijan and

5  Mr. Alptekin were talking about what had happened in

6  Turkey discussing who was behind the coup and what the

7  repercussions were for Turkey and, particularly, the

8  economic and political stability in Turkey.  Obviously,

9  when there is a coup, there is a lot of dislocation, a

10 lot of uncertainty, and a lot of economic instability

11 that goes along with that.

12         So they were talking about that, and it was a

13 commonly held view in Turkey among various -- certainly

14 among the Turkish leadership, as well as many of the

15 Turkish citizens, Mr. Alptekin included, that the

16 person who was behind the coup was Fethullah Gulen.

17         Now, Mr. Alptekin was a private citizen in

18 Turkey, and he has views that, in some respects, are in

19 line with his government.  In that way, you will see

20 that the private citizens of Turkey are no different

21 than the private citizens in any country.  Sometimes

22 they agree on the policies of their government, and

23 sometimes they don't.

24         In this case, Mr. Alptekin clearly and

25 energetically agreed that Gulen was a source of

1   instability in Turkey.  So Mr. Alptekin and Bijan began

2   talking about a business opportunity, and that business

3   opportunity would be to market to the Turkish

4   government the idea of an investigation of Gulen to

5   further the Turkish government's expectation and hope

6   in advancing their extradition efforts to get Gulen

7   back.  This, according to Alptekin and Bijan, was a way

8   of stabilizing the situation in Turkey once they

9   identified what the source of the problem was, Gulen.

10          So they talked about this, and one of the

11  ideas that they agreed on was that they would try to

12  get Turkey to hire FIG, no question about it.  They

13  wanted Turkey to hire FIG.  And Alptekin wanted to be,

14  essentially, a consultant to FIG on the ground in

15  Turkey.  So Turkey would hire FIG.  FIG would then hire

16  Alptekin as a consultant on the ground in Turkey to

17  interface as necessary.  So there would be a fee going

18  back to Alptekin.  That was the plan, and that was what

19  was being discussed in the summer and early fall of --

20  July and August of 2016.

21          There was some reason to be optimistic.

22  Alptekin was having conversations with -- or at least

23  he said he was having conversations with various

24  Turkish leaders.  Bijan was not party to those

25  conversations.  He only knew what was being

1  communicated to him by Alptekin.  But at a certain

2  point, it switched.  Turkey was not going to do it.

3  Alptekin was going to do it.  Alptekin basically said,

4  I am going to do this.

5           He was an important business leader in

6  Turkey, and he obviously was interested in enhancing

7  his own stature with the leadership.  He decided that

8  because the leadership was so interested in going after

9  Gulen, that he would advance his own interest by

10 essentially being the person who would get FIG involved

11 and help.  As I say, Bijan was not party to any of

12 those conversations, and he doesn't know why.

13          But -- and this is something else you didn't

14 hear from the government -- Turkey had already hired

15 someone else to do this work.  In 2015, Turkey openly

16 hired and engaged a law firm in the District of

17 Columbia by the name of Amsterdam & Partners to

18 investigate Gulen and to work to get him extradited

19 back to Turkey.  They couldn't have been more open

20 about it.  Amsterdam & Partners filed a FARA form and

21 openly disclosed that they had been hired by Turkey to

22 do this work.

23          Amsterdam & Partners couldn't have been more

24 public about the fact that they were doing this work.

25 In fact, as you will see, they published a big book

1  titled *Empire of Deceit, An Investigation of the Gulen*
2  *Charter School Network, Book I*, Amsterdam & Partners.
3           Here's the inside flap:  The Republic of
4  Turkey engaged Amsterdam & Partners to conduct a
5  comprehensive accounting of all Gulenist-controlled
6  chartered schools within the U.S. to document the
7  breadth and scope of the Gulenist network.
8           The material is distributed by Amsterdam &
9  Partners on behalf of the Republic of Turkey.
10          So it turns out Turkey had actually already
11  hired someone to do this work back in 2016.  That
12  contract that Turkey had with Amsterdam & Partners,
13  which you might be able to see in the evidence, was
14  still ongoing throughout this entire period of time.
15          But Bijan didn't know anything other than
16  that Alptekin wanted to hire FIG at a cost of $1,000
17  for three months of work.
18          So in September 2016, FIG and Inovo, which
19  was Alptekin's personal company, signed this agreement
20  for FIG to do this work.  He was focused on, as they
21  saw it, an examination of Gulen and his impact on the
22  economic and political instability in Turkey.
23          So they sign the contract, and then what
24  happened is Bijan, in a very short period of time,
25  received an e-mail from an individual who was going to

1   be working on this.  His name was James Courtovich, and

2   the e-mail made reference to FARA.  So Bijan went

3   looking for a lawyer to help with understanding FARA

4   and getting registration under FARA.  He eventually

5   ended up with a lawyer by the name of Robert Kelley.

