1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3  UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                )
4              Plaintiff,       )
                                )
5         v.                    )  Alexandria, Virginia
                                )  July 16, 2019
6  BIJAN RAFIEKIAN,             )  9:09 a.m.
                                )
7              Defendant.       )  Day 2
                                )  Pages 78 - 206
8  _____

9                     TRANSCRIPT OF TRIAL

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11           UNITED STATES DISTRICT COURT JUDGE

12                     AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
1  APPEARANCES:

2  FOR THE UNITED STATES OF AMERICA:

3        JAMES P. GILLIS, ESQUIRE
          EVAN N. TURGEON, ESQUIRE
4        JOHN T. GIBBS, ESQUIRE
          S. KATE SWEETEN, ESQUIRE
5        OFFICE OF THE UNITED STATES ATTORNEY
          2100 Jamieson Avenue
6        Alexandria, Virginia  22314
          (703) 299-3700
7
   FOR BIJAN RAFIEKIAN:
8
          ROBERT P. TROUT, ESQUIRE
9        TROUT, CACHERIS & SOLOMON, PLLC
          1627 I Street, N.W., Suite 1130
10       Washington, D.C.  20006
          (202) 464-3300
11
          MARK J. MACDOUGALL, ESQUIRE, PRO HAC VICE
12       STACEY H. MITCHELL, ESQUIRE, PRO HAC VICE
          JOHN C. MURPHY, ESQUIRE, PRO HAC VICE
13       JAMES E. TYSSE, ESQUIRE
          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
14       Robert S. Strauss Building
          1333 New Hampshire Avenue, N.W.
15       Washington, D.C.  20036-1564
          (202) 887-4000
16
   THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
17

18

19

20

21

22

23

24

25
```

1                           **I N D E X**

2   GOVERNMENT'S WITNESS              EXAMINATION          PAGE

3   Jeffrey M. Olson                 Direct               83
                                     Cross                105
4                                    Redirect             118

5   Suthahar Nadarajah               Direct               120
                                     Cross                135
6                                    Redirect             138

7   Kim T. Rosecrans                 Direct               139

8   Jeffrey Gilday                   Direct               181
                                     Cross                199

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (The jury is not present.)

 2              THE CLERK:  Criminal Case 1:18-cr-457, *United*

 3  *States v. Bijan Rafiekian*.

 4              Counsel, will you please note your

 5  appearances for the record.

 6              MR. GILLIS:  Good morning, Your Honor.  Jim

 7  Gillis, Evan Turgeon, and John Gibbs for the United

 8  States, along with Katie Sweeten, Special Agent Bryan

 9  Alfredo, and, again, our excellent paralegal, Latoya

10  Horsford.

11              THE COURT:  Welcome.

12              MR. MACDOUGALL:  Good morning, Your Honor.

13  Mark MacDougall for the defendant, Bijan Rafiekian.

14  Mr. Rafiekian is here in the courtroom.  I'm here with

15  my cocounsel, Robert Trout, Stacey Mitchell, and James

16  Tysse.

17              THE COURT:  All right.  Very good.

18              Are there any issues that either side would

19  like to raise?

20              MR. GILLIS:  Not yet, Your Honor.

21              THE COURT:  All right.

22              MR. MACDOUGALL:  Just one, Your Honor, and it

23  may not require being addressed this morning.

24              THE COURT:  Yes.

25              MR. MACDOUGALL:  On late Friday, the

1   government declassified two items that had been the

2   subject of CIPA litigation.  Those are now in a form

3   that I understand have no restrictions on their use

4   other than the rules of evidence.  We believe that they

5   are effectively substitutions that at the appropriate

6   time we would ask to be published to the jury in that

7   form.  Obviously, by the time they were declassified,

8   it was too late to try to obtain through *Touhy* or some

9   other means a witness to testify.  So we'd ask the

10  Court's permission at the appropriate time to publish

11  both of those statements.

12          THE COURT:  All right.  Could you provide the

13  Court with what was agreed upon as the declassified

14  version?

15          MR. MACDOUGALL:  Yes, Your Honor.  We'll

16  submit that today.  Thank you.

17          MR. GILLIS:  They won't need a sponsor for

18  those, Your Honor.  At the appropriate time during

19  their case, they can introduce them.

20          THE COURT:  All right.  Very good.

21          Are we anticipating any objections to any of

22  the exhibits that you anticipate presenting today?  Do

23  you know what those are?

24          MR. GILLIS:  I hope not, Your Honor.

25          THE COURT:  Okay.  All right.

1          MR. MACDOUGALL:  Your Honor, we anticipate,

2    to the extent that the issue of coconspirator

3    statements comes into play, that we will be objecting

4    to those.  And not knowing what the witnesses are going

5    to offer, we can't say what those are yet.

6          THE COURT:  All right.  Anything else?

7          MR. GILLIS:  No, Your Honor.

8          THE COURT:  All right.  We'll reconvene just

9    as soon as the jury is ready.

10          All right.  The Court will stand in recess.

11      (Recess from 9:12 a.m. until 9:44 a.m.)

12      (The jury is present.)

13          THE COURT:  Good morning.  I hope everybody

14    had a restful evening.  We're now ready to proceed with

15    the government's case.

16          Mr. Gillis, call your first witness.

17          MR. GILLIS:  Thank you, Your Honor.  The

18    government calls Jeffrey M. Olson.

19          THE COURT:  All right.

20          Mr. Olson will come forward, please.

21          Mr. Gillis.

22          MR. GILLIS:  Thank you, Your Honor.

23      JEFFREY M. OLSON, PLAINTIFF'S WITNESS, AFFIRMED

24                    DIRECT EXAMINATION

25    BY MR. GILLIS:

Olson - Direct

1  Q     Could you please tell us your name, sir.

2  A     Jeffrey M. Olson.

3  Q     And where do you work?

4  A     I work at the U.S. Department of Justice in the

5  Office of International Affairs.

6  Q     And what does the international affairs do?

7  A     Our office is the main office in the Department of

8  Justice handling all international extradition and

9  mutual legal assistance matters.

10  Q     And your position there is what?

11  A     I'm the associate director in charge of a team

12  that covers all of Africa, Asia, and the Middle East.

13  Q     Does that include Turkey?

14  A     It does.

15  Q     And as part of your job -- well, actually, you

16  mentioned the Mutual Legal Assistance Treaty.  Is it

17  also known as an MLAT?

18  A     That's an MLAT, correct.

19  Q     Could you explain to the jury what an MLAT is,

20  please.

21  A     An MLAT is a treaty allowing for the formal

22  exchange of evidence for use in criminal investigations

23  or prosecutions between two sovereign governments.

24  Q     And is that a tool that's available only in

25  criminal investigations?

Olson - Direct

1    A    Yes.

2    Q    When the United States makes an MLAT request to a

3    foreign country, what must it say about its

4    investigation?

5    A    It must say it's investigating criminal charges.

6    Q    And does it need to support with information what

7    those criminal charges are?

8    A    It needs to give some explanation of the nature of

9    the investigation and the charges against an individual

10   or individuals.

11   Q    Would that include the facts that are -- that gave

12   rise to the charges --

13   A    Yes.

14   Q    -- or the investigation?

15   A    It would -- right, that's correct.

16   Q    So an MLAT would be available before any charges

17   are brought against someone?

18   A    Correct.

19   Q    During the course of an investigation?

20   A    Correct.

21   Q    Now, where does an MLAT request go?

22   A    An MLAT request --

23   Q    Sorry.  From the United States, where would it go?

24   A    It goes from my office, the Office of

25   International Affairs, to our counterparts in the

1  foreign countries, the ministry of justice.

2  Q    So in the foreign government's ministry of

3  justice?

4  A    Correct.

5  Q    As part of your duties, do you also oversee

6  extradition requests from foreign countries?

7  A    I do.

8  Q    And could you tell us briefly what an extradition

9  request is?

10  A    An extradition request is a formal request seeking

11  the arrest and extradition of an individual wanted for

12  crimes or to serve a sentence from overseas.

13  Q    Are you familiar with someone named Fethullah

14  Gulen?

15  A    I am.

16  Q    Can you tell us who he is?

17  A    Mr. Gulen is an imam.  He is a writer and a

18  political figure.  He runs a network of schools and

19  charities throughout the world.

20  Q    Does that include in the United States?

21  A    Yes.

22  Q    And do you know where he lives?

23  A    He lives in Pennsylvania in the United States.

24  Q    And do you know what his status is in the United

25  States?

Olson - Direct

1    A     I don't know his status, no.

2    Q     Do you know how long he's been living in the

3    United States --

4    A     I understand --

5    Q     -- possibly?

6    A     I understand he's been in the United States for

7    the last two decades.

8    Q     At some point, did you become involved in

9    discussions with the government of Turkey concerning

10   Mr. Gulen?

11   A     I did.

12   Q     And when did those discussions start?

13   A     In approximate late 2015, early 2016.  The

14   ministry of justice informed us that they were

15   preparing an extradition request for Mr. Gulen.

16   Q     So what was the basis for that?  What was the

17   nature of the discussions?  If you could, sort of

18   summarize them at the initial phase.

19   A     At that point, the Turkish government believed

20   that Mr. Gulen and his followers were creating a

21   parallel state whose main objective was to overthrow

22   the Turkish government.

23   Q     And did they talk to you about extradition?

24   A     They did.

25   Q     Had they made an extradition request at that

Olson - Direct

1  point?

2  A    Not for Mr. Gulen, no.

3  Q    And who was president of Turkey at the time?

4  A    The president was Recep Tayyip Erdogan.

5  Q    Could you take a look, please, at Government

6  Exhibit 5.  It will appear in the binder.  I was going

7  to say on your screen but...

8       Can you tell us what that is?

9  A    That's President Erdogan.

10  Q    It's a photograph?

11  A    Yes.

12            MR. GILLIS:  Your Honor, I move to admit

13  Government's Exhibit 5.

14            THE COURT:  Any objection?

15            MR. MACDOUGALL:  No objection, Your Honor.

16            THE COURT:  Without objection, Exhibit 5 is

17  admitted.

18            MR. GILLIS:  May we display it to the jury?

19            THE COURT:  Yes.

20  BY MR. GILLIS:

21  Q    Could you then look, please, at Government's

22  Exhibit 4?  Do you have it in front of you?

23  A    Yes.

24  Q    What is that?

25  A    That's a photograph of Fethullah Gulen.

Olson - Direct

1        MR. GILLIS:  I move to admit 4, Your Honor.

2        THE COURT:  Any objection?

3        MR. MACDOUGALL:  No objection.

4        THE COURT:  Without objection, Government's

5    Exhibit 4 is admitted.

6    BY MR. GILLIS:

7    Q    Could you tell the jury what the history had been

8    between President Erdogan and Mr. Gulen?

9    A    Yes.  At one point, Erdogan and Gulen had been

10   political allies.  But over the course of the years,

11   they had had a falling out, and Mr. Erdogan began to

12   accuse Mr. Gulen and his followers of trying to

13   overthrow the government.

14   Q    And during your discussions with the Turkish

15   government, what was the gist of the crimes that they

16   said Gulen had committed?

17   A    The Turkish government was alleging that he led an

18   armed terrorist organization and that he had committed

19   a whole series of different crimes, from embezzlement

20   and fraud and money laundering, as part of he and his

21   network's efforts to create this parallel state to

22   overthrow the government.

23   Q    And what was the parallel state that the Turkish

24   government was alleging?

25   A    It was alleging that Gulen and his followers had

Olson - Direct

1   infiltrated main branches of the government from the

2   judiciary to the police forces to a wide range of

3   organizations within the Turkish government.

4   Q    In these discussions with the Turkish government,

5   how did they characterize Mr. Gulen?

6   A    They characterized him as what they called a

7   terrorist and the leader of a terrorist organization.

8   Q    Did they compare him to anybody?

9   A    They compared him to Osama bin Laden.

10  Q    In what way?

11  A    They said he was the lead terrorist who was trying

12  to overthrow the country, much like bin Laden was

13  attempting to overthrow the government of the United

14  States.

15  Q    And in those discussions, was there any mention of

16  Gulen-related schools among those allegations?

17  A    As part of those allegations, one part of it was

18  that this network of schools and charitable

19  organizations that Mr. Gulen and his foundation ran was

20  actually part of a operation to support the creation of

21  the parallel state and to raise money, laundering money

22  to support their objectives.

23  Q    And did they characterize those organization in

24  some way?

25  A    They just characterized them as part of this armed

Olson - Direct

1    terrorist organization.

2    Q    Are you familiar with an attempted coup in Turkey

3    that took place on July 15 and 16, 2016?

4    A    I am.

5    Q    Were there any deaths as a result of that coup

6    attempt?

7    A    Several hundred people died.  Several thousand

8    were injured.

9    Q    And did President Erdogan blame anyone for the

10   attempted coup?

11   A    Eventually, President Erdogan accused Fethullah

12   Gulen of being behind the attempted coup attempt --

13   attempted coup.

14   Q    And how about any groups affiliated with anyone?

15   A    As well as all of Gulen's followers in the

16   Fethullah Gulen movement.

17   Q    Up to this point in mid July, at the time of the

18   coup, had the government of Turkey made any formal

19   requests of the United States government for Gulen's

20   arrest or extradition?

21   A    Up until the time of the coup, no, they had not

22   made a request, but we had had several conversations

23   with them knowing that they were preparing one.

24   Q    Okay.  And did anything new happen regarding those

25   discussions after the coup attempt?

Olson - Direct

1  A    Yes.  Within a few days, we received what we call

2  provisional arrest request from Turkey for the arrest

3  of Mr. Gulen.

4  Q    And when did you get that?

5  A    That was on July 19, 2016.

6  Q    Tell us:  What is a provisional arrest warrant,

7  please.

8  A    A provisional arrest request, which leads to a

9  provisional arrest warrant, is a creature of an

10  extradition treaty.  It's an abbreviated extradition

11  request seeking the arrest of an individual with a view

12  to seeking his extradition following the passage of a

13  formal extradition request.

14  Q    Okay.  In this case, they were asking for the

15  United States government to arrest Gulen?

16  A    Correct.

17  Q    Did this request relate to the attempted coup?

18  Pardon me.  Did this provisional arrest request relate

19  to the attempted coup?

20  A    The underlying facts of the indictment charged in

21  the case did not relate to the coup.  It was all

22  conduct in the years leading up to the coup.

23  Q    Were you provided with formal charging documents

24  from the government of Turkey against Mr. Gulen?

25  A    We were.  We received copies of the arrest

Olson - Direct

1  warrants and the indictments.

2  Q    And how many were -- sorry.  How many of those

3  were there?

4  A    There were four different cases based out of

5  Ankara, Bursa, and two cases out of Istanbul.

6  Q    And can you tell us what those indictments

7  charged?

8  A    Each of the indictments charged a range of

9  offenses from leading an armed -- accusing Gulen of

10  leading an armed terrorist organization, overthrowing

11  the Turkish government, and a range of other offenses

12  which Gulen was accused of orchestrating, as I

13  mentioned, from embezzlement, money laundering to fraud

14  to slander.  All sorts of offenses.

15  Q    Were these essentially the allegations that it

16  made during your informal discussions before the coup?

17  A    Yes.

18  Q    And what did you do when you received this formal

19  request for a provisional arrest warrant?

20  A    Well, when we received the provisional arrest

21  request on July 19, I immediately assembled a team of

22  attorneys on my team to begin review of the request

23  because it was quite lengthy.

24  Q    And about how long did that take?  Do you recall?

25  A    The review took about -- a little over a day, and

Olson - Direct

1   we came up with a list of questions that we wanted to

2   ask the ministry of justice about the request.

3   Q    Okay.  And up until that point, had you reached a

4   preliminary conclusion about the request itself?

5   A    Within a day, we had assessed that the request was

6   deficient because we felt it lacked probable cause to

7   arrest Mr. Gulen on the charges and that it wasn't

8   sufficiently urgent, which is one of the requirements

9   under the extradition treaty for a provisional arrest

10  request.

11  Q    And when you saw it lacked probable cause, what

12  does that mean?

13  A    Probable cause means sufficient evidence that a

14  reasonable person would believe that the fugitive

15  accused has committed a crime.

16  Q    The conclusion of OIA, Office of International

17  Affairs, was there was not sufficient evidence of that?

18  A    At that time, we believed we did not have

19  sufficient evidence to go forward with the request.

