─────────────────United States v. Rafiekian─────────────────

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
                              :
UNITED STATES OF AMERICA,     : Criminal Action No.
                              :
          versus              : 1:18-CR-457
                              :
BIJAN RAFIEKIAN,,             : Day 2 (PM Session)
                              :
              Defendant. : July 16, 2019
------------------------------x

          The above-entitled Jury trial was heard by the
Honorable Anthony J. Trenga, United States District Judge.

          A P P E A R A N C E S

FOR THE GOVERNMENT:     JAMES PHILIP GILLIS, ESQ.
                        JOHN T. GIBBS, ESQ.
                        EVAN N. TURGEON, AUSA
                        United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314

FOR THE DEFENDANT:      ROBERT P. TROUT, ESQ.
(Rafiekian)             Trout Cacheris & Solomon, PLLC
                        1627 Eye St. N.W.
                        Suite 1130
                        Washington, DC 20006

                        MARK J. MACDOUGALL, ESQ.
                        STACEY H. MITCHELL, ESQ.
                        JOHN C. MURPHY, ESQ.
                        JAMES E. TYSSE, ESQ.
                        Akin, Gump, Strauss, Hauer & Feld, LLP
                        Robert S. Strauss Building
                        1333 New Hampshire Avenue, N.W.
                        Washington, D.C. 20036-1564

FOR MICHAEL T. FLYNN:   JESSE R. BINNALL, ESQ.
                        Harvey & Binnall, PLLC
                        717 King Street, Suite 300
                        Alexandria, Virginia 22314

─────────────────────United States v. Rafiekian─────────

208

```
 1 │ APPEARANCES (Cont'd)
   │
 2 │ FOR FLYNN INTEL GROUP:      DAVID A. WARRINGTON, ESQ.
   │                            Kutak Rock, LLP
 3 │                            1625 Eye Street, N.W.
   │                            Washington, D.C. 20006-4061
 4 │
   │ THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
 5 │
   │
 6 │ OFFICIAL COURT REPORTER:    MS. TONIA M. HARRIS, RPR
   │                            United States District Court
 7 │                            Eastern District of Virginia
   │                            401 Courthouse Square, Ninth Floor
 8 │                            Alexandria, VA 22314
   │
 9 │
   │
10 │
   │
11 │
   │
12 │
   │
13 │
   │
14 │
   │
15 │
   │
16 │
   │
17 │
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

─────── United States v. Rafiekian ───────

209

1            TABLE OF CONTENTS
              TRIAL WITNESSES
2

On behalf of the Government:
3

Jeffrey Gilday (continued)
4

5            Cross-examination by Ms. Mitchell............. 210
              Redirect examination by Mr. Turgeon.......... 214

6      Robert Kelner

7            Direct examination by Mr. Turgeon............. 216
              Cross-examination by Mr. MacDougall.......... 267
8            Redirect examination by Mr. Turgeon.......... 324

9      Grant Smith

10           Direct examination by Mr. Gibbs.............. 332
              Examination to be continued 7/17/2019
11

                    EXHIBITS
12

On behalf of the Government:
13                                                    Admitted

14     Number 19............................................ 336
       Number 22A........................................... 337
15     Number 22B........................................... 339
       Number 34............................................ 356
16     Number 50............................................ 234
       Number 90............................................ 221
17     Number 92............................................ 224
       Number 150A.......................................... 351
18     Number 150B.......................................... 353
       Number 151B.......................................... 246
19

On behalf of the Defendant:
20                                                    Admitted

21     Number 92............................................ 276
       Number 93............................................ 299
22     Number 94............................................ 299
       Number 95A........................................... 295
23     Number 98............................................ 316
       Number 99............................................ 301
24     Number 100........................................... 301

25

       Certificate of Court Reporter...................... 157

─── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───

EASTERN DISTRICT OF VIRGINIA

────── United States v. Rafiekian ──────

J. Gilday - Cross

210

1              **P R O C E E D I N G S**

2            **A F T E R N O O N   S E S S I O N**

3   (Court proceedings resumed at 2:12 p.m.)

4              THE COURT:  Are you ready to proceed?

5              MS. MITCHELL:  I am, Your Honor.

6              THE COURT:  All right.  Bring the jury out.

7              (Jeffrey Gilday resumes the stand.)

8              (Jury present.)

9              THE COURT:  All right.  Please be seated.

10             Mr. Gilday, you remain under oath.

11             Ms. Mitchell.

12             MS. MITCHELL:  Thank you, Your Honor.

13             Your Honor, I believe when we adjourned I had just

14  offered Defendant's Exhibit 69, 72, 73, 76, 78, 81, and 82,

15  which the witness identified as the Amsterdam filings.  We're

16  now again --

17             THE COURT:  All right.  Any objection?

18             MR. TURGEON:  No.

19             THE COURT:  All right.  Without objection, Defense

20  Exhibit 69, 72, 73, 76, 78, 81 and 82 are admitted.

21             MS. MITCHELL:  Now turning your attention, if I

22  could, to Defendant's Exhibit 86, please.

23                    **CROSS-EXAMINATION**

24  (Cont'd)

25  BY MS. MITCHELL:

────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ──────
                EASTERN DISTRICT OF VIRGINIA

1   Q.   Mr. Gilday, that's the report we spoke about earlier, the

2   annual report of the attorney general to the Congress of the

3   United States on the administration of Foreign Agents

4   Registration Act; is that correct?

5   A.   Yes, ma'am.

6   Q.   And that's for the six months ending December 31, 2016,

7   correct?

8   A.   Yes, ma'am.

9   Q.   I want to direct your attention to page 211 of the

10  document, not of the Bates number.

11       And that's where registrations applicable to the

12  government of Turkey start, correct?

13  A.   Yes, ma'am.

14  Q.   And there are actually 17 different registrations on

15  behalf of the government of Turkey; is that correct?

16  A.   Yes, ma'am.

17  Q.   All right.  So the government of Turkey clearly knows --

18  has registered openly with respect to its use of consultants

19  in the United States?

20  A.   Yes.

21  Q.   Thank you.

22       Now, I want to turn your attention back to

23  Exhibit 60, if I could.

24       You had an opportunity to look at this before,

25  briefly, correct?

1   A.   Yes.

2   Q.   It's a letter from the law firm of Covington to Heather

3   Hunt, correct?

4   A.   Correct.

5        MS. MITCHELL:  And I would ask that this be

6   displayed to the jury and the judge.

7        THE COURT:  You may publish it.

8        MS. MITCHELL:  Thank you, Your Honor.

9   BY MS. MITCHELL:

10  Q.   Heather Hunt, who is she?

11  A.   She is the former chief of that FARA Unit.

12  Q.   And she was chief at the time in March of 2017?

13  A.   Yes, ma'am.

14  Q.   All right.  Had you been aware of the extensive

15  discussions that had been going on between FIG's lawyers at

16  Covington and Heather Hunt with respect to this filing --

17  A.   No.

18  Q.   -- in March -- in the early months of 2017?

19  A.   I may have remembered them meeting, but I wasn't -- I

20  didn't take part in any of those meetings.

21  Q.   So you weren't part of any of those discussions that were

22  ongoing?

23  A.   No, ma'am.

24  Q.   All right.  Directing your attention, if I can, to

25  Exhibit 60, and focus in, if I can, on the second full

1    paragraph.

2              MS. MITCHELL:  And ask that that be highlighted for

3    the jury.

4              THE COURT:  All right.  You may do that.

5              MS. MITCHELL:  Thank you.

6    BY MS. MITCHELL:

7    Q.    If you could read that paragraph for us, please.

8    A.    Out loud?

9    Q.    Please.

10   A.    "In September 2016, Flynn Intel Group publicly disclosed

11   its representation of Inovo BV in the Federal Lobbying

12   Disclosure Act registration that was filed with the secretary

13   of the Senate and clerk of the House.

14             "After General Flynn was named in mid-November 2016

15   to serve as national security advisor in the new

16   administration, Flynn Intel Group shut down its operations,

17   did not renew its contract with Inovo BV and filed on

18   December 1st, 2016, a final public disclosure report

19   terminating its lobbyist registration for Inovo BV."

20   Q.    Fantastic.

21             MS. MITCHELL:  And then if I can highlight, for the

22   jury, paragraph No. 4, Your Honor.

23             THE COURT:  Yes.

24             MS. MITCHELL:  Thank you.

25   BY MS. MITCHELL:

─────── United States v. Rafiekian ───────
J. Gilday - Cross
214

1  Q.   If I can have you read that out loud as well, I'd

2  appreciate it.

3  A.   "The Department's regulations provide that filing under

4  the LDA is not an option.  However, if a foreign government,

5  even though not the client nonetheless is the principal

6  beneficiary of the work performed, this is an uncertain

7  standard not based on the statutory language and not defined

8  in the Department's regulations; nevertheless, because of the

9  subject matter Flynn Intel Groups work for Inovo BV, which

10  focused on Mr. --

11  Q.   Fethullah Gulen?

12  A.   -- Fethullah Gulen, whose extradition is sought by the

13  government of Turkey, the engagement could be construed to

14  have principally benefited the Republic of Turkey.  To

15  eliminate any potential doubt, the Flynn Intel Group therefore

16  is electing to file a registration under FARA, in lieu of its

17  prior LDA registration."

18  Q.   When you receive a packet complete like this, you look at

19  each page and consider them all as a -- in context to one

20  another, correct?

21  A.   Yes, ma'am.

22          MS. MITCHELL:  No further questions.

23          THE COURT:  All right.  Any redirect?

24          MR. TURGEON:  Yes, Your Honor.

25              **REDIRECT EXAMINATION**

United States v. Rafiekian

J. Gilday - Redirect

215

BY MR. TURGEON:

1

2  Q.    Could you take a look at Government Exhibit No. 65.

3          Do you recall if that's one of the documents that

4  Ms. Mitchell asked you about on cross-examination.

5  A.    I believe this was one of them, yes.

6  Q.    So please take a look at the second page of Exhibit 65.

7          First of all, what is Exhibit 65?

8  A.    This is a short form registration statement for Bijan

9  Rafiekian.

10 Q.    And who is the registrant in -- for that short form

11 registration statement?

12 A.    The Flynn Intel Group.

13 Q.    Was that document part of the Flynn Intel Group's FARA

14 filing?

15 A.    Yes.

16 Q.    Take a look at that second page.  Who signed that form?

17 A.    Bijan Rafiekian.

18         MR. TURGEON:  The Court's indulgence for one moment,

19 Your Honor.

20         No further questions.

21         THE COURT:  All right.  Thank you.  May the witness

22 be excused?

23         MR. TURGEON:  Yes, sir.

24         THE COURT:  Mr. Gilday is excused.  Do not discuss

25 your testimony outside of the courtroom with any other

────────────United States v. Rafiekian────────────

R. Kelner - Direct

216

1    witness.

2            THE WITNESS:  All right.

3            THE COURT:  Government will call its next witness.

4            MR. TURGEON:  Your Honor, the United States calls

5    Robert Kelner.

6            THE COURT:  All right.

7            (Witness excused.)

8            THE CSO:  Stand right here, face the clerk and raise

9    your right hand.

10           Thereupon,

11                        **ROBERT KELNER,**

12   having been called as a witness on behalf of the Government

13   and having been first duly sworn by the Deputy Clerk, was

14   examined and testified as follows:

15           (Witness seated.)

16                     **DIRECT EXAMINATION**

17   BY MR. TURGEON:

18   Q.   Could you please tell us your name.

19   A.   Robert Kelner.

20   Q.   How are you employed?

21   A.   I'm an attorney at the law firm of Covington & Burling in

22   Washington.

23   Q.   How long have you been with Covington & Burling?

24   A.   Almost 21 years.

25   Q.   What type of law do you practice?

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

United States v. Rafiekian

R. Kelner - Direct

217

1   A.   I practice what is called political law, as well as white

2   collar criminal defense.

3   Q.   Do you have an area of specialty?

4   A.   I do.  I have several specialties within political law.

5   They include campaign finance law and the Foreign Agents

6   Registration Act, FARA.

7   Q.   What is the Foreign Agents Registration Act?

8   A.   The Foreign Agents Registration Act is a law that was

9   enacted in 1938 which requires anybody who's acting as an

10  agent of a foreign person, or the language of the statute of a

11  foreign principal, to engage in certain activities in the

12  United States to register themselves with the Department of

13  Justice and to disclose their activities.

14  Q.   What is a foreign agent under FARA?

15  A.   A foreign agent is an individual or a firm that is

16  requested or directed by a foreign principal, like a foreign

17  government or a foreign corporation, to engage in lobbying

18  activities, or public relations activities, or other political

19  activities in the United States on behalf of that foreign

20  principal.

21  Q.   Relevant to this case, whom did Covington & Burling

22  represent?

23  A.   Covington represented General Michael Flynn and the Flynn

24  Intel Group, Inc.

25           THE COURT:  Mr. Turgeon, let me see counsel at the

R. Kelner - Direct

218

1    bench.

2              MR. TURGEON:  Yes, Your Honor.

3              (Bench Conference.)

4              THE COURT:  I assume you've met with Mr. Kelner and

5    he's familiar with the Court's ruling?

6              MR. TURGEON:  Yes.  That's right, Your Honor.

7              THE COURT:  Privilege and nonprivilege?

8              MR. TURGEON:  Yes.

9              THE COURT:  All right.  We have Flynn and FIG's

10   lawyer here, who wants to be in a position to state an

11   objection.  I was going to have him sit in the well of the

12   court, but off to the side, and let them have an opportunity

13   to serve any objections if and when that happens.

14             Any issue with any of that?

15             MR. TURGEON:  Well, Your Honor, we would object

16   to --

17             THE COURT:  I'm sorry.

18             MR. TURGEON:  We would object to anyone else being

19   present and admit any objections other than the attorneys for

20   the parties on trial.

21             THE COURT:  Well, these counsel are for Flynn, you

22   know, counsel for FIG and Flynn, so I'm going to let these

23   lawyers be here.

24             I assume he's familiar with the Court's rulings.

25   We're not going to have any needless objections, but I will

1    give him an opportunity.  He had made that request.

2              All right.

3              MR. TURGEON:  Thank you, Your Honor.

4              THE CSO:  Sir?

5              THE COURT:  Would you let Mr. Binnall -- ask Mr.

6    Binnall to come up here?

7              No, Mr. Binnall.

8              I believe Mr. Warrington is here for FIG.

9              MR. MACDOUGALL:  Oh, is that right?  I'm trying to

10   figure out who?

11             THE COURT:  Good.

12             (Mr. Binnall, Mr. Warrington, and Ms. Powell, joined

13             the side bar conference.)

14             THE COURT:  I want to confirm who is here for FIG

15   and who's here for Flynn.

16             MR. WARRINGTON:  David Warrington on behalf of Flynn

17   Intel Group.

18             THE COURT:  All right.

19             MR. BINNALL:  Jesse Binnall, one with -- on behalf

20   of General Flynn.

21             THE COURT:  All right.  I'm going to let both

22   of you-all to sit in the well of the court.  And if there's an

23   issue, I want you to object and raise your hand.

24             Are you familiar with the Court's rulings on

25   privilege issues?

1          MR. WARRINGTON:  Yes, Your Honor.

2          THE COURT:  I'm not anticipating we're going to get

3    into an area where it would require any further rulings.  I

4    did want to give you the opportunity to --

5          MR. BINNALL:  That's our anticipation.

6          THE COURT:  -- to make a record, if it's necessary.

7          All right.

8          MR. BINNALL:  Thank you, Your Honor.

9          (Open court.)

10          THE COURT:  All right.  Thank you.  Mr. Turgeon.

11   BY MR. TURGEON:

12   Q.   Is the Flynn Intern Group also referred to as FIG,

13   spelled F-I-G?

14   A.   It is.

15   Q.   Who at Covington was the lead attorney for those clients,

16   General Flynn and FIG?

17   A.   I was.

18   Q.   When did you begin representing General Flynn?

19   A.   Some time between Christmas of 2016 and New Year's Day.

20   So the very end of December of 2016.

21   Q.   Did you still represent General Flynn and FIG?

22   A.   No.

23   Q.   When did the representation end?

24   A.   To the best of my recollection, June 5, 2019, this year.

25   Q.   During the time that your firm, Covington, represented

---

1   General Flynn and FIG, did any other lawyers represent them as

2   well?

3   A.   They were also represented by another lawyer, not at

4   Covington, named Kristen Verderame.

5   Q.   What was Covington hired to do for FIG?

6   A.   Covington was hired to help FIG and General Flynn respond

7   to an inquiry letter from the U.S. Department of Justice.

8   Q.   So I would like to turn your attention to what's been

9   marked as Government Exhibit No. 90.

10  A.   Okay.

11  Q.   Have you seen that letter before?

12  A.   I have.

13  Q.   What is it?

14  A.   This is the inquiry letter from the U.S. Department of

15  Justice that I just mentioned.

16          MR. TURGEON:  Your Honor, the Government moves to

17  admit Exhibit No. 90.

18          THE COURT:  Any objection?

19          MR. MACDOUGALL:  No objection, Your Honor.

20          THE COURT:  Without objection, Government Exhibit 90

21  is admitted.

22                          (Government's Exhibit No. 90

23                          admitted into evidence.)

24  BY MR. TURGEON:

25  Q.   What components at DOJ sent this letter?

1    A.    It was sent by the Foreign Agents Registration Act unit

2    or FARA unit.

3    Q.    What is the FARA unit?

4    A.    The FARA unit is the part of the U.S. Department of

5    Justice that administers and enforces the Foreign Agents

6    Registration Act.

7    Q.    What is the purpose of an inquiry letter?

8    A.    The purpose of an inquiry letter is to ask a person

9    whether they should, in fact, have registered under the

10   Foreign Agents Registration Act prompted by some kind of

11   information that the Department of Justice has available to

12   it.

13   Q.    And in broad strokes, what was the subject of this letter

14   from the FARA unit?

15   A.    This letter concerned an op-ed article that had been

16   published by General Flynn in a publication called *The Hill* in

17   November of 2016, and it was asking whether or not, because of

18   that op-ed, FIG or General Flynn should have been registered

19   under FARA.

20   Q.    What was the subject matter of that op-ed article?

21   A.    The op-ed focused on a Turkish exile living in

22   Pennsylvania by the name of Fethullah Gulen.

23   Q.    Did FIG work on a project related to Fethullah Gulen in

24   the summer and fall of 2016?

25   A.    It did.

—United States v. Rafiekian—

R. Kelner - Direct

223

1    Q.    Who contracted with FIG for that project?

2    A.    The contract was between a dutch company called Inovo and

3    FIG.

4    Q.    Who owns Inovo?

5    A.    To the best of our understanding, it's owned by a Turkish

6    national named Ekim Alptekin.

7    Q.    In general terms, what did Covington do in response to

8    this inquiry letter?

9    A.    Covington collected and reviewed documents for FIG,

10   including e-mails.  We interviewed several key FIG personnel.

11   We reviewed public source information or public documents, and

12   we reviewed work product generated under the Inovo contract

13   under FIG.

14   Q.    Why did you gather that information and review those

15   documents?

16   A.    In order to advise FIG and General Flynn on whether they

17   needed to register under the Foreign Agents Registration Act

18   and how to respond to the inquiry letter from the Department

19   of Justice.

20   Q.    Did you respond to that inquiry letter?

21   A.    We did.

22   Q.    How did you respond to the inquiry letter?

23   A.    We sent a letter back to the FARA unit, which I believe

24   was dated January 11th, 2017, responding to the questions that

25   had been raised or responding to the inquiry.

1    Q.   So I would like to direct your attention to Government

2    Exhibit 92.

3    A.   Okay.

4    Q.   Can you identify that document, please?

5    A.   This is the response that we sent to the inquiry letter.

6              MR. TURGEON:  The Government moves to admit Exhibit

7    No. 92, Your Honor.

8              THE COURT:  Any objection?

9              MR. MACDOUGALL:  No objection.

10             THE COURT:  Without objection, Exhibit 92 is

11   admitted.

12                            (Government's Exhibit No. 92

13                            admitted into evidence.)

14   BY MR. TURGEON:

15   Q.   In response, what did that response letter say?

16   A.   In sum it said that it was likely that the Flynn Intel

17   Group was going to need to register under the Foreign Agents

18   Registration Act, that we were continuing to review

19   information, and that we had not yet made a final

20   determination as to who should be listed as the foreign

21   principal on the FARA registration.

22   Q.   After you sent that letter, did your fact gathering

23   continue?

24   A.   It did.

25   Q.   During what time period did Covington's fact gathering

1   take place?

2   A.    The fact gathering continued until the FARA filing was

3   submitted on March 7th of 2017.

4   Q.    You mentioned conducting interviews.  Who did Covington

5   interview in the course of its fact gathering?

6   A.    Prior to March 7th, we interviewed General Flynn, we

7   interviewed Bijan Rafiekian; we interviewed somebody named

8   Mike Boston who was the day-to-day project manager on the

9   Inovo contract for FIG; we interviewed someone named Bob

10  Kelley who was a lawyer for FIG.  There may have been other

11  interviews, but those are the ones I recall at this moment.

12  Q.    Do you see Bijan Rafiekian in the courtroom today?

13  A.    I do.

14  Q.    Can you please identify him by something he's wearing?

15  A.    He's the gentleman in the navy blue suit at this table

16  right here.

17         MR. TURGEON:  Your Honor, for the record, reflect

18  that the witness has identified --

19         THE COURT:  The record will reflect that Mr. Kelner

20  has identified Mr. Rafiekian.

21  BY MR. TURGEON:

22  Q.    You mentioned collecting documents.  What sort of

23  documents did you collect?

24  A.    To the best of my recollection, the documents that were

25  collected included e-mails from FIG's e-mail accounts, or some

1   of FIG's e-mail accounts.  We collected some of the work

2   product that had been generated by FIG under its contract with

3   Inovo.  We collected accounting records from the Flynn Intel

4   Group.  There may well have been other documents but those are

5   some of the things I recall right now.

