1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION

3    UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                  )
4               Plaintiff,        )
                                  )
5          v.                     )  Alexandria, Virginia
                                  )  July 17, 2019
6    BIJAN RAFIEKIAN,             )  9:04 a.m.
                                  )
7               Defendant.        )  Day 3 (AM Session)
     _____)  Pages 364 - 515
8

9                    TRANSCRIPT OF TRIAL

10       BEFORE THE HONORABLE ANTHONY J. TRENGA

11         UNITED STATES DISTRICT COURT JUDGE

12                    AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   APPEARANCES:

2   FOR THE UNITED STATES OF AMERICA:

3        JAMES P. GILLIS, ESQUIRE
         EVAN N. TURGEON, ESQUIRE
4        JOHN T. GIBBS, ESQUIRE
         S. KATE SWEETEN, ESQUIRE
5        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
6        Alexandria, Virginia  22314
         (703) 299-3700

7
    FOR BIJAN RAFIEKIAN:
8
         ROBERT P. TROUT, ESQUIRE
9        TROUT, CACHERIS & SOLOMON, PLLC
         1627 I Street, N.W., Suite 1130
10       Washington, D.C.  20006
         (202) 464-3300
11
         MARK J. MACDOUGALL, ESQUIRE, *PRO HAC VICE*
12       STACEY H. MITCHELL, ESQUIRE, *PRO HAC VICE*
         JOHN C. MURPHY, ESQUIRE, *PRO HAC VICE*
13       JAMES E. TYSSE, ESQUIRE
         AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
14       Robert S. Strauss Building
         1333 New Hampshire Avenue, N.W.
15       Washington, D.C.  20036-1564
         (202) 887-4000
16
    THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2   <u>GOVERNMENT'S WITNESS</u>              <u>EXAMINATION</u>      <u>PAGE</u>

3   Grant Smith                      Further Direct      375
                                     Cross               382
4                                    Redirect            387

5   Brian McCauley                   Direct              389
                                     Cross               439
6
    Michael C.        Boston         Direct              445
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Criminal Case 1:18-cr-457, *United*
2  *States v. Bijan Rafiekian.*
3          Counsel, will you please note your
4  appearances for the record.
5          MR. GILLIS:  Good morning, Your Honor.  Jim
6  Gillis, Evan Turgeon, John Gibbs, Latoya Horsford,
7  Katie Sweeten, and Special Agent Bryan Alfredo for the
8  United States.
9          THE COURT:  Good morning.
10          MR. TROUT:  Good morning, Your Honor.  Robert
11  Trout.  I am here with Mark MacDougall, Stacey
12  Mitchell, and James Tysse representing the defendant.
13          THE COURT:  All right.  Very good.
14          Mr. Gillis, do you have any issues you want
15  to raise?
16          MR. GILLIS:  I do, Your Honor.
17          THE WITNESS:  All right.
18          MR. GILLIS:  A couple, actually.
19          THE COURT:  All right.
20          MR. GILLIS:  First, I would like to do this
21  on the record before the jury, but preliminarily, I
22  wanted to ask the Court to take judicial notice of the
23  fact that the Third Bridge over the Bosphorus opened on
24  August 26, 2016.  Under Federal Rule of Evidence
25  201(b)(2), the Court is authorized to do that because

1    it is really something that is not in dispute and can

2    be readily established from sources, such as

3    newspapers.

4              I have a couple of articles that I can hand

5    up to the Court if the Court is interested.  One is

6    from Wikipedia, and one is from PBS, but there are

7    dozens, Your Honor, reporting on the opening of that

8    bridge on that day.

9              THE COURT:  All right.  Anything else?

10             MR. GILLIS:  I'm sorry?

11             THE COURT:  Anything else?

12             MR. GILLIS:  Yes, Your Honor.  May I hear --

13   sorry -- whether the Court would allow that?

14             THE COURT:  Well, let me hear your other

15   issues, and then I'll ask the defense.

16             MR. GILLIS:  I see.  Yes, sir.

17             So I renew my motion to strike.  I concede

18   that the question was at least ambiguous.  His question

19   was how many have resulted in indictment other than

20   this one, and he said none.  But whether that was in

21   the context of his own practice or meant as a general

22   question, you can see where they're going with this,

23   Your Honor.  He's established that this witness was

24   from an international firm, that he was the chairman of

25   the firm's department that oversees FARA filings, that

1  he's not heard of one.

2           And you can imagine that that's an argument

3  that they're going to try make here to establish

4  that -- in closing, that FARA filings are never

5  prosecuted.  It's not an important case, and for some

6  reason, there's something exculpatory about that.

7           Obviously, as we discussed yesterday, there's

8  nothing exculpatory or inculpatory about the number of

9  prosecutions that have been brought under a particular

10 statute.  So I want to make certain that I ask the

11 Court to order that that not be mentioned for that

12 purpose.

13          I submit, Your Honor, that -- in addition to

14 that, Your Honor, I would say it's not relevant for

15 impeachment purposes.  It doesn't show his bias in any

16 way, whether he knew or didn't know of FARA

17 prosecutions, or whether he himself had handled one.

18 It doesn't show anything about his competence or any of

19 the other factors that are proper impeachment.  So we

20 can leave the record where it is for that.  Although, I

21 think it also should be stricken as irrelevant.

22          But nonetheless, I would ask the Court to

23 make certain to order the defense not to mention it for

24 the purpose of showing something like this prosecution

25 not being important or that it in some way shows that

1  either the defendant is less culpable or that the

2  government has somehow acted improperly in this case.

3          THE COURT:  All right.  Anything else?  Is

4  that your full inventory of issues?

5          MR. GILLIS:  Yes, Your Honor.

6          All right.  Thank you.

7          THE COURT:  Mr. Trout.

8          MR. TROUT:  Your Honor, first of all, we

9  don't care about the bridge.

10         THE COURT:  All right.  The Court will take

11 judicial notice that the bridge was opened on

12 August 26.

13         Is that the date, Mr. Gillis?

14         MR. GILLIS:  August 26, 2016.

15         THE COURT:  2016.  All right.

16         MR. GILLIS:  Yes, sir.

17         MR. TROUT:  Your Honor, turning to the issue

18 Mr. Gillis also raised, I think the record is clear he

19 was talking about his own practice.  And it's clearly

20 relevant because what we want to establish is that

21 Mr. Kelner is very, very careful and studious about

22 doing his work and he's got the track record to prove

23 it.

24         So, I mean, the point is not that they never

25 prosecute these cases or a selected prosecution.  The

1   point is that Mr. Kelner is very rigorous in his

2   attention to detail and to how he fills out these

3   forms, and, as I say, he's got the track record to

4   prove it.

5            THE COURT:  All right.

6            MR. GILLIS:  If I may, Your Honor?

7            THE COURT:  Yes.

8            MR. GILLIS:  That has nothing to do with how

9   careful or meticulous he would be.  They've drawn that

10  out in spades on the cross-examination.

11           Again, it's not offered for any impeachment,

12  and whatever value it has is -- first of all, I submit

13  it has none.  Secondly, it would be certainly

14  overweighed by the prejudicial effect it would have in

15  any suggestion that this is somehow improper.

16           In fact, whether he has heard of a FARA

17  indictment has no bearing on he would have prepared the

18  documents in this case, how careful he would have been.

19  So for that reason, we submit it's just improper to

20  include it in closing argument.

21           THE COURT:  All right.  With respect to the

22  motion to strike, I've reviewed the transcript portion

23  that dealt with this, and it's clear that the comment

24  was within the context of Mr. Kelner's own practice and

25  experience.  Just as an initial observation, there was

1   no objection made at the time the question was asked or

2   the answer given.  So to that extent, the Court can

3   conclude that the objection is waived.

4          But getting beyond that, I think that within

5   the context in which it was made, it does relate to

6   Mr. Kelner's overall experience, how he approaches

7   these matters, the care with which he deals with these

8   issues.  But it also relates, it seems to me, with the

9   other issue in the case that he brought out, that this

10  is an ambiguous, mirky area where judgments are made.

11  I think that's reflected in his own experience with the

12  extent to which filings have been challenged.

13         So I'm going to deny the motion to strike.  I

14  am going to instruct the defense not to argue based on

15  that testimony, that these prosecutions are unusual or

16  unwarranted or exceptional or there's any kind of a

17  selective prosecution related here.

18         MR. TROUT:  Thank you, Your Honor.

19         I have a tepid matter.

20         THE COURT:  Yes.

21         MR. TROUT:  Your Honor, I understand that the

22  government intends to call the case agent, Special

23  Agent Alfredo, as a witness.  I have discussed with

24  Mr. Gillis, you know, what about.  My concern is that

25  he is being called as a summary witness, and we object.

1  There is no reason for a summary witness in this case.

2  If they want to summarize their evidence, they have an

3  ample opportunity in closing arguments.  So we would

4  object to testimony from Mr. Alfredo that essentially

5  amounts to summarizing the evidence in the case.

6          THE COURT:  All right.  Mr. Gillis, do you

7  want to speak to that?

8          MR. GILLIS:  Your Honor --

9          THE COURT:  Do you plan on calling

10  Mr. Alfredo?

11          MR. GILLIS:  Yes, we do, Your Honor.

12          THE COURT:  All right.

13          MR. GILLIS:  He will have substantive

14  testimony quite apart from any summary testimony that

15  we might offer.

16          THE COURT:  All right.

17          MR. GILLIS:  Your Honor, as you've seen, this

18  is an exceptionally document-intensive case.  The jury

19  has had difficulty reading some of the documents.  Yes,

20  they will have them in deliberations.  But given the

21  number of the documents and some of the dates that are

22  involved, I submit that it would be appropriate, as in

23  many cases it is, to have a summary agent who can put

24  in context a couple of vignettes.

25          This isn't going to be rehearsal of all of

1  the evidence that's been put in but some of the most

2  significant pieces of evidence to put in a

3  chronological and logical order with respect to what

4  other things were going on at the time.  So I ask the

5  Court's indulgence with respect to a limited number of

6  those sorts of things.

7             THE COURT:  When do you plan on calling him?

8             MR. GILLIS:  He will be our last witness,

9  Your Honor.

10             THE COURT:  All right.  I'll review this

11  issue.  It's always an issue, and I've always thought

12  it was an issue whether the rules of evidence even

13  contemplate summary witnesses as opposed to summary

14  documents.  But I'll look at it.

15             MR. GILLIS:  Your Honor, I'll explore that

16  1001 rule, I believe it is.

17             THE COURT:  All right.

18             MR. GILLIS:  I'll hope to convince you

19  otherwise.

20             THE COURT:  All right.

21             MR. GILLIS:  Thank you.

22             THE COURT:  Anything else?

23        (No response.)

24             THE COURT:  All right.  So we're going to

25  continue with Mr. Grant this morning; is that right?

1              MR. GIBBS:  Mr. Smith.

2              THE COURT:  I'm sorry.  Mr. Smith.

3              Then who is next?

4              MR. GIBBS:  Brian McCauley, Judge.

5              THE COURT:  All right.  Anything else?

6         (No response.)

7              THE COURT:  All right.  We'll stand in recess

8    until the jury is ready.

9         (Recess from 9:16 a.m. until 9:33 a.m.)

10        (The jury is not present.)

11             THE COURT:  Are we ready to proceed?

12             MR. GIBBS:  We are, judge.

13             THE COURT:  Let's bring the jury out.

14        (The jury enters at 9:34 a.m.)

15             THE COURT:  All right.  Please be seated.

16             Good morning.  We are now ready to proceed.

17             Mr. Smith, you remain under oath.

18             THE WITNESS:  Yes, Your Honor.

19    GRANT SMITH, PLAINTIFF'S WITNESS, PREVIOUSLY AFFIRMED

20                   FURTHER DIRECT EXAMINATION

21   BY MR. GIBBS:

22   Q    Good morning, Mr. Smith.

23   A    Good morning, sir.

24             MR. GIBBS:  Sir, just to take us back, if we

25   could, pull up Government Exhibit 34 and go to that

G. Smith - Direct

1  third page.  If we can, enlarge that transaction at the

2  top.

3  BY MR. GIBBS:

4  Q    Now, Mr. Smith, when we broke yesterday evening,

5  we were talking about this exhibit.  Can you just

6  remind us again what this exhibit is?

7  A    This is a Bank of America statement for an account

8  held in the name of the Flynn Intel Group,

9  Incorporated, for the period ending October 31, 2016.

10  Q    And the highlighted transaction, what does that

11  reflect?

12  A    That's an inbound international wire transaction

13  which cleared to this account on the 11th of October

14  2016 in the amount of $185,000.

15  Q    You said this was for the October Bank of America

16  statement?

17  A    Yes, sir.

18  Q    Let's move to November then.  I'd like to pull up

19  Government Exhibit 37A, which is in evidence.  Do you

20  see that there before you?

21  A    Yes, sir.

22  Q    What is Government Exhibit 37A?

23  A    It's an e-mail with a subject of invoice from

24  Bijan Kian to Ekim Alptekin, dated November 10, 2016.

25  Q    And in that e-mail from the defendant to Ekim

G. Smith - Direct

1  Alptekin, how much did the defendant say that Inovo

2  services to FIG for the month of November amounted to?

3  A    The e-mail states they amounted to $55,000.

4  Q    And in the next sentence of that e-mail, what did

5  the defendant say that the $55,000 was for?

6  A    Research and consultation services provided by

7  Inovo.

8  Q    And next I'd like to go to Government Exhibit 37B,

9  which is also in evidence.

10         MR. GIBBS:   If we can, enlarge the top of

11  that.

12  BY MR. GIBBS:

13  Q    Mr. Smith, what is Government Exhibit 37B?

14  A    It's an invoice from the Flynn Intel Group,

15  Incorporated, dated November 10, 2016.

16  Q    And what is the amount of the invoice?

17  A    $200,000.

18  Q    So the invoice on November 10 is for $200,000, and

19  the invoice is from and to whom?

20  A    It is from the Flynn Intel Group, Incorporated,

21  and it's submitted to Mr. Ekim Alptekin, Inovo BV.

22  Q    So we've got the $200,000 invoice here, but the

23  e-mail on that same date had said that the research and

24  consultation services provided by Inovo were $55,000.

25  Do you recall that?

G. Smith - Direct

1   A     Yes, sir, I do.

2   Q     Did you see any invoices in your review of the

3   documents in this case reflecting that $55,000?

4   A     I believe there was one.

5           MR. GIBBS:  If we could, pull up Government

6   Exhibit 161, which is also in evidence.  If we can,

7   enlarge that to the extent that we can.

8   BY MR. GIBBS:

9   Q     Mr. Smith, do you see that, Government

10  Exhibit 161, there before you?

11  A     I do.

12  Q     What is Government Exhibit 161?

13  A     It is an invoice from Inovo to the Flynn Intel

14  Group, dated November 11, 2016, and in the amount of

15  $55,000.

16  Q     And under description, what is the $55,000

17  described as being for?

18  A     Consultancy fee, Confidence project.

19  Q     Finally, if we can, go back to the November Bank

20  of America statement.  If we can, go back to page 3.

21          MS. HORSFORD:  Exhibit number?

22          MR. GIBBS:  Let me see.  Sorry.  I don't know

23  that I have that.

24          MS. HORSFORD:  Thirty-four?

25          MR. GIBBS:  Thirty-four, yeah.

G. Smith - Direct

1   BY MR. GIBBS:

2   Q     And, Mr. Smith, what is Government Exhibit 34?

3   A     This is the October statement.

4           MR. GIBBS:  Actually, go back to the

5   beginning.  Let's see if we can get that date.

6           If I can just have a moment, Judge.

7           THE COURT:  Yes.

8   BY MR. GIBBS:

9   Q     So, Mr. Smith, what I'd like to do -- and I

10  apologize for that.

11          MR. GIBBS:  If we can, pull up Government

12  Exhibit 38.

13  BY MR. GIBBS:

14  Q     I'm actually going to pull it up on your screen --

15  or actually, have you look at the binder, if I could.

16  A     Thirty-eight?

17  Q     Yes.

18  A     Yes, sir.

19  Q     And what is Government Exhibit 38?

20  A     It is a Bank of America bank statement for the

21  Flynn Intel Group, Incorporated, for a period ending

22  November 30, 2016.

23          MR. GIBBS:  Your Honor, at this time, we

24  would ask to move in Government Exhibit 38 and publish

25  it to the jury.

G. Smith - Direct

1        THE COURT:  Any objection?

2        MR. TROUT:  No, Your Honor.

3        THE COURT:  Without objection, Government

4   Exhibit 38 is admitted.  You may publish.

5   BY MR. GIBBS:

6   Q    On your screen, Mr. Smith, do you see the first

7   page of Government Exhibit 38?

8   A    I do.

9        MR. GIBBS:  Then, if we can, go to the third

10  page.  If we can, highlight, I believe, that second row

11  at the top.

12  BY MR. GIBBS:

13  Q    Now, do you see any incoming wires into FIG's Bank

14  of America account for November that reflected the

15  defendant's e-mail with Alptekin on November 10 about

16  the amount that was due for that month?

17  A    Are you referring to the $200,000?

18  Q    Right.  But do you recall the e-mail said that

19  there was a fee that was being subtracted?

20  A    Yes, sir.

21  Q    Can you just describe that?

22  A    Sure.  The fee was described as $55,000.

23  Q    Was there anything in the Bank of America account

24  that reflected $200,000 less the $55,000?

25  A    Yes, sir.  This wire for $145,000.

G. Smith - Direct

1    Q     And can you explain what this wire is reflective

2    of?

3    A     It is an inbound international wire which was

4    received the 14th of November 2016 in the amount of

5    $145,000.

6    Q     And does this wire indicate where it came from?

7    A     Yes, sir, from Kamil Ekim Alptekin.

8    Q     And does it reflect which country it came from?

9    A     Yes, sir, Turkey.

10   Q     Again, how can you tell this wire came from

11   Turkey?

12   A     The beginning two places of the international bank

13   account number.

14   Q     And they indicate what exactly?

15   A     TR, which stands for Turkey.

16   Q     And finally, in reviewing the -- so this was an

17   incoming wire.  In reviewing the November bank

18   statement, did you see any outgoing international wires

19   from FIG's bank account during the month of November?

20   A     No, sir.

21             MR. GIBBS:  One moment, Your Honor.

22             That's all I have for you, Mr. Smith.  I

23   believe the defense may have some questions for you.

24   Thank you.

25             THE COURT:  All right.  Mr. Trout.

G. Smith - Cross

1          MR. TROUT:  Thank you, Your Honor.

2                   CROSS-EXAMINATION

3    BY MR. TROUT:

4    Q    Mr. Smith, my name is Robert Trout.  I represent

5    the defendant, Mr. Kian.  We haven't met before; have

6    we?

7    A    No, sir.

8    Q    All right.  Were you part of the investigation

9    team in this case?

10   A    Yes, sir.

11   Q    So you were engaged with the special agents who

12   were setting the strategy for the case; is that

13   correct?

14   A    Yes, sir.

15   Q    One of your contributions was to provide expertise

16   on how to get information overseas, correct?

17   A    For financial information, yes, sir.

18   Q    You're familiar with foreign export report

19   controls that are imposed by many countries?

20   A    No, sir.

21   Q    Are you familiar with Turkish law that prohibits

22   certain export of hard currency out of Turkey?

23   A    No, sir.

24   Q    Now, you indicated that for the Netherlands you

25   made an MLAT request; is that correct?

G. Smith - Cross

1  A    The investigative team did, yes, sir.

2  Q    Were you the one that was processing that --

3  A    No, sir.

4  Q    -- or helping do that?

5  A    No, sir.

6  Q    All right.  And this was for financial records in

7  Holland, correct?

8  A    Yes, sir.

9  Q    There is an MLAT treaty with Holland that was the

10 basis for this request?

