UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:18cr457
                              .
      vs.                     .    Alexandria, Virginia
                              .    July 17, 2019
BIJAN RAFIEKIAN,              .    2:00 p.m.
                              .
              Defendant.      .    Day 3 (PM Session)
                              .    Pages 516 - 658
. . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ANTHONY J. TRENGA
UNITED STATES DISTRICT JUDGE
AND A JURY

APPEARANCES:

FOR THE GOVERNMENT:          JAMES P. GILLIS, AUSA
                             JOHN T. GIBBS, AUSA
                             S. KATE SWEETEN, SAUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR DEFENDANT RAFIEKIAN:     ROBERT P. TROUT, ESQ.
                             Trout, Cacheris & Solomon, PLLC
                             1627 I Street, N.W., Suite 1130
                             Washington, D.C. 20006
                               and
                             MARK J. MacDOUGALL, ESQ.
                             STACEY H. MITCHELL, ESQ.
                             JOHN C. MURPHY, ESQ.
                             JAMES E. TYSSE, ESQ.
                             Akin, Gump, Strauss, Hauer &
                             Feld, LLP
                             Robert S. Strauss Building
                             1333 New Hampshire Avenue, N.W.
                             Washington, D.C. 20036-1564


THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

517

1    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Third Floor
2                                    401 Courthouse Square
                                     Alexandria, VA 22314
3                                    (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

518

I N D E X

|  | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| **WITNESSES ON BEHALF OF THE GOVERNMENT:** | | | |
| Michael Boston (Resumed) | 519 | 524 | 531 |
| John Michael Elliott | 533 | 554 | |
| David Enders | 555 | 565 | |
| Thomas Neer | 571 | 589 | 594 |
| James Graham Miller | 595 | 633 | 654 |

EXHIBITS

|  | MARKED | RECEIVED |
|---|---|---|
| **GOVERNMENT'S:** | | |
| No. 30B | | 617 |
| 79A | | 627 |
| 79B | | 629 |
| 81 | | 632 |
| 98 | | 606 |
| 142 | | 574 |
| 143 | | 546 |
| 144 | | 548 |
| 146A | | 582 |
| 146B | | 583 |
| 152 | | 545 |
| **DEFENDANT'S:** | | |
| No. 51 | | 651 |
| 102 | | 658 |
| 106 thru 110 | | 646 |
| 111 | | 645 |
| 112 | | 646 |
| 113 | | 654 |

1                         P R O C E E D I N G S

2                           (Jury present.)

3              THE COURT:  All right, Mr. Gibbs?

4              Mr. Boston, you remain under oath.

5              THE WITNESS:  Yes.

6              MR. GIBBS:  Yes, Your Honor.

7                 MICHAEL BOSTON, GOVERNMENT'S WITNESS,

8                      PREVIOUSLY AFFIRMED, RESUMED

9                      DIRECT EXAMINATION (Cont'd.)

10   BY MR. GIBBS:

11   Q.   Good afternoon, sir.  Mr. Boston, when we broke for lunch,

12   we were talking about the efforts after the meeting in

13   November, when you were sick, to pull those packages together

14   for Mr. Alptekin.

15              Do you recall that?

16   A.   Yes, sir.

17   Q.   If we could pull up Government Exhibit 75, which is in

18   evidence.  Can we enlarge the top, starting with --

19              Mr. Boston, what is Government Exhibit 75?

20   A.   Yes, sir.  It's an e-mail from the defendant to

21   General Flynn and myself on Saturday, November 5, 2016, at

22   almost 11:30 at night.

23   Q.   And what does the message say?  Can you just read it out

24   loud?

25   A.   Yes, sir.  It says:  Thank you, Mike.  We will send out

1   the packages now.  All the best, Bijan.

2   Q.   Now, what were the packages he referred to there?

3   A.   Yes.  The compilation of documents that the team had put

4   together for the client.

5   Q.   And that was on November 5?

6   A.   Yes, sir.

7   Q.   If we could turn to Government Exhibit 78A and November 7.

8   This is already in evidence.  Could we enlarge the top there?

9         And what is Government Exhibit 78A?

10  A.   Yes, sir.  It's an e-mail from the defendant to Ekim

11  Alptekin.  It cc's General Flynn, Brian McCauley, and myself.

12  And it says Subject:  Assessment Report, dated Monday,

13  November 7, 5:30 in the afternoon, and it's got an attachment

14  of ONGOINGINVESTIGATIONGULEN.FINAL.pdf.

15  Q.   All right.  ONGOINGGULEN.FINAL.

16        Next, if we could highlight the third and fourth

17  paragraph of that e-mail.  And if you could read that to

18  yourself, Mr. Boston.

19        All right.  So in this e-mail, the defendant said

20  that there is no room for skillful criminals who hide behind

21  their masked ideologies.  It is my opinion that Mullah

22  Fethullah Gulen matches such a profile precisely.

23        Was that statement by the defendant consistent with

24  the type of information this project was designed to uncover?

25  A.   Yes, sir.

1              MR. GIBBS:  Thank you.  We can take that off.

2    BY MR GIBBS:

3    Q.   Now, Mr. Boston, at some point, did you become aware of

4    the op-ed piece that appeared in *The Hill* newspaper under

5    Michael Flynn's name that related to Fethullah Gulen?

6    A.   Yes, sir, I did.

7    Q.   How did you first learn of that op-ed?

8    A.   Yes, sir.  From one of the other team members, Graham

9    Miller.  He contacted me reference some sourcing for the op-ed.

10   Q.   And was he asking you to help him do some sourcing for the

11   op-ed?

12   A.   Yes, sir.  He had -- yes, sir, he had.

13   Q.   And what did you do as a result of that request?

14   A.   I went to find some internet sources that would support

15   the body of the op-ed.

16   Q.   Next, if we could go to Government Exhibit 82, that is

17   also in evidence.  And if we could maybe highlight the top

18   portion first so it's easier to read.

19              And what is Government Exhibit 82?

20   A.   Yes, sir.  That's an e-mail from myself on Friday,

21   November 11, to the defendant, and it says "Update."

22   Q.   And did the e-mail contain some updates?

23   A.   Yes, sir, it did.

24   Q.   And if we could go down into the body of the e-mail, and

25   the one -- highlight the paragraph that begins:  "General

1   Flynn's Op-ed Piece."

2            Can you read that to yourself, Mr. Boston?

3            Now, in the e-mail, it mentions that Sphere received

4   instructions to place General Flynn's op-ed piece as quickly as

5   possible.  You mentioned Graham Miller earlier.  Who does

6   Graham Miller work for?

7   A.   Yes, sir.  He's one of the principals at Sphere

8   Consulting.

9   Q.   And is that the person you were helping try to do some

10  sourcing with the op-ed?

11  A.   Yes, sir.

12  Q.   And this was one of the updates in the e-mail, correct?

13  A.   Correct.  Yeah, that's -- those are his words.

14  Q.   All right.  And then if we can next go to Government

15  Exhibit 83, which is also in evidence.

16            And what is Government 83, Mr. Boston?

17  A.   Yes, sir.  It's an e-mail from the defendant to Ekim

18  Alptekin.  I'm cc'd as well as Robert Kelley, and it said:

19  Recommended Statement by Sphere, and it's dated Friday,

20  November 11, at almost 5:30 in the afternoon.

21  Q.   What was going on at this time that required Sphere to

22  make a statement?

23  A.   Yes, sir.  They had received a number of phone calls,

24  referenced the op-ed and whether or not they also had received

25  calls with reference to General Flynn specifically commenting

1    as well about the op-ed for an interview.

2    Q.   And so if we can blow up the third paragraph of that

3    e-mail.

4            Can you read -- actually, can you read that out loud,

5    Mr. Boston?

6    A.   Yes, sir.  It says:  We stand by to assist as needed.

7    This environment will continue to persist.  Facts do not

8    change.  We do not work for any government.  You do not work

9    for any government, and Inovo is a longstanding company with

10   other businesses and clients.

11   Q.   And this was the defendant saying that in his e-mail?

12   A.   Yes, sir.

13   Q.   Now, during your time working as the project manager for

14   Operation Confidence, did the defendant tell you very much

15   about this company, Inovo?

16   A.   No, sir.

17   Q.   Did Ekim Alptekin tell you anything about this company,

18   Inovo?

19   A.   Nothing.

20   Q.   How much did you learn about Inovo while working on the

21   project as the project manager?

22   A.   Almost nothing.

23   Q.   And, Mr. Boston, what happened to FIG soon after this

24   e-mail?

25   A.   Yes, sir.  Shortly after this e-mail, General Flynn had

1    been selected to be the national security adviser, so the

2    decision was made by the corporate officers to close down the

3    corporation.

4    Q.   And what happened to Project Confidence?

5    A.   It closed down as well.

6              MR. GIBBS:  Okay.  One moment, Judge.

7              Mr. Boston, that's all I have for you.

8              THE WITNESS:  All right.

9              MR. GIBBS:  I believe the defense will have some

10   questions.  Thank you, sir.

11             THE COURT:  Mr. Trout?

12             MR. TROUT:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14   BY MR. TROUT:

15   Q.   Mr. Boston, my name is Bob Trout.  I represent Mr. Kian.

16             We haven't spoken before, have we?

17   A.   Not that I'm aware, no, sir.

18   Q.   Just very quickly, you testified about the use of

19   encryption software, Signal and Virtru, I think?

20   A.   Yes, I did.

21   Q.   All right.  General Flynn had been the director of the

22   Defense Intelligence Agency involved in intelligence

23   activities, correct?

24   A.   Yes, sir.

25   Q.   And you -- I think you probably are aware that there is a

Boston - Cross                                                      525

1   great deal of attention given to the threats of cybersecurity,

2   correct?

3   A.   Yes.

4   Q.   So it's not remarkable to you that this company that

5   Mr. Flynn headed would use encryption software, is it?

6   A.   No.

7   Q.   Okay.  Now, I want to direct your attention, I believe

8   it's to Government's Exhibit 43.  Let me ask you to look at

9   actually Exhibit 43B.

10           If we can pull that up.  It's in evidence.

11           So this is the talking points that you prepared?

12  A.   Yes, sir.

13  Q.   And it was in anticipation of an upcoming weekly phone

14  call?

15  A.   Yes.

16  Q.   With the client?

17  A.   Um-hum.

18  Q.   Mr. Alptekin?

19  A.   Yes, sir.

20  Q.   I'd like to direct your attention to the second page.  Do

21  you see under the paragraph entitled "Advantages"?  Is this

22  something you wrote?

23  A.   Not completely, no.

24  Q.   But it expresses the considered thinking of the team, does

25  it not?

1    A.    Yes, sir.

2    Q.    All right.  And would you read that paragraph aloud to the

3    jury, please?

4    A.    "The subject is widely viewed as a legitimate political

5    dissident seeking refuge in the United States.  The request for

6    extradition has raised the subject's public appraised value.

7    This action has created even a stronger shield for the subject.

8    Consolidation and centralization of power by the leadership in

9    the subject's home country provides an easy conclusion by the

10   public that he is an old man of God despised by an

11   authoritarian leader in his home country.  Any criticism of the

12   subject's acts is immediately interpreted as political

13   pressure, illegitimate smear campaign, and unjust attacks on a

14   nice old man.  Our asymmetric assessment indicates that an

15   announcement lifting the extradition request by his home

16   country will reduce the public appraised value of the subject.

17   This action, if executed, will open the space necessary for

18   public scrutiny of the subject's activities.  This action will

19   reduce the subject's shield of legitimacy as a political

20   dissident.  The extradition request has made the subject a lot

21   more important than he really is."

22   Q.    And that was the assessment of the team that had been

23   working on this now for, what, about a month?

24   A.    Actually, less than a month.

25   Q.    Let me ask you to turn to 70 -- excuse me -- 43C.  And

1    this is an initial mockup of the Gulenopoly board game,

2    correct?

3    A.    Yes.

4    Q.    Where did that idea come from?

5    A.    Sphere Consulting.

6    Q.    That was not something that Mr. Alptekin proposed to you

7    or the people --

8    A.    Not that I recollect, no.

9    Q.    Okay.  Let me direct your attention then to Government

10   Exhibit 73, I think it is.  So if you could look at 73A.

11           This is an e-mail of November 5, sometime after the

12   November -- excuse me -- the October 14 talking points memo,

13   correct?

14   A.    Yes.

15   Q.    And you attached with that various working papers,

16   correct?

17   A.    This isn't my e-mail, so I didn't attach anything.

18   Q.    All right.  Well, I apologize.

19           So attached to this e-mail were various working

20   papers, correct?

21   A.    Correct.

22   Q.    All right.  So if you could go to B, 73B.

23           Was this your work?

24   A.    I might have had some small input into this, but this is

25   not something that I personally created, not that I recollect.

1   Q.   All right.  But on the left side, it's kind of where we

2   started, correct?

3   A.   Yes.

4   Q.   And then it's where we are on November 4, 2016?

5   A.   Correct.

6   Q.   And then it's where are we headed; is that correct?

7   A.   Um-hum.

8   Q.   And with a discussion of how we will go there.

9        Let me then ask you to turn to the next page.  This

10  is -- or the next two pages, I guess.

11       Do you see "Advantages" again?

12  A.   Yes, sir.

13  Q.   And essentially, the same point is being made there, that

14  what ought to happen to create the opportunity to really go

15  after Gulen is to withdraw the extradition request, correct?

16  A.   Yes.  That's one potential outcome.

17  Q.   So nothing had really changed from October 14 until

18  November 4, is that correct, in terms of that recommendation?

19  A.   That was one of the recommendations.

20  Q.   Mr. Boston, do you recall any discussion internally or

21  with Sphere where there was some hope that if you did a good

22  job in this case, on this particular project, on this contract,

23  you would get actually a bigger -- there was an opportunity to

24  maybe get a bigger contract down the road?

25  A.   That was inferred, yes.

1    Q.    And was Sphere going to be part of that?

2    A.    My assumption would be yes; if the contract was extended,

3    yes.

4    Q.    There was -- there had been discussion -- and we, we saw

5    reference to it -- to plans for lobbying.  Do you recall seeing

6    those references?

7    A.    I'm sorry, could you restate that?

8    Q.    There were some plans for lobbying that was reflected in

9    some of the documents that we previously reviewed.

10   A.    Okay.

11   Q.    Do you recall what those plans were?

12   A.    It was based on the Gulen briefing sheet and talking to a

13   number of either senior government officials or elected members

14   of the House or potentially Senate.

15   Q.    And there was a hope for some hearings as well, correct?

16   A.    Yes.

17   Q.    All right.  Now, this was a -- the briefing sheet was

18   basically about what they intended to do in the future,

19   correct?

20   A.    Yes.

21   Q.    Did they do any of that?

22   A.    Did Sphere?  Who's "they"?

23   Q.    Well, did FIG do any of that as part of this contract?

24   A.    I would consider the meeting with Miles Taylor exactly

25   that.

1   Q.   Well, that was a meeting that occurred with Miles Taylor,

2   but there were also some additional meetings that were planned,

3   correct?

4   A.   I can't talk to what -- who Sphere may have engaged in

5   discussions about this, but my understanding is that they

6   engaged more than -- more than Miles Taylor was engaged.

7   Q.   Well, you were aware that Sphere had filed its own

8   Lobbying Disclosure Act forms, correct?

9   A.   I'm briefly aware of a side e-mail from -- where I got

10  Robert Kelley to counsel for FIG partnered up with Graham

11  Miller, and I didn't get involved.  I just connected them on

12  e-mail.

13  Q.   But you're not aware of any lobbying activity done by

14  Mr. Kian other than participating in the Miles Taylor meeting,

15  are you?

16  A.   Not that I recollect, no.

17  Q.   You're not aware of any of the other FIG employees doing

18  any lobbying work, correct?

19  A.   No.

20  Q.   So whatever discussion there was about the plan for

21  lobbying in the future, that lobbying work actually never

22  occurred because FIG basically closed down, correct?

23  A.   That's a fair assessment.

24  Q.   So FIG closed down because Michael Flynn was designated to

25  be the national security adviser?

1   A.   That's my understanding, yes.

2   Q.   And so there was basically the end of the contract with

3   Mr. Alptekin, correct?

4   A.   Yes.

5   Q.   And Mr. Flynn actually did become the national security

6   adviser on Inauguration Day, correct?

7   A.   Yes.

8   Q.   Did you stay in touch with Mr. Flynn?

9   A.   No.  Other than one message on that day to congratulate

10  him, but I've had no contact since then.

11  Q.   But you were aware that on February 13, Mr. Flynn resigned

12  as national security adviser, correct?

13  A.   It was widely published in the media, yes.

14  Q.   Okay.  And do you know what Mr. Flynn did after he was no

15  longer a government employee?

16  A.   No, sir.

17          MR. TROUT:  No further questions.

18          THE COURT:  All right.  Any redirect?

19          MR. GIBBS:  Briefly, Judge.  Thank you.

20                    REDIRECT EXAMINATION

21  BY MR. GIBBS:

22  Q.   Mr. Boston, Mr. Trout asked you at the beginning of your

23  cross-examination about these encryption applications, Virtru

24  and Signal.

25          Do you recall that?

1   A.    Yes, sir.

2   Q.    Now, who is the person who told you to communicate that

3   way on Project Confidence?

4   A.    The defendant, sir.

5   Q.    And you were also asked on cross-examination about some of

6   those comments in the working papers that indicated that

7   constantly pushing to extradite Fethullah Gulen sort of

8   perversely raises his profile and ends up making him more

9   sympathetic.

10          Do you recall those questions?

11  A.    Yes, sir, I do.

12  Q.    Now, did the defendant ever say to you that FIG should

13  recommend against extraditing Fethullah Gulen back to Turkey?

14  A.    Absolutely not.

15  Q.    Did Alptekin ever say that?

16  A.    Absolutely not.

17          MR. GIBBS:  Thank you, sir.

18          THE COURT:  All right.  May the witness be excused?

19          MR. GIBBS:  He may.

20          THE COURT:  All right.  Mr. Boston, you're excused.

21  Do not discuss this -- your testimony outside of the courtroom.

22          THE WITNESS:  Yes, Your Honor.

23                      (Witness excused.)

24          THE COURT:  Next witness.

25          MR. GIBBS:  Mick Elliott, Your Honor.

1          THE COURT:  All right.  Mick Elliott will come

2    forward, please.

3         JOHN MICHAEL ELLIOTT, GOVERNMENT'S WITNESS, AFFIRMED

4                       DIRECT EXAMINATION

5          THE COURT:  All right, Mr. Gibbs.

6          MR. GIBBS:  Thank you, Your Honor.

7    BY MR. GIBBS:

8    Q.   Good afternoon, sir.  Can you please tell us your name?

9    A.   John Michael Elliott.

10   Q.   And, Mr. Elliott, can you give us a brief overview of your

11   employment history?

12   A.   After 26 years, I retired from federal law enforcement as

13   a special agent with the FBI.  Of those 26 years, I spent seven

14   years with the Naval Criminal Investigative Service.  After

15   retiring, I started my own investigative consulting business,

16   where I do primarily financial fraud investigations for private

17   clients and for attorneys.  I am a certified fraud examiner.

18   I'm also a licensed private investigator in California and

19   Massachusetts.

20   Q.   All right.  Thank you, Mr. Elliott.  Now, do you know a

21   gentleman by the name of Thomas Neer, N-e-e-r?

22   A.   I do.

23   Q.   How did you two first meet?

24   A.   I met Tom in 1982, when we were both assigned to aircraft

25   carriers out of Norfolk with the Naval Criminal Investigative

Elliott - Direct                                                        534

1   Service.

2   Q.   And over the years, did you stay in touch with him?

3   A.   Yes.

4   Q.   And were you contacted by Mr. Neer in around the fall of

5   2016?

