1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION

3  UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                )
4              Plaintiff,       )
                                )
5       v.                      )  Alexandria, Virginia
                                )  July 18, 2019
6  BIJAN RAFIEKIAN,             )  9:00 a.m.
                                )
7              Defendant.       )  Day 4 (AM Session)
                                )  Pages 659 - 799
8

9              TRANSCRIPT OF TRIAL

10      BEFORE THE HONORABLE ANTHONY J. TRENGA

11        UNITED STATES DISTRICT COURT JUDGE

12                 AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE UNITED STATES OF AMERICA:

     JAMES P. GILLIS, ESQUIRE
     EVAN N. TURGEON, ESQUIRE
     JOHN T. GIBBS, ESQUIRE
     S. KATE SWEETEN, ESQUIRE
     OFFICE OF THE UNITED STATES ATTORNEY
     2100 Jamieson Avenue
     Alexandria, Virginia  22314
     (703) 299-3700

FOR BIJAN RAFIEKIAN:

     ROBERT P. TROUT, ESQUIRE
     TROUT, CACHERIS & SOLOMON, PLLC
     1627 I Street, N.W., Suite 1130
     Washington, D.C.  20006
     (202) 464-3300

     MARK J. MACDOUGALL, ESQUIRE, *PRO HAC VICE*
     STACEY H. MITCHELL, ESQUIRE, *PRO HAC VICE*
     JOHN C. MURPHY, ESQUIRE, *PRO HAC VICE*
     JAMES E. TYSSE, ESQUIRE
     AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
     Robert S. Strauss Building
     1333 New Hampshire Avenue, N.W.
     Washington, D.C.  20036-1564
     (202) 887-4000

THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON

1                          **I N D E X**

2     GOVERNMENT'S WITNESS              EXAMINATION        PAGE

3     Greg Lowman                      Direct             677
                                       Cross              695
4
      James Courtovich                 Direct             698
5                                      Cross              734
                                       Redirect           755
6
      Bryan T. Alfredo                 Direct             765
7                                      Cross              788

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (The jury and Mr. Turgeon are not present.)

 2              THE CLERK:  Criminal Case 1:18-cr-457, *United*

 3  *States v. Bijan Rafiekian*.

 4              Counsel, will you please note your

 5  appearances for the record.

 6              MR. GILLIS:  Good morning, Your Honor.  Jim

 7  Gillis and John Gibbs for the United States.  Your

 8  Honor, Mr. Turgeon had some sort of family emergency.

 9  I don't know what it was.

10              THE COURT:  All right.

11              MR. GILLIS:  I ask the Court's permission for

12  him to be able to enter the well --

13              THE COURT:  Yes.

14              MR. GILLIS:  -- when he's able to arrive.

15              THE COURT:  Of course.

16              MR. GILLIS:  Thank you.

17              MR. GIBBS:  Good morning.

18              THE COURT:  Good morning.

19              MR. MACDOUGALL:  Good morning, Your Honor.

20  Mark MacDougall for the defendant, Bijan Rafiekian, who

21  is here in court today, along with Robert Trout, Stacey

22  Mitchell, and James Tysse.

23              THE COURT:  All right.  Welcome to everyone.

24              Does either side have any issues they want to

25  raise?

1                  Mr. Gillis.

2                  MR. GILLIS:  Your Honor, the Court had asked

3     for a list of exhibits that we planned to ask Special

4     Agent Alfredo about.

5                  THE COURT:  All right.

6                  MR. GILLIS:  In truth, they're not all

7     intended for summary purposes, and there's very few.  I

8     can cite the Court to some cases --

9                  THE COURT:  All right.

10                 MR. GILLIS:  -- that permit that sort of

11    testimony.

12                 THE COURT:  Are you going to give me a list

13    of the exhibits?

14                 MR. GILLIS:  I can do that first.

15                 May I give that to Mr. Burns, please?

16                 THE COURT:  All right.

17        (Documents are given to the Court.)

18                 THE COURT:  All right.  Have you provided a

19    copy to the defense?

20                 MR. GILLIS:  I e-mailed it last night and

21    then early this morning.

22                 THE COURT:  All right.

23                 MR. GILLIS:  Would you like to hear any

24    argument?

25                 THE COURT:  Yes.

1          MR. GILLIS:  So, Your Honor, we have a couple

2  of cases here addressing specifically summary testimony

3  by an agent in a complex case such as this one, and one

4  is in the -- actually, I can hand up clean copies for

5  the Court through Mr. Burns.

6          Thank you.

7      (Documents are given to the Court.)

8          THE COURT:  Thank you.

9          MR. GILLIS:  So, Your Honor, I had provided a

10  copy of these to defense counsel as well.

11          THE COURT:  All right.

12          MR. GILLIS:  In that Fifth Circuit case,

13  *United States v. Baker*, 923 F.3d 390, a 2019 case from

14  the Fifth Circuit, on page 8 of the Westlaw printout,

15  that bottom paragraph there notes:  The agent's

16  testimony that tied specific, already-admitted exhibits

17  to the substantive indictment counts listed on a

18  demonstrative chart is summary testimony.  Such

19  testimony is permissible in complex cases with

20  voluminous evidence.

21          I submit that this is such a case, Your

22  Honor.

23          And then in the Fourth Circuit -- I guess I

24  should have started off with that one.  The Fourth

25  Circuit is *United States v. Janati*.  That's 374 F.3d

1   263, a 2004 decision.  On page 11 of the Westlaw

2   printout, at the bottom of page 10 onto the top of

3   page 11, it speaks of summaries may include witnesses'

4   conclusions or opinions or they may reveal inferences

5   drawn in a way that would assist the jury.  Of course,

6   it makes note that it's always within the discretion of

7   the Court.

8           Then in that first complete paragraph in the

9   second column of page 11, the Fourth Circuit says,

10  "Moreover, when the government prosecutes a conspiracy

11  involving a series of crimes -- alleged by the

12  government in this case to number more than 1300" -- of

13  course, that's not the case here -- "the government

14  must be given additional latitude during trial to carry

15  its burden of proof.  Similarly, when it is faced with

16  a difficult task of proving implied intent, it must

17  also be given some extra latitude to distinguish

18  purposeful conduct from mistake."

19          So we submit, Your Honor, that this brief

20  summary testimony by the agent would be perfectly

21  appropriate.

22          Truthfully, as the Court will see, not all of

23  those exhibits are intended to be summaries as much as

24  just to remind the jury where we are in the story, to

25  give background to what the agent will then testify

1  concerning specific things that he observed or searched

2  for in the electronic evidence of this case.

3          THE COURT:  His testimony is to summarize the

4  documents as opposed to essentially presenting a

5  narrative supported by documents?

6          MR. GILLIS:  No.  Exactly.  He's not going to

7  provide a narrative supported by documents.

8          THE COURT:  Right.

9          MR. GILLIS:  I think the Court will agree

10 that -- if permitted, the Court will agree that they're

11 really intended only to orient the jury to the

12 testimony that he's about to provide.

13         THE COURT:  All right.  Mr. Trout.

14         MR. TROUT:  Thank you, Your Honor.

15         We're opposed to the summary witness.  Your

16 Honor, I think if the Court -- if I could refer the

17 Court to *United States v. Johnson*, a Fourth Circuit

18 case from 1995, I think it speaks to the prejudices

19 that can occur.  I think it's typically what I

20 believe --

21         THE COURT:  What's the cite on *Johnson*?  Oh,

22 I see it.  It's 54 F.3d 1150.

23         MR. TROUT:  Yes, at 1167.

24         Your Honor, the length of the trial is

25 obviously a consideration.  We've had two days of

1   testimony.  The number of witnesses testifying is a

2   consideration.  We've had actually not many witnesses.

3   There has been one witness already who has been

4   essentially a summary witness.  That was Grant Smith

5   who went through various financial documents and just

6   kind of highlighted the financial documents.

7           This is just not a complex case that would

8   call for a summary witness.  I think if you look at the

9   exhibits that the government wants to use, what is

10  evident is that they want to essentially take this type

11  of evidence that might be an e-mail with lots of

12  hearsay and maybe this financial document over here and

13  piece it all together, really, the obligation of

14  counsel in closing argument.  They're really trying to

15  essentially summarize their case a second time -- or a

16  first time in advance of the closing argument.

17          I think what you will see with the documents

18  is that some of them, many of them, are being

19  offered -- that there's going to be testimony about

20  them in order to essentially show again to the jury

21  communications from Alptekin which are hearsay, and

22  they will -- it will have the effect -- no matter what

23  sort of instructions the Court gives, it will have the

24  effect of essentially emphasizing the inadmissible

25  hearsay.

1              So we do not believe that this is a case

2    where a summary witness is called for.  We don't

3    understand how Special Agent Alfredo really has any new

4    information, new evidence to present.

5              THE COURT:  All right.

6              MR. GILLIS:  Your Honor, if I just may

7    respond?

8              THE COURT:  Yes.  Mr. Gillis, just so I'm

9    clear, all the exhibits that you've listed in what

10   you've given the Court, those are in evidence or will

11   be in evidence?

12             MR. GILLIS:  They're in evidence.  He's going

13   to introduce a couple of them himself, but they are

14   otherwise -- they will be in evidence.  They either

15   already are -- and I can identify those that aren't in

16   evidence.  There will be two or three that will be

17   introduced by Special Agent Alfredo.

18             His testimony is certainly going to be

19   90 percent substantive concerning his own observations

20   based upon the evidence.

21             THE COURT:  Observations of what?

22             MR. GILLIS:  Observations that he made

23   concerning the electronic evidence and certain word

24   searches that he did and what he found or didn't find

25   in the searches of all of this electronic evidence of

1 which there is about 28,000 e-mails, all of which the

2 defense has and in a form that they, too, can do their

3 own word searches for.

4           THE COURT:  Which of these exhibits aren't in

5 evidence?

6           MR. GILLIS:  Are not in evidence, Your Honor?

7           THE COURT:  Are not in evidence, yes.

8           MR. GILLIS:  May I have just one moment?

9           THE COURT:  Yes.

10           MR. GILLIS:  I have to find my own list

11 again, Your Honor.  If you will, just give me one

12 second.

13           Exhibit 8A is just an amendment of -- we have

14 a new 8A that we've given to defense counsel.  It's

15 simply the actual e-mail, rather than the screenshot of

16 the e-mail.  That's really not a substantive change.

17           THE COURT:  All right.

18           MR. GILLIS:  Exhibit 15 is in evidence.

19 Exhibit 15A is not.  Exhibit 16 is in evidence.

20 Exhibit 17 is in evidence.  Exhibit 20 is in evidence.

21 Exhibit 23A is in evidence.  Exhibit 23B is in

22 evidence.  Exhibit 20H --B isn't -- no.  I'm sorry.

23 Exhibit 28B is not in evidence; although, I'm not sure

24 if we're going to use that.  Exhibit 41 is in evidence.

25 Exhibit 93B is in evidence.  Exhibit 93A is in

1   evidence.  Exhibit 26A is in evidence.  Exhibit 26B is

2   in evidence.  Exhibit 103A is in evidence, and 103B is

3   in evidence.  Exhibit 104A and B are in.

4          THE COURT:  All right.  I'll review this and

5   give you a decision before the agent testifies.

6          MR. GILLIS:  Thank you, Your Honor.

7          If I could just have one final word in

8   rebuttal.

9          THE COURT:  Yes.

10         MR. GILLIS:  There are 162 exhibits that are

11  entirely documentary in this case.  The jury has been

12  drinking from the fire hose with these exhibits.  And

13  simply to orient them as to date and subject, which is

14  really all these exhibits are for, to put in context

15  his substantive testimony, I think, Your Honor, is the

16  appropriate leeway that you have full discretion to

17  allow or not allow.

18         THE COURT:  All right.

19         MR. GILLIS:  Thank you, Your Honor.

20         THE COURT:  Yes.

21         MR. TROUT:  Your Honor, just on a separate

22  issue for Agent Alfredo.

23         THE COURT:  Yes.

24         MR. TROUT:  Mr. Rafiekian's electronic

25  devices were actually seized pursuant to search

1   warrant.  We essentially called them up and told them

2   that we had them, that they can come and get them from

3   us.  So we would ask that the Court direct Mr. Alfredo

4   not to essentially refer to them having conducted a

5   search and seizure of his --

6           THE COURT:  Any issue with that?

7           MR. GILLIS:  We did have a warrant, Your

8   Honor.

9           THE COURT:  No, I understand.  They were

10  turned over, though, I take it.

11          MR. GILLIS:  Pursuant to a warrant, Your

12  Honor.

13          MR. TROUT:  Just to be clear, there was a

14  subpoena.  Counsel asserted on behalf of Mr. Rafiekian

15  active production privilege and told them that we were

16  going to get the documents, and when they got a search

17  warrant, they should come to our offices.  They called

18  us up, told us that they had a search warrant.  They

19  were not going to search our offices.  They just wanted

20  us to meet them at the door and hand over the devices,

21  which we did.

22          THE COURT:  What are you asking?

23          MR. TROUT:  I'm asking that he not refer to

24  the fact that they had seized pursuant to search

25  warrant these devices as opposed to they examined the

1  devices.  If the point is we examined these devices, he

2  can talk about that without going through the

3  procedures under which they got them.

4          THE COURT:  All right.

5          MR. GILLIS:  It was not a voluntary

6  production, Your Honor.

7          THE COURT:  I understand.

8          MR. GILLIS:  There was a warrant that was --

9  actually, I believe it was for the office of Mr. Trout

10 for those search warrants.  As a convenience to him, we

11 allowed him to produce them.  But to suggest that they

12 were voluntarily provided by the defendant, they

13 certainly were not.

14         THE COURT:  No, I understand.  I'll let the

15 agent testify that he reviewed records that were

16 obtained through subpoena.

17         MR. GILLIS:  By subpoena?

18         THE COURT:  Oh, it was a search warrant.  All

19 right.  By warrant.

20         MR. GILLIS:  Thank you.

21         THE COURT:  All right.  Anything else?

22         MS. MITCHELL:  Yes, Your Honor.

23         THE COURT:  Yes.

24         MS. MITCHELL:  I wanted to report to the

25 Court this morning -- I have already advised counsel

 1   for --

 2             MR. GILLIS:  You should approach.

 3             MS. MITCHELL:  May we approach, Your Honor?

 4             THE COURT:  Yes.

 5        (Conference at the bench, as follows:)

 6             MS. MITCHELL:  Your Honor, as I was waiting

 7   out the rain last night in front of the building, I did

 8   not realize that a juror was standing next to me.  I

 9   did not say anything related to the case.  At some

10   point, as I looked to my left to check out the rain, I

11   realized it was a juror.  He said something to me.  I

12   don't know all the words, but it ended with the word

13   "case."  I looked down.

14             THE COURT:  He was talking to somebody else?

15             MS. MITCHELL:  Oh, no.  He was talking to me.

16   He said something, something, something, case.  I

17   looked down, and I ran out into the rain.

18             THE COURT:  All right.

19             MS. MITCHELL:  So Mr. Gillis and I have had a

20   chance to chat.  We believe it's the same juror that

21   said something to him in the elevator.  I think at this

22   point we're not suggesting anything.  Maybe a reminder

23   in the flow of things that they shouldn't talk to us

24   and we're not being rude.

25             MR. GILLIS:  Right.  We don't want to appear

1   that the two of us dimed him out.

2            THE COURT:  While we're talking about jurors,

3   there's one juror here who is enjoying a good nap every

4   now and then.  He's an alternate.

5            MR. GILLIS:  That could be my fault.

6            THE COURT:  If he were a regular juror, I

7   would think about striking him.  Given that he's an

8   alternate, unless you-all want me to do something else,

9   I'm inclined to just hang in there with him.

10           MS. MITCHELL:  We also think he might be the

11  same gentleman that's approaching us.

12           MR. GILLIS:  Actually, I thought it was

13  somebody else.

14           MS. MITCHELL:  Oh, all right.

15           THE COURT:  All right.

16           MR. MACDOUGALL:  Judge, we handled this at

17  sidebar yesterday.  If I may.

18           THE COURT:  Yes.

19           MR. MACDOUGALL:  Government Exhibit 146 had a

20  redaction ordered by the Court.  We prepared a

21  redaction.  I've given them to the government.  If we

22  could move those be used as a replacement.

23           THE COURT:  All right.  Good.

24           Thank you.

25           MR. MACDOUGALL:  Thank you, Your Honor.

 1            MR. GILLIS:  Thank you, Your Honor.

 2       (Proceedings continued in open court, as

 3       follows:).

 4            THE COURT:  All right.  We'll stand in recess

 5  until the jury is assembled.

 6            The Court will stand in recess.

 7       (Recess from 9:25 a.m. until 9:37 a.m.)

 8       (The jury is not present.)

 9            THE COURT:  Ready to bring the jury out?

10            MR. GILLIS:  Yes.

11            THE COURT:  All right.  Let's bring the jury

12  out.

13            MR. GILLIS:  Your Honor --

14            THE COURT:  Yes.

15            MR. GILLIS:  -- may we approach at sidebar

16  just having to do with Mr. Turgeon's absence and his

17  entry afterward?  I don't want it to appear that it's

18  disrespectful to the Court or the jury.

19            THE COURT:  All right.  We can deal with

20  that.

21            MR. GILLIS:  Okay.  Thank you, Your Honor.

22       (The jury enters at 9:38 a.m.)

23            THE COURT:  All right.  Please be seated.

24            All right.  Is the government ready to

25  proceed?

1            MR. GIBBS:  Well, Your Honor.  We have one

2   matter to take up with the Court.

3            THE COURT:  Yes.

4            MR. GIBBS:  At this time, we would offer two

5   new exhibits, Government's Exhibits 166 and 167.  They

6   are the LDA forms that were filed on behalf of the

7   defendant.  In addition, we've got 168 and 169, which

8   are the bills from the House and Senate that the forms

9   indicate the lobbying activities were taking place on

10  behalf of.

