```
                    ─United States v. Rafiekian─
                                                              800
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                          ALEXANDRIA DIVISION

 3   ─────────────────────────────x
                                    :
 4   UNITED STATES OF AMERICA,      : Criminal Action No.
                                    :
 5              versus              : 1:18-CR-457
                                    :
 6   BIJAN RAFIEKIAN,               : Day 4 (PM Session)
                                    :
 7                     Defendant. : July 18, 2019
     ─────────────────────────────x
 8
             The above-entitled Jury trial was heard by the
 9   Honorable Anthony J. Trenga, United States District Judge.

10                  A P P E A R A N C E S

11   FOR THE GOVERNMENT:    JAMES PHILIP GILLIS, ESQ.
                            JOHN T. GIBBS, ESQ.
12                          EVAN N. TURGEON, AUSA
                            United States Attorney's Office
13                          2100 Jamieson Avenue
                            Alexandria, VA 22314
14
     FOR THE DEFENDANT:     ROBERT P. TROUT, ESQ.
15   (Rafiekian)            Trout Cacheris & Solomon, PLLC
                            1627 Eye St. N.W.
16                          Suite 1130
                            Washington, DC 20006
17
                            MARK J. MACDOUGALL, ESQ.
18                          STACEY H. MITCHELL, ESQ.
                            JOHN C. MURPHY, ESQ.
19                          JAMES E. TYSSE, ESQ.
                            Akin, Gump, Strauss, Hauer & Feld, LLP
20                          Robert S. Strauss Building
                            1333 New Hampshire Avenue, N.W.
21                          Washington, D.C. 20036-1564

22   FOR MICHAEL T. FLYNN:  JESSE R. BINNALL, ESQ.
                            Harvey & Binnall, PLLC
23                          717 King Street, Suite 300
                            Alexandria, Virginia 22314
24

25
```

