IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

UNITED STATES OF AMERICA

v.

BIJAN RAFIEKIAN, *et al.*,

*Defendants*.

No. 1:18-cr-457-AJT

## UNITED STATES' AMENDED MEMORANDUM ON CO-CONSPIRATOR STATEMENTS AND OPPOSING DEFENDANT'S RULE 29 MOTION

Co-defendants Bijan Rafiekian and Kamil Ekim Alptekin conspired for Rafiekian, General Flynn, and the Flynn Intel Group ("FIG") to embark on an extensive campaign of covert political advocacy on behalf of the Turkish government within the United States. Critically, they and Flynn conspired to do so without revealing that relationship to the public or the United States government, rendering their entire course of conduct illegal under federal law.

To mask Turkey's involvement, defendants and Flynn created a sham consulting agreement with a Dutch shell corporation and Alptekin as the intermediary. They agreed to obscure Turkey's involvement from other consultants involved and to omit necessary formal disclosures from FIG's work on Turkey's behalf. When public inquiry thrust them into the spotlight, defendants sought to create a legal smokescreen. Alptekin, Rafiekian, and Flynn fed materially misleading information to their lawyers in an effort to hide Turkey's involvement from the Department of Justice's Foreign Agents Registration Act (FARA) Unit. At all times, defendants conspired to keep FIG's activities on behalf of Turkey secret in violation of federal law. The evidence adduced at trial establishes admissibility of co-conspirator statements and warrants denial of defendant's motion.

1

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. 2

Legal Standards ............................................................................................................... 3

I.     The government has proven sufficient foundation to admit co-conspirator statements under Rule 801. ............................................................................................. 3

II.    The Rule 29 standard highly favors the government. ..................................... 7

III.   Judicial discretion weighs heavily in favor of reserving decision until after a jury verdict. ..................................................................................................... 9

The Evidence at Trial .................................................................................................... 11

I.     The Foreign Agents Registration Act ......................................................... 11

II.    Title 18, United States Code, Section 951 ................................................... 13

III.   Turkey seeks to extradite, then undermine, Fethullah Gulen. ................... 14

IV.   From the beginning, Rafiekian, Flynn, and FIG acted at the direction of the Turkish government through Alptekin. ........................................................ 16

V.    Financial transactions show that Alptekin received a kickback for acting as an intermediary with the Turkish government. ................................................ 19

VI.   Rafiekian obscures Turkey's involvement and misleads internal and external associates about Alptekin's role. .................................................................. 22

VII.   Rafiekian and Flynn meet with Alptekin and Turkish Ministers in New York in September 2016. ................................................................................... 24

VIII.   Rafiekian and FIG engage in public- and policymaker-oriented advocacy. .............. 26

IX.   In response to Alptekin's frustration about the lack of publicity regarding Gulen, Rafiekian drafts and publishes an op-ed urging the U.S. to extradite Gulen. .............. 29

X.    After the November 2 meeting, Courtovich submits materials to Alptekin and receives responses from Turkish government officials. ............................... 32

XI.   Rafiekian and Flynn deceive FIG's lawyers and cause the filing of a false FARA registration. ................................................................................................. 33

Conclusion ..................................................................................................................... 39

## LEGAL STANDARDS

**I.** **The government has proven sufficient foundation to admit co-conspirator statements under Rule 801.**

As stated in the government's pre-trial memorandum, the unanimous view of the six federal circuits to address the issue is that Rule 801(d)(2)(E) authorizes the admission of statements made in furtherance of any joint venture, whether lawful or unlawful in nature.[1] *See, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 503 (5th Cir. 2011) ("[A] statement may be admissible under Rule 801(d)(2)(E) if it is made in furtherance of a lawful joint undertaking."); *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006); *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002); *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989); *United States v. Layton*, 855 F.2d 1388, 1398–400 (9th Cir. 1988), *overruled on other grounds by United States v. George*, 960 F.2d 97 (9th Cir. 1992); *United States v. Trowery*, 542 F.2d 623, 626–27 (3d Cir. 1976); *see also United States v. Shores*, 33 F.3d 438, 442 & n.3 (4th Cir. 1994) (citing *Layton*). The government has more than established the existence of such a joint venture, at minimum, among the two FIG principals, Flynn and Rafiekian, and Alptekin. For example, the signed agreements between FIG and Alptekin; the financial transactions for purported bi-directional services and consulting fees; and the numerous communications by email and Skype regarding the scope of the venture, its costs, and its overall strategy more than makes clear the defendants' status as co-venturers with each other, with Flynn, and with FIG as an entity.

---

[1] Defendant's objection to timeliness (Dkt. 322, at 1) is inapposite. The law is clear that pre-trial evidentiary rulings *in limine* are not conclusive on an issue. *See Luce v. United States*, 469 U.S. 41–42 (1984) ("[A motion in limine] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.").

Nonetheless, should the court instead conclude that a criminal conspiracy is necessary, the government has made that showing that by a preponderance of evidence as well. In making this finding, "the court is not bound by evidence rules" (Fed. R. Evid. 104) and the Court may consider both the contents of the co-conspirator statements as well as extrinsic evidence corroborating them. *See Bourjaily v. United States*, 483 U.S. 171, 181 (1987). To support admission, the government must prove by a preponderance of evidence "that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of that conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013).

"The existence of a 'tacit or mutual understanding' between conspirators is sufficient evidence of a conspiratorial agreement." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (quoting *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)). "Such proof need not be direct, but may be inferred from circumstantial evidence." *Ibid.* Indeed, the Fourth Circuit has held that evidence is sufficient to support the existence of a conspiracy "if the circumstances reveal two or more persons acting in concert to commit a criminal act." *United States v. Caudle*, 758 F.3d 994, 997 (4th Cir. 1985). A co-conspirator need not have "full knowledge of all of the conspiracy's details" so long as "he joins the conspiracy with an understanding of the unlawful nature thereof." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). Moreover, a party to a conspiracy may have the requisite knowledge of its nature through willfulness blindness or deliberate ignorance. *See United States v. Bivins*, 104 F. App'x. 892, 897 (4th Cir. 2004) ("Because willful blindness serves as a proxy for knowledge, there is nothing inconsistent in saying that a defendant knowingly joined a conspiracy because he was willfully blind to the conspiracy's existence and

purpose."); *accord United States v. Camara*, 908 F.3d 41, 45 n.1 (4th Cir. 2018) (affirming will-fulness blindness instruction on a conspiracy charge); *United States v. Sterling*, 701 F. App'x. 196, 205 (4th Cir. 2017) (same).

Moreover, it is well established that "subsequent conduct may be highly probative of prior intent." *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982); *accord United States v. Torrez*, 869 F.3d 291, 302 (4th Cir. 2017). "That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion." *Hadaway*, 681 F.2d at 217. As a common example, later attempts to hide or obscure conduct indicates consciousness of guilt and, therefore, criminal intent. *See, e.g.*, *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014). Likewise, false ex-culpatory statements are clearly probative evidence "of guilt, of illicit intent, and of consciousness of guilt." *United States v. Martindale*, 790 F.3d 1129, 1132–33 (4th Cir. 1986); *see also United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("In context, acts that exhibit a consciousness of guilt, such as false exculpatory statements may also tend to prove knowledge and intent of a conspiracy's purpose . . . ." (citation and internal quotation marks omitted)). The Fourth Circuit has specifically noted that "[f]rustration of investigatory efforts" by federal officials "in a highly regulated environment" may be "central to the conspiracy" and thus constitute an act in furtherance of the conspiracy's objects. *United States v. Mann*, 161 F.3d 840, 859 (4th Cir. 1998).

Below, the government describes substantial evidence in its case-in-chief that shows that Alptekin, Flynn, and Rafiekian agreed that FIG, its principals, and its employees would engage in political activities on behalf of the government of Turkey without disclosing that affiliation as

required by law.[2] Although the Court's determination should be made on the entire record, including otherwise inadmissible evidence, several key points are particularly salient. First, the Court has already concluded that a preponderance of evidence shows that Turkey directed and controlled Alptekin's engagement of FIG through Inovo. Dkt. 292 at 29. Second, Rafiekian and Flynn knew—or, as is equally sufficient, were willfully blind—about Turkey's direct involvement through, for example, Alptekin's repeated discussions about conferring with Turkey's ministerial cabinet and even its Prime Minister about the engagement, and the structure of the financial arrangements, which involved Alptekin transferring money personally from Turkey only to receive a purported "consulting fee" kickback every month, usually transferred to the Inovo account in the Netherlands. Third, these individuals undertook political actions on behalf of Turkey in the United States, including lobbying Members of Congress, preparing a documentary-style film about Gulen, and placing press articles and an op-ed to discredit him. And fourth, these individuals agreed not to disclose Turkey's direct involvement and took active, concerted steps to avoid doing so.

