**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | : | |
| **BIJAN RAFIEKIAN, et al.** | : | |

**DEFENDANT RAFIEKIAN'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER
FEDERAL RULE OF CRIMINAL PROCEDURE 29**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT...................................................................................1

II.    LEGAL STANDARD .............................................................................................3

III.   ARGUMENT ........................................................................................................7

    A.   The Government Failed To Introduce Substantial Evidence That The Defendant Acted As An Unregistered Foreign Agent ................................................7

        1.   *The Government Failed to Proffer Substantial Evidence of Direction and Control by Turkey* ................................................................7

        2.   *The Government Failed to Proffer Substantial Evidence That the Defendant Was Not Engaged in a Legal Commercial Transaction* ...........13

        3.   *The Government Failed to Proffer Substantial Evidence That the Defendant Was Required to Notify the Attorney General* ........................16

        4.   *The Government Failed to Proffer Substantial Evidence That the Defendant Acted Knowingly* ................................................................16

    B.   The Government Failed To Offer Substantial Evidence That Defendant Knowingly And Deliberately Conspired To Take Unlawful Action .....................17

        1.   *The Government Failed to Introduce Substantial Evidence That Rafiekian Agreed With Anyone to Act as an Unregistered Foreign Agent* ................................................................................................18

        2.   *The Government Failed to Introduce Substantial Evidence That Rafiekian Conspired To File False FARA Statements* ................................25

IV.    CONCLUSION.....................................................................................................29

# TABLE OF AUTHORITIES

**CASES:**

*Boeckenhaupt v. United States*,
  392 F.2d 24 (4th Cir. 1968) ...................................................................................5

*Bryan v. United States*,
  524 U.S. 184 (1998)...............................................................................................14

*Evans-Smith v. Taylor*,
  19 F.3d 899 (4th Cir. 1994) ....................................................................................4

*Liparota v. United States*,
  471 U.S. 419 (1985)...............................................................................................16

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019)...........................................................................................16

*United States v. Alerre*,
  430 F.3d 681 (4th Cir. 2005) ..................................................................................4

*United States v. Baker*,
  985 F.2d 1248 (4th Cir. 1993) ..............................................................................17

*United States v. Bonner*,
  648 F.3d 209 (4th Cir. 2011) ..................................................................................4

*United States v. Burgos*,
  94 F.3d 849 (4th Cir. 1996) ....................................................................................5

*United States v. Bursey*,
  416 F.3d 301 (4th Cir. 2005) ................................................................................14

*United States v. Eccleston*,
  615 F. App'x 767 (4th Cir. 2015) .........................................................................17

*United States v. Edlind*,
  887 F.3d 166 (4th Cir. 2018) ..................................................................................5

*United States v. Espinoza-Valdez*,
  889 F.3d 654 (9th Cir. 2018) ................................................................................17

*United States v. Fondren*,
  417 F. App'x 327 (4th Cir. 2011) ...........................................................................5

*United States v. Gengler*,
  No. 1:08cr12, 2009 WL 5549225 (E.D. Va. Oct. 23, 2009)..................................17

*United States v. George,*
    568 F.2d 1064 (4th Cir. 1978) ........................................................................18

*United States v. Grace,*
    367 F.3d 29 (1st Cir. 2004)...............................................................................5

*United States v. Hammond,*
    371 F.3d 776 (11th Cir. 2004) ...........................................................................4

*United States v. Herberman,*
    583 F.2d 222 (5th Cir. 1978) .............................................................................4

*United States v. MacCloskey,*
    682 F.2d 468 (4th Cir. 1982) .............................................................................4

*United States v. Nukida,*
    8 F.3d 665 (9th Cir. 1993) .................................................................................4

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994)...........................................................................................16

*Universal Health Servs., Inc. v. United States, ex rel. Escobar,*
    136 S. Ct. 1989 (2016).....................................................................................26

**STATUTES:**

18 U.S.C.
    § 951...............................................................................................................7
    § 951(a).........................................................................................................14

22 U.S.C.
    § 612(a).........................................................................................................14

**OTHER AUTHORITIES:**

28 C.F.R. § 73.1(f) .............................................................................................13

2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 461 (2d ed. 1982) ......................4

FED. R. CRIM P.
    29(a)..........................................................................................................3, 7
    29(b)............................................................................................................3

FED. R. EVID. 104(a) .........................................................................................6

## I.      PRELIMINARY STATEMENT

In reserving decision on the Defendant's Rule 29 motion, the court observed, in line with its suggestions at other times in this case, that

> [t]here are very substantial issues with respect to the sufficiency of the evidence as to many of the elements of both counts.  It's all very, very circumstantial.  Much of it is very speculative.

Trial Tr. 850:23-851:2 (July 18, 2019), ECF No. 334.  The question now before the court is whether that "very speculative" evidence is nevertheless substantial enough to allow the jury to determine whether Bijan Rafiekian is guilty of the charged offenses beyond a reasonable doubt.

Here is the fundamental problem with the government's case:  It is bereft of evidence that would allow a reasonable jury to conclude Rafiekian agreed with anyone else to commit a *crime*.  The record reveals that Turkey may have been aware of FIG's work; that Turkey also may have been aware of FIG's retention by Inovo; and that Rafiekian hoped to be engaged by Turkey and was working toward that goal.  But no aspect of that statement is a crime, and it certainly does not meet the elements of the crime with which Rafiekian was charged—which was conspiring to (a) act as an agent of a foreign government and then (b) hide what he was doing from U.S. government.  Even viewing the evidence (including the proffered hearsay evidence) in the light most favorable to the government, there is no evidence of either one.

Importantly, this is not a case where the underlying conspiracy is clear, and the only question is whether Rafiekian joined it.  The government has not suggested that Rafiekian passed along classified information, or otherwise broke U.S. law in such a way that would reasonably imply a clandestine, conspiratorial arrangement.  It has not introduced emails, Skype messages, or testimony reflecting a request or wish by Turkey to hide any relationship from the U.S. government.  Nor is this a case where credibility determinations play a major role:  The

government introduced no testimony from General Flynn, nor from any other coconspirator or cooperating witness, that would require the jury's particular expertise. For the most part, the government's witnesses all testified consistently about the identity of the actual client FIG served—Inovo BV—and what Rafiekian said and did. In other words, this is not a typical case where the jury must weigh dueling inferences or resolve clear conflicts in trial testimony.

Instead, this is a case where the government has asked the jury to speculate that, by working on a commercial project for a paying client that was largely (though not fully) aligned with Turkey's goals, with knowledge of Turkey's interest, Rafiekian both (a) agreed to act under Turkey's direction and control, and (b) agreed to do so while hiding that fact from the proper authorities. But there is an equally plausible (indeed, far more plausible) narrative: that there never was any such agreement, and that if FARA registration was required at all, the failure to file was the result of good faith reliance on erroneous legal advice, not criminal intent. Without evidence from which to infer an actual agreement to hide Turkey's alleged involvement in the project, it would be nothing more than speculation for the jury to choose one narrative over the other.

