IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:18-CR-457-AJT |
| BIJAN RAFIEKIAN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S REPLY IN OPPOSITION TO DEFENDANT'S
PROPOSED LEGAL COMMERCIAL TRANSACTION JURY INSTRUCTION**

The defense's response to the government's opposition to its jury instruction on 18 U.S.C. § 951(d)'s legal commercial transaction exception makes several incorrect claims about the statutes at issue and the government's theory of the case. Tellingly, the defense does not even attempt to parse the language of Section 951; instead, it just flatly asserts that the defendant can only be found guilty under Section 951 if the government proves a criminal violation of another statute. Both the history of Section 951 and the text of the statutes at issue in this case reveal that the defense is incorrect.

**I.  Section 951 Criminalizes Any Undisclosed Conduct
on Behalf of a Foreign Government**

The predecessor to Section 951 was passed to address a deficiency in federal criminal law and to criminalize otherwise lawful conduct when that conduct was performed on behalf of a foreign government and was not disclosed. In enacting the prohibitions currently found in Section 951, Congress sought to guarantee the U.S. government and public's ability to identify

efforts by foreign governments to shape public discourse in the United States and to influence U.S. government policy.

German activities preceding the United States' entry into World War I gave rise to the predecessor to Section 951. Before the First World War, the United States had "almost no protection against hostile activities," "inadequate protection against the activity of hostile propagandists," and "the few statutes aimed to prevent breaches of neutrality were most inadequate." John Lord O'Brian, *Civil Liberty in War Time*, N.Y. State Bar Ass'n Procs. of the 42nd Ann. Mtg. 275, 278-79 (1919).

In July 1915, Department of Justice agents conducted surveillance of a German attaché in New York City. The attaché apparently dropped his briefcase before a pursuit. The agents recovered the briefcase, which was found to contain documents describing "a sweeping secret campaign, linked to high-ranking German officials, of espionage, sabotage, and propaganda." David Greenberg, The Hidden History of the Espionage Act, Slate, Dec. 27, 2010. The German plans included, for example, plots to take over American newspapers, finance films, and organize domestic movements to agitate in favor of German causes. *Id.*; *Lansing Lays German Propaganda Evidence Before President Wilson; Secret Service Gathering Facts, May Involve Embassy Men, Government Officials Move with Caution in German Spy Inquiry*, N.Y. Times, Aug. 17, 1915, at 1 (hereinafter "1915 Times Article"); *How Germany has Worked in U.S. to Shape Opinion, Block the Allies, and Get Munitions for Herself, Told in Secret Agents' Letters*, N.Y. World, Aug. 15, 1915. These activities prompted concerns about German efforts to influence U.S. opinion about choosing sides in the war. 1915 Times Article at 2.

Against this background, Attorney General Thomas Watt Gregory included in the Attorney General's December 1916 Annual Report to Congress a proposal for "Changes in Laws Affecting Neutrality and Foreign Relations." In the introduction to his proposal, Gregory stated:

> From the experience of this department and of the State Department during the past three years in the administration of law in connection with the relations of this country with Mexico and with the problems arising out of the European war, it has become clear that there is urgent need of a revision of the statute law bearing on our international relations.
>
> Many acts committed in the U.S. in serious violation of its sovereignty and against the peace and safety of its citizens are not now punishable by any Federal criminal law; others are punishable only under unsatisfactory statutes passed in relation to conditions altogether different from those now prevailing.

1916 Ann. Rep't of the Attorney General at 12. The Attorney General emphasized two goals underlying his proposal: (1) the protection of the United States and it citizens, and (2) ensuring U.S. neutrality with regard to its obligations to other nations. *Id.* at 13. The proposal contained seventeen parts, the sixteenth of which eventually became 18 U.S.C. § 951.[1]

As German submarine warfare against commercial vessels—including U.S. vessels—increased in early 1917, and with Britain's February 1917 disclosure of the Zimmerman Telegram, Congress, at the request of President Woodrow Wilson, declared war on Germany in April 1917.

In June 1917, Congress enacted what is now referred to as the Espionage Act to address various threats to domestic security. The Act of June 15, 1917 was captioned "An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the

---

[1] This sixteenth part proposed prohibiting aliens other than diplomatic or consular officers from acting in the U.S. as agents of foreign governments without notice to the U.S. Government.

United States, to punish espionage, and better enforce the criminal laws of the United States, and for other purposes," Pub. L. 65-24 (hereinafter the "1917 Act"). The 1917 Act contained thirteen titles, roughly tracking or incorporating most of the proposals in the 1916 Attorney General report to Congress. Title VIII, Section 3 (Disturbance of foreign relations) contained the precursor to 18 U.S.C. § 951, and provided that:

> Whoever, other than a diplomatic or consular officer or attaché, shall act in the United States as an agent of a foreign government without prior notification to the Secretary of State shall be fined not more than $5,000, or imprisoned not more than five years, or both.

