1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                  )
4              Plaintiff,         )
                                  )
5         v.                      )  Alexandria, Virginia
                                  )  July 22, 2019
6   BIJAN RAFIEKIAN,              )  9:16 a.m.
                                  )
7              Defendant.         )  Day 6 (AM Session)
    _____)  Pages 956 - 1047
8

9                    TRANSCRIPT OF TRIAL

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12                     AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1  APPEARANCES:

 2  FOR THE UNITED STATES OF AMERICA:

 3       JAMES P. GILLIS, ESQUIRE
         EVAN N. TURGEON, ESQUIRE
 4       JOHN T. GIBBS, ESQUIRE
         S. KATE SWEETEN, ESQUIRE
 5       OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
 6       Alexandria, Virginia  22314
         (703) 299-3700
 7
    FOR BIJAN RAFIEKIAN:
 8
         ROBERT P. TROUT, ESQUIRE
 9       TROUT, CACHERIS & SOLOMON, PLLC
         1627 I Street, N.W., Suite 1130
10       Washington, D.C.  20006
         (202) 464-3300
11
         MARK J. MACDOUGALL, ESQUIRE, PRO HAC VICE
12       STACEY H. MITCHELL, ESQUIRE, PRO HAC VICE
         JOHN C. MURPHY, ESQUIRE, PRO HAC VICE
13       JAMES E. TYSSE, ESQUIRE
         AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
14       Robert S. Strauss Building
         1333 New Hampshire Avenue, N.W.
15       Washington, D.C.  20036-1564
         (202) 887-4000
16
    THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON
17

18

19

20

21

22

23

24

25
```

1                         **I N D E X**

2  DEFENDANT'S WITNESS           EXAMINATION        PAGE

3  Mark Mykleby                  Direct             997
                                 Cross              1002

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Criminal Case 18-cr-457, *United*

2 *States v. Bijan Rafiekian*.

3          Counsel, will you please note your

4 appearances for the record.

5          MR. GIBBS:  Good morning, Your Honor.  John

6 Gibbs, Jim Gillis, Evan Turgeon, Latoya Horsford, Katie

7 Sweeten, and Bryan Alfredo on behalf of the United

8 States.

9          THE COURT:  Welcome.

10          MR. MACDOUGALL:  Good morning, Your Honor.

11 The defendant, Mr. Rafiekian, is present in court.

12 Mark MacDougall for Mr. Rafiekian along with Robert

13 Trout, Stacey Mitchell, James Tysse, and our senior

14 legal assistant, Adria Hicks, is with us today.

15          Thank you, Your Honor.

16          THE COURT:  All right.  Welcome to everyone.

17          Mr. Gibbs, do you have any issues you want to

18 raise?  I have my own list but --

19          MR. GIBBS:  No, Judge.  We'll take up your

20 list.

21          THE COURT:  Okay.  Mr. MacDougall?

22          MR. MACDOUGALL:  The same, Your Honor.  We'll

23 work with your list.

24          THE COURT:  All right.  I reviewed the

25 instructions over the weekend and drafted up the

1  revised instructions as to the substantive offenses

2  themselves, and I gave those to you.  Before I give

3  those, I'll consider further argument on it.

4         I will tell the United States:  I did those

5  without the benefit of your instructions.  Although,

6  I've now reviewed them, and I think I tried to capture

7  pretty much what you were trying to do in those.  I'm

8  sure you will have some other comments you would like

9  me to consider, but we'll take that up, obviously,

10 before I give them.

11        Let me tell you a couple of other things that

12 I have concluded in connection with the instructions:

13        After reviewing this issue, I have concluded

14 that a showing of willfulness is not required with

15 respect to proving that conduct does not constitute a

16 legal commercial transaction because in violation of

17 Section 612(a), that statute simply is a blanket

18 prohibition on acting as a foreign agent without

19 requiring that it be done willfully; although, criminal

20 liability would only attach upon such a showing.  So

21 the willfulness issue has not been included with

22 respect to the object of the conspiracy that

23 constitutes a violation of Section 951.

24        I've also concluded that I will give an

25 advice of counsel instruction, particularly in light of

1  the conspiracy charge.

2          The Court is not going to give a missing

3  witness instruction.  As the parties have candidly

4  conceded, there's been no restriction on access to

5  General Flynn, who is subject to subpoena by both

6  sides.  And based on all the circumstances and

7  information available to the Court, instructing the

8  jury to draw the requested inferences would not be

9  warranted.

10          With respect to materiality, it seemed to me

11  that the only issue as to which materiality is an issue

12  is within the context of the 618(a)(2) violation that's

13  alleged as part of the conspiracy.  So I've included

14  the materiality instruction within the context, again,

15  of the conspiracy charge.

16          There really is no settled law on how to

17  articulate materiality within the context of this case.

18  I mentioned the *Escobar* decision which was within the

19  context of the False Claims Act.  There the Supreme

20  Court made clear that something more than a potential

21  to influence is required.  That statute is, obviously,

22  very different since it deals with what's material with

23  respect to a particular contract or a particular

24  contract requirement.

25          But I do believe that something more than

1    simply potential to influence was required, and I've

2    tried to frame it in terms of the objectives of the

3    disclosure requirement, albeit in more summary form.

4              I know the government's proposed jury

5    instruction sort of went down that line in a lot more

6    detail, but I'll entertain more argument on the

7    materiality definition.

8              Finally, with respect to the application of

9    Rule 801(d)(2)(E), the Court is going to adhere to its

10   previous rulings with respect to the application of

11   Rule 801(d)(2)(E), specifically that the out-of-court

12   statements of either Mr. Alptekin or General Flynn or

13   any other person are not admissible under the hearsay

14   exception for coconspirator statements.  In that

15   regard, the Court has considered the government's

16   argument that 801(d)(2)(E) does not require a criminal

17   conspiracy and can be based on lawful conduct involving

18   a common plan or a joint venture.

19             The Court appreciates that there are courts

20   that have adopted that view; although, others have not.

21   The Court has not found anything said by the Fourth

22   Circuit that would be controlling or even predictive of

23   how it would decide that issue.  In the Court's view,

24   the notion that 801(d)(2)(E) can apply to any lawful

25   common plan is inconsistent with the language and

1  purpose of the coconspirator hearsay exception and

2  would essentially collapse 801(d)(2)(E) with

3  801(d)(2)(D) and essentially make it a criminal

4  proceeding against someone who is a corporate officer

5  or an employee, nearly any intercorporate statement by

6  any officer, director, or employee a result that the

7  Court can't justify either under the rule or even the

8  constitutional protections applicable to criminal

9  proceedings.  So the Court will adhere to its previous

10 ruling.

11          That's pretty much all I have.

12          Anything, Mr. Gibbs or Mr. Gillis?

13          MR. GILLIS:  Your Honor, obviously, we've

14 all, at least those who hoped to argue the case today

15 on our side in particular, which would be me, have

16 spent a great deal of time putting together our

17 argument on the conspiracy.  If you would give me one

18 last opportunity to try to persuade you, if you are

19 willing to hear it, I would like to address that one

20 more time.

21          THE COURT:  Well, I'm not precluding you from

22 arguing that there was a conspiracy.

23          MR. GILLIS:  What I was going to propose,

24 Your Honor, is with respect to the finding on the

25 preponderance of the evidence.  I would like an

1    opportunity to argue why the Court should find that

2    there was a preponderance.

3            THE COURT:  All right.

4            MR. GILLIS:  I know, Your Honor, that you

5    have considered all of the evidence carefully, and I

6    just want to make sure that we have articulated

7    carefully our response to that.  I'd like you to

8    begin -- and I'm sure you're familiar with it -- with

9    this 8(b) that begins these communications.  It is on

10   July 27, Your Honor, 2016.  It's just a few days after

11   the coup in Turkey, which took place on the 15th.

12       (There's a knock on the jury room door.)

13           MR. GILLIS:  There's a knock at the door,

14   Your Honor.

15           THE COURT SECURITY OFFICER:  It's okay.

16           MR. GILLIS:  From that exhibit, Your Honor,

17   the defendant tells Alptekin:  We are ready --

18           It's clear from that document that there were

19   conversations that preceded that.  That's not merely

20   speculative.  It's a fair inference to draw from the

21   language of that very writing, and he goes on.  Then in

22   8(b) it's clear that he's not only talking about a

23   project that they had discussed before, but it's a

24   project that Alptekin had to confer with the foreign

25   minister of Turkey about.

1            Again, this is at a critical time, after a
2    coup that shook the foundations of the Turkish
3    government.  This is an important enough engagement to
4    involve the foreign minister of Turkey, the minister of
5    economy, the council of ministers, and the prime
6    minister himself.
7            In the days following the coup -- this is not
8    about tourism or the business community or anything of
9    the sort.  The defendant admits that he was engaged
10   during this time in an effort to obtain business from
11   the government of Turkey, which would be under the
12   government of Turkey's control and direction.  It would
13   be an outright contract between the two.
14           Alptekin says he's going to report back to
15   the defendant after his meeting with the foreign
16   minister.  It's clear from what the defendant said to
17   Alptekin -- this is all in Government's Exhibit 8B --
18   that whatever he had to say to him that was going to be
19   communicated to the foreign minister was very good
20   news.  It was important enough for Alptekin to bring it
21   to the attention of the foreign minister less than two
22   weeks after the coup.
23           Then the next e-mail in that chain shows the
24   defendant responding directly to Alptekin's statement
25   about meeting with the foreign minister.  The defendant

1  says:  We're ready to engage in what needs to be done.

2          Then he goes on to say this, which is

3  critical, Your Honor, for this conspiracy.  You've

4  asked what is the evidence of conspiracy?  Obviously,

5  there's not going to be any direct evidence of it.  But

6  taking all the circumstances together, this shows that

7  what began as something that was admittedly under the

8  direction and control of the Turkish government stayed

9  the same throughout this entire project right up until

10 the time that the op-ed was written.

11         That is clear because in 8B, at the bottom of

12 that e-mail -- and if it would be helpful, Your Honor,

13 I can have --

14         THE COURT:  I have it.

15         MR. GILLIS:  The defendant says:  Turkey's

16 security and stability is extremely important to world

17 security.  Erdogan can lead this campaign against

18 radical Islam.

19         Which throughout has been code for Gulen.

20 That was the theme, as I said, that carried through.

21 It was a drum that the defendant was going to beat

22 throughout the entire project, whether it was when he

23 was calling it Truth or when he was calling it

24 Confidence.  It continued throughout, including, as I

25 said, to the op-ed.

1          Now, in there, he says:  At the right time, I
2   will include our partners in the communication.
3          Now, what's significant about that, Your
4   Honor, is not that that -- they're trying to say -- you
5   know, they're trying to talk more about wins than
6   losses.  This has been talking about confidentiality
7   throughout this thing, and at the right time, to
8   include the others is only once they stop talking about
9   Truth and the Turkish ministers and Gulen directly and
10  they start talking about Confidence in the business
11  community and whatnot, hiring them.
12         So what that 8B tells you is that the
13  defendant is aware of Alptekin's connections at the
14  highest level.  He's aware that Alptekin is reporting
15  to him communicating what the foreign minister and
16  other ministers had to say about this project and that
17  this being right after the time of the coup is an
18  extremely important project that's got nothing to do
19  with tourism or foreign investment in the business
20  community of Turkey.
21         The whole project at that time is all about
22  Gulen.  And as you've heard from the witnesses and
23  you've seen from the documents in this case, that
24  remained the single-minded focus of this project
25  throughout both before and after they switched the name

1  of the project.

2         And what's important about that, Your Honor,

3  is that they are operating under -- and now if you

4  look -- sorry.  If they're operating under the

5  direction and control of the Turkish government, you

6  can see that from Exhibit 9, which is a continuation of

7  e-mail exhibits in 8B.

8         And this exhibit shows you, again, that

9  Alptekin is the conduit to the defendant for the

10  communications from the ministers of Turkey, and the

11  minister of Turkey is taking this project very serious

12  because he wanted to meet with the defendant and Flynn.

13  He wanted the defendant and Flynn and Alptekin to

14  formulate what kind of output they could generate, and

15  he wanted them to provide an indicative budget.

16         Your Honor, that is all three, direction and

17  control.  It is direction.  The foreign minister wants

18  to meet with them, directing them to meet with them,

19  directing them to formulate the kind of output they

20  could provide, and directing them to come up with an

21  indicative budget.  All of this is coming from the

22  foreign minister of Turkey.

