1048

```
                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:18cr457
                              .
      vs.                     .    Alexandria, Virginia
                              .    July 22, 2019
BIJAN RAFIEKIAN,              .    1:28 p.m.
                              .
              Defendant.      .    Day 6 (PM Session)
                              .    Pages 1048 - 1192
. . . . . . . . . . .
```

```
                     TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ANTHONY J. TRENGA
                 UNITED STATES DISTRICT JUDGE
                        AND A JURY
```

APPEARANCES:

FOR THE GOVERNMENT:          JAMES P. GILLIS, AUSA
                             JOHN T. GIBBS, AUSA
                             S. KATE SWEETEN, AUSA
                             EVAN N. TURGEON, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR DEFENDANT RAFIEKIAN:     ROBERT P. TROUT, ESQ.
                             Trout, Cacheris & Solomon, PLLC
                             1627 I Street, N.W., Suite 1130
                             Washington, D.C. 20006
                               and
                             MARK J. MacDOUGALL, ESQ.
                             STACEY H. MITCHELL, ESQ.
                             JOHN C. MURPHY, ESQ.
                             JAMES E. TYSSE, ESQ.
                             Akin, Gump, Strauss, Hauer &
                             Feld, LLP
                             Robert S. Strauss Building
                             1333 New Hampshire Avenue, N.W.
                             Washington, D.C. 20036-1564


THE DEFENDANT, BIJAN RAFIEKIAN, IN PERSON


          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1049

1    OFFICIAL COURT REPORTER:          ANNELIESE J. THOMSON, RDR, CRR
                                       U.S. District Court, Third Floor
2                                      401 Courthouse Square
                                       Alexandria, VA 22314
3                                      (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1050

1          I N D E X

2

Closing Argument by Mr. Gillis:              Page 1117

3

Closing Argument by Mr. MacDougall:          Page 1148

4

Rebuttal Argument by Mr. Gillis:             Page 1177

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           A F T E R N O O N   S E S S I O N

2                 (Defendant present, Jury out.)

3         THE COURT:  I believe you've been given a copy of the

4 Court's proposed jury instructions.  Let me summarize what,

5 what I've -- what rulings I've made that are reflected in these

6 instructions.

7         With respect to Instruction No. 35 dealing with

8 the -- what constitutes unlawful conduct under 951 and 618,

9 I've refashioned the materiality definition, and on reflection,

10 I'm going to change it further to say that the test for

11 materiality is whether in light of any false statement or

12 omission, the filed FARA registration statement and associated

13 forms that have been received into evidence failed to provide

14 the information requested.

15         Also, I've considered the -- considered whether it

16 would be appropriate to include within 35, as the government

17 has requested, reference to provisions of law other than 612(a)

18 for the purposes of 951.  The Court ruled that the -- that an

19 essential element of the offense in 951 was that the defendant

20 engaged in conduct other than a lawful commercial transaction,

21 and within that context, ruled that it considered the --

22 whether the superseding indictment was sufficient given the

23 standards applicable to the sufficiency of indictments.

24         The superseding indictment did not specifically

25 mention what the Court had determined would be an essential

1052

1    element and then considered whether that was fatal, and for

2    that purpose, considered the substance of the indictment, even

3    though it didn't specifically reference what made that conduct

4    not qualify for -- not qualify as a legal commercial

5    transaction and determine that there was sufficient substance

6    in the superseding indictment to fairly advise the defendant

7    that it was -- the contention was that it was unlawful under

8    612(a).

9            The Court specifically observed that it wasn't

10   sufficient for the purposes of the 618(a)(2), I believe it was,

11   and upon review, the Court concludes that it wasn't the

12   superseding indictment -- the substance of it is insufficient

13   to allege, allege unlawful conduct based on any other statute,

14   including the Lobbying Disclosure Act or the Section 614 of

15   FARA.

16           There's certainly no reference to that, and there's

17   no allegation of conduct that would satisfy the substance of,

18   of either of those -- any of those provisions, and indeed, the

19   government took the position that the Lobbying Disclosure Act

20   was irrelevant.  The Court -- they filed a motion to eliminate

21   any reference to it, and the Court denied that motion on the

22   grounds that it deemed it relevant for the purposes of

23   defendant's, defendant's intent and whether -- defendant's

24   intent essentially and whether there was, in fact, an

25   agreement.

1053

1    So I think it would be unwarranted to instruct the

2   jury that they could find unlawful conduct based on any

3   provision other than 612 and that to do so would constitute a

4   constructive amendment of the indictment.

5    With respect to Instruction No. 36, the Court has

6   reviewed the cases that have been cited and concludes that it

7   is appropriate to eliminate that last sentence.  I don't think

8   under the circumstances of this case that the principle that is

9   embodied within that statement is appropriate.  Certainly the

10  parties can argue about what significance the, the actions

11  were, but the allegation here is that the conspiracy continued

12  through March of 2017.

13   The -- also, again, I've reflected on the Court's

14  ruling with respect to coconspirators, and it's going to adhere

15  to that.  As I've indicated several times, there's very

16  different -- a very different issue as to whether to admit the

17  otherwise hearsay statements under that exception and whether

18  the evidence is sufficient for the jury to -- for the jury to

19  find, find guilt beyond a reasonable doubt in the -- for the

20  purposes of the hearsay statement, the Court's obligated under

21  Rule 104 to consider all the evidence, to weigh the evidence

22  and act as a fact finder.  As we all know, the standard for --

23  under Rule 29 and to allow the jury to consider is whether

24  there is substantial evidence when viewed most favorably to the

25  government, that is, that you ignore all the unfavorable

1    evidence, you focus on the favorable inference, construe it

2    most favorably to the government, and not worry about

3    credibility or weight.  So it's a very different -- they're

4    very different standards.

5            So the Court adheres to its previous ruling, and the

6    Court has included instructions that -- based on, based on that

7    ruling.

8            And that's really all I have.  I want to give the

9    parties an opportunity to raise any other issues they have

10   with, with the jury instructions.

11           Mr. Gibbs?

12           MR. GIBBS:  Thank you, Judge.  This one does relate

13   back to Instruction No. 35.

14           THE COURT:  Yes.

15           MR. GIBBS:  And it's a different issue than the Court

16   just spoke about, but at the top of page 42 --

17           THE COURT:  Yes.

18           MR. GIBBS:  -- it states:  The government alleges

19   that the conspiracy had as one of its objectives a violation of

20   Section 951 because the conspiracy contemplated lobbying

21   activities and the placement of an op-ed in the newspaper *The*

22   *Hill*.

23           We completely agree with that, that's appropriate.

24   We would also ask that since there is a third objective that we

25   think the evidence bears out, and that is the investigation of

1    the Gulen schools, that would hopefully result in a criminal

2    investigation.  That also was supported by the evidence in the

3    case, and we would ask that that be added in as well.

4              THE COURT:  But was that alleged in the indictment as

5    an unlawful objective?

6              MR. GIBBS:  I'll take a look.  I'm not sure.  Give me

7    one moment, Your Honor.

8              THE COURT:  Yes.  I guess it would be within the --

9    alleged is what was contemplated is part of the Section 951

10   violation?

11             MR. GIBBS:  Correct, Judge.

12             THE COURT:  All right.  We can look at that.

13             MR. GIBBS:  Thank you, Judge.

14             THE COURT:  All right.

15             MR. GIBBS:  And otherwise, I just had one question

16   sort of globally.  Will the Court put the entire set of jury

17   instructions as given?  Will they be filed under ECF, or how

18   will that work?  Because sometimes I know it's difficult sort

19   of pulling it out of the transcripts.

20             THE COURT:  Yeah.  No, I think we do, we do have

21   those docketed --

22             MR. GIBBS:  You do?  Okay.

23             THE COURT:  -- as part of ECF.

24             And the jury is going to have their own individual

25   copy.

1056

1       MR. GIBBS:  Okay.  That was going to be my next
2   question.
3       THE COURT:  Yes.  Every juror will have its own
4   separate set of the instructions.
5       MR. GIBBS:  Okay.  Well, that's all I have then,
6   Judge.
7       THE COURT:  All right.  Mr. Tysse?
8       MR. TYSSE:  Sure, Your Honor.  Thank you very much.
9       Beginning with what Mr. Gibbs just mentioned, we do
10  object to inclusion of that.
11      THE COURT:  Well, I'll look at the indictment.
12      MR. TYSSE:  It's not referenced in the indictment,
13  Your Honor.  At least we have not seen it.
14      I have a number of objections to make.  Some of them
15  are preserving the record.
16      THE COURT:  All right.
17      MR. TYSSE:  I think we can do it quickly.  We renew
18  the previous objections we made, but, specifically, I'm going
19  to go through --
20      THE COURT:  All right.
21      MR. TYSSE:  -- try to go throw all of them one by
22  one.
23      Starting with Instruction No. 19, this refers to
24  evidence from coconspirators, and it says, you know, "to be a
25  coconspirator of the defendant" in the first sentence,

1057

1    referring to Alptekin, and then it says "and others."  We would

2    ask the Court to please include General Michael Flynn

3    before "and others," since that was the other prominent hearsay

4    alleged coconspirator statement that the government sought to

5    bring in.

6            THE COURT:  Well, the statement, the instruction is

7    intended to cover not only coconspirators but all third party

8    statements, some of -- there was a lot of statements from

9    people other than people who were alleged to be coconspirators.

10           MR. TYSSE:  That's true, Your Honor.  And it is a

11   global instruction to that extent.

12           THE COURT:  Right.

13           MR. TYSSE:  We just thought because it mentions

14   Ekim Alptekin specifically, it should mention Michael Flynn as

15   well, but we wanted to raise that for Your Honor's

16   consideration.

17           THE COURT:  Does the government have any objection to

18   that?

19           MR. GIBBS:  No, Judge.

20           THE COURT:  All right.  We'll include that.

21           MR. TYSSE:  The next, next instruction is Instruction

22   No. 31.  It's on page 35 of what you sent us.

23           The first sentence says, "Defendant" -- refers to the

24   charges in Counts 1(a) and 2.  We would ask the Court to refer

25   to simply Counts 1 and 2.  We think the evidence that has come

1058

1  in has suggested that the statements were made -- that are

2  alleged to be part of the conspiracy to make false FARA

3  statements were made in connection --

4          THE COURT:  All right.

5          MR. TYSSE:  -- with discussions directly with

6  counsel, seeking counsel's advice in a privileged situation.

7          THE COURT:  All right.  Is there any objection to

8  that?

9          MR. TURGEON:  Yes, Your Honor.  We object to that

10 because there's, there's been no suggestion and there's been no

11 evidence at trial that advice of counsel was a defense to the

12 conspiracy to make false statements in the FARA filing, Your

13 Honor.  That's just -- those false statements -- the fact

14 gathering that led to that ultimately led to the FARA filing

15 began, the testimony established, in late December-early

16 January 2017.

17         Any contact that the defendant had saying, "I need to

18 register under FARA," that, you know, that was all back in

19 September of 2016.  So --

20         THE COURT:  But isn't it bound up with what Covington

21 was doing in that period?

22         MR. TURGEON:  Well --

23         THE COURT:  The FARA statement is, right?

24         MR. TURGEON:  Your Honor, the question is whether the

25 defendant conspired to make false statements in the FARA

1059

1 filing, and those false statements, again, were ultimately made

2 in March, not as a result of anything the defendant -- well,

3 not directly as a result of anything the defendant did in

4 September.

5          So the advice of counsel, the defense has alleged --

6          THE COURT:  Right.

7          MR. TURGEON:  -- is the advice, according to

8 Mr. Kelley, you know, or that Mr. Kelley advice, you don't have

9 to register under FARA, you can register under the LDA, that's

10 the advice of counsel claim that we heard.

11          We haven't heard any advice of counsel claim relating

12 to the false statements that were actually made in the FARA

13 filing.

14          THE COURT:  All right.

15          MR. TYSSE:  On that point, Your Honor, the government

16 has alleged that the FARA statement itself was false, and it's

17 alleged it was false based on things my client told counsel.

18 As we've seen, I think as the evidence came in, Mr. Kelner did

19 an extremely thorough review.  The communications between my

20 client and Mr. Kelner were privileged contacts where they were

21 discussing what to include on that, on that form, and if it

22 turns out that, you know, as part of those discussions,

23 Mr. Kelner made certain legal determinations that my client

24 relied on, it seems that that would play directly into the

25 advice of counsel as well.  We do think it's bound up --

1060

1    THE COURT:  All right.

2    MR. TYSSE:  -- and would therefore ask to remove the

3    reference to Count 1(a) and refer to Count 1 and 2.

4    THE COURT:  All right.  I'm going to refer to it as

5    Counts 1 and 2, and I think what Mr. Turgeon mentioned is

6    within the scope of argument.

7    All right.  What else?

8    MR. TYSSE:  Instruction No. 33, this is pretty minor,

9    Your Honor.  It's on page 38.  We believe the indictment refers

10   to in element 4 knowingly performed an overt act in the

11   jurisdiction, just to add that for technical purposes.

12   THE COURT:  Where are we?

13   MR. TYSSE:  This is on page 38.  It's Instruction

14   No. 33.

15   THE COURT:  No. 4?

16   MR. TYSSE:  No. 4.  Just to add within the

17   jurisdiction of the Eastern District of Virginia.

18   THE COURT:  Oh, I see.  Any objection to that?

19   MR. GIBBS:  No, Judge.  No objection.

20   THE COURT:  Okay.  All right.  So just add to the end

21   of that sentence "within the jurisdiction of the Eastern

22   District"?

23   MR. TYSSE:  That's right, or in a parenthetical in a

24   clause after "performed an overt act, within the Eastern

25   District of Virginia, in order to further or advance the

1061

1    purpose of the agreement."

2            However Your Honor would prefer to do it.

3            THE COURT:  Hold on.  All right.

4            MR. TYSSE:  Instruction No. 34, it's on the following

5    page, page 39.  Your Honor, in the third full paragraph, the

6    second sentence, "Proof of a conspiracy may be made by

7    circumstantial evidence."

8            THE COURT:  Yes.

9            MR. TYSSE:  After that clause, it says, "it need not

10   and normally will not be proven by direct evidence."  We would

11   just ask to remove "and normally will not."  We think -- we

12   don't object to an instruction saying that it may be proved by

13   direct or circumstantial evidence, but I don't think it's an

14   accurate statement of the law that it normally will not be

15   proven.

16           THE COURT:  All right.

17           MR. TYSSE:  I think it can be proven by either, for

18   example, if they had a coconspirator testifying who said, "Yes,

19   we were conspiring," that would be direct evidence.  So I don't

20   think "normally will not" is appropriate here.

21           THE COURT:  Any objection?

22           MR. GIBBS:  No, Judge.  That's fine.

23           THE COURT:  All right.

24           MR. TYSSE:  On page 40, continuing on the same

25   instruction, the final paragraph beginning with "What the

1062

1    evidence in the case must establish," to us sort of seems like

2    it's repeating some of the counts, but it's doing so in a way

3    that's partially incomplete.  For example, it doesn't talk

4    about knowingly and deliberately joining a conspiracy.

5            Because the counts are set forth elsewhere, we

6    propose just cutting that paragraph instead since we've already

7    talked about in other circumstances what -- well, actually, now

8    that I'm looking at this, this is the portion talking about the

9    existence of an agreement.

10           Either way, we're not sure it's necessary, Your

11   Honor, but --

12           THE COURT:  All right.  Any views of this?

13           MR. GIBBS:  We'd ask that it remain in, Judge.

14           THE COURT:  All right.  I'm going to leave it --

15           MR. GIBBS:  We think it's appropriate.

16           THE COURT:  I'm going to leave it in.

17           MR. TYSSE:  Thank you, Your Honor.

18           Instruction No. 35, page 41, we just renew our

19   "willfully" mens rea --

20           THE COURT:  All right.

21           MR. TYSSE:  -- objection for the record.

22           THE COURT:  All right.

23           MR. TYSSE:  On page 42, just to clarify something,

24   the first sentence refers to how the conspiracy contemplated

25   lobbying activities in the placement of an op-ed in the

1063

1  newspaper *The Hill* and its website on November 8, 2016.  We

2  would ask the Court to include after that sentence, "without

3  registering as an agent of a foreign government."

4          Otherwise, it makes it sound like the conspiracy is

5  just a lobby --

6          THE COURT:  Actually, as I read this, it probably

7  should read, "because the conspiracy contemplated lobbying

8  activities and the placement -- and an op-ed that was placed in

9  a newspaper."

10         MR. TYSSE:  We have no objection to that, Your Honor.

11 We just want to make clear that the conspiracy is not to do

12 those two things.  Conspiracy is to do those two things as --

13 while acting as an unregistered agent, if he had registered --

14         THE COURT:  I'm sorry, where is it?

15         MR. TYSSE:  It's the same first sentence, Your Honor.

16 Just after November 8, 2016, we would just ask to include a

17 clause, "without registering as an agent of a foreign

18 government" or "without registering as an agent of Turkey," in

19 that circumstance because otherwise, it makes it seem like all

20 the government would need to prove for a conspiracy is that two

21 people contemplated lobbying activities or the placement of an

22 op-ed.

23         MR. TURGEON:  Your Honor, the elements of conspiracy

24 are laid out immediately before this, and the purpose of this

25 language, as I understand it, is essentially to explain to the

1064

1   jury what the objects of the conspiracy were.  You know, I

2   don't think we need to again regurgitate every element of the

3   offense to do that.

4          THE COURT:  Right.  I'm going to leave it the way it

5   is.  It does talk about how it's -- the objective was a

6   violation of 951, and I think we've indicated that required

7   that the person be operating as an undisclosed agent.

8          MR. TYSSE:  Thank you, Your Honor.

9          On page 43, the -- in the carry-over paragraph,

10  there's a sentence beginning "The government must therefore

11  prove."  Then it refers --

12         THE COURT:  Where are we?

13         MR. TYSSE:  On page 43, the following page.

14         THE COURT:  All right.

15         MR. TYSSE:  The sentence says, "The government must

16  therefore prove that the conspiracy had as one of its

17  objectives conduct that satisfied the essential elements of a

18  violation of Section 612(a), namely, that a person would act as

19  an 'agent of a foreign principal,'" and I think we need to add

20  here "specifically the government of Turkey."

21         The reason being, this is the context of a

22  Section 951 charge, so although it would be permissible under

23  FARA to simply act as an agent of any foreign principal, for

24  the purposes of the actual substantive count this is referring

25  back to, they will also need to show the government of Turkey,

1065

1    and so without that language in there, the jury might

2    unreasonably think that it's sufficient to act as an agent of a

3    foreign principal, i.e., Alptekin or Inovo BV.

4              THE COURT:  Is there any objection to that?

5              MR. TURGEON:  Yes.  Your Honor, I just wanted to make

6    something clear.  The violation of Section 612(a) --

7              THE COURT:  Yes.

8              MR. TURGEON:  Actually, you know what, Your Honor, I

9    take that back.  No, there's no objection.

10             THE COURT:  All right.  So it would specifically --

11             MR. TYSSE:  Yeah.  ". . . as an 'agent of a foreign

12   principal,' specifically the Republic of Turkey," or whatever,

13   however else we've been referring to Turkey.  I just want to

14   make sure we're capturing who the foreign principal --

15             THE COURT:  The government of Turkey?

16             MR. TYSSE:  The government of Turkey.

17             THE COURT:  All right.

18             MR. TYSSE:  Okay.  Continuing down the same page, at

19   the very bottom, the last sentence, we renew our objection to

20   the materiality instruction, Your Honor.

21             THE COURT:  All right.

22             MR. TYSSE:  I understand Your Honor has given a lot

23   of thought to it, but again, we think that "material" would

24   capture something other than a mere failure to provide the

25   information requested.

1066

1        THE COURT:  Okay.

2        MR. TYSSE:  So, you know, even a minor misstatement

3   might fail to provide the information requested.  We'd ask that

4   either we add some language there saying failed to provide the

5   information requested to a significant or a serious extent, or

6   something, or to a -- you know, something to capture the idea

7   of a material --

8        THE COURT:  All right.

9        MR. TYSSE:  -- statement, or even just to take the

10  government's proposed language regarding whether it could

11  move -- you know, change government action.

12        Just to renew that objection.

13        THE COURT:  All right.

14        MR. TYSSE:  And nearing the end here, Your Honor.

15        Page 45, Instruction No. 36, we renew our objection

16  with regard to the cover-up language --

17        THE COURT:  All right.

18        MR. TYSSE:  -- you had decided in the *Grunewald* case.

19        Page -- Instruction No. 37, page 46, this is very

20  minor, but, again, just to add "at least" -- in the first

21  sentence, "at least one overt act in the jurisdiction" or "in

22  the Eastern District of Virginia."

23        THE COURT:  So where would that be?  Oh, "at least

24  one overt act"?

25        MR. TYSSE:  In the Eastern District of Virginia.

1067

1    THE COURT:  Eastern District of Virginia?

2    MR. TYSSE:  Yeah.

3    MR. GIBBS:  No objection.

4    THE COURT:  All right.

5    MR. TYSSE:  And then my last set of objections is on

6    Instruction 41, which goes to the essential elements of the

7    charged offense.  I have three different objections here.

8    First, with respect to the third element --

9    THE COURT:  Yes.

10   MR. TYSSE:  -- these -- I believe these all go to the

11   knowledge aspect.

