# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | **:** | |
| **BIJAN RAFIEKIAN, et al.** | **:** | |

**DEFENDANT RAFIEKIAN'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 AND IN SUPPORT OF MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT .......................................................................................................................... 6

I.  THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL
    UNDER RULE 29 ........................................................................................... 6

    A.  Legal Standard ...................................................................................... 6

    B.  The Court's Decision to Exclude Co-Conspirator Hearsay Compels
        a Judgment of Acquittal on Both Counts .............................................. 9

        1.  *The Court's Co-Conspirator Ruling Is Irreconcilable with
            the Rule 29 Standard* ................................................................ 10

        2.  *Without Excluded Hearsay Evidence, There Was Essentially
            No Evidence of Turkish Involvement in FIG's Work for
            Inovo* ........................................................................................ 11

    C.  The Government Failed To Introduce Substantial Evidence to
        Support Guilt Beyond A Reasonable Doubt On Count Two .................... 15

    D.  The Government Failed To Introduce Substantial Evidence to
        Support Guilt Beyond A Reasonable Doubt on Count One ..................... 17

        1.  *There Was No Substantial Evidence of Conspiracy to Act as
            an Unregistered Foreign Agent* .................................................. 18

        2.  *There Was No Substantial Evidence of Conspiracy to File a
            False FARA Statement* ............................................................... 28

II. THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33 ................. 33

    A.  The Evidence Weighed Strongly Against The Jury's Verdict .................. 34

    B.  The Government's Excessive Introduction Of Inadmissible
        Hearsay For A Limited Purpose Requires A New Trial ........................... 35

    C.  The Government Improperly Shifted the Burden to Rafiekian to
        Prove His Innocence ............................................................................ 37

    D.  The Superseding Indictment Is Defective Because It Fails to State
        an Essential Element of the Charged Offense ........................................ 41

    E.  A New Trial is Warranted to Correct Erroneous Jury Instructions ........... 44

        1.  *The Jury Instructions Did Not Accurately Define
            "Materiality"* ........................................................................... 44

        2.  *The Jury Instructions Failed to Incorporate* Liparota ................... 46

CONCLUSION ...................................................................................................................... 47

i

# TABLE OF AUTHORITIES

<u>CASES</u>:

*Boeckenhaupt v. United States*,
   392 F.2d 24 (4th Cir. 1968) ................................................................................9

*Evans-Smith v. Taylor*,
   19 F.3d 899 (4th Cir. 1994) ................................................................................8

*Harms v. United States*,
   272 F.2d 478 (4th Cir. 1959) ...............................................................................8

*In re Winship*,
   397 U.S. 358 (1970)......................................................................................6, 40

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004)...............................................................................................45

*Liparota v. United States*,
   471 U.S. 419 (1985)....................................................................................44, 46

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)............................................................................................7

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018)........................................................................................45

*Simmons v. South Carolina*,
   512 U.S. 154 (1994)..........................................................................................36

*Sullivan v. Louisiana*,
   508 U.S. 275 (1993)............................................................................................6

*United States v. Alerre*,
   430 F.3d 681 (4th Cir. 2005) ..............................................................................7

*United States v. Beck*,
   615 F.2d 441 (7th Cir. 1980) ..............................................................................7

*United States v. Becker*,
   230 F.3d 1224 (10th Cir. 2000) ...................................................................35, 36

*United States v. Blue*,
   808 F.3d 226 (4th Cir. 2015) ............................................................................15

*United States v. Bonner*,
   648 F.3d 209 (4th Cir. 2011) ..............................................................................9

*United States v. Campbell*,
    977 F.2d 854 (4th Cir. 1992) ................................................................34

*United States v. Cass*,
    127 F.3d 1218 (10th Cir. 1997) ...........................................................36

*United States v. Daniels*,
    973 F.2d 272 (4th Cir. 1992) ...............................................41, 42, 43

*United States v. Falcone*,
    311 U.S. 205 (1940) ............................................................................18

*United States v. Fondren*,
    417 F. App'x 327 (4th Cir. 2011) ..........................................................9

*United States v. Gengler*,
    No. 1:08 Cr. 12, 2009 WL 5549225 (E.D. Va. Oct. 23, 2009).........8, 9, 18

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)...............................................................8, 28

*United States v. MacCloskey*,
    682 F.2d 468 (4th Cir. 1982) .................................................................7

*United States v. Nukida*,
    8 F.3d 665 (9th Cir. 1993) .....................................................................7

*United States v. Parker*,
    839 F.2d 1473 (11th Cir. 1988) ...........................................................19

*United States v. Ray*,
    61 F. App'x 37 (4th Cir. 2003) ..........................................................7, 8

*United States v. Saint Louis*,
    889 F.3d 145 (4th Cir. 2018) ...............................................37, 40, 41

*United States v. Sallins*,
    993 F.2d 344 (3d Cir. 1993)..................................................................35

*United States v. Simon*,
    964 F.2d 1082 (11th Cir. 1992) ...........................................................40

*United States v. Souder*,
    436 F. App'x 280 (4th Cir. 2011) ........................................................34

*United States v. Stephens*,
    482 F.3d 669 (4th Cir. 2007) .................................................................9

*United States v. White*,
443 F.3d 582 (7th Cir. 2006) ................................................................................44

## STATUTES:

18 U.S.C.
§ 951(d) ................................................................................................................15
§ 951(d)(4) ......................................................................................................15, 42

22 U.S.C.
§ 612(a) ................................................................................................................16
§ 618(a)(2) ............................................................................................................44

## OTHER AUTHORITIES:

28 C.F.R. § 73.1(f) ....................................................................................................16, 42

Black's Law Dictionary ..............................................................................................45

2 Charles A. Wright, Federal Practice and Procedure § 461 (2d ed. 1982) ..................7

2A Fed. Prac. & Proc. Crim. § 467 (4th ed.) ................................................................7

Fed. R. Crim. P.
29(a) ..................................................................................................................7, 15
29(d)(1) ................................................................................................................33
33(a) ....................................................................................................................33

Fed. R. Evid. 104(a) ................................................................................................4, 10

## PRELIMINARY STATEMENT

More than a half-dozen times—across four different briefs, multiple oral arguments, and even a motion for reconsideration—the government urged the Court to allow the admission of alleged co-conspirator out-of-court statements for their truth.  The reason for the government's persistence is obvious:  Without such evidence—in fact, even with it—the government's case was extremely thin.  Other than a brief, uneventful meeting in New York, the government offered no evidence of any contacts between Rafiekian and the Turkish government at all, let alone evidence of an agreement to act under Turkey's "direction and control" (as 18 U.S.C. § 951 requires).  The government also offered no evidence that Rafiekian agreed with anyone else to commit an illegal act, such as to hide Flynn Intel Group's ("FIG") work from the U.S. government.  And, the government offered no alleged co-conspirator testimony at trial, including from its erstwhile cooperating witness, General Michael Flynn.  By the end of trial, all that was left for the government to do was urge the jury to join in the speculation that FIG's public paid consulting and lobbying work was really a front concealing Rafiekian's work as a clandestine Turkish agent— despite uncontroverted testimony that Rafiekian sought legal advice about *registering under FARA* on two separate occasions.

It is true that the jury returned a verdict mere hours after it began deliberating.  But in reserving decision on Rafiekian's Rule 29 motion, this Court noted substantial issues with the government's case, recognizing that it was "very, very circumstantial" and "[m]uch of it is very speculative."  The jury's hasty verdict does not change that fact.  This Court continues to play a vital role in ensuring that there was legally sufficient evidence for the jury not only to conclude that Rafiekian was possibly—or even probably—guilty of the crimes charged, but that he was in fact guilty *beyond a reasonable doubt*.

Without the government's proffered hearsay statements, the case against Rafiekian fails on every level. Count Two charges Rafiekian with acting as an unregistered agent of a foreign government. An essential element of that offense is that he was acting under the "direction and control" of the government of Turkey. Yet the record is bereft of evidence that the Turkish government was even aware of FIG's work, let alone that it directed or controlled it. The facts that FIG's work happened to advance Turkey's (alleged) goals, or that Turkey would have agreed with or condoned FIG's work, does not come close to permitting the inference that FIG was therefore acting at Turkey's direction and under Turkey's control. Aside from a single brief meeting in New York City (at which the government's witness testified that FIG's work was not even discussed), essentially *all* of the government's Turkey-related evidence was hearsay from Ekim Alptkein that was inadmissible for its truth. No evidence allowed the reasonable inference that Rafiekian was taking orders from Turkey.

A similar absence of evidence compels a judgment of acquittal on Count One. As this Court has recognized, to establish a conspiracy, the government must prove that the Defendant agreed with at least one other person to do something *illegal*. In the absence of evidence that Turkey was even aware of the Inovo project, let alone directed that work, neither of the illegal objects Rafiekian allegedly agreed with others to do—to act as an unregistered agent of the government of Turkey, and to lie about that agency relationship on a FARA form—was supported by substantial evidence. And even if the government of Turkey *had* directed and controlled the engagement (and there is no evidence it did), the prosecution still did not proffer substantial evidence that Rafiekian agreed with another person to *hide* that alleged unlawful conduct.

When the evidence viewed in the light most favorable to the prosecution calls for speculation—*i.e.*, if it gives equal or nearly equal circumstantial support to a theory of guilt as it

does to a theory of innocence—then a reasonable jury must *necessarily* entertain a reasonable doubt.  This Court has already concluded that the government cannot surpass a fifty percent threshold *even when the co-conspirator hearsay statements are considered for their truth*.  With those statements properly excluded, the government's proof further evaporates.  Even drawing all inferences in the government's favor, no reasonable jury could have found Rafiekian guilty beyond a reasonable doubt.

For all of these reasons, the Court should grant the Defendant's motion for judgment of acquittal.  Alternatively and at a minimum, the Court should grant a new trial pursuant to Federal Rule of Criminal Procedure 33.  This relief is mandated by the fact that the trial evidence was so heavily weighted against the verdict, as well as other prejudicial errors at trial—such as (i) the cumulative impact of the hearsay evidence admitted for a limited purpose, (ii) the government's improper burden-shifting arguments, (iii) an uncured defect in the Superseding Indictment, and (iv) errors in the jury instructions that invited conviction based on unknowing conduct and even *immaterial* misstatements or omissions in FIG's FARA filing.  Whether this Court grants acquittal under Rule 29, or merely a new trial under Rule 33, the jury's verdict cannot stand.

## BACKGROUND

On December 12, 2018, Rafiekian was indicted on two counts arising from work performed by FIG on behalf of Inovo relating to Turkey.  Count One charged a conspiracy with two objects: first, to knowingly act and cause others to act in the United States as an agent of the government of Turkey without prior notification to the Attorney General, in violation of 18 U.S.C. § 951; and second, to willfully make false statements of material fact or willfully omit material facts in a document filed with the Attorney General under FARA.  Count Two charged Rafiekian with knowingly acting and causing others to act in the United States as an agent of the government of

Turkey without prior notification to the Attorney General.  On July 23, 2019, a jury returned a verdict of guilty on both counts.