6   He had experience in FARA.  He would actually become

7   the general counsel of FIG.

8           Bijan went to Mr. Kelley, and he said:  We

9   need to file under FARA.  Will you help us put together

10  the registration forms for FARA?

11          Mr. Kelley asked him some questions,

12  determined from his answers that the client was not the

13  government of Turkey but was Inovo, and Mr. Kelley

14  said:  Well, you shouldn't file under FARA.  You should

15  file under the Lobbying Disclosure Act instead.

16          Mr. Kelley then filed on his own the Lobbying

17  Disclosure Act that you will see in this case.  So that

18  was done in September 2016.

19          Now, the question is -- the government claims

20  that there is this conspiracy and that this project

21  involving Gulen is the result of the conspiracy.  You

22  will recall Mr. Gillis talked about Bijan and his

23  associates failed to disclose; Bijan and his associates

24  lied on the form; Bijan and his associates acted as

25  agents of a foreign government.

1           So let's look at who those associates were.

2    Well, taking the lead in the case was a former

3    three-star general, a retired three-star general,

4    former director of the Defense Intelligence Agency.

5    That was Michael Flynn.  You will find that all of the

6    people who are associated in this enterprise were solid

7    citizens.

8           One of them, Bryan McCauley, had a 35-year

9    career in the Federal Bureau of Investigation.  He rose

10   to be the deputy assistant director of the Operations

11   Division of the FBI.  So that was one of the associates

12   that Mr. Gillis was referring to who was acting as an

13   agent of a foreign government.

14          Mr. McCauley and Mr. Flynn, as well as

15   Mr. Kian, were all present at the meeting in New York

16   that Mr. Gibbs described.  At no time after that

17   meeting in New York or at any other time did

18   Mr. McCauley, Mr. Flynn, or anyone else ever say, Hold

19   it.  We're representing Turkey here.  We've got to file

20   under FARA.

21          That never happened.  At no time during the

22   entire project or at any time thereafter did anyone --

23   this former FBI agent, this retired general -- ever

24   say, Time-out.  We're doing something illegal.  We're

25   in the middle of a criminal conspiracy.  I want out.

1           That did not happen.

2           The government here claims that FIG was

3   acting under the direction and control of the

4   government of Turkey.  The government claims that Bijan

5   had agreed to act under the direction and control of

6   Turkey.  There is no question that some of what FIG was

7   doing was aligned with the thinking of Turkish

8   leadership.  There's no question about that just as

9   there was no question that Alptekin's thinking aligned

10  with Turkish leadership, at least on the question of

11  Gulen.

12          So let's look at the evidence on that issue.

13  First, the only evidence that you will see is payments

14  were made from Alptekin's bank account to FIG's bank

15  account.  You will see no evidence of any payment made

16  by Turkey to Alptekin.  You will see no evidence of any

17  payments made by Turkey to any company that Alptekin

18  controlled.  The only evidence in the case of any

19  payments will be payments made by Alptekin's company to

20  FIG.

21          Second, you will recall the meeting in New

22  York in September 2016.  It was September 19, 2016.

23  There was a meeting in New York.  Bijan was there.

24  Flynn was there.  McCauley was there.  James Woolsey

25  was there.  The meeting lasted no more than a half an

1  hour.  There were certain Turkish leaders that were

2  there, Turkish officials who were there.  The meeting

3  was set up by Alptekin.

4         At the meeting, there was no discussion of

5  this contract.  There was no request by any Turkish

6  official for FIG to do anything.  It didn't come up.

7  Yes, they talked about Gulen.  Yes, they talked about

8  what a threat they regarded him, but the subject of the

9  contract with FIG between Inovo and FIG never came up.

10 The meeting lasted 15, 20 minutes, and after it was

11 over, everybody went -- that was the last time that

12 anyone from FIG and Bijan, in particular, had any

13 contact whatsoever with any Turkish official.

14        Now, at no time during this meeting -- you

15 will recall I made mention of Amsterdam & Partners.  At

16 no time during this meeting did any Turkish official

17 ever say, By the way, we want you to be in touch with

18 Amsterdam & Partners.  We want you to coordinate with

19 them.  We want to make sure you two don't work at

20 cross-purposes.