20  Q    And did you inform the Turkish government of that?

21  A    We did the next day.

22  Q    And that would have been when?

23  A    July 20, 2016.

24  Q    And what did you do after that?

25  A    We continued review of the request.  We had

Olson - Direct

1   conversations with the ministry of justice in Turkey,

2   as well as with representatives from the Turkish

3   embassy here in Washington about the request, and gave

4   them questions about what kind of evidence we would

5   need in order to fulfill the request.

6   Q     And when did those happen?

7   A     It happened over the course of a few days and

8   months following the receipt of the extradition -- of

9   the provisional arrest request.

10  Q     Okay.  So after the provisional arrest request and

11  your conclusion that it lacked probable cause, what

12  happened next?

13  A     A few days later on July 23, 2016, the State

14  Department received a formal extradition request from

15  Turkey.

16  Q     And was that based upon the attempted coup?

17  A     It was not based on the attempted coup, but it was

18  based on the four indictments that I mentioned.

19  Q     And what did this extradition request consist of?

20  A     The extradition request consisted of a number of

21  affidavits and other documents supporting the

22  allegations that Mr. Gulen had orchestrated this

23  parallel state in Turkey.

24  Q     And can you quantify about how many documents you

25  received?

1   A    The documents were in the thousands and thousands

2   of pages in both Turkish and English.

3   Q    And what did you do then?

4   A    The team of attorneys that we had formed in the

5   office began reviewing the request in detail.

6   Q    And in connection with that, did you have

7   discussions with the Turkish government as well?

8   A    We did.  Over the course of the next several

9   months, we had a number of meetings at various levels,

10  including the working level with Turkish counterparts

11  asking questions, seeking more information in order to

12  work on their request.

13  Q    And at some point, did you then reach a conclusion

14  with respect to these thousands of pages in the formal

15  extradition request?

16  A    We had formed a preliminary analysis that the

17  request itself, while it contained a lot of pages, did

18  not contain sufficient evidence to establish probable

19  cause for us to extradite Mr. Gulen.

20  Q    And did you inform the Turkish government of that?

21  A    We did at multiple levels.

22  Q    And if you could, explain:  Did your efforts

23  include sending anyone to Ankara to speak with the

24  Turkish government there?

25  A    It did.  We continued to engage our ministry of

1  justice counterparts with our questions.  In August

2  2016, we sent a team of prosecutors from my office to

3  meet with the prosecutors in Ankara to discuss the

4  requests.

5  Q    During those meetings, what sorts of things were

6  you telling them?

7  A    We were telling them that we -- well, we had a lot

8  of questions about the request.  We did not feel we had

9  enough information, but we wanted to work with them to

10  try to get the evidence together so that we could get

11  sufficient evidence for us to move forward with the

12  request.

13  Q    Okay.  You mentioned that this continued over the

14  course of some time.  When was this all taking place?

15  A    This happened within many months after the first

16  receipt of the extradition request, through the fall of

17  2016 into the spring, and thereafter in 2017.

18  Q    Ultimately, did the Office of International

19  Affairs reach a conclusion about this formal

20  extradition request that pertained to the four warrants

21  not having to do with the coup, if that's clear enough?

22  A    We have continued to work with the Turkish

23  government to establish sufficient evidence for us to

24  be able to move forward, and that conversation is

25  continuing with our colleagues at the State Department.

Olson - Direct

1  Q    And so -- but as of -- so what happened next then?

2       Sorry.  As part of this process that we're talking

3  about, what was the next significant event?

4  A    In October 2016, attorney general, Loretta Lynch,

5  met with the minister of justice of Turkey.

6  Q    Actually, if we can, back up for one second.

7  A    Sure.

8  Q    Was there another request submitted to the --

9  A    Yes.

10 Q    Okay.  Now, do you know when that -- all right.

11 Sorry.

12      What was it that they sent, and when was that,

13 please?

14 A    In September 2016, we received another provisional

15 arrest request for Mr. Gulen.  This request related

16 specifically to the accusation that he orchestrated the

17 attempted coup in July 2016.

18 Q    And do you happen to remember the date in

19 September that that request was --

20 A    I believe that was September 9, 2016.

21 Q    And then what did you do with that request?

22 A    As with the other request, the team of attorneys

23 assigned to work on the request began the review of the

24 request.

25 Q    And based upon the documents or information that

Olson - Direct

1  the Turkish government had provided up until that

2  point, what did your office conclude?

3  A    We continued to engage with the Turkish government

4  to try to develop evidence so that we might be able to

5  move forward on the provisional arrest request because

6  our preliminary analysis was that it was insufficient

7  for us to proceed.

8  Q    Insufficient in what way?

9  A    It did not meet probable cause that Mr. Gulen had

10 orchestrated a coup in Turkey.

11 Q    And during these discussions, did you inform the

12 government of Turkey of this?

13 A    Multiple times.

14 Q    And about when would that have taken place?

15 A    Within a few weeks of having received the second

16 provisional arrest request.  This was ongoing along

17 with a review of the initial extradition request from

18 the Turks related to the precoup conduct.

19 Q    Mr. Olson, can you tell me:  What is the Council

20 of Ministers in Turkey?

21 A    The Council of Ministers is sort of like the

22 president's cabinet here in the United States.  It's an

23 advisory body to the president of Turkey.

24 Q    And do you know who the prime minister of Turkey

25 was in the summer of 2016?

Olson - Direct

1   A     I do.  It was Prime Minister Binali Yildirim.

2   Q     Could you take a look at Government's Exhibit 14B,

3   please?

4           MR. GILLIS:  Your Honor, excuse me.  May I

5   have a moment?

6           THE COURT:  Yes.

7   BY MR. GILLIS:

8   Q     Do you have 14B in front of you?

9   A     Yes.

10  Q     What is that, please?

11  A     That's a photograph of Prime Minister Yildirim.

12          MR. GILLIS:  Your Honor, I move to admit 14B.

13          THE COURT:  Any objection?

14          MR. MACDOUGALL:  No objection, Your Honor.

15          THE COURT:  14B is admitted.

16          MR. GILLIS:  Could we publish that?

17          THE COURT:  Yes.

18          MR. GILLIS:  Thank you, Your Honor.

19  BY MR. GILLIS:

20  Q     Do you know who the Turkish foreign minister was

21  in the summer 2016?

22  A     Yes.

23  Q     Who was that?

24  A     The foreign minister was Mevlut Cavusoglu.

25  Q     Would you take a look, please, at Government

Olson - Direct

1  Exhibit 9B.

2  A     That's a photograph of Mevlut Cavusoglu.

3            MR. GILLIS:  I move to admit that, Your

4  Honor.

5            THE COURT:  Any objection?

6            MR. MACDOUGALL:  No objection.

7            THE COURT:  9B is admitted.

8  BY MR. GILLIS:

9  Q     Could you compare the foreign minister of Turkey

10  to a post in the United States government?

11  A     The post is similar to that of the secretary of

12  state of the U.S. government.

13  Q     And do you know who the Turkish minister of

14  economy was --

15  A     I do.

16  Q     -- during the summer of 2016?

17  A     Yes.

18  Q     Who was that, please?

19  A     It was Nihat Zeybekci.

20  Q     And if you would, please look at Government's

21  Exhibit 14C.  Could you tell us what that is?

22  A     That's the minister of economy, Nihat Zeybekci.

23            MR. GILLIS:  Move to admit 14C.

24            THE COURT:  Any objection?

25            MR. MACDOUGALL:  No objection.

Olson - Direct

1          THE COURT:  14C is admitted.

2    BY MR. GILLIS:

3    Q    Do you know whether Turkish President Erdogan's

4    son-in-law had a position in the Turkish government in

5    the summer 2016?

6    A    I do.

7    Q    Do you know his name?

8    A    His name is Berat Albayrak.

9    Q    Would you take a look at Government Exhibit 28A,

10   please.

11   A    I don't have that.

12   Q    Exhibit 28A you don't have?

13   A    I don't have that here.

14        Thank you.

15          MR. GILLIS:  Thank you, Mr. Burns.

16          THE COURT SECURITY OFFICER:  Sorry about

17   that, Counsel.

18   BY MR. GILLIS:

19   Q    Who is that, please?

20   A    That's a photograph of Mr. Albayrak.  He was the

21   former minister of energy and natural resources for

22   Turkey.

23          MR. GILLIS:  And I move to admit Government's

24   Exhibit 28A.

25          THE COURT:  Any objection?

Olson - Direct

1          MR. MACDOUGALL:  No objection.

2          THE COURT:  28A is admitted.

3  BY MR. GILLIS:

4  Q    Are you familiar with something called the Third

5  Bridge?

6  A    Yes.

7  Q    And can you tell us what that is, please?

8  A    The Third Bridge was built in 2016, and before

9  that, it's a span that covers the Bosphorus Strait that

10 connects to Asia and Europe in northeast Turkey.

11 Q    Is it regarded pretty much as the divide between

12 Europe and Asia?

13 A    It is.

14 Q    Do you know how to spell that?

15 A    Which part?  The strait?

16 Q    The strait, I think for me it would be a problem.

17 But Bosphorus actually is --

18 A    I believe -- and please correct me if I'm wrong if

19 anybody knows -- B-O-S-P-H-O-R-U-S.

20 Q    And I'd ask you to look, please, at Government's

21 Exhibit 20A.  Would you tell us what that is, please?

22 A    That's the Third Bridge that I mentioned.

23         MR. GILLIS:  I move to admit 20A.

24         THE COURT:  Any objection?

25         MR. MACDOUGALL:  No objection.

Olson - Direct

1          THE COURT:   20A is admitted.

2   BY MR. GILLIS:

3   Q    Do you know when the Third Bridge opened?

4   A    It opened in approximately August 2016.

5   Q    Do you know the date in particular?

6   A    I'm afraid I don't.

7   Q    Do you know who attended the opening of the --

8   well, obviously, a lot of people attended the opening,

9   but anybody of note in the Turkish government attend

10  the opening?

11  A    President Erdogan and Prime Minister Yildirim both

12  attended the opening of the bridge.

13  Q    At what levels of government were these

14  discussions about the Gulen extradition taking place

15  between the U.S. government and the Turkish government?

16  A    They were being conducted at multiple levels.  At

17  the working level, which is my level, the

18  subministerial level, as well as the ministerial level.

19  So the attorney general of the United States.

20  Q    Okay.  And were there meetings at that high level?

21  A    There were.

22  Q    And can you tell us when those were and who was

23  involved?

24  A    In October 2016, Attorney General Loretta Lynch

25  met with the Turkish minister of justice, Bekir Bozdag.

1  Q    Okay.  After the change in administration, was

2  there another meeting with the attorney general?

3  A    Yes.  In March 2017, Attorney General Jeff

4  Sessions also met or had a phone call with the minister

5  of justice, Bozdag.  And he also met with Foreign

6  Minister Cavusoglu.

7  Q    And had the foreign minister been involved in

8  discussions with the U.S. Department of Justice

9  concerning Gulen's extradition?

10 A    To some extent, yes.

11            MR. GILLIS:  Your Honor, that's all I have.

12            THE COURT:  All right.  Thank you.

13            Cross, Mr. MacDougall?

14            MR. MACDOUGALL:  Thank you, Your Honor.

15                      CROSS-EXAMINATION

16 BY MR. MACDOUGALL:

17 Q    Good morning, Mr. Olson.

18 A    Good morning.

19 Q    My name is Mark MacDougall.  I don't think you and

20 I have ever met before.  Have we?

21 A    I don't think so.

22 Q    I'm here representing, along with my colleagues,

23 the defendant in this case, Bijan Rafiekian.  I just

24 want to go over a couple of the things that you told

25 Mr. Gillis.  You talked in great detail about an

Olson - Cross

1  extradition treaty between the United States and

2  Turkey.  That was the bulk of your testimony.

3  A    Correct.

4  Q    And that's a bilateral treaty; is that right?

5  A    Correct.

6  Q    That means it goes in both directions?

7  A    Correct.

8  Q    Turkey asks us for things.  It could be evidence.

9  It could be extradition.  The United States asks Turkey

10 for things.  The same formula?

11 A    Correct.

12 Q    And the United States has lots of those treaties;

13 doesn't it?

14 A    It has a number of them, yes.

15 Q    Okay.  Some of them -- many of them are bilateral

16 country to country.  Some of them are multilateral with

17 large groups of countries all subscribing to the same

18 treaty.  Would you agree with that?

19 A    Correct.

20 Q    Okay.  And your office, the Office of

21 International Affairs, handles those requests in both

22 directions?

23 A    Correct.

24 Q    You are essentially the national office, the

25 national sponsor.  What's the term of art that's used

Olson - Cross

1  for that?

2  A    The central authority.

3  Q    The central authority for the United States.

4  Good.  Okay.

5      Now, extradition requests are sometimes granted,

6  and sometimes they're not; is that right?

7  A    Yes.

8  Q    All in the ordinary course of business?

9  A    Yes.

10 Q    And in this case, your office denied the request

11 for the extradition of Mr. Gulen?

12 A    No.

13 Q    I'm sorry?

14 A    We did not deny the request.

15 Q    You have not acted on it?

16 A    We have not made a final decision on the request.

17 Q    Okay.  Tell me what your current position is, your

18 office's current position on the Gulen extradition

19 request.

20 A    Our current position is to continue to work with

21 the government of Turkey to elicit evidence.

22 Q    And Turkey followed the procedures in the MLAT in

23 their efforts to obtain the extradition of Mr. Gulen;

24 didn't they?

25 A    Yes.

Olson - Cross

1    Q    They submitted evidence to your office?

2    A    Correct.

3    Q    The submitted declarations?

4    A    Correct.

5    Q    They responded to your questions?

6    A    For the most part.

7    Q    They did what a bilateral partner is supposed to

8    do in a Mutual Legal Assistance Treaty or an

9    extradition treaty; is that right?

10   A    Correct.

11   Q    Okay.  And rejections happen all the time; don't

12   they?

13   A    I don't know about all the time, but they happen

14   from time to time, yes.

15   Q    Well, requests from the United States to bilateral

16   and multilateral MLAT partners, other countries with

17   which we have those treaties, are rejected.  For

18   example, would you agree that no country in the

19   European Union will extradite anyone to the United

20   States if it's possible that that person will face the

21   death penalty?  That's correct; isn't it?

22   A    That's my understanding.

23   Q    That's true.  Well, that's your office, and that's

24   your business.  That's true, right?

25   A    Right.

Olson - Cross

1  Q    Okay.  And at the same time, many countries will

2  not extradite their own citizens at all; is that right?

3  A    Some countries will not extradite their own

4  citizens, correct.

5  Q    And so our request, if there's a possibility of

6  the death penalty, if it's a citizen of a country that

7  doesn't extradite its own citizens -- our requests are

8  rejected just like Turkey's has not been acted on;

9  isn't that right?

10 A    That is not exactly correct.  Countries may ask

11 for certain assurances from us before they may

12 extradite, such as we would not impose the death

13 penalty.

14 Q    But if we won't give them that assurance, that

15 request is not granted; is it?

16 A    Probably not, no.

17 Q    Probably not.

18     Now, you make your decisions whether to act on an

19 extradition request or not, whether to hold one up or

20 not, whether to continue to work on it or not based

21 upon the law; don't you?

22 A    Correct.

23 Q    You do it based upon the form of the treaty, the

24 Mutual Existence Treaty, correct?

25 A    In terms of the treaty, correct.

Olson - Cross

1  Q    And whatever U.S. statutory law may be brought to

2  bear with respect to how that treaty is to be enforced?

3  A    Right, and the Constitution as well.

4  Q    And the Constitution.

5       So that's the universe of standards that you have

6  in making your decisions about how to treat an

7  extradition request?

8  A    Correct.

9  Q    Okay.  It's not based on PR; is it?

10 A    No.

11 Q    It's not based on lobbying; is it?

12 A    No.

13 Q    You don't have lobbyists lining up at your door to

14 say, Please grant or deny this extradition request?

15 You don't even tolerate that; do you?

16 A    I won't say that never happens, but that's

17 something that is not necessarily considered.

18 Q    And you don't make your decisions based upon that?

19 A    Correct.

20 Q    And it's not public opinion either?  It's not what

21 you read in the newspaper?  You don't -- in the middle

22 of assessing an extradition request, you don't read

23 something in the newspaper and say, Wow, that really

24 changes my mind; do you?  You follow the law, the

25 treaty, and the Constitution; is that right?

Olson - Cross

1    A    That's correct.

2    Q    And that's it?

3    A    That's correct.

4    Q    Okay.  Now, Mr. Rafiekian, the defendant in this

5    case, never attempted to persuade your office to

6    approve Gulen's extradition; did he?