6   Q.   Did you collect any contracts?

7   A.   We did.  We collected contracts.

8   Q.   And you mentioned that you collected some FIG e-mails.

9   Were you able to collect all FIG e-mails?

10  A.   No.

11  Q.   Why not?

12  A.   The main reason is that FIG had begun to shut down its

13  operations in November of 2016.  And by the time we were

14  retained, it was -- it was shut down, and some of the e-mail

15  accounts either no long existed or we were no longer able to

16  gain access to them.

17          In addition, FIG had used encrypted e-mail accounts

18  using a specialized encryption software.  I'm not certain, as

19  I sit here today, whether we were able to recover all of the

20  encrypted e-mails.

21  Q.   Did you also receive information from Ekim Alptekin or

22  from his lawyer?

23  A.   We did.

24  Q.   So you mentioned interviewing the defendant, how many

25  formal in-person interviews did you conduct with the

1  defendant?

2  A.   Two.

3  Q.   At the beginning of those interviews, did you give the

4  defendant any warnings?

5  A.   We did.

6  Q.   What warnings did you give him?

7  A.   We delivered what's referred to by lawyers as an Upjohn

8  warning, in which we said that we represented General Flynn,

9  and we represented the Flynn Intel Group, but we did not

10 represent him personally, and that therefore the

11 attorney-client privilege was controlled by the corporate

12 entity FIG and not by him personally.

13 Q.   Is that your standard practice when interviewing

14 corporate employees?

15 A.   Generally, it is.

16 Q.   Aside from those formal interviews, did the defendant

17 communicate information to Covington any other way?

18 A.   Yes.  He, on some occasions, sent us e-mails, often

19 through Kristen Verderame, or it might be an e-mail to both

20 Kristen Verderame and to me, might have been.

21        And there was at least one phone call, but most of

22 the information was conveyed by e-mail or, I should add,

23 sometimes he would share information with Kristen Verderame,

24 and she would then call us and relay information.

25 Q.   So I would now like to discuss what specific information

─────── United States v. Rafiekian ───────
R. Kelner - Direct
228

1   you gathered from the interviews and the documents you just

2   referred to.

3           Is there a name that was used by the defendant and

4   others at FIG to refer to the work that FIG did under its

5   contract with Alptekin's company Inovo?

6   A.   Yes.  Mr. Rafiekian and others at FIG generally referred

7   to the work for Inovo as "Project Confidence."

8   Q.   I'm going to use the same term.

9           In the course of gathering facts to respond to the

10  FARA Unit's inquiry, did you try to determine whether Turkish

11  government officials were involved with Project Confidence?

12  A.   We did.

13  Q.   Why did you try to determine whether Turkish government

14  officials were involved?

15  A.   That was relevant to several questions.  It was relevant

16  to whether FARA registration was required.  It was relevant to

17  who would need to be listed as the foreign principal on the

18  registration.  It was also relevant to whether or not it was

19  sufficient to register under a different statute called the

20  Lobbying Disclosure Act, in lieu of registering under FARA.

21  Q.   So I would like to pull up Government Exhibit No. 14,

22  which is an e-mail dated August 8, 2016, from Ekim Alptekin to

23  the defendant and General Flynn.

24  A.   Okay.

25  Q.   Could you please read that e-mail to yourself.

1            (A pause in the proceedings.)

2            THE WITNESS:  Yes.

3    BY MR. TURGEON:

4    Q.   Did you ask the defendant about whether this e-mail was

5    related to Project Confidence?

6    A.   I believe we asked about this e-mail and several other

7    related e-mails, yes.

8    Q.   What did the defendant tell you?

9    A.   He said that it was not related to Project Confidence,

10   but rather that it related to a completely separate project

11   that had been contemplated and discussed, which would have

12   involved the Turkish government being the client, but which

13   never came to fruition.

14   Q.   Are you aware of a name being used to refer to that

15   earlier project that the defendant claimed didn't come to

16   fruition?

17   A.   Our understanding is that that earlier project that

18   didn't come to fruition was referred to as Project Truth.

19   Q.   Did you ask the defendant whether this earlier project,

20   Project Truth, was part of Project Confidence?

21   A.   Yes.

22   Q.   What did he tell you?

23   A.   He said it was not; he said it was completely separate

24   and that Project Truth never actually happened.

25   Q.   Did you ask the defendant who the client for that earlier

1   project was going to be?

2   A.   Yes.

3   Q.   And what did he say?

4   A.   That that would have been -- sorry.  That the client

5   would have been the government of Turkey.

6   Q.   Did you ask the defendant why the project didn't come to

7   fruition?

8   A.   We either asked it or he offered the explanation on his

9   own.

10  Q.   What was the explanation that he offered?

11  A.   My recollection is that he said that the Turkish

12  government had backed out of the discussions.  And that after

13  they backed out of the discussions, it came out Alptekin said

14  that he wanted to engage FIG under a separate project through

15  his dutch company, Inovo.

16  Q.   So I would like to pull up Government Exhibit 16, please,

17  which is an e-mail from two days later, August 10, 2016, again

18  from Alptekin to the defendant and General Flynn.

19           Could you please read that e-mail to yourself.

20           (A pause in the proceedings.)

21  A.   Okay.

22  Q.   Did you question the defendant about Alptekin saying that

23  he had a green light to discuss confidentiality, budget, and

24  the scope of the contract?

25  A.   We did.

1    Q.   What did he say?

2    A.   He said, again, that this related to an earlier project

3    that did not come to fruition, a contract that was never

4    actually entered into, in which the client would have been the

5    government of Turkey.

6    Q.   Did you ask the defendant about the Turkish government's

7    role in the project that FIG actually did, Project Confidence?

8    A.   We did.

9    Q.   What did he say?

10   A.   My recollection is that he said the Turkish government

11   played no role in the contract that was actually entered into

12   with Inovo.

13   Q.   Did you ask General Flynn the same question?

14   A.   We did.

15   Q.   What did General Flynn say?

16   A.   He indicated that, the best of his understanding, the

17   client was Inovo, the Turkish government was not involved with

18   the exception of a meeting that occurred on September 19,

19   2016, in New York with Turkish ministers at which there was a

20   brief discussion of -- or a bit of a discussion of the Inovo

21   contract.

22   Q.   So let's talk about that meeting.

23        Through your fact gathering did you become aware --

24   strike that.

25        At your first interview with the defendant, did you

─────────── United States v. Rafiekian ───────────
R. Kelner - Direct
                                                          232

1  ask the defendant about the relationship between that meeting

2  and Project Confidence?

3  A.    Yes.

4  Q.    What did he say?

5  A.    My recollection is that he said that meeting in New York

6  was unrelated to Project Confidence.

7  Q.    So next, I would like to discuss what publications were

8  part of Project Confidence.

9        In the course of gathering facts to respond to the

10 FARA unit's inquiry, did you try to determine whether FIG

11 published any articles as part of Project Confidence?

12 A.    We did.

13 Q.    Why did you try to determine whether FIG published

14 articles as part of Project Confidence?

15 A.    Publishing articles under a contract with a foreign

16 principal, such as Inovo, would be one thing that might

17 trigger FARA registration, depending on all the facts and

18 circumstances.  And, in addition, if you did register under

19 FARA, you would have to disclose articles that you wrote,

20 certain other things that you did on behalf of your client,

21 and so we would need to identify any articles in order to

22 properly disclose them in the FARA filing.

23 Q.    Did the inquiry letter from the FARA unit specifically

24 reference any op-eds?

25 A.    It did.

─────United States v. Rafiekian─────
R. Kelner - Direct
233

1  Q.    So under FARA, are there any requirements for

2  informational materials such as op-eds?

3  A.    Yes.

4  Q.    What are those requirements?

5  A.    FARA requires that any informational materials that are

6  distributed to two or more persons under that contract must be

7  filed with the U.S. Department of Justice within 48 hours and

8  publicly disclosed on the FARA website.  And, in addition, any

9  such materials must contain a disclaimer or a legend

10  indicating that it was prepared on behalf of the foreign

11  principal and additional information is available at the U.S.

12  Department of Justice.

13  Q.    Okay.  Can you take a look at Government Exhibit No. 50,

14  please?  Which I believe is not -- is not in evidence.

15  A.    Okay.

16  Q.    Have you seen that before?

17  A.    I have.

18  Q.    What is it?

19  A.    This is the op-ed that I mentioned earlier that

20  General Flynn published in *The Hill* in November of 2016.

21          MR. TURGEON:  Your Honor, the Government moves

22  Exhibit No. 50 into evidence.

23          THE COURT:  Any objection?

24          MR. MACDOUGALL:  No objection.

25          THE COURT:  Without objection, Government 50 is

1  admitted.

2                            (Government's Exhibit No. 50

3                            admitted into evidence.)

4  BY MR. TURGEON:

5  Q.   On what date was that op-ed published?

6  A.   November 8, 2016.

7  Q.   Was that during Project Confidence?

8  A.   It was.

9  Q.   And what was the subject matter of that op-ed?

10 A.   It concerned a Turkish exile living in Pennsylvania named

11 Fethullah Gulen.

12 Q.   What position did the op-ed take with regard to Gulen?

13 A.   The op-ed advocated extraditing Gulen back to his home

14 country of Turkey.

15 Q.   Are there any labels or legends on that op-ed?

16 A.   No, there are not.

17 Q.   So take a look at Government Exhibit 45A, please, which

18 is an e-mail dated November 2, 2016, from the defendant to

19 Ekim and to Bob Kelley attaching a draft to the op-ed, which

20 is Government Exhibit 45B.

21       Could you please read that e-mail, Exhibit 45A, to

22 yourself?

23 A.   Okay.  I've read it.

24 Q.   Do you see at the top where it says, "A promise made is a

25 promise kept"?

United States v. Rafiekian

1  A.   I do.

2  Q.   Did you ask the defendant about whether the op-ed was

3  part of Project Confidence?

4  A.   We did.

5  Q.   Did he say it was part of Project Confidence or it wasn't

6  part of Project Confidence?

7  A.   He said it was not part of Project Confidence.

8  Q.   Did you ask the defendant whose idea it was to write this

9  op-ed?

10 A.   We did.

11 Q.   What did he say?

12 A.   He said it was General Flynn's idea to write it.

13 Q.   Did you ask the defendant who wrote the op-ed?

14 A.   We did.

15 Q.   What did he say?

16 A.   He said that General Flynn wrote it but that he helped

17 him with the writing of it and also brought in an editor to

18 help with editing it, a gentleman named Hank Cox.

19 Q.   Did you ask the defendant about how the op-ed was placed

20 in *The Hill*?

21 A.   We did.

22 Q.   What did he say?

23 A.   He said that he had asked a public relations firm called

24 Sphere to help place it in the media.

25 Q.   What was Sphere's role on Project Confidence?

────────United States v. Rafiekian────────
R. Kelner - Direct
236

1  A.   Sphere was a subcontractor to FIG on the Inovo contract.

2  They are a public relations firm, and they are engaged in

3  providing public relations or media support to FIG in

4  connection with the Inovo contract.

5  Q.   Did FIG pay Sphere for this work?

6  A.   FIG paid Inovo as a subcontractor, yes.

7           I'm sorry, I misspoke.  FIG paid Sphere as a

8  subcontractor.

9  Q.   Thank you.

10          Did the defendant say anything about whether placing

11  the op-ed was part of Sphere's public relations work on

12  Project Confidence?

13  A.   To the best of my recollection, he said it was not, that

14  he had instead asked Sphere to help place this sort of as a

15  favor, because it had to be placed very quickly, and they had

16  the contacts in order to help get it placed.

17  Q.   So, according to the defendant, was the op-ed part of

18  Project Confidence?

19  A.   He said it was not.

20  Q.   Did you ask General Flynn whether the op-ed was part of

21  Project Confidence?

22  A.   We did.

23  Q.   What did General Flynn say?

24  A.   He said it was not part of Project Confidence.  It was

25  something that he had wanted to do.  Though his interest in

1  the issues covered in the op-ed had in part been generated by

2  the work that they were doing for Inovo -- Project Confidence

3  work had focused him on these issues, he had been thinking

4  about it and he wanted to write this op-ed.

5  Q.   Take a look at Government Exhibit 48A, if you would,

6  which is already in evidence.  That's an e-mail dated

7  November 4, 2016, from the defendant to Alptekin attaching

8  another draft of the op-ed, which is Government Exhibit 48B.

9  A.   Okay.

10 Q.   Can you please read the first four sentences of that

11 e-mail to yourself?

12 A.   Okay.

13 Q.   Now, please take a look at Government Exhibit 49, which

14 is an e-mail the following day, November 5th, from Alptekin

15 back to the defendant.

16       Could you please read that e-mail to yourself?

17 A.   Okay.

18 Q.   Did you ask the defendant why he sent drafts to the op-ed

19 to Alptekin?

20 A.   We either asked it or he volunteered an answer.

21 Q.   What did he say?

22 A.   My best recollection is he said something along the lines

23 of, you know, sort of for client relations reasons he wanted

24 Ekim to see it to be aware of it and that that's why he shared

25 it with him.

United States v. Rafiekian

R. Kelner - Direct

238

1  Q.   Did you ask the defendant what Alptekin's reaction to the

2  op-ed was?

3  A.   Again, we either asked or he offered an explanation.

4  Q.   And what did he say?

5  A.   He said that Alptekin was not happy with it, did not want

6  it to be -- and did not want it to be published because it

7  referred to something called the Muslim Brotherhood in a way

8  that, in Alptekin's mind, would be upsetting to the Turkish

9  government.

10 Q.   Okay.  I would like you to take a look, please, at what's

11 been marked as Government Exhibit 93B.

12 A.   Okay.

13 Q.   Have you seen that document, before?

14 A.   Yes.

15 Q.   What is it?

16 A.   This is a letter from the law firm, Arent Fox, which was

17 representing Mr. Alptekin.

18 Q.   Who signed that letter?

19 A.   It was signed by a lawyer at Arent Fox named Matt Nolan.

20 Q.   What's the date of the letter?

21 A.   January 18, 2017.

22 Q.   What do you recall about how Covington got this

23 memorandum?

24 A.   My best recollection is that Mr. Rafiekian had sent it to

25 Kristen Verderame and that she and -- that she, in turn,

United States v. Rafiekian

R. Kelner - Direct

239

1  forwarded it to me and perhaps others at Covington.

2  Q.   Was that during Covington's fact gathering?

3  A.   Yes.

4          MR. TURGEON:  Your Honor, the Government moves

5  Exhibit 93B into evidence.

6          THE COURT:  Any objection?

7          MR. MACDOUGALL:  Yes, Your Honor.

8          THE COURT:  All right.  Let me see counsel at the

9  bench.

10          (Bench Conference.)

11          THE COURT:  What's the objection?

12          MR. MACDOUGALL:  Your Honor, this is hearsay.  This

13  is a straight hearsay objection.

14          THE COURT:  All right.

15          This was -- this is provided, my understanding from

16  the witness's testimony, from Verderame to Covington, as part

17  of its fact gathering process.

18          MR. TURGEON:  Yes, Your Honor.  It's a document that

19  Covington quoted from in drafting the FARA filing.

20          THE COURT:  All right.

21          I'm going to let it in for that purpose.  I'm going

22  to give an instruction to the jury.

23          MR. TURGEON:  All right.  Thank you, Judge.

24          (Open court.)

25          THE COURT:  Over objection, Exhibit 93 will be

United States v. Rafiekian

R. Kelner - Direct

240

1  admitted for the limited purpose of establishing that

2  information that Mr. Kelner had received as part of his fact

3  investigation.

4         Ladies and gentlemen, this document is similar to

5  the other ones that we've been allowing.  It is being admitted

6  not as evidence that anything in this document that's stated

7  is true, but simply that it reflects information available and

8  provided to Mr. Kelner and Covington as part of its

9  investigation and preparation of the FARA statement.

10                          (Government's Exhibit No. 93

11                           admitted into evidence.)

12  BY MR. TURGEON:

13  Q.   Could you please describe the memorandum's subject matter

14  for the jury?

15  A.   The memorandum covered a wide range of issues, but one

16  key focus of it was whether or not Mr. Alptekin was an agent

17  of the Turkish government, either directly or through some

18  other entity.

19  Q.   Did you request this memorandum?

20  A.   No.

21  Q.   Before you received the memorandum, did you know that

22  Alptekin had been speaking with attorneys?

23  A.   To the best of my recollection, we did not.

24  Q.   Did you know that Alptekin was having this memorandum

25  prepared?

─────United States v. Rafiekian─────
R. Kelner - Direct
241

1   A.   The best of my recollection, no.

2   Q.   Does the memorandum say anything about whether Alptekin

3   was consulted about a draft of the op-ed?

4   A.   I believe it says that he was not consulted about a draft

5   of the op-ed.

6   Q.   So can I direct your attention to page 3, please?

7         Could you please read the bottom paragraph of page 3

8   to yourself?

9   A.   Okay.

10  Q.   What does the memorandum say about whether Alptekin was

11  consulted about a draft of the op-ed?

12  A.   I wonder if it could be kept up on the screen so I can

13  see it.

14  Q.   Sure.

15  A.   Thank you.

16        I'm sorry, ask the question again.

17  Q.   My question was:  What does the memorandum say about

18  whether Alptekin was consulted about the draft?

19  A.   It says that he was not consulted about the draft.

20  Q.   Thank you.

21        So now I would like to discuss the purpose of

22  Project Confidence.  In the course of gathering facts to

23  respond to the FARA unit's inquiry, did you try to determine

24  the purpose of Project Confidence?

25  A.   We did.

1    Q.   Why did you try to determine the purpose of the project?

2    A.   The purpose of the project was particularly relevant to

3    whether it was sufficient simply to register under a different

4    statute called the Lobbying Disclosure Act, because FIG had

5    filed a registration under the Lobbying Disclosure Act

6    previously.  And the purpose would make a difference in terms

7    of whether that registration was sufficient versus there being

8    a need to nonetheless register under the Foreign Agents

9    Registration Act.

10   Q.   Under what circumstances can an entity satisfy its FARA

11   obligations by registering under the LDA instead of under

12   FARA?

13   A.   There's an exemption in the Foreign Agents Registration

14   Act that would allow an entity to satisfy its FARA obligation

15   by instead registering under a different statute called the

16   Lobbying Disclosure Act if certain conditions are met.  And

17   those conditions include that the client is not a foreign

18   government or a foreign political party; that the registrant

19   has engaged in some federal lobbying activities; and that a

20   foreign government or a political party is not the "principal

21   beneficiary" of the work that's being performed.

22   Q.   Did Covington try to determine whether FIG's activities

23   under Project Confidence principally benefited a foreign

24   government?

25   A.   We did.

1   Q.   In trying to make that determination, did you review work

2   product generated as part of Project Confidence?

3   A.   We did.

4   Q.   What was the subject matter of the work products created

5   as part of the project?

6   A.   All or virtually all of the work product generated by

7   FIG, in connection with the Inovo contract, related to the

8   Turkish exile, Fethullah Gulen.

9   Q.   Did you identify any work product that was not about

10  Gulen?

11  A.   Not to the best of my recollection.

12  Q.   Did all of this work product portray Gulen in a positive

13  light or in a negative light?

14  A.   It portrayed him in a negative light.

15  Q.   Did you ask the defendant what the purpose of the Project

16  Confidence was?

17  A.   Yes.

18  Q.   What did the defendant tell you about the purpose of the

19  project?

20  A.   He said the purpose of the project was to improve the

21  U.S. business communities' confidence in the Turkish economy,

22  and to improve the economic environment between Turkey and the

23  United States.

24  Q.   Did you ask General Flynn about the purpose of Project

25  Confidence?

1   A.   We did.

2   Q.   What did General Flynn say?

3   A.   He also said that the purpose was to improve the U.S.

4   business communities' confidence in the Turkish economy and to

5   improve the business climate or environments between Turkey

6   and the United States and to -- to encourage U.S. investment

7   in Turkey.

8   Q.   Next, I would like to talk about payments that FIG made

9   during Project Confidence.

10          So in the course of gathering facts to respond to

11  the FARA inquiry, did you try to identify the flow of money

12  between FIG and Alptekin or Inovo?

13  A.   We did.

14  Q.   Why did you try to determine how money flowed?

15  A.   There were several reasons, but the main reason was

16  that -- well, there were several reasons.  One reason is that

17  if a FARA filing was filed, we would have to disclose payments

18  made and payments received by FIG.

19          In addition, if there was direct funding coming into

20  FIG from the Turkish government or funds routed through Inovo

21  from the Turkish government, that would have been relevant to

22  who the real foreign principal was and who would have to be

23  disclosed as the foreign principal.

24          We also wanted to understand some of the things that

25  we saw in the money flow so that we could be sure that we were

1   disclosing those things on the form that needed to be

2   disclosed.

3   Q.   What things are you referring to when you mention

4   "things"?

5   A.   There were, I believe, two $40,000 payments that showed

6   up in FIG's accounting records as payments from FIG back to

7   Ekim Alptekin.  And we wanted to understand the circumstances

8   around those two payments for a number of reasons, one of

9   which was to understand what we would need to do to properly

10  disclose it on a FARA filing.

11  Q.   So to step back, did you identify any contracts between

12  FIG and Alptekin or Inovo?

13  A.   Yes.  There was -- there were a set of contracts.  There

14  was a contract between Inovo and FIG, but there was also a

15  draft contract between FIG and Alptekin personally.

16  Q.   So let's talk first about the contract between Inovo and

17  FIG.  Can you take a look at what's been marked as Government

18  Exhibit 151B, please?

19  A.   Okay.

20  Q.   What is that document?

21  A.   This appears to be the contract between Inovo and FIG.

22  Q.   Do you recognize the Bates prefix at the bottom of that

23  page?

24  A.   I do.

25  Q.   What is that Bates prefix?

1  A.    FIG EDVA603.

2  Q.    What significance does that have for you?

3  A.    This indicates that it was produced by Covington in

4  responding to a grand jury subpoena that was issued to FIG.

5          MR. TURGEON:  The Government moves to admit Exhibit

6  151B into evidence.

7          THE COURT:  Any objection?

8          MR. MACDOUGALL:  No objection.

9          THE COURT:  151B is admitted.

10                        (Government's Exhibit No. 151B

11                         admitted into evidence.)