11 A    I believe so.

12 Q    And there's an MLAT treaty with the government of

13 Turkey; is there not?

14 A    I'm not sure.

15 Q    Did you discuss with the investigators getting

16 evidence from Turkey?

17 A    Yes.

18 Q    All right.  And they informed you that there

19 actually was an MLAT procedure in Turkey?

20 A    I don't recall that.

21         MR. GIBBS:  Judge, I object on hearsay, Your

22 Honor.

23         THE COURT:  I'm going to overrule the

24 objection.  This is information that he was given in

25 connection with his investigation.

G. Smith - Cross

1          Go ahead.

2     A    I don't recall specifically, sir.

3     Q    Do you recall that there was discussion about how

4     to get financial information out of Turkey?

5     A    Yes.

6     Q    All right.  And one of those ways was through an

7     MLAT request, correct?

8     A    I think that would be possible, sir, yes.

9     Q    And they discussed how to go about doing that,

10    correct?

11    A    I don't recall specifically for Turkey, but I know

12    that for the MLAT process in general.

13    Q    And one of the ways that you essentially comply

14    with the procedures that are set up by the MLAT or the

15    treaty that was agreed to between the United States and

16    the other country, correct?

17    A    Yes, sir.

18    Q    So in this case, Turkey and the United States had

19    an agreement about providing or exchanging evidence on

20    the request of the requesting country, correct?

21    A    As far as I know, yes, sir.

22    Q    In this case, you did not -- while you made a

23    request for financial information from Holland, from

24    the Netherlands, you made no request for financial

25    information from Turkey, correct?

G. Smith - Cross

1   A      Correct.

2   Q      And did you discuss with the investigative team

3   why you didn't want to do that?

4   A      I don't know that I was part of all of those

5   discussions.

6   Q      But there was a strategy decision made by the

7   investigation team to make a request for financial

8   information from the Netherlands, and there was also a

9   strategic decision by the investigative team not to

10  request information from Turkey, correct?

11  A      I believe so.

12  Q      Now, you're not suggesting that by not pursuing

13  the MLAT procedure with Turkey that the government

14  should be relieved of its burden of proof; are you?

15          MR. GIBBS:   Judge, objection.

16          THE COURT:   Sustained.

17  BY MR. TROUT:

18  Q      Mr. Smith, it's a fact that you didn't even try to

19  get evidence out of Turkey, correct?

20  A      Correct.

21  Q      Mr. Smith, were you part of the team that decided

22  whether or not to make this request?

23  A      So I was not part of the team under the Eastern

24  District of Virginia.

25  Q      Were you a part of the strategic thinking about

G. Smith - Cross

1    whether or not it was a good idea to seek financial

2    information from Turkey?

3    A    For a part of the investigation, yes, sir.

4    Q    Were you familiar with the fact that Turkey was

5    already paying Amsterdam & Partners to do work on

6    extraditing Gulen from the United States?

7    A    No, sir.

8    Q    Did it occur to you that Turkey might want to

9    cooperate with an investigation if it proved that they

10   had nothing to do with allegations that they were

11   somehow involved with FIG?

12   A    I'm sorry.  Could you restate the question?

13   Q    Sure.  Did it occur to you that Turkey might want

14   to cooperate with the investigation in order to prove

15   that they had nothing to do with FIG?

16        MR. GIBBS:  Judge, I object.  That calls for

17   a tremendous amount of speculation.

18        THE COURT:  I'll let him answer whether, in

19   fact, he considered that.

20   A    I don't recall.

21   Q    Do you know whether any of the individuals that

22   you were dealing with mentioned that as one of the

23   reasons either for going after the evidence or not?

24   A    If what was one of the reasons?

25   Q    Well, the fact that Turkey might want to provide

G. Smith - Redirect

1  information to show that they were not involved with

2  Flynn Intel Group.

3  A    I don't recall any discussion.

4  Q    But the bottom line, as far as the government's

5  investigation was, they didn't even try to get this

6  information, correct?

7  A    Yes, sir.

8  Q    That's correct?

9  A    Yes, sir.

10         MR. TROUT:  No further questions.

11         THE COURT:  All right.  Any redirect?

12         MR. GIBBS:  Yes, Judge.

13         THE COURT:  Yes.

14                REDIRECT EXAMINATION

15  BY MR. GIBBS:

16  Q    So, Mr. Smith, you were asked on cross-examination

17  about this MLAT, correct?

18  A    Yes, sir.

19  Q    And this was an MLAT from the United States to the

20  government of the Netherlands, correct?

21  A    Yes, sir.

22  Q    And in that MLAT, information was provided related

23  to this investigation of Inovo that involved the

24  defendant, correct?

25  A    I assume so, yes.

G. Smith - Redirect

1  Q    And as a result of that request, the U.S.

2  government was able to obtain bank records from AMRO

3  Bank in the Netherlands related to Inovo BV, correct?

4  A    Yes, sir.

5  Q    Now, in terms of the information that was provided

6  to the Dutch about the investigation -- well, first of

7  all, let me go back.  What country was implicated in

8  the investigation that involved Inovo BV and the

9  defendant and the Flynn Intel Group?

10  A    I believe Turkey.

11  Q    And you testified a moment ago that while you

12  submitted an MLAT request to the Netherlands about that

13  investigation, you did not -- or as part of the

14  investigation, an MLAT request was not submitted to the

15  government of Turkey, correct?

16  A    Correct.

17  Q    And what concerns were there with telling the

18  government of Turkey about this investigation of Inovo

19  and the defendant and the Flynn Intel Group?

20  A    I believe it was just to describe the matters

21  under criminal investigation.

22  Q    And describe those matters under criminal

23  investigation to whom specifically?

24  A    To the government of Turkey.

25          MR. GIBBS:  Thank you, sir.  That's all I

1   have.

2             THE COURT:  All right.  May the witness be

3   excused?

4             MR. GIBBS:  He may be, Judge.  Thank you.

5             THE COURT:  All right.  Mr. Smith, you're

6   excused.  Do not discuss your testimony outside of the

7   courtroom with any other witness.

8             THE WITNESS:  Thank you, Your Honor.

9        (The witness stands aside.)

10            THE COURT:  The government will call its next

11  witness.

12            MR. TURGEON:  The United States calls Brian

13  McCauley.

14            THE COURT:  Mr. McCauley will come forward.

15      BRIAN MCCAULEY, PLAINTIFF'S WITNESS, AFFIRMED

16                  DIRECT EXAMINATION

17  BY MR. TURGEON:

18  Q    Could you please tell us your name.

19  A    My name is Brian McCauley.

20  Q    What is your current occupation?

21  A    I'm currently retired.

22  Q    What did you do before you were retired?

23  A    I was a deputy assistant director with the FBI.

24  Q    When did you work at the FBI?

25  A    I worked at the FBI from 1997 until I retired in

McCauley - Direct

1   2015.

2   Q    What work did you do in the summer and the fall of

3   2016?

4   A    I was asked to work on a project with the Flynn

5   Intelligence Group.

6   Q    And is that group abbreviated as FIG?

7   A    Yes, sir, it is.

8   Q    Did you work on one project for FIG, or several

9   projects in 2016?

10  A    Just one.  Just one.

11  Q    Is there a name that members of FIG use to refer

12  to that project?

13  A    They called it Confidence.

14  Q    How did you first hear about Project Confidence?

15  A    I received a telephone call from General Michael

16  Flynn, retired, and Bijan.  It was a conference call.

17  Q    Is that Bijan Rafiekian?

18  A    Yes, sir.

19  Q    Do you see Mr. Rafiekian in the courtroom today?

20  A    Yes, sir, I do.

21  Q    Can you please identify him by something he's

22  wearing?

23  A    Sure.  He's wearing a gray suit with a blue

24  striped tie and glasses.

25            MR. TURGEON:  Your Honor, could the record

McCauley - Direct

1    reflect --

2              THE COURT:  All right.  The record will so

3    reflect.

4              MR. TURGEON:  Thank you.

5    BY MR. TURGEON:

6    Q    Did you know General Flynn before this phone call?

7    A    Yes, sir, I did.

8    Q    How did you know him?

9    A    I got to know General Flynn when I worked -- I was

10   in Afghanistan, and I worked with General Flynn when we

11   were there.

12   Q    Before this phone call, did you know the

13   defendant?

14   A    Yes.

15   Q    How did you know him?

16   A    I met him briefly at General Flynn's retirement

17   and then at a Medal of Honor ceremony, the Ellis Island

18   Medal of Honor ceremony in New York.

19   Q    Approximately when was that phone call with

20   General Flynn and the defendant?

21   A    It was towards the end of August or the early part

22   of September.  I'm not sure.

23   Q    On that phone call, who did most of the talking?

24   A    Bijan.

25   Q    And what did he say on that call?

McCauley - Direct

1  A    He asked me if I was familiar with the current

2  events going on in Turkey, and I said I was.  And he

3  said, you know about Gulen and Erdogan?

4       I went, Yes.

5       Basically, that was the points he brought up.

6  Q    By current events in Turkey, what events were

7  those?

8  A    There was a coup attempt in 2016, in the summer of

9  2016 in Turkey.

10 Q    Did the defendant say anything about the coup

11 attempt?

12 A    He didn't want to talk about it over the phone and

13 asked me if I could come in.

14 Q    What did you say?

15 A    I said I would.

16 Q    Did you say anything about whether he knew about

17 the events in Turkey?

18 A    Yes, sir, I did.  I did tell him I was aware of

19 the current events going on there and who they thought

20 was behind this coup attempt.

21 Q    So by "they," who do you mean?

22 A    Bijan -- I'm sorry.  Can you repeat that again?

23 Q    You just mentioned "they."  Who "they" thought was

24 behind the coup.

25 A    Oh, it was the news.  It was Erdogan who

McCauley - Direct

1  believed -- it was the Turkish government who believed

2  that Gulen was behind the coup attempt.  That was

3  covered by the news.  I'm sorry.

4  Q    On that phone call, did the defendant say anything

5  about the relationship of the potential project to that

6  coup attempt?

7  A    No, sir.

8  Q    So how did that call end?

9  A    He asked me if I would -- if I was interested -- a

10  potential project, would I be interested, and he said:

11  Would you come down to the office, and we can talk

12  further about it.

13  Q    And did you agree?

14  A    Yes, sir, I did.

15  Q    Did you meet with him at the office?

16  A    Yes.  The following day I traveled to Flynn Intel

17  Group, also known as FIG, in Alexandria, Virginia.

18  Q    Is that where FIG headquarters is located?

19  A    Yes, sir.

20        MR. TURGEON:  Your Honor, the government

21  moves for the Court to take judicial notice of the fact

22  that Alexandria, Virginia, is in the Eastern District

23  of Virginia.

24        THE COURT:  All right.  The Court will take

25  judicial notice of that fact.

McCauley - Direct

1          Ladies and gentlemen, the Court has just

2    taken judicial notice of the fact that Alexandria,

3    Virginia, is within the Eastern District of Virginia.

4    That judicial notice is sufficient proof for you to so

5    find; although, you have the final determination as to

6    those facts.

7          MR. TURGEON:  Thank you.

8    BY MR. TURGEON:

9    Q    Who was present for that meeting?

10   A    It was just Bijan.

11   Q    And you?

12   A    And myself, yes.

13   Q    What did the defendant say at that meeting?

14   A    He talked about a potential project involving --

15   as far as looking at -- excuse me.  He talked about a

16   potential project that may be doing an investigation

17   into Gulen, Fethullah Gulen, who was living in

18   Pennsylvania.

19   Q    Did the defendant say anything about Fethullah

20   Gulen?

21   A    He referred to him as similar to the Ayatollah

22   Khomeini.

23   Q    Who is the Ayatollah Khomeini?

24   A    The Ayatollah Khomeini was a cleric who led Iran

25   during the Iranian hostage situation.  He was in exile,

McCauley - Direct

1   I believe, in Paris.

2   Q    Now, do you recall the defendant ever telling a

3   specific story about the Ayatollah in reference to

4   Gulen?

5   A    I do, but I can't -- I can't recall the details of

6   it, sir.

7   Q    Is there anything you could recall about that

8   story?

9   A    He talked about a tree.  He talked about an apple,

10  but I can't -- he talked about Gulen, something that

11  Gulen had said pretty much in the blink of an eye.  He

12  can activate 100 -- a million cells or a million

13  people -- I'm not sure -- words to that effect.

14  Q    At your meeting with the defendant, did the

15  defendant say anything about the purpose of the

16  potential project?

17  A    No, sir.  He did do a telephone call to another

18  person.  I believe it was that meeting.

19  Q    Now, before that phone call and at that meeting,

20  did the defendant say anything about who would be

21  hiring FIG for the potential project?

22  A    He said there was some wealthy Turkish businessmen

23  who would be -- we'd be working for some wealthy

24  Turkish businessmen through a company in Copenhagen.

25  Q    Is that something you remember the defendant

McCauley - Direct

1  saying?

2  A    I remember the defendant saying potential contract

3  through a person that he knew in Copenhagen.

4  Q    Who is that person?

5  A    That person is Ekim Alptekin.

6  Q    And at the time of that conversation with the

7  defendant, had you ever met Ekim Alptekin?

8  A    No, sir.

9  Q    Had you ever spoken with him by phone?

10 A    No, sir.

11 Q    As of today, have you ever spoken with Alptekin by

12 phone?

13 A    Sir, I spoke to Alptekin by phone approximately

14 three times during this project.

15 Q    On all of those phone calls, who was on the call?

16 A    It was myself.  It was Bijan, and it was Ekim.

17 Q    Have you ever spoken with Alptekin without the

18 defendant being on the phone?

19 A    No, sir.

20 Q    How did your first phone call with Alptekin come

21 about?

22 A    Bijan called Alptekin and put him on a

23 speakerphone to do an introduction.  He introduced

24 myself to Alptekin on this phone call.

25 Q    And where were you and the defendant when that

McCauley - Direct

1  call took place?

2  A    Sir, that was at FIG, FIG space, FIG office.

3  Q    Where in the FIG offices?

4  A    Alexandria -- in Bijan's office.  I'm sorry.

5  Q    Was that call on speakerphone?

6  A    Yes, sir.

7  Q    On that call, did Alptekin say anything about the

8  purpose of the potential project?

9  A    Yes, sir.  He is the one who introduced the fact

10  that there's a potential project.  Some wealthy Turkish

11  businessmen were concerned about the future of Turkey,

12  and they were interested in possibly hiring FIG to look

13  at Gulen.  He called them Gulenist, Gulen and the

14  Gulenist.

15  Q    So was it Alptekin who made that reference to the

16  wealthy Turkish businessmen?

17  A    Yes, sir, he's the one who did it.

18  Q    Did he tell you any of their names?

19  A    No, sir, he didn't.

20  Q    Are you aware of Alptekin ever mentioning wealthy

21  Turkish businessmen ever after that phone call?

22  A    No, sir.

23  Q    Did Alptekin say anything about Gulen on that

24  phone call?

25  A    He thought that Gulen was behind the coup and that

McCauley - Direct

1    Gulen -- there were Gulenist.  He referred to Gulenist,

2    and that's what he explained what a Gulenist was.

3    Q     How did he explain what a Gulenist was?

4    A     A follower of Gulen and his preachings.  Similar

5    to what Bijan referenced earlier, the Ayatollah

6    Khomeini, a following to his beliefs, his Muslim

7    beliefs.

8    Q     Did you have any further meetings with the

9    defendant after that first meeting?

10   A     Yes, sir.

11   Q     When was the next meeting?

12   A     The next meeting was, I believe, a week later

13   and -- approximately a week later.

14   Q     Where did that meeting take place?

15   A     That meeting also took place at Bijan's office at

16   FIG.

17   Q     What was the purpose of that meeting at FIG

18   headquarters?

19   A     It was an invitation to go to New York.

20   Q     Who invited you to go to New York?

21   A     Bijan did.

22   Q     Who was at FIG headquarters when you arrived for

23   that meeting?

24   A     It was Ekim.

25   Q     And was anyone else there when you arrived?

McCauley - Direct

1  A     Bijan.  Bijan in his office.

2  Q     So could you please take a look at Government

3  Exhibit 2 for identification?

4  A     Yes, sir.

5  Q     Can you identify the individual in that picture?

6  A     That would be Ekim Alptekin.

7           MR. TURGEON:  Your Honor, at this time, we'd

8  move Government Exhibit 2 into evidence.

9           THE COURT:  Any objection?

10          MR. TROUT:  No, Your Honor.

11          THE COURT:  Exhibit No. 2 is admitted.

12          MR. TURGEON:  Could we publish that to the

13  jury, please?

14          THE COURT:  Yes.

15 BY MR. TURGEON:

16 Q     Now, where at FIG headquarters was Ekim Alptekin

17 when you arrived?

18 A     He was coming out of -- I was going into Bijan's

19 office, and he was exiting out of Bijan's office.  So

20 right outside the office in the hallway.

21 Q     Had you ever met him in person before this

22 meeting?

23 A     No, sir.

24 Q     Please describe for the jury your interaction with

25 Alptekin that day.

McCauley - Direct

1  A    It was very brief.  And Bijan introduced me to

2  Alptekin and said:  This is Brian McCauley.  He'll be

3  helping out on this project.

4  Q    Did you and Alptekin have any conversations at

5  that time?

6  A    No, sir.

7  Q    After Alptekin left, did you and the defendant

8  have any discussions?

9  A    Yes, sir, we did.

10 Q    What did you talk about?

11 A    A possible trip to New York to meet with some

12 Turkish officials.

13 Q    Did the defendant tell you anything about that

14 planned meeting in New York City?

15 A    No.

16 Q    Did he say with whom you'd be meeting?

17 A    Just -- at that point, it was just Turkish

18 officials.

19 Q    Did the defendant say who organized the meeting in

20 New York City with the Turkish government officials?

21 A    Sure.  I believe it was Ekim Alptekin, but I

22 just -- I don't remember seeing it coming out of his

23 mouth and hearing it.

24 Q    Did you eventually attend a meeting in New York

25 City with Turkish government officials?

McCauley - Direct

1   A    Yes, sir, I did.

2   Q    Sir, could you please turn to Exhibit -- take a

3   look at Government Exhibit 2B.

4   A    Yes.

5   Q    Who is sitting on the right side in that

6   photograph?

7   A    That would be Ekim Alptekin.

8   Q    And who is sitting on the left side in that

9   photograph?

10  A    That would be the Turkish foreign minister.

11       MR. TURGEON:  Your Honor, at this time, we'd

12  move Government Exhibit 2B into evidence.

13       THE COURT:  Any objection?

14       MR. TROUT:  No objection.

15       THE COURT:  2B is admitted.

16       MR. TURGEON:  Could we publish that to the

17  jury?

18       THE COURT:  Yes.

19       MR. TURGEON:  Thank you.

20  BY MR. TURGEON:

21  Q    Did the defendant offer you any compensation for

22  attending the New York meeting?

23  A    Yes.

24  Q    How much did he offer you?

25  A    My daily rate of $5,000.

McCauley - Direct

1    Q     And did you accept?

2    A     Yes.

3          MR. TURGEON:   So could we pull up Government

4    Exhibit 34, please, which is in evidence, and turn to

5    page 5 of that.   I'd like to blow up on the left side

6    the second check from the top.

7    BY MR. TURGEON:

8    Q     What is that check?

9    A     That check is my compensation for traveling to New

10   York.

11   Q     Could you please read the subject line of that

12   check on the bottom left?

13   A     Yes, for Confidence.

14   Q     So let's talk about that meeting you attended in

15   New York City.   When was that meeting?

16   A     That meeting was the end of September.

17   Q     And how did you get to the meeting?

18   A     I took a train up out of D.C. the morning of the

19   meeting.