6   A.   Yes, I was.

7   Q.   All right.  Without telling us what Mr. Neer specifically

8   said, what was the topic you discussed with him at that time?

9   A.   The topic was his involvement with the Flynn Intel Group

10  in a project that he was doing for them.

11  Q.   And as a result of that conversation with Mr. Neer, did he

12  put you in touch with somebody else?

13  A.   Yes, he did.

14  Q.   And who was that person?

15  A.   That was Brian McCauley, with the -- with the Flynn Intel

16  Group.

17  Q.   Had you ever met Mr. McCauley before?

18  A.   No.

19  Q.   And after being put in touch with him, did you discuss a

20  proposed project with him?

21  A.   Yes.

22  Q.   And based on that discussion, what was your understanding

23  as to what this project was about?

24  A.   My understanding was this was a project wherein I would do

25  the background investigation on certain individuals involved

Elliott - Direct                                                          535

1    with the Gulen movement, to include Mr. Gulen himself.

2    Q.   And when you say "Mr. Gulen himself," is that Fethullah

3    Gulen?

4    A.   That is correct.

5    Q.   Had you heard of Fethullah Gulen before being contacted by

6    Mr. McCauley?

7    A.   I had not.

8    Q.   And what sorts of services did you advise Mr. McCauley you

9    could provide on this project?

10   A.   I could do background investigations, basically we call it

11   profiling, which would be to look at a person's address

12   history, criminal and civil filings, bankruptcies, liens,

13   judgments, business associates, relatives, and business

14   ownerships.

15   Q.   And so after giving Mr. McCauley sort of the scope of what

16   you could potentially do on a project like this, did, did he

17   indicate to you to expect being contacted by another

18   individual?

19   A.   Yes, he did.

20   Q.   And who was the individual you should expect a call from?

21   A.   That would be Ekim Alptekin.

22   Q.   And, in fact, were you subsequently contacted by Ekim

23   Alptekin?

24   A.   I was.

25   Q.   Had you ever met him before?

Elliott - Direct                                                            536

1    A.    No.

2    Q.    Ever talk to him before?

3    A.    No.

4    Q.    And so what -- how was the first contact -- what type of

5    contact was it with Mr. Alptekin the first time?

6    A.    As I recall, he called me.  We had a brief discussion on

7    the telephone regarding what my investigative requirements

8    would be.

9    Q.    Do you know how he got your phone number?

10   A.    I presume he got it from Mr. McCauley.

11   Q.    And what did you tell him in that -- you said you told him

12   kind of the nature of what you could provide?

13   A.    I told him what my capabilities are, basically the same as

14   what I told Mr. McCauley, in terms of background

15   investigations, bankruptcies, liens, judgments, address

16   history, associates, business ownerships, things of that

17   nature.

18   Q.    And was anything formally finalized after that phone call?

19   A.    Not formally.

20   Q.    And did you have a subsequent conversation -- or, yeah,

21   communication with Ekim Alptekin after that first phone call?

22   A.    I did.

23   Q.    All right.  What was the second communication?

24   A.    The second communication was via Skype.

25   Q.    Can you explain what Skype is?

Elliott - Direct                                                537

1   A.   Skype is a video communications where you have

2   simultaneous video with a person that you're speaking with on

3   your laptop screen.

4   Q.   And what was discussed in the Skype conversation with Ekim

5   Alptekin?

6   A.   Mr. Alptekin was a little more specific as to his

7   characterization of Mr. Fethullah Gulen.  He characterized

8   Mr. Gulen in certain ways and requested that I provide the

9   investigative assistance to him.

10  Q.   And what date was the Skype communication with

11  Mr. Alptekin?

12  A.   As I recall, October 12, I believe, 2016.

13  Q.   And in the course of this Skype communication, did Ekim

14  Alptekin characterize Fethullah Gulen in any particular way?

15  A.   He did.

16  Q.   What did he say?

17  A.   He characterized Mr. Gulen --

18           MS. MITCHELL:  Objection.

19           THE COURT:  Sustained.  What's, what's the purpose of

20  this?

21           MR. GIBBS:  I mean, this is the co-conspirator,

22  Judge.

23           MS. MITCHELL:  Objection, Your Honor.

24           THE COURT:  Well, let me see counsel.

25           (Bench conference on the record.)

1          THE COURT:  All right.  I'm going to let in what he

2    said for the purposes of explaining what he did but not

3    otherwise.

4          MR. GIBBS:  Are you talking about Elliott or

5    Alptekin?

6          THE COURT:  Alptekin.

7          MR. GIBBS:  Well, Judge, this is the outgrowth of the

8    testimony we heard earlier today that McCauley said FIG and

9    Alptekin wanted to get dirt on all these Gulen people.

10          THE COURT:  Right.

11          MR. GIBBS:  At this point, as I understand the

12   Court's ruling, the co-conspirator statements, he said they

13   could not come in except for the effect on the listener, but

14   it's without prejudice to the government re-raising the

15   possibility of having them come in as co-conspirator

16   statements.

17          We would, you know, state that, you know, these are

18   Alptekin statements.  They're very closely connected to the

19   project.  This was a direct outgrowth of the project, and it

20   gets back to this digging up dirt on Gulen.

21          I'll make an offer of proof.  He would say at the end

22   of this Alptekin told him he needed to get this information

23   quickly on these different Gulen something because he had to

24   report to the board.

25          THE COURT:  I'm sorry?

1            MR. GIBBS:  He had to report to the board.  So he

2     didn't say it was for Inovo.  He didn't say it was for his

3     private company.  He indicated it was for the board, which we

4     believe helps to demonstrate the conspiracy.  This was, in

5     fact, for the Turkish government and not for a legitimate

6     private business.

7            THE COURT:  Well --

8            MS. MITCHELL:  May I be heard, Your Honor?

9            THE COURT:  Go ahead.

10           MS. MITCHELL:  Your Honor, actually we had almost

11    moved to preclude this entire witness.  We don't see the

12    relevance at all.  Mr. McCauley provided a phone number to this

13    individual.  It was quite clear that this individual did not

14    have any interaction with FIG or the defendant.

15           The fact that Alptekin was having a separate

16    conversation with him, particularly given the government's

17    revelation last Friday, is no surprise.  It cannot be and they

18    don't have any connection to our client.  And, in fact, this

19    witness will testify that he wouldn't work with FIG because

20    they didn't have their act together, so there is no connection

21    with this witness.

22           I was being patient, but I don't see the relevance,

23    and I object strenuously.

24           THE COURT:  The only context here is, as I understand

25    it, this is the fellow that McCauley put Alptekin in touch

Elliott - Direct                                                    540

1   with, right?

2           MR. GIBBS:  Right, because --

3           THE COURT:  At Alptekin's request.  He said he wanted

4   somebody.

5           MR. GIBBS:  Right.  But, again, as part of the same

6   project.  We would view this, obviously, as a conspiracy --

7           THE COURT:  I understand.

8           MR. GIBBS:  -- where Alptekin and Rafiekian are both

9   members.

10          They don't have to know every act committed in

11  furtherance of the conspiracy.

12          THE COURT:  I'm still not going to allow his,

13  Alptekin's statement in under the co-conspirator exception.

14  I'm going to let you ask this witness based on what Alptekin

15  said what he did, what explains what he did, but I'm not going

16  to let in substantively what you're suggesting he's going to

17  say Alptekin said at the end of that.

18          MR. GIBBS:  Okay.

19          THE COURT:  All right?

20          MR. GIBBS:  Okay.  That's fine, Judge.

21          THE COURT:  All right.  I think you can say that

22  based on what he said, he realized he needed to get something

23  quickly to Alptekin.

24          MR. GIBBS:  Yeah.  I mean, just so we don't keep

25  going back and forth up here, I'll make an offer of proof.  I

Elliott - Direct                                                          541

1    think the defense has the exhibits, but Elliott will say he

2    received a list of individuals to do background research on

3    from Alptekin.  He did.  He can talk about that, I assume, it's

4    an e-mail.

5            THE COURT:  Right.

6            MR. GIBBS:  He'll talk about, you know, the reports

7    he prepared as part of this project, who they were focused on,

8    and then how he was paid.  I can certainly bring all that out.

9            MS. MITCHELL:  Your Honor --

10           MR. GIBBS:  Yeah.  Yeah.  And, Judge, this does sort

11   of corroborate what was said in front of the defendant already

12   about, you know, them needing to try to get dirt on Gulen.

13   Sphere wasn't willing to do that.  That's really not in

14   Boston's lane.  But they had somebody who would do this

15   background information on Gulen.

16           MS. MITCHELL:  So to be clear, actually, FIG wouldn't

17   do it, and so FIG did the courtesy of getting him somebody who

18   would do it.

19           THE COURT:  That's what I understood McCauley's

20   testimony.

21           MS. MITCHELL:  Yes.  McCauley said that, and, Your

22   Honor, the government, to my knowledge, has absolutely zero

23   evidence to suggest that the report that this gentleman put

24   together ever got to FIG.

25           THE COURT:  All right.

1           MR. GILLIS:  Actually, I beg your pardon, Your Honor.

2   So my recollection of the testimony is that McCauley testified

3   that he was asked in front of the defendant to do the things

4   that Elliott would testify he did, was asked to do by Alptekin.

5   So we have evidence that McCauley said to the defendant --

6   rather, Alptekin said to McCauley, "I want you to get dirt on

7   these people," in front of the defendant.

8           And then McCauley said, "I won't do it."

9           THE COURT:  Right.

10          MR. GILLIS:  "But here's the number of somebody who

11  will."

12          And then there's a call to this guy, and he deals

13  directly with Alptekin.

14          THE COURT:  Right.

15          MR. GILLIS:  So separate from the copyright issue,

16  this shows that there was this --

17          THE COURT:  Well, I'm going to let you bring out what

18  he did in response to the request from Alptekin and who he gave

19  that information to.  What I'm not going to allow in are the

20  hearsay statements that I understand you want to bring in from

21  Alptekin about what he was going to do with the information,

22  who he was going to give it to.

23          MR. GILLIS:  But may I ask one question?

24          THE COURT:  Yeah.

25          MR. GILLIS:  So with respect to what was asked by

1    Alptekin of McCauley, "I want you to get dirt on these

2    people" --

3               THE COURT:  Right.

4               MR. GILLIS:  -- that is basically what this guy would

5    say.

6               Is that correct?

7               MR. GIBBS:  Yeah.  He was asked to do an

8    investigation of Gulen in this country.

9               MR. GILLIS:  So may we be allowed to ask what he was

10   asked by Alptekin and not what he did then with that

11   information, but simply to show that what, what Alptekin said

12   in front of the defendant is the same thing that Alptekin is

13   now asking --

14              THE COURT:  I'm going to allow you to bring out what

15   he did in response to a request from Alptekin.

16              MR. GILLIS:  Okay.

17              THE COURT:  All right?  And what he did -- what he

18   did with this information.

19              MR. GILLIS:  Okay.

20              THE COURT:  What this witness did with the

21   information.

22              MR. GILLIS:  Okay.

23              THE COURT:  All right?

24              MS. MITCHELL:  Just so the record is clear, they may

25   not go into --

Elliott - Direct                                                        544

1          THE COURT:  What Alptekin was saying about what he

2   was going to do with the information.

3          MS. MITCHELL:  Thank you, Your Honor.

4          (End of bench conference.)

5   BY MR. GIBBS:

6   Q.   All right.  So, Mr. Elliott, in the conversation you had

7   with Mr. Alptekin, without saying specifically what he said,

8   what individual was being discussed in that conversation?

9   A.   Mr. Fethullah Gulen.

10  Q.   And what type of information was desired about Fethullah

11  Gulen?  Positive or negative?

12  A.   Negative.

13  Q.   And what was your response following this conversation?

14  A.   I explained to Mr. Alptekin what my capabilities were and

15  how I would go about conducting my investigations.

16  Q.   And did you ultimately receive an e-mail from Alptekin

17  about this proposed engagement?

18  A.   Yes, I did.

19  Q.   Could you take a look at Government Exhibit 152?

20  A.   Okay.

21  Q.   Do you have it there, sir?

22  A.   I do.

23  Q.   And what is Government Exhibit 152?

24  A.   This is an e-mail from Mr. Alptekin dated October 16,

25  2016, to me.

Elliott - Direct                                                      545

1   Q.   And was this one of the communications that -- with

2   Mr. Alptekin that led to you getting involved in taking on this

3   engagement?

4   A.   Yes, it was.

5            MR. GIBBS:  Your Honor, I'd ask to admit Government

6   Exhibit 152 for the limited purpose of showing what the witness

7   relied on as he began to work on this project.

8            THE COURT:  Any objection?

9            MS. MITCHELL:  With the same objection, Your Honor.

10           THE COURT:  All right.  Over objection, the Court's

11  going to admit 152.

12           (Government's Exhibit No. 152 was received in

13  evidence.)

14           MR. GIBBS:  And if we could publish that to the jury,

15  please.

16           THE COURT:  Yes.

17           MR. GIBBS:  And can we just enlarge that?

18  BY MR. GIBBS:

19  Q.   Can you just read that to yourself, Mr. Elliott?

20  A.   I have read it.

21  Q.   And, Mr. Elliott, what's the date of this e-mail?

22  A.   The date is October 16, 2016.

23  Q.   And it said that there is a link below.  What is that

24  link?  What individual does that link relate to?

25  A.   I believe it relates to Mr. Fethullah Gulen versus

Elliott - Direct                                                        546

1   Mr. Chertoff.

2   Q.   Thank you.  We can take that down.

3        Mr. Elliott, can you next take a look in your binder,

4   and I believe it's Government Exhibit 143.

5        And what is Government Exhibit 143?

6   A.   This exhibit is an invoice from me to Mr. Alptekin

7   detailing my investigative charges and expenses.

8   Q.   And the e-mail we just looked at was October 16, 2016.  On

9   what date did you begin to -- well, first of all, did you take

10  on this project that Mr. Alptekin was asking you about?

11  A.   I did.

12  Q.   And on what date did you begin to do research on Fethullah

13  Gulen for Mr. Alptekin?

14  A.   I began on October 17, 2016.

15       MR. GIBBS:  Your Honor, if we could move into

16  evidence Government Exhibit 143.

17       THE COURT:  Any objection?

18       MS. MITCHELL:  No, Your Honor.

19       THE COURT:  All right.  Without objection --

20       MR. GIBBS:  May we publish that?

21       THE COURT:  Yes.  Government Exhibit 143 is admitted.

22       (Government's Exhibit No. 143 was received in

23  evidence.)

24  BY MR. GIBBS:

25  Q.   And if we can enlarge the top portion, where I believe the

Elliott - Direct                                                    547

1    date is October 17, 2016, is that what you said?

2    A.    That's correct.

3    Q.    And actually, within -- I'm sorry, within the -- all the

4    way across, if you could do it.  I'm sorry.  There we go.

5              And so what does the highlighted portion indicate?

6    A.    That indicates the first effort to begin this

7    investigation.

8    Q.    And had you ever done any work related to Fethullah Gulen

9    before?

10   A.    No.

11   Q.    Now, following -- once you started on this work in about

12   mid-October, did you subsequently receive another communication

13   from Alptekin about the project?

14   A.    I did receive subsequent e-mails.

15   Q.    And if I could have you take a look at Government

16   Exhibit 144 in your book.

17   A.    Okay.

18   Q.    What is Government Exhibit 144?

19   A.    This is an e-mail from Mr. Alptekin dated November 1,

20   2016, directed to me.

21   Q.    And was -- was some information provided to you in this

22   e-mail?

23   A.    Yes, there was.

24   Q.    Did some of that information help to guide you in the work

25   that you did on this project for Mr. Alptekin?

1  A.   Yes, it did.

2           MR. GIBBS:  Your Honor, at this time, we would ask to

3  have Government Exhibit 144 admitted.

4           THE COURT:  Any objection?

5           MS. MITCHELL:  With the same caveat, Your Honor.

6           THE COURT:  All right.  Over objection, 144 is

7  admitted.

8           (Government's Exhibit No. 144 was received in

9  evidence.)

10  BY MR. GIBBS:

11  Q.   All right.  So can you just sort of, to orient us, explain

12  what this exhibit is, Mr. Elliott?

13  A.   This is an e-mail from Mr. Alptekin wherein he identified

14  other individuals that he had an interest in me conducting a

15  background investigation.

16  Q.   And you say "other individuals."  Is that other

17  individuals beyond Fethullah Gulen?

18  A.   Yes, that's correct.

19  Q.   And where in the e-mail are these individuals listed?

20  A.   In the second paragraph.

21           MR. GIBBS:  Can we enlarge that, please?

22  BY MR. GIBBS:

23  Q.   Mr. Elliott, had you ever heard of any of these

24  individuals before?

25  A.   I had not.

Elliott - Direct                                                    549

1    Q.    Ever done any research on them?

2    A.    No.

3    Q.    And what was your understanding of the connection between

4    these individuals and Fethullah Gulen?

5    A.    These are persons identified by Mr. Alptekin to me as

6    possible successors to the Gulen movement.

7    Q.    And what was your understanding of where these individuals

8    lived?

9    A.    I -- my understanding was that they were in the United

10   States.

11   Q.    And what were you being tasked to do regarding these four

12   individuals?

13   A.    I was being tasked to do background investigation on all

14   four of them, the same tasking as I conducted with Mr. Gulen.

15   Q.    Thank you.

16         Now, in addition to the e-mail that contained the

17   four names, did you subsequently have another communication

18   with Mr. Alptekin in a phone call?

19   A.    Yes, I did.

20   Q.    And again, without going into a lot of detail about what

21   Mr. Alptekin said in that phone call, was there a discussion in

22   that phone call of other individuals that he was interested in

23   having you investigate?

24   A.    There were no other individuals identified subsequently.

25   Q.    Did he talk about possibly having the project expand

Elliott - Direct                                                    550

1    beyond just the four names that were in the previous exhibit

2    we --

3              THE COURT:  Why don't you rephrase the question?

4    BY MR. GIBBS:

5    Q.   Well, what was -- did the, the phone call with

6    Mr. Alptekin, did it -- did you discuss the possibility that

7    the scope of your work could increase?

8    A.   That's correct.

9    Q.   And can you explain why the scope of your work could

10   increase?

11   A.   He, he didn't state to me specifically why it would

12   increase, but he did state the numbers to me in terms of the

13   increase.

14   Q.   And is that in terms of money or numbers of people to

15   investigate or both?

16   A.   Numbers of people primarily at this time.

17   Q.   And who are these people -- what was your understanding of

18   who these people were connected to?

19   A.   My understanding was that these people were also connected

20   to the Gulen movement.

21   Q.   What was your understanding as to where these people were

22   located?

23   A.   In the United States.

24             MS. MITCHELL:  Your Honor, objection.

25             THE COURT:  I'll let him answer this last question.

1    Go ahead.

2    BY MR. GIBBS:

3    Q.   I'm sorry, and what was your understanding as to where

4    they were located?

5    A.   In the United States.

6    Q.   And were you being tasked to get positive or negative

7    information about these people?

8    A.   With respect to these people, it was neither positive or

9    negative.  We were interested basically in their business

10   dealings, their associations, things of that nature.

11   Q.   And that fits right in nicely with your background,

12   correct?

13   A.   Yes.

14   Q.   All right.  So, Mr. Elliott, did you ultimately agree to

15   this project?

16   A.   I did.

17   Q.   And how did you memorialize the agreement?

18   A.   We did not have a written agreement.  It was verbal.

19   Q.   Verbal?

20        And what was the original cost estimate for the

21   project?

22   A.   15,000.

23   Q.   And did the, the costs that you were paid exceed that over

24   the course of the project?