11           THE COURT:  All right.  Any objection?

12           MS. MITCHELL:  No objection, Your Honor.

13           THE COURT:  Without objection,

14  Exhibits 168 --

15           Is that --

16           MR. GIBBS:  Your Honor, it's 166, which is

17  the LD-1 form; 167, which is the LD-2 form; 168, which

18  is the -- I believe it's the House Bill; and 169 -- the

19  House legislation, I guess; and 169, which is the

20  Senate legislation.  They are both referenced within

21  the LDA documents.

22           THE COURT:  All right.  Exhibits --

23           MS. MITCHELL:  Your Honor, with one point of

24  clarification.  I think Mr. Gibbs inadvertently

25  referenced they were filed on behalf of the defendant.

1    It's actually on behalf of the Flynn Intel Group.  The

2    documents speak for themselves.

3                 THE COURT:  All right.

4                 MR. GIBBS:  Yes, Ms. Mitchell is exactly

5    right.  I apologize, Your Honor.  That's correct.

6                 THE COURT:  All right.  Exhibits 166, 167,

7    168, and 169 are admitted.

8                 MR. GIBBS:  Thank you, Judge.

9                 THE COURT:  All right.  The government will

10   call its next witness.

11                MR. GILLIS:  Your Honor, we call Greg Lowman,

12   please.

13                THE COURT:  All right.  Mr. Lowman will come

14   forward, please.

15          GREG LOWMAN, PLAINTIFF'S WITNESS, AFFIRMED

16                       DIRECT EXAMINATION

17   BY MR. GILLIS:

18   Q    Good morning, sir.  Would you tell jury your name.

19   A    Greg Lowman.

20   Q    And where in the fall of -- in the summer and fall

21   of 2016 did you work?

22   A    Sphere Consulting.

23   Q    And what was your position there?

24   A    Partner.

25   Q    In what city is Sphere's office?

Lowman - Direct

1  A     Washington, D.C.

2  Q     What kind of work does Sphere do?

3  A     Public affairs consulting, lobbying and

4  communications work.

5  Q     And what kind of work did you do?

6  A     I handled particularly financial services,

7  aerospace and defense, and a little bit of government

8  representation.

9  Q     When you say "government representation," what do

10  you mean?

11  A     Representing sovereign countries under the FARA

12  laws.

13  Q     And did Sphere file under the Foreign Agents

14  Registration Act when working with foreign sovereign

15  governments?

16  A     Yes.

17  Q     Are you familiar with the Flynn Intel Group or

18  FIG?

19  A     I am.

20  Q     Did you refer to is as FIG?

21  A     Yes.

22  Q     Did Sphere ever do any work for FIG?

23  A     Yes.

24  Q     How many projects did Sphere and FIG work

25  together?

Lowman - Direct

1   A    One.

2   Q    Were you involved in that work?

3   A    I was.  Not as in depth or as close as others, but

4   around the edges.

5   Q    Okay.  In what way?

6   A    I was at the initial meeting, one other meeting,

7   and was copied on some e-mails.  But was never

8   intensely involved in the project.

9   Q    Who was the principal contact for FIG on the

10  project?

11  A    Graham Miller.

12  Q    That's for Sphere, is that right?

13  A    Yep.

14  Q    And who was the principal contact for FIG?

15  A    Bijan Kian.

16  Q    Do you see Mr. Kian in the courtroom today?

17  A    I do.

18  Q    And where do you see him?

19  A    Right there.

20       THE COURT:  The record will reflect he's

21  identified Mr. Rafiekian.

22  BY MR. GILLIS:

23  Q    Sir, you mentioned that you were at the initial

24  meeting.  Was that with Sphere and FIG personnel about

25  a possible project with FIG?

1  A    That's right.  Yep.

2  Q    Where did that take place?

3  A    That was at their offices in Alexandria.

4  Q    Do you recall when that was?

5  A    September 2016 sounds about right.

6  Q    Let me ask you --

7  A    Oh, I'm sorry.  August.  That would have been

8  August, right?

9  Q    August?

10  A    2016.

11  Q    And if I could ask you to take a look at

12  government's grand jury -- pardon me --Governments

13  Exhibit 96A.  Could you read -- so this is -- do you

14  recognize Graham Miller?

15  A    Yep.

16  Q    In that e-mail, he says, thanks for thinking of

17  Sphere.  We have compiled our initial thoughts into a

18  memo, and I have attached it for your review.  Please

19  let us know of anything else we can provide.  I will

20  stand by for next steps.

21       Do you see that he refers to the briefing on

22  Tuesday?

23  A    That's right.

24  Q    Do you see that this e-mail is dated August 18, a

25  Thursday.

Lowman - Direct

1  A    That's right.  Yep.

2  Q    Does that help refresh your memory?

3  A    Yep.  It -- I was confusing the two meetings.

4  August was the first one.

5  Q    What date in August?

6  A    August 16, 2016.

7  Q    And do you recall who was there?

8  A    Myself, James Courtovich, Graham Miller, an

9  associate at the time of ours, John Kelley, Bijan Kian,

10 and General Flynn.

11 Q    What was the purpose for this meeting?

12 A    The purpose was to introduce the potential project

13 to us, and also get a little bit of a sense of what we

14 do, in particular, with General Flynn who hadn't heard

15 of us before.

16 Q    And who did most of the talking at this meeting?

17 A    I'd say Bijan did the bulk of the talking.

18 Q    What was it that the defendant said?

19 A    He was introducing the project as an opportunity

20 to showcase to the world, frankly, that a more balanced

21 view of why the coup was underway, and why Turkish

22 business interests were concerned about the perception

23 of Turkey at the time, and their needs to balance that

24 perception.

25 Q    You mentioned Turkish business --

1  A      Interests.

2  Q      -- interests.

3  A      Yep.

4  Q      Did he refer to the client in any way or describe

5  --

6  A      No.  It was always --

7  Q      Did he describe --

8  A      - at that stage, that very early stage, a

9  collection of business interests or individuals.

10 Q      You mentioned the coup.  Was there any mention of

11 who was involved in the coup?

12 A      Yeah.  It was -- the idea was certainly to inform

13 people of the actors involved so that the perception

14 wasn't that Erdogan's actions were out of thin air.

15 Q      And whose actions?

16 A      The president of Turkey, Recep Erdogan.  That his

17 actions in the country were taken out of thin air and

18 were not arbitrary so that there was some balance to

19 the perception of why he was doing what he was doing,

20 and it was because of actions by Fethullah Gulen to

21 foment the situation in the country.

22      In, you know, in dealing with investors,

23 international investors, typically they want to

24 understand a good sense of rule of law in a country.

25 And if they're looking at a country that's taking these

Lowman - Direct

1  actions -- at the time, there were concerns as to the

2  perception of why that was taking place.

3  Q    You mentioned the actions of President Erdogan at

4  the time.  What are you referring to?  What time period

5  are you talking about?

6  A    You know --

7  Q    I mean, in relation to any particular event?

8  A    The coup.

9  Q    Did you know who Gulen was at the time?

10  A    No.

11  Q    Did anyone at the meeting tell you about him?

12  A    Yes.

13  Q    Who?

14  A    Bijan Kian.

15  Q    And what did the defendant say?

16  A    He sketched a portrait of a man, who while seemly

17  innocent and living in the Poconos, was behind an

18  attempt to overthrow the Turkish government.

19  Q    Did he mention anything about a past relationship

20  that there had been between Erdogan and Gulen?

21  A    They were close at one time I remember hearing.

22  Q    Did you discuss what the end product of this

23  project would be?

24  A    It was going to be a video that we would promote

25  to the media, the mainstream media.

Lowman - Direct

1  Q    What kind of -- I mean, if you could characterize

2  it, what kind of video was in mind?

3  A    A *60 Minutes* style video, a one-on-one interview,

4  you know, in a nondescript room, is how I pictured it.

5  Q    Okay.  Was there going to be any particular

6  subject of this documentary video for -- like *60*

7  *Minutes*?

8  A    Yeah.  The subject was going to be the background

9  of Fethullah Gulen, and the issues surrounding the

10 coup.

11 Q    And what was Sphere's role going to be in that

12 project?

13 A    We weren't going to have any role in the

14 production of the video, but once the video was made it

15 was my belief that we were to promote it to the public

16 and through our strong relations in the media.

17 Q    Okay.  What was your understanding about whether

18 this video was going to be complementary or not

19 concerning Mr. Gulen?

20 A    Yeah.  I mean, I certainly got a sense that it

21 wasn't going to be a positive story to be told about

22 Gulen, you know, that's for sure.

23 Q    Do you recall him saying anything about -- or I

24 should say, what, if anything, did the defendant say

25 about the business concerns or the group of business or

Lowman - Direct

1    businessmen, what type of activities were they involved

2    in?

3    A    There was certainly an element of travel and

4    tourism, I remember hearing.  You know, just the

5    general perception of investing in a country during

6    such a destabilized time seemed to be the prime

7    concern.

8    Q    What, if anything, did he say about hotels?

9    A    That those interests were involved.

10   Q    If I could ask you to look at Government

11   Exhibit 16, please.

12              MR. GILLIS:  And if you would, just

13   enlarge -- yes.  Thank you.

14   BY MR. GILLIS:

15   Q    Your meeting at the Flynn Intel Group took place

16   on August 16; is that right?

17   A    Correct.

18   Q    Did you see this e-mail at any time during the

19   project?

20   A    I did not.

21   Q    Were you aware at the time that -- well, first of

22   all, did you learn later who Ekim Alptekin was?

23              MS. MITCHELL:  Your Honor, objection.  May we

24   approach?

25              THE COURT:  What?

Lowman - Direct

1          MS. MITCHELL:  Your Honor, this is a document

2    that's been entered for limited purpose and it's

3    hearsay.

4          THE COURT:  Right.  Why don't you take down

5    the exhibit.  I don't think you -- you asked him about

6    it.  Why don't you take the exhibit down.

7    BY MR. GILLIS:

8    Q    Did you hear anything said about a green light

9    being given six days before you met for some other

10   project?

11   A    No.

12   Q    At any time during this first meeting between

13   Sphere and FIG, what did the defendant tell you --

14   what, if anything, did the defendant tell you about a

15   potential project or contract with the government of

16   Turkey that related to Gulen?

17   A    I had never heard any mention of that.

18   Q    At any time during the meeting, what did the

19   defendant, if anything, tell you about any previous

20   potential project or contract that FIG had with the

21   Turkish government in the summer of 2016?

22   A    I never heard anything related to the Turkish

23   government being the client.

24   Q    At any time during the meeting, what did the

25   defendant say, if anything, about any potential project

Lowman - Direct

1   or contract that had fallen through shortly before the

2   date of your meeting?

3   A    I never heard anything about that.

4   Q    At any time during the meeting, what, if anything,

5   did the defendant tell you about meetings or

6   conversations that had been had with Turkish ministers

7   about any potential project or contract that related to

8   Gulen?

9   A    I never heard anything about that.

10  Q    The second meeting that you mentioned, where did

11  that take place?

12  A    It was at the University Club in Washington, D.C.

13  Q    And when was that?

14  A    September 2016.  Mid-September, if my memory

15  serves me correctly.

16  Q    If you could look at Government's Exhibit 105.  Do

17  you see the date of that e-mail is September 19, and

18  the defendant mentioned that they're in New York,

19  returning the next morning, and he looked forward to

20  seeing Graham Miller.  Does that help -- specifically

21  he mentioned the University Club.  Does that help you

22  recall when in September that meeting at the University

23  Club took place?

24  A    Yes.

25  Q    When was that?

Lowman - Direct

1  A    I guess that would have been the 20th of

2  September.

3  Q    Who was at the meeting at the University Club?

4  A    Myself, Graham Miller, Jim Courtovich, Bijan Kian,

5  General Flynn and Mike Boston, I believe.

6  Q    And did the subject of Gulen come up at that

7  meeting?

8  A    Yes.

9  Q    And what, if any, comparison did the defendant

10  make of Gulen to anybody else?

11  A    He compared him to Khomeini, the Iranian leader.

12  Q    How did he describe Khomeini?

13  A    He described him as someone who, when introduced

14  to the world when he was in France, was considered

15  somewhat of a peaceful Muslim cleric, and not

16  threatening.  But slowly developed obviously a harder,

17  more conservative brand of Islam, and moved to Iran,

18  pulling the wool over people's eyes, essentially, was

19  the message.  Similar to Fethullah Gulen.

20  Q    And with regard to Khomeini, did he -- what, if

21  anything, did he say about an apple tree?

22  A    That he would sit under an apple tree in Paris and

23  proselytize about his religion.

24  Q    That's Khomeini would sit under --

25  A    Khomeini.

Lowman - Direct

1   Q    I take it not the defendant?

2   A    Correct.

3   Q    Yes.  Okay.

4        So is that a comparison that you had heard the

5   defendant make before?

6   A    Yes.

7   Q    When was that?

8   A    That would be at the first meeting in August.

9   Q    Okay.  And in the -- in that meeting at the

10  University Club on November -- rather, September 20th,

11  do you recall, if anything, was distributed at the

12  meeting?

13  A    Yeah.  A set of talking points was handed out.

14  Q    Would you take a look, please, at Government

15  Exhibit 103B.  Have you seen that before?

16  A    I have.

17  Q    And what is that?

18  A    Those are the talking points handed out at that

19  September meeting.

20  Q    And if we could look at this first paragraph under

21  January there.  Is that consistent with the description

22  of Khomeini that the defendant gave?

23  A    Yes.

24  Q    And if we could look that the last paragraph under

25  September 18 referring to a cleric in the Poconos.  Is

Lowman - Direct

1  that consistent with the description that the defendant

2  gave you at the University Club?

3  A    It is.

4  Q    If you would, please turn to the second page of

5  Government Exhibit 103B.  If you could, look at the --

6  well, actually, if you could just -- let's just go from

7  questions to No. 2 there.  That's fine.

8       Do you recall seeing a list similar to these

9  questions at the University Club?

10  A    Yeah.

11  Q    Those were among the talking points?

12  A    Correct.

13  Q    And who was the subject of those questions?

14  A    Fethullah Gulen.

15  Q    Now, we've met before, and we've discussed this

16  exhibit; is that right?

17  A    Yes.

18  Q    What, if anything, is mentioned there about

19  foreign investments in Turkey?

20  A    There is not any mention of foreign investment in

21  Turkey.

22  Q    What, if anything, is mentioned about the hotel

23  industry in Turkey?

24  A    There's no mention of hotel industries in Turkey.

25  Q    How about tourism?

Lowman - Direct

1   A    No mention of tourism.

2   Q    All right.  If you would, take a look, please, at

3   Government Exhibit 104A.

4           MS. MITCHELL:  Objection based on the same

5   grounds, Your Honor.

6           THE COURT:  Let's hear the question.

7           MS. MITCHELL:  It's being displayed to the

8   jury, Your Honor.

9           THE COURT:  That's all right.  Why don't you

10  review it, take it down.

11          Do you have a question about this?

12          MR. GILLIS:  I do, Your Honor.  It has to do

13  with a statement in that -- that is was consistent

14  with --

15          THE COURT:  Well, he wasn't copied on this.

16  Why don't you just ask him about subject matter whether

17  it was inquired into, which is what you want to get at;

18  isn't that right?

19          MR. GILLIS:  Can I ask him to review the

20  e-mail?

21          THE COURT:  Yes.

22          MR. GILLIS:  All right.

23  BY MR. GILLIS:

24  Q    Do you have that in front of you there?

25  A    Not right now.

Lowman - Direct

1           THE COURT SECURITY OFFICER:  Mr. Gillis, gave

2   him your binder.

3           MR. GILLIS:  Thank you, sir.

4   BY MR. GILLIS:

5   Q    In this e-mail, do you see there the last sentence

6   there in 104A?  Just read that to yourself, please.

7   A    He is as important -- oh, to myself?

8   Q    No.  No.  To yourself, please.

9   A    Yeah.  Sorry.

10          Okay.

11  Q    Have you read it?

12  A    Yeah.

13  Q    Have you -- do you recall whether you ever heard

14  the defendant refer to President Erdogan in that way?

15  A    I don't recall.

16  Q    Do you recall President Erdogan being mentioned at

17  a meeting at the University Club?

18  A    I don't recall.

19  Q    Do you recall the subject of a trip to New York

20  coming up during that University Club meeting?

21  A    Yes.

22  Q    And if I can ask you to look at Government

23  Exhibit 105.

24          MR. GILLIS:  It's in evidence, Your Honor.

25          THE COURT:  Yes.

Lowman - Direct

1  BY MR. GILLIS:

2  Q    Could you focus in on this e-mail from Mr. Kian.

3  And he tells you there on the 19th that he's in New

4  York, scheduled to return tomorrow morning.  General

5  Flynn and I look forward to seeing you tomorrow.  Does

6  that refresh your memory as to when the meeting in New

7  York took place?

8              MS. MITCHELL:  Objection.

9              THE COURT:  Yes.  Sustained.  There's no

10 evidence he was at that meeting; is there?

11             MR. GILLIS:  I'm sorry, Your Honor?

12             MS. MITCHELL:  And he further -- I believe

13 the testimony was, Your Honor, that he didn't hear

14 about it.

15             THE COURT:  Right.  You want to ask him about

16 whether he was told anything about the meeting at the

17 University Club?

18             MR. GILLIS:  Yes.

19             THE COURT:  Why don't you ask him that

20 question.

21             MR. GILLIS:  I will, Your Honor.  Thank you.

22             MS. MITCHELL:  Can the exhibit be taken down?

23             THE COURT:  Yes.

24 BY MR. GILLIS:

25 Q    So do you recall the subject of a trip to New York

1  coming up at the University Club?

2  A    Yes.  It was my understanding that General Flynn

3  was headed up to New York from the University Club

4  meeting.

5  Q    And do you recall -- okay.  Do you recall any

6  mention at the New York meeting of -- well, what, if

7  anything, was said at that University Club meeting

8  about meeting with Turkish officials in New York?