───United States v. Rafiekian───

801

```
1    APPEARANCES (Cont'd)

2    FOR FLYNN INTEL GROUP:        DAVID A. WARRINGTON, ESQ.
                                   Kutak Rock, LLP
3                                  1625 Eye Street, N.W.
                                   Washington, D.C. 20006-4061
4
     THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
5

6    OFFICIAL COURT REPORTER:      MS. TONIA M. HARRIS, RPR
                                   United States District Court
7                                  Eastern District of Virginia
                                   401 Courthouse Square, Ninth Floor
8                                  Alexandria, VA 22314

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

─────United States v. Rafiekian─────

802

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Bryan Alfredo (continued)

      Cross-examination by Mr. Trout................ 803

Government Rest

Rule 29 arguments.................................... 808

On behalf of the Government:

Robert Kelley

      Direct examination by Mr. MacDougall.......... 852
      Cross-examination by Mr. Gibbs................ 873
      Redirect examination by Mr. MacDougall........ 892

Andrew Durkovic

      Direct examination by Mr. Trout............... 895
      Cross-examination by Mr. Gillis............... 903

Joellen Chatham

      Direct examination by Mr. MacDougall.......... 908

EXHIBITS

On behalf of the Government:
                                           Admitted

Number 173.......................................... 884

Certificate of Court Reporter....................... 915

────────────United States v. Rafiekian────────────
B. Alfredo - Cross
                                                                          803

1                      **P R O C E E D I N G S**

2                   **A F T E R N O O N   S E S S I O N**

3              (Court proceedings resumed at 2:06 p.m.)

4              THE COURT:  All right.  Mr. Trout, are you ready to

5    proceed?  Ready to proceed?

6              MR. TROUT:  Yes, Your Honor.

7              THE COURT:  All right.  Let's bring the jury in.

8              (Jury present.)

9              (Witness seated.)

10             THE COURT:  Please be seated.

11             We're ready to continue.  Special Agent Alfredo, you

12   remain under oath.

13             Mr. Trout.

14                      **CROSS-EXAMINATION**

15   (Cont'd)

16   BY MR. TROUT:

17   Q.   Special Agent Alfredo, I want to go back just a bit and

18   digress to an earlier point.  You indicated that you did a

19   number of search term -- searches of the Gmail account for

20   Mr. Alptekin, as well as the Gmail account for Mr. Kian; is

21   that correct?

22   A.   Yes, sir.

23   Q.   And if I remember you correctly, you said that you did a

24   search for the word "reimbursement"; is that correct?

25   A.   Yes.

1    Q.    And did you find any hits for the -- for reimbursement?

2    A.    Yes, sir.

3    Q.    All right.  And where did you -- where did you find that,

4    in Mr. Alptekin's e-mail account?

5    A.    Mr. Alptekin's account, "reimbursement" popped up in

6    there, yes, sir.

7    Q.    Okay.  Now, when we left off, we were talking about the

8    Muslim Brotherhood.  And you recall I asked you about the

9    FBI's investigation going back to May of 2017, correct?

10   A.    Yes, sir.

11   Q.    And I asked you whether you had had an opportunity to

12   review the FBI report of interview of Mr. Alptekin?

13   A.    You asked me if I reviewed it?

14   Q.    Yes.

15   A.    I have reviewed it in the past, yes.  I haven't reviewed

16   it like today.

17   Q.    But you reviewed -- as the lead agent, you would have --

18   that's something you would have reviewed?

19   A.    Yes, sir.

20   Q.    It would have been one of the earlier items you would

21   have reviewed, correct?

22   A.    Yes, sir.

23   Q.    And do you recall Mr. Alptekin saying that he thought

24   equating the Muslim Brotherhood to Gulen was a terrible idea?

25   A.    Again, I said I would have to review it through to see

1   it.

2           MR. TROUT:  Your Honor, if I could ask --

3           THE COURT:  Just show it to him.

4           MR. TROUT:  -- to see if the witness -- if this

5   would refresh his recollection.

6   BY MR. TROUT:

7   Q.   Just before you look at that, the FBI does -- and for its

8   interviews -- it does complete reports on what happened during

9   the course of the interview, correct?

10  A.   Yes, sir.

11  Q.   And those are reduced in what is referred to as a

12  Form 302?

13  A.   Yes, sir.

14  Q.   All right.  Is that what you have before you?

15  A.   Yes, sir.

16  Q.   All right.  If you would look at -- it's 12 pages, but if

17  you would look at the last page and the first full paragraph

18  and see if that refreshes your recollection.

19  A.   Page 12?

20  Q.   Yes.

21  A.   The last two paragraphs?

22  Q.   Well, no, the first paragraph.

23  A.   Oh.

24          (A pause in the proceedings.)

25          MR. GILLIS:  Your Honor, if I could ask for a

B. Alfredo - Cross
806

1  limited instruction.

2         THE COURT:  All right.

3  BY MR. TROUT:

4  Q.   Does that refresh your recollection, Agent Alfredo?

5  A.   Yes, sir.

6  Q.   And, in fact, didn't Mr. Alptekin tell you that he

7  thought it was a terrible idea to equate the Muslim

8  Brotherhood to Gulen?

9         THE COURT:  Ladies and gentlemen, the Court's

10  allowing this information to be presented to Special Agent

11  Alfredo solely for the purpose of establishing what

12  information he had available to him or he was provided during

13  the course of his investigation.

14         MR. GILLIS:  Also, Your Honor, I believe Mr. Trout

15  misspoke, that the interview was not conducted by Special

16  Agent Alfredo.

17         THE COURT:  All right.

18         MR. TROUT:  Yes, and I agree with that.

19         THE COURT:  All right.

20  BY MR. TROUT:

21  Q.   I apologize, Agent Alfredo, if I said that.

22  A.   That's fine.

23  Q.   I understand you were not there.

24         Agent Alfredo, as I understand it, you did not check

25  with the State Department to understand why he would have said

United States v. Rafiekian

B. Alfredo - Cross

807

1   that?

2   A.   I did not, no, sir.

3   Q.   Do I understand that you didn't check news media or news

4   reports or the Internet to determine why he might have said

5   that?

6   A.   Correct.

7   Q.   And I understand you didn't do a simple Google search

8   with the words "Erdogan" and "Muslim Brotherhood" that might

9   have explained why he said that?

10  A.   I can't say that I ever searched that term in Google.

11  Q.   Well, in fact, you never did, did you?

12  A.   I don't recall.

13  Q.   So you didn't check with the State Department, you didn't

14  check with the news media, you didn't pursue your rights under

15  the MLAT with Turkey.  All correct, yes?

16  A.   That's correct.

17  Q.   What else didn't you do as part of the investigation in

18  this case, Mr. Alfredo?

19          MR. GILLIS:  Objection.

20          THE COURT:  Sustained.

21          MR. TROUT:  No further questions.

22          THE COURT:  All right.  Any redirect?

23          MR. GILLIS:  No, Your Honor.

24          THE COURT:  All right.  Special Agent you may return

25  to your seat.

United States v. Rafiekian

B. Alfredo - Cross

808

1              (Witness excused.)

2              The government calls the next witness.

3              MR. GILLIS:  Your Honor, we would like the

4    opportunity to revisit the co-conspirator issue.

5              THE COURT:  All right.  Let me excuse the jury.

6              Ladies and gentlemen, I'm going to excuse you to the

7    jury room.  There's some procedural issues the Court needs to

8    take up at this point.  I'll bring you out just as soon as I

9    can.  Please do not discuss this case among yourselves during

10   the recess.

11             (Jury dismissed.)

12             THE COURT:  Does the government have anymore

13   witnesses?

14             MR. GILLIS:  No, Your Honor, we have no more

15   witnesses nor any further exhibits to offer.

16             THE COURT:  All right.

17             MR. GILLIS:  Your Honor, we have, in anticipation of

18   a Rule 29 motion -- given the Court's order of some few days

19   ago, we do have a brief that a number of people have spent a

20   lot of blood, sweat, and tears on, including, we received

21   daily copy of the -- of the -- and we'd ask the opportunity to

22   pass up this brief.

23             And then my colleague has some additional thoughts

24   on the -- on the evidence that has been presented to the Court

25   that were not available to the Court when it issued its order.

─────────── United States v. Rafiekian ───────────
Rule 29
                                                                    809

1   And that would address some of the specific points that the

2   Court raised in that memorandum opinion.

3              THE COURT:  All right.

4              MR. GILLIS:  If I may, this is a joint brief --

5   rather -- I mean, it's joint both on the co-conspirator issue

6   and on the anticipated Rule 29.

7              THE COURT:  All right.  Well, it seems to me that --

8   is there any reason why this issue can't be dealt with in the

9   context of the defendant's Rule 29 motion?

10             MR. GILLIS:  I don't --

11             THE COURT:  Isn't it part and parcel of that?

12             MR. GILLIS:  It would be, yes, Your Honor.

13             THE COURT:  All right.

14             MR. GILLIS:  We didn't want to rest without

15  address -- without trying to address that issue.  But, yes,

16  otherwise we rest and we would like to preserve that issue

17  argument along with the Rule 29.

18             THE COURT:  All right.  Does Defense want to make a

19  motion at this point?

20             Has counsel seen a copy of this memorandum,

21  Mr. Gillis?

22             MR. GILLIS:  We just finished it, Your Honor.

23             THE COURT:  But they do have a copy now?

24             MR. GILLIS:  They do, yes, Your Honor.

25             MR. TYSSE:  Just received it a moment ago.  So,

────────────United States v. Rafiekian────────────

1    obviously, I haven't had a chance to review it yet.

2           THE COURT:  Right.

3           MR. TYSSE:  James Tysse, Your Honor.

4           THE COURT:  Yes.

5           MR. TYSSE:  Defendant, Bijan Rafiekian, moves for

6    judgment of acquittal under Rule 29 as to both counts charged

7    in the indictment.

8           Your Honor, there are simply too many gaps in the

9    evidence in the government's case across both of those counts

10   to sustain a jury verdict in this case.

11          Even viewing the evidence in the light most

12   favorable to the government, the jury would have to

13   impermissibly speculate about what Mr. Rafiekian did or may

14   have agreed to in order to find him guilty beyond a reasonable

15   doubt.

16          I'll start briefly with the standard and then move

17   into the other -- the actual evidence as to each of those

18   counts, Your Honor.

19          But as far as the standard goes, the Court is

20   supposed to consider whether there's substantial evidence,

21   direct or circumstantial, which take in the light most

22   favorable to the prosecution that would warrant a jury finding

23   that the defendant was guilty beyond a reasonable doubt.

24          And substantial evidence, Your Honor, as defined in

25   the Fourth Circuit as evidence that a reasonable finder of

1   fact could accept as adequate and sufficient to support the

2   conclusion of the defendant's guilt beyond a reasonable doubt.

3          Essentially, the question is:  Could a reasonable

4   jury accept the government's evidence as sufficient to find

5   Mr. Rafiekian guilty beyond a reasonable doubt?

6          And that's a legal question for the Court to

7   determine, and the Court's role is to assure us, as a matter

8   of law, the jury is making this guilt or innocence

9   determination based upon substantial and competent evidence

10  and not impermissible speculation.

11         So moving to Count 1, Your Honor, that's the

12  conspiracy count.  There's four elements to that count:

13  Agreement to commit an unlawful act, here specifically to act

14  as an undisclosed Turkish agent that could cause the filing of

15  a false FARA statement; two, defendant knew the purpose;

16  three, he acted with knowledge and deliberately joined the

17  conspiracy; and four, there was an overt act within the

18  jurisdiction.

19         I'm simplifying the elements --

20         THE COURT:  Right.

21         MR. TYSSE:  -- to organize our thoughts today.

22         So starting with Element 1.  Okay.

23         So the essence of a conspiracy count is an agreement

24  to commit an unlawful act.  The Supreme Court has made that

25  clear in the *Ianelli* case cited in the parties' papers.  I

United States v. Rafiekian

1    think it's helpful, in talking about this count, to start with

2    the Court's July 9th ruling, which focused properly on whether

3    the defendant had knowledge of the conspiracy, whether there

4    was a conspiracy at all, but by focusing on the defendant's

5    role.

6         And what the July 9th order held, Your Honor held,

7    was that the government had not established at that time by

8    the preponderance of the evidence that Rafiekian was

9    conspiring to act as an undisclosed foreign agent, Turkish

10   agent, or to cause the filing of a false FARA statement.

11        Your Honor also found, the Court also found

12   insufficient evidence of Mr. Rafiekian's knowing participation

13   in any such conspiracy.

14        So the question becomes, after several days of

15   trial, what's changed since that July 9th order.  Now, the

16   Court's order in footnote 17, I believe, summarized five

17   general categories of evidence to review.

18        The first was e-mails, including, I gather,

19   statements in the indictment.  Second was documents regarding

20   the scope of the project.  The third was the September meeting

21   in New York City.  The fourth was payments, the payment

22   arrangements.  The fifth was the FARA filing itself and

23   statements related to that.

24        I'm going to add two more to those five categories

25   because, Your Honor, the Court's order also found them

1  significant.  And one is Flynn's testimony, and, two -- or

2  proffer testimony.  And, two, the fact that the defendant

3  sought advice of counsel.

4          So, Your Honor, in the defense's view, the

5  government has presented nothing in those five categories,

6  during trial or in its case in chief, that consist of

7  substantial evidence tending to prove Mr. Rafiekian's guilt

8  beyond a reasonable doubt.  If anything, the Government's case

9  has gotten worse with regard to each of those categories.  And

10  I will explain why if you'll indulge me.

11          The first category we talked about was the e-mails

12  between Mr. Alptekin and Mr. Rafiekian.  The Court had already

13  seen the government's -- had already seen the vast majority of

14  those e-mails, if not all of them.  I'm not sure if there were

15  any the Court had not seen either as an attachment to the

16  crime fraud exception motion or as recounted in the

17  indictment.

18          That evidence, as the Court noted, may have

19  established the Turkish government's involvement and interests

20  in FIG's retention, but it was not enough to show that there

21  was a conspiracy in which Mr. Rafiekian was a part, that he

22  agreed to, that he joined.

23          At trial, nothing new -- again, those are the same

24  e-mails.  We've seen them before.  Nothing new, and certainly

25  in substance, that the defense noticed.  And, again, nothing

─────────────────United States v. Rafiekian─────────────────

1   in them suggesting, which is the proper focus, any agreement

2   by Mr. Rafiekian to enter into an unlawful agreement, which is

3   the key to conspiracy:  Did he agree to do something unlawful?

4          Second category was the documents regarding the

5   scope of the project.  Now, the scope of the project, I think

6   the government's case has shown pretty conclusively that the

7   scope of the project suggested, and several witnesses

8   testified to it -- I believe all the Sphere witnesses did:

9   Mr. Miller, Mr. Lowman, and Mr. Courtovich -- that the scope

10  of the project was to restore confidence in the business

11  environment.  And part of that was to look into what Gulen was

12  doing.

13         That was an admitted part of the project from the

14  very beginning.  They had a number of witnesses who spoke to

15  that.  But that is the -- there's nothing new in the

16  government's case regarding the scope.

17         Secondly, the government's witnesses uniformly

18  testified that they understood the client was Inovo and

19  Alptekin.  There was not a single witness, to our knowledge,

20  that testified that they knew, believed, thought that the

21  project was actually being controlled or directed by the

22  Turkish government.

23         Mr. McCauley said that the client was

24  Inovo/Alptekin, so did Mr. Boston, Mr. Enders, Mr. Miller,

25  Mr. Courtovich.  I don't believe there was anything that

---
United States v. Rafiekian

1   suggested otherwise.  So this is not a credibility situation

2   where you have to figure out who believed was really

3   controlling the situation.  There was just no testimony that

4   anyone was controlling FIG's actions other than who everyone

5   agreed with the client, which was Alptekin and Inovo.

6         And I point out these are sophisticated people, Your

7   Honor, too.  This was former FBI agents, high-profile

8   consulting firms with their own compliance obligations under

9   these statutes.  So these are not a situation where, you know,

10   it -- it seems like if the government could have elicited that

11   testimony, it would have.

12         We also found out that Amsterdam & Partners -- still

13   talking about the scope of the project here, but Amsterdam &

14   Partners was openly doing the same work for the same client.

15   And I think that came out in several different witnesses'

16   testimony.  And, again, that -- Amsterdam & Partners did file

17   a FARA form.  Clearly Turkey had no compunction about having

18   its name out there with respect to that motion.

19         The third category of evidence the Court reviewed

20   was the meeting in New York.  Now, the only new things we

21   learned about that meeting undermines the significance of it,

22   including that the meeting was extremely short.  It was 20 to

23   25 minutes.  I think all the witnesses testified to that.

24         We learned that the Turkish representatives -- I

25   believe Mr. McCauley and perhaps others talked of this, the

─────────────── United States v. Rafiekian ───────────────
Rule 29
816

1    Turkish representatives didn't ask any questions or make any

2    requests.  They were essentially making a representation with

3    respect to Mr. Gulen, and that Bijan barely spoke at the

4    meeting, if he spoke at all.  It wasn't clear from the

5    testimony.

6           And, in fact, Mr. McCauley testified that the

7    meeting was essentially a pitch to eventually get actual work

8    from Turkey down the road.  So there was a good deal of

9    discussion about this meeting.  It was highlighted in the

10   indictment.

11          I think when it actually came out at trial, Your

12   Honor, it -- it certainly seemed not extremely significant in

13   the context of whether Mr. Rafiekian was knowingly engaged in

14   a conspiracy to commit some unlawful act.

15          The fourth category was payments.  Now, the

16   July 30th order the Court had noted that whatever inferences

17   can be reasonably drawn from the arrangement related to the

18   payment of fees, one cannot reasonably infer an agreement or

19   understanding that Rafiekian would act as an undisclosed

20   Turkish agent or cause the filing of a false FARA statement.

21          Again, I don't think we learned anything new that we

22   didn't already know on July 9th.  All of those payments and

23   where they came from were in the indictment.  And, in fact, I

24   think we actually learned a little bit more about where they

25   came from, which was specifically all from Mr. Alptekin.

United States v. Rafiekian

1   There was no question about that.

2           There was no evidence put on that those payments

3   were -- the providence of the payment came from the Turkish

4   government.  There was no evidence put on that -- that the

5   payments came from anywhere but Mr. Alptekin, as Mr. Rafiekian

6   has said all along.  And, again, I don't think the government

7   met its burden through that evidence either.

8           The fifth category the Court focused on was the FARA

9   statement itself.  And, again, in the July 9th order the Court

10  ruled that what was disclosed in the FARA statement is not

11  sufficient to allow any inference of the alleged conspiracies.

12          And, again, nothing in the government's evidence, in

13  our view, changed that at all.  The Court already had the FARA

14  statements themselves.  Now, they also have Mr. Kelner's

15  testimony, which demonstrates how very thoroughly, consisting

16  of well over 100 hours of work, I think 200 or more, spent

17  preparing and filing the FARA statement.

18          They -- I think it's part of the record now that the

19  Covington law firm had all of the documents that the -- or

20  many of the documents -- I don't know if I want to say all

21  just because I'm not exactly sure, but I know they had many of

22  the significant documents that the Court now says, or that the

23  government now alleges, indicates false FARA filings.

24          So, again, I think we have -- oh, and, you know,

25  Mr. Kelner's belief in the truth of the statements that were

─────────United States v. Rafiekian─────────

1   contained in that filing.  He did it carefully and thoroughly,

2   spent a lot of time on it, interviewed a bunch of people, made

3   his legal determination as a lawyer.

4           The two other categories I mentioned, Your Honor,

5   were not evidence that the government put on but things that

6   the July 9th order recognized.  But one of them was related to

7   the Flynn testimony, and Your Honor's order said that notably

8   absent from the government's proffers any evidence from

9   Michael Flynn.  Obviously that did not change either.

10          And if -- excuse me.

11          Obviously that did not change either.  Michael Flynn

12  did not testify.  And, if anything, new evidence has come to

13  light since that July 9th order -- well, actually I'm not

14  sure.  Yes, I believe that's true.  Since that July 9th order

15  regarding the fact that Alptekin -- the Turkish government

16  might have been seeking access to Mr. Flynn and Mr. Rafiekian

17  was not aware of that outreach.

18          I'm referring to the, to the half sheet filed last

19  week.  It was filed around the same time as the order, so I

20  don't want to misrepresent the exact timing, but it was not

21  mentioned in the order.

22          Finally, Your Honor pointed out -- and I think this

23  is very significant -- again, Your Honor, across multiple

24  counts since the scienter requirement for both Count 1 and