Specifically, Rafiekian and Flynn did not inform other internal personnel at FIG or any of their external consultants about Turkey's known, direct involvement.[3] Rafiekian explicitly instructed FIG's project coordinator to keep FIG's work "not disclosed." Alptekin, Flynn, and Rafiekian each and at different times repeated the same false cover stories to multiple individuals:

---

[2] At the close of its case-in-chief, the government gave the Court and opposing counsel copies of a memorandum summarizing evidence adduced through the end of day on July 17, 2019. This amended memorandum includes additional evidence adduced before the government rested. To the extent defendant asserts grounds for acquittal other than insufficiency of evidence of a conspiratorial agreement in its Rule 29 motion, the government does not waive its opposition to those grounds by not addressing them in this evidence-focused memorandum.

[3] This evidence demonstrates more than just routine business discretion, because FARA disclosures are public record. *See* 22 U.S.C. § 616. It therefore makes no sense to hide a foreign principal's involvement from your own employees if you intend to comply with the law requiring formal disclosures to the United States government—or mandatory notices on disseminated materials—which are publicly available.

*e.g.*, that Alptekin represented "some wealthy Turkish businessmen" (McCauley), that the project was funded by "private businesses seeking to improve investment" (Sphere), or that Project Confidence was focused on Turkey's "investment climate" (FIG budget) or "tourism" (Boston). Likewise, in a subsequent investigation by Covington, each individual gave demonstrably false—and substantially identical—statements to their lawyers, regarding, for example, the nature of the New York meeting with Turkish ministers and the meeting's connection to Project Confidence; the nature of the payments to Alptekin; the direct solicitation of Flynn's op-ed by Alptekin and his subsequent involvement in it; and Alptekin's direct coordination with Turkish ministers throughout all of Project Confidence.

Such coordinated, demonstrably false explanations throughout the conspiracy firmly establishes that their agreement to act on Turkey's behalf included hiding Turkey's involvement— and the acts and statements continuing to do so in response to a direct FARA inquiry letter confirm that deception was part of the conspiracy all along. Accordingly, statements by Rafiekian, Flynn, and Alptekin related to Project Confidence are admissible co-conspirator statements under Rule 801(d)(2)(E).[4]

## II.    The Rule 29 standard highly favors the government.

A court deciding a Rule 29 motion must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant

---

[4] Once the existence of the conspiracy is established, the government need not show that a defendant "knew all the particulars" to be a member and "need only establish a slight connection between the defendant and the conspiracy." *Burgos*, 94 F.3d at 858, 861. Additionally, the Fourth Circuit has stated that "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (quoting *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994)). In addition, the Fourth Circuit has construed the requirement that the proffered statements be made in support of the conspiracy "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception." *Id.* (quoting 5 Weinstein's Federal Evidence §§ 801.34[5], 801–89).

a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. Mac-Closkey*, 682 F.2d 468, 473 (4th Cir. 1982). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). "Even the trial court, which has heard the testimony of witnesses first hand, is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal." *Burks v. United States*, 437 U.S. 1, 16 (1978).

Accordingly, a court must deny the motion for acquittal "if, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. United Med. & Surg. Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993) (emphasis added). Defendants asserting insufficiency as a ground for acquittal "must overcome a heavy burden," as such findings "must 'be confined to cases where the prosecution's failure is clear.'" *United States v. Edlind*, 887 F.3d 166, 172 (4th Cir. 2018) (quoting *Burks*, 437 U.S. at 17).

Courts in this district have repeatedly confirmed that "the government is entitled to all favorable reasonable inferences from the evidence, notwithstanding that other reasonable inferences may be drawn." *United States v. Jaensch*, 678 F. Supp. 2d 421, 426–27 (E.D. Va. 2010). Nor does the government need "to provide direct evidence for each element of the charged offenses; 'circumstantial evidence may be sufficient to support a guilty verdict even though it does not exclude every hypothesis consistent with innocence.'" *United States v. Dillingham*, 320 F. Supp. 3d 809, 812 (E.D. Va. 2018) (quoting *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989)); *see also United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008) ("We consider both circumstantial and direct evidence, and allow the government all reasonable inferences that

8

could be drawn in its favor."). "It is the sole province of the jury to weigh the credibility of the evidence and resolve any conflicts in the evidence presented." *Dillingham*, 320 F. Supp. 3d at 811–12 (quoting *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994)).

As the Fourth Circuit has explained, "critical to [a court's] review of sufficiency challenges is the complete picture that the evidence presents"; a court "must not rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation." *Burgos*, 94 F.3d at 863. "[W]here the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc).

## III.    Judicial discretion weighs heavily in favor of reserving decision until after a jury verdict.

Prior to 1994, there was a split in authority over whether Rule 29 permitted district judges to reserve decision on motions for acquittal made at the close of the government's case in chief. *See United States v. Thomas*, 987 F.2d 697, 704–05 (11th Cir. 1993). The 1994 Rules Amendments made explicit that district courts could do so, citing several cases from the Supreme Court in which it praised district courts for reserving decision until after a factual finding on guilt or innocence. *See* Fed. R. Crim. P. 29(b) advisory committee notes (1994). For example, in one, the Supreme Court recognized "the public interest in the Government's right to appeal from an erroneous conclusion of law" and described reservation of decision "with approval." *United States v. Scott*, 437 U.S. 82, 100 n.13 (1978); *see also United States v. Ceccolini*, 435 U.S. 268, 271 (1978) (describing how the district court "sensibly made its finding on the factual question of guilt or innocence" before ruling on suppression motion to permit appeal).

That wisdom is particularly applicable in this case. Rafiekian is charged with criminal conspiracy, which "[b]y its nature . . . is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." *Burgos*, 94 F.3d at 857. Conspiracy, "therefore, 'may be

inferred from a development and collocation of circumstances.'" *Id.* at 858 (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). Indeed, conspiracy "generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced" and "may be proved *wholly* by circumstantial evidence." *Id.* at 857–58 (emphasis added). Such circumstantial evidence "need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt." *Id.* at 858. Evidence is sufficient to support the existence of a conspiracy—and thus go to the jury—"if the circumstances reveal two or more persons acting in concert to commit a criminal act." *Caudle*, 758 F.3d at 997. Likewise, defendant's § 951 charge requires the jury to make conclusions about defendant's knowledge and intent, findings that are not susceptible to direct proof and require credibility determinations about proffered explanations. *See United States v. Dorman*, 496 F.3d 438, 400 (4th Cir. 1974) (noting that intent "can rarely be proved by direct evidence" and generally "depends on inferences that can be reasonably drawn from all the evidence," including testimony "which the jury is not obliged to credit").

By definition, therefore, a verdict of guilt or acquittal in this case will require drawing inferences and making credibility determinations about witness testimony. The court should hesitate to substitute judgment as a matter of *law* for the jury's actual weighing of the evidence and making these inferences. Both the Supreme Court and the Fourth Circuit have instructed that the role of the jury in drawing inferences from the evidence is paramount. *See Schulz v. Pa. R.R. Co.*, 350 U.S. 523, 526 & n.8 (1956) ("The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable."); *Moye*, 454 F.3d at 394 ("[W]here the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept."). Nor is defendant prejudiced by reservation: Rule 29(b) expressly

requires the Court to consider the evidence as it existed when the motion was made. The 1994 amendments squarely rejected the view that courts were compelled to grant defendant's motion when it was made at the close of the government's case in chief. Since those amendments, the government has been unable to find any federal case holding that a defendant has a substantive right in preventing the case from being submitted to the jury, and two federal circuits have held to the contrary. *See United States v. Hunter*, 95 F.3d 14, 15–16 (4th Cir. 1996); *United States v. Robinson*, 813 F.3d 251, 260–62 (6th Cir. 2016).

## THE EVIDENCE AT TRIAL

### I.     The Foreign Agents Registration Act

The Foreign Agents Registration Act (FARA) was first enacted in 1938 and required agents of foreign principals to register with the Secretary of State. *See Rabinowitz v. Kennedy*, 376 U.S. 605, 608 (1964). Its chief purpose is disclosure, originally intended "to identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment." *Viereck v. United States*, 318 U.S. 236, 241 (1943). In short, "[t]he Act requires all agents of foreign principals to file detailed registration statements, describing the nature of their business and their political activities"; it is "comprehensive, applying equally to agents of friendly, neutral, and unfriendly governments." *Meese v. Keene*, 481 U.S. 465, 470 (1987). Moreover, "[w]hen an agent seeks to disseminate such political advocacy material, he or she must first label that material with certain information, the agent's identity, and the identity of the principal for whom he or she acts." *Ibid*. The central goal of such disclosures to "better enable the public to evaluate the import" of the information, requiring agents to "label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source." *Id.* at 480 & n.15 (quoting *Viereck*, 318

U.S. at 251 (Black, J., dissenting)). FARA thus rests on "the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false." *Ibid*.