Without substantial evidence of an agreement to act as an unregistered foreign agent or to willfully file a false form, there is no conspiracy and no knowing and deliberate entrance into that conspiracy for purposes of Count I. Nor is there evidence of a conspiracy to make *material* false statements or omissions, particularly when the FARA form—which disclosed Alptekin's pre-engagement conversations with Turkish officials, disclosed the September 19 meeting, suggested that Turkey could be considered the principal beneficiary of FIG's work, and disclosed the project's focus on Gulen in multiple places—is read in its entirety.

If anything, the evidence adduced in the government's case is flatly inconsistent with the charged crimes. The evidence is uncontested that Rafiekian twice sought out legal advice regarding whether FIG "needed to register under FARA." Trial Tr. 270:17-271:7 (July 17, 2019), ECF No. 326. Every insider witness uniformly testified that FIG was working for Alptekin and Inovo—the actual "client"—not Turkey, the big fish that FIG had not yet landed. *E.g.*, Trial Tr. 410:13-411:19 (July 17, 2019) ECF No. 330 (McCauley). And the government's proposed inference—that Rafiekian and General Flynn retained an expert law firm to spend hundreds of hours reviewing FIG's records (and incurring hundreds of thousands of dollars in fees), all with the ultimate goal of lying on that form—is not a reasonable one. All of this evidence, along with a great deal more, "substantially undercut[s]" any reasonable inference that Rafiekian was seeking to hide the truth from the U.S. Government. Mem. Op. & Order 29 (July 9, 2019), ECF No. 292 ("Mem. Op.").

In the end, the government's evidence leaves the Court with a record for which legal commercial conduct is equally (if not more) plausible than a conspiracy to unlawfully hide foreign agent status from the U.S. government. Because the government is ultimately asking the jury to speculate about whether Rafiekian's conduct was illegal, this Court can and should exercise its authority to enter a judgment of acquittal under Rule 29 on Counts One and Two.

## II.   LEGAL STANDARD

Rule 29 provides that the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM P. 29(a). Rule 29(b) permits the court, upon reserving a decision, to "submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." *Id.* 29(b). In doing so, the court "must decide the motion on the basis of the

evidence at the time the ruling was reserved," *id.*, though it may also consider evidence introduced by defendant to support "the grant of a judgment of acquittal," *see United States v. Hammond*, 371 F.3d 776, 779 (11th Cir. 2004).

In deciding such a motion, the court must consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). Substantial evidence, in turn, is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (citation omitted).

"While all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994). Thus, "a trial judge has the duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to defendant's guilt." *United States v. Herberman*, 583 F.2d 222, 231 (5th Cir. 1978). For example, a Rule 29 judgment of acquittal was affirmed by the Fourth Circuit where the government's case rested on "missing, flawed, or contradictory facts" that lead to the conclusion that no reasonable trier of fact could hold defendant guilty beyond a reasonable doubt. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011).

In this way, Rule 29 "is an important safeguard to the defendant," in that "[i]t tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE

4

§ 461, at 637–38 (2d ed. 1982)); *see United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004) ("Rule 29 protects a defendant against an improper or irrational verdict of the jury") (internal quotation marks omitted).  In making that determination, the court must look at "the complete picture that the evidence presents."  *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996).

Although the government stresses that Rule 29 is "confined to cases where the prosecution's failure is clear," Br. 8 (citing *United States v. Edlind*, 887 F.3d 166, 172 (4th Cir. 2018)), the failure is evident in this case.  Nor are such failures particularly unusual in Section 951 cases:  Of the fewer than 100 cases citing 18 U.S.C. § 951 on Westlaw, Defendant is aware of at least two judgments of acquittal on Section 951 or related conspiracy counts in the Eastern District of Virginia alone.  *See United States v. Fondren*, 417 F. App'x 327, 330–31 (4th Cir. 2011) (noting that the Hon. Claude M. Hilton of the Eastern District granted judgment of acquittal with respect to both Section 951 count and related conspiracy count); *Boeckenhaupt v. United States*, 392 F.2d 24, 25 n.1 (4th Cir. 1968) (noting that the Hon. Oren R. Lewis of the Eastern District granted judgment of acquittal with respect to conspiracy to act as a foreign agent without registering).  That was true, moreover, notwithstanding manifest espionage-related activity in those cases:  The defendant in *Fondren*, a government employee, separately was convicted of passing along classified information to the Chinese and Taiwanese governments in exchange for cash, while in *Boeckenhaupt*, the defendant, an Air Force sergeant, separately was given a 30-year sentence on espionage charges after being caught surreptitiously meeting and accepting money from a member of the Soviet embassy.

The Court has previously recognized "some tension between the [standard pertaining to] preliminary findings for the purposes of an evidentiary ruling" in its July 9 Order—which held that the government had not yet established a conspiracy by a preponderance of the evidence—

"and the standard pertaining to a Rule 29 motion." Trial Tr. 822:5-7 (July 18, 2019), ECF No. 334. Although it is true that the Court was not applying the Rule 29 standard in its July 9 Order, it is also true that the Court was not merely replicating the jury's role. For example, "the court [was] not bound by evidence rules, except those on privilege," Fed. R. Evid. 104(a)—meaning that it was looking at a broader universe of evidence than what it may consider on a Rule 29 motion, including obvious hearsay and other inadmissible (or otherwise non-admitted) evidence. In addition, although the Court was not bound to view the evidence and inferences in the light most favorable to the government, the Court nevertheless made several such inferences in the government's favor—including "that the actual contract between Inovo and FIG was entered into by Inovo on behalf of and at the direction of the Turkish government." Mem. Op. 29. Accordingly, there would indeed be "tension" in allowing the jury to reach a verdict despite the Court's July 9 ruling on the failure of proof as to conspiracy.

As explained in detail below, there is no basis for the Court to revisit its July 9 ruling on the co-conspirator exception: the government has not proffered sufficient evidence to prove a conspiracy by a preponderance of the evidence, and the jury should not be permitted to consider unreliable out-of-court statements by Emil Alptekin or General Flynn for their truth.[1] But equally important is that, regardless of whether, as a technical matter, the Court could allow the case to go to a jury under the Rule 29 standard despite its prior misgivings regarding the existence of a conspiracy, all of the Court's concerns regarding the speculative nature of the evidence remain just as salient today. Even viewed in the light most favorable to the government, the record still requires too much guesswork to determine that Rafiekian actually committed a crime. Rather than

---

[1] The government's Amended Memorandum re-raises certain legal arguments regarding the admission of co-conspirator statements, including its flawed "joint venture" argument. *See* Br. 3-7. Because Defendant does not understand the government to be making any new legal arguments, however, Defendant respectfully asks to incorporate by reference its prior briefing on this issue. *See* ECF Nos. 155, 204, 230, and 322.

tolerate a jury verdict that would necessarily be based on speculation instead of substantial evidence, the Court should exercise its Rule 29 authority to end this prosecution now.

## III.   ARGUMENT

In reserving judgment on Defendant's Rule 29 motion, this Court has already found serious issues with respect to "many of the elements of both counts." If the Court concludes, after a further review of the evidence, that there is a lack of substantial evidence with respect to even one element of either count, it "*must* enter a judgment of acquittal" for that count. FED. R. CRIM. P. 29(a) (emphasis added). Rafiekian urges the court to do so with respect to both counts.