1917 Act, Title VIII § 3. According to the House Judiciary Committee, the 1917 Act was "a result of the recommendations of the Department of Justice and the State Department, and these recommendations were made as a result of the experiences of these departments during the past three years in the administration of law in connection with the relations of this country with Mexico and with problems arising out of the European war." H.R. Rep. 65-30 at 9 (Apr. 25, 1917).

In 1940, Congress amended the sentencing provision of Title VIII § 3, which had been codified at 22 U.S.C. § 233 (Disturbance of foreign relations), to mandate a prison term and raised the maximum sentence by inserting the language, "shall be punished by imprisonment for not more than ten years and may, in the discretion of the court, be fined not more than $5,000." This was part of a general increase in sentences for violations of the 1917 Act. P.L. 76-443. The House Judiciary Committee emphasized—but not with respect to any specific section—the importance of the "certainty of punishment" and a desire for "firmer administration of the criminal law, and sterner punishment of . . . convicted criminals." H.R. Rep. 76-1716, at 2 (March 7, 1940).

In 1948, as part of an overhaul of the United States Code, Congress repealed Title VIII § 3, which had been moved to 22 U.S.C. § 601, and re-enacted it without substantive change as 18 U.S.C. § 951 within Chapter 45 (Foreign Relations). P.L. 80-772, 62. Stat. 683 at 743, 862 (June 25, 1948). In effecting this change, Congress stated that "[n]o inference of a legislative construction is to be drawn by reason of the chapter in Title 18 . . . in which any particular section is placed, nor by reason of the catchlines used in such title." *Id.*

Section 951 was amended several times, including in 1983, when Congress added the "legal commercial transaction" exception in 18 U.S.C. § 951(d). Contrary to the defense's insinuation, the legislative history of the 1983 amendments reveals that Congress never intended to exempt lobbying activities from the statute's ambit. *See* S. Rep. No. 98-225, at 415 (1983) ("The proposed Act is not intended to cover those individuals engaged in routine commercial matters *but is intended to cover individuals who represent foreign governments in political activities that may or may not come within the scope of the Foreign Agent[s] Registration Act*. By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States Government has a necessary interest.") (emphasis added). Despite this statement of intent, the defense claims that the government needs to prove a separate criminal violation in order to prove a violation of Section 951—a rule that would render Section 951 entirely redundant in cases of foreign lobbying. If the legislative history to the 1983 amendments makes one thing clear, it is that Congress intended exactly the opposite of that outcome.

In accordance with the original purpose of Section 951, and as exemplified by the cases cited in the government's opposition, prosecutions are often brought under Section 951 where

there are no underlying criminal violations whatsoever. *See* Dkt. 337 at 2-3.[2] That is not because Section 951 criminalizes innocent conduct, as the defense has repeatedly suggested, but because it criminalizes the failure to disclose working on behalf of a foreign government, as Congress intended.

## II. The Plain Text of the Legal Commercial Transaction Exception Reveals that Non-Criminal Violations of Law Render the Exception Unavailable

The legal commercial transaction exception applies only to conduct "not prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f). By its plain terms, this provision applies to violations of criminal, civil, and regulatory provisions alike.

Indeed, numerous legislatures have used similar language to encompass both criminal and non-criminal prohibitions. *See, e.g.*, *United States v. Ranger Elec. Commc'ns, Inc.*, 22 F. Supp. 2d 667, 670 (W.D. Mich. 1998), *rev'd on other grounds*, 210 F.3d 627 (6th Cir. 2000) (holding that radios in question were "prohibited by law" under the importation statute, 18 U.S.C. § 545, because of Federal Communications Commission regulations which require that CB radios broadcast on certain approved frequencies); *U.S. Dep't of Navy, et al. v. Fed. Labor Relations Auth.*, 975 F.2d 348, 349–50 (7th Cir. 1992) (holding that the release of information was "prohibited by law" as stated in the Federal Service Labor-Management Relations statute, 5 U.S.C. § 7114(b)(4), because it was forbidden by a provision of the Privacy Act, 5 U.S.C. § 552a); *see also* Mass. Gen. Laws Ann. ch. 140, § 131 (detailing numerous non-criminal ways that an individual can be "prohibited by law" from possessing a firearms license, including by

---

[2] In its opposition, the government referred to *United States v. Chapman et al.*, a case in which multiple individuals were charged with conspiracy to violate Section 951 for carrying out long-term, "deep-cover" assignments in the United States on behalf of the Russian Federation. While there were multiple charging instruments in that case, the complaint charging defendants Anna Chapman and Mikhail Semenko with conspiracy to violate Section 951 did not allege underlying violations of any law. *See* Complaint, No. 10-CR-598 (S.D.N.Y. June 27, 2010).