23         Now, if you turn to Exhibit 10, you're

24  familiar with this one because this is where they first

25  mention in the subject Truth.  Those nine bullet

1   points, which you've seen throughout, those nine bullet

2   points become exactly the same bullet points that they

3   used to describe the Confidence project.  Once, only

4   once they bring in the other people at FIG.

5            And as those bullet points show, Rafiekian

6   starts off by saying he wants Alptekin's active

7   participation in this project, and that's leading up to

8   the 20 percent cut that Alptekin is going to get.  And

9   that, in the later bullet points, when it's talked

10  about Covington goes from to secure your active

11  participation when he's talking to Alptekin.  And then

12  when he's talking to the group about Confidence, it's

13  to secure the active participation of an outside

14  advisor.  And that is included -- his 20 percent is

15  specifically included in the budget on this thing that

16  he's passing out.

17           Now, in Exhibit 15, Your Honor, this is the

18  one that attaches to it the article.  You can see from

19  15 that Alptekin is responding directly to the nine

20  bullet points for Truth that the defendant had set

21  forth and sent to him.  In that, he says:  I met with

22  the MFA and explained our proposed approach.  We'll

23  strategize on how best to approach that meeting.

24           This article that he attaches shows the depth

25  of the crisis that we are facing, and that article,

 1  Exhibit 15A, is all about how the U.S. has turned in
 2  the wrong direction from their point of view.  It's
 3  favorable to Gulen, and it's negative toward Erdogan.
 4  It points out specifically Turkey's efforts to
 5  extradite Gulen.  They point out that Turkey should be
 6  reminded that they have to follow the rule of law and
 7  they have to wait for the government's approval.
 8          Now, directly in response to this August 4
 9  e-mail, the defendant sets forth this famous analogy
10  about Khomeini under the apple tree and comparing him
11  to Gulen.  At the end of that, he returns to this
12  refrain about the world's need for a strong leader with
13  credibility in the Islamic faith.  And this, again,
14  stays the theme throughout.
15          On August 8, he's -- this is -- less than a
16  meeting after the attempted coup.  Alptekin is
17  responding back and says that he has had a long meeting
18  with the minister of foreign affairs.  Alptekin
19  explained what he and the defendant and Flynn could
20  offer.
21          So this is all indicative, Your Honor, of an
22  agreement up to this point to work with the government
23  of Turkey to paint Gulen as a bad figure who should be
24  extradited, that we should raise up Erdogan, keep him
25  close to us, and get rid of Gulen.

1              THE COURT:  The conspiracy, though, is an
2    agreement to do all of that unlawfully --
3              MR. GILLIS:  Yes, sir.
4              THE COURT:  -- that is, without the required
5    notifications.
6              MR. GILLIS:  Yes, sir.
7              THE COURT:  Whether the defendant was
8    required to file or whether he filed properly is a
9    separate issue --
10             MR. GILLIS:  Yes, sir.
11             THE COURT:  -- from whether or not there was
12   an agreement with somebody that he would not do that.
13             MR. GILLIS:  Yes, sir.
14             THE COURT:  And that's where I'm sort of
15   pulling up short.
16             MR. GILLIS:  All right.  So if I may, first,
17   the importance of this then August 10 e-mail, if I may.
18   August 10 --
19             THE COURT:  Which exhibit?
20             MR. GILLIS:  Government's Exhibit 16.
21             THE COURT:  All right.
22             MR. GILLIS:  Okay.  So on August 10, Your
23   Honor, they get the green light from the minister of
24   foreign affairs that after several meetings that he's
25   had --

1          Do you want me to stop for a moment?

2          THE COURT:  No.  I'm fine.

3          MR. GILLIS:  Okay.  It's several meetings

4   with the minister of commerce -- or, rather economy,

5   the foreign minister about this project.  Alptekin

6   tells the defendant -- while they're still calling it

7   the Truth campaign, while it's still admittedly being

8   done under the direction of the government of Turkey,

9   he tells the defendant that he has a green light to

10  discuss confidentiality, budget, and the scope of the

11  contract.  That's on August 10.

12         THE COURT:  Right.

13         MR. GILLIS:  The very next day, August 11, is

14  when all of a sudden there's this first reference.  As

15  the agent testified, it's the first reference to

16  Confidence anywhere, and the defendant and Alptekin

17  both lie to their attorneys about this notion that the

18  government of Turkey had simply dropped the ball.  They

19  dropped the project, and suddenly Alptekin had decided

20  to start this entirely different project completely

21  unrelated to the one beforehand.  That was the

22  testimony from the Covington lawyer, Mr. Kelner.

23  That's the only testimony that's been on this.

24         It is this lie, Your Honor, that overnight it

25  goes from the government of Turkey directing and

1 controlling this effort. Regardless of what you

2 believe up until this point that there was some

3 lawfulness to that agreement, overnight it goes from

4 being the Truth project controlled by the government of

5 Turkey about Gulen and it goes then to Confidence. The

6 government of Turkey, we say, but under Alptekin

7 supposedly being the one who is now interested in this

8 project to improve or restore the confidence in the

9 Turkish investment client. And he says --

10            THE COURT: Weren't the two related? Wasn't

11 the testimony consistent that the two were related,

12 that people viewed exposing and extradited Gulen as

13 somehow related to restoring confidence in the

14 environment in Turkey?

15            MR. GILLIS: Your Honor, that was a fig leaf

16 that was applied.

17            THE COURT: Well, I'm just saying; wasn't

18 that a part of the testimony?

19            MR. GILLIS: It was, Your Honor, at the very

20 beginning. What was testified to was at the very

21 beginning, there's one or two references to this notion

22 of restoring confidence. Every witness testified that

23 while -- in fact, some of them testified that from the

24 get-go, it was about Gulen. Some of them did testify

25 that it was about restoring confidence in the Turkish

1    economy, but that never --

2           THE COURT:  And confidence in or a better

3    understanding of why President Erdogan was doing what

4    he was doing.

5           MR. GILLIS:  Yes.  Again, that was ostensibly

6    the purpose that was given at the very beginning in the

7    first presentation, the first communications with

8    Sphere, with Mr. Courtovich about what this project was

9    supposedly about.  That initial faint in that direction

10   stopped being the case and went from Gulen, Gulen,

11   Gulen.  Nothing about any investigations about the

12   business climate, nothing about the American business

13   attitudes toward Turkey.  Nothing about that.  It's all

14   about dirt on Gulen.  It's all about getting, you know,

15   where is the action by DOJ who, by the way, is --

16          THE COURT:  How is that probative, that

17   switch as you've described it --

18          MR. GILLIS:  Yes.

19          THE COURT:  -- probative of an agreement to

20   violate the registration requirement?

21          MR. GILLIS:  Yes, sir.  Well, first of all,

22   the switch is powerful evidence that overnight there's

23   a lie here, right?  There's a lie overnight.  There's

24   no way in the world that the government of Turkey

25   dropped this after giving the green light from the

1 foreign minister on the 10th, that overnight they

2 switched to confidence in the investment climate, which

3 was never mentioned before this switch and never truly

4 mentioned in any detail, nor gone into in any sort of

5 way in the project.

6        But the part about it being completely

7 unrelated is a lie that he told that -- whether you

8 view Gulen and the investment climate as some sort of

9 connection -- which he tried to say yes, but then later

10 completely ignored.  What happened between the 10th and

11 the 11th is a lie.  It was just a flat-out lie.

12        THE COURT:  I guess --

13        MR. GILLIS:  And so, Your Honor --

14        THE COURT:  Let me ask this.

15        MR. GILLIS:  Yes, sir.

16        THE COURT:  How do you square -- again, I'm

17 dealing with this in my role as a fact-finder under

18 Rule 104 --

19        MR. GILLIS:  Yes, sir.

20        THE COURT:  -- which can be based on all

21 kinds of things.  It doesn't even have to be admissible

22 evidence.  In fact, the Court had considered matters

23 that aren't yet in evidence in reaching its first

24 ruling.

25        But how do you square this notion of an

 1   agreement to do all the things that you're talking

 2   about, a conspiracy to do that in violation of the

 3   registration requirements --

 4            MR. GILLIS:  Yes, sir.

 5            THE COURT:  -- with all the evidence that has

 6   been put in so far dealing with what was publically

 7   disclosed as to the interest and involvement of the

 8   Turkish government in exposing Gulen?

 9            MR. GILLIS:  Yes, sir.  Well, we're not

10   contesting -- I mean, obviously, our first witness on

11   there was that Turkey was trying its best to get Gulen

12   extradited.

13            THE COURT:  Right.

14            MR. GILLIS:  That approach was not working.

15   They had hired Robert Amsterdam.

16            THE COURT:  I guess that's the question.  How

17   do you square the notion that there was an agreement to

18   conceal Turkey's involvement in exposing Gulen with all

19   the public disclosures of Turkey's involvement with

20   disclosing Gulen?

21            MR. GILLIS:  Yes, sir.  How I square it is

22   this:  First of all, it's not about the government

23   trying to hide that it wanted Gulen extradited.  It's

24   not about that.

25            What it's about and what the statute is

1   intended to prevent is getting Lieutenant General

2   Michael T. Flynn, as the national security advisor to

3   the republican candidate for president, for him to get

4   out there and say that this guy has got to go.  There's

5   this -- and you'll see from the documents, and you'll

6   see from the testimony -- you've heard from the

7   testimony that the op-ed was part of this from the

8   start.  They lied about that.  They said it was

9   completely unrelated to the Turkey project.

10          What happened is, first, you've got the

11  e-mail, the first draft.  And I mentioned this before,

12  but let me, if I can, remind the Court.  There's this

13  blow-up at early November at FIG's office, and Alptekin

14  is angry about it.  Nothing has happened.  The video

15  hasn't been done, and basically, there's no progress.

16  He says, Your Honor:  What am I going to show Ankara?

17  Where is the media attention?  Where is congressional

18  hearings?  Where is action by DOJ, parentheses,

19  extradition?

20          Following right after that, Your Honor:  What

21  am I going to say to Ankara?  I've got to show progress

22  to Ankara.

23          It's immediately after that that the

24  defendant then drafts this op-ed, and he sends it first

25  to Alptekin.  He says there:  A promise made is a

1    promise kept.

2         That is an agreement, Your Honor, and it's

3    unlawful because it is not going to be disclosing

4    Lieutenant General Michael T. Flynn that he's getting

5    paid and encouraged to write this stuff as part of a

6    90-day project that started off being directed by the

7    government of Turkey.  In fact, the defendant himself

8    in his e-mail postdating the agreement said:  We've

9    been at work on this since July 15.

10        So this is one long continuum that overlaps

11   the time when it is admittedly under the direction and

12   control of the Turkish government postdating the

13   agreement to a point after it was supposedly this

14   Confidence project.

15        THE COURT:  All right.

16        MR. GILLIS:  So how we square it, Your Honor,

17   is in this way:  It is the entire purpose of this

18   statute to prevent a high profile person and others --

19   the Flynn Intel Group was certainly known to be

20   affiliated with, run by, formed by Lieutenant General

21   Flynn.  And those folks are out lobbying congressmen

22   without telling them about who they're doing it for.

23   They're out there trying to gin up more public

24   attention on this.

25        So everything that Alptekin is saying in the

1 meeting that he blew up about is what is trying to be

2 fulfilled by the defendant in this article that says "a

3 promise made is a promise kept."

4          THE COURT:  All right.

5          MR. GILLIS:  So, Your Honor, if you'll

6 just --

7          THE COURT:  All right.

8          MR. GILLIS:  You know, I have gone this far.

9          THE COURT:  Go ahead.

10          MR. GILLIS:  If you'll indulge me for a

11 couple of more minutes.

12          Now, Your Honor, there is nothing.  As you

13 heard, the first mention of Confidence is on August 11.

14 The defendant claims and Alptekin claimed that the

15 project that they were discussing with the government

16 of Turkey was completely unrelated.  That has got to be

17 very strong evidence of a conspiratorial agreement that

18 we're not going to disclose that the government of

19 Turkey has given the green light and wants an

20 indicative budget, has directed them to maintain

21 confidentiality.

22          They've done all of this on the 10th, and

23 overnight it switches to this.  They lie about it being

24 completely unrelated.  That lie, Your Honor, is

25 exceptionally strong proof that there was a tacit

 1  understanding not to reveal the true purpose of this

 2  project.