12   We appreciate the Honor -- Your Honor has added to

13   the second part of that sentence, "and that he knowingly failed

14   to notify the attorney general."  Although that gets part of

15   the way there, we don't think it gets all the way there because

16   again, whether or not he knew he didn't notify the attorney

17   general does not go to his criminal intent necessarily.  He

18   would have to know he didn't notify the attorney general and

19   realize that that constituted unlawful conduct or that he was

20   supposed to notify the attorney general.

21   THE COURT:  Well, I say "as required."

22   MR. TYSSE:  Excuse me?

23   THE COURT:  I say "as required."  He failed to notify

24   the attorney general as required.

25   MR. TYSSE:  As required, okay.  I see that.  He

1068

1    knowingly failed to -- okay.  I'm sorry, I misread it then.

2    You are correct, Your Honor.

3              THE COURT:  All right.

4              MR. TYSSE:  Similarly, the very last sentence of this

5    page, page 50, I'm reading the third line -- I'm sorry, the

6    second line from the bottom, beginning "government that did not

7    constitute illegal commercial transaction, as that term has

8    already been defined for you."  We would just request that the

9    Court include, "did not constitute a legal commercial

10   transaction and with knowledge that it was not a legal

11   commercial transaction, as that term already has been defined

12   for you in connection with Count 1."

13             Again, because the "knowingly" -- because Your Honor

14   has determined legal commercial transaction is an element of

15   the offense, and under the *X-Citement* case, "knowingly" applies

16   to all of them -- all of the elements, we would ask that Your

17   Honor makes clear that the fact that it was not a legal -- that

18   defendant knew that it was not a legal commercial transaction.

19             THE COURT:  Mr. Turgeon?

20             MR. TURGEON:  Judge, could I be heard on the last

21   two?

22             THE COURT:  Yes.

23             MR. TYSSE:  Sure.  If you wouldn't mind --

24             THE COURT:  You have another one?

25             MR. TYSSE:  -- I have a final point --

1    THE COURT:  All right.

2    MR. TYSSE:  -- and then he can respond to all three.

3    In general, Your Honor, we would ask, I guess just

4    renew our objection that given the *Liparota* case, we think it

5    would be appropriate to include language here that suggests

6    that he must know his conduct was unlawful in this

7    circumstance, knowing in this circumstance means knowing

8    unlawful.  We understand that it's captured partially in the

9    knowingly failed to notify the attorney general as required,

10    but --

11    THE COURT:  All right.

12    MR. TYSSE:  -- that's our position.

13    Thank you.

14    MR. TURGEON:  Thank you, Judge.  With regard to that

15    last point, Your Honor, has already ruled with regard to

16    willfulness and what mens rea is required, and I believe our

17    reply we filed this morning goes into it.

18    So I first wanted to talk about the -- just to make

19    clear on the record, that third element that currently

20    states that he currently -- "and that he knowingly failed to

21    notify the attorney general as required."

22    Your Honor, I did some brief research during lunch,

23    and the Eleventh Circuit has joined the Seventh Circuit in

24    holding -- and these are the only cases, I believe, that have

25    addressed this -- that it's a correct instruction to say that

1070

1    the defendants must have acted knowingly and then they must

2    have known that they had not provided prior notification to the

3    attorney general, but that says nothing of the requirement that

4    they know about a requirement that they notify the attorney

5    general and then not satisfy it.

6            And, in fact, the Eleventh Circuit in *Campa* and again

7    in *Duran* joined the Seventh Circuit in *Dumeisi*, holding that

8    there is no such requirement that the defendant know about a

9    registration requirement with the attorney general.

10           And I can pass this case up to Your Honor if that

11   would be helpful.

12           And -- thank you, Mr. Burns.

13           And, Your Honor, that logic applies equally to

14   Mr. Tysse's suggestion that the Court include a requirement

15   that the defendant have knowledge that the act was not a legal

16   commercial transaction.  I mean, that's -- that's something

17   that obviously has never been interpreted before, but the

18   applicability of *Duran* to that same language, which is in the

19   statute or is in this case in the parallel construction, by

20   that virtue, the same logic applies, Your Honor.

21           THE COURT:  All right.

22           Mr. Tysse?

23           MR. TURGEON:  So, Your Honor, just in sum, so we

24   would, first of all, object to changing the instruction as the

25   defense has requested, and we would also want the Court to

1071

1   clarify that "as required" under that third prong, the

2   language "as required" does not suggest that the defendant must

3   know about a notification requirement.

4           MR. TYSSE:   Thank you, Your Honor.   With respect to

5   the *Duran* case, a few points.   For one, it's not a case that

6   was analyzed in the legal commercial transaction language.   As

7   Your Honor recalls, the district court ruled on that issue, and

8   then it was not raised on appeal again.   So we don't actually

9   know whether the Eleventh Circuit would have changed its

10  opinion with respect to that had it be properly before it.

11          But I think more broadly, Your Honor, it is true, the

12  government, I believe, characterizes this case accurately in

13  terms of what it believes "knowledge" means in the

14  circumstance.   It does so, however, without analyzing the

15  *Liparota* case or that line of cases.   I'm pretty sure -- I just

16  received the case now, but I'm pretty sure it never refers to

17  them or the *X-Citement* case either.   So again, we're not -- and

18  it's not clear that those arguments presented to it.

19          I think the broader problem with the holding in this

20  case is that it's sort of to, in my view, erases the knowing

21  requirement from the statute, what it would mean to know that

22  you failed to notify the attorney general.

23          It's, of course, true that any client who fails to

24  register knows they didn't notify the attorney general, but he

25  also knows he didn't notify, you know, the Queen of England or

1072

1    the New York Yankees, too.  The question is, though, in this

2    context, what -- what is the mens rea getting at, and it's

3    whether you knew what you were doing in this context.  It's not

4    inherently --

5              THE COURT:  But it's a general intent crime, it's not

6    a specific intent.

7              MR. TYSSE:  It is, Your Honor.  But unlike, unlike a

8    crime where -- I mean, this -- this goes to the *Liparota* point,

9    which is that in certain circumstances where you're doing

10   things that are otherwise legal, you know, selling legal --

11             THE COURT:  I thought *Liparota* dealt with the

12   willfulness issue.

13             MR. TYSSE:  It was "knowing," Your Honor, I believe.

14             THE COURT:  All right.

15             MR. TYSSE:  So it's saying it's sort of the

16   heightened knowing for certain circumstances, and essentially

17   when the underlying conduct is not inherently illegal, it's not

18   something like selling drugs or doing something where there's

19   no question about what you knew, I think in this circumstance,

20   it is appropriate to have --

21             THE COURT:  All right.  I'll --

22             MR. TYSSE:  -- a knowing whether it actually goes to

23   whether you had knowledge of the requirement in the first

24   place.

25             THE COURT:  All right.  I'll look at it.

1073

1    MR. TYSSE:  Thank you.

2    THE COURT:  Anything else?

3    MR. TROUT:  Your Honor?

4    THE COURT:  Yes.

5    MR. TROUT:  Very briefly.  Your Honor, mindful that

6  the Court is reserving on Rule 29, and I know that we have --

7  the parties have briefed the issue, we believe that we have

8  dissected the government's case and exposed its shortcomings,

9  but I did want to make one final summary point.

10    Your Honor, this case illustrates the peril to

11  someone who advocates a position, a policy position that is

12  similar to a policy position being advocated by a foreign

13  government.  And there's genuine prophylactic value in

14  dismissing this case before the jury decides it, sending the

15  message to the government that accusations of criminal conduct

16  are not to be casually made up from innocent facts, and that

17  making up a criminal case as you go along is unacceptable.

18    If this case is allowed to be decided by the jury,

19  and heaven help us if they convict, I think the opposite

20  message will be sent, that quality control is not expected from

21  the Department of Justice, that the government will be

22  encouraged to bring cases that lack merit, that rank

23  speculation is an adequate substitute for actual evidence and

24  reasonable inference, and that the government can make it up as

25  it goes along.

1074

1    And so for all of those reasons, Your Honor, we

2    respectfully submit that allowing the jury to decide this case

3    would not be in the interests of justice.   Thank you.

4           THE COURT:   All right.   Thank you.

5           The Court's going to adhere to its decision to

6    reserve on this.

7           Anything else?   What about the jury verdict form?

8    Are you all in agreement on that?

9           MR. GIBBS:   We have no objection to that, Judge.   It

10   looks fine to us.

11          THE COURT:   To the one that the defense has provided?

12          MR. TURGEON:   (Nodding head.)

13          THE COURT:   All right.   How much time would you like

14   for closing?   Mr. Gillis?

15          MR. GILLIS:   Your Honor, I'd ask for 50 and 20,

16   please.

17          THE COURT:   I'm sorry?

18          MR. GILLIS:   50 and 20 minutes.

19          THE COURT:   All right.   So an hour and 15 minutes?

20          MR. GILLIS:   Yes, sir.

21          THE COURT:   All right.   That's fine.

22          Yes.

23          MR. MacDOUGALL:   Your Honor, was that five-oh and

24   one-five?

25          THE COURT:   It's an hour and 15 minutes, however he

1075

1    would like to divide it.

2              MR. GILLIS:  Thank you, Your Honor.

3              MR. MacDOUGALL:  Your Honor, we can live very well

4    with that.

5              THE COURT:  All right.

6              MR. MacDOUGALL:  Well within that.

7              THE COURT:  All right.  Very good.

8              Anything else?  I'm going to recess shortly, look at

9    this one or two open issues, and then we'll proceed.

10             Anything else?

11             MR. TYSSE:  No, Your Honor.

12             THE COURT:  All right.  The Court will stand in

13   recess.

14                  (Recess from 1:59 p.m., until 2:48 p.m.)

15                       (Defendant present, Jury out.)

16             THE COURT:  You've been given a revised Instruction

17   No. 41.  I've looked at the, the *Duran* case, *Liparota* case, the

18   *X-Citement* case.  This case certainly has no shortage of open,

19   unresolved challenging issues, the elements of the offense

20   being one of them, but I've concluded that under the *Liparota*

21   and the *X-Citement* case, that the mens rea knowing requirement

22   applies to each element of the offense, and that includes,

23   based on the Court's prior ruling, that the defendant knew he

24   was an agent, and "agent" is a defined term that has

25   incorporated into it that the person who is deemed an agent

1076

1    engage in conduct other than a legal commercial transaction, as

2    that term has been defined.

3            So I've fashioned the elements -- the third element

4    to reflect that mens rea requirement.  I do agree with -- upon

5    review with the government that the -- since 951 is a general

6    intent crime, it does not require that the defendant knew that

7    the filing itself was required, only that he knew that he had

8    not provided the notification to the attorney general, and so

9    the revision reflects both those, those -- both those

10   conclusions by the Court.

11           All right.  Anything else before we bring the jury

12   out?

13           MR. GILLIS:  No, Your Honor.

14           THE COURT:  All right.

15           MR. MacDOUGALL:  Nothing from the defense, Your

16   Honor.

17           THE COURT:  All right.  During the reading of the

18   instructions, when we get to the end, I'm going to ask that the

19   verdict form be placed on the Elmo so it can be seen by the

20   jury as I take the jury through it.

21           All right.  Let's bring the jury out.

22                      (Jury present.)

23           THE COURT:  Please be seated.  Ladies and gentlemen,

24   we are now at the point where I will instruct you as to the law

25   that you are to apply to the facts of this case as you

1077

1    determine those facts to be.  The instructions I give you will

2    be also provided to you in written form so that each of you

3    will have your own set of written instructions to review during

4    your deliberations.

5         So while you may -- you're certainly welcome to take

6    notes.  Again, don't let your note-taking interfere with

7    listening to the instructions, and know that you will have

8    these instructions with you during your deliberations.  It's

9    important that you hear all of the instructions and consider

10   all of the instructions as a whole.

11        Also, you will see that the instructions are

12   numbered, and I obviously will go through these instructions in

13   a certain order.  You are to attach no importance to the order

14   in which I provide these instructions.  All of these

15   instructions are equally important and should be considered by

16   you.

17        Now that you've heard all the evidence that is to be

18   received in this trial and each of the arguments of counsel, it

19   becomes my duty to give you the final instructions of the Court

20   as to the law that is applicable to this case.  You should use

21   these instructions to guide you in your decisions.

22        All of the instructions of law given to you by the

23   Court -- those given to you at the beginning of the trial,

24   those given to you during the trial, and these final

25   instructions -- must guide and govern your deliberations.

1078

1    It is your duty as jurors to follow the law as stated
2  in all of the instructions of the Court and to apply these
3  rules of law to the facts as you find them to be from the
4  evidence received during the trial.
5    Counsel may properly refer to some of these -- some
6  of the applicable rules of law in their closing arguments to
7  you.  If, however, any difference appears to you between the
8  law as stated by counsel and that as stated by the Court in
9  these instructions, you, of course, are to be governed by the
10 instructions given to you by the Court.
11   You are not to single out any one instruction alone
12 as stating the law, but must consider the instructions as a
13 whole in reaching your decisions.
14   Neither are you to be concerned with the wisdom of
15 any law -- any rule of law stated by the Court.  Regardless of
16 any opinion you may have as to what the law ought to be, it
17 would be a violation of your sworn duty to base any part of
18 your verdict upon any other view or opinion of the law than
19 that given in these instructions of the Court, just as it would
20 be a violation of your sworn duty as judges of the facts to
21 base your verdict upon anything but the evidence received in
22 the case.
23   You were chosen as jurors for this trial in order to
24 evaluate all of the evidence received and to decide each of the
25 factual questions presented by the allegations brought by the

1079

1    government in the indictment and the plea of not guilty by the

2    defendant.

3            In resolving the issues presented to you for decision

4    in this trial, you must not be persuaded by bias, prejudice, or

5    sympathy for or against any of the parties to this case or by

6    any public opinion.

7            Justice through trial by jury depends upon the

8    willingness of each individual juror to seek the truth from the

9    same evidence presented to all the jurors here in the courtroom

10   and to arrive at a verdict by applying the same rules of law as

11   now being given to each of you in these instructions of the

12   Court.

13           Testimony and exhibits can be admitted into evidence

14   during a trial only if they meet certain criteria or standards.

15   It is the sworn duty of attorneys on each side of a case to

16   object when the other side offers testimony or an exhibit which

17   that attorney believes is not properly admissible under the

18   rules of law.  Only by raising an objection can a lawyer

19   request and obtain a ruling from the Court on the admissibility

20   of the evidence being offered by the other side.  You should

21   not be influenced against an attorney or his or her client

22   because the attorney has made objections.

23           Do not attempt, moreover, to interpret my rulings on

24   objections as somehow indicating how I think you should decide

25   the case.  I am simply making a ruling on a legal question

1080

1    regarding that particular piece of testimony or exhibit.

2            It is the duty of the Court to admonish an attorney

3    who out of zeal for his or her cause does something which I

4    feel is not in keeping with the rules of evidence or procedure.

5    You are to draw absolutely no inference against the party to

6    whom any admonition of the Court may have been addressed during

7    the trial of this case.

8            The law of the United States permits a federal judge

9    to comment to the jury on the evidence in a case.  Such

10   comments are, however, only expressions of my opinion as to the

11   facts, and the jury may disregard them entirely.  You, as

12   jurors, are the sole judges of the facts in this case.  It is

13   your recollection and evaluation of the evidence that is

14   important to the verdict in this case.

15           Although you must follow the Court's instructions

16   concerning the law applicable to this case, you are totally

17   free to accept or reject any observations by me concerning the

18   evidence received in the case.

19           During the course of a trial -- during the course of

20   the trial, I have occasionally asked questions of a witness.

21   Do not assume that I hold any opinion on the matters to which

22   my question may relate.  The Court may ask a question simply to

23   clarify a matter, not to help one side of the case or hurt the

24   other side.  Remember at all times you, as jurors, are the sole

25   judges of the facts of this case.

1    The Court has permitted you to take notes during the

2  course of this trial.  You, of course, were not obligated to

3  take notes.  If you did take -- if you did not take notes, you

4  should not be influenced by the notes of another juror, but

5  rely upon your own recollection of the evidence.

6    Notes are only an aid to recollection and are not

7  entitled to any greater weight than actual recollection or the

8  impression of each juror as to what the evidence actually is.

9  Notes taken by any juror, moreover, are not evidence in the

10  case and must not take precedence over the independent

11  recollection of the evidence received in the case.  Any notes

12  taken by any juror concerning this case should not be disclosed

13  to anyone other than a fellow juror.

14    I instruct you that you must presume the defendant to

15  be innocent of the crimes charged.  Thus, the defendant,

16  although accused of crimes in the indictment, begins the trial

17  with a clean slate, with no evidence against him.  The

18  indictment is not evidence of any kind.  The defendant is, of

19  course, not on trial for any act or crime not contained in the

20  indictment.  The law permits nothing but legal evidence

21  presented before the jury in court to be considered in support

22  of any charge against the defendant.  The presumption of

23  innocence alone, therefore, is sufficient to acquit the

24  defendant.

25    The burden is always upon the prosecution to prove

1082

1   guilt beyond a reasonable doubt.  The burden never shifts to a

2   defendant, for the law never imposes upon a defendant in a

3   criminal case the burden or duty of calling any witnesses or

4   producing any evidence.  The defendant is not even obligated to

5   produce any evidence by cross-examining the witnesses for the

6   government.

7          It is not required that the government prove guilt

8   beyond all possible doubt.  The test is one of reasonable

9   doubt.  A reasonable doubt is a doubt based upon reason and

10  common sense, the kind of doubt that would make a reasonable

11  person hesitant to act -- to hesitate to act.  Proof beyond a

12  reasonable doubt must therefore be proof of such a convincing

13  character that a reasonable person would not hesitate to rely

14  and act upon it in the most important of his or her own

15  affairs.

16         Unless the government proves beyond a reasonable

17  doubt that the defendant has committed each and every element

18  of the offenses charged in the indictment, you must find the

19  defendant not guilty of the offenses.  If the jury views the

20  evidence in the case as reasonably permitting either of two

21  conclusions -- one of innocence, the other of guilt -- the jury

22  must, of course, adopt the conclusion of innocence.

23         If any reference by the Court or by counsel to

24  matters of testimony or exhibits does not coincide with your

25  own recollection of that evidence, it is your recollection

1083

1    which should control during your deliberations and not the

2    statements of the Court or of counsel.  You are the sole judges

3    of the evidence received in this case.

4              There is nothing particularly different in the way

5    that a juror should consider the evidence in a trial from that

6    in which any reasonable and careful person would deal with any

7    very important question that must be resolved by examining

8    facts, opinions, and evidence.  You are expected to use your

9    good sense in considering and evaluating the evidence in the

10   case.  Use the evidence only for the purposes for which it has

11   been received, and give the evidence a reasonable and fair

12   construction in light of your common knowledge of the natural

13   tendencies and inclinations of human beings.

14             If the defendant be proved guilty beyond a reasonable

15   doubt, say so.  If not proved guilty beyond a reasonable doubt,

16   say so.

17             Keep constantly in mind that it would be a violation

18   of your sworn duty to base a verdict upon anything other than

19   the evidence received in the case and the instructions of the

20   Court.  Remember as well that the law never imposes upon a

21   defendant in a criminal case the burden or duty of calling any

22   witnesses or producing any evidence because the burden of

23   proving guilt beyond the reasonable doubt is always with the

24   government.

25             The evidence in this case consists of the sworn

1084

1   testimony of witnesses, regardless of who may have called them,

2   all exhibits received in evidence, regardless of who may have

3   produced them, all facts which may have been agreed to or

4   stipulated, and all facts and events which may have been

5   judicially noticed.

6           When the attorneys on both sides stipulate or agree

7   to the existence of a fact, you may accept the stipulation as

8   evidence and regard that fact as proved.  You are not required

9   to do so, however, since you are the sole judges of the facts.

10          The Court has taken judicial notice of certain facts

11  or events.  When the Court declares that it has taken notice of

12  some fact or event, you may accept the Court's declaration as

13  evidence and regard as proved the fact or event which has been

14  judicially noticed.  You are not required to do so, however,

15  since you are the sole judges of the facts.

16          Any proposed testimony or proposed exhibit to which

17  an objection was sustained by the Court and any testimony or

18  exhibit ordered stricken by the Court must be entirely

19  disregarded by you.

20          Anything you may have seen or heard outside the

21  courtroom is not evidence and must be entirely disregarded.

22          Questions, objections, statements, and arguments of

23  counsel are not evidence in the case.

24          You are to base your verdict only on the evidence

25  received in the case.  In your consideration of the evidence

1   received, however, you are not limited to the bald statements

2   of the witnesses or to the bald assertions in the exhibits.  In

3   other words, you are not limited solely to what you see and

4   hear as the witnesses testify or as the exhibits are admitted.

5   You are permitted to draw from the facts which you find have

6   been proved such reasonable inferences as you feel are

7   justified in the light of your experience and common sense.

8            There are two types of evidence which are generally

9   presented during a trial, direct evidence and circumstantial

10  evidence.  Direct evidence is the testimony of a person who

11  asserts or claims to have actual knowledge of a fact, such as

12  an eyewitness.  Circumstantial evidence is proof of a chain of

13  facts and circumstances indicating the existence of a fact.

14           The law makes no distinction between the weight or

15  value to be given to either direct or circumstantial evidence.

16  Nor is a greater degree of certainty required of circumstantial

17  evidence than of direct evidence.  You should weigh all the

18  evidence in the case.

19           Inferences are simply deductions or conclusions which

20  reason and common sense lead the jury to draw from the evidence

21  received in the case.

22           The questions asked by a lawyer for either party to

23  this case are not evidence.  If a lawyer asks a question of a

24  witness which contains an assertion of fact, therefore, you may

25  not consider the assertion by the lawyer as any evidence of

1086

1     that fact.  Only the answers are evidence.