The issue of co-conspirator hearsay was front-and-center throughout the proceedings. Before trial, Rafiekian moved to exclude all out-of-court statements by his alleged co-conspirators, including Ekim Alptekin (Inovo's controlling shareholder), General Michael Flynn, and certain Turkish officials.[1]  After the government filed a response brief [ECF No. 198] and the court heard oral argument, the government filed a supplemental brief [ECF No. 225] arguing for the first time that the alleged co-conspirators statements were admissible as adoptive admissions.

On July 9, the Court granted Rafiekian's motion to exclude co-conspirator hearsay statements, holding that the government had failed to establish the existence of a conspiracy by a preponderance of the evidence and that the statements were not admissible as adoptive admissions. [ECF No. 292 at 28].  In so holding, the Court applied the standard set forth in Federal Rule of Evidence 104(a), which provides, "[t]he court must decide any preliminary question about whether . . . evidence is admissible" and that "[i]n so deciding, the court is not bound by evidence rules[.]" Fed. R. Evid. 104(a).  Thus, the Court considered not only admissible evidence, but also the hearsay statements themselves, which otherwise would not be admissible to prove the truth of the matters asserted.

On July 13, just days before trial, the government filed a Pre-Trial Memorandum on Co-Conspirator Statements that offered a new argument for the admissibility of co-conspirator hearsay statements:  that the admissibility of co-conspirator statements under Federal Rule of Evidence

---

[1] The central mischief of hearsay is that it allows a witness to testify without being subjected to cross-examination.  By charging Alptekin in the same indictment as Rafiekian, the government all but guaranteed that Alptekin would be unavailable for direct and cross examination at trial.

801(d)(2)(E) did not require the existence of a *criminal* conspiracy, but rather, could be based on *any* joint venture, including a lawful one.  [ECF No. 310].

On July 18, at the close of the government's case, Rafiekian moved for judgment of acquittal under Federal Rule of Criminal Procedure 29.  Trial Tr. 810:5-7 (July 18, 2019), ECF No. 334.  The Court reserved decision on the motion but expressed significant skepticism over the government's case.  The Court stated:

> There are very substantial issues with respect to the sufficiency of the evidence as to many of the elements of both counts.  It's all very, very circumstantial.  Much of it is very speculative.

Trial Tr. 850:24-851:2 (July 18, 2019), ECF No. 334.

On July 20, the government filed a 39-page Amended Memorandum on Co-Conspirator Statements and Opposing Defendant's Rule 29 Motion—its fourth brief addressing co-conspirator hearsay—which purported to summarize the evidence in the case establishing a conspiracy.  Rafiekian filed a brief in support of his Rule 29 motion on July 21, which also addressed the co-conspirator hearsay issue.  [ECF No. 342].[2]

Upon the close of all the evidence, the Court confirmed its prior ruling that the out-of-court statements of Rafiekian's alleged co-conspirators were not admissible for their truth and rejected the government's argument that such hearsay was admissible via a showing of a lawful joint venture.  Trial Tr. 962:8-963:10 (July 22, 2019), ECF No. 350.  The government then offered another lengthy oral argument, seeking one last time to change the Court's mind.  *Id.* at 963:13-987:21.  In response, the Court again expressed doubt that the government had provided evidence of any agreement to commit an illegal act:

---

[2] Although some repetition is inevitable, Rafiekian has endeavored to avoid needless overlap between this brief and its prior Rule 29 brief [ECF No. 342] to the extent practicable.  Rafiekian respectfully requests that the Court consider both briefs together in support of his Rule 29 motion.

THE COURT:  The conspiracy, though, is an agreement to do all of that unlawfully --

MR. GILLIS:  Yes, sir.

THE COURT:  -- that is, without the required notifications.

MR. GILLIS:  Yes, sir.

THE COURT:  Whether the defendant was required to file or whether he filed properly is a separate issue --

MR. GILLIS:  Yes, sir.

THE COURT:  -- from whether or not there was an agreement with somebody that he would not do that.

MR. GILLIS:  Yes, sir.

THE COURT:  And that's where I'm sort of pulling up short.

Trial Tr. 971:1-15 (July 22, 2019), ECF No. 350.

The Court treated the government's latest argument as a motion for reconsideration (Trial Tr. 996:9-11 (July 22, 2019), ECF No. 350) and denied that motion shortly thereafter (Trial Tr. 1053:13-1054:7 (July 22, 2019), ECF No. 351).  The Court also continued to reserve decision on Rafiekian's Rule 29 motion, sending the case to the jury on July 22.  Just a few hours after deliberations began, the jury returned a verdict of guilty on Counts One and Two.

## ARGUMENT

## I.      THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL UNDER RULE 29

### A.      Legal Standard

The U.S. Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970); *see Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (Constitution "require[s] . . . a jury verdict of guilty beyond a reasonable doubt").  That is because it would be unconstitutional "to have a jury determine that the defendant is *probably* guilty."  *Id.*;

6

*see, e.g., United States v. Ray*, 61 F. App'x 37, 50 (4th Cir. 2003) ("[T]he fact that the evidence would permit a jury to find that [the defendant] *might* have participated in the shooting with the intent to further the drug conspiracy, or even that he *probably* did so, is not adequate to sustain his conviction.").

Rule 29 thus offers "an important safeguard to the defendant," in that "[i]t tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (quoting 2 Charles A. Wright, Federal Practice and Procedure § 461, at 637-38 (2d ed. 1982)). A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In doing so, the court should consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982); *see United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (citation omitted) (defining "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt"). But while this standard requires inferences to be drawn in favor of the government, it "not so strict that the defendant's evidence must be disregarded." *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980). Instead, "[i]n considering the motion, the Court should examine the evidence as a whole including that offered by the defendant." *Id.*; *see* 2A Fed. Prac. & Proc. Crim. § 467 (4th ed.) ("The court must look to all of the evidence."); *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (noting, in Rule 50 civil context, that court should consider "evidence

supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses").

As this Court has recognized, Rule 29 motion should be granted where the government has failed to offer "more than mere speculation and conjecture" to support a given charge. *United States v. Gengler*, No. 1:08 Cr. 12, 2009 WL 5549225, at *8 (E.D. Va. Oct. 23, 2009) (Trenga, J.). "[C]ircumstantial evidence is equally available with direct evidence to prove the conspiracy, but suspicion or conjecture cannot take the place of evidence." *Harms v. United States*, 272 F.2d 478, 483 (4th Cir. 1959); *see Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994) ("While all inferences must be made in favor of the prosecution, leaps of logic should not be."). In cases where the evidence, though viewed deferentially, still gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," and the court should enter a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation and internal quotation marks omitted). Though "the government's proof need not be so certain as to exclude all inferences of innocence, in a case where the government's overall evidence of guilt is so thin, the alternate hypotheses consistent with innocence become sufficiently strong that they must be deemed to instill a reasonable doubt in our hypothetical reasonable juror." *Ray*, 61 F. App'x at 49 (citation omitted); *see, e.g.*, *Glenn*, 312 F.3d at 64 (reversing and remanding for entry of judgment of acquittal despite circumstantial evidence showing that defendant had "motive and opportunity to commit the crime," that he "possessed a handgun, departed the general area of [the victim's] death, and reacted casually when informed of the shooting," and later "made false statements to the police about his activities around the time of the murder").

For example, the Fourth Circuit reversed a denial of a motion for judgment of acquittal (and remanded for *vacatur*) despite a defendant's extrajudicial confession to ATF agents, where there was insufficient record evidence to corroborate that confession. *See United States v. Stephens*, 482 F.3d 669, 673 (4th Cir. 2007). It has also affirmed a judgment of acquittal where the government's case rested on "missing, flawed, or contradictory facts" that led to the conclusion that no reasonable trier of fact could hold the defendant guilty beyond a reasonable doubt. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011). This court, too, has granted a judgment of acquittal on a conspiracy count where there was "no evidence from which any inference of such an agreement [to violate the law] could be reasonably drawn." *Gengler*, 2009 WL 5549225, at *9. Moreover, on multiple occasions, courts in this district have granted judgments of acquittal in Section 951 cases specifically, notwithstanding grave underlying allegations of espionage-related conduct.[3]

### B.     The Court's Decision to Exclude Co-Conspirator Hearsay Compels a Judgment of Acquittal on Both Counts

This Court's decision to exclude co-conspirator hearsay evidence, made after careful consideration and extensive briefing and argument, has two important ramifications for Rafiekian's Rule 29 motion. First, the conclusion that the government failed to prove a conspiracy by a preponderance of the evidence is incompatible with the jury's finding of guilt beyond a reasonable doubt. Second, in light of this Court's ruling, which excluded the vast majority of the

---

[3] *See United States v. Fondren*, 417 F. App'x 327, 330-31 (4th Cir. 2011) (noting that the Hon. Claude M. Hilton of the Eastern District granted judgment of acquittal with respect to both Section 951 count and related conspiracy count, notwithstanding evidence that defendant passed along classified information); *Boeckenhaupt v. United States*, 392 F.2d 24, 25 n.1 (4th Cir. 1968) (noting that the Hon. Oren R. Lewis of the Eastern District granted judgment of acquittal with respect to conspiracy to act as a foreign agent without registering, notwithstanding that defendant accepted cash from a member of the Soviet embassy); *see also* Rule 29 Mot. [ECF no. 342] at 5.

government's Turkey-related evidenced for its truth, there was insufficient evidence in the record from which a reasonable jury could find Rafiekian guilty of either Count.

1. *The Court's Co-Conspirator Ruling Is Irreconcilable with the Rule 29 Standard*

A judgment of acquittal on Count One is the only outcome that is consistent with the Court's decision to exclude co-conspirator hearsay.  Before and during trial, the Court was repeatedly asked to consider whether the out-of-court statements of Rafiekian's alleged co-conspirators should be admitted for the truth of the matters asserted therein.  At every turn, the Court correctly concluded that the government had failed to prove a conspiracy by a preponderance of the evidence, and excluded the hearsay statements for their truth.  In reaching this conclusion, the Court considered not only admissible evidence, but also the inadmissible hearsay statements themselves.  *See* Fed. R. Evid. 104(a).

While the standards under Rule 29 and Evidence Rule 104(a) differ, those differences cut both ways.  *See* Tr. 822:3-7 (July 18, 2019), ECF No. 334 (recognizing some "tension" between standards).  Rule 29 is more deferential to the government than Rule 104(a) in the sense that it requires the Court to draw favorable inferences in the government's favor—though, it should be noted, the Court drew numerous inferences in the government's favor under Rule 104(a) as well.  *See* ECF No. 292 at 29 (inferring that "Alptekin/Inovo was acting on behalf of the Turkish government" and "that the actual contract between Inovo and FIG was entered into by Inovo on behalf of and at the direction of the Turkish government").  At the same time, Rule 29 is less deferential to the government than Rule 104(a) in the sense that, under the latter, "the court is not bound by evidence rules," Fed. R. Evid. 104(a)—meaning that the Court was free to consider the proffered hearsay itself under that Rule.