21        That never happened.

22        The evidence will also show that at no time

23 did any Turkish official ever say to anyone at

24 Amsterdam & Partners:  Listen, we're also working with

25 Flynn Intel Group.  We want to make sure you coordinate

1   with Flynn Intel Group.  We want to make sure you don't

2   work at cross-purposes with Flynn Intel Group.

3            That never happened.

4            So one of the deliverables of Flynn Intel

5   Group you've heard about -- Mr. Gillis made reference

6   to it -- was a board game called Gulenopoly.  It sounds

7   goofy.  It was goofy.  Spoiler alert here:  Gulenopoly

8   was not the brain child of President Erdogan in Turkey.

9   And when you look at Gulenopoly, the product of the

10  work that FIG did for Alptekin, I want you to compare

11  it with the work product of what was done by Amsterdam

12  & Partners, the acknowledged agent of Turkey.  You will

13  see a difference as you examine the evidence.

14           You will also hear in the evidence that there

15  are any number of instances not only where FIG was not

16  acting under the direction and control of Turkey, they

17  weren't even accepting some of the direction and

18  control from Alptekin.  There were times when Alptekin

19  wanted them to do something, and they refused to do it.

20           And -- this is also important -- you will

21  learn that there were instances where Flynn Intel Group

22  was actually not aligned with Turkish policy, was not

23  doing what Turkey would have wanted.  Let me give you

24  an example.  Recalling that Amsterdam & Partners is

25  working hard on getting Gulen extradited, you will read

1 in black and white in the memos that were created by

2 Flynn Intel Group that they came to the view that the

3 extradition effort by Turkey was counterproductive, and

4 they recommended -- they felt that what should happen

5 is Turkey should withdraw the extradition request.  Of

6 course, that never happened, but that was their point

7 of view.  Trust me:  That was not the point of view of

8 Turkey.  Turkey would never have directed or asked for

9 such a point of view.

10          So now I come to the Flynn op-ed dated

11 November 8, 2016.  The evidence will show that Turkey

12 had nothing to do with this op-ed.  In early November,

13 Bijan Kian wrote the first draft of the op-ed.  It's

14 related to Gulen.  It's related to Turkey.  Bijan

15 promised Alptekin that he would let him read it, and on

16 November 2, Bijan sent a copy of the first draft of the

17 op-ed to Alptekin.  There is no evidence at all that

18 Alptekin sent the op-ed to any Turkish official.  There

19 will be no evidence of that at all.

20          There will be evidence that Alptekin did

21 speak with Bijan about the op-ed, and there will be

22 evidence that he expressed some concern about the op-ed

23 and that he gave advice about the op-ed.  You will

24 learn that Bijan listened politely and essentially

25 rejected the suggestions and the expressions of

1    concern.

2           You will see that the op-ed, as it was

3    ultimately published under the name of Michael Flynn,

4    was essentially no different at all from the op-ed that

5    Bijan had sent to Alptekin on November 2.

6           Ladies and gentlemen, there will be no

7    evidence that Turkey received a copy of the op-ed

8    before it was published.  There will be no evidence

9    that Turkey commented on the op-ed before it was

10   published, and there will be no evidence that Turkey

11   actually even knew about the op-ed before it was

12   published.

13          It was published on November 8, Election Day.

14   To everyone's surprise, Donald Trump won, and Michael

15   Flynn went from being a warm-up act for the Trump

16   campaign to being the designated national security

17   advisor for the incoming administration.  The press was

18   all over this.  So as a result, the Department of

19   Justice FARA Unit sent a letter to Flynn Intel Group

20   and said:  Hey, we are reading about this in the press.

21   Shouldn't you have registered under FARA?

22          So they went to a law firm to get advice

23   about this:  Did we register about it correctly or not?

24   But they didn't go to just any law firm.  They went to

25   Covington & Burling, one of the oldest and largest law

1  firms in the city.  Covington & Burling gather up all

2  of the evidence.  They gathered up all of the

3  documents, including all the documents that the

4  government is going to introduce in this case to prove

5  their case.  The green light memo that Mr. Gibbs

6  referred to, Covington had it.  Covington looked at it.

7  The reference to the payments back and forth, the

8  reference to the idea that this was actually really

9  just a refund for work that was not being performed,

10 Covington had all of that.

11         They interviewed General Flynn.  They

12 interviewed Bijan.  They interviewed others at FIG.

13 They actually even got information from Alptekin's

14 lawyers.