7    A    I'm not aware of him doing that.

8    Q    Never showed up at your door?

9    A    I'm not aware of him doing that.

10   Q    Never wrote you a letter?

11   A    I'm not aware.

12   Q    Never came to see you?

13   A    I'm not aware.

14   Q    You don't even know him, do you, other than from

15   this case?

16   A    I don't.

17   Q    You don't.

18        Now, in fact, the Gulen case was not unusual

19   except it was very high profile?  Is that what made it

20   out of the ordinary?

21   A    It was out of the ordinary.  It was high profile,

22   and it was quite lengthy.

23   Q    Okay.  And when the new administration was

24   preparing to take office in December, January into

25   February -- December 2016, January and February of

Olson - Cross

1  2017, this was one of the items that you highlighted --

2  your office highlighted for the transition as an

3  important matter in your office?

4  A    We did.

5  Q    Because you were asked to tell us:  What are the

6  important things going on as the new administration

7  takes office?

8  A    Correct.

9  Q    Okay.  Now, Turkey is a major U.S. ally; isn't it?

10 A    As far as I'm aware from my little position, yes.

11 Q    But you just described the attention that this

12 matter received all the way up to the attorney general

13 of the United States talking to the minister of justice

14 in Turkey, correct?

15 A    Correct.

16 Q    Okay.  So it was a big deal, and it was a big deal

17 because the Turkish government is an important ally of

18 the United States?

19 A    It's an important case, yes.

20 Q    Okay.  Now, would you agree with me that the

21 Department of State says that Turkey is an important

22 U.S. security partner?  Do you agree with that?

23 A    Yes.

24 Q    That Turkey is engaged in intensive efforts to

25 defeat terrorist organizations both inside and outside

Olson - Cross

1  its borders?  Do you agree with that?

2  A    That's my understanding.

3  Q    The State Department also says Turkey contributes

4  to international security alongside U.S. forces in

5  Afghanistan, the seas bordering Somalia and the

6  Mediterranean, and is a key partner for U.S. policy in

7  the surrounding region.  Do you agree with that?

8  A    I am not aware of the earlier parts of your

9  statement, but I do agree they are a key partner in the

10  region.

11  Q    Okay.  Now, it's also -- the government of Turkey

12  is also a government and an administration that has

13  regularly cooperated with the Department of Justice to

14  which you're an official, right?

15  A    Yes.

16  Q    Actually, the FBI maintains a legat, a legal

17  attaché office, in the embassy in Ankara; isn't that

18  correct?

19  A    Correct.

20  Q    And isn't it correct that the FBI's efforts as

21  described by the embassy in Turkey cover, with the

22  exception of narcotics investigations which are covered

23  by the DEA, all statutory violations investigated by

24  the FBI and the United States working directly with

25  different departments of the Turkish national police?

Olson - Cross

1   A     Correct.

2   Q     It's an active relationship?

3   A     Correct.

4   Q     And it's a good relationship because the United

5   States needs things from Turkey just as Turkey needs

6   things from the United States?

7   A     Correct.

8   Q     And sometimes we grant them, and sometimes we

9   don't?

10  A     Correct.

11  Q     And sometimes we wait and decide later?

12  A     Correct.

13  Q     And that's what's going on here; isn't it?

14  A     It's an effort -- the current effort right now is

15  an ongoing effort to work with the Turkish government.

16  Q     Now, Mr. Olson, your office, the Office of

17  International Affairs at the Justice Department, also

18  handles mutual legal assistance activities aside from

19  extradition?

20  A     Correct.

21  Q     And that would include -- often includes requests

22  for evidence and requests for testimony from partners

23  like Turkey that have MLAT relationships with the U.S.?

24  A     That's correct.

25  Q     And those relationships, just like extradition, go

Olson - Cross

1  in both directions.  The United States is seeking

2  evidence from other countries with which it has MLAT,

3  Mutual Legal Assistance Treaty, relationships, and vice

4  versa.  Those countries sometimes come to the United

5  States seeking the same evidence?

6  A    That's correct.

7  Q    Now, the U.S., as you've testified, has a Mutual

8  Legal Assistance Treaty with Turkey, and that's been in

9  effect since January 1981.  I don't expect you to know

10 that off the top of your head, but does that sound

11 about right?

12 A    That's right, yes.

13 Q    It was signed into law by President Jimmy Carter?

14 A    Correct.

15 Q    I'd like you to please take a look at Defense

16 Exhibit 97 marked for identification.  It should be on

17 the screen.  Do you recognize that document?

18 A    I do.

19 Q    What is it?

20 A    It's a copy of the extradition and Mutual Legal

21 Assistance Treaty with Turkey.

22         MR. MACDOUGALL:  Your Honor, I'd move the

23 admission of Defense Exhibit 97 for identification

24 based upon judicial notice.

25         THE COURT:  All right.  Any objection?

1          MR. GILLIS:  No, Your Honor.

2          THE COURT:  All right.  Without objection,

3    Defense Exhibit 97 is admitted.

4    BY MR. MACDOUGALL:

5    Q    Now, Mr. Olson, would you take a look at

6    Section 2, Article 7 of that treaty?  Do you have that

7    in front of you?

8    A    I'm sorry.  Article 7, Section 2 you said?

9    Q    Yes.

10   A    Okay.

11   Q    That provides for the central authority of the

12   United States, which is your office, to collect

13   evidence for criminal cases in Turkey; is that right?

14   A    No.

15   Q    Okay.  Can you find the section that does?

16   A    I'm sorry?

17   Q    Would you point out to me the section that permits

18   the United States to request the production of evidence

19   in criminal cases in Turkey?

20   A    That's a later part of the treaty if you're

21   referring to mutual legal assistance.

22   Q    Which section is that?

23   A    I think it's further down.  I'm afraid I don't

24   know the exact article off the top of my head.

25   Q    Have a look at Section 2, Article 24.

Olson - Cross

1    A      Okay.

2    Q      Contents of requests?

3    A      Uh-huh.

4    Q      So that provision essentially allows the United

5    States to obtain evidence in criminal cases from the

6    government of Turkey with the assistance of the Turkish

7    government?

8    A      Correct.

9    Q      And that's what this treaty does in part?

10   A      It does.

11   Q      And that would include banking records; is that

12   right?

13   A      It does.

14   Q      So this treaty, the Mutual Legal Assistance

15   Treaty, permits the United States to request assistance

16   of the government of Turkey in obtaining financial and

17   banking records, but the Department of Justice would

18   have to make that request; is that right?

19   A      If we needed evidence for a criminal case, yes, we

20   would generally make an MLAT request.

21   Q      And that would be done in the ordinary course of

22   your office --

23   A      Correct.

24   Q      -- of the Turkish government for banking records?

25   A      Correct.

Olson - Redirect

1          MR. MACDOUGALL:  Nothing further, Your Honor.

2    Thank you.

3          THE COURT:  All right.  Thank you.

4          Any redirect?

5               REDIRECT EXAMINATION

6    BY MR. GILLIS:

7    Q    Mr. Olson, as we mentioned, MLAT requests occur in

8    connection with ongoing investigations?

9    A    Correct.

10   Q    Those would include investigations being conducted

11   by a grand jury?

12   A    Correct.

13   Q    And would they be covered by some sort of secrecy

14   requirement?

15   A    There's a provision within all MLATs, including

16   the Turkish MLAT, that requests confidentiality for the

17   request itself, as well as anything that's being

18   sought.

19   Q    And we make that request why?

20   A    When or why?

21   Q    Why?

22   A    Well, we make that request to preserve the

23   integrity of an ongoing investigation or prosecution.

24   Q    And do countries always honor that request for

25   confidentiality?

Olson - Redirect

1  A     For the most part, they do, but not always.

2  Q     And, in fact, in some countries, do their

3  procedures require that the person involved be notified

4  of the request so that they can contest it?

5  A     In some countries, yes, that happens.

6           MR. GILLIS:  Nothing further, Your Honor.

7           THE COURT:  All right.  Thank you.

8           May the witness be excused?

9           MR. GILLIS:  Yes, sir.

10          THE COURT:  All right.  Mr. Olson, you're

11  excused.  Do not discuss your testimony outside of the

12  courtroom with any other witness.

13          THE WITNESS:  Thank you.

14          THE COURT:  The government will call its next

15  witness.

16          MR. GILLIS:  Actually, Your Honor, if I could

17  ask Mr. Olson to be subject to recall.

18          THE COURT:  All right.  Mr. Olson, remain

19  available.  You may be subject to recall.

20          THE WITNESS:  Yes, sir.

21       (The witness stands aside.)

22          THE COURT:  All right.

23          MR. GILLIS:  Your Honor, we call Suthahar

24  Nadarajah.

25          THE COURT:  All right.  Mr. Nadarajah will

1   come forward, please.

2      SUTHAHAR NADARAJAH, PLAINTIFF'S WITNESS, AFFIRMED

3                      DIRECT EXAMINATION

4   BY MR. GILLIS:

5   Q    Good morning, sir.

6   A    Good morning.

7   Q    Could you tell us your name, please.

8   A    My name is Suthahar Nadarajah.

9   Q    Mr. Nadarajah, first, am I pronouncing your name

10  correctly?

11  A    You are pronouncing it correctly.

12  Q    Where do you work, sir?

13  A    I work at Covington & Burling.

14  Q    And what's your position there?

15  A    I am a senior project manager for the litigation

16  support services.

17  Q    Are you aware that Lieutenant General Michael T.

18  Flynn and the Flynn Intel Group were clients of

19  Covington?

20  A    Yes, that's correct.

21  Q    As part your job, did you examine certain Flynn

22  and Flynn Intel Group e-mails that had been stored

23  electronically?

24  A    Yes, that's correct.

25  Q    What were you asked to do with those e-mails?

Nadarajah - Direct

1  A    I was asked to process them and load them into a

2  review platform for associates to review those

3  documents.

4  Q    Okay.  And what was that program?

5  A    The processing software is called Law, L-A-W.

6  Q    Yes, sir.

7  A    And the review platform is called Ringtail.

8  Q    Ringtail?

9  A    Yes, Ringtail, R-I-N-G-T-A-I-L.

10 Q    Like a raccoon?

11 A    Yes.

12 Q    And so you said available for the associates to

13 review it.  Do you mean associates of the law firm?

14 A    Yes, Covington's associates.

15 Q    These two programs, Ringtail and Law, are they

16 programs that you've worked with quite a bit?

17 A    Yes, I have.

18 Q    And can you tell us in not too technical terms

19 since there may be computer programmers on the jury,

20 but none of us all -- we are not all.  Could you tell

21 us in not too technical terms what you did using these

22 software packages?

23 A    Okay.  So when we get the e-mail data, the

24 client's e-mail data, we use the software, Law, to

25 process them.  The process involves converting the

Nadarajah - Direct

1   e-mails into separate documents, an e-mail and

2   attachment as separate documents, and then also to

3   extract the metadata -- metadata is like the to, from,

4   CC -- and also to image these documents for production.

5   So all of those steps are done through the processing

6   software called Law.

7       And once Law has completed those steps, all those

8   imaged documents, metadata and everything, gets loaded

9   into the Ringtail database.  The Ringtail is the review

10  platform.  And once it's on Ringtail, it will be able

11  to -- the associates can review those documents.

12  Q    Okay.  And are the e-mails contained in any

13  particular sort of file?

14  A    E-mails, when we get the e-mails -- usually we get

15  them in PSD format or in-box format.  Those are formats

16  where the e-mails are in a container.  So the Law

17  processing software basically extracts those e-mails

18  from those containers.

19  Q    Is that a common way of storing e-mails in in-box?

20  A    Yeah, in-box and PSD is a common way of storing

21  e-mails.  That's correct.

22  Q    Were some of the e-mails that you reviewed

23  encrypted in some way?

24  A    Yes, that is correct.

25  Q    And were you able to read them at that time?

Nadarajah - Direct

1  A     At that time, we were not able to read them.

2  Q     Were you able to decrypt the e-mails at some

3  point?

4  A     Yes, at some point we were able to decrypt them.

5  Q     And how did you do that?

6  A     We were able to contact the encryption software

7  company called Virtru and work with them, and they were

8  able to give us the decryption key.  And also, they

9  gave us instructions, step-by-step instructions how to

10  decrypt those e-mails.  And then we follow those

11  instructions, and we were able to decrypt the e-mails.

12  Q     Have you used the term tool before in connection

13  with this process with Virtru?

14  A     No.  This was the first time we used -- you mean

15  the decryption tool?

16  Q     I mean, is that what they provided to you?

17  A     Yeah.  It's called a CLI, command line interface.

18  Command line interface, short for CLI.

19  Q     And could we refer to that as the decryption tool?

20  A     That is correct.

21  Q     And did some of the e-mails contain attachments?

22  A     That is correct.

23  Q     I believe you mentioned it briefly, but could you

24  tell us how the software that you used handles

25  attachments to an e-mail?

Nadarajah - Direct

1  A    All right.  So the software, how it handles the

2  e-mails and attachments is it always extracts the

3  e-mail, and the very next document will be the

4  attachment.  So when it creates a document IED, it will

5  always be the attachment to the parent e-mail.

6  Q    And at some point, were you asked to assemble

7  those e-mails for a production of some sort?

8  A    Yes, that's correct.  So once the associates

9  review the documents, they tag the documents, and they

10 tell me to finalize for production.  So I isolate those

11 documents and create a production set.

12 Q    Basically, that process is what you call a

13 production?

14 A    That is correct.  It involves -- it encompasses

15 putting a Bates number to the documents and any

16 confidential label that has to be stamped on the

17 document and also creating a text file for the

18 corresponding document.  Those steps are involved when

19 we do a production.

20 Q    Okay.  And I believe you mentioned a Bates number.

21 Can you tell us what that is, please?

22 A    Yes.  So when we do a production, each document

23 should get a unique Bates number.  So we give a prefix

24 and also a unique number, a stocking number.  So the

25 software Ringtail, when it does the production, it

Nadarajah - Direct

1  automatically stamps each document with the Bates

2  number, the prefix and the number.  And each page of

3  the document will have this unique Bates number.

4  Q    And is that something that you can do also with

5  electronic documents, such as e-mails?

6  A    That is correct.

7  Q    Did you do that in this case?

8  A    That's correct.

9  Q    And are those Bates numbers applied sequentially

10 to the documents?

11 A    Yes.  The Bates numbers are applied sequentially

12 to the documents.  That means if you have an e-mail and

13 attachment, the e-mail and attachment would have

14 sequential numbers right after the e-mail.

15 Q    And we talked before this today; is that right?

16 A    Yes, that's correct.

17 Q    Could you look, please, at Government's

18 Exhibit 45 -- I beg your pardon -- 45A, please?

19 A    Yes, I'm looking at it.

20 Q    Okay.  Can you tell us what that is, please?

21 A    It's an e-mail that was produced by Covington.

22 Q    And how can you tell it was produced by Covington?

23 A    Because it has our Bates number that starts with

24 FIG, underscore, EDVA, and the Bates number.

25 Q    And who is that e-mail from?

Nadarajah - Direct

1    A    It's from Bijan Kian.

2    Q    And to whom is it to?

3    A    To Ekim Alptekin and Bob Kelley.

4    Q    And what is the date of that e-mail?

5    A    November 2, 2016.

6    Q    Did I ask you the subject of the e-mail?

7    A    No.

8    Q    What is the subject?

9    A    It's "Getting Turkey Wrong."

10   Q    And is there an attachment to it?

11   A    Yes, it has an attachment.

12              MR. GILLIS:  Your Honor, I move to admit 45A.

13              THE COURT:  Any objection?

14              MR. TROUT:  No, Your Honor.

15              THE COURT:  Without objection, 45A is

16   admitted.

17   BY MR. GILLIS:

18   Q    And that number in the lower right, the one that

19   begins FIG_EDVA, can you tell us what that is?

20   A    That is our Covington Bates numbers that we use to

21   number the documents when we did our production.

22   Q    The FIG_EDVA, is that a set of initials that you

23   chose?

24   A    Yeah.  The case team chose the prefix for the

25   Bates number.

Nadarajah - Direct

1  Q    So you provide a different one for each matter?

2  A    Yes, that's correct.

3  Q    And was the application of this FIG_EDVA Bates

4  number, was it applied to all of the e-mails in the

5  production, all of the attachments?

6  A    Yes, that's correct.

7  Q    Do you see that Bates stamp that begins *U.S. v.*

8  *Kian*?