12  BY MR. TURGEON:

13  Q.   On this first contract, who is the client and who is

14  providing the services?

15  A.   On the first contract, the client was Inovo and the

16  service provider was FIG.

17  Q.   What is the amount of that contract?

18  A.   I believe it was $600,000.

19  Q.   How was that $600,000 to be paid, according to the

20  contract?

21  A.   The contract specifies it would be paid in three payments

22  of $200,000 each.

23  Q.   So let's talk about the second contract, the draft

24  contract you mentioned.

25          Can you take a look at Government Exhibit 25D, which

United States v. Rafiekian

R. Kelner - Direct

247

1   I believe is already in evidence?

2   A.   25D?

3   Q.   That's right.  I believe it should be on your screen as

4   well.

5   A.   Oh, I see it.

6   Q.   On this second contract, who is the client and who is

7   providing the services?

8   A.   Under this contract, the client would be FIG, and the

9   services would be provided by Alptekin.

10  Q.   Did you ask the defendant why there was one contract

11  where Alptekin's company Inovo was supposed to pay FIG, and

12  this second contract with Alptekin was supposed to get paid by

13  FIG?

14  A.   Yes.

15  Q.   What did the defendant say about that?

16  A.   He said that there had been consideration of retaining

17  Alptekin as a consultant on the project so that he could

18  provide advice regarding local conditions in Turkey, but that

19  Alptekin never actually became a consultant; he never actually

20  rendered consulting services to FIG.

21  Q.   Do you see at the bottom of page 1 under Compensation,

22  where it says, "Parties agree that the advisor shall receive a

23  mobilization fee of $40,000"?

24  A.   I do.

25  Q.   "At the execution of this agreement.  Subsequent payments

R. Kelner - Direct

1   shall follow."  And it goes on from there.

2   A.    I do.

3   Q.    In the course of your fact gathering, did you identify

4   $40,000 payments from FIG to Alptekin's company, Inovo?

5   A.    We did.

6   Q.    How many $40,000 payments were there?

7   A.    To the best of my recollection, there were two $40,000

8   payments.

9   Q.    So if you could take a look at Government Exhibit 35B,

10  which is in evidence, which is an invoice from Inovo to FIG

11  dated October 14, 2016.

12          What is the amount of that invoice?

13  A.    $40,000.

14  Q.    What does that invoice say that the payment is for?

15  A.    It says, "Consultancy fee Confidence Project."

16  Q.    I think you mentioned that Covington reviewed FIG's

17  accounting records as part of its fact gathering; is that

18  correct?

19  A.    Correct.

20  Q.    According to the accounting records, how were $40,000

21  payments recorded?

22  A.    My recollection is that they were recorded as consultancy

23  fees.

24  Q.    So I would like to pull up Government Exhibit 33C, which

25  is an e-mail from three days before the date of that invoice

1    we just looked at.  It's dated October 11, 2016, from the

2    defendant to General Flynn's son, Michael Flynn, Jr., copying

3    General Flynn and Alptekin.

4            Can you please read that e-mail to yourself?

5    A.   Okay.

6    Q.   Do you see at the top where it says -- where the

7    defendant says, "Please initiate and execute a wire transfer

8    in the amount of $40,000 from Flynn Intel Group"?

9            And it refers to consulting services that he's

10   providing to FIG on the Confidence Project.

11   A.   I do.

12   Q.   Did you ask the defendant about that e-mail?

13   A.   We did.

14   Q.   What did he say about that e-mail and the payment?

15   A.   He said that the $40,000 payments, both of them, to

16   Alptekin were actually refunds, not consulting fees.  So they

17   were refunds for public relations and lobbying services that

18   had not been rendered by FIG but which Alptekin had been

19   expecting.

20   Q.   Could you please take a look at -- back at Government

21   Exhibit 93B, the memorandum from Alptekin's lawyers?

22           On the third page in the second paragraph, could you

23   please read the last four sentences to yourself where it

24   begins, "FIG introduced Mr. Alptekin to Sphere Consulting"?

25   A.   Okay.

R. Kelner - Direct

250

1   Q.   And can you tell me how, again, did Covington get this

2   memorandum?

3   A.   My recollection is it was sent to us by Kristen Verderame

4   who had received it from Mr. Rafiekian.

5   Q.   Do you see where that paragraph refers to lobbying and PR

6   components never materializing?

7   A.   It just disappeared from my screen.

8   Q.   That's the -- on the third page in the second paragraph.

9        Thank you.

10  A.   Okay.  I'm sorry, say that again.

11  Q.   Do you see there where it refers to lobbying and PR

12  components never materializing?

13  A.   I do.

14  Q.   From your fact gathering, do you know whether any

15  entities provided lobbying or public relations work on Project

16  Confidence?

17  A.   I do.

18  Q.   Who performed lobbying or public relations services as

19  part of the project?

20  A.   Sphere provided public relations services and I believe

21  some lobbying services as well.  In addition, FIG itself

22  engaged in some lobbying service.

23  Q.   On behalf of FIG, did the defendant engage in any

24  lobbying?

25  A.   He did.

────── United States v. Rafiekian ──────
R. Kelner - Direct
251

1  Q.   So let me go back to the work Sphere performed.  What

2  work did Sphere do?

3  A.   To the best of my recollection, Sphere engaged with some

4  media.  They, I believe, also had some contacts with state

5  government officials -- although this is stretching my memory

6  a bit -- and they were helping to prepare for distribution to

7  the media of the materials that might be generated by FIG

8  under the Inovo contract.

9  Q.   And according to FIG's accounting records, did FIG pay

10 Sphere as part of this work?

11 A.   Yes.

12 Q.   Now, you mentioned the defendant performing some lobbying

13 services.  What lobbying did the defendant do himself?

14 A.   My recollection is that he attended at least one meeting

15 with congressional staff at which he discussed Turkey and the

16 subject matter that FIG was working on for Inovo.

17 Q.   What subject matter was that that FIG was working on for

18 Inovo?

19 A.   Research regarding Fethullah Gulen, the Turkish exile in

20 Pennsylvania.

21 Q.   So now I would like to talk about or I'd like to discuss

22 what Covington did with the facts that it gathered.

23        What did Covington do with the facts that it

24 gathered?

25 A.   Initially, facts we gathered contributed to the letter

R. Kelner - Direct
252

1  that you showed me earlier that we sent to the Department of

2  Justice on January 11th with what I'd describe as preliminary

3  findings.  And then later on we used the information we had

4  gathered to prepare a draft FARA filing which ultimately was

5  filed on March 7, 2017.

6  Q.   Did Covington notify the defendant that it planned to

7  register under FARA?

8  A.   Yes.

9  Q.   On behalf of FIG?

10 A.   Yes.

11 Q.   What was the defendant's reaction?

12 A.   My recollection is that he was not happy about it.  In

13 particular, was not happy about the suggestion that FIG's work

14 principally benefited the government of Turkey.

15 Q.   Did you have any private conversations with the defendant

16 on this topic?

17 A.   I had one -- to the best of my recollection, I had one

18 private conversation where he and I were the only

19 participants.

20 Q.   Around what time of day did that conversation take place?

21 A.   The only thing I remember is that it was late at night.

22 Q.   Was that a phone call?

23 A.   Yes.

24 Q.   What do you recall the defendant saying on that phone

25 call?

1   A.    I don't remember in great detail what was said in the

2   conversation.  What I do remember is that he was concerned

3   about the FARA filing.  He told me that he had a heart

4   condition, that he had had either a heart attack or some sort

5   of cardiac event in the past and that, you know, he was upset

6   and concerned about the FARA filing.

7   Q.    Okay.  I would like to show you six exhibits which are

8   already in evidence, Government Exhibits 56, 58, 61, 64, 65

9   and 66.

10  A.    Okay.  Get the binder for that, please.

11  Q.    That's 56 through --

12  A.    Different binder.

13  Q.    They are all between 56 and 66.

14  A.    Thank you.

15        Okay.

16  Q.    Collectively, what are these documents?

17  A.    Collectively, these are the FARA filing.

18  Q.    Who is the registrant for that FARA filing?

19  A.    Flynn Intel Group, Inc. is the registrant, and then there

20  are what's referred to as short form registrations filed by

21  Michael Flynn and by Bijan Rafiekian.

22  Q.    When was this filing made?

23  A.    March 7, 2017.

24  Q.    What lawyers for FIG drafted or had input into the

25  drafting of this FARA filing?

1  A.   Lawyers at Covington, and, in addition,

2  Kristen Verderame.

3  Q.   Did Covington ask the defendant questions during the

4  drafting process?

5  A.   Yes, generally through Kristen Verderame and perhaps in

6  one or two instances directly.

7  Q.   Who on behalf of FIG reviewed a draft of the filing

8  before it was submitted?

9  A.   Drafts were reviewed by Mr. Rafiekian and by

10  General Flynn and by Kristen Verderame, and I believe that's

11  it to the best of my recollection.

12  Q.   Did the defendant request any edits to the draft?

13  A.   He did.

14  Q.   What edits did he request?

15  A.   There were several.  One was that he wanted us to remove

16  from the filing the word "kickback."  Another proposed change

17  was that he preferred that it not reference James Woolsey, the

18  former CIA director who had been involved to some extent in

19  the project.

20        In addition, the draft of the filing indicated that

21  he had attended a Turkey-related conference under the

22  contract, and he told us he had not attended that conference

23  so he wanted that removed from the filing.

24        In addition to that, he saw that in the draft filing

25  in the listing of expenditures by FIG it showed the two

1   $40,000 payments.  The way that they appeared in the

2   accounting records, the filing said that based on the

3   accounting records these showed up as consulting fees and he

4   wanted that changed to refunds.

5          There may have been other edits he proposed but

6   those are the ones that I can recall off the top of my head.

7   Q.   All right.  Can you take a look at Government Exhibit 65,

8   which is the short form FARA registration statement for the

9   defendant?

10  A.   Okay.

11  Q.   So, first of all, was the defendant given a draft of all

12  the forms in the FARA filing or just this one form?

13  A.   He was at least, in one instance, given the full draft.

14  Q.   That includes all the forms?

15  A.   Yes.

16  Q.   When a FARA presentation is being filed, what short form

17  statements does the registrant need to submit?

18  A.   The registrant needs to submit a short form for each of

19  its employees.  At a minimum, for each of its employees who

20  perform services under the contract that were not merely

21  clerical or administrative in nature.

22  Q.   So in the context of FIG's FARA filing, what does this

23  short form statement for the defendant disclose?

24  A.   It discloses the foreign principal for which he was

25  working, which is shown here as Inovo, and it includes a

United States v. Rafiekian

1   description of services rendered.

2   Q.   So take a look at the bottom of the second page.  Whose

3   signature appears there?

4   A.   That's an electronic signature for Bijan Rafiekian.

5   Q.   How did the defendant sign this form?

6   A.   Because it's an electronic filing system, in order to

7   sign it, Covington, which electronically submits the form, has

8   to get authorization from the individual who is signing so

9   that we can apply his electronic signature.  So that's what

10  happened here.  There was an e-mail exchange with

11  Mr. Rafiekian asking him if after his review of the document

12  he authorized us to file and sign it with his name.

13  Q.   And what did he say?

14  A.   He said, in so many words, yes, he authorized us to make

15  the filing.

16  Q.   All right.  I would like to look at a couple of segments

17  of the FARA filing.

18        Could I please direct your attention to Government

19  Exhibit 58?

20  A.   Okay.

21  Q.   On the first page in item No. 3 under "Name of Foreign

22  Principal," what does it say?

23  A.   Inovo BV.

24  Q.   Does that reflect what the defendant told you?

25  A.   Yes.

United States v. Rafiekian

R. Kelner - Direct

257

1   Q.   What did he tell you?

2   A.   That the work was performed for Inovo.

3   Q.   Did the defendant suggest any edits to this entry?

4   A.   No.

5   Q.   All right.  On page 2 of the document, under 8B, where

6   the form asks:  Is this foreign principal supervised by a

7   foreign government for a political party or other foreign

8   principal or directed by a foreign government for a political

9   party or other foreign principal?

10          What boxes are checked there?

11  A.   In the final version the boxes for "no" are checked and

12  there's an indication to see an attachment.

13  Q.   Could you please turn to that attachment on the next

14  page?

15  A.   Yes.

16  Q.   Does anything in that attachment say that Inovo BV was

17  supervised or directed by a foreign government, foreign

18  political party, or other foreign principal?

19  A.   No.

20  Q.   Do those boxes checked "no" reflect what the defendant

21  told you?

22  A.   Yes.

23  Q.   What did he tell you?

24  A.   He told us that the work was directed by Inovo through

25  Ekim Alptekin and that the Turkish government played no role

United States v. Rafiekian

R. Kelner - Direct

258

1    in directing the Project Confidence.

2    Q.   Did the defendant suggest any edits to these entries?

3    A.   Not that I recall.

4    Q.   On the next page of that document, could you please read

5    the first sentence of the final paragraph out loud?

6         Where it begins, "Flynn Intel Group does not

7    know..."

8    A.   Is it in the attachment?

9    Q.   I believe so, yes.

10   A.   I have it, yes.

11   Q.   Could you please read that first sentence beginning,

12   "Flynn Intel Group does not know..." out loud?

13   A.   Out loud?

14   Q.   Yes, please.

15   A.   "Flynn Intel Group does not know whether or the extent to

16   which the Republic of Turkey was involved with its retention

17   by Inovo for the three month project."

18   Q.   Does that reflect what the defendant told you?

19   A.   Not exactly, because what the -- what Mr. Rafiekian told

20   us was more categorical than that.  He told us that the

21   government of Turkey played no role in the engagement of FIG

22   for Project Confidence, which is referred to here as the three

23   month project.

24   Q.   Did the defendant suggest any edits to that entry in the

25   FARA filing?

1   A.   I don't recall that he did.

2   Q.   Please take a look at Government Exhibit 61, which is

3   another document that was part of FIG's FARA filing.

4   A.   Okay.

5   Q.   On page 4 and entry No. 13, can you please read out loud

6   what's written in the beginning with "On his own initiative"?

7   A.   Okay.

8   Q.   Could you read that out loud, sir.

9   A.   I'm sorry.

10          "On his own initiative Michael T. Flynn published an

11  op-ed in *The Hill* on November 8, 2016 that related to the same

12  subject matters as the Flynn Intel Group work for Inovo BV.

13  Neither Inovo BV nor any other person requested or directed

14  publication of the op-ed."

15  Q.   Does that reflect what the defendant told you?

16  A.   I'm sorry.  Could you put that back up on the screen?

17  Q.   Sure.

18  A.   The whole quote.

19          Partly it reflects what he told us, in that it

20  reflects that General Flynn published the op-ed on his own

21  initiative and that they were not requested to do so by any

22  other person.

23          I would say that the clause that says that the op-ed

24  related to the same subject matter as the Flynn Intel Group

25  worked for Inovo BV was something that -- that we added.

1   Q.   When the defendant reviewed the draft of the filing, did

2   he suggest any edits to that -- to any of that language?

3   A.   I don't recall that he did.

4   Q.   On page 10 of the same document, can I direct you to the

5   last paragraph.  Could you please read the first sentence of

6   that last paragraph out loud, where it begins "In early

7   September..."?  Could you read that out loud, please?

8   A.   "In early September 2016, Flynn Intel Group was invited

9   by Mr. Alptekin to meet with a group of government officials

10  from Turkey for the purpose of understanding better the

11  political climate in Turkey at the time, as background for the

12  project."

13  Q.   Does that reflect what the defendant told you?

14  A.   Not exactly.

15  Q.   What do you mean by "not exactly"?  What did he tell you?

16  A.   He did acknowledge that there was a meeting in September

17  of 2016 with Turkish government officials.  But he told us

18  that there wasn't discussion of the Inovo contract and he told

19  us that the meeting was not related to Project Confidence.

20       So this language here, regarding the purpose being

21  background for the project, is language that we added based on

22  all the information we had acquired from different sources,

23  but did not come, I don't believe, directly from

24  Mr. Rafiekian.

25  Q.   So is it fair to say that the defendant requested -- the

─────United States v. Rafiekian─────
R. Kelner - Direct

261

1 | defendant told you, in stronger terms, that the meeting was

2 | unrelated to the project?

3 | A.    Yes.  He said that the meeting was simply not related to

4 | the Project Confidence.

5 | Q.    Did the defendant suggest any edits to this language?

6 | A.    Not that I recall.

7 | Q.    And finally, higher up on the same page, in the middle of

8 | the page, could you please read out loud the sentence

9 | beginning with "Flynn Intel Group understood..."

10 | A.    "Flynn Intel Group understood the engagement to be

11 | focused on improving U.S. business organizations' confidence

12 | regarding doing business in Turkey, particularly with respect

13 | to the stability of Turkey and its suitability as a venue for

14 | investment in commercial activity."

15 | Q.    Does that reflect what the defendant told you?

16 | A.    Yes.

17 | Q.    What did he tell you?

18 | A.    That the purpose of Project Confidence was to improve

19 | U.S. -- U.S. business communities confidence in the Turkish

20 | economy.

21 | Q.    Did the defendant suggest any edits to that language?

22 | A.    No, not that I recall.

23 | Q.    Can I have the Court's indulgence, Your Honor?

24 |         THE COURT:  Yes.

25 |         (A pause in the proceedings.)

 1          MR. TURGEON:  No further questions, Your Honor.

 2          THE COURT:  All right.

 3          We are going to take our afternoon recess at this

 4  time.  We'll reconvene in five to -- five to 4:00.  During the

 5  recess do not discuss this case among yourselves.

 6          (Jury dismissed.)

 7          THE COURT:  Court stands in recess.  Mr. Kelner, do

 8  not discuss your testimony.

 9          (Recess.)

10          (Court proceedings resumed at 3:58 p.m.)

11          THE COURT:  I understand there's an issue.

12          MR. TURGEON:  Yes, Your Honor.  The Government has

13  been provided the exhibits to the defense plan to use during

14  the cross-examination of the witness, and there are a couple

15  of objections that we wanted to raise with Your Honor.

16          THE COURT:  All right.

17          MR. TURGEON:  We can come to sidebar or here --

18          THE COURT:  All right.  Why don't you come to

19  sidebar.

20          (Bench Conference.)

21          THE COURT:  All right.

22          MR. TURGEON:  Your Honor, the first is Defense

23  Exhibit 101, which is the plea agreement of Mr. Flynn.

24          Frankly, Your Honor, that is improper impeachment.

25  The defense can cross-examine Mr. Kelner on Mr. Flynn's

1   agreement by introducing the document itself or publishing the

2   document to the jury.

3                THE COURT:  How did you want to use it?

4                MR. MACDOUGALL:  It's straight bias, Your Honor.

5                THE COURT:  Bias of this witness?

6                MR. MACDOUGALL:  Bias of this witness.  This

7   witness's client was Mr. Flynn throughout.  Mr. Flynn agreed

8   to cooperate with the government.  We believe he violated Rule

9   1.7 throughout by continuing to represent FIG while he was --

10  including in this process -- while also representing General

11  Flynn.

12               MR. TURGEON:  He no longer represents General Flynn.

13               THE COURT:  Right.  What else?

14               MR. TURGEON:  The other one was this e-mail, Your

15  Honor.  Defense Exhibit No. 90.  And the government has --

16  I've been thinking about how this can possibly be introduced

17  other than for the truth of the matter asserted, this top

18  statement, regarding the defendant's or the witness's

19  characterization of the defendant's thinking.

20               And I just -- it is hearsay.

21               MR. MACDOUGALL:  State of mind, Your Honor.

22               THE COURT:  When was this?

23               MR. TURGEON:  Six months after the FARA filing.

24               MR. MACDOUGALL:  Your Honor, at the same time he

25  engaged Mr. Kelley, as the Court is aware, he contacted

R. Kelner - Direct
                                                                    264

 1   Covington and tried to engage Mr. --

 2              (Interruption.)

 3              MR. TURGEON:  Your Honor, the witness's state of

 4   mind is not relevant.

 5              THE COURT:  What is this referring to?

 6              MR. TURGEON:  As I read it, Your Honor, this top

 7   e-mail is in regards to what Mr. Kelner said out of court

 8   regarding his characterization of how something compares to

 9   the defendant's thinking.

10              MR. MACDOUGALL:  I ask the Court to read down to the

11   bottom.

12              THE COURT:  That's what I'm doing.

13              Who is Mr. Lenhard?

14              MR. MACDOUGALL:  Lenhard is the Covington partner

15   who was contacted by Mr. Rafiekian seeking advice on --

16              (Court reporter clarification.)

17              MR. MACDOUGALL:  Mr. Lenhard was a partner -- is a

18   partner at Covington who was contacted by Mr. Rafiekian in

19   September 2016 for the purposes of advice under FARA in this

20   matter.

21              MR. TURGEON:  If the defense wants to introduce

22   anything about that communication, they can call Mr. Lenhard

23   or the defendant to testify, but introducing Mr. Lenhard's

24   statement for the truth of what Mr. Rafiekian did is similar

25   to hearsay and objectionable for the same reasons.

1    THE COURT:  I'm going to allow him to be

2  cross-examined on this.  This is information that he had

3  available to him.  And it reflects his own thinking and

4  impressions based on the information he did have.

5    With respect to the --

6    Is that all of them?

7    MR. TURGEON:  Yes, Your Honor.

8    THE COURT:  Do you want to get into the Statement of

9  Facts?

10    MR. MACDOUGALL:  No, Your Honor.

11    THE COURT:  The Statement of Facts.

12    MR. MACDOUGALL:  Simply the plea agreement to show

13  this witness's bias and essentially protecting General Flynn

14  at the expense of Mr. Rafiekian.  So the only things I'm going

15  to get into is the opposition to cooperate and the -- and the

16  immunity it has on this case.

17    MR. TURGEON:  Your Honor, that's not proper

18  impeachment as to this witness.

19    THE COURT:  How?

20    MR. TURGEON:  Right.  And if he -- if the defense

21  wants to explore those topics, they can do so without the

22  agreement itself.  Nothing about this agreement is relevant to

23  our case, about the contents of the agreement.