20   Q     Who did you travel with?

21   A     Bijan.

22   Q     Did anyone else travel with you?

23   A     No, sir.

24   Q     On the train, did you and the defendant talk about

25   the Gulen project?

McCauley - Direct

1    A    Yes, we did.

2    Q    What did you talk about?

3    A    We talked briefly about the strategy.  Bijan asked

4    me what would be the strategy in the event we did get

5    this contract.

6    Q    And what did you say your strategy on the project

7    would be?

8    A    The strategy would be against Gulen as far as

9    investigating Gulen, how did he come to the U.S., how

10   was he living in the U.S., but we would have to rely on

11   open source information.

12   Q    By "open source information," what do you mean by

13   that?

14   A    Internet, newspaper, anything that's published

15   that anybody in the public can see and find for

16   themselves.

17   Q    On the train, did the defendant ask you about any

18   FBI resources in relation to the project?

19   A    Yes, he did.

20   Q    What did he ask you?

21   A    He asked me if I had access to records against

22   Gulen.

23   Q    Records from where?

24   A    FBI classified records.

25   Q    Did he ask you about any FBI databases?

McCauley - Direct

1    A    Yes, he did.

2    Q    And how did you respond to that?

3    A    I said, no, I don't.  I said, I'm retired.  I no

4    longer have those -- I no longer have that access.

5    Q    On the train, did you and the defendant discuss

6    any work product that was going to be created as part

7    of the project?

8    A    Yes.  We were discussing putting together open

9    source information and trying to look at -- you know,

10   using open source information.  Was he in violation of

11   any law here in the U.S.?  This is Gulen.  We're

12   speaking about Gulen.

13   Q    And did you discuss any sort of products that

14   would be generated as part of the project?

15   A    Yes, I did.  I did suggest using evidence from the

16   Turkish government, as well as open source information,

17   compile all of that and produce possibly a documentary.

18   Q    What kind of a documentary?

19   A    A documentary that would expose Gulen in violation

20   of law and how he got to the U.S.

21   Q    Do you mean a documentary video?

22   A    Yes, sir.  Yes, sir, I do.

23   Q    On the train, did the defendant mention any

24   meetings he had planned in New York City before you

25   were supposed to meet with Turkish government

McCauley - Direct

1  officials?

2  A    Yes.  He was going to meet with or have lunch with

3  Ekim.

4  Q    Do you know if that lunch meeting took place?

5  A    No, sir, I don't.

6  Q    Around what time of day did you and the defendant

7  arrive in New York City?

8  A    Approximately noontime.

9  Q    And what time of day was the meeting with the

10 Turkish government officials scheduled for?

11 A    It was later that night at approximately

12 10:00 p.m.

13 Q    And where in New York City did that meeting take

14 place?

15 A    It took place at the Helmsley Hotel.

16 Q    I just want to make sure you've said what time of

17 day was that meeting.

18 A    It was evening.  It was about 10:00 p.m.

19 Q    Who was at that meeting?

20 A    At that meeting, it was Bijan.  It was General

21 Flynn.  It was James Woolsey.  It was myself, the

22 Turkish -- Ekim, the Turkish foreign minister, the

23 minister of energy from Turkey -- that was Erdogan's

24 son-in-law -- and the translator.

25 Q    Now, how do you know that the Turkish minister of

McCauley - Direct

1 energy was Erdogan's son in-law?

2 A    He was introduced that way by, I believe, Ekim.

3          MR. TURGEON:   So could we please pull up

4 Government Exhibit 9B, which is already in evidence.

5 BY MR. TURGEON:

6 Q    Could you identify that individual, please.

7 A    That's the Turkish foreign minister right there.

8          MR. TURGEON:   And can we pull up Government

9 Exhibit 28A, which is already in evidence.

10 BY MR. TURGEON:

11 Q    Who is that individual?

12 A    That is the Turkish minister of energy, Erdogan's

13 son-in-law.

14 Q    Who was Jim Woolsey?

15 A    Jim Woolsey was the former director of the CIA.

16 Q    And at the meeting, who was he affiliated with?

17 A    He was affiliated with FIG.

18 Q    Can you please describe how everyone was seated at

19 the meeting?

20 A    Yes, sir.  We were seated at a long conference

21 table, a very long conference table, and at -- going

22 from left to right, the far left, it would be Bijan.

23 To his right, it would be General Michael Flynn.  To

24 General Flynn's right, it would be Jim Woolsey, and to

25 his right, I sat at the end of the table.

McCauley - Direct

1  Q     And for the Turkish side, who sat across from
2  those folks?
3  A     On the Turkish side, from left to right, across
4  from Bijan, it was Ekim Alptekin.  Across from General
5  Flynn, it was the foreign minister, the Turkish foreign
6  minister.  Across from Jim Woolsey, it was the minister
7  of energy, Erdogan's son-in-law, and across from me was
8  the translator.
9  Q     Now, at the meeting, did anyone use the
10 translator?
11 A     No, sir.
12 Q     After sitting down, how did the meeting begin?
13 A     Introductions starting with Bijan, General Flynn,
14 Jim Woolsey, and myself, and then it went down to the
15 Turkish side.
16 Q     And after those introductions, how did the meeting
17 begin?
18 A     I remember the foreign minister wished General
19 Flynn and Trump good luck in the election and that he
20 hoped that the Turkish government would be working
21 close with the new administration, whoever it is.
22 Q     Did the foreign minister say anything else?
23 A     Yes.  He brought up the subject of Fethullah
24 Gulen.
25 Q     And what was his focus at the meeting?

McCauley - Direct

1          MR. TROUT:  Objection, Your Honor.  I ask

2    that he ask what he said.

3          THE COURT:  Well, instead of asking that

4    characterization, why don't you ask what people

5    actually said.

6          MR. TURGEON:  Yes.  Thank you, Your Honor.

7    BY MR. TURGEON:

8    Q    What did the foreign minister say at that meeting?

9    A    The foreign minister said that he was concerned

10   that they had a terrorist living in the U.S., and they

11   considered Gulen, Fethullah Gulen, the Osama bin Laden

12   of Turkey.

13   Q    Now, what language was the foreign minister

14   speaking?

15   A    English.

16   Q    How would you describe his English language

17   skills?

18   A    Fine.  I could hear him.  I understood him

19   perfectly.

20   Q    Did the foreign minister say anything about the

21   attempted coup in Turkey?

22   A    Yes, he did.  He believed that Gulen was

23   responsible for the attempted coup in Turkey.

24   Q    Did he say anything about what the Turkish

25   government wanted done about Gulen?

McCauley - Direct

1  A    He brought up that they would like to have him

2  tried -- charged and tried in Turkey.

3  Q    Did you say anything at the meeting?

4  A    Yes, I did.  Towards the end of the meeting -- the

5  meeting lasted 25 minutes -- I did say that if, in

6  fact, Fethullah Gulen is a terrorist and we found him

7  violating U.S. law, he would be charged and possibly

8  deported, but it would be U.S. law.

9  Q    What topics were discussed at that meeting other

10  than Gulen?

11  A    Sir, I can't think of any.

12  Q    How long did that meeting last?

13  A    That meeting lasted approximately 25 to

14  30 minutes.

15  Q    And what happened at the end of the meeting?

16  A    Exchange of cards, a handshake, and that was about

17  it.

18  Q    By cards, do you mean business cards?

19  A    Business cards, yes, sir.  Sorry.

20  Q    Did you leave the meeting with anyone?

21  A    I left the meeting with Bijan and General Flynn.

22  Q    Where did you go?

23  A    We went back to the hotel.

24  Q    When you got back to the hotel, did you and the

25  defendant discuss the Gulen project?

McCauley - Direct

1  A    Briefly we discussed it, yes.

2  Q    Was General Flynn part of that discussion?

3  A    He walked with us initially but then broke off to

4  take a phone call.

5  Q    Did the defendant say anything about the value of

6  the project?

7  A    The defendant, Bijan, told me.  He said:  Brian,

8  if we get this contract, our budget is $330,000.

9  Q    Did the defendant say anything about the time

10  frame for the Gulen project?

11  A    He said it was a 90-day project but we would have

12  to do it in 45.

13  Q    Did he say anything about the importance of

14  showing results on the project?

15  A    Yes:  It's important that we show results to

16  potentially get another contract.

17  Q    Now, what other contract is that that you're

18  referring to?

19  A    My understanding was that if we did well on this

20  45-day project and we showed results -- that Gulen was,

21  in fact, violating the U.S. law -- that we would be

22  awarded a follow-on contract worth $5 million, up to

23  $5 million.

24  Q    And where did that understanding come from?

25  A    Bijan told me.

McCauley - Direct

1  Q    Did he tell you that during that same conversation

2  or was that at a later time?

3  A    Sir, I believe that was at a later time, the

4  $5 million.   My apologies.

5  Q    Did the defendant later say anything about the

6  dollar value of that larger contract?

7  A    Yes, sir, he did.

8          MR. TROUT:   Your Honor, I object to the

9  leading questions.

10         THE COURT:   Why don't you focus him on what

11 conversation we're talking about and when and why don't

12 you ask him.

13         MR. TURGEON:   Thank you, Your Honor.

14 BY MR. TURGEON:

15 Q    During that later conversation with the defendant

16 that you mentioned, what did the defendant say, if

17 anything, about that larger contract?

18 A    Again, if we did well, we would be awarded a

19 $5 million contract.

20 Q    Did he say who the client would be for that larger

21 contract?

22 A    Sir, he did not.

23 Q    After that New York City meeting, did the

24 defendant ever say anything about FIG getting hired?

25 A    Yes.

McCauley - Direct

1  Q     How did that conversation come about?

2  A     Bijan called me on the phone and asked me if I

3  could come into the office.

4  Q     And did you go into the office?

5  A     Yes, sir, I did.

6  Q     And when you got there, what did the defendant

7  say?

8  A     The defendant said that we got the contract.

9  Q     Did he say anything about how or why FIG got the

10 contract?

11 A     No, sir.

12 Q     What happened next during that meeting?

13 A     As I came into the office, Bijan's office, he was

14 coming out of General Flynn's office.  And he said:

15 Brian, we got the contract.

16       He also mentioned that I was to build a team of

17 investigative -- retired agents, investigators to build

18 my team.

19 Q     Did the defendant say anything else to you after

20 coming out of General Flynn's office?

21 A     He did.

22 Q     What did he say?

23 A     He said:  Brian, the General wants me to file with

24 DOJ.

25       He said:  But -- and he used his finger.  He

McCauley - Direct

1  pointed up.  He said; but I have a better idea to file

2  with -- it was either commerce or Congress.

3  Q    Please describe for the jury how the defendant

4  acted when he said that to you.

5  A    He was excited.

6            MR. TROUT:  Objection.  Your Honor, I'm

7  sorry.  Objection, describing how he acted.

8            THE COURT:  Overruled.  You can describe his

9  reaction.

10           MR. TURGEON:   Thank you.

11  BY MR. TURGEON:

12  Q    Can you please describe the defendant's reaction

13  or how the defendant acted when he said that to you?

14  A    He was very happy, very pleased, excited that we

15  got this contract.

16  Q    Now, what did he say about keeping the project

17  under the radar?

18           MR. TROUT:  Objection, Your Honor.

19           THE COURT:  I'm sorry.  There's been no

20  testimony of that.

21           MR. TURGEON:  I apologize, Your Honor.  I

22  apologize, Your Honor.

23  BY MR. TURGEON:

24  Q    When the defendant came out of General Flynn's

25  office, do you recall him saying anything else?

McCauley - Direct

1  A    Yes.  He said:  Brian, the General wants me to
2  file with DOJ.
3      He said:  But to keep it under the radar, we'll
4  file with -- it was either commerce or Congress.
5  Q    Did the defendant say why he wanted to keep the
6  project under the radar?
7  A    Not during that conversation.
8  Q    Did he ever say anything about that to you?
9  A    Yes, he did.
10 Q    What did he say?
11 A    The purpose of keeping it under the radar was to
12 avoid detection by Tony Podesta and other members of
13 Congress who were favorable to Gulen.
14 Q    And when was that conversation?
15 A    That was a follow-on conversation.  I'm not sure
16 how many days or weeks after.
17 Q    Now, what did you say in response to the defendant
18 saying that he was going to file this other way?
19 A    When he told me he was not going to follow General
20 Flynn's direction and file with DOJ -- excuse my
21 language, ladies -- I told him:  I wouldn't fuck around
22 with that.
23 Q    Why did you say that?
24 A    Because I know coming from my previous -- my past
25 that when you file -- when you work with foreign

McCauley - Direct

1  governments, you file with DOJ.  That was just a rule

2  that I knew of, personally knew of.  I did not know

3  anything about commerce or Congress, another way to

4  file.

5  Q    Who at FIG managed Project Confidence on a

6  day-to-day basis?

7  A    Bijan.

8  Q    What was your role on the project?

9  A    My role was to gather some investigators working

10  with a certain budget, to work on open source

11  information, go through open source information.

12  Q    Who reported to you on that?

13  A    Thomas Neer.

14  Q    Did Mr. Neer have people reporting to him as well?

15  A    Yes, sir, he did.

16  Q    What sort of an investigation did FIG conduct?

17  A    We conducted an investigation looking at --

18  focusing on Gulen, the charter schools Gulen was

19  involved with.  There was 168, I believe, in the U.S.

20  Q    And were you trying to find positive information

21  about Gulen or negative information about Gulen?

22  A    Negative information about Gulen.

23  Q    Did the defendant ever say or suggest to you that

24  Project Confidence was separate from that meeting in

25  New York City that you just testified about?

McCauley - Direct

1    A    No.

2    Q    Did Alptekin?

3    A    No.

4    Q    Did the defendant ever tell you about any separate

5    potential project or contract that FIG had with the

6    Turkish government in the summer of 2016?

7    A    No, sir.

8    Q    Did Alptekin?

9    A    No, sir.

10   Q    Did the defendant ever tell you about any contract

11   with the Turkish government that had fallen through?

12   A    No, sir.

13   Q    Did Alptekin?

14   A    No, sir.

15   Q    At any point during the project, did the defendant

16   ever tell you that FIG would be issuing a refund for

17   the project?

18   A    No, sir.

19            MR. TROUT:  Your Honor, he's continues

20   leading.

21            THE COURT:  He is.

22            Why don't you ask him what he said or if he

23   can remember anything else he said.

24   BY MR. TURGEON:

25   Q    Can you remember anything else the defendant said

1 about whether or not FIG would be issuing a refund for

2 the project?

3 A    No, sir.

4 Q    Is there anything else you remember about whether

5 the defendant mentioned a separate contract with the

6 Turkish government that had fallen through?

7          MR. TROUT:  Your Honor, he's continuing to

8 lead.

9          THE COURT:  I think you can direct him

10 generally to the topics that he covered and see if he

11 remembers anything else.

12 BY MR. TURGEON:

13 Q    Mr. McCauley, is there anything else you remember

14 about the defendant discussing a separate project aside

15 from Project Confidence involving the Turkish

16 government?

17 A    There was -- and I have to go back a little bit,

18 and I apologize.  When we were going down the road to

19 how -- the approach we would take, Bijan and later

20 Alptekin wanted to focus on a terrorism investigation,

21 and I corrected him.  And I said:  FIG is not qualified

22 to conduct a terrorism investigation.  Any terrorism

23 investigation can only be conducted by the FBI and the

24 FBI only.  We do not have the authority, the manpower,

25 the budget, anything.

1    So that did come up.  That's why we focused on the

2 open source information looking at fraud, potential

3 fraud, and immigration violations.

4 Q    Did anyone at FIG lobby members of Congress as

5 part of Project Confidence?

6 A    Yes.

7 Q    Who did that?

8 A    Bijan.

9 Q    Who did the defendant lobby?

10 A    Congressman Dana Rohrabacher from California.

11 Q    Do you know Dana Rohrabacher personally?

12 A    Yes, I do.

13 Q    How do you know him?

14 A    At one time, I was -- I used to be Secret Service,

15 and I knew Dana.  He was a speech writer for Ronald

16 Reagan, and we used to work out together.

17 Q    Did you and the defendant ever speak with Dana

18 Rohrabacher?

19 A    Yes, sir, we did.

20 Q    How did you speak with him?

21 A    By phone.

22 Q    So please take a look at Government Exhibit 102

23 which is already in evidence, which is an e-mail from

24 the defendant to a staffer for Congressman Rohrabacher

25 copying several people, including you and General

McCauley - Direct

1  Flynn.  Can you please read that e-mail to yourself?

2  A    Yes, sir.

3  Q    Does this e-mail refer to the phone call you just

4  mentioned?

5  A    Yes, sir, it does.

6  Q    Who else was on that call?

7  A    It was Bijan, myself, and Dana Rohrabacher.

8  Q    Where were you and the defendant during that call?

9  A    In Bijan's office.

10 Q    Was that at FIG headquarters?

11 A    Yes, sir.

12 Q    What did the defendant say on the call?

13 A    The defendant said, Dana -- words to the effect of

14 we'd like to meet with you.  We have an urgent matter.

15 And he brought up the subject of Gulen and we need to

16 see you about Gulen.

17 Q    What did he say -- did the defendant anything

18 about Gulen on that phone call?

19 A    Sir, I'm not sure if he did.

20 Q    Did you say anything on the call?

21 A    Other than, Hello, Dana.  It's been a long time.

22 That was about it.  Nothing about the case.

23 Q    During the call, did the defendant tell

24 Congressman Rohrabacher that he or FIG was lobbying on

25 behalf of the government or Turkey or Inovo?

McCauley - Direct

1   A    Not on that phone call.

2   Q    Did he ever tell -- to your knowledge, have you

3   ever observed the defendant tell Congressman

4   Rohrabacher that he or FIG was lobbying on behalf of

5   the government of Turkey or Inovo?

6   A    No, sir.

7           MR. TROUT:  Your Honor, he is continuing to

8   lead.

9           THE COURT:  Again, you need to ask nonleading

10  questions.  Ask him what, if anything, he said about a

11  topic.

12          MR. TURGEON:  Thank you, Your Honor.

13  BY MR. TURGEON:

14  Q    What, if anything, do you recall the defendant

15  saying about for whom he or FIG were lobbying?

16  A    Sir, I don't remember him saying that.  The only

17  thing I do recall is that he wanted to meet with him

18  regarding an urgent matter about Gulen.

19  Q    Did you yourself say anything about for whom

20  Flynn -- excuse me -- for whom FIG or the defendant or

21  yourself were lobbying?

22  A    No, sir.

23  Q    After that call ended, did you and the defendant

24  have any further conversations about lobbying?

25  A    Yes, we did.

McCauley - Direct

1   Q     What did the defendant say during that

2   conversation?

3   A     He wanted me to attend this meeting, to go with

4   Bijan to go meet with Dana Rohrabacher.

5   Q     Did he say anything else about that meeting?

6   A     He wanted me to talk about Gulen and how he was a

7   terrorist, and I would not commit to that.

8   Q     Did the defendant say anything about disclosing

9   Project Confidence to members of Congress?

10              MR. TROUT:   Objection, Your Honor.

11              THE COURT:   I'll let him answer that.

12              Go ahead.

13  A     There were certain members of Congress Bijan

14  thought he could trust and talk openly about Gulen and

15  this Project Confidence.

16  Q     Is that something he said?

17  A     Yes.  He trusted Dana Rohrabacher.

18  Q     Did you go with the defendant to meet with Dana

19  Rohrabacher?

20  A     No, sir, I didn't.

21  Q     Why not?

22  A     I refused to commit to calling Gulen a terrorist.

23  There was no evidence to support that, and I wasn't

24  going to compromise myself saying something like that.

25  Q     Do you know whether the defendant ended up meeting

McCauley - Direct

1    with Congressman Rohrabacher?