25   A.   Yes, it did.

Elliott - Direct                                                    552

1    Q.   And how much were you paid in total on the project?

2    A.   26,873.

3    Q.   And how many different payments comprised that 26,000 and

4    change that you received?

5    A.   Those were three different payments.

6    Q.   And can you describe how they were broken out?

7    A.   I would have to review my invoice.

8    Q.   Okay.  We may have that.  That's the previous one.

9         Can we pull up his previous invoice, which is --

10   A.   I have it in front of me.

11   Q.   And what's that exhibit number, sir?

12   A.   143.

13   Q.   Okay.  Why don't you just take a look at 143, and if you

14   could just indicate --

15   A.   The first payment of $10,000 was paid on November 21,

16   2016.

17   Q.   How about the second one?

18   A.   The second payment was paid -- may I take this out of the

19   binder?

20   Q.   Sure.  Please.

21   A.   The second invoice was paid in the amount of $10,000.  The

22   second payment, I should say, was paid in the amount of $10,000

23   on December 14, 2016; and the third payment was made on

24   February 3, 2017, in the amount of $6,873.

25   Q.   Okay.  And so you were paid roughly a little over $26,000

Elliott - Direct                                                    553

1    as part of this project.  What did you produce as part of the

2    project?

3    A.    I produced the seven reports.

4    Q.    And what were the seven reports related to?

5              MS. MITCHELL:  Objection, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  The first two reports were primarily

8    related to the subject matter of Fethullah Gulen, and the

9    remaining reports covered the other four individuals in that

10   November 1, 2016, e-mail.

11   BY MR. GIBBS:

12   Q.    Okay.  And those are the four names we saw on the screen a

13   few moments ago?

14   A.    That's correct, yes.

15   Q.    So all these reports dealt either with Fethullah Gulen or

16   people that were repeatedly part of the Gulen movement?

17   A.    That's correct.

18   Q.    And over what time span did you produce these seven

19   reports?

20   A.    My first report was dated and issued on December 1, 2016,

21   and my last report was dated and issued on February 28, 2017.

22   Q.    And, I mean, that's a fairly tight time frame.  Were you

23   working on a tight deadline?

24   A.    I was.

25   Q.    Was that as a result -- was that at the request of the

1  client?

2  A.   Yes.

3            MR. GIBBS:  One moment, Your Honor.

4            Thank you, Mr. Elliott.  That's all I have.  The

5  defense may have some questions for you.

6            THE COURT:  Ms. Mitchell?

7            MS. MITCHELL:  Thank you, Your Honor.

8                         CROSS-EXAMINATION

9  BY MS. MITCHELL:

10  Q.   Good afternoon, Mr. Elliott.

11  A.   Good afternoon.

12  Q.   My name is Stacey Mitchell.  Nice to meet you.

13  A.   Nice to meet you.

14  Q.   Have we met before?

15  A.   We have not.

16  Q.   All right.  I will be very brief.

17            Other than your call with Mr. McCauley, did you have

18  any interaction with the Flynn Intel Group?

19  A.   I did not.

20  Q.   In fact, you think the Flynn Intel Group did not have its

21  act together, correct?

22  A.   That was my impression.

23  Q.   All right.  And you provided all your materials to

24  Mr. Alptekin?

25  A.   You're referring to my reports?

1  Q.    Yes.

2  A.    Yes.

3  Q.    And you were paid directly by Mr. Alptekin?

4  A.    That's correct.

5  Q.    And that was from Inovo BV?

6  A.    That's correct.

7         MS. MITCHELL:  Nothing further, Your Honor.

8         THE COURT:  All right.  Thank you.

9         Any redirect.

10        MR. GIBBS:  No, Judge.  Thank you.

11        THE COURT:  All right.  Mr. Elliott, you're excused.

12 Do not discuss your testimony outside of the courtroom.

13                    (Witness excused.)

14        THE COURT:  Your next witness?

15        MR. GILLIS:  Your Honor, the government calls

16 David Enders.

17        THE COURT:  All right.  Mr. Enders will come forward.

18        DAVID ENDERS, GOVERNMENT WITNESS, AFFIRMED

19                    DIRECT EXAMINATION

20 BY MR. GILLIS:

21 Q.    Excuse me.  Good afternoon, sir.  Could you tell us your

22 name, please.

23 A.    David Enders.

24 Q.    Mr. Enders, where do you live?

25 A.    Beirut, Lebanon.

1    Q.   And what do you do for a living?

2    A.   I'm a journalist.

3    Q.   Could you give us some examples of where you've worked

4    before?

5    A.   *VICE* and *Al Jazeera*.

6    Q.   Were you subpoenaed to appear in court today?

7    A.   I was.

8    Q.   Do you understand that U.S. law requires you to be here to

9    testify?

10   A.   I do.

11   Q.   Do you know someone by the name of Bijan Rafiekian, or

12   Bijan Kian?

13   A.   I do.

14   Q.   Do you see him in court today?

15   A.   I do.

16   Q.   Could you point him out and tell us what he's wearing?

17   A.   Glasses, dark suit, striped tie.

18            MR. GILLIS:   Could the record reflect he's identified

19   the defendant?

20            THE COURT:   The record will so reflect.

21   BY MR. GILLIS:

22   Q.   How do you know the defendant, please?

23   A.   He hired me to do some work a few years ago.

24   Q.   And about when was that?

25   A.   2016, in the fall, September-October.

1   Q.   And did, did Mr. -- did you eventually meet with

2   Mr. Rafiekian?

3   A.   I did.

4   Q.   And when was that?  About the same time?

5   A.   I believe the first time was in August.

6   Q.   Where did you first meet the defendant?

7   A.   At the Flynn Intelligence Group office in Virginia.

8   Q.   Did you meet anyone else at Flynn Intel Group at the time?

9   A.   I did.

10  Q.   Who was that?

11  A.   I met Carl Pilgrim and briefly met Mr. Flynn.

12  Q.   General Flynn?

13  A.   General Flynn, yes.

14  Q.   And at that meeting, did the defendant tell you what he

15  wanted you to do?

16  A.   He did, yes.

17  Q.   And what was that?

18  A.   He asked me to cut a trailer of archival footage related

19  to Ayatollah Khomeini.

20  Q.   And was there a theme that you were supposed to use or you

21  were supposed to address for this particular trailer?

22  A.   Yes.  Building on his transition from exile to going back

23  to Iran and the understandings of his intentions in the West.

24  Q.   And did that trailer compare him to anybody in particular?

25  A.   The trailer itself was just archival footage of Khomeini.

1  Q.    And what is -- can you tell us, do you know who

2  Fethullah Gulen is?

3  A.    I do.

4  Q.    And did you speak with the defendant about

5  Fethullah Gulen?

6  A.    I did.

7  Q.    And did he draw any comparisons between Gulen and any

8  particular figure?

9  A.    Between Gulen and Ayatollah Khomeini.

10  Q.    And what did he say about Gulen?

11  A.    That he was someone who is considered relatively safe by

12  Western countries versus his intentions of being revolutionary

13  inside the country where he was from.

14  Q.    Speaking of Gulen?

15  A.    Gulen.

16  Q.    And did you produce the trailer that the defendant asked

17  you to do?

18  A.    I did.

19  Q.    And how long was it?

20  A.    A minute or two.

21  Q.    And what did you do to produce the trailer?

22  A.    Just downloaded and edited archival footage.

23  Q.    Then what did you do with it?

24  A.    I delivered it to Mr. Kian.

25  Q.    And did the defendant say anything about your work?

1   A.   He was pleased with it, and then said we'd continue with a

2   documentary project.

3   Q.   Okay.  Did he tell you what he was going to do with this

4   trailer?

5   A.   My understanding was it would be potentially used in a

6   longer documentary.

7   Q.   All right.  And did he say anything about a client that he

8   had for this video?

9   A.   He just mentioned that there was a client who had

10  commissioned the video.

11  Q.   And did he further identify this client?

12  A.   He did not.

13  Q.   Did he say anything -- or what, if anything, did he say

14  about showing this video to the client, this trailer?

15  A.   I believe he was intending to show it to the client.

16  Q.   So what did the defendant ask you to do after you gave him

17  this trailer?

18  A.   He indicated that there would be production for a longer

19  documentary, and then I just waited for further instructions.

20  Q.   Okay.  And was this documentary going to be about anybody

21  in particular?

22  A.   Fethullah Gulen.

23  Q.   And was this going to be another short video?

24  A.   He indicated he wanted to produce a 30- to 60-minute

25  documentary.

1    Q.    And how did he describe what kind of documentary this

2    might be?

3    A.    Like something you would see on *60 Minutes* or *FRONTLINE* is

4    how it was described.

5    Q.    And what did he say about how the video would characterize

6    Gulen?

7    A.    He didn't specify.

8    Q.    And how did he -- did he, did he describe the format of

9    the documentary?

10   A.    An investigative documentary with a host.

11   Q.    And investigative in what sense?

12   A.    Looking into what the reality of Gulen and his movement

13   was or is.

14   Q.    Okay.  And you mentioned that there would be a host.

15   A.    Yes.

16   Q.    Did the video -- did you actually film a video at some

17   point?

18   A.    We filmed three interviews.

19   Q.    And was -- and who was the host of this?

20   A.    Rudi Bakhtiar.

21   Q.    And when you say "the host," she was the interviewer?

22   A.    Yes.

23   Q.    Who is Rudi Bakhtiar?

24   A.    She's a freelance journalist as well.

25   Q.    And has she been on any news programs that we would know?

1  A.   Previously worked for *CNN* and *Reuters*.

2  Q.   And what did the defendant tell you about these three

3  people to be interviewed before the -- before you appeared to

4  take the video?

5  A.   I was not aware of who they were prior to the interviews.

6  Q.   Did you later learn who they were?

7  A.   Yes.

8  Q.   And who were they?

9  A.   I believe they were a former judge, a journalist, and then

10  a military or intelligence official.

11  Q.   And what did the defendant say about who would make the

12  arrangement for these interviews?

13  A.   He indicated he would provide contact.

14  Q.   And what is it that he wanted you to do for this video?

15  A.   Shoot and edit.

16  Q.   That's all?

17  A.   That's -- yes.

18  Q.   And the filming of these videos, you said the three

19  interviews actually took place?

20  A.   Yes.

21  Q.   And about when was that?

22  A.   October 2016.

23  Q.   And where were the interviews conducted?

24  A.   In a hotel near Dupont Circle.

25  Q.   How did you get your equipment up to that hotel room?

Enders - Direct                                                    562

1    A.    I carried it up.

2    Q.    Okay.

3    A.    In the elevators.

4    Q.    All at one go?

5    A.    I was asked to do it in multiple trips so as to be

6    discreet.

7    Q.    Who asked you to do that?

8    A.    The defendant.

9    Q.    And did you, in fact, make multiple trips to bring up your

10   equipment a little at a time?

11   A.    More or less.

12   Q.    And did the defendant -- or what did the defendant say

13   about why he wanted you to do it that way?

14   A.    I understood he wanted us to be discreet so that people

15   were not necessarily aware that we were filming interviews at

16   the hotel.

17   Q.    Okay.  And was there any person or entity that he was

18   concerned about being discreet about?

19   A.    He did indicate that he didn't want Flynn Intelligence

20   Group connected to what we were doing.

21   Q.    So who was present during the filming of the interviews?

22   A.    The three people being interviewed.  They had a translator

23   and, I believe, some other staff with them, Mr. Kian, Rudi,

24   myself, and I believe Carl Pilgrim.

25   Q.    And who is Carl Pilgrim?

1    A.    He was an assistant of Mr. Kian.

2    Q.    Who conducted the interviews?

3    A.    Rudi did.

4    Q.    Do you know whether Ms. Bakhtiar knew in advance who the

5    interviewees were?

6    A.    I don't believe she did.

7    Q.    Do you know who formulated the questions for the

8    interview?

9    A.    My understanding was it was Mr. Kian.

10   Q.    And how did the defendant give Ms. Bakhtiar the questions?

11   A.    I believe he had them printed and gave them to her on a

12   sheet of paper.

13   Q.    At the interviews?

14   A.    Yeah.

15   Q.    What was the focus of the interviews?

16   A.    Fethullah Gulen and his movement.

17   Q.    And what?

18   A.    His movement.

19   Q.    And how did the people interviewed portray Gulen?

20   A.    As someone who is leading a revolutionary movement in

21   Turkey.

22   Q.    Was this in positive light or in negative light?

23   A.    Negative.

24   Q.    What did the defendant say about how the video would

25   improve the image of the business climate in Turkey?

1    A.    That was never discussed.

2    Q.    Did you ultimately produce a finished documentary?

3    A.    No.

4    Q.    Why not?

5    A.    The project was dropped after November.

6    Q.    Okay.  And were you at some point told to put the project

7    on hold?

8    A.    After the election, I was told to put the project on hold,

9    and then it was formally canceled, I believe, in January.

10   Q.    And how long after the election were you told?

11   A.    I believe the following day.

12   Q.    Were you paid for your work on the video?

13   A.    I was.

14   Q.    And how much were you paid?

15   A.    I think $3,200.

16   Q.    And that represents what?

17   A.    Four days' worth of work.

18   Q.    And who paid you?

19   A.    I received a check from Flynn Intelligence Group.

20   Q.    And whom did you give the video to -- or, well, first of

21   all, did you give the video to anyone at Flynn Intel Group?

22   A.    It was delivered to Mr. Kian.

23   Q.    Did you keep a copy of the video?

24   A.    I did.

25   Q.    And did you give a copy of it to anyone besides the

1    defendant?

2    A.    I did.

3    Q.    Whom did you give it to?

4    A.    I provided it to the FBI and to some journalists.

5    Q.    And when was it that you provided it to the journalists?

6    A.    After the FARA filing, I started receiving calls because I

7    had been publicly identified as having worked on this, so

8    whenever that occurred.

9    Q.    And you did give a copy to the FBI upon their request?

10   A.    Yes.

11            MR. GILLIS:  Okay.  One moment, please, Your Honor.

12            That's all, Your Honor.

13            THE COURT:  All right.  Mr. MacDougall?

14                         CROSS-EXAMINATION

15   BY MR. MacDOUGALL:

16   Q.    Good afternoon, Mr. Enders.  My name is Mark MacDougall.

17   I am representing Bijan Rafiekian.

18            You and I have not met before; is that right?

19   A.    Correct.

20   Q.    You were hired to make a video, as you described to

21   Mr. Gillis, and I take it you have been contracted to make

22   videos before?

23   A.    Yes.

24   Q.    So you're a journalist, you write, you also do documentary

25   work, but you're willing to be hired out as you were here to

1    essentially record and edit production?

2    A.    Yes.

3    Q.    And videographers like yourself are hired for lots of

4    things.  You'd agree with that?

5    A.    Yes.

6    Q.    Political campaigns hire you to -- could hire you to do

7    their work; is that right?

8    A.    Potentially.

9    Q.    Public interest groups promoting a particular point of

10   view?

11   A.    (Nodding head.)

12   Q.    You know, any sort of promotional activity, you're

13   essentially available to do whatever needs to be done in the

14   videography world.  Is that a fair statement?

15   A.    Yes.

16   Q.    Would you agree with that?

17   A.    Yes.

18   Q.    Okay.  You told Mr. Gillis that you brought your equipment

19   up to the hotel.  Do you remember which hotel it was?

20   A.    Not offhand.

21   Q.    Okay.  In the Dupont Circle neighborhood in Washington?

22   A.    Yes.

23   Q.    And you did that because, if I understood your testimony

24   correctly, Mr. Rafiekian did not want the Flynn Intel Group

25   associated or publicly perceived to be associated with the

1    interviews that were going on.

2           Do you agree with that?

3    A.   (Nodding head.)

4    Q.   Okay.  So the Flynn Intel Group, the name "Flynn," who --

5    just remind us, I think everyone knows, but for the record, who

6    was the Flynn in the Flynn Intel Group?

7    A.   General Flynn.

8    Q.   General Flynn.

9           And what do you understand about his position at the

10   time?

11   A.   He was the principal member of the Flynn Intelligence

12   Group.

13   Q.   All right.  And this was when?  This was October?

14   A.   October 2016.

15   Q.   October 2016.  And what was going on in October 2016 in

16   the United States of America?

17   A.   (Shaking head.)

18   Q.   You don't know?

19   A.   You're referring to the election?

20   Q.   I could be, yes.

21   A.   That would be one thing that was happening at that time.

22   Q.   Okay.  And did Mr. Flynn of the Flynn Intel Group, did he

23   have anything to do with the election, if you remember?

24   A.   Yes.

25   Q.   Tell me what you remember him doing.

1    A.    He was quite public in his support of President Trump.

2    Q.    Quite public.

3    A.    I think most people remember the speech he gave at the

4    convention.

5    Q.    And what do you remember about that?

6    A.    Quite a bit of press coverage.  What do I remember?

7    Q.    I'm sorry?

8    A.    Yeah.

9    Q.    Yeah.

10   A.    It was quite controversial.

11   Q.    Quite controversial.  And he remained so, you would agree

12   with me, up to the election?

13   A.    Yes.

14   Q.    Including that day in October when you were making the

15   video?

16   A.    Yes.

17   Q.    And you've testified there was also a business that had

18   his name associated with it?

19   A.    Yes.

20   Q.    Okay.  And it's certainly possible that that business

21   was -- that the controversy associated with --

22            MR. GILLIS:  Calls for speculation.

23            THE COURT:  Overruled.

24   BY MR. MacDOUGALL:

25   Q.    And you would agree with me that the controversy

1   associated -- the great controversy associated with Mr. Flynn

2   might well affect the business?  It would be reasonable,

3   wouldn't it?

4   A.    Reasonable.

5   Q.    I'm sorry?

6   A.    I suppose you could reach that conclusion.

7   Q.    And so that would be a reasonable explanation for why the

8   Flynn Intel Group did not want to be associated with the work

9   they were doing for their client that day?

10  A.    I wasn't given a specific explanation.

11  Q.    All right.  Do you disagree that that's a reasonable

12  explanation?

13  A.    I -- no.

14  Q.    You don't disagree?

15  A.    I don't disagree.

16  Q.    So you agree?

17  A.    Yeah.

18  Q.    The court reporter can't take gestures down.

19  A.    I agree that that is a reasonable explanation.

20              MR. MacDOUGALL:  Thank you.

21              One moment, Your Honor?

22              THE COURT:  Um-hum.

23              MR. MacDOUGALL:  Nothing further at this time.

24              THE COURT:  All right.  Any redirect?

25              MR. GILLIS:  No, Your Honor.

1          THE COURT:  All right.  May the witness be excused?

2          MR. GILLIS:  Yes.

3          THE COURT:  Mr. Enders, you're excused.  Do not

4     discuss your testimony outside of the courtroom with any other

5     witness.

6                         (Witness excused.)

7          MR. GIBBS:  Your Honor, the government calls Tom Neer

8     to the stand.

9          THE COURT:  All right.  Mr. Neer, come forward,

10    please.

11         How long do you anticipate with Mr. Neer?

12         MR. GIBBS:  He should be pretty short.

13         THE COURT:  All right.

14         MR. GIBBS:  Twenty to thirty minutes maybe, Your

15    Honor.

16         THE COURT:  All right.  I'll tell you what, why don't

17    we take our afternoon break at this time.

18         MR. GIBBS:  That would be fine, Judge.

19         THE COURT:  And then we'll pick up with Mr. Neer.

20         Ladies and gentlemen, we'll take our afternoon break

21    at this time.  Please do not discuss this case among yourselves

22    during the recess, and we'll take about a 20-minute break.

23                         (Jury out.)

24         THE COURT:  Who is -- who's after Mr. Neer?

25         MR. GIBBS:  Graham Miller, Your Honor, and then we

1   have Greg Lowman and Jim Courtovich.