9           MS. MITCHELL:  Objection.

10          THE COURT:  Overruled.

11 A    There was no mention.

12 Q    At the time of that University Club meeting, or

13 actually during the meeting, what, if anything, did the

14 defendant tell you about a prior potential project or

15 contract with the government of Turkey that related to

16 Gulen?

17 A    He did not.

18 Q    What, if anything, did the defendant tell you at

19 the University Club about meetings or conversations

20 that Mr. Alptekin had had with Turkish ministers about

21 a potential project that related to Gulen?

22 A    He did not tell me anything about that.

23 Q    At any time during the meeting did the defendant

24 ever tell you about any previous potential project or

25 contract that FIG had with the Turkish government in

Lowman - Cross

1   the summer of 2016?

2   A     No.

3   Q     And during that meeting at the University Club,

4   what, if anything, did the defendant tell you about

5   meetings or conversations that had been had with

6   Turkish ministers about any potential project or

7   contract that related to Gulen?

8   A     Nothing.

9            MR. GILLIS:  Nothing further, Your Honor.

10           THE COURT:  All right.  Any cross?

11           MS. MITCHELL:  I'll be very brief, Your

12  Honor.

13                    CROSS-EXAMINATION

14  BY MS. MITCHELL:

15  Q     Good morning, Mr. Lowman.  How are you?

16  A     Good morning.

17  Q     My name is Stacey Mitchell.  I represent Mr. Kian.

18  We've not spoken before, correct?

19  A     Correct.

20  Q     All right.  Great.  I want to direct your

21  attention back to the first meeting you had with FIG

22  about a potential contract.  And that was the

23  August 16th meeting, correct?

24  A     Correct.

25  Q     And you recall Mr. Flynn being there?

1  A     I do.

2  Q     And was Mr. Flynn in a position to be able to hear

3  as the defendant told his story about Ayatollah

4  Khomeini under the apple tree?

5  A     Yes.

6  Q     Now, Mr. Lowman, in your position, on a day-to-day

7  basis, you are frequently involved in business

8  development, correct?

9  A     Yes, ma'am.

10 Q     And can you explain to the jurors what business

11 development is from a perspective of a firm like

12 Sphere?

13 A     It's anything from responding to a request for a

14 proposal, which is a very formal process where you're

15 competing with other firms to a referral business where

16 you've been established as a credible, good consultant

17 and been passed along as someone who you should be --

18 they're a partner you should be working with.  Or cold

19 pitches where you're responding to situations where

20 you're going in and offering your services to someone

21 who has never heard of you before, and may not even

22 know they need you.

23     So it sort of runs the gamut between a number of

24 different situations.

25 Q     And as you are working on a potential project,

1   you're surely hopeful you're going to get the project

2   and get the work, correct?

3   A     Correct.

4   Q     But some you get, right?

5   A     Right.

6   Q     And some you don't?

7   A     Correct.

8   Q     Do you frequently share with all your business

9   partners all the business opportunities you did not

10  get?

11  A     No.

12  Q     When you meet with associates, do you frequently

13  tell them about unrelated business meetings you had on

14  different days?

15  A     When you're referring to associates, you're

16  referring to my colleagues?

17  Q     No.  When you meet with potential partners that

18  are not within Sphere.

19  A     Got it.

20  Q     But at other entities.

21  A     Got it.

22  Q     Do you frequently tell them about unrelated

23  meetings you had on different days?

24  A     Never.

25              MS. MITCHELL:  No further questions, Your

1  Honor.

2          THE COURT:  All right.  Any redirect?

3          MR. GILLIS:  No, Your Honor.  The witness may

4  be excused.

5          THE COURT:  All right.  Mr. Lowman, you're

6  excused.  Do not discuss your testimony outside of the

7  courtroom with any other witness.

8      (The witness stands aside.)

9          THE COURT:  All right.  The next witness.

10          MR. GILLIS:  Your Honor, we call Jim

11  Courtovich, please.

12          THE COURT:  All right.  Mr. Courtovich will

13  come forward, please.

14     JAMES COURTOVICH, PLAINTIFF'S WITNESS, AFFIRMED

15                  DIRECT EXAMINATION

16  BY MR. GILLIS:

17  Q    Good morning, sir.

18  A    Good morning.

19  Q    Would you tell us your name, please.

20  A    James Courtovich.

21  Q    Where do you work?

22  A    Sphere Consulting.

23  Q    What's your position there?

24  A    Managing partner.

25  Q    Oh, you have some papers in front of you?

Courtovich - Direct

1  A    Oh.

2       (Papers are handed to the court security officer.)

3  Q    If there's a time you need to refreshing your

4  memory, you can ask to review those.

5  A    Okay.  It was just the e-mails.

6  Q    Oh, you'll see them.

7  A    Okay.

8  Q    Okay.  So -- I'm sorry.  You were telling us what

9  Sphere Consulting does, I believe.

10 A    We're a lobbying and public relations firm based

11 in Washington, D.C.

12 Q    And how do you -- do you know Bijan Rafiekian or

13 Bijan Kian?

14 A    Yes.

15 Q    How long have you known him?

16 A    Ten or twelve years.

17 Q    Do you see him in court today?

18 A    Yes.

19 Q    Could you tell us where he is?

20 A    Right here.

21       THE COURT:  The witness has identified

22 Mr. Rafiekian.

23 BY MR. GILLIS:

24 Q    Are you familiar with the Flynn Intel Group or

25 FIG?

1  A    Yes.

2  Q    Do you refer to it as FIG?

3  A    FIG.

4  Q    Do you know whether the defendant had any role at

5  FIG?

6  A    He was vice chairman of the company.

7  Q    At some point, did the defendant ask you to become

8  involved in a project with FIG?

9  A    Yes.  He reached out to us to see if we'd be

10 interested in a project.  He didn't identify who the

11 client was, but he had just reached out and gave a

12 rough overview.

13 Q    Would you take a look please at Government

14 Exhibit 95.

15 A    Uh-huh.

16 Q    Do you have that in front of you there?

17 A    Yes.

18 Q    Is this the initial reach out that the defendant

19 sent you?

20 A    He reached out over the weekend to see if we could

21 speak as soon as possible about a possible project.

22 Q    And did you hear from the defendant again after

23 this e-mail?

24 A    Yeah.  We soon had a meeting.  We had a phone call

25 and then a meeting.

1      (Mr. Turgeon enters.)

2  BY MR. GILLIS:

3  Q     When was that?

4  A     The meeting itself at FIG?

5  Q     Let's start with the phone call.

6  A     The phone call I think was -- I think we did it on

7  Sunday or Monday.  We did it pretty quickly after his

8  e-mail.

9  Q     And what did he tell you during the phone call?

10  A     This was a very -- it was just a vague overview.

11  I think generally seeing if there could be any

12  conflicts on our side and then asking if, you know --

13  definitely had mentioned that it was Turkey-related or

14  the project would be borne from businessmen or a

15  business -- like a group of business people in Turkey

16  that were looking to do a project.  But we did not go

17  into any specific detail because it was just so early

18  on in the process.

19  Q     Did he mention what he wanted Sphere to do during

20  that call?  Do you recall?

21  A     I'm pretty sure it was -- I think early on it was

22  the promotion of a video, but there weren't particular

23  specifics at that point.

24  Q     Okay.  After the e-mail that we just saw and your

25  call with the defendant, what was the next thing to

1  happen regarding this potential project?

2  A    He brought us in for an introductory meeting with

3  General Flynn at Flynn Intel Group in Alexandria.

4  Q    Let me ask you to look at Government's

5  Exhibit 96A.

6  A    Uh-huh.

7  Q    So you see this e-mail in which you're copied.

8  The date of the e-mail is Thursday, August 18.  You

9  referred to the briefing on Tuesday.  Do you recall

10 from that when the meeting at FIG took place?

11 A    It would have been on the 16th of August.

12 Q    And who was at this meeting, please?

13 A    General Flynn, Bijan, myself, Graham Miller from

14 my office, Greg Lowman, and John Kelly from our office.

15 Q    So John Kelly is from your office?

16 A    He was really our driver, and he just kind of came

17 into the meeting.

18 Q    Now, if you would, look at Government Exhibit 96B,

19 please.

20 A    Uh-huh.

21 Q    Can you see that well enough?

22 A    Yes.

23         MR. GILLIS:  Actually, let's zoom in on the

24 header there if you would.

25 BY MR. GILLIS:

Courtovich - Direct

1 Q    Is that something that you drafted?

2 A    These documents are drafted by the whole team, but

3 they usually go out under my name.  I was part of the

4 drafting.

5          MR. GILLIS:  And then you can zoom down?  Can

6 you now zoom in on the top there?

7 BY MR. GILLIS:

8 Q    Is this the memo that you sent over to the

9 defendant at some point?

10 A    Yeah, this is -- what we usually do, we have the

11 initial meeting.  We take some -- we take notes and

12 then try to respond back to the client or potential

13 client as to what we heard and what we're thinking and

14 where we could be of assistance.

15 Q    Okay.  And was that memo based upon discussions

16 you had at FIG on August 16?

17 A    Correct.

18 Q    Now, at this meeting on the 16th at FIG, who did

19 most of the talking?

20 A    Bijan led the meeting, and General Flynn would

21 join in.

22 Q    Looking at the second paragraph of Government

23 Exhibit B -- pardon me -- 96B --

24 A    The second bullet point?

25 Q    Yes.  I'm sorry.  It's the second bullet point

 1   there.

 2          MR. GILLIS:  Can we zoom that up?

 3   BY MR. GILLIS:

 4   Q    Do you see that second bullet point?

 5   A    Yes, I do.

 6   Q    Does that reflect what the defendant told you

 7   was --

 8          MR. GILLIS:  Actually, I'm sorry.  If you

 9   could, go back to this second paragraph, "As

10   discussed."

11   BY MR. GILLIS:

12   Q    Is that how the defendant described the people

13   behind the project?

14   A    Correct.

15   Q    If you would now turn to the -- well, first, let

16   me ask you this.  I'm sorry.  Did the defendant mention

17   Fethullah Gulen during this meeting, your first

18   meeting?

19   A    Yes.  Through the whole process, Gulen was

20   mentioned because of the nature of the video and the

21   concern that the -- then the clients we did not know,

22   the business people, of how the private sector was

23   looking at the actions of the Erdogan administration

24   and not understanding it in full context, which would

25   slow private investment in Turkey, the Turkey

1   businesses, more importantly.

2   Q    Did he describe or make a comparison of Gulen to

3   any notorious person during that time?

4   A    So the belief was that private -- well, it was

5   explained to us that private investors around the world

6   are not understanding the Gulen role in trying to drive

7   instability in Turkey and, therefore, can't understand

8   or put in context the reaction by the Erdogan

9   administration.

10       So the comparison was people understood America's,

11  you know, movement against Osama bin Laden, and now

12  these private investors have to understand that this is

13  no different than that.

14  Q    What, if anything, did he say about schools in the

15  United States?

16  A    That the insurgency was being partially funded by

17  dollars syphoned off of the Gulen schools in America,

18  sent back into Turkey to fuel the insurgency, as well

19  as to fuel activities here to destabilize Turkey as

20  well.

21  Q    Did the defendant say what was going on in Turkey

22  that might be of concern to these foreign companies?

23  A    The actions you had seen on the daily news.  And

24  so we do a lot of work --

25  Q    Remind us what those were in terms --

Courtovich - Direct

1   A    So there were arrests.  They were removing people

2   who were in prison for more -- well, more or less

3   serious crimes.  But people who were already in prison,

4   they were removing them to put in what they considered

5   dissidents that were trying to destabilize the Erdogan

6   administration and the Turkish government.

7   Q    And when you say they were doing that, who are you

8   referring to?

9   A    Well, the Erdogan administration and their

10  reaction in trying to settle the unrest that was

11  accused upon the Gulen for creating.

12  Q    Could you look at the second bullet of page 2.  Is

13  that consistent with what you were being asked to do in

14  connection with this potential project?

15  A    Yeah.  This is our specific assignment.

16  Q    Now, in there you talk about using fact-based,

17  unbiased information to research Fethullah Gulen.  What

18  do you mean by that?

19  A    So if we have a video that we're not really

20  producing -- and this says "produce and promote."  But

21  eventually, we were just to promote it and they were

22  going to produce it.

23      The concern is we've got reporters around the

24  world that we work with all the time.  And so when we

25  get a product that we're not part of the production, we

Courtovich - Direct

1  have to make sure it's 100 percent accurate.  It has to

2  have fact-based, and it has to be compelling.  And it

3  has to have new information in it.

4       Because what happens is if we get something that

5  doesn't have all of that, then they have expectations

6  for us to get a great deal of attention to it and to

7  move the issue and to drive the issue.  But if it

8  doesn't have all of this in it, then we can't do it.

9  So, you know, if it's inaccurate or if it's old

10  information or if it's too emotional and not

11  fact-based.  So we like to put that in at the beginning

12  so they know what we need to be able to be successful

13  for them.

14  Q    Was it your expectation at the time, based upon

15  what the defendant was telling you, that this video

16  would portray Gulen in a complementary light or a

17  negative light?

18  A    Well, I think they wanted to demonstrate that --

19  it would be in a factual light, and it wouldn't be

20  complimentary because of, you know, the premise that he

21  is fueling and driving this insurgency.

22       And so what we wanted to make sure is that the

23  information and data was new and relevant, and if --

24  how they outlined his role in the insurgency, it

25  certainly wouldn't have been a complementary one, but

Courtovich - Direct

1  it would have been an accurate one.

2  Q    Now, at the meeting at FIG, did you hear any

3  mention of an apple tree?

4  A    Yes.

5  Q    Tell us what that was.

6  A    A reference to Khomeini.

7  Q    First of all, can you tell me the reference?

8  A    The reference is that there was an old cleric

9  under --

10 Q    Who made that?

11 A    Oh, I'm sorry.  Bijan.

12      And it was a cleric under an apple tree outside of

13 France who said he wanted to lead to get rid of the

14 shah of Iran or the dictator, as I think it was

15 referred to specifically, but didn't want to run the

16 country or rule the country but just to remove the shah

17 of Iran.

18 Q    Go ahead.

19 A    And later he became the Ayatollah Khomeini and the

20 results...

21 Q    And did the defendant draw any comparison between

22 Khomeini and anyone else?

23 A    Yes, to Gulen.

24 Q    Was that an analogy that you heard afterward in

25 connection with the Turkey project?

1  A     It was a consistent theme.

2  Q     Now, at this initial meeting on August 16, did you

3  ask the defendant whether the client was a company or a

4  foreign government?

5  A     Well, in the initial meeting, we just thought it

6  was a group of Turkish businessmen is how we were told

7  the potential client might be.

8  Q     I see.  At some point, did the subject of whether

9  the client was a government or --

10 A     No.

11 Q     Okay.  Up until the point of this meeting,

12 including this initial meeting between and Sphere,

13 what, if anything, did the defendant say about dealing

14 with Turkish officials about a project involving Gulen?

15 A     None.

16 Q     What, if anything, did the defendant say about

17 meetings or conversations with Turkish ministers about

18 any potential project or contract that related to

19 Gulen?

20 A     None.

21 Q     What, if anything, did he say about Turkish

22 officials deciding not to go through with the project

23 involving Gulen?

24 A     Zero.

25 Q     What, if anything, did he say about dealing with

1 any Turkish officials just a few weeks before your

2 meeting?

3 A    Zero.

4 Q    At some point after this initial meeting, did you

5 discuss with the defendant some filing that the

6 government might require Sphere to make?

7 A    So, yeah, between the Lobbying Disclosure Act or

8 the Foreign Agents Registration Act, FARA.

9 Q    Would you look please at Government's Exhibit 140,

10 which is in evidence.  I beg your pardon.  Exhibit 140

11 is not in evidence.  Would you look please at

12 Government's Exhibit 140.

13 A    Okay.  I have it.

14 Q    All right.  Do you recognize that, please?

15 A    Yes.  That's an e-mail chain between Graham Miller

16 and myself.

17 Q    What's the subject of that e-mail?

18 A    FARA versus LDA.

19 Q    Would you --

20         MR. GILLIS:  Your Honor, I move 140.

21         THE COURT:  Any objection?

22         MS. MITCHELL:  It's hearsay, Your Honor.  I

23 think he can testify to the topic.

24         THE COURT:  Over objection, Exhibit 140 is

25 admitted.

1  BY MR. GILLIS:

2  Q    Now, first of all, you see there the blacked out

3  part says "redacted for privilege."

4  A    Uh-huh.

5  Q    How did that get on there?

6  A    It just references a communication to Graham to

7  double-check with our lawyer that we should, you know,

8  follow suit.

9  Q    So who did the redacting?  Was it Sphere?

10  A    Our lawyer did.

11  Q    Okay.  Fine.

12       Now, if you could, then go to the next portion of

13  that, this e-mail here.  What does this concern?

14  A    I think this is just trying to get the contract

15  done.  I'm just saying:  Why can't we just move

16  forward?  The question is what we have to do in the way

17  of registration.

18          MR. GILLIS:  All right.  You can take that

19  down, please.

20  BY MR. GILLIS:

21  Q    So how was this question of FARA or LDA relevant

22  to this project?

23  A    So FARA has two sides to it.  One side is whether

24  you get paid directly from a government or indirectly

25  from a government or if the main beneficiary is the

1 government.  So if some businessman in some country

2 wants to promote their leader and they do an

3 advertising campaign in the United States to win favor

4 with their leader, then that would have to be under

5 FARA because the main beneficiary is the government or

6 government leader or a political party or whatever it

7 might be.

8     So the Lobbying Disclosure Act is more for --

9 because we knew there was going to be political

10 outreach, policymakers, and that.  So the FARA would

11 have been if the belief was -- and it was deferred to

12 Bob Kelley, the counsel at FIG, to make that

13 determination.