25  Count 2 in different respects, but the July 9th order held

1   that any inference of an agreement by Mr. Rafiekian to act as

2   an undisclosed Turkish agent is substantially undercut by his

3   contemporaneous conduct, which included seeking out legal

4   advice concerning his fair disclosure obligation in

5   August 2016 from Covington and again in September 2016 from

6   Kelley and subsequently filing an LDA disclosure statement

7   pursuant to Kelley's advice.

8          Now, the government's case in chief has now

9   confirmed those facts.  Kelner testified that Mr. Rafiekian

10  reached out to him in August of 2016 for the specific purpose

11  of filing a FARA statement.

12         Miller and Courtovich, I believe, perhaps others,

13  also testified that Kelley gave advice to them regarding the

14  LDA filing and that he had no reason to doubt -- I think

15  Miller testified that he had no reason to doubt the

16  reasonableness or competency of that opinion.

17         So, you know, again, Your Honor, looking at all this

18  evidence, I don't see any evidence of any agreement to file a

19  false FARA statement given that there's no evidence in the

20  agreement at all, first of all.  But, second of all, there

21  is -- all the evidence goes to Mr. Rafiekian actually seeking

22  out affirmatively to comply with his FARA and LDA obligations

23  once he became aware of them.

24         THE COURT:  Well, what we do have that we didn't

25  have before is the testimony of a few people.  We have

United States v. Rafiekian

1   Mr. McCauley's testimony, the attributed statements to

2   Mr. Rafiekian, we have aspects of Mr. Kelner's testimony about

3   information that he wasn't provided.  What about that

4   testimony?

5           MR. TYSSE:  Which aspect?

6           THE COURT:  Well, Mr. McCauley's testimony that -- I

7   believe it was McCauley who said that Mr. Rafiekian wanted to

8   operate under the radar and he had a better idea than -- he

9   didn't want to file under FARA, he wanted -- he had a better

10  idea to file under the Lobbying Disclosure Act and Kelner's

11  testimony that he wasn't aware of the information in the

12  Skype -- the Skype exchanges.

13          MR. TYSSE:  Right.  Okay.  So taking each of those

14  in terms of the McCauley testimony, Your Honor, I think that's

15  an ambiguous statement at best just because -- I don't think

16  Mr. McCauley testified in any detail about any subsequent

17  conversations we had about that or what he actually meant by

18  that comment.

19          It sounded from, at least my reading of the

20  testimony -- and obviously, you know, the Court will take it

21  in the light most favorable to the government, but at the same

22  time, Your Honor, it was an ambiguous statement about a --

23  someone who had already received advice that LDA registration

24  was improper under those circumstances.  So I don't think --

25  again, it's not -- so that's one point.

—United States v. Rafiekian—

1          The second point, Your Honor, is, again, we're

2    looking at an agreement to do so unlawfully.

3          THE COURT:  Let me ask you --

4          MR. TYSSE:  He said it independently.  It still

5    would not constitute any sort of agreement.

6          THE COURT:  Let me ask you a procedural question.

7          MR. TYSSE:  Sure.

8          THE COURT:  Do you think the Court can consistently

9    allow the case to proceed to the jury either by denying the

10   motion or under a reservation as to your motion without

11   revisiting its ruling on the co-conspirator statements?

12         MR. TYSSE:  No, Your Honor, I don't.  And the reason

13   is, if Your Honor does not believe it's even more likely than

14   not that a conspiracy exists in the first place, then I don't

15   think it would logically follow that you could find there was

16   still substantial and competent evidence that a jury could

17   find beyond a reasonable doubt that he was -- that he was

18   convicted of this crime.

19         THE COURT:  All right.

20         MR. TYSSE:  It sounds to me like those are

21   irreconcilable standards.  I'll say even if you did revisit

22   your prior ruling and co-conspirator statements, that still

23   would not mean you could not grant this motion.  I think all

24   the preponderance of the evidence standard means more likely

25   than not it could be 51 percent and you could still say that's

————————United States v. Rafiekian————————
Rule 29

822

1   not close enough to what you need for beyond a reasonable

2   doubt standard, which Your Honor is very familiar with.

3          THE COURT:  Yeah.  I'm not sure it is the same

4   standard.  I'm not sure necessarily they are inconsistent.

5   There is certainly some tension between the preliminary

6   findings for the purposes of an evidentiary ruling and the

7   standard pertaining to a Rule 29 motion.

8          MR. TYSSE:  Well, I think, Your Honor, we will have

9   to revisit it to the extent that now that the evidence is in,

10  they have removed -- or suggested that they're now able to

11  bring in that evidence.  You would now have to look at it

12  based on the record as a whole if no longer a preliminary

13  finding based on the evidence at the time.  It would now be a

14  determination based on the evidence that's now come in.

15         I think Your Honor allowed the government to revisit

16  its position by establishing a proper factual foundation to

17  bring in those statements.  But I -- as -- you know, the

18  recitation I've just completed, with respect to this count, is

19  meant to show it's -- the evidence that's come in has not

20  dramatically changed, and not even really substantively

21  changed, I don't think, the evidence that was already before

22  the Court July 9th.

23         I mean the evidence the government presented to you

24  on July 9th was essentially its best -- its greatest hits.

25  You know, it was presenting to you what it thought were the

1  most salient pieces of evidence that would point to my

2  client's guilt or innocence.  And if at that time it was not

3  even more likely than not that a conspiracy had been reached,

4  seems to me very inconsistent to then say it should be able to

5  go to the jury and the jury could find, nevertheless, by

6  beyond a reasonable doubt that my client had done so.

7          But, again, I think, Your Honor, to the extent that

8  there was any concerns about that I think, you know, Your

9  Honor can and should take another look at the evidence and

10  determine whether or not they've met their burden to introduce

11  that evidence.  But I think that for many reasons there's a,

12  you know --

13          THE COURT:  Well, but the ruling as to the 104

14  ruling as to co-conspirator statements was based on a

15  preponderance of the evidence as the Court evaluated the

16  evidence, including the reliability of evidence and what even

17  credibility issues.  I'm not sure the Court was required to or

18  the Court, in fact, viewed all the evidence most favorably to

19  the government in connection with its initial ruling, which is

20  the standard now under Rule 29.  So --

21          MR. TYSSE:  That might be right, Your Honor.  I

22  thought the government had, at that stage, viewed the evidence

23  in the light most favorable to the government to make that

24  position since you weren't actually allowed to make

25  credibility determinations at that point since there were no

—United States v. Rafiekian—

Rule 29

824

1   witnesses or anything.  So I assumed that -- that wasn't --

2          THE COURT:  Well, it's an unclear -- sometimes

3   unclear standard under Rule 104 where the Court was evaluating

4   even inadmissible evidence, hearsay evidence, and everything

5   else in making a judgment at that point.  But I understand

6   your argument.

7          MR. TYSSE:  Right.  I think the bottom line from --

8   bottom line I took away, Your Honor --

9          THE COURT:  Yeah.

10         MR. TYSSE:  -- and I would urge you to keep in mind

11  is that you did take a close look at that evidence.  There was

12  a lot of documentary evidence that was submitted to you.  You

13  looked at what the government put in its detailed indictment

14  about what -- you know, at least the factual aspects of it,

15  what the most salient features it thought were the -- through

16  the communications and found that it just wasn't enough at

17  that point to reach a conspiracy.  And nothing much has

18  changed from that point.

19         THE COURT:  All right.

20         MR. TYSSE:  And, again, I really would urge the

21  Court to focus, but the most important thing is ultimately,

22  you know, the fact that Turkey might have had interest and

23  involvement in this contract, the fact that Mr. Alptekin might

24  have been working, you know, with Turkey and behind the scenes

25  and doing these things.  All of those things your court -- I'm

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

────────────United States v. Rafiekian────────────

1  sorry -- the Court considered in the July 9th order and said

2  there might be evidence of a conspiracy involving Mr. Alptekin

3  and someone else.  But the key that I need to focus on is what

4  evidence is as to Mr. Rafiekian.

5           THE COURT:  Right.

6           MR. TYSSE:  And that evidence is quite sparse still,

7  and I don't think it's changed from the government's position

8  before.

9           THE COURT:  All right.

10          MR. TYSSE:  So that's on conspiracy.  I can walk

11  through each of the elements, but I think they all kind of

12  merge into one.  We don't think there's enough evidence on

13  either of those first three elements that I mentioned.  Either

14  conspiracy itself, knowing the purpose of the conspiracy, or

15  evidence that would acknowledge he deliberately entered it,

16  which, again, it really goes to the mens rea.  And I think the

17  seeking out advice of counsel on this point really kind of

18  hammers the point home.

19          It was seeking -- it just -- it seems very

20  inconsistent, if not totally irreconcilable, to say that

21  someone was seeking out attorney advice and then following

22  that advice with respect to the very thing that they're now

23  charging my client with failing to do.

24          I'll turn to Count 2 now if the Court will indulge

25  me.

─────────United States v. Rafiekian─────────
Rule 29

826

1          THE COURT:  All right.

2          MR. TYSSE:  The second count is the acting as an

3    unregistered foreign agent.  Section 951.  Again, we have

4    briefing on them, but we think the element should be, but to

5    summarize briefly for the purposes of this discussion, the

6    defendant acted in the United States as an agent of Turkey.

7    The defendant was not engaged in a legal commercial

8    transaction.  The defendant was required to register and

9    failed to do so; and, finally, that he acted knowingly with

10   respect to those elements.

11          So we can walk through those elements again as well.

12          First, was he acting as an agent of Turkey?  And we

13   think this element comes down to direction and control.  Okay.

14   The Government admits -- the Government has argued before that

15   the question in a situation like this, where there is no

16   dispute that the direct client was Inovo and Alptekin, the

17   question is was Rafiekian nevertheless acting under the

18   direction and control of a foreign government.  For the

19   purpose of this Count, it's not.

20          Was the foreign government involved in some way?

21   It's not.  Was it for the, you know, principal beneficiary of

22   some other country?  It's simply was he acting under the

23   direction and control of Turkey.  And I'll submit that there's

24   just no evidence that he was acting as -- at the direction and

25   control of the Turkish Government.

─────────── United States v. Rafiekian ───────────

1    All the evidence that came in suggested that he was

2    acting at the direction and control of Mr. Alptekin and Inovo,

3    and sometimes not even -- sometimes not even that.  As we've

4    seen several times, there was obviously a mismatch between

5    what Mr. Alptekin wanted and what FIG was doing.  But put that

6    aside for a moment, clearly there was not -- you know, clearly

7    the evidence that came in focused on that.

8    There was no evidence, to my knowledge, that the

9    Turkish government ever asked my client anything, never asked

10   FIG anything, never asked -- yeah, anyone who Mr. Rafiekian

11   personally controlled or himself to do anything.

12   At the highly touted New York City meeting, there

13   were no questions or requests made by the Turkish officials.

14   You would think, if they were directing and controlling a

15   project at a meeting like that, they would have provided some

16   direction and instruction about what to do.

17   No one who worked for FIG testified that they

18   thought Turkey was actually the one calling the shots.  No one

19   who worked for Sphere thought -- testified that they thought

20   that Turkey was the one really calling the shots.

21   So, again , there's no request to acting Turkish

22   officials, including that in-person meeting, and, again, no

23   direct communications between Turkish officials at all.

24   The only evidence that's come in so far with respect

25   to, you know, Turkish involvement, was the New York City

─────────────United States v. Rafiekian─────────────
Rule 29
828

1    meeting, and then all the hearsay statements by Mr. Rafiekian,

2    which Your Honor admitted thus far only for a limited purpose.

3          So, again, there's just nothing -- so for all

4    Mr. Rafiekian knew, those are not even true.  And as far as

5    the jury is concerned right now, it may or may not have been

6    true he was even talking to Turkish officials.

7          So, again, I don't think, again, there was evidence

8    of that.  There's, I think, a fundamental lack of direction

9    and control with respect to this Count.

10          Second, Your Honor, this is whether or not

11    Mr. Rafiekian was engaged in a legal commercial transaction.

12    Now, the Court has already found in the July 9th order, again,

13    that although Mr. Rafiekian was not charged with a FARA

14    violation, his activities would violate FARA -- and I'm

15    quoting -- and therefore be illegal if they are covert

16    activities and Rafiekian willfully engaged in them as an agent

17    of the Turkish government and without a proper FARA

18    registration.

19          So, in other words, regardless of whether he should

20    have registered under FARA, the question is whether he

21    willfully failed to do so, because otherwise his transactions

22    or his interactions with lobbying activities and writing the

23    op-ed were legal commercial transactions as I read Your

24    Honor's order.

25          So where is the evidence of the willful behavior?

United States v. Rafiekian

1  And, again, I refer you back to the evidence from Kelner where

2  he says he saw it in *VICE* specifically related to FARA in

3  August 2016.

4          The question was:  "And it was about FARA

5  registration?

6          "ANSWER:  It was.

7          "QUESTION:  And about whether he -- and about how he

8  should go about registering with regard to the INOVO contract;

9  is that right?

10         "ANSWER:  It was about whether or not they needed to

11 register under FARA."

12         Evidence from Mr. Miller was consistent with that.

13         The lawyer had suggested the LDA over FARA.  I think

14 Mr. Courtovich testified to it as well.  It was a discussion

15 between them.  They went to a lawyer, they got advice.  The

16 lawyer's advice was register under the LDA.  And Mr. Miller

17 was comfortable with that analysis.

18         So other than that FARA violation, I'm not aware of

19 any other nonlegal commercial activities the government has

20 alleged.  They say that was the underlying illegal activities.

21 And, again, I don't think any other evidence was elicited that

22 there was anything else that was illegal that he was doing.

23 It was just the fact that he was doing it as an unregistered

24 agent under FARA, allegedly.

25         So, again, the idea that he would seek out advice

─────United States v. Rafiekian─────

1    with desire to register and told that he did not have to,

2    which are both facts in evidence, is just completely

3    irreconcilable in our view with the idea that he failed to do

4    so willfully.

5            And importantly -- actually, I'll start at the next

6    point.

7            So third, the question is whether he was required to

8    notify the attorney general and failed to do so.  Again, we

9    don't think there's evidence of this, for two reasons:  One,

10   it ties back into legal commercial transaction point we were

11   just talking about, but it also ties into whether or not he

12   qualifies for FARA's LDA exception, because there's no

13   requirement to file under FARA if he filed under the LDA and

14   you're not acting on behalf of a -- principally benefiting a

15   government.

16           So, again, the question is whether he failed to do

17   so when he was required to and if -- if the engagement was not

18   principally benefiting the government, and he did not

19   willfully fail to do so -- in other words, if he did not

20   knowingly -- you know, knowingly and intentionally, with

21   knowledge of -- that it was unlawful, failed to register under

22   FARA, then he would qualify for that exception.

23           And so, you know, I think the Court itself has

24   acknowledged it's a murky area of law, so I just think that

25   the "willfully" scienter requirement here just makes, again,

United States v. Rafiekian

1   this very irreconcilable with the government's theory.

2         So, finally, the -- with respect to the acting as an

3   agent of a foreign government in general, Your Honor, it's --

4   there's a requirement that he act knowingly -- my client acted

5   knowingly with respect to each of the elements.  And we cited

6   law to this effect.

7         I'd be happy to go through it if you'd like, but

8   essentially it's well established that the presumption in

9   favor of the scienter requirement applies to each of the

10  statutory elements that criminalizes otherwise innocent

11  conduct.

12        I think the Court has recognized in the July 9th

13  order that the underlying activities would not be legal absent

14  the filing requirement.  Accordingly, this Court should hold,

15  and I think it implicitly already did, that to act as an agent

16  he needs to have known he was supposed to -- act as an

17  unregistered agent, he needs to know he was supposed to do so.

18        And we cited the *Rehaif v. United States* case that

19  just -- the Supreme Court just issued a few weeks ago.  But

20  there's many others as well.

21        The *Liparoata* case is kind of the classic Supreme

22  Court case involving food stamps and whether or not someone

23  knew that they were unlawfully in possession of food stamps

24  and the Court said you have to know not only that you're

25  possessing the food stamps but that it was unlawful to do so,

─────────── United States v. Rafiekian ───────────

1   because otherwise you'd be criminalizing a broad swath of

2   innocent conduct.

3         And we think that's exactly what's happening here.

4   The takeaway from that case was, yeah, exactly, it would be to

5   criminalize a broad swath of apparently innocent conduct.

6         So, again, happy to talk about any of those

7   elements, but, again, I think that the idea that he was

8   knowingly acting as an unregistered foreign agent -- even

9   assuming that they could show direction and control, which I

10  believe there's zero evidence of.

11        But even assuming they could get over that hurdle,

12  they would then have to show that he was knowingly acting as

13  an unregistered agent.  And, again, I just don't think there's

14  anything to suggest that -- or I think it's irreconcilable to

15  suggest that by going to a lawyer saying, I need to file under

16  FARA, that could somehow constitute enough evidence for a

17  reasonable jury to come back and say, without speculating, no,

18  he -- beyond a reasonable doubt he knowingly failed to

19  register --

20              THE COURT:  All right.

21              MR. TYSSE:  -- with the attorney general.

22        So that's my presentation, Your Honor.  I'm happy to

23  answer any particular questions you have.  I think you had a

24  question about Mr. Kelner.  I'm happy to respond to that if --

25              THE COURT:  That's all right.  Let me hear from the

─────United States v. Rafiekian─────

1  United States.

2          MR. TYSSE:  Sure.  Thank you, Your Honor.

3          MR. TURGEON:  Thank you, Your Honor.  As Your Honor

4  knows, the Rule 29 standard asks or says that the Court should

5  consider the evidence in light most favorable to the

6  prosecution.  And in ruling on a Rule 29 motion, the Court is

7  not to weigh evidence or address credibility of witnesses.

8  Instead, the government is entitled to all favorable,

9  reasonable inferences from the evidence.

10          Your Honor, in this case the government's case was

11  only three days, but a lot of evidence came into the record.

12  This is a fact intensive case.  It's a document intensive

13  case.

14          We have a good jury.  They've been attentive.

15  They've been taking notes.  And so we'd ask that the jury be

16  allowed to determine the outcome of this case.

17          THE COURT:  Let me ask you:  Do you think, in your

18  view, the Court can allow the case to proceed to the jury

19  without revising its ruling on the co-conspirator statements?

20          MR. TURGEON:  Well, Your Honor, we do ask Your Honor

21  to revisit that order, but, yes, we believe it could proceed

22  to the jury regardless.

23          THE COURT:  All right.

24          MR. TURGEON:  Now, our written brief, which is

25  submitted, has citations to the record and that leads on our

─────────────── United States v. Rafiekian ───────────────

 1   full argument on Rule 29 and asks that Your Honor consider

 2   that.

 3        But more importantly right now, Your Honor, we would

 4   like to address the reasons the Court should revisit its

 5   previous ruling on the admissibility of co-conspirator

 6   statements.  That issue is addressed in our brief as well, but

 7   I wanted to highlight for Your Honor the evidence that the

 8   Court has now before it that the Court did not have at the

 9   time of its July 9th order.

10        In sum, there's a lot of evidence.  It's all of the

11   evidence the Government submitted, but there are a few points

12   specifically I wanted to highlight.

13        In Your Honor's previous ruling, Your Honor cited

14   the Federal Rules of Evidence is a codification of the Supreme

15   Court's holding in *Borgelay* (ph).

16        And as Your Honor pointed out, that rule states that

17   the Court must consider, in addition, the circumstances

18   surrounding the statement, such as the identity of the

19   speaker, the context in which the statement was made, or

20   evidence corroborating the contents of the statement in making

21   its determination as to each preliminary question.