As currently enacted, FARA sets forth a comprehensive scheme of required disclosures for any individual acting under the direction or control of a foreign principal. Individuals are deemed "agents of a foreign principal" if they act in any capacity "at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized, in whole or in major part by a foreign principal" and if they engage in certain activities in the United States, including "political activities for or in the interests of such foreign principal"; political consultancy or public relations; collecting, soliciting, or disbursing money; or representing "the interests of such foreign principal before any agency or official of the Government of the United States." 22 U.S.C. § 611(c)(1). Agreeing to act as an agent of a foreign principal, "whether or not pursuant to a contractual relationship," suffices. *Id.* § 611(c)(2).

Any person acting as an agent of a foreign principal must file with the United States Attorney General "a true and complete registration statement" and supplements every six months, detailing the agent's name, individual or corporate national status, business information, written or oral agreements with the foreign principal, payment from the foreign principal, and activities on behalf of that principal, in addition to information required by regulations promulgated by the Attorney General. 22 U.S.C. § 612; *cf.* 28 C.F.R. § 5.1 *et seq*. These registration statements and supplements must be made under oath. *See* § 612(c).

In addition to registration statements, FARA requires specific disclosures when agents disseminate information or advocacy materials and when they interact with official government entities. Agents of a foreign principal must file with the Attorney General copies of "any informational materials for or in the interests of such foreign principal . . . which is reasonably adapted to being, or which [the agent] believes will be, or which he intends to be disseminated or circulated among two or more persons." 22 U.S.C. § 614(a). FARA also makes it unlawful to disseminate informational materials on behalf of a foreign principal "without placing in such informational materials a conspicuous statement that the materials are distributed by the agent on behalf of the foreign principal, and that additional information is on file with the Department of Justice, Washington, District of Columbia." *Id.* § 614(b); *see also* 28 C.F.R. § 5.402 (requiring materials be "marked or stamped conspicuously at their beginning").

It is likewise unlawful for agents of a foreign principal to "transmit, convey, or otherwise furnish to any agency or official of the Government (including a Member or committee of either House of Congress)" any informational materials or to request from them "any information or advice" about any matter "pertaining to the political or public interests, policies, or relations of a foreign country or of a political party . . . unless the [material] or request is prefaced or accompanied by a true and accurate statement to the effect that such person is registered as an agent of such foreign principal under this subchapter." § 614(e).[5]

## II.   Title 18, United States Code, Section 951

Title 18, United States Code, Section 951 provides that

---

[5] Section 614 contains vestigial references to "political propaganda," which was the statutory term for informational materials prior to 1995. In the Lobbying Disclosure Act of 1995, Congress amended FARA to replace "political propaganda" with "informational materials" but appears to have inadvertently omitted changes to § 614(e). *See* Pub. L. 104-65, sec. 9, 109 Stat. 691, 699–700.

> Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

Subsection (d) defines "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official," and excludes from that definition several categories of individuals, including any person engaged in a legal commercial transaction.

In contrast to FARA, Section 951 does not require that the activity be political. Section 951 therefore encompasses both political and non-political activities of foreign government agents.

## III.    Turkey seeks to extradite, then undermine, Fethullah Gulen.

Fethullah Gulen is an Islamic imam and political figure who runs an international network of schools and charities. *See* Tr. 86:13–19. He currently resides in the United States and has for two decades. Tr. 86:22–87:7. In late 2015 or early 2016, the Turkish Ministry of Justice informed the Office of International Affairs ("OIA") at the U.S. Department of Justice that "they were preparing an extradition request for Mr. Gulen" because it believed "that Mr. Gulen and his followers were creating a parallel state whose main objective was to overthrow the Turkish government." Tr. 87:8–22. Gulen and Turkish President Recep Tayyip Erdogan were former political allies who "had had a falling out, and Mr. Erdogan began to accuse Mr. Gulen and his followers of trying to overthrow the government." Tr. 89:7–13. In discussions regarding extradition, the Turkish government alleged that Gulen committed embezzlement, fraud, and money laundering, in addition to attempting to overthrow the government and leading a terrorist organization. Tr. 89:14–90:7. The Turkish government also alleged that Gulen's schools were "part of an operation to support the

creation of the parallel state and to raise money, laundering money to support their objectives." Tr. 90:15–22.

On July 15 and 16, 2016, an attempted coup took place in Turkey, resulting in several hundred deaths and several thousand injuries. Tr. 91:2–8. President Erdogan accused Gulen of orchestrating the attempted coup. Tr. 91:9–16. On July 19, Turkey sent the United States a provisional arrest warrant for Gulen, which is an "abbreviated extradition request seeking the arrest of an individual with a view to seeking his extradition following the passage of a formal extradition request." Tr. 92:1–16. The warrant was based on four criminal cases filed in Turkey, alleging the same crimes alleged in prior discussions. Tr. 92:20–93:17. After investigation, the OIA concluded that the request was not "urgent" and lacked probable cause, meaning Turkey had not provided "sufficient evidence that a reasonable person would believe that the fugitive accused has committed a crime." Tr. 94:5–19. OIA informed the Turkish government it would not execute the provisional warrant on July 20 but continued discussions and review. Tr. 94:20–95:9. On July 23, OIA received a formal extradition request from Turkey for Gulen, based on the same criminal indictments. Tr. 95:10–18. OIA reviewed thousands of pages in attached affidavits and supporting documents and conducted discussions and meetings with Turkey's Ministry of Justice over several months, including an October 2016 meeting between then-Attorney General Loretta Lynch and the Turkish Minister of Justice, Bekir Bozdag. Tr. 95:19–98:5, 104:24–25. After the presidential administration changed, Turkish Foreign Minister Melvut Cavusoglu and Minister Bozdag met with Attorney General Jeffrey Sessions. Tr. 105:1–6.

Turkey sent another provisional arrest warrant on September 9, 2016, this time alleging that Gulen orchestrated the July 2016 attempted coup. Tr. 98:8–20. OIA again formed a preliminary conclusion that it did not establish probable cause and continued discussions with Turkey. Tr. 98:21–99:18.

## IV. From the beginning, Rafiekian, Flynn, and FIG acted at the direction of the Turkish government through Alptekin.

Less than a week after OIA declined to execute Turkey's provisional warrant for Gulen, Rafiekian, co-conspirator Michael Flynn, and Alptekin exchanged a series of emails, establishing the beginning of their activities on behalf of the Turkish government in the United States.[6] On July 26, Rafiekian sends Alptekin an email with the subject: "All good to go." Ex. 8A. Alptekin replies, "Thats good news. I'm seeing the MFA[7] in Ankara tomorrow to confer before their imminent US visit. Anything new we need to discuss tonight before my meeting?" Ex. 8A. Rafiekian responds that he "had a detailed discussion with MF [Michael Flynn] last night" and they "are ready to engage on what needs to be done." Ex. 8B. Rafiekian goes on to state that "Turkey's security and stability is extremely important to world security" and that "RTE[8] can lead the campaign against Radical Islam to protect the image of Islam. No other leader in the world of Islam has the power to lead this campaign." Ex. 8B. On July 29, Alptekin replies again: "I met with MC [Cavusoglu] . . . He is interested in exploring this seriously and it is likely he'll want to meet you and [Flynn]." Ex. 9. Alptekin reports that Cavusoglu asked for a proposed short- and mid-term output

---

[6] Most of these emails were encrypted using software from a company called Virtru; they were only accessible after litigation support from Covington & Burling LLP obtained a decryption key from Virtru. *See* Tr. 122:8–11.

[7] At that time, Turkey's Minister of Foreign Affairs was Melvut Cavusoglu. *See* Tr. 100:20–24; Ex. 9B.

[8] At that time, Turkey's President was Recep Tayyip Erdogan. *See* Tr. 88:3–4; Ex. 5.

and "an indicative budget." Ex. 9. Alptekin also reports that the Turkish minister "asked [Alptekin] not to read in anyone else for the time being and keep this confidential." Ex. 9.

The next day, Rafiekian sends an email titled "Truth," laying out the beginning of the requested action plan in nine bullet points he called "PHASE ZERO." Ex. 10. Rafiekian reports that he and Flynn have "discussed broad contours of the 'truth' campaign" and that executing Phase Zero "at a managed cost and time frame" will permit moving "to a more expanded design and implementation of selected path forward . . . within the next 90 days (August, September, October 2016)." Ex. 10. Rafiekian assures Alptekin that "this conversation shall remain limited to you, General Flynn and myself." Ex. 10. Flynn emails afterwards: "The time to do this is now and there must be a sense of urgency in execution." Ex. 10A. A little over forty-eight hours later, Rafiekian sends a follow-up email titled "We are ready." and reassures Alptekin that "You, [Flynn] and I are the only cleared entities on this at this time" but that "[w]e will need to bring in other specialists which I will talk to you about when we can Skype." Ex. 11.