### A.   The Government Failed To Introduce Substantial Evidence That The Defendant Acted As An Unregistered Foreign Agent

To survive a Rule 29 motion with respect to Count Two, the government must proffer substantial evidence in support of each of the following elements: (1) the Defendant acted in the United States as an agent of the government of Turkey; (2) the Defendant was not engaged in a legal commercial transaction; (3) the Defendant was required to give notice to the Attorney General and failed to do so; and (4) the Defendant acted knowingly. 18 U.S.C. § 951. The government has failed to meet this burden with respect to each of these elements.

#### 1.   *The Government Failed to Proffer Substantial Evidence of Direction and Control by Turkey*

**a.** The government's evidence in support of Count Two fails at the most basic level. It has failed to offer any proof, beyond mere speculation, that the Defendant acted under the direction and control of the Turkish government. Instead, the evidence shows the opposite: that everyone associated with FIG understood Inovo and Alptekin gave the orders, not Turkey; that Inovo and Alptekin paid for FIG's services; that Turkey never gave FIG or Rafiekian any instructions; and that Turkey took no steps to hide its *actual* agency relationships.

7

*First*, the evidence shows it was Alptekin himself who was the client, not Turkey. For example, it was Alptekin, not any Turkish official, who participated in the project's weekly update calls. Trial Tr. 465:17-21 (July 17, 2019), ECF No. 330 (Boston) ("And just generally, what was Alptekin's role during those 30-minute weekly update calls? A: I saw him as the client asking questions about our progress and as we informed him as to where we were with the project."). There is no evidence that any member of the Turkish government participated in these calls, nor is there any evidence (not even hearsay evidence) of anything that Alptekin said that conveyed that he was in contact with Turkish officials after the project began or that he was passing on requests from the Turkish government to FIG.

In fact, not a single witness with personal knowledge of the engagement testified that they thought FIG was acting under the direction and control of the government of Turkey:

- **McCauley**: "Q: And you understood that Inovo was the client for the work that you were doing, correct? A: yes, sir." Trial Tr. 440:5-7 (July 17, 2019), ECF No. 330.

- **Boston**: "Now, again, who did you understand was the client for this project? A: Inovo BV. Q: And who was the individual that you were dealing with as the client? A: Ekim Alptekin." *Id.* at 465:1-6.

- **Miller**: "Q: [A]t this time as of Halloween 2016, what was your understanding as to who the client was? A: It was Inovo. Q: And was there any particular individual associated with Inovo? A: Yeah, Ekim Alptekin." Trial Tr. 623:10-13 (July 17, 2019), ECF No. 331.

- **Lowman**: "I never heard anything related to the Turkish government being the client." Trial Tr. 686:22-23, (July 18, 2019), ECF No. 333.

- **Courtovich**: "There was never a discussion of Turkish officials' involvement." Trial Tr. 713:4-5 (July 18, 2019), ECF No. 333. "[W]e definitely knew it was a Turkish businessman who was leading the effort." *Id.* at 715:21-22.

These are not men who would be easily duped.  Brian McCauley was a deputy assistant director of the FBI, and all of them are accomplished and experienced professionals.[2]

*Second*, the government did not offer a single piece of evidence from which a reasonable inference could be drawn that the government of Turkey paid for the engagement.  Instead, the evidence shows that Alptekin paid for the engagement himself.  FIG's bank statements, for example, show that Alptekin made the payments to FIG from his own bank account.  GEX 25A, 34.  There is no evidence in the record to suggest that the government of Turkey advanced these funds to Alptekin or reimbursed him for the cost of the engagement.

McCauley's testimony is decisive on this point.  McCauley testified about a meeting between Alptekin and members of FIG and Sphere in early November 2016, in which Alptekin expressed displeasure regarding FIG's progress:

> Q:     What did Michael Boston present to Alptekin?
>
> A:     He presented him a PowerPoint slide presentation with a cover page, Mr. Monopoly, a guy, you know, running with the money.
>
> Q:     What did Alptekin do with the PowerPoint presentation?
>
> A:     He looked at it, and he said:  *I paid for this?*  And he slid it across the table. . . .  He was very dismissive, and he said:  *I paid for this?  This is what I paid for?*

Trial Tr.  431:17-432: 4 (July 17, 2019), ECF No. 330 (emphasis added).[3]

---

[2] Although the evidence uniformly shows that Alptekin/Inovo were the client, it bears noting that FIG did not even consistently follow *Alptekin's* direction—let alone some phantom "direction" from Turkey.  The record reveals numerous instances in which FIG disagreed with Alptekin or rejected his requests out-of-hand.  For example, while Alptekin may have wanted to see Gulen extradited, FIG determined this would be counter-productive to the goal of discrediting Gulen.  Trial Tr. 525:7-526:24, 528:13-16 (July 17, 2019), ECF No. 331 (discussing FIG's recommendation to withdraw extradition request); GEX 43B at 2 (same).  McCauley also testified that Alptekin wanted FIG to get "dirt" on Gulen, conduct video and audio surveillance on Gulen and his associates, and prove that Gulen was a "terrorist."  Trial Tr. 424:2-425:12, 442:13-442:22 (July 17, 2019), ECF No. 330.  FIG rejected each of these requests and conducted no such work.  *Id.* at 444:20-22 ("Q:  So every request that he [Alptekin] made of you in your presence, you basically rejected, correct?  A:  Correct, yes, sir.").

[3] The Defendant maintains that all of Alptekin's out-of-court statements, including this one, are hearsay and are inadmissible to prove the truth of the matter asserted.  If the Court agrees, this statement would still be admissible to prove its effect on the Defendant, to show that he reasonably believed Alptekin was funding the engagement on his

For its part, the government conceded it did not even try to obtain evidence from Turkey that might support its speculation that the engagement was, in fact, funded by the Turkish government.  Trial Tr. 384:22-385:1 (July 17, 2019), ECF No. 330 (Smith) ("Q:  [Y]ou made no request for financial information from Turkey, correct?  A:  Correct."); *id.* at 387:4-9 (Smith) ("Q:  But the bottom line, as far as the government's investigation was, they didn't even try to get this information, correct?  A:  Yes, sir.  Q:  That's correct?  A:  Yes, sir.").  In the absence of any actual records linking Alptekin's money to Turkey, the government tries to fill in the gaps with highly speculative circumstantial evidence.  For instance, the government attempts to transform an urgent request by Alptekin for FIG's electronic banking information into a "suggest[ion], at least, that Alptekin was essentially walking around with a suitcase full of cash."  Trial Tr. 835:13-20 (July 18, 2019), ECF No. 334.  That is exactly the sort of rank speculation that a jury should not be permitted to make.