6

virtue of being younger than 21 years old, being an alien who does not maintain lawful permanent residency, or having received a dishonorable discharge from the armed forces); *United States v. Peck*, 545 F.2d 962, 963 (5th Cir. 1977) (discussing Louisiana statute 14:63.6(4), which defines "open range area" as "any area in which livestock are not prohibited by law to freely rove").

Similarly, the language in 28 C.F.R. § 73.1(f) means what it says: any violation of law, criminal or otherwise, renders conduct ineligible for the legal commercial transaction exception.

### III. Non-Criminal Violations of the Provisions of FARA and the LDA Would Make the Legal Commercial Transaction Exception Unavailable

#### A. *All of FARA's Prohibitions Are Enforced Civilly, with No Mens Rea Requirement*

First and foremost, the defense's response completely ignores the fact that FARA prohibits more than just willful conduct. 22 U.S.C. § 618(f) and (g) lay out civil remedies for noncompliance with FARA's provisions:

§ 618(f): Whenever in the judgment of the Attorney General any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal **fails to comply** with any of the provisions of this subchapter or the regulations issued thereunder**, or otherwise is in violation of the subchapter**, the Attorney General may make application to the appropriate United States district court for an order enjoining such acts or enjoining such person from continuing to act as an agent of such foreign principal, or for an order requiring compliance with any appropriate provision of the subchapter or regulation thereunder. The district court shall have jurisdiction and authority to issue a temporary or permanent injunction, restraining order or such other order which it may deem proper.

§ 618(g): If the Attorney General determines that a registration statement **does not comply with the requirements of this subchapter or the regulations issued thereunder,** he shall so notify the registrant in writing, specifying in what respects the statement is deficient. It shall be **unlawful** for any person to act as an agent of a foreign principal at any time ten days or more after receipt of such notification without filing an amended registration statement in full compliance with the requirements of this subchapter and the regulations issued thereunder.

7

(Emphasis added).

These provisions prohibit noncompliance with FARA's provisions regardless of whether an entity's noncompliance was willful. As a result, the legal commercial transaction exception does not apply when an individual fails to comply with any of FARA's provisions, regardless of whether the individual had the intent necessary for criminal prosecution under 22 U.S.C. § 618(a). *See* 28 C.F.R. § 73.1(f) (". . . not prohibited by federal or state legislation or implementing regulations").

### B. *Defendant's Conduct Violated the Provisions of Multiple Laws Separate and Apart from FARA's Registration Requirement*

The defense further suggests that "the only conduct the Defendant engaged in this case other than a 'legal commercial transaction' is his supposed failure to register under FARA[.]" Dkt. 340 at 1. That claim incorrect for two reasons. First, as the government established at trial, the defendant's conduct was prohibited by numerous provisions of FARA other than the registration requirement in 22 U.S.C. § 612. And second, the defendant's conduct was prohibited by numerous provisions of the Lobbying Disclosure Act (LDA).

1. <u>Defendant's Conduct Violated Several Provisions of FARA Independent of the Registration Requirement</u>

FARA's registration requirement appears in 22 U.S.C. § 612. A separate provision of FARA, 22 U.S.C. § 614, lays out several prohibitions separate from the FARA registration requirement. Those provisions include:

§ 614(a): Every person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter and who transmits or causes to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any informational materials for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be, or which he intends to be, disseminated or circulated among two or more persons shall,

8

§ 614(b): It shall be unlawful for any person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter to transmit or cause to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any informational materials for or in the interests of such foreign principal without placing in such informational materials a conspicuous statement that the materials are distributed by the agent on behalf of the foreign principal, and that additional information is on file with the Department of Justice, Washington, District of Columbia. The Attorney General may by rule define what constitutes a conspicuous statement for the purposes of this subsection.

§ 614(e): It shall be unlawful for any person within the United States who is an agent of a foreign principal required to register under the provisions of this subchapter to transmit, convey, or otherwise furnish to any agency or official of the Government (including a Member or committee of either House of Congress) for or in the interests of such foreign principal any political propaganda or to request from any such agency or official for or in the interests of such foreign principal any information or advice with respect to any matter pertaining to the political or public interests, policies or relations of a foreign country or of a political party or pertaining to the foreign or domestic policies of the United States unless the propaganda or the request is prefaced or accompanied by a true and accurate statement to the effect that such person is registered as an agent of such foreign principal under this subchapter.