 3          There's no mention in any of the e-mails, the

 4  thousands of e-mails that the agents scoured, no

 5  mention whatsoever of the government of Turkey dropping

 6  the ball or deciding they're not going to go through

 7  with the project.  But on the 10th of August, they say:

 8  You have the green light for it.  No evidence -- not

 9  only is there no -- there's positive evidence that they

10  never mentioned it.

11          Now, think about that, Your Honor.  You've

12  got the prime minister being advised about this.  It's

13  being taken up by the council of ministers of Turkey.

14  It has the active involvement of the foreign minister.

15  Out of all of this, out of all of this, there's no

16  mention -- wouldn't there -- there's a lot of e-mails

17  before this, e-mail traffic, Skype chats, and whatnot

18  about this project.  Wouldn't you see some e-mail,

19  something that said, Gee, it's too bad we lost that

20  contract with the Turkish minister.  We were so close.

21  We had the green light and everything from the foreign

22  minister of Turkey, and there's nothing.  They don't

23  say a word about that.

24          They don't say a word about it to anybody

25  else, and they make a point that they don't say it to

1   anybody outside FIG.  But they don't say a word about

2   it to Mike Boston, who's the project manager on this

3   project that's doing exactly the same thing that they

4   had promised to do under the earlier project.

5           And the keeping of that secret and the

6   failure to mention anything about it shows you very

7   strongly that this is a lie.  It's a lie, and that

8   means there's a tacit understanding not to register.

9           And, Your Honor, with respect to the

10  conspiracy not to register, what you'll see from the

11  evidence is that, yes, Alptekin went to Robert Kelley.

12  Flynn tells him -- you know, he comes out.  McCauley

13  sees him.  He comes out of the office of General Flynn.

14  He tells McCauley:  The General wants me to file under

15  FARA, but I've got a better way to keep it under the

16  radar.

17          He goes to his friend, Bob Kelley, who

18  testified that he did this not as a lawyer, not as his

19  lawyer but as his friend.

20          He asked me a question.  I told him, you

21  know, if it's a private client, then you can file under

22  the LDA.

23          That's it.  That's the only thing he does.

24  Again, he's tell -- that alone is a lie, I submit,

25  based on all of what you've heard so far, that the

1   government of Turkey is really the one behind this.

2           But the most telling thing about this, Your

3   Honor, is that that is an active issue that is at play,

4   as you heard from the testimony, when they have this

5   University Club meeting.  You remember the University

6   Club meeting was on September 20.  On September 19,

7   they're meeting with the foreign minister and Erdogan's

8   son in-law, and in the e-mail that Rafiekian sent, he

9   says that it's about Confidence.

10          McCauley heard what was going on.  At least

11  to the extent that he could hear -- he was at one end.

12  He said that Woolsey was being disruptive.  But he

13  heard the foreign minister and Flynn discussing Gulen,

14  that he was a terrorist, that he had to go, and the

15  extradition that Turkey was interested in.  So there's

16  even e-mails that the subject of which is LDA versus

17  FARA.

18          Graham Miller on September 19 says:  Could

19  you give me a copy of Kelley's opinion that we could

20  file under LDA?

21          And he responds back:  I'll put you in touch

22  with Kelley.

23          Kelley testified that he don't do anything

24  else except answer that one question and then file the

25  LDA form.  He didn't say he didn't -- in fact, he said

1   he did nothing else.  So that conversation never took

2   place.

3            But we also know that there was never any

4   opinion letter.  The defendant never went back to

5   Kelley for an opinion letter, a formal letter, because

6   now Kelley would have been acting as his lawyer, and he

7   would be -- he would then be asking questions.  And

8   that's not speculation, Your Honor.  That is just

9   common sense inference from the facts.

10           But what is happening here?  FARA and LDA is

11  a live issue, and he tells them that we're returning

12  from New York.  He doesn't mention what that meeting is

13  about.  He said it's about Confidence and a

14  cabinet-level position.  He says nothing about that at

15  the meeting at the University Club.

16           Now, he claims that it was just to get

17  background.  It was just background on Gulen.  Well,

18  why doesn't he say anything about that at the meeting

19  that's the -- you know, the talk about the status of

20  the project?  Why doesn't he say:  Hey, you know,

21  coincidently, we just happened to be in New York last

22  night, and we were talking with the foreign minister.

23  We were actually talking to Erdogan's son-in-law.  And,

24  you know what?  They gave us their views on Gulen.

25  He's a terrorist.  He thought this, and he thought

1    that.

2            And he says nothing to the whole team over

3    there.  He says nothing at all.

4            That is, again, this tacit understanding that

5    they are not -- no matter what, they are not going to

6    reveal this relationship between them.  And you ask

7    about what makes it not a lawful transaction?  It's

8    that LDA filing because of the lie that he told to

9    Kelley.  It's clear from this throughout that that was

10   one of the purposes, and that was one of the overt acts

11   that carried out.

12           That, among other things, is what made it not

13   a lawful commercial transaction, by lying to Kelley and

14   getting him to file an LDA and also to keep this secret

15   about this meeting in New York while this whole issue

16   of where to file is still an open question.

17           The telling thing, Your Honor, is that these

18   conversations, the direction and control from the

19   government of Turkey, continue because you'll recall at

20   least two Skype chats that took place afterward, after

21   they said the Turkish government is out of this, that

22   this has nothing to do with the Turkish government.

23           What you see is a Skype chat.  One Skype chat

24   that says:  We are a go.  I just met with the foreign

25   minister.  I'm hoping to meet with his boss.  Not his

1  direct boss but you know who.  I inferred this from the

2  fact that I've been invited to the opening of the Third

3  Bridge.

4           This is the Bosphorus bridge that Mr. Olson

5  testified about and the bridge that you judicially

6  found was open on the 26th.

7           So he tells the defendant:  I'm going to be

8  meeting -- well, first of all he tells them this:  You

9  are a go.  We are a go.  I have met with the foreign

10 minister, and we are a go.

11          Then he says:  I hope to be meeting with the

12 prime minister -- or rather, President Erdogan because

13 he's going to be there.

14          In fact, as you've heard, he was there at the

15 opening ceremony.

16          Then what happens?  Alptekin tells him in

17 that same conversation:  I'm hoping to meet the Turkish

18 president, but either way we are a full go.

19          He says:  We are a full go.

20          That is the direction from the government of

21 Turkey that he has hidden, that he has kept hidden by

22 filing a false LDA.  So it is that.

23          Again, this is an accretion of evidence that

24 is inexorably leading to this, at least a preponderance

25 of the evidence, that there is a conspiracy among them.

1          That's not the only Skype chat because

2    there's one later, and it is from MC's guy who is read

3    into the project.  That's what Alptekin tells the

4    defendant.  He says, I had a meeting with MC -- in

5    other words, Foreign Minister Cavusoglu.  I heard from

6    the foreign minister's guy, who is read into

7    Confidence, and he wants me to write an op-ed about

8    this.

9          This couldn't be more damning, Your Honor.

10   It is, first, the foreign minister saying you're a full

11   go, and Alptekin telling him:  No matter whether we

12   meet the president or not, he told me we are a full go.

13   This is direction and control from the foreign minister

14   of Turkey after August 11, after it's supposedly about

15   business confidence in Turkey.

16         There's another one in which he talks about

17   the foreign minister's guy who is read into Confidence.

18   Read into, Your Honor.  As you know, read into means

19   like any classification compartment, you get read into

20   something, meaning you're told about it in a way that

21   is secret.

22         THE COURT:  All right.

23         MR. GILLIS:  So he's read into.  It's not

24   some guy who knows about it, but he's read into it.

25   He, as part of that Confidence project that he's read

1   into, wants me to write an op-ed.

2          Now, it didn't turn out to be Alptekin that

3   wrote the op-ed.  It turned out to be Lieutenant

4   General Flynn.  However, those two Skype chats coming

5   after all of this, again, shows you that there is this

6   continuing conspiracy not just to hide the government's

7   of Turkey's involvement in what -- I mean, they're

8   saying it's a lawful transaction.  Of course, it's not

9   a lawful --

10         You see the circularity.  I understand what

11  you're saying about the circularity of 951, but they

12  lie on the LDA form.  That alone, along with all the

13  other evidence, makes it not a lawful commercial

14  transaction, Your Honor.

15         THE COURT:  All right.

16         MR. GILLIS:  I think I'm getting the hook,

17  Your Honor.

18         THE COURT:  All right.

19         MR. GILLIS:  All right, Your Honor.  Thank

20  you very much for hearing me out.

21         THE COURT:  All right.

22         MR. TURGEON:  Your Honor, just one other

23  thing very briefly.  We've received Your Honor's

24  proposed jury instructions, and we'll continue to

25  digest those.  I expect we'll propose further changes

 1  in line with what the government submitted last night.

 2          Just before this hearing, though, Your Honor,

 3  the government filed a reply regarding the defense's

 4  proposed legal commercial transaction instruction.

 5  That reply addresses a few issues, including the

 6  willfulness issue that Your Honor just ruled upon.  It

 7  also addresses what constitutes unlawful conduct under

 8  951, and that is the subject of one of Your Honor's

 9  proposed instructions.

10          THE COURT:  Right.

11          MR. TURGEON:  In sum, the defense claims that

12  the only unlawful conduct was the defendant's failure

13  to register under FARA, but that's not correct.  The

14  reply explains --

15          THE COURT:  No.  I understand.  You're now

16  claiming it was the filing of the LDA, but this is an

17  evolved position.  I understand.

18          MR. TURGEON:  Well, Your Honor --

19          THE COURT:  You've never taken that position

20  previously; have you?

21          MR. TURGEON:  Your Honor, it's a position

22  that's evident now based on the evidence that's been

23  introduced at trial.

24          THE COURT:  I understand, and I'll consider

25  whether the instruction needs to make reference to that

1   as well.

2             MR. TURGEON:  Thank you, Your Honor.

3             Our brief addresses that point.  So I have a

4   few courtesy copies of that for Your Honor, and I'd ask

5   that Your Honor consider that before the charge

6   conference.

7             THE COURT:  All right.

8             MR. TURGEON:  Thank you.

9             THE COURT:  All right.  Mr. MacDougall or

10  someone from your side, I'll give you a brief

11  opportunity to respond to Mr. Gillis' closing.

12            MR. MACDOUGALL:  Yes, Your Honor.  I think

13  Mr. Tysse is going to respond.

14            THE COURT:  Yes.

15            MR. TYSSE:  Thank you very much, Your Honor.

16            James Tysse.  I'll be brief.

17            I'm happy to answer any questions you have,

18  but I think Your Honor hit the nail on the head.  That

19  is that the question here is whether there is evidence

20  of a conspiracy to commit unlawful acts, whether there

21  was a true partnership in crime.  I think what we heard

22  a lot about was discussions, ambiguous discussions,

23  hearsay statements from Mr. Alptekin regarding

24  communications he may have had with Turkey.  What is

25  missing from all of those discussions is any sort of

1   request for direction and control from Turkey itself,

2   or any sort of agreements on the part of my client to

3   actually perform any of the unlawful acts that the

4   government has charged in the indictment.

5            Now, I'm happy to talk about all the

6   individual pieces of evidence.  The government went

7   through a lot of them.  I took some notes but just a

8   few kind of highlights.  You know, they emphasized the

9   green light e-mail on August 10.  What the green light

10  e-mail says is it's a green light to discuss budget, to

11  discuss confidentiality.  It was not a green light to

12  go forward with a project.  It's not a reasonable

13  inference to take from that.

14           There was testimony that the -- from the

15  beginning, the project was about Gulen.  But the trial

16  testimony confirms that the business climate in Turkey

17  and Mr. Gulen's status in the United States were

18  intricately related.  They were two sides of the same

19  coin.

20           There was very clear evidence on that,

21  including from the Sphere Consulting presentation,

22  which said that the goals of the project would be to

23  produce a *60 Minutes* style documentary that both

24  bolstered the business climate and addressed

25  Mr. Gulen's behavior.

```
 1              Turning to another piece of evidence -- oh,
 2    with regard to the green light e-mail and the
 3    transition from August 10 to 11, none -- there's
 4    nothing inconsistent in any of those e-mails with
 5    Mr. Alptekin talking to someone in Turkey and finding
 6    out from a Turkish minister, "We've already engaged
 7    Robert Amsterdam & Partners for this exact same
 8    project, so we're not going to move forward with it,"
 9    and having FIG move forward with the project on its own
10    for its own reasons.