2               An indictment is only a formal method used by the

3     government to accuse a defendant of a crime.  It is not

4     evidence of any kind against the defendant.  The defendant is

5     presumed to be innocent of the crimes charged.  Even though

6     this indictment has been returned against the defendant, the

7     defendant begins this trial with absolutely no evidence against

8     him.

9               The defendant has pled not guilty to this indictment

10    and, therefore, denies that he is guilty of the charges.

11              If a party offers weaker or less satisfactory

12    evidence when stronger or more satisfactory evidence could have

13    been produced at trial, you may, but are not required to,

14    consider this fact in your deliberations.

15              You must remember, however, that a defendant is not

16    obliged to produce any evidence or to call any witnesses.

17              Your decision on the facts of this case should not be

18    determined by the number of witnesses testifying for or against

19    a party.  You should consider all the facts and circumstances

20    in evidence to determine which of the witnesses you choose to

21    believe or not believe.  You may find that the testimony of a

22    smaller number of witnesses on one side is more credible than

23    the testimony of a greater number of witnesses on the other

24    side.

25              You have heard the testimony of one or more law

1   enforcement officials.  The fact that a witness may be employed

2   by the federal government as a law enforcement official does

3   not mean that his or her testimony is necessarily deserving of

4   more or less consideration or greater or lesser weight than

5   that of an ordinary witness.

6          At the same time, it is quite legitimate for defense

7   counsel to try to attack the credibility of a law enforcement

8   witness on the grounds that his or her testimony may be colored

9   by a personal or professional interest in the outcome of the

10  case.

11         It is your decision, after reviewing all the

12  evidence, whether to accept the testimony of the law

13  enforcement witness and to give to that testimony whatever

14  weight, if any, you find it deserves.

15         In certain instances, evidence has been admitted only

16  for a particular purpose and not for all purposes.  For the

17  limited purpose for which this evidence has been received, you

18  may give it such weight as you feel it deserves.  You may not,

19  however, use this evidence for any other purpose not

20  specifically mentioned.

21         Evidence has been received in this case of statements

22  made by Ekim Alptekin, who is alleged in Count 1 of the

23  indictment to be a coconspirator of the defendant, and others,

24  including Michael Flynn.  Such statements were admitted, not as

25  evidence that what was stated was, in fact, true, but solely as

1088

1  evidence of what was said to or in the presence of the

2  defendant, Mr. Rafiekian.  Accordingly, those statements may be

3  considered by you solely for that purpose in connection with

4  any issue that relates to what information Mr. Rafiekian had at

5  any particular time.

6           Evidence has been received in this case that certain

7  persons, who are alleged in Count 1 of the indictment to be

8  coconspirators of the defendant, and others, have done things

9  during the existence or life of the alleged conspiracy in order

10  to further or advance its goals.

11           Such acts of these other individuals may be

12  considered by you in determining whether or not the government

13  has proven the charges in Count 1 of the indictment against the

14  defendant.

15           Since these acts have been performed outside the

16  presence of the defendant and even done or said without the

17  defendant's knowledge, these acts should be examined with

18  particular care by you before considering them against the

19  defendant who did not do the particular act.

20           Acts done by an alleged coconspirator before a

21  defendant joined the conspiracy may also be considered by you

22  in determining whether the government has sustained its burden

23  of proof in Count 1 of the indictment.  Acts done by an alleged

24  conspiracy begun -- acts done before an alleged conspiracy

25  began or after an alleged conspiracy ended, however, may only

1089

1    be considered by you regarding the person who performed that

2    act.

3            The defendant in a criminal case has an absolute

4    right under our Constitution not to testify.  The fact that the

5    defendant did not testify must not be discussed or considered

6    in any way when deliberating and in arriving at your verdict.

7    No inference of any kind may be drawn from the fact that a

8    defendant decided to exercise his privilege under the

9    Constitution and did not testify.

10           As stated before, the law never imposes upon a

11   defendant in a criminal case the burden or duty of calling any

12   witnesses or of producing any evidence.

13           The defendant has offered evidence of his good

14   general reputation for truth and veracity, honesty and

15   integrity, and being a law-abiding citizen.  The jury should

16   consider this evidence, along with all the other evidence in

17   the case, in reaching its verdict.

18           Evidence of a defendant's reputation, inconsistent

19   with those traits of character ordinarily involved in the

20   commission of the crime charged, may give rise to a reasonable

21   doubt since the jury may think it improbable or unlikely that a

22   person of good character for truth and veracity, honesty and

23   integrity, and being a law-abiding citizen would commit such a

24   crime or crimes.

25           You, as jurors, are the sole and exclusive judges of

1090

1    the credibility of each of the witnesses called to testify in

2    this case, and only you determine the importance or the weight,

3    if any, that their testimony deserves.  After making your

4    assessment concerning the credibility of a witness, you may

5    decide to believe all of that witness' testimony, only a

6    portion of it, or none of it.

7              In making your assessment of that witness, you should

8    carefully scrutinize all of the testimony given by that

9    witness, the circumstances under which each witness has

10   testified, and all of the other evidence which tends to show

11   whether a witness in your opinion is worthy of belief.

12   Consider each witness' intelligence, motive to falsify, state

13   of mind, and appearance and manner while on the witness stand.

14   Consider the witness' ability to observe the matters as to

15   which he or she may -- has testified, and consider whether he

16   or she impresses you as having an accurate memory or

17   recollection of these matters.  Consider also any relation a

18   witness may bear to either side of the case, the manner in

19   which each witness might be affected by a verdict, and the

20   extent to which, if at all, each witness is either supported or

21   contradicted by other evidence in the case.

22             Inconsistencies or discrepancies in the testimony of

23   a witness or between the testimony of different witnesses may

24   or may not cause you to disbelieve or discredit such testimony.

25   Two or more persons witnessing an incident or transaction may

1  simply see or hear it differently.  Innocent misrecollection,

2  like failure of recollection, is not an uncommon human

3  experience.  In weighing the effects of a discrepancy, however,

4  always consider whether it pertains to a matter of importance

5  or an insignificant detail, and consider whether the

6  discrepancy results from innocent error or from intentional

7  falsehood.

8           After making your own judgment or assessment

9  concerning the believability of a witness, you can then attach

10  such importance or weight to that testimony, if any, that you

11  feel it deserves.  You will then be in a position to decide

12  whether the government has proven the charges beyond a

13  reasonable doubt.

14           The testimony of a witness may be discredited or, as

15  we sometimes say, impeached by showing that he or she

16  previously made statements which are different than or

17  inconsistent with his or her testimony here in court.

18           The earlier inconsistent or contradictory statements

19  are admissible only to discredit or impeach the credibility of

20  the witness and not to establish the truth of these earlier

21  statements made somewhere other than here during this trial.

22  It is the province of the jury to determine the credibility of

23  a witness who has made prior inconsistent or contradictory

24  statements.

25           If a person is shown to have knowingly testified

1    falsely concerning any important or material matter, you

2    obviously have a right to distrust the testimony of such an

3    individual concerning other matters.  You may reject all of the

4    testimony of that witness or give it such weight or credibility

5    as you may think it deserves.

6            The defendant is not on trial for any act or conduct

7    not specifically charged in the indictment.

8            A separate crime is charged in each count of the

9    indictment.  Each charge, and the evidence pertaining to it,

10   should be considered separately by the jury.  The fact that you

11   may find the defendant guilty or not guilty as to one of the

12   counts should not control your verdict as to any other count.

13           The indictment charges that each offense alleged was

14   committed "on or about" a certain date.  Although it is

15   necessary for the government to prove beyond a reasonable doubt

16   that each offense was committed on a date reasonably near the

17   date alleged in the indictment, it is not necessary for the

18   government to prove that the offense was committed precisely on

19   the date charged.

20           Where a statute is worded in the disjunctive, meaning

21   it uses the word "or," federal pleading requires the government

22   to charge in the conjunctive, meaning it must use the

23   word "and."  Where a statute specifies several alternative ways

24   in which an offense may be committed, if only one of those

25   alternatives is proved beyond a reasonable doubt, that is

1093

1    sufficient for conviction.

2         The term "knowingly," as used in these instructions

3    to describe the alleged state of mind of the defendant, means

4    that he was conscious and aware of his action, realized what he

5    was doing or what was happening around him, and did not act

6    because of ignorance, mistake, or accident.

7         The intent of a person or the knowledge of a

8    person -- the intent of a person or the knowledge that a person

9    possesses at any given time may not ordinarily be proved

10   directly because there is no way of directly scrutinizing the

11   workings of the human mind.  In determining the issue of what a

12   person knew or what a person intended at a particular time, you

13   may consider any statements made or acts done by that person,

14   and all other facts and circumstances received in evidence

15   which may aid in your determination of that person's knowledge

16   or intent.

17        You may infer, but you are certainly not required to

18   infer, that a person intends the natural and probable

19   consequences of acts knowingly done or knowingly omitted.  It

20   is entirely up to you, however, to decide what facts to find

21   from the evidence received during the trial.

22        The defendant claims that he is not guilty of the

23   willful or deliberate wrongdoing as charged in Counts 1 and 2

24   of the indictment because he acted on the basis of advice from

25   his attorney.

1094

1    If before taking any action or failing to take some

2    action, Defendant, while acting in good faith and for the

3    purpose of securing advice on the lawfulness of his future

4    conduct sought and obtained the advice of an attorney whom he

5    considered to be competent, and made a full and accurate report

6    or disclosure to this attorney of all important and material

7    facts of which he had knowledge or had the means of knowing,

8    and then acted strictly in accordance with the advice his

9    attorney gave following this full report or disclosure, then

10   defendant would not be willfully or deliberately doing wrong in

11   performing some act the law forbids or omitting some act which

12   the law requires, as those terms are used in these

13   instructions.

14   Whether defendant acted in good faith for the purpose

15   of truly seeking guidance as to the questions about which he

16   was in doubt, and whether he made a full and complete report or

17   disclosure to his attorney, and whether he acted strictly in

18   accordance with the advice received, are all questions for you

19   to determine.

20   I now am going to give you instructions on the

21   specific charges in this case.

22   Count 1 of the indictment alleges a conspiracy in

23   violation of Title 18 of the United States Code, Section 371.

24   Title 18 of the United States Code, 371, provides in part that:

25   If two or more persons conspire either to commit any offense

1095

1    against the United States . . . [or] any agency thereof in any

2    manner or for any purpose, and one or more of such persons do

3    any act to effect the object of the conspiracy, each . . .

4    shall be guilty of an offense against the United States.

5            Briefly summarized, Count 1 of the indictment alleges

6    a conspiracy that had two unlawful objectives in violation of

7    Section 371.  The first alleged unlawful objective was to

8    violate Title 18 of the United States Code, Section 951, which

9    I sometimes will refer to in these instructions as simply

10   Section 951.  951 prohibits acting as an agent of a foreign

11   government without proper disclosure.

12           The second unlawful objective was to violate Title 22

13   of the United States Code, Section 618(a), which I will

14   sometimes refer to in these instructions simply as Section

15   618(a).

16           Section 618(a) prohibits filing or causing to be

17   filed a materially false registration statement under the

18   Foreign Agents Registration Act, referred to as FARA.

19           More specifically, Count 1 of the indictment charges

20   that from at least July 2016 through at least March 2017, in

21   the Eastern District of Virginia and elsewhere, the defendant,

22   Bijan Rafiekian, together with others known and unknown,

23   knowingly and intentionally conspired with Kamil Ekim Alptekin,

24   first, to knowingly act and cause others to act in the United

25   States as an agent of a foreign government, that is, the

1096

1    government of Turkey, without prior notification to the

2    attorney general, in violation of Title 18, United States Code,

3    Section 951; and secondly, to willfully make in a document

4    filed with or furnished to the attorney general under the

5    provisions of the Foreign Agents Registration Act a false

6    statement of a material fact, and to willfully omit from the

7    document a material fact required to be stated therein, and to

8    willfully omit from the document a material fact or a copy of a

9    material document necessary to make the statements therein and

10   the copies of documents furnished therewith not misleading, in

11   violation of Title 22 of the United States Code, Section

12   618(a)(2), all in violation of Section 371.

13           You may find that the government has met its burden

14   of proof as to none, one, or both of these unlawful objectives

15   charged in this count.  To find the defendant guilty of the

16   offense of conspiracy, however, you must agree unanimously as

17   to which one or more of the charged unlawful objectives, if

18   any, are proven beyond a reasonable doubt.

19           The defendant has entered a plea of not guilty to

20   this charge.  The government therefore assumes the

21   responsibility of proving beyond a reasonable doubt each of the

22   essential elements of the offense charged in Count 1 of the

23   indictment as to the defendant.

24           As I have already stated, Count 1 of the indictment

25   charges the defendant with a conspiracy to violate Sections 951

1097

1    and 618(a).

2         Four essential elements are required for the

3    government to prove the offense of conspiracy as charged in

4    Count 1 of the indictment:

5         First, the -- the first essential element is that the

6    conspiracy, agreement, or understanding to violate Section 951

7    and 618(a) as described in the indictment, was formed, reached,

8    or entered into by two or more persons;

9         The second is that at some time during the existence

10   or life of the conspiracy, agreement, or understanding, the

11   defendant knew the purposes of the agreement;

12        Third, with knowledge of the purposes of the

13   agreement, understanding -- conspiracy, agreement or

14   understanding, the defendant then deliberately joined the

15   conspiracy, agreement, or understanding; and

16        Fourth, at some time during the existence or life of

17   the conspiracy, agreement, or understanding, one of its alleged

18   members knowingly performed an overt act within the Eastern

19   District of Virginia in order to further or advance the purpose

20   of the agreement.

21        A criminal conspiracy is an agreement or a mutual

22   understanding knowingly made or knowingly entered into by at

23   least two people to violate the law by some joint or common

24   plan or course of action.  A conspiracy is, in a very true

25   sense, a partnership in crime.

1        A conspiracy or agreement to violate the law, like

2   any other kind of agreement or understanding, need not be

3   formal, written, or even expressed directly in every detail.

4   The government must prove that the defendant and at least one

5   other person knowingly and deliberately arrived at an agreement

6   or understanding that they, and perhaps others, would violate

7   Section 951 and Section 618(a)(2) by means of some common plan

8   or course of action as alleged in Count 1 of the indictment.

9        It is proof of this conscious understanding and

10  deliberate agreement by the alleged members that should be

11  central to your consideration of the charge of conspiracy.

12  Unless the government proves beyond a reasonable doubt that a

13  conspiracy, as just explained, actually existed, then you must

14  acquit the defendant and find him not guilty.

15        To prove the existence of a conspiracy or an illegal

16  agreement, the government is not required to produce a written

17  contract between the parties or even produce evidence of an

18  express oral agreement spelling out all the details of the

19  understanding.  Proof of a conspiracy may be made by

20  circumstantial evidence.  It need not be proven by direct

21  evidence.  Moreover, to prove that a conspiracy existed, the

22  government is not required to show that all the people named in

23  the indictment as members of the conspiracy were, in fact,

24  parties to the agreement or that all members of the alleged

25  conspiracy were named or charged, or that all of the people

1099

1    whom the evidence shows were actually members of a conspiracy

2    agreed to all of the means or methods to carry out the alleged

3    conspiracy, or that all means and methods which were agreed

4    upon were actually used -- were actually used -- were put into

5    operation.  Nor is the government required to prove that the

6    parties to or members of the alleged agreement or conspiracy

7    were successful in achieving any or all of the objects of the

8    agreement or conspiracy.

9              What the evidence in the case must establish beyond a

10   reasonable doubt is that the alleged conspiracy was knowingly

11   formed, and that one or more of the means and methods that the

12   government has alleged were agreed upon to be used in an effort

13   to effect or accomplish some object or purpose of the

14   conspiracy as charged in the indictment, and that two or more

15   persons, including the defendant, were knowingly members of the

16   conspiracy as charged in the indictment.

17             As I have explained to you, the indictment charges a

18   conspiracy to violate Section 951 and Section 618(a), and you

19   therefore must consider whether any conspiracy included an

20   agreement to engage in conduct that would violate those laws.

21             I'm now going to explain to you what conduct

22   constitutes a violation of Section 951.

23             Title 18 of the United States Code, Section 951,

24   provides in part that:

25             Whoever, other than a diplomatic or consular officer,

1100

1    or attaché, acts in the United States as an agent of a foreign

2    government without prior notification to the attorney general,

3    shall be guilty of an offense against the United States.

4           For the purposes of Section 951, an "agent of a

5    foreign government" means "an individual who agrees to operate

6    within the United States subject to the direction or control of

7    a" government -- "of a foreign government or official, except

8    such term does not include . . . any person engaged in a legal

9    commercial transaction."

10          A "legal commercial transaction" means "any exchange,

11   transfer, purchase or sale, of any commodity, service or

12   property of any kind, including information or intellectual

13   property, not prohibited by federal or state legislation or

14   implementing regulations."

15          Based on these definitions, in order to be an "agent

16   of a foreign government," a person must agree to operate within

17   the United States, subject to the direction or control of a

18   foreign government or official, and to engage in conduct other

19   than a "legal commercial transaction."

20          In order to prove a conspiracy to violate 951, the

21   government must therefore prove that there existed a conspiracy

22   whose objective was to engage in conduct other than a legal

23   commercial transaction, subject to the direction and control of

24   a foreign government or official.

25          The government alleges that the conspiracy had as one

1101

1    of its objectives a violation of Section 951 because the

2    conspiracy contemplated lobbying activities and an op-ed, which

3    was placed in the newspaper *The Hill* and its website on

4    November 8, 2016.  The government contends that the lobbying

5    activities and the op-ed did not meet the definition of a legal

6    commercial transaction and the person who engaged in those

7    activities was therefore not concluded from the definition of

8    an "agent of a foreign government" under Section 951, because

9    engaging in those activities violated another provision of FARA

10   not separately charged in this case, that is, Section 612 of

11   Title 22 of the United States Code, and therefore were

12   prohibited by federal legislation.

13          The Court further instructs you that Title 22 of the

14   United States code, Section 612(a), states in pertinent part

15   that "no person shall act as an agent of a foreign principal

16   unless he has filed with the attorney general a true and

17   complete registration statement and settlements thereto . . ."

18   as required by FARA.

19          For the purposes of 612(a), an "agent of a foreign

20   principal" is defined as any person who acts as:

21          [A]ny agent, representative, employee or servant, or

22   any person who acts in any other capacity at the order,

23   request, or under the direction or control of a foreign

24   principal or of a person, any of whose activities are directly

25   or indirectly supervised, directed, controlled, financed, or

1102

1   subsidized, in whole or in major part by a foreign principal,

2   and who directly or through any other person:

3           One, engages within the United States and political

4   activities for or in the interests of such a foreign principal;

5           Two, acts within the United States as a public

6   relations counsel, publicity agent, information-service

7   employee or political consultant for or in the interests of a

8   foreign principal;

9           Three, within the United States solicits, collects,

10  disperses, or dispenses contributions, loans, money, or other

11  things of value for or in the interests of such foreign

12  principal; or

13          Four, within the United States represents the

14  interests of such foreign principal before any agency or

15  official of the government of the United States.

16          Accordingly, in order to prove that there exists --

17  there existed a conspiracy to violate Section 951, the

18  government must prove that the alleged conspiracy included an

19  agreement to engage in conduct that violated Section 612(a).

20  The government must therefore prove that the conspiracy had as

21  one of its objectives conduct that satisfied the essential

22  elements of a violation of Section 612(a), namely, that a

23  person would act as an agent of a foreign principal,

24  specifically the government of Turkey, as defined for the

25  purposes of Section 612(a), without filing with the attorney

1103

1    general the required registration statement and supplements

2    under FARA.

3            In determining whether the government has proven a

4    conspiracy to violate Section 951, the government is not

5    required to prove that the conspiracy contemplated all of the

6    activities that would cause conduct to constitute a violation

7    of Section 612, but you must unanimously agree which

8    contemplated activities constituted a violation of Section

9    612(a).

10           I'm now going to tell you what constitutes a

11   violation of Section 618(a).  Section 618(a) of Title 22 of the

12   United States Code provides in pertinent part that:

13           Any person who in any registration statement or

14   supplement thereto or in any other document filed with or

15   furnished to the attorney general under the provisions of this

16   subchapter willfully makes a false statement of a material fact

17   or willfully omits any material fact required to be stated

18   therein or willfully omits a material fact or a copy of a

19   material document necessary to make the statements therein

20   and the copies of documents furnished therewith not

21   misleading . . . shall be guilty of an offense against the

22   United States.

23           A false statement is a fact -- a false statement of

24   fact is an assertion that is untrue when made or when used and

25   which is known by the person making it or using it to be

1104

1    untrue.

2         For the purposes of determining whether a false

3    statement of fact or an omission of a fact was "material," the

4    test of materiality is whether in light of any false statement

5    or omission, the filed FARA registration statement and

6    associated forms that have been received into evidence failed

7    to provide the information requested.

8         A person acts "willfully" when he knowingly performs

9    an act, deliberately and intentionally, as contrasted with

10   accidentally, carelessly or unintentionally, and with knowledge

11   that his conduct was unlawful.

12        Accordingly, in order for you to find that there

13   existed a conspiracy to violate Section 618(a), the government

14   must prove that the conspiracy included an agreement that any

15   registration statement filed under FARA would contain a willful

16   material false statement or omission.