If the government failed to prove the existence of a conspiracy under a preponderance of the evidence standard (*i.e.*, 51% confidence) *even when considering the hearsay statements for their truth*, it necessarily failed to offer sufficient evidence that Rafiekian was guilty beyond a reasonable doubt (*i.e.*, much closer to 100% confidence) *when those statements were excluded*. That is particularly true on the facts of this case, where the government relied heavily on the substance of the hearsay statements themselves in seeking to prove the conspiracy. *See generally* Gov. Opp'n to Mot. to Exclude Co-Conspirator Hearsay [ECF No. 198] at 4-5; Gov. Rule 29 Opp'n [ECF No. 341]. With those hearsay statements excluded, the evidence supporting the existence of a conspiracy—which already fell below even a 51% confidence threshold—is further diminished. It would be in serious tension with the court's prior ruling, and manifestly contrary to the evidence, to permit the jury's guilty verdict to stand upon such meager proof.

2.    *Without Excluded Hearsay Evidence, There Was Essentially No Evidence of Turkish Involvement in FIG's Work for Inovo*

The Court's co-conspirator ruling is important in another way. Over the course of pretrial proceedings and trial, the government persisted in seeking to admit the proffered co-conspirator hearsay for its truth for a reason: without it, the government's case was entirely speculative, particularly once the government elected not to seek testimony from Michael Flynn.[4] Indeed, once the hearsay statements by Flynn and Alptekin were properly excluded, the government's case was almost entirely bereft of evidence connecting Turkey to Rafiekian at all. At most, the government's evidence established that FIG's work for Inovo was designed to advance policy goals that the

---

[4] At a hearing on June 13, 2019, the government stated, "we do not contend that General Flynn was a part of [the] conspiracy." Hr'g Tr. 65:21-22 (June 13, 2019), ECF No. 213. Three weeks later, on July 3, the government reversed this position and contended for the first time that Flynn was a co-conspirator. [ECF No. 261]. The government's change of position was not based on any new evidence or showing that Flynn was actually involved in the alleged conspiracy, but rather was a tactic to introduce Flynn's out-of-court statements after it was determined that he could not credibly testify as a witness at trial.

Turkish government would have condoned or agreed with. Such evidence falls short of direction and control.

As discussed in greater detail in Rafiekian's earlier Rule 29 brief [ECF No. 342 at 7-13], the evidence in the record overwhelmingly weighs against a finding that Turkey directed and controlled FIG's work. Every witness with personal knowledge of the project testified consistently that Alptekin or Inovo was the client, not the government of Turkey. Trial Tr. 440:5-7 (July 17, 2019), ECF No. 330 (McCauley); *id. at* 465:1-6 (Boston); *id.* at 623:10-13 (July 17, 2019), ECF No. 331 (Miller); *id.* at 686:22-23 (July 18, 2019), ECF No. 333 (Lowman); *id.* at 713:4-5 (Courtovich). There is no dispute that Alptekin acted like the client: He made the payments to FIG from his own personal bank account (GEX 25A, 34, 38), and he participated as the client representative on weekly update calls and meetings with FIG (Trial Tr. 396:13-16 (July 17, 2019), ECF No. 330 (McCauley)); *id.* at 423:1-4 (McCauley, testifying that Alptekin made requests of FIG during these calls); *id.* at 451:19-24 (Boston); *id.* at 455:2-4 (Boston); *id.* at 459:5-15 (Boston); *id.* at 465:17-21 (Boston) ("Q: [W]hat was Alptekin's role during those 30-minute weekly update calls? A: I saw him as the client asking questions about our progress and we informed him as to where we were with the project."); *id.* at 481:5-9 (Boston); *id.* at 496:22-497:6 (Boston); *id.* at 503:6-9 (Boston); *id.* at 505:4-10 (Boston). Moreover, Alptekin's statements during the November 2, 2016 meeting conclusively show that Alptekin *viewed himself* as the client. Expressing his frustration that FIG had not produced more results, he stated: "*I paid for this? This is what I paid for?*" Trial Tr. 432:1-4 (July 17, 2019), ECF No. 330 (McCauley) (emphasis added).

In contrast, there is no evidence that any Turkish official ever acted as FIG's client, participated in weekly update calls with FIG, or funded any portion of FIG's work. There is likewise no competent evidence that Alptekin acted as an intermediary between FIG and the

government of Turkey.  For example, there was no evidence, nor even a proffer of evidence, that Alptekin conveyed during the weekly update calls any request from the Turkish government to FIG, nor is there evidence that Alptekin reported back to any Turkish official regarding the information he received during these updates.  *See* Trial Tr. 465:17-25 (July 17, 2019), ECF No. 330 (Boston) ("Q:  And do you know what Alptekin did with the information that he received during those weekly 30-minute update calls?  A:  No, sir.").  In fact, without considering Alptekin's hearsay statements for their truth, there was not even any proof that *Alptekin* was an intermediary— or ever even in contact with—the Turkish government.

Indeed, the sole admitted evidence that Turkish government officials ever communicated with Rafiekian, Alptekin, or Flynn relates to the September 19, 2016 meeting between FIG representatives and Turkish officials in New York City.  This meeting, however, cannot support a finding of direction and control.  According to the uncontradicted testimony of Brian McCauley, one of the government's witnesses and the only witness who attended the meeting, there was no discussion of FIG's work at this meeting, and no Turkish officials gave any orders to Rafiekian or FIG or asked them to do anything.  Trial Tr. 440:14-17 (July 17, 2019), ECF No. 330 ("Q:  And at this meeting, there was really no discussion at all of FIG and any work that FIG was doing, correct?"  A:  No, sir, there wasn't."); *id.* at 442:1-3 ("Q:  But there was no request from any Turkish official for Flynn Intel Group to do anything?  A:  No, sir.").

Moreover, McCauley did not testify that the September 19 meeting was related to any ongoing project for the government of Turkey.  Instead, McCauley gave uncontradicted and unimpeached testimony only as to a "*potential* project [that was] being discussed" after the meeting that night (not an ongoing one), with a "budget of $330,000" (not the $600,000 that Inovo had already begun paying FIG).  ECF No. 341 at 25 (emphasis added).  Whatever project

McCauley had in mind, it was plainly *not* the same as the Inovo engagement, which had already been signed and partially paid for weeks before the New York meeting. *See* GEX 25A, 151B. The government never reconciles this discrepancy or explains why, if FIG had actually undertaken a secret project for Turkey back in late July or early August, its own witness would testify that Rafiekian and FIG were still pursuing a "potential project" with Turkey nearly two months later. ECF No. 341 at 25.

The government's "proof" of direction and control relies on alleged similarities between the project as it was envisioned (i) when the Defendant hoped FIG would be engaged by the Turkish government, and (ii) after it was determined that FIG would actually be engaged by Inovo, a private business. For example, the government argues that the project was focused on Gulen throughout, and that Rafiekian repeated the same Ayatollah Khomeini "apple tree" story on several occasions. This argument is flawed, however, because it assumes that Rafiekian actually did reach an agreement with the Turkish government to perform work on its behalf. There is no evidence in the record that this ever occurred. *See* Trial Tr. 229:4-230:15 (July 16, 2019), ECF No. 326 (Kelner explaining that the Defendant told him that the hoped-for engagement by the Turkish government never came to fruition). Without such evidence, all the government can show is that FIG's work for Inovo was *consistent* with the work that Rafiekian envisioned FIG would perform (but ultimately did not perform) on behalf of the government of Turkey. That is not sufficient to prove Turkey's direction and control.

In sum, beyond the brief and uneventful September 19 meeting, there is no evidence whatsoever that Rafiekian had any contact with any official of the Turkish government. There is certainly no evidence that Rafiekian agreed to act as a Turkish agent without disclosure to the U.S. government. That deficiency in proof, standing alone, is fatal to the government's case.

### C. The Government Failed To Introduce Substantial Evidence to Support Guilt Beyond A Reasonable Doubt On Count Two

The government's failure of proof becomes clear when considering each element of the two counts of conviction. If the Court concludes that there is a lack of substantial evidence with respect to even one element of either count, it "*must* enter a judgment of acquittal" for that count. Fed. R. Crim. P. 29(a) (emphasis added).

In order to prove Count Two, which charges Rafiekian with acting as an unregistered foreign agent in violation of 18 U.S.C. § 951, the government was required to prove the following elements: (1) that Rafiekian knowingly acted in the United States as an agent of a foreign government; (2) that he knowingly engaged in conduct other than a legal commercial transaction; and (3) that he knowingly failed to notify the Attorney General that he would be acting as an agent of the foreign government before doing so. Final Jury Instruction No. 41. The government failed to proffer substantial evidence of any of those elements.

First, the government failed to establish that Rafiekian acted as an agent of a foreign government. An "agent of a foreign government" is one "who agrees to operate within the United States *subject to the direction and control* of a foreign government or official." 18 U.S.C. § 951(d) (emphasis added). The government failed to proffer substantial evidence of Turkey's involvement in FIG's work at all, and therefore necessarily failed to establish that he agreed to act at Turkey's direction and control (let alone "knowingly"). *See, e.g.*, *United States v. Blue*, 808 F.3d 226 (4th Cir. 2015) (reversing denial of judgment of acquittal for conspiracy to distribute over 100 grams of heroin found in an apartment, where government failed to proffer substantial evidence that defendant knew heroin was there).

Second, the government failed to present substantial evidence that Rafiekian knowingly engaged in conduct other than a "legal commercial transaction." 18 U.S.C. § 951(d)(4); *see* ECF

No. 292 at 2.  The government theorized that Rafiekian was not engaged in a legal commercial transaction because his conduct allegedly violated FARA.  But a violation of FARA, like Section 951, requires proof that Rafiekian acted as an agent of a foreign principal—in this case, the government of Turkey.  *See* 22 U.S.C. § 612(a); see also Final Jury Instruction No. 35.  Because the government failed to introduce such evidence, it cannot establish the absence of a legal commercial transaction.

The government also failed to proffer substantial evidence that Rafiekian *knew* he was engaged in conduct other than a legal commercial transaction.  *See* Final Jury Instruction No. 41 (requiring that the government prove Rafiekian "knew he was a person who agreed . . . to engage in conduct other than a 'legal commercial transaction'").[5]  As discussed in Rafiekian's prior Rule 29 brief, the unrebutted trial testimony revealed that Rafiekian contacted two separate attorneys for the specific purpose of assisting with FARA registration.  *See* ECF No. 342 at 14-15; *see also* Trial Tr. 270:12-272:23  (July 16, 2019), ECF No. 326 (Kelner, testifying that Rafiekian contacted him and his partner, Robert Lenhard, regarding advice on FARA before seeking advice from Robert Kelley); *id.* at 858:4-8  (July 18, 2019), ECF No. 334 (Kelley:  "I said that I was -- is it a foreign government or a foreign political party, and he said, no, it's a private company.  And I said, You don't have to register at FARA.  You can register at [] Lobbying Disclosure Act in the Congress.").