15         They went back and forth about how they saw

16 the legal situation:  Was this properly filed under the

17 Lobbying Disclosure Act?  Was FARA registration really

18 appropriate?

19         They met with the Department of Justice to

20 discuss what they were thinking, what their findings

21 were, what their tentative views were.  Eventually,

22 based on all of the information that they had, they

23 prepared the FARA registration forms.  They made the

24 decision to file under FARA, not because they found

25 that FIG was acting as an agent of a foreign

1  government.  They made the decision to file because

2  under the regulations, even if you are not acting as an

3  agent of a foreign government, if the work that you are

4  doing principally benefits a foreign government, then

5  in that circumstance, you do have to file under FARA.

6  It doesn't work to file under the Lobbying Disclosure

7  Act.

8          So even though there is nothing that

9  Covington & Burling filed that said FIG was an agent of

10 Turkey, they felt that the safer choice was to file

11 under FARA in view of the fact that it could be

12 argued -- given everything that was being done by FIG,

13 it could be argued that Turkey was the principal

14 beneficiary.

15         And so they filed FARA registration forms on

16 March 7, 2017.  Those forms were signed -- all of the

17 forms that the government alleges are false were filed

18 by Michael Flynn.  Bijan did not file any of them.

19         And speaking of Michael Flynn, there is one

20 last point, and it's an important point because Bijan

21 was not involved in it.  In fact, he didn't even know

22 anything about it until this past Friday.  You will

23 hear the government say it is in possession of multiple

24 independent pieces of information relating to the

25 Turkish government's efforts to influence United States

1   policy on Turkey and Fethullah Gulen, including

2   information relating to communications, interactions,

3   and a relationship between Ekim Alptekin and Michael

4   Flynn and Ekim Alptekin's engagement of Michael Flynn

5   because of Michael Flynn's relationship with an ongoing

6   presidential campaign -- here's the kicker -- without

7   any reference to the defendant or FIG.

8           There will be no evidence.  The government

9   has conceded that there is no evidence that this

10  activity that they have now described involves Bijan.

11          So let me conclude where I began.  Bijan

12  never conspired with anyone to violate the laws of our

13  country.  Bijan never, ever sought to avoid registering

14  under FARA.  Bijan never conspired with anyone to serve

15  as an agent of a foreign government acting under their

16  direction and control, and Bijan never conspired with

17  anyone to file false documents under the FARA

18  registration with our government.

19          Thank you.

20          THE COURT:  Thank you, Mr. Trout.

21          Ladies and gentlemen, we are going to adjourn

22  for today.  We'll begin with the evidence tomorrow when

23  everybody is fresh.  We have had a long day.

24          So I'm going to excuse you until 9:15

25  tomorrow.  Again, please make whatever travel

1  arrangements you need to get here around that time.

2  It's my intention to start at 9:30 with the evidence.

3          Again, I want to remind you that it is

4  important that you not discuss this case with anyone.

5  Obviously, your friends and family will be curious

6  about how you spent the day.  Simply tell them that

7  you're instructed by the Court not to discuss it with

8  them.

9          Also, please avoid any coverage and news

10 media that you may see about the case.  There's no

11 alternative other than to direct that you simply not

12 listen to anything.  If you happen to hear something on

13 the radio or something comes on the television, you

14 just simply walk away from it and don't engage.

15         Again, don't conduct any research.  Don't go

16 online.  Don't communicate through any social

17 networking.

18         So with those instructions, you're excused

19 until tomorrow morning.

20         Thank you.

21     (The jury exits at 5:29 p.m.)

22         THE COURT:  All right.  We'll begin tomorrow

23 morning.  What is the lineup for tomorrow morning,

24 Mr. Gibbs or Mr. Gillis?

25         MR. GILLIS:  I'm sorry?

1              THE COURT:  What is the lineup?

2              MR. GILLIS:  Sorry, Your Honor.  The first

3  witness will be Jeffrey Olson.  The second witness will

4  be Suthahar Nadarajah, and the third witness will be

5  Kim Rosecrans.  The fourth will be Jeffrey Gilday, and

6  then we will get to Rob Kelner.

7              THE COURT:  All right.  Very good.

8              Thank you.

9              We'll meet at 9:00 tomorrow in case there's

10 any issues.

11             We'll stand in recess until tomorrow morning

12 at 9:00.

13             ------------------------------------
                      Time:  5:30 p.m.
14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                                    /s/
25                          Rhonda F. Montgomery, CCR, RPR


Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599