9  A    Yes.

10 Q    Did you put that on there?

11 A    No.

12 Q    Do you know what that is?

13 A    No.

14 Q    Now, looking at Government's Exhibit 45A, does it

15 show that it has an attachment?

16 A    Yes, it does.

17 Q    And where do you see that?

18 A    On the top of -- next to the subject line, it has

19 an attachment field, and then it gives the name of the

20 attachment.

21 Q    Would you turn to Government's Exhibit 45B,

22 please.

23 A    Yes.

24 Q    What is that, please.

25 A    That is the attachment of the e-mail -- of the

1  previous e-mail.

2          MR. GILLIS:  Your Honor, I move to admit 45B.

3          THE COURT:  Any objection?

4          MR. TROUT:  I'm sorry.  No.

5          THE COURT:  45B is admitted.

6  BY MR. GILLIS:

7  Q    So how can you tell that it's an attachment to

8  45A, the e-mail?

9  A    Because it has -- considering the very next Bates

10 number of the parent e-mail.  So it would be an

11 attachment to the parent e-mail.

12 Q    If you would, look at Government's Exhibit 104A.

13 Do you have it in front of you there, sir?

14 A    Yes, I have it.

15 Q    Can you tell us what that is?

16 A    It's an e-mail from --

17 Q    And who is it to?

18 A    It's to Bijan.

19 Q    And who is it from?

20 A    It's from Flynn.

21 Q    And what's the date of the e-mail?

22 A    The date of the e-mail is September 18, 2016.

23 Q    And what is the subject of that e-mail?

24 A    The subject is saying -- refers to talking points.

25          MR. GILLIS:  Your Honor, I move to admit

1   104A.

2           THE COURT:  Any objection?

3           MR. TROUT:  Your Honor, could we approach

4   briefly?

5           THE COURT:  Yes.

6       (Conference at the bench, as follows:)

7           THE COURT:  Yes.

8           MR. TROUT:  Yes.  Thank you, Your Honor.

9           Now we're getting into a hearsay issue

10  because this is a statement by Flynn to Alptekin.  It

11  may be admitted for a limited purpose, but we have our

12  hearsay objection.  We would ask the Court to issue an

13  appropriate limiting instruction until there's a ruling

14  on the hearsay.  This is going to be an ongoing issue

15  as there will be other similar situations where

16  Alptekin is making a statement.

17          THE COURT:  Right.

18          MR. TROUT:  It's one thing, but then there

19  might be a response.  We want to make sure that it's an

20  appropriate limiting instruction.

21          MR. GILLIS:  Your Honor, yes.  We do, at

22  least at this point, ask to admit it for the purpose of

23  the effect on the listener, the defendant.

24          THE COURT:  Right.

25          MR. GILLIS:  We will, of course, seek to

1  produce it as substantive evidence.

2          THE COURT:  All right.  I'm going to admit it

3  with a limiting instruction.  Then to the extent we

4  deal with this other issue and it needs to be modified,

5  I can so instruct the jury.

6          MR. GILLIS:  Thank you, Your Honor.

7          MR. TROUT:  Thank you, Your Honor.

8      (Proceedings continued in open court, as follows:)

9          MR. GILLIS:  Your Honor, I move to admit

10  Government's Exhibit 104A.

11          THE COURT:  All right.  Without objection,

12  Exhibit 104A is admitted.

13          Ladies and gentlemen, the document that I've

14  just admitted is an e-mail communication from Michael

15  Flynn to Mr. Rafiekian.  It contains statements by

16  Mr. Flynn to Mr. Rafiekian.  As such, these are

17  statements by someone who is not testifying here in

18  court.  These are what we call hearsay statements.

19  They are statements by someone who is not testifying in

20  court and subject to cross-examination.

21          So for the purposes of this document, it's

22  not being admitted and you should not consider it as

23  proof of the accuracy or the truth of what is stated in

24  this e-mail.  It is being admitted solely for the

25  purpose of establishing what information was conveyed

Nadarajah - Direct

1   to Mr. Rafiekian for whatever bearing that may have on

2   the issues in the case.

3            MR. GILLIS:  Thank you, Your Honor.

4   BY MR. GILLIS:

5   Q    So can you tell us:  Does Government's

6   Exhibit 104A have an attachment?

7   A    Yes, it does.

8   Q    Where do you see that?

9   A    On the top of the -- underneath the subject line,

10  you have an attachment field, and it says the name of

11  the attachment.

12  Q    Okay.  And can you look at Government's

13  Exhibit 104 -- pardon me.

14           MR. GILLIS:  I beg your pardon, Your Honor.

15  BY MR. GILLIS:

16  Q    Exhibit 104B, can you tell us what that is?

17  A    That is an attachment to the previous e-mail.

18  Q    And how can you tell that?

19  A    From the Bates number, which is the number from

20  the parent e-mail.

21           MR. GILLIS:  I move to admit Government's

22  Exhibit 104B.

23           THE COURT:  Any objection?

24           MR. TROUT:  The same comment.

25           THE COURT:  All right.  Exhibit 104B is

Nadarajah - Direct

1   admitted.

2          Again, ladies and gentlemen of the jury, this

3   is being admitted for the purpose of what information

4   is being provided to Mr. Rafiekian.

5          MR. GILLIS:  May we give the jury a moment to

6   review it briefly?

7          THE COURT:  Yes, that's fine.

8          All right.

9          MR. GILLIS:  Thank you, Your Honor.

10  BY MR. GILLIS:

11  Q    If you would, please look at Government's

12  Exhibit 118A, please.  Do you have that in front of

13  you?

14  A    Yes.

15  Q    Can you tell us what that is?

16  A    It's an e-mail from Michael Flynn to Bijan Kian.

17  Q    And what is the date of that e-mail?

18  A    It's October 15, 2016.

19  Q    And the subject?

20  A    The subject says reference to Inovo.

21         MR. GILLIS:  I move to admit 118A, Your

22  Honor.

23         THE COURT:  All right.  118A will be admitted

24  with the same limiting instruction as evidence solely

25  of what was provided to Mr. Rafiekian.

Nadarajah - Direct

1  BY MR. GILLIS:

2  Q    And, sir, is this, as well as the last exhibits,

3  is this one that came from the Flynn e-mails that you

4  processed?

5  A    That is correct.

6  Q    And how do you tell that?

7  A    From the Bates prefix and the Bates number,

8  FIG_EDVA_000646.

9  Q    Please look at Government's Exhibit 118B.  Do you

10 have that?

11 A    Yes, I have it.

12 Q    And can you tell us what that is, please?

13 A    It's an attachment to the previous e-mail.

14 Q    And how can you tell that?

15 A    From the consecutive Bates number from the parent

16 e-mail.

17          MR. GILLIS:  I move to admit 118B, Your

18 Honor.

19          THE COURT:  All right.  Any objection?

20          MR. TROUT:  No.

21          THE COURT:  Exhibit 118B is admitted.

22          MR. GILLIS:  Could we have a moment for them?

23          THE COURT:  Yes.

24          All right.

25 BY MR. GILLIS:

Nadarajah - Direct

1   Q     Would you, please, look at Government's

2   Exhibit 162.  Have you seen that before?

3   A     Yes.

4   Q     Can you tell us what that is?

5   A     These are exhibit numbers of the productions done

6   by Covington.

7             MR. GILLIS:  I move to admit Government's

8   Exhibit 162.

9             THE COURT:  Any objection?

10            MR. TROUT:  No, Your Honor.

11            THE COURT:  Without objection, Exhibit 162 is

12  admitted.

13  BY MR. GILLIS:

14  Q    Mr. Nadarajah, did you compare the government

15  exhibits from that that are listed there to the

16  production documents by looking at the FIG_EDVA number?

17  A     That is correct.

18  Q     And so these are all documents from the FIG_EDVA

19  production?

20  A     That is correct.

21            MR. GILLIS:  Your Honor, I move to admit all

22  of the documents that are listed there in 162.

23            THE COURT:  All right.  Is there any

24  objection?

25            MR. TROUT:  Your Honor, we may have a similar

Nadarajah - Cross

 1  objection.  I just haven't been able to go through it.

 2          THE COURT:  All right.  I'm going to

 3  conditionally admit those subject to your review.

 4          MR. TROUT:  Thank you.

 5          THE COURT:  All right.

 6          MR. GILLIS:  Thank you, Your Honor.

 7          Your Honor, that's all I have.

 8          THE COURT:  All right.  Thank you.

 9          Mr. Trout.

10          MR. TROUT:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12  BY MR. TROUT:

13  Q    Mr. Nadarajah, my name is Bob Trout.  I represent

14  Mr. Kian.  We haven't met before; have we?

15  A    No.

16  Q    Now, as I understand it, you were basically in

17  charge of essentially processing all the data that came

18  from Flynn Intel Group; is that correct?

19  A    That is correct.

20  Q    And there were no restrictions at all on what you

21  could process, what you could review?  You were

22  essentially tasked with getting everything and getting

23  it into a reviewable, usable form; is that correct?

24  A    Yes.

25  Q    And all of these documents came from Flynn Intel

Nadarajah - Cross

1   Group; is that correct?

2   A    I can't say that because it was handed over to me

3   from the case team.  So they gave us the -- they gave

4   me the in-box of all the data.  So I can't confirm that

5   everything came from FIG.

6   Q    But your understanding is that you got personal

7   information from Mr. Kian's computer; is that correct?

8   A    That is correct.

9   Q    Do you know how many e-mails there were that

10  you-all processed from his computer?

11  A    I can't recall the numbers.

12  Q    Well, was it over 10,000?

13  A    No, I can't recall.

14  Q    And you also got e-mails from every other one of

15  the individuals that used a Flynn Intel Group computer;

16  is that correct?

17  A    I'm not quite sure if I got from all the

18  individuals, but we got some of the custodian e-mail

19  data as well.

20  Q    That would include General Flynn?

21  A    Yes, that's correct.

22  Q    As well as Mr. Kian?

23  A    Yes, that's correct.

24  Q    Did it include Mr. McCauley?  Do you know?

25  A    I can't recall his name.

1  Q     What about Mr. Boston?  Do you recall?

2  A     I can't recall Boston's name.

3  Q     Now, you made mention of the fact that some of the

4  e-mails were encrypted, correct?

5  A     That's correct.

6  Q     You are aware, are you not, that the issue of

7  cyber security is a very important issue that is a big

8  problem in the United States; is that correct?

9  A     That's correct.

10 Q     And so it would be unsurprising that companies

11 would be taking steps to increase their cyber security

12 and the security of their data; is that correct?

13 A     That's correct.

14 Q     So it was unremarkable to you that there would be

15 encrypted e-mails?

16 A     That's correct.

17 Q     And you were not put on any limitation in terms of

18 the expense involved in trying to decrypt the e-mails;

19 is that correct?

20 A     Expense?  Can you clarify?

21 Q     Well, there was an expense associated with

22 decrypting the encrypted e-mails, correct?

23 A     Correct.

24 Q     And no one suggested you that you should not go to

25 the expense of getting the data in the encrypted

Nadarajah - Redirect

1   e-mails?

2   A     That's correct.

3   Q     In fact, they wanted you to decrypt everything,

4   correct?

5   A     That is correct.

6              MR. TROUT:  Thank you.  No further questions.

7              THE COURT:  All right.  Any redirect?

8                    REDIRECT EXAMINATION

9   BY MR. GILLIS:

10  Q     Mr. Nadarajah, among the e-mails, was it your

11  understanding that they came either from Flynn Intel

12  Group or from General Flynn but they were all from

13  Covington's client, Flynn or Flynn Intel Group?

14  A     Yeah, it's from Covington's client.

15  Q     Did I understand you to say that you actually

16  analyzed Mr. Rafiekian's laptop or his individual

17  computers?

18  A     No, I did not analyze them.

19  Q     You did not?

20  A     No.

21             MR. GILLIS:  That's all I have, Your Honor.

22             THE COURT:  All right.  Thank you.  May the

23  witness be excused?

24             MR. GILLIS:  Your Honor, I would like him

25  subject to recall, please.

1          THE COURT:  All right.  You remain subject to

2   recall.  Do not discuss your testimony outside of the

3   courtroom with any other witness.

4          THE WITNESS:  All right.

5      (The witness stands aside.)

6          THE COURT:  The government will call its next

7   witness.

8          MR. GILLIS:  Yes, Your Honor.  We call Kim T.

9   Rosecrans, please.

10          THE COURT:  All right.  Mr. Rosecrans will

11   come forward, please.

12          Mr. Gillis.

13          MR. GILLIS:  Thank you, Your Honor.

14      KIM T. ROSECRANS, PLAINTIFF'S WITNESS, SWORN

15                  DIRECT EXAMINATION

16   BY MR. GILLIS:

17   Q    Sir, would you tell us your name, please.

18   A    My name is Kim Rosecrans.

19   Q    Mr. Rosecrans, where do you work?

20   A    I work for the FBI as an information technology

21   specialist, forensic examiner.

22   Q    And when did you start with the FBI?

23   A    I joined the FBI in 1998.

24   Q    I'm sorry?

25   A    In 1998.

Rosecrans - Direct

1  Q    Okay.  Could you try to keep your voice up, sir?

2  A    Okay.  Is -- it's not coming?

3  Q    No.  I just want to make sure that everyone can

4  hear you.

5  A    Okay.  February of 1998.

6  Q    And can you tell us about your background with the

7  FBI, please?

8  A    Okay.  When I first joined the FBI, I joined a

9  software development project office, and then in

10 October of 2000, I joined the Computer Analysis

11 Response Unit.  And I was a tester in the test and

12 evaluation group for the unit.

13 Q    Just one moment.  If you could, tell us:  What

14 does the testing and evaluation unit do?

15 A    The CART unit, which is the Computer Analysis

16 Response Team, we test our utilities to make sure that

17 they work as advertised.

18 Q    And you were part of the unit that did that?

19 A    Yes.  I was part of the group within the unit that

20 did that, yes.

21 Q    And so -- I'm sorry.  Continue, please.

22 A    Okay.  So then in November 2002, I became a

23 full-time forensic examiner in training.  And then in

24 March of 2005, I became a fully-certified CART

25 examiner.

Rosecrans - Direct

1  Q    And what do you do now in your current position?

2  A    I am a forensic examiner.

3  Q    And tell us what you do.

4  A    Okay.  Forensic examiners in the CART Unit will

5  assist case agents in going to search sites and

6  performing searches for digital media.

7  Q    So you yourself go to the place or the residence

8  or the business to be searched?

9  A    Yes, sir.

10  Q    And you go why?

11  A    Say again?

12  Q    Why is it that you go on those searches?

13  A    To assist in collecting digital evidence.

14  Q    And then apart from actually going and seizing the

15  electronic evidence, what else do you do?

16  A    We also examine the evidence that would be

17  collected and sometimes -- particularly within my unit,

18  because we are at the headquarters Laboratory Division,

19  we go and actually have evidence sent to us,

20  particularly for the larger cases.

21        MR. GILLIS:  Your Honor, I'm sorry.  I'm

22  having trouble hearing.  Is the microphone -- this one,

23  is that the microphone for the --

24        THE COURT:  Can you-all hear the witness?

25        A JUROR:  Yes.

1        THE COURT:  Just try to keep your voice up a
2   little bit.
3        THE WITNESS:  Yes, sir.
4   BY MR. GILLIS:
5   Q    So how do you handle electronic evidence that is
6   seized during a search?
7   A    Typically, we go and image it, if at all possible,
8   right on-site.  Sometimes the digital evidence is
9   actually seized, and then it would be processed back in
10  the lab and/or the office that the case agent comes
11  from.
12  Q    Okay.  And you mentioned imaging a computer.  Can
13  you tell us what that is, please?
14  A    Yes.  That's making an exact copy of, for
15  instance, the laptop hard drive.  You can make an exact
16  copy of it so that you can say that any evidence
17  extracted from it, derivative evidence extracted from
18  it is actually something that could be traced back to
19  the original evidence.
20  Q    Do you use a software program?
21  A    We use a number of utilities to actually image the
22  digital evidence, and then we use other utilities that
23  will help us process it so that the evidence can be
24  reviewed by case agents.
25  Q    And are those software programs ones that you work

Rosecrans - Direct

1  with frequently in your profession?

2  A    Yes, sir.

3  Q    And are they commonly accepted utilities within

4  the computer forensic --

5  A    Yes, they are.

6  Q    Now, are you familiar with the term "metadata"?

7  A    Yes, I am.

8  Q    Can you tell us what metadata is, please?

9  A    Metadata is a set of data that actually describes

10 or provides more information about data.  An example of

11 that would be a file considered data.  Metadata for

12 that file would be file size, the creation date.