24    THE COURT:  I think it does go.  I am going to let

25  you have some limited examination about the fact that he did

1 represent Flynn and in connection with resolving his criminal

2 issues and that --

3          What else did you want besides that?

4          MR. MACDOUGALL:  That's really the three issues.

5 The continue representation agreement to cooperate with the

6 government and an immunity from any further charges.

7          THE COURT:  I'm sorry.

8          MR. MACDOUGALL:  Any immunity from further charges.

9          MR. TURGEON:  Your Honor, unless the witness denies

10 any of those, we would submit it can't be used to impeach him.

11          THE COURT:  You don't necessarily need this?

12          MR. MACDOUGALL:  No, Your Honor.  I'm going to use

13 it to refresh his recollection.

14          THE COURT:  If he refuses and denies it.

15          MR. MACDOUGALL:  That's correct.

16          (Open court.)

17          THE COURT:  All right.  Ready to proceed?

18          MR. TURGEON:  Yes, Your Honor.

19          THE COURT:  All right.  Let's bring in the witness.

20 And the jury.

21          (Witness seated.)

22          (Jury present.)

23          THE COURT:  All right.  Please be seated.  We are

24 ready to proceed.

25          Mr. Kelner, you remain under oath.

United States v. Rafiekian

R. Kelner - Cross

267

1    THE WITNESS:  I understand.

2    THE COURT:  Mr. MacDougall.

3    MR. MACDOUGALL:  Thank you, Your Honor.

4                **CROSS-EXAMINATION**

5  BY MR. MACDOUGALL:

6  Q.   Good afternoon, Mr. Kelner.

7  A.   Good afternoon.

8  Q.   We've met briefly before.  My name is Mark MacDougall,

9  and I'm here representing Bijan Rafiekian.  Let me ask you

10 just a few preliminary questions just to clarify.

11      You've been a partner at Covington & Burling for

12 close to 22 years; is that right?

13 A.   I've been a lawyer at the firm for close to 21 years.

14 I've been a partner since 2004.

15 Q.   Okay.  You are currently chair of the election and

16 political law practice group; is that right?

17 A.   That's right.

18 Q.   Okay.  And you are -- you would consider yourself an

19 expert on the Foreign Agents Registration Act, I take it?

20 A.   I do a lot of work with respect to FARA, and I think

21 that's a fair description.

22 Q.   Okay.  And your law firm is one of the lead firms in

23 America, isn't it?  You wouldn't disagree with that?

24 A.   I would not disagree with that.

25 Q.   So it's 100 years old this year actually; is that right?

United States v. Rafiekian
R. Kelner - Cross
268

1   A.   That's correct.

2   Q.   And you have offices really all over the world; London,

3   New York, Los Angeles, San Francisco, Brussels, Johannesburg,

4   lots of other places, right?  You're an international law

5   firm?

6   A.   That's correct.

7   Q.   And you've got over a thousand lawyers currently

8   employing your firm, including partners; is that right?

9   A.   I believe that's correct.

10  Q.   Okay.  You also have many famous lawyers who passed

11  through your doors.  Eric Holder is currently a partner there,

12  President Obama's attorney general; is that right?

13  A.   Yes.

14  Q.   And John Bolton is currently the national security

15  advisor -- was once an associate of your firm; is that right?

16  A.   That's correct.  He may have been a partner as well.

17  Q.   And the list goes on.  Very prominent law firm, you would

18  agree with that?

19  A.   I think that's a fair description.

20  Q.   So you would agree with it?

21  A.   I would.

22  Q.   You agree.  Okay.

23       Your website says that Covington's Foreign Agents

24  Registration Act practice, at which you're the chair, is one

25  of the oldest and most experienced in the county.  You give me

─────United States v. Rafiekian─────
R. Kelner - Cross
269

1  that?

2  A.   I think that's true of our political law group.  We don't

3  have a distinct FARA practice, but I think that's a fair

4  description of it as well.

5  Q.   Okay.  That's what your website says.  Do you disagree

6  with your website, or are you okay with that?

7  A.   If that's what the website says.

8  Q.   Okay.  It also says that Covington advises consulting

9  firms, think tanks, trade associations, advocacy

10  organizations, and individuals on FARA compliance, and the

11  complex statutory provisions that determine whether activities

12  require registration.

13        You would agree with that, I take it?

14  A.   I would agree with that.

15  Q.   And it goes on to say, "We, Covington, have handled

16  numerous Department of Justice inquiries, both for FARA

17  registrants and unregistered organizations, including several

18  high-profile inquiries that involve significant media

19  attention and Department of Justice scrutiny."

20        I take it you would include this in one of those?

21  A.   I would.

22  Q.   So give me a ballpark.  How many FARA registrations have

23  you overseen in your 21-year career with Covington?

24  A.   It's hard to say with precision, but probably several

25  dozen.

─────United States v. Rafiekian─────
R. Kelner - Cross
270

1   Q.   Several dozen FARA registrations?

2   A.   Probably.

3   Q.   Okay.  Just -- and how about inquiries in the Department

4   of Justice?

5   A.   They come in different forms.  It's a little hard to

6   categorize them, but varying degrees of seriousness, you know,

7   maybe on the order of 20.

8   Q.   Okay.  How many resulted in an indictment under this one?

9   A.   None.

10  Q.   So the only one, right?

11  A.   That's correct.

12  Q.   Okay.  You have a partner named Mr. Lenhard?

13  A.   I do.

14  Q.   Okay.  Now, you were hired by the Flynn Intel Group in

15  January of 2017, you testified on direct; is that right?

16  A.   Right.

17  Q.   But that was not the first inquiry from Mr. Rafiekian to

18  your firm seeking FARA advice, was it?

19  A.   That's correct.

20  Q.   When was the first inquiry?

21  A.   To the best of my recollection, Mr. Rafiekian contacted

22  my partner, Robert Lenhard, in August of 2016.

23  Q.   And he contacted him because he had an agreement with

24  Inovo and he wanted to register under FARA; is that right?

25  A.   I'm not sure that's correct.  I did have a direct

1  conversation with Mr. Rafiekian.

2  Q.   And it was about FARA registration?

3  A.   It was.

4  Q.   And about whether he -- and about how he should go about

5  registering with regard to the Inovo contract; is that right?

6  A.   It was about whether or not they needed to register under

7  FARA.

8  Q.   And that's September 2016?

9  A.   I believe it was August of 2016.

10 Q.   Okay.  Late August, early September?

11 A.   Around that time.

12 Q.   Dates will get important later.  Not important now.

13 Okay?

14 A.   Okay.

15 Q.   So around then, Mr. Lenhard -- Mr. Rafiekian contacts Mr.

16 Lenhard, and it turns out -- do you know what Mr. Lenhard's

17 political affiliation is?

18 A.   He is a democrat.

19 Q.   Right.  And for that reason, I take it, Mr. Rafiekian's

20 inquiry was transferred to you?

21 A.   Correct.

22 Q.   And your orientation is?

23 A.   I'm a Republican.

24 Q.   But he didn't hire you for what reason?

25 A.   I was aware that he was contacting me because Bob Lenhard

─────────United States v. Rafiekian─────────

R. Kelner - Cross

272

1  was a democrat, but I informed Mr. Rafiekian that while I was

2  a Republican, I was relatively widely known to be an outspoken

3  so-called "never Trumper."  I had publicly opposed the Trump

4  nomination for president.

5  Q.   And so Mr. Rafiekian went elsewhere for advice?

6  A.   He did.

7  Q.   And contacted you -- he then went to Robert Kelley, is

8  that right?

9  A.   I now know that to be the case, yes.

10 Q.   Right.  And as requested Mr. Kelley, as you know, was the

11 same, "How can I register under FARA"?

12 A.   I don't know that that's my understanding.  My

13 understanding is that he asked Mr. Kelley what their

14 obligation was.  I'm basing this on what Mr. Kelley told us.

15 Q.   Right.  He met with Mr. Kelley.  You're aware of that?

16 A.   Yes.

17 Q.   And he met with Mr. Kelley seeking legal advice?

18 A.   That's my understanding, yes.

19 Q.   Okay.  And that -- and Mr. Kelley gave him that legal

20 advice, and as I think you touched on earlier in your

21 testimony, that legal advice led to Flynn Intel Group

22 registering under the Lobbying Disclosure Act?

23 A.   Yes.

24        MR. TURGEON:  Objection, Your Honor.  That calls for

25 hearsay.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

1          THE COURT:  Overruled.  It's based on what he

2   received.

3          THE WITNESS:  That's my understanding, yes.

4   BY MR. MACDOUGALL:

5   Q.   Now, you were engaged in January 2017, you've testified,

6   by the Flynn Intel Group.  But you had another client

7   associated with the Flynn Intel Group and that was Mr. Flynn,

8   wasn't it?

9   A.   Correct.

10  Q.   Okay.  So you were engaged by both of them at the same

11  time --

12  A.   Correct.

13  Q.   -- is that right?

14          Now, to put all of this into context in the

15  environment of your direct testimony, at the time, Donald

16  Trump had been elected president, and Mr. Flynn had been

17  designated to become National Security Advisor upon the advent

18  of a new administration.  That was all true?

19  A.   True.

20  Q.   When they called you during the first couple of days of

21  January of 2017?

22  A.   True.

23  Q.   And Flynn Intel Group was in the process of stopping his

24  business because it's marquee name, Mr. Flynn, was going into

25  the government?

R. Kelner - Cross

1  A.    That's right.

2  Q.    But there was some concern because the Justice Department

3  had made inquiry about whether a FARA registration was

4  necessary; is that right?

5  A.    That's right.

6  Q.    So you had these two things going on:  You had the

7  representation of Mr. Flynn, about to become National Security

8  Advisor; you had representation of Flynn Intel Group and its

9  issue with the Department of Justice.

10        That's a fair statement of where things stood?

11 A.    The only point I would clarify is that the

12 representation, with respect to the Department of Justice, was

13 both on behalf of Michael Flynn and on behalf of FIG.

14 Q.    Okay.  And Mr. Flynn, at the time, was a retired

15 lieutenant general in the army?

16 A.    Yes.

17 Q.    His career had been primarily in intelligence?

18 A.    Yes.

19 Q.    He had been a director of the Defense Intelligence Agency

20 under President Obama?

21 A.    Yes.

22 Q.    And your impression was he was a really smart guy; is

23 that right?  Are you going to disagree with me on that?

24 A.    I would say that he is somebody who is very accomplished

25 in life, and I would say very wise.  And I would even say very

1  smart within the field that he worked in, which was

2  intelligence.

3  Q.    And intelligence is getting to the facts; isn't that

4  right?

5  A.    That's part of it, sure.

6  Q.    Getting to the heart of the matter?

7  A.    Yes.

8  Q.    Okay.  And you would probably agree with me that

9  Mr. Flynn is not somebody who is easily fooled, given that

10  he's a career intelligence officer?

11  A.    You know, honestly, I don't know that I'm in a position

12  to assess that one way or the other.

13  Q.    Okay.  Would you please turn -- well, I think it will be

14  on your screen to -- or the book, if we have it -- Defense

15  Exhibit 92 for identification.

16  A.    Thank you.  Okay.

17  Q.    Do you have it in front of you?

18  A.    I do.

19  Q.    Who prepared this letter?

20  A.    It was probably prepared by me.  It was certainly edited

21  by me.

22  Q.    You recognize this as something that was prepared either

23  by you or under your supervision?

24  A.    Yes.

25  Q.    Okay.  And what letterhead is it on?

R. Kelner - Cross

276

1    A.    It's on my letterhead.

2    Q.    And what's the date?

3    A.    January 9, 2017.

4    Q.    To whom is it addressed?

5    A.    It's addressed to General Michael T. Flynn, Flynn Intel

6    Group, Inc.

7    Q.    And is it reflected, the purpose of this -- of the

8    engagement that you're embarking on is to provide FARA advice;

9    is that right?

10   A.    Yes.

11             MR. MACDOUGALL:  Your Honor, with that, I would move

12   the admission of Defense Exhibit 92.

13             THE COURT:  Any objection?

14             MR. TURGEON:  No, Your Honor.

15             THE COURT:  Without objection, Defense Exhibit 92 is

16   admitted.

17             MR. MACDOUGALL:  Thank you, Your Honor.

18                          (Defendant's Exhibit No. 92

19                          admitted into evidence.)

20   BY MR. MACDOUGALL:

21   Q.    Mr. Kelner, would you please have a look at Defense

22   Exhibit 92 and look at page 3.

23   A.    Okay.

24   Q.    Do you see that?  Now, this letter is addressed to

25   General Michael T. Flynn; is that correct?

R. Kelner - Cross

1  A.  Well, it's addressed to him at the Flynn Intel Group.

2  Q.  Right.  Okay.  Addressed to General Michael T. Flynn,

3  Flynn Intel Group, January 9, 2017.

4       Do you remember that?

5  A.  Yes.

6  Q.  And this is what we lawyers call an engagement letter; is

7  that right?

8  A.  Yes.

9  Q.  An engagement letter is -- it does several things.  It is

10  particularly required by the Bar to lay out the terms of the

11  engagement.  It's also, for business purposes, to make sure a

12  client understands this is how our representation of you will

13  proceed.

14       Do you disagree with any of that?

15  A.  I agree with that.

16  Q.  Okay.  Please have a look at page 3, the top -- the first

17  paragraph is there in total.

18       Could you read that aloud, please?

19  A.  Beginning with "You acknowledge"?

20  Q.  Yes, please.

21  A.  "You acknowledge, on behalf of Flynn Intel Group, Inc.,

22  that we will also be representing you personally concerning

23  the Foreign Agents Registration Act matter.  While we perceive

24  no current adversity between you and Flynn Intel Group, Inc.,

25  if such adversity were to arise later, we would terminate our

1   representation of Flynn Intel Group, Inc., but would continue

2   to represent you personally.  By signing below, you consent to

3   this arrangement on behalf of Flynn Intel Group, Inc., and you

4   represent that you are authorized to so consent on behalf of

5   Flynn Intel Group, Inc."

6   Q.   So as of January 9, 2017, you have two new clients,

7   Michael Flynn and the Flynn Intel Group.

8              Do you agree with that?

9   A.   Yes.

10  Q.   And as you reflect in this letter, you don't perceive

11  there to be any adversity, any difference between the now,

12  legally, but if that happens, Flynn Intel Group's got to go;

13  Is that right?

14  A.   Those are the terms of the agreement, that's correct.

15  Q.   That was your terms with Flynn Intel Group in January.

16  And Mr. Flynn will stay.  You'll keep him, Flynn Intel Group

17  goes; is that correct?

18  A.   That's correct.

19  Q.   Okay.  Now, let's talk a little bit about Flynn Intel

20  Group.  The jury has heard lots about it, but not about what's

21  under the hood.  It wasn't a big business, was it?

22  A.   I would not describe it as a big business, no.

23  Q.   For most of the time it had two principal shareholders,

24  Mr. Flynn and Mr. Rafiekian; is that right?

25  A.   In terms of principal shareholders, that's correct.

──────United States v. Rafiekian──────
R. Kelner - Cross
279

1   Q.   And although there was another board member from time to

2   time, it really only had two board members most of the time;

3   Mr. Flynn, Mr. Rafiekian?

4   A.   I don't recall with precision.  I thought there was

5   another board member, but I may be misremembering that.

6   Q.   And we'll look at the FARA registration in a moment and

7   that may refresh your recollection.

8        It didn't have a lot of business, did it?

9   A.   It did not.

10  Q.   It didn't have a lot of money, did it?

11  A.   It did not.

12  Q.   Didn't pay your bills, did it?

13  A.   Some of our bills were paid.

14  Q.   It didn't pay all of your bills, did it?

15  A.   Not all of our bills were paid.

16  Q.   But it was high profile because Mr. Flynn was about to be

17  National Security Advisor?

18  A.   You're referring to FIG being high profile?

19  Q.   Yeah.  It had his name on the -- on the letterhead.  I

20  mean, that's -- that made it an interesting company, right?

21  A.   Certainly Michael Flynn was high profile and

22  derivatively, I suppose FIG was as well.

23  Q.   Okay.  I'm going to ask you to next take a look at

24  Defense Exhibit 660, which is in evidence.

25  A.   Okay.

1   Q.   Do you have it in front of you?

2   A.   Yes.

3   Q.   Do you need to take a minute to take a look at it, or are

4   you good with it?

5   A.   I'm good with it.

6   Q.   Okay.  Just to remind everyone that this -- this is in

7   evidence.  This is dated March 7, 2017.  It's addressed to

8   Heather Hunt at the FARA registration unit at the Department

9   of DOJ, the letter is, and it is signed by you, correct?

10  A.   The cover letter is signed by me.

11  Q.   Right.  And the cover letter is the first two pages of

12  the document.  And you -- I take it you wrote it or you

13  ultimately approved a draft someone else wrote; is that right?

14  A.   Referring to the cover letter?

15  Q.   Yeah.

16  A.   I think a number of us worked on the letter, but I

17  certainly signed it and therefore approved it.

18  Q.   Okay.  I would like you to please have a look at the

19  second paragraph.

20  A.   Okay.

21  Q.   And if you could read -- you can read the whole thing, if

22  you'd like, but I'm principally interested in the first

23  sentence.

24  A.   "In September 2016, Flynn Intel Group publicly disclosed

25  its representation of Inovo BV in a Federal Lobbying

1    Disclosure Act registration that was filed with the Secretary

2    of the Senate and the Clerk of the House."

3    Q.   And those are the appropriate places you file an LDA or

4    Lobbying Disclosure Act registration; is that right?

5    A.   Correct.

6    Q.   This is March 7th.  You've had the Department of Justice

7    inquiry, and you're telling the -- Heather Hunt at the FARA

8    registration unit, "I want to make you aware that this client

9    registered in September 2016 under the LDA."

10        That's what you're telling her here, right?

11   A.   That's right.

12   Q.   And that's because -- and that was done at the

13   suggestion -- at the recommendation of Mr. Kelley, from

14   Mr. Rafiekian -- from whom Mr. Rafiekian sought legal advice?

15   A.   That's my understanding, yes.

16   Q.   If you could drop down to the fourth paragraph.  Now, you

17   mentioned a moment ago that several people helped you prepare

18   this; is that right?

19   A.   Yes.

20   Q.   Okay.  And that's because it was really important?

21   A.   I would like to think all of our client matters are

22   really important, but this one was, too, right.

23   Q.   This one was particularly important and this language

24   particularly important.  You wouldn't disagree with that?

25   A.   I think all of our client matters are important,

R. Kelner - Cross

282

1   including this one.

2   Q.   Okay.  Let's take a look at the fourth paragraph.  If you

3   could read that slowly for the jury and in total, please.

4   A.   "The department's regulations provide that filing under

5   the LDA is not an option, however, if a foreign government,

6   even though not the client, nonetheless, is the 'principal

7   beneficiary of the work performed.'  This is an uncertain

8   standard not based on the statutory language and not defined

9   in the department's regulations.

10          "Nevertheless, because of the subject matter of

11  Flynn Intel Group's work for Inovo BV, which focused on

12  Mr. Fethullah Gulen, whose extradition is sought by the

13  government of Turkey, the engagement could be construed to

14  have principally benefited the Republic of Turkey.  To

15  eliminate any potential doubt, the Flynn Intel Group,

16  therefore, is electing to file a registration under FARA in

17  lieu of its prior LDA registration."

18  Q.   The engagement could be construed to have principally

19  benefited the Republic of Turkey.  That's what you're telling

20  the chief of the FARA registration unit on March 7th about

21  Flynn Intel Group?

22  A.   That's right.

23  Q.   Okay.  And you're also saying that this is an uncertain

24  standard.  This is a murky area; is that right?

25  A.   That's right.

───────United States v. Rafiekian───────
R. Kelner - Cross
283

1    Q.   But you're being careful, and you say, "To eliminate any

2    potential doubt, we are filing this FARA registration, and

3    we're telling you it might represent Turkey."

4           Is that a fair statement?

5    A.   Generally, but I would just clarify, we're telling you

6    that it might principally benefit Turkey.

7    Q.   Right.  Exactly.  If I didn't say that, that's what I

8    intended to say.

9           That's what this says:  We're being careful.  This

10   might principally benefit Turkey.  We want to let you know.

11   Notwithstanding the fact we already did the LDA registration?

12   A.   That's correct.

13   Q.   Okay.  And there's no doubt in your mind the Department

14   of Justice got this message?  They got your letter?

15   A.   I don't have any doubt of that.

16   Q.   I'm going to stay with Defense Exhibit A for just a

17   couple minutes.  Mr. Kelner, I'd like to ask you -- and

18   unfortunately these pages are not numbered, but I think you

19   know it well enough, you could probably help me find them.  If

20   you could turn to Exhibit A to the registration and the

21   attachment.

22          And the attachment is the second page of Exhibit A.

23   It says, "Exhibit A of the registration statement," and then

24   it's the second page of that.

25   A.   Yeah.

1   Q.   The attachment you created begins items A through 10.  Do

2   you see that?

3   A.   I'm looking at a different attachment.  Give me just a

4   moment.

5            I've got it.

6   Q.   Okay.  Begins with Inovo BV is a Dutch company.  Do you

7   see that?

8   A.   I do.

9            THE COURT:  Which exhibit are we working off of?

10           MR. MACDOUGALL:  Your Honor, this is Defense Exhibit

11  60, 6-0.

12           THE COURT:  All right.  6-0?

13           MR. MACDOUGALL:  Yes, sir.

14  BY MR. MACDOUGALL:

15  Q.   So let's look at the first numbered paragraph.  But

16  before we do that, I take it this was also prepared by you or

17  by lawyers who work for you.

18  A.   That's correct.

19  Q.   And in the first paragraph --

20  A.   Actually, if I can just clarify.

21  Q.   Sure.

22  A.   And, in addition, Kristen Verderame.

23  Q.   And remind the jury who Kristen Verderame is.

24  A.   She had been the lawyer for FIG and for General Flynn

25  before we were engaged, and she continued to represent him,

1   and we were, to some extent, reporting through her.

2   Q.   Okay.  And just for members of the jury who are not

3   familiar with the ways of big law firms, you, Covington &

4   Burling, have thousands of lawyers all over the world.

5   Kristen Verderame is a sole practitioner.  She works by

6   herself; is that right?