2    A    Yes.  I know he traveled to the office.

3    Q    How do you know that?

4    A    He told me the following day.

5    Q    What did he say the following day?

6    A    He was disappointed.  He went to meet with Dana

7    Rohrabacher, and when he showed up to Dana's office, he

8    thought he was falling into a trap -- words to that

9    effect -- or a hornet's nest because there were 20

10   other people in that office, approximately 20 other

11   people in the office with Dana waiting for Bijan.

12   Q    Did the defendant say anything about discussions

13   he had with Congressman Rohrabacher at that time?

14   A    No.  He said hello and good-bye.  It was that

15   quick.

16   Q    Was that meeting with Dana Rohrabacher before or

17   after the New York City meeting?

18   A    It was after the New York City meeting.

19   Q    Was it during the project?

20   A    Yes, sir, it was.

21   Q    Did you have anymore phone calls with Alptekin

22   during the project?

23   A    Yes, sir.  To provide an update, there was a phone

24   call Bijan made to Alptekin, and I was in his office.

25   Q    Who was on those phone calls?

McCauley - Direct

1   A    It was Bijan, Alptekin, and myself.

2   Q    Did Alptekin ever make requests of FIG during

3   those phone calls?

4   A    Yes, he did.

5   Q    What requests did he make?

6   A    He wanted to get dirt on Gulen, and he wanted to

7   get dirt on some of the people living in D.C. who were

8   supporters of Gulen.

9   Q    Did he tell you which specific individuals he

10  wanted the information on?

11  A    He said there were about six to eight or there

12  were half a dozen or so, and he provided that list to

13  Bijan.

14  Q    And did you see that list?

15  A    I did.

16  Q    Who showed it to you?

17  A    Bijan.

18  Q    Did Alptekin say what information he wanted on

19  these individuals?

20  A    He wanted surveillance, physical and audio

21  surveillance of these individuals living in D.C.

22  Q    Did he say anything about what information he

23  hoped to develop based on this sort of surveillance?

24            MR. TROUT:  Again, Your Honor --

25            THE COURT:  I think it's broad enough.

McCauley - Direct

1      Go ahead.  You may answer.

2  A    He wanted to find dirt on who they were talking to

3  and who they were meeting with, especially with a focus

4  on Congress.

5  Q    What was your response to Alptekin's request for

6  surveillance?

7  A    I tried to talk him out of it.  I told him that I

8  wouldn't be doing it.  None of the people that I knew

9  would be involved.  I tried to talk him out of it

10 telling him it would be very costly and he doesn't know

11 what he's asking for.

12 Q    In response to you telling Alptekin that it was

13 too costly, did he say anything?

14 A    He said that he would add his own money towards

15 it.  I gave him an example, and then he said he would

16 throw money into -- his own money into it.

17 Q    Did he say how much of his own money he planned to

18 spend on it?

19 A    $30,000.

20 Q    Do you recall him using those words, "his own

21 money"?

22 A    Yes.

23 Q    Did you refer Alptekin to anyone who could conduct

24 surveillance?

25 A    Yes.  I told him that I was -- one, I didn't

McCauley - Direct

1  believe in it; two, I wasn't going to be involved in

2  it; and I would find somebody, but it would have to be

3  a licensed private investigator for D.C., Virginia, and

4  Maryland.

5  Q    On those calls with Alptekin, did Alptekin ever

6  provide feedback on the investigation that FIG had

7  done?

8  A    When Bijan called Alptekin, I was in the office to

9  provide him an update.  Alptekin dismissed what we had

10  found.  We found some potential fraud in immigration,

11  as well as heavy fraud with Department of Education

12  funds.

13  Q    And what did he say about those findings?

14  A    He dismissed them and said:  We knew that from

15  Amsterdam.

16  Q    Who is Amsterdam?

17  A    I learned later it was Robert Amsterdam.  I don't

18  know who he is.

19  Q    On that call, did you ask Alptekin to put you in

20  touch with Amsterdam?

21  A    Yes.

22  Q    What did he say?

23  A    He said, no.

24  Q    Did he say why?

25  A    He said it wasn't possible, and the call ended

McCauley - Direct

1  after that.

2  Q    After that phone call ended, did you and the

3  defendant have any further discussion?

4  A    Yes.

5  Q    What was that discussion?

6  A    I said:  I need to know who this Amsterdam is and

7  if he -- is there a parallel investigation going on

8  that we're not aware of?  I need to see -- I need to

9  speak with him, and I need to see what he has to save

10 money and time.

11       And the defendant told me -- Bijan told me it

12 wasn't possible.

13 Q    Did he say why it wasn't possible?

14 A    No.

15 Q    So please take a look at what's been marked as

16 Government Exhibit 121, which is not in evidence.

17 A    Thank you.

18 Q    Who sent that e-mail?

19 A    It looks like Bijan.  Well, it was from Mike

20 Boston to Bijan.

21           THE COURT:  Which exhibit?  Exhibit 121?

22           MR. TURGEON:  Yes, Your Honor, 121.

23 BY MR. TURGEON:

24 Q    Is that Government Exhibit 121?

25 A    Yes, sir.

McCauley - Direct

1  Q     At the top where it says from, what is listed

2  there?

3  A     Michael Boston.

4          MR. TURGEON:  I believe we're talking about

5  different documents, Your Honor.

6          THE COURT:  Right.  I have a different name.

7          MR. TURGEON:  Your Honor, we have here a copy

8  of Government Exhibit 121 I'd like to ask Mr. Burns to

9  hand up to Mr. McCauley.

10         THE COURT:  He may be looking at 122.

11 A     I have it under 121 -- Exhibit 122 is here.

12 Q     Is there a 121 in that binder?

13 A     Exhibit 121?

14 Q     Yes, sir.

15 A     And it's from myself?

16 Q     Yes.

17 A     Yes.  Yes.

18 Q     Thank you.

19        Did you write that e-mail?

20 A     Yes, sir, I did.

21         MR. TURGEON:  Your Honor, at this time, we'd

22 move Government Exhibit 121 into evidence.

23         THE COURT:  Any objection?

24         MR. TROUT:  No, Your Honor.

25         THE COURT:  Without objection, 121 is

McCauley - Direct

1  admitted.

2  BY MR. TURGEON:

3  Q    Now, that's an e-mail from yourself to the

4  defendant, dated October 21, 2016.  Can you please read

5  that e-mail to yourself?

6  A    Okay.

7  Q    So, first of all, when you wrote Anderson, who did

8  you mean by that?

9  A    I should have wrote Amsterdam.

10  Q    Do you see where it says, Tom is frustrated due to

11  redundant work being done by FIG and Anderson -- or

12  Amsterdam?

13  A    Yes, sir.

14  Q    What redundant work did you mean?

15  A    That was the work when I found out that Ekim had

16  already -- he mentioned -- he dismissed that he already

17  had that information from Amsterdam.  It was a parallel

18  investigation.

19  Q    Now near the end of the e-mail, you refer to

20  placing a dark cloud over the organization.  Whose

21  organization were you referring to there?

22  A    Fethullah Gulen.

23  Q    Why did you refer in that e-mail to placing a dark

24  cloud over Gulen's organization?

25  A    To show that we were making progress on a

McCauley - Direct

1  potential -- a case of fraud in immigration, Department

2  of Education fraud, financial fraud.

3  Q    Was that part of the project?

4  A    Yes, sir, it was.

5  Q    I would like to show you what's been marked as

6  Government Exhibit No. 40.

7  A    Yes, sir.

8  Q    So what is this exhibit?

9  A    This was an e-mail, a message we received from

10 General Flynn, in reference to a phone call.

11 Q    And what is the date of this communication?

12 A    10/22/2016.

13 Q    And who received the communication?

14 A    It was Bijan.  It was General Flynn copied

15 himself.  It was myself, Michael Boston, and I'm not

16 sure who the other person is.

17          MR. TURGEON:  Your Honor --

18 A    It says John Doe.

19          MR. TURGEON:  Your Honor, at this time, we'd

20 move Government Exhibit 40 into evidence.

21          THE COURT:  All right.  Any objection?

22          MR. TROUT:  Yes, Your Honor, hearsay.

23          THE COURT:  All right.  I'm going to let this

24 in for the fact of its transmission to Mr. Rafiekian.

25          MR. TURGEON:  Thank you, Your Honor.

McCauley - Direct

1        Could we publish that to the jury, please?

2        THE COURT:  Yes.

3  BY MR. TURGEON:

4  Q    Do you see where General Flynn refers to the FM?

5  A    Yes.

6  Q    Who is the FM?

7  A    Foreign minister.

8  Q    How do you know that FM refers to the foreign

9  minister?

10  A    Again, going back to my previous job, I would meet

11  with ministers.  Prime minister would be PM; FM,

12  foreign minister; and minister of defense, MD.

13  Q    And who is RA?

14  A    RA is -- it's Robert or Richard Amsterdam.  I

15  believe it's Robert Amsterdam.

16  Q    How do you know that?

17  A    I found out just in discussions with Tom Neer, as

18  well as Bijan.

19  Q    So after the New York City meeting, did you ever

20  meet with Alptekin in person again?

21  A    Yes, we did.

22  Q    What was the purpose of that meeting?

23  A    That was to provide him the final -- our 6 weeks,

24  45 days was up.  We were going to provide him the final

25  product of what we had come up with at that point.

McCauley - Direct

1  Q     And around what time frame was that meeting?

2  A     I remember it being the day before the election.

3  It was in November.

4  Q     Where did that meeting take place?

5  A     It took place at the FIG office in Alexandria,

6  Virginia.

7  Q     Who else attended that meeting?

8  A     At the meeting was Bijan; myself; Tom Neer;

9  Michael Boston; Ekim; the lawyer, Kelley -- I can't

10 think of his first name; Richard Kelley, I believe --

11 two people I think from Sphere -- that was a lobbying

12 public relations firm -- and I believe Mike Flynn, Jr.,

13 but I'm not sure.  He might have been in and out.

14 Q     On behalf of FIG, who presented FIG's findings to

15 Alptekin?

16 A     It was Mike Boston and myself.

17 Q     What did Michael Boston present to Alptekin?

18 A     He presented him a PowerPoint slide presentation

19 with a cover page, Mr. Monopoly, a guy, you know,

20 running with the money.

21 Q     What did Alptekin do with the PowerPoint

22 presentation?

23 A     He looked at it, and he said:  I paid for this?

24       And he slid it across the table.

25 Q     Did he say how he knew this?  Strike that.

McCauley - Direct

1    Did Alptekin say anything else when he slid the

2  PowerPoint across the table?

3  A    No.  He was very dismissive, and he said:  I paid

4  for this?  This is what I paid for?

5    He in a way put down Michael Boston and his

6  efforts.

7  Q    Did Alptekin receive any other work product at the

8  meeting?

9  A    Yes, sir.  That was the investigative work

10 product.

11 Q    And who presented that to him?

12 A    I did.

13 Q    So could you please take a look at Government

14 Exhibit 78B, which is not in evidence?  Is this the

15 report you presented to Alptekin?

16 A    Yes.

17 Q    What is the title of the report?

18 A    Fethullah Gulen:  A Primer for Investigators.

19         MR. TURGEON:  Your Honor, at this time, we

20 move Government Exhibit 78B into evidence.

21         THE COURT:  Any objection?

22         MR. TROUT:  No, Your Honor.

23         THE COURT:  Without objection, Government

24 Exhibit 78B is admitted.

25         MR. TURGEON:  Could we publish that first

McCauley - Direct

1  page to the jury?

2          THE COURT:  Yes.

3          MR. TURGEON:  Thank you.

4  BY MR. TURGEON:

5  Q    How did you present this report to Alptekin?

6  A    I summarized the report.  I gave him a verbal

7  assessment, and I told him what we had found out is

8  that there's potentially fraud going on with human

9  trafficking, immigration fraud, visa fraud, but also

10 fraud against the United States government in the sum

11 of $500 million a year.

12 Q    How did Alptekin react to this written report?

13 A    He was not dismissive towards me the way he was

14 with Mike Boston, but he responded:  I know this.

15      He said:  I'm looking for dirt.

16 Q    Did he say anything about how he knew this?

17 A    No, sir, I don't remember him saying that.

18 Q    Did Alptekin take the report with him when he

19 left?

20 A    No, he didn't.  He left it on the table.

21 Q    Now, did Alptekin say anything in that meeting

22 about what he wanted?

23 A    He said he wanted dirt, and then he said:  Can't

24 you plant dirt?

25      And I said:  No, we cannot.

McCauley - Direct

1      He said he was just kidding.

2  Q    What kind of dirt did he want?

3  A    He wanted something to charge -- something that he

4  could charge with -- he could go back to whoever he was

5  reporting to with hard evidence that this guy committed

6  a crime.

7  Q    Did he make any reference at that meeting to who

8  he was reporting to?

9  A    No, he did not.

10 Q    Did he say anything to suggest that he was

11 reporting to someone?

12         MR. TROUT:  Your Honor, I'm --

13         THE COURT:  I'll sustain that objection.

14 BY MR. TURGEON:

15 Q    At that meeting, did he say why he wanted dirt?

16 A    No, sir.

17 Q    About how long did that meeting last?

18 A    Approximately 30 minutes, maybe 35.

19 Q    Did the defendant say anything in response to

20 Alptekin?

21 A    No.

22 Q    After this meeting, were you involved in any

23 further work on Project Confidence?

24 A    No.

25 Q    Did you and Alptekin ever speak again?

McCauley - Direct

1   A    No, we did not.

2          MR. TURGEON:  Can I have the Court's

3   indulgence, Your Honor?

4          THE COURT:  Yes.

5      (Counsel confer.)

6   BY MR. TURGEON:

7   Q    Actually, I have one more question:  Did you have

8   anymore interactions with Alptekin after that meeting?

9          MR. TROUT:  Asked and answered I believe,

10  Your Honor.

11         THE COURT:  It's a little different question.

12  I'll let him answer.

13  A    No, sir.

14      Excuse me, sir.  I would like to correct myself.

15  Yes.  In a phone call between Bijan, myself, and

16  Alptekin, Alptekin said he wanted something else, maybe

17  some financial fraud records or something like that,

18  and he was looking for somebody.

19      I offered up somebody who does financial

20  investigations who is a retired FBI agent, and I

21  received that contact information through Tom Neer.  I

22  said:  I will put you in touch with him -- I did not

23  get involved in it -- and that would be separate.  So

24  that was the final conversation.

25  Q    So how did that conversation take place?

1  A     That took place in Bijan's office, Bijan calling

2  Alptekin and Alptekin saying:  I need more.  I need

3  financial crime information.  I need to know about his

4  finances.

5      That's what it was.

6  Q     Who was on that call?

7  A     That was Bijan, myself, and Alptekin.

8  Q     And around when did that call take place?

9  A     That took place -- it was after the election,

10 several days after the election.

11 Q     And what sort of financial investigation did

12 Alptekin want?

13 A     He wanted to get -- find out who was paying Gulen

14 and how they were getting paid, how they were making

15 money.

16 Q     And what did you do in response to that?

17 A     I provided a name and a number where he could

18 contact himself.  I wasn't going to be involved at that

19 point.

20 Q     Do you know whether he contacted that person?

21 A     No, sir, I don't.

22 Q     Did you have anymore interactions with Alptekin

23 after that?

24 A     No, sir.

25           MR. TURGEON:  Can I have the Court's

McCauley - Direct

1   indulgence for a moment?

2          THE COURT:   Yes.

3       (Counsel confer.)

4   BY MR. TURGEON:

5   Q    So could we go back to Government Exhibit 40,

6   please.

7   A    Yes, sir.

8   Q    Now, do you see at the top where it says, Team,

9   Overall, a very good call?

10  A    Yes, sir.

11  Q    Who was this call with?

12  A    This call, I thought, was with Alptekin.

13  Q    Who and Alptekin?

14  A    I'm sorry.  I can't tell.

15  Q    Who wrote this message?

16  A    This is by Mike Flynn, General Flynn.

17  Q    And I wanted to circle back to one thing about

18  that New York City meeting.

19  A    Yes, sir.

20  Q    I think you mentioned that Jim Woolsey was

21  present.  Is that right?

22  A    Yes, sir.

23  Q    Please describe what you observed of Jim Woolsey

24  during that meeting.

25  A    He came in late.  Going by his demeanor, he did

McCauley - Direct

1   not want to be there.  He was a little bit frustrated

2   to the point where he was distracting.  He was a

3   distraction at the meeting.  I couldn't hear the

4   conversation between the foreign minister and General

5   Flynn.

6   Q    Did you hear clearly the parts of the conversation

7   that you testified about?

8   A    Yes, I heard -- yes, what I heard about Osama bin

9   Laden, the Turkish, the Gulen.  Yes, I did hear that.

10  Actually, I had to move away from him and sit at the

11  very end of the table.

12  Q    Was Jim Woolsey present throughout that

13  conversation?

14  A    Yes.  We waited for Jim Woolsey before we started

15  the meeting.

16  Q    Once he sat down at the table, did he remain at

17  the table throughout the conversation?

18  A    No, sir.  He got up and went to use the restroom.

19          MR. TURGEON:  Can I have the Court's

20  indulgence for another moment, Your Honor?

21          THE COURT:  Yes.

22      (Counsel confer.)

23  BY MR. TURGEON:

24  Q    What time of day did that meeting take place?

25  A    That meeting took place, I believe -- we were

McCauley - Cross

1  supposed to be there at 10:00.  I think it took place

2  about 10:30.

3  Q    Was Jim Woolsey attentive during the meeting?

4  A    No.  He was distracted.  He was annoyed.

5            MR. TURGEON:  Thank you.

6            No further questions, Your Honor.

7            THE COURT:  All right.  Thank you.

8            Mr. Trout.

9            MR. TROUT:  Thank you, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. TROUT:

12  Q    Mr. McCauley, you're generally aware of the

13  Foreign Agents Registration Act; are you not?

14  A    Yes, sir, vaguely.  But in my career, I'm familiar

15  with it.

16  Q    But you knew that if you were going to be working

17  as an agent for a foreign country, you would have to

18  register under the Foreign Agents Registration Act;

19  didn't you?

20  A    Correct.

21  Q    All right.  You knew that Mr. Alptekin was a

22  private citizen of Turkey?

23  A    Yes, sir.

24  Q    Were you familiar with a company called Inovo?

25  A    Yes, sir.

McCauley - Cross

1    Q    And Inovo was his company, correct?

2    A    Yes, sir.

3    Q    A private company in Turkey?

4    A    Yes, sir.

5    Q    And you understood that Inovo was the client for

6    the work that you were doing, correct?

7    A    Yes, sir.

8    Q    All right.  Now, let me turn to the meeting in New

9    York that you described in September 2016.

10   A    Yes, sir.

11   Q    You said it lasted about 25 minutes or maybe as

12   much as a half an hour, correct?

13   A    Yes, sir.

14   Q    And at this meeting, there was really no

15   discussion at all of FIG and any work that FIG was

16   doing, correct?

17   A    No, sir, there wasn't.

18   Q    There was a lot of discussion by the foreign

19   minister and the Turkish officials about the threat

20   that they saw in Gulen, correct?

21   A    Correct.

22   Q    That's really what the agenda was, for them to

23   speak to you-all about their perspective on Fethullah

24   Gulen, correct?

25   A    Correct, sir.

McCauley - Cross

1  Q    They essentially did all the talking?

2  A    Yes.

3  Q    You don't recall Mr. Kian, Bijan Kian, really

4  saying much of anything, correct?

5  A    No, sir.

6  Q    In fact, Mr. Alptekin really didn't say much of

7  anything; did he?

8  A    He made one comment.  That was about it.

9  Q    In addition, you indicated that you later learned

10  about Amsterdam & Partners or Robert Amsterdam,

11  correct?