2              THE COURT:  All right.  Court will stand in recess.

3                 (Recess from 3:15 p.m., until 3:35 p.m.)

4                              (Jury out.)

5              THE COURT:  Are we ready to proceed?

6              MR. GIBBS:  We are, Judge.  Thank you.

7              THE COURT:  Let's bring the jury out.

8                          (Jury present.)

9              THE COURT:  All right.  Please be seated.

10             The government will call its next witness.

11             MR. GIBBS:  The government calls Tom Neer to the

12  stand, Your Honor.

13             THE COURT:  All right.  Mr. Neer, come forward,

14  please.

15             THOMAS NEER, GOVERNMENT'S WITNESS, AFFIRMED

16                        DIRECT EXAMINATION

17  BY MR. GIBBS:

18  Q.   Good afternoon, sir.

19  A.   Hello.

20  Q.   Sir, could you please tell us your name, and could you

21  also spell your name for the record?

22  A.   Thomas Neer, N-e-e-r.

23  Q.   Mr. Neer, what is your work history?

24  A.   I'm a retired FBI agent.  After graduate school, I worked

25  2 years in the Federal Bureau of Prisons and 5 years with the

1    Navy Federal Criminal Investigative Service, 25 years in the

2    FBI, and I've been working in a contract capacity since then.

3    Q.    And while you were still working at the FBI, did you meet

4    a gentleman by the name of Brian McCauley?

5    A.    Yes.

6    Q.    When did you two first meet?

7    A.    I met Brian in around 2008 in Afghanistan.

8    Q.    And moving ahead to 2016, did you receive a phone call

9    that year from Brian McCauley about a possible job opportunity

10   that involved a gentleman by the name of Fethullah Gulen?

11   A.    Yes.

12   Q.    And what was that job opportunity?

13   A.    To do an open source review of Fethullah Gulen, and to

14   connect dots to learn more about him.

15   Q.    Did you know who Fethullah Gulen was before you talked to

16   McCauley?

17   A.    No.

18   Q.    Did you ultimately agree to take the job?

19   A.    Yes.

20   Q.    What were you tasked to do as part of this project?

21   A.    To conduct an open source review of Gulen, and again, it

22   was to expose him, to learn what he was up to in the United

23   States, to connect dots, but it was all open source.

24   Q.    And when you talk about exposing Gulen based on open

25   source information, was there any particular aspect of Gulen

Neer - Direct                                                          573

1   that you came to focus upon?

2   A.    His operation of charter schools in America.

3   Q.    And what was the end goal of the project in terms of what

4   your research would be used for?

5   A.    Well, one of the things I understood that they -- that a

6   documentary was going to be assembled, in part based on

7   information that I found.

8   Q.    And, Mr. Neer, when you agreed to do the project, did you

9   begin by starting to do open source research on Fethullah

10  Gulen?

11  A.    Yes.

12  Q.    Once you started doing that research, did anything in

13  particular stand out to you?

14  A.    What stood out was that I -- I found that this was a

15  project where -- as I said earlier, I didn't know anything

16  about this guy.  As I started doing the research, what I found

17  was there was a massive amount of information, and so I was

18  concerned about what it was I was going to be able to actually

19  come up with that hadn't either already been reported or

20  somehow wasn't in the literature.

21  Q.    And as a result of those concerns in terms of just the

22  volume of information and how to focus your report, I want to

23  have you take a look at Government Exhibit 142.  It will be in

24  a binder.

25  A.    Which one?

1    Q.   142, sir.

2    A.   Yes.

3    Q.   And, Mr. Neer, what is Government Exhibit 142?

4    A.   This is an e-mail from me to Brian McCauley, and I titled

5    it "Proposed Avenues of Open Source Investigation of Gulen

6    Schools in America By" -- the business that I was operating

7    under -- "Operational Behavioral Services."

8    Q.   And what's the date of this e-mail?

9    A.   October 7, 2016.

10          MR. GIBBS:  Your Honor, at this time, we would ask to

11   move Government Exhibit 142 into evidence and publish it.

12          THE COURT:  Any objection?

13          MR. MacDOUGALL:  No objection.

14          THE COURT:  Without objection, Exhibit 142 is

15   admitted.

16          (Government's Exhibit No. 142 was received in

17   evidence.)

18   BY MR. GIBBS:

19   Q.   And can we blow up that top portion?

20          And, again, what is Government Exhibit 142, Mr. Neer?

21   A.   Proposed open source work for Gulen schools.

22   Q.   And then within the body of the e-mail, what did you --

23   and this was to Brian McCauley, correct?

24   A.   Yes.

25   Q.   And as of this point, was he your primary point of contact

1  on the project?

2  A.   Yes.

3  Q.   And at some point, did that change?

4  A.   No.  He was my primary point of contact.

5  Q.   Okay.  And in terms of the information that you included

6  in the e-mail -- can we blow that up?

7         Mr. Neer, what type of information did you include in

8  the e-mail in terms of proposed open source work?

9  A.   Suggestions about how to go about getting -- learning

10  about Gulen.

11  Q.   And at that -- at this stage, as of October 7, were you

12  looking for direction for your work?

13  A.   Yes.

14  Q.   And when you first started working on the project, were

15  you being contacted for regular weekly updates on your

16  progress?

17  A.   Roughly.

18  Q.   And who was contacting you?

19  A.   Brian McCauley.

20  Q.   Now, did there come a point in time while you were working

21  on the project that you first met the defendant, Bijan

22  Rafiekian?

23  A.   Yes.

24  Q.   And is he here in the courtroom today?

25  A.   Yes.

Neer - Direct                                                      576

1    Q.   And can you identify him by what he's wearing?

2    A.   He's wearing a striped tie, right across from the computer

3    monitor.

4              MR. GIBBS:  Your Honor, we'd ask that the record

5    reflect.

6              THE COURT:  The record so reflects.

7    BY MR. GIBBS:

8    Q.   Now, the first time you met the defendant, was that

9    meeting very substantive?

10   A.   I think I -- the first meeting was probably not.  It was

11   probably just an introduction.

12   Q.   And where was that first introduction meeting?

13   A.   It was at the office of the Flynn Intel Group, which they

14   shared with White Canvas in Old Town, Alexandria.

15   Q.   Okay.  And the office that FIG shares with White Canvas --

16   first of all, what is White Canvas?

17   A.   My understanding was it was some other contracting company

18   with some former or current DoD representatives.

19   Q.   And you said that the first meeting was somewhat in

20   passing at the FIG offices.  Did you subsequently have a more

21   substantive meeting with the defendant?

22   A.   Yes.

23   Q.   How did that come about?

24   A.   I was down at the Flynn Group to meet with Brian, and I

25   think I was waiting for Brian, and I had a chance to talk to

1  Bijan, who invited me into his office.

2  Q.   And that's his, his own office there at FIG?

3  A.   Yes.

4  Q.   Who else was there during this meeting?

5  A.   It was just the two of us.

6  Q.   Now, in the course of this project, did you ever meet

7  General Michael Flynn?

8  A.   Yes.

9  Q.   And how substantive were those meetings?

10  A.   Not very substantive.  It was just in passing, saying

11  hello.

12  Q.   All right.  So back to the meeting with the defendant in

13  his office there at FIG, can you describe what happened in that

14  meeting with him?

15  A.   I was happy to be able to have the opportunity to talk to

16  Bijan to get more clarification that I wasn't able to

17  necessarily get from Brian McCauley, and -- but the way the

18  meeting started off is Bijan outlined a very moving and

19  interesting history of, of his family, which I can't remember

20  all the details, but essentially his roots were from Iran.

21       There were some heroic people in his family who were

22  persecuted, was my takeaway, and somehow that led to we don't

23  know what this guy Gulen's up to essentially, and after that, I

24  took the opportunity to say, well, here's where I'm at with my

25  open source project, and I'm trying to figure out how I can

Neer - Direct                                                      578

1   justify the amount of time I've already sunk into this and what

2   I can do to deliver value.

3   Q.   And when he talked about we don't know what to do about

4   this guy Gulen, was the purpose of your meeting to get guidance

5   from him about Fethullah Gulen?

6   A.   Guidance on my project, yes.

7   Q.   Right.  And did he give you some guidance on your project?

8   A.   Yes, yes.

9   Q.   And did he advise you about what areas in particular you

10  should focus on related to Fethullah Gulen?

11  A.   Yes.

12  Q.   And what, what type of information was the defendant

13  looking for on Gulen?  Positive or negative?

14  A.   Negative.  I mean, if -- the best way to describe it would

15  be evidence of wrongdoing, evidence of violations of law, I

16  think, is how he put it.

17  Q.   What did the defendant tell you in this meeting at his

18  office about Gulen potentially being a threat here in this

19  country?

20  A.   Well, the suggestion was that, that he was up to no good,

21  and because I didn't know about Gulen and his background, I was

22  learning the same thing through the sources I was reading.

23  Q.   And in saying that Gulen was up to no good, did he compare

24  him to any other figures during your conversation with him?

25  A.   I think he said the same thing that I had heard before,

1   which was comparison with perhaps Muslim Brotherhood.

2   Q.   And following that more substantive meeting with the

3   defendant in his office, did you start to pull materials

4   together on Gulen?

5   A.   Yes.

6   Q.   And after meeting with the defendant, did you feel like

7   you had a better idea for the focus of your research?

8   A.   Yes.

9   Q.   And where were you getting most of your information from?

10  A.   Open sources.

11  Q.   And during the time you worked on this project, did the

12  defendant ever ask you to get information on anyone other than

13  Fethullah Gulen?

14  A.   No.

15  Q.   Now, Mr. Neer, as part of this project, what did you

16  ultimately produce?

17  A.   A report that was -- yes, a report.

18          MR. GIBBS:  Okay.  I'd like to pull up, Your Honor,

19  Government Exhibit 78B, which is in evidence.

20          THE COURT:  All right.

21  BY MR. GIBBS:

22  Q.   And, Mr. Neer, what we have on our screen before you is

23  Government Exhibit 78B.

24          Do you recognize this document?

25  A.   Yes.

1  Q.    What is this?

2  A.    Well, this is the report I produced on Gulen, and it's

3  entitled "Fethullah Gulen: A Primer for Investigators."

4  Q.    What's the date on the cover of the report?

5  A.    November 2, 2016.

6  Q.    Can we turn to page 2 of the report, which is the table of

7  contents?  And can we blow up the top?  Yes.

8          Can you just read that to yourself, Mr. Neer?

9          So how did the topics in your table of contents

10  compare with the topics the defendant told you he wanted you to

11  focus on regarding Fethullah Gulen?

12  A.    They were inclusive of the items that, that Bijan wanted

13  me to put in there, but I added some in order to build the

14  narrative and to set the table for the report itself.

15  Q.    Got it.  But you produced the report the defendant had

16  asked you for; is that correct?

17  A.    Yes.

18  Q.    Next, could we go to -- and this is a lengthy report,

19  correct?  It's about 80 pages long?

20  A.    Yes.

21  Q.    Could we go to page 46?

22          And, Mr. Neer, the -- what we're looking at, page 46

23  of your report, what does this section of your report relate

24  to?

25  A.    As a result of my open source work, I, I came to the

1    conclusion that the only way to investigate Gulen properly was

2    to, to really first of all know as much about how he's

3    exploiting and operating the charter schools and to look at

4    previous investigations that have been conducted of him, and

5    that this was going to be a laborious undertaking that would

6    really require investigators to probe the complexity of his

7    business apparatus.

8    Q.   And in the course of your dealings with this project and

9    the defendant, what, if anything, did he say to you about

10   possibly obtaining evidence of criminal wrongdoing against the

11   Gulen schools?

12   A.   If I could get it, great.

13   Q.   And were you able to get evidence of criminal wrongdoing?

14   A.   No.

15   Q.   Next, Mr. Neer, I'd like to have you take a look at

16   Government Exhibit 146A.  Yeah, that's not in evidence, so

17   you'll need the binder for that as well, sir.

18   A.   146A?

19   Q.   Yeah.  And it may be -- I don't know if it's in that

20   binder or not.

21   A.   Okay.  I have it.

22   Q.   Okay.  And, sir, what is Government Exhibit 146A?

23   A.   This is an e-mail to -- from me to Brian McCauley.

24   Q.   What's the date of the e-mail?

25   A.   It's October 20, 2016.

1              MR. GIBBS:  And, Your Honor, we'd ask to move in

2     Government Exhibit 146A.

3              THE COURT:  Any objection?

4              MR. MacDOUGALL:  Your Honor, I just want to be sure

5     that what I'm looking at is a single page here.

6              THE COURT:  146A, is that what you want?

7              MR. GIBBS:  It's just that one page.

8              MR. MacDOUGALL:  If it's just a single page, Your

9     Honor, no objection.

10             THE COURT:  All right.  146A is admitted.

11             (Government's Exhibit No. 146A was received in

12     evidence.)

13             MR. GIBBS:  And we'd ask to publish that, Your Honor.

14             THE COURT:  All right.

15             MR. GIBBS:  And it's a little light.  If we could

16    pull that up?

17    BY MR. GIBBS:

18    Q.   And, Mr. Neer, was there also an attachment with this

19    e-mail to Brian McCauley on October 20, 2016?

20    A.   Yes.

21    Q.   And I believe it should be the next exhibit in your

22    binder, which is 146B.

23    A.   Yes.

24    Q.   Is that the attachment?

25    A.   Yes.

Neer - Direct                                                         583

1    Q.   And --

2              MR. GIBBS:  Well, Judge, at this time, we'd ask to

3    move in Government Exhibit 146B, which is the attachment.

4              THE COURT:  Any objection?

5              MR. MacDOUGALL:  We would object, Your Honor, on the

6    basis of hearsay.

7              THE COURT:  All right.  Over objection, the Court is

8    going to admit Exhibit 146B.

9              MR. MacDOUGALL:  Thank you, Your Honor.

10             (Government's Exhibit No. 146B was received in

11   evidence.)

12             MR. GIBBS:  And if we could publish that?

13   BY MR. GIBBS:

14   Q.   Now, can you explain -- or describe what 146B is,

15   Mr. Neer?

16   A.   This was an update to Brian McCauley on where I was with

17   the -- basically an update, status update on the open source

18   work.

19   Q.   And so this was your update to Mr. McCauley?

20   A.   Yes.

21   Q.   And this sort of provides the status of where your work

22   was as of October 20, 2016?

23   A.   Yes.

24   Q.   And if we could go to the fourth page of this exhibit, and

25   if we could highlight the second full paragraph there?

1          Now, could you read that to yourself, Mr. Neer?

2    A.   Okay.

3    Q.   All right.  And in your sort of description of your work,

4    you said:  "Bijan" -- that's the defendant, correct?

5    A.   Yes.

6    Q.   ". . . is absolutely correct that obtaining evidence of

7    criminal wrongdoing is essential."

8          What limits did you personally face in trying to

9    prove criminal wrongdoing?

10   A.   Well, I didn't have subpoena power, and -- as the note

11   suggests, and my -- as someone that's participated in many

12   investigations over the years, I recognize that it would be

13   unrealistic in a short amount of time to obtain incriminating

14   information.  I didn't have the authority, didn't have the

15   authorities needed, and you need sources, you need subpoena

16   power, and I had none of those.

17   Q.   All right.  And next, Mr. Neer, if we could go to the next

18   paragraph in the exhibit.

19          MR. MacDOUGALL:  May we approach, Your Honor?

20          THE COURT:  Yes.

21          (Bench conference on the record.)

22          THE COURT:  Yes.

23          MR. MacDOUGALL:  Your Honor, with respect to

24   Government Exhibit 146B now in evidence over defense objection,

25   the paragraph that counsel is about to go through begins with

1   the sentence, "My sense is that the client country."

2             THE COURT:  Yeah.

3             MR. MacDOUGALL:  I don't believe there's any

4   foundation for that, nor would this witness be in a position to

5   know that, and it would be highly prejudicial to the defense.

6             THE COURT:  Right.  I'm going to ask you to lay a

7   foundation for that in terms of who he felt the client was.

8             MR. GIBBS:  I've already asked him that question.

9   He'll say Turkey.

10            THE COURT:  What's that based on?

11            MR. GIBBS:  You know, he's a former FBI agent, you

12  know, and --

13            MR. MacDOUGALL:  Well, I mean, he used that term.

14  I'm not sure, you know, I asked him what he was referring to

15  with that.  He said the client country.

16            THE COURT:  Well, I think, I think unless you can tie

17  it into something he was told by the defendant or you can --

18  McCauley.

19            MR. GIBBS:  Well, the -- you know, I think those are

20  his perceptions from working on this project.  I fully expect

21  the defense to say for any FIG employee who didn't draw the

22  conclusion that this was being done for the government of

23  Turkey, that was clear that it was being done.  He certainly

24  drew the conclusion that this was -- or, you know, that the

25  client country was Turkey.  It wasn't some other country.

1          THE COURT:  Well, it's not so much the client --

2    country involved.  It's whether it was a client, which is the

3    big issue here.

4          MR. GIBBS:  Right.

5          THE COURT:  I'm not going to let him express that

6    opinion unless you can lay a foundation that it's based on

7    something he was told by, by Alptekin or McCauley.

8          MR. GIBBS:  Yeah, I don't think he can say that.

9          THE COURT:  Okay.

10          MR. GIBBS:  I think it's based on his perception as a

11   former investigator for 25 years.

12          THE COURT:  Okay.  I'm not going to let him do that.

13   I'm going to -- we can either -- we should redact that in some

14   fashion.  All right?

15          MR. GIBBS:  We can take care of that.

16          THE COURT:  Okay.

17          MR. MacDOUGALL:  Just for the record, Your Honor,

18   that paragraph would be redacted before it would go to the

19   jury, or at least the first sentence?

20          THE COURT:  At least the first sentence.  All right?

21          MR. GIBBS:  Okay.

22          MR. MacDOUGALL:  Thank you, Your Honor.

23          MR. GIBBS:  Thank you, Judge.

24          (End of bench conference.)

25   BY MR. GIBBS:

1  Q.   Mr. Neer, once you completed your report, what did you do

2  with it?

3  A.   I, I gave copies to Bijan and Brian.

4            THE COURT:  Excuse me, would you take the exhibit

5  down?

6            MR. GIBBS:  Oh.

7            THE COURT:  Thanks.

8            MR. GIBBS:  Thank you.

9  BY MR. GIBBS:

10  Q.   I'm sorry, sir.

11            So when you completed your report, what did you do

12  with it?

13  A.   I gave copies to Brian and to Bijan.

14  Q.   And where was this when you gave copies to Brian and

15  Bijan?

16  A.   In Bijan's office.

17  Q.   That's the FIG offices in Alexandria?

18  A.   Yes.

19  Q.   Was there anyone else there besides you, Brian, and the

20  defendant?

21  A.   No.

22  Q.   And how much were you paid for this report?

23  A.   $20,000.

24  Q.   And when were you paid?

25  A.   Right when I handed it -- right when I gave the -- I think

1   that was November, roughly November 10.

2              MR. GIBBS:  And if we could go to Government

3   Exhibit 38, the fifth page of that, that's the Bank of America

4   records for November.  Page 5, thanks.

5              Can we blow up the check in the upper left-hand

6   corner?

7   BY MR. GIBBS:

8   Q.   And, Mr. Neer, what is that -- what do you see on the

9   screen there before you?

10  A.   A check from the -- drawn from the Flynn Intel Group to

11  the business -- my business, Operational Behavioral Services.

12  Q.   And did the defendant hand you that check?

13  A.   Yes.

14  Q.   And is it signed by him?

15  A.   Yes.

16  Q.   And what did the defendant ask you when he handed you that

17  check?