14 Q   Okay.  Let's stop there for a second.  So you were

15 distinguishing FARA from the LDA.  What is your

16 understanding of who the client needs to be to file

17 under LDA?

18 A    Under LDA, you know, a private client.

19 Q    Okay.

20 A    I mean, a private citizen, businessman.  But also

21 the other --

22 Q   I'm sorry.  So was that a live issue in

23 mid-September 2016 among you folks?

24 A    Yeah, for the -- as we were leading into

25 contracting, because we like to put it in the contract.

1  Q     And up through that point, did the defendant say

2  anything or what, if anything, did he say about dealing

3  with Turkish officials about a project involving Gulen?

4  A     There was never a discussion of Turkish officials'

5  involvement.

6  Q     And what about any discussion with Turkish

7  ministers about any potential project or contract that

8  related to Gulen?

9  A     No discussion.

10 Q     And what did he say about Turkish officials

11 deciding not to go through with the project involving

12 Gulen?

13 A     We were unaware of any Turkish involvement.

14 Q     Now, do you recall a meeting at the University

15 Club regarding this Turkey project?

16 A     Yes.

17        MR. GILLIS:  If I could ask you to put up

18 Government Exhibit 105.

19 BY MR. GILLIS:

20 Q     Would you agree that you're still needling about

21 this question of whether to file under LDA or FARA?  Is

22 that right?

23 A     That's correct.  That's the time they said that

24 Bob Kelley was researching and making a determination.

25 Q     Okay.  Now, this was sent on November 19, and it

1   reflects that they're returning from New York and

2   looking forward to meeting with you the next day.  Do

3   you recall that meeting?

4   A    Yes.  That was on September 20, the day after that

5   e-mail.

6   Q    And that was where again?

7   A    University Club in Washington.

8   Q    How many meetings did y'all have considering this

9   project at the University Club?

10  A    Just one, that one.

11  Q    And who was at that meeting, please.

12  A    General Flynn, Bijan, Mike Boston, who was the

13  project manager, Graham Miller, Greg Lowman, and

14  myself.

15  Q    And what was the purpose of the meeting?

16  A    It was to follow up with General Flynn, see where

17  they're heading with the project.  We're getting into,

18  you know, having another discussion of talking points,

19  messages.  Bijan had a document he wanted to present to

20  us.

21  Q    Okay.  Was that a one-way flow of information from

22  them to you or --

23  A    I think we were exchange ideas.  But for the most

24  part, Bijan had a document that he reviewed, and then

25  we just had a general conversation as to, you know,

Courtovich - Direct

1  when the video was going to get done.

2       Our concern -- not concern.  But what we really

3  wanted to do was find out what this video was going to

4  be and how it was going to be compelling and how we

5  could be successful for what they needed out of it.

6  Q    Do you recall how the defendant referred to this

7  project?  Did he have a name for it?  Do you recall?

8  A    I don't remember any -- a lot of our projects have

9  different code names or, you know, titles to it and

10 whatever have you.  I don't remember one associated

11 with this.

12 Q    And by this time, the University Club meeting, did

13 you know who FIG's client was?

14 A    I don't believe we knew the individual at this

15 point.

16 Q    Okay.  And --

17 A    It could have been -- I think -- it was just

18 around this time when we found out.  So it could have

19 been that day.  It could have been a few days after.  I

20 think we were just getting into contract time.  But we

21 still -- we definitely knew it was a Turkish

22 businessman who was leading the effort.

23 Q    Okay.  And do you recall any document being

24 distributed at that meeting?

25 A    There was a -- if I remember, it was like a four

Courtovich - Direct

1  or five-page listing of talking points and also kind of

2  tying in Gulen to the Ayatollah.  I think it started

3  under the beginning of a reference to the apple tree in

4  Paris.

5  Q    Would you look at Government Exhibit 104B, please.

6  Does that look familiar to you?

7  A    Yes.

8  Q    And you can turn the page, please.  Does that look

9  also familiar to you?

10 A    Uh-huh.

11 Q    What is that?

12 A    It's a list of questions, talking points.

13 Q    Rather than -- when did you see that document?

14 A    At the University Club.

15 Q    Who distributed it?

16 A    Bijan.

17 Q    Do you recall the subject of a meeting in New York

18 coming up during the University Club meeting?

19 A    They said they had come from New York, but there

20 was no specific meeting they had referenced.

21 Q    If you would, please look at Government

22 Exhibit 24A.

23       MS. MITCHELL:  Objection, Your Honor.  Again,

24 hearsay.  He has indicated --

25       THE COURT:  Is this in evidence?

Courtovich - Direct

1          MR. GILLIS:  It is, Your Honor.  It's an

2    e-mail from the defendant.

3          MS. MITCHELL:  This witness is not copied.

4          THE COURT:  All right.  Do you want him to

5    look at that?

6          MR. GILLIS:  Yes, Your Honor.

7          THE COURT:  All right.  After looking at it,

8    what's your question?

9    BY MR. GILLIS:

10   Q    Do you recall the defendant saying anything, or

11   was there anything said at the University Club meeting

12   about a high-level meeting in New York City the day

13   before your meeting at the University Club?

14   A    No.  I knew they were going to be in New York

15   just, I think, from the e-mail traffic right, you know,

16   that Monday that they were coming down from New York.

17   But we weren't made aware of any meetings in New York.

18   Q    If you could, look at 24B, which is in evidence.

19   How about a cabinet-plus level meeting related to

20   Confidence that took place in that New York City

21   meeting?  Do you recall any mention of a cabinet-plus

22   meeting related to Confidence coming up?

23   A    No, not at all.

24          MR. GILLIS:  You can take that down.

25   BY MR. GILLIS:

Courtovich - Direct

1  Q    Up until the point of this University Club

2  meeting, what did the defendant say about FIG having

3  dealings with Turkish officials concerning a project

4  involving Gulen?

5  A    I believe there was zero mention of that.

6  Q    And what did Flynn say about that, General Flynn?

7  A    He had never mentioned Turkish government

8  officials either.

9  Q    And what did the defendant say about Turkish

10 officials deciding not to go through with the project

11 involving Gulen?

12 A    That was never mentioned.

13 Q    Did General Flynn?

14 A    He never mentioned it.

15 Q    Did either of them say anything at all about

16 dealing with any Turkish ministers in the summer of

17 2016?

18 A    Never any mention.

19 Q    At some point, did you have a meeting with the

20 client, FIG's client?

21 A    Yes.

22 Q    And by that time, did you know who that was?

23 A    Correct.

24 Q    And when was that meeting?

25 A    That was in November, early November.

1  Q    Do you recall it being before or after the

2  election?

3  A    Before the election.

4  Q    And where did that take place?

5  A    At Flynn Intel Group.

6  Q    Now, by this time, what was Sphere's principal

7  role in the project supposed to be?

8  A    Still promoting the video that was, I think at

9  that point, in production.

10  Q    And whom were you supposed to give this -- rather,

11  who was supposed to give you this video to promote?

12  A    FIG, Bijan and his team.

13  Q    And as of that time, had you been given the video?

14  A    No.

15  Q    And who was at this meeting place?

16  A    Ekim -- I can't pronounce his last name --

17  Alptekin and Bijan, Mike Boston, Mike McCauley, Graham

18  Miller, Bob Kelley.  I think in and out was General

19  Flynn's son.  I'm not 100 percent sure.

20  Q    And you were there as well?

21  A    Correct.

22  Q    Had you met Alptekin before this meeting?

23  A    No.

24  Q    When you were introduced to Alptekin, what, if

25  anything, did he say?

1   A    When the meeting started -- I mean, we were

2   introduced.  But when the meeting started, he looked at

3   me and said, "Oh, great.  The great Olivia Pope is

4   here.  You're supposed to be doing all of these great

5   things, but I'm not seeing anything.  I'm expecting

6   congressional hearings.  I'm expecting big news

7   stories.  I'm expecting the Department of Justice to be

8   involved."

9        That was the first conversation that we had.  Not

10  a great one from a client.

11  Q    And who is Olivia Pope, if you know?

12  A    So I did this big project for this -- Olivia Pope

13  is a TV show.  I forget the name of the show, but it's

14  about a D.C. lobbyist who can just fix problems in five

15  minutes.  And I was referred to in a magazine once as

16  the Olivia Pope of Washington.  He must have read that,

17  and that's where he did the tie-in.

18  Q    And so after that, how did the meeting begin?

19  A    I think -- you know, I remember the highlights of

20  the meeting.  But I think then they did a rollout of

21  the research and data that was done by, I think --

22  well, McCauley presented it.  I don't know who put all

23  the research together.  But it was primarily all on the

24  Gulen schools, the flow of dollars, how it's going.

25       I also touched on some immigration issues, how

Courtovich - Direct

1  they brought people in to be a teacher but turned them

2  into a -- at the Gulen schools, into a janitor and

3  shaved dollars off of their paychecks.  That's how they

4  would fuel some of the insurgency.

5  Q    Was this produced in physical form in some way?

6  A    It was a -- the document, as I remember, was

7  supposed to be completed but wasn't.  So he was reading

8  from, like, a binder but said he would get everyone the

9  final intel packet soon thereafter.

10 Q    Was there some sort of PowerPoint that was

11 presented?

12 A    There could have been a PowerPoint in the binder,

13 but we weren't given anything to leave with.  And I

14 just remember seeing a lot of data.  And if it was in

15 the presentation form, it could have been, but I don't

16 remember.

17 Q    Do you recall whether Alptekin had anything in his

18 hands during that presentation?

19 A    I think he had his documents from -- I think he

20 was doing -- we didn't have the document in front of

21 us.  We were just listening in.  But I don't remember

22 what he had in his hand.

23 Q    Okay.  And do you recall anything -- what, if

24 anything, do you recall about some papers being thrown

25 on the table?

Courtovich - Direct

1    A    So he was visibly upset for --

2    Q    Who is this?

3    A    Ekim.  He was visibly upset during the meeting and

4    concerned that we were far behind where, I think, he

5    had expected.  And so he had some materials, but I

6    don't remember what exactly he threw.

7    Q    And so what were the things that he expected, if

8    he expressed them, that didn't happen?

9    A    Congressional hearings, DOJ investigation, and

10   major news article/stories pertaining to the data that

11   was presented at that meeting.

12   Q    And what congressional investigations did Alptekin

13   want?

14   A    Well, we assumed from that it would probably be

15   the permanent subcommittee of investigations, or it

16   would be financial services if the money is flowing

17   through correspondent banks in New York.  There's a

18   whole host of different areas where the Congress could

19   investigate and highlight these issues.

20   Q    But regardless of what body might do it, what --

21   if he expressed them, what were the hearings that he

22   wanted to take place?

23   A    The hearings to showcase the flow of money from

24   Gulen schools to funding insurgency in Turkey.

25   Q    And besides Gulen or Gulen affiliated officials or

1   entities, did he express anything else that he

2   expected?

3   A    Well, this was the meeting where he had said -- he

4   goes, what am I going to tell Ankara in that meeting?

5   Because he was -- you know, as I said, he was upset

6   with where he saw everything.

7   Q    What did he tell -- what do I tell Ankara?  Is

8   that what he said?

9   A    Yes.

10  Q    And whom did he say that to?

11  A    To Bijan and, you know, into the room.

12         MR. GILLIS:  May I have a moment, Your Honor?

13         THE COURT:  Yes.

14  BY MR. GILLIS:

15  Q    So do you recall how -- what was your reaction to

16  this?

17  A    So, I mean, I almost fell off of my chair, and

18  Graham was with me.  And Graham runs the day-to-day.

19  And I wasn't even supposed to be at this meeting.  He

20  was going to drop me off at the airport, and I was

21  going to fly down to South Carolina.  When I find out

22  that Ekim was going to be there, I'm like, well, I'm

23  going to meet the client.  It's a client.

24         So I just continued on, and we went over to FIG.

25  You know, the sandwiches were out.  I thought it was

Courtovich - Direct

1   going to be just a general meeting.  Then he kind of

2   ruled that out.

3       So I -- you know, Graham is doing day-to-day.  So

4   I'm trying to figure out what the heck is going on.

5   That's when I said at the meeting -- and I sent a memo

6   right after.  I said, Listen, if that's what you're

7   trying to do, then this has to be a government action.

8   It has to be done by a prosecutor in Turkey.  It has to

9   be, you know, someone from the ministry of justice that

10  has current, you know, charges against Gulen.  Then you

11  have to file a 1782 petition in federal court to get

12  subpoena power.

13      Because after hearing the research and intel, you

14  know, they don't have -- you know, he's a former FBI

15  agent, but he doesn't have the access that he would if

16  he were still in the FBI.

17      So we outlined what the 1782 procedure was and how

18  if that's able to demonstrate the flow of money, then

19  you're going to have something that's going to get you

20  everything you need.  But it has to be done by the

21  government.  So we sent a memo indicating that and

22  walking through that process.

23  Q   It would have to be done by which government?

24  A   The Turkish government.

25  Q   Initially, you said that you almost fell off your

1  chair when you saw this reaction by Alptekin.  Why?

2  A   Well, our whole goal with FIG and Bijan was to get

3  a great working relationship with them because it was

4  going to be a growing company.  It was, you know, very,

5  very active over there.  We expected it to be in

6  business for some time.  So I wanted this project to be

7  very successful.

8      We really don't get hired to promote videos.

9  We're not a video promoter.  But we saw this as an

10  opportunity to let them see our work at a very, you

11  know, minimal amount of money compared to the hours

12  that were being put into it.

13      So when you sit there and the client basically

14  tells you you've filed in every single level, then

15  you're pretty concerned.  And it took me until -- I got

16  on the elevator with Graham and expressed a little

17  concern about the meeting, and he was just as surprised

18  as I was.

19  Q   Okay.  Let's just stop there because I don't want

20  to get into what -- we have evidence rules that might

21  stop us from you getting into that.

22  A   Sure.

23  Q   So if -- let me ask you this first:  These things

24  that Alptekin said he was expecting and what he was

25  upset about, how do they line up with what you had been

1  told up until that time about the project?

2  A    Zero.  We were hired to promote a video that

3  hadn't been made yet.

4  Q    How did that line up with your understanding of

5  the overall project that FIG was engaged in?

6  A    When I sat there and he rolled that out, I just

7  divorced the two because what he was talking about was

8  something completely different and independent from

9  what we were looking to do in the way of size, scope,

10 content across the board.

11         MR. GILLIS:  May I have another moment, Your

12 Honor?

13         THE COURT:  Yes.

14         MR. GILLIS:  I promise this is to shorten

15 things, not to lengthen things, Your Honor.

16 BY MR. GILLIS:

17 Q    Could you please take a look at Government's

18 Exhibit 129, which is not yet in evidence.

19 A    Yes.

20 Q    Do you recognize that?

21 A    That's the memorandum that we subsequently

22 followed up the conversation on the 1782

23 recommendation.

24         MR. GILLIS:  I move to admit Government's

25 Exhibit 129.

Courtovich - Direct

1           THE COURT:  Any objection?

2           MS. MITCHELL:  None, Your Honor.

3           THE COURT:  Exhibit 129 is admitted.

4   BY MR. GILLIS:

5   Q    Under "Goals" there, was that your understanding

6   of the goals of the project at that time?

7   A    From what he outlined at that meeting.

8   Q    Who outlined?

9   A    Ekim.  What he outlined at that meeting, this was

10  the way they could get there.  It's certainly not the

11  previous plan that we were implementing or would

12  implement when the video was done.

13  Q    Was this meant to respond to what he had said at

14  the meeting?

15  A    Yes.  We also wanted to showcase that we were

16  hired to promote a video.  And so we didn't fail at any

17  level because we didn't in any way have the

18  understanding that that was the objective or goals of

19  him or anyone.

20  Q    And who prepared this?

21  A    I wrote it with Graham, and then we conferred with

22  a law firm to help us on some of the other aspects of

23  the 1782 procedure.

24  Q    Did you send this memorandum to anybody?

25  A    At first to Bijan.

Courtovich - Direct

1  Q    Did you later send it to anyone else?

2  A    I then sent it -- I didn't hear back.  And so we

3  wanted to move forward with it, and so we also sent it

4  to Ekim.

5  Q    Was that your strategic analysis of how you wanted

6  to get to where Alptekin wanted to go?

7  A    Yes.  It was the only way that we saw we could

8  move forward in that direction.

9            MR. GILLIS:  You can take that down.

10 BY MR. GILLIS:

11 Q    Now, if you would, look at the first paragraph on

12 page 2 of that exhibit.  Could you take a moment to

13 read that.

14 A    Uh-huh.

15 Q    Now, in that last sentence you say, "If done

16 correctly, this will stir parallel criminal

17 investigations."  Why did you write that?

18 A    Because that is what he outlined with the --

19 Q    Who?  Who outlined?

20 A    Ekim outlined in that meeting in November, that

21 they wanted Department of Justice action against Gulen.

22 Q    What action did they want against Gulen?

23 A    I don't remember him specifically saying what, but

24 I assumed they didn't -- or he didn't want him to end

25 up in a Pennsylvania prison.  I assume they wanted him

1    extradited to Turkey.

2    Q    So in parallel criminal investigations, whom are

3    you referring to there?

4    A    I'd say the Department of --

5    Q    Well, I'm sorry.  About any particular subject?

6    Person?  Individual?

7    A    About Gulen.  It would be about the money flow

8    going into Turkey from the United States.

9    Q    And if you would, look under "Media Outreach to

10   Complement the 1782 Petition."  Take a moment to read

11   that if you would.

12   A    Uh-huh.

13           MR. GILLIS:  Can we give the jury a bit

14   longer to read the document?

15           THE COURT:  Yes.

16   BY MR. GILLIS:

17   Q    Does that also reflect what Alptekin was

18   complaining about at the meeting before?

19   A    Well, it reflects what he'd need to do.  Well, not

20   he would.  What the Turkish government would need to do

21   if that's what they wanted done.  Or if this was

22   something that he wanted done -- I should say at this

23   point if it was something he wanted done, he would have

24   to go back and say, I can't do this myself.  Here's the

25   pathway.  And it would have to be done by the Turkish

1  government.