22        Now in evidence, Your Honor, is something the Court

23   did not have previously.  It's all of the defendant's Skype

24   chats with Alptekin.

25        Those chats include Government's Exhibit 67J.  And

──────────United States v. Rafiekian──────────

1   in that chat, dated September 8th, Alptekin said:  Hi, Bijan.

2   We'll send the agreement.  Just left PM's office.

3          And those three comments occurred within a period of

4   one minute, it appears.

5          And in response, one minute later, the defendant

6   writes:  Thank you, Ekim.  MF and I are going to meet in 30

7   minutes at 1400.

8          Now, the defendant didn't say in that chat, why were

9   you at the PM's office with the agreement, he just said he was

10  meeting with General Flynn.  And that happened on

11  September 8th, the same day that the FIG-Inovo contract was

12  signed.

13         The very next day, Alptekin told defendant:  Bijan,

14  I urgently need a BIC/swift code, and ideally an IBAN version

15  of the bank account and, finally, an address linked to that

16  account.  I have the money but need to deposit ASAP before

17  banks close.

18         In response, the defendant didn't ask questions

19  about that statement, which suggests, at least, that Alptekin

20  was essentially walking around with a suitcase full of cash.

21         Instead, two hours later the defendant sent Alptekin

22  FIG's bank account information.  And the very same day,

23  September 9th, the day after the FIG-Inovo contract was

24  signed, Alptekin's company, Inovo, generated an invoice for a

25  $40,000 kickback.  And all of this took place about a month

1   after the defendant said that FIG had been retained by a Dutch

2   client.

3           Your Honor also noted in the July 9th order that

4   there was no contention that Covington wrote the FARA filing

5   without relevant e-mails or documents.

6           Well, that evidence, including the evidence I've

7   just discussed, is now in the record.

8           On redirect, Mr. Kelner stated that he did not have

9   any of defendant's Skype chats, including the ones I just

10  read, and the defendant didn't even tell him about the Skype

11  chats with Alptekin.

12          Your Honor's order on July 9th noted further that

13  the government's proffer lacked evidence from General Flynn.

14          Well, contrary to what Mr. Tysse just said, now we

15  do have evidence from General Flynn.  We heard testimony from

16  his and FIG's former attorney, Robert Kelner, which shows that

17  the defendant and Alptekin and General Flynn told the same

18  lies about the involvement of Turkish officials in the

19  project, the connection of the New York meeting to the

20  project, the purpose of the project, Alptekin's solicitation

21  and review of multiple drafts of the op-ed and the op-ed's

22  relationship to the project, and the purpose of those $40,000

23  kickback payments to Alptekin.

24          So even based on Your Honor's current rulings, we

25  know that these were lies because what the defendant and

United States v. Rafiekian

1   Alptekin and General Flynn said was different from what was in

2   their minds, which was the purpose for which Your Honor

3   admitted many of the Skype chats and e-mails along with the

4   co-conspirators.

5          Your Honor, conspiracy is about a meeting of the

6   minds.  True stories can match up, but two people's lives only

7   match up when those people have gotten together and gotten

8   their stories straight.

9          We submit that the defendant's and Alptekin's and

10  General Flynn's matching lies are extremely persuasive

11  circumstantial evidence of the conspiracy.

12         And in its previous order, Your Honor, the Court

13  also cited that the government's contention that the defendant

14  agreed to act as an undisclosed Turkish agent was undercut by

15  his contemporaneous conduct in seeking out legal advice on

16  FARA in late August and early September 2016, and by FIG's

17  subsequent LDA filing.

18         But, Your Honor, the evidence now in the record

19  shows that the defendant's agreement was not contemporaneous

20  with his attempts to contact counsel.  According to an e-mail

21  now in evidence, the defendant said, I believe on September 3,

22  2016, that he and FIG had been at work on the project since

23  July.

24         Now, that's over a month before he allegedly reached

25  out to counsel and, frankly, that's why this was a FARA

─────────── United States v. Rafiekian ───────────

1   violation.

2          Perhaps this goes without saying, Your Honor, but

3   based on what's currently in evidence, the defendant would not

4   be entitled to advice of counsel jury instruction under Fourth

5   Circuit precedent.

6          Moreover, Your Honor, in terms of Brian McCauley's

7   testimony about operating under the radar in terms of FIG's

8   registration, let's look at the LDA, which is now in evidence.

9          What it says is that Kelley was lobbyist.  We know

10  that's not correct based on the testimony we heard and the

11  documents we saw that it was the defendant who did lobbying,

12  including to Dana Rohrabacher.  And the LDA also says that

13  Mr. Kelley was lobbying on two bills, which also are now in

14  evidence.

15         At the time the LDA was filed, one of those bills

16  had already been vetoed and one consisted of over a thousand

17  pages that had nothing to do with Gulen or the Turkish

18  economy.

19         And moreover, Your Honor, the LDA lobbying report

20  filed on December 1st, 2016, after the conclusion of the

21  project, says that no lobbying was done, which we just now

22  know is not true.

23         So for those reasons, Your Honor, we believe that

24  circumstances have changed very significantly since Your

25  Honor's July 9th order, and we would ask that you revisit

─────────United States v. Rafiekian─────────

1    those findings.

2            THE COURT:  All right.

3            MR. TURGEON:  May I have the Court's indulgence for

4    one more second, Your Honor?

5            (Counsel confers.)

6            MR. TURGEON:  One more thing, Your Honor.  I believe

7    Your Honor asked if it's possible to reserve decision.  Under

8    Rule 29B, the Court may reserve decision on the motion,

9    proceed with the trial where the motion is made before the

10   close of all the evidence, submit the case to the jury, and

11   decide the motion either before the jury returns a verdict or

12   after it returns a verdict of guilty or is discharged without

13   having returned a verdict.

14           And, Your Honor, that amendment to Rule 29 -- if I

15   could continue, Your Honor.  If the Court reserves decision,

16   it must decide the motion on the basis of the evidence at the

17   time the ruling was reserved.

18           And, Your Honor, I want to make one point about the

19   amendments to Rule 29.  The 1994 amendment made explicit that

20   district courts could reserve decision and they cited

21   several -- those amendments cited several cases from the

22   Supreme Court in which it praised district courts for

23   reserving decision until after a factual finding on guilt or

24   innocence.

25           Thank you.

─────────────── United States v. Rafiekian ───────────────

1        THE COURT:  Let me ask you a question.  Articulate

2 for me the evidence you think establishes the agreement prong

3 of the conspiracy?

4        MR. TURGEON:  The agreement prong of the conspiracy,

5 Your Honor?

6        THE COURT:  Yes.  I understand your argument about

7 his -- the evidence with respect to his acting as a foreign

8 agent, but what evidence -- articulate for me the evidence

9 that would allow a -- the jurors to conclude that this was all

10 pursuant to an agreement to not disclose his status as a

11 Turkish agent with anybody.

12        MR. TURGEON:  Well, Your Honor, under Fourth Circuit

13 precedent, the existence of a tacit or mutual understanding

14 between co-conspirators is sufficient evidence of a

15 conspiratorial agreement.

16        THE COURT:  And I understand that.  But there has to

17 be some evidence that it's based on.  You have to have -- you

18 have to draw the inference from some evidence.

19        MR. TURGEON:  And the Fourth Circuit has also held

20 that you can draw that from circumstantial evidence, Your

21 Honor, which --

22        THE COURT:  Well, all right.  What is it?

23        MR. TURGEON:  In this case it is the co-conspirators

24 acting in concert, seeking throughout the project to conceal

25 the involvement of Turkish government officials, lying about

United States v. Rafiekian

1    it after the fact, including on government forms.

2              And, Your Honor, if I -- if I were asked to set

3    forth all of the evidence demonstrating an agreement, it would

4    be -- it would be in the brief and it would also be most

5    of what the -- most of the evidence the government has

6    presented through the course of its presentation at trial.

7              THE COURT:  All right.

8              MR. TURGEON:  Could I have one more moment, Your

9    Honor?

10             (Counsel confers.)

11             MR. TURGEON:  Your Honor, the first thing I should

12   say is that our full argument is laid out in the brief, and so

13   we would encourage Your Honor to review that brief and to get

14   the full scope of our argument.

15             THE COURT:  All right.

16             MR. TURGEON:  But essentially all the testimony

17   we've heard at trial, many of the exhibits, and when taken all

18   together, that is what establishes the fact of the agreement,

19   Your Honor.

20             There's been a lot of testimony about what people

21   do -- were doing, what they were saying about it.  A lot of

22   times that didn't match up.  And -- but the co-conspirators'

23   actions and statements did line up almost perfectly, Your

24   Honor.  So that's what I'll say about that, Your Honor, aside

25   what's in our brief.

United States v. Rafiekian

1        THE COURT:  Well, Alptekin's statements didn't line

2   up with Rafiekian's, did they?

3        MR. TURGEON:  In some cases, I believe they did,

4   Your Honor.  I believe there was overlap between -- for

5   example, in that memo from Arent Foxx, Alptekin's lawyers,

6   the -- what the defendant said about Alptekin's review of the

7   op-ed and what Alptekin said about his review of the op-ed

8   lined up quite well and we -- we know that those were both not

9   factually accurate based on the documents that were introduced

10  at trial.

11       THE COURT:  All right.  Mr. Tysse.

12       MR. TYSSE:  Thank you, Your Honor.  Three points, if

13  you will indulge me.

14       The first speaking to the agreement evidence, I just

15  think it's relevant, Your Honor, to look back.  What we've

16  been told is that they were acting in concert, that there was

17  some conspiratorial intent, that, you know, somehow they were

18  coordinating their behavior.

19       But the question is not whether they were

20  coordinating their behavior as part of a business enterprise.

21  The question is whether they were coordinating their behavior

22  as part of an agreement to commit some sort of unlawful act,

23  which is to act as a foreign agent or to conspire to make

24  false statements on a form.

25       And what the Government has shown at trial, these

1   past few days, is the same evidence that it showed -- that it

2   presented to Your Honor prior to the July 9th order.  And what

3   Your Honor said is things like, you know, showing the interest

4   and involvement of the Turkish government, you know, the fact

5   that the Government might have approved Alptekin's and Inovo's

6   retention of FIG and/or Flynn, the fact that the actual

7   contract between Inovo and FIG was entered into by Inovo on

8   behalf of and at the direction of the Turkish government, and

9   that FIG was acting at direction and control of Inovo.

10          None of that establishes the agreement by

11   Mr. Rafiekian to commit a conspiratorial offense to enter into

12   a conspiracy, the essence of which is to commit an unlawful

13   act, agreeing with someone else.

14          And, again, they have a lot of evidence that

15   Mr. Rafiekian might have been aware that Mr. -- or that

16   Mr. Alptekin was speaking to Turkish ministers.  I think

17   that's the gist of their agreement evidence, but to me that

18   doesn't answer the question that Your Honor has already

19   answered, we think, in the negative in the July 9th order,

20   which is that that doesn't show what Mr. Rafiekian was

21   thinking or doing.

22          The second point I would like to address, Your

23   Honor, is the new evidence that counsel mentioned.  I think

24   counsel mentioned that we did not have a bunch of the Skype

25   chats.  I'm not sure about the ones he's referring to, Your

─────United States v. Rafiekian─────

1    Honor, but I will point out that the indictment recounts a

2    number of Skype chats, including several of the ones they've

3    discussed today.  Your Honor looked at those previously with

4    regard to the prior order.

5            Government Exhibit 41, for example, is indictment

6    paragraph -- superseding indictment paragraph 41.  Government

7    Exhibit 20 is indictment paragraph 20.  Actually I might have

8    gotten those wrong.  But there are -- but many of them line

9    up.  Again, I'm not sure about that one.  But I do think kind

10   of the sum and substance of those Skype chats amount to the

11   same thing.

12           Again, they presumably presented their best case

13   about what they thought were the most significant facts.  And

14   what they showed was that Mr. Rafiekian, through FIG, was

15   acting as part of a business relationship with Inovo and that

16   Inovo had some interactions, at least as part of the hearsay

17   evidence that's been introduced so far, with the Turkish

18   government.  And that's what it shows.  It doesn't show an

19   agreement between the two of them to act for an unlawful

20   purpose.

21           The final point I'll make, Your Honor, is on the

22   Rule 29B point that Mr. Turgeon mentioned.

23           It is true, Your Honor, under the Federal Rules of

24   Criminal Procedure the Court can reserve decision.  The Rules

25   do allow for that.  But I guess I would just urge the Court to

1    consider the role of the Court, again, in the Rule 29 inquiry.

2           And the purpose of the Court is to essentially serve

3    as a gatekeeper and prevent cases where -- prevent cases from

4    going to the jury where the jury would be forced to speculate

5    on insubstantial evidence when someone's freedom is at stake.

6           So in that circumstance, Your Honor, I think the

7    Court should exercise that rule seriously and consider whether

8    or not there actually is substantial evidence in this case.

9    And I think, for the reasons we've said before, the evidence

10   is extremely weak.  It's entirely circumstantial, based mainly

11   on hearsay.  This should end, Your Honor.  Bijan should be

12   allowed to have this in without having to go through a jury

13   verdict.  Thank you very much.

14          THE COURT:  All right.  The Court is going to take

15   recess.  I'm going to read the Government's brief and I'll be

16   back.  The Court stands in recess.

17          (Recess.)

18          (Court proceedings resumed at 3:47 p.m..)

19          MR. GILLIS:  Your Honor.

20          THE COURT:  Yes.

21          MR. GILLIS:  If I may, I'd like to add just a few

22   more comments with respect to the Court's question about

23   evidence of the conspiracy itself.  And, Your Honor, I want to

24   draw your attention to November 2nd at FIG's office where

25   they're making this presentation to Alptekin, and McCauley

────────────United States v. Rafiekian────────────

1   begins his presentation and Alptekin takes the slide deck and

2   throws it across the table.  And as Courtovich testified, at

3   that time Alptekin turned to the defendant and said, Where is

4   my congressional hearings?  Where's the media coverage?  Where

5   is the DOJ action?

6         And, obviously, these were expectations that

7   Alptekin had of the defendant in that -- that -- that was the

8   essence of their agreement.  In fact, the evidence of that is

9   that Alptekin says to Rafiekian afterward, right afterward,

10  What am I going to tell Ankara?

11        Not what I'm going to tell the folks in the

12  Netherlands, what am I going to tell Ankara.  In context of

13  all of the hearsay statements, which you are permitted to take

14  into account, between Mr. Alptekin, on the one hand hearsay,

15  but the defendant receiving all of this information, clearly

16  he knows what Ankara refers to and clearly they had a

17  discussion -- at least by a preponderance of the evidence,

18  Your Honor, they had a discussion that reflected these

19  understandings.

20        And the best proof of that, in addition to those

21  conversations, is this:  recall, Your Honor, Exhibit 23B, the

22  Operation Confidence playbook that the defendant drafted.  And

23  it says at the bottom there that the end product of this

24  entire -- of this entire project is going to be a 60-minute

25  video production documenting the investigations.

United States v. Rafiekian

Rule 29

847

1          23B, Your Honor.

2          THE COURT:  Right.

3          MR. GILLIS:  At the bottom.

4          Now, when they get to the November 2nd meeting, this

5    is pretty close to the end of their 90-day engagement and they

6    don't have anything.  This video hasn't yet materialized, the

7    end product is not around, and Alptekin is angry that there's

8    no media coverage on this.

9          And what happens then?  That very day, Your Honor,

10   November 2nd is the day of the -- of the blowup at FIG's

11   office.  November 2nd, that very day, the defendant, in answer

12   to Alptekin's concerns about where is the media attention,

13   Alptekin -- or, rather, this defendant sends to Alptekin,

14   Government Exhibit 45A.  A promise made is a promise kept.

15         And what he's doing there is he is enclosing this

16   article, which he describes as, you know, something that is --

17   if you see in the next thing, his interest in moving forward

18   in executing the plan.  The important thing here, Your Honor,

19   is a promise made is a promise kept.  A promise is the essence

20   of an agreement.  And in this case, the promise being kept is

21   that there will be some media attention.  Even though we

22   screwed up on the video, I've heard your complaints this

23   morning.  Here is this article that's going to be published.

24         And it just so happens that this article mimics

25   everything it mimics everything that was put in the various

─────────────── United States v. Rafiekian ───────────────

Rule 29

848

1    documents that the Court has seen, including this apple tree

2    argument.  It explicitly recommends the extradition of Gulen,

3    which is, again, part of what Alptekin was complaining about.

4    Where is the DOJ action on this, as Mr. Courtovich testified?

5          And, in fact, Alptekin was happy with it.  Despite

6    what he meant to say -- what he might have said after the fat

7    was in the fire, after FARA was now asking, despite what he

8    and Alptekin may have said about it, at the time, immediately

9    after receiving this on November 5th, Alptekin writes back in

10   Exhibit 49:  Hi, Bijan, the general is right on target.

11         And then he said in the first and second paragraph,

12   you know, the name is misspelled.  Fethullah is written with

13   one L.  That's Exhibit 49.

14         Your Honor, here is an agreement.  This is as close

15   as you're going to get to an agreement in a case that, as

16   every Court says, conspiracies must be based upon on

17   circumstantial evidence.  And these interlocking conversations

18   and passage of documents and these conversations had in front

19   of witnesses about the expectations for media attention and

20   DOJ action, right after that is when the defendant delivers

21   and says, Ekim, a promise made is a promise kept.

22         THE COURT:  All right.

23         MR. GILLIS:  Thank you, Your Honor.

24         THE COURT:  All right.  Mr. Tysse, do you want to

25   respond to any of that?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

1          MR. TYSSE:  I'm happy to, Your Honor.

2          First of all, with regard to the Ankara statement --

3    a few points.  Sorry.

4          The Ankara statement, a few points.  First of all,

5    this -- the testimony came out that Mr. Alptekin was the head

6    of the equivalent of the U.S. Chamber of Commerce for Turkey.

7    That's an ambiguous statement.

8          Second point, four people testified about that

9    meeting.  Four people.  One of them was Mr. Courtovich.  We

10   also had Mr. Boston, Mr. Miller, and one other person.  Four

11   people testified to that meeting.  Only one of them testified

12   to that statement, Your Honor.

13         Third, it's a hearsay statement.  That's the other

14   side, as the government concedes.

15         And, finally, I think there's also evidence that

16   meeting that he slammed down the piece of paper and said, This

17   is what I paid for.  This is what I paid for.  This is where

18   my money went.

19         Okay.  So, again, none of that evidence shows an

20   agreement to act as an unregistered foreign agent.

21         With respect to the same-day media attention, okay,

22   there's evidence about that already in the superseding

23   indictment.  Your Honor has already reviewed it.

24         The statement about a promise made is a promise

25   kept, a promise made is a promise kept is -- you know, to let

United States v. Rafiekian

Rule 29

850

1  you review a copy of the draft op-ed, it doesn't suggest that

2  I -- you know, any sort of agreement to act as an unregistered

3  agent or to conspire to file false statements.

4           In fact, there's nothing, not even a whiff of any

5  sort of agreement ever to file a false report with FARA.  And

6  there's no -- not even any communications after November

7  between any of these people, and the FARA filing wasn't made

8  until 2017.

9           So, Your Honor, again, I think the government is

10  trying its best to come up with some sort of evidence of the

11  agreement.  What they have is conduct, parallel conduct,

12  related to acting on behalf of a -- you know, it's essentially

13  trying to generate work, trying to have a business

14  arrangement.

15          And they have some evidence that Mr. Alptekin was in

16  contact with certain Turkish officials.  But at the end of the

17  day, they do not have evidence and there's nowhere

18  that they -- nowhere in the evidence they've presented thus

19  far or at the time of the July 9th order that suggest a

20  meeting of the minds with respect to the criminal ends that

21  they've alleged in their complaint.

22          THE COURT:  All right.  Thank you.

23          The Court's reviewed the evidence and the argument

24  of counsel and the government's brief.  There are very

25  substantial issues with respect to the sufficiency of the

United States v. Rafiekian

1   evidence as to many of the elements of both counts.  It's all