On August 4, Alptekin responds to Rafiekian's Phase Zero outline: "I met with the MFA and explained our proposed approach. He is receptive and indicated he would like to meet with us during his upcoming visit to DC." Ex. 13. Alptekin notes that "Sec. Kerry appears to be visiting TR[9] on August 21. Do we know anyone in his team?" Ex. 13. The same day, Flynn responds to a linked article included in Alptekin's email and notes that he will "get with [Rafiekian] today on your question regarding [then-Secretary of State] Kerry's staff." Ex. 12. Rafiekian follows up with an email of his own, recounting an anecdote about a "soft spoken cleric sitting under an apple tree

---

9 "TR" is the country code abbreviation for Turkey assigned by the International Organization for Standardization. *See* ISO 3166-1:2013; *cf.* Tr. 344:24–345:2 (identifying "standard two digit country reference" for Turkey as "TR"). As this fact is not reasonably subject to dispute, the court may take judicial notice of it. *See United States v. Dolan*, 544 F.2d 1219, 1223 n.8 (4th Cir. 1976) (taking judicial notice under Fed. R. Evid. 201 of common abbreviation established by publicly available materials).

in Neuphle-le-Chateau in France" who became the Ayatollah Khomeini, "turned the clock back 1400 years," and made Iran "a Pariah State." Ex. 13.

Four days later, on August 8, Alptekin emails Rafiekian and Flynn to report that he had "a long meeting with the Minister of Economy[10] upon the referral of MFA Cavusoglu" and "explained what we can offer." Ex. 16. Alptekin then states that the minister "agreed to discuss in general lines at the council of ministers today and subsequently with PM Yildirim[11]] in more detail." Ex. 16. On August 10, Alptekin again reports that he "finished in Ankara after several meetings today with Min of Economy Zeybekci and MFA Cavusoglu" and that he has "a green light to discuss confidentiality, budget, and the scope of the contract." Ex. 16. Alptekin states that he is "flying to LA tomorrow at the request of MFA" and requests a time to talk. Ex. 16. That day, Rafiekian and Alptekin arrange a phone call. *See* Exs. 17, 17A.

On August 11, one day after Alptekin reports receiving a "green light" after meeting with Turkish ministers (Ex. 16)—and while attempting to connect with Alptekin by phone (Ex. 17, 17A)—Rafiekian responds to the same email chain with Alptekin to inform him that Flynn and he "have activated the FIG LAB as of tonight" and are "ready to push the start button immediately." Ex. 17. He reports to Alptekin that he has defined the "[e]ngagement purpose" as "[t]he business community is engaging FIG to restore '**confidence through clarity**' in the trade and investment climate."[12] Ex. 17. What was previously termed "the 'truth' campaign" among Rafiekian, Flynn,

---

[10] At that time, Turkey's Minister of Economy was Nihat Zeybekci. *See* Tr. 101:13–19; Ex. 14C.

[11] At the time, Turkey's Prime Minister was Binali Yildirim. *See* Tr. 99:24–100:1; Ex. 14B.

[12] As government witness Bryan Alfredo testified today, he conducted a search of emails related to Confidence and did not find discussions of tourism or Turkey's investment climate. Instead, as Kelner also testified, Confidence's entire focus was disseminating negative information on Gulen. Tr. 243:4–14.

and Alptekin (*e.g.*, Exs. 10, 10A, 12–14, 14A, 15–16) now becomes "Operation Confidence." *E.g.*, Exs. 17, 18B, 19.

Rafiekian continued to arrange matters to disguise Alptekin's role as intermediary between FIG and Turkey. On August 25—after the name-change to Operation Confidence—Rafiekian and Alptekin exchanged Skype messages confirming that Turkey directed and controlled the engagement. After reporting that "[w]e are confirmed to go," Alptekin made very clear that he was meeting "no 1 tomorrow" "for details"—a person he described as "mc's boss," "not direct boss but u know who." Ex. 20. He said the individual's identity was his assumption based on "mc's request to come to 3rd bridge opening tomorrow for final instructions" but that "either way he said we are a full go." Ex. 20.[13] Responding to Alptekin's go-ahead, Rafiekian told Alptekin that "[w]e are very pleased to see that RTE is taking a decisive stance on fighting Radical Islam" and that they "firmly believe that RTE is 'uniquely' qualified to take this global leadership role." Ex. 20. He also reported that he and Flynn "just sent [Alptekin] a confirmation email with some logistical action targets." Ex. 20. On August 26, via Skype, Alptekin asks Rafiekian to send Flynn's full CV: "rather than profile they asked for a full cv." Ex. 67E.

## V.    Financial transactions show that Alptekin received a kickback for acting as an intermediary with the Turkish government.

In that logistics email dated August 25, Rafiekian thanked Alptekin "for informing us of your decision to engage Flynn Intel Group on Operation 'CONFIDENCE'" and identified "the following schedule of actions." Ex. 19. Rafiekian requested a "draft engagement letter between [Alptekin's] company in the Netherlands and Flynn Intel Group." Ex. 19. Rafiekian assured

---

[13] On August 26, 2016, Turkey completed construction on the Third Bridge, which "covers the Bosphorus Strait that connects to Asia and Europe in northeast Turkey." Tr. 103:4–104:4; *see also* Ex. 20A; Tr. 370:10–15. Both President Erdogan and Prime Minister Yildirim attended the bridge opening. *See* Tr. 104:7–12.

Alptekin that the engagement letter "will not entail operational details for obvious reasons." Ex. 19. In a subsequent paragraph, Rafiekian noted that Flynn and he "welcome and appreciate [Alptekin's] active participation and counsel on this engagement and have allocated 20% of $150K per month as the advisory support cost provided by your firm." Ex. 19. In short, after being told that "MC"—Foreign Minister Casuvoglu—had "said we are a full go" and that Alptekin was meeting with "mc's boss"—"u know who"—**"for full instructions,"** Rafiekian solicited an engagement letter from Alptekin's company while simultaneously agreeing to pay Alptekin 20% of the engagement fee as an advising consultant.

The subsequent financial transactions demonstrate that Alptekin received a monthly consulting kickback for acting as an intermediary with the Turkish government. Prior to this transaction, Inovo BV—the purported client—had just $3,000 in its corporate account at the end of June 2016. *See* Ex. 150A, at 00000187; Tr. 352:14–16. Inovo has one employee and one sole shareholder ("Ekim Holding BV"), and its executive director is Alptekin. Tr. 353:19–355:11; Ex. 150B. On September 3, Rafiekian sent Alptekin an engagement letter listing Inovo as the client and FIG as the advisor. *See* Exs. 22A, 22B. FIG's engagement letter nowhere mentions 20% professional advisory services from Alptekin. *See* Tr. 340:5–10.

In his cover email accompanying the engagement letter, Rafiekian states that Flynn and he have been "at work on this engagement since July 31st," again demonstrating that "Truth" and "Confidence" are identical. Ex. 22A; *cf.* Ex. 10 (email dated July 30, stating that they "need to discuss a PHASE ZERO execution now"). On the evening of September 8—the day the contract was signed—Alptekin Skyped Rafiekian that he had "just left pm's office" and "will send the agreement." Ex. 67J. A little over sixteen hours later, Alptekin again Skyped Rafiekian that he "urgently" needed banking information because "I have the money but need to deposit it asap

before banks close." Ex. 67K. An hour and forty minutes later, he again asks Rafiekian to "urgently talk," and Rafiekian responds with the requested information. Ex. 67L. Later that day, Alptekin suggests altering the agreement to reflect how the money would travel:

> Since i had to wire from my personal account i suggest we alter the agreement to an agreement between fig and my person while inovo invoices for services provided to fig.

Ex. 67M.

From then on, whenever FIG receives a monthly payment, it originates from Alptekin's personal account in Turkey, rather than Inovo's account in the Netherlands. *See* Exs. 25A (September), 34 (October), 38 (November); *see also* Tr. 344:9–345:2. FIG's monthly invoices uniformly total $200,000 each. Exs. 33B (October), 37B (November); *see also* Ex. 22B (FIG-Inovo Agreement) (providing for three monthly $200,000 payments). Financial records reveal that for every payment wired to FIG from Alptekin's personal account, a minimum of $40,000 in fees returned back to Alptekin, usually to Inovo's account in the Netherlands. *See, e.g.*, Exs. 25A, 33C, 34, 35A, 35B, 37A, 94L, 161; Tr. 349:4–23, 357:8–20; *cf.* Ex. 150A (showing $40,000 deposits to Inovo from Flynn Intel Group on 9/14 and 10/17); Ex. 38 (showing Alptekin transferred $145,000 to FIG—$200,000 less $55,000—in November).