*Third*, the evidence does not show even a single request from Turkey to FIG or Mr. Rafiekian during the entire purported conspiracy.  Indeed, the record reveals only a single contact between Turkish officials and FIG during—namely, a 25-30-minute meeting on September 19, 2016 with two Turkish officials in New York City.  Trial Tr. 409:4-5 (July 17, 2019), ECF No. 330.  McCauley was the only witness who attended this meeting, and he testified without hesitation that there was no discussion of the work FIG was doing, and the Turkish officials did not ask or direct the FIG representatives to do anything.  *Id.* at 440:14-17 ("Q:  And at this meeting, there was really no discussion at all of FIG and any work that FIG was doing, correct?"  A:  No, sir, there wasn't."); *id.* at 442:1-3 ("Q:  But there was no request from any Turkish official for Flynn Intel Group to do anything?  A:  No, sir.").  Other than that September 19 meeting, the government introduced no

---

own.  If the Court does admit this statement for its truth under Rule 801(d)(2)(E), then it is conclusive evidence that Alptekin paid for the project himself.

evidence of any contact between Rafiekian (or any other member of FIG) and any member of the Turkish government.[4]

*Finally*, the evidence shows that Turkey does not ordinarily hide its involvement for this type of project.  Turkey was perfectly willing to engage consultants in its own name (and pay out of its own pocket) for highly similar projects—and it was perfectly willing to do so publicly.  The evidence shows that the government of Turkey retained Amsterdam & Partners on August 28, 2015 for the specific purpose of investigating and exposing Gulen.  Trial Tr. 897:13-14 (July 18, 2019), ECF No. 334 (Durkovic) ("We were retained to investigate and expose Fethullah Gulen and his criminal network in the United States.").  The government of Turkey retained Amsterdam in its own name and paid Amsterdam with its own funds, and the retention was publicly disclosed.  DEX 69 (contract between Amsterdam and the Embassy of the Republic of Turkey; the header to the contract states it was "Received by [the] NSD/FARA Registration Unit").  Having publicly retained Amsterdam in 2015, it makes no sense that the government of Turkey would then hire a second firm in secret to conduct essentially the same work.  *See* Trial Tr. 428:10-18 (July 17, 2019), ECF No. 330 (noting significant redundancy between FIG's work and work already performed by Amsterdam); GEX 146B at 1 ("I kept uncovering information already acquired by attorney Anderson [Amsterdam].").

The evidence also showed that the government of Turkey requested a proposal from Sphere for work that was very similar to the work Sphere performed for FIG and Inovo.  The evidence shows that Alptekin arranged for the Turkish government to request an RFP from Sphere; Sphere

---

[4] McCauley offered testimony that after the September 19 meeting, the Defendant informed him that FIG had gotten the contract with Inovo.  This testimony cannot be correct, however, because the documentary evidence shows that the contract between FIG and Inovo was signed on September 8, eleven days before the meeting in New York (GEX 151B), and Alptekin sent the first payment under the contract on the same day (GEX 25A).  It is clear that either McCauley misheard, misremembered, or misunderstood the context of the Defendant's remarks.

then sent a proposal directly to a member of the Turkish government; and then Sphere met in person with members of the Turkish government at their embassy.  Trial Tr. 651:6-9 (July 17, 2019), ECF No. 331 (Miller) ("He [Alptekin] connected us -- or informed us that there is an RFP, and we met with the embassy as a result of that."); Trial Tr. 730:22-24 (July 18, 2019), ECF No. 333 (Courtovich) ("We received an e-mail from the deputy chief of mission at the Turkish embassy to come and present a full overview . . . ."); *id.* at 753:9-12 (Courtovich) (stating that Sphere met personally with the Turkish government in connection with the RFP); DEX 51 (January 25, 2017 email from Courtovich to a Turkish government official, attaching Public Affairs Proposal).  This is how the government of Turkey operates when it seeks to engage a U.S. company:  directly and openly through its embassy, not through secret back channels.

In sum, it is not an exaggeration to say that there is no evidence whatsoever linking any directions or requests from Turkey to the Defendant or FIG.

**b.**  Rather than rely on any direct showing of direction and control, the government would have the jury make a "leap of logic" from *Alptekin's* contacts with Turkish officials to prove that *Rafiekian* was acting as an agent of Turkey.  But there is no evidence that any Turkish officials asked Alptekin to do anything in connection with the project, either, nor is there evidence that Alptekin gave updates on the project or forwarded any of FIG's work to the Turkish government.  Indeed, after the engagement was formalized on September 8, 2016 (GEX 151B), there is no evidence that Alptekin communicated with Turkish officials at all other than in connection with the September 19 meeting (which entailed no discussion of the project, Trial Tr. 409:9-11 (July 17, 2019), ECF No. 330).

It is true that certain documents contain hearsay statements made by Alptekin prior to the signing of the engagement letter referencing communications between Alptekin and various

Turkish officials.  Because the government has not laid a foundation for their admission under Rule 801(d)(2)(E) (or any other hearsay exclusion or exception), they cannot be considered in determining whether Turkey directed and controlled the project.  But even if the Court considers these statements for their truth, they do not suffice to meet the government's burden of presenting substantial evidence showing Turkey's direction and control of the project, particularly given the evidence (and lack of evidence) in the entire record regarding control:  the uniform belief that the client was Inovo; the absence of evidence showing Turkey's involvement in the project after the engagement letter was signed; the absence of evidence showing that Turkey funded the project; and the fact that the Turkish officials did not even discuss the project at the September 19 meeting.  At most, Alptekin's statements show that the Turkish government was aware of (and approved of) the project—there is no evidence that the Turkish government *directed* or *controlled* the project.

2.      *The Government Failed to Proffer Substantial Evidence That the Defendant Was Not Engaged in a Legal Commercial Transaction*

To prove its Section 951 charge, the government must also prove beyond a reasonable doubt that the Defendant was not engaged in a legal commercial transaction.  The government failed to proffer substantial evidence to meet this element.

A "legal commercial transaction" means "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations."  28 C.F.R. § 73.1(f).  The government contends this element is met because the Defendant's conduct violated FARA.  Addressing this argument, the Court has held that "the Defendant's actions would violate FARA, and therefore be illegal, if they are covered activities [under FARA] and Rafiekian willfully engaged in them as an agent of the Turkish government and without a proper FARA registration."  Mem. Op. 24.  Thus, to prove the absence of a legal commercial transaction, the government must

13

prove (1) that the Defendant violated FARA and (2) that the Defendant did so willfully.   The government has not offered substantial evidence in support of either element.

To prove a violation of FARA, the government acknowledges that it must, at a minimum, prove that the Defendant acted as an agent of a foreign principal without registering.  *See* 22 U.S.C. § 612(a); Gov't Opp'n to Def.'s Legal Commercial Transaction Jury Instruction 1 (government acknowledging that it must "prove that [Rafiekian's] acts constituted conduct prohibited by FARA").  As discussed above, the government has not offered substantial evidence of this fact. The government has also suggested it can establish a violation of FARA by showing that the Defendant acted as an agent of Alptekin or Inovo, rather than the Turkish government.  Trial Tr. 927:14-22 (July 20, 2019), ECF No. 339.  But that is insufficient as a matter of law:  Section 951 requires proof that the Defendant acted as an agent of a foreign *government*, not just a foreign company.  18 U.S.C. § 951(a).  If the Defendant was acting solely as an agent of Alptekin or Inovo, then the government cannot prove the Section 951 charge.

In addition, the government failed to proffer substantial evidence that the defendant acted willfully.   To prove that the Defendant acted willfully, the government must show that the defendant "acted with knowledge that his conduct was unlawful" and acted with a "bad purpose" or "culpable state of mind."  *United States v. Bursey*, 416 F.3d 301, 309 (4th Cir. 2005) (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)); *see also Bryan*, 524 U.S. at 191 ("[I]n the criminal law ['willfully'] also typically refers to a culpable state of mind," and "[a]s a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'").