§ 614(f): Whenever any agent of a foreign principal required to register under this subchapter appears before any committee of Congress to testify for or in the interests of such foreign principal, he shall, at the time of such appearance, furnish the committee with a copy of his most recent registration statement filed with the Department of Justice as an agent of such foreign principal for inclusion in the records of the committee as part of his testimony.

The text of the legal commercial transaction exception states that any conduct "prohibited by federal or state legislation or implementing regulations" is not eligible for the exception. 28 C.F.R. § 73.1(f). If the jury finds that the defendant's conduct ran afoul of the requirements above, which apply regardless of whether an entity has registered under FARA, the defendant's conduct would not qualify for the legal commercial transaction exception.

2. Defendant's Conduct Violated Multiple Provisions of the LDA

9

The defense has claimed that the defendant's conduct was not in violation of FARA because, at his direction and based on the information he provided Robert Kelley, FIG registered under the LDA. However, as discussed below, the LDA registration form contains numerous false statements in violation of multiple LDA requirements. If the jury were to find the LDA's requirements infringed, the defendant's conduct would not be in complince with the LDA, and therefore could not qualify as a legal commercial transaction.

FIG's LDA registration form was filed on September 30, 2016—after the defendant lobbied then-Congressman Dana Rohrabacher regarding Fethullah Gulen. Ex. 102, 166; Tr. 418:4-422:20. At trial, Robert Kelley testified that he knew nothing about FIG's activities other than what the defendant told him. Tr. 877:17-878:15. However, the LDA registration form falsely stated that FIG's client was Inovo, that no entity contributed more than $5,000 to fund FIG's lobbying activities, that Robert Kelley was expected to be the lobbyist, and that FIG would be lobbying on two identified pieces of legislation, one of which had been signed into law almost a year earlier and neither of which concerned any aspect of FIG's work. Ex. 166, 168, 169.

In causing a false LDA registration form to be filed, the defendant's conduct violated numerous provisions of the Lobbying Disclosure Act, including:

- 2 U.S.C. § 1603(b)(2), requiring that registration forms truthfully state the name of the registrant's client;

- 2 U.S.C. § 1603(b)(3)(A), requiring that registration forms truthfully state the name of any organization, other than the client, that contributes more than $5,000 to the registrant or the client in the quarterly period to fund the lobbying activities of the registrant;

- 2 U.S.C. § 1603(b)(5)(A), requiring that registration forms truthfully state, to the extent practicable, specific issues that have (as of the date of the registration) already been addressed or are likely to be addressed in lobbying activities; and

- 2 U.S.C. § 1603(b)(5)(B), requiring that registration forms truthfully state the name of each employee of the registrant who has acted or whom the registrant expects to act as a lobbyist on behalf of the client.

If the jury were to find that the defendant's conduct was inconsistent with any of these requirements of federal law, the defendant's conduct would not qualify as a legal commercial transaction under 18 U.S.C. § 951(d).

## Conclusion

Contrary to the defense's refrain, the defendant is not being prosecuted for failing to comply with FARA. He has been charged with failing to comply with U.S. law while under the direction and control of a foreign government, and failing to disclose to the U.S. government that he and his coconspirators were agents of a foreign government. Had the defendant provided notice, his conduct would not have been criminal.

Based on the foregoing, the government respectfully requests that the Court instruct the jury in accordance with the government's proposed jury instructions on the offenses, their elements, and the legal commercial transaction and LDA exceptions to Section 951.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

| /s/ | By: /s/ |
|---|---|
| Evan N. Turgeon | John T. Gibbs |
| Trial Attorney | Virginia Bar No. 40380 |
| Counterintelligence | James P. Gillis |
|    and Export Control Section | Virginia Bar No. 65055 |
| National Security Division | Assistant United States Attorneys |
| United States Department of Justice | The Justin W. Williams |
| 950 Pennsylvania Ave., NW |    United States Attorney's Office |
| Washington, DC 20530 | 2100 Jamieson Avenue |
| (202) 353-0176 | Alexandria, VA 22314 |
| Evan.Turgeon@usdoj.gov | (703) 299-3700 |
|  | (703) 299-3982 (fax) |
|  | James.P.Gillis@usdoj.gov |
|  | John.Gibbs@usdoj.gov |

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2019, I electronically filed the foregoing using the CM/ECF system, which will send a notification of such filing to counsel of record.

Respectfully submitted,

/s/
John T. Gibbs
Trial Attorney
U.S. Department of Justice