11              Again, the government is asking the Court in
12    this proceeding and the jury more broadly to make these
13    giant speculative leaps about what very ambiguous
14    conduct and statements in a series of e-mails actually
15    say.
16              There is -- there was also a reference to the
17    reference to Ankara.  Again, we addressed this in a
18    great deal more detail in our brief that we filed
19    yesterday afternoon, Your Honor, but there was
20    extensive trial testimony that the client of the
21    project was Alptekin and Inovo.  It was being supported
22    and funded by wealthy Turkish businessmen.  So a
23    reference to Ankara does not mean a reference to the
24    government of Turkey.
25              It's also, I would say, inconsistent with the
```

1 government's own theory that Mr. Rafiekian was keeping
2 it a secret, along with Mr. Alptekin, Turkey's
3 involvement from everyone else.  If Mr. Alptekin is
4 going to make a statement with reference to the
5 government of Turkey at that meeting, it seems very
6 inconsistent with the goal that this was meant to be a
7 secret from even their own team.

8          Beyond that, Your Honor, again, ultimately --
9 and we keep coming back to it -- there has to be an
10 agreement to actually commit a crime, and that is
11 what's missing from the government's presentation.

12          One more point on Mr. Kelley.  The government
13 keeps emphasizing that he was just a friend and not a
14 lawyer.  Again, I don't think there was any evidence of
15 that.  He was ultimately paid $10,000.  That's part of
16 the record.

17          Similarly, they say our client lied to
18 Mr. Kelley.  Again, that's not what the testimony said.
19 The testimony said:  Who is your client?  He told him
20 the answer.  It's not the client's job to ask the
21 lawyer what questions he should be asked and what the
22 intricacies of the regime are.  He went to him and
23 said:  I would like to file under FARA.

24          I don't think there's any reasonable
25 inference that could be drawn from that, and I think

1   Your Honor has properly concluded that that is not a --

2   that that was not a lie to Mr. Kelley.

3            I want to make sure, again, to -- oh, I think

4   one more point as well on the powerful contradictory

5   evidence of the government's theory.  The government

6   made a lot of arguments about speculative and often

7   hearsay evidence, but what was missing was any

8   reference to the contradictory evidence that goes

9   completely against their theory, which is, number one,

10  Turkey had already engaged Robert Amsterdam & Partners

11  for the exact same project and -- or at least a very

12  similar project.  They were paying them openly, and

13  they had filed openly on a FARA form.  That's very

14  contradictory evidence to the government's entire

15  theory in this case considering it was also focused, as

16  we know, on Mr. Gulen.

17           Similarly, the legal advice on multiple

18  occasions, this was not simply a matter of talking to

19  Mr. Kelley and getting advice to file under LDA.

20  Before he contacted Mr. Kelley, the undisputed

21  testimony is that he went to Mr. Kelley and said:  I am

22  contacting you to find out whether or not we need to

23  file under FARA.

24           Okay, again, if this was part of a scheme to

25  hide the true identity and to avoid filing under FARA,

1   that evidence is powerful, contradictory -- or it

2   contradicts that powerfully in our view.

3            And at the end of the day, Your Honors, this

4   is a case where the government has asked the jury to

5   speculate, essentially, that by working on a commercial

6   project for a paying client that aligns with many of

7   the goals of Turkey and that Turkey might have been

8   aware of, that our client actually agreed to act as an

9   agent of Turkey and to follow Turkey's direction and

10  control.  The record has absolutely no evidence that

11  Turkey ever gave any direction or control.  There's no

12  statement from Turkey.  There's no request from Turkey.

13  Even at the meeting, the New York meeting that the

14  government emphasizes so much, there is not a single

15  piece of testimony that Turkey asked FIG to do anything

16  or told FIG to do anything or requested or directed FIG

17  to do anything.

18           At the end of the day, they're asking based

19  on ambiguous evidence for this Court to speculate for

20  purposes of this 104 ruling and the jury to speculate,

21  ultimately, that there was an agreement to commit an

22  unlawful act.  We submit that that is completely

23  lacking.

24           Thank you.

25           MR. GILLIS:  May I have the last word, Your

1  Honor?

2           THE COURT:  All right.  Briefly.

3           MR. GILLIS:  At the risk of annoying --

4           THE COURT:  No.  It's fine.  No, I

5  understand.

6           MR. GILLIS:  I have to address this business

7  about Robert Amsterdam.

8           THE COURT:  Yes.

9           MR. GILLIS:  Because, yes, Robert Amsterdam

10  filed.  As we've said, there's no secret that the

11  government of Turkey wanted Gulen back.  The secret is

12  that they were hiring FIG, Flynn Intel Group, headed by

13  General Flynn and General Flynn himself to publicly

14  proclaim the very same position but without revealing

15  that it was being done at the behest of the Turkish

16  government.

17           So it is one thing --

18           THE COURT:  You're talking about the op-ed?

19           MR. GILLIS:  I'm talking about the whole

20  project, Your Honor.  But when Flynn Intel Group, for

21  example, goes to lobby Congress, that says a lot more

22  than who's not being disclosed to be the -- if I may.

23           So the last point, Your Honor.

24           THE COURT:  Go ahead.

25           MR. GILLIS:  It is one thing to have Robert

1  Amsterdam say it as an agent of the government of

2  Turkey, and it's an entirely different thing to have

3  Lieutenant Michael T. Flynn -- General Michael T. Flynn

4  say the same thing but without revealing that it's

5  being done, paid for, and asked for and approved by the

6  government of Turkey through Alptekin, who was having

7  these very high-level discussions with the government

8  of Turkey.

9         THE COURT:  All right.  The Court will take

10 it under advisement as a motion for reconsideration,

11 and I'll rule when it's appropriate.

12        All right.

13        MR. TYSSE:  Your Honor, would you like to

14 hear objections to the jury instructions now or a

15 discussion about it or at some later time?

16        THE COURT:  Let's do it later.  I'd like to

17 get the jury back out here.

18        Counsel, are you prepared to go forward with

19 additional witnesses?

20        MR. MACDOUGALL:  We are, Your Honor.  We have

21 a single brief witness, and then we would ask to be

22 permitted to read to the jury the three stipulations of

23 fact and move them into evidence.  That will be our

24 case, Your Honor.

25        THE COURT:  All right.  Does the government

1  anticipate any rebuttal?

2            MR. GIBBS:  No, Your Honor.

3            THE COURT:  All right.  Let's bring the jury

4  out.

5       (The jury enters at 10:12 a.m.)

6            THE COURT:  All right.  Please be seated.

7            Good morning.  I hope everyone managed to

8  stay cool this weekend.

9            We are now ready to proceed with the

10 defendant's case.

11           Mr. MacDougall.

12           MR. MACDOUGALL:  Thank you, Your Honor.  The

13 defense calls Colonel Mark Mykleby.

14           THE COURT:  Colonel Mykleby will come

15 forward, please.

16           Counsel.

17           MR. MACDOUGALL:  Thank you, Your Honor.

18      MARK MYKLEBY, DEFENDANT'S WITNESS, AFFIRMED

19                   DIRECT EXAMINATION

20 BY MR. MACDOUGALL:

21 Q    Good morning, Colonel Mykleby.

22 A    Good morning.

23 Q    My name is Mark MacDougall.  I'm one of the

24 attorneys who is representing Bijan Rafiekian.  You and

25 I met for the first time this morning; is that right?

1  A    That is correct.

2  Q    Could you tell us where you live, please.

3  A    I'm currently in Cleveland, Ohio.

4  Q    What do you do for a living?

5  A    I'm a consultant.

6  Q    What kind of consultant?

7  A    Job consultant.  Some for the Department of Navy

8  and then also for EcoDistricts, economic development

9  for municipalities.

10 Q    And what did you do before you became a

11 consultant?

12 A    I was a colonel in the Marine Corps, Marine

13 officer, career.

14 Q    How long were you in the Marine Corps?

15 A    Twenty-four years in the Marine Corps.

16 Q    I'm sorry?

17 A    Twenty-four years.

18 Q    Twenty-four.

19       And what your speciality?

20 A    I was an F-18 pilot.

21 Q    Where did you serve?

22 A    Most of my operations were out of Beaufort, South

23 Carolina.

24 Q    Anywhere else?

25 A    Also up in Quantico, Virginia, for a couple of

1  tours.  And then I led a special operations command,

2  and then I ended up my career at the Pentagon working

3  for the chairman of joint chiefs of staff.

4  Q    What year did you retire from the Marine Corps?

5  A    In 2011.

6  Q    Do you know the defendant here, Mr. Rafiekian?

7  A    Yes, I do.

8  Q    Is he sitting at defense table?

9  A    Yes, he is.

10 Q    And how did you come to know him?

11 A    I was introduced to him in, I believe, 2010 by a

12 gentleman I was working with, Captain Wayne Porter.  We

13 were both working for Admiral Mullen when he was the

14 chairman of the joint chiefs of staff.

15 Q    Who is Admiral Mullen?

16 A    Admiral Mullen was the chairman of the joint

17 chiefs of staff.

18 Q    And about what year was that?

19 A    About 2010, I believe, is when I first met Bijan.

20 Q    So you've known Mr. Rafiekian about nine years;

21 would that be right?

22 A    Approximately, yes.

23 Q    And could you give me a little more detail about

24 what work you've done, what your association has been

25 with Mr. Rafiekian both back when you were both working

1  for Admiral Mullen and since then?

2  A    Right.  I believe it was 2010 when we first met,

3  and Bijan was on the board of directors for the U.S.

4  Export-Import Bank.  I was a special assistant for

5  Admiral Mullen.  At that time, Wayne Porter and I were

6  doing work for Admiral Mullen and developing a new

7  strategy for the nation.  And Bijan took an interest in

8  it and -- in the work that we were doing.  And at that

9  point, it was mostly social.

10      Once I retired in 2011, in 2012 Bijan asked me to

11  help stand up a small technology company called Green

12  Zone Systems.  So I worked as a paid consultant for

13  getting Green Zone Systems up and running from about

14  2012 to 2015.

15  Q    When you say "stand up" a company, what does that

16  mean?

17  A    It was very -- just a small technology company.

18  So we were just organizing, developing a product,

19  specifically that would -- a communications product

20  that would help support special operations forces and

21  special tactical units for law enforcement.

22  Q    Have you had other involvement with Mr. Rafiekian

23  over the last nine years?

24  A    Just mostly on a social basis.

25  Q    How often do you speak with Bijan on average?

1  A    Oh, probably now not all that often.  Probably
2  about once every couple of months.
3  Q    Do you know his family?
4  A    Yes, we do.
5  Q    Do you know his wife, Gissou?
6  A    Yes, I do.
7  Q    Is she here in the courtroom today?
8  A    Yes, she is.
9  Q    Would you point her out, please.
10 A    She's right there.
11 Q    So generally speaking, how well do you know
12 Mr. Rafiekian?
13 A    I know him fairly well.  I got to work with him
14 both, you know, professionally but then also on a
15 social basis.
16 Q    And do you have an opinion as to whether he's a
17 truthful person?
18 A    He's always been truthful with me.
19 Q    I'm sorry.  I spoke over you.
20 A    He's always been truthful with me.
21 Q    How certain are you of that opinion?
22 A    I'm very certain of that.
23 Q    What's it based on?
24 A    My personal experience.  He's told me -- he
25 basically has always done what he said he was going to

1  do when dealing with me.

2  Q    To the extent you've observed him with other

3  people, is that your experience as well?

4  A    As far as my observations, yes.

5          MR. MACDOUGALL:  No further questions, Your

6  Honor.  Thank you.

7          THE COURT:  All right.  Mr. Gibbs.

8          MR. GIBBS:  Thank you, Judge.

9                    CROSS-EXAMINATION

10 BY MR. GIBBS:

11 Q    Now, Colonel Mykleby, I believe you testified

12 about being hired by the defendant in 2012 to work with

13 Green Zone.  Is that correct?

14 A    That's correct.

15 Q    All right.  Did the defendant specifically hire

16 you?

17 A    The actual source of the capital was from NJK

18 Holdings.  It was a company underneath NJK Holdings,

19 but he specifically made the connection.  He was the

20 president of the company and hired me to be the senior

21 advisor of strategy.