17        In order for the jury to find that the defendant or

18   any other person became a member of the conspiracy charged in

19   Count 1, the evidence must show beyond a reasonable doubt that

20   the defendant knew the purpose or goal of the agreement or

21   understanding and then deliberately entered into the agreement,

22   intending in some way to accomplish the goal or purpose by this

23   common plan or joint action.

24        Merely associating with others and discussing common

25   goals, merely -- mere similarity of conduct between or among

1105

1   such persons, merely being present at a place where a crime

2   takes place or is discussed, or even knowing about criminal

3   conduct does not of itself make someone a member of the

4   conspiracy or a conspiratorial agreement.

5           To prove the defendant joined the alleged conspiracy,

6   the government must prove the defendant intended to commit at

7   least one of the substantive offenses that are the alleged

8   unlawful objectives of the conspiracy agreement.

9           For a defendant to join a conspiracy, he must share

10  with the partners in the criminal plan the same overall goal

11  and must agree to pursue the same criminal objective.  A

12  defendant cannot join a conspiracy after its central objectives

13  have been achieved.

14          In order to sustain its burden of proof under Count 1

15  of the indictment, the government must prove beyond a

16  reasonable doubt that one of the members of the alleged

17  conspiracy or agreement knowingly performed at least one overt

18  act in the Eastern District of Virginia and that this overt act

19  was performed during the existence or life of the conspiracy

20  and was done to somehow further the goals of the conspiracy or

21  agreement.

22          The term "overt act" means some type of outward,

23  objective action performed by one of the parties to or one of

24  the members of the agreement or conspiracy which evidences that

25  agreement.

1    Although you must unanimously agree that the same

2    overt act was committed, the government is not required to

3    prove more than one of the overt acts charged.  The overt act

4    may, but for the alleged illegal agreement, appear totally

5    innocent and legal.

6    For the purposes of the charges in the indictment,

7    the term "foreign nation" refers to any nation other than the

8    United States, and the term "foreign government" refers to any

9    government other than the government of the United States,

10   regardless of whether the government or nation is an ally or

11   enemy of the United States.

12   In order to sustain its burden of proof for Count 1,

13   the government must show that the single conspiracy alleged in

14   Count 1 of the indictment existed.  Proof of separate or

15   independent conspiracies is not sufficient.

16   In determining whether or not any single conspiracy

17   has been shown by the evidence in the case, you must decide

18   whether common, master, or overall goals or objectives existed

19   which served as the focal point for the efforts and actions of

20   any members to the agreement.  In arriving at this decision you

21   may consider the length of time the alleged conspiracy existed,

22   the mutual dependence or assistance between various persons

23   alleged to have been its members, and the complexity of the

24   goals or objectives shown.

25   A single conspiracy may involve various people at

1107

1    differing levels and may involve numerous transactions which

2    are conducted over some period of time and at various places.

3    In order to establish a single conspiracy, however, the

4    government need not prove that an alleged coconspirator knew

5    each of the other alleged members of the conspiracy nor need it

6    establish that an alleged conspirator was aware of each of the

7    transactions alleged in the indictment.

8              Even if the evidence in the case shows that the

9    defendant was a member of some conspiracy but that this

10   conspiracy is not the single conspiracy charged in the

11   indictment, you must acquit the defendant of this charge.

12   Unless the government proves the existence of the single

13   conspiracy described in the indictment beyond a reasonable

14   doubt, you must acquit the defendant of this charge.

15             I'm now going to give you an instruction on Count 2

16   of the indictment.

17             Count 2 of the indictment charges that from

18   approximately July 2016 through approximately March of 2017, in

19   the Eastern District of Virginia and elsewhere, Bijan Rafiekian

20   and another defendant, Kamil Ekim Alptekin, knowingly acted and

21   caused others to act in the United States as an agent of a

22   foreign government, that is, the government of Turkey, without

23   prior notification to the attorney general, as required by law,

24   all in violation of Title 18, United States Code, Sections 951

25   and 2.

1108

1    The defendant has entered a plea of not guilty and

2  has denied that he is guilty of the offense charged in Count 2

3  of the indictment.  The government, therefore, assumes the

4  responsibility of proving beyond a reasonable doubt each of the

5  essential elements of the offense charged in Count 2 of the

6  indictment as to the defendant.

7    Count 2 of the indictment charges Bijan Rafiekian

8  with knowingly acting in the United States as an agent of a

9  foreign government without prior notification to the attorney

10  general.

11    In order to establish a violation of Count 2, the

12  government must prove beyond a reasonable doubt the following:

13    First, that Bijan Rafiekian acted in the United

14  States as an agent of a foreign government;

15    Second, that Bijan Rafiekian failed to notify the

16  attorney general of the United States that he would be acting

17  in the United States as an agent of the foreign government

18  prior to so acting;

19    Third, that Bijan Rafiekian acted knowingly, that is,

20  that he knew he was a person who agreed to operate within the

21  United States subject to the direction and control of a foreign

22  government or official, and to engage in conduct other than a

23  legal commercial transaction as defined in Instruction 35 that

24  I've read to you, and that he knew that he had not provided

25  prior notification to the attorney general; and

1109

1     Fourth, that Bijan Rafiekian acted, at least in part,

2  as an agent for a foreign government in the Eastern District of

3  Virginia during the time period alleged in the indictment.

4     As the Court has previously instructed you with

5  respect to Count 1, the conspiracy charge, in order to prove

6  that the defendant acted as an agent of a foreign government

7  without notification in violation of Section 951, the

8  government must prove beyond a reasonable doubt that the

9  defendant agreed to engage in conduct at the direction and

10  control of a foreign government that did not constitute a legal

11  commercial transaction, as that term has already been defined

12  for you, in connection with Count 1.

13     During your deliberations, you should not discuss or

14  provide any information about the case with anyone other than

15  your fellow jurors while in the jury room.  This includes

16  discussing the case in person, in writing, by phone, or by any

17  electronic means, via text messaging, e-mail, Facebook,

18  LinkedIn, Twitter, Instagram, blogging, or any internet chat

19  room, website, social media, or other feature.  In other words,

20  do not talk to anyone, on the phone or in person, correspond

21  with anyone, or communicate by electronic means about this case

22  with anyone except with your fellow jurors, and only then while

23  you are in the jury room.

24     If you are asked or approached in any way about your

25  jury service or anything about this case, you are to respond

1110

1     that you have been ordered by the judge not to discuss this

2     matter, and you should report the contact to the Court as soon

3     as possible.

4             Along the same lines, you should not try to access

5     any information about the case or do research on any issue that

6     arose during the trial or from any outside source, including

7     dictionaries, reference books, or anything on the internet.

8     Information that you may find on the internet or in a printed

9     reference might be incorrect or incomplete.  In our court

10    system, it is important that you not be influenced by anyone or

11    anything outside of the courtroom.  Your sworn duty is to

12    decide this case solely and wholly on the evidence that was

13    presented to you in this courtroom.

14            Upon retiring to the jury room to begin your

15    deliberations, you must elect one of your members to act as

16    your foreperson.  The foreperson will preside over your

17    deliberations and will be your spokesperson here in court.

18            Your verdict must represent the collective judgment

19    of the jury.  In order to return a verdict, it is necessary

20    that each juror agree to it.  Your verdict, in other words,

21    must be unanimous.

22            It is your duty as jurors to consult with one another

23    and to deliberate with one another with a view towards reaching

24    an agreement, if you can do so, without violence to individual

25    judgment.  Each of you must decide the case for himself and

1111

1    herself, but do so only after an impartial consideration of the

2    evidence in the case with your fellow jurors.

3           In the course of your deliberations, do not hesitate

4    to reexamine your own views and to change your opinion if

5    convinced it is erroneous.  Do not surrender your honest

6    conviction, however, solely because of the opinion of your

7    fellow jurors or for the mere purpose of thereby being able to

8    return a unanimous verdict.

9           Remember at all times that you are not partisans.

10   You are judges -- judges of the facts of this case, and your

11   sole interest is to seek the truth from the evidence received

12   during the trial.

13          Your verdict must be based solely on the evidence

14   received in the case.  Nothing you have seen or read outside of

15   the courtroom may be considered.  Nothing I have said or done

16   during the course of this trial is intended in any way to

17   somehow suggest to you what I think your verdict should be.

18   Nothing said in these instructions and nothing in any form of

19   verdict is to suggest or convey to you in any way or manner any

20   intimation as to what verdict I think you should return.  What

21   the verdict shall be is the exclusive duty and responsibility

22   of the jury.  And as I have told you many times, you are the

23   sole judges of the facts.

24          The punishment provided by law for the offenses

25   charged in the indictment is a matter exclusively within the

1112

1    province of the Court and should never be considered by the

2    jury in any way in arriving at an impartial verdict as to the

3    offenses charged.

4         A form of verdict has been prepared for your

5    convenience, and I want to show that to you now.

6         If we can put that up on the --

7         This is the verdict form that you'll complete once

8    you have reached the verdict on each of the two counts.  You'll

9    see that as to the first count you need to indicate "Not

10   Guilty" or "Guilty" as to each alleged objective of the

11   conspiracy.

12        With respect to Count 2, you need also to indicate

13   "Not Guilty" or "Guilty" with respect to that charge.

14        And once you've reached the unanimous decisions on

15   those counts, the foreperson should sign and date the verdict

16   form.

17        As I indicated, you'll take this form to the jury

18   room, and when you've reached the unanimous agreement as to

19   your verdict, you'll have your foreperson write your verdict on

20   the form, date and sign the form, and then return with your

21   verdict to the courtroom.

22        If it becomes necessary during your deliberations to

23   communicate with the Court, you may send a note signed by your

24   foreperson or by one or more members of the jury through the

25   court security officer, Mr. Burns.  No member of the jury

1113

1    should ever attempt to communicate with the Court by any means

2    other than a signed writing, and the Court will never

3    communicate with any member of the jury concerning the

4    evidence, your opinions, or the deliberations other than in

5    writing or orally here in the courtroom.

6           You will note from the oath about to be taken by

7    Mr. Burns that he, too, as well as other persons, are forbidden

8    to communicate in any way or manner with any member of the jury

9    concerning the evidence, your opinions, or deliberations.

10          Bear in mind also that you are never to reveal to any

11   person -- not even to the Court -- how the jury stands,

12   numerically or otherwise, on the question of whether or not the

13   government has sustained its burden of proof until after you

14   have reached a unanimous verdict.

15          As I indicated to you, each of you will have your own

16   set of these instructions with you during, during your

17   deliberations.

18          Ms. Zirk, would you swear Mr. Burns, please?

19          (Court Security Officer Burns affirmed.)

20          THE COURT:  Let me see counsel at the bench, please.

21          (Bench conference on the record.)

22          THE COURT:  Does the government have any objections

23   to the instructions as written?

24          MR. GIBBS:  Judge, I don't know about that --

25          THE COURT:  There are a couple --

1114

1           MR. GIBBS:  Right.

2           THE COURT:  -- edits that need to be made to the

3     instructions.

4           MR. GIBBS:  Right.  You know, it looked like, I could

5     see that the Court caught some of the edits, but the one that

6     seemed most substantive was on Instruction No. 35.  There was a

7     number 2 there, and Your Honor caught, that should have said

8     "foreign government or official."

9           THE COURT:  I think I said it, didn't I?

10          MR. GIBBS:  You did.  So as long as that goes into

11    the version that goes to the jury.

12          THE COURT:  Okay.

13          MR. GIBBS:  The other one we had, I thought on

14    Instruction 32 that Michael Flynn was going to be listed.

15          THE COURT:  I said it.

16          MR. GIBBS:  Okay.

17          THE COURT:  It's not in there.  We're going to add

18    it.

19          MR. GIBBS:  Yeah.  And that's all we had, Judge.

20          THE COURT:  Yeah, I said it.

21          THE LAW CLERK:  You said it as to a different

22    instruction, not to 32.

23          THE COURT:  I said it as to --

24          THE LAW CLERK:  I believe on pages 23 and 24.  I

25    reprinted those to have that added.

1115

1    THE COURT:  It's page 23?

2    THE LAW CLERK:  I believe.

3    MS. MITCHELL:  I think it's on 22?

4    THE LAW CLERK:  22, yes.  22 and 23 sounds right.

5    THE COURT:  Where's 22?  Yeah.

6    THE LAW CLERK:  Yeah.  I made that change, and that's

7    where you said it.  You're just referring to a different

8    instruction.

9    THE COURT:  I said it in the context of No. 19.  You

10   were referring to another one?

11   MR. GIBBS:  Yes, Your Honor.  On the last paragraph

12   on page 36 of Instruction No. 32.

13   THE COURT:  Where?

14   MR. GIBBS:  Well, actually there, Judge, let me

15   correct that because I think that's directly quoting from the

16   indictment.

17   THE COURT:  Yeah, yeah.

18   MR. GIBBS:  And so I think that's right.

19   MR. TURGEON:  Actually I don't believe that's

20   correct.  I think the indictment says that the defendant and

21   Alptekin conspired with others, known and unknown, I believe is

22   what the indictment says.

23   THE COURT:  Right.  That was just taken from the

24   indictment.

25   MR. GIBBS:  Right.

1116

1    THE COURT:  Okay.  Anything else?

2    MR. GIBBS:  I think we're fine.

3    MR. TURGEON:  I believe the distinction we're trying

4    to draw is that conspired with Alptekin and also with Michael

5    Flynn.

6    THE COURT:  Well, that's just the statement from the

7    indictment.  I'm not going to -- I'm not going to make that

8    change.  All right?

9    MR. TURGEON:  Can I refer to the indictment?

10   MR. GILLIS:  No, that's fine.

11   THE COURT:  Okay.  All right?  Anything else?

12   MR. GIBBS:  Are you going to dismiss the two

13   alternates at this time?

14   THE COURT:  No.  I'm going to wait until closing

15   argument.

16   MR. GIBBS:  Okay.  Very good.

17   THE COURT:  Any other -- any objections to the

18   instructions as read?

19   MR. MacDOUGALL:  Other than renewing and rearguing

20   our prior objections, nothing new, Your Honor.

21   THE COURT:  All right.  You know, I didn't put on the

22   record as to having a colloquy with Mr. Rafiekian concerning,

23   to establish that he knew he had the right to testify.  I

24   assume you advised him of that and he's, he's knowingly waived

25   his right to testify?

1117

1       MR. MacDOUGALL:  We've discussed it at length, Your

2  Honor, and --

3       THE COURT:  All right.

4       MR. MacDOUGALL:  Well, we've given him appropriate

5  advice, and he's made his decision.

6       THE COURT:  All right.  Should we have the colloquy

7  directly with him?

8       MR. GIBBS:  I would certainly accept the

9  representations of counsel.

10       THE COURT:  All right.  In this case, I don't think

11  we need to do it.

12       All right.  Anything else?

13       MS. MITCHELL:  Thank you.

14       THE COURT:  All right?

15       MR. GIBBS:  Thank you, Judge.

16       (End of bench conference.)

17       THE COURT:  We will now proceed with closing

18  argument.  Mr. Gillis?

19                    CLOSING ARGUMENT

20                    BY MR. GILLIS:

21       Thank you, Your Honor.

22       Good afternoon, ladies and gentlemen.  This is the

23  first time I've had a chance to talk directly to you, so let me

24  introduce myself.  First, my name is Jim Gillis.  I have the

25  privilege to be an assistant United States attorney in your

1118

1    district.

2          As you've heard, ladies and gentlemen, on July 15,

3    2016, there was a coup attempt in Turkey.  There -- it was

4    against President Erdogan.  There were hundreds killed.  There

5    were thousands injured.  It was a two-day coup attempt that

6    shook the very foundations of the Turkish government, and

7    shortly thereafter, Erdogan blamed one man for being behind it:

8    Fethullah Gulen, the person whom he'd been trying to have

9    extradited from the United States for quite some time.

10          Now, it does not matter in this case however you feel

11    about Fethullah Gulen, whether he's a terrorist or not a

12    terrorist.  It does not matter.  It does not matter whether you

13    believe that he should be extradited or not from the

14    United States.  That's a decision for the Department of Justice

15    ultimately to make.  But neither of those things matter here.

16          The thing that matters, and only the thing that you

17    alone can decide, is whether the defendant conspired with

18    Ekim Alptekin and others to act as an agent of the Turkish

19    government without notifying the United States Department of

20    Justice, in other words, by keeping it a secret from the

21    government and from the American people.

22          Now, I'm going to be going through this -- the

23    exhibits, and I -- you've seen our binders of them.  There's

24    more than a hundred, so I won't be able to cover them all with

25    you, and those that I do, I'll be able only to speak of

1119

1    briefly.  So if you're taking notes, you may want to note the

2    exhibit number that I discuss.  Sometimes I won't even --

3    pardon me -- sometimes I won't even put it up on the, on the

4    screen for you.

5          But I'd like to begin with -- let's see.  First --

6    there.  I'd like to begin with Government Exhibit 8A.  8 -- now

7    it's 8B, rather.  This says "8A," but it's actually 8B.  8A was

8    never admitted, but 8B is the one that this would be.

9          Now, the first e-mail in this chain is from July 27,

10   2016, and it's from the defendant to Alptekin, saying:  Ekim,

11   we're ready.  We're looking forward to speaking with you.

12         What this tells you, folks, is that before July 27 --

13   and evidently Tem is July in Turkish -- but in any case, this

14   tells you that before this 27th e-mail, the defendant and

15   Alptekin had been talking about some sort of active -- some

16   sort of project.

17         And in the next e-mail, you see what that project is,

18   that it's not just some project; it's a project that, according

19   to Alptekin, involves the minister of foreign affairs in

20   Ankara, and that he -- whatever it is that Alptekin had told --

21   rather, that Rafiekian, the defendant, had told him before

22   these conversations on the 27th were very good news, and they

23   were good enough, according to Alptekin, that he wanted to

24   bring them to the attention of the minister of foreign affairs

25   of Turkey.

1120

1        Now, see the defendant's response to this.  Again,

2   these are all the same day.  And he says -- and this is a theme

3   that you are going to be hearing over and over -- in that first

4   line:  We are ready to engage on what needs to be done.

5   Turkey's security and stability is extremely important to world

6   security.  President Erdogan -- his abbreviation there, RTE for

7   Erdogan -- can lead the campaign against radical Islam to

8   protect the image of Islam.

9        Now, you know from this case that "radical Islam" for

10  the defendant is code for Gulen.  He doesn't speak about

11  anybody else in connection with radical Islam.  He's only been

12  talking about Gulen throughout this whole -- this whole time.

13       Now, what this tells you, folks, is that, that the

14  defendant knows from what he's hearing -- he understands from

15  what he's hearing from Alptekin that this project is being

16  taken very seriously at the highest levels.  And in particular,

17  that theme about Erdogan being so important to world stability

18  and Gulen as the face of Islamic terror is bad, and it's

19  completely in line with the government of Turkey's position

20  with respect to Gulen, and that is, keep Erdogan close and give

21  him Gulen.

22       Now, that is a theme that you're going to see carry

23  through this whole project.  Regardless of what they called it,

24  regardless of who they said was the supposed client, this

25  theme -- and regardless of whether they claimed it was for

1121

1    tourism or for business or investment in Turkey, it had nothing

2    to do with that.

3            This was always about Gulen, and it was always about

4    that theme, and it stayed right up until the end, when the

5    defendant ghostwrote that op-ed piece for the defendant --

6    for -- rather, for Michael Flynn, General Flynn.

7            And when he says there constantly and in all of these

8    things is that, you know, we're going to -- at this time, we're

9    only going to include our partners.  And as you'll see from the

10   other -- from the other e-mails, the right time, according to

11   the defendant, is only once they've stopped talking about the

12   Turkish ministers and they've started talking about Inovo,

13   Alptekin's shell company in the Netherlands, and once they

14   start claiming that this is about confidence in the business

15   climate in Turkey.

16           Now, this string of e-mails shows you that the

17   defendant understood just how high in the Turkish government

18   Alptekin's connections went, that he understood that Alptekin

19   was reporting to the defendant about his conversations with

20   Turkish ministers just days after the coup, folks.

21           Remember, this is days after a two-day coup, and

22   Alptekin is telling the defendant:  I've been having

23   discussions with the foreign minister of Turkey about this

24   project that we're going to be working on.

25           This is not about tourism or investment climate in

1122

1    Turkey.  Nobody in the government of Turkey at that point is

2    concerned about tourism or investment in Turkey.  What they're

3    concerned about is getting a handle on Gulen and getting the

4    United States government to turn him over because he is the one

5    that they blame for being behind this coup.

6            What these e-mails also tell you is that Alpekin is

7    the conduit to the defendant from the ministers of the Turkish

8    government.  Alpekin is right in between.  He's keeping the

9    defendant informed of what he's being told by the Turkish

10   officials, and that is something that you will see recur again

11   and again.

12           Now, if you look at Government's Exhibit 9, this is

13   two days later, and as Alpekin tells the defendant, he's --

14   you know, the foreign minister is still able to take time out

15   of his busy day after, you know, putting down a coup and

16   jailing people and cracking down, he's still able to take time

17   and speak with Alpekin about this.

18           The MC refers to Mevlut Cavusoglu.  As you heard,

19   that's the Turkish foreign minister.  It shows you again that

20   the defendant understood that the Turkish foreign minister was

21   taking this very, very seriously.

22           As he says right there, he wants to explore it

23   seriously.  He wants to meet with the defendant and General

24   Flynn; and he wants Alpekin and the defendant to formulate

25   what kind of output they could generate, and finally, he wants

1123

1    to know an indicative budget.