---

[5] In his prior Rule 29 brief, Rafiekian argued that the government was required to prove that he acted "willfully" in order to prove that he violated FARA for the purpose of establishing the absence of a legal commercial transaction.  The Court later determined that the appropriate mens rea is knowledge, not willfulness.  Trial Tr. 960:13-23 (July 22, 2019), ECF No. 350.  As a practical matter, however, there is little difference between willfulness (which requires knowledge that conduct was unlawful) and the Court's ruling that the government must prove Rafiekian knew he was not engaged in a legal commercial transaction (which requires knowledge that his conduct was "prohibited by federal or state legislation or implementing regulations").  28 C.F.R. § 73.1(f).  Accordingly, Rafiekian's argument in his prior Rule 29 brief that the government failed to prove a willful violation of FARA applies equally here to his argument that he did not knowingly engage in conduct other than a legal commercial transaction.

That uncontradicted testimony is totally inconsistent with the government's allegation that Rafiekian *knew* he was in violation of FARA.[6]

Finally, the government failed to show that Rafiekian knowingly failed to register with the Attorney General, for the same reasons.  To be sure, the government's theory ascribes nefarious (and convoluted) motives to Rafiekian's encounters, including an apparent desire to retain attorneys for a FARA filing with the intention of misleading them.  But faced with uncontradicted evidence that he contacted two attorneys for the express purpose of filing under FARA, no rational jury could find beyond a reasonable doubt that Rafiekian *knew* he was acting as an unregistered foreign agent.

For all of these reasons, the government's failure to proffer substantial evidence of Turkey's involvement in FIG's work requires dismissal of Count Two.

### D.     The Government Failed To Introduce Substantial Evidence to Support Guilt Beyond A Reasonable Doubt on Count One

The Government also failed to proffer substantial evidence to support a guilty verdict on Count One, which charges Rafiekian with conspiracy to act as an unregistered foreign agent and conspiracy to make materially false statements or omissions in a FARA filing.  As relevant here, the final jury instructions required the government to prove:  (1) that a conspiracy existed to commit either of two unlawful acts (to act as an unregistered agent or to willfully make false statements on a FARA form); (2) that, at some time during the existence of the conspiracy,

---

[6] McCauley's testimony that Rafiekian wanted to "keep it under the radar" does not change the analysis. Trial Tr. 414:1-4 (July 17, 2019), ECF No. 331 ("He [Rafiekian] said:  Brian, the General wants me to file with DOJ. He said:  But to keep it under the radar, we'll file with -- it was either commerce or Congress.").  McCauley testified that this conversation took place after the September 19 meeting in New York (*see id.* at 411:23-24)—and therefore after Rafiekian had already received legal advice from Kelley that he did not need to file under FARA, which Kelley testified took place in the first week of September (Trial Tr. 856:13-14 (July 18, 2019), ECF No. 334).  The reference to filing with "Congress" in McCauley's testimony is a direct reference to the LDA, and Rafiekian had by that point consulted with counsel, who informed him that FIG could file under the LDA instead of FARA.

Rafiekian knew its purpose; and (3) with knowledge of the conspiracy's purpose, Rafiekian deliberately joined it. Final Jury Instruction No. 33.

As this Court recognized at trial, the critical question is whether the government introduced substantial evidence of a conspiracy to act "unlawfully . . . that is, without the required notifications," as "[w]hether the defendant was required to file or whether he filed properly is a separate issue . . . from whether or not there was an agreement with somebody that he would not do that." Trial Tr. 971:1-12 (July 22, 2019), ECF No. 350. Without substantial evidence that Rafiekian knowingly and deliberately agreed to do something *illegal*, there was no conspiracy. *See Gengler*, 2009 WL 5549225, at *9 (granting judgment of acquittal on conspiracy count where there was "no evidence from which any inference of such an agreement [to violate the law] could be reasonably drawn"); *see also United States v. Falcone*, 311 U.S. 205, 210 (1940) ("Those having no knowledge of the conspiracy are not conspirators."). Once again, the government failed to proffer substantial evidence with respect to either allegedly illegal object of the conspiracy.

> 1. *There Was No Substantial Evidence of Conspiracy to Act as an Unregistered Foreign Agent*

The government's core theory is that Rafiekian conspired to hide the fact that Turkey was directing and controlling FIG's work for Inovo. Because there is no evidence that the government of Turkey was involved in the project, however, there was nothing to disclose and nothing to hide. It is no crime to fail to disclose something that legally does not need to be disclosed. Because there was no admissible evidence that Rafiekian or FIG agreed to act under Turkey's direction and control, to believe in the very existence of the alleged conspiracy in the first place requires extensive speculation from circumstantial evidence.

Any circumstantial evidence, even granting all inferences in favor of the government, is at least equally consistent with an agreement to do something lawful—namely, to act on behalf of

Inovo/Alptekin rather than to act on Turkey's behalf (never mind to do so without registering). *See, e.g.*, *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988) ("The appellants certainly directed their efforts toward the common goal of making money for themselves and their employer. But to support a conspiracy conviction, the evidence must establish a common agreement to violate the law.").

The government relies on four main categories of evidence to support the existence of a conspiracy:  (i) the use of encrypted communications and references to confidentiality, (ii) the $40,000 payments from FIG to Inovo, (iii) Rafiekian's failure to disclose Turkey's connection to the project and supposed "false cover story" that FIG had been retained by a private business, and (iv) alleged parallel false statements made by Rafiekian, Alptekin, and Flynn.  As discussed below, however, whether considered alone or collectively, none of these allegations supports the jury's guilty verdict beyond a reasonable doubt; instead, all are equally or more consistent with legal behavior.

**(i) Encrypted Communications and Confidentiality**.  The government suggests that a conspiracy can be inferred from the use of encrypted communications and references to confidentiality.  *See, e.g.*, Trial Tr. 35:14-20  (July 15, 2019), ECF No. 324 (Gibbs:  "As you will hear, Alptekin and the defendant . . . worked hard to keep this confidential.  They only discussed Turkey's involvement in the project with a limited number of people, and they used various types of encryption to ensure that they could communicate securely about Gulen.").  But multiple witnesses testified that the use of encrypted communications is commonplace and unremarkable given the importance of cybersecurity.  *E.g.*, Trial Tr. 137:3-16 (July 16, 2019), ECF No. 325 (Nadarajah agreeing that it would be "unsurprising that companies would be taking steps to increase their cyber security and the security of their data"); Trial Tr. 524:21-525:6 (July 17, 2019),

ECF No. 331 (Boston agreeing that it is "not remarkable to you that this company that Mr. Flynn headed would use encryption software").  Nor is it remarkable that FIG would want to keep certain aspects of the project confidential.  *See* Trial Tr. 641:23-642:8 (July 17, 2019), ECF No. 331 (Miller:  "Q:  Do you think there's anything untoward about potentially keeping a client's identity as low profile as possible?  A:  No. . . .  Q:  Is it not unusual for a client to want to keep a low profile?  A:  No, it's not unusual.").

Given the many reasons why a company co-owned by a former military intelligence officer would want to protect its sensitive information—particularly at the beginning of a new representation—mere secrecy does not permit a reasonable inference of an unlawful conspiracy, as this Court has recognized.  *See* ECF No. 292 at 29 (although "[t]here is some mention [in the government's evidence] of 'confidentiality' and limiting the number of people privy to the discussions concerning the retention of FIG in communications between Alptekin and Rafiekian, . . . those references are in the context of Alptekin's then on-going, preliminary, formative business discussions with FIG.").

The government's premise is also wrong.  The idea that Rafiekian was interested in keeping the Inovo-related work a secret is inconsistent with the fact that Rafiekian sought legal advice about filing under FARA, and later publicly filed under the LDA based on the legal advice received.  Trial Tr. 858:4-8 (July 18, 2019), ECF No. 334 (Kelley).  Rafiekian also consulted with experienced attorneys at Covington, a respected law firm, in connection with the FARA filing.  Covington conducted extensive work to develop an objectively accurate explanation of FIG's work for Inovo, based upon interviews with several FIG personnel and review of pertinent emails, contracts, work product, and public information.  Trial Tr. 223:9-13 (July 16, 2019), ECF No. 326 (Kelner).  Although the government quibbles with some of the details of the FARA filing, this

Court has correctly held that any alleged inaccuracies in the filing are "not sufficient to allow any inference of the alleged conspiracies," in light of the robust disclosures contained therein.[7] [ECF No. 292 at 29]. There is a big difference between a general desire to maintain a low profile for sensitive work and a willingness to break the law to do so. While the evidence may establish the former, it falls well short of the latter.

(ii) **Failure to Disclose Turkey's Involvement to FIG Representatives**. The government next argues that a conspiracy may be inferred because Rafiekian did not disclose Turkey's connection to the project to "internal and external associates." *See generally* ECF No. 341 at 22-24. But this argument begs the question, as in the absence of evidence that Turkey directed and controlled the project, there was nothing for Rafiekian to disclose.

In its closing, the government relied heavily on Rafiekian's communications with Alptekin on August 10 and 11, 2016, which the government contended reflected a switch from Project Truth (contemplating work directly for the government of Turkey) to Project Confidence (contemplating work directly for Inovo). *See* Trial Tr. 1127-1131 (July 22, 2019), ECF No. 351. But there was no evidence that anything untoward was being hidden, as there was no evidence of Turkish direction and control in the first place. The government also cites the *absence* of email traffic reflecting the "switch." Trial Tr. 1130:11-22 (July 22, 2019), ECF No. 351. But that argument calls for immense speculation, given how many communications between Rafiekian and Alptekin

---

[7] Although the government insists that the FARA forms should have been worded differently, the evidence it relies on to argue that the information in the forms was false or incomplete is, as a practical matter, the same evidence that Covington relied upon when it prepared the forms. The trial confirmed that, with rare exceptions, Covington indeed had the relevant documents in its possession—including, for example various communications between Rafiekian and Alptekin, including emails in which Alptekin referenced communications with Turkish officials, the "green light" email (DEX 102G), and emails relating to the $40,000 payments from FIG to Inovo (DEX 102L). *See generally* DEX Ex. 102A-M. The only documents the government claims were not already in Covington's possession are the "Skype conversations involving Rafiekian and Alptekin," ECF No. 341 at 34, in which Alptekin claims to be in contact with Turkish officials in August and September—but those are the very same hearsay statements the Court properly excluded. And even considering the hearsay, as Covington might have, they do not materially add to the mix of information that Covington did have.

mentioned phone calls where such an exact conversation could have taken place.  *See, e.g.*, GEX 9 (Email from Alptekin to Defendant, July 29, 2016:  "Can we skype tomorrow am your time?"); GEX 8B, 11.

Once again, the government's premise is wrong.  The record makes clear that Rafiekian did *not* hide the existence of the New York meeting—the lone substantiated example of a contact between Rafiekian and Turkey—from his associates.  Although the government maintains that McCauley and Boston were both somehow misled about Turkey's involvement, ECF No. 341 at 22-23, its own evidence reveals that both of them were aware of the New York meeting with Turkish officials; indeed, McCauley attended it.  *See* Trial Tr. 405:19-24  (July 17, 2019), ECF No. 330 (McCauley and Woolsey, who were not part of the charged conspiracy, attended New York meeting); ECF No. 341 at 35 n.19 (government acknowledging that "McCauley, who only worked on Project Confidence for FIG, was nonetheless invited to the New York meeting."); Trial Tr. 455:5-19  (July 17, 2019), ECF No. 330 (Boston)  ("Q:  At some point, did the defendant tell you about a meeting that was planned for in New York City? A:  Briefly, yes.  He mentioned there was a high-level meeting in New York. . . .  Q:  And when he told you it was a high-level meeting in New York, what did he say, if anything, about who these high-level people were? A:  They would be senior officials from the Turkish government.").