13 Q    Is this metadata information that's always visible

14 to the user?

15 A    In some instances, it is.  In other instances, it

16 is not just due to the way that a person might have

17 their computer set up.

18 Q    And what do you do with this image of the hard

19 drive once you create it?

20 A    We process the image -- with a utility that will

21 allow us to provide a viewable rendition of the

22 contents of the, for instance, hard drive.

23 Q    Does that system have a -- or that's a computer

24 program?

25 A    Yes.

Rosecrans - Direct

1  Q    Does it have a name?

2  A    In the case that we're here for right now, one of

3  them is AccessData Laboratory.

4  Q    And how long have you been working with that

5  program?

6  A    Oh, approximately ten years.

7  Q    Are you quite familiar with that program?

8  A    Yes, I am.

9  Q    And is that one also that is accepted within the

10 forensic science community?

11 A    Yes, it is.

12 Q    Do you also examine evidence that is obtained from

13 e-mail accounts?

14 A    Yes.

15 Q    And how do you do that?

16 A    Once again, one of the programs that we use is the

17 AccessData Lab program, and it will provide -- it will

18 basically provide a viewable rendition of the data as

19 you might see it on your computer if you were looking

20 at it.

21 Q    And would that include attachments that came with

22 the e-mail?

23 A    Yes, if there were attachments there.

24 Q    They would be associated with the e-mail?

25 A    Yes.

Rosecrans - Direct

1  Q     And so the e-mails, ultimately when you process

2  them, would be viewable to the agent or to you as they

3  would appear to the original user; is that correct?

4  A     Yes.

5  Q     Now, what about in the case of e-mails that are

6  encrypted?

7  A     For those, the encrypted portion may not show up

8  in the e-mail.  And if it did show up, it would look

9  like a string of characters that you couldn't make any

10 sense of.  But what we do there is typically we try to

11 decrypt it.

12 Q     Okay.

13 A     And decrypting it just makes it into something

14 that is viewable for the case agent, once again.

15 Q     In the same fashion that we talked about before?

16 A     Yes.

17 Q     Including the attachments?

18 A     Yes.

19 Q     And then what does the program that the agents

20 have access to in a way that the user would see it,

21 what kinds of things could the agents do with those

22 e-mails?

23 A     Okay.  So what we have is -- for the FBI, we've

24 set up a system where they can view the information

25 using a virtual machine.  Basically, the virtual

Rosecrans - Direct

1   machine presents a desktop just like you would have on

2   a computer, and they then have access to those bits of

3   data and evidence that are on the network that are

4   associated with the case.

5   Q    Would they be able to perform word searches?

6   A    Yes.  The utility is then set up so that the case

7   agent can view the information, and that utility is,

8   once again, AccessData Lab.

9   Q    And could they be sorted by date order?

10  A    Yes, it can be sorted.  You can do searches, live

11  searches.  You can do index searches because it indexes

12  all the information.

13  Q    And how about sorting by the sender or the

14  recipient?  Can you do that as well?

15  A    Yes, you can do that too.

16  Q    Did you work with electronic data in connection

17  with the investigation that brings us to court today?

18  A    Yes.

19  Q    And did you examine laptop computers that have

20  been seized from Bijan Rafiekian?

21  A    Yes, I did, two of them.

22  Q    I beg your pardon?

23  A    There were two of them.

24  Q    Did you examine any Gmail accounts belonging to

25  the defendant?

Rosecrans - Direct

1  A    Yes, I did.

2  Q    And did you examine any Gmail accounts belonging

3  to Ekim Alptekin?

4  A    Yes, I did.

5  Q    And did you use the same process that you've

6  described to prepare the defendant's laptops for review

7  by the agents?

8  A    Yes.

9  Q    And did you make that data available to the agents

10 who are working on this investigation?

11 A    Yes, I did.

12 Q    Were there e-mails on the defendant's two laptops?

13 A    Yes.

14 Q    Were those encrypted?

15 A    Some of them were probably encrypted.  Some were

16 out in the open.

17 Q    And were you able to decrypt the e-mails that were

18 encrypted?

19 A    The e-mails that I decrypted came from the Google

20 returns.

21 Q    Actually, before you go on there, let me ask you

22 another question.  I'm just really asking a yes or no

23 question.  Were you able to decrypt the e-mails that

24 you found on the defendant's two computers?

25 A    There were no e-mails that I can remember offhand

1  that were encrypted on the computers themselves.

2  Q    Okay.

3  A    I almost have to say that -- yes, there were

4  because they made reference to the Virtru software, and

5  as a result of working with the Virtru contractor, we

6  were able to distinguish some that were actually

7  encrypted.  It's just that we did not encrypt the

8  e-mails from the laptops.

9  Q    Were some of the e-mails on the Gmail accounts?

10 A    Yes.

11 Q    Well, let's start with the defendant's Gmail

12 accounts.  Were some of those encrypted?

13 A    Yes.

14 Q    E-mails on Alptekin's Gmail account, were those

15 encrypted?

16 A    Yes.

17 Q    And were you eventually able to decrypt those

18 e-mails?

19 A    Yes.

20 Q    All of them?

21 A    The majority of them.  There were some that --

22 when we were working with the Virtru representative, we

23 got software from them.  They gave us the keys.  We

24 were able to decrypt a majority of the e-mails.  There

25 were some e-mails that we could not decrypt, and the

Rosecrans - Direct

1   representative there said that it was probably due to

2   the fact that there were users there that also --

3            MR. TROUT:  Objection, Your Honor.

4            THE COURT:  Sustained.

5   BY MR. GILLIS:

6   Q    So in working with the encryption company, did you

7   learn that the tool that you used was an updated

8   version of that that had been used on the FIG_EDVA

9   e-mails that you saw?

10  A    Yes.

11  Q    What is it that you learned?

12  A    That it was, in fact, a newer version.  They had

13  indicated to me that they were continuously in the

14  process of updating their software.

15  Q    Did you find e-mails between Alptekin and the

16  defendant on the defendant's laptops?

17  A    Yes.

18  Q    And how about in the Gmail accounts of the

19  defendants?

20  A    Yes.

21  Q    And did you find e-mails between them on

22  Alptekin's Gmail account?

23  A    Yes.

24  Q    Did those include attachments that came with the

25  e-mails?

Rosecrans - Direct

1    A    Yes.

2    Q    And on Alptekin's Gmail account, were you also

3    able to see e-mails from others at the Flynn Intel

4    Group that had been sent to or from him?

5    A    Yes.

6    Q    Were you asked to find on the defendant's Gmail

7    account certain exhibits that we planned to introduce

8    today at trial?

9    A    Yes.

10   Q    And were you asked to find on Alptekin's Gmail

11   account certain exhibits that we planned to introduce

12   at trial?

13   A    Yes.

14   Q    And did you prepare a chart of those exhibits and

15   where they were found?

16   A    Yes, I did.

17   Q    Would you, please, take a look at Government's

18   Exhibit 68.  Can you tell us what that is, please?

19   A    This is a listing of the government exhibits and

20   where they were found, the defendant's Gmail,

21   Alptekin's e-mail, the defendant's MacBook Pro, which

22   has a 1B4 label, and the defendant's MacBook Pro that

23   has a 1B5 label.

24   Q    As long as we're on the subject, can you tell us

25   what 1B4 and 1B5 pertain to?

Rosecrans - Direct

1   A    Those were the MacBook Pros that were provided by

2   one of the case agents, and they were the ones that

3   were processed for this case.

4   Q    Okay.  Thank you, sir.

5        So you have one of them labeled 1B4, and one of

6   them labeled IB5?

7   A    It's just the way in which the FBI labels some of

8   the evidence.

9   Q    One for one computer, and one for another?

10  A    Yes, sir.

11          MR. GILLIS:  Can I have one moment, Your

12  Honor?

13          THE COURT:  Yes.

14      (Counsel confer.)

15          MR. GILLIS:  Your Honor, the witness will be

16  referring back to Government's Exhibit 68.  If I could,

17  with counsel's permission, I would like for the witness

18  to be able to have access to it during his testimony.

19          THE COURT:  That's fine.

20          MR. GILLIS:  If I could give it to Mr. Burns,

21  please.

22          Thank you, sir.

23  BY MR. GILLIS:

24  Q    In your examination of the defendant's computers,

25  did you find any text messages?

Rosecrans - Direct

1   A    Yes.

2   Q    And was there any particular software used in

3   that?

4   A    Well, for the special type of text messaging that

5   we got, which was the Skype chats.

6   Q    Okay.  And did you process those Skype chats in

7   more or less the same way as you did the e-mails?

8   A    Yes.  I used the laboratory.  We were able to

9   extract the conversations that were of interest to the

10  case agent.

11  Q    And where did you find those Skype chats?

12  A    On 1B5.

13  Q    And that refers to the defendant's computer?

14  A    Yes.

15  Q    And did you prepare a list of the exhibit numbers

16  corresponding to those Skype chats?

17  A    Yes, I did.

18  Q    Would you take a look, please, at Government

19  Exhibit 163.  Can you tell us what that is?

20  A    That is a list of the Skype chats that are

21  separated by each interaction that they had with each

22  other in a short period of time, a conversation.

23  Q    I may have misspoke.  That's Government's

24  Exhibit 163?

25  A    This is 163, yes, sir.

1          MR. GILLIS:  I move to admit that, Your

2   Honor.

3          THE COURT:  Any objection?

4          MR. TROUT:  We don't have an objection to

5   163, Your Honor.

6          THE COURT:  All right.  Exhibit 163 is

7   admitted.

8          Are we offering 68 as well?

9          MR. GILLIS:  Yes, Your Honor.

10          THE COURT:  Any objection to 68?

11          MR. TROUT:  No, Your Honor.

12          THE COURT:  All right.  Exhibit 68 is

13   admitted as well.

14   BY MR. GILLIS:

15   Q    So could I ask you now to look at Government's

16   Exhibit 9, please.  When you find it, would you tell us

17   what it is, please.

18   A    This is an e-mail from Alptekin to Rafiekian, and

19   the date of it is 7/29/2016 at 1:21 p.m.

20   Q    And the subject?

21   A    The subject is "response all good to go."

22   Q    You mean re?

23   A    Re.  Excuse me.  Re.

24   Q    When there's a reply to it, that's what we get.

25   Okay.

1          MR. GILLIS:  Your Honor, I offer Government's

2   Exhibit 9.

3          THE COURT:  Any objection?

4          MR. TROUT:  Just the same limitation, Your

5   Honor.

6          THE COURT:  All right.  Exhibit 9 is admitted

7   solely for the purpose of establishing what

8   Mr. Rafiekian received, the information he received,

9   and not for the truth of what's stated in this e-mail.

10          MR. GILLIS:  May we give the jury a moment to

11   read the document?

12          THE COURT:  Yes.

13   BY MR. GILLIS:

14   Q    Sir, would you look at Government's --

15          MR. GILLIS:  May I proceed, Your Honor?

16          THE COURT:  Yes.

17   BY MR. GILLIS:

18   Q    Would you look, please, at Government's

19   Exhibit 14, please.  When you find it, would you tell

20   us what it is, please.

21   A    This is also an e-mail from Alptekin to Bijan Kian

22   and a copy to Michael Flynn.  The date of it is Monday,

23   August 8, 2016, at 12:36 p.m. and 43 seconds.

24          MR. GILLIS:  First of all, Your Honor, may I

25   ask that Government's Exhibit 9 be put back up on the

1   screen?

2          And I move to admit Government's Exhibit 14.

3          THE COURT:  All right.  Government's

4   Exhibit 14 will be admitted, again, for the same

5   limited purpose of showing what information was

6   received by Mr. Rafiekian.

7          MR. GILLIS:  And if I could ask that the two,

8   9 and 14, be shown side-by-side?

9          THE COURT:  Yes.

10         MR. GILLIS:  May we give the jury a moment

11  the read Government Exhibit 14, please?

12         THE COURT:  All right.  Mr. Gillis.

13         MR. GILLIS:  Yes, sir.

14  BY MR. GILLIS:

15  Q    Where did you find Government's Exhibit 14?

16  A    Government's Exhibit 14 was found in Alptekin's

17  e-mail.

18  Q    And would you, please, turn to Government's

19  Exhibit 15.  And when you find it, would you, please,

20  tell us what that is.

21  A    This is also an e-mail from Ekim Alptekin and to

22  Bijan Kian, copy to Michael Flynn.  The date is

23  Thursday, August 4, 2016, at 5:11:17 a.m.

24  Q    And I think we can dispense with the time.  I'm

25  more interested in the date for the time being.

Rosecrans - Direct

1   A    Okay.

2          MR. GILLIS:  And so I move to admit

3   Government's Exhibit 15.

4          THE COURT:  All right.

5          MR. TROUT:  The same limitation.

6          THE COURT:  Government's Exhibit 15 is

7   admitted for the same limited purpose.

8   BY MR. GILLIS:

9   Q    Where did you find Government's Exhibit 15?

10  A    That was found on Alptekin's Gmail.

11  Q    Would you, please, take a look at Government

12  Exhibit 16.  Tell us what that is.

13  A    Once again, that's an e-mail from Alptekin to

14  Rafiekian, and the date is 8/10/2016.

15         MR. GILLIS:  I move to admit Government

16  Exhibit 16, Your Honor.

17         THE COURT:  Government's 16 is admitted for

18  the same limited purpose.

19         MR. GILLIS:  And can we show the jury 16 and

20  give them a moment to read it, please?

21         THE COURT:  Yes.

22  BY MR. GILLIS:

23  Q    Where did you find Government's Exhibit 16?

24  A    Government's Exhibit 16 was found in Alptekin's

25  Gmail.

1          MR. GILLIS:  Then, Your Honor, if I could ask

2   to have 15 and 16 shown side-by-side?

3          THE COURT:  All right.  You may do that.

4   BY MR. GILLIS:

5   Q    Would you take a look, please, at Government's

6   Exhibit 17.  Do you have that in front of you?

7   A    Yes, I do.

8   Q    What's the subject, please?  What's the subject of

9   that e-mail?

10  A    Re:  Welcome back.

11  Q    And would you tell us the date, the to, the from.

12  A    That was 8/11/2016.

13         MR. GILLIS:  I move to admit Government's

14  Exhibit 17 --

15         THE COURT:  All right.

16         MR. GILLIS:  -- and ask that the jury be

17  allowed to read it for a moment.

18         THE COURT:  Any objection?

19         MR. TROUT:  Your Honor, not to this

20  particular e-mail, but it's part of a chain.  There are

21  some other e-mails that Mr. Kian did not write that

22  would be subject to the same limitation.

23         THE COURT:  All right.  Government's

24  Exhibit 17 will be admitted.

25         All right.  Thank you, Mr. Gillis.

1          We're going to take our morning recess at

2    this time.  We'll have a 20-minute recess, and we will

3    reconvene.

4          During the recess, do not discuss this case

5    among yourselves.

6       (The jury exits at 11:24 a.m.)

7          THE COURT:  All right.  We'll stand in

8    recess.

9          Mr. Rosecrans, do not discuss your testimony

10   during the recess.

11      (Recess from 11:25 a.m. until 11:49 a.m.)

12      (The jury is present.)

13         MR. GILLIS:  Your Honor, may we approach for

14   a moment?

15         THE COURT:  Yes.

16      (Conference at the bench, as follows:)

17         THE COURT:  All right.  Mr. Gillis.

18         MR. GILLIS:  Your Honor, our colleagues have

19   noticed that some of the jurors appear not to be able

20   to see the screen adequately to view it.  It's

21   important for them to see the documents in context.  I

22   was going to ask the Court's permission for a little

23   more time for them to read them.  At the same time, I

24   would read certain portions for those that may not be

25   able to see them.

1          THE COURT:  Well, they're coming up on the

2   larger screen there as well; aren't they?

3          MR. GILLIS:  They are, but it appears that

4   some -- for example, some of the folks on that side,

5   particularly those that are a little more closer to my

6   age, aren't able to see that far or see the one in

7   front of them.  So what I propose to do is to read

8   certain portions while it's up on the screen.

9          This witness is taking a little longer than I

10  expected, but the rest of them should go more quickly,

11  especially since we are getting the exhibits in for

12  these purposes.  So I would ask the Court's indulgence

13  for that.