7   A.   That's my understanding, yes.

8   Q.   But she had an existing relationship with Mr. Flynn and

9   the Flynn Intel Group as their lawyer; is that right?

10  A.   Yes.

11  Q.   And she contacted you three months or so after

12  Mr. Rafiekian first contacted you for the same purpose?

13  A.   Yes.

14  Q.   Okay.  And not withstanding the fact that she introduced

15  you, she continued work alongside you in this process.  So as

16  we hear Kristen Verderame's name, we're talking about that

17  individual lawyer who brought the work to you and brought the

18  client to you but continued to work with you.  That's all

19  true, right?

20  A.   Yes.

21  Q.   Okay.  So let's look at paragraph No. 1 on the attachment

22  to the supplement to the registration statement Defense

23  Exhibit 60.

24       Can you read that first paragraph for me?

25  A.   Numbered paragraph 1.

R. Kelner - Cross

286

1   Q.   Yes, please.

2   A.   Just above it, if I could include that, it says,

3   "According to Arent Fox, LLP, counsel to Mr. Alptekin, one,

4   Inovo is a privately owned company that has not received,

5   directly or indirectly, funds or financial support from any

6   government during the course of its engagement of Flynn Intel

7   Group, Inc., including the Republic of Turkey."

8   Q.   So as far as you know -- this language kind of gets to

9   the point -- Flynn Intel Group never got any money from the

10  Republic of Turkey?

11  A.   As far as I know, as I sit here today, that's correct.

12  Q.   And you've never seen any evidence to suggest that?

13  A.   I have never seen any evidence to suggest that.

14  Q.   I would like you to drop down, please, to the last

15  paragraph on attachment -- the attachment, Exhibit A, to the

16  supplement captioned items 8 through 10.  That paragraph is

17  not numbered.

18          Do you see where I am?

19  A.   Yes.

20  Q.   Okay.  And that last paragraph, the final sentence --

21  again, you can read the entire thing if you'd like, but if you

22  could just read aloud for us the last sentence of that final

23  paragraph.

24  A.   "Flynn Intel Group is aware that Mr. Alptekin consulted

25  with officials of the Republic of Turkey regarding potential

1   work by Flynn Intel Group.  And Mr. Alptekin introduced

2   officials of the Republic of Turkey to Flynn Intel Group

3   officials at a meeting on September 19, 2016, in New York."

4   Q.   That's all true, right?

5   A.   To the best of our understanding, yes.

6   Q.   All right.  And you attach that to your letter and submit

7   it to the Justice Department, believing it's true?

8   A.   Yes.

9   Q.   And sitting here today, you have no reason to think it's

10  not?

11  A.   Let me just reread it one more time.

12  Q.   Please.

13  A.   That's correct.

14  Q.   Okay.  And a couple more things on this document -- and,

15  again, we're going to get deep into it, and I apologize to the

16  Court because I don't have page numbers.  But if you could go

17  to the form that Mr. Turgeon was asking you about, it's

18  captioned "Supplemental statement pursuant to the Foreign

19  Agents Registration Act of a six-month period ending

20  November 30, 2016, registrant."

21          Do you see that?

22  A.   The beginning of the supplemental statement.

23  Q.   Yes.  For the six-month period ending November 30th, and

24  then there's several pages there.

25  A.   Give me a second to find it.

─────────────── United States v. Rafiekian ───────────────

R. Kelner - Cross

288

1              THE COURT:  Hold on.  I'm trying to find it.

2              It's after the attachment?

3              MR. MACDOUGALL:  Yes, Your Honor.  It's -- if you

4    see the bylaws of Flynn Intel Group, that's a large document

5    kind of in the middle of the exhibit.

6              THE COURT:  Yes.

7              MR. MACDOUGALL:  Immediately after that there's a

8    supplemental statement.

9              THE COURT:  All right.

10   BY MR. MACDOUGALL:

11   Q.   And I would like you to go, please, Mr. Kelner, to

12   page 4.

13   A.   I see.  Page 4?

14   Q.   Yes, please.

15   A.   Okay.

16   Q.   To item No. 13.  I believe Mr. Turgeon asked you about

17   that in particular.

18             THE COURT:  Hold on a moment.  I don't have it, at

19   least in my exhibit.

20             THE WITNESS:  The Bates, Your Honor, is Defense

21   60-19.

22             THE COURT:  Dash 19?

23             THE WITNESS:  Dash 019.

24             THE COURT:  All right.  I have it.  Well, that's --

25   we're in exhibit 60; is that right?

───────United States v. Rafiekian───────

1     MR. MACDOUGALL:  Defense 60, yes, Your Honor.

2     THE COURT:  All right.  Let's proceed.  I don't have

3  it.  That's all right.

4  BY MR. MACDOUGALL:

5  Q.   This is item No. 13 --

6  A.   Yes.

7  Q.   -- at the bottom of the page.

8     THE COURT:  Oh, I see it.  I do have that.

9  BY MR. MACDOUGALL:

10 Q.   Mr. Kelner, we're in the same place, exhibit -- item

11 No. 13?

12 A.   Yes.

13 Q.   Mr. Turgeon asked you about that.  And the last paragraph

14 reads, "On his own initiative, Michael T. Flynn published an

15 op-ed in *The Hill* publication on November 8, 2016.  It related

16 to the same subject matters as the Flynn Intel Group work for

17 Inovo BV.  Either Inovo BV requested or directed publication

18 of the op-ed."

19     Now, that was included in this supplemental

20 registration when you filed it; is that right?

21 A.   Yes.

22 Q.   And at the time you were representing Flynn Intel Group

23 as the subject to the registration, right?

24 A.   Yes.

25 Q.   And you're also representing Mr. Flynn, personally?

1    A.    Yes.

2    Q.    And in representing Mr. Flynn personally, you have the

3    benefit of the individual attorney-client privilege; is that

4    right?

5    A.    Yes.

6    Q.    In fact, the law encourages clients to tell their lawyers

7    everything so that lawyers can do their best work in

8    protecting their interest; is that right?

9    A.    That's the policy behind the attorney-client privilege,

10   yes.

11   Q.    And you enjoyed, and more importantly, Mr. Flynn enjoyed

12   the attorney-client privilege with you?

13   A.    Yes.

14   Q.    And if you had any doubt about the integrity or the

15   truthfulness of that statement, you had every opportunity, and

16   maybe you took it, to ask Mr. Flynn, "What's the story,"

17   didn't you?

18   A.    Yes.

19   Q.    Nothing is stopping you from doing that?

20   A.    That's correct.

21   Q.    And, finally --

22             MR. MACDOUGALL:  Can I have a moment, Your Honor?

23             THE COURT:  Yes.

24             MR. MACDOUGALL:  Your Honor, the Bates number for

25   Defense Exhibit 60 that I'm now going to go to is 60-0026.

1            THE COURT:  Thank you.

2  BY MR. MACDOUGALL:

3  Q.   Finally, Mr. Kelner, on that page, which I think you're

4  probably at now --

5  A.   Yes.

6  Q.   -- there's another paragraph at the bottom of that

7  supplement that talks about the op-ed again.

8            Could you read that aloud, just the first couple of

9  sentences?

10 A.   "In late October and early November 2016, General Flynn

11 of Flynn Intel Group developed an op-ed based, in part, on the

12 research conducted by Flynn Intel Group under the Inovo

13 engagement.  The op-ed was not written or published at the

14 request of or under the direction or control of Inovo, the

15 Republic of Turkey, or any other party.  No compensation was

16 received for the publication of op-ed.

17           "In addition to General Flynn, Bijan Rafiekian, and

18 Hank Cox participated in drafting.  Inovo, Mr. Alptekin, and

19 the Republic of Turkey did not participate in the drafting.

20 Nonetheless, the op-ed addresses subject matter related to the

21 research that Flynn Intel Group conducted for Inovo and a

22 draft of the op-ed was shared with Inovo in advance for

23 publication.

24           "No changes, other than technical edits, were made

25 to the op-ed based on feedback from Inovo.

1          "To the best of our knowledge, Inovo did not

2    communicate with the Republic of Turkey regarding the op-ed or

3    provide the draft op-ed to the Government.  SGR, LLC,

4    government relations and lobbying assisted Flynn Intel Group

5    with placement of the op-ed with *The Hill* publication."

6    Q.   And that was all true at the time you submitted it; is

7    that right?

8    A.   That was our best understanding of it.

9    Q.   And just with the other inquiry, if you had any doubt

10   about that, about Mr. Flynn's involvement in it, you could

11   have called him and had a conversation with him under the

12   personal attorney-client privilege that he enjoyed with you

13   and your firm?

14   A.   We could have.

15   Q.   I would like you to please, if you would, on the same

16   document -- and I'll stick with the Bates numbers for

17   clarity -- turn to Bates No. 0008.

18   A.   Okay.

19   Q.   And would you agree with me this is the execution page

20   for the registration form, which we're referring to as Defense

21   Exhibit 60 that was submitted to the FARA registration unit at

22   your direction; is that right?

23   A.   Yes.

24   Q.   And if you look at about midway down the page where the

25   signature page is electronically signed, which I take it is as

1  valid as a personal signature if you have the person's

2  authority to do it; is that right?

3  A.    Yes.

4  Q.    And whose signature is there?

5  A.    Michael T. Flynn.

6  Q.    Anybody else?

7  A.    No.

8  Q.    Do you see Mr. Rafiekian's name anywhere?

9  A.    Not there.

10 Q.    Okay.  Please turn forward to -- so -- Bates No. 0011

11 under the execution page.  Same question:

12         Did you cause the signature to be affixed

13 electronically?

14 A.    One of my colleagues at Covington did.

15 Q.    And whose signature is there?

16 A.    Michael T. Flynn.

17 Q.    Anybody else?

18 A.    Not there.

19 Q.    So I would like you to compare, if we could, please, this

20 exhibit to another document that would be in your book, and

21 it's Defense Exhibit 95A.

22 A.    Thanks.  95A?

23 Q.    Yes, please.

24 A.    Okay.

25 Q.    Do you recognize this document as distinct from Defense

R. Kelner - Cross

294

1  Exhibit 60?

2  A.   It's difficult for me to tell whether this is a draft or

3  the final of the final -- of the FARA filing.  This is a draft

4  of the FARA filing.

5  Q.   It is a draft also prepared by you and your colleague; is

6  that right?

7  A.   I believe this is a version that was edited by Kristen

8  Verderame.  I'm not certain of that, but I believe that to be

9  the case.

10 Q.   But it was prepared by your firm, perhaps edited by her;

11 is that right?

12 A.   Yes.

13 Q.   And you'd agree with me it predates the final document

14 that was submitted?

15 A.   Yes.

16 Q.   Whether it's days or weeks, it doesn't really matter.  It

17 was an earlier version of the registration statement of

18 Defense Exhibit 60, correct?

19 A.   Yes.

20 Q.   Okay.  I'd like you to have a look at Attachment 2 which

21 appears at Bates No. 0009.

22         MR. MACDOUGALL:  Well, Your Honor, first, given the

23 foundation laid, defense would move the admission of Defense

24 Exhibit 95.

25         THE COURT:  95A?  Any objection?

United States v. Rafiekian

R. Kelner - Cross

295

1          MR. TURGEON:  No, Your Honor.

2          THE COURT:  All right.  Without objection, 95A is

3   admitted.

4          MR. MACDOUGALL:  Thank you, Your Honor.

5                            (Defendant's Exhibit No. 95A

6                             admitted into evidence.)

7   BY MR. MACDOUGALL:

8   Q.   If you'd look at -- on Exhibit 95A, page 0009, there

9   begins a table captioned "Receipt of Monies"; is that right?

10  A.   Yes.

11  Q.   And that table is intended to show what disbursements, in

12  this case, the registrant, Flynn Intel Group, made or is

13  making in connection with its registration; is that right?

14  A.   The one that says, "Receipt of Monies" reflects payments

15  received by FIG.

16  Q.   Okay.  And turn to the next page, 0010.

17  A.   Yes.

18  Q.   And that demonstrates disbursements of monies under

19  Attachment 3; is that right?

20  A.   Correct.

21  Q.   So that's monies, as I correct myself, paid out by FIG?

22  A.   Correct.

23  Q.   Up at the top, there's been -- on your direct you talked

24  about the $40,000 payments that went back to Inovo; is that

25  right?

1   A.   Yes.

2   Q.   Now, at the top of -- strike that.

3             If we could go back and do a comparison to Defense

4   Exhibit 60 on page 27, which is the final version of that

5   table, we can do it side by side.

6             The Bates number on Exhibit 60 is 0027.  The Bates

7   number on 95A in evidence is 0010.

8   A.   Okay.

9   Q.   So is it correct, then, if you look at the two payments

10  to Ekim Alptekin in the draft -- Exhibit 95A, in the draft you

11  recite, "Refund for reduction in scope"; is that right?

12  A.   That's what it says.

13  Q.   So when the draft was prepared, prior to the final,

14  that's what somebody knew in your firm or Kristen Verderame?

15  A.   That's what this draft says.

16  Q.   That's what it says.

17            Okay.  But the final one, if you look at the same

18  dates and the same payments, the same $40,000 payments about

19  midway down on September 13, 2016, and October 17 --

20            MR. GILLIS:  I beg your pardon, if we can take down

21  95, I don't think that --

22            MR. MACDOUGALL:  95A.  I'm sorry, Your Honor.  We

23  haven't moved in 95.

24            THE COURT:  Please take it down.

25            MR. MACDOUGALL:  I'm just working with 95A,

United States v. Rafiekian

R. Kelner - Cross

297

1    Mr. Kelner, and 60.

2              THE WITNESS:  I understand.

3    BY MR. MACDOUGALL:

4    Q.   So going back to the final version, Defense Exhibit 60,

5    the same $40,000 payments and the draft that were called

6    "Refund for reduction in scope" are now called "consultancy

7    fee"?

8    A.   Correct.

9    Q.   So between the time you had the draft, this -- the

10   reflection for reduction in scope was changed to the final

11   consultancy fee; is that right?

12   A.   Just to clarify, there were --

13   Q.   Please answer my question, then you can clarify.

14              Is that true?

15   A.   I think it's important to clarify there were multiple

16   drafts --

17   Q.   Is it true?  Yes or no?  Then you can clarify.

18   A.   It's true with respect to this draft, yes.

19   Q.   Thank you.

20              Mr. Kelner, again, for people who are fortunate

21   enough not to swim in the aquarium of a big law firm, could

22   you describe for us how time entries are kept by law firms?

23   A.   Typically individual lawyers or other law firm personnel

24   record, during a course of a day, the time that they spend on

25   particular matters for different clients, identifying the

—————United States v. Rafiekian—————

R. Kelner - Cross

298

1  client, how much time they spent on the work, whatever it was,

2  and some description of the work.

3  Q.   And those time entries are then taken and transformed

4  into bills, invoices are sent to clients in hope that they'll

5  be paid; is that about right?

6  A.   Yes.

7  Q.   Okay.  And your firm, like most firms, does exactly that?

8  A.   Yes.  Sometimes the time entries go to the client,

9  sometimes they don't, but generally that's correct.

10  Q.   Now, between January 3, 2017 and March 7, 2017, you and

11  several of your colleagues, you would agree with me, spent a

12  great deal of time on the Flynn Intel Group registration; is

13  that right?

14  A.   Yes.

15  Q.   I am going to ask you to please have a look at two

16  exhibits.  And in the interest of time, we'll try to get them

17  done quickly.  These will be Defense Exhibits 93 and 94 for

18  identification.

19  A.   Thank you.

20  Q.   Okay.  Do you have those in front of you?

21  A.   I do.

22  Q.   And do you recognize those as time entry runs, I'll call

23  them, for the month ending March 31, 2017 and February 28,

24  2017?

25  A.   Yes.

1   Q.   And you would, in the ordinary course, receive these a

2   few days after the end of the month and you would then, from

3   that, prepare your invoice; is that right?  That's the

4   process?

5   A.   Yes.

6   Q.   Okay.  And are these forms prepared by people at

7   Covington responsible for this work, accounting, bookkeepers,

8   and so forth?

9   A.   I believe so.

10  Q.   And I take it lawyers in your firm have a responsibility

11  to report their time in the ordinary course; is that right?

12  A.   Yes.

13  Q.   And within a rough proximity, these time entries are made

14  contemporaneous within the events, within a day or so,

15  hopefully, without too much time passing.  They are done at

16  the same time?

17  A.   They should be, yes.

18  Q.   And that's a routine practice in your law firm, isn't it?

19          MR. MACDOUGALL:  Your Honor, with that foundation, I

20  move the admission of Defense Exhibits 93 and 94.

21          THE COURT:  Any objection?

22          MR. TURGEON:  No, Your Honor.

23          THE COURT:  Without objection, 93 and 94 are

24  admitted.

25                          (Defendant's Exhibits Nos. 93-94

─────────United States v. Rafiekian─────────
R. Kelner - Cross
                                                          300

1                            admitted into evidence.)

2           MR. MACDOUGALL:  Thank you, Your Honor.

3   BY MR. MACDOUGALL:

4   Q.   We talked about the time entries.  I'd like to shift over

5   to the second part of that, the invoices, the billing.  And

6   for that purpose, ask you to have a look at exhibits --

7   Defense Exhibits 99 and 100 for identification.

8   A.   Okay.

9   Q.   And would you confirm for me that Defense Exhibit 99 for

10  identification is an invoice issued on March 31, 2017, to

11  General Michael T. Flynn, the Flynn Intel Group, for

12  regulatory advice?

13  A.   Yes.

14  Q.   And same question with regard to Exhibit 100, except for

15  the dates, is that an invoice issued by your firm to General

16  Michael T. Flynn, Flynn Intel Group for services performed

17  January 31, 2017?

18  A.   Yes.  I'm pausing for the fact that Exhibit 99, I don't

19  see a cover letter, which would reflect the transmittal.  But

20  I presume it was sent.

21  Q.   But taking a look, it looks like a bill that you sent; is

22  that right?

23  A.   Minus the cover letter, yes.

24  Q.   Okay.  And like the time sheets, this document is

25  prepared by a person responsible for this work?

─────────────────────────────────────────────

─────United States v. Rafiekian─────
R. Kelner - Cross
301

1    A.    Yes.

2    Q.    Okay.  And you have a billing part, you have a duty to

3    send invoices out that record accurately the time; is that

4    right?

5    A.    Either -- certainly the bill has to be accurate.  It may

6    or may not include the time entries.

7    Q.    And these are prepared contemporaneous with the event?

8    A.    Roughly contemporaneously, yes.

9    Q.    And that's a routine practice as well?

10   A.    Yes.

11            MR. MACDOUGALL:  With that foundation, Your Honor, I

12   move admission of 99 -- Defense 99 and 100.

13            THE COURT:  Any objection?

14            MR. TURGEON:  No, Your Honor.

15            THE COURT:  All right.  Exhibit -- Defense Exhibit

16   99 and 100 are admitted.

17                           (Defendant's Exhibit Nos. 99 - 100

18                             admitted into evidence.)

19            MR. MACDOUGALL:  Thank you, Your Honor.

20   BY MR. MACDOUGALL:

21   Q.    Mr. Kelner, I'm just going to ask you a few questions

22   about the time you spent as reflected on these time sheets and

23   on the invoices, and I -- you were -- now, they are in

24   evidence, you're welcome to refer to them to confirm any of my

25   questions, but we will proceed on that basis in the interest

1  of moving things along.

2  A.   Okay.

3  Q.   So it's correct, then, in January of 2017, you and your

4  colleagues spent 115 hours working on the Flynn Intel Group

5  FARA matter; is that right?

6         And you can look at Exhibit 100.  That may help you

7  out.

8  A.   This bill shows 115 hours of time.

9  Q.   Right.  Professional time.  And you, yourself, spent 27.9

10 hours that month; is that right?

11 A.   That's what this shows, yes.

12 Q.   At a billing rate of $960 an hour; is that right?

13 A.   That's what this shows, yes.

14 Q.   What's your current billing rate?

15 A.   I believe it is $1160 an hour.

16 Q.   So a client, on average, will pay for an hour of your

17 time $1160 an hour now?

18 A.   What a particular client pays there is --

19         MR. TURGEON:  Your Honor, objection, as to the

20 relevance of that.

21         THE COURT:  Overruled.

22 BY MR. MACDOUGALL:

23 Q.   And at the time it was $960 for an hour; is that right?

24 A.   I don't actually recall, but it appears to be so based on

25 this document.

1   Q.   Okay.  So -- and the Flynn Intel Group was billed $74,979

2   for that month of January; is that right?

3   A.   I believe so.  The only reason I'm hesitating is whether

4   this is the FIG bill or the Michael Flynn bill.  I believe

5   it's the FIG bill, in which case that's correct.

6   Q.   It's addressed to Flynn Intel Group, right?

7   A.   I believe that's right.

8   Q.   So in February you spent -- and you can look at Exhibit

9   99 in evidence for this -- you spent 119 -- you and your

10  colleagues spent 119.8 hours working on this FARA registration

11  matter; is that right?

12  A.   That's right.

13  Q.   And you -- you, yourself, worked 35.1 hours that month of

14  February?

15  A.   That's what this says, correct?

16  Q.   And you billed Flynn Intel Group another $85,422 for

17  February; is that right, Mr. Kelner?

18          (Court reporter clarification.)

19  A.   That is what this indicates, yes.

20  Q.   And let's go on to March, which you'll find at Exhibit 93

21  in evidence.  And that was the month, you'll recall -- I think

22  it was March 7th that you filed the FARA registration form; is

23  that right?

24  A.   That's correct.

25  Q.   Okay.  And that month, even though you filed the FARA

─────United States v. Rafiekian─────
R. Kelner - Cross
1  registration form on the 7th, you and your colleague spent

2  228.7 hours working on this matter; is that right?

3  A.   Now, another thing, this bill is the Michael T. Flynn

4  bill, if you look at the first page where it says, "Client

5  name."  And for the Michael T. Flynn work, it indicates, for

6  that month, a total bill of $160,000 -- $161,000.