12  A    Yes, sir.

13  Q    But in this meeting, there was no mention of

14  Amsterdam, correct?

15  A    No, sir, there was not.

16  Q    So no one from the Turkish side ever said, We've

17  got these folks, Amsterdam & Partners, working for us,

18  and we want you to coordinate with them?  That was not

19  a conversation that happened?

20  A    No, sir, not at all.

21  Q    At this meeting, no one on the Turkish side made

22  any request of anyone on the Flynn Intel Group side to

23  do anything, correct?

24  A    No, sir.  There was a sarcastic remark by Ekim, I

25  took it, towards Jim Woolsey, but that was about it.

McCauley - Cross

1  Q    Okay.  But there was no request from any Turkish

2  official for Flynn Intel Group to do anything?

3  A    No, sir.

4  Q    As you've reflected on the meeting, it occurred to

5  you or it seemed to you that this was simply a meeting

6  that Mr. Alptekin had set up in order to be able to

7  demonstrate that he could bring -- to demonstrate to

8  these Turkish officials that he could bring some big

9  shots to the meeting, correct?

10 A    I felt that it was Alptekin and Bijan.  They were

11 both measuring up, seeing what they could bring to the

12 table.  Yes, sir.

13 Q    Now, you mentioned in your testimony that there

14 were a couple of occasions where Mr. Alptekin conveyed

15 requests to Flynn Intel Group as part of the work that

16 it was doing for Mr. Alptekin, correct?

17 A    Yes, sir.

18 Q    On one of those occasions, you said that he wanted

19 surveillance, correct?

20 A    Yes, sir.

21 Q    This was surveillance of Gulenists in the District

22 of Columbia?

23 A    Yes, sir.

24 Q    And he wanted some sort of audio surveillance as

25 well, correct?

McCauley - Cross

1 A    Yes, sir.

2 Q    And then you basically told him, You're not doing

3 that?

4 A    I believe I told him:  You watch too many movies.

5 We don't do that.

6 Q    In fact, you never did any surveillance, correct?

7 A    No, sir, I did not.

8 Q    You also indicated in another conversation he

9 wanted dirt on Gulen?

10 A    He mentioned that several times.

11 Q    All right.  He wanted to be able to show that he

12 was a terrorist, correct?

13 A    Yes, sir.

14 Q    That's what he wanted you-all to do?

15 A    Right.  Correct.

16 Q    And you told him you don't do that?

17 A    We don't do that.  FIG doesn't do that.  Only the

18 FBI does that.

19 Q    All right.  And you didn't do that, correct?

20 A    Correct, sir.

21 Q    And he also met with you on November 2, 2016; is

22 that correct?  That was the meeting that you described

23 where he was dismissive of Mike Boston and his work?

24 A    Sir, I don't -- I'm not sure if it was November 2.

25 I know the report said November 2, but I do remember it

McCauley - Cross

1  was the day before the election.  So whatever date that

2  was.

3  Q    All right.  In any event, you're at a meeting

4  before the election where he attended?

5  A    Yes, sir.

6  Q    At that meeting, he said that he wanted something

7  more.  He wanted -- what did he want at that meeting?

8  A    I need more than this.  I need dirt.

9       Then he said he was kidding.  He said:  Plant

10 dirt.

11      I said:  We don't do that.

12 Q    And he said he was kidding?

13 A    Yes, he did say he was kidding.

14 Q    In fact, you didn't do anything as a result of any

15 request that he made at that meeting, correct?

16 A    No, sir, we didn't.

17 Q    Do you recall any other request that he made of

18 you that we have not discussed?

19 A    No, sir.

20 Q    So every request that he made of you in your

21 presence, you basically rejected, correct?

22 A    Correct, yes, sir.

23           MR. TROUT:  One moment, Your Honor.

24      (Counsel confer.)

25           MR. TROUT:  I have no further questions.

Boston - Direct

1            THE COURT:  All right.  Any redirect?

2            MR. TURGEON:  No, Your Honor.  Thank you.

3            THE COURT:  All right.  May the witness be

4   excused?

5            MR. TURGEON:  Yes, Your Honor.

6            THE COURT:  All right.  Mr. McCauley, you're

7   excused.  Do not discuss your testimony outside of the

8   courtroom with any other witness.

9            THE WITNESS:  Thank you, Your Honor.

10       (The witness stands aside.)

11            THE COURT:  The government will call its next

12  witness.

13            MR. GIBBS:  Michael Boston, Your Honor.

14            THE COURT:  All right.  Mr. Boston will come

15  forward.

16     MICHAEL C. BOSTON, PLAINTIFF'S WITNESS, AFFIRMED

17                    DIRECT EXAMINATION

18  BY MR. GIBBS:

19  Q    Good morning, sir.

20  A    Good morning.

21  Q    Sir, can you please state your name for the

22  record.

23  A    Yes, sir.  Michael Craig Boston.

24  Q    And you and I have met before, correct?

25  A    Yes, sir.

Boston - Direct

1  Q    And as a result of meeting you, I understand you

2  have some lower back issues.  Is that correct?

3  A    Yes, sir.

4  Q    All right.  So am I correct that that may cause

5  you to move around in your chair a little bit to try to

6  get comfortable?

7  A    Yes, sir.

8  Q    Okay.  And by all means, if you get to the point

9  it is very uncomfortable, please let us know.  Okay?

10 A    I will.

11 Q    Fair enough?

12 A    I will.  Thank you.

13 Q    All right.  Mr. Boston, where do you work?

14 A    Yes, sir.  Oh, currently?

15 Q    Yes.

16 A    I'm a consultant.  I run my own consulting firm.

17 Q    And can you just -- don't go into elaborate

18 detail, but just give us a general overview of your

19 employment history.

20 A    Sure.  Briefly, I'm a retired United States Army

21 reserve officer, and I've held senior-level positions

22 on the faculty and staff of major universities in

23 Washington, D.C., and Baltimore.

24 Q    Thank you.

25          THE COURT SECURITY OFFICER:  Counsel, give me

Boston - Direct

1  a minute.  Let me move the mic up a little bit more so

2  we can hear him a little bit better.

3  A    Is that better?

4  Q    It sounds better from here.  Thank you.

5       Mr. Boston, do you know retired General Michael

6  Flynn?

7  A    I do, sir.

8  Q    And when and where did you first meet Michael

9  Flynn?

10  A    Yes, sir.  We briefly met in the summer of 2004 in

11  Iraq.

12  Q    And do you also known the defendant, Bijan

13  Rafiekian?

14  A    Yes, sir, I do.

15  Q    Is he here in court?

16  A    Yes, sir.

17  Q    Can you just point him out and identify what he's

18  wearing, please?

19  A    Sure.  He's the gentleman in the dark suit and the

20  bluish tie.

21       MR. GIBBS:  Your Honor, we just ask that the

22  record reflect that he's identified the defendant.

23       THE COURT:  It is so reflected.

24       MR. GIBBS:  Thank you.

25  BY MR. GIBBS:

Boston - Direct

1  Q    Now, Mr. Boston, when did you first meet the

2  defendant, Bijan Rafiekian?

3  A    Approximately five years ago through a mutual

4  friend of ours.

5  Q    And I want to move past that first meeting with

6  the defendant initially about five years and jump ahead

7  to 2016.

8  A    Yes, sir.

9  Q    In that year, were you approached by the defendant

10 about a potential job opportunity?

11 A    Yes, sir, I was.

12 Q    Can you describe what happened?

13 A    He just mentioned that there was some potential

14 work and once it matured a little bit and what it may

15 be, he would get back with me on it.

16 Q    So the first conversation was not particularly

17 detailed?

18 A    No, sir.

19 Q    When was that first conversation?

20 A    Sometime over the summer in 2016.  I don't

21 remember an exact date.

22 Q    And following that sort of initial just general

23 conversation, did you eventually agree to work on a

24 project with the defendant?

25 A    Yes, sir, I did.

Boston - Direct

1  Q    And once you agreed to work on that project, what

2  is your initial understanding from the defendant about

3  what the project was about?

4  A    Sure.  The project was going to be, as I

5  understood it at the time, to provide some information.

6  We were going to help restore confidence for the

7  tourism industry in the country of Turkey.

8  Q    In terms of returning confidence in the tourism

9  industry in Turkey, what, if any, events had occurred

10 by that point that made an issue?

11 A    Sure.  There had been an attempted coup in Turkey

12 just prior to that over the summer in 2016.

13 Q    So the initial description from the defendant was

14 this was related to the coup in Turkey; is that

15 correct?

16 A    Yes, sir.

17 Q    Now, at that time -- this is the initial

18 description of the project from the defendant.  At that

19 time, what did the defendant tell you about who was

20 paying for this project?

21 A    Ultimately, the name of the company was Inovo BV.

22 Q    And did he tell you that Inovo BV was the company

23 funding the project right from the outset?

24         MR. TROUT:  Objection, Your Honor, leading.

25         THE COURT:  Sustained.

1          Why don't you ask him what, if anything, else

2    did he say about it.

3    BY MR. GIBBS:

4    Q    What, if anything, did he say initially about who

5    was funding the project?

6    A    He said it would be Inovo BV.

7    Q    Inovo BV.  Okay.

8         And in your discussions with the defendant, what

9    did he tell you the name of this project was?  Did it

10   have a particular name?

11   A    Project Confidence.

12   Q    Now, you testified a moment ago that at the

13   beginning, your understanding was this project, Project

14   Confidence, was an attempt to restore confidence in the

15   economy of Turkey in the tourism industry, correct?

16   A    Yes, sir.

17   Q    How long was that the focus of Project Confidence?

18   A    A very short amount of time.

19   Q    And after that very short amount of time, what did

20   the focus of the project change to?

21   A    Yes.  It pretty much exclusively focused on

22   Fethullah Gulen.

23   Q    And how did you learn that the project was going

24   to be focused exclusively or mainly on Fethullah Gulen?

25   A    From the defendant and the notes that were being

1 created for the project.

2 Q    And did you know who Fethullah Gulen was before

3 the defendant told you that the project would be

4 focused upon him?

5 A    Only briefly from the news reports about the coup.

6 Q    And once the focus of the project was changed to

7 focus on Gulen, what, if any, work was done to return

8 confidence in the government of Turkey?

9 A    Almost none.

10 Q    And what, if any, work was done on Project

11 Confidence related to the economy or the tourism

12 industry of Turkey?

13 A    Almost none.

14 Q    Now, once you started working on this project,

15 what, if anything, did the defendant tell you about a

16 previous potential project or contract with the

17 government of Turkey that related to Gulen?

18 A    I don't -- I'm not aware of any other projects.

19 Q    And when you began working on this project -- and

20 we will get to this -- did you meet Ekim Alptekin?

21 A    Ultimately, yes, once.

22 Q    And did you have conversations with him on the

23 phone?

24 A    On the weekly conference calls, yes.

25 Q    What, if anything, did Alptekin ever say about a

Boston - Direct

1    previous project or contract with the government of

2    Turkey that related to Gulen?

3    A    I don't recollect any other discussions like that.

4    Q    And once you began working on the project, what,

5    if anything, did the defendant tell you about meetings

6    or conversations Alptekin had had with Turkish

7    ministers about a previous potential contract or

8    project related to Gulen?

9    A    I don't remember any discussions like that.

10   Q    And what, if anything, did Alptekin say about

11   previous meetings or conversations with Turkish

12   ministers about a previous project or a previous

13   contract?

14   A    I don't have any knowledge of that.

15   Q    Now, you testified that after some discussion with

16   the defendant, you agreed to work on this project?

17   A    Yes, sir.

18   Q    And what were your duties as part of the project?

19   A    Sure.  I was the project coordinator, and my

20   responsibilities basically were to compile the

21   information from the other individuals or teams on the

22   project, which would be the media wing of it, the

23   investigative part, and then the social media part.

24   Q    And who had named you as coordinator on the

25   project -- on this project?

1    A    The defendant.

2    Q    And who were you getting the majority of your

3    direction from while you were working on the project?

4    A    Almost exclusively from the defendant.

5    Q    Now, you testified that the project -- once it

6    shifted, it was focused almost exclusively on Gulen.

7    Did the defendant direct you to focus on Gulen in a

8    positive way or a negative way?

9    A    He -- it seemed in a negative light.

10   Q    And other than trying to obtain information about

11   Gulen that cast him in a negative light, what

12   particular sorts of information did the defendant want

13   you to -- want you and the team to obtain about Gulen?

14   A    Broadly, information that was not previously in

15   the public domain.

16   Q    And anything in particular about Gulen that was of

17   interest regarding information not in the public

18   domain?

19   A    Information that would be derogatory, that would

20   potentially question his legal status in the United

21   States.

22   Q    And, Mr. Boston, after you started working on the

23   project, did the defendant ever compare Gulen to a

24   notorious historical figure in your presence?

25   A    Yes, sir.

1  Q     Who did he compare him to?

2  A     Ayatollah Khomeini.

3  Q     How often do you recall the defendant comparing

4  Fethullah Gulen to Ayatollah Khomeini?

5  A     Probably two or three times over a period of

6  months or years.

7  Q     Now, you testified you took on the position of

8  project coordinator.  Could you just sort of generally,

9  for the jury, describe the first six to eight weeks of

10 this project in terms of the type of information that

11 was being pulled together by this team?

12 A     Yes, sir.  The three teams basically were -- one

13 was a social media team.  So they were doing open

14 source social media discovery, if you will.  There was

15 a media firm that was compiling information as well for

16 potential engagement with either senior government

17 officials or elected officials, and there was a

18 separate investigative team that was looking into other

19 things on Mr. Gulen and the charter schools related to

20 Gulen.

21 Q     And so the first six to eight weeks of the

22 project -- I think you used the term discovery.  Was

23 that sort of what was going on at this time?

24 A     Yes, sir.

25 Q     And who were you primarily communicating with

Boston - Direct

1   about the project during this discovery phase?

2   A    The internal team and the defendant and General

3   Flynn and then on the weekly conference calls, with the

4   client, which is Ekim Alptekin.

5   Q    All right.  We'll come to him in a bit, but I want

6   to turn your attention to a particular meeting that

7   occurred fairly early in the project.  At some point,

8   did the defendant tell you about a meeting that was

9   planned for in New York City?

10  A    Briefly, yes.  He mentioned there was a high-level

11  meeting in New York.

12  Q    Okay.  And that's what he told you before the

13  meeting?

14  A    Yeah.  To the best of my recollection, yes, sir.

15  Q    And when he told you it was a high-level meeting

16  in New York, what did he say, if anything, about who

17  these high-level people were?

18  A    They would be senior officials from the Turkish

19  government.

20  Q    And what, if anything, did he say about Ekim

21  Alptekin's role in this meeting?

22  A    My understanding was that he helped arrange the

23  meeting.

24  Q    And who did you get that understanding from?

25  A    The defendant.

1  Q    And what did the defendant tell you -- and you did

2  not attend the New York meeting, correct?

3  A    No, sir, I did not.

4  Q    What did the defendant tell you about the New York

5  meeting after it occurred?

6  A    That it was a very good meeting and that we should

7  expect work to be forthcoming.

8  Q    I don't think I heard you.  Could you --

9  A    I'm sorry.  The meeting went very well and that we

10 should expect work to be forthcoming.

11 Q    Work for Project Confidence?

12 A    Which ultimately became Project Confidence, yes,

13 sir.

14 Q    Where did you get the understanding that work

15 would probably be coming from the meeting?

16 A    The defendant.

17 Q    I would like to pull up an exhibit.  It's in

18 evidence already.  It's Government Exhibit 135A.  You

19 will have it there on your screen, Mr. Boston.  If you

20 could, take a look at that and just for the record

21 identify what that is.  Then we will enlarge some

22 portions so it's easier to see.

23 A    Yes, sir.  This is an e-mail from the defendant

24 to -- the primary addressee is Brian McCauley.  I'm

25 CC'd, as well as a number of other folks, and the

Boston - Direct

1   subject is open source information to kick off the

2   investigative process with an attachment, open source

3   information, Project Confidence.

4   Q    And I don't know if you said or not, but what is

5   the date of this e-mail?

6   A    I'm sorry.  September 23, 2016, 7:30 at night.

7   Q    No.  That's fine.

8        Now, the first line there, it says, quote --

9             THE COURT:  I don't believe this is in

10  evidence yet.  Is it?

11            MR. GIBBS:  I thought it was, Judge.  If

12  not --

13            THE COURT:  Any objection?

14            MR. TROUT:  No objection.

15            THE COURT:  All right.  Exhibit 135A is

16  admitted.

17            MR. GIBBS:  Thank you, Judge.  I apologize.

18            Can we just blow up the text at this point?

19  We don't need the headers.  If we can do that, it may

20  be easier to see.

21  BY MR. GIBBS:

22  Q    So, Mr. Boston, the first line, it says:  I am

23  forwarding open source links provided by Ekim to

24  broaden the process.

25        Now, remind us again who Ekim is.

1  A    Yes, sir.  My understanding is that he was the

2  client and represented Inovo BV in this engagement.

3  Q    In the second paragraph of 135A, what does the

4  defendant say that your title on the project will be?

5  A    Yes, sir, engagement manager.

6  Q    And as the engagement manager on the project,

7  what, if any, responsibilities did you have regarding

8  the project budget?

9  A    I had none.

10 Q    And did you ever discuss that with the defendant?

11 A    I asked the defendant about -- if there was a

12 budget for the project, and he responded that I didn't

13 need to be concerned with that, that it wasn't part of

14 my job.

15 Q    And at any point during the project, did you ever

16 learn what the budget for the project was?

17 A    No, sir.

18 Q    Did you ever learn where the money for the project

19 was coming from?

20 A    No, sir.

21       MR. GIBBS:  I'm sorry.  Could we pull 135A up

22 for a minute again and keep the text highlighted?

23 BY MR. GIBBS:

24 Q    Now, at the end of that first paragraph,

25 Mr. Boston, it says that 30-minute weekly updates will

Boston - Direct

1  be provided to the client.  Do you see that?

2  A     Yes, sir.

3  Q     Now, did that, in fact, happen on this project?

4  A     Yes, sir, they did.

5  Q     Can you describe those 30-minute weekly updates

6  with the client?

7  A     Yes, sir.  Briefly, I was there to take notes.

8  The defendant would call Ekim Alptekin, and General

9  Flynn was generally present.  And they would go through

10  the meeting notes or talking points that had been

11  prepared for that specific week's meeting.

12  Q     And so would there be sort of a dialogue going

13  back and forth between the people there at FIG and

14  Mr. Alptekin on the other end of the call?

15  A     That's a good representation, yes, sir.

16  Q     All right.  And where would these calls take

17  place, and where were you physically located when they

18  took place?

19  A     Sure.  In the Flynn Intel Group office space in

20  Alexandria, Virginia.

21  Q     And was there any particular type of application

22  that was used for making these phone calls?

23  A     Yes, sir.  The defendant would use the mobile

24  application Signal, which is an encrypted voice program

25  on his mobile phone, to call Ekim Alptekin.

Boston - Direct

1  Q    You said Signal was a secure mobile app you said?

2  A    Yes, sir.

3  Q    And that's short for application?

4  A    Application.  I'm sorry.

5  Q    Okay.  And then if we go back to Government

6  Exhibit 135A for a moment, at the end of that fourth

7  paragraph, the defendant advised to use the Virtru

8  system on all communications related to Project

9  Confidence.  Can you explain what the Virtru system

10 was?

11 A    Yes, sir.  Briefly, Virtru is an e-mail program

12 that when you send an e-mail, it encrypts the e-mail

13 between the sender and whoever you're addressing the

14 e-mail to.