18  A.   Well, he wanted to know if I would be interested in

19  writing an article for *The Hill* about -- in essence, an article

20  speaking to what I had just produced in terms of the Gulen

21  report.

22  Q.   And what was your initial reaction to this proposal?

23  A.   Well, I wasn't interested in doing it because I had just

24  finished doing a huge report, and I didn't, you know, just sit

25  and do another report, which that wasn't part of the initial

1   agreement, wasn't something I was interested in doing.

2   Q.   So did you push back on him about doing this op-ed?

3   A.   Yes.

4   Q.   What was his response?

5   A.   He, he said, "Well, I'll get somebody to ghostwrite it for

6   you."

7   Q.   And when he said, "I'll get somebody to ghostwrite it for

8   you," were you receptive to that idea?

9   A.   No.

10  Q.   And what happened with this idea of ghostwriting a report

11  for *The Hill*?

12  A.   Well, that's the last I -- you know, he said anything

13  about it.  That was it.

14          MR. GIBBS:  All right.  Thank you, Mr. Neer.  I have

15  no further questions at this time.

16          Thank you, Judge.

17          THE COURT:  All right.  Mr. MacDougall?

18          MR. MacDOUGALL:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20  BY MR. MacDOUGALL:

21  Q.   Good afternoon, Mr. Neer.  My name is Mark MacDougall.

22  I'm a lawyer for Mr. Alptekin here.

23          You and I have not met before; is that right?

24  A.   Right.

25  Q.   I was going to ask you a few questions following up on

1   what you just told counsel for the government.  You're a

2   behavioral science specialist; is that right?

3   A.    That's my speciality.

4   Q.    Okay.  And that's essentially the psychological aspects of

5   investigation?

6   A.    Yes.

7   Q.    It involves how people think and react, criminal profiles,

8   that sort of thing; is that right?

9   A.    In general, yes.

10  Q.    Okay.  And you used the phrase repeatedly "open source,"

11  you did an open source investigation.  And open source, if I

12  understand it correctly, means things that anybody can get,

13  internet --

14  A.    Yeah.

15  Q.    -- public records, marriage, birth, death records, to the

16  extent they're available, newspapers, stuff that's out there

17  that anyone can collect, but because of your background in the

18  FBI as an investigator, you're probably better at it than the

19  average person.

20         Do you agree with all that?

21  A.    I don't know that I'm better than the average person, but

22  it's a fair characterization of open source.

23  Q.    Okay.  And that kind of investigative work that you've

24  done and other FBI agents that the Court's heard in the last

25  couple days, that is a very common occupation for retired FBI

1    agents, isn't it, doing investigations?

2    A.   I think there's a lot of agents doing investigations after

3    retirement.

4    Q.   And often upon retirement or shortly thereafter, agents

5    are out looking for those kind of jobs because they fit very

6    neatly into what they've learned to do; is that right?

7    A.   Yes, yes.

8    Q.   Nothing illegal about it?

9    A.   Correct.

10   Q.   Nothing improper about it?

11   A.   That's correct.

12   Q.   And they're hired by clients to find out information

13   through any lawful means they can?

14   A.   That's correct.

15   Q.   And that's what you do some of the time?

16   A.   Yes.

17   Q.   Okay.  I'd like you to go back to Exhibit 146B, which

18   subject to redaction is in evidence, in the book, and if we

19   could just see the first page of that, 146B, Government 146B.

20        Have a look, if you would, Mr. Neer, at the fourth

21   paragraph that begins:  "As I began focusing on the five

22   tasks."  You said, "I kept uncovering information already

23   inquired by an attorney, Anderson."

24        Was that name really Amsterdam?

25   A.   That's correct.  That was a mistake.

1   Q.    Okay.  And so you were talking about an attorney

2   Amsterdam; is that right?

3   A.    That's right.

4   Q.    Okay.  And you go on to say, "What has become quite clear

5   is that over the past year or two since he was retained" -- and

6   you understand he was retained by the Republic of Turkey?

7   A.    That's what I read.

8   Q.    All right.  ". . . his law firm has acquired a vast amount

9   of public records related to the formation and operation of

10  Gulen schools, which he has used as the basis for lawsuits."

11  A.    Yes.

12  Q.    And you learned that as part of your open source public

13  information; is that right?

14  A.    Yes.

15  Q.    Investigation?

16  A.    Yes.

17  Q.    That, that Amsterdam had been retained by the Republic of

18  Turkey and had gone out and collected a whole bunch of

19  information and was using it to instigate lawsuits.  That was

20  all part of what you learned in the public domain?

21  A.    Yes.

22  Q.    And then you go on to say, Amsterdam -- "Anderson," but

23  meaning Amsterdam -- "has posted many of these documents online

24  and I have downloaded a number of them"; is that right?

25  A.    Yes.

1   Q.   So you actually took the information, some of the

2   information Amsterdam collected and posted online, and took it

3   and used it for your open source purposes?

4   A.   Yes.

5   Q.   Nothing wrong with that?

6   A.   No.  I sourced it, and I put it in appropriate places.  I

7   thought it was an amazing job of what he had acquired.

8   Q.   What he did?

9   A.   Yes.

10  Q.   In depth.  It was in-depth, high-quality research?

11  A.   I thought so.

12  Q.   Okay.  The last thing I'd like to touch upon, I think, is

13  the last thing that you told counsel for the government.  You

14  said that Mr. Rafiekian had asked about doing an op-ed?

15  A.   Yes.

16  Q.   And we've heard that phrase repeatedly.  Would you agree

17  with me "op-ed" stands for opinion editorial?

18  A.   Op-ed I think is probably short for opinion, yes.

19  Q.   Sure.  And if you turn, often in the inside last page of a

20  newspaper, you will -- it's typically the op-ed page.  It's not

21  always there, but do you agree with that?

22  A.   Yes.  Editorials, op-eds.

23  Q.   Right.  And those are essays or written pieces, typically

24  750, 1,000 words, that express an opinion; is that right?

25  A.   They express an opinion.  I don't know how many words.

1  Q.   Okay.

2  A.   I've never written one.

3  Q.   All right.  And, and many op-ed writers become very

4  well-known journalists.  George Will, Maureen Dowd, many

5  others.

6  A.   Yes.

7  Q.   That's what they do for a living.  They write op-eds; is

8  that correct?  You have to respond verbally so the court

9  reporter --

10 A.   Yes.  I'm aware of George Will.

11 Q.   Okay.  And so what Mr. Rafiekian suggested to you was

12 based upon -- as your testimony reflected, was based upon your

13 research that you write an op-ed and that he would get you some

14 help to write it?

15 A.   That's correct.

16 Q.   And there's nothing wrong with that, is there?

17 A.   No.

18         MR. MacDOUGALL:  Thank you, Your Honor.  No further

19 questions.

20         THE COURT:  Any redirect?

21         MR. GIBBS:  Yeah, just very briefly.

22                    REDIRECT EXAMINATION

23 BY MR. GIBBS:

24 Q.   And in terms of help to write it, what term did he use?

25 A.   Ghostwrite.

Miller - Direct                                                    595

1           MR. GIBBS:  Okay.  Thank you.

2           THE COURT:  May the witness be excused?

3           MR. GIBBS:  Yes, Judge.

4           THE COURT:  Mr. Neer, you're excused.  Do not discuss

5    your testimony outside of the courtroom with any other witness.

6    All right?

7                     (Witness excused.)

8           THE COURT:  Next witness.

9           MR. GIBBS:  Graham Miller, Your Honor.

10          THE COURT:  All right.  Mr. Miller will come forward.

11       JAMES GRAHAM MILLER, GOVERNMENT WITNESS, AFFIRMED

12          THE COURT:  Mr. Gibbs?

13                     DIRECT EXAMINATION

14   BY MR. GIBBS:

15   Q.   Good afternoon, sir.

16   A.   Good afternoon.

17   Q.   Sir, could you please state your name for the record.

18   A.   James Graham Miller.

19   Q.   Who do you work for, Mr. Miller?

20   A.   Sphere Consulting.

21   Q.   Can you just describe briefly what Sphere Consulting does?

22   A.   We are a public affairs firm in D.C.  We do media

23   relations and government relations.

24   Q.   How long have you worked for Sphere Consulting?

25   A.   About ten years.

Miller - Direct                                                          596

1   Q.   And what is your position there?

2   A.   Partner.

3   Q.   Now, were you working at Sphere Consulting back in August

4   2016?

5   A.   I was.

6   Q.   And at that time, was Sphere Consulting contacted by the

7   Flynn Intelligence Group, or FIG, about a potential engagement?

8   A.   Yes.

9   Q.   How did that contact first come about?

10  A.   I believe Bijan had e-mailed or called Jim Courtovich.

11  Q.   Who is Jim Courtovich?

12  A.   He's the managing partner of Sphere.

13  Q.   So you work with him?

14  A.   Yes.

15  Q.   And did a meeting take place following that phone call

16  from the defendant?

17  A.   Yes.

18  Q.   When was that?

19  A.   A couple days later.

20  Q.   And that was in August 2016?

21  A.   Yes.

22  Q.   Who attended that meeting from FIG?

23  A.   Bijan.

24  Q.   And who attended from Sphere Consulting?

25  A.   Jim Courtovich, Greg Lowman, and myself.

1   Q.   Now, you said the defendant attended from Sphere -- or

2   attended from FIG.  Was anyone else there from FIG at that

3   meeting?

4   A.   No.

5   Q.   And is the defendant here in court today?

6   A.   Yes.

7   Q.   Can you point to him and identify him by something he's

8   wearing?

9   A.   Yes.  Right here in the blue tie.

10           THE COURT:  The witness has identified Mr. Rafiekian.

11           MR. GIBBS:  Thank you.

12  BY MR. GIBBS:

13  Q.   Now, where did this first meeting take place in August

14  2016?

15  A.   At the offices of FIG.

16  Q.   And where is that?

17  A.   In Alexandria, Virginia.

18  Q.   And just describe for us the meeting.  What, what

19  particular world events did the defendant describe when he met

20  with you and Jim Courtovich?

21  A.   He invited us to -- he was bringing us in on a potential

22  project that focused on the sort of instability in Turkey

23  following the failed coup.

24  Q.   And was there any -- at that time, what did he describe

25  the purpose of this project was, related to the failed coup in

1  Turkey?

2  A.   It was to show that the root causes to the -- of the coup,

3  specifically the influence that Fethullah Gulen and his network

4  of followers might have had in orchestrating the coup.

5  Q.   And did the defendant discuss business or the economy in

6  Turkey during this first meeting?

7  A.   Yes.  It was the -- discussed the negative impact it was

8  having on the economy of Turkey.

9  Q.   And in terms of this negative impact, who did the

10  defendant say was behind the negative impact?

11  A.   Well, he, he described how Fethullah Gulen and the -- his

12  followers were responsible for the, for the coup which caused

13  the instability that resulted in the negative economic impact.

14  Q.   And you mentioned Fethullah Gulen.  Had you ever heard of

15  him prior to this meeting?

16  A.   No.

17  Q.   And who first brought up his name in the meeting?

18  A.   Bijan.

19  Q.   And what did Bijan say that he wanted FIG -- or he wanted

20  Sphere to promote or produce for FIG in this meeting?

21  A.   Yeah.  The idea was that FIG would do research and

22  intelligence that would inform a video that was to be produced,

23  and our role was to publicize that video.

24          THE COURT:  Mr. Gibbs, could you hold off for a

25  moment?  I think we have a technical issue with Mr. Rafiekian's

Miller - Direct                                                          599

 1   headset.

 2           Are you --

 3           THE COURT SECURITY OFFICER:  Your Honor, I think the

 4   system is turned off somehow.  The headsets have power, but

 5   they're not picking up anything.

 6           THE COURT:  All right.  Can we proceed, or do we need

 7   to --

 8           MS. MITCHELL:  He indicates he can hear the witness.

 9           THE COURT:  All right.

10           MS. MITCHELL:  Maybe I could ask everybody to keep

11   their voices elevated.

12           THE COURT:  All right.

13           THE DEFENDANT:  Thank you, Your Honor.

14           THE COURT:  Thank you.

15   BY MR. GIBBS:

16   Q.   Mr. Miller, do you understand that?

17           THE COURT:  Let's proceed.

18   BY MR. GIBBS:

19   Q.   It's always important to try to keep your voice up, so try

20   to speak nice and loud.  Okay?

21   A.   Sure.

22   Q.   Let me ask that question again.  So what did the defendant

23   say FIG wanted Sphere to produce or promote as part of this

24   engagement?

25   A.   A video, like a *60 Minute*-style video that laid out the

1   case against Fethullah Gulen.

2   Q.   And what did the defendant tell you in that meeting about

3   who was behind this project, who was funding it?

4   A.   That it was private businesses, or business or businesses,

5   not exactly clear, but it was not a -- didn't reference a

6   specific client.

7   Q.   So you didn't get any names in this meeting?

8   A.   No.

9   Q.   Now, what, if anything, did the defendant tell you in this

10  meeting about getting a green light just a few days earlier

11  from the Turkish government for a project involving Gulen?

12        MS. MITCHELL:  Objection, Your Honor.  That's a

13  leading question.

14        THE COURT:  Why don't you rephrase it?

15  BY MR. GIBBS:

16  Q.   What, if anything, did the defendant tell you about any

17  sort of green light he had received from the Turkish government

18  shortly before that meeting?

19        THE COURT:  I'll let him answer that question.  Go

20  ahead.

21        MR. GIBBS:  Thank you, Judge.

22        THE WITNESS:  Nothing.

23  BY MR. GIBBS:

24  Q.   And what, if anything, did he tell you in that meeting

25  about a potential project or contract with the government of

Miller - Direct                                                           601

1    Turkey that related to Gulen that FIG was involved in prior to

2    that meeting?

3    A.   Nothing.

4    Q.   Well, what, if anything, did he tell you about any

5    previous potential project or contract FIG had had with the

6    Turkish government in the summer of 2016?

7           MS. MITCHELL:  Objection, Your Honor.  These are

8    leading questions that assume things that are not in evidence.

9           THE COURT:  I'll let the witness answer.  He can

10   testify to it.

11          THE WITNESS:  Nothing.

12          THE COURT:  The jury knows that the questions are not

13   evidence.  It's only the answers.

14          MR. GIBBS:  Thank you, Judge.

15   BY MR. GIBBS:

16   Q.   And what, if anything, did the defendant tell you in that

17   meeting about any potential project or contract that had fallen

18   through shortly before that meeting?

19   A.   Nothing.

20   Q.   Now, as a result of this meeting with the defendant in

21   August, what did you do?

22   A.   We prepared a proposal and sent it a few days later.

23   Q.   Okay.  And if we could pull up Government Exhibit 96A,

24   which is in evidence?

25          We should be able to blow all that up.

1        All right, Mr. Miller, do you see Government Exhibit

2   96A on your screen?

3   A.   I do.

4   Q.   What is this?

5   A.   This is an e-mail from me to Bijan on Thursday, August 18.

6   Q.   All right.  First of all, in the e-mail, you said,

7   "Subject:  Following up on Tuesday's Meeting."

8        And what is the date of this e-mail?

9   A.   This e-mail is Thursday, August 18.

10  Q.   All right.  And does that give you a better idea of when

11  the initial meeting with the defendant occurred?

12  A.   Yes.  It would be on the Tuesday.

13  Q.   Tuesday what?

14  A.   Tuesday, the 16th of August.

15  Q.   Thank you.

16       And there was also an attachment in this e-mail,

17  correct?

18  A.   Yes.

19  Q.   And if we could turn to that attachment, that would be

20  96B, which is also in evidence.

21       What is Government Exhibit 96B?

22  A.   This is a memo, a proposal to General Flynn and Bijan from

23  Jim Courtovich dated August 18.  The subject is "Partnership to

24  Promote a Prosperous and Stable Turkey."

25  Q.   And was it your understanding at that time that that was

Miller - Direct                                                          603

1    the goal of this project?

2    A.   Yeah.

3    Q.   All right.  You mentioned it was addressed to the

4    defendant and General Flynn.  Had you met General Flynn by that

5    point?

6    A.   No, not at that point.

7    Q.   And does the memo reflect what was discussed at the

8    meeting two days earlier?

9    A.   Yes, I think so.

10   Q.   And can we highlight the second paragraph of that first

11   page?  That's short enough.

12          If you can just read that into the record,

13   Mr. Miller?

14   A.   Yes.  "As discussed, this effort would be funded directly

15   by private businesses seeking to improve investment in business

16   to drive a stronger economy."

17   Q.   And who had told you that the source of funding from this

18   project would come from private businesses?

19   A.   Bijan.

20   Q.   Did he tell you who those private businesses were?

21   A.   No.

22   Q.   Can we go to the second page of the memo and highlight the

23   second bullet on page 2, under "Strategic Approach"?

24          Can you read that into the record, Mr. Miller?

25   A.   Yes.

Miller - Direct                                                          604

1            "Produce and promote a documentary-style video that

2    uses fact-based, unbiased information and research to 1)

3    highlight Fethullah Gulen's network of loyalists and his

4    influence over them, and 2) showcase a resilient investment

5    climate in the wake of the recent attempted coup."

6    Q.   And who had told you that one objective of the project was

7    to -- was to have Sphere work on a documentary-style video?

8    A.   Bijan did.

9    Q.   And who said that the video should be focused on Gulen's

10   network of loyalists and his influence over them?

11   A.   Bijan.

12   Q.   We can take that off.  Thank you.

13            Now, Mr. Miller, the e-mail we just looked at was

14   dated August 18, 2016.  I want you to take a look at --

15   actually, we'll publish it because it's in evidence --

16   Government Exhibit 97.  Maybe we can highlight the top.

17            Now, what is Government Exhibit 97?

18   A.   This is an e-mail from me to Bijan, "Subject:  Following

19   up on Tuesday's Meeting."

20   Q.   And is this actually an e-mail thread where you're

21   responding to another e-mail from the defendant?

22   A.   Yes.

23   Q.   And can we go down to the defendant's e-mail?  I believe

24   it's dated August 18.

25            THE COURT:  These are in evidence?

1            MR. GIBBS:  These are, Judge.  Yes, Your Honor.

2    BY MR. GIBBS:

3    Q.   All right.  So what was the date of the defendant's e-mail

4    to you and Jim Courtovich and Greg Lowman?

5    A.   It was Thursday, August 18, 2016.

6    Q.   And in the middle of that e-mail, who did the defendant

7    say he would like Jim Courtovich to meet?

8    A.   Ekim Alptekin.

9    Q.   Did you know who that was at that point?

10   A.   No.

11   Q.   And where was Jim Courtovich expected to travel around

12   this time?

13   A.   To Istanbul, Turkey.

14   Q.   And at that time, did you know what Ekim Alptekin's role

15   on the project was, if any?

16   A.   No.

17   Q.   All right.  We can take that up.

18            Next, if we could go -- actually, I'd like to have

19   you take a look at Government Exhibit 98, which is not in

20   evidence, but it should be in one of our binders.

21   A.   Okay.

22   Q.   What is Government Exhibit 98?

23   A.   It is an e-mail or e-mail chain.  The most recent one is

24   from me to Jim Courtovich on Monday, August 29, and the subject

25   is the reply "Hello."

1  Q.   And is this related to the project -- the potential

2  project with FIG?

3  A.   Yes.

4           MR. GIBBS:  Your Honor, we'd ask to move in

5  Government Exhibit 98 and publish it to the jury.

6           THE COURT:  Any objection?

7           MS. MITCHELL:  None, Your Honor.

8           THE COURT:  All right.  98 is admitted.

9           (Government Exhibit No. 98 was received in evidence.)