2         MR. GILLIS:  Okay.  You can take that down.

3  BY MR. GILLIS:

4  Q    After you gave the memo to Alptekin, what, if

5  anything, did he say about it?

6  A    He was --

7         MS. MITCHELL:  Objection, Your Honor.

8         THE COURT:  Overruled.

9         MS. MITCHELL:  To Alptekin?

10        THE COURT:  I'm sorry.  When is this

11 conversation?

12        MR. GILLIS:  This is what Alptekin said he

13 would do with the memorandum.

14        THE COURT:  In a conversation?

15        MR. GILLIS:  With this witness.

16        THE COURT:  All right.  I'm going to sustain

17 the objection.

18 BY MR. GILLIS:

19 Q    Well, let me ask you this:  After you gave this

20 memo to Alptekin, what's the next thing of significance

21 that happened?

22 A    We received an e-mail from the deputy chief of

23 mission at the Turkish embassy to come and present a

24 full overview, not just in this category but a

25 comprehensive communications plan for the government of

1  Turkey for the United States.

2  Q    And this official that you referred to, deputy --

3  I'm sorry?

4  A    He's the number two in the Turkish embassy as we

5  understood his role.

6  Q    And he's from what country?

7  A    Turkey.

8  Q    I see.  Okay.

9  A    A Turkish diplomat.

10 Q    What was your involvement in the placement of an

11 op-ed that was published on Election Day 2016?

12 A    Yes, we were.

13 Q    Do you recall there being some controversy about

14 the article?

15 A    I do, a lot of controversy relative to the origins

16 of the op-ed.

17 Q    And shortly after the controversy about the op-ed,

18 do you recall a phone call you had with the defendant

19 and others?

20 A    I -- well, there was a phone call that Graham

21 Miller, Bijan, and Bill McGinley, who then, I think,

22 was still in his role as -- yeah, he was in his role as

23 counsel to the Trump campaign.

24 Q    And when did this take place, roughly, in relation

25 to the election?

Courtovich - Direct

1   A    A few days after the election when the stories

2   started to pop up in various publications.

3   Q    Where were you at the time?

4   A    I was in South Carolina.

5   Q    What was the purpose of the call?

6   A    Mike McGinley wanted to know the origins of the

7   op-ed and if it was related to any project or contract.

8   Q    Did Mike McGinley ask questions about that of

9   anyone?

10  A    So the call started without me.  I had called up

11  to the office to speak to Graham.  I was told by the

12  secretary that he was on the phone with McGinley and

13  Bijan.  So I kind of jumped in.  I had them put another

14  number in, and I joined in.

15      So, at that point, the conversation was focused on

16  exactly where did this op-ed come from, why was it

17  written, was it part of any paid contract.  That's what

18  McGinley was trying to get to the bottom of.  Because I

19  think the White House was getting -- or I should say

20  the president-elect's office was getting inquiries.

21  Q    Were these questions directed at anyone in

22  particular?

23  A    Bijan.

24  Q    Do you recall how the defendant responded to the

25  question about the op-ed?

1  A    And so the op-ed -- he did say that General Flynn

2  wrote the op-ed and it was his words and it was his

3  belief and his long history and understanding of this

4  issue, that that was his position.  So he just wrote it

5  and was passionate to get it and wanted it done on

6  Election Day.

7  Q    Okay.  How did the defendant respond to the

8  question of whether anyone paid for the op-ed?

9  A    So there wasn't a -- I expected a response to --

10 that was Inovo who paid for the contract.  But, again,

11 the position with FIG was that this was actually

12 written outside the contract.  This was just something

13 the General decided to do independent from what the

14 project was, which was -- but still, McGinley wanted to

15 know about the Inovo project, and the flow came

16 directly on the contract.  And there wasn't an

17 immediate or direct answer to that.

18 Q    From whom?

19 A    From Bijan.

20 Q    So when you say there wasn't an immediate or

21 direct answers, what do you mean?

22 A    I just remember being concerned that with the

23 pause of what I thought up to that point would be a

24 very easy answer, Inovo -- and then I'm thinking, well,

25 maybe it came from -- because Bijan has -- not Bijan.

Courtovich - Cross

1  I'm sorry.  Ekim has -- at that point, we had known he

2  had, you know, at least a dozen companies.  If it came

3  from this company or Company Y.

4      So I asked Bijan:  Where did the money -- which

5  company did it come from?  And then I had said:  I

6  think we should get Ben Ginsberg, my lawyer.

7      And McGinley used to be my lawyer at Jones Day.

8  So I said:  Let's get Ginsberg on the phone.

9      And then that's when McGinley said:  I think we

10  have a conflict here.  Let's hang up.

11      And that ended the call.

12  Q    Mr. Courtovich, was Sphere paid for its work on

13  this project?

14  A    Yes.

15  Q    How much were you paid?

16  A    In total, $40,000.  The first contract was 30, and

17  then Bijan paid us an extra 10,000, as he said, for the

18  extra work that was being done and the extra attention

19  to the account.

20          MR. GILLIS:  One moment, Your Honor.

21      (Counsel confer.)

22          MR. GILLIS:  That's all I have, Your Honor.

23          THE COURT:  All right.  Ms. Mitchell.

24          MS. MITCHELL:  Thank you, Your Honor.

25                  CROSS-EXAMINATION

Courtovich - Cross

1  BY MS. MITCHELL:

2  Q     Good morning.

3  A     Good morning.

4  Q     How are you?

5  A     I'm fine.

6  Q     My name is Stacey Mitchell.  I'm representing

7  Bijan Rafiekian.  We have not spoken before; have we?

8  A     No.

9  Q     Okay.  I am going to walk through a series of

10  questions predominantly focused on following up on some

11  of the direct examination.

12       You were asked at the beginning of your direct

13  testimony about a comparison that Bijan has made

14  between Ayatollah Khomeini and Gulen.

15  A     Uh-huh.

16  Q     You explained the allegory of Khomeini, and then

17  you said the rest is history.  Would you explain the

18  history of Khomeini.  Don't take forever.  Take a short

19  brief moment.  Some of the jurors may not be familiar

20  with his role in Iran.

21  A     Sure.  Well, during the fall of the shah of Iran's

22  regime in coming to America, Ayatollah Khomeini took

23  power, took a very aggressive position against the

24  United States, took American hostages that were held

25  for more than a year, and drove a growing anti-American

Courtovich - Cross

1  fever in Iran that we still see today.

2  Q    Are you familiar where Bijan is originally from?

3  A    Yes.

4  Q    Where is that?

5  A    Iran.

6  Q    And you understand that this was something that

7  was --

8  A    Very passionate.

9  Q    Very passionate about it.

10     Did he share the same concern about the future of

11 Turkey if this were to progress and Gulen were to

12 essentially follow in the same steps as Khomeini did?

13 A    I think he thought of it as a concern.  I don't

14 think the comparison would be to Iran today but

15 certainly heading in that direction if it went that

16 way.  But I don't think we were at complete disaster.

17 Q    To be clear, the concern from Bijan was, let's not

18 get there, correct?

19 A    Correct.

20 Q    All right.  Now, talking again about -- you said

21 Sphere was brought in to promote a video?

22 A    Correct.

23 Q    And it's important to your credibility to make

24 sure that that video is accurate?

25 A    Uh-huh.

Courtovich - Cross

1  Q      You have to say yes or no.

2  A      Yes.  Sorry.

3  Q      And to make sure that it's bringing something new

4  to the scene, correct?

5  A      Correct.

6  Q      So you were engaged with the Flynn Intel Group

7  through the person of Graham Miller to make sure that

8  that investigation was going on; is that correct?

9  A      Well, I mean, we were there to promote a video,

10 and we're trying to help as much we can along the way

11 to make sure what we end up with can be given to, you

12 know, a significant journalist that would take this and

13 use it as either a -- sometimes it just promotes an

14 idea.  Then they go and do their own research, which

15 they always do.  But something that really catches

16 their eye.

17 Q      Right.

18 A      And interest.

19 Q      Right.

20        Turning your direction now to your testimony with

21 respect to the Foreign Agents Registration Act and the

22 Lobbying Disclosure Act.  This is a significant

23 question at the beginning of the engagement where there

24 are foreign contacts, correct?

25 A      Correct.

1  Q     Would you agree the Foreign Agents Registration

2  Act is complicated?

3  A     Well, the good thing is you can just call the FARA

4  office, and they'll actually answer the question for

5  you, which saves us a lot of legal bills.

6        But I look at it very simply:  You know, it's

7  either you're paid by a government.  And if you're

8  indirectly paid, then you just have to -- at the end of

9  it, even with the LDA, you just have to make sure all

10 the parties that you knowingly are helping are on the

11 sheet.

12       The only confusion we have is under the Lobbying

13 Disclosure Act, they have an exclusion.  They have an

14 LDA exclusion to FARA.  So let's say we represent a

15 foreign airline that's controlled by the country.  Then

16 if you show that your work is primarily helping the

17 airline as opposed to the country that owns the

18 airline, then there's that.  So that's the only thing

19 that we get concerned about.

20       For the most part, it kind of falls where it

21 falls.

22 Q     So a great point.  When a business has retained

23 you to promote their interests in a country where

24 business is closely aligned with government, sometimes

25 that distinction can be very difficult to figure out?

1  A     You just make sure that you have documented and

2  can demonstrate from the materials that you're using

3  and the information that you're doing and what you're

4  driving fall into that category.  So if we were working

5  for --

6  Q     Let me actually stop you and ask you.  I think

7  this will --

8           MR. GILLIS:  Excuse me, Your Honor.  May the

9  witness be allowed to finish his answer?

10          THE COURT:  I think he did.  You could follow

11  up on that.

12 BY MS. MITCHELL:

13 Q     Let me turn you to Defendant's Exhibit 60, if I

14 could, please.  I want to highlight the fourth

15 paragraph.

16 A     Exhibit 60?

17 Q     Yes.  Oh, it's in evidence.  It will be brought up

18 on the screen.

19          MS. MITCHELL:  Actually, let's show the whole

20 page first.

21          This is in evidence, Your Honor.

22 BY MS. MITCHELL:

23 Q     If you look at it generally, it appears to be a

24 letter from Covington, is that correct, to Heather Hunt

25 of the FARA registration unit.

Courtovich - Cross

1  A    Okay.

2              MS. MITCHELL:  If you can, scroll to page 2

3  for the witness' benefit.

4  BY MS. MITCHELL:

5  Q    This is signed by Rob Kelner.  Going back up to

6  page 1 in paragraph 4 --

7              MR. GILLIS:  Your Honor, the same objection

8  was made with respect to the documents that I was

9  trying to show the witness.

10             THE COURT:  Right.  What's going to be your

11 question?  Whether he agrees with the substance?

12             MS. MITCHELL:  I'm going to ask him to read

13 the paragraph and ask him if he agrees with it.

14             THE COURT:  All right.  I'm going to sustain

15 the objection.

16             MS. MITCHELL:  You're going to sustain the

17 objection?

18             THE COURT:  Yes.

19             MS. MITCHELL:  Thank you, Your Honor.

20 BY MS. MITCHELL:

21 Q    Let's go back to the Foreign Agents Registration

22 Act and LDA.  This was an issue that you were

23 discussing with Bijan at the beginning of your

24 engagement, correct?

25 A    Yes.

Courtovich - Cross

1    Q     He indicated to you that he was speaking with

2    attorneys; is that correct?

3    A     Bob Kelley, their attorney.

4    Q     Did you know in advance of that that he had

5    reached out to Rob Kelner at Covington?

6    A     No.

7    Q     Do you recall having forwarded to Mr. Kian a

8    memorandum, a client alert if you will, drafted by Rob

9    Kelner summarizing FARA?

10   A     Yes.

11   Q     All right.  So you were not aware that after

12   receiving that from you he picked up the phone and

13   called Rob Kelner?

14   A     I don't have a memory of it.

15             MR. GILLIS:  Assumes facts not in evidence,

16   Your Honor.

17             THE COURT:  He answered the question.

18   A     Kelner didn't send me that memo.  I do a lot of

19   work for Covington.  So we get their 800 alerts and

20   whatever.  So they came just at the right time, and I

21   forwarded it to Bijan.

22   Q     Right.  Client alerts, we lawyers send them all

23   the time to try and get business, correct?

24   A     Yes.

25   Q     So you referred to Bob Kelley.  Who is that?

Courtovich - Cross

1  A     He is the counsel in FIG.

2  Q     You understood in or about September of 2016 that

3  he was researching the question of whether to file a

4  FARA or an LDA?

5  A     Correct.

6  Q     In fact, Graham Miller from your office --

7            MR. GILLIS:  Objection, Your Honor.  Well, I

8  beg your pardon.  I was premature.

9            THE COURT:  Go ahead.

10  BY MS. MITCHELL:

11  Q     And Graham Miller from your office was in

12  communication with Bob Kelley; is that correct?

13  A     Correct.

14  Q     All right.  What ultimate decision was made with

15  respect to filing under FARA or the Lobbying Disclosure

16  Act?

17  A     LDA.

18  Q     All right.  In your position, in addition to doing

19  work for clients, you also do a fair amount of business

20  development, correct?

21  A     Correct.

22  Q     That's really how you get more work and keep

23  Sphere Consulting operating, correct?

24  A     Correct.

25  Q     As you attempt to get new business, you're hopeful

Courtovich - Cross

1  that you'll get it?

2  A    That's correct.

3  Q    Sometimes you actually get the business?

4  A    Yes.

5  Q    And sometimes you don't get it?

6  A    That's correct.

7  Q    Would you agree it's not uncommon that if you

8  don't get some business, you won't share that

9  information outside Sphere?

10 A    What information?

11 Q    So if you are pitching a client and you don't get

12 the business, do you tell colleagues outside of Sphere:

13 Hey, we didn't get the business?

14 A    I mean, it all depends on, you know, what the

15 circumstances are.  It's not something we keep dire

16 secret.

17 Q    But you also don't advertise that you didn't get

18 work?

19 A    Well, it all depends.  So with the trade

20 association, they put you through an RFP process and it

21 goes on and on and on and you spend a ton of resources

22 and at the end they actually don't do the project, you

23 say, Oh, these guys.

24       So there are conversations that -- it's nothing

25 we're ashamed of, I mean, win or lose.  Plus, most of

Courtovich - Cross

1   these are competitively bid.  So there are four other

2   firms involved, and they know who the other three firms

3   are.  And if you don't get it, you don't get it.

4   Q     You don't get it?

5   A     Yeah.

6   Q     But it's not uncommon -- withdrawn.

7   A     We talk about our wins more than our losses.

8   Q     Okay.  When you actually get the work, it's not

9   uncommon for clients to hire you to generate media

10  attention, correct?

11  A     Correct.

12  Q     And some of those are media attention regarding

13  political figures?

14  A     We do mostly -- we work pretty much mostly on the

15  private investment side, but yeah, we do on the other

16  side as well.

17  Q     All right.  Sometimes that's within the U.S. that

18  you're doing media work for clients?

19  A     Correct.

20  Q     And sometimes that's foreign?

21  A     I'd say about -- it's mostly two-thirds foreign

22  and one-third U.S.

23  Q     All right.  Fair to say that sometimes the media

24  attention that you're trying to draw to whatever figure

25  is positive and sometimes it's negative?

Courtovich - Cross

1  A     Correct.

2  Q     All right.  There's nothing illegal with any of

3  that; is that correct?

4  A     I hope not.

5  Q     You follow the law as closely as you can?

6  A     Yes, we do.

7  Q     Turning your attention now to that November 2

8  meeting with Ekim Alptekin, not a happy meeting,

9  correct?

10 A     No.

11 Q     And your takeaway from that meeting was that FIG

12 and, as a result, Sphere were not meeting Ekim

13 Alptekin's objectives?

14 A     Well, once I conferred with Graham -- so ten

15 minutes later I walked away from that meeting thinking

16 that Ekim had a completely different playbook in his

17 mind and was expecting a completely different set of

18 outcomes than a $40,000 promotion of a video.

19       What he was talking about would be a $2 million,

20 $3 million massive effort campaign, a legal strategy

21 activity to actually get him where he wanted to be.

22 Q     So a very expensive project?

23 A     Exactly.

24 Q     All right.  And for a substantially reduced

25 budget, one would get something more akin to what you

Courtovich - Cross

1    thought was going to be happening, namely, a

2    documentary style video and some media attention

3    associated with that, correct?

4    A    So I went in there, you know, still under the

5    umbrella of promoting private investment in Turkey by

6    private business people.  And then this cat jumped out

7    of the bag and, you know, I just didn't know what to do

8    with it.  And throughout, as we sat there, I tried to

9    figure out, as we always do, how we can get there.

10        And I just kind of put the video out of mind.  At

11   this point, I was nervous about the video, that

12   whatever came out would be a disaster.  So I said,

13   well, let's focus on getting the government involved

14   with this and let's focus on putting together a real

15   plan to get them where they need to be if this is where

16   they want to go.

17   Q    And that was -- you were hoping that that would

18   happen in the future?

19   A    Correct.

20   Q    All right.  Turning your attention to -- well,

21   following up on that.  So as you left that meeting, you

22   thought 1782 discovery process would make some sense?

23   A    Exactly.

24   Q    And you put together a memo that we looked at

25   earlier?

1    A    Yes.

2    Q    Do you recall the date of that memo?

3    A    Yes.

4          MS. MITCHELL:  If we could, display

5    Government Exhibit 129, please.

6    A    November 6.

7    Q    I'm sorry?

8    A    November 6, 2016 -- oh, the 8th.

9    Q    Great.  What was happening on November 8, 2016?

10   A    Election.

11   Q    And you sent that memo to FIG to the person of

12   Bijan at some point presumably after you finished

13   drafting it?

14   A    Correct.

15   Q    So it happened either on November 8 or in the

16   following days?