2   very, very circumstantial.  Much of it is very speculative.

3          But there has been additional evidence presented

4   that has to be -- needs to be considered with respect to the

5   sufficiency of the evidence.  And under all the circumstances,

6   particularly in light of the standard that's applicable to the

7   Rule 29 motion, at this point the Court is going to reserve on

8   that motion and allow the case to proceed.

9          All right.  Mr. MacDougall, are you prepared to go

10  forward?

11         MR. MACDOUGALL:  We are, Your Honor.

12         THE COURT:  All right.  Do you have your witness

13  available?

14         MR. MACDOUGALL:  If I could have a moment, Your

15  Honor.

16         THE COURT:  All right.

17         MR. MACDOUGALL:  Your Honor, the defense calls

18  Robert Kelley.

19         THE COURT:  All right.  Let's bring the jury out.

20         (Jury present.)

21         THE COURT:  All right.  Please be seated.  Ladies

22  and gentlemen, thank you for your patience.  We've worked

23  through what we needed to and we're now ready to proceed.

24         Mr. Gillis, the government rests; is that correct?

25         MR. GILLIS:  That's correct.

──────United States v. Rafiekian──────

Rule 29

852

1          THE COURT:  All right.  We'll now proceed with the

2  defense case.  Mr. MacDougall, call your first witness.

3          MR. MACDOUGALL:  Thank you, Your Honor.  The defense

4  calls Robert Kelley.

5          Thereupon,

6                        **ROBERT KELLEY,**

7  having been called as a witness on behalf of the Defendant and

8  having been first duly sworn by the Deputy Clerk, was examined

9  and testified as follows:

10          (Witness seated.)

11                    **DIRECT EXAMINATION**

12  BY MR. MACDOUGALL:

13  Q.   Good afternoon, Mr. Kelley.

14  A.   Yes, good afternoon.

15  Q.   My name is Mark MacDougall.  You and I -- I met you and

16  your wife just less than a hour ago; is that right?

17  A.   In the hallway.

18  Q.   In the hallway.  That's right.

19          Could you tell us what you do for a living, please?

20  A.   I'm a retired D.C. lawyer.

21  Q.   Okay.  And how long did you practice law?

22  A.   I graduated from law school in 1972.  I'm bad at

23  arithmetic.  40 years.

24  Q.   Long time in practice.

25  A.   Yeah.

1  Q.   And are you still licensed to practice?

2  A.   No.

3  Q.   Where were you last licensed when you last practiced law?

4  A.   I was the member of the D.C. Bar.

5  Q.   And where did you go to law school?

6  A.   University of California at Berkeley, and it's called

7  Boalt Hall.

8  Q.   Could you give us just a very brief rundown?  You

9  practiced for 40 years, private practice government, just a

10  very short summary.

11  A.   Yeah.  I was -- I started in a big law firm, and it was

12  about a 150 lawyers.  And it was called Wilmer, Cutler, and

13  Pickering.  And I went to Capital Hill on the forerunner to

14  the Senate Intelligence Committee, and I want to go back to

15  the -- before law school I was the member of the U.S. Foreign

16  Service and I had a Top Secret clearance and I was living in

17  Germany.

18        And I was -- I went to Capital Hill with the Senate

19  Intelligence Committee and I worked on -- I had a variety of

20  jobs, including the senate deputy legal counsel and the chief

21  of staff of Republican senator from Maryland.

22  Q.   So part of your career was spent on Capital Hill working

23  legislative matters, part of it in private practice.  Is that

24  a fair summary?

25  A.   Yes.

─────United States v. Rafiekian─────

R. Kelley - Direct
854

1  Q.   Okay.  Going back to the second half of the year 2016,

2  were you still practicing then?

3  A.   Yes.

4  Q.   What were you doing?  What kind of work?

5  A.   I was in Jefferson Waterman International.  And I have a

6  little trouble talking.

7  Q.   Would you like some water?  Would you like a glass of

8  water?  Would you like some water?

9  A.   No.  It's -- something to do with -- I don't know what.

10 Doctor's note.  Don't know what.

11 Q.   If you'd like some water, let me know.

12         THE CSO:  Counsel, he has some water.

13         THE WITNESS:  So I was in the foreign service and I

14 was rifle platoon leader in the U.S. Army in Germany and I was

15 in the foreign service in Germany.  And I was practicing in

16 Jefferson Waterman International at the -- Jefferson is

17 obviously Thomas Jefferson, and Waterman was the founder of

18 the firm, and it was three CIA guys and me.

19 BY MR. MACDOUGALL:

20 Q.   And this is 2016 now, fall of 2016?

21 A.   Yes.

22 Q.   Okay.  Do you know the defendant in this case,

23 Bijan Rafiekian?

24 A.   Yes.

25 Q.   And he's sitting right here with me?

1  A.    Yes.

2  Q.    How did you first meet Mr. Rafiekian?

3  A.    I sent him an e-mail blind.  I was building a Baghdad

4  hotel and I was financing through the U.S. Government overseas

5  private investment corporation and I thought I should know

6  somebody at the U.S. Export-Import Bank, and I sent an e-mail

7  and asked him if I could come over.

8  Q.    And about when was that introduction?  When did that --

9  A.    Five years before 2016.

10  Q.    So around 2011, seven, eight, nine years ago.

11  A.    Yeah.

12  Q.    Okay.  So you've known him for a few years.

13         During the intervening years, from when you first

14  met in 2011 until the fall of 2016 that we're interested in

15  this afternoon, tell me about your relationship with

16  Mr. Rafiekian.

17  A.    I was his friend and he -- he invited me to the Nowruz

18  Commission's Black Tie Dinner, like 300 people attended.

19  Q.    What was the Nowruz Commission?

20  A.    The Nowruz Commission is a charitable organization, they

21  use the proceeds for open heart surgery and Afghan children

22  and the -- they had Kurdish school children backpacks stuffed

23  with school supplies.  And I was -- I wanted to say that the

24  motto of the Nowruz Commission was good thoughts, good words,

25  and good deeds.

United States v. Rafiekian

R. Kelley - Direct

856

1  Q.   Did you have a role with the Nowruz Commission?

2  A.   I was secretary general.  I was -- I attended the board

3  meetings, but I was not on the board.

4  Q.   Did you provide legal services at all for the Nowruz

5  Commission?

6  A.   No.

7  Q.   And Mr. Rafiekian, did he have a role in it as well?

8  A.   Yes, he was the vice chairman.

9  Q.   And did there come a time -- again, we're talking about

10 the second half of 2016 -- when Mr. Rafiekian contacted you

11 about a legal matter?

12 A.   Yes.

13 Q.   Do you recall about when that happened?

14 A.   It was in the first week of September 2016.

15 Q.   And do you recall how he contacted you?  In telephone?

16 In person?

17 A.   Yes, telephone.  He telephoned me.  And he knew my number

18 from -- it was a friend.

19 Q.   And what did you understand him to be interested in legal

20 advice about?

21 A.   He said that we have to register at FARA, the Justice

22 Department Foreign Agents Registration Act.  And if you could

23 come out, he said, to assist me with the registration.

24 Q.   When you say "we," was he talking about a particular

25 business company?

─────United States v. Rafiekian─────
R. Kelley - Direct
857

1   A.   I don't know.  I don't know.

2   Q.   Okay.

3   A.   It was Flynn Intelligence Group, I think.

4   Q.   Okay.  And what did you know about the Flynn Intel Group

5   at the time when Mr. Rafiekian --

6   A.   I don't know anything about him.

7   Q.   You just knew --

8   A.   At the time.

9   Q.   Okay.  And what did you learn in your initial discussion

10  with Mr. Rafiekian about the Flynn Intel Group and what he was

11  interested in?

12  A.   Well, I -- I assumed that I was not a part of the Flynn

13  Intelligence Group and I should steer away from -- I didn't --

14  did not want to pry about how much the money they're making

15  or -- it was a client.

16  Q.   And when Mr. Rafiekian contacted you, how specific was he

17  in describing the issue?

18  A.   He said that I have to -- the firm has to register at the

19  Foreign Agents Registration Act.

20  Q.   And following this initial contact, did there come a time

21  when a meeting took place?

22  A.   Sunday afternoon -- or in early September.

23  Q.   Do you recall where that was?

24  A.   In his house.

25  Q.   Was anyone else present?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

1  A.   No.

2  Q.   And did you gather further information at that meeting at

3  Mr. Rafiekian's home?

4  A.   No.  I said that I was -- is it a foreign government or a

5  foreign political party, and he said, no, it's a private

6  company.

7           And I said, You don't have to register at FARA.  You

8  can register at LD -- Lobbying Disclosure Act in the Congress.

9  Q.   About how many times in your career had you had a client

10 in some fashion inquire or led you to discuss with them the

11 Foreign Agents Registration Act versus the LDA?

12 A.   About 30 times.

13 Q.   Thirty times.

14 A.   I represented -- at the Law Office of John Sears, I

15 represented South Africa and Belize Ambique and Japan Airlines

16 and Japan automobile manufacturers.  And I filed for both of

17 them, all of them, four of them, every six months for ten

18 years.

19 Q.   You mentioned a minute ago, is there a common alternative

20 to the Foreign Agents Registration Act, FARA?

21 A.   There's the Lobbying Disclosure Act.  The Foreign Agents

22 Registration Act was passed in 1938 by Congress and signed

23 into law by F.D.R.  And it was a disclosures statute and you

24 can do anything you want, but you have to disclose it to the

25 government and to the American people.  The public records are

1   on file.

2          And in 1995, the -- the Congress passed the Lobbying

3   Disclosure Act, which removed a class of lobbyists for the

4   governments and foreign governments and foreign political

5   parties.

6   Q.   Under what circumstances in your practice did you

7   typically advise a client to file under the LDA versus FARA?

8   A.   I didn't.  I made the decision in 1993 to register at

9   FARA -- oh, LDA, Lobbying Disclosure Act, for the Japanese

10  automobile manufacturers because I was lobbying and I fell

11  under the statute.

12  Q.   Let's go back to the day you met with Mr. Rafiekian at

13  his home.

14         What -- did you learn anything that led you to reach

15  a conclusion about whether FARA or the LDA was the proper

16  place to register?

17  A.   Yeah.  I said that the -- it was a -- I asked the

18  question:  Is it a foreign government or foreign political

19  party?

20         And they said no -- and he said, no, it was a

21  private company.

22         And I said, You don't have to register at Foreign

23  Agents Registration Act.  You can register in the U.S.

24  Congress.

25         And I asked him, Will lobbying be involved?

1          And I said -- he said, It might.

2          And I said, You can register at Lobbying Disclosure

3   Act.

4   Q.   Why is the fact that the contract was with a private

5   company an important consideration for you?

6   A.   Well, the 1995 act removed a class of lobbyists who are

7   representing a foreign company and -- or the private company

8   altogether, American companies, and they didn't have to

9   register at FARA.

10  Q.   And you testified a few minutes ago that Mr. Rafiekian in

11  his initial contact with you said, I need to register with

12  FARA.

13          Is that a fair summary?

14  A.   Yes.

15  Q.   And what was it that made you steer --

16  A.   It was a private company and it didn't have to register

17  at -- he didn't have to register at FARA.

18  Q.   Was that the advice you gave Mr. Rafiekian?

19  A.   Yes.

20  Q.   About how soon after this meeting with Mr. Rafiekian do

21  you recall you filed the Lobbying Disclosure Act registration?

22  A.   I think it was in September or a couple weeks afterwards.

23  Q.   Where did you find -- how did you gather the information

24  that you used to fill out the form?

25  A.   I knew how to fill out the form.

1  Q.   Where did you gather the factual information that you

2  entered?

3  A.   Oh, I called -- I asked Bijan what was the address of the

4  private company, and he said it was the Netherlands and he

5  gave me his address and I wrote it down.  And so the client

6  was a Dutch company.

7  Q.   Do you recall the name of the company?

8  A.   Inovo.

9        MR. MACDOUGALL:  Your Honor, to avoid having

10  competing exhibits, I would like to use the government's

11  exhibits with this witness.

12        THE COURT:  That's fine.

13        MR. GIBBS:  No objection, Judge.

14  BY MR. MACDOUGALL:

15  Q.   Mr. Kelley, I would like you to please have a look at

16  what's been previously marked as Government Exhibit 166.  And

17  that's just for identification right now.

18        Thank you, Mr. Burns.

19  A.   166.

20  Q.   Yes, sir.

21  A.   I've got it, I think.  It's the lobbying registration --

22  Lobbying Registration Act, Government Exhibit 166.

23  Q.   Okay.  Could you tell the jury or tell the Court if you

24  recognize this document?

25  A.   Yes.

1    Q.   And if you'd just repeat, please, what it is.

2    A.   The lobbying registration.  It's LDA -- LD-1 disclosure

3    form.  It says it at the top.

4    Q.   Did you prepare this yourself?

5    A.   Yes.

6    Q.   Do you recall about what date?

7    A.   Something -- I remember in late September.

8    Q.   Did anyone help you do this or did you do this yourself?

9    A.   I used an intern, Sam Soberie (ph), who is the -- is

10   sitting at the front desk, and later he was a paralegal or

11   something.

12   Q.   Is it at your law firm?

13   A.   Yeah.

14   Q.   Okay.  So it was a paralegal or intern at your law firm?

15   A.   Yeah.

16   Q.   Okay.  And where did you file this form once you

17   completed it for Flynn Intel Group?

18   A.   The clerk of the Senate or the -- the Senate -- Secretary

19   of the Senate and the clerk of the House.  It was filed

20   online.  It was different than earlier when I went to the

21   Japanese Automobile Manufacturers Association and I -- they

22   didn't have it online and it was a clerk of the House, and it

23   was papers everywhere.

24   Q.   So you filed this online and I take it you affixed your

25   signature electronically as well; is that right?

United States v. Rafiekian

1   A.   Yes.

2          MR. MACDOUGALL:  Your Honor, the defense would move

3   the admission of Government Exhibit 166.

4          THE COURT:  I believe it's already in.

5          MR. GIBBS:  Yeah.  And there will be no objection.

6   But I think it is, and just to confirm that, but if it's not

7   in, we have no objection.

8          THE COURT:  All right.  Exhibit 166 is in.

9          THE WITNESS:  There should be a second page to this.

10  There's only one page.  My digital signature is on the other

11  side of -- oh, here.

12  BY MR. MACDOUGALL:

13  Q.   Do you have the entire document, Mr. Kelley?

14  A.   Yes.  I took it out of the plastic.

15  Q.   That's perfectly fine.

16  A.   Yeah.

17  Q.   Are you able to see --

18  A.   It says September 30th, 9/30/2016, digitally signed by

19  Robert Kelley.

20  Q.   Just a few questions about this document.

21          MR. MACDOUGALL:  If I could ask it to be published

22  to the jury, Your Honor.

23          THE COURT:  Yes.

24  BY MR. MACDOUGALL:

25  Q.   Who is registrant under this Lobbying Disclosure Act form

────────United States v. Rafiekian────────
R. Kelley - Direct
864

1  that you completed after meeting with Rafiekian --

2  A.   Flynn Intelligence Group is the line of the registrant.

3  Q.   What's the address for Flynn Intel Group?

4  A.   44 Canal Center Plaza.  I call it 44 Canal Square,

5  Alexandria, Virginia.

6  Q.   Mr. Kelley --

7  A.   It was on the Potomac River.

8  Q.   Mr. Kelley, who is listed as the individual contact on

9  the form?

10  A.   Me.

11  Q.   Why did you list --

12  A.   Since the -- I was filling out the form and I was -- it

13  made sense to put myself down as the contact person.

14  Q.   And did you believe that you would be doing any lobbying

15  for Flynn Intel Group and Mr. Alptekin --

16  A.   I think so, yeah.

17  Q.   Is that right?

18  A.   Yes, yes.

19  Q.   And is that the reason that you put yourself down as the

20  contact?

21  A.   Yes.

22  Q.   Going forward, after you filed the Lobbying Disclosure

23  Act form after Flynn Intel Group, what discussions, if any,

24  did you have regarding a regular working relationship with

25  that firm?

1   A.   Well, Bijan asked me to be the general counsel of the

2   Flynn Intelligence Group, and I didn't move from -- I didn't

3   have an office in the Flynn Intelligence Group.  I stayed at

4   14th and K, Jefferson Waterman law firm.

5   Q.   That was your law firm?

6   A.   Yes.  And I thought of him as a client.

7   Q.   In your experience, is that completely usual that a

8   lawyer may remain physically present in a law firm while

9   providing general counsel?

10  A.   Yes.

11  Q.   Along those same lines, did you have an office at the

12  Flynn Intel Group ever?

13  A.   No.

14  Q.   How about an e-mail address?

15  A.   I think I had an e-mail, but I never checked it.  I -- my

16  wife have to ask about Twitter.

17  Q.   I understand.  I do too.

18       Tell me the reason why you never checked your e-mail

19  box beyond just a lack of --

20  A.   Well, I was -- you know, if you have 15 things to check,

21  it's not sensible.  I -- if a person wanted to send me an

22  e-mail, they knew this e-mail address.

23  Q.   It was really important to call you, right?

24  A.   Yes.  And Bijan traditionally called me.

25  Q.   One more question on Government Exhibit 166.  Mr. Kelley,

─────United States v. Rafiekian─────
R. Kelley - Direct
866

1   could you have a look, please, at line item 12, which you will

2   find at the very bottom of the first page?

3   A.   Yes.

4   Q.   That asked a question:  Specific lobbying issues (current

5   and anticipated.)

6          What did you respond there?

7   A.   I responded the registrant will advise on U.S. domestic

8   and foreign policy, period, and S.1635 and the House

9   counterpart H.1735 and the Senate counterpart.

10  Q.   Let's take those one at a time.  S.1635, what was that

11  about?

12  A.   I think it was the National Defense Authorization Act.

13  Q.   And S stands for Senate; is that right?

14  A.   Huh?

15  Q.   S in the S.165 [sic] stands for Senate?

16  A.   Yes, yes, the U.S. Senate.

17  Q.   And the other entry is H.R.1735.  And HR stands for House

18  of Representatives, right?

19  A.   Yes.

20  Q.   Okay.  What was that about?  What --

21  A.   I think it was the State Department authorization bill.

22  Q.   Why did you enter those statutes here where the form

23  asked for specific lobbying issues current and anticipated?

24  A.   Well, it was not -- it was the committee action.  And the

25  Senate Foreign Relations Committee and the Senate Armed

R. Kelley - Direct
867

1   Services Committee, they had hearings.  And they -- one Pompeo

2   goes to the hearing on the budget of the State Department.  I

3   know the guy that prepared the binder.  And he doesn't ask --

4   the congressmen do not ask questions of Pompeo, but why are we

5   in Yemen or why is NATO demanding to increase the

6   contribution.  They don't ask about the budget.

7           And I knew that the -- from my experience with the

8   Japan automobile -- automobile manufactures and the Japan

9   airlines, that private company is interested in U.S. foreign

10  policy and defense policy and the State Department.

11  Q.   So that was your best estimate at the time?

12  A.   Yes.

13  Q.   And did Mr. Rafiekian ask you to put that in?

14  A.   No.  I just put it in myself.

15  Q.   Could you please have a look -- in the same binder,

16  Mr. Kelley, at Government Exhibit 168 for identification?

17  A.   It is the --

18  Q.   And you're welcome to take it out of the sleeve if you'd

19  like.

20  A.   Okay.

21  Q.   Do you recognize that document?

22  A.   It's the Department of State Authorities Act fiscal year

23  2017.

24  Q.   And on the upper right-hand corner of the first page,

25  there's a numerical designation that follows.

1   A.    S.1635.

2   Q.    And how does that relate to the entry you had made on

3   the --

4   A.    I made the entry following the -- I was going to monitor

5   the State Department authorization bill.  They call it the

6   authorization bill and for the next year fiscal year 2017.

7   And they had -- typically they would have a lot of hearings.

8   And Pompeo would come up and Secretary of -- Secretary of

9   State Tillerson, was it, and he testified but not on the

10  budget, the -- but the process.

11  Q.    So in other words, Exhibit 169 was one of the pieces of

12  legislation you cited in the --

13  A.    Yes.

14  Q.    -- application; is that right?

15  A.    I was going to monitor the committee hearings.

16          MR. MACDOUGALL:  Your Honor, may I ask the Court to

17  take -- I'm sorry -- Government Exhibit 168, may I ask the

18  Court to take judicial notice of --

19          THE COURT:  168 or 169?

20          MR. MACDOUGALL:  Well, it's 168 initially, then

21  169 --

22          THE COURT:  Right.  I believe they're both in

23  evidence.  They're already in evidence.

24          MR. GIBBS:  They are.

25          MR. MACDOUGALL:  Thank you, Your Honor.

─────United States v. Rafiekian─────

1   BY MR. MACDOUGALL:

2   Q.   So I'm sorry, I misspoke.  Mr. Kelley, if you could have

3   a look quickly at Government Exhibit 169, which should be

4   right after that in the binder?

5   A.   Yes.  Okay.  Defense Authorization Act for fiscal year

6   2016.

7   Q.   And how does that document relate to the entry you made

8   in -- on space 12 of the --

9   A.   Well, I know it was -- after the fact, I knew it was

10  vetoed, but -- by President Obama, but it was -- it was the

11  process that I was interested in, not the bill number.  And

12  they have -- Richard Thornberry -- Mac -- William Mac

13  Thornberry, I went to see him for when I represented the vice

14  president of Iraq and the -- I was in Iraq for two years in

15  2003 through 2005.  And I had a Top Secret clearance.  And I

16  was organizing a company at the -- the senators and

17  representatives, and they came about every three days and --

18  for the period of time for two years.  And it was 350 or

19  something.  And --

20  Q.   So were you paid by the Flynn Intel Group for the legal

21  work you did?

22  A.   Yes.

23  Q.   Do you recall how much?

24  A.   I think $10,000.

25  Q.   Do you remember who paid you?

─────United States v. Rafiekian─────

1  A.   Bijan.  He handed me a check from the Flynn Intelligence

2  Group.  And I -- and I had no contract, I had no fixed salary,

3  and it was for my status as the -- title as the general

4  counsel, and it was not for lobbying.

5  Q.   Now, did there later come a time -- and, again, the date

6  on the -- the original filing is September 15, 2016.  That's

7  the effective date of registration.

8       Did there come a time later when you terminated --

9  you said terminated --

10 A.   Yes.  Bijan telephoned me and said we have to terminate

11 because Flynn and I are being considered for a job in the

12 administration and the transition team did not allow lobbyists