These payments were not ad hoc but rather planned early and executed consistently. On August 11, Rafiekian discusses budget with Alptekin and explains that although he "could not squeeze enough to fit the figures you mentioned," "I did not touch the advisory support we discussed at 20%." Ex. 17. In the email and budget Rafiekian circulated within FIG on the same day, Rafiekian describes the "COGS" line item as referring to the "active participation of SENIOR ADVISOR." Ex. 18A, 18B. In Rafiekian's attached pro forma budget, COGS accounts for $120,000, paid as $40,000 every month over three months—20% of the $600,000 gross revenue. Ex. 18B; *see* Tr. 335:24–336:4. Number seven on the list of individuals to be paid is Ekim

Alptekin: $120,000. Ex. 18B. Rafiekian then directed FIG employees to work out an advisory agreement for Alptekin to work as an "outside advisor on the Confidence Project." Ex. 25B; *see also* Exs. 25C. That agreement provided for a $40,000 "mobilization fee" and subsequent payments by invoices. *See* Ex. 25D; *see also* Exs. 35B (October Invoice), 161 (November Invoice).

## VI. Rafiekian obscures Turkey's involvement and misleads internal and external associates about Alptekin's role.

Rafiekian made certain to obscure Alptekin's true role as an intermediary for the Turkish government, even from others within FIG. On August 11, he sends an internal email to Flynn but, for the first time, includes other associates at FIG: Flynn's son, Michael G. Flynn ("Flynn Jr."), and Philip Oakley. *See* Ex. 18A. Rafiekian informs the group that he has "high confidence" FIG is "about to be engaged by a Dutch client for the above campaign," which he titles "Operation Confidence." Ex. 18A. The email repeats Rafiekian's "Phase Zero" bullet points from his July 30 email to Alptekin (*see* Ex. 10) and identifies the "end 'product'" as a "video production" that should be "credible, effective and durable in validity with maximum ease for distribution on broadcast." Ex. 18A. Rafiekian's budget describes Confidence as a project of "[t]he business community" to "bring[] back business confidence." Ex. 18B.

One of FIG's investigators, Brian McCauley, testified that Rafiekian never disclosed that the government of Turkey was directly involved in the project. In an initial call, Rafiekian never mentioned a relationship with Turkey but only broadly asked about the investigator's knowledge of current events in Turkey and Gulen. Tr. 391:23-393:14. In a second, in-person meeting conducted in Alexandria, Rafiekian said only that FIG would be working for "a person that he knew in Copenhagen." Tr. 396:2-396:5. On a subsequent call, Alptekin told McCauley that "[s]ome wealthy Turkish businessmen were concerned about the future of Turkey, and they were interested

in possibly hiring FIG to look at Gulen[,]" Tr. 397:7–14—a claim Alptekin never repeated during the project or afterwards.

Project Confidence's internal coordinator at FIG, Michael Boston, was told that Project Confidence was "going to help restore confidence for the tourism industry in Turkey" and that the client would be Inovo BV. Tr. 449:1–450:11. After "a very short amount of time," the project's focus changed "exclusively" to Gulen. Tr. 450:17–451:1. Despite being on weekly conference calls with Rafiekian, Flynn, and Alptekin, Boston never heard Alptekin mention conversations "with Turkish ministers" about a prior project." Tr. 451:19–452:14; *see also* Tr. 459:5–20. Boston got his direction for the project "almost exclusively" from Rafiekian. Tr. 453:2–4. Project Confidence involved a social media team doing open source discovery, a media firm that compiled information and prepared for "potential engagement with either senior government officials or elected officials," and an investigative team focused on Gulen's charter schools. Tr. 454:7–20. Rafiekian told Boston that "we wanted to keep FIG and our work not disclosed." Tr. 461:16–24.

Rafiekian's obfuscation continued outside of FIG. On August 16, he met with members of Sphere Consulting, a media and public affairs firm in Washington, D.C. *See* Ex. 96A. There, he said FIG worked for "private business" but "didn't reference a specific client." Tr. 600:2–8. Based on Rafiekian's representations, Sphere's memorandum in response identified the "effort" as "funded directly by private businesses seeking to improve investment in business to drive a stronger economy." Ex. 96B; Tr. 603:14–19; *see also* Ex. 111. Nowhere does this memo suggest Rafiekian disclosed the involvement of Turkish cabinet-level officials. As described in the memo, one component of the proposed strategic approach was to produce and distribute a documentary film "highlight[ing] Fethulah Gulen's network of loyalists and his influence over them." Ex. 96B.

Rafiekian also ensured that external consultants hid even Alptekin's participation from those they spoke with. On October 9, Boston inquired whether Sphere could use Inovo's name "as they work on setting up meetings." Ex. 112. Prior to that, Rafiekian had instructed Boston not to use Inovo's name "outside of our working group internal at FIG." Tr. 476:22–477:3. On October 12, 2016, a member of Sphere Consulting's team assures Rafiekian that Sphere will "say we are working with a European company with interests in the economic and political stability of Turkey" and only "[a]s a last resort" will it "disclose that the client is Inovo." Ex. 30B. When speaking with David Enders, a journalist who had been hired to help with the documentary on Gulen, Rafiekian did not identify his client at all. Tr. 559:7–12. He also told Enders that he "didn't want Flynn Intelligence Group connected to what we were doing." Tr. 562:12–20.

## VII. Rafiekian and Flynn meet with Alptekin and Turkish Ministers in New York in September 2016.

On August 30, Rafiekian and Alptekin exchanged Skype chats, in which Alptekin reports that he "is also scheduling a meet with MF and MC and perhaps even RTE in third week of NY." Ex. 20. Rafiekian continued to obscure Turkey's direct involvement when discussing the project with other FIG employees. For example, in early September while attempting to coordinate a meeting with Turkish cabinet ministers, he told Flynn Jr. only that the "[c]lient is seeking a high level meeting in NYC on September 19th or 20th." Ex 24A. When asked for more detail, he said "the meeting is with high level audience (Cabinet+ level) related to 'CONFIDENCE.'" Ex. 24B.

McCauley testified that he was invited to join the meeting in New York while meeting with Rafiekian in Alexandria. Tr. 398:17-21. Alptekin was just leaving Rafiekian's office, and Rafiekian introduced McCauley to him. Tr. 399:16-20. Although Rafiekian did not tell McCauley the purpose of the meeting, he did state that it was with Turkish officials. Tr. 400:13-23. While working for FIG, McCauley worked only on Project Confidence. Tr. 390:8-13. McCauley acted

as lead investigator, "to work on open source information" and "focusing on Gulen, the charter schools Gulen was involved with." Tr. 415:8-19. Rafiekian paid McCauley his $5,000 daily rate to attend the meeting in New York City, using a check that read "for: Confidence" in the memo line. Tr. 401:21-25; Ex. 34, at 00001176. On the train to the New York meeting, Rafiekian and McCauley discussed strategy for investigating Gulen. Tr. 402:21-403:11. Rafiekian asked McCauley if he had access to classified FBI records. Tr. 403:17-404:4. McCauley suggested using open source and Turkish government evidence to make the documentary about Gulen. Tr. 404:5-22.

On September 19, the major players gathered for a meeting late at night in a hotel. Tr. 405:9-18. From FIG, Rafiekian and Flynn attended, along with the investigator McCauley and James Woolsey, another FIG consultant. Tr. 405:19-24. On the other side of the table sat Alptekin, Foreign Minister Cavusoglu, Energy Minister (and President Erdogan's son-in-law) Berat Albayrak,[14] and a translator. Tr. 405:19-406:25. The meeting lasted between 25 and 30 minutes. Tr. 409:12-14. At the meeting, Cavusoglu talked extensively about Gulen, describing him as a terrorist residing in the United States and attributing responsibility to him for the failed July coup in Turkey. Tr. 407:22-408:23. Cavusoglu stated that he wanted to have Gulen charged and tried in Turkey. Tr. 408:24-409:2. McCauley testified that he could not think of any other topics discussed at the meeting. Tr. 409:9-11.

In the hotel after the meeting, Rafiekian and McCauley privately discussed the meeting. Rafiekian told McCauley that the potential project being discussed had a budget of $330,000 and would have to be show results in 45 days. Tr. 410:5-12. Rafiekian told McCauley that if successful, FIG would get a follow-up project, which he later stated would be worth up to $5 million.

---

[14] *See also* Tr. 102:3–8; Ex. 28A (identifying Albayrak).

Tr. 410:13-411:3. In a subsequent in-person conversation at FIG headquarters, Rafiekian told McCauley that FIG got the Gulen contract. Tr. 411:23-412:8. In that meeting, Rafiekian had just emerged from Flynn's office and told McCauley that Flynn "wants me to file with DOJ." Tr. 412:19-24. McCauley testified then that Rafiekian said that "to keep it under the radar, we'll file with—it was either commerce or Congress." Tr. 413:24-414:4. Later, Rafiekian told McCauley that the purpose "of keeping it under the radar was to avoid detection by Tony Podesta and other members of Congress who were favorable to Gulen." Tr. 414:5-16. McCauley testified that he advised Rafiekian against doing that, because he knew "when you work with foreign governments, you file with DOJ." Tr. 414:19-415:4.