Here, there is no substantial evidence showing that the Defendant acted with "knowledge that his conduct was unlawful."   On the contrary, the evidence shows that he fully intended to register under FARA and sought out legal advice on two occasions to do so.  Robert Kelner testified

that he had a "direct conversation with Mr. Rafiekian [in August 2016] . . . about whether or not they needed to register under FARA."  Trial Tr. 270:25-271:9 (July 16, 2019), ECF No. 326.  The evidence also shows that the only reason the Defendant did not file under FARA was that he was advised by another attorney, Robert Kelley, that he could register under the LDA instead.  Kelley's testimony was clear:  Rafiekian called him in the first week of September 2019 and said, "we have to register at FARA, the Justice Department Foreign Agents Registration Act."  Trial Tr. 856:17-23 (July 18, 2019), ECF No. 334; *see also id.* at 857:18-19 ("He said that I have to -- the firm has to register at the Foreign Agents Registration Act.").  Shortly thereafter, Kelley visited Rafiekian's home to discuss the matter further, and Kelley advised that because FIG's client was a private company, FIG could register under the LDA rather than FARA:  "I said that I was -- is it a foreign government or a foreign political party, and he said, no, it's a private company.  And I said, You don't have to register at FARA.  You can register at [] Lobbying Disclosure Act in the Congress."  *Id.* at 858:4-8.  Although the government contends that Rafiekian failed to give Kelley the full picture, that misses the key point, which is that Rafiekian sought out legal advice for the express purpose of finding out "whether or not they needed to register under FARA" from multiple lawyers.  That conduct alone obviates willfulness—regardless of the questions asked by counsel or the quality of the legal advice ultimately given.  It is not the client's responsibility to figure out what questions the lawyer should be asking.  Any suggestion that the Defendant *willfully* violated FARA cannot be reconciled with the Defendant's consultations with counsel.[5]

---

[5] As discussed in more detail below, McCauley's testimony that Rafiekian wanted to "keep it under the radar" does not change the analysis.  McCauley testified that this conversation took place after the September 19 meeting—and therefore after Rafiekian had already received legal advice from Kelley that he did not need to file under FARA, which Kelley testified took place in the first week of September.

### 3. The Government Failed to Proffer Substantial Evidence That the Defendant Was Required to Notify the Attorney General

For the same reasons discussed above, the government has also failed to proffer substantial evidence to meet the third element of Section 951—that the Defendant was required to give notice under Section 951. The government failed to proffer substantial evidence that the Defendant was acting as an agent of the government or Turkey or that the Defendant was not engaged in a legal commercial transaction. As such, the government failed to show that the Defendant or FIG was required to give notice under Section 951.

### 4. The Government Failed to Proffer Substantial Evidence That the Defendant Acted Knowingly

Lastly, the government failed to proffer substantial evidence that the Defendant acted knowingly. Where a statute criminalizes otherwise innocent conduct, the scienter requirement applies to *each* element of the crime. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) ("[T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."); *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (describing the same "longstanding presumption, traceable to the common law," which applies "even when Congress does not specify any scienter in the statutory text").

Rafiekian's activities were "otherwise innocent." This Court has already held that "Rafiekian's lobbying and op-ed activities fall well within the definition of legal commercial transactions unless" prohibited by FARA. Mem. Op. 23. As a result, to prove a violation of Section 951, the government must prove that (1) the Defendant knew he was acting as an agent of a foreign government, (2) the Defendant knew he was not engaged in a legal commercial transaction, and (3) the Defendant knew he was required to give notice to the Attorney General. With respect to that last element, the government must prove, at a minimum, that the Defendant knew that his failure to register would violate FARA. *See Liparota v. United States*, 471 U.S. 419,

16

426 (1985) (holding that similar statute criminalizing otherwise innocent conduct required defendant to know that his conduct was unauthorized by statute or regulations); *see also* Mem. in Support of Proposed Jury Instructions 11 (July 14, 2019), ECF No. 313 (discussing *Liparota*, *Rehaif*, and related cases).  For all of the reasons discussed above, the government has not offered substantial evidence to support these elements in light of the requisite *mens rea*.

> **B.   The Government Failed To Offer Substantial Evidence That Defendant Knowingly And Deliberately Conspired To Take Unlawful Action**

To prove a conspiracy, the government must demonstrate (1) an unlawful agreement between two or more people to commit a crime—namely, to knowingly act as an unregistered foreign agent or to willfully make false statements and omissions of material fact in a FARA filing; (2) that Rafiekian knew about the objects of the conspiracy; (3) that Rafiekian knowingly and willingly agreed to join that conspiratorial endeavor; and (4) an overt act committed in furtherance of the conspiracy within the Eastern District of Virginia.  Because the essence of a conspiracy is an "agreement" to commit a criminal act, *United States v. Baker*, 985 F.2d 1248, 1255 (4th Cir. 1993), "simple presence or association" with another is not enough to establish a meeting of the minds to do something unlawful, *United States v. Eccleston*, 615 F. App'x 767, 790 (4th Cir. 2015); *see United States v. Gengler*, No. 1:08cr12, 2009 WL 5549225, at *14 (E.D. Va. Oct. 23, 2009) (even "a shared common goal" does not, "by itself, . . . establish an agreement to violate the law"); *see also United States v. Espinoza-Valdez*, 889 F.3d 654, 657 (9th Cir. 2018) ("[T]he government has the obligation to establish not only the opportunity but also the actual meeting of minds.  Mere association and activity with a conspirator does not meet the test.") (citation omitted).

The government failed to proffer substantial evidence of Rafiekian's agreement with respect to either alleged unlawful object.

1.    *The Government Failed to Introduce Substantial Evidence That Rafiekian Agreed With Anyone to Act as an Unregistered Foreign Agent*

The government's evidence fails to demonstrate the existence of an agreement between Rafiekian and anyone else to act as an agent of the government *without prior notification to the Attorney General*—the crime with which Rafiekian is charged.  This Court has already recognized that discussions between Alptekin and Rafiekian concerning the retention of FIG do not "on their face reflect or suggest any agreement to have Rafiekian operate as an undisclosed Turkish agent or cause the filing of a false FARA statement."  Mem. Op. 28.  Moreover, the Court has already determined that none of the following would demonstrate, even by a preponderance of evidence, the existence of the charged conspiracy:  (i) the interest of the Turkish government in the project; (ii) that Alptekin/Inovo could be viewed as acting on behalf of the Turkish government; (iii) that the actual contract between Inovo and FIG was entered into by Inovo on behalf of and at the direction of the Turkish government; and (iv) that FIG was acting at the direction and under the control of Inovo.  *Id.* at 28, 29.  The bottom line is that the Court could not "sufficiently infer from [the government's] evidence that Rafiekian was conspiring to act as an undisclosed Turkish agent or to cause the filing of a false FARA statement."  *Id.* at 29.