22 Q    Okay.  So he -- you had an interview with him, sat

23 down and talked about it, determined it was a good fit,

24 and he actually was the one who hired you for the --

25 and the position was senior advisor, correct?

1  A    Senior advisor for strategy, that's correct.

2  Q    Right, senior advisor for strategy.

3       And that was -- and you held that position from

4  2012 to 2015; is that correct?

5  A    Approximately, yes.

6  Q    And was the defendant your boss?

7  A    Yes.

8  Q    And how much were you paid in that position?

9  A    I was paid -- I believe it was about $150 an hour

10 consulting fee.

11 Q    And how many hours would you generally bill in

12 that position?

13 A    I, roughly, did about ten hours a week, something

14 like that.

15 Q    Okay.  So not a full-time position then?

16 A    No.

17 Q    Okay.  And then you testified on direct that the

18 defendant hired you for that position in 2012, and that

19 lasted until about 2015, correct?

20 A    That is correct.

21 Q    And what happened in 2015?  Is that when you moved

22 to Cleveland?

23 A    No, I didn't move to Cleveland.  But the work that

24 I was doing, my primary job was, again, developing

25 concepts around grant strategy.  I was at New America

1 Foundation and then was hired by Case Western Reserve

2 University to stand up a strategic innovation lab.

3 That was just going to take up more time.  Quite

4 honestly, I am not a business guy.  Helping Green Zone

5 Systems get off the ground, my connections with special

6 operations command, I pretty much had served my

7 purpose.  So it was just time to move on.

8 Q    Okay.  And I want to talk about moving on.  So

9 when did you get hired which Case Western Reserve

10 University?

11 A    I got hired by Case Western approximately around

12 September 2014, somewhere around that neighborhood.

13 Q    And when did you actually -- so -- and when did

14 you actually move to the Cleveland area as part of that

15 position?

16 A    I didn't.  I commuted from Beaufort, South

17 Carolina.  The position that I had was not -- it didn't

18 require me to be at Cleveland, so I just commuted from

19 Beaufort, South Carolina.

20 Q    Okay.  Yeah, and I think maybe I misunderstood

21 your direct testimony.  But so you currently live in

22 Beaufort, South Carolina, correct?

23 A    I'm transitioning right now.  I recently just

24 moved to Cleveland.

25 Q    Okay.  When did you move to Beaufort?

1  A    I first got to Beaufort -- it was my first duty

2  station -- somewhere around December 1990,

3  January 1991.

4  Q    But recently.  So -- well, let me to do it this

5  way:  Where were you living for all of 2016?

6  A    In Beaufort, South Carolina.

7  Q    Where were you living for all of 2017?

8  A    Beaufort, South Carolina.

9  Q    So when you testified on direct that your

10 interactions with the defendant were fairly

11 intermittent, that's because you two lived in different

12 cities, correct?

13 A    That's correct.

14 Q    And so -- okay.  So when's the last time you and

15 the defendant actually lived in the same place?

16 A    I'm not sure that we ever lived -- well, I take

17 that back.  When I was at the Pentagon, I lived in D.C.

18 I was a geographical bachelor, and he lived in the

19 area.  I never visited Bijan's home.

20 Q    Okay.  Fair enough.  So it's really a professional

21 relationship?

22 A    For the most part, yes.

23       MR. GIBBS:  Great.  One moment.

24    (Counsel confer.)

25       MR. GIBBS:  Thank you, Judge.

1    Colonel Mykleby, I have no further questions.

2  Thank you, sir.

3    THE COURT:  All right.  Anything further?

4    MR. MACDOUGALL:  Nothing else, Your Honor.

5    THE COURT:  All right.  Thank you for

6  appearing.  Please do not discuss your testimony

7  outside of the courtroom.

8    THE WITNESS:  Yes, sir.

9    (The witness stands aside.)

10   THE COURT:  Mr. MacDougall.

11   MR. MACDOUGALL:  Your Honor, we have the

12 three stipulations to read into evidence and move into

13 evidence.

14   THE COURT:  All right.  Ladies and gentlemen,

15 you're now about to hear statements that have been

16 agreed to by the parties.  You may accept the

17 statements as proof of the facts stated in those

18 stipulations, but it's up to you as far as what weight

19 or importance you attach to them.

20   Yes.

21   MS. MITCHELL:  Good morning, Your Honor.

22 Thank you.

23   Good morning.  Referring now to Defendant's

24 Exhibit 66, Stipulated Statement of Fact No. 1:

25   The United States government is in possession

1    of multiple, independent pieces of information relating

2    to the Turkish government's efforts to influence United

3    States policy on Turkey and Fethullah Gulen, including

4    information relating to communications, interactions,

5    and a relationship between Ekim Alptekin and Michael

6    Flynn and Ekim Alptekin's engagement of Michael Flynn

7    because of Michael Flynn's relationship with an ongoing

8    presidential campaign without any reference to the

9    defendant or FIG.

10           Referring now to Defendant's Exhibit 6,

11   Stipulated Statement of Fact No. 2 entitled Memorandum

12   for Record:

13           On 14 September 2016, the undersigned was

14   instructed to contact Lieutenant General Michael Flynn,

15   USA retired, who had indicated he wanted to make a

16   report in person.

17           On 15 September 2016, the undersigned and

18   Curtis Guy met with Lieutenant General Flynn at this

19   place of business, 44 Canal Center Plaza, Suite 400,

20   Alexandria, Virginia.  He advised as follows:  He as

21   planning to go to Japan in October 2016 to meet with

22   the Japanese minister and deputy minister of defense.

23   On 19 September 2016, he planned to meet with the

24   president of Egypt, Abdel Fattah el-Sisi, in New York

25   at the Egyptian Consulate.  That day he also planned to

1  meet with the Turkish foreign minister (NFI) and

2  possibly might also meet Erdogan, the Turkish

3  president, in New York.  He was not questioned about

4  any past foreign contacts or travel since his military

5  retirement as it was believed that matter was covered

6  during his recent background investigation, and it was

7  not reason he contacted DIA on this occasion.

8          He also mentioned that his company was

9  supporting a Dutch company (NFI) to assist in renewing

10 the confidence of the international community in the

11 Turkish government.  He used the terms "strategic

12 advantage" and "confidence project."  He provided no

13 further details.

14         This document is signed by Karl James, Chief

15 SEC-2, and dated March 21, 2017.

16         The last document is Defendant's Exhibit 14

17 entitled Stipulated Statement of Fact No. 3:

18         In a meeting with a U.S. government agency on

19 September 28, 2016, Bijan Rafiekian provided an

20 overview of the Flynn Intel Group, outlined recent

21 business activities and potential access.  Rafiekian

22 reported the following:

23         Rafiekian continues to work on business in

24 Qatar, Saudi Arabia, Turkey, and Kazakhstan.  The Flynn

25 Intel Group is involved in both security consulting and

1  aviation, including unmanned aerial vehicles and

2  unmanned aircraft systems.  On the aviation side, the

3  Flynn Intel Group is working with the government of

4  Georgia to establish a hub in Tblisi, Georgia, for

5  SOCOM-related cargo transport.

6          Rafiekian shared that he was aware of an

7  investigation into an educational compound in

8  Pennsylvania that was tied to the Fethullah Gulen

9  movement (FGM).  A Turkish teacher at the complex

10  claimed that teachers were required to return

11  40 percent of their earnings to the school

12  administrators.  Further, although the teachers were

13  not native English speakers, they were identified as

14  English teachers, which raised suspicions.  Rafiekian

15  believed that the compound, its activities, and

16  staffing were concerning and highlighted this.

17  Rafiekian has been asked to consult on a

18  documentary-style commercial to raise awareness about

19  the concerning activities/suspicions regarding this FGM

20  school/compound.

21          Rafiekian identified Ekim Alptekin, a

22  Turkish-Dutch duel national, as a business contact.

23  Rafiekian claims that he provided a reference for

24  Alptekin, whom he described as the head of the American

25  chamber of commerce in Turkey.  Alptekin has senior

1   level contacts in the Turkish government, particularly

2   related to finance and economics, and was previously

3   involved with the Eclipse Aviation, a company that

4   produces small jet planes in New Mexico.  Alptekin is

5   also the sole owner of Inovo, a Dutch company.

6           Rafiekian also provided business cards for

7   the Flynn Intel Group.

8           THE COURT:  Thank you.

9           MR. MACDOUGALL:  Your Honor, the defense

10  rests.

11          THE COURT:  All right.  Thank you.

12          Mr. Gibbs, does the government have any

13  rebuttal?

14          MR. GIBBS:  We do not, Your Honor.

15          Thank you.

16          THE COURT:  All right.  Ladies and gentlemen,

17  you have now heard all the evidence in the case.

18  Before you begin your deliberations, we need to take up

19  some procedural matters and then instruct you as to the

20  law and then have closing arguments.

21          I'm going to excuse you to the jury room at

22  this time.  I hope to bring you back out shortly and

23  let you know what our schedule is going to be going

24  forward.

25          So you're excused for right now.  Please do

1  not discuss this case among yourselves.

2          Thank you.

3      (The jury exits at 10:29 a.m.)

4          THE COURT:  Please have a seat.

5          Mr. MacDougall.

6          MR. MACDOUGALL:  Your Honor, Mr. Tysse will

7  take up the argument for the defense.

8          THE COURT:  All right.  Let's see where we

9  are after the motion.

10         MR. TYSSE:  Thank you, Your Honor.

11         We've had a chance to review the jury

12  instructions and have four points to make.

13         The first one with regard to the conspiracy

14  count as to what constitutes unlawful conduct under

15  Section 951 and 618(a), we simply would like to

16  preserve our argument that this -- to prove something

17  that is not a legal commercial transaction requires a

18  willful state of mind.

19         THE COURT:  All right.

20         MR. TYSSE:  With respect to the -- what

21  constitutes a violation of 618(a), we'd like to object

22  to the definition of "material" that Your Honor has

23  chosen.

24         THE COURT:  All right.

25         MR. TYSSE:  The reason, Your Honor, is the

1  definition unlike either -- the definition that defense

2  suggested or the government -- the defense that it was

3  significant or important or the government that it was

4  capable of influencing government action, we think the

5  language proposed referring to whether the information

6  is inaccurate or misleading is a pretty low bar for

7  what might constitute something that's material.

8           And, in fact, the word "inaccurate" in

9  particular I don't think adds a lot to the current

10 language of the statute, which is whether something is

11 false.  False and inaccurate are kind of the same

12 thing.  So I think if we chose this sort of language,

13 inaccurate or misleading, you're going to essentially

14 read the word "material" out of the statute.

15          And we know from the *Escobar* case that Your

16 Honor, I think, referred to the other day, it said that

17 materiality is a very high standard and, you know, it's

18 the government's obligation to put forth the proof of

19 that.

20          So I think merely requiring the government to

21 show something that's inaccurate -- which, again, is an

22 extremely low bar and, I think, inconsistent with the

23 meaning of material.  We suggest that it should be

24 either, you know, significant or important, something

25 that's a synonym of material or something capable of

1  influencing government action.

2          With respect to that same definition Your

3  Honor proposed --

4          THE COURT:  So what would you be proposing?

5  Anything other than what you've already proposed?

6          MR. TYSSE:  Yeah.  I think we'd continue to

7  suggest the language that we proposed in our original

8  jury instruction.  But, in particular, inaccurate and

9  misleading.  Like I said, I think it reads out the word

10  "material" a little bit from the statute.

11          THE COURT:  All right.

12          MR. TYSSE:  Because even a minor sort of

13  immaterial statement could still be inaccurate or

14  misleading to some extent.

15          With respect to the same definition, Your

16  Honor defines willfully as someone who knowingly

17  performs an act deliberately and intentionally as

18  contrasted with accidentally, carelessly, or

19  unintentionally.

20          Your Honor, we propose that that should also

21  include knowledge that the conduct itself was unlawful.

22  We cited a couple of cases for that.  I think the

23  *Bursey* case from the Fourth Circuit.  I believe it was

24  from the Fourth Circuit.