2              Alptekin is telling the defendant straightforwardly

3    this is coming right from the top here.  And not only that,

4    this is the foreign minister directing these guys to meet first

5    of all, formulate what kind of output they can come up with,

6    and come up with some sort of budget.

7              And what happens next then is the nine -- the nine

8    bullet points that you've seen so much.  Now, those nine bullet

9    points -- observe, this is the subject Truth.  These nine

10   bullet points are under the Truth category at this point still.

11             What you're going to see, of course, is that these

12   very same bullets are included later in what they're calling

13   the Confidence Project.  But that didn't change anything about

14   the focus of this entire undertaking.

15             And so what those -- what -- you know from this, as

16   the defendant told his lawyer -- told FIG's lawyer, Kelner, at

17   the time -- Mr. Kelner testified here.  Mr. Kelner told you

18   that the defendant told him that this concerned a completely

19   separate project from this Confidence thing.  Completely

20   separate.

21             But he admits that that supposedly completely

22   separate project was for the government of Turkey.  And why

23   does he do that?  He has to.  There's this e-mail.  There's a

24   bunch of e-mails that show that he's in contact through

25   Alptekin with the foreign ministers of Turkey, and the lawyers

1124

1    have it.

2              So he's got to come up with some sort of story to

3    cover this, and the story is, yeah, we had this thing with the

4    government of Turkey, but it's completely different and it

5    fell -- it fell apart, by the way.

6              Now, you'll notice there at the beginning, he talks

7    about the active participation of Alptekin in the project.

8    They had again carried right through to the Confidence Project,

9    as they called it.  Same bullet points, but now it's supposedly

10   Alptekin being the senior adviser on this thing.

11             Now, this -- this then leads us to Exhibit 15; and

12   this, you'll see, is Alptekin responding to the defendant's

13   nine bullets under the Truth.  Again, see this?  This e-mail is

14   about the Truth Project, supposedly completely different.

15   Yeah, it was for the government of Turkey, but it was

16   completely different from this other thing.

17             And so what you see here is again Alptekin telling

18   the defendant:  I met with the foreign minister, and I

19   explained our proposed approach.  He's receptive.  He wants to

20   meet.  And as soon as we can work out the dates, we'll

21   strategize how to approach this.

22             Strategize?  That's another word for conspiracy.

23   Because you get together and you strategize about something,

24   and that's part of an agreement.

25             And there's a lot of different ways to make an

1125

1    agreement.  This one standing alone doesn't mean that it's

2    illegal, but there's a lot of different ways to make an

3    agreement, and you're going to -- we're going to talk about

4    that in a minute.

5            But this, this -- now, this e-mail tells you what

6    this project is going to be about, because you see that second

7    PS there.  As, as Agent Alfredo told you, this article shows

8    the depth of the crisis we're facing.  That's the article.

9            And this article, I won't -- you'll have it with you,

10   15A.  You'll have it back with your deliberations, but the gist

11   of it is not very complimentary of Erdogan.  It does -- it does

12   not portray Gulen in a bad way; in fact, it says that he has a

13   legal right to remain in the United States.  And finally, he

14   says that the Turkish government had better follow the rules

15   with the Department of Justice.

16           This is *The New York Times* article.  This, Alptekin

17   says, is the depth of the crisis we are facing.  And he sends

18   this to the defendant in response to those nine bullet points.

19   And in response -- and after saying that he's talked to the

20   foreign minister about what they can offer, what they can do

21   for them, and then he explains:  Here's what we're facing here.

22   Okay?  We've got to get the United States turned in the right

23   direction because right now they're saying Gulen has a legal

24   right to be here.

25           Now, this crisis is what this project is all about,

1126

1   and it's solving this crisis that Alptekin is telling the

2   defendant that -- that Turkey is facing.

3          And now, if you look at Government's Exhibit 13, this

4   again under the Truth category, who's he going to be solving

5   this crisis for?  Well, there is the apple tree analogy you've

6   heard so much about.  And it makes this connection ad nauseam

7   about Khomeini and Gulen, that Gulen is the next Khomeini.

8          Now, this, this part right here, this persists again

9   throughout this entire project.  You're going to see this

10  analogy when the defendant, during the time that the defendant

11  admits that he was working under the direction of the

12  government of Turkey, that this was a project with the

13  government of Turkey, it was completely separate, but yes, it

14  involved the government of Turkey, and all of these e-mails

15  show you that he knew who was pulling the strings with respect

16  to this.  And it's here that he makes this analogy for the

17  first time, under the Truth -- under the Truth rubric.

18         Now, what is it that is going to solve this crisis?

19  It's establishing for the American people, the U.S. Congress,

20  and whoever else can be influenced, that the world needs

21  Erdogan, and they -- and Erdogan is the only one who can

22  guarantee this stability.  Erdogan is good.  We gotta keep him

23  happy, and we gotta get Gulen out of here because he's the next

24  Khomeini.

25         So that's how the defendant plans to deal with this

1127

1    crisis that he's now responding to in this very e-mail, the one

2    that Alptekin brought to his attention, that *New York Times*

3    article that shows how everything is going in the wrong way.

4            Now, this is Alptekin's response to the defendant's

5    apple tree analogy:  I had a long meeting with the minister of

6    economy upon the reference of the foreign minister.  I

7    explained what we can offer, you and me.  Rafiekian and me.  He

8    agreed to discuss in general lines along with -- at the council

9    of ministers and then with the prime minister.

10           Now, this tells you that again, Alptekin know --

11   rather, the defendant knows through Alptekin.  He's being told.

12   This is all the way at the top levels of the government of

13   Turkey.  And this right here, folks, is right directly in

14   response to this famous apple tree analogy that Alptekin --

15   rather, that Rafiekian drew time and again.  And it didn't

16   change, and neither did the purpose of this project.  No matter

17   how many times or whether they changed the name of it or tried

18   to say that it was some completely separate project, this tells

19   you that this thing that they are doing never, ever changes.

20           Now, if I could move you on to 16.  Now, here this is

21   where the magic happens, folks, because here you've got

22   August 10, 2016, and Alptekin is telling Flynn and the

23   defendant that he just had several meetings with the minister

24   of economy and the Turkish foreign minister, and he's got a

25   green light to discuss confidentiality, budget, and the scope

1128

1    of the contract, and he says he's flying in at the MFA's

2    direction to talk about it.

3            Now, this is -- as I said, keep your eye on that

4    date.  Here's the next one, August 11:  Welcome back.

5            The defendant is very happy to see and hear that

6    Alptekin is coming back, just like he said the day before.

7    He's coming to LA at the direction of the MFA.

8            But now they're talking about this Confidence

9    Project.  The business community has engaged FIG to restore

10   confidence through clarity in the trade and investment climate.

11           The what?  Where did that come from?  You had never

12   heard anything about that before this.  You heard from Special

13   Agent Alfredo that he looked through these thousands of

14   e-mails.  This is the very first time there's any mention of

15   confidence or investment in connection with this project.

16           And what you've heard from all the other witnesses is

17   while this may have been some sort of fig leaf that they came

18   up with to get their stories straight, never was that a serious

19   objective of this project.  It was always about getting dirt on

20   Gulen and getting him extradited and making sure that Erdogan

21   was viewed favorably by the United States government and the --

22   and the people of the United States.

23           Now, just think for a moment about this, okay?  The

24   defendant's been told by the Turkish -- by Alptekin that the

25   Turkish foreign minister is on this, that the prime minister

1129

1    has been informed about it, it's been taken up to the council

2    of ministers, and the foreign minister has given us the green

3    light on August 10, the green light.  And then somehow in the

4    next 12 hours, that all evaporates, and suddenly a completely

5    separate project springs forth on August 11.

6              They want you to believe that there was never any

7    mention of this in any of the e-mails, no mention of it to

8    anyone?  Like, gee, we had this -- we were so close on this

9    contract with the minister of foreign affairs.  He gave us the

10   green light.  And then, like, you know, a few hours later, all

11   of a sudden the rug is pulled out from under us.

12             Wouldn't you expect that there would be some sort of

13   communication, some sort of Skype chat?  These guys were

14   talking all the time by e-mail, and yet there's nothing in

15   there, like, oh, some -- no kind of explanation for why it all

16   went poof?

17             No.  It's just you're supposed to believe that this

18   project just -- the project that Alptekin -- rather, the

19   defendant says was involved with the government of Turkey,

20   you're supposed to believe that in 12 hours, that magically

21   disappeared without them saying a word about it, and then

22   mysteriously out of the mist comes this other project,

23   completely unrelated, another project, and that all happens

24   overnight.  But don't worry, folks, because this new project

25   has got nothing to do with the government of Turkey, nothing to

1130

1    do with Gulen.  What it's about is restoring confidence in the

2    investment climate.

3         And then I want you to look at this right here.

4    This, folks, we are not -- as the judge told you, we're not

5    obliged to show you a smoking gun or an actual written

6    agreement, but this is about as close as you're going to get,

7    because what this is is a cover story.  You replace engagement

8    purpose with cover story, and that is what this is.  Ekim,

9    Bijan here, cover story, the business community is engaging FIG

10   to restore confidence through clarity.

11        Well, that's nonsense, folks, and your common sense

12   will tell you that without doing any sort of back and forth by

13   e-mail or chat or anything, mentioning it to anybody at FIG at

14   any time.

15        You know, we were so close to getting this project

16   with the Turkish government, but it just went away, and you

17   won't believe what happened next, like, within 12 hours.

18   Suddenly there's this other business community that comes to

19   the rescue on a completely separate project, and, thank God,

20   they're willing to pay us 600,000 to do it, and we would manage

21   to do all of that without a single e-mail taking place before

22   then.

23        We're all talking with the government of Turkey.  The

24   agent tells you there's nothing in there about confidence,

25   nothing about anything else that relates to this supposedly new

1131

1    project, and yet we're supposed to believe that this springs

2    out of thin air without ever there being any sort of

3    negotiation about the price.  Suddenly they're willing to pay

4    $600,000, these unnamed businessmen, or tourist industry, or

5    Alptekin's Dutch shell company, whichever lie the defendant is

6    telling at the time.

7             Government's Exhibit 17.  Now, look, he says he did

8    not touch the adviser support at 20 percent.  I'm not going to

9    spend a lot of time on this, folks, but this, this all refers

10   to this supposed refund.  You've seen the invoices.  You've

11   seen the bank account records.  You're going to have them all

12   with you.  You've seen the wire transfer.

13            This is, this is coming right out of the payments

14   from Alptekin to FIG and then back to Alptekin, except it's

15   coming first from Turkey, from Alptekin's account in Turkey.

16            Now, why didn't we get an MLAT?  Well, because we

17   might not want to tell the government of Turkey that we were

18   investigating the activities of the government of Turkey in

19   influencing the American people in the U.S. Congress.  So yeah,

20   we didn't file an MLAT request with Turkey, as if it would have

21   done any good, but even if it would have, we did not want to

22   disclose at that point our investigation.

23            Now, if you look at Government's Exhibit A, now, this

24   shows you his senior adviser status, and in the attached cost

25   of goods sold, you'll see his 20 percent fee there, his adviser

1132

1    fee.

2         Now, you know what the evidence shows you that is.

3    That is a kickback, right?  The evidence shows you that that's

4    a kickback.  It's money coming from Turkey.  Now, we don't need

5    to show you where the money came from.  We don't even need to

6    show that there was any money, okay?  The question is was he

7    acting as an agent of a foreign government without disclosing

8    it?  That's the question, whether he was paid or not paid.

9         But by looking at these transactions, it's a very

10   strong inference, folks, that this money, because it came

11   through Alptekin's account in Turkey, and then his 20 percent

12   kickback was sent up to his shell company in the Netherlands,

13   that tells you pretty strongly where the money is truly coming

14   from.

15        And again, as I said, you compare 10, when it's the

16   Truth Project, and 18A, when it's now the Confidence Project,

17   those bullet points always the same.

18        Now, the end product of this whole engagement is

19   going to be this video, and as you've heard from witnesses,

20   including the videographer who took it, this was all about

21   dirtying up Gulen.  This had nothing to do with the investment

22   climate or the financial picture or the finance investments,

23   whatever, tourism, whatever.  It was single-mindedly focused on

24   dirtying up Gulen, portraying him as a terrorist and a fraud

25   and getting him extradited.

1133

1    Now, if you had any doubt about who was driving this

2    train, who the defendant knew, understood was driving this

3    train, it is this exhibit here, 20, this chat.  Note it's on

4    August 25, right?  We're already calling it Confidence.  This

5    is all about businessmen or Alptekin's company or whatever, and

6    Alptekin tells the defendant:  We are confirmed to go.  Meeting

7    him tomorrow for details.

8    And he says in response:  Great.  Now I can engage

9    the film crew.

10    So this is the word he's been waiting for:  We are

11    confirmed to go.  Not from Alptekin, you are confirmed to go.

12    I'm Alptekin, I'm the client now, you are confirmed to go.  No.

13    He, he said:  We are confirmed to go.  Meeting him tomorrow

14    evening for details.

15    And then this drives the point home, okay?  I'm

16    meeting -- let's meet tomorrow night, assuming my flight isn't

17    delayed.  I'm meeting MC's boss, you know, not direct boss but

18    you know who.

19    And this is, this is the opening ceremony for that

20    beautiful bridge you saw.  This is taking place the day before,

21    and Alptekin's here telling him:  Tomorrow, at the opening of

22    the Third Bridge -- at the opening of the Third Bridge, I'm

23    going to be meeting perhaps No. 1.

24    But no matter what, either way, MC, the foreign

25    minister, Mevlut Cavusoglu, either way, he said:  We're a full

1134

1    go.  Not you got the full go from me because I'm the client.

2    No, not that.  He said:  Either way, you're a full go.  I've

3    heard it from the foreign minister himself.

4          Now, this Skype chat, again, if you come to this --

5    this is the same day, same day as the full go.  Alptekin says:

6    I want the Flynn's -- I want Flynn's CV.

7          And rather than profile "they" ask for a full CV,

8    Rafiekian says:  Okay.  I'll get it for you.

9          "They" want his full CV, not "I" want it.  They.

10   Who?  Minister Cavusoglu and the rest of his buddies in the

11   council of ministers.

12         Now, this, this 19, now he's sending this draft

13   engagement now that he's gotten the go-ahead, and this brief

14   engagement will not entail operational details for obvious

15   reasons.

16         I'll say.  And you know what those obvious reasons

17   are.

18         Now, again, later in this e-mail, there's that same

19   20 percent cut that he's going to get.  And now there's this,

20   this -- actually let's just pass over that because that's not

21   as important as this, okay?

22         Again, here it is, "Confidence," right?  Business

23   community, tourism, you know, confidence in the climate here.

24         No.

25         Thank you for sharing this important publication.

1135

1    This work is critical on a global scale as it relates to

2    international security on the most sensitive and critical

3    levels.

4              Doesn't sound a lot like tourism.  Doesn't sound a

5    lot like foreign investment in Turkey.  This sounds a lot like

6    the message that the government of Turkey and Erdogan have been

7    trying to get across to the United States government and that

8    they haven't yet been able to do because of the crisis that

9    he's -- that's reflected in that *New York Times* article.

10             Now, that's a theme, as I said, that's going to go

11   throughout this whole project.  Look at Government's

12   Exhibit 8B.  We're ready to engage on what needs to be done.

13             And, you know, Turkey's security and stability is

14   extremely important.  Government's Exhibit 13 is the same

15   effect as is Government's Exhibit 10.

16             Now, all of those, by the way, are back when they're

17   still calling this project Truth and when it's for the Turkish

18   government, as the defendant admits to his lawyers.  But here's

19   one thing that really drives again the nail home, and that is

20   this e-mail about backdating or, rather, postdating the date of

21   the agreement.

22             He says here:  We have been at work on this

23   engagement since July 31.  However, we decided to set the date

24   as August 15.

25             Well, why would they do that?  Because July 31,

1136

1    folks, is when they were still working for the government of

2    Turkey.  That's when they still had this project about Gulen,

3    back when they were talking about truth.  So we don't want to

4    date it then.  We've got to date it for the 15th now that we're

5    talking about Confidence and business climate and all of that

6    other stuff.

7            So that's why they have to postdate that contract.

8            Now, next comes this playbook that the defendant

9    drafts, and you'll see in there the mission, okay?  All about

10   X, who you now know is Gulen.

11           And this has nothing to do with foreign investment in

12   Turkey.  Nothing at all.  In that last bullet point there,

13   register under the Lobbying Disclosure Act, that, folks, is --

14   look, Alptekin, or, rather, the defendant was going to lie

15   about who was the client, no matter whether it was FARA or the

16   LDA, and so he went to Kelley, but when -- it was Sphere that

17   was raising the questions about whether to file, how to file

18   and what not, and so Alptekin -- rather, the defendant went to

19   his friend, Mr. Kelley, and said:  I've got to file under FARA.

20           And Kelley says:  Who's the client?

21           And the defendant says:  It's a private entity.

22           Lie.  You know it's a lie.  But it's a lie.

23           But the fact that he went to Kelley and said, "I need

24   to file under FARA," he didn't care whether it was FARA or

25   whether it was under LDA.  What he cared about was that it

1137

1    didn't reveal who the true client was:  the government of

2    Turkey.

3            His intent throughout this was to lie about that, and

4    so the fact that he went to Kelley, so what?  He was going to

5    lie and he did lie to Kelley, his good friend, and not only did

6    he lie to him; he took advantage of him.  Because as Kelley

7    told you, he did this for a friend.  He didn't do it as a

8    lawyer.  He did it for his friend.  He asked him one question,

9    the defendant gave him one answer, and that was that.

10           Now, again, this playbook has this *60-Minute*-style

11   video that's going to document their investigation.  Now,

12   here's the scenario for that video.  You're never going to

13   guess who it's about.  And it is, indeed, about strategy to

14   combat the rise of radical Islam.  And who can do it?  Only

15   Erdogan.

16           Same theme.  Same theme throughout all of this.

17           Now, you'll see here that right after this

18   November 12, when he, when he sent the agreement to Alptekin

19   and agreed to the 20 percent kickback, he writes this e-mail to

20   Flynn, Jr. -- we'll call him Flynn, Jr.  Michael Flynn is, is

21   General Flynn's son.  And he says:  Michael, we need to wire

22   40,000 to Mr. Ekim Alptekin.  He is our outside adviser on the

23   Confidence Project.

24           Wait a second.  Our outside adviser?  I thought he

25   was the client.  Why are we paying him $40,000?  He's supposed

1138

1   to be paying us 200,000.  Why are we, why are we paying him?

2          And why is because, well, there's that -- there's

3   that whole kickback thing, but, you know, that's, that's, you

4   know, a problem we have to explain, but how do they do it?

5          And again, attached is the general scope adviser

6   agreement for Ekim Alptekin.  This is not the one for FIG to

7   act as the adviser.  This is the one for Alptekin to act as the

8   adviser.  And why?  Well, they've got an audit trail now to

9   properly document the relationship.  Of course, they need an

10  audit trail.  You need to explain what's going on.

11         But you can't explain away the fact that now FIG is

12  supposed to be providing outside services to Alptekin for

13  $200,000 and then Alptekin is supposed to get back $40,000 as

14  the outside consultant to the outside consultant, who's the

15  outside consultant of the outside consultant.  It's just a

16  circle of lies, folks.  It makes no sense, and it's entirely

17  fabricated.

18         Now, the next thing to happen here is this high-level

19  meeting with the client in New York on the 19th or 20th, and,

20  in fact, not only is it high-level, but as, as the defendant

21  tells you there, it's a cabinet-plus level related to

22  Confidence.  Now, he lied about that later.  He told, he told

23  Mr. Kelner it had nothing to do with Confidence, you know, this

24  was just kind of a meet-and-greet thing.  This didn't have

25  anything to do with it.

1139

1    Right here he tells you that it was related to
2  Confidence.  Not only was it related to Confidence, but -- let
3  me back up one second.  Not only was it related to Confidence,
4  but, as you heard, Mr. McCauley was paid $5,000 for the purpose
5  of attending it, and as you'll see, the check to him was -- the
6  memo was "Confidence."  This meeting was about Confidence.
7    And -- now, at the meeting, McCauley was there.  He
8  couldn't hear everything, but he heard enough.  He couldn't
9  hear everything because Woolsey was there, Woolsey was
10 distracted, he wasn't paying attention, he was making noise.
11 So McCauley couldn't hear everything that was going on, but he
12 certainly could hear that they were talking about Gulen, they
13 were talking about extradition, they were talking about Gulen
14 being a terrorist, and they were talking about how Gulen is the
15 Osama Bin Laden of Turkey.
16    And all of that is happening during this time, right?
17 Now, this is the lead up to that meeting in New York on
18 September 9.
19    Then, this you'll see is September 14.  Again, this
20 is before that meeting but well after they're claiming that
21 this is for the Turkish business community.
22    Now, what's he say there to -- this is Alptekin to
23 the defendant:  MC's guy, in other words, the foreign
24 minister's guy who is read into Project Confidence, advised me
25 to include an op-ed that FIG would get published.

1140

1    Now, he says "under my name."  In fact, ultimately it

2  was under Flynn's name, but what this tells you is that as late

3  as September 14, the defendant understands directly from the --

4  from Alptekin that the foreign minister of Turkey is still very

5  much involved in this project and still very much engaged in

6  directing it.

7    This wasn't some separate project.  This was always

8  the same, no matter what they called it, and MC's guy being

9  read into the Project Confidence tells you that that never

10 changed, because MC's guy is read into Confidence.  He's not

11 read into Truth.  He's not read into that other thing.  He's

12 read into this completely separate project for the business

13 community or the tourism community or the Dutch shell company

14 or somebody, but it's a completely different thing.