The government also argues that, to hide the supposedly "true" identity of his client, Rafiekian "repeated the same false cover stories to multiple individuals" *i.e.*, that the project was funded by a "private business[]" with the goal of improving confidence in the Turkish economy. [ECF No. 341 at 6-7].  That narrative, however, *is true*:  The government's uncontradicted evidence showed that FIG's work came directly from Alptekin's bank accounts, not from Turkish government sources.  And while the engagement ultimately focused on Gulen, the government's

witnesses testified there was a clear connection between the Turkish economy and Gulen, who was believed to be having a negative impact on economic stability in Turkey.  Trial Tr. 597:24-598:13 (July 17, 2019), ECF No. 331 (Miller); *id.* 635:24-636:7 (Miller:  "Q:  There was a connection in your mind, I believe you testified on direct, between Gulen, the coup, and economic stability in Turkey, correct?  A: Correct.  Q:  And that was the understanding at that first meeting?  A:  Yes.  Q:  And that was your understanding at subsequent meetings as well?  A:  Yes."); *see also id.* 449:1-12 (July 17, 2019), ECF No. 330 (Boston, noting connection between the coup and the tourism industry in Turkey); *id.* 705:4-9 (July 18, 2019), ECF No. 333 (Courtovich:  "[I]t was explained to us that private investors around the world are not understanding the Gulen role in trying to drive instability in Turkey.").[8]

**(iii) $40,000 Payments from FIG to Inovo**.  The government relies heavily on two $40,000 payments from FIG to Inovo, which the government labels a "kickback for acting as an intermediary with the Turkish government."  [ECF No. 341 at 19].  But the trial evidence showed that Alptekin first paid FIG, and FIG sent back a portion of those payments to Inovo, a company wholly owned and controlled by Alptekin.  (GEX 25A, 34, 38).  Given that money was both coming from and returning to Alptekin, it is purely speculative to assume that this was evidence of an illegal kickback rather than a refund or consulting fee, or even that the original source of the funds was the Turkish government rather than "some wealthy Turkish businessmen."  Tr. 395:22-24 (July 17, 2019), ECF No. 331 (McCauley); *see id.* at 384:22-385:20 (government did not seek Turkish banking records).  As this Court aptly observed, "[w]hatever inferences can be reasonably

---

[8] That the government never understood the linkage between a focus on Gulen and the political and economic stability of Turkey does not mean that Alptekin or Rafiekian did not see such linkage.  The government chose to dwell extensively on Rafiekian's example of the simple cleric sitting under the apple tree.  Given how that turned out for Rafiekian's native land, there is little wonder why he would see a link between exposing Gulen as a malefactor and political and economic stability in Turkey.

drawn from that arrangement, one cannot reasonably infer an agreement or understanding that Rafiekian would act as an undisclosed Turkish agent or cause the filing of a false FARA statement." [ECF No. 292 at 31].

 **(iv) "Parallel" Statements to Covington**.  The government also contends that Rafiekian, Alptekin, and Flynn all made false and "substantially identical" statements to Covington regarding (a) "the nature of the New York meeting with Turkish ministers and the meeting's connection to Project Confidence; (b) the nature of the payments to Alptekin; (c) the direct solicitation of Flynn's op-ed by Alptekin and his subsequent involvement in it; and (d) Alptekin's direct coordination with Turkish ministers throughout all of Project Confidence."  [ECF No. 341 at 7].  Besides hinging on out-of-court statements that cannot be considered for their truth, this argument fails for multiple additional reasons:  the statements were not false, they were not parallel, and they were often not material to the alleged conspiracy.

*The New York Meeting*.  The government claims a conspiracy can be inferred from allegedly parallel false statements regarding the September 19, 2016 meeting in New York, including Rafiekian's statement that the meeting was "unrelated to Project Confidence."  This statement, however, was not false:  the undisputed evidence at trial was that Project Confidence *was not* a topic at the meeting.  Trial Tr. 440:14-17 (July 17, 2019), ECF No. 330 (McCauley:  Q: "And at this meeting, there was really no discussion at all of FIG and any work that FIG was doing, correct?  A:  No, sir, there wasn't.").  It was also not made in parallel with any alleged co-conspirator:  neither Flynn nor Alptekin made any similar statement to Covington.  Kelner testified to Flynn's hearsay statement that the "Inovo contract"—*i.e.*, Project Confidence—*was* a brief topic of discussion at the meeting.[9]  Trial Tr. 231:16-21 (July 16, 2019), ECF No. 326.  And Alptekin

---

[9] Flynn's statement is hearsay and inadmissible for its truth.

did not make any statement to Covington on this topic, false or otherwise. *See generally* GEX 93B. Finally, the FARA filing disclosed that the meeting was "for the purpose of understanding better the political climate in Turkey at the time, *as background for the project*." DEX 60 at 0025 (emphasis added). Although both Rafiekian and Flynn received a copy of the draft FARA filing, neither objected to this characterization or suggested that it be revised. *See* Trial Tr. 254:12-255:4 (July 16, 2019), ECF No. 326 (Kelner). If the government's theory were correct, one might expect *both* of these men to object to the inclusion of that sentence, which would supposedly contradict their "cover story."[10] That neither person did so is compelling evidence that no such conspiracy existed.[11]

 *Alptekin's Involvement in the Op-Ed.* The government relies on statements allegedly made by Rafiekian, Flynn, and Alptekin relating to the op-ed, including Rafiekian's statements that the op-ed was "not part of Project Confidence" and that it was "General Flynn's idea to write it." ECF No. 341 at 36 (quoting Tr. 235:2-12 (July 16, 2019), ECF No. 326 (Kelner)). The evidence at trial, however, supports Rafiekian's statement that the op-ed was not part of FIG's work for Inovo. In particular, Boston testified that although the topic of an op-ed was discussed with Alptekin during a phone call on October 7, 2016, the participants on the call determined that "*an op-ed would be outside the scope of the original contract*," and that an op-ed "would need additional funding." Trial Tr. 484:2-11 (July 17, 2019), ECF No. 330 (emphasis added). There was no evidence that

---

[10] In fact, Rafiekian did object to certain aspects of the filing, indicating that he had no problem raising such concerns with Covington, and lending greater evidentiary weight to his silence. *See* Trial Tr. 254:12-255:4 (July 16, 2019), ECF No. 326.

[11] At bottom, the government's argument is an illustration how the government has distorted innocent facts into a speculative case for guilt. Different people could have different subjective judgments about what the New York meeting was about. Rafiekian understandably could have thought it was unrelated to Project Confidence because FIG's work for Inovo never came up during the meeting. Someone else, sitting in the same meeting, might have thought it was related to Project Confidence because the discussion largely focused on Gulen, the same topic FIG was focused on. In that case, both would have been telling the truth. In any event, what is material to the charge of conspiracy to make a false statement is that Covington had all of the pertinent information and accurately described the September 19 meeting in New York.

Alptekin ever gave additional funding to FIG that might bring the op-ed within the scope of the engagement.[12] Nor was there any record evidence contradicting Rafiekian's statement that the idea for the op-ed originated with Flynn, such as testimony from Flynn himself.

The government has also suggested that Rafiekian lied to Covington when he said that Alptekin was not happy about the op-ed and did not want it to be published. *See* Trial Tr. 238:5-9 (July 16, 2019), ECF No. 326. But there is support in the record for this statement as well: Alptekin expressed "concern" about the op-ed, yet Flynn ignored this concern and published it anyway. *See* DEX 48A (Email from Rafiekian to Alptekin, dated Nov. 4, 2016: "The attached article will be published on Monday. . . . I told MF [Michael Flynn] about your advice and concern. He wants you to know that he appreciates your professional and valuable advice on a personal level."). Finally, the FARA filing disclosed considerable detail about the op-ed, including that it was "based, in part, on research conducted by Flynn Intel Group under the Inovo engagement," that "the op-ed addresse[d] subject matter related to the research that Flynn Intel Group conducted for Inovo," and that "a draft of the op-ed was shared with Inovo in advance of publication." DEX 60 at 0026. Again, if Rafiekian and Flynn had been engaged in a conspiracy to obscure Inovo's connection to the op-ed, one might have expected them to object to these disclosures. They did not.

*FIG's Payments to Inovo.* Next, the government argues that a conspiracy can be inferred from allegedly false and parallel statements relating to the FIG payments to Inovo, which Rafiekian had characterized as "refunds" for "public relations and lobbying services that had not been rendered by FIG but which Alptekin had been expecting." But Flynn made no parallel statement

---

[12] The government's reliance on a single ambiguous statement in a single email—"[a] promise made is a promise kept" (GEX 45A)—is far too circumstantial and speculative to support a guilty verdict, given Boston's clear and unrebutted testimony that an op-ed was outside the scope of the engagement.

on this issue, and Alptekin's only "parallel" statement came in the form of a memorandum Alptekin's outside lawyer prepared on FARA issues.  GEX 93B; Trial Tr. 238:22-239:1 (July 16, 2019), ECF No. 326.  That memorandum noted that Alptekin had "argued Inovo should be reimbursed for part of the retainer since both the Lobbying and PR components never materialized," but it stopped short of referencing any specific payments or characterizing them as refunds.  Nor was there any evidence to suggest that referring to these payments as "refunds" rather than "consulting fees" was in any way material, or that Alptekin and the Defendant would have any motive to lie about the characterization of these payments.

   *Alptekin's Alleged Coordination with Turkish Ministers.*  The government also argues that both Rafiekian and Flynn lied to Covington by stating that the Turkish government was not involved in the project, and by failing to disclose that Alptekin was coordinating with Turkish government officials for the duration.  [ECF No. 341 at 35].  Once again, that argument begs the question by assuming that those statements were lies, despite a lack of admissible evidence that Alptekin was actually coordinating with Turkish officials.   All of the admissible evidence on which the government relies to argue that Rafiekian and Flynn lied to Covington was in the hands of Covington when the law firm prepared the FARA forms.  In language Covington chose, those FARA forms accurately *disclosed* that (1) the engagement could be construed to principally benefit Turkey, (2) FIG representatives met with Turkish officials in New York City, and (3) Alptekin consulted with Turkish officials regarding the potential engagement of FIG.  DEX 60 at 0001, 0026, 0031.  If a conspiracy existed to hide Turkey's supposed connection to the project, one would expect both Rafiekian and Flynn to object to these disclosures—yet once again, there is no evidence that either of them did so.  *See* Trial Tr. 254:12-255:4 (July 16, 2019), ECF No. 326 (Kelner).

***

Whether each category is viewed in isolation or all the categories are viewed cumulatively, the result is the same:  there is simply no substantial evidence that would allow a rational trier of fact to find Rafiekian guilty beyond a reasonable doubt.  Because the government's circumstantial evidence is at least equally compatible with a "theory of innocence"—that Rafiekian agreed to act solely on behalf of Inovo/Alptekin, and had never agreed to act at the direction or control the Turkish government—the jury necessarily must have entertained a reasonable doubt, and the court should enter judgment of acquittal.  *Glenn*, 312 F.3d at 70.