14         THE COURT:  Do you have anything to

15  contribute to this?

16         MR. TROUT:  A little bit of my concern is the

17  completeness issue.

18         THE COURT:  Right.

19         MR. TROUT:  For example, on some of the

20  documents that we have already looked at, they have

21  highlighted a certain portion and left off -- you know,

22  because that's what they want to highlight.  They have

23  left off other parts, including, for example, responses

24  or whatnot that may put it all in a better context.  So

25  I am concerned about kind of the completeness aspect of

1   specifically reading one little segment without reading

2   the whole thing.

3            MR. GILLIS:  Your Honor, I think that could

4   be addressed on cross-examination.

5            THE COURT:  All right.  Can you expand the

6   portion on the screen so it appears larger?

7            MR. GILLIS:  Yes, but there's still some

8   limitation for the ones on this side.  So if I could

9   read certain portions of that.  Then, if necessary,

10  they can read other portions of it on

11  cross-examination.

12            THE COURT:  All right.  I don't want to get

13  in too much of this.  I'll let you do it with respect

14  to very discrete sections of it.

15            MR. GILLIS:  Yes, sir.

16            THE COURT:  During cross, you can have the

17  witness read a portion that you think is necessary to

18  put it into context.  I don't want to do too much of

19  this.  So be very judicious in what you want them to

20  read.

21            MR. GILLIS:  Yes, sir.

22            THE COURT:  Okay.

23            MR. GILLIS:  Okay.  Thank you.

24            THE COURT:  How much longer do you have with

25  him on direct?

1            MR. GILLIS:  I'm guessing about another --
2  well, as I was telling Mr. Trout, I have 12 pages.  I'm
3  on page 6.

4            THE COURT:  All right.  Let's get through it.

5            MR. GILLIS:  All right.  Thank you.

6      (Proceedings continued in open court, as follows:)

7            THE COURT:  All right.  Mr. Gillis.

8            MR. GILLIS:  Your Honor, I have spoken to
9  defense counsel.  I was going to suggest that some of
10  the jurors be allowed to move into the empty seats
11  closer to the large screen, if the Court would permit
12  that.

13            THE COURT:  Would the two jurors on the end
14  be able to see better in these seats?  I'm happy to
15  have you move down here.

16            Oh, you're all right where you are.

17            Ma'am, would like to move, or are you
18  comfortable where you are?

19            A JUROR:  I'm fine.

20            THE COURT:  Why don't we proceed.  If you
21  would like to at some point get a better view, just let
22  me know, and I'll try to accommodate you.

23            All right.  Mr. Rosecrans, you remain under
24  oath.

25            THE WITNESS:  Yes, sir.

Rosecrans - Direct

1          MR. GILLIS:  With the Court's indulgence, may

2  I just go back to 15 and 16 for one moment, Your Honor?

3          THE COURT:  Yes.

4          MR. GILLIS:  So if I could ask that

5  Government's Exhibit 15 be brought up.  If you could,

6  zoom in on the second and third paragraphs there.

7          Thank you for the eloquent outline.  I have

8  met with the MFA and explained our proposed approach.

9  He is receptive and indicated he would like to meet

10  with us during his upcoming visit to D.C.  As soon as

11  the visit dates are scheduled and confirmed, I will

12  inform you, and we can strategize how best to approach

13  the meeting.

14          That's Government's Exhibit 15, and the

15  subject of that is Truth.

16          Then, if we could, turn to Government

17  Exhibit 16 and just zoom in on the text of that e-mail:

18  Gentlemen, I just finished in Ankara after several

19  meetings today with Min of Economy Zeybekci and MFA

20  Cavusoglu.  I have a green light to discuss

21  confidentiality, budget, and the scope of the contract.

22  I am flying to L.A. tomorrow at the request of the MFA.

23          That, Your Honor, is Government Exhibit 16,

24  and again, the subject is Truth.

25          Then, if we could, look, please, at

Rosecrans - Direct

1  Government's Exhibit 17.  I believe that's in evidence.

2         If you could -- Government's Exhibit 16 was

3  dated August 11.  Government's Exhibit 17 is dated

4  August -- pardon me.  Exhibit 16 was August 10.

5  Exhibit 17 is August 11.

6         If you could, zoom in on the last two

7  paragraphs, "Mike and I" and "engagement purpose."

8         Mike and I have activated the FIG LAB as of

9  tonight and ready to push the start button immediately.

10        Engagement purpose:  The business community

11  is engaging FIG to restore Confidence Through Clarity

12  in the trade and investment climate.

13  BY MR. GILLIS:

14  Q   Would you, please, look at Government Exhibit 18A,

15  please.  I beg your pardon.  If you could, look at

16  Government's Exhibit 10.  Can you tell us what that is,

17  please?

18  A   Yes.  This is an e-mail from Bijan Kian to Ekim

19  Alptekin on Saturday, July 30, 2016.

20  Q   The subject is Truth?

21  A   Yes.

22        MR. GILLIS:  I move to admit Government's

23  Exhibit 10, Your Honor.

24        THE COURT:  Any objection?

25        MR. TROUT:  No, Your Honor.

1       THE COURT:  Government's Exhibit 10 is

2  admitted.

3       MR. GILLIS:  If I could ask that the first

4  paragraph there be enlarged.

5       THE COURT:  All right.

6       MR. GILLIS:  This is from Bijan to Ekim:  It

7  was my pleasure continuing our conversation today.

8  General Flynn and I have discussed broad contours of

9  the Truth Campaign.

10       If we could, zero in on the Phase Zero and

11  the bullets after that, please.

12       May the jury have a moment to read that, Your

13  Honor?

14       THE COURT:  Yes.

15       All right.

16  BY MR. GILLIS:

17  Q    Mr. Rosecrans, this is an e-mail from Bijan Kian

18  to Michael Flynn and Philip Oakley.  It is the subject

19  Confidence Through Clarity Campaign; is that correct?

20  A    Which?

21  Q    Government Exhibit 18A.  I'm sorry if I didn't ask

22  you to turn to that.

23  A    18A, Bijan Kian it's from and to Michael Flynn,

24  subject Confidence Through Clarity Campaign.

25  Q    Is that correct?

Rosecrans - Direct

1  A     Yes.

2           MR. GILLIS:  Okay.  I move to admit 18A,

3  please.

4           THE COURT:  Any objection?

5           MR. TROUT:  No objection.

6           THE COURT:  Without objection, 18A is

7  admitted.

8           MR. GILLIS:  If I could ask that we look,

9  first, at the first paragraph of 18A.  This is also

10 dated August 11.  The first paragraph says:  We are

11 about to be engaged by a Dutch client for the above

12 campaign, Confidence Through Clarity.

13          Phil:  I will brief you over Skype or on the

14 phone when we can talk on the phone.  I have been given

15 high confidence that this engagement is imminent.

16          If I could ask that you zoom in now on the

17 Phase Zero on those bullets, please.

18          Is there any way to enlarge that?

19          THE COURT:  All right.

20          MR. GILLIS:  If I could ask that Government's

21 Exhibit 10 and Government's Exhibit 18A be displayed

22 side-by-side?

23          THE COURT:  All right.

24 BY MR. GILLIS:

25 Q    Mr. Rosecrans, where did you find Government's

Rosecrans - Direct

1  Exhibit 18A?

2  A    18A was found on one of the defendant's MacBook,

3  1B4 to be exact.

4  Q    Could you look, please, at Government's

5  Exhibit 20?  Do you have that in front of you?

6  A    Yes, I do.

7  Q    Could you tell us what that is, please?

8  A    It is a representation of a Skype conversation.

9  Q    Okay.  What is the date of that conversation?

10  A    August 25, 2016.

11  Q    And who are the participants to this -- first of

12  all, this is from a Skype chat?

13  A    Yes.

14  Q    That you processed?

15  A    Yes.

16  Q    In the way that you've told us?

17  A    Yes.

18  Q    Okay.  And the participants are?

19  A    Ekim Alptekin and Bijan Kian.

20  Q    Okay.  And can you --

21       MR. GILLIS:  First of all, Your Honor, I move

22  to admit Government's Exhibit 20.

23       THE COURT:  Any objection?

24       MR. TROUT:  Just the same limitation as

25  before.

1          THE COURT:  All right.  The Court will admit

2    it for the limited purpose of establishing what

3    information was shared with Mr. Rafiekian.

4    BY MR. GILLIS:

5    Q    Then if I could ask -- well, first of all, before

6    we go any further, first of all, the date on this is

7    August 25, 2016.  How do you get that date?

8    A    From the spreadsheet that I provided, it had the

9    date on it.

10   Q    But I guess more specifically, in your examination

11   of the Skype chats, how do you know that that's the

12   date of the Skype chat itself?

13   A    That information was extracted from the Skype

14   chat.

15   Q    Okay.  And how about the --

16   A    That was on the --

17   Q    I beg your pardon?

18   A    It was on the Skype chat that was on 1B5.

19   Q    And what about the times that are reflected there?

20   A    There would be the times that would -- that this

21   conversation would have taken place.

22   Q    No.  I understand that, but where do you get --

23   how do you know that those are the times?

24   A    Once again, it comes from the file that I

25   provided.  And then that file was used to make a more

Rosecrans - Direct

1    viewable form for this presentation, and it provides

2    the appearance as you would see it on a computer

3    screen.

4    Q    Okay.  The parts on the left side that are in

5    blue, who is the writer there?

6    A    Mr. Alptekin.

7    Q    And the parts on the right side that are

8    highlighted in green, who is the writer there?

9    A    Mr. Rafiekian.

10            MR. GILLIS:  If I could ask you to zoom in on

11   the "okay thank you" and then down to this down here.

12            If I could read that:  Okay.  Thank you.

13   Let's talk tomorrow night.  Assumingly, I will manage

14   to meet Number 1 tomorrow.  If my flight delays, I

15   might not make the slot they gave me.  I think I'm

16   meeting MC's boss, not direct boss, but you know who.

17            Then Alptekin goes on:  My assumption based

18   on MC's request to come to Third Bridge opening

19   tomorrow for final instructions.  Either way, he said

20   we are a full go.

21   BY MR. GILLIS:

22   Q    Would you please look at --

23            MR. GILLIS:  I beg your pardon, Your Honor.

24   BY MR. GILLIS:

25   Q    If you could, please look at Government's

Rosecrans - Direct

1  Exhibit 67E.

2         MR. TROUT:  Your Honor, excuse me.  Could I

3  ask the Court just to -- because Mr. Gillis took the

4  opportunity to read that in, I think it would be

5  appropriate for the Court to remind the jury that it's

6  not admitted for the truth of the matter stated

7  therein.

8         THE COURT:  All right.

9  A    67E?

10 Q    67E, that's another Skype chat between

11 Mr. Alptekin and Rafiekian; is that correct?

12 A    Correct.

13 Q    And the date is the same, August 25, 2016?

14 A    Yes, sir.

15 Q    Do you see there that Mr. Alptekin asks for the CV

16 of the general at the top?

17 A    Yes.

18        MR. GILLIS:  Have I moved to admit

19 Government's Exhibit 67E?  I beg your pardon.  I do

20 move it.

21        THE COURT:  All right.  The Court will admit

22 Government's Exhibit 67E.

23        Ladies and gentlemen, this document, like the

24 other ones, contains statements by both Mr. Rafiekian

25 and Mr. Alptekin.  The statements by Mr. Alptekin are

1  being admitted solely for the purpose of showing what

2  information was shared with Mr. Rafiekian, not as proof

3  of the truth of what is contained in those statements.

4       MR. GILLIS:  Your Honor, may I ask that the

5  jury be instructed with respect to the defendant's

6  statements themselves.

7       THE COURT:  There is no such restriction on

8  the statements by Mr. Rafiekian himself.

9       MR. GILLIS:  Thank you, Your Honor.

10       If you could, just zoom in on the top two

11 balloons there.

12 BY MR. GILLIS:

13 Q    Now, if you would, turn the page to the second

14 page of Exhibit 67E.

15       MR. GILLIS:  And if you could, zoom in from

16 the profile of MF down to the last there, please.

17 BY MR. GILLIS:

18 Q    Mr. Rafiekian refers to the profile for MF and

19 sending the e-mail on Virtru now.

20       Mr. Alptekin responds:  Yes.  Thank you.

21       Rather than profile, they asked for a full CV.

22       Please look at government's exhibit -- first, if

23 we can, return to Exhibit 20 on the second page.

24 Strike that.  We'll move on.  Thank you.

25       Government's Exhibit 21 is a Skype chat between

Rosecrans - Direct

1  the defendant and Mr. Alptekin.  It's dated August 29

2  and 30.

3          MR. GILLIS:  If I may move that in evidence,

4  Your Honor.

5          THE COURT:  All right.  It is admitted with

6  the same instructions.

7          MR. GILLIS:  If you could, pull up those two

8  balloons there, please.

9  BY MR. GILLIS:

10 Q    Mr. Rafiekian refers to the CV, and then

11 Mr. Alptekin responds:  Hi Bijan, I received it in good

12 order.  We are contemplating the best way to pay and

13 avoid additional cost.  I will be depositing the total

14 200K on the FIG account.  I will let you know when it's

15 settled and will honor the deadline.  We are also

16 scheduling a meet with MF and MC and perhaps even RTE

17 this [sic] week in New York.  Will keep you posted.

18          MR. TROUT:  It says in the third week.

19          MR. GILLIS:  I beg your pardon.  In the third

20 week.

21 BY MR. GILLIS:

22 Q    Where did you find Exhibit 21?

23 A    Exhibit 21 is not on my sheet.

24 Q    Can you turn to Exhibit 21?  Do you have it in

25 front of you?

Rosecrans - Direct

1  A    I do have Exhibit 21, and it would have come from

2  the 1B5 extract that I did.  Then this conversation was

3  turned into this of which we're looking at right now.

4  Q    Just to shorten things up, all of these Skype

5  chats came from the one computer, 1B5; is that correct?

6  A    Yes.

7  Q    That was the defendant's computer?

8  A    Yes.

9  Q    Would you turn to 67F.

10  A    67F.

11  Q    That's a Skype chat between the defendant and

12  Alptekin.  It's dated August 27, 2016, correct?

13  A    Correct.

14          MR. GILLIS:  I move to admit 67F, Your Honor.

15          THE COURT:  All right.  67F is admitted,

16  again, for the limited purpose of showing what

17  information was shared with Mr. Rafiekian.

18          MR. GILLIS:  Would you, please, zoom in on

19  the last three -- actually, all of those bullets,

20  please, all three -- four rather.

21          The link title is

22  exclusive-fbi-raids-home-of-ex-college-board-official-i

23  n-probe-of-sat-leak.  That is from Alptekin.  His next

24  statement is:  I think there is a Gulenist link here.

25  They are doing in the U.S. what they are used to doing

1  in Turkey.  Of course, I prefer these reports coming

2  out after our engagement.

3  BY MR. GILLIS:

4  Q    If you look, please, at Government's Exhibit 24A,

5  that's an e-mail from the defendant to Michael Flynn,

6  subject New York -- or rather, NYC-September 19th or

7  20th; is that right?

8  A    Yes.

9           MR. GILLIS:  I move to admit 24A.

10          THE COURT:  Any objection?

11          MR. TROUT:  The same limitation, Your Honor.

12          THE COURT:  This is from --

13          MR. TROUT:  I'm sorry.  This is from him.

14  Sorry.  Yes.

15          THE COURT:  Exhibit 24A is admitted.

16          MR. TROUT:  Right.

17          MR. GILLIS:  May we give the jury a moment

18  with that?

19  BY MR. GILLIS:

20  Q    If you turn to 24B, if you would, that's an e-mail

21  from the defendant to Michael Flynn dated November --

22  rather, September 9.  The subject is September 19 or

23  20th.

24          MR. GILLIS:  I move that exhibit, Your Honor.

25  BY MR. GILLIS:

1  Q    That's correct, first of all?

2  A    Yes.

3           MR. GILLIS:  I move that exhibit into

4  evidence, Your Honor.

5           MR. TROUT:  The same limitation, Your Honor.

6           THE COURT:  All right.  Exhibit 24B is

7  admitted.  The statements from Mr. Flynn are admitted

8  solely for the purpose of evidencing information shared

9  with Mr. Rafiekian.  Mr. Rafiekian's statements

10 reflected in here are without that limitation.

11          MR. GILLIS:  That e-mail from the defendant

12 reads:  We don't have the details but will have it from

13 the client shortly.  The duration will not exceed an

14 hour.  As I mentioned, the meeting is with a high-level

15 audience, cabinet-plus level, related to Confidence.  I

16 understand the difficulty to hold two days and have

17 told the client the same.  I have asked them to get

18 back to me with some precision, and they have promised

19 to do so as soon as possible.