7  Q.   $160,000.  And the reason you know it's also Michael

8  Flynn work is that part of it's redacted, blacked out; is that

9  right?

10  A.   Actually, the reason I know it is on the first page of

11  the bill it says, "Client name:  Michael T. Flynn," but you're

12  correct, I also know it because of redactions.

13  Q.   And the reason for the redactions is the work you were

14  doing for Michael Flynn, personally, was privileged with

15  respect to him and not part of the Flynn Intel Group's

16  representation?

17  A.   That is correct.

18  Q.   Now, the reason that you recorded several hundred hours

19  over this period of time, as we've just discussed, is you did

20  an internal investigation; is that right?

21  A.   I generally don't think I thought of it as an internal

22  investigation, but we reviewed facts in connection with

23  preparing a FARA filing.

24  Q.   Extensively?

25  A.   Yes.

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──
EASTERN DISTRICT OF VIRGINIA

R. Kelner - Cross

1   Q.   For hundreds of hours?

2   A.   I believe that's correct.

3   Q.   You conducted interviews?

4   A.   Yes.

5   Q.   Met with the clients?

6   A.   We met with individuals who worked for Flynn Intel Group.

7   Q.   Did open source research, research outside of what the

8   clients told you, you looked at independent records to the

9   best you could?

10  A.   Yes.

11  Q.   Okay.  And you were also in frequent contact with

12  Mr. Flynn; is that right?

13  A.   I would not say we were in frequent contact with him

14  during that period.

15  Q.   You were not.  Let's have a look at Exhibit 100 in

16  evidence.

17  A.   Okay.

18  Q.   You just testified you were not in frequent contact with

19  General Flynn; is that right?

20  A.   Not what I would consider frequent contact.

21  Q.   So let's look at the time you entered during the first

22  part of January 2017.  And I'm only talking about your

23  entries.

24        Will you agree with me, among other things, on

25  January 2, 2017, you had a meeting with General Flynn?

R. Kelner - Cross

1   A.   Yes.

2   Q.   And the very next day, on January 3, 2017, you had

3   calls -- multiple calls with General Flynn?

4   A.   I did see that it says "Calls with General Flynn."  As I

5   sit here today, I don't recall there being more than one.

6   Q.   But you entered multiple, so at least at one time you

7   thought there was more than one.  You wouldn't disagree with

8   that?

9   A.   That's possible.  It's also possible that it was a

10  typographical error.  I recall talking to him that following

11  day.

12  Q.   Okay.  So the 2nd, the 3rd, let's go to the 4th.  The

13  first entry, "Call to General Flynn"?

14  A.   Yes.

15  Q.   Okay.  Let's go to the very next day, the 5th, "Robert

16  Kelner, call to General Flynn"?

17  A.   Yes.

18  Q.   Let's go to the next day after that, January 6th.  Robert

19  Kelner -- well, we got calls, multiple perhaps, with General

20  Flynn?

21  A.   Yes.

22  Q.   So at least during that period of time you were talking

23  to Mr. Flynn a lot?

24  A.   During those first days of engagement, it does appear

25  that we talked.

1  Q.   It does so appear.  And if we can go to January 9th,

2  please, your entry.  Do you see that on the next page?

3  A.   Yes.

4  Q.   What's the very last entry you have there?  Interview

5  with Bob Kelley?

6  A.   Yes.

7  Q.   And Bob Kelley, we'll remember, was the lawyer that

8  Mr. Rafiekian went to in September, after --

9            MR. TURGEON:  Objection, Your Honor.  Attorney is

10  testifying.

11            THE COURT:  Overruled.

12            MR. MACDOUGALL:  It's cross-examination, Your Honor.

13  BY MR. MACDOUGALL:

14  Q.   Mr. Kelley, you'll recall, was the lawyer that Mr.

15  Rafiekian went to to seek advice in September after he came to

16  Mr. Lenhard in your firm.  That's who the Bob Kelley is here?

17  A.   Yes.

18  Q.   Now, I'd like to talk to you, briefly, about your

19  contacts with Mr. Rafiekian.  You actually did meet with

20  him -- if you look at your bill for January, Defense Exhibit

21  100 -- on the 16th.  Is that right?  You have a meeting with

22  Mr. Rafiekian?

23  A.   Yes.

24  Q.   And then on January 21st, you would agree with me, that

25  you were, by that time, reviewing the materials for the draft

1    FARA filing?

2    A.   We were definitely reviewing materials that ultimately

3    would be used in the FARA filing.

4    Q.   That's what you were doing that day?

5    A.   Let me take a look.

6    Q.   Okay.  Let's drop back, if you could, please, to Defense

7    Exhibit 99, which is the invoice for February.

8    A.   Okay.

9    Q.   On the 14th, your entry shows a conference call with

10   General Flynn; is that right?

11   A.   Yes.

12   Q.   And then on the 22nd, in the same bill, February 22nd,

13   under your entry, it shows "Interview with General Flynn.

14   Follow-up correspondence, confer with Mr. Smith," and the rest

15   is redacted.  And you spent eight hours that day; is that

16   right?

17   A.   Yes.

18   Q.   Eight hours with General Flynn?

19   A.   Actually, if I can just find it.

20        Well, it shows several things on that day, which

21   totaled up to eight hours.  Part of that was the interview

22   with General Flynn.  I don't think it was an eight-hour

23   interview.

24   Q.   It was a long interview, wasn't it?

25   A.   I don't recall with precision, but I would -- if I had to

1   estimate, I think it was probably, more or less, a three-hour

2   interview.

3   Q.   You had lots of time to talk to Mr. Flynn, didn't you?

4   A.   On that day, yes.

5   Q.   Right.  And generally you had lots of phone calls, too,

6   right?

7   A.   We had several phone calls.

8   Q.   And there was no reason you couldn't ask him anything you

9   wanted to ask him during those meetings because you had the

10  attorney-client privilege personally?

11  A.   That's correct.

12  Q.   Okay.  I would like you to have a look please -- and it

13  should be in that book, and if it's not, I apologize.  It

14  should be Defense Exhibit 102.  If it's not in the book, it

15  will come up on the screen in just a second.

16  A.   It's not in the book.

17  Q.   In fact, we could turn that off.  Let me just ask you

18  some questions about that.

19          You received extensive e-mails from Flynn Intel

20  Group; is that right?

21  A.   If you're including everyone at Flynn Intel Group, we

22  received quite a number of e-mails from various people at

23  Flynn Intel Group, yes.

24          MR. MACDOUGALL:  Can I have a moment, Your Honor?

25          (A pause in the proceedings.)

─────United States v. Rafiekian─────

1  BY MR. MACDOUGALL:

2  Q.   Do you recall in January -- in January of 2017 receiving

3  a package of e-mails from General Flynn, Kristen Verderame,

4  and Michael that were ten particularly important e-mails?

5  A.   I don't recall whether I received e-mails.  I do recall

6  that our team at Covington and Kristen Verderame received a

7  set of e-mails from Mr. Rafiekian's custodial file and from

8  others.

9  Q.   Would a -- would a piece of correspondence from your firm

10 refresh your recollection as to what you received?

11 A.   It might.

12          MR. MACDOUGALL:  Okay.  Your Honor, with permission,

13 I would like the witness to have a look at Exhibit 102 --

14 Defense Exhibit 102 for identification.

15          THE COURT:  Show that to him.  I have a copy.

16          (A pause in the proceedings.)

17 BY MR. MACDOUGALL:

18 Q.   Does that refresh your recollection, Mr. Kelner?

19 A.   Just give me a second to read it, please.  Thank you.

20 Q.   Sure.

21          (A pause in the proceedings.)

22          THE WITNESS:  It doesn't really change my

23 recollection, which is that our team at Covington, and Kristen

24 Verderame, received certain e-mails early on from

25 Mr. Rafiekian's custodial files, and probably others as well.

United States v. Rafiekian

1  I don't know that those went directly to me, which is why my

2  recollection is a little bit fuzzy on the details.

3          MR. MACDOUGALL:  Your Honor, the attachments, I

4  believe, are loaded in the system and the Court has copies of

5  them, as well as the government.  If I could ask -- and I'll

6  do this quickly -- Mr. Kelner to just have a look at each of

7  those e-mails and confirm them?

8          THE COURT:  All right.  Do we have those?  You want

9  to identify them?

10 BY MR. MACDOUGALL:

11 Q.   They'll be on your screen, Mr. Kelner.

12         So I would like you to look quickly at Defense

13 Exhibit 102A, which I'll represent to you was attached to the

14 e-mail from Ms. Langdon.  Did you have that e-mail?

15 A.   Sorry.

16         THE COURT:  It should be taken down.  It's not in

17 evidence.

18         MR. MACDOUGALL:  Yes, it should be taken down, yes,

19 sir.  It should be on the witness' --

20         THE CSO:  Counselor, it only comes up with

21 everything at one time.

22         MR. MACDOUGALL:  Oh.

23         THE COURT:  Can you provide hard copies to him?

24         MR. MACDOUGALL:  I can.  Yes, Your Honor.

25         THE COURT:  All right.

1          THE WITNESS:  Thank you.

2   BY MR. MACDOUGALL:

3   Q.   So, Mr. Kelner, I'm just going to go through these very

4   quickly.  There's 13 of them.  Defense Exhibit 102A, do you

5   recognize that as something you had?

6   A.   Uhm, I don't question that we had it, but I'm not sure I

7   remember having it.

8   Q.   Okay.  You don't specifically remember?

9   A.   No.

10  Q.   Let's go to 102B.  E-mail dated July 30, 2016.

11  A.   Okay.

12  Q.   Do you remember having that?

13  A.   I have seen this before.  I don't recall when we obtained

14  it.

15  Q.   Okay.  102C, please.

16  A.   I would say the same thing.  I have seen this before; I

17  don't recall when we obtained it.

18  Q.   Okay.  102D.

19  A.   I have seen this before, and I do recall this is one of

20  the ones that we obtained, I believe, in that initial set of

21  e-mails.

22  Q.   102E.

23  A.   I don't remember this one as clearly.

24  Q.   Do you question that it was included?

25  A.   I don't question it, but I don't actually remember.

R. Kelner - Cross

1    Q.    102F.

2          There are multiple copies in each folder, so.

3    A.    I see.  Okay.

4          I've seen this before, but I don't recall exactly

5    when.

6    Q.    102G.

7    A.    I've seen this and this is one of the ones that we

8    obtained very early on.

9    Q.    And I take it the prior one you don't dispute you

10   obtained them early on, you just don't recall as you're

11   sitting here today?

12   A.    That's correct.

13   Q.    102H, please.

14   A.    I recall this one.

15   Q.    102I.  A couple more.

16   A.    It's vaguely familiar, but I'm not sure.

17   Q.    Defense Exhibit 102J.

18   A.    I do recall seeing this before.

19   Q.    102K.  Two more.

20   A.    I'm not certain.

21   Q.    You don't dispute it, though?

22   A.    I don't dispute it, but I don't particularly remember

23   this one.

24   Q.    102L.

25   A.    I recall this one.

1   Q.   You do.  And 102M.

2   A.   Uhm, I don't clearly recall this one.

3   Q.   So reaching the least common denominator, subject the

4   limitations you place on each of these, you don't dispute, as

5   reflected in the length of this e-mail, that you had all of

6   these in January?

7   A.   I don't dispute, but I'm not -- I don't have a certain

8   recollection of it.

9   Q.   I would like you to turn, please, to Defense Exhibit 91,

10  and which I believe is in evidence.  We looked at that

11  earlier.

12  A.   Okay.

13  Q.   You are a licensed to practice law in the District of

14  Columbia?

15  A.   District of Columbia and Maryland.

16  Q.   And your office is in the District of Columbia that's

17  your principal place of practice, is that right?

18  A.   Yes.

19  Q.   Just like me?

20  A.   Yes.

21  Q.   And as such you are subject to the D.C. Code of

22  Professional Responsibility?

23  A.   Yes.

24  Q.   And that's really important because that's the law that

25  governs all of us lawyers?

──────United States v. Rafiekian──────
R. Kelner - Cross
315

1    A.    Yes.

2    Q.    And it tells us what we can do and what we can't do and

3    it's focused largely in protecting our clients, would you

4    disagree with that?

5    A.    I would not disagree.

6    Q.    Are you familiar with Section 1.7 of the D.C. Code of

7    Professional Responsibility relating to conflicts of interest?

8    A.    Yes.

9    Q.    Tell me what that means in your own words?

10   A.    Rule 1.7 of the D.C. Bar rules lays out the circumstances

11   in which a lawyer either has to cease representing a client

12   because of a conflict of interest or has to obtain a client's

13   informed consent to continue representing them because of a

14   actual or a potential conflict.

15   Q.    And could you turn, please, to Defense Exhibit 98, in

16   your book.

17   A.    Yes.

18   Q.    Do you recognize that as a copy of Rule 1.7 of the D.C.

19   Code?

20   A.    It appears to be that.

21         MR. MACDOUGALL:  Your Honor, I'd ask that Defense

22   Exhibit 98 be admitted with judicial notice.

23         THE COURT:  Any objection?

24         MR. TURGEON:  No, Your Honor.

25         THE COURT:  All right.  Defense Exhibit 98 is

───────── United States v. Rafiekian ─────────

R. Kelner - Cross

316

1    admitted.

2                              (Defendant's Exhibit No. 98

3                              admitted into evidence.)

4              MR. MACDOUGALL:  Thank you, Your Honor.

5    BY MR. MACDOUGALL:

6    Q.    Now, could you read the first sentence aloud for me,

7    please, Rule 1.7, Mr. Kelner?

8    A.    "Rule 1.7A.  A lawyer shall not advance two or more

9    adverse positions in the same matter."

10   Q.    That's kind of a simple statement.  We can't have two

11   adverse positions or two adverse clients in the same matter,

12   is that right?

13   A.    That's correct.

14   Q.    And if we go back to the engagement letter, which is

15   Defense Exhibit 92 in evidence.  You thought about this,

16   didn't you, when you were being engaged by both Mr. Flynn and

17   Flynn Intel Group?

18   A.    Yes.

19   Q.    And that's why on page 3 of Exhibit 92, Defense 92 in

20   evidence you talk about what will happen if a conflict arises

21   between the two when Intel Group will go, Mr. Flynn will stay,

22   is that a fair statement of what you said here?

23   A.    Yes, it is.

24   Q.    And that was because Rule 1.7 requires you to do that and

25   put that in the engagement letter, is that right?

United States v. Rafiekian

R. Kelner - Cross

317

1   A.   The way I would say it that because of Rule 1.7 this is

2   one way that lawyers deal with potential for a conflict.

3   Q.   Okay.  Now, there came a time, after you filed the FARA

4   registration form, that your client, Mr. Flynn entered into a

5   guilty plea, is that right?

6   A.   Yes.

7   Q.   And that was in December of 2017?

8   A.   Yes.

9   Q.   Roughly nine months or so after you filed the FARA

10  registration?

11  A.   Yes.

12  Q.   And you represented him in that guilty plea in District

13  of Columbia, is that right?

14  A.   We did.

15  Q.   And you continued to represent Flynn Intel Group?

16  A.   We did.

17  Q.   Now part of Mr. Flynn's plea agreement -- plea was a plea

18  agreement, is that right?

19  A.   Yes.

20  Q.   And you negotiated that plea agreement on his behalf?

21  A.   Yes.

22  Q.   And a plea agreement, for those who don't deal with these

23  things, you'd agree with me there's a contract, an agreement,

24  between the defendant and his counsel and the prosecutors

25  about what else is going to happen in addition to him simply

United States v. Rafiekian

318

1  pleading guilty, do you agree with?

2  A.   Yes.

3  Q.   Has other stuff in it.  And two of the other things that

4  were in Mr. Flynn's plea agreement was an agreement to

5  cooperate, is that right?

6  A.   Yes.

7  Q.   You drafted it, and I can show it to you if you need to

8  refresh your recollection?

9  A.   I wouldn't necessarily we drafted it, but, yes, that's

10 correct.

11 Q.   And you signed it?

12 A.   Yes.

13 Q.   And the agreement to cooperate, you would concede is very

14 broad?

15 A.   It is.

16 Q.   Mr. Flynn, as part of his agreement with the government,

17 has to help the Government do all kinds of things, is that

18 right?

19 A.   Yes.

20 Q.   Investigate other cases?

21 A.   Yes.

22 Q.   Including this one?

23 A.   Yes.

24 Q.   Testify if called upon?

25 A.   Yes.

EASTERN DISTRICT OF VIRGINIA

United States v. Rafiekian

R. Kelner - Cross

319

1    Q.    Provide information?

2    A.    Yes.

3    Q.    Release documents?

4          MR. TURGEON:  Your Honor, we would object.  This

5    goes beyond the scope.

6          THE COURT:  Overruled.

7    BY MR. MACDOUGALL:

8    Q.    You agree with all of that?

9    A.    Yes.

10   Q.    Okay.  And another aspect of the plea agreement in

11   negotiated with Mr. Flynn is that he didn't get prosecuted for

12   anything else?

13   A.    Yes.

14   Q.    Including this case?

15   A.    Yes.

16   Q.    We'll just call that getting a pass, you got a pass, is

17   that right?

18   A.    I don't know that I would call it that, but you correctly

19   stated or described the agreement.

20   Q.    We'll stick with my first characterization.

21         So those two aspects of his plea agreement are

22   present there, you negotiated them, and you continued to

23   represent the Flynn Intel Group, is that right?

24   A.    You said continued past tense.

25   Q.    You continued after the plea agreement was entered,

United States v. Rafiekian

1    December 2017 to represent FIG?

2    A.   Yes.

3    Q.   And as Mr. Flynn's plea agreement played out, as his

4    cooperation obligation was performed, it became clear that

5    there was an investigation going on of the FARA registration,

6    is that right?

7    A.   That was cleared before the plea agreement.

8    Q.   I'm sorry.

9    A.   That was cleared before the plea agreement.

10   Q.   Okay.  So you knew about both things when you entered the

11   plea agreement?

12   A.   Yes.

13   Q.   And so moving from December 2017 into 2018, as

14   Mr. Flynn's cooperation continues, you continue to represent

15   FIG even though FIG is under -- is the subject of the

16   investigation; is that right?

17   A.   The way that I would describe it, I think, more

18   accurately is that following the plea agreement there was not

19   any indication that FIG itself was subject to indictment, but

20   there was an ongoing investigation, as it turned out, of

21   Mr. Rafiekian.

22   Q.   And who was the registrant under the Foreign Agents

23   Registration Act?

24   A.   The registrant was Flynn Intel Group with short form

25   registrations by Mr. Rafiekian and General Flynn.

R. Kelner - Cross

1    Q.   So there was no legal reason to believe or to know, to

2    know, that Flynn Intel Group couldn't have been prosecuted for

3    this, is there?

4    A.   I think it's fair to say that it was possible, but I

5    think for completeness, there was no indication of that, and

6    it was exceedingly unlikely.

7    Q.   Even though the Flynn Intel Group was the registrant and

8    registration form was the subject of the investigation?

9    A.   Yes, that's right.

10   Q.   And you continue to represent both?

11   A.   Yes.

12   Q.   Okay.  And in June 2018, the Government asked for a

13   waiver of the attorney-client privilege of Flynn Intel Group,

14   didn't they?

15   A.   Yes.

16   Q.   And you gave it to them, didn't you?

17   A.   General Flynn, as the CEO of Flynn Intel Group,

18   authorized a waiver, yes.

19   Q.   And the letter authorizing that waiver was on your

20   letterhead signed by you?

21   A.   Yes.

22   Q.   And your client, Mr. Flynn, and your client, Flynn Intel

23   Group, no problem?

24   A.   Correct.

25   Q.   Okay.  In December 2018, Mr. Rafiekian was charged in

1    this case.  You still didn't withdraw, did you?

2    A.   We did not withdraw from representing FIG or General

3    Flynn.

4    Q.   Continued to represent them.  And, in fact, at

5    Mr. Flynn's first sentencing hearing in December 2018, isn't

6    it correct you asked for the sentencing to be continued so

7    that Mr. Flynn can cooperate in this case?

8    A.   That's correct.

9    Q.   And the judge granted that and put off Mr. Flynn's

10   sentencing so that he could cooperate in this case against

11   Mr. Rafiekian as a result of the FIG registration.  That's all

12   true?

13   A.   That's correct.

14   Q.   And it wasn't until June of this year that your

15   representation of both Mr. Flynn and FIG was terminated; is

16   that right?

17   A.   That's correct.

18   Q.   So from January 2017 through all of these events, until

19   June of 2019, you continued to represent Michael Flynn and the

20   Flynn Intel Group.  That's true?

21   A.   That's correct.

22   Q.   And it was only in June of 2018 that the Flynn Intel

23   Group got its own lawyers?

24   A.   June of 2019.

25   Q.   2019.  I apologize.  2019.

United States v. Rafiekian

1          And you're aware that on Friday, last Friday, July

2   12th, the Government made the following statement:  The United

3   States Government is in possession of multiple, independent

4   pieces of information relating to the Turkish government's

5   efforts to influence United States policy on Turkey and

6   Fethullah Gulen, including information relating to

7   communications, interactions, and a relationship between Ekim

8   Alptekin and Michael Flynn, and Ekim Alptekin's engagement of

9   Michael Flynn because of Michael Flynn's relationship with an

10  ongoing presidential campaign without any reference to the

11  defendant or FIG.

12          Did you know all about that?

13  A.   Uhm, I would say no.  I learned of that through a media

14  report last week.

15  Q.   I'm sorry?

16  A.   I learned of that through a media report last week.

17  Q.   So you didn't know anything about what the Government

18  characterized as Mr. Flynn's communications, interactions, or

19  relationship with Ekim Alptekin unrelated to Mr. Rafiekian or

20  FIG?  You knew nothing about that?

21  A.   Not hearing any objection from Mr. Flynn's current

22  counsel, I'll answer the question, though it involves matter

23  of privilege.

24          No, that's news to me.

25  Q.   So Mr. Flynn never told you about that?

United States v. Rafiekian

R. Kelner - Redirect

324

1   A.   Absent any objection from Mr. Flynn's current counsel

2   based on privilege, no.