15 Q    And as instructed by the defendant, did you use

16 the Virtru system on all your communications related to

17 Operation Confidence -- or Project Confidence, I guess?

18 A    Generally, most of the time, yes, sir.

19 Q    How user friendly was Virtru to use?

20 A    Not very.

21 Q    Why not?

22 A    It's designed for security.  So you can't forward

23 e-mails, and replying is difficult.  You can't forward

24 with attachments or anything like that.  So it's a

25 little cumbersome.

Boston - Direct

1  Q    We may come to this in a bit, but in terms of the

2  weekly meetings made using this Signal app to Ekim

3  Alptekin, who was the person who drafted up the talking

4  points to be used when you would have those phone calls

5  with Alptekin?

6  A    Yes.  I did generally.  The first set were

7  developed by the defendant, and after that, I picked it

8  up and developed the rest of the talking points.

9  Q    And when you got the first set of talking points

10 from the defendant, did you generally try to stick with

11 that as a model going forward?

12 A    Yes, sir.

13       MR. GIBBS:  We can take 135A down now.  Thank

14 you.

15 BY MR. GIBBS:

16 Q    Now, as the project moved forward and you were

17 fulfilling the position of project coordinator, what,

18 if anything, did the defendant tell you about whether

19 to associate FIG's name with Project Confidence?

20 A    He said that we wanted to keep FIG and our work

21 not disclosed.

22 Q    And who did he tell that to?

23 A    Myself, and I'm pretty sure it came up in one of

24 our project meetings.

25       MR. GIBBS:  Next, if we could turn -- Your

Boston - Direct

1  Honor, I believe this is in evidence as 135B.

2              Yeah, it's in evidence.

3              If we could, pull up 135B.

4  BY MR. GIBBS:

5  Q    If you could, just briefly identify what this

6  exhibit is.

7  A    Yes, sir.  It's titled Open Source Information --

8  Project Confidence.  It's dated -- I think that says

9  July 30, 2016, and it's 11:57 a.m.

10             THE COURT:  Are you moving this into

11 evidence?

12             MR. GIBBS:  I believe it is in evidence,

13 Judge.  This was attached to 135A.

14             THE COURT:  All right.  Any objection to

15 this?

16             MR. TROUT:  No, Your Honor.

17             THE COURT:  All right.  135B is as admitted.

18             MR. GIBBS:  Thank you.

19 BY MR. GIBBS:

20 Q    And in terms of 135B, I believe you'll recall in

21 135A the defendant talked about open source links

22 provided by Ekim.  Do you recall that?

23 A    Yes, sir.

24 Q    Now, have you had a chance to review the open

25 source links provided by Ekim?

Boston - Direct

1  A    Yes, sir.  This is the attachment to the previous

2  e-mail we discussed.

3  Q    And what did many of those open source links

4  relate to?

5  A    Yes, sir.  A number of these links, the hyperlinks

6  were linked to Fethullah Gulen.

7           MR. GIBBS:  Can we enlarge the fifth one from

8  the top?  I believe it's the one -- yep.

9  BY MR. GIBBS:

10 Q    In that fifth link from the top on open source

11 links provided by Ekim, what is the title of that link?

12 A    Yes, sir.  I'll go to the end:  Is the U.S. behind

13 Fethullah Gulen?

14           MR. GIBBS:  All right.  We can take that

15 down.  Thank you.

16           Next, if we can pull up Government Exhibit

17 110A, which is also in evidence.

18 BY MR. GIBBS:

19 Q    If you could, just briefly for the record indicate

20 what 110A is.

21 A    Yes, sir.  This is an e-mail from the defendant,

22 dated October 4, 2016.  It's addressed to myself,

23 Timothy Newberry, Brian McCauley, Graham Miller,

24 Michael Flynn, Kelley, which is Robert Kelley, and

25 David Enders.  And it's entitled Project Confidence,

Boston - Direct

1   independent contractor agreements and sensitive

2   information attachments.

3   Q    And the people listed there, were they all people

4   that worked on Project Confidence for FIG?

5   A    Yes, sir, they were.

6              THE COURT:   This is also in evidence?   These

7   documents were listed in the list of government

8   exhibits?

9              MR. GIBBS:   They were.   I believe it was

10  Government 68.

11             THE COURT:   Exhibit 68.   All right.

12             MR. GIBBS:   Thank you, Judge.

13             THE COURT:   Exhibit 110A is admitted.

14             MR. GIBBS:   And can we enlarge the -- I think

15  it's the first and second paragraphs.

16  BY MR. GIBBS:

17  Q    Now, Mr. Boston, in the e-mail from the defendant,

18  he said that -- he thanked you for accepting the role

19  of project coordinator.   Earlier you testified about

20  being the engagement manager.   Did either of those

21  titles really change what your duties were on this

22  project?

23  A    No.

24  Q    And in the second paragraph, the defendant said

25  that, quote, I will serve as the POC with the client.

Boston - Direct

1       Now, again, who did you understand was the client

2  for this project?

3  A    Inovo BV.

4  Q    And who was the individual that you were dealing

5  with as the client?

6  A    Ekim Alptekin.

7  Q    And did the defendant, in fact, act as the POC

8  with Ekim Alptekin going forward on this project?

9  A    Yes, sir.

10 Q    And I think we talked about this earlier, but the

11 e-mail also says, General Flynn plans to hold a weekly

12 30-minute update session with the client.

13      And what was your role in those weekly 30-minute

14 update sessions?

15 A    Yes, sir.  To prepare the talking points prior to

16 the meeting and to take notes during the meetings.

17 Q    And just generally, what was Alptekin's role

18 during those 30-minute weekly update calls?

19 A    I saw him as the client asking questions about our

20 progress and as we informed him as to where we were

21 with the project.

22 Q    And do you know what Alptekin did with the

23 information that he received during those weekly

24 30-minute update calls?

25 A    No, sir.

1          MR. TROUT:  Objection, Your Honor.

2          THE COURT:  He has answered.

3          All right.  Thank you, Mr. Gibbs.

4          We're going to take our morning recess at

5   this time.  We'll stand in recess until 11:45.

6          During the recess, do not discuss this case

7   among yourselves.  You're excused to the jury room.

8       (The jury exits at 11:27 a.m.)

9          THE COURT:  We'll stand in recess.

10          Mr. Boston, do not discuss your testimony

11   during the recess.

12          THE WITNESS:  Yes, sir.

13       (Recess from 11:29 a.m. until 11:51 p.m.)

14       (The jury is not present.)

15          THE COURT:  Ready to proceed?

16          MR. GIBBS:  We are, Judge.

17          THE COURT:  All right.  Bring the jury out.

18       (The jury enters at 11:51 a.m.)

19          THE COURT:  All right.  Please be seated.

20          Mr. Boston, you remain under oath.

21          Mr. Gibbs.

22          MR. GIBBS:  Thank you, Judge.

23   BY MR. GIBBS:

24   Q    Hello again, Mr. Boston.

25          MR. GIBBS:  Judge, we just have one matter

Case 1:18-cr-00457-AJT   Document 330   Filed 07/17/19   Page 104 of 152 PageID# 3994

Boston - Direct

1   we'd like to approach on briefly.

2            THE COURT:  Yes.

3            MR. GIBBS:  Thank you.

4       (Conference at the bench, as follows:)

5            THE COURT:  Yes.

6            MR. GILLIS:  Your Honor, I just wanted to

7   advise the Court -- and, first of all, I have to say

8   that I'm not sure about this.  I believe that it was

9   one of the jurors on the elevator down with me who

10  asked me, "Are we allowed to ask any questions," and I

11  said, I can't say anything about that.  Then I had my

12  head down.  So I really didn't get a good look at him

13  to tell you the truth, but there was no exchange of

14  information or anything of the sort.

15           It was terrifying, Your Honor.

16           THE COURT:  I'm not inclined to make any

17  inquiry.

18           All right.  While I have you, apparently,

19  there's been a request by at least one of the reporters

20  to have access to the exhibits in the case.  I don't

21  know if they've approached you-all.

22           MR. MACDOUGALL:  Yes.

23           THE COURT:  I mean, whether you want to

24  share -- the only concern I have is sharing with

25  reporters exhibits that aren't in evidence as the basis

Boston - Direct

1  of reporting about the case.  To the extent you-all

2  want to share your exhibits, I'm not sure I otherwise

3  have a problem with it.

4          MR. MACDOUGALL:  We have not as of today,

5  Your Honor.  If the Court has no objection, I don't

6  know whether we do or not.

7          MR. GILLIS:  We've been asked.  I believe

8  it's up to the press guy.  Up until now, we have said

9  no.  We've insisted upon them contacting the Court,

10 which apparently they did.

11         THE COURT:  Yeah.

12         MR. GILLIS:  One reporter insisted that she

13 had a First Amendment right to see --

14         THE COURT:  Well, to the extent you want to

15 cooperate with them and give them access, I would only

16 do it as to the exhibits that have actually been

17 admitted into evidence as part of the public trial and

18 not potential evidence that may or may not be admitted.

19         MR. GILLIS:  Yes, sir.

20         MR. MACDOUGALL:  I understand, Your Honor.

21         THE COURT:  Thank you.

22         MR. TROUT:  Thank you.

23      (Proceedings continued in open court, as follows:)

24         THE COURT:  All right.  Mr. Gibbs.

25         MR. GIBBS:  Thank you, Your Honor.

Boston - Direct

1              If we could, pull up Government Exhibit 110A

2    again.  That was the exhibit we were looking at before

3    the break.

4    BY MR. GIBBS:

5    Q    Mr. Boston, just to reorient you, this is

6    Government Exhibit 110A.  It's the October 4, 2016,

7    e-mail.  Do you see that?

8    A    Yes, sir.

9    Q    Now, were there attachments included with this

10   e-mail from the defendant?

11   A    Yes, sir.  There's two attachments listed.

12   Q    Let's start with the first one.  Can we go to

13   Government Exhibit 110B, which is in evidence?

14              MR. GIBBS:  If we can, just highlight the top

15   paragraph there and the heading.

16   BY MR. GIBBS:

17   Q    What is Government Exhibit 110B?

18   A    Yes, sir.  It's the -- actually, I can't see the

19   top of the document, but it's a -- yeah.  It's an

20   independent advisory services agreement for any of the

21   subcontractors for the Flynn Intel Group.

22   Q    And what would this be used with regarding the

23   various subcontractors for Flynn Intel Group?

24   A    Yes, sir.  It was -- this was a document that we

25   would have used with any of the independent people

Boston - Direct

1   working on this project with us, such as Sphere

2   Consulting or some of the other folks that worked with

3   us.

4   Q     Okay.  Thank you.

5        If you could, try -- I know it's hard sometimes,

6   but try to keep your voice up.  I have a hard time not

7   talking too fast.  Some people have a hard time talking

8   low.  Just try to keep your voice up.

9   A     Yes, sir.

10  Q     You said there were two attachments?

11  A     Yes, sir.

12  Q     Let's go to the second one, Government

13  Exhibit 110C, which is also in evidence.  Mr. Boston,

14  what is Government Exhibit 110C?

15  A     Yes, sir.  It's a sensitive information

16  nondisclosure agreement.

17            MR. GIBBS:  And if we could, highlight the

18  first half of the top of that to make it easier to

19  read.

20  A     Yes, sir.  This one was specifically for Rudabeh

21  Bakhtiar.

22  Q     Rudabeh Bakhtiar?

23  A     Yes, sir.

24  Q     And it was between Rudabeh Bakhtiar and who?

25  A     The Flynn Intel Group or FIG.

Boston - Direct

1  Q     Who is Rudabeh Bakhtiar?

2  A     She was a journalist that we -- that had been

3  contracted for this particular engagement.

4  Q     Okay.  I'm going to get to her in just a moment.

5        But if we can, go back to 110A, the e-mail, again

6  for a moment.

7             MR. GIBBS:  Latoya, can you highlight the

8  lower portion?  There we go.

9  BY MR. GIBBS:

10  Q     Now, in the defendant's e-mail of October 4, the

11  defendant said, quote, Prepare the playbook for the

12  project.

13        Mr. Boston, what was the playbook?

14  A     Yes, sir.  It was a boilerplate for how the

15  engagement was going to play out, if you will, over the

16  period of the engagement.

17  Q     When you talk about the engagement, what is that a

18  reference to?

19  A     The Project Confidence.

20  Q     Lets go to the playbook.  Can we go to Government

21  Exhibit 23B, which is also in evidence?  And,

22  Mr. Boston, just for the record, can you explain what

23  23B is?

24  A     Yes, sir.  It's titled Operation Confidence

25  Playbook, and it lists a number of team members and

Boston - Direct

1  their roles.   It talks about the mission statement and

2  then what the end product would be for the engagement.

3  Q    And who did you get this playbook from?

4  A    Yes, sir, the defendant.

5         MR. GIBBS:  Can we just highlight the lower

6  portion that be begins "mission" and then "end

7  product?"

8  BY MR. GIBBS:

9  Q    Now, in the first bullet point there where it says

10 investigate and document the activities of X in the

11 United States, who did X refer to?

12 A    Fethullah Gulen.

13 Q    And at the bottom of that page, it indicate under

14 end product a *60 Minutes* video production documenting

15 the investigations.   What did that *60 Minutes* video

16 production relate to on this project?

17 A    It was supposed to be a *60 Minutes* type of video

18 for the -- as a product for the engagement.

19 Q    And, in fact, as part of this project, was video

20 footage shot?

21 A    Yes, sir.

22 Q    And did you take part in that?

23 A    I was there when the video was being shot, yes,

24 sir.

25 Q    And where did that take place?

Boston - Direct

1   A     In a hotel in Washington, D.C.  The Hotel Palomar.

2   Q     Who was present for the shooting of the video

3   footage?

4   A     Yes, sir.  Myself, the defendant, Carl Pilgram,

5   and one other person -- I'm not sure what his name

6   is -- and then three individuals from the country of

7   Turkey.

8   Q     And as far as the person you didn't know whose

9   name it was, was there somebody there who was actually

10  shooting the video footage?

11  A     Yes, sir, and David Enders was the video

12  journalist, and then previously mentioned Rudabeh

13  Bakhtiar was also there asking questions.

14  Q     And that's the person we saw earlier in that

15  agreement; is that correct?

16  A     Yes, sir.

17  Q     Can you describe what took place at the hotel when

18  the video footage was shot?

19  A     She asked a series of questions of these

20  individuals, and they answered.

21  Q     Who were these individuals again?

22  A     Yes, sir.  There were three Turkish individuals.

23  One was a journalist that worked in Turkey.  The other

24  was a former military officer and a senior judge from

25  Turkey.

Boston - Direct

1  Q    Now, during the questioning with these three

2  Turkish figures, what was Rudabeh Bakhtiar's

3  questioning focused on?

4  A    The coup and who might have perpetrated the coup.

5  Q    And the coup where?

6  A    In Turkey.

7  Q    Now, how involved was the defendant in setting up

8  the video shoot for this footage?

9  A    My impression or what I've experienced was he's

10 the one who set up the shoot.

11 Q    And how involved was he in asking questions during

12 the shooting of this video?

13 A    None to my recollection.

14 Q    So what was he doing while Rudabeh Bakhtiar was

15 asking questions?

16 A    In the background talking to some of the other

17 folks.

18        MR. GIBBS:  And, if we can, go to the second

19 page of 23B now.  Can we enlarge the section Scenario,

20 Part 1?

21 BY MR. GIBBS:

22 Q    Mr. Boston, have you seen this before?

23 A    Yes, sir, I have.

24 Q    And what notorious figure is described under

25 Scenario, Part 1?

Boston - Direct

1  A    Yes, sir.  Ayatollah Khomeini.

2  Q    Had you ever heard this analogy made by anyone

3  before?

4  A    Yes, sir.

5  Q    Who?

6  A    The defendant.

7          MR. GIBBS:  Next, can we pull up -- I believe

8  it's part 3, commentary, on page 2?

9  BY MR. GIBBS:

10 Q    Have you had a chance to read that to yourself?

11 A    Yes, sir.

12 Q    Mr. Boston, have you ever heard of this analogy

13 before of the cleric under the apple tree?

14 A    Yes, sir, I have.

15 Q    Where have you heard that from?

16 A    From the defendant.

17         MR. GIBBS:  Then, finally, can we pull up the

18 very bottom of that second page?

19 BY MR. GIBBS:

20 Q    It reads:  Country X significance in maintaining

21 global stability and security.

22     Do you recognize the reference to Country X in

23 that document?

24 A    Yes.

25 Q    And what did you recognize that to be a reference

1  to?

2  A    The country of Turkey.

3  Q    And then, finally, can we go back to page 1 of

4  Government Exhibit 23B, and it's the last bullet on

5  page 1.  Mr. Boston, do you see the reference to a

6  Dutch entity?

7  A    Yes, sir, I do.

8  Q    I'd like to now turn to Government Exhibit 110,

9  which is also in evidence -- I'm sorry 112.

10          MR. GIBBS:  If we could, enlarge that.

11  BY MR. GIBBS:

12  Q    Mr. Boston, what is Government Exhibit 112?

13  A    Yes, sir.  That's an e-mail from myself sent on

14  Sunday, October 9, 2016, to the defendant, and the

15  subject is use of Inovo's name.

16  Q    And what did you ask in that e-mail to the

17  defendant on October 9?

18  A    Yes, sir.  My question was, I just want to

19  double-check that it is okay for Sphere to

20  use/reference them, Inovo, as they work on setting up

21  meetings, *et al.*

22  Q    Why did you feel the need to ask the defendant

23  that question?

24  A    Yes, sir.  Prior to that, we had been told to not

25  use our client's name in discussions outside of our

Boston - Direct

1  working group internal at FIG.

2  Q    Who had told you that?

3  A    The defendant.

4  Q    And next I want to go back to Government

5  Exhibit 23B, again, to page 5 of that document, the

6  playbook.

7        MR. GIBBS:  If we can, enlarge "target

8  audiences" in the middle.

9  BY MR. GIBBS:

10  Q    Mr. Boston, can you read to yourself the part --

11  the first bullet under policymakers?

12  A    Yes, sir.

13  Q    Mr. Boston, during your time working on this

14  project, did any congressional outreach take place

15  regarding the project?

16  A    Yes, sir, it did.

17        MR. GIBBS:  If we can, now go to Government

18  Exhibit 30A, we should be able to enlarge the top of

19  that.

20  BY MR. GIBBS:

21  Q    What is Government Exhibit 30A?

22  A    Yes, sir.  That's an e-mail from myself to Graham

23  Miller, the defendant, Brian McCauley, Emalee, another

24  member on our team, and the subject is congressional

25  outreach.

Boston - Direct

1  Q     Mr. Boston, in the first paragraph of your e-mail

2  to Graham Miller and the defendant and Brian McCauley,

3  you said:  I am including Bijan in this thread since he

4  has already met with national security advisor in

5  Chairman McCaul's office.

6       First of all, who is Chairman McCaul?

7  A     Yes, sir.  At the time, that's Congressman McCaul

8  from the State of Texas.  He was the chairman of the

9  Homeland Security committee in Congress.

10 Q     And the e-mail said Bijan had met with the

11 national security advisor in Chairman McCaul's office.

12      Who was the national security advisor for Chairman

13 McCaul?

14 A     I believe his name was Miles Taylor.

15 Q     How did you know that?

16 A     From a meeting that we had in the FIG office space

17 at some point after this e-mail.

18 Q     Well, why don't we just go to that?  Can you

19 describe the meeting in the FIG office space sometime

20 after this e-mail?

21 A     Yes, sir.  We had a project team meeting, and we

22 were in the midst of discussing the project.  At some

23 point during our meeting, the defendant brought in

24 Miles Taylor and, I believe, one other individual from

25 that office.  And we were asked to explain what the

Boston - Direct

1  specific project -- what we're working on.