10 BY MR. GIBBS:

11 Q.   And, Mr. Miller, you testified that it's an e-mail chain.

12 If we could start with the earliest one down at the bottom and

13 enlarge that?

14           All right.  Who is that one from, and who is it to?

15 A.   The one all the way on the bottom?  Is from Bijan to Jim

16 Courtovich.

17 Q.   Can we go down to the one that I think it's 10:55 a.m.,

18 the one below that?

19           Can we go to the second page?

20           And can you just read that to yourself, Mr. Miller?

21 A.   Okay.

22 Q.   All right.  So in the e-mail, Jim Courtovich asked

23 about -- or he said, "Touching base ahead of the Labor Day

24 weekend to see whether Flynn Intel Group is progressing with

25 the potential client in Turkey."

Miller - Direct                                                       607

1           Did the defendant respond to this question in this

2    e-mail thread?

3    A.    I believe so.

4    Q.    And I think that's the one I was trying to get you to look

5    at before.  So let's go back to the bottom of the first page.

6           And can you go below there?

7           MR. GIBBS:  Your Honor, I'll just come back to this

8    one if need be.

9           THE COURT:  All right.

10          MR. GIBBS:  It is in evidence.

11   BY MR. GIBBS:

12   Q.    All right.  Now, Mr. Miller, by this point in the

13   interactions with the defendant, had, had Sphere entered into a

14   contract for this project?

15   A.    No.

16   Q.    But were there subsequent meetings going forward about the

17   potential engagement?

18   A.    Yes.

19   Q.    And I want to move you ahead to September, towards the end

20   of September 2016.  Did you have another face-to-face meeting

21   with the defendant about the project and this proposed

22   engagement?

23   A.    Yes.

24   Q.    When was that?

25   A.    It was mid-September.  I don't have an exact date.

Miller - Direct                                                    608

1    Q.   All right.  Mid-September is fine.

2             Where was the next meeting about the proposed

3    project?

4    A.   At the University Club in Washington, downtown Washington,

5    D.C.

6    Q.   And who attended that meeting at the University Club in

7    Washington, D.C.?

8    A.   Bijan, General Flynn, Mike Boston, Jim Courtovich, Greg

9    Lowman, and myself.

10   Q.   And in advance of that meeting -- well, first of all, I

11   want to have you take a look at an exhibit that is in evidence.

12   It's Government Exhibit 105.

13            And what is Government Exhibit 105?

14   A.   It is an e-mail from me sent to Bijan on Monday,

15   September 19, 2016.

16   Q.   And what's the subject of this e-mail?

17   A.   It's a reply:  "Tomorrow."

18   Q.   And down in the middle of that e-mail, is there another

19   e-mail?

20   A.   Yes.

21   Q.   And who is that from?

22   A.   That is from Bijan to me, same subject.

23   Q.   And could you read that e-mail aloud?

24   A.   Yes.

25            "Thank you, Graham.  We are in New York, scheduled to

Miller - Direct                                                        609

1  return tomorrow morning.  General Flynn and I look forward to

2  seeing you tomorrow.  We will meet at the University Club same

3  time instead of the office.  I want General Flynn and I both to

4  be with you, thus the change of venue.  I will have our general

5  counsel, Bob Kelley, communicate with you on LDA.  See you

6  tomorrow."

7  Q.   And you talk about seeing you tomorrow.  This e-mail is

8  dated September 19.  Does that give you a better idea of the

9  date of the meeting at the University Club?

10 A.   Yes.  I believe it would be September 20.

11 Q.   Now, in the e-mail to you, the defendant said, "We are in

12 New York, scheduled to return tomorrow."

13         Did you, in fact, meet with the defendant the next

14 day in Washington?

15 A.   Yes.

16 Q.   When you met with him the next day, what, if anything, did

17 he tell you about having met with the Turkish Foreign Minister,

18 Mevlut Cavusoglu, the day before?

19 A.   Nothing.

20 Q.   What, if anything, did he tell you about having met with

21 the Turkish Minister of Energy and Natural Resources,

22 Berat Albayrak, the day before?

23 A.   Nothing.

24 Q.   What, if anything, did he say about having met with

25 President Erdogan's son-in-law the day before?

1   A.   Nothing.

2   Q.   What, if anything, did he say about having met with any

3   senior Turkish officials the day before?

4   A.   Nothing.

5   Q.   What did he say about what was discussed in New York?

6   A.   Nothing.

7   Q.   All right.  So let's move to the meeting at the University

8   Club.  You did testify that General Flynn was there?

9   A.   Yes.

10  Q.   Had you ever met him before?

11  A.   No.

12  Q.   How about Mike Boston?  Had you ever met him before?

13  A.   No.

14  Q.   Now, what occurred in the, in the meeting?  What did the

15  defendant talk about when you met with him at the University

16  Club?

17  A.   We spoke about the project, and sort of along the same

18  lines as the previous meeting, about the instability in Turkey,

19  about Fethullah Gulen being a root cause of that, and sort of

20  the importance of maintaining a good relationship with Turkey

21  as a NATO ally, that sort of thing.

22  Q.   And in the course of discussing Fethullah Gulen as being

23  the root cause for some of these problems, what notorious

24  figure did the defendant compare him to?

25  A.   To Ayatollah Khomeini.

1   Q.   And over the course of this project, did you hear the

2   defendant compare Gulen to Khomeini on more than one occasion?

3   A.   Yes.

4   Q.   I think you might have testified to this earlier, but at

5   the time of this University Club meeting, there was no signed

6   contract with FIG, correct?

7   A.   Correct.

8   Q.   Did there come a point in time that that changed?

9   A.   Yes.

10  Q.   And was there what you would describe as a kick-off

11  meeting to memorialize the signing of the contract?

12  A.   Yes.  I think it happened right around the same time.

13  Q.   And where did the kick-off meeting take place?

14  A.   At FIG's office in Alexandria.

15  Q.   And who attended that kick-off meeting from Sphere?

16  A.   Just me.

17  Q.   And who else was there for the kick-off meeting?

18  A.   Bijan; Mike Boston; Carl Pilgrim; Emily from White Canvas

19  Group; and Rudi, I'm forgetting her last name.

20  Q.   Was General Flynn there?

21  A.   No.

22  Q.   Now, during the course of this, how many different

23  projects did Sphere work on for FIG?

24  A.   Just this.

25  Q.   And as part of the kick-off meeting, what did the

Miller - Direct                                                    612

1   defendant say that Sphere was going to be responsible for

2   within this project?

3   A.    Media, media relations.

4   Q.    And what was the understanding about Sphere's role, if

5   any, in helping to promote a video?

6   A.    That was a piece of it, absolutely.

7   Q.    And that -- in promoting a video, would that be sort of

8   included under the heading of media?

9   A.    Yes, absolutely.

10  Q.    Okay.  Either in this meeting or at another time, what did

11  the defendant tell you that you should use to communicate with

12  about the project?

13  A.    We were told to use two applications, one for e-mail,

14  Virtru, and another app called Signal for sort of like

15  messaging.

16  Q.    And what did these two applications, Signal and Virtru,

17  do?

18  A.    They are -- they encrypt the messages.

19  Q.    And who told you that you needed to use Signal and Virtru

20  to communicate about this project?

21  A.    Bijan did.

22  Q.    And going forward, did you use those encrypted

23  applications when you communicated about the project?

24  A.    Most of the time.

25  Q.    Now, following the kick-off meeting in October -- or

Miller - Direct                                                          613

1  following the kick-off meeting, who was the project focused

2  upon going forward?

3  A.    Fethullah Gulen.

4  Q.    Exclusively?

5  A.    Well, he and sort of those organizations and individuals

6  and businesses that sort of make up a, sort of a network of

7  folks that follow him.

8  Q.    And are those what are known as Gulenists or the Gulen

9  movement?

10 A.    Yes.

11 Q.    Now, how much focus was there after this point on the

12 economy of Turkey in this project?

13 A.    Not a whole lot.

14 Q.    And how much focus was there after this point on the

15 stability of the government of Turkey?

16 A.    Not a whole lot.

17 Q.    Now, once the project got underway, who was named as the

18 project coordinator or the project manager for FIG?

19 A.    Mike Boston.

20 Q.    And who was the person primarily overseeing the project on

21 behalf of FIG?

22 A.    I believe Bijan.

23 Q.    How long was this project scheduled to last?

24 A.    About three months.

25 Q.    So 90 days?

Miller - Direct                                                            614

1    A.    Sure.

2    Q.    More or less?

3          And as you began to work on the project, Mr. Miller,

4    how often were you expected to provide updates from Sphere

5    about your progress?

6    A.    Weekly.

7    Q.    How involved was the defendant with the project at this

8    point?

9    A.    I believe very involved.

10   Q.    Mr. Miller, during the course of this Gulen project with

11   FIG, did Sphere put together any proposals related to

12   congressional outreach?

13   A.    Yes.

14   Q.    And if you could -- if we could pull up Government

15   Exhibit 111, which is in evidence.

16         Mr. Miller, what is Government Exhibit 111?

17   A.    It is a memo to Flynn Intel Group from me dated October 5,

18   2016, "Subject:  Engagement Strategy and Activities."

19   Q.    And maybe if we could remove the heading?

20         What was this memo about?

21   A.    It was about the, the project and what our efforts would

22   be moving forward.

23   Q.    And if we could enlarge the second paragraph on page 1

24   there.

25         Can you read that paragraph, Mr. Miller?

1    A.    Yes.

2          "As discussed, this effort is funded directly by

3    private businesses seeking to improve public understanding of

4    the root causes of Turkey's political turmoil and expose the

5    vast network and organization of the nation's adversaries."

6    Q.    Now, Mr. Miller, who told you that the project was funded

7    directly by private businesses seeking to improve public

8    understanding of the root causes of Turkey's turmoil?

9    A.    Bijan did.

10   Q.    How many private businesses did he say were funding this

11   effort?

12   A.    At, at this point, I'm not -- I'm not sure if I knew that.

13   Q.    And in the course of your work on this project for FIG,

14   how many different adversaries of the government of Turkey did

15   Sphere focus upon?

16   A.    Just one.

17   Q.    And who was that one?

18   A.    Fethullah Gulen.

19   Q.    Now, could we enlarge the last bullet point on page 1?

20   Actually, can we go down -- I'm sorry -- go to -- the third

21   bullet point is the one I wanted.  Thank you.

22          Can you read that bullet point, Mr. Miller?

23   A.    Yes.

24          "Identify and engage U.S. policymakers to incorporate

25   the team's messaging and intelligence into official and public

Miller - Direct                                                      616

1    actions, including statements, letters, investigations,

2    hearings, inquiries, and other meaningful activities."

3    Q.   And so I'd asked you earlier about congressional outreach,

4    if Sphere worked on any of that.

5         Is this bullet point related to that aspect of the

6    project?

7    A.   Yes.

8    Q.   And then if we can go down?  I believe it's on page 2 --

9    actually, yeah, the middle one, "Activities and Timing," the

10   first bullet there.

11        And what does that say, Mr. Miller?

12   A.   "Assemble initial congressional target list."

13   Q.   And what is that -- what is that a reference to?

14   A.   A, I believe, reference to a list that we created of

15   potential members of Congress and offices or committees to

16   target and potentially reach out to in the future.

17   Q.   And target specifically about what topic?

18   A.   About the involvement of Gulen in the coup and the

19   potential risks or, you know, the potential threat that they

20   pose in the future.

21   Q.   All right.  Thank you.

22        Will you take that off the screen?

23        And next I'd like to have you take a look at

24   Government Exhibit 30B, which is not in evidence yet.

25        Do you have that there before you, sir?

1   A.    I do not.

2   Q.    Oh, I'm sorry.  It will be in a binder.  It's not in

3   evidence.

4   A.    I'm sorry, what?

5   Q.    30B, as in bravo.

6   A.    I think this is the wrong book.

7         30B.  Okay.

8   Q.    What is Government Exhibit 30B, sir?

9   A.    This is an e-mail from me to Mike Boston on Wednesday,

10  October 12.  Subject is "midweek update."

11  Q.    And is this e-mail -- you talked about the weekly updates

12  that were required.  Is this e-mail representative of those

13  weekly updates that you were providing on behalf of Sphere?

14  A.    Yes.

15        MR. GIBBS:  Your Honor, we'd ask to move in

16  Government Exhibit 30B and publish it.

17        THE COURT:  Any objection?

18        MS. MITCHELL:  None.

19        THE COURT:  30B is admitted.

20        (Government's Exhibit No. 30B was received in

21  evidence.)

22  BY MR. GIBBS:

23  Q.    And you said that the subject is "midweek update"?

24  A.    Yes.

25  Q.    And as part of that midweek update, can we enlarge

Miller - Direct                                                    618

1    paragraph 2 on page 1?

2           Can you just read that short paragraph, sir?

3    A.   Yes.

4           "How Sphere/SGR represents ourselves/client to

5    policymakers and media.  We have been vague to date.  Barring

6    any concerns, we will avoid the issue, but when it comes up, we

7    say we are working with a European company with interest in the

8    economic and political stability of Turkey.  As a last resort,

9    we will disclose that the client is Inovo."

10   Q.   Mr. Miller, where did this direction come from about being

11   vague and only disclosing Inovo's name as a last resort, come

12   from?

13   A.   From discussions I had with Bijan.

14   Q.   Thank you.

15          Now, next if we could go to page 2 and enlarge No. 6,

16   I believe?

17          Can you just read that short paragraph into the

18   record, sir?

19   A.   Yes.

20          "Policymaker fact sheet.  Per this morning's e-mails,

21   Sphere is producing a briefing document ahead of a policymaker

22   meetings and will circulate a draft by midday Thursday.

23   Attaching incomplete draft for reference."

24   Q.   What was the purpose of the policymaker fact sheet?

25   A.   It was sort of talking points ahead of future potential

1    meetings with policymakers.

2    Q.   And can you explain what a policymaker is?

3    A.   A member of Congress, their staff, person in

4    administration.

5    Q.   And, Mr. Miller, you mentioned -- you can take that down.

6    Thank you.

7             You mentioned a member of Congress or their staff.

8    In fact, did there come a point in time in the project that the

9    defendant introduced you to a member of a congressional staff

10   at the FIG offices in Alexandria?

11   A.   Yes.

12   Q.   And what were you doing at the FIG offices that day

13   initially?

14   A.   I was attending a meeting with Mike Boston there.

15   Q.   About what?

16   A.   About this project.

17   Q.   Was anybody else there for that meeting other than you and

18   Mike Boston?

19   A.   I don't believe so.

20   Q.   So what happened during this meeting with you and Mike

21   Boston?

22   A.   Well, Bijan informed me when the, the congressional staff

23   arrived and introduced me.

24   Q.   Okay.  And let's back up.  So did -- were you expecting to

25   meet with a congressional staffer that day?

Miller - Direct                                                    620

1    A.    No.  No, I was not.

2    Q.    And so how did you first learn that you would, aside from

3    meeting with Mr. Boston about the project, be meeting with a

4    congressional staffer?

5    A.    Bijan invited me to, to be introduced to this -- to the

6    staffer.  It was either while I was there or shortly before

7    attending the scheduled meeting with Boston.

8    Q.    And who was this particular staffer?

9    A.    Miles Taylor.

10   Q.    Who is Miles Taylor?

11   A.    He is a National Security staffer on -- or was, I should

12   say, at the House Homeland Security Committee.

13   Q.    And was Miles Taylor introduced to you and Mike Boston by

14   the defendant?

15   A.    To, to me, at least.  I'm not sure about Mike Boston.

16   Q.    And when he introduced Miles Taylor to you, what did the

17   defendant ask you to discuss with him, if anything?

18   A.    To -- asked to discuss sort of the outline of the project

19   in the case against Gulen and how, you know, this network

20   could -- is, is a concern that House Homeland Security

21   Committee should be focused on.

22   Q.    And were you expecting to be talking to a, a congressional

23   staffer at this meeting when you, when you first came to FIG

24   that day?

25   A.    No.  I thought it was sort of more of a -- sort of a

Miller - Direct                                                        621

1    handshake introduction-type thing, but it turned into more of a

2    meeting.

3    Q.   Okay.  What did the defendant say -- you described it as

4    it turned into more of a meeting.  What did the defendant say

5    to Miles Taylor during that meeting?

6    A.   Sort of along the lines of what I just said, that Gulen

7    and the network of charter schools and organizations and

8    individuals that follow him in the U.S. are something that the,

9    the committee should be concerned about as a threat.

10   Q.   And did the defendant ask Miles Taylor to raise awareness

11   with anyone in particular about Fethullah Gulen?

12   A.   Yeah.  I mean, I imagine to his -- I don't remember

13   anything about a specific ask to.

14   Q.   Okay.  That's fine.  No.

15            And how about in the course of talking with Miles

16   Taylor, did the defendant compare Fethullah Gulen to anyone?

17   A.   Yes, Ayatollah Khomeini.

18   Q.   And was that the reference you talked about earlier that

19   you heard from the defendant on more than one occasion?

20   A.   Yeah.  It was like a cautionary tale.

21   Q.   And cautionary tale in what sense?

22   A.   The -- as a comparison of Gulen to Khomeini when he was

23   younger, and stories of he's in Paris sitting under a tree,

24   like, reading or writing poetry, and he was sort of an

25   unassuming character that one would not think would become such

1  a radical figure.

2  Q.   Okay.  Thank you.

3            Now, Mr. Miller, you testified earlier that very

4  early on in the engagement, the defendant had mentioned that he

5  wanted Jim Courtovich to meet Ekim Alptekin, correct?

6  A.   Yes.

7  Q.   And you didn't know who Ekim Alptekin was at that point,

8  right?

9  A.   Correct.

10 Q.   Did there come a point in time in this project that you

11 actually had an opportunity to meet Ekim Alptekin in person?

12 A.   Yes.

13 Q.   All right.  I'd like to pull up Government Exhibit 128A,

14 which is in evidence.

15           If we could just enlarge that whole thing?  I think

16 it's --

17           Now, what is Government Exhibit 128A, Mr. Miller?

18 A.   It's an e-mail from Mike Boston on October 31 to me and a

19 host of other people.  The subject is "Project meeting

20 Wednesday at noon our office suite."

21 Q.   And was the defendant included in this e-mail?

22 A.   Yes.

23 Q.   And would this e-mail sort of include a number of people

24 that were on the FIG team for Project Confidence?

25 A.   Yes.

Miller - Direct                                                    623

1   Q.   Can you read that e-mail, please, aloud?

2   A.   Yes.

3          "Team:  We are scheduled to brief the client this

4   Wednesday at the FIG office suite at noon.  Please see the

5   attached very short SlideDeck.  It is very high level and is

6   generic with respect to our work.  If you have any additions,

7   etc., please send them to me for consideration.  Also, see the

8   latest version of Gulenopoly developed by Graham and his folks.

9   I am aware that the WCG leads are traveling this week."

10  Q.   All right.  In terms of that e-mail talking about briefing

11  the client, at this time as of Halloween 2016, what was your

12  understanding as to who the client was?

13  A.   It was Inovo.

14  Q.   And was there any particular individual associated with

15  Inovo?

16  A.   Yeah, Ekim Alptekin.

17  Q.   And did that meeting, in fact, take place?

18  A.   Yes.

19  Q.   Where was the meeting?

20  A.   At FIG offices in Alexandria.

21  Q.   Who attended from Sphere?

22  A.   Jim Courtovich and myself.

23  Q.   Who attended from FIG?

24  A.   Bijan, Mike Boston, Bob Kelley, Brian McCauley, Carl

25  Pilgrim.  I think that's it.

Miller - Direct                                                    624

1    Q.   And when you attended that meeting, how was Ekim Alptekin

2    first introduced to you?

3    A.   Bijan introduced him to the room.

4    Q.   And did he introduce him as the client, or how did he

5    introduce him?