17   A    Yeah.  I'd have to see the e-mail to know which

18   day it was sent.

19   Q    And you've testified before you never got a

20   response from the defendant to that; is that correct?

21   A    He could have e-mailed me back that he received

22   it, but there was never a green light:  Let's do this,

23   or I think we can move forward with this.

24   Q    Okay.  But as it turns out, starting on

25   November 9, FIG was winding down their business;

Courtovich - Cross

1  weren't they?

2  A    I think they were going to wind down at one point

3  one element of FIG and keep two open.  It was fluid as

4  to -- I don't remember the final decision.  But I don't

5  remember the day after that being the case but I

6  don't...

7  Q    But you don't really recall?

8  A    There was a lot going on the day after the

9  election.  People were trying to assess a lot of

10  things, and so I can't recall.  I just remember -- we

11  were in -- you know, a lot of contact.  Bijan was

12  coming to our office.  And so we were talking about

13  this even if it didn't -- you know, and moving forward

14  in that direction.

15       The Flynn stuff I remember -- I don't think -- I

16  think it was soon after the election they said they

17  were going to close one aspect of it but two were going

18  to stay open.  Eventually, it was all to be closed.

19  Q    Okay.  All closed.

20       Is it fair to say that November 9 at the Flynn

21  Intel Group was a different day than November 7 with

22  respect to its marque partner, General Flynn?

23  A    I never went back there after the election.  So I

24  don't know what happened.

25  Q    Do you understand that General Flynn became the

Courtovich - Cross

1  national security advisor to then --

2  A    Yes, I was of aware of that.  But don't forget.

3  That doesn't mean you have -- if your principal goes in

4  to the government as a national security advisor, that

5  doesn't mean your company is going to close.  It could

6  actually raise and rise in stature.  I wasn't

7  automatically thinking this would lead to the closing

8  of Flynn Intel Group.  It could lead to, you know,

9  growth.

10 Q    Okay.  Did you understand -- withdrawn.

11      You referenced previously that after not moving

12 forward with respect to the 1782 process with Flynn

13 Intel Group, at some point later, you then reached out

14 on your own to Ekim Alptekin.  Is that correct?

15 A    We sent it to him directly, but it wasn't like --

16 we weren't going around anyone.  It was more of we're

17 talking to Bijan.  We want to get the ball moving.

18 But, you know, they had a lot of things going on, and I

19 had promised to Ekim that we'd get back with some more

20 background on the 1782.  So we just moved the ball

21 forward, but we were in communication with Bijan as

22 well.  It wasn't independent.

23 Q    Okay.  Do you recall about when -- well,

24 withdrawn.

25           MS. MITCHELL:  Could I have the witness shown

Courtovich - Cross

1   Defense Exhibit 37.  It's not in evidence.

2              THE COURT:  Defense Exhibit 37?

3              MS. MITCHELL:  Yes, Your Honor.

4   A    Uh-huh.

5   Q    Does that refresh your recollection as to when you

6   reached out to Mr. Alptekin on this 1782 process?

7   A    This is the earlier memo.  This was January -- or

8   December, yeah.

9   Q    All right.  So when did you reach out to him?

10  A    On this e-mail, this is December 14.  I

11  remember --

12  Q    That's all I needed to know.

13  A    Okay.

14  Q    So you reached out to Ekim, and you sent him a

15  proposal with respect to 1782 in December of '16?

16  A    Uh-huh.  I just can't guarantee that I hadn't

17  reached out to him before this in between.  So I just

18  want to be accurate.

19  Q    Okay.  But that was certainly a day in which you

20  did it formally, correct?

21  A    Yeah.  I'm not sure if this is a follow-up or the

22  first.

23  Q    Okay.  And then at some point, you learned --

24  actually, you talked about this before, that after

25  sending this to Ekim, the next thing that happened was

1  you got an e-mail from the government of Turkey.

2  A    That I remember as the most significant.  There

3  could have been something else that popped up, but that

4  was the one I remember.

5  Q    So do you remember that, in fact, Mr. Alptekin

6  said to you:  I think the government of Turkey might be

7  interested in this?

8  A    Well, I don't remember that, but it very well --

9  well, he was encouraging.  He goes, Let me get this to

10 the right people.

11      And he very well could have then said, I think

12 this is positive.

13      But clearly, our communications with Ekim is what

14 led to the outreach from the embassy because they just

15 wouldn't have reached out to us otherwise.

16 Q    So Ekim was telling you he could put you in touch

17 with the government of Turkey?

18 A    Well, we had asked him to.  We had said, If this

19 is where you want to go, you need to bring this to the

20 government's attention.

21 Q    And so he said, I can put you in touch with the

22 government of Turkey?  I can help with that?

23 A    Not immediately.  But, yeah, it was clear that he

24 was going to bring this back to whoever he knew in

25 government and try to move the ball forward.

Courtovich - Cross

1  Q    And then at some point, he clearly was successful

2  because you received an e-mail from the government of

3  Turkey, correct?

4  A    That's correct.

5  Q    A direct communication to you from the government

6  of Turkey saying, We are interested in talking to you

7  about this RFP?

8  A    So as I understand it, they had an open RFP

9  process at the time that had, I think, either closed or

10  was close to being closed.  They did a request for

11  information and then a request for proposal.  I think

12  they were in that process.

13      What we got from -- I believe from the embassy, if

14  not Ekim, saying, Hey, we're going to get you added to

15  this process even though it's past the addition point.

16  Q    So you actually had communications with the

17  government of Turkey?

18  A    Only when they reached out to us saying come to

19  this and present from the deputy chief of mission, I

20  believe, or his assistant at the Turkish embassy in

21  Washington.

22  Q    In advance of that, you put together pitch

23  material, correct?

24  A    Correct, a full presentation.

25  Q    And let me direct your attention to Defendant's

1  Exhibit 51 in evidence and have you take a look at

2  that.  It will appear on your screen for you.

3  A    Uh-huh.

4  Q    Do you recognize that?  What is that?

5  A    It's our proposal, overview.

6  Q    Do you recall the budget for that piece of work?

7  A    So we were told the budget should be for a project

8  this size, I think, $4 million.

9  Q    Okay.  In fact, after having e-mail

10 communications, did you, in fact, go to the embassy of

11 Turkey to --

12 A    Our whole team did.

13 Q    I'm sorry.  Say that again.

14 A    Our whole team did.  Twelve people went over

15 there.

16 Q    Then did you end up getting the work?

17 A    No.

18         MS. MITCHELL:  May I have a moment, Your

19 Honor?

20         THE COURT:  Yes.

21     (Counsel confer.)

22 BY MS. MITCHELL:

23 Q    Mr. Courtovich, at some point, did you become

24 aware that Robert Amsterdam had been doing similar work

25 with respect to Gulen?

Courtovich - Cross

1  A    His name has popped up and -- but not anything

2  specific that I remember.

3  Q    Do you know that he had been retained in --

4         MR. GILLIS:  Objection, Your Honor.  It

5  assumes facts not in evidence.

6         THE COURT:  I'll let her ask the question.

7  BY MS. MITCHELL:

8  Q    Do you know that he had been retained by the

9  government of Turkey to do work on behalf of the

10 government of Turkey beginning in as early as December

11 2015?

12 A    The only thing I heard about him -- or I should

13 say the -- when we reached out to Luis Botts

14 (phonetic), the law firm, to help us write the 1782

15 petition -- because I had done a few -- or one 1782

16 petition with our senior partner in New York -- they

17 had the information of all the affiliates.

18      If you look at the 1782 memo, there are a lot of

19 affiliates of the Gulen school.  And so they had that

20 knowledge because they were either working with him or

21 were involved with him.  And it was not relative to

22 Turkey, but it was some gold trader from Turkey in a

23 New York jail or something.  I forget the specifics.

24 So they had this -- we've never had an affiliation with

25 Amsterdam, but Luis Botts had knowledge or affiliation.

1  I don't remember the two.

2  Q    So from the first meeting you had at FIG --

3  A    Uh-huh.

4  Q    -- in August through, let's say, the November 2

5  meeting, did you have any awareness of Robert

6  Amsterdam's work on behalf of Turkey?

7  A    You know, I could have seen his name, but I wasn't

8  day-to-day on the project.  So if his name popped up,

9  it wouldn't have been of note.

10           MS. MITCHELL:  May I have one more moment,

11  Your Honor?

12           THE COURT:  Please.

13      (Counsel confer.)

14           MS. MITCHELL:  Nothing further.

15           THE COURT:  All right.  Any redirect?

16                 REDIRECT EXAMINATION

17  BY MR. GILLIS:

18  Q    Mr. Courtovich, you mentioned the project that you

19  ultimately made the pitch to the Turkish embassy about.

20  Did you say that that had been closed?

21  A    Well, it was -- I'd say it's pretty far along in

22  the process of other firms presenting their

23  qualifications.  And so they weren't -- if we had just

24  gone and rang the doorbell and said, "Hey, we have a

25  presentation for you," they would've said, you know,

1  "Thanks, but we're coming to our decision."

2  Q    I see.  Did anyone help you to get past just

3  ringing the doorbell?

4  A    I believe it was Ekim.  And we were -- and it

5  wasn't just Ekim and I.  But, you know, we were in

6  conversations with Bijan as well during this whole

7  process.

8         MR. GILLIS:  Would you mind putting the last

9  exhibit, Exhibit 51, up.

10 BY MR. GILLIS:

11 Q    Now, you were saying that essentially, if I

12 understand it, you gave this memorandum of yours to

13 Alptekin.  The next thing that's happening is that you

14 get an e-mail from the deputy minister of station or --

15 at the Turkish embassy.

16 A    The DCM we call them.

17 Q    DCM?

18 A    (Nods head up and down.)

19 Q    Okay.  And then Ekim and the defendant allow you

20 to get in the door; is that correct?

21 A    Yes, correct.

22 Q    All right.  In this e-mail that you were asked

23 about --

24         MR. GILLIS:  Could you just zoom in on the

25 e-mail for the two lines, just that one line that has

1  two.

2  BY MR. GILLIS:

3  Q    Now, could you read the domain name of that e-mail

4  after the @ sign.

5  A    mfa.gov.tr.

6            MR. GILLIS:  That's all I have, Your Honor.

7            Thank you very much.

8            THE COURT:  All right.  May the witness be

9  excused?

10           MR. GILLIS:  Yes, sir.

11           THE COURT:  All right.  Mr. Courtovich,

12  you're excused.  Do not discuss your testimony outside

13  of the courtroom with any other witness.

14           THE WITNESS:  Thank you.

15      (The witness stands aside.)

16           THE COURT:  Ladies and gentlemen, we're going

17  to take our morning recess at this time.  You're

18  excused until 11:45.  Do not discuss this case among

19  yourselves during the recess.

20      (The jury exits at 11:28 a.m.)

21           THE COURT:  All right.  Who is the

22  government's next witness?

23           MR. GILLIS:  Our next and last witness is

24  Special Agent Alfredo, Your Honor.

25           THE COURT:  All right.  We'll deal with that

758

 1  issue before you call him when we reconvene.

 2          All right.  The Court will stand in recess.

 3      (Recess from 11:29 a.m. until 11:56 a.m.)

 4      (The jury is not present.)

 5          THE COURT:  Mr. Gillis, with respect to

 6  Special Agent Alfredo, it's still not clear to me what

 7  you contemplate doing with him relative to the exhibits

 8  that are already in evidence that you've identified.

 9          MR. GILLIS:  Well, Your Honor, if I may have

10  a moment.

11          For example, Exhibit 17 -- and I believe the

12  exhibit before that is --

13          THE COURT:  Well, you have listed Exhibit 16,

14  which --

15          MR. GILLIS:  Sorry.  Exhibit 16.

16          THE COURT:  -- you've posted before the jury

17  several times and have had read to the jury several

18  times.  What would you have this witness do with

19  Exhibit 16?

20          MR. GILLIS:  Only to orient the jury as to

21  time.  So the green light e-mail is on August 10.  The

22  Confidence Through Clarity e-mail is August 11, and

23  that was just to orient them as to the change from the

24  10th to the 11th.

25          THE COURT:  Would this be in the context of

1  other documents that he's going to talk about, or do

2  you simply want him to go through these exhibits and

3  make observations about how they relate to each other?

4          MR. GILLIS:  No.  No.  Apart from that, just

5  to say, you know, we talked about the green light

6  e-mail.  Can you remind us of what the date is of that?

7          Then after that is the Confidence Through

8  Clarity e-mail.  Can you remind us what the date is of

9  that.

10          Then there's nothing more that's summary

11  about that.  It's just simply to orient the testimony

12  so that what he's about to say makes sense.

13          For example, his testimony as to Government's

14  No. 17 is that Confidence is the first time -- the

15  first use of that term in all of the e-mails that have

16  been produced in this case, and that is a significant

17  point, obviously.  So that testimony is not summary.

18  It's simply a factual testimony.  But to make sure that

19  it makes sense to the jury, to show that this is

20  happening on August 11, we would like simply to remind

21  them that the green light e-mail was the evening

22  before.

23          So that basically is all that I plan to do

24  with those two exhibits.

25          THE COURT:  What new documents is he going to

1   reference?

2          MR. GILLIS:  What new documents is he going

3   to reference, Your Honor?

4          THE COURT:  Yes.

5          MR. GILLIS:  Well, he will introduce

6   Government Exhibit 8A, which is simply a substitution

7   of a previous government's exhibit that we had given to

8   the defense but we had not introduced.  What the Court

9   may still have is just a screenshot of that e-mail.

10          MR. TROUT:  We will stipulate to the

11   substitution, Your Honor.

12          THE COURT:  All right.

13          MR. GILLIS:  That's fine, Your Honor.  I

14   don't need to ask any questions about 8A if it's in

15   evidence.

16          THE COURT:  All right.

17          MR. GILLIS:  Then, for example, a new exhibit

18   will be Exhibit 103B.  103A, Your Honor, is already in

19   evidence.

20          THE COURT:  All right.  And 103B Mr. Lowman

21   went through in some detail.

22          MR. GILLIS:  No, Your Honor.  This is new.

23          THE COURT:  103B?

24          MR. GILLIS:  I take that back, Your Honor.  I

25   beg your pardon.  No.  103B I don't need.  That was not

1   my -- I'm sorry.

2           Oh, I beg your pardon, Your Honor.

3           15A is not yet in evidence.  15A, Your Honor,

4   is a *New York Times* article that was -- the length of

5   which was contained in an e-mail that's already in

6   evidence from Alptekin to the defendant and Flynn in

7   which he said:  This is the depth of the crisis that we

8   are facing, colon, link to a *New York Times* article.

9           This *New York Times* article is essentially

10  part of that document.  The agent will testify that he

11  went to that link and this is the article that he

12  found, that was being sent by Alptekin to the

13  defendant.

14          THE COURT:  All right.  And so what do you

15  want him to say about any other document based on this

16  document?

17          MR. GILLIS:  Based on this document?

18          THE COURT:  Yes.

19          MR. GILLIS:  I would like -- with this

20  document --

21          THE COURT:  Well, you want to present him as

22  a summary witness.

23          MR. GILLIS:  Actually --

24          THE COURT:  I don't think that's an accurate

25  description of what you're proposing.  You're not

1  asking him to summarize voluminous documents by saying

2  what's entered in voluminous documents.  You want him

3  to simply provide the jury with a chronological

4  narrative of these documents.

5          MR. GILLIS:  It is certainly not a summary,

6  Your Honor.  I think that's the characterization that

7  was given by the defense.  To the extent we accept

8  that --

9          THE COURT:  All right.

10         MR. GILLIS:  If I may, Your Honor.  So he

11 will not be putting numerous documents in chronological

12 order and telling some story about it.  It is simply

13 to -- he has a great deal of factual evidence from his

14 own observations relevant to this prosecution that he

15 will talk about.  To put what he talked about in

16 context, it's necessary for the jury to know where that

17 comes from.

18         So, for example, as I said -- so this is an

19 article.  This is a new article.  Do we have any

20 problem with him talking about this new exhibit?

21         THE COURT:  I don't know if there's going to

22 be an objection or not.  I wouldn't think so.

23         MR. TROUT:  No, Your Honor.  As far as I'm

24 concerned, it can come into evidence.

25         THE COURT:  All right.

1            MR. GILLIS:  I beg your pardon, Your Honor.

2            THE COURT:  What I'm not going to allow you

3    to do is what you were suggesting at the beginning,

4    which is, through this agent, to have him simply go

5    through the evidence and, quote, remind the jury that

6    this document was on X date, this document was on Y

7    date, and take him through the evidence that's already

8    here.  That's not really a witness.  That's not a

9    witness who is presenting facts to the jury.  That's

10   simply a summary or a preview of your closing argument.

11           MR. GILLIS:  So for the two exhibits that I

12   mentioned, the green light exhibit versus the --

13           THE COURT:  If the only purpose is to have

14   this witness get on the stand and say, Here's

15   Exhibit 16.  This is the green light memo.  Remember,

16   this is the green light memo on X date.  Then, I want

17   you to next look at this memo.  The next day, This is

18   the XYZ memo just so you know that those are there.

19   We're not going to do that.

20           MR. GILLIS:  Okay, Your Honor.  Understood.

21           THE COURT:  All right.

22           MR. GILLIS:  Yes, sir.

23           THE COURT:  All right.  Do you still need to

24   call Agent Alfredo?

25           MR. GILLIS:  Oh, yes.  Yes.

 1              THE COURT:  All right.  Let's call him.

 2              MR. GILLIS:  Your Honor, will you indulge me

 3 a few minutes during the testimony as I reorient things

 4 somewhat?

 5              THE COURT:  Yes.

 6              MR. GILLIS:  Thank you.

 7        (The jury enters at 12:05 p.m.)

 8              THE COURT:  All right.  Have a seat, please.

 9              The government will call its next witness.

10              MR. GILLIS:  Thank you, Your Honor.

11              I beg your pardon, Your Honor.  There's one

12 question I have.  If we could just approach briefly.