13 for the transition team and we have to terminate and no more

14 lobbying.

15 Q.   About when did you get that message, when in time?

16 A.   I don't know.  I think it was late in October or early

17 November.

18 Q.   Please have a look at one more document, Mr. Kelley,

19 Government's Exhibit 167.

20 A.   167.

21      MR. MACDOUGALL:  Which I believe is in evidence,

22 Your Honor.

23      THE COURT:  Yes.

24      THE WITNESS:  Okay.

25 BY MR. MACDOUGALL:

1  Q.  Could you tell us what this is, please?  And if I could

2  ask to publish to the jury.

3  A.  The lobbying report says LDA2 at disclosure form at the

4  top and it says the lobbying report.  And it was Lobbying

5  Disclosure Act of 1995, Section 5, all filers are required to

6  complete this page.  And it was -- it was a quarterly report

7  and used for termination.

8  Q.  Okay.  And line 10 in that report asks that question,

9  doesn't it, check if this is a termination report?

10  A.  Line 10?

11  Q.  Yes, sir.

12  A.  Check if this is a termination report, yes.

13  Q.  And you checked that box; is that right?

14  A.  Yes.

15  Q.  Tell the jury, and in general terms, how that works.  You

16  filed that registration, as we've seen, with Exhibit 166 and

17  then you file a termination in this case --

18  A.  Yes.

19  Q.  -- like in December, a couple of months later.

20      What's the effective terminating the report?

21  A.  Termination date is 11/16 -- November 16, 2016.  I don't

22  know.  I'm used to 1900.

23      So no lobbying issue activity.

24      You register and you file quarterly reports who you

25  saw and if you terminated.

1    Q.    And when you terminate -- when you check the box to

2    terminate, as you did here, what's the effect of that?  How

3    does that affect the registration?

4    A.    It's -- it ends the registration.

5    Q.    A couple more questions on Exhibit 167, Mr. Kelley, and

6    then we'll be finished.

7          It asked a couple of questions.  One is No. 12,

8    lobbying, and you'll see you checked the box that says less

9    than $5,000; is that right?

10   A.    Yes.

11   Q.    What was your basis for that?

12   A.    Well, I -- I called Matt Zweig was the -- the staffer for

13   Chairman Royce, who was the -- I asked him what is the status

14   of the State Department authorization bill.  And I only asked

15   him what is the status and when is the next hearing.  And he

16   said -- that was all the lobbying I did.  It was less than

17   $5,000.

18   Q.    And did you discuss this with Mr. Rafiekian?

19   A.    No.

20   Q.    And with respect to paragraph -- I'm sorry -- line

21   No. 11, it says no lobbying issue activity.  You checked that

22   box as well; is that right?

23   A.    Yes.

24   Q.    What does that mean?  What was your intent there?

25   A.    No lobbying issue activity -- but because -- asking the

1  status of a bill is not lobbying, you're not trying to

2  influence a legislator, a lawmaker.  And you are only asking

3  about the status and when is the next hearing.

4  Q.   I take it you didn't discuss that with Mr. Rafiekian

5  either?

6  A.   No.

7  Q.   You just made that decision yourself?

8  A.   Yeah.  I -- I've learned a long time ago that you should

9  volunteer.  You should take the responsibility on yourself.

10 Q.   Thank you.

11         MR. MACDOUGALL:  May I have a moment, Your Honor.

12         THE COURT:  Yes.

13         (Counsel confers.)

14         MR. MACDOUGALL:  Thank you, Your Honor.  Thank you,

15 Mr. Kelley.  Please answer any questions that the government

16 has of you.

17         THE COURT:  Mr. Gibbs?

18         MR. GIBBS:  Thank you, Judge.

19                     **CROSS-EXAMINATION**

20 BY MR. GIBBS:

21 Q.   Good afternoon, Mr. Kelley.

22 A.   Good afternoon.

23 Q.   Mr. Kelley, my name is John Gibbs.  I'm one of the

24 assistant U.S. Attorneys on the case today.  I just have a few

25 questions for you.

1  A.    Yeah.

2  Q.    I want to go back to that conversation that you had with

3  the defendant back in the fall of 2016 where he came to you

4  and he had a question for you.

5  A.    He telephoned me and --

6  Q.    Okay.

7  A.    -- and asked the question.

8  Q.    Okay.  Yeah.  Thank you.

9        So you had the phone call and then you had a more

10 substantive follow-up conversation with the defendant at his

11 house, correct?

12 A.    Yes.

13 Q.    Okay.

14 A.    It lasted about 15 minutes.

15 Q.    Okay.  And you've been to his house before because you're

16 good friends with the defendant, correct?

17 A.    I was not at his house in -- he moved several times and I

18 asked him for directions.

19 Q.    Okay.  But you and your wife have had dinner with he and

20 his wife at his house?

21 A.    Yeah.

22 Q.    Had Thanksgiving with them?

23 A.    Yes, yes.

24 Q.    So this was more business, because, as you testified

25 earlier, the defendant reached out to you and he said, I need

1   to register under FARA, correct?

2   A.   Yes, yes.  Exactly.

3   Q.   And can you tell the jury what FARA, that acronym,

4   F-A-R-A, stands for?

5   A.   Foreign Agents Registration Act.

6   Q.   Thank you.

7          And so Mr. Rafiekian is a very accomplished

8   individual, is he not?

9   A.   Yes.

10  Q.   And he's -- I think some would call him a D.C. insider,

11  correct?  He is friends with Joe Lieberman?

12  A.   Yes, I think so.

13  Q.   Dana Rohrabacher?

14  A.   Yes.

15  Q.   And he was presidentially appointed to the Export-Import

16  Bank?

17  A.   Yes.

18  Q.   So when somebody like Mr. Rafiekian comes to you and

19  says, I need to register under FARA, essentially what he's

20  telling you is I need to register as a foreign agent?

21  A.   Yes.

22  Q.   And I need to disclose that and let the world know, and

23  certainly let the United States public and the United States

24  Congress know that, correct?

25  A.   Yes.

1  Q.   And you, as a very good lawyer, sort of cut right to the

2  chase and you asked him a very important question.  I think

3  you testified on direct that you asked him:  Are you -- are

4  you working for a foreign government or a foreign political

5  party.

6          Isn't that what you asked him?

7  A.   Yes, I asked him that.

8  Q.   Okay.  Mr. Kelley, can you explain why that is such an

9  important question to ask in that context?

10 A.   Because if you represent a foreign government or a

11 foreign political party, you have to register under FARA,

12 Foreign Agents Registration Act.  But if you represent a

13 private company, there's 10,000 private companies in the

14 United States and 10,000 overseas, and you have to register

15 under the Lobbying Disclosure Act.

16 Q.   And let's stay under FARA for the moment.

17          But if you -- if a determination is made that you're

18 working for a foreign agent or a foreign political party,

19 then, as you said, the registration needs to be made under

20 FARA.

21          Can you explain the registration?  I mean, how

22 public is that document?

23 A.   Well, it's online.  And I -- you can view the

24 registrations online.  Any member of a courtroom can go to see

25 the -- the UA defense lobbyist.

United States v. Rafiekian

1  Q.   Right.  And I'm certainly technologically challenged

2  myself.  Pretty much anyone with a computer terminal at that

3  point can go online and find out if somebody is acting as an

4  agent of a foreign government?

5  A.   Yes.

6  Q.   But only if they register that way, correct?

7  A.   Yes, only if they register.

8  Q.   So you asked him that very important question.  He told

9  you that he was not working for a foreign government, correct?

10 A.   Yes.

11 Q.   Said he was not working for a foreign political party,

12 correct?

13 A.   Yes.

14 Q.   And, in fact, that he was working -- did he say a foreign

15 private company?

16 A.   Yes.  He was -- he said it was a foreign private company.

17 Q.   Okay.  And as you said, the conversation was only about

18 15 minutes.  At that point, you've already testified about

19 your legal advice about a different statute, the Lobbying

20 Disclosure Act, but did you go out and do any further

21 information investigation at that point?

22      Did you go do research or do you simply take

23 Mr. Rafiekian's word for it?

24 A.   I took Mr. Rafiekian's word for it.

25 Q.   All right.  Thank you.

─────United States v. Rafiekian─────
R. Kelley - Cross
878

1   A.   I was a friend and I was not employed by Flynn

2   Intelligence Group and I thought I should take his word for

3   it.

4   Q.   Oh, absolutely.

5        And in terms of that, I think you just made a point

6   that you were a friend, not an employee of Flynn Intelligence

7   Group.  And, in fact, your office was in Washington, the

8   defendant's was in Alexandria, correct?

9   A.   Yes.

10  Q.   So -- I'm sorry, I didn't mean to cut you off.

11  A.   No, correct.

12  Q.   And so you were not -- you didn't have any intimate

13  knowledge of what type of work FIG had been doing in the

14  months prior to this conversation with Mr. Rafiekian, did you?

15  A.   No.

16  Q.   Now, Mr. Kelley, just I want to go back to this one point

17  I want to make sure I don't forget.  I know you talked about

18  Mr. Rafiekian being a friend of yours.

19       Did he actually help to get you the position with

20  the Nowruz Commission as the -- I think you were the --

21  A.   Secretary general.

22  Q.   Secretary general.  Exactly.

23       And he was the director of that organization, I

24  believe, correct?

25  A.   Yes.  The vice-chairman.

United States v. Rafiekian

R. Kelley - Cross

879

1  Q.   Vice-chairman.

2        And was Ekim Alptekin also an officer with the

3  Nowruz Commission?

4  A.   I don't think so.  At that time, when I was the -- I was

5  made the secretary general by Mr. Kian and he was not a member

6  of the board of directors.

7  Q.   Let me see if -- maybe I can hand you something that

8  might help you refresh your recollection on that point.

9        Was he ever on the Nowruz Commission to your --

10 A.   He was -- I met him at the Turkish embassy.  The Nowruz

11 Commission had a planning session at the Turkish embassy at

12 the ambassador's residence.  And it was not the Turkish

13 embassy, it was the ambassador's residence.  And it was on

14 Sheridan Circle or something and it was a historical building.

15       The Atlantic Records guy was the -- the son of the

16 ambassador in the '40s.  And I met Ekim and his wife, who was

17 Azra Bajrami (ph) or something.  And she's -- she said she

18 liked the Communist system.  I said why?

19 Q.   Seem like a good question.

20 A.   Yes.  And she said everybody had a job and you didn't

21 have to worry about it.

22 Q.   Well, just -- I don't want to certainly belabor this

23 point, Mr. Kelley, but if I could hand up just briefly just on

24 this question about Mr. Alptekin's role in the Nowruz

25 Commission, I think you were actually interviewed by the FBI

United States v. Rafiekian

1  at one point, correct?

2  A.    Yes.

3  Q.    And you know what a FBI 302 is?

4  A.    I've heard of it on Fox TV.

5  Q.    Okay.  So you don't do a lot of criminal law, I take it?

6  A.    No.

7  Q.    So if I could, I would like to hand up the document, and

8  I don't have it stapled, so we need to have a --

9  A.    I never seen a 302.

10 Q.    And, again, this -- I'll explain when I hand it to you,

11 but I just want to ask you a quick question after you've had a

12 chance to maybe refresh your recollection briefly.

13         MR. MACDOUGALL:  Your Honor, there's nothing

14 provided to the defense.  May we see it?

15         THE COURT:  Yes.

16         (A pause in the proceedings.)

17         MR. MACDOUGALL:  Thank you, Your Honor.

18         THE WITNESS:  This is a 302.

19 BY MR. GIBBS:

20 Q.    So, Mr. Kelley, this is not your written statement, this

21 is not a statement you've adopted your belief in.  This is

22 simply an FBI's agent written summary of an interview with

23 you.

24         Do you see that?

25 A.    He didn't take the notes.  I wondered how he could come

1  up with many pages of notes.  He didn't take notes at the

2  meeting.

3  Q.  Yeah, and I think every agent sort of has their own style

4  when they're conducting these interviews.

5       But if I could direct your attention, sir -- first

6  of all, this was a -- well, it sounds like you remembered the

7  interview, so I don't have to take you back to that.

8  A.  Yes.

9  Q.  Could you turn to the second page, sir?

10 A.  Yes.

11 Q.  And if you would, on the second page, if you could reed

12 not the first paragraph, but the two underneath there.  Don't

13 read them aloud, just read them to yourself.

14       (A pause in the proceedings.)

15       THE WITNESS:  Yes.

16 BY MR. GIBBS:

17 Q.  Okay.  Sir, have you had a chance look at that?  Does

18 that refresh your recollection at all as to Ekim Alptekin's

19 roles within the Nowruz Commission?

20 A.  Oh, I think Ekim was not on the Nowruz Commission.  He

21 was the -- Bijan was the vice-chairman of the Nowruz

22 Commission.

23 Q.  But if you read further down, I believe there's a

24 reference to -- again, read it to yourself.  I believe there's

25 a reference to Mr. Alptekin.

────United States v. Rafiekian────

1   A.   Further down?

2   Q.   It's the end of that third paragraph, sir.

3   A.   Ekim Alptekin was the vice-chairman of the Nowruz

4   Commission.  I said that it was different than what I said.

5   Bijan Kian was the vice-chairman of the Nowruz Commission.

6   Q.   And how about Ekim Alptekin, what was his role in the

7   Nowruz Commission?

8   A.   He was never at any board meeting.  And I was not on the

9   board of directors, but I was -- I attended the meetings.

10  Q.   Okay.  Well, you can set that aside.

11       Did you ever -- did you -- was your first

12  introduction to Ekim Alptekin through the Nowruz Commission?

13  A.   No.  It was the -- for the Flynn Intelligence Group.

14  Q.   And, roughly, do you recall when you first met

15  Mr. Alptekin?

16  A.   October 2016.

17  Q.   And who introduced him to you?

18  A.   I just passed him -- I was sitting at the tables in the

19  bar area and I was drinking tea and he came -- walked by and

20  somebody said, I know him, and he was introduced to me.

21  Q.   But it wasn't the defendant that introduced you to him?

22  A.   No.

23  Q.   Okay.  So you met Mr. Alptekin independently of that?

24  A.   Yes.

25  Q.   Okay.  Mr. Kelley, I do want to ask you primarily about

United States v. Rafiekian

R. Kelley - Cross

883

1  those Lobbying Disclosure Act forms that were filed in

2  September of 2016 by you.  And before I get to that, though,

3  you actually put together a written declaration regarding some

4  of those events, correct, about two years ago?

5  A.   Yes.

6  Q.   If I could hand the witness --

7  A.   I did it for Covington.

8  Q.   Okay.  All right.  Thank you, Mr. Kelley.

9       What you have before you has got an exhibit sticker

10  on the bottom.  I believe it's 173.

11  A.   Yes.

12  Q.   And what is that document?

13  A.   It's a statement I made at the -- with Covington.  The

14  process was that I met the -- Bob Kelner or Rob Kelner at

15  Covington's office.  And I went to the office building of

16  the -- on Connecticut Avenue in Washington, D.C.

17       And it was the police inspector or something, a

18  retired policeman.  He -- I -- I talked about this and he

19  typed it up and -- he -- he typed it up and --

20  Q.   And you actually signed it, correct?

21  A.   Yes.

22  Q.   Could you go to the third page of that and see if that is

23  your signature on that third page?

24  A.   Yes.  It's my signature.

25  Q.   And what's the date on that?

United States v. Rafiekian

1   A.   October 27, 2017.

2   Q.   All right.  So it's a couple years closer to the events

3   that we are talking about here today, correct?

4   A.   Yes.

5        MR. GIBBS:  Okay.  Your Honor, at this time we would

6   move Government Exhibit 173 into evidence?

7        THE COURT:  Any objection?

8        MR. MACDOUGALL:  One moment, Your Honor.

9        No objection, Your Honor.

10       THE COURT:  All right.  Without objection, 117 -- is

11  that --

12       MR. GIBBS:  I said 173, Your Honor.

13       THE COURT:  173 is admitted.

14       (Government's Exhibit No. 173 admitted into

15       evidence.)

16       MR. GIBBS:  All right.  And at this point I would

17  like to publish the first page of 173.

18       THE COURT:  All right.

19  BY MR. GIBBS:

20  Q.   And if we could enlarge the paragraph No. 8 on page 1.

21  A.   Yes.

22  Q.   It will actually appear on your screen there, sir.

23  A.   I would like to -- I'm used to -- I'm used to holding

24  a -- a copy in my hand.

25  Q.   I am too, sir.  So you hold on to that as much as you

1  want, believe me.

2  A.   Okay.

3  Q.   So in that paragraph, Mr. Kelley, you sort of recount

4  this encounter with the defendant, where you asked him, again,

5  that key question:  Is it a foreign government or a foreign

6  political party?  He tells you, no, it's a foreign private

7  company.

8         And then since you were in the process of steering

9  him from FARA to LDA -- first of all, what does LDA stand for?

10  A.   Lobbying Disclosure Act.

11  Q.   All right.  So --

12  A.   It was passed in 1995.  And I made a mistake earlier when

13  I said that I was -- thought about it in 1993 for the Japanese

14  automobile manufacturers, but it was 1995 or so, '96.

15  Q.   Okay.  And -- but in terms of the statute that you

16  informed Mr. Rafiekian about, the Lobbying Disclosure Act, the

17  first word is "lobbying," right?

18  A.   Yes.

19  Q.   And as part of your encounter with him in September of

20  2016, you asked the defendant if they were going to do any

21  lobbying and you indicated a couple of years ago that Bijan

22  told you that they might?

23  A.   Yes.

24  Q.   Did he elaborate on that at all?

25  A.   No.

United States v. Rafiekian

R. Kelley - Cross

886

1   Q.   I mean, did he tell you what -- when he said that they

2   might do lobbying, did he tell you what they might do lobbying

3   about?

4   A.   No.

5   Q.   And did he tell you in that conversation that he had

6   recently spoken to Dana Rohrabacher of California about the

7   project that FIG was currently working on?

8   A.   No.

9   Q.   Did he tell you that he had met with Miles Taylor who --

10  do you know Mr. Taylor?

11  A.   No.

12  Q.   Are you familiar with Chairman McCaul from Texas, I

13  believe?

14  A.   Yes.

15  Q.   Okay.  Did he tell you that he had met with Chairman

16  McCaul's national security advisor prior to meeting with you?

17  A.   No.  He said, I might lobby.

18  Q.   Okay.  And so if we can carry on to the next page, that's

19  paragraph 8, which carries over onto the next page.  If we can

20  enlarge that top portion.

21       So the sentence is broken up, but it says, I did not

22  ask any additional questions.

23       Is that your recollection?  That's what you recalled

24  a couple of years ago.  Is that your recollection here today?

25  A.   Yes.

1  Q.   Okay.

2  A.   Because I was a friend, I was not acting as a lawyer.

3  Q.   In fact, did you even charge Mr. Rafiekian for this --

4  A.   No.

5  Q.   -- for this service?

6  A.   I didn't charge him.  It was free.

7  Q.   That's a good friend.

8        Mr. Kelley, I want to go to -- can we -- can we just

9  enlarge paragraph 10 of the second page of Exhibit 173?

10  A.   Yes.

11  Q.   All right.  So Mr. -- you were asked by the defense a

12  little while ago about the -- what was included on the form.

13  And the form itself indicated that the registrant will advise

14  client on U.S. domestic and foreign policy.

15        And you testified that Senate 1635 and the House

16  counterpart HR1735 and the Senate counterpart, that shouldn't

17  have been in there; is that -- do you recall that.

18  A.   It should have been in there.

19  Q.   It should have or should not have been?

20  A.   It should have been in there.  Client on the U.S. and

21  domestic foreign policy, period, S1635 and HR1735.

22  Q.   Right.  And I think we'll all agree that at least you had

23  no information that Mr. Rafiekian or that FIG was doing any

24  lobbying on behalf of Inovo on bills related to the National

25  Defense Act or the State Department, correct?  He never told

—United States v. Rafiekian—
R. Kelley - Cross
888

1   you that?

2   A.   No.

3   Q.   And -- but it looked like at least a couple of years ago

4   you said you had no idea, so you put those in there?

5   A.   Yes.

6   Q.   I mean, did the defendant give you any guidance when he

7   told you we might do some lobbying, about what that might

8   entail?

9   A.   No.

10  Q.   Okay.

11  A.   He said I might and it was all he said.

12  Q.   Okay.  No, that's fine.

13          And then if we can pull up paragraph 11 of your

14  declaration, Mr. Kelley.  You can read that to yourself and

15  then --

16  A.   Yes.  I'm finished.

17  Q.   Okay.  Thank you.  So -- and I can pull up the form if

18  you need it, but actually -- well, why don't we pull it up?

19  Can we pull up 166?  And just blow up the section with the

20  bold heading "Lobbyist."

21          Can you pull it up a little bit so we can see the

22  signature block?

23  A.   The lobbyist -- the registrant will advise on -- client

24  on U.S. domestic and foreign policy, period.

25  Q.   Well, on the form itself, it may be easier to see on the

1    TV screen because I've been sort of moving from document to

2    document.  This is the actual registration form itself?

3    A.    Yes.

4    Q.    And it does list yourself as the lobbyist, right?

5    A.    Yes.

6    Q.    At that time were you a registered lobbyist?

7    A.    I think so.

8    Q.    Okay.

9    A.    I was a lobbyist under the -- registered under Lobbying

10   Disclosure Act for the Japan Automobile Manufacturers

11   Association.

12   Q.    Okay.  But did the defendant ask you to do any lobbying

13   on behalf of FIG?

14   A.    No.

15   Q.    And did you do any lobbying on behalf of FIG?

16   A.    I called the -- Matt Zweig was the chairman of the --

17   staffer of the chairman of the Senate -- of the House Foreign

18   Relations Committee.

19          And he -- I asked him, What is the status of the --

20   the next hearing?

21   Q.    And a hearing on what?

22   A.    The State Department authorization bill.

23   Q.    Okay.  And I think -- yeah, my question was not that

24   clear.

25          But in terms of the LDA registration where FIG was

R. Kelley - Cross

890

1   registering under the Lobbying Disclosure Act as the

2   registrant for the client, Inovo, the defendant never asked

3   you to do any lobbying for that engagement, did he?

4   A.   Well, he gave me the name of Matt Zweig.

5   Q.   Okay.

6   A.   Call him -- he said, Call him if you have any questions.

7        And I -- I asked -- I called Matt Zweig, and I asked

8   him, What is the status of the bill, the state department

9   authorization bill, and when is the next hearing?

10       And -- because the -- when Tillerson and Pompeo come

11  to -- or any Secretary of State, going back to Dean Acheson,

12  all -- earlier -- it's the issues -- they don't talk about the

13  State Department budget, they ask about the -- what's in the

14  paper today, what's in the -- why are we -- why are we in