Rafiekian had told Boston that there would be a "high-level" meeting with "senior officials from the Turkish government in New York" but did not invite him to attend. Tr. 455:5–456:3. After the meeting, Rafiekian informed Boston that "it was a very good meeting and that we should expect work to be forthcoming," which "ultimately became Project Confidence." Tr. 456:4–16. The day after the New York meeting, Rafiekian and Flynn met with Sphere employees to discuss the project; they never mentioned the prior day's meeting with Turkish ministers. Tr. 608:6–610:6.

## VIII.   Rafiekian and FIG engage in public- and policymaker-oriented advocacy.

Contrary to Rafiekian and Flynn's repeated statements on internal documents, the goal of FIG's engagement had nothing to do with the Turkish "investment climate" or business opportunities; instead, it was to discredit and foment suspicion about Fethullah Gulen. On September 5, Rafiekian sent to Flynn a "draft playbook" for "defining the story and the roles" of FIG's participation. Ex. 23A. That playbook had as a central "mission": "Investigate and document the activities of 'X' in the United States," including references to his "[r]eligious schools" "political network using a religious movement." Ex. 23B. Both this playbook and later-prepared FIG talking points

expressly linked Ayatollah Khomeini and Gulen, describing both as "soft spoken," gray-haired elderly Muslim clerics who nonetheless would nonetheless threaten radical violence. Exs. 26B, 23B; *see also* Ex. 26A (Sept. 18, 2016). Project Confidence's "ultimate aim" was obtaining material to support a criminal referral against Gulen to allow a change of legal status and extradition. Tr. 495:14–496:12.

At FIG and Rafiekian's direction, Sphere reached out to policymakers, including state-level officials, and news outlets to influence opinions against Gulen. *See* Exs. 30B, 111; *see also* Ex. 43D (showing story covering Gulen's schools published in Politico). Congressional hearings was a key goal of Project Confidence. Tr. 510:17–23. Rafiekian himself spoke with the national security advisor for Congressman Michael McCaul, who was then the Chairman of the House Committee on Homeland Security. *See* Ex. 30A; Tr. 477:13–478:14, 619:8–622:1. FIG prepared talking points for that meeting. Exs. 43F, 122C. At the meeting, Rafiekian encouraged the advisor to counsel Congressman McCaul to hold "public hearings on Gulen," a repeated goal of Rafiekian's. Tr. 479:14–480:8. In mid-September 2016, Rafiekian engaged in lobbying then-Congressman Dana Rohrabacher of California. Tr. 418:4-10; *see also* Ex. 102. Rafiekian and McCauley called Congressman Rohrabacher from FIG's offices in Alexandria. Tr. 418:20-419:11. On the call, Rafiekian told the congressman that he had an urgent matter to discuss and brought up the subject of Gulen. Tr. 419:12-16. McCauley did not recall Rafiekian ever informing the congressman that he or FIG was lobbying on behalf of Turkey or Inovo. Tr. 420:2-6. Rafiekian wanted McCauley to accompany him and discuss Gulen as a terrorist, but McCauley declined. Tr. 421:1-7, 18-24.

Turkey's involvement in these activities continued well behind the initial interactions. On September 15, 2016, Alptekin and Rafiekian discussed an article about Gulen published in the

27

Washington Times. They discuss the effect it will have on the issue, and Alptekin reports that "MC's guy who is read into project confidence advised me to include an oped that fig would get published under my name but I didn't raise it as his advice aims to help me score points in Turkey more than anything else." Ex. 41. As Sphere produced materials and had stories placed in news media, FIG then discussed forwarding them "to Ekim for review and comment." Ex. 43A.

On subsequent calls with Rafiekian and Alptekin, McCauley testified that Alptekin made demands for surveillance of Gulen supporters in Washington, D.C., sending Rafiekian a list of six specific names. Tr. 423:2-75. Alptekin wanted physical and audio surveillance of these individuals and "to find dirt on who they were talking to and who they were meeting with, especially with a focus on Congress." Tr. 423:18-424:4. When McCauley declined and tried to dissuade him, Alptekin responded that he would put about $30,000 of "his own money" into it. Tr. 424:5-22.

Alptekin also directed FIG's efforts, based in part on information coming from another investigation in the United States conducted by a known Turkish agent. For example, on one call, Alptekin dismissed FIG's investigation into potential immigration and funding fraud, stating that "[w]e knew that from Amsterdam." Tr. 425:5-15. McCauley later learned that Amsterdam referred to Robert Amsterdam.[15] Tr. 425:16-18. Alptekin refused to put McCauley in contact with Amsterdam. Rafiekian also refused when McCauley stated he needed to know if there was "a parallel investigation going on." Tr. 425:19-426:12. In a late-October email, McCauley told Rafiekian that he and Thomas Neer, another FIG investigator, needed to speak with Amsterdam and that there was frustration over "redundant work being done." Ex. 121; Tr. 428:3:18. In the course of inves-

---

[15] Rafiekian told Boston that Amsterdam "was investigating the charter schools that are related to Mr. Gulen." Tr. 501:19–25.

tigating, Neer learned that "the overseas government"—*i.e.*, Turkey—had openly hired Amsterdam "to investigate Gulen schools" and had "acquired a vast amount of public records." Ex. 146B; Tr. 591:20–592:21. Subsequently, McCauley and others at FIG received an email from Flynn referring to a phone call with Alptekin, in which Flynn reported that Alptekin found FIG's analysis "very interesting and worth talking to the [Foreign Minister] about as well as all other talking points." Ex. 40; Tr. 430:4-12. Additionally, Flynn reported that "[r]egarding [Robert Amsterdam]…he felt a phone call between Us would work best"; Flynn stated that he told Alptekin "that if it was a parallel effort I'm okay" but that "[w]e don't want to trip over each other." Ex. 40; Tr. 430:13-18. In short, after Alptekin complained that he already had certain information from a known, publicly disclosed agent of Turkey, he then set up a coordinating effort between the two firms, clearly showing Alptekin's official authority on behalf of the Turkish government.

## IX.   In response to Alptekin's frustration about the lack of publicity regarding Gulen, Rafiekian drafts and publishes an op-ed urging the U.S. to extradite Gulen.

The scope of Project Confidence had long included a video documentary demonizing Gulen that could be disseminated widely. Ex. 17, 23B, Tr. 404:13-22. Op-eds were also discussed as a potential deliverable for the project. On September 14, Alptekin told Rafiekian that "MC's guy who is read into project confidence" suggested including an op-ed as a deliverable for the project.[16] Ex. 41. Additionally, on October 7, on a conference call, Rafiekian, Flynn, Alptekin, and Boston discussed that FIG "will attempt to have an op-ed written that links funding, Islamists, and subject, et al., as mullahs/imams." Ex. 43B at 7, Tr. 488:25–489:21.

---

[16] In the same conference call, Alptekin pressed for additional negative information allowing for extradition and the group discussed a continued strain on the U.S.-Turkey relationship "until the Gulen issue with the country of Turkey is resolved." Tr. 486:14–487:14. At the same time, Alptekin pressed Flynn to have the Republican presidential candidate "specifically ask questions about subject's operations and funding." Tr. 490:7–25.

On November 2, 2016, the defendant, Alptekin, and numerous individuals who had worked on Project Confidence met at FIG headquarters to provide Alptekin "the final product of what [FIG] had come up with at that point." Tr. 430:22-431:6; Ex. 128A; *accord* Tr. 718:19-720:10.  In addition to the defendant and Alptekin, Michael Boston, Brian McCauley, James Courtovich, Graham Miller, and Bob Kelly, and others were present for the meeting.  Tr. 718: 25-719:19.  Although portions of the video documentary had been filmed, Tr. 560:16-564:5, no video had been completed by the time of the meeting.  *Id.*; Tr. 719:13-14.

Alptekin was dismissive of FIG's presentation. Tr. 431:14-432:6. When McCauley presented a report alleging that Gulen was potentially involved in "human trafficking, immigration fraud, visa fraud," and a $500 million fraud on the United States government, Alptekin responded that he knew it already and he was looking for "dirt." Tr. 433:5-17.  He then asked whether they could plant dirt, which McCauley refused, before Alptekin claimed that he was not serious. Tr. 433:21-434:6.

According to the testimony of James Courtovich's, at the meeting Alptekin complained, "I'm expecting congressional hearings. I'm expecting big news stories. I'm expecting the Department of Justice to be involved."  Tr. 720:3-8.  Courtovich testified that Alptekin became "visibly upset during the meeting and concerned that we were far behind where, I think, he expected," specifically at the lack of "congressional hearings, DOJ investigation, and major news stories pertaining to the data that was presented at the meeting." Tr: 722:3-6; Tr. 722 7-11. According to Courtovich, "Ekim outlined…they wanted Department of Justice action against Gulen." Tr. 728:15-18.  Alptekin became so upset he threw documents across the table and questioned Courtovich about what he was supposed to tell Ankara when he reported about the project. Specifically, Courtovich testified:

Q: And besides Gulen or Gulen affiliated officials or entities did he express any-
thing else that was expected?