The evidence at trial has done nothing to alter this conclusion.  Instead, as discussed in Part A above, the evidence shows that the Defendant did not act as an agent of the government of Turkey and did not knowingly or willfully fail to register under FARA or Section 951.  This compels a conclusion that the Defendant did not *agree* to act as an agent of Turkey, and he could not logically have *agreed* to hide that fact (because there was in fact nothing to hide).  *See United States v. George*, 568 F.2d 1064, 1072 (4th Cir. 1978) (reversing conspiracy conviction because, where "the thing actually done[,] . . . standing alone, does not constitute [a substantive violation of conducting an illegal gambling business], the agreement to do that thing cannot be said to be an

18

illegal conspiracy in contravention of § 371"). Although circumstances may exist where a defendant may be found guilty of a conspiracy even if the underlying substantive offense is not completed, this is not one of those cases. If the Court determines that the government has not proffered substantial evidence sufficient to withstand dismissal of Count Two, it follows that the Court should dismiss Count One as well.

The government, in its papers and at argument, has suggested that certain new evidence presented at trial overcomes the prior defects this Court found in its July 9 Order and provides substantial evidence of a conspiracy. The government is incorrect.

**New Skype communications.** The government has suggested that certain Skype communications between Alptekin and Rafiekian were not presented to the Court at the time of the July 9 Order. To be clear, many Skype communications—presumably the ones the government considered most significant—were quoted or summarized in the Superseding Indictment. *See, e.g.*, Indictment ¶ 20, 21, 41 (May 24, 2019), ECF No. 141 (describing Skype communications).

To the extent the Skype chats the government now relies on reflect "new" information, and the court decides to admit them over Rafiekian's hearsay objections, they are of the same sum and substance as the evidence this Court already reviewed, *i.e.*, evidence permitting the reasonable inference that Turkey was supportive of the project, that Alptekin was meeting with Turkish officials, and that Alptekin was supportive of the Turkish government's goals. Br. 17-19; *see, e.g.*, GEX 67J (Alptekin's hearsay statements that he "will send the agreement" and had "just left pm's office" on September 8, 2019). But nothing in those Skype communications (most of which occurred prior to FIG's engagement by Inovo was formalized on September 8, 2016) would allow a rational trier of fact to draw the inference the government seeks. Even if those communications establish that Rafiekian was agreeing to act as an agent of the Turkish government (and for reasons

19

already discussed, they do not), those communications do not permit the reasonable inference that Rafiekian was agreeing to hide that fact from the U.S. Government.

**The November 2 Meeting.**   At the Rule 29 hearing, the government stressed Courtovich's testimony that, at a November 2 meeting at FIG's office, Alptekin conveyed disappointment to Rafiekian and FIG that there had been no Congressional hearings, media coverage, or DOJ action with respect to Gulen, and claimed "what am I going to tell Ankara?"  Trial Tr. 723:3-6 (July 18, 2019), ECF No. 333.   Given Mr. Alptekin's role as a prominent Turkish businessman, it is speculative to assume that the reference to "Ankara" is to the Turkish government; it may equally have been referring to the extensive evidence that Alptekin was running point for a group of Turkish businessmen.   *E.g.*, Trial Tr. 395:19-24 (July 17, 2019), ECF No. 330 (McCauley) (describing how Rafiekian "said there was some wealthy Turkish businessmen who would be -- we'd be working for some wealthy Turkish businessmen through a company in Copenhagen"); Trial Tr. 628:8-9 (July 17, 2019), ECF No. 331 (stating that the Defendant described the client as a "collection of business interests or individuals"); Trial Tr. 701:13-16 (July 18, 2019), ECF No. 333 (Courtovich) ("[The Defendant] definitely had mentioned that it was Turkey-related or the project would be borne from businessmen or a business -- like a group of business people in Turkey that were looking to do a project.").[6]

Even assuming Alptekin actually made that statement and it implies what the government suggests, it would at most allow a reasonable factfinder to draw the inference that *Alptekin/Inovo* had his own reasons for pleasing the Turkish government, not that "*Rafiekian* was conspiring to act as an undisclosed Turkish agent."  Mem. Op. 29.  And even if the statement shows (contrary to

---

[6] Although the government contends that the idea that Alptekin/Inovo represented the interests of "wealthy Turkish businessmen" (McCauley) or "private businesses" (Sphere) was actually a "false cover story," the government offered no proof, such as Turkish bank records, that might prove this story "false."  Gov't Mem. On Co-Conspirator Statement & Opp'n to Def.'s R. 29 Mot. 6-7 (July 20, 2019), ECF No. Dkt. 341.

all other evidence) that the government of Turkey was directing FIG's work through Alptekin, it does not show any agreement by Rafiekian to be directed or to *hide* that fact.   Indeed, openly admitting in a meeting with multiple FIG and Sphere representatives that "Ankara" was demanding results flatly contradicts the government's theory that Rafiekian had conspired to "not inform other internal personnel at FIG or any of their external consultants about Turkey's known, direct involvement."  Gov't Mem. On Co-Conspirator Statement & Opp'n to Def.'s R. 29 Mot. 6 (July 20, 2019), ECF No.  341.  If anything, this statement shows that Alptekin had his own separate motives to please the Turkish government (and, according to McCauley, that FIG was not doing a very good job of taking direction from Alptekin anyway).

The government also points to email correspondence from Rafiekian to Alptekin shortly after this meeting, wherein Rafiekian attaches a draft of the General Flynn op-ed and notes, "A promise made is a promise kept."  *See* GEX 45A, *see also* GEX 23B and 49.  The op-ed was about Gulen and Turkey, and as the FARA form disclosed, it overlapped with the work that FIG was doing for Inovo. The sensible reading of the ambiguous "promise kept," and the only evidence pertaining to it, is that Rafiekian allowed Alptekin to review the draft prior to publication "for client relations reasons."  Trial Tr. 237:22-25 (July 16, 2019), ECF No. 326 (Kelner).  But even if that statement could reasonably suggest that the op-ed itself was a promise to Alptekin, that would not allow a jury to reasonably infer that Rafiekian sought to fulfill a promise to *Turkey*, or that he agreed to act on Turkey's behalf without registering.

**The "better idea" statement.**  McCauley testified that Rafiekian told him he had a "better idea" than filing under FARA:  he would file under the LDA instead "to keep it under the radar." Trial Tr. 413:1-414:13 (July 17, 2019), ECF No. 330.  The government posits nefarious intent, but that is not a reasonable inference from the trial testimony.  First, it is clear that McCauley (a former

FBI deputy assistant director) did not view it as nefarious at the time, as he continued to work on the matter notwithstanding that there was no FARA registration.   Second, this discussion came after uncontested trial testimony that Rafiekian had already reached out to two lawyers regarding "whether or not [FIG] needed to register under FARA," Trial Tr. 270:14-271:17 (July 16, 2019), ECF No. 326, and after having received advice that registering under the LDA would suffice. Third, McCauley subsequently testified that the reference to keeping it "under the radar" "was to avoid detection by Tony Podesta and other members of Congress who were favorable to Gulen." Trial Tr. 414:11-13 (July 17, 2019), ECF No. 330.   That desire to keep the *subject matter* of the engagement under the radar contradicts the government's theory that Rafiekian was trying to hide the *identity of the true principal* from the U.S. government.   Finally, if Rafiekian had truly been trying to hide foreign involvement, filing a registration form under the LDA—even one referring to a Turkish businessman's company rather than Turkey itself—was not a recipe for keeping Turkish involvement a secret.   In any event, the fact that Rafiekian ultimately filed under the LDA pursuant to legal advice—which is fully consistent with McCauley's testimony—"substantially undercut[s]" "any inference of an agreement by Rafiekian to act as an undisclosed Turkish agent." Mem. Op. 29.