25          If you will indulge me.  I'm sorry.  Yeah.

1 Yeah.  The *Bursey* case from the Fourth Circuit and both

2 the *Bryan* case -- both define willfully in contrast and

3 knowingly as someone having acted with knowledge that

4 his conduct was unlawful.  We think that is what

5 actually distinguishes willful from knowing and

6 accordingly would object to that language not being

7 included.

8            THE COURT:  All right.

9            MR. TYSSE:  On the Count 2 charge, Your

10 Honor, this is the third of the four points.  On the

11 Count 2 charge, it's a similar sort of charge -- or a

12 similar sort of objection, which is that the third

13 element says that Bijan Rafiekian acted knowingly.  We

14 would request in line with our proposed instruction

15 that that knowingly include additional information

16 based on the *Liparota* case, that the knowledge in this

17 context because it would otherwise criminalize unlawful

18 conduct -- or excuse me, legal conduct should be

19 knowledge that conduct was not authorized by the

20 statute or regulation.  That's the *Liparota* case.  I'm

21 happy to talk about that further or send you the cite,

22 but I believe it's in our papers.

23            Similarly, that the knowledge that he was

24 actually required to register I think that's what it

25 would mean in this context.  And that comes from the

1  *X-Citement* case as well.  And the idea is that the

2  knowingly would apply to each of the prior elements.

3  And because one of the elements is that Mr. Rafiekian

4  acted in the United States as an agent of a foreign

5  government when required to register.  So he had to

6  know that he was required to register.  That comes from

7  the *X-Citement* case.

8          The fourth point I'll make, Your Honor, is

9  that in light of Your Honor's 801(d)(2)(E) ruling with

10  respect to coconspirator statements, we would

11  propose -- it's not in the proposed instructions --

12          THE COURT:  Do you have the cite for the

13  *Liparota* case?

14          MR. TYSSE:  I do.  It's *Liparota v. United*

15  *States*, 471 U.S. 419.

16          There's also a very recent Supreme Court

17  decision, *Rehaif v. United States*, R-E-H-A-I-F, 139 S.

18  Ct. 2191.  That's 2019.

19          THE COURT:  2919, is that what you said?

20          MR. TYSSE:  2191.  139 S. Ct. 2191.  It was

21  just issued about a month ago.

22          THE COURT:  All right.

23          MR. TYSSE:  But that -- it says the same

24  thing, and it says it's not a situation where

25  evidence -- or, I'm sorry, ignorance of the law is no

1   excuse.  But, rather, that in certain contexts, it's

2   still the government's burden to show that the

3   defendant actually was aware that his conduct was

4   unlawful.  Because otherwise you're criminalizing

5   things that would otherwise not be --

6           THE COURT:  You referenced a Fourth Circuit

7   case as well, I believe.

8           MR. TYSSE:  Yes.  That one is the *Bursey*

9   case.  I believe it's *United States v. Bursey*, 416 F.3d

10  301.  That's Fourth Circuit, 2005.

11          THE COURT:  All right.

12          MR. TYSSE:  And what that holds is that for a

13  defendant to have acted willfully as opposed to

14  knowingly, he must have acted with knowledge that his

15  conduct was unlawful.

16          THE COURT:  All right.

17          MR. TYSSE:  And that, in turn, quotes *United*

18  *States v. Bryan*, a Supreme Court case, that says the

19  same thing, and it's specifically contrasted with

20  knowingly.

21          The fourth and final point on the

22  instructions, Your Honor, is that in light of Your

23  Honor's ruling with respect to 801(d)(2)(E), we think

24  it would be appropriate to include a short instruction

25  that reiterates that point to the jury.

1      THE COURT:  All right.

2      MR. TYSSE:  Your Honor said multiple times

3  during the trial, but we think it would be important to

4  remind the jury of that.

5      Now, a final point, Your Honor, that is not

6  related to the jury instructions, but we'd like to

7  move, again, for judgment of acquittal under Rule 29.

8      THE COURT:  All right.  I know you've filed a

9  brief on that.

10      MR. TYSSE:  That's right.

11      THE COURT:  Do you want to just summarize

12  briefly that, or do you want to say anything further?

13      MR. TYSSE:  Sure, Your Honor.  I think we've

14  probably said it best in the papers that we've already

15  filed.

16      THE COURT:  All right.

17      MR. TYSSE:  Essentially, it's what we've have

18  also talked about this morning as well.

19      THE COURT:  All right.  That's fine.

20      MR. TYSSE:  At the end of the day, this

21  requires an agreement to commit an unlawful act.  We

22  think that's where the government's case has gone awry.

23      THE COURT:  All right.

24      MR. TYSSE:  Thank you.

25      MR. TURGEON:  Thank you, Your Honor.

1           First, with regard to the materiality jury

2  instruction --

3           THE COURT:  Yes.

4           MR. TURGEON:  -- we would suggest that the

5  Court give the instruction that we proposed last night.

6  The one notable difference in that from what the

7  defense has proposed or what the Court has proposed is

8  that it actually does cite the statute for materiality.

9           In Section 612 of FARA, Subsection A, it says

10  that the registration statement shall include the

11  following, which shall be regarded as material for

12  purposes of this subchapter.  Then it lists, I believe,

13  11 subcategories of information.

14           THE COURT:  Aren't those categories reflected

15  on the registration form itself that's in evidence?

16           MR. TURGEON:  Your Honor, yes, they include

17  what's listed on the form.  In fact, Subsection 10

18  says -- I'm going to paraphrase.  Subsection 10 says

19  essentially anything on the form is material.

20           THE COURT:  Right.

21           MR. TURGEON:  So what the government --

22           THE COURT:  Instead of having that

23  description, I made reference to the form.  Why isn't

24  that adequate?  I made reference to the information

25  requested in the form.

1          MR. TURGEON:  Yes, Your Honor.  I apologize.

2    I'm flipping to that.

3          Is Your Honor referring to the language for

4    the purpose of determining whether a false statement --

5          THE COURT:  Yes.

6          MR. TURGEON:  Your Honor, in addition to the

7    FARA registration statement, we would request that that

8    say "and associated forms" essentially since there are

9    several.  I mean, not to be hypertechnical, but there's

10   the registration statement.  There's the supplemental

11   statement.  There's Exhibit A.  I mean --

12         THE COURT:  Those are all in evidence?

13         MR. TURGEON:  A variety of forms.  Yes, Your

14   Honor, that's right.

15         THE COURT:  What about what makes an accurate

16   or misleading language?  Do you have any objections to

17   that?  The defense wants those qualified in some

18   fashion.

19         MR. TURGEON:  Your Honor, we think -- I mean,

20   I think our instructions, I would say, do a good job of

21   laying out essentially what's required to prove a

22   violation of 618(a)(1).  That's --

23         THE COURT:  So what you would say is simply

24   whether the false statement or omission makes --

25         MR. TURGEON:  The statute, Your Honor,

1    says -- again, looking at the statute:   In any

2    registration statement or supplement thereto or any

3    other document, a false statement of a material fact

4    are willfully -- makes a false statement of a material

5    fact or willfully omits any material fact required to

6    be stated therein or willfully omits a material fact or

7    a copy of a material document necessary to make the

8    statements therein and the copies of documents

9    furnished therewith not misleading.

10           So, Your Honor, there's essentially three

11   ways you can qualify under that provision, and we'd

12   request that the instruction say that.

13           THE COURT:   Well, it mentions misleading is

14   the only thing I heard in that definition pertaining to

15   materiality.

16           MR. TURGEON:   No, not pertaining to

17   materiality there.   No, Your Honor.

18           THE COURT:   All right.

19           MR. TURGEON:   And with regard to the second

20   item on my list, willfulness, in accordance with Your

21   Honor's previous ruling that the willfulness will not

22   be imputed to the legal commercial transaction element,

23   we're fine with the instruction referencing the Supreme

24   Court's opinion in *Bryan*, but we would request that

25   that be given immediately after the materiality

 1  instruction.

 2          THE COURT:  Which instruction are you on now?

 3          MR. TURGEON:  I apologize, Your Honor.  I

 4  don't have --

 5          THE COURT:  This is under 951?

 6          MR. TURGEON:  No, Your Honor.  Under the law

 7  of the conspiracy.  What I understood Mr. Tysse to be

 8  referring to was the instruction that the defense

 9  originally proposed on willfulness --

10          THE COURT:  Yes.

11          MR. TURGEON:  -- in arguing that that second

12  sentence be given.  The government has no opposition to

13  that second sentence being given.

14          THE COURT:  All right.

15          MR. TURGEON:  So the instruction reflects the

16  *Bryan* decision.

17          THE COURT:  So materiality would include --

18  I'm sorry.  Willfully will include knowledge that the

19  conduct is unlawful?

20          MR. TURGEON:  Yes, Your Honor.  For purposes

21  of the conspiracy in Count 1, yes.

22          THE COURT:  All right.

23          MR. TURGEON:  But, again, in the sequence of

24  instructions, if that is to be a separate instruction,

25  we'd ask that it be given immediately after the

1   materiality instruction so that it's clear to the jury

2   that the willfulness applies only to the violation of

3   618.

4            And I'm convinced, Your Honor, that the

5   willfulness instruction isn't entirely necessary.  The

6   forms make that pretty clear given the evidence at

7   trial, but we're fine with that.

8            THE COURT:  I believe, though, he was

9   referring to the knowledge element in Count 2, the

10  knowingly --

11           MR. TURGEON:  As I understand, Your Honor,

12  that's a separate question, and that's not what I was

13  just talking about.

14           THE COURT:  No.  I understand.  All right.

15           MR. TURGEON:  Then, Your Honor, we would

16  contend that there's no need for a separate instruction

17  to inform the jury, once again, the purpose for which

18  those statements were admitted.  I mean, they've heard

19  Your Honor's admonishment enough times they could

20  probably recite it from memory, but that's up to the

21  Court.

22           THE COURT:  All right.  I'll consider it and

23  decide what to do on that.

24           Anything else on the instructions?

25      (No response.)

1          THE COURT:  I've gone through the others, the

2    proposed joint instructions, as well as everybody's

3    nonagreed to instructions.  We'll get those to you

4    shortly.  You can go through those, and we can take

5    those up.

6          Anything else on these that I've --

7          MR. TURGEON:  Your Honor, there's one other

8    thing on Your Honor's -- which I alluded to earlier --

9    on Your Honor's proposed instruction about what

10   constitutes unlawful conduct under Section 951.  On the

11   second page of that instruction, the paragraph begins,

12   The government alleges that the conspiracy had as one

13   of its objectives --

14         I mean, that is one of the violations of law

15   that the government has alleged.  It's not the only

16   one, though, and our reply brief makes that clear.

17   It's not just about failure to register.  It's failure

18   to comply with numerous provisions of FARA independent

19   of and in a separate section from the registration

20   requirement.

21         And so that continues on to the following

22   page, Your Honor, where it says, The government has,

23   therefore, proved that a conspiracy had one of its

24   object -- one of its -- the conspiracy had as one of

25   its objectives conduct that satisfied the essential

1   elements of a violation of 612(a).

2            That's not the only way that, Your Honor --

3   Your Honor, that the government can prove that it

4   wasn't a legal commercial transaction.

5            THE COURT:  What else?  The Lobbying Act?

6            MR. TURGEON:  Yes, Your Honor.  In addition

7   to 612(a), there are numerous provisions of --

8            THE COURT:  Well, you have to tell me what

9   they are.  I can't tell the jury there are numerous

10  provisions.

11           MR. TURGEON:  Yes, Your Honor.  Our proposed

12  instructions lay them out and identify them by -- the

13  ones we filed last night lay them out by the statute

14  and the text of the statute.  It's --

15           THE COURT:  Hold on.

16           Which instruction is it in?

17           MR. TURGEON:  It is the one that we proposed

18  last night, Your Honor.

19           THE COURT:  Which number?

20           MR. TURGEON:  I don't believe it has a

21  number, Your Honor.  It's the one that includes several

22  block quotes, I believe, and identifies Section 614(a),

23  614(b), 614(e) and (f), I believe, are the sections

24  identified.  Those are the other provisions aside from

25  the registration requirement that were violated.

1        And then in that instruction as well, Your

2   Honor, we address the provisions of the Lobbying

3   Disclosure Act that were violated.  I believe

4   Mr. Gillis would like to speak to that issue.

5        THE COURT:  Those are the provisions that --

6   the 614, I don't have the statute in front of me.