15   Now, here we are leading up to the meeting in New

16 York.  It's September 18.  This is the day before the meeting.

17 The defendant drafts talking points for that meeting, and he

18 sends them to Alptekin and to Flynn, and he's limiting the

19 distribution at that time.

20   Now, those talking points are here:  background and

21 talking points.  Again, you'll never guess who it talks about,

22 but somebody sitting under an apple tree in Paris.

23   These are the talking points that he's telling Flynn

24 and Alptekin:  Here's what we're going to cover with the

25 ministers in New York when we're meeting with them.

1141

1    And he again compares him to Gulen.  The same, same,

2    same theme that's gone through this whole thing.

3    Now, what are the questions that he's putting forth?

4    Well, as you'll see when you see those, there's nothing about

5    those that has anything to do with business climate.  It's all

6    about Gulen.

7    And here it is again.  The theme that carries through

8    this whole thing:  Keep Erdogan close and give him Gulen,

9    because he's the only one that can fix our problems.

10   Now, this is on -- so they have the meeting in

11   New York.  Then after that meeting, you'll recall they had the

12   meeting at the University Club, which was to go over the status

13   of the project, right?

14   And as you heard from Greg Lowman -- by the way,

15   here's the check to -- as you heard from Greg Lowman, there

16   were talking points that were passed out at that University

17   meeting.  And guess what?  They were the very same talking

18   points that the defendant had sent to Alptekin and to Flynn to

19   talk over with the foreign ministers.

20   This is not some separate meeting, having nothing to

21   do with each other, as he claimed.  You know, New York had

22   nothing to do with Confidence.  It just so happens that we had

23   exactly the same talking points for the two projects, but they

24   had nothing to do with each other.  Don't -- don't pay

25   attention to that.

1142

1    Instead, what we have here is -- now, this is -- this

2    is Greg -- Graham Miller, rather, writing to -- to the

3    defendant.  Note the date there:  September 19, the day of the

4    meeting with the foreign ministers, with the talking points

5    that they're ultimately going to hand out at the University

6    Club.

7    And Miller is asking him:  What about this LDA versus

8    FARA issue?  It's still a very live issue here.

9    And the defendant even tells him:  We're returning

10   from New York, so, you know, we'll get with you.  Our general

11   counsel, Bob Kelley, will communicate with you on the LDA.

12   Now, what's important here is that on this first one,

13   he said:  Would it be possible to receive a copy of your

14   counsel's recommendation?

15   Well, he never got a copy.  Why not?  Because if he

16   had gone back to Kelley and said:  I need a legal -- you know,

17   I need a legal opinion here, Kelley would have started asking

18   questions because he'd have to do it as a lawyer rather than as

19   a friend.  It would be more than just one question:  Who's your

20   client?  It would have been a lot more than that.

21   So instead, he says:  Bob Kelley will communicate

22   with you.  All right?

23   That, you know, never happened because Bob Kelley

24   testified that he didn't do anything.  But he answered that one

25   question and then filed it LDA.  There isn't any conversation

1143

1    about this, but more importantly, they're in New York.  They're

2    talking about FARA versus the LDA.  They're meeting with the

3    Turkish foreign minister and Erdogan's son-in-law, and they

4    don't think to mention it to Miller and Sphere and those

5    outside.  And, of course, they do think about it but they

6    decide purposefully not to do so.

7              Here's the lobbying registration form.  Now, this is

8    what Mr. Kelley filed.  Inovo is the client.

9              Well, as I said, it doesn't matter what, he was going

10   to lie about that.  And not only did he lie about it, but he

11   left his friend, Robert Kelley, holding the bag by having him

12   sign the LDA.

13             Now, 45(a), let's first talk about this November

14   meeting at -- at FIG.  This is when Alptekin is there and he

15   blows up because there hasn't been enough progress on this

16   thing.

17             You remember Jim Courtovich was there.  He'd never

18   met Alptekin before.  He's on his way to the airport, and he

19   decides -- the client's going to be there; I'm going to be

20   there, too.  So he's laser focused on this, the first time he

21   met the client.

22             And so what does he hear?  The first time he walks in

23   the door, Alptekin says to me:  You're the great star from

24   Scandal, and yet you haven't done anything for me.  Where's the

25   Congressional hearings?  Where's all the media coverage?

1144

1   Where's DOJ action?  Extradition, by the way.

2          And he turns to the defendant and he says:  What am I

3   going to tell Ankara?  Not what am I going to tell, you know,

4   the shell company up in the Netherlands?  What am I going to

5   tell Ankara?

6          And Ankara, of course, is the capital of Turkey,

7   where the minister of foreign affairs hangs out along with all

8   of the other minister friends that Alptekin has and has been

9   telling him about.

10          Now, he blows up.  This is the meeting very early in

11   November, before the election, several days before the

12   election.  He blows up, and Rafiekian has got to scramble, and

13   so what he does is he quickly drafts this op-ed for General

14   Flynn to send out.  And what he does when he sends this -- this

15   is the first one you're going to see about this -- he sends it

16   first to Alptekin, and he says to him:  Ekim, a promise made is

17   a promise kept.  Here's the article.

18          When you see that article back in your deliberations,

19   folks, you're going to see that it concerns only -- it concerns

20   only the points that the Turkish government wanted made, right

21   down to the apple tree analogy.  This was all the defendant's

22   handiwork.  Now, there's the article; there's the analogy.

23          Now, this is after it's been approved by Flynn.  He

24   writes back November 4:  Ekim, the arrow has left the bow.

25          Now, he claims that he told his attorneys this op-ed

1145

1    had nothing at all to do with this project.  It was Mike

2    Flynn's idea, he's always been passionate about this, yada,

3    yada.  But instead, you see that it's him drafting it.  And not

4    only that, but it is done specifically, according to both of

5    these e-mails, it's clear to you that he was doing it for Ekim

6    and he was doing it in response to Ekim's fury at getting no

7    results.  And instead, he writes the e-mail -- this, rather, he

8    writes the op-ed and e-mails it, saying:  The arrow has left

9    the bow.  This is the promise that he made and that he kept.

10          Now, a promise, folks, is an agreement, and this is

11   the agreement.  It's the culmination.

12          Now, he couldn't get the video done, but he got

13   basically the same thing in a high-profile article by General

14   Flynn, making all these points that the Turkish government

15   wanted made.

16          And so this is going to get very high-profile

17   exposure.  This is to give Alptekin what he needed, which was

18   something to show Ankara.  What am I going to tell Ankara?

19   Well, tell them that Lieutenant General Michael T. Flynn wrote

20   this article for you that ticks off all the points that we were

21   going to do in that video, and it so happens to be exactly the

22   same thing that started at the very beginning of this, when

23   they were still calling it Truth and when they were still

24   working for the government.

25          Now, this -- this -- now, so, folks, we have to prove

1146

1    a conspiracy.  Now, you're never going to find direct evidence

2    of it, but this parallel activity between the defendant and

3    Alptekin and these lies, not the least of which is this lie

4    about the refund, it's clearly a lie.  A lie about the op-ed

5    and why it was written, clearly a lie.  A lie about whether the

6    New York meeting was related to Confidence or not.  Clearly a

7    lie.

8              When you've got those kind of lies going on, that

9    tells you the intent of the defendant.  It tells you what's

10   going on inside his head, and that is, to work as an

11   undisclosed agent for the foreign government.

12             Now, the evidence -- our conspiracy charges two

13   objects, one being to make false statements on the FARA filing,

14   but more importantly acting as a foreign agent for the

15   government of Turkey.  As the judge said, you can find one or

16   the other.  You have to be unanimous, but that's going to be on

17   your -- on your deliberate -- your verdict form to fill out.

18             Now, you know from all the evidence that this was not

19   a legal commercial transaction, because way back when he went

20   to see Kelley, he knew he was going to lie about it, and by

21   filing under the LDA, in fact, he violated FARA, as is

22   mentioned by the judge in the Instruction 35, that section

23   that's mentioned in -- in Instruction 35.

24             By not filing under FARA, he violated FARA.  By not

25   filing and revealing the government of Turkey, he violated

1    FARA.

2            Now, that's not what this case is about.  The case is

3    about acting as an undisclosed foreign agent, but in order for

4    it to be that, it can't be a lawful transaction.

5            And it was not a lawful transaction.  All the

6    evidence shows that this was an effort to obfuscate the

7    involvement of the government of Turkey, and a part of that

8    involved not filing under that section that the judge talked to

9    you about.

10           Now, they will try to portray this as a simple

11   regulatory violation that should have been, you know, dealt

12   with in some sort of civil way, or maybe it was just a simple

13   misunderstanding.

14           No, folks.  When you get in bed with the top of the

15   foreign government, with a government of Turkey, to influence

16   the American people and the American Congress and the United

17   States Department of Justice, when you do all of that and keep

18   it a secret, that is acting under the direction and control of

19   a foreign government, and that is a heck of a lot more serious

20   than simply failing to file something with a FARA unit.

21           They tried to subvert the American process so that

22   Erdogan could get his hands on Gulen.  This was a fundamental

23   foreign policy point that was going on between Turkey and --

24   and the government of the United States.  And they tried to

25   subvert and influence that position by making it appear as if

1148

1   Michael T. Flynn had this opinion about Gulen and lying about

2   who was behind it.  And -- and that is the fundament of this --

3   of this case, lying about it, as they told so many lies and as

4   you've seen.

5          So I ask you to find the defendant guilty of both

6   counts because he is guilty.  The evidence shows that he's

7   guilty, and I ask you to find him guilty as charged.

8          Thank you very much.

9          THE COURT:  Thank you, Mr. Gillis.

10         Ladies and gentlemen, we're going to take a short

11  recess before we proceed with the defendant's closing.  We'll

12  take about a ten-minute recess.  You're excused to the jury

13  room.  Please do not discuss this case among yourselves.

14                      (Jury out.)

15         THE COURT:  All right.  Court will stand in recess.

16          (Recess from 4:42 p.m., until 5:04 p.m.)

17                  (Defendant present, Jury out.)

18         THE COURT:  All right.  Let's bring the jury out.

19                  (Jury present.)

20         THE COURT:  Please be seated.

21         Mr. MacDougall?

22                CLOSING ARGUMENT

23                BY MR. MacDOUGALL:

24         Thank you, Your Honor.  May it please the Court.

25         Members of the jury, harken to the evidence, to the

1149

1    complaint the defendant pleads that he is not guilty and for

2    trial places himself upon the country, which country you are.

3    You are now sworn to try the issue.  If he is guilty, you will

4    say so.  If he is not guilty, you will say so and no more.

5    Members of the jury, harken to the evidence.

6           I first heard those words in a country courthouse in

7    a place called Rock Hill, South Carolina, some years ago,

8    shortly after I left the Justice Department, and that's right,

9    I once sat on this side of the courtroom, as did Mr. Trout and

10   Ms. Mitchell.

11          It was a capital murder case, and it went on for some

12   time, and I sort of forgot about those words when they were

13   used to call the jury together, but they left -- I remembered

14   them, and in short, a couple years later, I heard them again in

15   a courtroom in Massachusetts.

16          He is not guilty and for trial places himself upon

17   the country, which country you are.  And that's the essence of

18   the jury.

19          Judge Trenga, at the beginning of the trial when you

20   were first assembled, made note of the fact, and it's a

21   remarkable fact, truly, that this country, the United States,

22   is one of the very few that has a regular assembly of jurors

23   like yourselves.  Much of the world, there are professional

24   jurors, there are magistrates, there are other systems that

25   don't draw from the community, draw from the people, draw from

1150

1    the country, and form a jury.

2              And there's an incredibly important reason for that.

3    And the men and some women, but the men who devised that walked

4    actually the streets of this town 240 or so years ago.  The

5    best known, the one who, who gets the credit by most

6    historians, James Madison, knew what it was like to live under

7    a king.  He knew what it was like to live with a government

8    that decides who's guilty and who isn't.  And so he included in

9    our Constitution the Sixth Amendment, the right to a jury

10   trial, a right for a defendant to plead not guilty and to be

11   put upon the country.

12             And here's why he did it.  Do you know why he did it?

13   They've got to get past you.  They can investigate, they can

14   take Skype messages, they can question people over and over

15   again, but before any citizen is guilty of any crime, they have

16   to get past you, the country.

17             So today Mr. Rafiekian has put himself upon the

18   country, put himself upon the jury, and that's you.

19             My grandmother was from Cape Breton Island in Nova

20   Scotia.  You may have never heard of it, but it's, it's a part

21   of Canada that juts on the edge of the North American

22   continent.  It's pretty rural now.  Most of the coal mines shut

23   down years ago and the farms.

24             But she, she was a school teacher 100 years ago this

25   year in a place called Hay River, a little one-room

1151

1    schoolhouse.  It's actually still there.  And she moved to

2    Boston with many people from Cape Breton Island and married my

3    grandfather and had 5 children and 20 grandchildren.

4            She was, to me and really to all of my cousins, the

5    most remarkable person I've ever known.  She was tough and she

6    was wise and she was smart, and she would tell us things that

7    we, now in our middle age and some of us our late middle age,

8    still remember, and one of them is, and I've been thinking

9    about it in the last few days -- and I won't try to do justice

10   to her West Highland brogue, as I would just embarrass myself

11   and her memory -- but she would tell her grandchildren all the

12   time when there was some question about what we were saying:

13   Just because you say it, dear, doesn't make it true.  Just

14   because you say it doesn't make it true.

15           And I will ask you to remember that.  I'll mention it

16   a couple of more times before I'm done this afternoon.  When

17   you listen to the government's rebuttal and you go into that

18   jury room to deliberate, just because you say it doesn't make

19   it true.

20           It was the same with all my grandmother's 20

21   grandchildren.  It's the same with the prosecution today.

22           A week ago, Mr. Gibbs in his opening statement began

23   with:  As a nation, we value transparency.

24           Really?  Transparency?  If we're so transparent,

25   where is Michael Flynn?  Where is Michael Flynn?  He hasn't

1152

1    been in this courtroom.

2         Now, the company is named after him, of course.  He

3    was the largest stockholder of Flynn Intel Group.  There's

4    Michael Flynn.  He was the chief executive.  He signed the FARA

5    registration form, Defense Exhibit 60, which Mr. Gillis did not

6    ask you to look at but I surely will.  The op-ed was published

7    under his name, along with lots of other op-eds he published

8    during the election campaign in 2016.

9         He has a wide-ranging, deep cooperation agreement, as

10   you heard his lawyer, Mr. Kelner, testify with his plea

11   agreement, that obligates him to do whatever the government

12   needs him to do from investigate, to cooperate, to testify, to

13   appear, to go in the grand jury.  All of those things, and you

14   never heard from him.  Transparency.  You never heard from

15   Michael Flynn.

16        Now, Mr. Gillis may well tell you on rebuttal the

17   defense could have called him, and that's technically true, of

18   course, but as the judge instructed you, our job is not to

19   prove Mr. Rafiekian's innocence.  Our job is to demonstrate to

20   you the evidence in this case that proves he is not guilty.

21   And more than that, Mr. Flynn is a wholly owned subsidiary of

22   the prosecution, as his own lawyer testified.

23        So we haven't seen Mr. Flynn here at all from the

24   beginning to the end except his picture, which has been marked

25   as Defense Exhibit 77.

1     Transparency.  As a nation, we value transparency.

2   What about Mr. Flynn's mysterious relationship with Alptekin

3   that you heard about this morning that is now in evidence as

4   Defense Exhibit 66?  It's only a sentence long, but you really

5   ought to have a look at it.

6     The United States government, the United States

7   government is in possession of multiple, independent pieces of

8   information relating to the Turkish government's efforts to

9   influence the United States, the United States policy on Turkey

10  and Fethullah Gulen, including information related to

11  communications, interactions, and a relationship between

12  Alptekin and Flynn, and Alptekin's engagement of Flynn because

13  of Flynn's relationship with an ongoing presidential

14  campaign -- and here's the killer -- without any reference,

15  without any reference to the defendant or the Flynn Intel

16  Group.

17    Read that carefully.  It makes your head spin.  We've

18  got lots of secrets, lots of bits of information about Alptekin

19  and Flynn and what they were doing, but we're not going to tell

20  you.  We've got them, but we're not going to tell them.  We

21  don't want you to know.

22    We're a nation that values transparency.  Perhaps.  I

23  hope we do.  In this case, not so much.

24    And how about the Turkish bank records?  You heard

25  Mr. Gillis talk about those.  Well, we didn't want to use our

1154

1  mutual legal assistance treaty with Turkey to get bank records

2  because it would tip off the Turkish government of what was

3  going on, except they weren't Turkish bank records.  They were

4  the bank records of Mr. Alptekin.

5          The United States, as with many countries, and you

6  heard this testimony, has a very active relationship with

7  Turkey, and asking for a private citizen's bank records is not

8  going to blow any investigation.  They don't have them because

9  they didn't try to get them because they didn't use the MLAT

10 request, and that's why you haven't seen them.  And you haven't

11 seen them, and you can't know, and they don't know.

12         But they didn't go looking for them, and I suggest to

13 you one of the reasons, perhaps the only reason they didn't go

14 looking for them, is they knew there was no evidence in there.

15 They knew what you know, that there is no evidence of the

16 Turkish government paying a nickel toward this matter,

17 transferring any money to Alptekin.  They didn't want to know,

18 and they didn't want you to know.

19         You don't have to guess in this case.  You don't have

20 to speculate.  You don't have to imagine anything as a jury.

21 The Court instructed you to only consider the evidence, and you

22 take those instructions back with you.

23         This case is about Bijan Rafiekian, a man 65 years

24 old at the time, 2016-2017, an immigrant to this country,

25 worked hard, raised his family, served the country whenever he

1   could, and faced -- and when he was faced with a legal matter,

2   he did what people do when they have a legal matter and they're

3   not lawyers:  He called a lawyer.  Then he called several more.

4          He told the lawyer that he wanted to file under FARA.

5   You heard that witness on, on Thursday of last week, and that

6   lawyer told him that he didn't have to file under FARA; he had

7   to file under the Lobbying Disclosure Act.

8          He then went to another -- he went to another lawyer

9   before that with the leading law firm in the planet, and that

10  lawyer's politics didn't match up, and now the government wants

11  to make him a criminal.  Now the government wants to make

12  Mr. Rafiekian a criminal for going to a lawyer, asking the

13  lawyer for help, paying a lawyer $10,000, and doing what the

14  lawyer said.

15         Those are the facts.  There's no other side to that

16  story.  That's what happened.

17         You heard Mr. Kelley, the tall gentleman with the

18  gray hair.  He was paid.  A long history, practicing lawyer.

19  Looked at the situation, looked at the facts, and told

20  Mr. Rafiekian what his advice was, and Mr. Rafiekian took it.

21         Essentially what the government is asking you to do

22  is convict a man because the form he filled out is not the one

23  the government likes.  That's what this is all about.  Clear

24  away all the debris and all the talk and all the paper.  That's

25  really what it's like, and we'll get right to that in a minute.

1156

1        But you need to understand the world of Michael Flynn

2   and Bijan Rafiekian during the time we're talking about:

3   August 2016 to March 2017, about a six-month period.   Summer

4   before the election, election happens in November, the

5   inauguration in January, Mr. Flynn loses his job about three

6   weeks later, the FARA registration form that is at the very

7   heart of this case is filed shortly after that, September 7.

8        So let's go -- I'm sorry, March 7, excuse me.   Strike

9   that.

10        So let's go back to September and October 2016.

11   Things are pretty good.   Flynn Intel Group has got its first

12   shot at a contract, its first significant shot at a contract

13   with Inovo.   They're hoping for a larger contract.   They're

14   hoping that larger contract is on the way.   These are two

15   separate things.   Inovo is Inovo, and that deal is on its way.

16        Now, Flynn at the time, again, we're talking about

17   September and October 2016, is getting a lot of attention.   He

18   speaks in a fairly notorious way to the Republican National

19   Convention.   He is making speeches.   He is writing op-eds, and

20   you have many of them in evidence.

21        In November, things keep getting better.   They filed

22   under the LDA, they're working on the contract, and then Trump

23   is elected president.   Flynn is going to become somebody really

24   important now.   He's going to become a Cabinet member or the

25   equivalent.

1157

1    And in January, the inauguration happens, and Flynn

2    is the national security adviser.  So Bijan and Flynn begin, as

3    you've seen through their correspondence, closing down Flynn

4    Intel Group.  You can't be an important government functionary,

5    an important government official, and have a private business.

6    So they're closing it down.

7    Unfortunately for him, Mr. Flynn's time with the

8    administration lasts less than four weeks, and on February 13,

9    2017, he is fired in disgrace by many accounts.  His reputation

10   is badly damaged.  The business, Flynn Intel Group, is gone.

11   Bijan Rafiekian is unemployed, and so is Michael Flynn.

12   So take that period of time and go from the heights

13   of what looked like, you know, coming prosperity and then

14   political success to late February-March.  Flynn is out of a

15   job.  Bijan is out of a job.  Their company is gone.

16   Everything has gone very badly.

17   And then they try to get the FARA registration done.

18   What's really going on here -- and we'll talk about

19   Mr. Alptekin's role in this -- these are not businessmen,

20   Michael Flynn and Bijan Rafiekian.  These are not people who

21   are entrepreneurs, you know, who have developed great,

22   successful businesses.