> ## 2.  *There Was No Substantial Evidence of Conspiracy to File a False FARA Statement*

As this Court has previously recognized in determining that the government had failed to establish the existence of a conspiracy by a preponderance of the evidence, "what was disclosed in the FARA statement is not sufficient to allow any inference of the alleged conspiracies," considering that its extensive disclosures included the following:

> (1) Turkey could be viewed as the primary beneficiary of FIG's work;

> (2) FIG worked at the direction of and under the control of Inovo, a foreign principal;

> (3) FIG was aware that Alptekin and Inovo consulted with Turkish officials regarding potential work by FIG, and Alptekin introduced FIG officials to Turkish officials at a meeting on September 19, 2016, but Inovo had represented to FIG, through Inovo's counsel, that no part of its fees paid to FIG was provided by any foreign government;

> (4) FIG's work for Inovo pertained to both the business climate in Turkey and to Gulen;

> (5) Rafiekian and others participated in the drafting of the op-ed; and

> (6) Alptekin, through counsel, made representations concerning the retention of FIG that were not endorsed by FIG or its principals.

ECF No. 292 at 29-30 (footnotes omitted).  This Court further observed this was especially true given that Covington had in its possession "the e-mails and other documents the government contends reflects the alleged conspiracy." *Id.* at 31.

Nothing at trial changed those conclusions.  Under this Court's proffered jury instruction, the test of whether the FARA filing was "materially" false "is whether in light of any false statement or omission, the filed FARA registration statement and associated forms that have been received into evidence *failed to provide the information requested*."  Final Jury Instruction No. 35 (emphasis added).  As shown in the chart below, there was no substantial evidence offered to demonstrate that the FARA filing failed to provide that information.  On the contrary, viewed as a whole, there can be no serious dispute that the FARA form, which was carefully prepared over hundreds of hours of attorney time costing hundreds of thousands of dollars, disclosed all of the information requested:

| Alleged False Statement or Omission | Actual FARA Filing Disclosure |
| --- | --- |
| "[FIG] understood the engagement to be focused on improving U.S. business organizations' confidence regarding doing business in Turkey."  Indictment ¶ 62 | • The FARA filing disclosed in multiple places that the engagement "focused on Mr. Fethullah Gulen," DEX 60 at 0001, 0025. |
| Failure to disclose Turkey or Turkish ministers as foreign principals who directed and controlled the engagement.  Indictment ¶¶ 56, 58, 59, 60, 63, | • "[T]he engagement could be construed to have principally benefitted the Republic of Turkey . . . ."  DEX 60 at 0001;<br><br>• FIG met with members of the Turkish government in New York on September 19, 2016.  DEX 60 at 25-26, 31;<br><br>• "Alptekin consulted with officials of the Republic of Turkey regarding potential work by Flynn Intel Group." DEX 60 at 0031; |

| | |
|---|---|
| | • "Flynn Intel Group does not know whether or the extent to which the Republic of Turkey was involved with its retention by Inovo . . . ."  DEX 60 at 0031. |
| Inovo did not request or direct the op-ed.  Indictment ¶¶ 57, 61. | • The op-ed was "based, in part, on the research conducted by Flynn Intel Group under the Inovo engagement."<br><br>• The op-ed addresses "subject matter related to the research that Flynn Intel Group conducted for Inovo"<br><br>• "[A] draft of the op-ed was shared with Inovo in advance of publication."<br><br>• "No changes, other than technical edits, were made to the op-ed based on feedback from Inovo."<br><br>• "To the best of our knowledge, Inovo did not communicate with the Republic of Turkey regarding the op-ed or provide the draft op-ed to the government."<br><br>DEX 60 at 0026. |

Although the argument is presented here only in summary form because this issue has already been extensively briefed elsewhere, *see, e.g.,* ECF No. 195 (crime-fraud exception brief), there was nothing new at trial demonstrating that the FARA form was materially false or misleading.  With respect to the government's claim that the filing was false because the Inovo representation was not truly about the Turkish "business climate," for example, the evidence was undisputed that there was a direct link in the minds of the project participants between Gulen and Turkish economic stability.  *See, e.g.*, Trial Tr. 635:24-636:7 (July 17, 2019), ECF No. 331 (Miller: "Q:  There was a connection in your mind, I believe you testified on direct, between Gulen, the coup, and economic stability in Turkey, correct?  A: Correct.  Q:  And that was the understanding at that first meeting?  A:  Yes.  Q:  And that was your understanding at subsequent meetings as well?  A:  Yes."); *see also* Rule 29 Brief [ECF No. 342] at 24-25.

With respect to the government's contention that FIG falsely claimed that it did "not know whether or the extent to which the Republic of Turkey was involved with its retention by [Inovo] for the three-month project," Indictment ¶ 58, the *very next sentence* of the FARA filing disclosed Alptekin's contacts with Turkish officials.   DEX 60 at 0031.   No evidence admitted at trial suggested that (i) any communications with Turkey actually took place outside of the September 19 meeting in New York City, (ii) Rafiekian participated in, or had firsthand knowledge of, any such communications, or (iii) Alptekin accurately conveyed the substance of any such communications to Rafiekian.   Quite frankly, given the absence of personal knowledge of anyone at FIG regarding communications between Alptekin and Turkish officials, no competent counsel would have drafted the FARA forms to suggest that anyone at FIG did have knowledge "whether or the extent to which the Republic of Turkey was involved with [FIG's] retention by [Inovo]."

Finally, with respect to the government's claim that certain statements about the op-ed were misleading, it ignores the detailed description in the FARA filing itself, which belies the government's theory that Rafiekian intended the forms to be false (let alone willfully so).[13]

---

[13] The FARA form detailed the origin of the op-ed as follows:

In late October and early November 2016, Gen. Flynn of Flynn Intel Group developed an op-ed article based, in part, on the research conducted by Flynn Intel Group under the Inovo engagement. The op-ed was not written or published at the request of, or under the direction or control of, Inovo, the Republic of Turkey, or any other party.   No compensation was received for the publication of the op-ed.   In addition to Gen. Flynn, Bijan Rafiekian and an editor, Hank Cox, participated in the drafting.   Inovo, Mr. Alptekin, and the Republic of Turkey did not participate in the drafting. Nonetheless, the op-ed addresses subject matter related to the research that Flynn Intel Group conducted for Inovo, and a draft of the op-ed was shared with Inovo in advance of publication.   No changes, other than technical edits, were made to the op-ed based on feedback from Inovo.   To the best of our knowledge, Inovo did not communicate with the Republic of Turkey regarding the op-ed or provide the draft op-ed to the government.   S.G.R. LLC Government Relations and Lobbying assisted Flynn Intel Group with placement of the op-ed with *The Hill* publication.

DEX 60 at 0026.

Regardless, the ultimate question for the jury was not whether the FARA responses—which were carefully (and expensively) crafted by a team of skilled professionals—contained something the prosecution deemed false or misleading.  Rather, the question was whether the FARA form "failed to provide the information requested," and there is no substantial evidence that the FARA forms failed to do that.  Indeed, Kelner testified that not only were the ultimate disclosures accurate to his knowledge, Trial Tr. 286:2-292:8 (July 16, 2019), ECF No. 326, but that Rafiekian never asked Covington to alter or omit any of the above disclosures from the filing.  *See* Trial Tr. 254:12-255:4 (July 16, 2019), ECF No. 326 (Rafiekian did not ask to change FARA statements regarding Gulen); *id.* (Rafiekian did not ask to change FARA statements that representation could be construed to have benefited government of Turkey, or that Alptekin may have been in contact with Turkish officials); *id.* (Rafiekian did not ask to change statements about New York meeting's relationship to Project Confidence); *id.* (Rafiekian did not ask to change detailed description of op-ed creation).  The fact that Rafiekian left these disclosures undisturbed is incompatible with the government's theory that Rafiekian was conspiring with anyone else to willfully make false statements.

The tenuous nature of the government's case is further highlighted by the Defendant's slim connection to the FARA filing itself:  it was Michael Flynn, not the Defendant, who signed the majority of the filings, while the Defendant signed and approved only a single short form statement which contained virtually none of the statements that the government claims were false.  Trial Tr. 201:21-202:15 (July 16, 2019), ECF No. 325 (Gilday); *id.* at 330:4-7  (July 16, 2019), ECF No. 326 (Kelner, testifying that the Defendant gave authority to sign the "short form registration" only); *see generally* GEX 56, 58, 61, and 64 (FARA forms signed by Flynn); GEX 65 (short form registration signed by Rafiekian).

Lastly, even if one could conclude, contrary to the evidence, that certain aspects of the FARA filing were materially false or omitted material facts, the government still cannot prove Count One because it cannot prove that the Defendant *agreed with another person* that the FARA filing should contain those false statements or omit those material facts, for the reasons described above. This is particularly true because, as the Defendant has noted in prior briefing, the allegedly false statements that Rafiekian made to Covington bear almost no relation to the false statements or omissions that the government claims exist in the FARA filing. *See* ECF No. 195 at 20-21 (crime-fraud exception brief).

## II.   THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33

As discussed above, the government has failed to proffer substantial evidence sufficient to find Rafiekian guilty beyond a reasonable doubt on either count, and a judgment of acquittal under Rule 29 is the appropriate outcome. "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed," and in doing so "must specify the reasons for that determination." Fed. R. Crim. P. 29(d)(1). Regardless of whether it grants a judgment of acquittal, the Court should grant Rafiekian a new trial under Rule 33, which permits the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

Here, the interest of justice requires a new trial for five reasons: (A) the jury's verdict was against the weight of the evidence, (B) the cumulative effect of the limited-purpose hearsay evidence severely prejudiced Rafiekian; (C) the government improperly shifted the burden to Rafiekian to prove his innocence, (D) the indictment was fatally defective because it failed to specifically allege a critical element of Rafiekian's illegal activity, and (E) certain aspects of the final jury instructions misstated the applicable law.

### A.    The Evidence Weighed Strongly Against The Jury's Verdict

For all of the reasons discussed above in connection with Rafiekian's motion for judgment of acquittal, the government's failure to offer substantial evidence supporting a guilty verdict also warrants a finding that the verdict was against the weight of the evidence.  Regardless of whether the Court grants a judgment of acquittal, at a minimum it should grant a new trial under the court's "much broader" Rule 33 authority.  *See United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) ("When the motion [for a new trial under Rule 33] attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence.").  Significantly, "[i]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government." *Id.*  Thus, unlike Rule 29, "the trial court may grant relief if it determines that the evidence—even if legally sufficient to convict—weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Souder*, 436 F. App'x 280, 289 (4th Cir. 2011); *see, e.g.*, *id.* (reversing trial court's grant of judgment of acquittal while upholding conditional grant of new trial as against the weight of the evidence).