20 BY MR. GILLIS:

21 Q    I would ask you to look at Government's

22 Exhibit 41.

23 A    Exhibit 41.

24 Q    This is a Skype chat between the defendant and

25 Alptekin.  This one is dated September 14, 2016; is

Rosecrans - Direct

1  that correct?

2  A    Yes, it is.

3           MR. GILLIS:  I move 41, Your Honor.

4           THE COURT:  All right.  Exhibit 41 will be

5  admitted with the instruction that the statements of

6  Mr. Alptekin are limited solely for the purpose of

7  evidencing what was shared with Mr. Rafiekian.

8           MR. GILLIS:  If I could ask you to zoom into

9  that last balloon, please.

10  BY MR. GILLIS:

11  Q    There Alptekin tells the defendant:  Actually,

12  MC's guy who is read into Project Confidence advised me

13  to include an op-ed that FIG would get published under

14  my name, but I didn't raise it as his advice aims to

15  help me score points in Turkey more than anything else.

16  BY MR. GILLIS:

17  Q    Exhibit 26A, could you take a look at that,

18  please.

19  A    26A?

20  Q    26A.  That's an e-mail from the defendant to

21  Michael Flynn that's dated September 18, 2016, with the

22  subject talking points; is that right?

23  A    Yes.

24           MR. GILLIS:  I move to admit 26A, Your Honor.

25           THE COURT:  Any objection?

1          MR. TROUT:  No, Your Honor.

2          THE COURT:  26A is admitted.

3          MR. GILLIS:  Then, if you would, please, zoom

4   in on the header down to Bijan, please.

5   BY MR. GILLIS:

6   Q    Then would you turn to Government's Exhibit 26B.

7   A    26B.

8   Q    26B?

9   A    Yep.

10  Q    Is that the attachment to the e-mail 26A?

11  A    Yes, it is.

12         MR. GILLIS:  And I move to admit 26B, Your

13  Honor.

14         THE COURT:  Any objection?

15         MR. TROUT:  No, no objection.

16         THE COURT:  26B is admitted.

17         MR. GILLIS:  If I could ask you to zoom in

18  from "background and talking points" down to this

19  bolden print here.

20         That reads:  In 1978, a soft-spoken, gray

21  beard elderly Shia cleric sat under an apple tree in --

22  somewhere near Paris.  He claimed that he was a man of

23  God, set out to topple a dictator.  He said he has no

24  intention of taking over the government.  He spoke of

25  love and compassion.  He said his goal was to go to the

Rosecrans - Direct

1   mosque and pray.  He said he will lead the people to

2   topple a dictator.

3           A perfect picture of peace and harmony aimed

4   at liberating the oppressed.  The elderly cleric's name

5   was Ayatollah Ruhollah Khomeini.

6           If I could ask you to zoom in on

7   September 18, 2016, that's from the same talking

8   points.  That reads:  A soft-spoken, gray haired,

9   elderly Muslim cleric lives in a secluded compound in

10  Poconos, Pennsylvania.  He claims to be a man of peace.

11  He encourages devout Muslims to build schools and not

12  mosques.  He publicly promotes the ideas of tolerances

13  and denounces violence.  According to close observers,

14  his followers jump if he orders them to jump.  What his

15  staff and followers do not deny is that his movement

16  runs 130 or more publicly funded charter schools in 26

17  states all over the United States with at least 36 of

18  such charter schools in Texas.  The schools don't teach

19  Islamic studies.  Their focus is on math and science.

20          A perfect picture of peace and harmony aimed

21  at liberating the oppressed.  The elderly cleric's name

22  is Fethullah Gulen.

23  BY MR. GILLIS:

24  Q    If I could ask you to look at --

25          MR. GILLIS:  May I have a moment, Your Honor?

Rosecrans - Direct

1  BY MR. GILLIS:

2  Q    If you could, turn to Government's Exhibit 13.

3  That's an e-mail from the defendant to Alptekin.  It's

4  dated August 4, 2016?

5  A    Correct.

6  Q    The subject is Truth; is that right?

7  A    Correct.

8          MR. GILLIS:  I move to admit 13, Your Honor.

9          THE COURT:  Any objection?

10          MR. TROUT:  No objection, Your Honor.

11          THE COURT:  All right.  Exhibit 13 is

12  admitted.

13          MR. TROUT:  Let me just add that it does

14  include e-mails from Alptekin in there.  As to those

15  e-mails, we would ask for the instruction.

16          THE COURT:  Again, ladies and gentlemen, the

17  statements by anyone other than Mr. Rafiekian are

18  admitted solely for the purpose of showing what

19  information was shared with Mr. Rafiekian and not for

20  the truth of what's stated in those statements.

21          MR. GILLIS:  So reading from Government's

22  Exhibit's 13, the August 4 e-mail with the subject

23  Truth, in the first paragraph, he refers to

24  investigative work and special investigation:  The

25  longer the time distance between an event and active

1   start of a special investigation, the lesser the effect

2   of revealing the truth.  The main event becomes old

3   news and the findings less relevant.

4           Let me give you a real-life experience:

5   1978, a soft-spoken cleric sitting under an apple tree

6   somewhere in Paris -- France, rather, looked so

7   harmless, spoke of equality and spirituality, declared

8   that if he were to gain power, he would go to a

9   religious shrine and would not get into politics and

10  governance.

11          Sound familiar?

12          Your Honor, I would move into evidence all of

13  the exhibits listed on Government's Exhibit 68, the

14  e-mails that this witness found on the electronic

15  evidence that he described.

16          THE COURT:  All right.  Mr. Trout.

17          MR. TROUT:  Yes.  Just provisionally, we

18  would like --

19          THE COURT:  All right.  I'll conditionally

20  admit those subject to your review and any objections

21  you might have.

22          MR. TROUT:  Right.  They presumably will

23  include the same hearsay objection.

24          THE COURT:  Yes.

25          MR. TROUT:  Thank you.

Rosecrans - Direct

1  BY MR. GILLIS:

2  Q    Then if I could ask you to look, please, at 163.

3  Actually, that's already in evidence.

4          MR. GILLIS:  Your Honor, I would move that

5  all of those exhibits listed on 163 be admitted in

6  evidence.

7          THE COURT:  All right.  The same position,

8  Mr. Trout?

9          MR. TROUT:  The same position, Your Honor.

10          THE COURT:  All right.  The Court will

11  conditionally admit the exhibits referenced in 163.

12          MR. GILLIS:  That's all I have, Your Honor.

13          THE COURT:  All right.  Thank you.

14          Mr. Trout.

15          MR. TROUT:  Excuse me, Your Honor.  May I

16  have a moment?

17          THE COURT:  Yes.

18      (Counsel confer.)

19          MR. TROUT:  No questions.

20          THE COURT:  All right.  Thank you.

21          Mr. Rosecrans, you're excused.  Do not

22  discuss your testimony outside of the courtroom with

23  any other witness.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.

Gilday - Direct

 1        MR. GILLIS:  Your Honor, I ask that he be

 2   subject to recall.

 3        THE COURT:  All right.  You will be subject

 4   to recall.  Just make yourself available.  You may

 5   leave the courthouse however.

 6        (The witness stands aside.)

 7        THE COURT:  All right.  The next witness,

 8   Mr. Turgeon.

 9        MR. TURGEON:  Thank you, Your Honor.  The

10   United States calls Jeffrey Gilday.

11        THE COURT:  All right.  Mr. Gilday will come

12   forward please.

13      JEFFREY GILDAY, PLAINTIFF'S WITNESS, AFFIRMED

14                   DIRECT EXAMINATION

15   BY MR. TURGEON:

16   Q    Can you please tell us your name?

17   A    My name is Jeffrey Gilday.

18   Q    How are you employed?

19   A    I work for the Department of Justice in the FARA

20   Unit.

21   Q    What is your position with the FARA Unit?

22   A    I'm an intelligence research specialist.

23   Q    What is the Foreign Agents Registration Act or

24   FARA?

25   A    The Foreign Agents Registration Act is a statute

Gilday - Direct

1  where individuals or organizations within the United

2  States doing certain activities on behalf of a foreign

3  principal need to make periodic disclosures to the

4  Department of Justice through the FARA unit.

5  Q    What is the purpose of FARA?

6  A    The purpose of FARA is so the American public --

7  the messages that they are receiving or their elected

8  officials are receiving, if they are from a foreign

9  principal or from a foreign source, that disclosure is

10 made, and they are made aware of that.

11 Q    How long have you been with the FARA Unit?

12 A    In September, it will be 12 years.

13 Q    What are your primary job functions with the FARA

14 Unit?

15 A    My primary job functions are to review all of the

16 FARA filings and registrants that are assigned to me.

17 Q    And who at the FARA Unit is the first person to

18 review those?

19 A    The reviewer or someone like myself.

20 Q    Now, I want to ask you about when someone has to

21 register under FARA.  Who has to register under FARA?

22         MS. MITCHELL:  Objection, Your Honor.

23         THE COURT:  Yes.  Let me see counsel.

24     (Conference at the bench, as follows:)

25         THE COURT:  All right.  What are you

Gilday - Direct

1   proposing to get out of this witness?

2           MR. TURGEON:  Your Honor, he's going to talk

3   about the statute and the process for submitting FARA

4   restrictions.  He's going to talk about what the

5   statute requires, which is something that he deals with

6   every day in reviewing filings and advising people on

7   the phone.

8           MS. MITCHELL:  I would oppose that, Your

9   Honor.  That's a legal issue that really is before Your

10  Honor.  I don't have any sort of objection to the very

11  high-level -- you know, the people who are required.

12          THE COURT:  The jury is going to be

13  instructed on what FARA requires.  I think you can

14  bring out the process that he follows without asking

15  him to opine on what FARA actually, in fact, requires.

16          MR. TURGEON:  Your Honor, the statute is

17  quite complex.

18          THE COURT:  Right.

19          MS. MITCHELL:  Right, exactly.

20          MR. TURGEON:  So explaining to the jury --

21          THE COURT:  That's the problem.

22          MR. TURGEON:  That is why we called this

23  witness, Your Honor, explaining to the jury what FARA

24  requires and what --

25          THE COURT:  That's the Court's obligation.

1  That's the Court's job.  We don't need a justice

2  department lawyer to explain to the jury what the law

3  is, but I think you can work through this by asking him

4  what kind of information he requires and what the

5  process is for filing.  All right.

6          MR. TURGEON:  So the information required of

7  registrants?

8          THE COURT:  What information he requires of

9  registrants --

10          MR. TURGEON:  Yes, sir.

11          THE COURT:  -- during that process.

12          MR. TURGEON:  Yes, Your Honor.

13          THE COURT:  I don't think he should be

14  opining about what the whole statute requires.

15          MR. TURGEON:  Your Honor, again, nothing, in

16  his planned testimony at least, concerns opining on

17  anything or comparing what was filed --

18          THE COURT:  Well, I think you can take him

19  through what he requires among registrants.

20          MR. TURGEON:  Thank you, Your Honor.

21          THE COURT:  All right.

22      (Proceedings continued in open court, as follows:)

23          THE COURT:  Mr. Turgeon.

24          MR. TURGEON:  Thank you, Your Honor.

25  BY MR. TURGEON:

Gilday - Direct

1  Q    If someone agrees to act as an agent of a foreign

2  principal in the United States, when are they required

3  to register under FARA?

4  A    Once they have agreed to act on behalf of a

5  foreign principal, they have ten days to register and

6  they cannot act until they do register.

7  Q    What is the Lobbying Disclosure Act or LDA?

8  A    The Lobbying Disclosure Act is another disclosure

9  statute that is enforced by the U.S. Senate and U.S.

10 House of Representatives.

11 Q    So when someone has to file a FARA registration,

12 what is the first step?

13 A    You have to fill out a variety of forms.

14 Q    Where does the registrant send those forms?

15 A    To the FARA Unit either electronically or through

16 hard copy.

17 Q    What happens to the forms after they're received

18 by the FARA Unit?

19 A    They are assigned to a reviewer, and they are put

20 up on a website.

21 Q    What website is that?

22 A    It's fara.gov.  It's the website the unit

23 administers.

24 Q    Who has access to that website?

25 A    Anyone with access to the Internet.

Gilday - Direct

1   Q    So after a registration is uploaded to the public

2   website, does anyone at the FARA Unit perform an

3   initial screening of the registration?

4   A    It is reviewed after it's gone up.

5   Q    Who does that?

6   A    The reviewer, somebody like myself.

7   Q    What does a reviewer do when assigned a FARA

8   registration that someone has submitted?

9   A    Go through the forms line by line to make sure

10  that the forms have been completed.

11  Q    And what do you do if the forms haven't been

12  completed and the registrant has omitted information

13  that's required to be listed?

14  A    I will reach out to the registrant and get it

15  resolved, work with them and get it resolved.

16  Q    What happens if the registrant doesn't resolve a

17  deficiency?

18  A    Then they're in violation of FARA.

19  Q    Now, do you take any steps to investigate whether

20  the information listed on the forms is true or false?

21  A    No.

22  Q    Do you have the ability to investigate whether the

23  information on the forms is true or false?

24  A    No.

25  Q    Under the statute, which foreign programs does the

Gilday - Direct

1    registrant need to disclose on the forms?

2    A    All of them.

3    Q    If a foreign principal is providing direction or

4    supervision over a registrant's activities, does the

5    registrant need to list that foreign principal?

6    A    Yes.

7    Q    If one foreign principal is being supervised or

8    directed by another foreign principal, does the

9    registrant need to list that?

10   A    Yes.

11   Q    What if a registrant is acting on behalf of two

12   completely separate foreign principals?  Does the

13   registrant need to list that?

14   A    They would need to list them both.

15   Q    What if the foreign principal is not the one

16   paying for the work?  Does the registrant still need to

17   list that foreign principal even if it's not paying?

18   A    Yes.

19   Q    What if work is being done for one foreign

20   principal but another foreign principal is the one

21   paying?

22   A    Then they both need to be disclosed.

23   Q    When someone submits a FARA registration, what do

24   they need to disclose about agreements with foreign

25   principals?

Gilday - Direct

1  A     If there is a signed executed contract, that needs

2  to be uploaded with the registration documents.   If

3  that doesn't exist and -- for example, if the agreement

4  is an exchange of communication, those communicaions

5  need to be disclosed.  Even then, if that doesn't

6  exist, then a narrative of the terms of the agreement

7  need to be disclosed on the forms.

8  Q     If a registrant has multiple contracts with a

9  foreign principal, do all of those contracts need to be

10  attached?

11  A     Yes.

12  Q     When someone submits a FARA registration, what do

13  they need to disclose about the activities they're

14  going to engage in?

15  A     They need to disclose all the activities they've

16  agreed to do.

17  Q     What if a registrant does something that benefits

18  the foreign principal but the activity isn't directed

19  by the foreign principal?  Does that need to be

20  disclosed?

21  A     Yes.

22  Q     Under statute, what ongoing requirements are there

23  for a registrant to report the work that the registrant

24  did for the foreign principal?

25  A     Every registrant every six months needs to file a

Gilday - Direct

1  supplemental statement which discloses the prior six

2  months activities, financial information, and that kind

3  of stuff.

4  Q    Okay.  I'd like to show you what's been marked as

5  Government Exhibit 154.  What is this for?

6  A    This is a supplemental statement.  This is what

7  would be filed every six months.

8  Q    Is this particular form filled out, or is it

9  blank?

10 A    No.  This form appears to be blank.

11 Q    Was this the supplemental statement form that was

12 in effect in March 2017?

13 A    Yes.

14 Q    How do you know that?

15 A    On the top of the form, it says this form expired

16 April 30, 2017, which would be after that date.

17        MR. TURGEON:  Your Honor, the government

18 moves Exhibit 154 --

19        THE COURT:  Any objection?

20        MR. TURGEON:  -- into evidence.

21        MS. MITCHELL:  No objection.

22        THE COURT:  Without objection, Exhibit 154 is

23 admitted.

24        MR. TURGEON:  Thank you, Your Honor.

25 BY MR. TURGEON:

Gilday - Direct

1  Q     Now, I want to ask you about some specific

2  categories of information that FARA requires

3  registrants to disclose.

4  A     Okay.

5  Q     First, I want to talk about the flow of money.

6  Could you, please, take a look at Government

7  Exhibit 154.

8  A     Yes.

9  Q     On page 5 of that form, what category is listed

10 there?