3            MR. MACDOUGALL:  A moment, Your Honor.

4            THE COURT:  I'm sorry.

5            MR. MACDOUGALL:  May I have a moment?

6            THE COURT:  Yes.

7            MR. MACDOUGALL:  Thank you, Your Honor.  No further

8   questions.

9            THE COURT:  All right.  Any redirect?

10            MR. TURGEON:  Yes, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MR. TURGEON:

13   Q.   When did Michael Flynn enter his guilty plea in the

14   District of Columbia?

15   A.   I believe it was December 1, 2017.

16   Q.   Now, I want to ask you, about six months earlier in the

17   spring of 2017, at that time, how many officers did FIG have?

18   A.   I believe, at that time, it was General Flynn,

19   Mr. Rafiekian -- it may have been just the two of them.

20   Q.   How many employees did FIG have at the time?

21   A.   Six months before the guilty plea?

22   Q.   Yes.

23   A.   At that point, it was -- it was shut down.  It had no

24   employees.

25   Q.   In the spring of 2017, did Covington ever identify a

United States v. Rafiekian

R. Kelner - Redirect

325

1  potential conflict of interest involving its representation of

2  FIG?

3  A.   No.

4  Q.   In the spring of 2017, did Covington help the defendant

5  find a lawyer?

6  A.   Yes.

7  Q.   What did Covington do to help the defendant find a

8  lawyer?

9  A.   We recommended Mr. Trout to be Mr. Rafiekian's counsel,

10 and we made an introduction between Mr. Trout and

11 Mr. Rafiekian.

12 Q.   Do you see Mr. Trout in the courtroom today?

13 A.   I do.

14 Q.   Could you please point him out?

15 A.   The gentlemen raising his hand.

16 Q.   After your recommendation, did the defendant retain

17 Mr. Trout?

18 A.   He did.

19 Q.   So Mr. -- Mr. MacDougall asked -- showed you an e-mail

20 you received in April 2017, attaching several e-mails that you

21 went through one by one.  He asked you, I believe, if you had

22 those e-mails on January 11, 2017.

23       Do you recall whether you had those e-mails in

24 decrypted form at that time?

25 A.   It's difficult for me to remember with precision, as I

United States v. Rafiekian

R. Kelner - Redirect

326

1   sit here right now, when we received each of those e-mails.

2   Several of them, as I indicated, are familiar to me.  But as I

3   sit here right now, I don't think I can answer, with

4   precision, as to when we were able to view them, including

5   because of decryption issues.

6   Q.   So Mr. MacDougall also asked about essentially why

7   Covington made the representations that it made in the FARA

8   filing.  So I would like to bring up Government Exhibit 58,

9   which we just saw, please.

10          And you were asked about page 3 of that last

11  paragraph.

12  A.   Yes.

13  Q.   Now, when was the language in this last paragraph

14  submitted to the Department of Justice?

15  A.   March 7, 2017.

16  Q.   And is that true of all the statements in the FARA

17  filing?

18  A.   Yes.

19  Q.   Was that based on your best understanding of the facts at

20  the time?

21  A.   Yes.

22  Q.   So when you drafted the FARA filing, did you have access

23  to any Skype conversations?

24  A.   I don't believe we did.

25  Q.   Did the defendant ever -- did the defendant ever provide

─────United States v. Rafiekian─────

R. Kelner - Redirect

327

1   you any Skype conversations?

2   A.   Not to the best of my recollection.

3   Q.   Take a look at Government's Exhibit No. 20, please.

4   Which is a Skype chat between Alptekin and the defendant on

5   August 25, 2016.

6          Do you see on the left where Alptekin says, "Let's

7   talk tomorrow night, assuming I will manage to meet No. 1

8   tomorrow"?  And then he goes on to say, "I think I'm meeting

9   MC's boss, not direct boss, but you know who."

10         And in response the defendant says, "Looking forward

11  to speaking with you.  And FNI just sent you a confirmation

12  e-mail with some logistical action targets."

13  A.   I see that now, yes.

14  Q.   And Mr. Alptekin continues, "My assumption based on MC's

15  requests to come to the third bridge opening tomorrow for

16  final instructions, either way he said, We are a full go."

17  A.   I see that.

18  Q.   Did the defendant give you a copy of this Skype chat or

19  tell you about it?

20  A.   No.

21  Q.   Had you seen this Skype chat and knew that Alptekin was

22  saying that he was meeting with No. 1, MC's boss, and that

23  MC -- and said that MC said they were a full go, would you

24  have pressed the defendant and General Flynn on their claims

25  that Turkish government officials were not involved in the

United States v. Rafiekian

R. Kelner - Redirect

328

1  project?

2  A.   Yes.

3        MR. TURGEON:  Court's indulgence, Your Honor.

4        (A pause in the proceedings.)

5  BY MR. TURGEON:

6  Q.   Sir, I would like you to take a look at Government

7  Exhibit 67J, which is a Skype chat between Alptekin and the

8  defendant on September 8, 2016.

9        In this chat, Alptekin says, "Hi, Bijan.  Will send

10  the agreement.  Just left PM's office."  And the defendant

11  responds, "Thank you, Ekim.  MF and I are going to meet in 30

12  minutes at 1400 hours."

13        Did the defendant give you a copy of this Skype chat

14  or tell you about it?

15  A.   No.

16  Q.   Did he tell you that he had had any Skype chats with

17  Alptekin in which Alptekin said he had just left the PM's

18  office?

19  A.   No.

20  Q.   Take a look at Government Exhibit 67K, please, which is a

21  Skype chat between Alptekin and the defendant the following

22  day.

23        And do you see on the left where Alptekin asked the

24  defendant for bank account information and then says, "I have

25  the money, but I need to deposit it ASAP before banks close."

United States v. Rafiekian

R. Kelner - Redirect

329

1   A.   I see that.

2   Q.   Did the defendant give you a copy of this Skype chat or

3   tell you about it?

4   A.   No.

5   Q.   Did he say anything about Alptekin telling him that

6   Alptekin had the money but needed to deposit it?

7   A.   No, not that I recall.

8   Q.   Now, Mr. MacDougall had you look at several documents

9   with Michael Flynn's signatures on them.

10          Do you recall that?

11  A.   Yes.

12  Q.   And those were all documents from FIG's FARA filing; is

13  that right?

14  A.   Yes.

15  Q.   Was the defendant given a copy of all of those documents

16  to review?

17  A.   They were sent through Kristen Verderame.  I believe he

18  had a full draft set of the papers.  I don't know for sure

19  exactly what he was given in terms of the final draft, because

20  we were working through Kristen Verderame.

21          But he was sent a draft set before the filing, which

22  we understood through Kristen Verderame he had reviewed and

23  signed off on except with respect to certain comments, which I

24  think I itemized for you before.

25  Q.   And other than those comments that we went through

United States v. Rafiekian

R. Kelner - Redirect

330

1   originally, did the defendant request any other edits to those

2   documents?

3   A.   Not that I'm aware of and not to me.

4   Q.   And did the defendant give you his e-mail consent to sign

5   on his behalf?

6   A.   He did authorize us to sign the short form registration

7   on his behalf, yes.

8   Q.   And now, finally, Mr. MacDougall brought up an earlier

9   draft of the FARA filing that listed those $40,000 payments as

10  refunds.

11  A.   Yes.

12  Q.   And then I think you pointed out that the final was

13  changed to list them as consultancy fees; is that correct?

14  A.   That's correct.

15  Q.   Why did Covington change the characterization of the

16  $40,000 payments from refunds to consultancy fees?

17  A.   We spent a lot of time trying to figure out what those

18  payments were and how to accurately disclose them.  And I

19  think we had a number of different drafts with different views

20  by different lawyers on how to handle it.

21       But ultimately when it came time to prepare the

22  final FARA filing and to submit it, we did not believe that

23  there was any evidence to support the proposition that those

24  payments were refunds.  And essentially all of the evidence we

25  had referred to them as consultant payments, but we weren't

1    even completely convinced that they were consulting payments.

2           And so the way we decided to deal with that

3    ultimately was to simply recount in the FARA filing what was

4    in the accounting records and to indicate the accounting

5    records show them as consulting payments.

6           But we did not think there was really any support to

7    list them as refunds.

8    Q.   And is that how the defendant represented them to you?

9    A.   He represented them as refunds.  And as I mentioned, one

10   of his few comments on the draft filing was to request that we

11   change it from consulting fees to refunds.

12          MR. TURGEON:  Court's indulgence, Your Honor.

13          (A pause in the proceedings.)

14          MR. TURGEON:  No further questions.

15          THE COURT:  All right.  May the witness be excused?

16          MR. TURGEON:  Yes, Your Honor.

17          THE COURT:  All right.  Mr. Kelner, you're excused

18   and you're not to discuss your testimony with anyone outside

19   the courtroom.

20          THE WITNESS:  Thank you, Your Honor.

21          (Witness excused.)

22          THE COURT:  Who is the Government's next witness?

23          MR. GIBBS:  Grant Smith, Your Honor.

24          THE COURT:  Call Mr. Smith, please.

25          THE CSO:  Face the clerk and raise your right hand.

United States v. Rafiekian

1                 Thereupon,

2                               **GRANT SMITH,**

3    having been called as a witness on behalf of the Government

4    and having been first duly sworn by the Deputy Clerk, was

5    examined and testified as follows:

6                 (Witness seated.)

7                            **DIRECT EXAMINATION**

8    BY MR. GIBBS:

9    Q.   Good afternoon, sir.

10   A.   Good afternoon.

11   Q.   Can you please state your name for the record.

12   A.   My name is Grant Smith.

13   Q.   And who do you work for?

14   A.   I work for the Federal Bureau of Investigation.

15   Q.   That's the FBI?

16   A.   Yes, sir.

17   Q.   What is your position with the FBI?

18   A.   I'm a forensic accountant.

19   Q.   Can you explain what sort of training you have to be a

20   forensic accountant?

21   A.   So I have an undergraduate agree in accounting from the

22   University of Tennessee.  I have a master's in professional

23   accounting from The University of Texas.  I have my CPA

24   license as well as a couple of certifications, the CFE and the

25   CFF.

─────United States v. Rafiekian─────

G. Smith - Direct

333

1    Q.    And are you a certified fraud examiner?

2    A.    I am, yes, sir.

3    Q.    How long have you been a forensic accountant with the

4    FBI?

5    A.    I've worked for the FBI since September of 2010.

6    Q.    Now, Mr. Smith, as part of your duties as a forensic

7    accountant with the FBI, did you review financial documents

8    related to the Flynn Intelligence Group or FIG?

9    A.    I did.

10   Q.    Did you also review communications related to FIG and the

11   defendant, Bijan Rafiekian?

12   A.    I did.

13   Q.    And did you review financial records for the company

14   called "Inovo"?

15   A.    I did.

16   Q.    And did you also review corporate records for a company

17   called "Inovo"?

18   A.    I did.

19         MR. GIBBS:  Your Honor, if we could pull up

20   Government Exhibit 17, it is in evidence?

21         THE COURT:  All right.  You may.

22   BY MR. GIBBS:

23   Q.    And can we enlarge the big paragraph in the middle there?

24         And, Mr. Smith, do you recognize Government

25   Exhibit 17?  Is this a document you've seen previously?

────────United States v. Rafiekian────────

G. Smith - Direct

334

1    A.    Yes, it is.

2    Q.    And in the paragraph that we are looking at here on this

3    particular e-mail -- well, first of all, this is an August 11,

4    2016 e-mail from the defendant to Ekim Alptekin with the

5    subject "Welcome back."

6              And in the paragraph that's enlarged, what did the

7    defendant say in that paragraph at the bottom about how much

8    the advisory support would be?

9    A.    The e-mail states, "I did not touch the advisory support

10   we discussed at the 20 percent."

11   Q.    You said "20 percent"?

12   A.    Yes, sir.

13   Q.    All right.  Next, if we can go to Government's

14   Exhibit 18A, which is also in evidence.  If we can just

15   enlarge the top.

16             And just for the record, this is in evidence.  But

17   if you can just explain what this document is very quickly.

18   A.    Sure.  This is an e-mail from Bijan Kian to Mike Flynn

19   and Philip Oakley.

20   Q.    And if you can just keep your voice up a little bit, sir.

21   A.    Yes, sir.

22   Q.    Thank you.  What's the date of this e-mail?

23   A.    It's dated August 11, 2016.

24   Q.    And what's the subject of the e-mail?

25   A.    "Confidence through clarity campaign - Operation

———United States v. Rafiekian———

G. Smith - Direct

335

1  Confidence."

2  Q.   And if we could blow up the portion of the e-mail that

3  has the bullet points.

4        Now, on the first bullet, it says that phase zero

5  will cover to secure active participation of senior advisor

6  COGS or C-O-G-S refers to this cause?

7        Do you see that?

8  A.   Yes, sir.

9  Q.   Mr. Smith, what does COGS stands for?

10  A.   COGS is an acronym that often reflects cost of goods

11  sold.

12  Q.   And then if we could blow up the second to last paragraph

13  of Exhibit 18A, please.

14        And in that second to last paragraph, the defendant

15  said, "Attached is the budget for this 90-day campaign."

16        And what did the particular e-mail say was attached

17  to it?

18  A.   A budget for the campaign.

19  Q.   Let's turn to that.  Let's go to Government Exhibit 18B,

20  which is also in evidence.

21        And if we could blow up -- I believe the top

22  portion.  Can you go higher than that?  Yup, you got it.

23  Thank you.

24        In this particular exhibit, 18B, what is listed as

25  FIG's revenue per month?

---United States v. Rafiekian---

1    A.   It lists $200,000 for a period.

2    Q.   And then how about that acronym, COGS, what does it list

3    that as a 20 percent per month?

4    A.   $40,000 per month.

5    Q.   All right.  Thank you.

6         MR. GIBBS:  And, Your Honor, I'd like to publish

7    Government Exhibit 19.  This was actually one of the exhibits

8    that was on Exhibit 68, which is the one that Mr. Rosecrans

9    testified about.  I believe those were all provisionally

10   admitted, but I wanted to ask first.

11        THE COURT:  All right.  Any objection to 19?

12        MR. TROUT:  No, Your Honor.

13        THE COURT:  Without objection, 19 will be admitted

14   and you may publish.

15                  (Government's Exhibit No. 19

16                   admitted into evidence.)

17   BY MR. GIBBS:

18   Q.   All right.  And take a look at 19.  This has not been

19   published previously.  So, Mr. Smith, can you explain what

20   this is?

21   A.   This is an e-mail dated August 25, 2016, from Bijan Kian

22   to Ekim Alptekin copying Michael Flynn.

23   Q.   And what is the subject of the e-mail?

24   A.   "Action update."

25   Q.   Now, if we can enlarge the paragraph at the bottom that

─────United States v. Rafiekian─────
G. Smith - Direct
337

 1  begins with "General Flynn."

 2          In that paragraph, what did the defendant say that

 3  20 percent per month was being allocated for?

 4  A.   It was for the advisory support cost provided by your

 5  firm.

 6  Q.   And then a couple lines down there, how else did he

 7  describe that 20 percent?

 8  A.   Professional advisory services, or the firm's advisory

 9  fee.

10  Q.   And then if we could go to Government Exhibit 22A.  That

11  is not in evidence, so if you could take a look at that.

12  Thank you, sir.

13          Do you see, sir?

14  A.   Yes, sir.

15  Q.   What is Government Exhibit 22A?

16  A.   It's an e-mail with the subject line of "Confidence" from

17  Bijan Kian with a copy to Michael Flynn, and it's dated

18  September 3, 2016.

19          MR. GIBBS:  Your Honor, at this time, we move

20  Government's Exhibit 22A into evidence and ask to publish it.

21          THE COURT:  Any objection?

22          MR. TROUT:  No objection.

23          THE COURT:  22A is admitted.  You may publish it.

24          MR. GIBBS:  Thank you.

25                          (Government Exhibit No. 22A

─────United States v. Rafiekian─────

1                              was admitted into evidence.)

2   BY MR. GIBBS:

3   Q.   Now, if we can blow up the top of that e-mail, the first

4   line.

5             Now, on the first line of that e-mail, Mr. Smith,

6   what did the defendant tell Ekim Alptekin was attached to the

7   e-mail?

8   A.   An engagement letter between Inovo and FIG.

9   Q.   And did the -- this e-mail, Government Exhibit 22A,

10  indicate up in the header that there was an attachment

11  included with it?

12  A.   I don't see it in the header, but I believe --

13  Q.   Okay.  But he did indicate -- okay.  Sorry.

14            Ms. Horsford is one step ahead of me as always.

15            Do you see that?

16  A.   Yes, sir.

17  Q.   All right.  So that does indicate there was an attachment

18  included?

19  A.   Yes, sir.

20  Q.   All right.  If we could go to that then.  Let's go to

21  Government Exhibit 22B.  You'll need to look at it first

22  because it is not in evidence yet.

23            Do you have it there before you?

24  A.   I do, sir.

25  Q.   And what is 22B?

United States v. Rafiekian

1   A.   It's a document tiled "Independent Advisory Services

2   Agreement."

3             MR. GIBBS:  Your Honor, we'd ask to move that in and

4   publish it, please.

5             THE COURT:  This is exhibit --

6             MR. GIBBS:  22B, as in "bravo."

7             THE COURT:  Any objection?

8             MR. TROUT:  No objection.

9             THE COURT:  22B is in.

10                         (Government's Exhibit No. 22B

11                         admitted into evidence.)

12  BY MR. GIBBS:

13  Q.   Can we enlarge that first paragraph at the top?

14            So, Mr. Smith, in that first paragraph, who does it

15  list as the client?

16  A.   The client is described as Inovo BV.

17  Q.   And then, also in that paragraph, who does it list as the

18  advisor?

19  A.   The advisor is ascribed as the Flynn Intel Group,

20  Incorporated.

21  Q.   And then if we could go to the second page of the

22  independent services advisory agreement, there in the middle

23  we've got the compensation.  Can we enlarge that, please?

24            Now, in this particular document, what is the

25  compensation listed for this project?

United States v. Rafiekian

G. Smith - Direct

340

1    A.    It lists a fixed price of $600,000 comprised of three

2    installments of $200,000.

3    Q.    And you've seen this document previously, correct?

4    A.    Yes, sir.

5    Q.    What, if any, reference was made in this document to that

6    20 percent professional advisory services?

7    A.    None.

8    Q.    What, if any, reference was made in here to the

9    20 percent for cost of goods sold, C-O-G-S?

10   A.    None.

11   Q.    Thank you.

12             Next, if we could pull up Government's Exhibit 67J,

13   which is in evidence.

14             If we could enlarge the top of that.

15             And in this Skype message between Ekim Alptekin and

16   the defendant, what did Ekim Alptekin say he was just about to

17   send?

18   A.    That he would be sending the agreement.

19   Q.    Where did he say it was coming from?

20   A.    The PM's office.

21   Q.    And at the top -- and you can see the date of this

22   particular Skype message?

23   A.    Yes, sir.

24   Q.    What is that date?

25   A.    September 8, 2016.

─────United States v. Rafiekian─────
G. Smith - Direct
341

1   Q.   Let's go to that next day, then.  Let's pull up 67K,

2   which is already in evidence.

3          And if we can enlarge the top of that.  And

4   Mr. Smith -- or -- yeah, Mr. Smith, what is Government

5   Exhibit 67K?

6   A.   It looks to be another Skype message.

7   Q.   And this is Ekim Alptekin sending a Skype message.  And

8   at the top one it says, "Bijan, I urgently need a BIC/swift

9   code."

10          Can you explain what that is?

11  A.   Codes identify a bank, BIC stands for bank identification

12  code.

13          MR. TROUT:  Your Honor, I think it would be

14  appropriate to remind the jury of the limiting instruction.

15          THE COURT:  Well, these are all in.  They've already

16  been instructed.  This is simply information available to

17  Mr. Rafiekian.  Go ahead.

18  BY MR. GIBBS:

19  Q.   All right.  And, sir, did you complete your answer as far

20  as what a BIC/swift code -- what that is?

21  A.   I believe so.

22  Q.   Okay.  And then the next line he asked about urgently

23  needing IBAN version of the bank account.  Can you explain

24  what an IBAN is?

25  A.   Yes, sir.  IBAN stands for international bank account

1    number, it's a standardized format used in international

2    transactions.

3    Q.   And then under that he said, "And, finally, a direct link

4    to that account."

5         And then just below that he said, "I have the money

6    but need to deposit it ASAP before the banks close."

7         Do you see that?

8    A.   Yes.

9    Q.   Let's go to the next Skype message, which is 67L.

10        And if we could enlarge the green part.  What is

11   Government Exhibit 67L?

12   A.   Another Skype message.

13   Q.   And what information is being transmitted in the green

14   blocks there?

15   A.   The swift code, statement to U.S. does not use IBAN

16   numbers, and then the address for Bank of America.

17   Q.   If we can go next to Government Exhibit 67M.  If we could

18   enlarge that.  Thank you.

19        What is Government Exhibit 67M?

20   A.   Another Skype message.

21   Q.   Okay.  And in this Skype message, Alptekin said, "Since I

22   had to wire from my personal account, I suggest we alter the

23   agreement to an agreement between FIG and my person while

24   Inovo invoices for services provided to FIG.  What do you

25   think?"

United States v. Rafiekian

G. Smith - Direct

343

1          Now, in that message he talked about wiring from my

2    personal account.  As part of your activities in this

3    investigation, did you review banking records related to an

4    international wire transfer that was also dated on

5    September 9th?

6    A.   I believe so.

7    Q.   If we could -- I'd like you to take a look at Government

8    Exhibit No. 25S.  It's not in evidence yet, but if you could

9    identify that.

10   A.   Yes, sir.  It is a FIG statement from Bank of America for

11   the Flynn Intel Group, Incorporated, for the period ending

12   September 30th, 2016.

13          MR. GIBBS:  Your Honor, at this time, we'd ask to

14   move in Government Exhibit 25A.