2  Q    And before we get to that, you said we were there

3  having a project meeting.  Who was there besides

4  yourself when the defendant brought Miles Taylor in?

5  A    Yes, sir.  To the best of my memory, myself, Brian

6  McCauley, Graham Miller.  I think Graham might have had

7  one other person with him.  Those were the main ones in

8  the room.

9  Q    Now, when the defendant brought Miles Taylor into

10 that meeting at the FIG offices, what, if anything, did

11 he say about whether he was acting as a paid lobbyist

12 for the government of Turkey?

13 A    I don't remember anything like that.

14 Q    Can you describe what happened when the defendant

15 brought Miles Taylor into that meeting in the FIG

16 offices?

17 A    He brought him in, and Miles sat down with the

18 other person in his office.  And it was a discussion

19 about specifically the project we were working on,

20 specifically Mr. Gulen.

21 Q    And what, if anything, did the defendant say

22 during this meeting with the defendant and Miles

23 Taylor?

24 A    That we were working on this and it would be great

25 if, through him, Chairman McCaul could potentially hold

Boston - Direct

1  public hearings on Mr. Gulen.

2  Q     Public hearings on Mr. Gulen?

3  A     Yes, sir.

4  Q     And during your time working on the project, how

5  often did you hear the defendant make statements like

6  that about wanting to have hearings on the Hill

7  about -- or hearings in Congress about Fethullah Gulen?

8  A     It came up more than once.

9  Q     Now, you talked earlier that there were weekly

10  update meetings on this project, correct?

11  A     Yes, sir.

12  Q     If I could have you take a look at an exhibit

13  which is not in evidence.  This is Government

14  Exhibit 42.

15  A     Yes, sir.

16  Q     What is Government Exhibit 42?

17  A     Yes, sir.  This is a copy of my handwritten notes

18  that I took on October 7, which was our first

19  conference call with the client, Ekim Alptekin.

20  Q     That was those conference calls using Signal with

21  Mr. Alptekin?

22  A     Yes, sir.

23          MR. GIBBS:  Your Honor, at this time, we

24  would move Government Exhibit 42 into evidence.

25          THE COURT:  Any objection?

Boston - Direct

1          MR. TROUT:  No, Your Honor.

2          THE COURT:  Exhibit 42 is admitted.

3   BY MR. GIBBS:

4   Q    Now, first of all, Mr. -- well, yeah.

5        Mr. Boston, who participated in the October 7

6   conference call with Mr. Alptekin?

7   A    Yes, sir.  Myself, the defendant, and General

8   Flynn on our side, and then Inovo BV and Mr. Alptekin

9   on the other side.

10  Q    So he was --

11  A    On a phone call somewhere.  I don't know where he

12  was located.

13  Q    How did you set this up?  Was this sort of like

14  you had a conference feature on the phone so he could

15  speak and you could speak to him?  Was it that sort of

16  thing?

17  A    It was a mobile phone.  So it was just put on

18  speaker.

19  Q    And I don't know if I've already asked you this,

20  but who took part in that particular call?  Did you

21  say?

22  A    Yes, sir.  Myself, the defendant, and General

23  Flynn.

24  Q    Now, I want to ask you about some of the

25  notations.  So during the course of that conference

Boston - Direct

1  call where Mr. Alptekin was on the phone, you took

2  handwritten notes; is that correct?

3  A    Yes, sir.

4  Q    Could we highlight the top couple of lines there?

5           MR. TROUT:  Your Honor, could we have a

6  limiting instruction on this in terms of the hearsay?

7           THE COURT:  Well, let me hear the question,

8  and then we'll --

9           MR. GIBBS:  Well, I was going to ask about

10  what the reference to op-ed funding refers to, and then

11  I would ask about who was talking about that in the

12  meeting.

13           THE COURT:  Well, let me see counsel.

14       (Conference at the bench, as follows:)

15           THE COURT:  Why don't you just ask him about

16  what was said at the meeting and, if he needs to, use

17  the notes to refresh his recollection as opposed to

18  having him go line by line on the notes.

19           MR. GIBBS:  I can.

20           THE COURT:  Really, there was no objection.

21  It came into evidence.

22           MR. GIBBS:  Well, you know, again, we're not

23  arguing the hearsay or any objection at this point

24  other than a limiting instruction.

25           THE COURT:  Right.

```
1          MR. GIBBS:  I think the testimony was there
2   were notes taken contemporaneously in a meeting the
3   defendant was part of with the other remaining
4   coconspirator.
5          THE COURT:  But they're meaningless without
6   his testimony about what was said.  I assume you just
7   want him to recount what happened there and to the
8   extent he needs his notes to reflect that or refresh
9   his recollection.
10         MR. GIBBS:  Right.  He can keep the notes in
11  front of him.  I am just going to walk him through a
12  few things on there.  That's fine.
13         THE COURT:  Instead of going line by line,
14  why don't you ask him by topic what it is was talked
15  about.
16         MR. GIBBS:  I can do that.  That's fine.
17         THE COURT:  All right.
18      (Proceedings continued in open court, as follows:)
19  BY MR. GIBBS:
20  Q    Now, Mr. Boston, during the course of that meeting
21  in the FIG offices or the phone call with Alptekin in
22  the FIG offices on October 7, 2016, did the topic of
23  op-ed funding come up?
24  A    Yes, sir, it did.
25  Q    All right.  Can you describe how that topic came
```

Boston - Direct

1  up?

2  A    The discussion -- op-ed came up in the discussion.

3  And to the best of my recollection, funding came up

4  because my interpretation or impression of that was

5  that an op-ed would be outside of the scope of the

6  original contract, which is why I had written funding

7  down, which would mean additional funding.

8  Q    Who said op-ed would be outside the scope of the

9  additional contract?

10  A    They didn't specifically say that, but they said

11  we would need additional funding, the defendant.

12  Q    What, if anything, did Mr. Alptekin say about

13  op-ed funding in the meeting?

14            MR. TROUT:  Objection, hearsay.

15            THE COURT:  I'll allow it just for the fact

16  of what was said.

17  A    I don't remember.  The discussion just continued.

18  Q    This meeting where the topic of op-ed funding came

19  up, this was all related to Project Confidence?

20  A    Yes, sir.

21  Q    Now, was there also a discussion in this meeting

22  with the defendant and Alptekin about hearings at

23  Congress and McCaul of Texas?

24  A    Yes, sir.

25  Q    How did that come up?

Boston - Direct

1   A    I'm not sure how in the discussion -- I was

2   obviously busy taking notes -- which person brought up

3   that specific point, but it was discussed during the

4   meeting that one of the objectives was hearings at

5   Congress and Chairman McCaul specifically because of

6   Homeland Security.

7   Q    And Chairman McCaul is the individual you spoke

8   about a few minutes ago?

9   A    Yes, sir.

10  Q    Now, was there also a discussion in the meeting on

11  October 2 about extradition, a follow-up call, Ekim,

12  what is alternative strategy?

13  A    Yes, sir.

14  Q    Can you explain what that is a reference to?

15  A    That would be -- extradition would be a change in

16  his legal status in the United States, and that was

17  going to take place in a follow-up phone call.

18  Q    And you said extradition would lead to a change in

19  his legal status.  Whose legal status?

20  A    Mr. Gulen's.

21  Q    Was it discussed how that would happen?

22  A    No, sir, it wasn't.

23  Q    Was there also a reference in the meeting to Ekim

24  uncovered new info, original documents, pics?  Was that

25  discussed in the meeting?

Boston - Direct

1   A    Yes, sir, it was.

2   Q    What was discussed about that topic?

3   A    Yes, sir.  The client was very specific in wanting

4   us to --

5           MR. TROUT:  Objection, Your Honor, to

6   hearsay.

7           THE COURT:  Well, again, I'm going to allow

8   it in for the fact of what was discussed at the

9   meeting.

10          Go ahead.

11          MR. GIBBS:  Thank you, Judge.

12  BY MR. GIBBS:

13  Q    You can complete your answer, Mr. Boston.

14  A    He was very insistent about our engagement

15  uncovering new information, documents, and pictures on

16  Mr. Gulen that would be derogatory in nature.

17  Q    Mr. Alptekin was saying he wanted pictures of

18  Gulen that were derogatory in nature?

19  A    Yes, sir.

20  Q    Now, was there also a reference made in the

21  meeting on October 7 to box in as a terrorist?

22  A    Yes, sir.

23  Q    What did that reference relate to?

24  A    Yes, sir.  That's a reference to redefining his

25  status as basically a mullah and box him in as a

Boston - Direct

1 terrorist, and that would potentially change his legal

2 status.

3 Q    Who was making the comments about boxing in

4 Fethullah Gulen as a terrorist?

5 A    The defendant.

6 Q    Was there also discussion in that meeting or the

7 call on October 7 related to U.S. relationship nowhere

8 until this is addressed?

9 A    Yes, sir, there is.

10 Q    What was that a reference to?

11 A    Yes, sir.  That the U.S. relationship with the

12 country of Turkey will continue to be strained until

13 the Gulen issue with the country of Turkey is resolved

14 with the United States.

15 Q    All right.  Thank you, sir.

16     If we could, go next to Government Exhibit 43A,

17 which is in evidence.

18         MR. GIBBS:  If we could, enlarge the top part

19 first just to orient ourselves.

20 BY MR. GIBBS:

21 Q    What is Government Exhibit 43A, sir?

22 A    Yes, sir.  That's an e-mail from myself, dated

23 Thursday, October 13, 2016.  It's to the defendant, and

24 the subject is talking points for October 14.  It

25 contains a number of attachments.

Boston - Direct

1  Q    What was scheduled for October 14?

2  A    Our weekly conference call with the client.

3  Q    So you sent this to the defendant and included, as

4  you said, a number of attachments.  Who was responsible

5  for getting those materials to the client?

6  A    My understanding would be the defendant if they

7  were sent to the client at all.

8  Q    And during the time you worked on the project, who

9  was the primary point of contact with Ekim Alptekin?

10  A    Yes, sir.  The defendant.

11  Q    Now, if we could, turn to the first attachment

12  included with this e-mail, 43A.  It's Government

13  Exhibit 43B.  If you could, just pull that up.

14  Mr. Boston, what is Government Exhibit 43B?

15  A    Yes, sir.  That's the Project Confidence talking

16  points for October 14, 2016.

17  Q    These are the talking points you talked about

18  earlier.  You sort of got the format from the

19  defendant, and then you would be responsible for this?

20  A    Yes, sir.

21  Q    Could we go to page 6 of 43B.

22        MR. GIBBS:  Could we just highlight the

23  middle there.

24  BY MR. GIBBS:

25  Q    Now, in 43B, it reads:  Record of conversation

1  with the client, October 7, 2016, discussion, and then

2  there's some bullet points.  What did that section of

3  the talking appoints relate to?

4  A    Yes, sir.  So, while these were for the 14th, they

5  included a condensed version of the notes from the

6  previous week.  Specifically here, it's the bullet

7  comments from the client from the week's prior meeting.

8  Q    So you sort of encapsulated the prior week's notes

9  and put them into the document for the following week;

10  is that correct?

11  A    Correct.  It was chronological over time.

12  Q    Got it.

13      Let's go to page 7 of the talking points.  Can we

14  go to the seventh bullet there just above client

15  feedback?  Now, it indicates there:  We will attempt to

16  have an op-ed written that links funding, Islamists,

17  and the subject, *et al.*, as mullahs/imams.

18      Mr. Boston, when did you first hear about the idea

19  of having such an op-ed meeting?

20  A    In the week prior meeting.  The October 7 meeting

21  was the first time I ever heard about an op-ed.

22  Q    Now, can we go to the bottom of that page under

23  client feedback.  Mr. Boston, I believe the bullets

24  under client feedback carries over onto the next page.

25  Correct?

Boston - Direct

1  A     Yes, sir.

2  Q     Can we go to that next page?

3  A     Yes, sir.

4        MR. GIBBS:  And can we highlight that bullet

5  at the top?

6  BY MR. GIBBS:

7  Q     Now, Mr. Boston, the two bullets we looked at on

8  the other page and then this one, they all appeared

9  under the heading Client Feedback.  Who are you

10 referring to in this document as the client?

11 A     Inovo BV and then Mr. Ekim.

12 Q     Mr. Alptekin?

13 A     Alptekin.  I'm sorry.

14 Q     So who was it that was saying that the republican

15 presidential candidate hasn't defended the subject's

16 home country publicly and he should specifically ask

17 questions about subject's operations and funding?

18 A     Mr. Alptekin.

19 Q     When did he waive that issue?

20 A     In the October 7 conference call.

21 Q     And what, if any, relationship did General Flynn

22 have with the republican presidential candidate as of

23 October 2016?

24 A     Yes, sir.  He was working on the then-president --

25 or candidate Trump's campaign.

Boston - Direct

1          MR. GIBBS:  All right.  Latoya, if we could,

2    go to page 11 of this exhibit, please.  At the bottom

3    there, subject related websites.

4    BY MR. GIBBS:

5    Q    First of all, who was the subject of this project?

6    A    Mr. Gulen.

7    Q    And what was listed on this page and then the

8    page-and-a-half that follows?  We can pull that up.

9    A    Yeah, I can only see the highlighted part.

10         These are project notes, basically updates on

11   where every specific team is, if you will.

12   Q    Okay.  I'll move on from there.

13         Now, you indicated that for the October 14

14   meeting, you sent a number of attachments to the

15   defendant to get to Mr. Alptekin.  I want to go to the

16   next attachment, which is 43C, that is in evidence.

17   What is Government Exhibit 43C?

18   A    Yes, sir.  This is a very early preliminary

19   version of what would ultimately be called or

20   referenced as a Gulenopoly.

21         MR. GIBBS:  If we can, enlarge sort of the

22   middle -- that square on the right inside the board.

23   BY MR. GIBBS:

24   Q    Can you read that aloud, Mr. Boston?

25   A    Yes, sir.  It says, Chance:  You attempt a coup in

Boston - Direct

1   Turkey killing 265 people.  You fail to overthrow

2   Erdogan, and Turkish authorities detain over 15,000 of

3   your followers.

4           MR. GIBBS:  Then can we enlarge the square in

5   the upper right-hand corner of this board.

6   BY MR. GIBBS:

7   Q    What does that say, Mr. Boston?

8   A    Yes, sir.  Extradition.

9   Q    How did extradition fit into the goals of Project

10  Confidence?

11  A    That was the ultimate goal of the project.

12  Q    And if extradition was the ultimate goal of the

13  project, where would Fethullah Gulen be extradited to

14  if that goal were achieved?

15  A    The country of Turkey would be my understanding.

16  Q    I want to go back to Government Exhibit 43A for a

17  minute, the first page.  That's the e-mail again.

18          MR. GIBBS:  Latoya, can you enlarge the

19  biggest paragraph there in the middle.  I think it's

20  the third one.

21  BY MR. GIBBS:

22  Q    Mr. Boston, can you just read that to yourself.

23       Now, Mr. Boston, at the end of that paragraph, it

24  said:  Gulen briefing -- Initial draft of the points we

25  will make with the McCaul folks.

1    So I want to talk about this initial draft.  Was
2 there a briefing document also attached to this e-mail,
3 Government Exhibit 43A?

4 A    Yes, sir.

5 Q    Let's go to Government Exhibit 43F which was
6 attached to this e-mail.  Mr. Boston, what is
7 Government Exhibit 43F?

8 A    It's titled the First Draft -- Gulen Briefing
9 Sheet.

10 Q    And was this the first draft of the points to be
11 made with what were described as the McCaul folks?

12 A    Yes, sir, and other elected officials, if you
13 will.

14 Q    And other elected officials?

15 A    Potentially, yes.

16 Q    Can we turn to the second page of 43F.

17         MR. GIBBS:  Well, we can enlarge all of that.
18 It's small enough.

19 BY MR. GIBBS:

20 Q    Mr. Boston, what does that bold heading on page 2
21 say?

22 A    Information about political donations in
23 connection to the Clinton foundation.  Am I reading the
24 right thing?

25 Q    No.  I think we're looking at -- it should be on

Boston - Direct

1    your screen, but the text in bold under the two bullet

2    points.

3    A      Oh, I'm sorry.  Responsible for the attempted coup

4    in Turkey.

5          There we go.

6    Q      During the course of the time you worked on the

7    project, what, if anything, did the defendant say about

8    Fethullah Gulen's role in the attempted coup?

9    A      The impression I had was that the defendant was

10   convinced that he had a major role in the coup attempt.

11   Q      Thank you.

12         Next, if we could, go to -- so I want to have you

13   look at Government Exhibit 114.  It's in a binder.  I

14   don't think it's in evidence, yet.  So...

15              THE COURT:  Any objection to 114?

16              MR. TROUT:  No objection, Your Honor.

17              THE COURT:  All right.  Exhibit 114 is

18   admitted.

19              MR. GIBBS:  We'd ask to publish it, Your

20   Honor.

21              THE COURT:  Yes.

22              MR. GIBBS:  Maybe we can just enlarge the top

23   and the date, and I'll ask.

24   BY MR. GIBBS:

25   Q      So, Mr. Boston, what is Government Exhibit 114?

1   A    Yes, sir.  That's an e-mail from myself to Graham,

2   which is Graham Miller.  I must've blind copied myself.

3   Brian is Brian McCauley, and there's another addressee.

4   I'm not sure.

5   Q    And the portion that's enlarged says you are

6   reading a secure message protected by Virtru.

7        Is this the way e-mails sometimes look with the

8   Virtru application?

9   A    Yes, sir.  When you extract an e-mail, it strips

10  certain things.  It was rather cumbersome to work with.

11          MR. GIBBS:  Now, if we could, go to the fifth

12  paragraph of the e-mail and enlarge that, please.

13  BY MR. GIBBS:

14  Q    Now, on that portion of the e-mail, you indicated

15  rule of law, items/issues that we can gain a criminal

16  referral on are the ultimate aim of our work.

17       Where did you get that understanding from?

18  A    From General Flynn during our first conference

19  call.

20  Q    And did that understanding ever change at all

21  during your time working on Project Confidence?

22  A    No, sir.

23  Q    And when it talks about a criminal referral, a

24  criminal referral against whom?

25  A    There was a reference to Mr. Gulen.

Boston - Direct

1  Q    What would the criminal referral potentially

2  result in?

3  A    A change in his legal status in the United States,

4  and the outcome of that would be extradition.

5  Q    What was the defendant's attitude towards this

6  idea of getting a criminal referral against the

7  defendant -- or against Fethullah Gulen?

8  A    I'm sorry.  Could you repeat or restate that?

9  Q    Sure.  What was the defendant's attitude towards

10 this idea of obtaining a criminal referral against

11 Fethullah Gulen?

12 A    Positive.

13 Q    Next, if we could, go to Government Exhibit 122A.

14         MR. GIBBS:  If we can, enlarge the top.

15 BY MR. GIBBS:

16 Q    Mr. Boston, what is 122A?

17 A    Yes, sir.  That's a -- this is an e-mail from

18 myself, dated -- it's on Saturday, October 22, 2016,

19 5:40 in the morning.  It's addressed to General Flynn,

20 and it's -- I've CC'd the defendant, and the other

21 Michael Flynn reference there is General Flynn's son.

22 Q    All right.  I won't belabor the point, but

23 presumably, there was another conference call with

24 Alptekin a week after the prior one.  Is that correct?

25 A    Yes, sir.  These were the notes for the --

Boston - Direct

1  actually, the October 21 meeting which had to be

2  postponed because General Flynn wasn't in town.  So

3  he -- I sent him all the notes on that Saturday morning

4  for him to do the call.

5  Q    And do the call with whom?

6  A    The client, Inovo BV, Mr. Alptekin.

7  Q    And if we can, go to the second page of 122A for a

8  moment to your e-mail.