6    A.   Oh, yeah.  As the client, yeah.

7    Q.   And can you describe how the meeting started?

8    A.   I think there were some introductions and that sort of

9    thing, but then Brian McCauley started going through the, the

10   work that FIG had done on the research and intelligence

11   gathering.

12   Q.   And as Brian McCauley was doing his presentation for Ekim

13   Alptekin, what was Alptekin's reaction?

14   A.   He sort of interrupted and, and was -- sort of expressed

15   displeasure with, with what he was hearing.

16   Q.   What were any of Ekim Alptekin's specific complaints about

17   what he was hearing?

18   A.   One, I think that it wasn't the types of, of intelligence

19   that he was hoping for, and that there was a lack of, of it

20   sort of being public and being used and being out in the

21   public, so that it was sort of like the project was moving too

22   slowly or something along those lines.

23   Q.   So too slowly and not public enough?

24   A.   Right.

25   Q.   Now, what, if anything, did Alptekin say in that meeting

1    about trying to get scandalous information about Fethullah

2    Gulen?

3    A.   He said he would be -- he was interested in that, and he,

4    he made a reference to the, to the show *Scandal*, so I think he

5    had sort of a more Hollywood version of perhaps what, what

6    FIG's work was actually like.

7    Q.   And so how did the meeting with Mr. Alptekin end?   It

8    didn't sound like it was a very happy meeting, that the client

9    was not pleased.

10   A.   Yeah.   I mean, upon leaving, Jim Courtovich and I, we

11   were -- sort of expressed a little surprise that -- of sort of

12   the expectations were not in sync with what we sort of

13   understood them to be, and, you know, did not like necessarily

14   the fact that we felt some of that was directed at us, even

15   though we don't -- we didn't think that that was sort of our

16   responsibility.

17   Q.   And to be clear, McCauley was the one doing the briefing,

18   not Sphere, correct?

19   A.   Right.   Everyone was speaking at some point, but, yes, it

20   was McCauley that was presenting the findings of FIG to date.

21   Q.   All right.   Now, Mr. Miller, did there come a point in

22   time that you were contacted by the defendant about getting

23   Sphere's assistance in getting an op-ed piece published?

24   A.   Yes.

25   Q.   Can you describe what happened in that first communication

Miller - Direct                                                    626

1   from the defendant about this op-ed piece?

2   A.    Yeah.  Bijan contacted me on Monday evening before the

3   2016 election.  He said that General Flynn was trying or was

4   going to have an op-ed placed in, I believe, *Fox News*, but that

5   if that fell through, would we be able to help get that placed.

6   Q.    And did the defendant say who had written this op-ed piece

7   that he wanted placed either in *Fox News* or somewhere else?

8   A.    Yeah.  It was penned by, by General Flynn.

9   Q.    That's what the defendant told you?

10  A.    That's who the -- it would be placed on behalf of.

11  Q.    Okay.  Gotcha.  And that's what the defendant said?

12  A.    Yeah.

13  Q.    Now, you mentioned that the defendant had said he was

14  trying to get it on *Fox News*, but if that fell through, he

15  wanted Sphere's help.  Is that correct?

16  A.    Correct.

17  Q.    Did he, in fact, come back for Sphere's help?

18  A.    Yes.

19  Q.    And what sort of timing was the defendant asking about in

20  terms of getting this op-ed placed?

21  A.    Oh, to get it placed immediately that next day, that

22  Tuesday.

23  Q.    And you've obviously been a media consultant for a long

24  time.  How easy is it to do something like that on such a short

25  time frame?

Miller - Direct                                                      627

1   A.    It's, it's not particularly easy.  It's a little uncommon

2   to get something placed that quickly.

3   Q.    Now, what did the defendant tell you about the connection

4   between this op-ed and the Sphere-FIG contract on Project

5   Confidence?

6   A.    That, that they were disconnected, that they were -- this

7   was not part of the project.

8   Q.    And did the defendant ultimately send you the op-ed that

9   you were discussing with him?

10  A.    Yes.

11  Q.    And if we could -- if I could have you take a look, it

12  will be in your binder, we're not going to pull it up yet, it's

13  Government Exhibit 79A.

14  A.    Okay.

15  Q.    What is Government Exhibit 79A, Mr. Miller?

16  A.    It is an e-mail from Bijan to me on Monday, November 7,

17  "Subject:  Article."

18          MR. GIBBS:  Your Honor, we'd ask to move in

19  Government Exhibit 79A.

20          THE COURT:  Any objection?

21          MS. MITCHELL:  No, Your Honor.

22          THE COURT:  Without objection, 79A is admitted.

23          (Government's Exhibit No. 79A was received in

24  evidence.)

25          MR. GIBBS:  And we'd ask to publish that.

1           THE COURT:  Yes.

2           MR. GIBBS:  And can we enlarge the top third or so of

3    that?  We should be able to read it.

4    BY MR. GIBBS:

5    Q.   Mr. Miller, can you read the -- well, first of all, who's

6    the e-mail from again?

7    A.   It's from Bijan.

8    Q.   To?

9    A.   To me, on Monday, November 7, "Subject:  Article."

10   Q.   What time of day did the defendant send it to you on

11   Monday, November 7?

12   A.   At 11:47 p.m.

13   Q.   And how soon did he want you to get this placed by another

14   media organization?

15   A.   The next day.

16   Q.   Can you read the e-mail from the defendant to you?

17   A.   "Graham:  This article won't be on *Fox*.  Please give this

18   your best shot in placement.  *New York Post*?  *Drudge*?  Thank

19   you, Bijan."

20   Q.   All right.  And so the defendant had talked about *Fox*, and

21   obviously he sort of predicted it might fall through, and it

22   looks like it had fallen through; is that correct?

23   A.   Correct.

24   Q.   What did you do -- upon getting this e-mail from the

25   defendant, what did you do?

Miller - Direct                                                      629

1    A.   We tried to get it placed, I think it was the next

2    morning, but --

3    Q.   All right.  And obviously, the e-mail we just saw, the

4    defendant -- did he attach the op-ed itself?

5    A.   Yes.  I believe it was attached to that e-mail, yes.

6    Q.   Well, take a look at Government Exhibit 79B.  It should be

7    the next exhibit.  It's not in evidence yet, so take a look at

8    that, and if you could identify that?

9    A.   This is the, the op-ed that was attached.

10   Q.   And when you got the op-ed from the defendant, did you

11   read it?

12   A.   I am sure I read it at some point.  Yes, I read it upon

13   receiving it.

14   Q.   And how did the content of the op-ed compare with the work

15   that Sphere had been doing on Project Confidence?

16   A.   It was largely focused on Gulen, so they were similar.

17          MR. GIBBS:  And, Your Honor, we'd ask to move in

18   Government Exhibit 79B.

19          THE COURT:  Any objection?

20          MS. MITCHELL:  No, Your Honor.

21          THE COURT:  Without objection, 79B is admitted.

22          (Government's Exhibit No. 79B was received in

23   evidence.)

24   BY MR. GIBBS:

25   Q.   And we'd ask to go to page 3.  And if we could blow up the

1  paragraph that starts:  "This image is a stark" -- yep.

2           Can you just read that to yourself, Mr. Miller?

3  A.   Yes.

4  Q.   Had you ever heard of this analogy before of the cleric

5  under an apple tree in a chateau in the suburbs of Paris

6  before, Mr. Miller?

7  A.   Yes.

8  Q.   Where had you heard that before?

9  A.   From Bijan.

10  Q.   And then can we go to the last -- the very end of the last

11  page of the last paragraph of the op-ed.  Enlarge that.

12           Can you just read that paragraph, Mr. Miller?

13  A.   Yeah.

14           "The forces of radical Islam derive their ideology

15  from radical clerics like Gulen, who is running a scam.  We

16  should not provide him safe haven.  In this crisis, it is

17  imperative that we remember who our real friends are."

18  Q.   Now, Mr. Miller, how similar was that sentiment that you

19  just read with the Confidence Project that you were working on

20  on behalf of FIG?

21  A.   It was similar.

22  Q.   All right.  Now, let's talk about your efforts to get this

23  op-ed placed.

24           We can take that down now.

25           You mentioned that the defendant contacted you late

1    on the evening of November 7, the day before the election,

2    correct?

3    A.   Correct.

4            MR. GIBBS:  Can we pull up Government Exhibit 80,

5    which is in evidence?  And we should be able to enlarge the

6    whole thing, I think.

7    BY MR. GIBBS:

8    Q.   What is Government Exhibit 80, Mr. Miller?

9    A.   It is an e-mail from me to Bijan on Tuesday, November 8,

10   at six in the morning, "Subject:  Article placement."

11   Q.   So you got up early to start working on this?

12   A.   Yes, I guess so.

13   Q.   And can you read the second paragraph, that starts

14   with "Thanks, Bijan."

15   A.   "Thanks, Bijan.  We are working on this now and understand

16   that immediate placement is the goal versus approaching the

17   major papers one by one.  As such, we are currently looking at

18   *Politico*, *The Hill*, *Wall Street Journal's* 'Think Tank' section,

19   and *Forbes* online."

20   Q.   Now, you mentioned in there that you understand the media

21   placement is the goal.  Where did you get that understanding

22   from?

23   A.   From Bijan.

24   Q.   And then, Mr. Miller, I don't believe this is in evidence,

25   but if you could take a look at Government Exhibit 81, which

1    should be in your binder.

2    A.    Okay.

3    Q.    And what is Government Exhibit 81?

4    A.    It is an e-mail from me to Mike Boston and Bijan, subject

5    to reply:  "Article placement."

6             MR. GIBBS:  All right.  And, Your Honor, we'd ask to

7    move in Government Exhibit 81.

8             THE COURT:  Any objection?

9             MS. MITCHELL:  No, Your Honor.

10            THE COURT:  81 is admitted.

11            (Government's Exhibit No. 81 was received in

12   evidence.)

13            MR. GIBBS:  And we'd ask to publish it.

14            THE COURT:  Yes.

15            MR. GIBBS:  And we can blow up that whole top

16   portion.

17   BY MR. GIBBS:

18   Q.    Now, Mr. Miller, you said the date was November 8, 2016?

19   A.    Yes.

20   Q.    And the time?

21   A.    8:25 a.m.

22   Q.    And what did you -- can you read that last paragraph?

23   A.    The last paragraph:  "*The Hill* was the only option where

24   we felt confident we could get it posted today.  In fact, they

25   tried repeatedly to push us to tomorrow, and I ultimately had

1    to insist that it be posted today."

2    Q.   And so did you have to be pretty persistent with *The Hill*

3    in order to get this published on Election Day?

4    A.   Yeah.  They had sort of agreed to it and then wanted to

5    push it, so we held them to their original agreement.

6    Q.   And -- you can take that down.

7              And so the article gets published -- or the op-ed

8    gets published on Election Day.  What happened with the

9    Sphere-FIG Confidence Project contract following the election?

10   A.   Over the next couple weeks, it sort of fizzled and

11   ultimately ended.

12   Q.   So fairly soon thereafter, your engagement with them

13   ended?

14   A.   Yeah.  In the weeks following the election, yeah.

15             MR. GIBBS:  All right.  One moment, sir.

16             All right, Mr. Miller, thank you.  That's all the

17   questions I have.  I believe the defense may want to ask you

18   some questions.

19             THE COURT:  All right.  Before we begin, it's a

20   little late in the afternoon.  If anybody would like to just

21   stand up and stretch their legs, please take a moment and do

22   that.

23             All right.  Ms. Mitchell?

24             MS. MITCHELL:  Thank you, Your Honor.

25                           CROSS-EXAMINATION

1    BY MS. MITCHELL:

2    Q.   Good afternoon, Mr. Miller.  How are you?

3    A.   Good.

4    Q.   My name is Stacey Mitchell.  I believe you and I had one

5    quick telephone conversation but never actually discussed the

6    substance of this matter; is that correct?

7    A.   That's right.

8    Q.   All right.  And I am part of the counsel team on behalf of

9    Mr. Rafiekian, and I'm going to remind both of us to keep our

10   voices up.

11        So I want to turn your attention back to Government's

12   Exhibit 96B.

13        And if we could have that pulled up in front of the

14   witness?

15        This was a pitch material you put together in an

16   attempt to get the prospective business that FIG was -- to work

17   in conjunction with FIG; is that correct?

18   A.   Correct.

19   Q.   And at the time you were putting this together, it was

20   your understanding that FIG didn't have a firm client at that

21   point, did it?

22   A.   Correct.

23   Q.   And if we direct your attention to -- well, the memo, as

24   you've previously testified, was really borne out of your

25   conversation two days before at the FIG location; is that

1  correct?

2  A.   Yes, that's correct.

3  Q.   All right.  And directing your attention now to the

4  first -- sorry, the second bullet, under "Objectives" on the

5  first page, what was one of the objectives of this potential

6  partnership?

7  A.   "Reestablish international confidence in Turkey's economic

8  fundamentals and highlight the stability of its investment and

9  business environment."

10  Q.   All right.  But even at the first meeting, Fethullah Gulen

11  came up, correct, in his, his potential impact or the question

12  of whether he had impacted that stability?

13  A.   Yes.

14  Q.   All right.  And, in fact, if you look at page 2 of that

15  document, focusing in on the second bullet on page 2 -- and I

16  believe you looked at that on direct; is that correct?

17  A.   Yes.

18  Q.   All right.  And, in fact, the question was:  How does

19  Fethullah Gulen's network of loyalists potentially impact

20  confidence in the government of Turkey and business ability to

21  do economic fundamentals in Turkey?

22        Poorly asked question, I am sorry.  I will withdraw

23  that and ask it again.

24        There was a connection in your mind, I believe you

25  testified on direct, between Gulen, the coup, and economic

Miller - Cross                                                      636

1    stability in Turkey, correct?

2    A.    Correct.

3    Q.    And that was the understanding at that first meeting?

4    A.    Yes.

5    Q.    And that was your understanding at subsequent meetings as

6    well?

7    A.    Yes.

8    Q.    So turning now to later that month, you had not heard back

9    from FIG about the prospective engagement; is that correct?

10   A.    What's the time frame, I'm sorry?

11   Q.    Later that month.  Within the next ten days or so.

12   A.    Yes, that is correct.

13   Q.    And, sorry, I had referenced -- I thought I had written

14   down the exhibit number.

15           Anyway, so you and Jim Courtovich -- and who is Jim

16   Courtovich?

17   A.    He is the -- a coworker of mine and managing partner of

18   Sphere.

19   Q.    Okay.  And you and Jim Courtovich wanted to get this

20   business; is that correct?

21   A.    Yes.

22   Q.    And as always when trying to get business, you think, What

23   can I offer that client as a way to bring them in?

24   A.    Sure.

25   Q.    All right.  And so later that month, do you recall writing

Miller - Cross                                                    637

1    an e-mail, drafting it for Jim Courtovich to send to the

2    defendant inviting him to -- sort of forwarding an article and

3    inviting him to the Sphere Hill House for a meeting -- or

4    actually a dinner?

5    A.   Yeah.  Yeah, I remember some e-mail like that.

6    Q.   All right.  And did -- was that anything that the

7    client -- that Mr. Rafiekian had asked you for?

8    A.   No.

9    Q.   Okay.  It was a way to reel in the client --

10   A.   It was an existing dinner that -- we extended an

11   invitation to him dinner.

12   Q.   All right.  I want to turn your attention now to

13   Exhibit 105, which you looked at previously.

14           Actually, before we get there, it was important to

15   you, was it not, that the engagement was with private

16   businesses?  It was important for you to know that; is that

17   correct?

18   A.   It was important to know that, yes.

19   Q.   Right.  Because it would actually impact whether or not

20   you had to file under FARA, is that correct?

21   A.   Correct.

22   Q.   And is that an issue that you discussed with

23   Jim Courtovich?

24   A.   Yes, probably.  Yeah, I think so.

25   Q.   Okay.  And at some point, did you have discussions with

1  the defendant about whether and how FIG was going to file?

2  A.   Yes.

3  Q.   And specifically, whether they were going to file under

4  the Foreign Agents Registration Act or the Lobbying Disclosure

5  Act?

6  A.   Right.  Yeah, that was discussed.

7  Q.   Okay.  So if I direct your attention again to that

8  Exhibit 105, and at the bottom of that e-mail, the original

9  e-mail from you, if I can have you read that to yourself?

10  A.   Yes.

11  Q.   So you were following up on his counsel's recommendation

12  to file under the LDA versus FARA; is that correct?

13  A.   Correct.

14  Q.   And you wanted to do it so that you could structure your

15  agreement properly?

16  A.   Correct.

17  Q.   And this is a pretty important situation, isn't it?

18  A.   Yeah.

19  Q.   So if you look at the e-mail next above it, the reply,

20  Mr. Rafiekian willingly says:  "Let me put you in touch with

21  our attorney."

22  A.   Right.

23  Q.   And was it your understanding he'd had discussions with

24  his attorney in advance of that?

25  A.   Yes.

Miller - Cross                                                            639

1   Q.   All right.  And were you, in fact, in touch with

2   Mr. Kelley?

3   A.   Yes.

4   Q.   And did you have discussions with Mr. Kelley about the

5   basis upon which he arrived at the determination to file a

6   Lobbying Disclosure Act?

7            MR. GIBBS:  Objection to anything Mr. Kelley says,

8   Your Honor.

9            THE COURT:  All right.  Well, we haven't gotten there

10  yet.

11           MR. GIBBS:  Okay.  We're getting close.  Thank you,

12  Judge.

13           THE WITNESS:  I'm sorry, can you repeat the question?

14  BY MS. MITCHELL:

15  Q.   I hope I can.  Did you have discussions with Mr. Kelley

16  about he arrived at the need to --

17  A.   Yes.

18  Q.   -- to disclose under the Lobbying Disclosure Act?

19  A.   Yes.

20  Q.   And were you comfortable in that analysis?

21  A.   Yeah.

22  Q.   You didn't have any concerns that he was hiding anything

23  on you?

24  A.   No.

25  Q.   All right.  And so, in fact, Sphere followed suit and

1   ultimately filed under the Lobbying Disclosure Act?

2   A.   Correct.

3   Q.   All right.  Now, I also want to turn your attention, if I

4   could, to Exhibit 111 that you looked at previously.  And

5   generally, this exhibit is about engagement strategies and

6   activities, correct?

7   A.   Yes.

8   Q.   And on page 2, you -- again, focusing on activities and

9   timing.

10  A.   Okay.

11  Q.   You testified on direct that you had pulled some names

12  together and were preparing to engage on this, on outreach to,

13  let's say, congressional target list?

14  A.   I'm sorry, are you saying -- are you asking if I already

15  said that or if that's in here?

16  Q.   Terrible.  I'm doing terribly today.  I apologize; I will

17  focus.

18         On -- under "Activities and Timing," your first

19  bullet is:  "Assemble initial congressional target list."

20  A.   Yes.

21  Q.   And it indicates that it's complete.

22  A.   Yep.

23  Q.   Had you actually taken any action to reach out to any of

24  those on that target list?

25  A.   I don't believe so, no.

Miller - Cross                                                          641

1   Q.   All right.  And actually, did you personally undertake to

2   outreach to any congressional staffer?

3   A.   No.

4   Q.   All right.  And that's in the, in the -- up until -- let's

5   see, we're looking at that date of that memo -- October 5,

6   2016, correct?

7   A.   Right.

8   Q.   All right.  Mr. Miller, were you aware that the government

9   of Turkey had retained Robert Amsterdam's firm to act on their

10  behalf with respect to the extradition of Gulen?

11  A.   I was -- I was aware of Amsterdam.  I'm not sure if I knew

12  who the client was.