13              THE COURT:  Yes.

14        (Conference at the bench, as follows:)

15              THE COURT:  Yes.

16              MR. GILLIS:  I'm sorry, Your Honor.  I don't

17 want to run afoul of the Court's order.

18              THE COURT:  That's all right.

19              MR. GILLIS:  So, for example, I -- not for

20 example.  My concern is the *New York Times* article, you

21 recall, comes from an exhibit where there's a link to a

22 *New York Times* article that he found.

23              THE COURT:  Right.

24              MR. GILLIS:  I would like to able to start

25 with that to show that's a link and have him testify

1  that's the link he followed.

2          THE COURT:  Yeah.  I don't see a problem with

3  that.

4          MR. GILLIS:  Thank you, Your Honor.

5      (Proceedings continued in open court, as follows:)

6          THE COURT:  Your next witness.

7          MR. GILLIS:  Your Honor, it's Special Agent

8  Bryan T. Alfredo.

9          THE COURT:  All right.  Agent Alfredo will

10 come forward, please.

11    BRYAN T. ALFREDO, PLAINTIFF'S WITNESS, AFFIRMED

12                   DIRECT EXAMINATION

13 BY MR. GILLIS:

14 Q    Sir, would you please tell us your name.

15 A    Bryan T. Alfredo.

16 Q    Mr. Alfredo, where do you work?

17 A    With the FBI.

18 Q    And what's your position there?

19 A    Special agent.

20 Q    How long have you been with the Federal Bureau of

21 Investigation?

22 A    September 2012.

23 Q    What did you do before joining the FBI?

24 A    I was and still am in the United States Air Force.

25 Q    What's your rank there?

Alfredo - Direct

1   A    Major.

2   Q    And you've been a pilot in the Air Force?

3   A    Yes, sir.

4   Q    What aircrafts do you fly?

5   A    I flew a C-130.

6   Q    Would you please take a look at Government

7   Exhibit 15, which is in evidence.  This is an e-mail

8   from Alptekin to Flynn and the defendant on August 4.

9   It says there:  "This article shows the depth of the

10  crisis we are facing," and then it shows a link there.

11  Do you see that?

12  A    Yes, sir.

13  Q    Could you please take a look at Government

14  Exhibit 15A?

15  A    Okay.

16  Q    Can you tell us what that is?

17  A    It's an editorial in the *New York Times*.

18  Q    And how did you find that editorial?

19  A    It was attached to the e-mail, the link.

20  Q    It was the link that you followed?

21  A    Yes, sir.

22        MR. GILLIS:  I move to admit the exhibit,

23  Your Honor, 15A.

24        THE COURT:  Without objection, Exhibit 15A is

25  admitted.

Alfredo - Direct

1  BY MR. GILLIS:

2  Q    If you could, please take a look on the second

3  page of that.  First of all, who is this article

4  written by or opinion written by?

5  A    The Editorial Board.

6  Q    Of?

7  A    The *New York Times*.

8  Q    And if you turn to the second page, please, would

9  you please look at the last two full paragraphs there.

10  Could you read those to the jury, please.

11  A    Yes:  "American officials assume, with good

12  reason, that Mr. Erdogan is ratcheting up his criticism

13  to press Washington to comply with his demand that

14  Mr. Gulen, a former ally who broke with him a few years

15  ago, be extradited to Turkey.  Turkey has given the

16  administration documents but no formal legal request

17  for extradition, and so far the Americans see no

18  evidence that Mr. Gulen was culpable.

19      "The Turks need to be reminded that Mr. Gulen has

20  a legal right to be in the United States, and that the

21  Justice Department would have to go through a rigorous

22  process before deciding whether he could be handed

23  over, especially to a country where due process is

24  increasingly unlikely and torture is reportedly used

25  against detainees."

Alfredo - Direct

1  Q     Going back to the header of Exhibit 15, please,

2  could you tell us, what's the subject of the e-mail

3  that included that link?

4  A     Truth.

5  Q     Special Agent Alfredo, are you the lead case agent

6  on the investigation that brings us to court today?

7  A     Yes, sir.

8  Q     Would you please take a look at Government Exhibit

9  20A -- no.  I beg your pardon, Your Honor -- Government

10 Exhibit 20.

11 A     Okay.

12 Q     Do you see there a reference -- first of all, what

13 is the date of that text message?

14 A     August 25, 2016.

15 Q     And could you read to us that Skype chat, please.

16          MR. TROUT:  Your Honor, objection.  I think

17 this is --

18          THE COURT:  There's no need for that.  This

19 is already in evidence.  The jury has already been

20 taken through this message.

21          MR. GILLIS:  I apologize, Your Honor.

22          MR. TROUT:  Could we take that down, please.

23          MR. GILLIS:  Your Honor, if I could ask the

24 Court to take judicial notice of the fact that the

25 Third Bridge over the Bosphorus opened for the first

1 time on August 26, 2016.

2          THE COURT:  The Court will take judicial

3 notice of that fact.

4 BY MR. GILLIS:

5 Q    Now, what e-mail address did Alptekin use to

6 communicate with the defendant and others at FIG, with

7 Sphere, and with others that were involved in this

8 Turkey project?

9 A    Kian@flynnintelgroup.com.

10 Q    No.  I'm sorry.  Alptekin?

11 A    Ekimalptekin@gmail.com.

12 Q    And in your investigation of all the evidence in

13 this case, do you recall seeing any other e-mail

14 address for Alptekin that he used in connection with

15 the Turkey project?

16 A    No, sir.

17 Q    Did the government obtain a search warrant for

18 Alptekin's Gmail account?

19 A    Yes, sir.

20 Q    And approximately how many e-mails were in the

21 Alptekin Gmail account?

22 A    Approximately 400,000.

23 Q    And for the period that's charged in this case

24 between June 2016 and March 2017, about how many

25 e-mails were there in Alptekin's Gmail account for that

Alfredo - Direct

1  time?

2  A      Approximately 13,000.

3  Q      What e-mail address did the defendant use to

4  communicate with Alptekin and those at FIG and Sphere

5  concerning the Turkey project?

6  A      Kian@flynnintelgroup.com.

7  Q      And did he use another e-mail address?

8  A      Bijankian@gmail.com.

9  Q      Did the government obtain a search warrant for the

10 defendant's Gmail account?

11 A      Yes, sir.

12 Q      Approximately how many e-mails were there in the

13 defendant's Gmail account?

14 A      Approximately 400,000.

15 Q      For this period charged in the indictment from

16 June '16 to March '17, about how many e-mails were

17 there in the defendant's Gmail account for that time?

18 A      Approximately, between 13,000 to 14,000.

19 Q      Now, I'd ask you to please take a look at

20 Government Exhibit 17.  Take a moment to read that if

21 you would.

22        What's the significance of that sentence?

23            MR. TROUT:  Objection, Your Honor.

24            THE COURT:  Sustained.  You need to ask a

25 fact-based question.

Alfredo - Direct

1 BY MR. GILLIS:

2 Q    Special Agent Alfredo, what, if any, e-mails did

3 you see in your investigation of this case, including

4 all the Gmails from the defendants and Alptekin's

5 account -- what, if any, e-mails did you see that

6 mentioned "Confidence" in connection with this Turkey

7 project?

8 A    There are quite a few where the word "confidence"

9 would be on the subject line and numerous e-mails

10 between the two.

11 Q    All right.  And with respect to the date of this

12 particular e-mail --

13 A    Yes, sir.  This was --

14 Q    -- preceding --

15 A    -- the first time we really started seeing

16 Confidence where it was regarded as Truth before.

17 Q    When you say it is really the first time, what do

18 you mean by that?  Is it or isn't it the first time?

19 A    It was the first time this was -- this term, this

20 buzzword "confidence" was the new word for this

21 project.

22 Q    Now, did you perform word searches of Alptekin's

23 Gmail account for certain words based upon the terms

24 used in that sentence?

25 A    Yes, sir.

Alfredo - Direct

1  Q    And did you perform word searches of the

2  defendant's Gmail account for certain words based upon

3  the terms used in that sentence?

4  A    Yes, sir.

5            MR. GILLIS:  If I could ask that Government's

6  Exhibit 23A be brought up.  If you could, just zoom to

7  the header of that.

8  BY MR. GILLIS:

9  Q    Does that e-mail show that there's an attachment

10 to that e-mail?

11 A    Yes, sir.

12           MR. GILLIS:  You can take that down.

13 BY MR. GILLIS:

14 Q    Would you please turn to Government's Exhibit 23B.

15 What is that?

16 A    The attachment.

17 Q    And what's the title of that document?

18 A    Operation Confidence Playbook.

19 Q    And if you could turn, please, to page 3 of 23B.

20 A    Okay.

21 Q    Could you read that last sentence, please.

22           MR. TROUT:  Your Honor, I think this is --

23           THE COURT:  The last sentence on the page?

24           MR. GILLIS:  The last sentence of that

25 paragraph, Your Honor.  In fact, we can just zoom to

1    that one.

2         THE COURT:  I'll let him do that.

3    BY MR. GILLIS:

4    Q    Read that last sentence to the jury, please.

5    A    "As discussed, this effort would be funded

6    directly by private businesses seeking to improve

7    investment in business to drive a stronger economy."

8    Q    And if you would, turn to -- well, first of all,

9    let me ask you this:  Did you perform word searches

10   based upon the terms used in that sentence?

11   A    Yes.

12   Q    Would you please turn to page 4 and look at the

13   second bullet.  Could you read that to the jury?

14   A    "Reestablish international confidence in Turkey's

15   economic fundamentals and highlight the stability of

16   its investment and business environment."

17   Q    Okay.  Then if you would, please -- this is all

18   part of the playbook attached to that e-mail from the

19   defendant?

20   A    Yes, sir.

21   Q    So if you would, please turn to the third-to-last

22   bullet on that page.  Could you read that to the jury,

23   please.

24   A    "Produce and promote a documentary style video

25   that uses fact-based, unbiased information and research

Alfredo - Direct

1  to highlight Fethullah Gulen's network of loyalists and

2  his influence over them and showcase a resilient

3  investment climate in the wake of the recent attempted

4  coup."

5  Q     And did you perform word searches based upon the

6  terms used in that portion of the document?

7  A     Yes, sir.

8             MR. GILLIS:  You can take that down.

9  BY MR. GILLIS:

10  Q     Did you search for the term "investment" among

11  those 14,000 e-mails of Alptekin's for the period

12  during the indictment?

13  A     Yes, sir.

14  Q     And why did you search for that word?

15  A     It was mentioned in previous e-mails and in the

16  document that we just discussed right now.  It was one

17  of the buzzwords used.

18  Q     What did you determine after searching all of

19  those 14,000 or so e-mails?

20  A     It was mentioned but not in the terms of the

21  project.

22  Q     What do you mean it was mentioned?

23  A     So increasing the business confidence, investing

24  with Turkey in the U.S., I did not see those

25  communications back and forth between the defendant and

1   Ekim.

2   Q     After searching the word "investment"?

3   A     Yes, sir.

4   Q     Did you search for the term "business" among those

5   14,000 e-mails of Alptekin's?

6   A     Yes.

7   Q     Why did you search for that term?

8   A     Again, it was mentioned in the supposed engagement

9   purpose and playbook and previous e-mails.  So we

10  searched that.

11  Q     All right.  And what did you find or not find as a

12  result of that search?

13  A     I did not see e-mail communication between the

14  defendant and Ekim where there was mention of

15  increasing the business climates or the business

16  stability between Turkish and U.S. relations.

17  Q     Did you search for the term "community" among

18  those 14,000 e-mails?

19  A     Yes, sir.

20  Q     Why did you search for that term?

21  A     As previously stated, it was a word that was

22  mentioned in the playbook or in e-mails or in the

23  engagement purpose.

24  Q     What did you determine after that search?

25  A     The same thing.  I did not observe any

Alfredo - Direct

1  communication between the defendant and Ekim regarding

2  that subject and the Project Confidence.

3  Q    Did you search for the term "climate" among those

4  14,000 e-mails of Alptekin's?

5  A    Yes, sir.

6  Q    What did you determine after that search?

7  A    Climate, like some of the other words, would

8  populate, but it was in terms of, like, the global

9  climate.  But I did not see anything regarding

10  increasing the business climate in Turkey or improving

11  the climate between U.S. and Turkey relations.

12  Q    For example, if there was a mention of global

13  climate change, that would hit as well?

14  A    Yes, sir.

15  Q    Okay.  Did you look at even those e-mails where it

16  mentioned global climate to see if there was any

17  relationship to the project?

18  A    Yes, sir.

19  Q    After searching for "climate" through all of these

20  e-mails, what is that you determined?

21  A    As I just stated, I didn't see any communication

22  between the two where there was talk of increasing the

23  business climate between the U.S. and Turkey.

24  Q    Did you search for the term "tourism" among the

25  14,000 e-mails?

1  A    Yes, sir.

2  Q    And?

3  A    I did not see discussions between the defendant

4  and Ekim where there was a goal to increase the tourism

5  in Turkey.

6  Q    And did you search for the term "hotel"?

7  A    Yes, sir.

8  Q    What did you find after that search?

9  A    Again, "hotel" was populated numerous times for

10  hotel registrations and confirmations, but I did not

11  see anything about -- I did not observe any

12  communication between the two, the defendant and Ekim,

13  regarding hotel business in Turkey.

14  Q    Nonetheless, when "hotel" came up in your search,

15  you read each of those e-mails?

16  A    Yes, sir.

17  Q    Now, did you search for the term "Skype"?

18  A    Yes, sir.

19  Q    And what did you find among the e-mails of

20  Alptekin's?  Well, actually, let's just cut that short

21  and say the e-mails between the 28,000 or so e-mails

22  between the defendant and Alptekin.  What did you find

23  when you searched for the term "Skype"?

24         MR. TROUT:  Your Honor, just to clarify, I

25  don't think he said --

1          THE COURT:  Yeah.  Mr. Gillis, would you

2     clarify?  You're not suggesting that this witness has

3     said there's 28,000 e-mails between Alptekin and --

4          MR. GILLIS:  No.  I beg your pardon, Your

5     Honor.  I misspoke.  I did not mean to give that

6     impression, and I apologize.

7     BY MR. GILLIS:

8     Q    So did you search, let's say, the 27,000-28,000

9     e-mails approximately that were in the accounts of the

10    defendant and Alptekin for the term "Skype"?

11    A    For the date frame that we discussed, yes.

12    Q    Okay.  The charges -- the date frame of the

13    charges in the indictment?

14    A    Yes, sir.

15    Q    What did you find when you searched for that term?

16    A    There's numerous mentions of Skype in both

17    accounts, whether it be trying to set up a Skype

18    communication --

19    Q    Those were communications between any particular

20    people?

21    A    So the e-mails between Ekim and the defendant, I

22    did observe Skype populate multiple times in reference

23    to missed calls or trying to coordinate Skype chats at

24    a later time.

25    Q    Now, did you search for the term "refund" among

Alfredo - Direct

1  Alptekin's 14,000 e-mails?

2  A    Yes, sir.

3  Q    Why was that?

4  A    "Refund" was searched because that's what -- we

5  were told that that's what the 20 percent back was for,

6  was for the refunds.

7  Q    And when you searched for the term "refund" in

8  Alptekin's e-mails, what did you find?

9  A    I did not find anything with refunds in Alptekin's

10  e-mails unless it was a refund for, like, an expense of

11  some sort, but nothing regarding the -- between Ekim

12  and the defendant.

13  Q    Okay.  So in all of Alptekin's e-mails, you didn't

14  find any mention of any of those terms in connection

15  with the Turkey project; is that right?

16  A    No, sir.

17  Q    That's not right?

18  A    No.  You're correct.  I did not see that in

19  relation to the Turkey project.

20  Q    Would you please turn to Exhibit 93B and turn to

21  the third page of 93B.  If you would, just focus on

22  that last sentence there.  First of all, before we get

23  started with that, what is 93B, please?

24        MR. GILLIS:  Could we go to the first page

25  there and just zoom in on the top half.

Alfredo - Direct

1  BY MR. GILLIS:

2  Q    What is 93B?

3  A    It's a letter from Arent Fox.

4  Q    And who is it addressed -- well, we'll leave it at

5  that.

6       So if you would, turn to page 3 of 93B, what is it

7  that the Arent Fox letter says at the bottom there?

8  Could you read that to the jury, please, the last two

9  sentences, if you would.

10 A    "Mr. Alptekin argued Inovo should be reimbursed

11 for part of the retainer since both the lobbying and PR

12 components never materialized.  Inovo never hired

13 Sphere Consulting."

14 Q    All right.  So having read that, did you --

15           MR. GILLIS:  May I have a moment, Your Honor?

16 BY MR. GILLIS:

17 Q    Having read that, did you search for the term

18 "reimburse" or "reimbursement"?

19 A    Yes, sir.

20 Q    And you searched all of Alptekin's 14,000 e-mails

21 for the period of the indictment?

22 A    Yes, sir.

23 Q    What did you find?

24 A    I did not see mentions of reimbursements or

25 reimburse in reference to the Turkey project.

Alfredo - Direct

1  Q    Did you also perform a word search of the

2  defendant's e-mails in his Gmail account for the period

3  alleged in the indictment?

4  A    Yes.

5  Q    And there were 13 or 14,000 e-mails there?

6  A    Approximately.

7  Q    And did you do a search for the same terms that we

8  just went through for the Alptekin 14,000 or so

9  e-mails?

10  A    Yes, sir.

11  Q    And what results did you find after those

12  searches?

13  A    The same.

14  Q    And that is what?

15  A    Regarding the terms that you asked me about, I did

16  not observe communication between the two in reference

17  to the Turkey project.

18  Q    But if you found a hit for any of those terms, did

19  you read each of those e-mails?

20  A    If the term populated, I read the e-mail, yes.

21  Q    When you say "populated," what do you mean by

22  that?

23  A    Like a control find function.  If you type in

24  "Skype" and Skype pops up, I would read the article or

25  read the e-mail.