15  Yemen or why aren't we beating up the Germans to make more

16  contributions to NATO?

17  Q.   Well, thank you, sir.

18       Mr. Kelley, I've taken more of your time than you

19  were hoping this afternoon, so I have just a couple of final

20  questions.

21  A.   Yeah.

22  Q.   If we can go back to your declaration, 173.  And if we

23  can enlarge paragraph 16.

24  A.   Yes.

25  Q.   Read that to yourself.

─────United States v. Rafiekian─────
R. Kelley - Cross
891

1    A.    My involvement with FIG was limited.

2    Q.    You can read it silently.  I'll ask you some questions.

3    Thank you, sir.  Just let me know when you've had a chance to

4    read it.

5              (A pause in the proceedings.)

6              THE WITNESS:  Yes.

7    BY MR. GIBBS:

8    Q.    Okay.  And, Mr. Kelley, the first sentence there is:  My

9    involvement with FIG was limited.

10             That's certainly a true statement, correct?

11   A.    Yes.

12   Q.    And then you go through some topics --

13   A.    I didn't have any contract and I didn't -- have no

14   office.  There was no room at the office.

15   Q.    Pretty tight space down there, correct?

16   A.    Right.

17   Q.    So your involvement was limited.  You didn't know

18   anything about op-ed and *The Hill* newspaper.  You didn't know

19   about a meeting -- any meetings in New York with Turkish

20   Government officials or any other matter involving the Flynn

21   Intel Group.  And if we can just -- if we can go to the last

22   page and enlarge the rest of that paragraph.

23   A.    I believe I was told -- to be complete, on one occasion

24   Bijan asked me -- he said write a letter to brainwave (ph) or

25   something.  It was sort of silly.

─────United States v. Rafiekian─────
R. Kelley - Cross
892

1    Q.   All right.  And so that was sort of an unrelated project

2    beyond the FIG-Inovo project, whatever that was about?

3    A.   Yes.

4    Q.   All right.  So, essentially, Mr. Kelley, you, as a friend

5    of Mr. Rafiekian, gave him some advice about how to file in

6    September of 2016.

7            You asked him a very pertinent question.  His answer

8    was that not acting for a foreign government or a foreign

9    political party, correct?

10   A.   Yes, correct.

11   Q.   And he's your friend.  You're not going to investigate

12   that.  You took his word for it.

13           And as a result of that, that resulted in the LDA

14   filing that we looked at here today, correct?

15   A.   Yes.

16   Q.   Okay.  Thank you, sir.  Mr. Kelley, that's all I have.

17   Thank you.

18   A.   Okay.

19           THE COURT:  All right.  Any redirect?

20           MR. MACDOUGALL:  Yes, Your Honor.  Just a bit.

21           Thank you, Your Honor.

22                       **REDIRECT EXAMINATION**

23   BY MR. MACDOUGALL:

24   Q.   Mr. Kelley, just a couple of follow-up questions and then

25   we'll let you go or the judge will let you go.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

United States v. Rafiekian

R. Kelley - Redirect

893

1        You -- in response to Mr. Gibbs, you said that you

2   took Mr. Rafiekian's word; is that right?

3   A.   Yes.

4        THE CSO:  Counsel, give me a second.  His mic fell

5   off.

6        Go ahead, sir.  Thank you, Counselor.

7   BY MR. MACDOUGALL:

8   Q.   You knew Mr. Rafiekian for eight or ten years.  Is that

9   your testimony?

10  A.   Five or six.

11  Q.   Okay.  Why did you take his word?

12  A.   I didn't want to pry.  I didn't -- I didn't ask him let's

13  see the contract or -- I was his friend.

14  Q.   And you trusted him?

15  A.   Yeah.

16  Q.   Okay.

17  A.   I trusted him because he was twice confirmed by the U.S.

18  Senate.

19  Q.   Okay.  Thank you, Mr. Kelley.

20        Mr. Kelley, Mr. Gibbs showed you a 302, and I

21  believe you testified this is the first one you've ever seen?

22  A.   Yeah.

23  Q.   And I will count the pages here for you, but you're

24  welcome to do it yourself.  I count it to be about seven pages

25  single-spaced typed; is that right?

1  A.   Yes.

2  Q.   Is it your testimony there were FBI agents who were

3  taking notes at this interview?

4  A.   No, they were not taking notes.

5  Q.   They were not.  So nobody took any notes?

6  A.   Yeah, no.

7  Q.   And so this seven -- so based upon your observation, this

8  seven-page single-spaced document was a result of someone's

9  really good memory?

10  A.   Yeah.  I was impressed.

11  Q.   Okay.  A couple of other questions.  You were asked about

12  the declaration, the statement that you provided, Exhibit 173.

13         Do you remember that just a few minutes ago?

14  A.   Yeah.

15  Q.   And you testified that you went to Covington's office or

16  an investigator or --

17  A.   Yes.

18  Q.   All right.  Were you compelled to do that or did you do

19  that on your own?

20  A.   I did that on my own.  But Kelner set up the appointment

21  and he sort of directed me to make the statement.  And he -- I

22  was -- he was at that time Flynn's -- Michael Flynn's lawyer,

23  and I took orders from him.

24  Q.   Okay.  About how many times did you meet with the FBI?

25  Do you recall?

─────────United States v. Rafiekian─────────

1   A.    Twice.

2   Q.    Okay.  And with respect to the statement, once --

3   Exhibit 173, the one you did with Mr. Kelner, was that

4   produced to the government?  Do you know?

5   A.    No.  I don't know.

6   Q.    Okay.  May I have a moment, Your Honor?

7               THE COURT:  Yes.

8               (Counsel confers.)

9               MR. MACDOUGALL:  Mr. Kelley, thank you very much.

10  Your Honor, no further questions.

11              THE COURT:  All right.  Mr. Kelley, you're excused.

12  Do not discuss your testimony outside the courtroom or with

13  any other witness.

14              THE WITNESS:  Okay.

15              (Witness excused.)

16              THE COURT:  Mr. MacDougall, next witness.

17              Mr. Trout.

18              MR. TROUT:  Yes.  The defense calls Andrew Durkovic.

19              Thereupon,

20                          **ANDREW DURKOVIC,**

21  having been called as a witness on behalf of the Defendant and

22  having been first duly sworn by the Deputy Clerk, was examined

23  and testified as follows:

24              (Witness seated.)

25                         **DIRECT EXAMINATION**

1  BY MR. TROUT:

2  Q.   Could you please state your full name?

3  A.   Sure.  Andrew Durkovic.

4  Q.   Mr. Durkovic, how are you employed?

5  A.   I'm a lawyer.

6  Q.   And where are you employed?

7  A.   Amsterdam & Partners.

8  Q.   How long have you been employed at Amsterdam & Partners?

9  A.   I've been a partner there for roughly ten years.

10  Q.   And what is the nature of the work at Amsterdam &

11  Partners?

12  A.   We do advocacy work, international advocacy, disputes.

13  Q.   How many professionals are at Amsterdam or employed by

14  Amsterdam & Partners?

15  A.   I don't know the exact number as I sit here, but it's in

16  the range of 15 to 20.

17  Q.   Mr. Durkovic, I'm going to direct your attention to 2015.

18       Did Amsterdam & Partners enter into a contract with

19  the Republic of Turkey at that time?

20  A.   Yes, we did.

21  Q.   Were you personally involved in the engagements with the

22  Republic of Turkey?

23  A.   I think I signed the engagement letter, if I'm not

24  mistaken.

25       MR. TROUT:  Your Honor, let me ask the witness to

1  refer to Defendant's Exhibit No. 69, which I believe is in

2  evidence.

3            THE COURT:  69 is in evidence.

4            MR. TROUT:  Yes.

5            THE COURT:  Yes.

6  BY MR. TROUT:

7  Q.   Mr. Durkovic, could you please review that?  And if you

8  look on the third page, I think you'll see it is signed.

9  A.   Yeah.

10 Q.   By you?

11 A.   Yes, that's my signature.  Yup.

12 Q.   What was the purpose of this engagement?

13 A.   We were retained to investigate and expose

14 Fethullah Gulen and his criminal network in the United States.

15 Q.   And who did you personally deal with on behalf of the

16 client?

17 A.   Our primary interaction was with the embassy, Turkish

18 Embassy in Washington, D.C., and Ambassador Kilic.

19 Q.   Okay.  But your work was unquestionably partnered with

20 the Republic of Turkey?

21 A.   Turkey.  Correct, yes.

22 Q.   Are you familiar with the Foreign Agents Registration

23 Act?

24 A.   I am.

25 Q.   And how often is it that Amsterdam & Partners registered

A. Durkovic - Direct

1   under the Foreign Agents Registration Act as an agent of a

2   foreign government?

3   A.    How many times have we?  I don't know the exact number.

4   I know that we've at least done it one time before using the

5   Lobbyist Disclosure Act forms, not the FARA forms that are

6   much more involved.

7           In the prior instance that I can think of, we

8   weren't representing a foreign government, so there's an

9   exception where you can file a different kind of form.  But it

10  was nevertheless a FARA registration.  So I would say the

11  answer to the question is, prior to this instance, at least

12  one other time.

13  Q.    And you referred to one other time.  What form did you

14  actually use to register that one other time?

15  A.    I believe it was the LDA form, the Lobbying Disclosure

16  Act form.

17  Q.    And in certain circumstances, if you file under the

18  Lobbying Disclosure Act form, you don't have an obligation to

19  file a separate FARA registration?

20  A.    Yeah, that's my understanding of the law.  Unless it's a

21  foreign government or a political party, I believe.

22  Q.    Now, in this case did you file a registration under the

23  FARA?

24  A.    We did, indeed.

25  Q.    If you could look, please, at Defense Exhibit No. 70.

────────United States v. Rafiekian────────

A. Durkovic - Direct

899

1          Do you recognize Defense Exhibit No. 70?

2          I believe this is also an exhibit.

3   A.    I wasn't personally responsible for submitting the form

4   within our organization, but I believe this is it, yes.  And I

5   see that legal services agreement that I signed is attached.

6   I know that's one of the requirements, so I believe this is

7   the form, yes.

8   Q.    And did you -- are you not the one that actually executed

9   this particular form?

10  A.    No, I don't believe I was.  I could -- oh, no, I guess --

11  well, I didn't sign it personally.  E-signed.

12  Q.    Okay.  So this was an electronic signature?

13  A.    Correct, correct.  And we essentially had lawyers that

14  did it for us.

15  Q.    And as an attachment to this form that is filed, did you

16  attach a copy of the contract that you had with the Republic

17  of Turkey?

18  A.    Yes.

19  Q.    And all of this is publicly available; is that correct?

20  A.    That's my understanding, yes, sir.

21  Q.    And when was it that you filed the FARA registration with

22  the Republic of Turkey?

23  A.    I don't remember.  I would have to look through the

24  document.  I don't remember specifically doing it, but it

25  looks like it's October 26th of 2015.

1   Q.   All right.  This -- the actual engagement or the contract

2   is signed August 28th, 2015; is that correct?

3   A.   That's right.

4   Q.   And then on the 26th of October, two months later, that's

5   when you signed the Foreign Agents Registration Act?

6   A.   Like I said, I couldn't remember specifically the date,

7   but that sounds right and that's what the date is on the form.

8   So I would say, yes, that's correct.

9   Q.   So, Mr. Durkovic, if -- in the interest of time, could

10  you just quickly look at Exhibit -- Defense Exhibit 72 --

11  A.   Yes.

12  Q.   -- and 73, 76?

13  A.   Okay.  Hold on.  There's 72.  Yeah.  73.  Yeah.

14  Q.   And also look at --

15  A.   And 76 you said?  Is that what you said?  72, 73, 76?

16  Supplemental statement, yep.

17  Q.   And 78.

18  A.   Okay.  Thank you very much.  78.  Yeah, these all look

19  like our forms, yes.

20  Q.   If you could confirm that these are FARA registration

21  forms and reports that were filed as part of your work for the

22  Government of Turkey.

23  A.   Yeah, that's correct.

24  Q.   And all of these are publicly disclosed?

25  A.   That's my understanding, yes.

United States v. Rafiekian

901

1   Q.   And in these forms, do you identify the Republic of

2   Turkey as your client?

3   A.   Yes, we do.

4   Q.   Now, did you receive any requests from any Turkish

5   official that you try to keep secret engagement that you had

6   with the Republic of Turkey?

7   A.   Not at all.  We filed it publicly.

8   Q.   Did you receive any requests from any Turkish officials

9   that you tried to figure out a way to avoid filing under FARA?

10  A.   Not at all.

11  Q.   And did you receive any requests from any Turkish

12  officials that you coordinate with Flynn Intel Group?

13  A.   No.

14  Q.   Did you receive any requests from any Turkish official

15  that you reach out or have any contact at all with Flynn Intel

16  Group?

17  A.   No.

18  Q.   As a result of the work that you did -- well, first of

19  all, how long did this contract go on?

20  A.   Well, I'd have to look at the contract itself to remember

21  the terms --

22  Q.   Let me see if I can save some time.

23  A.   Thank you.

24  Q.   Were you doing this work in the fall of 2016?

25  A.   It was signed again in --

1  Q.   I believe it was signed in October or the letter -- the

2  engagement was in August of 2015 and then the FARA

3  registration was in October of 2015?

4  A.   And your question is were we still working when?

5  Q.   In the fall of 2016.

6  A.   Yes.

7  Q.   And into 2017, were you continuing to work?

8  A.   Yes, yes.  Technically we're still representing them,

9  Although not doing much work right now, but yes.

10 Q.   And, Mr. Durkovic, I'd like to have marked as Defense

11 Exhibit No. 77 a book.  A copy for the Court and for the

12 witness.

13 A.   Thank you.

14 Q.   What is this book?

15 A.   This is a book that we published as a result of our

16 investigation into Fethullah Gulen's criminal network in the

17 United States.

18 Q.   And when was it published?

19 A.   Well, I don't remember exactly as I sit here, but let me

20 see if the date is on here.  Copyright 2017.  So sometime in

21 or after 2017.

22 Q.   Now, Mr. Durkovic, in this -- in this book, do you

23 disclose that Amsterdam & Partners did this work on behalf of

24 and as an agent of the Republic of Turkey?

25 A.   We do.  On the very first page, it says:  This material

United States v. Rafiekian

A. Durkovic - Direct

903

1   is distributed by Amsterdam & Partners, LLP, on behalf of the

2   Republic of Turkey.  Additional information is available at

3   the Department of Justice, Washington, D.C.

4           MR. TROUT:  Your Honor, we would move the admission

5   of Exhibit -- Defense Exhibit 77.

6           THE COURT:  Any objection?

7           MR. GIBBS:  No objection.

8           THE COURT:  Without objection, exhibit -- what's the

9   exhibit number?

10          MR. TROUT:  77.

11          THE COURT:  77.  And 69 through 73 and 76 and 78 are

12  in as well; is that right?

13          MR. TROUT:  I believe they are.  And if I could ask

14  the witness simply just to verify from Government Exhibits --

15  I think it's 148 and 149.  I believe those may also be --

16          THE WITNESS:  148, 149?

17          MR. TROUT:  I believe 148 and 149.

18          THE COURT:  Government Exhibits?

19          MR. TROUT:  Yes, these are Government Exhibits.

20          THE WITNESS:  140-- is the hard -- oh, here it is,

21  yes, 148.  Okay.

22          THE COURT:  Those are in evidence?

23          MR. TROUT:  Yes.

24  BY MR. TROUT:

25  Q.   And those are also publicly filed form -- FARA

1  registration forms for Amsterdam & Partners, acting as agent

2  for the government of Turkey; is that correct?

3  A.   They appear to be so, yes.

4         MR. TROUT:  I have nothing further.

5         THE COURT:  All right.  Any cross?

6         MR. GILLIS:  Yes, Your Honor.  Thank you.

7                    **CROSS-EXAMINATION**

8  BY MR. GILLIS:

9  Q.   Mr. Durkovic, how are you?

10  A.   Fine, thank you.

11  Q.   Good to see you.  We've never met, but we've talked on

12  the phone, I believe; is that right?

13  A.   I don't know your name.

14  Q.   Oh, well -- my name?

15  A.   Yes.

16  Q.   Oh, it's Jim Gillis.

17  A.   Oh, yes, we have spoken.

18  Q.   Okay.  You didn't recognize my voice.

19  A.   Well, we've never met.

20  Q.   So you mentioned that the government of Turkey is -- that

21  is technically still your client.

22  A.   That's right.

23  Q.   But you really don't do -- you don't do much work for

24  them anymore?

25  A.   Well, at the moment we're not doing any work in the

─United States v. Rafiekian─

A. Durkovic - Cross

905

1   United States -- any registrable work.

2   Q.   For Turkey, you mean?

3   A.   That's correct.

4   Q.   I see.  Okay.  And when did the active work that you were

5   doing for the government of Turkey in the United States end,

6   more or less?

7   A.   Well, I want to say it culminated when we published the

8   book, but that's not actually true.  We continued our research

9   and have, as I understand it, the makings of second book that

10  has yet been published.

11  Q.   And so you culminated your work, you said when, roughly?

12  A.   Well, we published that book, so in terms of FARA

13  registrable activity, we published that book.  We continued

14  our research --

15  Q.   I see.

16  A.   -- and at one point payments stopped, so we stopped our

17  work.

18  Q.   Yeah.

19  A.   And we have the makings of book No. 2.

20  Q.   Okay.

21  A.   Discussions are ongoing.  And we may yet complete book

22  two.

23  Q.   Okay.  And so as recently as a few months ago, the

24  government of Turkey owed Amsterdam & Partners more than a

25  million dollars; is that right?

1   A.   That's correct.

2   Q.   And how much do they owe you now?

3   A.   I couldn't tell you.  I don't know.

4   Q.   More or less than a million?

5   A.   I don't know.  I'd have to look at the numbers.

6   Q.   Okay.  And what you're -- what you're waiting on is for

7   the government of Turkey to pay you, basically, before you

8   publish that second book?

9   A.   Well, to pay us and to authorize us to do it also.

10  Q.   Well, I mean -- they can authorize you all you want, but

11  you're not going to publish that book unless they pay you a

12  million dollars or more in back legal fees, right?

13  A.   We -- I'm sure we won't publish book two until we are

14  paid some amount that satisfies us.  I can't speak to the

15  number.  Theoretically, they could say, we'll negotiate a

16  lower number.  We might accept that and continue working

17  but --

18  Q.   Are you negotiating that number now?

19  A.   I'm not personally.  I under --

20  Q.   But someone in your firm is?

21  A.   I believe so.

22  Q.   Robert Amsterdam, in fact?

23  A.   I think so.  I think so.

24  Q.   So Robert Amsterdam is in direct contact with the

25  government of Turkey trying to get his $1 million bill paid?

A. Durkovic - Cross

1   A.   Correct.

2   Q.   Is that right?

3   A.   Yeah.

4   Q.   As we speak, in fact?

5   A.   Well --

6   Q.   Well, I don't mean about now.

7   A.   Yeah.

8   Q.   One of these days?

9   A.   Yes, correct.

10  Q.   Okay.

11  A.   That's correct.

12  Q.   All right.  Thank you very much.

13          THE COURT:  Any redirect?

14          MR. TROUT:  No, Your Honor.

15          THE COURT:  All right.

16          Mr. Durkovic, you're excused.  Do not discuss your

17  testimony outside of the courtroom with any other witness.

18          THE WITNESS:  Thank you.

19          THE COURT:  Let me see counsel at the bench.

20          (Bench Conference.)

21          THE COURT:  Do you have another witness you have to

22  get on today?

23          MR. MACDOUGALL:  We have a character witness from

24  California.  It's a very short witness, Your Honor.

25          THE COURT:  All right.  We'll take care of him.  All

United States v. Rafiekian

1   right.

2          MR. MACDOUGALL:  Will that be it for the day, Your

3   Honor?

4          THE COURT:  Yes.

5          (Open court.)

6          THE COURT:  Next witness.

7          MR. MACDOUGALL:  Thank you, Your Honor.  The Defense

8   calls Joellen Chatham.

9          THE COURT:  All right.

10         THE CSO:  Stand here please.  Turn and face the

11  clerk.  Raise your right hand.

12

13         Thereupon,

14                        **JOELLEN CHATHAM,**

15  having been called as a witness on behalf of the Defendant and

16  having been first duly sworn by the Deputy Clerk, was examined

17  and testified as follows:

18         (Witness seated.)

19                       **DIRECT EXAMINATION**

20  BY MR. MACDOUGALL:

21  Q.   Thank you, Your Honor.

22         Good afternoon, Ms. Chatham.

23  A.   Good afternoon.

24  Q.   Would you please let us know where you live?

25  A.   Orange County, California.

─────United States v. Rafiekian─────

J. Chatham - Direct

909

Q.   And why did you come here today?

A.   I came here in support of my good friends, the Kians.

Q.   How long have you lived in Orange County?

A.   Oh, about 40 years.

Q.   I'm sorry?

A.   About 40 years.

Q.   And what do you -- do you work there?

A.   I did for about 35 years.  I retired four years ago.

Q.   What was your trade or profession?

A.   I was director of Public Affairs for Southern California Edison.

Q.   That was a utility?

A.   Second largest utility in the country.

Q.   That's a big utility.

     So I take it you know Mr. Rafiekian?

A.   Yes, I do.

Q.   Is he here with us in court today, for the record?

A.   Yes, he's right there.

Q.   Sitting at the defense table.

     And could you give us a little bit of background of how you know Mr. Rafiekian?

A.   I've known -- may I call him Bijan Kian?

     I've known Bijan for just about 30 years.  And I've known his wife for that long, although my relationship with her, in a close relationship, is shorter, maybe about 15

─────United States v. Rafiekian─────

1  years.

2          I first met Bijan -- we had a number of interests

3  and activities and friends who intersected, the World Affairs

4  Council of Orange County, I was an appointee of the governor

5  to the state bar association.  I'm not an attorney.  I was a

6  lay member.

7          At the time Bijan was also working for the State of

8  California.  I believe he was appointed by the governor, doing

9  international trade relations for the state.

10          We had some same political interests.  I had a

11  number of friends in the Iranian-American community, so we had

12  a lot of overlapping interests.

13  Q.   Where do the Rafiekians live now?

14  A.   They live in San Juan Capistrano, which is about 20, 25

15  miles form me in Orange County, California.

16  Q.   So do you see them periodically because you live fairly

17  close together?

18  A.   Oh, yes.  I saw them quite a bit before they moved back

19  to California.

20  Q.   How often do you see or speak with Bijan?

21  A.   Oh, at least several times a week.  We're working on a

22  project together.  And before they moved back to California, I

23  used to stay at their home.  I would come to Washington

24  several times a year and I would visit with them as well.

25  Q.   You mentioned Mrs. Rafiekian, and know her well, as well?

J. Chatham - Direct

911