A: Well this was the meeting where he had said—he goes, what am I supposed to
tell Ankara in that meeting? Because—you know, as I said he was upset with where
he saw everything.

Q: What did he tell—what do I tell Ankara? Is that what he said?

A: Yes.

Q: And to whom did he say that to?

A: To Bijan and, you know, into the room.

Tr. 723: 3-11.

Later the same day, Rafiekian first sent Alptekin a draft of an op-ed on Gulen entitled
"Getting Turkey Wrong," stating, "A promise made is a promise kept." Ex. 45A; *see also* Ex. 45B
(op-ed). The op-ed included the pervasive "cleric under an apple tree" anecdote that FIG used to
link Ayatollah Khomeini and Gulen. *See* Ex. 45B. On November 3, Rafiekian sends an edited
version of that op-ed to Flynn, under whose name it would eventually be published. Ex. 47. The
following day, Rafiekian sends another version to Alptekin titled "Our Ally Turkey Is In Crisis
and Needs Our Support." Exs. 48A, 48B. Rafiekian reports that Flynn "wants [Alptekin] to know
he appreciates your professional and valuable advice on a personal level." Ex. 48A. Rafiekian also
tells Alptekin that Flynn has extended the length of FIG's engagement past 90 days to allow for
release of the "teaser and the full video," which will "go to the entire congress and selected USG
agencies." Ex. 48A. Alptekin replies to the draft and states "the General is right on target" and
corrects the spelling of Erdogan and Gulen's names in the draft, indicating that he has read it.
Ex. 49.

That op-ed was published in *The Hill* on November 8, 2016, during Project Confidence. Ex. 50; Tr. 233:13–234:8. It did not contain any labels or legends disclosing the involvement of any foreign principal, including Turkey. Tr. 234:15–16. As Rafiekian told Alptekin in an email announcing its publication, it was "a very high profile exposure one day before the election." Ex. 48A.

## X.   After the November 2 meeting, Courtovich submits materials to Alptekin and receives responses from Turkish government officials.

After learning that Project Confidence was being done on behalf of the Turkish government, Courtovich explained to Alptekin and the defendant that certain legal processes were available to seek Gulen's extradition, and Alptekin and the defendant availed themselves of these processes.  As Courtovich testified, after "this cat jumped out of the bag," Tr. 746: 6-7, as to the goal of the project (Gulen's extradition) and its client (the Turkish government), Courtovich told Alptekin and the defendant, "If that's what you're trying to do, then this has to be a government action. It has to be done by a prosecutor in Turkey. It has to be, you know, someone from the ministry of justice that has current, you know, charges against Gulen. Then you have to file a 1782 petition in a federal court to get subpoena power." Tr. 724:6-12. Courtovich further testified that he went on to explain to the defendant and Alptekin, "But it has to be done by the government.  So we sent a memo indicating that and walking through the process." Tr. 724: 20-22; Ex. 129. When asked at trial which government it would have to be done by, Courtovich responded, "The Turkish government." Tr. 724: 23-24.

When asked about the ultimate goal of the project, Courtovich went on to say "I don't remember him specifically saying what, but I assume they didn't—or he didn't want him to end up in a Pennsylvania prison. I assume they wanted him extradited to Turkey." Tr. 728 15-729:1. When asked about whether the media outreach compliment to the 1782 petition reflected what

Alptekin was "complaining about," specifically, the extradition of Gulen, Courtovich responded, "Well, it reflects what he'd need to do. Well, not what he would. What the Turkish government would need to do if that is something they wanted done." Tr. 729:17-21.

The response Courtovich received after sending Alptekin the 1782 memorandum is further circumstantial evidence that Alptekin and the defendant were receiving direction from Turkish government officials. After sending Alptekin the memorandum, Courtovich received an "email from the deputy chief of mission at the Turkish embassy to come and present a full overview, not just in this category but a comprehensive communications plan for the government of Turkey," describing the individual as "the number two in the Turkish embassy" and "a Turkish diplomat" with an email address "mfa.gov.tr" confirming that fact.  Tr. 19-731: 9; Tr. 757: 3-5.  Courtovich went on to detail that he had continued contact about extraditing Gulen with not just Alptekin, but with the defendant as well: "It was more of we're talking to Bijan. We wanted get the ball moving. But, you know, they had a lot of things going on, and I had promised to Ekim we'd get back with some more background on the 1782. So we just moved the ball forward, but were in communication with Bijan as well. It wasn't independent." Tr. 749: 11-22.

## XI.   Rafiekian and Flynn deceive FIG's lawyers and cause the filing of a false FARA registration.

On November 11, Rafiekian sent Alptekin an email expressly laying out the lies they were to tell in the wake of public scrutiny of Flynn's op-ed. Rafiekian's email said that "we do not work for any government. You do not work for any government and INOVO is a long standing company with other businesses and clients." Ex. 83. Rafiekian also included a proposed statement from Alptekin's perspective, identifying Inovo as an "a Netherlands based international business consultancy." Ex. 83.

Around Christmas 2016, Flynn and FIG retained Covington & Burling LLP to assist them in responding to an inquiry letter from the DOJ regarding FARA. *See* Tr. 217:21–24, 220:15–20, 221:5–15; Ex. 90. The FARA inquiry letter concerned Flynn's op-ed in *The Hill* in November 2016 and inquired whether FIG or Flynn himself should have registered under FARA. Ex. 90; Tr. 222:13–19. Based on its conversations with FIG personnel and documents FIG provided, Covington prepared and filed a response letter on January 11, 2017. Ex. 92; Tr. 223:7-25. That letter stated that it was "likely" FIG needed to file under FARA but that the firm had not yet made a final determination as to the identity of the foreign principal. Ex. 92. After further fact-gathering, Covington eventually submitted a late FARA registration for FIG on March 7, 2017. Tr. 225:2–3.

During Covington's investigation, it could not obtain all of FIG's emails because FIG had begun to shut down operations in November 2016 and "some of the e-mail accounts either no longer existed or [Covington was] no longer able to gain access to them." Tr. 226:8–16. In addition, FIG used "encrypted e-mail accounts using a specialized encryption software." *Id.* at 226:17–18. Notably, Covington had no access to any Skype conversations involving Rafiekian and Alptekin. Tr. 326:22–327:2.[17] Covington also received information from Alptekin and his lawyer. *Id.* at 226:21–23. Covington's review of work product generated as part of Project Confidence revealed that "[a]ll or virtually all of the work product generated by FIG, in connection with the Inovo contract, related to the Turkish exile, Fethullah Gulen," and "portrayed him in a negative light." Tr. 243:4–14.

---

[17] Specifically, Kelner testified that he had never seen the August 25 conversation between Rafiekian and Alptekin, in which Alptekin states that he is scheduled "to meet no 1 tomorrow"—"mc's boss," "not direct boss but u know who"—"based on mc's request to come to 3rd bridge opening tomorrow for final instructions." Ex. 20; *cf.* Tr. 327:21–328:2 ("Q: Had you seen this Skype chat . . . would you have pressed the defendant and General Flynn on their claims that Turkish government officials were not involved in the project? A: Yes.").

Covington's lead lawyer on the team, Robert Kelner, testified that one of Covington's key priorities was to determine whether Turkish government officials were involved so it could determine whether FARA filing was required and who should be listed as the foreign principal on the registration form. Tr. 228:9–20. Covington interviewed Rafiekian about the August 10 email from Alptekin stating that he had a "green light to discuss confidentiality, budget and the scope of the contract" after Alptekin had "finished in Ankara after several meetings today with Min of Economy Zeybekci and MFA Cavusoglu." Ex. 16. Rafiekian misled his lawyers, telling them that the email was "related to a completely separate project . . . which would have involved the Turkish government being the client, but which never came to fruition." Tr. 229:4–13. Rafiekian told Kelner that project had been "referred to as Project Truth," that "the client would have been the government of Turkey," but that it "never actually happened."[18] *Id.* at 229:19–230:5. Rafiekian told Covington that "the Turkish government played no role in the contract that was actually entered with Inovo." *Id.* at 231:6–12.

Contrary to numerous emails on which he was copied, Flynn told Covington that "the best of his understanding" was that Turkey was not involved in Project Confidence "with the exception of a meeting that occurred on September 19, 2016, in New York with Turkish ministers at which there was a brief discussion of—or a bit of discussion of the Inovo contract." Tr. 231:13–21. Rafiekian told Covington that "the meeting in New York was unrelated to Project Confidence." *Id.* at 231:25–232:6.[19] In September, Rafiekian had expressly told another FIG employee that the

---

[18] As Special Agent Alfredo testified this morning, his search of relevant emails produced no mention of losing any contract with the government of Turkey.