**LDA filing**.   The government asserts that FIG's LDA filing itself falsely listed Kelley as a lobbyist and falsely stated that no lobbying had been performed.   But again, one cannot draw Rafiekian's nefarious intent to hide his foreign-agent status from this testimony.   Kelley testified that the LDA was prepared by Kelley himself, based on his prior experience filing under the LDA and FARA.   Kelley testified that he listed himself as the lobbyist on the form because he believed he would be doing lobbying for FIG and Alptekin.   Trial Tr. 864 8-21 (July 18, 2019), ECF No. 334.   He also testified that he listed two bills, S.1635 and H.1735, as specific lobbying issues on

the LDA form because those were the hearings at which the Secretary of State would testify.  *Id.*
at 866:4-867: 12; *see id.* at 9-19 (noting that "it was. . . .the process that [Kelley] was interested
in, not the bill number").  Kelley also made clear that Rafiekian—who is not himself a lawyer and
has no prior experience filing LDA or FARA forms—did not ask Kelley to put that information in
the form, but rather relied on Kelley's expertise.  *Id.* at 867:13-14.  Miller relied on that advice
too.  *See* Trial Tr. 638:7-640:2 (July 17, 2019), ECF No. 331 (Miller testifying that Sphere was
"comfortable" with Kelley's legal advice after contacting him, and that it ultimately followed suit
in filing under the LDA).  Although Kelley was Rafiekian's friend, the only reasonable inference
is that he called Kelley for legal advice—something that is plain from the fact that Rafiekian had
previously contacted Kelner, another FARA lawyer, about the same issue.  To the extent that Kelley
failed to ask a sufficient number of questions or provided incorrect legal advice, those are Kelley's
failings and cannot be attributed to Rafiekian.

  **Payments.**  The government suggests that the payments Alptekin made to FIG, and that
Alptekin in turn received from FIG, are evidence of an agreement to commit a crime.  In its July
9 order, the Court considered this evidence and found that, "[w]hatever inferences can be
reasonably drawn from that [payment] arrangement, one cannot reasonably infer an agreement or
understanding that Rafiekian would act as an undisclosed Turkish agent or cause the filing of a
false FARA statement."  Mem. Op. 31.  In light of the many other plausible legal explanations for
the payments to Alptekin, such as that they were Alptekin's cut of money raised from "wealthy
Turkish businessmen," Trial Tr. 395:22-24 (July 17, 2019), ECF No. 330, or that they were refunds
for work never performed, the government's assertion that these were "kickback[s]" is nothing
more than bald speculation.  Br. at 20.

No new evidence has come to light at trial with respect to those payments. The government completely failed to establish any link between the money paid to FIG and anyone in the Turkish government. On the contrary, the government's financial records and testimony from Agents Alfredo and Smith reflect that all of the payments came from Alptekin's personal account, and the government made no effort to seek pertinent banking records via an MLAT request to Turkey. Trial Tr. 345:7-346:5 (July 16, 2019), ECF No. 326.

**Efforts to "obscure" Alptekin's role.** The government argues repeatedly that Rafiekian's efforts to "obscure Alptekin's true role as an intermediary for the Turkish government" (Br. 22) from his business associates is further evidence of a conspiracy. Needless to say, there is an equally plausible explanation: that Rafiekian had never agreed to act as an unregistered agent of Turkey, and therefore he was not concealing or "obscuring" anything. All of the evidence cited by the government is, in fact, more consistent with the innocent inference, including the uniform testimony that (1) "Rafiekian inform[ed] the group that he has 'high confidence' FIG is 'about to be engaged by a Dutch client for the above campaign,'"; (2) "Rafiekian never disclosed that the government of Turkey was directly involved in the project"; (3) Rafiekian "told McCauley that '[s]ome wealthy Turkish businessmen were concerned about the future of Turkey, and they were interested in possibly hiring FIG to look at Gulen'"; and (4) Rafiekian told members of Sphere Consulting that "FIG worked for 'private business.'" Br. 22-23. In the absence of any evidence regarding the "true" source of the funding, it would be highly speculative for the jury to assume that all of these consistent statements were actually lies.

**Focus on Gulen.** Finally, the government suggests that FIG's focus on Gulen somehow demonstrates that Rafiekian must have known he was working on Turkey's behalf. But the documents and testimony were very clear that, from the outset of the project, its goals were *both*

to "1) highlight Fethullah Gulen's network of loyalists and his influence over them, and 2) showcase a resilient investment climate in the wake of the recent attempted coup." *E.g.*, Trial Tr. 604:1-5 (July 17, 2019), ECF No. 331.  Those were simply different sides of the same coin. Although it is evident that the FBI does not see any connection, there is no evidence that *Alptekin and Rafiekian* thought there was no connection between Gulen and political and economic instability in Turkey.  In light of the testimony regarding Gulen's possible role in a coup attempt, the two goals were fully consistent.  The same is true for the repeated references to the comparison of Gulen to Ayatollah Khomeini, which likewise show that Alptekin's views were aligned with Rafiekian's.  Regardless, just because the government of Turkey might support many of the same goals as Rafiekian and Alptekin does not lead to the reasonable inference that *Rafiekian* agreed to act as an *agent* of Turkey—much less that he agreed to do so while hiding that information from the U.S. Government.

> 2.   *The Government Failed to Introduce Substantial Evidence That Rafiekian Conspired To File False FARA Statements*

The record also contains no evidence or testimony that Rafiekian either (1) desired false statements or omissions of material fact to be made in a FARA filing or (2) agreed with anyone else to do so.

**a.**  At the outset, it bears keeping in mind what the completed FARA filing actually says. Contrary to the government's intimations throughout trial, the FARA filing discloses all of the following information:

- That FIG's work could be construed to have principally benefited Turkey, *see* DEX0060-0001 ("[B]ecause of the subject matter of Flynn Intel Group's work for Inovo BV, which focused on Mr. Fethullah Gulen, whose extradition is sought by the Government of Turkey, the engagement could be construed to have principally benefitted the Republic of Turkey.");

- That the project "focused" on Mr. Fetullah Gulen, *see* DEX0060-0025 ("Under the contract, Flynn Intel Group conducted open-source research for Inovo and at Inovo's

direction.  The research, which was conducted by independent contractors retained for this purpose, *focused on Mr. Fethullah Gulen and charter  schools in the United States that are associated with, or allegedly associated with, Mr. Gulen*.") (emphasis added);

- That the FIG team met with Turkish principals after the project had begun, as "background for the project," *see* DEX0060-0025 ("In early September 2016, Flynn Intel Group was invited by Mr. Alptekin to meet with a group of government officials from Turkey for the purpose of understanding better the political climate in Turkey at the time, as background for the project.");

- That "Mr. Alptekin consulted with officials of the Republic of Turkey regarding potential work by Flynn Intel Group," DEX0060-0031; and

- That various "consulting" payments were made back to Inovo BV during the course of the project, DEX0060-0031.