7   Those are the ones that relate to who constitutes an

8   agent of a foreign principal?

9        MR. TURGEON:  No, Your Honor.  Those

10  provisions concern -- well, the section is titled

11  Filing and Labeling of Political Propaganda.  If I

12  could paraphrase them, Your Honor, essentially, 614(a)

13  says that anyone who is an agent of a foreign principal

14  and required to register, whether or not they have

15  registered, needs to file copies of disseminated

16  informational materials with the Department of Justice

17  within 48 hours of doing so.

18        Subsection (b) includes labeling requirements

19  for such materials, which were not met in this case.

20        Subsection (e) details the requirements

21  that -- the disclosures that someone needs to make when

22  they're lobbying on behalf of a foreign principal

23  before they do that lobbying.

24        THE COURT:  All right.

25        MR. TURGEON:  And (f) concerns appearances

1   before Congress.

2           So those four provisions of Section 614 are

3   also violations.

4           THE COURT:  You're including (f)?

5           MR. TURGEON:  Yes, Your Honor.

6           THE COURT:  All right.  You don't have that

7   in your instruction, I don't believe.

8           MR. TURGEON:  Oh, Your Honor, actually, (f)

9   was in our brief but not in our instructions.  So, no

10  (f), Your Honor.

11          THE COURT:  No (f).  All right.

12          MR. TURGEON:  That's not relevant here.

13          THE COURT:  All right.

14          MR. TURGEON:  And then Lobbying Disclosure

15  Act provisions appear just before that in that proposed

16  instruction, Your Honor.

17          THE COURT:  All right.

18          MR. TURGEON:  And there are several of those.

19          That's all.  Thank you.

20          THE COURT:  All right.

21          MR. GILLIS:  I'm sorry, Your Honor.

22          THE COURT:  Yes.

23          MR. GILLIS:  If I could, I just wanted to

24  respectfully point out what I believe is -- I believe,

25  Your Honor, I respectfully submit that the third --

1    fourth page of the instructions under conspiracy,

2    existence of an agreement, in that fourth line up from

3    the bottom, proof of the conspiracy may be made by

4    circumstantial evidence and --

5             THE COURT:  Which one is it?  It's the --

6             MR. GILLIS:  Sorry.  It's the -- on

7    conspiracy, existence of an agreement --

8             THE COURT:  Yes.

9             MR. GILLIS:  -- the fourth line from the

10   bottom, I believe it's meant to say, It need not and

11   normally will not be proven by direct evidence.

12            I just think that the "a" should be an "and"

13   there instead.

14            THE COURT:  Yes.  Thank you.

15            All right.

16            MR. TURGEON:  One more thing, Your Honor,

17   with regard to Your Honor's proposed instruction about

18   conspiracy and membership in an agreement --

19            THE COURT:  Yes.

20            MR. TURGEON:  -- there are a couple of points

21   I wanted to raise there.

22            THE COURT:  Yes.

23            MR. TURGEON:  The end of the second paragraph

24   ends:  A member of the conspiracy or a

25   conspiratorial -- I believe that should be agreement or

1  something to that effect.

2              THE COURT:  Where are we?

3              MR. TURGEON:  Paragraph 2, the very last

4  line.

5              THE COURT:  A member of the conspiracy or a

6  conspiratorial agreement, yes.

7              MR. TURGEON:  In the next paragraph, Your

8  Honor, it says, The government must prove the defendant

9  intended to commit the substantive offenses that are

10 the alleged unlawful objectives of the conspiracy.  I

11 believe that should be commit one of the substantive

12 offenses.

13             THE COURT:  At least one?

14             MR. TURGEON:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. TURGEON:  And then the very last sentence

17 on that page, Acts of covering up even though done in

18 the context of a mutually understood need for secrecy

19 cannot themselves constitute proof the concealment of

20 the crime was part of the original agreement.

21             Your Honor, in the context of this case, we

22 believe that that language is misleading, essentially.

23 I mean, from the very beginning, as Mr. Gillis laid

24 out, covering up the existence of -- the involvement of

25 Turkish government officials in the project was part of

 1  the conspiracy from the very beginning.  So we would
 2  object to that language for that reason.
 3          THE COURT:  All right.  I'll consider that.
 4          MR. TURGEON:  Thank you.
 5          THE COURT:  Mr. Tysse, why don't we start
 6  with the last point on membership in the agreement.
 7          MR. TYSSE:  Which language in particular?
 8          THE COURT:  The acts of covering up.
 9          MR. TYSSE:  I'm sorry.  I'm trying to find
10  the language, Your Honor.
11          THE COURT:  It's in the conspiracy,
12  membership, and an agreement.
13          MR. TYSSE:  I'm sorry.  Okay.  I skipped that
14  page.
15          THE COURT:  The last sentence.  I don't have
16  the citations.  I'm trying to --
17          MR. TYSSE:  So the government contends that
18  this is misleading in the context of this case?
19          THE COURT:  Yes.
20          MR. TYSSE:  I mean, Your Honor, I think the
21  government's argument begs the question a little bit,
22  which is that they're assuming illegality and then
23  suggesting that what we contend are totally true
24  statements are -- should be and can be construed as
25  acts of covering up.  We don't think that's consistent

 1  with conspiracy law.  We think there needs to be

 2  additional evidence beyond just what they allege to be

 3  acts of cover up.

 4          THE COURT:  I don't have your citations.

 5  Where does that come from?  Do you know?

 6          MR. TYSSE:  What case?

 7          THE COURT:  Yes.

 8          MR. TYSSE:  I don't --

 9          THE COURT:  The source of that instruction?

10          MR. TYSSE:  I don't have it handy, Your

11  Honor.

12          THE COURT:  All right.  I can track it.

13          MR. TYSSE:  I'm sorry.

14          THE COURT:  All right.  I'll look at it.

15          All right.  What about the legal commercial

16  transaction instruction, including the reference to the

17  Lobbying Disclosure Act and the other provisions of

18  FARA that the government has proposed in its

19  instruction?

20          MR. TYSSE:  Your Honor, we object.  We object

21  for a number of reasons.  We think that it is, frankly,

22  shocking that at this point in the case, on the eve of

23  the case going to the jury, the government literally

24  last night for the first time is suggesting that there

25  were other nonlegal commercial transactions than the

1  one they've said was illegal all along.  I think if you

2  look at the evolution of the government's theory with

3  this point, it's very telling and goes exactly to why

4  we moved to dismiss this case from the get-go.

5          In the beginning, the government gave us a

6  superseding indictment, issued a superseding

7  indictment, went to a grand jury without ever

8  specifying what our client did that was in any way

9  anything other than a legal commercial transaction.

10  They listed that we did lobbying and op-ed work that

11  was protected by the First Amendment.  They did not

12  specify that there was any underlying violation of the

13  FARA statute.  They certainly don't refer to the FARA

14  statute in particular, and they don't even say that

15  during that time we should have -- we should have, you

16  know, registered under FARA.

17          Instead, what they charged us with was 18 --

18  my client with was 18 U.S.C. 951, which has a lower

19  *mens rea* and a higher jail term.  And we think -- like

20  I said, it is shocking and frustrating that, again,

21  right now for the very first time we're hearing that

22  there's all of these other new violations of both the

23  FARA and the LDA.  I mean, I think it's wrong enough

24  that the government suggests that there are now

25  additional FARA violations besides 612(a)

1   notwithstanding the arguments made in the motion to

2   dismiss briefing when the government could have raised

3   this argument and in Your Honor's prior ruling, which

4   recognized that 612(a) was the only statute the

5   government suggested we violated.  But now they're

6   actually bringing in an entirely separate statute that

7   they say constitutes something other than an illegal

8   commercial transaction.

9           THE COURT:  All right.

10          MR. TYSSE:  If Your Honor recalls, when we

11  moved to dismiss, we did so on the ground that this is

12  a -- not only a problem with the elements of the

13  offense, Your Honor, but it is also a notice issue.

14          THE COURT:  Right.

15          MR. TYSSE:  It is a notice issue both for

16  purposes of preparing the defense but also just so the

17  grand jury -- it's brought to the grand jury's

18  attention what the crimes were that my client is

19  alleged to have violated or -- excuse me, what statutes

20  my client is alleged to have violated.

21          And I do not think it is appropriate at this

22  stage after all we've been through -- this is also not

23  the first time that the government had a chance to

24  propose jury instructions that we're now getting brand

25  new crimes we've had no chance to put on evidence of,

 1   no chance to defend.

 2           This is, I think, extremely inappropriate.

 3   We think the Court has already ruled on this issue and

 4   said 612(a) is the only nonlegal commercial transaction

 5   alleged, and that's where this should rest.

 6           THE COURT:  All right.  Tell me, again, your

 7   position with respect to the knowledge requirement in

 8   Count 2.

 9           MR. TYSSE:  In Count 2, Your Honor, yes.

10           THE COURT:  The acted knowingly.

11           MR. TYSSE:  Exactly.  So this count requires

12   that the defendant have acted knowingly.  And the

13   question is what does that mean in this context?  And

14   what we say for a couple of reasons -- both the

15   *X-Citement* case, which suggests that the knowingly

16   element applies to each of the prior elements,

17   including that Bijan Rafiekian acted in the United

18   States as an agent of a foreign government --

19           THE COURT REPORTER:  I'm sorry?

20           MR. TYSSE:  Excuse me.

21           -- including that Bijan Rafiekian acted in

22   the United States as an agent of a foreign government

23   if required to register by regulations promulgated by

24   the attorney general.

25           So we think that knowingly element applies to

1  that as well and, therefore, would require him to have

2  known he was supposed to register.  And the reason why

3  this --

4           THE COURT:  Acted knowingly -- what would you

5  add to that?  Knowingly with respect to the requirement

6  to --

7           MR. TYSSE:  Right.  I think our proposed jury

8  instructions set it out, I believe, with a separate

9  element.  One, that Mr. Rafiekian acted; two, that he

10 failed -- that he was required to notify the attorney

11 general, which, again, is part of the first sentence.

12          THE COURT:  So the issue is whether the

13 knowingly element applies to that portion of the

14 statute as well.

15          MR. TYSSE:  Exactly.

16          THE COURT:  All right.

17          MR. TYSSE:  And, Your Honor, we believe it

18 does for a couple of reasons:  One is the *X-Citement* --

19          THE COURT:  Right.

20          MR. TYSSE:  -- case which says that

21 essentially -- and that was reiterated in the *Rehaif*

22 case, the R-E-H-A-I-F.  But we think it's also true

23 because of the *Liparota* case.  And if you look at the

24 facts of that case, we think it's very analogous to

25 this one.  That was a situation where it was --

1            THE COURT:  What you want to say is -- the

2  way this is set up, it says Rafiekian acted as an

3  agent, that he failed to notify the attorney general,

4  and that he acted knowingly.

5            And you want a separate statement that makes

6  it clear that the knowingly requirement applies both to

7  his acting as an agent and also knowingly with respect

8  to the fail to notify element?

9            MR. TYSSE:  That's right, Your Honor.

10            THE COURT:  All right.

11            MR. TYSSE:  And so I think there's a couple

12  of ways to do it.  We think one would just to add a

13  sentence perhaps prior to the paragraph beginning, "As

14  the Court has previously instructed," just making that

15  clear.  Because, you know, given both the *X-Citement*

16  case but also the *Liparota* case, which involved a

17  situation where it was a crime to possess food stamps

18  except as authorized by law or something like that.

19  And what the Supreme Court held -- I don't have it

20  handy with me, but it essentially says because there's

21  nothing inherently wrongful with possessing food stamps

22  even though it's just a knowingly offense.

23            In that situation, the government must prove

24  that they actually knew that they were not allowed to

25  have them.  Of course, that doesn't mean that the

1    defendant must know the specific provision of law or

2    anything like that, but there must be actual criminal

3    intent with respect to that element because otherwise

4    you could be criminalized for writing op-eds and

5    selling consulting services to paying clients.  And

6    that's the point.

7           You asked me before, Your Honor, about our

8    citation for that point.  It's a Supreme Court case.