23   Flynn has been in the Army most of his life, and

24   Bijan has been in the government for much of his life and has

25   had a little bit of experience in the financial world, but

1158

1    these are not successful businessmen.  This is their first

2    substantial paying client, Inovo.

3            They have a public profile by association with the

4    Trump campaign, and Alptekin -- and you can reach this

5    conclusion yourself pretty easily -- is an operator.  He's a

6    player.  He wants to be a big shot.  He is in Turkey, where

7    he's got some money, and he wants to be a prosperous,

8    well-connected guy with the government.

9            If you live in Washington long enough, you meet a few

10   of these people, and sometimes you meet a lot of these people,

11   and they're trying to develop a relationship and a profile with

12   the government, and Gulen is a hot topic.  Mr. Gillis is right

13   about that.  We agree on that.  Gulen is a very big deal.

14   Gulen is alleged, and I have no idea whether this is true or

15   not, to have been involved with the attempted coup.  He is a

16   controversial leader.  He is a big deal.

17           So you've got an operator in Alptekin and you have a

18   hot topic in Gulen and you've got that magical formula that has

19   people thinking here's my play.  Here's how I can ingratiate

20   myself to the leadership.  So he's making an investment.  He's

21   putting a deal together.

22           But don't forget Exhibit 66, all the things we don't

23   know about his relationship with Michael Flynn, the parts we

24   haven't been told about.  Don't let that go.

25           So Alptekin connects with, with Bijan, connects with

1159

1    Flynn, and then the work happens, and you, you heard about the

2    dissatisfaction that Alptekin had with the results.

3            Let me touch briefly on one of the instructions that

4    you're going to take back with you, and that's Instruction

5    No. 35, what constitutes unlawful conduct, in particular, a

6    legal commercial transaction.  The judge recited this to you,

7    gave this to you, and you will have it with you in the jury

8    room.

9            A legal commercial transaction means any exchange,

10   transfer, purchase or sale, of any commodity, service, or

11   property of any kind, including information or intellectual

12   property, not prohibited by federal or state legislation or

13   implementing regulations.  In order to be an agent of a foreign

14   government, a person must agree to operate within the United

15   States subject to the direction or control of a foreign

16   government or official and engage in conduct other than a legal

17   commercial transaction.

18           So you look at those instructions carefully because

19   what they say -- and this is my interpretation of them, but you

20   should read it for yourself and follow the judge's

21   instructions -- what they say is if it's a legal commercial

22   transaction, you're not a foreign agent, and I would suggest to

23   you that that's exactly what this was.

24           This was Ekim Alptekin with some money to spend, with

25   the goal of becoming a player in the Turkish hierarchy, as you

1   see people in Washington do all the time.  He hires people in

2   Washington who are connected, who have a big name, and Michael

3   Flynn, who can make introductions, and that's all legal.

4   That's a perfectly legal thing to do.  So I would suggest to

5   you that what you have there is exactly a legal commercial

6   transaction.

7           So on March 7, I think the most important date in

8   this case, after hundreds of hours of lawyer time from

9   Covington at $960 an hour, you didn't miss that part, a FARA

10  registration is filed with the Department of Justice.

11  Mr. Gillis never mentioned that in his presentation.  Perhaps

12  he will touch on it in his rebuttal.

13          If you don't read anything else, I beg you, I implore

14  you, read Defense Exhibit 60, because that is the heart and

15  soul of this case.  That's what it's all about.  That's the

16  thing that you didn't hear about a few minutes ago, but you're

17  going to hear about it in detail now.

18          This is the submission made by Covington on behalf of

19  Flynn Intel Group on March 7, 2017, and let's take a look at

20  it.  Let's start with the cover letter.  Second paragraph:  In

21  September 2016, the Flynn Intel Group publicly disclosed its --

22  publicly disclosed its representation of Inovo BV in a Federal

23  Lobbying Disclosure Act registration that was filed with the

24  secretary of the Senate and the clerk of the House.

25          That's the Lobbying Disclosure Act that Mr. -- and

1161

1     registration that Mr. Kelley filed that you heard from him

2     directly last week.

3              So we start with that.  Go to paragraph 4, where the

4     lawyers from Covington say:  This is an uncertain standard, not

5     based on the statutory language and not defined in the

6     department's regulations.

7              Nobody argues with that.

8              Nevertheless, because of the subject matter of

9     Flynn's Intel Group work for Inovo BV, which focused on

10    Fethullah Gulen, whose extradition is sought by the government

11    of Turkey, the engagement could, could be construed, could be

12    construed to have principally benefitted the Republic of

13    Turkey.  To eliminate any potential doubt, the Flynn Intel

14    Group therefore is electing to file a registration under FARA

15    in lieu of the prior LDA registration.

16             That's it right there in black and white, submitted

17    to the Department of Justice, the same Department of Justice

18    that employs the prosecutors on March 7, 2017.  But there's

19    more.

20             When you look and you're keeping notes -- this is

21    Defense Exhibit 60 -- have a look at page 25, which will be on

22    the screen in just a second.  You start with that block that's

23    at the top:  In September 2016, the Flynn Intel Group filed a

24    registration under the Lobbying Disclosure Act for its

25    representation of Inovo BV.

1       We already talked about that.  That's in the cover

2  letter.  Here it is again.

3       Further down you see the Flynn Intel Group closed its

4  operations in November 2016, all consistent with our history.

5       Go to the next paragraph:  In August 2016, the Flynn

6  Intel Group entered into a contract with Inovo, a consulting

7  firm based in the Netherlands.  The contract provided that the

8  Flynn Intel Group would perform research, engage a public

9  relations firm, and a filming and production crew to

10  potentially distribute the results of its research, and hold

11  weekly calls with the clients to discuss the project.

12       You heard all about that in the testimony.

13       Let's drop down to the next paragraph:  Under the

14  contract -- and we'll just go to the second sentence:  The

15  research, which was conducted by independent contractors -- you

16  heard from many of them -- retained for this purpose focused on

17  Mr. Fethullah Gulen and charter schools in the United States.

18       You heard the witnesses on that.

19       The next paragraph begins:  In early September 2016,

20  the Flynn Intel Group was invited by Mr. Alptekin to meet with

21  a group of government officials from Turkey.  And it goes on in

22  the next page to name them all.

23       And then if you go on -- the same document, go on to

24  the next page, the paragraph that begins:  In late October and

25  early November 2016 -- remember our time frame:  September

1  2016, when everything's going great; November, there's the

2  election; February, Flynn is fired; March, they're out of

3  business.

4          In late October and early November 2016, General

5  Flynn of the Flynn Intel Group developed an op-ed article based

6  in part on the research conducted by the Flynn Intel Group, by

7  the research conducted by the Flynn Intel Group -- not just

8  him -- under the Inovo engagement.

9          Go down a couple of lines:  In addition to General

10 Flynn -- in addition to General Flynn, Bijan Rafiekian right

11 here and an editor named Hank Cox, participated in the

12 drafting.  That's the famous op-ed with the apple tree.

13         So why did I make you go through this just now?  Why

14 is this important?  Why is this the most important document in

15 the case and the one that I beg you to look at?

16         Because it's all there.  The whole story is all

17 there.  Signed by Michael Flynn, submitted by the Department of

18 Justice, written by the four or five lawyers at Covington,

19 spent 200 hours, the whole story is there, submitted to the

20 government.

21         I don't get it.  I don't understand it, but there it

22 is.  I don't understand -- there it is.  It's right there in

23 front of everybody.

24         Now, what about the two claims that the prosecution

25 seems to love the best?  I don't want to miss those.  How about

1164

1    the refund versus the consulting fee?  Do you remember that?

2    You've heard all about that.  The refund versus the consulting

3    fee.  The $40,000 payments.  Money comes -- it doesn't come

4    from the Turkish government, no evidence of that.  Comes from

5    Alptekin's account in Turkey to FIG.  $40,000 of it goes back

6    to Inovo's account in the Netherlands.

7            What do we know about that?  The first thing we know,

8    and you heard this over and over again, and this is -- this is

9    something that I think you can fairly infer from all you've

10   heard, when people tell Bijan Rafiekian that he owes him --

11   that he owes them money or his company owes them money, he pays

12   them.  He pays his bills.

13           You didn't hear one witness say that he hadn't been

14   paid, that he wasn't paid currently.  And I'm sure the

15   government, if they had somebody like that, you would have

16   heard them, but they have no one like that.

17           And you heard him pay $10,000 to Robert Kelley.

18   Mr. Kelley sat here and told you that.

19           $3,400 to Mr. Enders, the young man with the beard

20   who took the video.

21           $40,000 to Sphere Consulting.  You heard three

22   different witnesses from that firm.

23           Massive bills.  $300-plus thousand from Covington for

24   legal fees.

25           So how do you know -- how do you know that

1165

1    Mr. Rafiekian is returning money, as he said, to Inovo?

2    Because Alptekin asked for his money back.  And Bijan does what

3    Bijan does when people say:  You owe me money.  He gives it to

4    him.  He gives it to him.  No secret.

5            And Covington knew.  Covington knew it all.

6    Covington, who prepared Defense Exhibit 60, the FARA

7    registration, knew about it.  And here's how you can know about

8    it:  Look at Defense Exhibit 95A in evidence.

9            You will find in that exhibit on page 9, 0009, a

10   table.  And at the table at the top, where Covington disclosed

11   and submitted to the government where all the money went, you

12   see:  Refund for reduction in scope.  Refund for reduction in

13   scope, $40,000 and $40,000.  That's the money that was given

14   back to Mr. Alptekin to his account in the Netherlands because

15   he said so.

16           Look at the comparable page in Exhibit -- Defense

17   Exhibit 60.  And that's page 27.  And by the time you see that

18   on page 27, if you compare the two on the screen, you'll see

19   that Covington decided that it was a consultancy fee, and

20   that's how they published it.

21           When they had a draft, 95A, it was a refund.  When

22   they had -- when they submitted it, they called it a

23   consultancy fee.  You heard Mr. Kelner try to explain why that

24   was, but keep in mind, Kelner's personal legal relationship is

25   with Michael Flynn, not with Bijan Rafiekian.  You heard him

1166

1    testify to that.

2         His personal lawyer -- and the relationship he had of

3    attorney-client privilege, that sacred, sort of vacuum-sealed

4    relationship was there.  So anything Mr. Kelner wanted to know

5    about what this money was for, he had complete access to

6    Michael Flynn and complete access to records, and that's what

7    he entered.

8         But there's no doubt that Covington knew this was a

9    refund.  Why they put that -- why they called it a consultancy

10   fee in the final version of Exhibit 60 -- Defense Exhibit 60 is

11   up to you to decide, but it's known best to them.  So that's

12   one of the facts that the government seems to like the most.

13        There's one other.  There's text messages.  Text

14   messages and Skype messages.  And I must tell you I don't

15   understand the technology, and I don't understand how all of

16   this relates to the case, but there's a couple in particular

17   that you heard about over and over again, and I don't want to

18   be shy about them.  We want to go back to them.

19        If you look at Defense -- I'm sorry, Government

20   Exhibit 67J, that is the Skype message from Mr. Alptekin -- or

21   communication with Mr. Alptekin to Mr. Rafiekian apparently on

22   September 8, 2016.  That will being on the screen in a second.

23        Do you remember this one?  So here's my question

24   about this:  It says that they're communicating at 5:21 p.m.,

25   except if you look down at the bottom, it was purportedly

1167

1   Mr. Rafiekian's response, he said he's going to meet with MF,

2   Michael Flynn, in 30 minutes at 1400, which I think is 2 p.m.

3   This says it's 5 p.m.

4            Now, if it's 5 p.m. in the East Coast, that means

5   it's well after midnight in Turkey.  If it's 2 p.m. in

6   Washington, then 5:21 p.m. is somewhere over the Atlantic

7   Ocean.

8            I don't understand this.  I don't know that the

9   government's explained it to you, and I don't think it really

10  conveys anything other than they're going to be -- they're

11  going to be back in touch, but I would ask the question does

12  this really suggest to you that Mr. Alptekin is in the prime

13  minister's office after midnight in Ankara?

14           The companion piece, 67K, is the next day, Government

15  Exhibit 67K.  And have a quick look at that.  That's the next

16  day, September 9:

17           Bijan, I urgently need a BIC/Swift code and ideally

18  an IBAN version of the bank account and, finally, an address

19  linked to that account.  I have the money but need to deposit

20  it ASAP before the banks close.

21           I would suggest to you that you replace the word

22  "deposit" with "wire" and this all makes sense.  They have to

23  wire the money.  The suggestion the government's made that

24  Alptekin is walking around Ankara with a suitcase full of cash

25  that he's been given by the government is incredible.

1168

1    Incredible in the purest sense of that word, which means

2    unbelievable.

3            Just because they say it doesn't make it true, and

4    snatching bits and pieces out of a text or Skype account and

5    saying, oh, here's what it means, just remember Grandmother's

6    words:  Just because they say it, doesn't make it true.

7            Judge, Judge Trenga gave you instructions on the

8    government's burden, the presumption of innocence and

9    reasonable doubt, and that's the heart of our jury system.

10   That's the heart of our criminal justice system.  Reasonable

11   doubt.

12           And you have the judge's instructions on that.  And

13   you'll, you'll have them close by when you deliberate, but what

14   I'd like to tell you right now is the Top 10 things, the Top 10

15   things in this case that you have to believe if you're going to

16   convict Mr. Rafiekian of these offenses charged.  You have to

17   believe these, and if you can't believe one of them, then you

18   can't convict him.  I would submit that you can't believe any

19   of them, but I'll let you be the judge.  Top 10 list of things

20   you have to believe, you have to believe to convict

21   Mr. Rafiekian.

22           No. 1, in March 2017, when Defense Exhibit 60, the

23   registration statement, is filed, Mr. Flynn and

24   Mr. Rafiekian -- Mr. Flynn is disgraced, neither one have a

25   job, the business is gone, they are out of money, so they

1169

1    decide let's -- here's what we do now:  Let's fool the

2    government.  Let's fake the government out somehow because we

3    don't have enough problems.  Let's, let's talk about a contract

4    that we finished months ago and go through this elaborate

5    scheme now, months later, to fool the government into thinking

6    it was something else.

7              You have to believe that.  You have to believe that.

8    I suggest you can't.

9              The second is Covington billed Flynn Intel Group

10   $322,000.  You have to believe that Mr. Flynn and

11   Mr. Rafiekian, out of a job, Mr. Flynn disgraced, decided that

12   the thing they were going to do in February and March -- look

13   at the bills; the bills are in evidence -- in February and

14   March 2017, decided that they were going to run up bills of

15   $300,000 trying to fool the government about a contract that

16   had closed months ago, that they hadn't -- that they hadn't

17   completed.

18             No. 3, you have to believe -- you have to believe

19   that the government of Turkey, which the prosecution contends

20   is behind all of this, is so intent on trying to keep this

21   secret that they hire Amsterdam firm -- Amsterdam & Partners.

22   You heard Mr. Durkovic testify.  They're so intent on keeping

23   it secret and so intent on keeping this effort that the

24   government contends they have with the Flynn Intel Group to

25   encourage the United States to extradite Gulen, that they

1170

1    publish a book with their name in it, by a firm that filed

2    under FARA, and filed and filed again.

3            You have to believe that the government of Turkey is,

4    is somehow so inept that they've got this little secret

5    operation going while they're blasting, blasting the fact that

6    they're trying to get Mr. Gulen back and they've hired people

7    to do it.  You have to believe that.

8            If you want to convict Bijan, you have to believe

9    that a man trying to commit deception, commit falsehood, to, to

10   submit it -- to pretend to be something he's not, first goes to

11   Covington -- Mr. Lenhard you heard about -- and said:  I want

12   to file under FARA.  And he finds out Lenhard is a Democrat and

13   that doesn't work for him.  You have to believe that.

14           You have to believe No. 5, that Bijan, a man trying

15   to fake the government out, then goes to Mr. Kelley and says

16   not what do I do?  He says:  I want to file under FARA.  You

17   have to believe a man who's trying to keep this hidden says to

18   his lawyer:  I need to file under FARA.

19           No. 6.  And I'll ask you to have a look at Defense

20   Exhibit -- or Exhibit 6, Defense Exhibit 6, a stipulation,

21   which is in evidence.  Ms. Mitchell read this to you this

22   morning.

23           You have to believe that Flynn and Rafiekian, as part

24   of their scheme to hide all of this in the case of Flynn, go to

25   the DIA, the Defense Intelligence Agency, as stated here, and

1171

1    say:  Here's what we're doing.  Here's what we're doing.  I

2    want you to know about it.

3             You have to believe that people trying to commit this

4    conspiracy did that.

5             And then, No. 7, you have to believe -- have a look

6    at Exhibit 14.  Mr. Rafiekian goes to another unnamed agency

7    and essentially says:  Here's what we're doing.  In September.

8    Both of these are in September.  Here's what we're doing.

9             So this notion that we're trying to hide things has

10   to coexist with men who are telling, evidently, everybody they

11   can find:  We're doing this for Turkey, in addition to

12   submitting to the government.  You've got to believe that if

13   you're going to convict him.

14            You have to believe that the op-ed that has received

15   so much attention in the last week, the one that makes a very

16   disparaging remark about the Muslim Brotherhood, which for all

17   I know may well be well intended and well placed, is done at

18   the behest of the Turkish government that is very fond of the

19   Muslim Brotherhood, as you heard.

20            You have to believe that that's what's going on, that

21   an op-ed in service of the Turkish government has a direct and

22   very nasty attack on the Muslim Brotherhood.  That's because

23   it's written by Michael Flynn, and that's his opinion.  But

24   you've got to believe that.

25            You have to believe that notwithstanding all that the

1172

1  government has told you, there is not a scintilla of evidence

2  of money from the Turkish government.  You've got to believe

3  that this plan was so slick, so well planned, that there's no

4  evidence anywhere of money from the Turkish government.  Now,

5  there's also no effort by the United States to do that either

6  under the MLAT, as you heard Mr. Gillis admit.

7           And finally, there's no evidence any Turkish official

8  gave any direction.  You have to believe that the scheme for

9  the benefit of the Turkish government had no evidence and, in

10  fact, had no action from the Turkish government.  You have to

11  believe all of those things if you're going to convict this

12  man.

13          I don't think you can believe any of them.  That's up

14  to you.  But if you don't believe one of them, you have to

15  acquit him.  Just because you say it, just because they say it,

16  doesn't make it true.

17          The apple tree story, that didn't make the Top 10.

18  It's No. 11, but I'll share it with you anyway.  You heard

19  Mr. -- you heard Graham Miller testify last week that Mr. Flynn

20  sat in a meeting where Mr. Rafiekian told that story.  I

21  suspect Mr. Flynn sat in lots of meetings where Mr. Rafiekian

22  told that story.  It's a kind of an interesting story.  It's

23  got trees in it and Paris and, you know, all that.

24          The notion that Michael Flynn included that in his

25  op-ed shouldn't surprise anybody.  His partner, the guy he's in

1173

1    business with, used to talk about it all the time.

2         Let me touch on some jury instructions that I think

3    are important that I'd like you to consider carefully, and then

4    we'll, we'll wind it up.

5         Instruction No. 7 that Judge Trenga read to you is

6    captioned:  Presumption of Innocence, Burden of Proof, and

7    Reasonable Doubt.  And in that, you will see the following

8    sentence that I would ask you to make note of and think about

9    and go back and look at before you deliberate:

10        Proof beyond a reasonable doubt must be proof of such

11   a convincing character that a reasonable person would not

12   hesitate to rely and act upon it in the most important of his

13   or her own affairs.

14        That is the standard.  That's the standard that's

15   imposed in this case and every case, and I ask you to think

16   very carefully about those words and what it means.

17        And just below that, there's another sentence that

18   is -- takes it to a different, a different level, but I've

19   always found it interesting and I always think it's worth

20   pointing out in jury instructions.  It says:  If the jury -- if

21   the country -- if the jury views the evidence in the case as

22   reasonably permitting either of two conclusions -- one of

23   innocence, the other of guilt -- the jury must, of course,

24   adopt the conclusion of innocence.

25        So if you go back there and you say, Jeez, I don't

1174

1    know, I'm torn, you know, I heard the evidence of both sides,

2    then it's easy:  Not guilty.  And you don't have to listen to

3    me.  Those are the instructions that were given to you by the

4    Court.

5             And that, that level of judgment is well short of

6    beyond a reasonable doubt.  But just in case you go in, you're

7    kind of torn because you heard two different stories, look at

8    this instruction, and I beg you follow this instruction.

9             I'd ask you to also have a careful look at

10   Instruction No. 31, and that's captioned Advice of Counsel.

11   You heard that when Judge Trenga read it to you.  The

12   defendant, while acting in good faith and for the purpose of

13   securing advice on the lawfulness of his future conduct,

14   sought -- or in this case, seeks -- and obtained the advice of

15   an attorney whom he considered to be competent, and made a full

16   and accurate disclosure -- sorry -- a full and accurate report

17   or disclosure to this attorney of all important facts, and

18   acted strictly in accordance with the advice, then, then that

19   defendant would not be willfully or deliberately doing wrong in

20   performing some act the law forbids or omitting some act which

21   the law requires, as those terms are used in this instruction.

22            You met a lot of lawyers in this case, and they were

23   all giving advice, and they were all charging for their time.

24   You heard about Mr. Lenhard.  He didn't testify.  That was the

25   first lawyer that Mr. Rafiekian went to with Covington.  Then

1175

1    you heard the testimony of Robert Kelley, the lawyer that he

2    went to and said:  I've got to file under FARA.  Help me out.