The Court's ruling excluding co-conspirator hearsay logically compels a finding that the jury's verdict was against the weight of the evidence with respect to Count One.  By definition, this Court has already found that the evidence, which did not support a conspiracy by a preponderance of the evidence, contradicted the jury's verdict.  Indeed, considering that the Court reached that judgment when considering all the hearsay for its truth, the government's case must necessarily be even weaker with same evidence excluded.  The same is true with respect to Count Two—the total absence of evidence of direction and control by Turkey, and the absence of any evidence that Rafiekian *knowingly* acted as an unregistered foreign agent, demonstrates that the verdict was against the weight of evidence on that count as well.

Accordingly, regardless of whether this Court grants the Rule 29 motion, it should at a minimum follow the logic of its co-conspirator ruling and find that, if the government could not make a preponderance showing even when considering all the hearsay evidence for its truth, *a fortiori* it cannot do so when that evidence is *excluded*.  Because the evidence weighs so heavily against the verdict of guilt beyond a reasonable doubt, a new trial should be granted.

### B.    The Government's Excessive Introduction Of Inadmissible Hearsay For A Limited Purpose Requires A New Trial

The sheer volume of inadmissible hearsay evidence the government introduced to the jury for a limited purpose also warrants a new trial.  Virtually all of the government's key exhibits— including every email exchange and Skype chat between the Defendant and Alptekin—were hearsay.  Through a pre-trial motion *in limine* and early on in testimony, Rafiekian objected to the admission of this hearsay, but the Court allowed its admission—though solely for its effect on the listener, rather than for its truth.  Trial Tr. 130:2-131:2 (July 16, 2019), ECF No. 325 (Court's initial limiting instruction).  The government made the most of that opportunity, introducing hundreds of pages of emails containing Alptekin's and Flynn's hearsay statements and other clear hearsay statements.  *See, e.g.*, Trial Tr. 723:3-9 (Courtovich describing Alptekin's hearsay question, "What am I going to tell Ankara?").

None of this hearsay evidence, however, was shown to actually have had any effect on Rafiekian.  *See United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993) ("[C]ourts have a responsibility to assess independently whether the ostensible non-hearsay purpose is valid.").  Moreover, "[t]he government's identification of a relevant non-hearsay use for such evidence . . . is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice."  *United States v. Becker*, 230 F.3d 1224, 1229

35

(10th Cir. 2000). This rule undoubtedly applies here, as the jury would have found it very difficult to ignore the hearsay statements for their truth.

Indeed, the government in its closing argument repeatedly cited these hearsay statements for their truth, despite the Court's limiting instruction, in order to suggest that the government of Turkey was directing and controlling the engagement. *See, e.g.*, Trial Tr. 1122:6-8 (July 22, 2019), ECF No. 351 ("What these e-mails tell you is that Alptekin is the conduit to the defendant from the ministers of the Turkish government."), *id.* at 1123:23-25 ("There's a bunch of emails that show that [Rafiekian] is in contact through Alptekin with the foreign ministers of Turkey . . . ."); *see also id.* at 1144:2-1145:18 (repeating phrase "What am I going to tell Ankara?" three different times).

Upon Rafiekian's objection, the Court repeatedly (and properly) instructed the jury not to consider the hearsay for its truth. But "[w]hile juries ordinarily are presumed to follow the court's instructions . . . , in some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994) (citation and internal quotation marks omitted); *see, e.g.*, *United States v. Cass*, 127 F.3d 1218, 1224 (10th Cir. 1997) (holding that the district court erred in admitting out-of-court statements for their effect on listener because the admission of such statements was extensive, the evidence went directly to the defendant's guilt, and the government used the evidence in opening statement and closing argument for the truth of the matters asserted); *Becker*, 230 F.3d at 1229 (similar).

Here, it is highly likely that the practical limitations of the jury were strained by the task of having to ignore the volumes of seemingly relevant—but unquestionably inadmissible—

hearsay evidence that comprised the bulk of the government's case.  Especially given how thin all of the other evidence was with respect to Rafiekian's connections to the Turkish government, it is likely that the jury failed to heed the Court's instruction not to consider the hearsay from Alptekin, Flynn, and others for their truth.  Moreover, the cumulative effect of this evidence ended up being highly prejudicial to Rafiekian, given that the government centrally focused on this hearsay evidence in its closing argument.  The Court should order a new trial to cure this prejudicial error.

**C.    The Government Improperly Shifted the Burden to Rafiekian to Prove His Innocence**

A new trial should also be granted because the government made arguments improperly shifting the burden of proof to Rafiekian.  It is well established that "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."  *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018).  That is exactly what the government did here.

Initially, during the government's examination of Special Agent Bryan Alfredo, the government elicited testimony that strongly implied that Rafiekian was required to come forward with evidence to prove his innocence:

> Q:  Now, we heard from FBI Forensic Examiner Rosecrans, that he created an image of both of the defendant's laptops that were seized pursuant to a warrant from the defendant.  Did the government produce a copy of those images to the defense in this case?
>
> A:  Yes, sir.
>
> Q:  Were they produced in a manner that would allow the defense to do word searches of their own or conduct other methods of examination that Mr. Rosecrans talked about?
>
> A:  I believe so.
>
> Q:  And what about the FIG e-mails from Covington that Mr. Nadarajah testified about?  Were those all turned over to the defense in this case?

A:  Yes, sir.

Q:  Were they produced in a manner that would allow the defense to do word searches and other methods of examination that Mr. Rosecrans talked about?

A:  Yes, sir.

Q:  What about the defendant's Gmail account?  Were those provided to the defense?

A:  Yes, sir.

Q:  And were those produced in a decrypted form that Mr. Rosecrans was able to untangle?

A:  Yes, sir.

Q:  Were they produced in a manner that would allow the defense to do word searches of their own and do other methods of examination that Mr. Rosecrans talked about?

A:  Yes, sir.

Q:  What about Mr. Alptekin's Gmail account?  Were all of those provided to the defense?

A:  Yes, sir.

Q:  Were they produced in a decrypted form?

A:  Yes, sir.

Q:  Were they produced in a manner that would allow the defense to do their own word searches and other examination that Mr. Rosecrans talked about?

A:  I believe so, yes.

Q:  What about other participants in the Turkey project, like Sphere?  Were all of those provided to the defense?

A:  Yes, sir.

Q:  Were they produced in a manner that would allow the defense to do word searches and other methods of examination?

A:  Yes, sir.

****

> Q:  So, Agent Alfredo, just to shorten this up, with respect to all of the electronic evidence that you had in this case available to you, was all of that turned over to the defense?
>
> A:  Yes, sir.

Trial Tr. 785:8-788:18 (July 18, 2019), ECF No. 333.  Upon objection, the Court cautioned the government that "the way [this evidence was] being presented does sound as if – you're giving the jury the impression that the defense should come forward with evidence of these items."  *Id.* at 787:24-788:4.

Later, during its closing argument, the government used Alfredo's improper testimony as a springboard to argue that Rafiekian should have introduced evidence to rebut the government's case and prove his innocence:

> [W]hen they do choose to put on a case, you can presume that these fine lawyers here put on the very best case they possibly could, they possibly could to explain all of this.  And what kind of explanation did you hear for this midnight-hour shift from truth to confidence, from the government of Turkey, yes, we're working for the government of Turkey, to all of a sudden, no, it's a completely separate thing.  It sprang up out of nowhere.  Just by happenstance happened to occur right at midnight, this thing with the government went away, and all of a sudden at midnight, we had this separate thing with Turkish businessmen.  Astonishing bit of good luck.
>
> But you didn't see any e-mails of that kind.  As you heard, they had access to the very same evidence we did, the very same e-mails, those thousands, tens of thousands of e-mails that they had access to.  Not a single shred of evidence did they choose to put in in their case trying to explain that midnight hour between August 11 and -- pardon me -- 10th and 11th.
>
> To be clear, our burden is to prove him guilty beyond a reasonable doubt, but if they put on a case, you can expect that it would be the best one they can, and it certainly wasn't much.

Trial Tr. 1180:20-1181:17 (July 22, 2019), ECF No. 351.  Again, upon objection, the Court noted its "concern[]" that this argument improperly shifted the burden to Rafiekian, and it agreed to caution the jury that the jury instructions should control their deliberations.  *Id.* at 1188:10-25, 1189:19-1190:3.  The Court gave only a general instruction, however, and declined to specifically

address or correct the government's improper argument.  *See id.* at 1189:19-23 ("Ladies and gentlemen, in the instructions I gave you, I indicated that both sides may refer to the jury instructions, but if what they tell you is different than what you're instructed by way of my instructions, you obviously are to be bound by the instructions that I've given you.").

In determining whether a defendant's due process rights were violated by a prosecutor's remarks, courts consider "(1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *Saint Louis*, 889 F.3d at 156.

There can be no real doubt that the government's remarks were improper.  "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364.  For that reason, a defendant need not disprove the government's case nor prove innocence; indeed, the defendant need not put on any defense at all.  *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).  Nevertheless, during its case-in-chief, the government strongly implied that Rafiekian had an obligation to wade through the same categories of evidence Agent Alfredo described and come forward with exculpatory evidence.  Later, in closing argument, the government again argued that, despite Rafiekian's counsel having the "very same evidence we did, the very same e-mails," there was "[n]ot a single shred of evidence [that] they choose to put in in their case" in exculpation—stating quite explicitly that Rafiekian's guilt was demonstrated by his failure to "put in" proof of innocence.  That line of argument is plainly improper.

The question then becomes whether it was prejudicial, which turns on such non-exclusive factors as "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the

remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *St. Louis,* 889 F.3d at 157. Here, the offending remark in closing argument followed a lengthy elicitation of all of the categories of evidence from which Rafiekian *could have* introduced evidence. That remark, moreover, was prominently placed in the government's closing arguments, in which the government was emphasizing the event it contended was the origin of the central conspiracy in the case. There is no suggestion that the remark was invited by any improper conduct by defense counsel, and as noted, the general curative instructions did not address the specific offending point.

Most importantly, as discussed at length above and as this Court has already recognized, the case against Rafiekian was highly circumstantial and speculative. Given the absence of concrete corroborative evidence supporting the charges, the government's improper burden shifting may well have misled the jury and made the difference between a verdict of guilty and not guilty. The Court should grant a new trial to correct the government's error.

### D. The Superseding Indictment Is Defective Because It Fails to State an Essential Element of the Charged Offense.

A new trial should be granted because of an uncured defect in the Superseding Indictment. Specifically, that Indictment fails to specify the statute or regulation Rafiekian violated that would make his conduct anything other than a "legal commercial transaction," an essential element of 18 U.S.C. § 951.[14]

---

[14] Although the Court has already denied Rafiekian's motion to dismiss the indictment on a similar ground (despite deeming it a "close issue," ECF No. 292 at 24), Rafiekian respectfully makes this argument here because the Court's prior order did not address this specific argument regarding the impact of *United States v. Daniels*, 973 F.2d 272 (4th Cir. 1992).

Count Two of the Superseding Indictment charges the Defendant with acting as an unregistered agent of a foreign government in violation of 18 U.S.C. 951, while Count One(a) charges Rafiekian with conspiracy to act as an unregistered agent.  Section 951 exempts from liability "any person engaged in a legal commercial transaction."  18 U.S.C. § 951; *see* 28 C.F.R. § 73.1(f) (defining a "legal commercial transaction" as sales or exchanges "not prohibited by federal or state legislation or implementing regulations").