11 A     Financial information.

12 Q     Could you take a look at Entry 14A, please.  On

13 that form, what receipts of money by the registrant

14 need to be disclosed?

15 A     Any money that the registrant received from the

16 foreign principal.

17 Q     Okay.  Now, take a look at Entry No. 15 on the

18 next page, please.  What payments by the registrant

19 need to be disclosed there?

20 A     Any money that the registrant disbursed on behalf

21 of the activities of the foreign principal.

22 Q     Okay.  Next I want to talk about lobbying.  Do the

23 FARA forms require that registrants disclose their

24 political activities for foreign principals?

25 A     Yes.

Gilday - Direct

1  Q     Is lobbying one of those political activities?

2  A     Yes.

3  Q     Does FARA require that the registrant do anything

4  before lobbying for the foreign principal?

5  A     If you are lobbying on behalf of a foreign

6  principal, you need to disclose to the individual

7  you're lobbying to that you are working on behalf of a

8  foreign principal.

9  Q     Do you need to say which foreign principal that

10 is?

11 A     Any foreign principal that you're acting for, that

12 you're lobbying on behalf of.

13 Q     No.  My question was, do you need to identify

14 which foreign principal?

15 A     Yes.  Yes.

16 Q     And to whom does that need to be disclosed?

17 A     To the individual or individuals that you're

18 lobbying to.

19 Q     And when does that need to happen?

20 A     Right in the beginning.

21 Q     What if the registrant calls a member of Congress

22 to set up a meeting for lobbying?  Is that something

23 required to be disclosed on the supplemental statement?

24 A     Yes, it is.

25 Q     So could you, please, take a look at Entry No. 12

Gilday - Direct

1  on that same form.  It's on page 4.  On that

2  supplemental statement, after the fact, what needs to

3  be disclosed about lobbying for a foreign principal?

4  A    For Item 12 under political activity, you would

5  need to disclose the date of the contact that you made,

6  the person you made it to, the mode of which you made

7  it, whether it's an e-mail or a phone call, or an

8  in-person meeting, and then what it was about.

9  Q    Okay.  Now, I want to talk about publications.  In

10 general, do the FARA forms require that registrants

11 disclose informational materials that they disseminate

12 to foreign principals?

13 A    Yes.

14 Q    Do publications, such as op-ed articles, qualify

15 as informational materials?

16 A    Yes.

17 Q    If a registrant reaches out to a media outlet to

18 try to get an article published on behalf of a foreign

19 principal, is that something that needs to be disclosed

20 on the forms?

21 A    Yes.

22 Q    What sort of disclosure does the registrant or

23 does the person reaching out need to make at that time?

24 A    At that time, you would -- the registrant would

25 need to disclose who the foreign principal is and that

Gilday - Direct

1  they are registered for that foreign principal at the

2  Department of Justice.

3  Q     And who do they disclose that to?

4  A     To anyone if they're making inquiry about posting

5  that particular op-ed or any other informational

6  material.

7  Q     When does that disclosure need to happen?

8  A     Right in the very beginning.

9  Q     When a registrant is getting an article published

10 on behalf of a foreign principal, are there any

11 disclosure obligations on FARA forms for that?

12 A     On the FARA forms, there are.  There also is --

13 you have to put a conspicuous label on the

14 informational material being disseminated stating

15 that -- who you are as the registrant, who you're

16 working on behalf of, the foreign principal, and that

17 more information can be found at the Department of

18 Justice.

19 Q     Does that rule still apply when something is

20 published online?

21 A     Yes.

22 Q     How does the DOJ get a copy of that article?

23 A     It is the responsibility of the registrant to

24 submit a copy of any disseminated information to the

25 FARA office within 48 hours of its dissemination.

Gilday - Direct

1  Q    And after the fact, are there additional

2  requirements under FARA about disclosing informational

3  materials?

4  A    When you file the supplemental statement, there is

5  a section where you detail all the information about

6  that kind of activity.

7  Q    Okay.  Let's take a look at that.  Can you look

8  back at Exhibit 154, please, on page 8?  What category

9  does that page address?

10 A    Informational materials.

11 Q    Take a look at Entry No. 17, please.  What needs

12 to be disclosed there?

13 A    All the foreign principals that you're

14 disseminating informational materials on behalf of.

15 Q    Okay.  Now take a look at Entry No. 18, please.

16 What needs to be disclosed there?

17 A    If there was any budget allocated for the

18 activities of disseminating informational materials.

19 Q    And Entry No. 19, what needs to be disclosed

20 there?

21 A    Any that apply, any publications that the

22 registrant reached out to or the mode of the

23 information needs to be disclosed there.

24 Q    Okay.  Now Entry No. 20 is next.  What needs to be

25 disclosed there?

Gilday - Direct

1  A    Again, all that applies.  So whoever you're

2  directing this informational material to needs to be

3  disclosed here.

4  Q    Now, please take a look at Entry No. 22.  What

5  does that ask about?

6  A    It asks the registrant if they filed with the FARA

7  Unit a copy of the disseminated materials.

8  Q    Finally, please take a look at Entry No. 23.  What

9  does that ask about?

10 A    It asks if the disseminated informational

11 materials had the required label on them when they were

12 disseminated.

13 Q    Okay.  I'd like to show you six exhibits which

14 have been marked as Government Exhibits 56, 58, 61, 64,

15 65, and 66.  The first one was 56.  Collectively, what

16 are these documents?

17 A    They are registration forms that one would need to

18 fill out if they want to register under FARA.

19 Q    Who filled out -- on whose behalf -- strike that.

20      Who is the registrant for these particular forms?

21 A    The Flynn Intel Group.

22 Q    When was this filing made?

23 A    It was made on March 7, 2017.

24 Q    Have you seen these documents before?

25 A    Yes.

Gilday - Direct

1  Q     In what context did you see them?

2  A     After this organization registered, it was

3  assigned to me as the reviewer.

4  Q     And did you review it?

5  A     Yes.

6         MR. TURGEON:  Your Honor, the government

7  moves to admit the Flynn Intel Group FARA filing,

8  Exhibits 56, 58, 61, 64, 65, and 66 into evidence.

9         THE COURT:  Any objection?

10         MS. MITCHELL:  None, Your Honor.

11         THE COURT:  Without objection, Government's

12  Exhibits 56, 58, 61, 64, 65, and 66 are admitted.

13         MR. TURGEON:  Thank you.

14  BY MR. TURGEON:

15  Q     Did the Flynn Intel Group file a copy of an op-ed

16  with its FARA registration?

17  A     No.

18  Q     Did the Flynn Intel Group attach copies of any

19  informational materials to its FARA registration?

20  A     No.

21  Q     To your knowledge, did the Flynn Intel Group ever

22  provide a copy of an op-ed to the FARA Unit?

23  A     Not to my knowledge, no.

24  Q     Okay.  I would like to show you what's been marked

25  as Government Exhibits 147, 148, and 149, please.

Gilday - Direct

1        Do you have 147?

2   A    Yes.

3   Q    Collectively, what are these forms?

4   A    These are, again, registration documents that a

5   registrant would need to fill out if they want to

6   register under FARA.

7   Q    Who filled out these particular forms?

8   A    Amsterdam & Partners, LLP.

9   Q    Is Amsterdam & Partners the registrant for those

10  forms?

11  A    Yes.

12  Q    Have you seen these forms before?

13  A    Yes.

14  Q    In what context did you see them?

15  A    Similar to the other one, I was assigned -- I was

16  the assigned reviewer for this registration.

17            MR. TURGEON:  Your Honor, the government

18  moves to admit Exhibits 147, 148, and 149 into

19  evidence.

20            THE COURT:  Any objection?

21            MS. MITCHELL:  None, Your Honor.

22            THE COURT:  Exhibits 147, 148, and 149 are

23  admitted.

24            MR. TURGEON:  Thank you.

25  BY MR. TURGEON:

Gilday - Direct

1  Q    Could you take a look at Exhibit 148, please.

2  Under Entry No. 3, who is listed as the foreign

3  principal that Amsterdam & Partners was acting on

4  behalf of?

5  A    The Republic of Turkey.

6  Q    When did Amsterdam & Partners register as an agent

7  of the government of Turkey?

8  A    October 26, 2015.

9  Q    Is this registration still active?

10 A    Yes.

11 Q    Okay.  Could you, please, direct your attention to

12 Exhibit 149.  What is that form?

13 A    This is a short form registration statement.

14 Q    What does a short form registration statement

15 disclose?

16 A    It discloses individuals who have agreed to do the

17 activity on behalf of the foreign principal.

18 Q    What does this particular short form disclose?

19 A    It discloses Mr. Robert R. Amsterdam has agreed to

20 do activity on behalf of the Republic of Turkey through

21 Amsterdam & Partners.

22 Q    Could you, please, turn to the second page of that

23 document at the bottom.  Who signed this form?

24 A    Robert R. Amsterdam.

25          MR. TURGEON:  Could I have the Court's

Gilday - Cross

1  indulgence for a moment, Your Honor?

2            THE COURT:  Yes.

3            MR. TURGEON:  No further questions, Your

4  Honor.  Thank you.

5            THE COURT:  All right.  Ms. Mitchell, any

6  cross?

7            MS. MITCHELL:  One moment, Your Honor.

8                    CROSS-EXAMINATION

9  BY MS. MITCHELL:

10 Q    Good afternoon, Mr. Gilday.  How are you?

11 A    I am well.  How are you?

12 Q    I'm fine.  Thank you.

13      My name is Stacey Mitchell, and I represent the

14 defendant here.

15      You and I have never spoken before; is that

16 correct?

17 A    No, ma'am.

18 Q    All right.  You're responsible within the FARA

19 Unit.  Are you assigned particular countries for which

20 you receive and take primary responsibility in

21 reviewing FARA filings?

22 A    That is correct, yes.

23 Q    And what areas are those?

24 A    It's kind of random.  It's just -- there's four

25 different reviewers, but even though some of us have

Gilday - Cross

1  different tasks than others, my responsibility is

2  mainly reviewing these forms.  So I get assigned more

3  countries, but there really -- it's more random than

4  anything else how they get assigned.

5  Q    Okay.  Do you have responsibility for the country

6  of Turkey?

7  A    I do.

8  Q    So any filing that pertains to the country of

9  Turkey comes through you?

10 A    It does except in the -- it's got to be -- when

11 someone registers for the first time -- so when an

12 initial registration comes in, if they're a registrant

13 for Turkey, it gets assigned to me at that point.

14 There was a scenario where an organization registers

15 for a country that I normally would not get assigned,

16 but then they add Turkey as a foreign principal later

17 on.  Then in that case, it stays with the original

18 reviewer, and it won't get over to me.

19 Q    That makes sense.  Thank you.

20      But anyone that is registering the first time and

21 it's with Turkey, that would be reviewed by you?

22 A    Yes, ma'am.

23 Q    Do you assist at all in the compilation at the end

24 of the year that the justice department puts together,

25 the submission by the attorney general to Congress?

1   A     Yes.

2   Q     And is it your obligation to ensure that each of

3   the filings, for instance, for Turkey are recorded in

4   that document?

5   A     Yes.

6   Q     Great.

7         I want to turn your attention back to the

8   documents that Mr. Turgeon had you look at, the

9   registration filed on behalf of the Flynn Intel Group,

10  which were Government's Exhibits 56, 58, 61, and 64.

11            MS. MITCHELL:  Those are admitted.  If I

12  could also have them brought up, that would be great.

13  A     What was the first one?

14  Q     Sure.  Actually, you know what?  I think you can

15  look at the screen and let this gentleman help you

16  along.  So if we can, look, first, at Exhibit 56 that

17  you were looking at previously.  That was the

18  registration statement for the Flynn Intel Group; is

19  that correct?

20  A     Yes, ma'am.

21  Q     And if you could, turn to -- well, we will direct

22  your attention to the second-to-last page of that.

23  That has been signed, and who is that signed by?

24  A     Michael T. Flynn.

25  Q     All right.  Thank you.

Gilday - Cross

1      I want to direct your attention now to Government

2  Exhibit 58, which will be pulled up, and then have you

3  look at page 2 on that at the bottom.  Who is that

4  signed by?

5  A    Michael T. Flynn.

6  Q    Great.  Thank you.

7      Turn now to Exhibit 61 if you would, please.  I

8  direct your attention to that.  Let's have you look at

9  page 9 of that.  Who is that signed by?

10 A    Michael T. Flynn.

11 Q    All right.  Thank you.

12     So your assessment is that Mike Flynn is the

13 registrant that's signing -- the individual signing on

14 behalf of this registrant; is that correct?

15 A    Yes, ma'am.

16 Q    When you received this filing, it came in

17 electronically; is that correct?

18 A    Yes, ma'am.

19 Q    Did you also receive a cover letter that was

20 submitted at the same time?

21 A    If it was submitted at the same time, I would have

22 received it, yes.

23         MS. MITCHELL:  Can I have him look at

24 Defendant's Exhibit 70, please, for identification --

25 I'm sorry -- 60.

Gilday - Cross

1           THE COURT:  Exhibit 60?

2           MS. MITCHELL:  Yes, Your Honor, Defense

3  Exhibit 60.

4  BY MS. MITCHELL:

5  Q    Have you seen that document before?

6  A    Yes.

7  Q    Now that you have looked at it, did that document

8  get submitted at the same time as the other documents?

9  A    I believe so.  What was the date stamp date on the

10  initial registration statement?

11  Q    That date -- I'm looking at Exhibit 57 -- is

12  March 7, 2017, at 6:02:45 p.m.

13  A    Then yes, ma'am, they were all submitted at the

14  same time.

15  Q    When you receive a letter like this, do you review

16  it for its content as well?

17  A    Yes.

18  Q    So you would take into account what's in the cover

19  letter in addition to what's in the filings that we've

20  just gone through?

21  A    Yes.

22           MS. MITCHELL:  I would offer Defendant's

23  Exhibit 70.

24           THE COURT:  Exhibit 60?

25           MS. MITCHELL:  Yes, 60.

Gilday - Cross

1          THE COURT:  Any objection?

2          MR. TURGEON:  No, Your Honor.

3          THE COURT:  Without objection, Defense

4    Exhibit 60 is admitted.

5    BY MS. MITCHELL:

6    Q    Directing your attention now, if I could -- you

7    looked with Mr. Turgeon at two government exhibits, 148

8    and 149, which were the Amsterdam & Partners filing

9    with respect to their work in Turkey, correct?

10   A    Yes, ma'am.

11   Q    You indicated that it's still valid, right?

12   A    Yes.  As far as I know, they are still active.

13   Q    But they have obligations to file six-month

14   reports, as well as annual submissions, correct?

15   A    Well, they have to file every six months.  So it's

16   semiannual.

17   Q    Right.  So I'd like to direct your attention, if I

18   could, to Defendant's Exhibits -- and I hope they're in

19   front of you -- 69, 72, 73, 76, 78 --

20   A    No.

21   Q    Not so lucky.

22        -- 78, 81, and 82.

23   A    Yes.

24   Q    Those are six-month filings by the Amsterdam &

25   Partners; is that correct?

Gilday - Cross

1   A    Yes.  It appears that way, yes.

2   Q    These were are all received in the FARA Unit; is

3   that correct?

4   A    Yes, ma'am.

5          MS. MITCHELL:  We would offer each of these

6   exhibits, Your Honor.

7          THE COURT:  Any objection?

8          MR. TURGEON:  Can I have one moment to

9   confer, Your Honor?

10         THE COURT:  Yes.

11     (Counsel confer.)

12         MS. MITCHELL:  Your Honor, if we could have

13  the Court's indulgence one moment.

14         THE COURT:  All right.  Ms. Mitchell, thank

15  you.

16         We'll go ahead and take our luncheon recess

17  at this time.  You're excused until 2:00.  Please do

18  not discuss this case among yourselves during the

19  luncheon recess.

20     (The jury exits at 1:04 p.m.)

21         THE COURT:  All right.  We'll stand in recess

22  until 2:00.

23         Mr. Gilday, do not discuss your testimony

24  during the luncheon recess.

25         THE WITNESS:  Yes, sir.

1            THE COURT:   The Court will stand in recess.

2       ------------------------------------
                   Time:   1:05 p.m.
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21       I certify that the foregoing is a true and

22    accurate transcription of my stenographic notes.

23

24
                                    _____
                                         /s/
25                             Rhonda F. Montgomery, CCR, RPR


   Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703) 299-4599