15          THE COURT:  Any objection?

16          MR. TROUT:  No, Your Honor.

17          THE COURT:  Exhibit 25A is admitted.

18                      (Government's Exhibit No. 25A

19                      admitted into evidence.)

20          MR. GIBBS:  And if we could publish the third

21   page -- well, first of all, yeah, just publish the first page.

22   I'm sorry.

23          THE COURT:  All right.

24   BY MR. GIBBS:

25   Q.   Okay.  And that's the first page, 25A; do you see that?

G. Smith - Direct

344

1    A.    Yes, sir.

2    Q.    Let's go to the third page.  And if we could, I would

3    like to enlarge the second transaction from the top.

4              And Mr. Smith, can you explain what type of

5    transaction we're looking at here?

6    A.    This appears to be an international wire that's inbound

7    to the account.  It was credited to the account on September

8    9th, 2016 in the amount of $200,000.

9    Q.    And in the Skype message we just looked at a moment ago

10   from September 9th, Alptekin said, "I had to wire from my

11   personal account."  What, if anything, did you see in this

12   particular transaction that reflected a particular name was

13   listed?

14   A.    On the second line after ORIG, which typically stands for

15   "originator," is listed Kamil Ekim Alptekin.

16   Q.    And then does this record indicate anywhere, for this

17   particular $200,000 wire transfer, what country this wire was

18   coming from?

19   A.    It does.

20   Q.    And what country was it coming from?

21   A.    Turkey.

22   Q.    And how can you tell from looking at this record that

23   it's coming from Turkey?

24   A.    The information after the word "ID," following Alptekin,

25   as the beginning of an IBAN number.  The first two digits of

G. Smith - Direct

345

1   an IBAN identify a country by the standard two digit country

2   reference.  TR stands for Turkey.

3   Q.   And you mentioned that this wire transfer that we're

4   looking at here came from Turkey.

5           MR. GIBBS:  We can take that off screen now.

6   BY MR. GIBBS:

7   Q.   As part of your investigation, were you able to obtain

8   any financial records from Turkey that provided any further

9   detail about this particular international wire?

10  A.   No, sir.

11  Q.   And is there any reason you were not able to obtain those

12  records?

13  A.   Because we were unable to -- you are unable to serve a

14  subpoena to a foreign bank.

15  Q.   How about a MLAT, or a Mutual Legal Assistance Treaty?

16  Would that be an avenue to getting more detail about this

17  particular international wire?

18  A.   It would be.

19  Q.   And would there be any concerns with trying to request an

20  MLAT for this type of international wire?

21  A.   Well, the MLAT, from my understanding, is provided to the

22  government, not the institution from which you're seeking

23  records.  And it often includes a summary of the criminal

24  matter under investigation.

25  Q.   It is describing what was being investigated?

United States v. Rafiekian

G. Smith - Direct

346

1   A.   Yes, sir.

2   Q.   And as far as you're aware, no MLAT was submitted to

3   request further details about that particular wire; is that

4   correct?

5   A.   Correct.

6   Q.   Now, in the prior Skype message we looked at,

7   Mr. Alptekin also talked about altering the agreement.  Do you

8   recall that?

9   A.   Yes, sir.

10       MR. GIBBS:  If we could pull up Government Exhibit

11  25B, which is in evidence.  I think we can just enlarge the

12  top and see everything.

13  BY MR. GIBBS:

14  Q.   Sir, what is Government Exhibit 25B?

15  A.   It's an e-mail with the subject of "wire to Ekim" from

16  Bijan Kian to Michael Flynn, dated September 12, 2016.

17  Q.   Sir, that's a relatively short message.  Could you just

18  read that into the record, please?

19  A.   Yes, sir.

20       "Michael, we need to wire 40K to Mr. Ekim Alptekin.

21  He is our outside advisor on the Confidence project.  I will

22  draft an advisory agreement to be executed with him to

23  document this relationship.  How is your schedule today?

24  Thanks, BK."

25  Q.   All right.  Thank you.

United States v. Rafiekian

1          MR. GIBBS:  And next, I'd like to have Government

2    Exhibit 25C, which is also in evidence, pulled up.  And can we

3    enlarge that?

4    BY MR. GIBBS:

5    Q.    Now, can you, just for the record, state what Government

6    Exhibit 25C is?

7    A.    Yes, sir.  It's an e-mail from Bijan Rafiekian to Michael

8    Flynn with a carbon to Michael Flynn, sent September 12, 2016.

9    The subject is "advisory agreement" -- with parentheses --

10   (general scope) for Ekim Alptekin."

11   Q.    Okay.  And in this e-mail, the defendant talked about an

12   agreement being composed in a way that is not specific so that

13   it could be operationalized with task orders.  And then it

14   said, "We need this to create an audit trail on properly

15   documenting the relationship."  Is that correct?

16   A.    Yes, sir.

17   Q.    And what is listed as an attachment to that particular

18   e-mail?

19   A.    The attachment is described as Ekim's -- "Ekim advisory

20   agreement BK 9122016."

21          MR. GIBBS:  And if we can go to that, and that is in

22   evidence.  It's Government Exhibit 25D.

23          Can we pull up that -- enlarge that first paragraph,

24   please?

25   MR. GIBBS:

1  Q.   All right.  What is this document, 25D, first of all?

2  A.   It's an Independent Advisory Services Agreement.

3  Q.   And who is listed in the first line of this agreement?

4  A.   Mr. Ekim Alptekin.

5  Q.   How did that name compare to the name on the $200,000

6  wire we saw from Bank of America for the September statement?

7  A.   I believe it's the same last two words.

8  Q.   And in the -- I think it's the third line of that

9  paragraph, what is Ekim Alptekin referring to in this

10 agreement?

11 A.   An advisor.

12 Q.   And then a couple of lines down, how is FIG referred to

13 in this agreement?

14 A.   They're referred to as the client.

15 Q.   And then at the bottom of 22D --

16      MR. GIBBS:  If we pull up the compensation.

17 BY MR. GIBBS:

18 Q.   And how much compensation is listed in this agreement,

19 Mr. Smith, for Mr. Alptekin?

20 A.   The compensation is described as a mobilization fee of

21 $40,000 upon execution, with subsequent -- subsequent payments

22 based on task orders issued by the client.

23 Q.   Okay.  $40,000 as a mobilization fee?

24 A.   Yes, sir.

25      MR. GIBBS:  All right.  If we can go back to

G. Smith - Direct

1   Government Exhibit 25A, which is the Bank of America statement

2   again and go back to that third page.

3   BY MR. GIBBS:

4   Q.   In looking at that third page, Mr. Smith, were there any

5   $40,000 transactions there?

6   A.   There were.

7   Q.   And where was that?  Maybe you can help me.

8   A.   It's the --

9   Q.   There you go.  All right.  So on your screen, you have --

10  well, what is the portion that's enlarged there?

11  A.   This is the details regarding a September 13, 2016

12  outbound international wire transfer in the amount of $40,000.

13  Q.   And you said it's an outbound wire transfer.  Who is it

14  sent to?

15  A.   It was sent to Inovo BV.

16  Q.   And which country was it sent to?

17  A.   An account in the Netherlands.

18  Q.   And is the $40,000 transfer described in any way in this

19  Bank of America record?

20  A.   At the end of the description -- at the end of the text

21  is a reference to consultancy fee.

22  Q.   Okay.  Not mobilization fee?

23  A.   Correct.  Consultancy fee.

24  Q.   And Mr. Smith, you had an opportunity to look at this

25  September Bank of America statement previously?

G. Smith - Direct

350

1   A.   Yes, sir.

2   Q.   Other than the $200,000 inbound wire on September 9th and

3   this outbound wire on the 13th, was there -- were there any

4   other international wire activity for the FIG account for

5   September 2016?

6   A.   No, sir.

7          THE COURT:  Anything else?

8   Q.   And Mr. Smith, did you also review banking records from

9   the Netherlands that related to this transaction?

10  A.   I did.

11  Q.   And were those records obtained by an MLAT?

12  A.   Yes, sir.

13  Q.   And if we could -- actually this is not in evidence yet,

14  so if you could take a look --

15         MR. GIBBS:  I think it's going to be a different

16  binder.  150A.  Thank you, sir.

17  BY MR. GIBBS:

18  Q.   And Mr. Smith, what is Government's Exhibit 150A?

19  A.   150A appears to be a response received from the

20  Netherlands documenting their actions based on the receipt of

21  an MLAT.

22  Q.   And specifically the MLAT was asking for -- requested and

23  obtained documents from what entity?

24  A.   So one of the steps that the investigator took was an

25  investigation of a bank account held at ABN AMRO.

─────United States v. Rafiekian─────
G. Smith - Direct
351

1   Q.   And that's the name of the bank, ABN AMRO?

2   A.   Yes, sir.

3   Q.   And whose account statement at ABN AMRO did this MLAT

4   obtain?

5   A.   It stated that the account number is in the name of

6   Inovo BV.

7           MR. GIBBS:  And, Your Honor, at this time, we'd move

8   Government Exhibit 150A into evidence?

9           THE COURT:  Any objection?

10          MR. TROUT:  No, sir.

11          THE COURT:  150A is admitted.

12                          (Government's Exhibit No. 150A

13                           admitted into evidence.)

14  BY MR. GIBBS:

15  Q.   So, Mr. Smith, we have before us on the screen, this is

16  the first page of Government Exhibit 150A, correct?

17  A.   Yes, sir.

18  Q.   And are these the Dutch bank documents you just testified

19  about?

20  A.   This is the cover letter, yes.

21  Q.   Oh, the cover letter.  That's correct.

22          Now, can we go -- it's the ninth page, I think, but

23  it's Bates No. 189.  Thank you.

24          Mr. Smith, what does it reflect in these Dutch

25  banking records for the Inovo account regarding any large

G. Smith - Direct

352

1    incoming wires for the month of September into that bank

2    account?

3    A.    So on the 14th of September, 2016, this statement

4    documents a deposit of a wire received from the Flynn Intel

5    Group, Incorporated.

6    Q.    And what was the -- did you say what the amount was, the

7    amount of the wire?

8    A.    $40,000.

9    Q.    Thank you.  Now, if we can go back one page, I think it's

10   Bates No. 188.  I think it's the two rows at the top.

11         All right.  Mr. Smith, this is also part of the

12   Inovo records; is that correct?

13   A.    Yes, sir.

14   Q.    And at the top there, what was listed for Inovo BV's

15   previous balance for the month of September?

16   A.    $3,000.

17   Q.    And what is listed for the new balance?

18   A.    $27,897.72.

19   Q.    And how about the total withdrawals?

20   A.    $30,102.28.

21   Q.    And, finally, total deposits?

22   A.    $55,000.

23   Q.    And as part of your review of documents from Inovo -- you

24   can take that down, thank you -- did you also review records

25   that related to -- there were corporate records related to

1   Inovo BV?

2   A.   Yes, sir.

3   Q.   All right.  You'll have to look in your binder, it's

4   Government Exhibit 150B.  If you would, take a look at that.

5   A.   I don't see a 150B.

6   Q.   We can probably put it on your screen, I think.

7           THE COURT:  Do we have a 150B?

8           MR. GIBBS:  Your Honor, we have a electronic version

9   of 150B.  We don't have a paper copy -- if there's no

10  objection from --

11          THE COURT:  Any objection?

12          MR. TROUT:  No objection.

13          THE COURT:  All right.  150B will be admitted.

14                  (Government's Exhibit No. 150B

15                  admitted into evidence.)

16          MR. GIBBS:  All right.  Thank you.

17  BY MR. GIBBS:

18  Q.   So if we can publish 150B.

19          And, Mr. Smith, what is Government Exhibit 150B?

20  A.   It's records from the Chamber of Commerce provided in

21  response to the MLAT.

22  Q.   And if we could blow up the -- maybe the top third of

23  that.

24          Now, what is the legal entity listed in the first

25  big row at the top of this particular document?

United States v. Rafiekian

G. Smith - Direct

354

1   A.   So the document, it's Inovo BV.

2   Q.   And then below that, how many -- under "persons

3   employed," what is listed there?

4   A.   It lists one.

5   Q.   And then can we go down a little bit?  Just a little

6   more.  Great.

7        And also listed there is a listing for sole

8   shareholder.

9        Do you see that?

10  A.   Yes, sir.

11  Q.   And who is listed on this particular document as the sole

12  shareholder?

13  A.   Ekim Holding BV.

14  Q.   And if we can go to the second page of 150B.  Blow that

15  whole thing up.

16        And who is listed as the executive director for

17  Inovo BV?

18  A.   Kamil Ekim Alptekin.

19  Q.   Now, Mr. Smith, you testified a moment ago this document

20  identified the sole shareholder for Inovo BV as Ekim Holding

21  BV; is that correct?

22  A.   Yes, sir.

23  Q.   And did the Dutch records that were obtained also contain

24  an extract or business record for Ekim Holdings BV?

25  A.   They did.

EASTERN DISTRICT OF VIRGINIA

─────────United States v. Rafiekian─────────
G. Smith - Direct
355

1   Q.   So if we can go to the third page of that, and if we can

2   do the same thing, if we can pull up the top third.

3           And what is the legal entity for this extract listed

4   up there at the top?

5   A.   Ekim Holding BV.

6   Q.   And then if we can go down to the bottom.

7           What number is listed next to persons employed?

8   A.   One.

9   Q.   And who is listed as both sole shareholder and executive

10  director?

11  A.   Kamil Ekim Alptekin.

12  Q.   Thank you.  Now, Mr. Smith, did you also review financial

13  records in this case from October 2016?

14  A.   Yes, sir.

15  Q.   All right.  Do you have the binder in front of you?  This

16  will be Government's Exhibit 34.

17          And Mr. Smith, what is Government Exhibit 34?

18  A.   It's a bank statement for a Bank of America account held

19  in the name of Flynn Intel Group for the period ending

20  October 31, 2016.

21          MR. GIBBS:  And, Your Honor, we'd ask to move in

22  Government Exhibit 34.

23          THE COURT:  All right.  Any objection?

24          MR. TROUT:  No.

25          THE COURT:  All right.  34 is admitted.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

United States v. Rafiekian

G. Smith - Direct

356

1           (Government's Exhibit No. 34

2            admitted into evidence.)

3  BY MR. GIBBS:

4  Q.   And, again, if we can go to the third page of this bank

5  statement.  If we can blow up the transaction right there at

6  the top.

7           Mr. Smith, can you explain what this transaction is?

8  A.   This is an inbound international wire transaction

9  credited on October 11, 2016, in the amount of $185,000.

10  Q.   And you said it's an international inbound wire.

11           Can you tell what country this wire was coming from?

12  A.   Turkey.

13  Q.   And what was the name listed in this incoming wire?

14  A.   Kamil Ekim Alptekin.

15  Q.   All right.  Now, if we can go to Government Exhibit 35B,

16  which is in evidence.  If we can pull that up.

17           If we can enlarge that.

18           What is Government Exhibit 35B, Mr. Smith?

19  A.   It is an invoice from Inovo to the Flynn Intel Group.

20  Q.   And what's the date of the invoice?

21  A.   It's dated October 14, 2016.

22  Q.   And what is the amount of the invoice?

23  A.   $40,000.

24  Q.   And what's the description of this particular invoice?

25  A.   Consultancy fee, Confidence project.

1   Q.   Now, in looking at this document, Mr. Smith, was there an

2   IBAN number listed on the invoice?

3   A.   There is.

4   Q.   And where is the IBAN number listed?

5   A.   Second line from the bottom.

6   Q.   And it is the one that starts with IBAN?

7   A.   Yes, sir.  The number starts with that.

8   Q.   So let's go back to Government Exhibit 34, to that third

9   page again.

10          If we could enlarge that $40,000 transaction again.

11          How did the IBAN number on the invoice we just saw,

12   which is Government Exhibit 35B, how did that compare to the

13   IBAN number on the Bank of America statement from October

14   2016?

15   A.   Closely.  The number on the Bank of America statement is

16   slightly truncated.

17   Q.   Okay.  So it's incomplete?

18   A.   Correct.

19   Q.   But otherwise it appears to be the same IBAN number?

20   A.   Yes, sir.

21          THE COURT:  Thank you, Mr. Gibbs.

22          We're going to adjourn for today.  We will continue

23   tomorrow morning and begin at 9:30.  Please make whatever

24   arrangements you need to in order to be in the jury room by

25   around 9:15, and -- so we can begin promptly at 9:30.

─────────────United States v. Rafiekian─────────────

G. Smith - Direct

358

1          Again, I instruct you not to discuss this case among

2    yourselves or with anyone outside of the courtroom.  And,

3    again, please do not engage in any research or anything else

4    that might have pricked your interest here today.

5          And with that, you're excused until tomorrow

6    morning.

7          (Jury dismissed.)

8          THE COURT:  All right.  Mr. Smith, you're excused

9    until tomorrow morning at 9:30.  Do not discuss your testimony

10   during the evening recess.

11         (Witness excused.)

12         THE COURT:  Anything else before we adjourn?

13         MR. GILLIS:  I had one matter, Your Honor.

14         THE COURT:  Yes, please be seated.

15         MR. GILLIS:  During the cross-examination of

16   Mr. Kelner, Mr. MacDougall asked a quick question about how

17   many FARA indictments there had been.  And I asked that the

18   question and the answer be stricken.  Those are -- that is

19   irrelevant, Your Honor.  How many prosecutions there may have

20   been in the FARA case is no more relevant than how many

21   robbery indictments there have been in a robbery.  It does not

22   tend to suggest guilt or innocence.  There is, in this case,

23   no suggestion whatsoever of selective prosecution, which is

24   the only circumstances in which that sort of question and

25   answer would be appropriate.  It 's just that the defendant

─────────────────United States v. Rafiekian─────────────────

359

1  wants the jury to draw some kind of conclusion that this case

2  is not -- is --

3          THE COURT:  I thought the question was related to

4  indictments arising out of his FARA filings.

5          MR. GILLIS:  No, Your Honor.  It was entirely how

6  many indictments under FARA have there been.  That was the

7  question, and it's irrelevant, Your Honor.  We should -- if

8  that comes in, we should be able to say there have been plenty

9  of 951 charges because there are very serious offenses, and we

10 should be allowed to say that there are thousands of 375 --

11 371 -- pardon me -- charges brought every day in this country.

12 So they're equally irrelevant.  That question and answer

13 should be stricken, Your Honor.

14         THE COURT:  All right.  MacDougall, do you want to

15 respond?

16         MR. MACDOUGALL:  I don't have the transcript.  The

17 question was very clear.  I think the Court heard it clearly.

18 This was directed to a man who was the preeminent expert in

19 FARA, and I asked him how many registrations he had, and how

20 many inquiries he had, and how many had been indicted.  And

21 that was the question and I think the transcript will reflect

22 that.

23         THE COURT:  So it pertained to his filing?

24         MR. MACDOUGALL:  Absolutely.  Yes, Your Honor.

25         THE COURT:  All right.  Yes.

United States v. Rafiekian

360

1          MR. GILLIS:  Your Honor, I would like the

2   opportunity, if you would, for us to review the record.

3          THE COURT:  That would be fine.  That would be fine.

4   I'll reflect on this and rule at an appropriate time.

5          Yes?

6          MR. MACDOUGALL:  Just one other matter, Your Honor.

7   Very quickly, that I put everyone through the tedium of

8   listening to 102, A through M.  We have, under subpoena,

9   several people at Covington, Katherine Langdon (ph) is not one

10  of them.  That document, we didn't think it would be

11  controversial, and the sole purpose of it is to make clear

12  that they had those documents in January, which is what I

13  think her e-mail says, the Government objected to that as

14  hearsay.

15         So what we'd ask is if we can't reach a resolution,

16  for the Court's permission to subpoena Ms. Langdon in the

17  defense case for the limited purpose of coming in and

18  authenticating that e-mail.

19         THE COURT:  Which e-mails are we talking about?

20         MR. MACDOUGALL:  This was the one --

21         THE COURT:  The one A through M that you went

22  through?

23         MR. MACDOUGALL:  Yes, Your Honor.

24         THE COURT:  I thought he testified that he didn't

25  dispute that Covington had had those, those e-mails.

─────United States v. Rafiekian─────

1          MR. MACDOUGALL:  If that's his testimony, I -- he

2   kind of was, you know, back and forth depending upon the

3   document.  And, again, the sole issue that we're trying to

4   reach is that they had them in January, and I think that's

5   what the e-mail clearly says.  And I would hate to

6   inconvenience Ms. Langdon, but if we need to, we would like to

7   have the Court's permission to do that.

8          MR. TROUT:  Your Honor, we have no objection to the

9   exhibit coming in without a sponsor, so it's not necessary to

10  call Mrs. -- Ms. Langdon.

11         MR. MACDOUGALL:  Langdon.

12         THE COURT:  All right.

13         MR. TROUT:  But apart from that, we reserve any

14  other --

15         MR. MACDOUGALL:  Thank you, Your Honor.

16         THE COURT:  All right.  It sounds like that may cure

17  it.

18         All right.  How much longer do you have with

19  Mr. Grant?

20         MR. GIBBS:  Five minutes, Judge.

21         THE COURT:  Okay.  And who is in the queue for

22  tomorrow?

23         MR. GIBBS:  We have McCauley.  Boston.  Well, I

24  don't want to try to do it from memory.  I'm pretty sure those

25  are the first two.

──United States v. Rafiekian──

362

1         Smith is on now.  McCauley.  Well, it's going to be

2    McCauley, Boston, and Elliot in some order.  I think that will

3    take us through the morning for sure.

4         THE COURT:  All right.  All right.

5         MR. GIBBS:  We'll talk.

6         THE COURT:  All right.  And then we'll meet at

7    9 o'clock tomorrow.

8

9         **(Proceedings adjourned at 6:06 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury trial

7    in the case of the **UNITED STATES OF AMERICA versus BIJAN**

8    **RAFIEKIAN**, Criminal Action No. 1:18-CR-457, in said court

9    on the 16th day of July, 2019.

10         I further certify that the foregoing 157 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this July 17, 2019.

17

18

19

20
                              _____
21
                              Tonia M. Harris, RPR
22                            Official Court Reporter

23

24

25