9         MR. GIBBS:  If we can, enlarge the section

10  Policymaker Outreach and Activity.

11  A    Yes, sir.

12  Q    Now, I'm not going to have you read all of this

13  right now, but what does the section Policymaker

14  Outreach and Activity -- what did that section of the

15  e-mail relate to?

16  A    Yes, sir.  That's an extract from Sphere

17  Consulting's work, and it broadly discusses their

18  either current outreach or forthcoming outreach.  This

19  is a list of individuals that they want to reach out to

20  as part of this project of Mr. Gulen.

21  Q    So does this potentially relate to lobbying?

22  A    Yes, sir, it does.

23       (Mr. Trout stands.)

24         THE COURT:  I'll let him answer.

25         Go ahead.

Boston - Direct

1  BY MR. GIBBS:

2  Q    Does this potentially relate to lobbying?

3  A    Yes, sir.

4  Q    You said that as part of the e-mail sending the

5  attachments for the call with Alptekin, there were

6  items included with that e-mail, correct?

7  A    Yes, sir, there were a number of attachments.

8  Q    All right.  If we can pull up one of those

9  attachments, which is Government Exhibit 122C, which is

10 in evidence.  What is the heading of this document?

11 A    Yes, sir, the Gulen Briefing Sheet.

12 Q    And what was the Gulen Briefing Sheet to be used

13 for?

14 A    Yes, sir.  This is a finalized version of the

15 previous draft, and this briefing sheet would be used

16 by individuals to talk to either government officials

17 or elected officials, specifically about Mr. Gulen.

18 Q    And if we can, go to the second page of the

19 congressional briefing sheet.  Again, what is that bold

20 heading -- the first bold heading stated up towards the

21 top?

22 A    Yes, sir.  Responsible for the attempted coup in

23 Turkey.

24 Q    All right.  Let's go back to the e-mail that

25 was -- that forwarded this document for purposes of the

1  call.  Let's go to the third page of that e-mail,

2  Government Exhibit 122A.

3      First of all, Mr. Boston, was the e-mail that was

4  sent out in anticipation of this call, was that an

5  internal FIG document or was it intended to be used for

6  briefing Congress, the e-mail?

7  A    The e-mail itself was an internal document.

8  Q    And, in fact, what does it say in the lower

9  left-hand corner of the e-mail?

10 A    Are you talking about the confidential marking?

11 Q    Yes.

12     (No response.)

13 Q    And then on the third page there, Mr. Boston,

14 what, if anything, does it say about the attempted coup

15 in Turkey in July?

16 A    I'm sorry.  Which page are you on?

17 Q    It should be page 3.

18         MR. GIBBS:  Can you enlarge that a little

19 bit, Latoya?  It's the third paragraph.

20 A    Yes, sir.

21 Q    What does that say in the middle of that document?

22 A    Yes, sir.  This is an extract from the social

23 media -- open source social media, and the comment is:

24 We have found no evidence to support money laundering

25 or moving funds out of his schools other than the

Boston - Direct

1  claims in the media.

2          MR. GIBBS:  One moment, Your Honor.

3          Can we enlarge the fourth paragraph there?

4  BY MR. GIBBS:

5  Q    Can you just read that into the record?

6  A    Yes, sir, I will:  We have found no evidence to

7  support Gulen's responsibility for the failed coup in

8  July.  We can assess that he most likely wanted it to

9  happen but nothing direct or concrete to say he

10  directed it.

11          MR. GIBBS:  Judge, I did have one question.

12  Mr. Trout did point out to me the confidential marking

13  was actually put on there after the fact.  So I do want

14  to correct that testimony.  I was mistaken about that.

15          MR. TROUT:  I think it was part of the

16  document production, Your Honor.

17          MR. GIBBS:  Right.

18          THE COURT:  All right.  Ladies and gentlemen,

19  you will strike any testimony as to that marking and

20  not attach any significance to it.

21          MR. GIBBS:  Thank you, Judge.

22  BY MR. GIBBS:

23  Q    Mr. Boston, I want to go to one other attachment

24  to that e-mail.  It's Government Exhibit 122I.

25  Actually, I was just advised that's not in evidence.

Boston - Direct

1  So, Mr. Boston, if you can, take a look in your binder,

2  it's 122I, as in "Indigo."

3  A    Yes, sir.

4  Q    What is Government Exhibit 122I?

5  A    Yes.  It's dated 20 October 2016 update.  This is

6  the social media update that I received as the project

7  coordinator.

8  Q    And social media was one of the aspects of this

9  project?

10 A    Yes, sir.

11           MR. GIBBS:  Judge, we would move in 122I.

12           THE COURT:  Any objection?

13           MR. TROUT:  No, Your Honor.

14           THE COURT:  Without objection, 122I is

15 admitted.

16 BY MR. GIBBS:

17 Q    So is that the cover of 122I, Mr. Boston?

18 A    Yes, sir.

19 Q    If we could, turn to the third page.  And on that

20 third page, Mr. Boston, what does the Robert Amsterdam

21 investigation relate to?

22 A    My understanding was he was investigating the

23 charter schools that are related to Mr. Gulen.

24 Q    And how did you learn that?

25 A    Through our discovery and from the defendant.

Boston - Direct

1          MR. GIBBS:  All right.  We can take that

2 down.

3 BY MR. GIBBS:

4 Q    Mr. Boston, you testified that the e-mail we

5 looked at with all the attachments, 122A, that was an

6 attachment that was going to be used for the weekly

7 conference call with Alptekin, correct?

8 A    Yes, sir.

9 Q    Did that conference call take place?

10 A    Yes, sir, it did.

11 Q    And was there anything different about that

12 conference call?

13 A    Yes, sir.  It was moved a day, and the defendant

14 was unable to be on the call.  I was supposed to be on

15 the call with General Flynn; however, he decided to do

16 the call himself at home.

17 Q    And so what happened after the call when he did it

18 at home by himself?

19 A    Yes, sir.  After the call, he sent a text message

20 to a number of us summarizing the details of the call.

21 Q    And it's already in evidence, but I'd like you to

22 take a look at Government Exhibit 40.  Now, in terms of

23 the text message from Michael Flynn summarizing the

24 call on October 22 --

25          One moment.

1           (Counsel confer.)

2     BY MR. GIBBS:

3     Q    Mr. Boston, can you just read this to yourself for

4     a moment?

5     A    Yes, sir.

6     Q    So, Mr. Boston, who was participating in this

7     particular call on the 22nd of October?

8     A    In the conference call, it was my understanding it

9     was General Flynn and Inovo BV, Mr. Alptekin.

10    Q    And then when the call was summarized in the text

11    message, what was the wider audience that that text

12    message was forwarded to?

13    A    Yes, sir.  Myself, the defendant, General Flynn's

14    son, and some other individuals.

15           MR. GIBBS:  And can we enlarge the call

16    again?  I just had a couple of questions about some of

17    the content.

18    BY MR. GIBBS:

19    Q    Now, the second line of Government Exhibit 40, it

20    talks about the tax issue that Mike B. and I discussed

21    this morning.  Is Mike B. yourself?

22    A    Yes, sir.

23    Q    What was the tax issue?

24    A    It was a reference based on our discovery that

25    charter schools that are affiliated with Mr. Gulen are

Boston - Direct

1  nonprofits and they may be doing work that would

2  potentially compromise their nonprofit status.

3  Q    That was, in fact, one of the objectives of the

4  project?

5  A    Yes, sir.

6         MR. GIBBS:  One moment, Your Honor.

7      (Counsel confer.)

8         THE COURT:  Mr. Gibbs.

9         MR. GIBBS:  Yes, Your Honor.  We are trying

10 to see if we can enlarge the very uppermost right

11 corner of the text message so it's visible.

12        THE COURT:  Well, it's repeated; isn't it?

13 It's already blown up; isn't it?

14 BY MR. GIBBS:

15 Q    All right.  At the end of the text message in

16 Government Exhibit 40, you indicate:  Bottom line, a

17 good call and we are on the right track.

18     By this point, Mr. Boston, have you received any

19 negative feedback from Ekim Alptekin about how things

20 are going?

21 A    No, sir.

22 Q    Now, let's jump ahead a couple of weeks to a

23 meeting at the FIG office.  Did there come a point in

24 time that you first met Ekim Alptekin in person?

25 A    Yes, sir.

1  Q     When was that?

2  A     To the best of my recollection, the very end of

3  October, first couple of days of November 2016.

4  Q     Can you describe how you came to first meet

5  Mr. Alptekin?

6  A     My understanding was he was in town for a

7  conference or a symposium or something like that.  He

8  came to our office suite to get -- instead of our

9  weekly conference call, since he was in town, we were

10 going to do the update in person.

11 Q     In preparation for doing the update in person, did

12 you also prepare documents for that meeting?

13 A     Yes, sir, I did.

14         MR. GIBBS:  If we could, pull up Government

15 Exhibit 128A, which is in evidence.  If we could,

16 enlarge that.

17 BY MR. GIBBS:

18 Q     Can you read that to yourself, Mr. Boston?  It

19 should be on your screen.

20       Now, Mr. Boston, in the first line of the e-mail,

21 you indicate:  We are scheduled to brief the client

22 this Wednesday at the FIG office suite at noon.

23       Who are you referring to as the client?

24 A     Yes, sir.  Inovo BV, Mr. Alptekin.

25 Q     And then, if we can, go to -- are there two

Boston - Direct

1   attachments to your e-mail?

2   A    Yes, sir, our presentation and the Gulenopoly.

3   Q    All right.  I'm not going to worry about the

4   Gulenopoly, but let's look at the first one.  That's

5   Exhibit 128B, the project update.  Is this one of the

6   items attached to your e-mail?

7   A    Yes, sir, it is.

8   Q    I am going to just -- I am just going to have you

9   testify to that, and we'll move on.

10       Now, following this e-mail with the attachments,

11  did the meeting with Mr. Alptekin actually take place

12  at the FIG offices in Alexandria?

13  A    Yes, it did.

14           MR. GIBBS:  Your Honor, I think you've done

15  this, but I just want to establish that the Court can

16  take judicial notice of the fact that this meeting did

17  occur in the Eastern District of Virginia.

18           THE COURT:  The Court has already taken

19  judicial notice that Alexandria is in the Eastern

20  District.

21           MR. GIBBS:  Okay.  Then we're good.  Thank

22  you.

23  BY MR. GIBBS:

24  Q    Mr. Boston, did you have any health issues prior

25  to that meeting?

Boston - Direct

1  A    Yes, sir.  I had a very bad cold.

2  Q    So what did you do in order to help set up the

3  meeting?

4  A    I prepared everything and made all the copies, had

5  the conference room set up, and participated in a few

6  minutes of the meeting.  I had a doctor's appointment,

7  so I had to leave early.

8  Q    Prior to leaving early --

9       First of all, who was chairing the meeting on

10 behalf of FIG?

11 A    Yes, sir, the defendant.

12 Q    And during the short period of time that you were

13 in the meeting, what was Mr. Alptekin's demeanor like?

14 A    From the very beginning, after we got through what

15 I'll call the pleasantries of him meeting everybody, he

16 seemed somewhat agitated.

17 Q    And, as you said, you had to leave early for a

18 doctor's appointment?

19 A    Yes, sir, I did.

20 Q    So you didn't see the rest of the meeting,

21 obviously?

22 A    I didn't, no.

23 Q    Following the meeting, did you get any indications

24 from the defendant about how the meeting went?

25 A    Not specifically, no.

Boston - Direct

1   Q    Okay.  Well, let me just jump to the exhibits

2   then.

3           MR. GIBBS:  If we could, go to Government

4   Exhibit 71, which is in evidence.  If you can, enlarge

5   the top.

6   BY MR. GIBBS:

7   Q    What is Government Exhibit 71?

8   A    Yes, sir.  That is an e-mail from the defendant to

9   Ekim Alptekin.  He CC'd myself and Brian McCauley --

10  Brian McCauley twice.  The subject is document, and

11  it's dated Friday, November 4, 2016, at 10:00 p.m. at

12  night.

13          MR. GIBBS:  Can we go down to the first line

14  of the first paragraph of the e-mail?

15  BY MR. GIBBS:

16  Q    Now, in the e-mail, the defendant said, Ekim, the

17  team is assembling the update document for review by

18  MF.  He intends to complete his review by close of

19  business tomorrow.

20      Mr. Boston, what was going on at this point in the

21  project?

22  A    Yes, sir.  My instructions were to compile any and

23  everything that we had done as part of this project

24  over approximately five to six weeks and compile that

25  information and get it to the defendant with the

1  understanding it was going to be sent to the client,

2  Mr. Alptekin.

3  Q    And you said that this was based on a number of

4  weeks of work.

5       If we can, go down to the fifth paragraph.

6       How many pages did the defendant say that this

7  work product would come out to be?

8  A    Just short of 700 pages.

9  Q    And what did you do after you got this e-mail?

10 A    I started working with the team for them to

11 compile all of their respective work, raw notes, etc.

12 for the project, compile it, and then get it to the

13 defendant.

14 Q    When you talk about "the team," this is the

15 Project Confidence team?

16 A    Yes, sir.

17 Q    Next, we can go to Government Exhibit 74.

18          MR. GIBBS:  If we can, enlarge the top and

19 the first couple of lines, if we could.  That's fine.

20 BY MR. GIBBS:

21 Q    What is Government Exhibit 74?

22 A    Yes, sir.  Well, it reads that it's from me to the

23 defendant.  This has to be a Virtru message that's

24 inverted because the context where it says, "Mike, I

25 feel terrible," are not my comments.  They are the

Boston - Direct

1    defendant's comments.

2    Q    Now, were you still sick at this point?

3    A    Yes, sir, I was.

4    Q    Did Virtru sometimes do that with e-mails?

5    A    Yes, sir.

6    Q    What's the subject of this e-mail?

7    A    Comments on the document layout.

8    Q    And was this part of pulling everything together

9    for the client?

10   A    Yes, sir, it was.

11             MR. GIBBS:   If we can, go to the middle of

12   that e-mail and enlarge it under -- yeah.   Let's see.

13   BY MR. GIBBS:

14   Q    Mr. Boston, in the middle of that e-mail, next to

15   congressional action, it says:   Hearings-McCaul,

16   Rohrabacher, Royce.

17        Now, Mr. Boston, was one of the objections of this

18   product to have congressional hearings?

19   A    Yes, sir, it was.

20   Q    What would those hearings be about?

21   A    Bringing up derogatory information about Mr. Gulen

22   that would potentially change his legal status in the

23   United States.

24   Q    All right.   Thank you.

25        I would like you to take a look at Government

1   Exhibit 139, which is in the binder.  What is

2   Government Exhibit 139?

3   A    Yes, sir.  That's an e-mail from myself to the

4   defendant.  It's dated November 5 at 6:46 p.m.

5   Q    And what did this e-mail relate to?

6   A    Yes, sir.  It related to the comments on the

7   document layout.

8          MR. GIBBS:  Your Honor, at this time, we

9   would ask to move that exhibit in, 139.

10          THE COURT:  Any objection?

11          MR. TROUT:  No, Your Honor.

12          THE COURT:  Without objection, 139 is

13  admitted.

14  BY MR. GIBBS:

15  Q    All right.  So, Mr. Boston, we see the e-mail here

16  before us on the screen, and there's different color

17  font.  There's some red and some that are -- it look

18  like blue or black.  Can you explain the difference in

19  font color here?

20  A    Yes, sir.  It's a combination of e-mails.  In

21  Virtru, it's very difficult to forward and reply to

22  e-mails.  So the different colors are my comments,

23  and/or some of the other comments are the defendant's

24  original e-mail.

25  Q    This e-mail is between you and the defendant?

1  A     Yes, sir, it is.

2           MR. GIBBS:  Now, if we go to the bottom of

3  that document on page 1, if we could, enlarge it.

4  BY MR. GIBBS:

5  Q     Now, at the bottom of page 1, it says:

6  Congressional action, hearings -- McCaul, Roharabacher,

7  Royce.

8          You testified about that a moment ago.

9          Then in red, it says:  As you already know, they

10 gave us a fairly high bar that this isn't a fishing

11 expedition.

12         Whose comments are they in red?

13 A     Yes, sir.  Those are my comments.

14 Q     What was the reference to a fairly high bar that

15 this isn't a fishing expedition to?

16 A     Yes, sir.  In our meeting with Miles Taylor, who

17 was the national security advisor for Chairman McCaul,

18 during that meeting, he set a very high bar for --

19 they're not just going to hold public hearings on

20 someone without a significant amount of factual basis

21 to have that kind of congressional testimony.  So

22 they're not just going to *ad hoc* call a meeting for us.

23 Q     All right.  Thank you.

24         Next, we can go to Government Exhibit 73A.  If we

25 could, pull that up.

Boston - Direct

1    Mr. Boston, what is 73A?

2 A    Yes, sir.  That's an e-mail from the defendant to

3 Ekim Alptekin and CCing myself, General Flynn, and

4 Brian McCauley.  The subject is working papers.  It's

5 dated Saturday, November 5, 2016, at 11:30 at night.

6 It contains a couple of attachments.

7 Q    Those couple of attachments, was this material

8 that had been pulled together to get to Mr. Alptekin?

9 A    Yes, sir, that is my understanding.

10 Q    All right.  Let's look at some of those

11 attachments.  I want to go to 73B, which is in

12 evidence.  Mr. Boston, just for the record, what is

13 73B?

14 A    Yes, sir.  That's a slide that basically talks

15 about where we are August 15.  It's around the project

16 engagement date, if you will, and it covers what FIG

17 has done to date.

18 Q    And this was a document prepared for Mr. Alptekin

19 specifically?

20 A    Yes, sir, it was.

21         MR. GIBBS:  Can we enlarge that second

22 column?

23 BY MR. GIBBS:

24 Q    Can you read that to yourself, Mr. Boston.

25         Now, in 73B, that column talks about where we are

1  changing the narrative from and then to.  Immediately

2  under to, it says FG is a terrorist.  Who is FG a

3  reference to?

4  A    That's a reference to Mr. Gulen.

5           MR. GIBBS:  Then, if we could, enlarge the

6  third column.

7  BY MR. GIBBS:

8  Q    If you could, read that to yourself.

9      Now, Mr. Boston, in the third column, it talks

10  about -- among others things, it talks about where

11  we're headed.  It talks about changing the public

12  perception, educating Congress, and exposing Turkey's

13  Osama bin Laden.

14      So by early November, was the project still

15  exclusively focused on Fethullah Gulen?

16  A    Yes, sir.

17  Q    Was it still focused on getting U.S. Congress to

18  scrutinize his activities here?

19  A    Yes, sir, it was.

20  Q    Then, if we could, pull up the fourth column.  If

21  you could, just read that to yourself.

22      Again, so this would go to Ekim Alptekin.  And

23  under "How Will We Get There," it indicates:  Expose FG

24  as a strategic national security threat.

25      Was that also one of the objectives of Project

Boston - Direct

1  Confidence?

2  A     Yes, sir.

3            MR. GIBBS:  All right.  Thank you.  We can

4  take that off.

5  BY MR. GIBBS:

6  Q     Next, if I can have you take a look -- because I

7  don't believe it's in evidence -- Government

8  Exhibit 75.

9            THE COURT:  Thank you, Mr. Gibbs.

10           We're going to take our luncheon recess at

11  this time.  You are excused until 2:00.  Do not discuss

12  this case among yourselves.

13           (The jury exits at 1:00.)

14           THE COURT:  We'll stand in recess.

15           Mr. Boston, do not discuss your testimony

16  during the luncheon recess.

17           ------------------------------------
                    Time:  1:00 p.m.
18

19

20

21

22       I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24

25                                 _____
                                    /s/
                           Rhonda F. Montgomery, CCR, RPR