13  Q.   Okay.

14  A.   I don't remember.

15  Q.   All right.  But you never coordinated with Amsterdam on --

16  with respect to this matter?

17  A.   I -- no, I never -- I had never spoken or met Amsterdam.

18  Q.   All right.  Turning your attention back again to

19  Government Exhibit 30B, looking at the paragraph No. 2,

20  Mr. Gibbs focused you in on the question about the way you were

21  going to represent yourselves and the client to policymakers.

22  A.   Um-hum.

23  Q.   There was an undertone that keeping the client

24  confidential for as long as you can, there's something untoward

25  about that.  Do you think there's anything untoward about

1    potentially keeping a client's identity as low profile as

2    possible?

3    A.    No.

4    Q.    All right.  And, in fact, as a consultant and a media

5    relations consultant, do you do that with some frequency?

6          Let me ask another question:  Is it not unusual for a

7    client to want to keep a low profile?

8    A.    No, it's not unusual.

9    Q.    In fact, your website indicates:  "Our team excels in

10   intelligence gathering within government, media, and business

11   communities.  Armed with real-time intelligence, our team

12   crafts both public and under-the-radar campaigns to help our

13   clients reach stakeholders in order to accomplish their goals."

14         Correct?

15   A.    I --

16   Q.    Will you accept my representation that I pulled it off

17   your website?

18   A.    Yes.

19   Q.    It sounds, it sounds generally accurate?

20   A.    Sure, yeah.

21   Q.    And there's nothing illegal about that?

22   A.    No.

23   Q.    It's perfectly proper?

24   A.    Yes.

25   Q.    And sometimes you keep the identity of a client low key

Miller - Cross                                                          643

1   until such time as you want to roll out a particular finding;

2   is that correct?

3   A.   Correct.

4   Q.   All right.  Turning your attention now again to Monday,

5   the 7th of November, if I could, this is not any Monday, right?

6   A.   Correct, yeah.

7   Q.   Monday, November 7, 2016, was a big day, and Tuesday,

8   November 8, was a very big day, correct?

9   A.   Correct.

10  Q.   All right.  And you testified previously that Bijan

11  reached out to you late night on the 7th with a, with a really

12  rushed request to get this op-ed posted the next day.

13  A.   Yes.

14  Q.   And you indicated that General Flynn really wanted this up

15  on the website the next day; is that correct?

16  A.   Yes.

17  Q.   I'm sorry, wanted it published the next day.

18  A.   Right, right, right, right.

19  Q.   And you indicated it's actually a pretty difficult thing

20  to do, to get it up and posted, an op-ed posted in a handful --

21  12 hours?

22  A.   Yes, correct.

23  Q.   All right.  Again, focusing on the timing, fair to say

24  General Flynn was fairly fully invested in the outcome of the

25  election the next day?

1   A.   Yes.

2   Q.   All right.  And op-eds are actually one way to elevate a

3   campaign's perspective on an issue to benefit its candidate,

4   correct?

5   A.   Yes, I would think so.

6   Q.   All right.  Well, in fact, doesn't Sphere use op-eds from

7   time to time in its work?

8   A.   Yes.

9   Q.   And isn't that for the purpose of highlighting or a

10  perspective of a client on a particular issue?

11  A.   Yes.

12  Q.   All right.  And fair to say that given General Flynn's

13  affiliation to Candidate Trump on November 8, posting Flynn's

14  article was probably easier than, say, if I had asked you to

15  get my op-ed posted?

16  A.   Yes, I think so.

17  Q.   All right.  And, in fact, General Flynn had been using the

18  method of op-eds throughout the campaign to highlight the

19  candidate's and the campaign's focus on particular issues,

20  correct?

21  A.   I'm not familiar if he has other op-eds.

22  Q.   And would you say that General Flynn had been fairly

23  public --

24  A.   Yes.

25  Q.   -- in his statements about various and sundry policy

1   positions?

2   A.   Yes.

3   Q.   And did he do that in an effort to benefit, in your

4   estimation, his candidate's campaign?

5   A.   I would think so, yes.

6   Q.   All right.  I want to show you what I have just marked --

7   and I have one for the Court, one for you -- actually, can you

8   give that to the Court?

9            Defendant's Exhibit 111, what is that?

10           THE COURT SECURITY OFFICER:  Counsel, you just told

11   me to give it to the judge.

12   BY MS. MITCHELL:

13   Q.   What is that?

14   A.   This is a -- appears to be an op-ed by Michael Flynn on

15   April 18, 2016, on *Fox News* titled "Lieutenant General Michael

16   Flynn:  America Has Forgotten How to Win at War."

17           MS. MITCHELL:  Your Honor, we would offer Defense

18   Exhibit 111 and also ask the Court to take judicial notice of

19   it as a --

20           THE COURT:  Any objection?

21           MR. GIBBS:  No objection, Judge.

22           THE COURT:  All right.  Exhibit 111 is admitted.

23           MS. MITCHELL:  All right.

24           (Defendant's Exhibit No. 111 was received in

25   evidence.)

Miller - Cross                                                          646

1    BY MS. MITCHELL:

2    Q.   I want to show you now what's been marked as

3    Defendant's 106.  And what is that?

4    A.   This is another op-ed by General Flynn published by *Fox*

5    *News* on May 23, 2016.

6    Q.   What's the topic of that?

7    A.   This is General Flynn:  "Why the Silence About the Deadly

8    Terror Threat in Our Own Hemisphere?"

9    Q.   And what news media is that in?

10   A.   *Fox News*.

11            MS. MITCHELL:  Again, we'd offer 106.

12            THE COURT:  All right.  Any objection?

13            MR. GIBBS:  No objection.

14            THE COURT:  All right.  I see there's 106 through

15   Exhibits 111 -- I'm sorry, 112.  Are you offering all of them?

16            MS. MITCHELL:  We are, Your Honor.

17            THE COURT:  Any objection?

18            MR. GIBBS:  No objection.

19            THE COURT:  All right.  Defense Exhibits 106 through

20   112 are admitted.

21            (Defendant's Exhibit Nos. 106 through 110 and 112

22   were received in evidence.)

23            MS. MITCHELL:  And actually, unfortunately, Your

24   Honor, I believe it's -- if I can do the numbers --

25            THE COURT:  Yes.

Miller - Cross                                                          647

1              MS. MITCHELL:  We didn't do them in order.

2              THE COURT:  That's fine.

3              MS. MITCHELL:  111, 106, 107, 110, 109, 113, and

4       108 -- I'm sorry -- and 112.

5              THE COURT:  I don't have 113.

6              MR. GIBBS:  I don't either, Your Honor.

7              THE COURT:  Is there a 113?

8              MS. MITCHELL:  I don't believe so, Your Honor.

9              THE COURT:  All right.

10             MS. MITCHELL:  If there was, I withdraw it.

11             THE COURT:  All right.

12      BY MS. MITCHELL:

13      Q.   And, Mr. Miller, in the interests of time, could I just

14      have you run through each of those and tell us what they are,

15      the date they were, and the media they were posted on?

16      A.   Yes.  One is an op-ed by Michael Flynn on July 9, 2016, in

17      the *New York Post*.  The title is "The Military Fired Me for

18      Calling Our Enemies Radical Jihadists."

19             The next one is another *Fox News* op-ed by

20      Michael Flynn on August 3, 2016, "General Michael Flynn,

21      Representative Allen West, Dr. David Grantham:  Yes, We Can

22      Defeat Terrorism."

23             Another *Fox News* op-ed by Michael Flynn on October 6,

24      2016, "Why Hillary's Record on Libya is Even Worse Than You

25      Think."

Miller - Cross                                                              648

1   Q.   And that's on *Fox News*?

2   A.   Yes, that's on *Fox News*.

3          And another *Fox News* op-ed by Michael Flynn on

4   November 2, 2016, "After Mosul is Liberated, ISIS Could Attack

5   U.S. Next."

6   Q.   Is that the end of them?

7   A.   That's the end of them.

8   Q.   All right.  Now, on November 8, maybe the morning of

9   November 9, the world changed for General Flynn, did it not?

10  A.   I would think so.

11  Q.   All right.  He actually was candidate/now President-elect

12  Donald Trump's right-hand man, right?

13  A.   He was certainly a high-level national security advisor,

14  yeah.

15  Q.   Correct.  And ultimately gets appointed to that position

16  after inauguration, is that correct?

17  A.   Yes.

18  Q.   All right.  And you already testified that following the

19  election, unsurprisingly, Flynn Intel Group ceased to do much

20  work anymore, correct?

21  A.   Right.

22  Q.   And Sphere basically assisted the defendant and others in

23  winding down the work you had been doing?

24  A.   Yes.

25  Q.   All right.  And after Mike Flynn was acting as national

1   security adviser sort of in the pre-inaugural phase, so in the,

2   in between election and inauguration --

3   A.   Okay.

4   Q.   -- he was obviously fairly busy, off doing other matters,

5   correct?

6   A.   I would think so.  I don't know --

7   Q.   Did you ever see him during that time?

8   A.   No.

9   Q.   All right.  And did you have any conversations with him

10  during that time?

11  A.   No.

12  Q.   All right.  And ultimately, General Flynn, under what I

13  would say is a cloud of concern, resigned as national security

14  adviser.  Would you agree with that?

15  A.   Yes.

16  Q.   And there was a fair amount of scandal associated with

17  that resignation, wouldn't you agree?

18  A.   Yeah.

19  Q.   All right.  Now, picking up, if you will, after you wound

20  down your work with Flynn Intel Group, did you stay in touch

21  from time to time with Bijan?

22  A.   Yes.

23  Q.   All right.  And had some conversations with respect to LDA

24  and FARA with Bijan?

25  A.   I believe so, yeah.

Miller - Cross                                                          650

1    Q.   Does that -- do you generally recall that?

2    A.   Yes.  I think there would have been some conversations,

3    yeah.

4    Q.   All right.  And did there come a time in either late

5    December or early January when you heard from Ekim Alptekin

6    about the potential of a project, an RFP that had been put out

7    for the government of Turkey, to do public affairs work for the

8    government of Turkey?

9    A.   Yeah, what was the time frame again?

10   Q.   Late December, early January.

11   A.   That, that sounds about right, yeah.

12   Q.   Let me turn your attention, if I can, to Defendant's

13   Exhibit 51.

14           THE COURT SECURITY OFFICER:  Which binder?

15           MS. MITCHELL:  Defendant's binder, please, 51.

16           THE WITNESS:  I'm sorry, what number again?

17           MS. MITCHELL:  51.  Thanks.

18   BY MS. MITCHELL:

19   Q.   Do you recognize that document?  Take a moment to look

20   through it.

21   A.   I'm just looking at the e-mail here?

22   Q.   Yeah.  And then you can look at the attachment to it as

23   well.

24           So backing up, does looking at that e-mail refresh

25   your recollection that sometime either late December, early

1    January, you heard from Mr. Alptekin about an RFP --

2    A.   Yes.

3    Q.   -- to put a pitch in to the government of Turkey to do

4    public affairs work?

5    A.   Yep.

6    Q.   All right.  And what's your recollection about your

7    interaction with Mr. Alptekin on that point?

8    A.   He connected us -- or informed us that there is an RFP,

9    and we met with the embassy as a result of that.

10   Q.   All right.  And you actually -- the document in front of

11   you, 51 and the attachment, is the document you put together

12   and sent to the embassy; is that correct?

13   A.   That looks correct, yeah.

14          MS. MITCHELL:  I'd offer that, Your Honor.

15          THE COURT:  Any objection?

16          MR. GIBBS:  No objection, Judge.

17          THE COURT:  All right.  Defense Exhibit 51 is

18   admitted.

19          (Defendant's Exhibit No. 51 was received in

20   evidence.)

21          MS. MITCHELL:  Why don't we put up, if we can, page 2

22   of that document.

23   BY MS. MITCHELL:

24   Q.   Tell the jurors what that is, please.

25   A.   This is the -- a proposal from Sphere SGR titled "Public

1    Affairs Plan for the Republic of Turkey."

2              Do you just want me to read the whole thing?

3    Q.   You can just tell me generally what it is.

4    A.   Yeah, it's a proposal to the embassy.

5    Q.   And did you help put that together?

6    A.   I believe so.

7    Q.   All right.  And what was the budget for that, if you

8    recall?

9    A.   I don't recall.

10   Q.   Does it -- does around $4 million sound accurate?

11   A.   If there's something you can show me, that would be

12   helpful.

13   Q.   If I can turn your attention to Defendant's Exhibit 54,

14   please?  Just take a moment to read that.

15             THE COURT:  Why don't you ask him to review 51.  51

16   is what --

17             MS. MITCHELL:  Oh, if you would remove that?  Thank

18   you.

19             THE WITNESS:  54, correct?

20             MS. MITCHELL:  If you would review 54.  We're taking

21   51 off the screen.

22             THE COURT:  Okay.  That's fine.  I think you can

23   refresh his recollection with 51 as well.

24             MS. MITCHELL:  Oh.

25             THE WITNESS:  Okay.

Miller - Cross                                                        653

BY MS. MITCHELL:

Q.   Does that refresh your recollection?

A.   I don't think I was on this, but yes.  Yeah.

Q.   All right.  And actually, if you go back to Document 51 in evidence, and why don't we focus in on the first page of it, the second full paragraph.

A.   The second full paragraph?

Q.   "Please find."

A.   Yeah.  Do you want me to read this?

Q.   Please.

A.   "Please find the attached Public Affairs Proposal for your review and consideration with regard to the requested USD 4 million annual budget campaign."

Q.   Does that refresh your recollection that it was approximately $4 million?

A.   Yes.

Q.   And, in fact, you went to the Turkish Embassy and had a meeting for that; is that correct?

A.   Yes.

Q.   And you met with foreign officials from Turkey in the context of seeking to obtain that engagement; is that correct?

A.   Yes.

        MS. MITCHELL:  All right.  May I have the Court's indulgence one moment?

        THE COURT:  Yes.

Miller - Redirect                                                          654

1             MS. MITCHELL:  Your Honor, with the Court's

2    indulgence, we have found Defendant's Exhibit 113.

3             THE COURT:  All right.

4             MS. MITCHELL:  I will --

5             THE COURT:  All right.

6             MR. GIBBS:  No objection.

7             THE COURT:  All right.  Without objection, 113 is

8    admitted.

9             (Defendant's Exhibit No. 113 was received in

10   evidence.)

11   BY MS. MITCHELL:

12   Q.   All right.  And if I could have you indicate what

13   Defendant's Exhibit 113 is?

14   A.   It is a, once again, article on *Fox News*.  I'm not, I'm

15   not sure I see who wrote it.  I feel like that's what you're

16   getting at.

17   Q.   Actually, the very last paragraph.

18   A.   Okay.  So yeah, it looks like this is another op-ed by

19   General Flynn on *Fox News* called "The Truth About What's

20   Happening in Mosul.  Hint:  Trump's Right."

21            MS. MITCHELL:  No further questions.  Thank you.

22            THE COURT:  All right.  Any redirect?

23            MR. GIBBS:  Real briefly, Judge.  Thank you.

24            THE COURT:  Yes.

25                      REDIRECT EXAMINATION

Miller - Redirect                                                    655

1  BY MR. GIBBS:

2  Q.   Now, Mr. Miller, you were provided a number of defense

3  exhibits.  I think it's 106 through 113.  There might have been

4  one missing, 108, but they were all op-eds under Michael

5  Flynn's byline.

6            Do you recall that?

7  A.   Yes.

8  Q.   And you only looked at it briefly, I understand, but in

9  your brief review of those, how many of those appeared to

10 relate to Fethullah Gulen?

11 A.   I did not -- just reading the headlines, I did not see any

12 mention of Gulen.

13 Q.   And how many of them, just reading the headlines, appear

14 to relate to the government of Turkey?

15 A.   None of them.

16 Q.   And how many of those op-eds that you have there before

17 you did the defendant contact you about trying to get you to

18 get them immediately placed with some media organization?

19 A.   None of them.

20 Q.   Now, you were also asked about this $4 million contract

21 and the proposal in January of 2017 on cross-examination.

22            Do you recall that?

23 A.   Um-hum, yes.

24 Q.   Now, you were also asked on both cross and direct about

25 the FIG-Gulen Project, and you testified that that had ended --

1  sort of fizzled out a couple weeks after Election Day, correct?

2  A.   Right.

3  Q.   So whatever that other contract was you testified about,

4  that was something separate and apart from the FIG-Gulen

5  Project that ended in November, correct?

6  A.   Yes.

7           MR. GIBBS:  All right.  Thank you.  That's all I

8  have, Judge.

9           THE COURT:  All right.  May the witness be excused?

10          MR. GIBBS:  He may, Your Honor.  Thank you.

11          THE COURT:  Mr. Miller, you're excused.  Do not

12  discuss your testimony outside the courtroom with anyone.

13                     (Witness excused.)

14          THE COURT:  Ladies and gentlemen, we're going to

15  adjourn for today.  We'll begin tomorrow again at 9:30.  Please

16  make arrangements to arrive at the courthouse by 9:15.

17          Again, please do not discuss this case with anyone

18  outside of the courtroom.  Do not engage in any research on

19  your own or investigations.  And we will see you tomorrow

20  morning at 9:15.

21                     (Jury out.)

22          THE COURT:  All right.  Mr. Gillis, Mr. Gibbs,

23  Mr. Turgeon, where -- where are we in the lineup?

24          MR. GILLIS:  We have -- pardon me, Your Honor.  We

25  have three more witnesses:  Greg Lowman, Jim Courtovich, and

1  then Special Agent Alfredo.

2           THE COURT: All right. With respect to Agent

3  Alfredo, in order for the Court to consider the issue you

4  raised, I'm going to need to know what specific documents you

5  would want him to summarize. So if you could be prepared to

6  identify those for, for the Court --

7           MR. GILLIS: I will, Your Honor.

8           THE COURT: -- in the morning?

9           MR. GILLIS: I will.

10          THE COURT: All right?

11          MR. GILLIS: All right.

12          THE COURT: All right. Any other issues?

13          Mr. MacDougall, it looks like you're approaching for

14  a reason.

15          MR. MacDOUGALL: I am. This will be just very brief,

16  just housekeeping. At the end of the day yesterday, the Court

17  will recall we asked about Exhibit 102, which was Ms. Langton's

18  memorandum. I believe Mr. Gillis agreed that there would be no

19  objection.

20          THE COURT: Right.

21          MR. MacDOUGALL: We had not formally moved it into

22  evidence yet.

23          THE COURT: All right.

24          MR. MacDOUGALL: In anticipation of the government

25  closing tomorrow, or resting tomorrow, I wanted to move that

1    into evidence now.

2              THE COURT:  All right.

3              MR. MacDOUGALL:  Thank you, Your Honor.

4              THE COURT:  Any objections?

5              MR. MacDOUGALL:  This is Defense 102.

6              THE COURT:  Right.

7              MR. MacDOUGALL:  This, this is Ms. Langton's e-mail

8    that had all the attachments with it.  We're just moving in 102

9    that talks about -- that we discussed yesterday.

10             THE COURT:  All right.  Without objection, Defense

11   Exhibit 102 will be admitted.

12             (Defendant's Exhibit No. 102 was received in

13   evidence.)

14             THE COURT:  Anything else?

15             MR. GILLIS:  No, Your Honor, thank you.

16             THE COURT:  All right.  We'll convene at 9:00

17   tomorrow morning.

18             MR. GILLIS:  Thank you, Your Honor.

19             (Recess from 5:36 p.m., until 9:00 a.m., July 18,

20   2019.)

21                  CERTIFICATE OF THE REPORTER

22       I certify that the foregoing is a correct transcript of

23   the record of proceedings in the above-entitled matter.

24

25                                    /s/
                                   _____
                                   Anneliese J. Thomson