Alfredo - Direct

1  Q    Okay.  I got it.

2       In particular, with respect to the word "refund,"

3  did you find any mention of that word in the

4  defendant's e-mails -- Gmail account?

5  A    Yes, in terms of, you know, refund for an expense

6  but nothing in relation to this project that we've been

7  talking about or in communication with Ekim.

8  Q    And how about the term "reimburse" or

9  "reimbursement"?

10 A    The same.

11 Q    Just to be clear, tell us what the same is.

12 A    I did not observe communication between the two

13 regarding that term.

14 Q    Do you recall FBI Forensic Examiner Rosecrans

15 testifying that he found Skype chats on the defendant's

16 laptop?

17 A    Yes, sir.

18 Q    Did you perform the same word searches on those

19 Skype chats?

20 A    Yes, sir.

21 Q    Did you search for the term "confidence" in the

22 Skype chats?

23 A    Yes, sir.

24 Q    If you could, turn to Government Exhibit 41,

25 please.  Did you find "confidence" in this particular

Alfredo - Direct

1   document?

2           MR. TROUT:  Your Honor, objection.  I think

3   this runs afoul of the --

4           THE COURT:  What was the question?

5           MR. GILLIS:  Well, Your Honor, he said he

6   searched for the term "confidence."  He found it once

7   among the Skype chats.

8           THE COURT:  This is the document.  All right.

9   I'll let you ask this question.

10  BY MR. GILLIS:

11  Q    So if you look at that last one down there, would

12  you read that to the jury, please.

13  A    I mean credibility in Turkey.  Actually, MC's guy

14  who is read into Project Confidence advised me to

15  include an op-ed that FIG would get published under my

16  name, but I didn't raise it as his advice aims to help

17  me score points in Turkey more than anything else.

18          MR. TROUT:  Your Honor, could we ask for a

19  limiting instruction on that.

20          THE COURT:  Yes.  Again, ladies and

21  gentlemen, this is simply admitted for the purpose of

22  showing what information was conveyed to Mr. Rafiekian

23  and not as proof of the truth of what's contained in

24  that statement.

25  BY MR. GILLIS:

Alfredo - Direct

1  Q   Now, how many chats did you find that mentioned

2  "investment," chats between the defendant and Alptekin?

3  A   I don't recall seeing any.

4  Q   How many chats did you find that mentioned

5  "business"?

6  A   I don't recall seeing any.

7  Q   How many did you find that mentioned "climate"?

8  A   I don't recall seeing any.

9  Q   What about "tourism"?

10  A   I don't recall seeing any.

11  Q   And what about "refund"?

12  A   None.

13  Q   What about "reimbursement"?

14  A   None.

15  Q   Now, in your search of the Gmails, Alptekin's

16  Gmail and Rafiekian's Gmail, for that period during the

17  indictment, for those 28,000 or so e-mails, what did

18  you find about a contract with the government of Turkey

19  falling through?

20  A   None.

21  Q   What did you find about any contract having to do

22  with Gulen falling through?

23  A   I'm sorry.  Can you repeat that?

24  Q   My question earlier was meant to refer to Gulen.

25  I'm sorry.  So let me rephrase that question.  What did

Alfredo - Direct

1   you find, if anything, about a contract regarding Gulen

2   with the government of Turkey falling through?

3   A    I did not see any.

4   Q    What did you see, if anything, about the

5   government of Turkey pulling out of a contract

6   involving Gulen?

7   A    I did not see any.

8   Q    Now, we heard from FBI Forensic Examiner

9   Rosecrans, that he created an image of both of the

10  defendant's laptops that were seized pursuant to a

11  warrant from the defendant.  Did the government produce

12  a copy of those images to the defense in this case?

13  A    Yes, sir.

14  Q    Were they produced in a manner that would allow

15  the defense to do word searches of their own or conduct

16  other methods of examination that Mr. Rosecrans talked

17  about?

18  A    I believe so.

19  Q    And what about the FIG e-mails from Covington that

20  Mr. Nadarajah testified about?  Were those all turned

21  over to the defense in this case?

22  A    Yes, sir.

23  Q    Were they produced in a manner that would allow

24  the defense to do word searches and other methods of

25  examination that Mr. Rosecrans talked about?

Alfredo - Direct

1   A     Yes, sir.

2   Q     What about the defendant's Gmail account?  Were

3   those provided to the defense?

4   A     Yes, sir.

5   Q     And were those produced in a decrypted form that

6   Mr. Rosecrans was able to untangle?

7   A     Yes, sir.

8   Q     Were they produced in a manner that would allow

9   the defense to do word searches of their own and do

10  other methods of examination that Mr. Rosecrans talked

11  about?

12  A     Yes, sir.

13  Q     What about Mr. Alptekin's Gmail account?  Were all

14  of those provided to the defense?

15  A     Yes, sir.

16  Q     Were they produced in a decrypted form?

17  A     Yes, sir.

18  Q     Were they produced in a manner that would allow

19  the defense to do their own word searches and other

20  examination that Mr. Rosecrans talked about?

21  A     I believe so, yes.

22  Q     What about other participants in the Turkey

23  project, like Sphere?  Were all of those provided to

24  the defense?

25  A     Yes, sir.

1  Q     Were they produced in a manner that would allow

2  the defense to do word searches and other methods of

3  examination?

4  A     Yes, sir.

5  Q     Now, all of these e-mails from FIG from the

6  defendant's laptops, from the defendant's Gmail, from

7  Alptekin's Gmail, from the others involved in the

8  Turkey project, can you give us an order of magnitude,

9  an estimate of how many e-mails were given to the

10 defense?

11            MR. TROUT:  Your Honor, may we approach?

12            THE COURT:  Yes.

13       (Conference at the bench, as follows:)

14            THE COURT:  Yes.

15            MR. TROUT:  Thank you, Your Honor.

16            I think this is getting pretty close to the

17 defense having to produce --

18            THE COURT:  Yes, it is.

19            MR. GILLIS:  Your Honor, my understanding is

20 that the defense plans to put on a defense.  They are

21 going to be calling two witnesses.  They wanted to call

22 them out of order.  I can call this witness in

23 rebuttal, if necessary.

24            THE COURT:  Well, I'm going to let you just

25 finish bringing out all the documents were taken over,

1  but the way it's being presented does sound as if --

2  you're giving the jury the impression that the defense

3  should come forward with evidence of these items.  So

4  let's just get through it and complete it.

5          MR. GILLIS:  Yes, sir.

6          THE COURT:  Let's just complete all of this

7  that was turned over.

8          MR. GILLIS:  Yes, sir.

9          THE COURT:  All right.

10     (Proceedings continued in open court, as follows:)

11         THE COURT:  All right.  Mr. Gillis.

12         MR. GILLIS:  Thank you, Your Honor.

13 BY MR. GILLIS:

14 Q   So, Agent Alfredo, just to shorten this up, with

15 respect to all of the electronic evidence that you had

16 in this case available to you, was all of that turned

17 over to the defense?

18 A   Yes, sir.

19         MR. GILLIS:  Your Honor, that's all I have.

20         THE COURT:  All right.  Mr. Trout.

21         MR. TROUT:  Thank you, Your Honor.

22                   CROSS-EXAMINATION

23 BY MR. TROUT:

24 Q   Special Agent Alfredo, you were the lead case

25 agent in this case?

Courtovich - Cross

1    A    Yes, sir.

2    Q    How many agents were there working on this matter?

3    A    Throughout the entire project?

4    Q    Yes.

5    A    Numerous.  I don't have an exact number.

6            MR. TROUT:  Your Honor, I would like to have

7    marked for identification Defendant's Exhibit No. 117.

8            THE COURT:  All right.  Exhibit 117?

9            MR. TROUT:  Yes.

10           MR. GILLIS:  No objection, Your Honor.

11           THE COURT:  All right.  Do you want to move

12   it into evidence?

13           MR. TROUT:  Yes, Your Honor.

14           THE COURT:  All right.  Exhibit 117 is

15   admitted.

16           MR. TROUT:  Could we just show that on the

17   screen.

18   BY MR. TROUT:

19   Q    Who is that?

20   A    That is General Michael Flynn.

21   Q    Now, in your investigation, you were aware that

22   there was a Mutual Legal Assistance Treaty between the

23   United States and the Netherlands, correct?

24   A    Yes, sir.

25   Q    You wanted to take advantage of that opportunity

Courtovich - Cross

1  to get evidence from the Netherlands, correct?

2  A    Yes, sir.

3  Q    This is simply a treaty between two countries

4  where they agreed that they will exchange evidence on a

5  request assuming you go by the specified procedure to

6  get evidence from the foreign country, correct?

7  A    Yes, sir.

8  Q    You took advantage of that opportunity to get

9  evidence from the Netherlands; is that correct?

10  A    We did, yes, sir.

11  Q    You're aware that there is a Mutual Legal

12  Assistance Treaty with Turkey as well, correct?

13  A    Yes, sir.

14  Q    The same deal, agreement between two countries to

15  provide evidence on request, right?

16  A    Yes, sir.

17  Q    You made no request for evidence from the

18  government of Turkey; isn't that correct?

19  A    That's correct.

20  Q    So you never even asked for bank records or

21  financial records from Turkey that would perhaps,

22  according to the government's theory of the case, show

23  evidence of money going from Turkey to Alptekin,

24  correct?

25  A    Correct.

1  Q    How much time did you spend on all of the word

2  searches that you've described?

3  A    It took some time.  I don't have an exact amount.

4  Q    Was it more than ten hours?

5  A    I believe so.

6  Q    More than 20 hours?

7  A    Like I said, I don't have an exact time, but it

8  took some time.

9  Q    Now, when you got involved in this case, you

10 wanted to understand some of the background, correct?

11 A    Yes, sir.

12 Q    You went to various open source material to find

13 out about Turkey, yes?

14 A    Perhaps, yes.

15 Q    And about Gulen?

16 A    Yes.

17 Q    About General Flynn?

18 A    Yes, sir.

19 Q    And about the defendant, Bijan Kian?

20 A    Yes, sir.

21 Q    And did you want -- I think you indicated that you

22 actually looked at -- I think it was the article in the

23 *New York Times* that Mr. Alptekin had sent to indicate

24 the challenges that Turkey was experiencing as a result

25 of the coup.

1   A    Yes, sir.

2   Q    You did do other research about what was going on

3   in Turkey, correct?

4   A    A little bit.

5   Q    Now, I would like you to look at Government

6   Exhibit 50.  This is the op-ed that General Flynn

7   published on November 8, correct?

8   A    Yes, sir.

9   Q    I would like you to look over at the second page

10  to the part that begins, "For those of us who have

11  closely studied the careers of Seyed Qutb and Hasan al

12  Bana...."  Do you see that there?

13  A    Yes, sir.

14  Q    And it basically makes reference to the founders

15  of the Muslim Brotherhood; is that correct?

16  A    Yes, sir.

17  Q    And essentially describes the Muslim Brotherhood

18  as a terrorist organization?

19  A    Do you want me to read the whole article?

20  Q    So the paragraph that begins, "To professionals in

21  the intelligence community, the stamp of terror is all

22  over Mullah Gulen's statements in the tradition of Qutb

23  and al Bana."  They're the founders of the Muslim

24  Brotherhood.  Do you see that there?

25  A    Yes, sir.

1  Q    Do you recall receiving information in May 2017

2  that President Erdogan was affiliated with the Muslim

3  Brotherhood and was in solidarity with the Muslim

4  Brotherhood and would never have approved of this op-ed

5  as written?

6  A    Sir, I did not receive that information.

7  Q    Were you aware that that was an issue in this

8  case?

9  A    No, sir.

10 Q    As you sit here today, you were not aware that

11 that was an issue in this case?

12 A    Between the Muslim Brotherhood and Erdogan?

13 Q    That President Erdogan would never have approved

14 of an op-ed that equated Gulen to the Muslim

15 Brotherhood because of President Erdogan's affiliation

16 with --

17        MR. GILLIS:  Objection, Your Honor.  This

18 assumes facts that are not in evidence.

19        THE COURT:  Well, he's asking him, as the

20 lead agent, whether he was aware that that was an

21 issue.  I'll allow that.

22 A    I was not aware of that.

23 Q    Well, were you aware of an interview by

24 Mr. Alptekin in May 2017?

25 A    On CNN?

1  Q     No.  With the FBI.

2  A     Oh, yes, sir.

3  Q     In that interview, weren't you told

4  specifically --

5              MR. GILLIS:  Objection, Your Honor.

6              THE COURT:  Let me see counsel.

7         (Conference at the bench, as follows:)

8              THE COURT:  All right.  What's the objection?

9              MR. GILLIS:  Well, Your Honor, first of all,

10  again, it assumes facts.  I mean, he should be saying:

11  What was there about this, rather than were you aware

12  of that.  Because that assumes the facts in evidence,

13  rather than asking the witness if that occurred.

14  That's one objection.

15             THE COURT:  Well, as I understand it, he

16  asked him whether he was aware there was an issue.  He

17  said no.  I assume he's trying to impeach him.

18             MR. TROUT:  Yes.

19             THE COURT:  Is that what's in that FBI memo?

20             MR. TROUT:  Yes.

21             THE COURT:  I'm going to let him answer.

22             MR. GILLIS:  So with respect to what Alptekin

23  told the FBI, that -- you've heard objections all day

24  long about Alptekin's hearsay being admissible.

25             THE COURT:  As I understand, it's not coming

Courtovich - Cross

1  in for that.  It's just to impeach his testimony that

2  he was not aware that was an issue.  I'll give a

3  limiting instruction.

4           MR. TROUT:  Just to be clear, if he was the

5  case agent, I assume he was in court when we were

6  arguing about this.  He's basically saying, I never

7  knew anything about it until today.

8           THE COURT:  All right.  I'm going to let you

9  do it.

10           MR. GILLIS:  Okay.  That's fine.

11      (Proceedings continued in open court, as follows:)

12           THE COURT:  Mr. Trout.

13           MR. TROUT:  Thank you.

14  BY MR. TROUT:

15  Q    Special Agent Alfredo, were you aware from your

16  interview with or the interview of Mr. Alptekin that he

17  had pointed out that there was a problem with the op-ed

18  but that Erdogan would never approve of an op-ed in

19  which the Muslim Brotherhood was compared with Gulen?

20           MR. GILLIS:  Could I just ask counsel to

21  clarify whether it was an interview he conducted or

22  someone else conducted?

23           THE COURT:  Could you identify the source of

24  what you're referring to.

25           MR. TROUT:  Sure.

1   BY MR. TROUT:

2   Q    Are you aware that the FBI conducted an interview

3   of Mr. Alptekin?

4   A    Yes, sir.

5   Q    I take it that, as the lead agent, you would have

6   reviewed that.

7   A    Sure.

8   Q    Are you aware then that Mr. Alptekin had during

9   the course of the interview indicated that President

10  Erdogan would never have approved an op-ed that equated

11  the Muslim Brotherhood with Gulen?

12  A    I'd have to refer back to that 302.

13  Q    You were in court for various proceedings in this

14  case; were you not?

15  A    Some of them.

16  Q    Were you aware that there was an issue raised by

17  the defense about whether the government should look

18  for evidence that the Muslim Brotherhood was aligned

19  with Erdogan?

20  A    I don't recall that information, no, sir.

21  Q    All right.  Were you aware as part of your

22  research Mr. -- Special Agent Alfredo, were you aware

23  that in May 2017, Secretary of State Tillerson

24  testified before Congress that in opposition to the

25  Muslim Brotherhood being designated as a --

1          MR. GILLIS:  Objection, Your Honor.

2          THE COURT:  I'm going to ask him:  Are you

3   aware of the Secretary of State Tillerson's remarks

4   before Congress?

5          THE WITNESS:  No, Your Honor.

6          THE COURT:  All right.

7   BY MR. TROUT:

8   Q    So, Special Agent Alfredo, how much time did you

9   spend interviewing anyone at the Department of State to

10  understand the relationship of the Muslim Brotherhood

11  and President Erdogan?

12  A    I don't recall doing any interviews with people

13  with the Department of State.

14  Q    So you never even looked into the question of

15  whether the Muslim Brotherhood was affiliated in some

16  way with leaders of the government of Turkey?

17  A    No, sir.

18  Q    Did anybody ask you to look at that question from

19  the government?

20  A    I don't believe so.

21  Q    At any time during the course of your

22  investigation, did you give any consideration to

23  whether Erdogan or senior Turkish officials would ever

24  bless an op-ed that compared the Muslim Brotherhood to

25  Gulen?

1  A    That did not cross my mind.

2  Q    Did you ever consider whether -- as you were doing

3  your investigation, did you ever consider whether

4  Erdogan or senior Turkish officials would ever bless an

5  op-ed that equated the Muslim Brotherhood to a

6  terrorist organization?

7  A    It is not something I considered.

8           MR. TROUT:  One second, Your Honor, if I

9  could.

10      (Counsel confer.)

11          MR. TROUT:  Your Honor, there was a document

12 that we would like to be able to show the witness to

13 refresh his recollection.

14          THE COURT:  All right.

15          MR. TROUT:  If we could --

16          THE COURT:  Are you having trouble finding

17 it?

18          MR. TROUT:  Yes, we are.

19          THE COURT:  All right.  Ladies and gentlemen,

20 we'll take our luncheon recess at this time.  We'll

21 reconvene at 2:00.  Do not discuss this case among

22 yourselves during the luncheon recess.

23      (The jury exits at 1:00.)

24          THE COURT:  We'll stand in recess until 2:00.

25          Special Agent, do not discuss your testimony

Courtovich - Cross

1    during the luncheon recess.

2                THE WITNESS:  Yes, sir.

3                -----------------------------------
                        Time:  1:01 p.m.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          I certify that the foregoing is a true and

22    accurate transcription of my stenographic notes.

23

24                                    _____
                                              /s/
25                                    Rhonda F. Montgomery, CCR, RPR