```
1   A.    Very well.

2   Q.    Is she here in the courtroom as well?

3   A.    Yes, she is.

4   Q.    Can you point her out, please?

5   A.    There she is, sitting right over there.

6   Q.    Thanks.

7         So with respect to Mr. Rafiekian and your long time

8   association, friendship, with him and his wife -- and you live

9   in the same community and have for some time?

10  A.    Yes.

11  Q.    Have you developed an opinion with respect to

12  Mr. Rafiekian as a truthful person?

13  A.    Absolutely without question.

14  Q.    And what's -- what opinion is that?

15  A.    There are few people in my life that I would literally

16  trust anything to as I would to both Bijan and Gissou.  We've

17  worked together.  We have many friends together.  I know many

18  people in the community know him.

19        I would also believe that someone who has been in

20  the financial industry for all of his life, as well as his

21  wife, who had a high position dealing in those areas in

22  California, someone who was twice approved by the United

23  States Senate to serve three presidents of the United States

24  on the EXIM Import Bank.  Served three presidents of each

25  party, by the way.  And to have served all those years in
```

─────United States v. Rafiekian─────

1   those capacities, and I've known them all that time and never

2   one word of any kind of scandal or question of any behavior.

3          That says a lot to me, as well as my knowing them

4   and their family, which includes his sisters and the daughters

5   and everyone else.  I have so much faith in who these people

6   are, I call them family.

7   Q.   You mentioned a moment ago that you live in the same

8   community maybe 20 miles apart in Southern California?

9   A.   Yes.

10  Q.   Do you have many common friends and acquaintances?

11  A.   Yes, we do.

12  Q.   Does Mr. Rafiekian have a reputation for truthfulness in

13  that community?

14  A.   Without question.  I've never heard anything other than

15  positive comments.

16  Q.   What is that reputation?

17  A.   That reputation is that he's an honorable man, a very

18  professional man.  Portrays himself in a very dignified

19  manner.  Very articulate, community-oriented.  Probably loves

20  this country as much as -- almost as much as his wife, a

21  strong American.  Honest.  So many very, very good adjectives.

22  Q.   How certain are you of that opinion?

23  A.   I just took an oath.  I wouldn't have taken that oath if

24  I was not 100 percent certain.

25  Q.   Thank you, Ms. Chatham.

United States v. Rafiekian

1          MR. MACDOUGALL:  Nothing further, Your Honor.

2          Please answer any questions the Government has.

3          THE COURT:  Any question?

4          MR. GILLIS:  Thank you very much for coming to talk

5     to us today.

6          THE WITNESS:  It's my honor.

7          MR. GILLIS:  Your Honor, I have no questions.

8          THE COURT:  All right.  Thank you.  Thank you very

9     much.  You're excused.

10         Do not discuss your testimony outside of the

11    courtroom.

12         (Witness excused.)

13         THE COURT:  Ladies and gentlemen, we're going to

14    adjourn and reconvene, as I indicated to you, on Monday.

15    We're not going to have court tomorrow.  That doesn't mean we

16    won't be doing things, but we won't be proceeding with the

17    trial and we'll reconvene Monday morning.

18         Given the long weekend, it's particularly important

19    that you avoid any coverage of this trial or engaging in any

20    conversations and not talk about this case -- this case with

21    anyone.

22         So with those instructions, I will see you Monday

23    morning at 9:15.

24         (Jury dismissed at 5:30.)

25         THE COURT:  All right.  Are there additional

─────────United States v. Rafiekian─────────

J. Chatham - Direct

914

1    witnesses that you're planning on presenting?

2          MR. MACDOUGALL:  There may be one or two, Your

3    Honor, but it won't be a long time.

4          THE COURT:  All right.  Why don't we meet Monday and

5    we'll -- actually, what I would like to do, if we could, is

6    meet tomorrow afternoon to discuss jury instructions.  And I

7    would like to do that at 2:30.  All right?

8          MR. MACDOUGALL:  Yes, Your Honor.

9          MR. GILLIS:  Thank you, Judge.

10         MR. MACDOUGALL:  Be here in the courtroom?

11         THE COURT:  Yes.  All right.  Stand in recess.

12         MR. GILLIS:  I'm sorry.  With the Court's

13   permission, we would like to supplement the brief that we gave

14   you with the testimony from today.

15         THE COURT:  All right.

16         MR. GILLIS:  Thank you.

17         THE COURT:  Court will stand in recess.

18         **(Proceedings adjourned at 5:31 p.m.)**

19

20

21

22

23

24

25

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Jury trial

7     in the case of the **UNITED STATES OF AMERICA versus BIJAN**

8     **RAFIEKIAN**, Criminal Action No. 1:18-CR-457, in said court

9     on the 18th day of July, 2019.

10         I further certify that the foregoing 116 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16    name, this July 18, 2019.

17

18

19

20

21    _____

22    Tonia M. Harris, RPR
      Official Court Reporter

23

24

25

915