[19] McCauley, who only worked on Project Confidence for FIG, was nonetheless invited to the New York meeting. He testified that the only subject he could recall at the meeting was Gulen, about whom the Turkish Foreign Minister talked extensively and negatively. Tr. 398:17-21. Indeed, Gulen—as Covington observed—was the subject of "[a]ll or virtually all" FIG's work product for Project Confidence.

meeting was "with high level audience (Cabinet+ level) related to 'CONFIDENCE.'" Ex. 24B. Moreover, McCauley testified that he was paid his daily rate of $5,000 to attend this meeting with a check stating that the payment was "For: Confidence." Tr. 401:21-25; Ex. 34, at 00001176.

Covington also interviewed Rafiekian about the publication of the op-ed in *The Hill*. Rafiekian told Covington that it was "not part of Project Confidence" and that it was "General Flynn's idea to write it." Tr. 235:2–12. Rafiekian admitted to Covington that he had used Sphere, the media firm FIG hired for Project Confidence, to have the piece published in *The Hill*—but stated that he had "asked Sphere to help place this sort of as a favor." Tr. 235:19–236:16. Rafiekian told Covington that he had distributed the draft op-ed to Alptekin "sort of for client relations reasons." Tr. 237:18–25. During its investigation, Covington received an unsolicited memorandum signed by Alptekin's lawyers at Arent Fox LLP that, according to the memorandum, reflected facts told to them by Alptekin. Tr. 239:2-3; Tr. 240:19-241:1; Ex. 93B. Alptekin sent this memorandum to the defendant, who provided it to Verderame and Covington. 238:22-239:3. The memorandum stated that according to Alptekin, Flynn "did not commit to or announce that he had any intentions of writing an article" and that he "had never consulted Mr. Alptekin on this, or asked his opinion." Ex. 93, at 3. The memorandum further stated that Alptekin would have "strongly advised against publishing an article along the lines of his opinion letter that appeared in the Hill on election day." Ex. 93B, at 3. Of course, Rafiekian, Flynn, and Alptekin had all discussed the exact idea of an op-ed along these identical lines during a conference call on October 7. Tr. 488:25–489:21; *see also* Ex. 45A ("A promise made is a promise kept."). And on November 5—three days before publication—Alptekin had responded to Rafiekian's distribution of the draft saying "the General is right on target" and correcting his spelling of Erdogan's and Gulen's names. Ex. 49.

---

Tr. 243:4-14.

Covington also reviewed the financial structure of the relationship. *See* Ex. 151B (Inovo-FIG contract); Ex. 25D (FIG-Alptekin contract). Rafiekian told Covington that FIG had considered "retaining Alptekin as a consultant on the project so that he could provide advice regarding local conditions in Turkey, but that Alptekin never actually became a consultant; he never actually rendered consulting services to FIG." Tr. 247:10–20. But not only did Alptekin's invoices each list "Consultancy Fee Confidence Project" (Exs. 35B, 161), FIG's accounting books recorded the payments as consultancy fees. Tr. 248:16–23; *see also* Ex. 33C (email from Rafiekian instructing Flynn Jr. to wire $40,000 to Alptekin "for consulting services that he is providing to FIG on the Confidence project"); Ex. 37A ("We will process a wire transfer to INOVO for research and consultation services provided by INOVO . . . .").

When Covington asked Rafiekian about these documents, Rafiekian again lied, saying that they "were actually refunds, not consulting fees," and that they were for "public relations and lobbying services that had not been rendered by FIG but which Alptekin had been expecting." Tr. 249:12–19. Alptekin's letter through Arent Fox also stated that "the lobbying PR components ultimately never took place" and that "INOVO never hired Sphere Consulting." Ex. 93B. But in fact, Covington's investigation established that "Sphere provided public relations services and . . . some lobbying services as well"; that "FIG itself engaged in some lobbying service," including Rafiekian personally; and that FIG "pa[id] Sphere as part of this work." Tr. 250:14–251:11. Covington's investigation established that Rafiekian personally lobbied congressional staff during a meeting "at which he discussed Turkey" and "[r]esearch regarding Fethullah Gulen, the Turkish exile in Pennsylvania." Tr. 251:12–20.  In addition, Rafiekian lobbied Congressman Rohrabacher regarding Gulen by phone and attempted to lobby him in person. Ex. 102, 76S at 2-3; Tr. 418:22-422:20.

When Covington concluded that its preliminary findings warranted registration under FARA and prepared its response letter to DOJ, Kelner testified that Rafiekian "was not happy about it" and particularly "was not happy about the suggestion that FIG's work principally bene-fited the government of Turkey." Tr. 252:6–14. On a late-night phone call with Kelner, Rafiekian told him that Rafiekian was "concerned about the FARA filing," "that he had a heart condition, that he had had either a heart attack or some sort of cardiac event in the past and that, you know, he was upset and concerned about the FARA filing." Tr. 252:15–253:6.

Rafiekian asked for several changes to the draft FARA filings Covington provided. He asked for deletion of the word "kickback," asked that it not reference James Woolsey—a former CIA director who had been involved with the project—and asked to delete a reference to a Turkey-related conference that Rafiekian told Covington "he had not attended." Tr. 254:12–23. He also asked Covington to change references to the $40,000 payments to Alptekin from consulting fees to refunds. *Id.* at 254:24–255:4.

When Covington eventually filed the FARA registration statement, it declined to rely on several statements Rafiekian and Flynn had made about the nature of Project Confidence. Alt-hough Rafiekian had stated "categorically" that "the government of Turkey played no role in the engagement of FIG for Project Confidence," Covington instead stated that "Flynn Intel Group does not know whether or the extent to which the Republic of Turkey was involved with its retention by Inovo for the three month project." Tr. 258:15–23; *see also* Ex. 58.[20] When describing the op-

---

[20] Rafiekian withheld numerous Skype conversations from Covington. *See* Ex. 67J ("will send the agreement / just left pm's office"); Tr. 328:16–19 ("Q: Did the defendant give you a copy of this Skype chat or tell you about it? A: No."); Ex. 67K ("i have the money but need to deposit it asap before banks close"); Tr. 328:20–329:7 ("Q: Did the defendant give you a copy of this Skype chat or tell you about it? A: No.").

ed, Covington chose to add that it was "related to the same subject matter as the Flynn Intel Group work[] for Inovo BV" even though Rafiekian had told them it was "not requested to do so by any other person."[21] Tr. 259:10–25; *cf.* Ex. 45A ("A promise made is a promise kept. . . . I am copying Bob as we move forward with executing the plan."). Despite Rafiekian telling Covington that "there wasn't discussion of the Inovo contract" at the November 19 meeting and that it "was not related to Project Confidence," Covington chose to describe the meeting as involving "background" for the project "based on all the information we had acquired from different sources." Tr. 260:8–261:4. And while Covington was not "even completely convinced that [the $40,000 payments to Alptekin] were consulting payments," it likewise "did not believe there was any evidence to support the proposition that those payments were refunds" as Rafiekian insisted. Tr. 330:15–331:11.

## CONCLUSION

In short, the evidence adduced in the government's case-in-chief sufficiently establishes the existence of a conspiracy for purposes of Rule 801(d)(2)(E). Moreover, it provides more than sufficient evidence—both direct and circumstantial—to support a jury's verdict of guilty on both charges. Accordingly, the government requests the Court admit the co-conspirator statements for the truth and deny defendant's Rule 29 motion or, at minimum, defer until after the jury renders its verdict.

---

[21] Of course, publishing an op-ed associating images of Gulen and Khomeini was, quite literally, a page out of FIG's Project Confidence playbook. *See* Ex. 23B, at 00001573 ("Images of the old cleric sitting under an apple tree in france claiming that he is a holy man . . . . Interviews and commentary by the senior team members focused on findings by the investigative team."); *id.* at 0001576 (identifying "media outlets" as target audiences to "[l]everage our network of U.S. and international media contacts to position Turkey, and its adversaries, in an accurate light"). Moreover, Alptekin, Flynn, and Rafiekian had explicitly discussed placing an op-ed for Project Confidence. Tr. 488:25–489:21.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

_____/s/_____          By: _____/s/_____
Evan N. Turgeon                        James P. Gillis
Trial Attorney                        Virginia Bar No. 65055
Counterintelligence                   John T. Gibbs
    and Export Control Section        Virginia Bar No. 40380
National Security Division            Assistant United States Attorneys
United States Department of Justice   The Justin W. Williams
950 Pennsylvania Ave., NW                 United States Attorney's Office
Washington, DC 20530                  2100 Jamieson Avenue
(202) 353-0176                        Alexandria, VA 22314
Evan.Turgeon@usdoj.gov                (703) 299-3700
                                      (703) 299-3982 (fax)
                                      James.P.Gillis@usdoj.gov
                                      John.Gibbs@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2019, I electronically filed the foregoing using the CM/ECF

system, which will send a notification of such filing to all counsel of record.


<u>      /s/                               </u>
Evan N. Turgeon
Trial Attorney
U.S. Department of Justice