These disclosures are presumably why this Court has already correctly held that "what was disclosed in the FARA statement is not sufficient to allow any inference of the alleged conspiracies."  Mem. Op. 29.  The disclosures also underscore the absence of evidence that FIG made any "material" false statements or omissions.  *See* Trial Tr. 947-949 (July 19, 2019), ECF No. 339 (observing that, in the False Claims Act context, "we now know from the Supreme Court that in order to establish materiality, you have to show how the government would have, in fact, been influenced by the particular nondisclosure.  But there's none of that evidence in here; is there?"); *see Universal Health Servs., Inc. v. United States, ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) (noting that this "materiality standard is demanding" and noting that it is the government's burden to introduce "proof of materiality""").

Given that all of these facts were disclosed to the government, nothing in Kelner's testimony permits a rational factfinder to conclude that Rafiekian secretly desired to ensure that they were kept hidden.  Although Kelner testified that he did not have all of Rafiekian's text messages (because FIG had already shut down by the time Kelner was retained), it is undisputed that Covington "received quite a number of e-mails from various people at Flynn Intel Group," Trial Tr. 309:21-23 (July 16, 2019), ECF No. 326, including most of the critical communications

on which the government relies, *see* DEX 102–102M; *see also* Trial Tr. 312:3-314:8 (July 16, 2019), ECF No. 326 (walking through Defense exhibits 102A through 102M and not disputing that he had them in January).

Beyond that, Kelner testified to the thoroughness of Covington's review:  that he collected and reviewed emails, conducted interviews of a number of FIG employees, reviewed the payments to FIG and Ekim Alptekin, and spent hundreds of hours (and incurred hundreds of thousands of dollars in fees) working on the FIG FARA matter.  Given Covington's retention and thorough efforts, it is (at best) a "leap of logic" to suggest that Rafiekian did so in order to conspire to hide the identity of FIG's true principal.

It is true that Kelner testified that he questioned some of Rafiekian's characterizations of certain historical facts.  But that does not permit the reasonable inference that Rafiekian was attempting to file a materially false form.  Kelner, an experienced FARA lawyer, used his judgment and experience in drafting FIG's FARA registration.  Importantly, Kelner testified that Rafiekian reviewed a draft of the FARA filing and repeatedly declined to request changes to Kelner's chosen disclosures.  *See, e.g.*, Trial Tr. 258:19-259:1 (July 16, 2019), ECF No. 326 (although Rafiekian had told Covington in privileged investigative communications that the government of Turkey played no role in FIG's retention, he did not "suggest any edits to that entry in the [final] FARA filing"); *id.* at 259-260 (similar with respect to op-ed); *id.* at 260-261 (similar with respect to New York meeting).  It is again a "leap of logic" to assume that Rafiekian was conspiring to file a false or misleading FARA statement, considering that he never actually insisted that those "false" statements make it into the completed filing.[7]

---

[7] In the FARA forms that it filed, Covington simply represented how the disbursements from FIG were described in FIG's books and records.  Like the other statements Covington carefully drafted in the FARA forms, this statement was unquestionably accurate.

Regardless, even if one could assume that Rafiekian desired to file a false FARA statement, Count One requires evidence that he *agreed with someone else* to provide that false information. The government has offered no evidence that Alptekin, Turkish officials, or anyone else communicated with Rafiekian about what information to put in the FARA filing.  *See* Br. 36. Although the government suggests that the alleged "lies" of Flynn, Rafiekian, and Alptekin match up, their statements are different in the same way different witnesses innocently perceive or remember matters differently.   For example, the government cites General Flynn's (hearsay) statement to Covington that "the best of his understanding" was that Turkey was not involved in Project Confidence "with the *exception* of a meeting that occurred on September 19, 2016, in New York with Turkish ministers at which there was a brief discussion of—or a bit of discussion of the Inovo contract." Br. 35 (citing Trial Tr. 231:13–21 (July 16, 2019), ECF No. 326) (emphasis added).   But Kelner testified that Rafiekian told him something different—"that there *wasn't* discussion of the Inovo contract and he told us that the meeting was *not related* to Project Confidence."  Trial Tr. 260:16-19 (July 16, 2019), ECF No. 326 (emphasis added).[8]  And the Arent Fox letter to Mr. Alptekin does not mention the meeting at all.  *See* GEX 93B.  The government's own evidence thus belies the idea that the purportedly coordinated stories confirm some sort of agreement to lie.

Finally, even if the government is correct that all the statements lined up precisely, the government's argument completely ignores the most plausible inference:  that all of the statements are actually *true*.  The fact that three statements align is only probative of a conspiracy if those statements were false.  As with the rest of its case, the government's evidence simply begs the

---

[8] What Kelner learned from Rafiekian is similar to what he would have learned from McCauley.  Trial Tr. 440:14-17 (July 17, 2019), ECF No. 330 ("Q:  And at this meeting, there was really no discussion at all of FIG and any work that FIG was doing, correct?"  A:  No, sir, there wasn't.");  *id.* at 442:1-3 ("Q:  . . . But there was no request from any Turkish official for Flynn Intel Group to do anything?  A:  No, sir.").

question by assuming illegality from the start, and then asks the jury to make that same logical leap based on "very, very circumstantial" evidence.  Trial Tr. 850:23-851:2 (July 18, 2019), ECF No. 334.  This Court should ensure that the jury does not do so.

## IV.    CONCLUSION

The Court should grant Defendant's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.

Dated: July 21, 2019                              Respectfully submitted,

                                                          /s/ _____
                                                          Mark J. MacDougall (*Pro Hac Vice*)
                                                          Stacey H. Mitchell (*Pro Hac Vice*)
                                                          James E. Tysse (VA Bar #73490)
                                                          John C. Murphy (*Pro Hac Vice*)
                                                          Adam A. Bereston (*Pro Hac Vice*)
                                                          Samantha J. Block (*Pro Hac Vice*)
                                                          *Counsel for Bijan Rafiekian*
                                                          Akin Gump Strauss Hauer & Feld LLP
                                                          2001 K Street, NW
                                                          Washington, DC 20006
                                                          Telephone:  (202) 887-4000
                                                          Fax:  (202) 887-4288
                                                          E-mail:  mmacdougall@akingump.com
                                                                       shmitchell@akingump.com

                                                          /s/ _____
                                                          Robert P. Trout (VA Bar # 13642)
                                                          *Counsel for Bijan Rafiekian*
                                                          Trout Cacheris & Solomon PLLC
                                                          1627 Eye Street, NW
                                                          Suite 1130
                                                          Washington, DC 20006
                                                          Telephone:  (202) 464-3311
                                                          Fax:  (202) 463-3319
                                                          E-mail:  rtrout@troutcahceris.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on the 21st day of July 2019, true and genuine copies of Defendant

Rafiekian's Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29

were sent via electronic mail by the Court's CM/ECF system to the following:

> James P. Gillis
> John T. Gibbs
> Evan N. Turgeon
> U.S. Attorney's Office (Alexandria-NA)
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> Telephone:  (703) 299-3700
> Email:  james.p.gillis@usdoj.gov
> john.gibbs@usdoj.gov
> evan.turgeon@usdoj.gov

*/s/*_____
Robert P. Trout (VA Bar # 13642)