9           THE COURT:  On which one?

10          MR. TYSSE:  On the conspiracy point before.

11   I'm sorry.

12          THE COURT:  The acting, the covering up?

13          MR. TYSSE:  That's right.  And the citation

14   we have for that is the *Grunewald*, G-R-U-N-E-W-A-L-D,

15   *v. United States*, 353 U.S. 391.  It's a 1957 Supreme

16   Court case.

17          THE COURT:  353 391?

18          MR. TYSSE:  353 U.S. 391.

19          THE COURT:  All right.

20          MR. TYSSE:  I think that stands for that

21   proposition.

22          If there's any other questions Your Honor

23   has, I'm happy to address those.

24          THE COURT:  All right.  Okay.  Mr. Turgeon.

25          MR. GILLIS:  Your Honor, if I could just

1   briefly address the LDA issue, and then Mr. Turgeon

2   will address the rest of the points.

3              THE COURT:  Yes.

4              MR. GILLIS:  Your Honor, first of all, in

5   fairness, the Court's order that ruled that we had to

6   prove a separate violation to disprove the -- the Court

7   ruled that we had to prove that the conduct in order

8   not to be a lawful transaction had to be a violation of

9   some other statute.  That was in the Court's ruling

10  that came out on the evening -- or late in the

11  afternoon on Wednesday, and that was really the first

12  notice that we had certainly after the superseding

13  indictment.  It should come as no surprise, Your Honor,

14  that we would maintain that the statement in the LDA

15  was false, that Inovo was --

16             THE COURT:  Right.  The point that Mr. Tysse

17  is making, which I think is a substantial one, is that

18  the Court in response to the motion to dismiss ruled

19  that the legal transaction piece of this was an

20  essential element of the offense.  Then the issue was

21  whether the superseding indictment adequately alleged

22  that as an element.  The Court ruled that although it

23  was not specifically pleaded as such, the Court found

24  sufficient substance in the superseding indictment to

25  place the defendant on notice that the legal

1   transaction piece of it was being violated, if you

2   will, that there was not a legal transaction based on

3   912(a).

4            It was never argued and the Court never

5   considered whether the superseding indictment

6   adequately disclosed that the defendant had engaged in

7   something other than a legal commercial transaction

8   because of violations of any other provision, including

9   the LDA or now 614.  It really gets back to whether the

10  superseding indictment is sufficient for the purposes

11  of now allowing this case to go to the jury upon a

12  theory that there was no legal commercial transaction

13  because of violations of something other than 612.

14           MR. GILLIS:  No, Your Honor.  It is

15  exactly -- it is essentially the same.  What we're

16  alleging, Your Honor, is that the false statement on

17  the LDA, whether it was in violation of the LDA or

18  whether it was -- the false statement on the LDA form

19  that Inovo was the client is essentially the only

20  allegation that we are making that has to do with

21  that -- excluding it from a lawful transaction.  That

22  can hardly come as a surprise to them because they've

23  had that LDA filing from the beginning.  We've alleged

24  that that statement was false.

25           They have raised it themselves as one of the

 1  defenses that it was made.  They certainly could assume

 2  that we were going to argue that the advice of counsel

 3  does not apply because he didn't fully reveal the facts

 4  and he lied about the -- about the existence of --

 5  about who the client was.

 6          And so I submit that it's fair for us to

 7  argue that that was one of the means by which it was

 8  not a lawful commercial transaction.

 9          THE COURT:  Well, that's why I have to go

10  back and look at it.  Whether the substance of the

11  superseding indictment is sufficient to cover what you

12  are now claiming in substance were violations other

13  than 612 or whether this constitutes some kind of a

14  constructive amendment or improper variance from the

15  superseding indictment.

16          MR. GILLIS:  All right, Your Honor.  Thank

17  you very much.

18          THE COURT:  All right.  Mr. Turgeon, let me

19  ask you:  With respect to this knowingly element in

20  Count 2, is there any objection to making it clear that

21  the knowingly element applies both to the defendant

22  acting as an agent and also failing to notify the

23  attorney general?

24          MR. TURGEON:  I mean, essentially, Your

25  Honor, the knowing requirement applies to every element

 1   of the offense.

 2              THE COURT:  Right.

 3              MR. TYSSE:  It's in Your Honor's discretion

 4   how best to explain that to the jury.

 5              THE COURT:  All right.

 6              MR. TURGEON:  Your Honor, there is one

 7   statute -- excuse me -- one decision that I wanted to

 8   cite for Your Honor in reference to that point I raised

 9   about the -- about whether -- to what extent proof of a

10   cover-up can serve as evidence of the conspiracy.  And

11   that's the *United States v. Mann* case.  It's a Fourth

12   Circuit case from --

13              THE COURT:  Hold on a second.

14              MR. TURGEON:  Excuse me?

15              THE COURT:  Just one second.  I need to make

16   those notes in the right place.

17              MR. TURGEON:  Yes, Your Honor.

18              THE COURT:  *U.S. v. Mann*?

19              MR. TURGEON:  *Mann* with two Ns, a Fourth

20   Circuit case from 1991.  We cited it previously.

21              THE COURT:  What's the cite?

22              MR. TURGEON:  I do not have the cite, Your

23   Honor, but it is cited in our opposition on the Rule 29

24   motion.

25              THE COURT:  All right.

1        MR. TURGEON:  It holds that cover-ups in

2    highly regulated areas may be acts in furtherance of a

3    criminal conspiracy.

4        THE COURT:  All right.  Anything else on

5    those?

6        MR. TURGEON:  Could I have the Court's

7    indulgence for just one moment, Your Honor?

8      (Counsel confer.)

9        MR. GILLIS:  Your Honor, leaning to one side

10    whether you agree to rule with us on Mr. Turgeon's

11    argument, I just respectfully submit that that last

12    sentence is confusing.  It's such a compound sentence.

13    I don't know whether it comes directly from some legal

14    decision, but just for purposes of giving it to a lay

15    jury, I believe it could be split up into perhaps more

16    than one sentence to express the point that the Court

17    is trying to express there.

18        So if you will permit us, we'll take a crack

19    at doing that as well.

20        THE COURT:  All right.

21        MR. GILLIS:  If the Court could also consider

22    in the meantime what it might be willing to do with

23    respect to perhaps clarifying that last sentence for a

24    lay jury.

25        THE COURT:  All right.

1    MR. GILLIS:  Thank you, Your Honor.

2    THE COURT:  Something else, Mr. Tysse?

3    MR. TYSSE:  Well, just very briefly, if

4  you'll indulge me.  I promise I'll be quick.

5    First of all, the government mentioned that

6  this was a -- you know, it was a surprise to them that

7  the Court was going to require legal commercial

8  transaction proof as part of the indictment last week.

9  I don't think it should be a surprise because Your

10  Honor's order of July 9 says that although Rafiekian is

11  not charged with a FARA violation under 22 U.S.C.

12  612(a), which is the only provision that the government

13  mentioned at the hearing -- as we know, nothing about

14  the substantive offenses in the indictment itself --

15  these activities would violate FARA and, therefore, be

16  illegal if they were covered activities and Rafiekian

17  willfully engaged in them as an agent of the Turkish

18  government without a proper FARA registration.

19    The Court found it a close call but made very

20  clear that was the only unlawful legal conduct -- I

21  mean legal commercial conduct alleged.  And the defense

22  has been preparing this defense based on that.  Today

23  we receive -- or last night, I guess, we receive the

24  government's proposed instructions which for the first

25  time mention a series of other alleged FARA violations.

1    We think there's no evidence of any of these, Your

2    Honor.

3              But more importantly -- or just as

4    importantly, I mean, if you look at some of this

5    language, no persons of an agent or a foreign principal

6    shall disseminate informational materials on behalf of

7    a foreign principal without filing two copies of the

8    materials.  There's no evidence in the record about

9    whether or not any of that happened.

10             And, again, if we had known that this was the

11   nonlegal commercial activity that was going to be

12   alleged, then we would have tailored the defense

13   appropriately.  We just think it's way too late for the

14   government to come forward with this sort of thing.

15             THE COURT:  All right.

16             MR. TYSSE:  Quickly, the second point, they

17   mention the LDA shouldn't be a surprise to us either.

18   LDA is not even mentioned in the indictment.  It's only

19   been a part of the defense.  So the idea that we should

20   have been expecting them to make some sort of argument

21   that the LDA was illegal just, you know, beg's belief.

22   There's -- it was never part of the government's case.

23             THE COURT:  I think there was a motion *in*

24   *limine* to prohibit any reference to it.

25             MR. TYSSE:  That's true, Your Honor, exactly.

1        Finally, with respect to the LDA too, Your

2   Honor, there's no evidence that Mr. Rafiekian had any

3   role in the filing of the LDA or its preparation other

4   than that initial conversation.  I think the testimony

5   is very clear on that.  So, again, you would be really

6   asking the jury to essentially speculate on whether or

7   not there may be some illegal -- by reading, you know,

8   three or four or five pages of different complex LDA

9   and FARA regulations and provisions, speculate that

10  maybe something in there is illegal enough to go

11  forward.  We don't think that's the --

12          THE COURT:  All right.  I'll look at this.

13          MR. TYSSE:  Thank you very much.

14          THE COURT:  All right.  Here's what I'd like

15  to do.  I think I'm going to release the jury until

16  2:00.  I need to review these, and I'll come up with

17  the Court's decision on how to proceed on these open

18  issues under the instructions.  We also will distribute

19  to you the balance of the instructions.  What I'd like

20  to do is reconvene at 1:00.  Hopefully, we can get to

21  you the other instructions or the revised instructions

22  sometime shortly before that.

23          All right.  Anything else before I bring the

24  jury out and tell them how we're going to proceed?

25          MR. TURGEON:  No, Your Honor.  Thank you.

1        THE COURT:  All right.  The Court continues

2   to reserve on the Rule 29 motion.

3        MR. GIBBS:  Thank you, Judge.

4        THE COURT:  All right.  Let's bring the jury

5   out.

6      (The jury enters at 11:14 a.m.)

7        THE COURT:  Please be seated.

8        Ladies and gentlemen, I want to let you know

9   where we are.  As you know, all the evidence is in, and

10  we're still dealing with some procedural issues that we

11  need to complete.  So what I'm going to do is excuse

12  you until 2:00 at which time I'm hopeful that we can

13  reconvene, at which time you'll be given your final

14  instructions.  Then we'll proceed with closing

15  arguments following which you will begin your

16  deliberations.

17       So you're excused now until 2:00.  Have lunch

18  or take a walk, clear your head, whatever you want to

19  do.  But it's important that you do not begin any

20  discussions about this case among yourselves or talk to

21  anybody about this case.  So you're now excused until

22  2:00.

23     (The jury exits at 11:16 a.m.)

24       THE COURT:  Why don't we have a seat for a

25  moment.  I also wanted to just go through some of these

1  instructions that I don't think apply.  There was a

2  proposed instruction on opinion evidence by an expert

3  witness.  I don't think we've had any experts.  Have

4  we?  I don't think we have.

5          MR. TYSSE:  No objection, Your Honor.

6          MR. TURGEON:  No, Your Honor.

7          THE COURT:  All right.  There was a proposed

8  instruction on the credibility of witnesses,

9  accomplices.  Again, I don't think that applies.  Any

10  different view on that?

11          MR. TYSSE:  No objection.

12          MR. TURGEON:  No, Your Honor.

13          THE COURT:  Likewise, immunized witnesses, we

14  don't have any of that; do we?

15          MR. TYSSE:  That's correct.

16          MR. TURGEON:  No, Your Honor.

17          THE COURT:  Nor informants, correct?

18          MR. TYSSE:  Correct.

19          MR. TURGEON:  No, Your Honor.

20          THE COURT:  All right.  There's a proposed

21  instruction on charts and summaries.  I don't think

22  we've had any, have we, admitted or unadmitted?

23          MR. GILLIS:  There has been just the listing

24  of the e-mails and whatnot that the agent and the

25  computer fellow -- the two computer guys put together,

1    but I don't believe they constitute summaries.

2              THE COURT:  Right.  Do you think we need an

3    instruction on it?

4              MR. GILLIS:  No, sir.

5              THE COURT:  All right.  I won't give that.

6              All right.  I think that's it.  We'll stand

7    in recess until 1:00.

8              ------------------------------------
                         Time:  11:18 a.m.
9

10

11

12

13

14

15

16

17

18

19

20

21
         I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                                    /s/
25                        Rhonda F. Montgomery, CCR, RPR