3            He said:  LDA, here you go.

4            And he was paid for that.

5            You heard at length from Mr. Kelner of Covington, and

6    if you want to look at the bills, Exhibits 93, 94, 99, and 100,

7    these are all defense exhibits, take a look at those.  You will

8    see a long list of other lawyers:  Brian Smith, Steve Anthony,

9    Catherine Langton.  These are all the lawyers that passed on

10   this, all the lawyers that prepared Defense Exhibit 60, the

11   filing with FARA that's at the heart of this case.

12           Those lawyers were consulted, and I ask you, please,

13   please, carefully apply Instruction 31 to the counsel that,

14   that Mr. Rafiekian sought.

15           So I want to thank you because you've spent a week

16   with us, on behalf of Mr. Trout, Ms. Mitchell, Ms. Hicks.  This

17   case is about a man, Bijan Rafiekian, who went to lawyers and

18   asked them for help, asked them to help comply with the law.

19   He did as they counseled him.  He hired the leading lawyers in

20   the land, Covington & Burling.  He completed the forms as they

21   advised.  He disclosed everything, and then he went further.

22   And if you want to know how far he went, again, I can't, you

23   know, you're getting sick of hearing it, but look at

24   Defendant's Exhibit 60.  Look at the FARA registration.  It's

25   all there.

1         So now we're all here.  You're here because the

2    prosecutors claim that Mr. Rafiekian didn't fill out the form

3    the way they would like.

4         Mr. Gillis used a phrase in his closing, and I want

5    to return to that.  He said, and I wrote it down and my

6    colleagues did, too:  "Strategize" is another word for

7    conspiracy.  "Strategize" is another word for conspiracy.

8         What?  When you strategize -- if you remember,

9    President George W. Bush used the name stratergery for

10   strategize -- if you strategize, if you make plans, you're

11   conspiring.

12        That's the government's position, and that's what you

13   see in this case.  Just because you say it doesn't make it

14   true.

15        So we ask on behalf of Mr. Rafiekian that you find

16   him in this case not guilty on both counts.  We ask that you

17   apply your common sense, the things you've learned in life,

18   working, raising children if you have them, paying your bills,

19   and return the only verdict that can be reached in this case,

20   in this very strange and confused case, of not guilty.

21        So Mr. Rafiekian has put himself upon the country,

22   and so do we.  You're the country.  You're the people.  You're

23   the jury that's been selected in this case to judge this man.

24   We ask you to do it well and carefully.  God bless you.

25             THE COURT:  Mr. Gillis?

1177

<pre>
 1                      REBUTTAL ARGUMENT

 2                     BY MR. GILLIS:

 3              Thank you, Your Honor.

 4              First of all, let's talk about this comment I made

 5    about strategy.  I was trying to tell you that there are a

 6    number of ways to create an agreement.

 7              Agreements aren't unlawful, obviously.  Strategizing

 8    isn't unlawful, obviously, but when you strategize to avoid

 9    detection of what your agreement is about, when you strategize

10    how to make it appear that it's a commercial, sort of business

11    thing having to do with tourism or whatever in Turkey, when you

12    do that kind of strategery, that is a crime.  That is a

13    criminal conspiracy.

14              So obviously, I'm not trying to tell you that any

15    strategy, anytime you sit down and strategize, that, you know,

16    football coaches are committing conspiracies left and right,

17    but it's just one of the many words that can be used to

18    describe any sort of agreement, and when it's being done

19    criminally, that is a conspiracy.

20              Now, let's talk -- first of all, Mr. MacDougall spent

21    a lot of time talking about what the evidence shows.  It's all

22    about talking about the evidence, looking at the evidence.

23              Well, I don't know why he went on for about

24    ten minutes about his grandmother and his, and his family

25    history.  It's lovely to know, but this isn't quite the place
</pre>

1178

1    for it.  But I will say this:  that the evidence is what he

2    didn't discuss.

3          Two things.  First of all, he spent an extreme amount

4    of time, virtually everything he had to say was whether or not

5    this FARA filing in March was false and whether they conspired

6    to make that thing false, and here's the thing:  That's one

7    object.

8          And if you're not persuaded by that, I submit you

9    should be by the evidence, but if you're not persuaded by that,

10   there's this other thing, the bigger thing, the conspiracy to

11   violate 951, to act as a foreign agent in the United States, to

12   influence the United States Congress and various Congressmen,

13   to influence the American public by convincing General Flynn to

14   write an op-ed about it.

15         Now, listen, folks.  By the time that they did all of

16   these things that he spent most of his time talking about, the

17   fat was already in the fire.  Two or three days, as you heard

18   from the witnesses, two or three days after this op-ed came

19   out, shortly before -- actually, on the election, it came out

20   on Election Day, and two or three days later, they're writing

21   opinions about this, calling into question this deal that FIG

22   had with the Turkish government and Flynn's relationship with

23   the Turkish government.

24         Now, the fat is in the fire by that time.

25         Lying about it on the FARA form is another

1179

1    continuation of the conspiracy and how they were going to go

2    about it.  And, yes, at the very beginning, they had agreed

3    that we're going to conceal it.  It doesn't matter whether we

4    lie on the LDA or we lie on the FARA, but we're going to

5    certainly lie about the government being behind this, but by

6    the time all of the things that he's talking about, that you

7    have to believe this, you have to believe that, you have to

8    believe this, that, and the other thing, all of that is after.

9         Because, folks, a conspiracy requires only two

10   things:  a criminal agreement, in other words, two people come

11   together, like the defendant and the -- Alptekin, and they

12   reach an agreement to act as an agent of the foreign government

13   of Turkey, and they agree that they're not going to disclose it

14   through the machinations that you've heard about all through

15   this trial.  Okay?

16        Now, a conspiracy is a separate crime from the --

17   what we call the substantive count, or the second count, which

18   is actually to do so, to act as a foreign agent.  They're two

19   separate crimes, and the law makes sense because when two

20   people get together and conspire to commit a crime, it's pretty

21   serious, and it's a serious thing that's more difficult to

22   detect.

23        And so if, if, if that agreement takes place and

24   somebody performs one overt act, as you know from the judge's

25   instructions, the crime of conspiracy is complete at that

1180

1   moment.  It does not matter whether the conspiracy was

2   successful.  It does not matter, in fact, whether anything

3   happened.

4          In that period of time up through August 10, in that

5   midnight hour between August 10 and August 11, speaking of

6   things you have to believe, I mean, he didn't say anything

7   about any kind of reason why that might have been the case.

8          Now, we do have the burden of proof, and we wear it

9   like a mantle.  That is the foundation of our government.  We

10  certainly agree upon that.  But we have carried that burden in

11  spades because you have heard the evidence, but here's the

12  thing:  The defense does not have to put on a case.  The

13  defendant is presumed innocent.

14         The government has to prove him guilty beyond a

15  reasonable doubt.  That's our burden, and it's always our

16  burden.  It's our burden whether he chooses to put on a case or

17  he doesn't choose to put on a case.  That is our burden now, it

18  was at the beginning, and it remains that way for the rest of

19  history, I hope.

20         But when they do choose to put on a case, you can

21  presume that these fine lawyers here put on the very best case

22  they possibly could, they possibly could to explain all of

23  this.  And what kind of explanation did you hear for this

24  midnight-hour shift from truth to confidence, from the

25  government of Turkey, yes, we're working for the government of

1181

1   Turkey, to all of a sudden, no, it's a completely separate

2   thing.  It sprang up out of nowhere.  Just by happenstance

3   happened to occur right at midnight, this thing with the

4   government went away, and all of a sudden at midnight, we had

5   this separate thing with Turkish businessmen.  Astonishing bit

6   of good luck.

7            But you didn't see any e-mails of that kind.  As you

8   heard, they had access to the very same evidence we did, the

9   very same e-mails, those thousands, tens of thousands of

10  e-mails that they had access to.  Not a single shred of

11  evidence did they choose to put in in their case trying to

12  explain that midnight hour between August 11 and -- pardon

13  me -- 10th and 11th.

14           To be clear, our burden is to prove him guilty beyond

15  a reasonable doubt, but if they put on a case, you can expect

16  that it would be the best one they can, and it certainly wasn't

17  much.

18           Now, here's the other things.  Why are we talking

19  about Flynn here, right?  Mr. MacDougall correctly points out

20  that you're supposed to make your decision based upon the

21  evidence in this case.  Okay?  What is the evidence?  You've

22  got it in the documents, and you've heard it from the

23  testimony.

24           He's right, Flynn wasn't here.  He says, well,

25  technically we have the right to call him as a witness, after

1182

1    spending so much time talking about the importance of the

2    Constitution and how our Founding Fathers and Mothers thought

3    about the importance of justice in this case, in every case.

4              And what the Constitution guarantees and what he

5    passed over as a technicality, what the Constitution guarantees

6    to the defendant is the right to compel witnesses to appear

7    here, including Michael Flynn.

8              So we could have called him; they could have called

9    him.  They apparently didn't think it would be of any use to

10   you, nor did we.  But they -- if they wanted him here, that

11   judge, Judge Trenga, would have ordered him to be here, to be

12   on that stand so that you could hear from him.

13             They didn't do that.

14             Now, I want to get to this business about this

15   supposedly earth-shattering exhibit, Defense Exhibit 66.

16   Before I do that, though, I want to -- before I do that, let me

17   say this, okay?

18             So imagine Tom and Dick.  Tom and Dick are two bank

19   robbers.  They've got a string of bank robberies under their

20   belt, and the United States government knows all about them.

21   They know all about their string of bank robberies.  They know

22   that they're in a conspiracy together, okay?  Tom and Dick do.

23             Now, later on, Harry decides to join Tom and Dick in

24   another bank robbery, okay?  Now, the fact that Tom and Dick

25   and the government knew about Tom and Dick and their string of

1183

1    bank robberies, the fact that the government knew about that

2    and in the -- and didn't mention Harry until Harry joined the

3    bank robbery scheme, so what?

4           So if you take a look at this Government's Exhibit --

5    whoops, sorry.  I beg your pardon.

6           If you take a look at this exhibit here, let's just

7    replace Ekim with Tom, and let's replace Flynn with Dick.  And

8    then we can replace Rafiekian with Harry, and FIG with Harry

9    and Dick's company.

10          And instead of talking about information related to

11   the Turkish government, let's talk about the example of a bank

12   robbery, and how about the interactions between these folks?

13   Instead, it would be experience with bank robberies.  Instead

14   of his relationship with ongoing presidential campaigns, let's

15   say it's bank robberies.

16          So what?  So take a look at this, at this exhibit

17   while you're -- and consider that it says nothing.  It really

18   says nothing at all, folks.

19          So what then should you take away from, from all of

20   this?  I want to say that -- let me emphasize again, conspiracy

21   happens when the agreement happens in any overt act.  An overt

22   act can be anything completely legal, like sending an e-mail,

23   like the one that the defendant sent to his team saying, hey,

24   we've been hired by a bunch of Turkish businessmen.  That's an

25   overt act in furtherance of the criminal conspiracy they had.

1184

1    So, so why are we talking about Flynn?  Don't, don't

2    look at my client.  Don't look at my client.  Here's Flynn.

3    You've got to focus on Flynn.

4    But wait a second.  But there's this whole thing

5    about the midnight hour and there's the refund versus when, you

6    know, when you got all these invoices and you got instructions

7    and e-mails.  You'll see them all.  And yet he describes them

8    as consulting fees, but later on he's telling you it's a

9    refund.  Why?

10    And all about these Covington lawyers?  The Covington

11    lawyers did not have those Skype chats that you now have that

12    show the involvement of these Turkish officials that the

13    defendant was told about by Alptekin.

14    So don't look at Flynn.  Look over here while I pick

15    your pocket.  Keep an eye over here.  Don't look at me.  Don't

16    look at me.  I'm just the guy who had the deal with the Turkish

17    government.

18    This isn't some -- this isn't some regulatory

19    violation.  This is not some small deal, as they would like to

20    paint it.  As I said before, this is about the Turkish

21    government trying to influence our political system, and that

22    is illegal.

23    Now, the fact that Robert Amsterdam was involved in

24    this, so what?  Robert Amsterdam is some on loan lawyer in

25    Texas.  I bet you that in the summer and fall of 2016, none of

1185

1    you had heard of Robert Amsterdam.  These guys couldn't even

2    get his name straight.  They kept calling him Anderson, right?

3         So if Robert Amsterdam writes a book like this, I

4    mean, this is certainly a best seller, right?  I mean, you guys

5    would be going to bed with this every night, couldn't put it

6    down, right?  So that is Robert Amsterdam.

7         For him to say we should get rid of Gulen, and by the

8    way, I'm being paid by the government of Turkey to say so,

9    well, that's one thing, but for Lieutenant General Michael T.

10   Flynn to write an op-ed piece that says Gulen is a bad guy,

11   Erdogan is a good guy, we've got to get rid of Gulen, and when

12   he does that as part of a scheme that is to influence the

13   American political system without disclosing that Michael Flynn

14   and the defendant are being paid and directed by the government

15   of Turkey, let me return to this, payment is irrelevant.

16        Yes, we think the evidence proves it, but you don't

17   need to worry about that.  You won't hear anything in the

18   judge's instructions when you go back and read them, you will

19   not see anything about proving a payment.  We have no

20   obligation to do that.

21        And, in fact, the conspiracy was complete before any

22   money changed hands because they agreed to do it and they

23   committed an overt act in furtherance, and, bang, the crime is

24   committed, and they didn't have to pay a single penny to do so.

25        So don't, don't be fooled by this, by this nonsense

1186

1    about, about us not going and disclosing our case to the

2    Turkish government and trying to get records from the Turkish

3    government, when the minister of foreign affairs and the prime

4    minister involved in the mix.  That, that is the thing that's

5    not worthy of belief.

6              So let me, let me close with this:  I will tell you

7    just one thing since Mr. MacDougall took the time.  I want to

8    tell you about my mother, who grew up in Italy, and she was

9    practicing with her father as a lawyer.  She had graduated in

10   the 1940s from Italy.  She had graduated as one of two women in

11   a law school class of 400.

12             She met my father at the end of the World War, and

13   they came here, and I was raised by her and my father,

14   obviously.

15             But my mother had a very strong sense of justice.

16   She was a lawyer, and she was practicing with her father.  And

17   the way she brought me up was to say that when you do something

18   wrong, there are consequences for it.

19             That is justice as well, ladies and gentlemen.  The

20   evidence in this case does cry out for justice, and the only

21   just verdict that you should return, I submit to you based on

22   all the evidence that you've heard, the only just verdict is to

23   find that man guilty of the crimes he's been charged with.

24             And I thank you very much for your attention.

25             THE COURT:  Thank you, Mr. Gillis.

1187

1    MR. MacDOUGALL:  May we approach, Your Honor?

2    THE COURT:  Yes.

3    (Bench conference on the record.)

4    THE COURT:  Yes.

5    MR. MacDOUGALL:  Your Honor, in Mr. Gillis's

6    rebuttal, of course, the transcript will be the record of it,

7    but it's quite clear that we heard him misdescribe

8    "conspiracy."  My hearing was that -- and I think Mr. Trout and

9    Ms. Mitchell's hearing was -- that he said there were two

10   elements, that there'd be an agreement and an overt act.

11   There are, of course, four that the jury has been

12   instructed.  We'd ask that the Court at a minimum provide a

13   curative instruction with respect to that misstatement of the

14   law.

15   MR. GILLIS:  Your Honor, there are a number of

16   different ways any number of different courts have explained

17   it.

18   THE COURT:  Right.

19   MR. GILLIS:  Your jury instructions are perfectly

20   clear.  The jury is not going to be confused by having four

21   versus two, and if, if -- I submit that the way I represented

22   it was an accurate compression of the various courts that have

23   discussed it.

24   THE COURT:  I don't, I don't think it was -- they do

25   have the instructions.  I'm not going to give the jury an

1    instruction.

2            MR. MacDOUGALL:  Okay, Your Honor.

3            MS. MITCHELL:  Do you want me to make my point?

4            MR. MacDOUGALL:  Sure.

5            MS. MITCHELL:  Jim?

6            MR. GILLIS:  Sorry.

7            MS. MITCHELL:  Your Honor, I'd also raise for the

8    record that I think --

9            THE COURT:  I'm sorry?

10           MS. MITCHELL:  For the record, I believe that there

11   was a burden shifting in his, in his second argument,

12   specifically when he referred to all the documents that were

13   available to the defense to put in.  They are not all

14   available.  Many of them are defendant's statements, which we

15   are not permitted to put in.

16           I think that is an inappropriate representation of

17   what we are permitted to put in.

18           THE COURT:  I am more concerned about that.

19           MR. GILLIS:  Well, Your Honor --

20           THE COURT:  I know you tried to couch it in terms of

21   the context of your own burden, but I am concerned that arguing

22   that they put on the very best case they could --

23           MR. GILLIS:  Yes.

24           THE COURT:  -- and they had all this information that

25   they could have put on --

1           MR. GILLIS:  Your Honor, the context in which I said

2    that was specifically about this, this August 10 to August 11

3    time frame, and there was -- I made it abundantly clear to them

4    that we had that burden and we keep it.

5           THE COURT:  Right.

6           MR. GILLIS:  But it's fair game, Your Honor, when --

7    the Courts of Appeals make this perfectly plain, when the

8    defense puts on -- chooses to put on a case, we can attack its,

9    its sufficiency, its weight, but it's not shifting the burden

10   for me to say in that context, they had the, the, the e-mails

11   that, that we had regarding this arrangement, and there's --

12          THE COURT:  All right.  What I'm going to do is

13   simply tell the jury that both sides have referred to the jury

14   instructions.  They should read those themselves and be

15   governed by the jury instructions that they've been given.

16          MR. GILLIS:  Thank you, Your Honor.

17          MR. MacDOUGALL:  Thank you.

18          (End of bench conference.)

19          THE COURT:  Ladies and gentlemen, in the instructions

20   I gave you, I indicated that both sides may refer to the jury

21   instructions, but if what they tell you is different than what

22   you're instructed by way of my instructions, you obviously are

23   to be bound by the instructions that I've given you.

24          Both sides have -- both parties have made reference

25   to the jury instructions.  You should refer to the written

1    instructions that you will have for the purpose of determining

2    the Court's instructions and your obligation to apply the law

3    with respect to the facts as you determine those facts.

4         We are now at the point where you need to begin your

5    deliberations.  I know you're eager to begin.  It's going to

6    take some time for us to assemble the exhibits and get those to

7    you, and so I think it's best that we adjourn for the day and

8    let you begin tomorrow morning fresh at 9:15.

9         It's also my duty at this point to excuse the two of

10   you who were seated as alternate jurors, and that would be

11   Sean Palmer and Ashraf Ahmadzai.  It's always an unpleasant

12   duty to excuse the alternate jurors because I know you've

13   participated attentively during this process.  I want you both

14   to know that your contribution to this process has been as

15   important as any other juror, and we thank you for your, your

16   service.  You may retire to the jury room with the rest of the

17   jury, but you'll have to -- you will not return tomorrow for --

18   to participate in those deliberations.

19        When you do return tomorrow, your first order of

20   business should be to select one of your -- one of you as the

21   foreperson.  That person will simply have the duty to preside

22   over the deliberations and to ensure that all members of the

23   jury have a fair opportunity to express themselves.  Beyond

24   that, you can conduct your deliberations in any fashion that

25   you, you deem appropriate.

1191

1     One suggestion I would make, and it's only a

2     suggestion, is that you not begin your deliberations as you may

3     have sometimes seen in the movies, where you take -- everybody

4     immediately takes a straw poll.  It's just human nature that

5     once somebody commits to a position, it's more difficult, it's

6     more difficult to keep an open mind.  So I would encourage

7     you-all to have some discussion before, before committing to

8     any, any particular position.  But it's entirely up to you how

9     you proceed with your deliberations.

10          You have no time limits.  You can take as long as you

11    need.  When you need breaks, just tell Mr. Burns, and he'll

12    excuse you for lunch or other breaks that you need.

13          What is important, though, is that all of your

14    deliberations take place in the jury room together as a group.

15    So if you break for lunch, don't discuss the case among

16    yourselves during lunch.  Even within the jury room, don't

17    break up into smaller groups and discuss the case.  All of your

18    deliberations should be as a group, and everybody should have

19    the benefit of everybody's thinking about the case.

20          If, if you need to contact the Court, simply knock,

21    and Mr. Burns will be there, and he'll convey any messages

22    that, that you need.

23          So with those instructions, I excuse you until

24    tomorrow morning at 9:15.  Again, it's particularly important

25    that you not talk about this case with anyone outside of the

1192

1    jury.  Also, try to shield yourself from any publicity that you

2    may, may be exposed to.  It's important, obviously, that you

3    decide this case solely based on the evidence here in the

4    courtroom and not, and not be exposed to any other, any other

5    information, and that would include any, any research that I've

6    mentioned, any kind of social media, anything beyond what's

7    been presented in this courtroom.

8            So with those instructions, you're excused until

9    tomorrow morning at 9:15.

10                           (Jury out.)

11           THE COURT:  All right.  Anything before we adjourn?

12           MR. GILLIS:  Not from the government.

13           MR. MacDOUGALL:  Not for defense.

14           THE COURT:  All right.  The Court will stand in

15   recess pending hearing from the jury.

16      (Recess from 6:12 p.m., until 9:15 a.m., July 23, 2019.)

17

18                    CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of

20   the record of proceedings in the above-entitled matter.

21

22

23   _____/s/_____
                                   Anneliese J. Thomson
24

25