As the Court correctly noted in its July 9, 2019 order, "the legal commercial transaction limitation on Section 951's coverage constitutes a substantive offense element rather than an affirmative defense," and therefore must be "alleged and proven by the United States in order to establish a violation of Section 951."  [ECF No. 292 at 16].  Although the Superseding Indictment itself failed to specify any regulations that rendered his underlying conduct illegal, the government argued at the motion to dismiss hearing for the first time that the indictment adequately alleged that Rafiekian acted illegally by failing to register under FARA.  Deeming it a "close issue," the Court agreed, holding that the Superseding Indictment was sufficient because paragraphs 56-57 sufficiently "allege that the FARA statement that was filed failed to disclose, as required, that Rafiekian had acted on behalf of the Turkish government."  ECF No. 292 at 24.

With respect, the Court's conclusion was error.  Under similar circumstances, the Fourth Circuit has held that an indictment is fatally defective—and justifies vacating a guilty verdict— when it fails to *specifically name* the precise statutory offense that would render otherwise legal conduct illegal.  In *United States v. Daniels*, 973 F.2d 272 (4th Cir. 1992), defendant Daniels was charged with transferring a firearm in violation of 26 U.S.C. § 5861(e), which made it unlawful for any person "to transfer a firearm in violation of the provisions of this chapter."  *Id.* at 273-74. Because the original indictment failed to specify which "provision[] of th[e] chapter" Daniels was

allege to have violated, the trial court permitted the government on the eve of trial (and over Daniels's objections) to amend the indictment to add a reference to the provision Daniels allegedly violated, 26 U.S.C. § 5812(a) (providing that a firearm may not be transferred without a written application, taxes, and approval by the Secretary of the Treasury).  Daniels proceeded to trial and was convicted on the § 5861(e) count.

On appeal, the Fourth Circuit reversed Daniels's § 5861(e) conviction and remanded with instructions to dismiss the count.  The court of appeals determined that, "[a]lthough the indictment returned by the grand jury properly charged Daniels with the knowing transfer of a firearm, it utterly failed to charge that Daniels had accomplished this transfer in violation of the provisions of Title 26, Chapter 53, except by reference to § 5861(e)."  *Daniels*, 973 F.2d at 275.  It recognized that "the mere citation to the statute of which the defendant is charged"—*i.e.*, § 5861(e)—was "insufficient to cure the failure of the indictment . . . because the citation alone does not insure that the grand jury considered and found each of these elements," including the required cross-reference to § 5812(a).  *Id.*  The court acknowledged that this ruling may appear "hypertechnical, especially in light of Daniels' concession that he had adequate notice of the charges against him and the fact that Daniels received a fair trial[.]"  *Id.* at 276.  Nonetheless, the court found the "absence of prejudice . . . irrelevant."  *Id.* at 275.  Under controlling precedent, Daniels was entitled to an indictment before a grand jury that specifically named the statutory provision he allegedly violated—and without one, reversal was mandatory.  *See id.* at 275-76.

As in *Daniels*, the indictment in this case is fatally defective because the Superseding Indictment did not name, and thus the grand jury did not consider, an essential element of the offense—namely, the statutory or regulatory provision demonstrating that Rafiekian engaged in conduct other than a legal commercial transaction.  It is undisputed that the Superseding Indictment

43

neither specifies the FARA provisions the government contends Rafiekian violated (22 U.S.C. §§ 612(a) and 618(a)(1)), nor otherwise contends that Rafiekian acted in violation of FARA's registration requirements.  Under *Daniels*, that circumstance requires reversal of his convictions under both Count Two and Count One(a)—regardless of whether Rafiekian was adequately on notice of the government's theory, whether such a post-trial reversal of the verdict is considered "hypertechnical," or even whether Rafiekian suffered any prejudice.

### E.    A New Trial is Warranted to Correct Erroneous Jury Instructions

The Court should also order a new trial to correct two errors in the final jury instructions. To receive a new trial based on erroneous jury instructions, a defendant must show "both that the instructions did not adequately state the law and that the error was prejudicial to him because the jury was likely to be confused or misled."  *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (alteration omitted).  Here, the jury instructions were erroneous in at least two respects:  (1) the instructions failed to provide an accurate definition of "materiality," and (2) the instructions failed to incorporate the relevant principles from the Supreme Court's decisions in *Liparota v. United States*, 471 U.S. 419, 426 (1985).  Both errors were prejudicial.

### 1.    The Jury Instructions Did Not Accurately Define "Materiality"

Count One-(b) required the government to prove that Rafiekian conspired to make a *materially* false statement or omit a *material* fact in a FARA filing.  22 U.S.C. § 618(a)(2).  With respect to the element of materiality, the Court instructed the jury:

> For the purposes of determining whether a false statement of fact or an omission of a fact was "material" the test of materiality is whether in light of any false statement or omission, the filed FARA registration statement and associated forms that have been received into evidence failed to provide the information requested.

Trial Tr. 1104:2-7 (July 22, 2019), ECF No. 351.  This instruction failed to give sufficient guidance to the jury.  The common understanding of the word "material" connotes some level of importance,

significance, or ability to influence. *See* Black's Law Dictionary (defining "material" to mean, among other things, "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"). When interpreting a statute, courts must give words their "ordinary or natural" meaning. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). The Court's instruction, however, omitted the ordinary and natural meaning of the word "material." Under the given instruction, the jury was misled into believing that a conspiracy could be based on even trivial or insignificant misstatements or omissions. Indeed, the jury instruction appears to render superfluous the word "material," as any false statement or omission, no matter how immaterial, could be described as failing to provide the information requested. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

The failure to instruct the jury that a misstatement or omission must be significant, important, or capable of influencing government action operated to Rafiekian's prejudice. As the Court has recognized, the disclosures in the FARA filing were robust, to the point that any purported false statements therein were insufficient to allow an inference of a conspiracy. [ECF No. 292 at 29-30]. As a result, any misstatements or omissions identified by the jury were likely to be minor and unimportant—*i.e.*, immaterial. The government, moreover, failed to introduce any evidence that the alleged false statements and omissions in the FARA filing would have influenced any government agency to act any differently. *See* Trial Tr. 186:19-24 (July 16, 2019), ECF No. 325 (Gilday testifying that he takes no steps to investigate the information listed FARA filings and has no authority to do so). Yet based on the Court's instruction, the jury may have found Rafiekian guilty based on minor inaccuracies that "failed to provide the information

requested," but that would not have actually mattered to anyone.  This was error, and the Court

should grant a new trial to correct it.

### 2.    *The Jury Instructions Failed to Incorporate* Liparota

The Court also erred in its formulation of the "knowledge" element of Section 951 by

failing to properly incorporate the Supreme Court's holdings in *Liparota*.  In *Liparota*, the Supreme

Court explained that when a statute "criminalize[s] a broad range of apparently innocent conduct,"

the government is required to prove that the "defendant knew he was acting in a manner not

authorized by statute or regulations."  471 U.S. at 423, 426.  Notwithstanding *Liparota*, this Court

held that, "since 951 is a general intent crime, it does not require that the defendant knew that the

filing itself was required, only that he knew that he had not provided the notification to the attorney

general."  Trial Tr. 1075:16-1076:10 (July 22, 2019), ECF No. 351.  The Court thus instructed the

jury that the government was required to prove the following with respect to Rafiekian's

knowledge:

> that Bijan Rafiekian acted knowingly, that is, that he knew he was a person who
> agreed to operate within the United States subject to the direction and control of a
> foreign government or official, and to engage in conduct other than a legal
> commercial transaction as defined in Instruction 35 that I've read to you, and that
> *he knew that he had not provided prior notification to the attorney general.*

Trial Tr. 1108:19-25 (July 22, 2019), ECF No. 351 (emphasis added).

That was error.  The statutory provision at issue in *Liparota* was also a general intent crime.

But the Supreme Court's decision did not focus on that fact, but rather noted that the statute would

criminalize otherwise innocent behavior without a heightened mens rea.  Accordingly, to protect

the accused, the statute had to be read to require the defendant knew he was acting in a manner not

authorized by the statute or regulations.  Because the underlying conduct in this case—lobbying

and other commercial activities—is not inherently illegal unless one fails to register, the same rule

should apply. ECF No. 292 at 23.

The Court's error in declining to instruct the jury that it needed to find that Rafiekian *knew* not only that he had not provided prior notification to the attorney general, but also that he was acting in a manner not authorized by FARA or Section 951, prejudiced Rafiekian. As previously discussed, the jury was presented with unrebutted evidence that Rafiekian consulted with experienced attorneys and followed their advice. As a result, there was ample evidence from which the jury could have found Rafiekian not guilty based on the fact that, even if what he did was *actually* illegal because of a requirement to file under FARA, he never knew that his conduct was unauthorized by statute or regulation. Had the jury been properly instructed, there is a strong likelihood it would have found Rafiekian not guilty. The Court should grant a new trial to remedy this defect.

## CONCLUSION

The Court should grant Defendant's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 as well as conditionally grant him a new trial. In the alternative, the Court should grant Rafiekian's motion for a new trial under Federal Rule of Criminal Procedure 33.

Dated: August 17, 2019                                    Respectfully submitted,

                                                         */s/*_____
                                                         Mark J. MacDougall (*Pro Hac Vice*)
                                                         Stacey H. Mitchell (*Pro Hac Vice*)
                                                         James E. Tysse (VA Bar #73490)
                                                         John C. Murphy (*Pro Hac Vice*)
                                                         Adam A. Bereston (*Pro Hac Vice*)
                                                         Samantha J. Block (*Pro Hac Vice*)
                                                         *Counsel for Bijan Rafiekian*
                                                         Akin Gump Strauss Hauer & Feld LLP
                                                         2001 K Street, NW
                                                         Washington, DC 20006
                                                         Telephone:  (202) 887-4000
                                                         Fax:  (202) 887-4288

E-mail:   mmacdougall@akingump.com
shmitchell@akingump.com


/s/
Robert P. Trout (VA Bar # 13642)
*Counsel for Bijan Rafiekian*
Trout Cacheris & Solomon PLLC
1627 Eye Street, NW
Suite 1130
Washington, DC 20006
Telephone:  (202) 464-3311
Fax:  (202) 463-3319
E-mail:   rtrout@troutcahceris.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on the 17th day of August 2019, true and genuine copies of Defendant

Rafiekian's Memorandum of Law in Further Support of Motion for Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29 and in Support of Motion for a New Trial

Pursuant to Federal Rule of Criminal Procedure 33 were sent via electronic mail by the Court's

CM/ECF system to the following:

      James P. Gillis
      John T. Gibbs
      Evan N. Turgeon
      U.S. Attorney's Office (Alexandria-NA)
      2100 Jamieson Avenue
      Alexandria, VA 22314
      Telephone:  (703) 299-3700
      Email:  james.p.gillis@usdoj.gov
              john.gibbs@usdoj.gov
              evan.turgeon@usdoj.gov


                                    */s/*_____
                                    Robert P. Trout (VA Bar # 13642)