IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:18-cr-457-AJT-1 |
| BIJAN RAFIEKIAN, | |
| *Defendant*. | |

**UNITED STATES' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR ACQUITTAL OR A NEW TRIAL**

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Table of Authorities ................................................................................................. ii

Argument .................................................................................................................. 1

I.  Substantial evidence supported the jury's verdict. .......................................... 1

    A.  Defendant's legal analyses are wrong. ....................................................... 2

        1.  Defendant applies an incorrect sufficiency standard. ......................... 2

        2.  Inferences must be considered together with all other permissible inferences. . 6

    B.  Substantial evidence established that defendant acted as an undisclosed foreign agent. ........................................................................... 8

        1.  Substantial evidence established that defendant operated subject to Turkey's direction and control. ..................................................... 9

        2.  Substantial evidence established that defendant acted with the requisite knowledge. ................................................................... 14

    C.  Substantial evidence established that defendant engaged in a criminal conspiracy. ......................................................................... 16

        1.  Defendant's sufficiency challenges conflate a conspiracy conviction with its underlying substantive offense. ........................... 18

        2.  Substantial evidence established that defendant conspired to act as an undisclosed foreign agent. .............................................. 19

        3.  Substantial evidence established that defendant conspired to make materially false and misleading statements and omissions in FIG's FARA filings. ......... 29

II.  A new trial is unwarranted. ............................................................................ 34

    A.  The Court should not order a new trial on weight-of-the-evidence grounds. ......... 34

    B.  The Court's admission of hearsay evidence for a limited purpose was appropriate. ......................................................................... 36

    C.  The government never shifted the burden to defendant. ........................... 40

    D.  The superseding indictment is not defective. ........................................... 42

    E.  The jury instructions were not erroneous. ................................................ 44

        1.  The instructions appropriately defined materiality. ........................... 44

        2.  The instructions on defendant's knowledge were correct. ................. 46

Conclusion ............................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States*,
  417 U.S. 211 (1974) ................................................................................................ 25

*Boyce Motor Lines v. United States*,
  342 U.S. 337 (1952) ................................................................................................ 15

*Bryan v. United States*,
  524 U.S. 184 (1998) ........................................................................................ 15, 47, 48

*Cavazos v. Smith*,
  565 U.S. 1 (2011) ...................................................................................................... 1

*Cheek v. United States*,
  498 U.S. 192 (1991) ................................................................................................ 16

*Coleman v. Johnson*,
  566 U.S. 650 (2012) ...................................................................................... 5, 6, 7, 34

*Dirring v. United States*,
  328 F.2d 512 (1st Cir. 1962) ...................................................................................... 7

*Donnelly v. DeChristoforo*,
  416 U.S. 637 (1974) ................................................................................................ 38

*Glasser v. United States*,
  315 U.S. 60 (1942) .................................................................................................... 2

*Iannelli v. United States*,
  420 U.S. 770 (1975) ................................................................................................ 19

*Jackson v. Virginia*,
  443 U.S. 307 (1979) .............................................................................................. 1, 5

*Liparota v. United States*,
  471 U.S. 419 (1985) ............................................................................................ 47, 48

*McDaniel v. Brown*,
  558 U.S. 120 (2010) .................................................................................................. 5

*Ocasio v. United States*,
  136 S. Ct. 1423 (2016) ............................................................................................ 29

*Precision Piping & Instrs., Inc. v. E.I. du Pont de Nemours & Co.*,
  951 F.2d 613 (4th Cir. 1991) ...................................................................................... 5

*Richardson v. Marsh*,
  481 U.S. 200 (1987) ................................................................................................ 39

*Schwab v. Reilly*,
  560 U.S. 770 (2010) ................................................................................................ 45

*Staples v. United States*,
    511 U.S. 600 (1994) ............................................................................................ 48

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ............................................................................................ 45

*United States v. Ali*,
    735 F.3d 176 (4th Cir. 2013) ............................................................................. 11

*United States v. Allen*,
    716 F.3d 98 (4th Cir. 2013) ............................................................................... 21

*United States v. Aquart*,
    912 F.3d 1 (2d Cir. 2018) ..................................................................................... 4

*United States v. Arrington*,
    757 F.2d 1484 (4th Cir. 1985) ..................................................................... 35, 36

*United States v. Barsanti*,
    943 F.2d 428 (4th Cir. 1991) ............................................................................. 14

*United States v. Becker*,
    230 F.3d 1224 (10th Cir. 2000) ......................................................................... 39

*United States v. Belardo-Quinones*,
    74 F.3d 941 (1st Cir. 1995) ............................................................................... 18

*United States v. Boddy*,
    622 F. App'x 219 (4th Cir. 2015) ................................................................ 35, 36

*United States v. Bolden*,
    325 F.3d 471 (4th Cir. 2003) ............................................................................. 17

*United States v. Bright*,
    630 F.2d 804 (5th Cir. 1980) ............................................................................. 40

*United States v. Browning*,
    390 F.2d 511 (4th Cir. 1968) ............................................................................. 37

*United States v. Burfoot*,
    899 F.3d 326 (4th Cir. 2018) ............................................................................. 35

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) (en banc) ....................................................... passim

*United States v. Bursey*,
    416 F.3d 301 (4th Cir. 2005) ............................................................................. 15

*United States v. Campa*,
    529 F.3d 980 (11th Cir. 2008) ..................................................................... 46, 47

*United States v. Caraballo-Rodriguez*,
    726 F.3d 418 (3d Cir. 2013) (en banc) ............................................................... 3

*United States v. Carmichael*,
    685 F.2d 903 (4th Cir. 1982) ............................................................................. 17

*United States v. Cass*,
   127 F.3d 1218 (10th Cir. 1997) ................................................................ 39

*United States v. Caudle*,
   758 F.2d 994 (4th Cir. 1985) ............................................................. passim

*United States v. Chambers*,
   985 F.3d 1263 (4th Cir. 1993) ................................................................ 17

*United States v. Chavez*,
   894 F.3d 593 (4th Cir. 2018) ............................................................ 35, 36

*United States v. Chorman*,
   910 F.2d 102 (4th Cir. 1990) ................................................................. 17

*United States v. Daniels*,
   973 F.2d 272 (4th Cir. 1992) ............................................................ 42, 43

*United States v. Davis*,
   63 F. App'x 76 (4th Cir. 2003) .............................................................. 40

*United States v. Diaz-Calderon*,
   216 F. App'x 331 (4th Cir. 2007) ........................................................... 18

*United States v. Dumeisi*,
   424 F.3d 566 (7th Cir. 2005) ................................................................. 46

*United States v. Duran*,
   596 F.3d 1283 (11th Cir. 2010) ............................................................. 46

*United States v. Ellis*,
   121 F.3d 908 (4th Cir. 1997) ................................................................. 17

*United States v. Feola*,
   420 U.S. 671 (1975) ........................................................................... 29

*United States v. Fin. Comm. to Re-Elect the President*,
   507 F.2d 1194 (D.C. Cir. 1974) ............................................................... 8

*United States v. Fowler*,
   55 F. App'x 125 (4th Cir. 2003) ............................................................ 37

*United States v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ................................................................. 35

*United States v. Glantz*,
   810 F.2d 316 (1st Cir. 1987) ................................................................. 42

*United States v. Glenn*,
   312 F.3d 58 (2d Cir. 2002) ..................................................................... 3

*United States v. Gunther*,
   No. 96-4804, 1998 WL 29259 (4th Cir. Jan. 28, 1998) .......................... 17

*United States v. Hager*,
   721 F.3d 167 (4th Cir. 2013) ................................................................. 46

*United States v. Hughes,*
716 F.2d 234 (4th Cir. 1983)................................................................. 7, 8, 20, 24

*United States v. Iwuala,*
789 F.3d 1 (1st Cir. 2015) ........................................................................... 8

*United States v. Jennings,*
438 F. Supp. 2d 637 (E.D. Va. 2006)..................................................... 35, 36

*United States v. Jimenez Recio,*
537 U.S. 270 (2003) ................................................................................. 18

*United States v. Jones,*
471 F.3d 535 (4th Cir. 2006)................................................................. 40, 42

*United States v. Kellam,*
568 F.3d 125 (4th Cir. 2009)..................................................................... 17

*United States v. Leake,*
642 F.2d 715 (4th Cir. 1981)................................................................. 19, 37

*United States v. Lopez,*
74 F.3d 575 (5th Cir. 1996)......................................................................... 3

*United States v. Louthian,*
756 F.3d 295 (4th Cir. 2014)....................................................................... 2

*United States v. Lyons,*
740 F.3d 702 (1st Cir. 2014)..................................................................... 40

*United States v. MacPherson,*
424 F.3d 183 (2d Cir. 2005)......................................................................... 4

*United States v. Mares,*
940 F.2d 455 (9th Cir. 1991)..................................................................... 40

*United States v. Mayo,*
705 F.2d 62 (2d Cir. 1983)......................................................................... 43

*United States v. Min,*
704 F.3d 314 (4th Cir. 2013)..................................................................... 18

*United States v. Moye,*
454 F.3d 390 (4th Cir. 2006) (en banc)..................................................... 4, 6

*United States v. Nersesian,*
824 F.2d 1294 (2d Cir. 1987)....................................................................... 4

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010) (en banc)..................................................... 3

*United States v. Perry,*
335 F.3d 316 (4th Cir. 2003)..................................................................... 35

*United States v. Robinson,*
855 F.3d 265 (4th Cir. 2017)....................................................................... 2

*United States v. Runyon*,
    707 F.3d 475 (4th Cir. 2013) ................................................................ 39, 40

*United States v. Saint Louis*,
    889 F.3d 145 (4th Cir. 2018) ................................................................ 41, 42

*United States v. Schrader*,
    675 F.3d 300 (4th Cir. 2012) ...................................................................... 45

*United States v. Shahane*,
    517 F.2d 1173 (8th Cir. 1975) ...................................................................... 7

*United States v. Singh*,
    518 F.3d 236 (4th Cir. 2008) ...................................................................... 35

*United States v. Smith*,
    407 F.2d 35 (4th Cir. 1969) ........................................................................... 7

*United States v. Smith*,
    451 F.3d 209 (4th Cir. 2006) ...................................................................... 35

*United States v. Strickland*,
    245 F.3d 368 (4th Cir. 2001) ...................................................................... 17

*United States v. Vargas-Ocampo*,
    747 F.3d 299 (5th Cir. 2014) (en banc) ........................................................ 3

*United States v. Vidacak*,
    553 F.3d 344 (4th Cir. 2009) ...................................................................... 25

*United States v. Wicks*,
    187 F.3d 426 (4th Cir. 1999) ................................................................ 43, 44

*United States v. Williams*,
    479 F.2d 1138 (4th Cir. 1973) ................................................................... 40

*United States v. Wilson*,
    118 F.3d 228 (4th Cir. 1997) ...................................................................... 35

*United States v. Wilson*,
    133 F.3d 251 (4th Cir. 1997) ...................................................................... 48

*United States v. Wilson*,
    484 F.3d 267 (4th Cir. 2007) ................................................................ 24, 26

*United States v. Zayyad*,
    741 F.3d 452 (4th Cir. 2014) ........................................................................ 4

*United States v. Zitron*,
    810 F.3d 1253 (11th Cir. 2016) ................................................................. 40

*Wright v. West*,
    505 U.S. 277 (1992) ............................................................................... 8, 20

**Statutes**

18 U.S.C. § 951 ............................................................................................................ passim

22 U.S.C. § 612 ...................................................................................................... 44, 45, 46

22 U.S.C. § 618 ............................................................................................................ 17, 33

26 U.S.C. § 5812 ............................................................................................................... 43

**Rules**

Fed. R. Evid. 801 ............................................................................................................. 25

**Regulations**

28 C.F.R. § 73.1 ............................................................................................................... 16

## ARGUMENT

After hearing six days of evidence, a jury concluded that defendant Bijan Rafiekian conspired with Michael Flynn and Ekim Alptekin to hide their activities as foreign agents of Turkey from the United States government. In reaching this decision, the jury heard evidence that the conspirators' innocent explanations were pretextual; that they repeatedly lied about the true nature of their work; and that Rafiekian specifically mislead two separate lawyers to establish a smokescreen of legality surrounding these activities. The jury saw through these pretenses and, as the law permits them, concluded that defendant violated the law.

Defendant's challenges to the jury's verdict should be rejected. The Court may not reweigh the evidence or make new credibility determinations, and taking all rational inferences in favor of the government as required, substantial evidence supports the jury's conclusion. Defendant also fails to identify any error that would merit a new trial. The Court properly admitted Alptekin's statements to defendant for non-truth purposes—*i.e.*, to show defendant's state of mind and knowledge of the conspiratorial scheme. Defendant's additional claims of error—in the government's closing argument and in the Court's jury instructions—are equally unpersuasive. Likewise, defendant's challenges to the indictment and the jury instructions have already been rejected by the Court, and none of his additional arguments merit reconsideration.

Accordingly, the Court should deny defendant's motion for acquittal or a new trial.

## I.    Substantial evidence supported the jury's verdict.

The Supreme Court has consistently reiterated that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). Thus, "a jury verdict '*must be sustained* if there is substantial evidence, taking the view most favorable to the

Government, to support it.'" *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)) (emphasis in original). In reviewing a conviction for sufficiency, courts must "defer to the jury's determinations of credibility and resolutions of conflicts in the evidence, as they are within the sole province of the jury and are not susceptible to judicial review." *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014).

Here, the jury drew rational inferences from direct and circumstantial evidence to reach its guilty verdicts. In moving to set aside these well-supported verdicts, defendant invokes an incorrect standard and misapplies the law governing circumstantial evidence and conspiracies. Accordingly, the government addresses defendant's erroneous legal arguments before describing the evidence supporting the verdicts.

## A.      Defendant's legal analyses are wrong.

Defendant argues that this Court's evidentiary ruling on co-conspirator statements "compels" a judgment of acquittal. *See, e.g.*, Def. Br. 9. This argument misunderstands the difference between this Court's role as an evidentiary gatekeeper and as a reviewer of a jury's verdict. Moreover, defendant's argument interposes a standard of sufficiency directly contrary to binding Supreme Court and Fourth Circuit precedent. Finally, defendant's factual arguments impermissibly re-weigh isolated pieces of evidence, when governing law requires considering the evidence as a whole.

### 1.      Defendant applies an incorrect sufficiency standard.

Under well-established principles, a court reviewing the sufficiency of the evidence must view the record in its totality, draw all inferences it can in favor of the government, and determine whether the evidence and inferences are sufficient to permit any rational jury to find each element of the offense. *See United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017). By contrast, defendant proposes a different and incompatible standard: that to permit a verdict of guilty beyond

a reasonable doubt, the evidence cannot "give[] equal or nearly equal circumstantial support to a theory of guilt as it does to a theory of innocence." *E.g.*, Def. Br. 2; *see also* Def. Br. 8, 18–19, 28. For this premise, defendant invokes an out-of-circuit case (*see* Def. Br. 13 (citing *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)), which in turn drew from *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). This formulation of sufficiency review—often called the "equipoise rule"—is simply bad law. Both the Second and Fifth Circuits no longer apply *Glenn* or *Lopez*; the Fourth Circuit's cases are incompatible with the equipoise rule; and two additional federal courts of appeals, sitting en banc, have rejected it as impermissible under Supreme Court precedent.

In 2014, the Fifth Circuit reheard a case en banc in order to "abandon use of the 'equipoise rule'" because it presented the "inescapable" "potential to usurp the jury's function" and conflicted with the Supreme Court's articulated standard for sufficiency review. *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc). The Fifth Circuit concluded that sufficiency review is limited to considering "whether the inferences drawn by a jury were rational, as opposed to speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime." *Id.* at 302. Likewise, the Third and Ninth Circuits, also sitting en banc, have over-ruled their prior precedents applying the equipoise rule and have now instructed that motions for acquittal should be granted only when the evidence amounts to "mere speculation" or evinces "a total failure of proof of a requisite element." *E.g.*, *United States v. Nevils*, 598 F.3d 1158, 1165–67 (9th Cir. 2010) (en banc); *see also United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431–32 (3d Cir. 2013) (en banc) ("Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of suffi-ciency of the evidence challenges . . . .").

The Second Circuit has repeatedly rejected the reading of *Glenn* that defendant advances here: instead, it holds that a jury may draw inferences of guilt even where inferences of innocence are equally available. *See United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (holding that evidence is sufficient even if there is a "possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence"); *United States v. Nersesian*, 824 F.2d 1294, 1314 (2d Cir. 1987) ("That the evidence permits inferences that are consistent with innocence does not detract from its sufficiency."). The circuit just recently reiterated that *Glenn* cannot be applied as defendant wishes, holding that acquittal is only warranted where the "evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *United States v. Aquart*, 912 F.3d 1, 44–45 (2d Cir. 2018).

The binding precedent in this Circuit would not permit application of the equipoise rule in any event. The en banc Fourth Circuit has twice described sufficiency review in terms incompatible with that rule. *See United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) ("[W]here the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept."); *Burgos*, 94 F.3d at 859 (holding that "circumstantial evidence need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt"). More recently, the Fourth Circuit has explicitly stated that "it does not matter that the Government's evidence also supported innocent inferences," because "[t]he jury was entitled to reject the theory consistent with innocence and accept the one consistent with guilt, so long as there was substantial evidence for its choice." *United States v. Zayyad*, 741 F.3d 452, 464 (4th Cir. 2014). The Circuit has adopted this rule for good reason: the contrary approach is inconsistent with Supreme Court precedent.

4

In *Coleman v. Johnson*, the Supreme Court addressed the appropriate federal standard for distinguishing "a reasoned inference from 'mere speculation.'" 566 U.S. 650, 655 (2012). The Third Circuit had applied a standard for sufficiency that defined a reasonable inference as "one where the fact inferred is more likely than not to flow from the proved fact on which it is made to depend." *Id.* at 654–55. The Supreme Court reversed, holding that "the deferential federal standard" for sufficiency applied and "does not permit [that] type of fine-grained factual parsing." *Id.* at 655. Instead, "the only question under *Jackson*" is whether the jury's inference "was so insupportable as to fall below the threshold of *bare rationality*." *Id.* at 656 (emphasis added). This formulation reiterated the Supreme Court's past admonitions that courts should not set aside jury verdicts unless they conclude that no juror acting rationally could have found defendant guilty. *See, e.g.*, *McDaniel v. Brown*, 558 U.S. 120, 130–31 (2010) (noting as "clearly correct" the statement that "the purpose of a *Jackson* analysis is to determine whether the jury acted in a rational manner in returning a guilty verdict based on the evidence before it"); *see also Jackson*, 443 U.S. at 317 & n.9 (noting *Holland*'s rule that circumstantial evidence need not exclude every hypothesis except that of guilt).

In short, the Rule 29 standard does not permit the Court to re-weigh evidence as if it were another factfinder sitting alongside the jurors. Thus, the Court's weighing of the evidence as an independent evidentiary gatekeeper does not affect this analysis. Unlike on sufficiency review, the Court may—indeed, must—make conclusions on preliminary evidentiary questions based on its independent weighing of "the credibility and reliability of evidence." *Precision Piping & Instrs., Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 621 (4th Cir. 1991). But even if the Court credits an innocent inference more than a guilty one, that decision cannot displace the jury's contrary conclusion unless the guilty inference is irrational. *See Coleman*, 566 U.S. at 656. Thus, the

Court's conclusion that a conspiracy was not more probable than the lack of a conspiracy does not—and cannot—establish that the jury lacked substantial evidence to reach its guilty verdict. If the jury made credibility findings, weighed evidence, and drew inferences that the Court deems less likely than those the Court drew, that is the jury's prerogative. *See Moye*, 454 F.3d at 394.

Defendant's proposed role for the Court—determining whether the jury's inferences are more probable than inferences under the Court's view of the evidence—is exactly the role the Supreme Court and Fourth Circuit have emphatically rejected. The question for this Court is not whether, as defendant puts it, categories of evidence "are equally or more consistent with legal behavior." Def. Br. 19. The jury concluded that defendant's behavior was illegal; the proper question is whether the inferences of guilty behavior are "below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. So long as there was some evidence from which the jury could rationally infer the existence of a fact—even if the Court views that inference to be equally as or less likely than another—the verdict must be affirmed.

> ## 2.     Inferences must be considered together with all other permissible inferences.

Defendant commits a distinct legal error by isolating individual pieces of evidence from the whole and failing to consider them in conjunction with the rest of the evidence. Importantly, the law requires the Court to consider whether a chain of reasoning, linked by rational inferences, supports the jury's verdict. Defendant engages in no such analysis, divorcing each piece of evidence from its context and the other evidence introduced. For example, defendant insists on taking at face value certain witness testimony that defendant *told* others Alptekin was the client, rather than confronting the substantial evidence the government introduced that these statements were lies to cover up Alptekin's role as an intermediary. *See, e.g.*, Def. Br. 12–14. Defendant's myopic focus on some evidence to the exclusion of the rest of the case is not a permissible approach.

As the Fourth Circuit has explained, "critical to [a court's] review of sufficiency challenges is the complete picture that the evidence presents"; a court "must not rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation." *Burgos*, 94 F.3d at 863. Likewise, in *Coleman*, the Supreme Court condemned "fine-grained factual parsing" as inappropriate. *See* 566 U.S. at 655. *Coleman* itself illustrates just how circumstantial evidence may be taken to establish an element: There, the Court found that a jury could rationally infer the defendant's specific intent to kill, even though there was no direct evidence that the defendant ever threatened the victim himself or knew that his co-conspirator had a gun. *See id.* at 656. The Court relied on evidence that the co-conspirator had threatened to kill the victim earlier that day and was "noticeably concealing a bulky object under his trenchcoat" when the defendant accompanied him and the victim into an alleyway. *Ibid. Coleman* thus demonstrates how circumstantial evidence, taken as a whole, sustains a jury verdict, even if there are other reasonable explanations for each individual thread of the evidentiary tapestry.

Moreover, in evaluating circumstantial evidence, a jury is permitted to layer inferences upon one another in order to reach a conclusion of guilt. *See United States v. Hughes*, 716 F.2d 234, 240 (4th Cir. 1983) ("[T]he proper construction is to view the evidence together as a coordinated and interrelated whole."); *see also United States v. Shahane*, 517 F.2d 1173, 1178 (8th Cir. 1975) (citing cases). Likewise, the Fourth Circuit has long recognized that, so long as each inference in the chain meets the minimum threshold of rationality, the Court must defer to the jury's chain of reasoning. *See United States v. Smith*, 407 F.2d 35, 38 (4th Cir. 1969) (citing *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir. 1962)). In other words, there need not be only one inferential step between the evidence and the jury's conclusion; a series of rational inferences,

building on one another, may lead to a conclusion of guilt. *See, e.g.*, *United States v. Iwuala*, 789 F.3d 1, 11 (1st Cir. 2015).

Additionally, the jury's credibility determinations may themselves support the necessary factual findings for guilt. For example, if the jury discredits a defendant's innocent explanations for his conduct, it may consider the false explanations as "affirmative evidence of guilt." *E.g.*, *Wright v. West*, 505 U.S. 277, 296 (1992). Where the jury concludes that a defendant acted in a deceitful manner during the relevant conduct, it may view those lies as evidence of guilty intent. *See Hughes*, 716 F.2d at 240 ("'Secrecy or openness in the involved transaction are clear indicators of guilty intent or its absence.'" (quoting *United States v. Fin. Comm. to Re-Elect the President*, 507 F.2d 1194, 1197–98 (D.C. Cir. 1974))). Similarly, if the jury concludes that the defendant presented fabricated evidence or gave "false explanations that will aid in his defense," it may view that falsity as further evidence of guilty intent. *Id.* at 240–41. For example, as relevant here, the jury's determination that Project Confidence was a pretextual front for actions taken on behalf of Turkey not only rejects defendant's innocent explanation but—when coupled with the evidence that Alptekin, Flynn, and Rafiekian all perpetuated the same lies to obscure that fact—is a rational chain of inferences that permissibly supports the jury's finding of a criminal agreement.

In sum, when reviewing the evidence for sufficiency, the Court must consider the rationality of all inferences in light of the entire record, including other rational inferences that the jury could have also drawn in the government's favor.

### B. Substantial evidence established that defendant acted as an undisclosed foreign agent.

Defendant's challenge to his substantive conviction under 18 U.S.C. § 951 boils down to two propositions. First, he argues that there is insufficient evidence of Turkey's actual direction and control. *See* Def. Br. 11–13, 15. Second, he argues that the government was required to prove

that defendant knew that his conduct and lack of notification was illegal, essentially recapitulating his arguments that the required mens rea is willfulness. *See* Def. Br. 15–17. Neither of these arguments is correct.

### 1. Substantial evidence established that defendant operated subject to Turkey's direction and control.

The jury had substantial evidence from which to conclude that Project Confidence was subject to the direction and control of Turkey, with Alptekin acting as the intermediary. Defendant's claim that the trial was "almost entirely bereft of evidence connecting Turkey to Rafiekian" cannot be reconciled with whole record, particularly when all rational inferences are drawn—as they must be—in the government's favor.

First, the government introduced defendant's own statements admitting that the government of Turkey was the client. FIG's lawyer Robert Kelner testified that defendant told him that Project Truth "would have involved the Turkish government being the client" but that it had backed out and Project Confidence was "totally separate." Tr. 229:4–230:15 (Kelner). But of course, the government introduced overwhelming evidence that "Truth" and "Confidence" were one continuous project. For example, not one contemporaneous document or communication suggested that FIG's potential lucrative engagement by the Turkish government had fallen through. *See* Tr. 784:15–785:7 (Alfredo). Defendant used the same bullet points he had written up for Project Truth when reading others at FIG into Project Confidence. *Compare* GX 10, *with* GX 18. In a September 3, 2016, email discussing "Confidence," defendant stated that FIG had "been at work *on this engagement* since July 31st," when the project was still called "Truth." GX 22A (emphasis added); *see also* GX 10, 10A, 11–13 (emails dated July 30 through August 4). A jury is entitled to weigh this evidence against defendant's contrary description (which not a single piece of evidence

supported), conclude that defendant gave a falsely exculpatory explanation to Kelner, and infer that defendant was "lying in an attempt to cover up illegal activities." *Burgos*, 94 F.3d at 867–68.

Second, the government introduced evidence of actual contact with Turkish officials as a part of "Confidence," which defendant claimed was "completely separate" from "Truth." Notably, on September 19, 2016, defendant, Flynn, and Alptekin all met with Cabinet-level Turkish ministers in New York, including President Recep Tayyip Erdogan's son-in-law and Turkish Foreign Minister Mevlut Cavusoglu. Although defendant again told Kelner that this meeting was "unrelated to Project Confidence" (Tr. 231:25–232:6), defendant invited along Brian McCauley, who was FIG's lead investigator on Confidence and worked *only* on that project for FIG. *See* Tr. 390:8–13, 400:7–23. Defendant paid McCauley for his time with a check that had "for Confidence" on the memo line. Tr. 401:21–25; GX 34, at 1176. Indeed, defendant's lies are particularly stark in this instance, since he sent an email to FIG's employees on September 9 explicitly describing this meeting as "related to 'CONFIDENCE.'" GX 24B. Moreover, defendant prepared talking points for this September 19 meeting (GXs 103A, 103B) that he also distributed at a University Club meeting with Sphere Consulting the following day to discuss Confidence. *See* Tr. 689:9–690:12, 716:8–16. Again, the jury had ample evidence to reject defendant's denial of the connection between Project Confidence and the Turkish government and could further use that false denial to infer guilty conduct and intent.

Moreover, the jury could quite properly infer that the September 19 meeting comprised part of the government of Turkey's oversight and direction of the FIG engagement. Defendant's argument that "there was no discussion of FIG's work at this meeting, and no Turkish officials gave any orders to Rafiekian or FIG or asked them to do anything" contradicts the record. Def. Br.

13. The half-hour meeting exclusively focused on Gulen, and Foreign Minister Cavusoglu expressly informed defendant, Flynn, Alptekin, and other FIG attendees that the Turkish government wanted Gulen deported from the United States and tried in Turkey. *See* Tr. 408:20–409:14. The extradition of Gulen to Turkey was the "ultimate aim" of FIG's work on Confidence. Tr. 492:9–15, 495:14–496:12 (Boston); *see also* GX 114. An express statement by the Turkish Foreign Minister that he wants Gulen deported clearly permits the inference that this was direction by a principal to his agents about the purpose of the project. In conversations with McCauley immediately after the meeting, defendant described the necessity of showing results—*i.e.*, "that Gulen was, in fact, violating the U.S. law"—in 45 days "to potentially get another contract," "a follow-on contract worth . . . up to $5 million." Tr. 410:9–23. And shortly after the meeting, defendant emailed Flynn to discuss "feedback from the late night meeting" and "very specific expectations" that had emerged, again suggesting that defendant viewed the meeting as generating specific instructions and directions. GX 29 (reporting that defendant had told Alptekin "We deliver what we promise").

Defendant's explanation—that this was a meeting to get "background" on Gulen—is one the jury could quite rationally reject. For example, while background can be obtained from any minor diplomatic functionary, the attendance of *two* Cabinet-level ministers, including the Foreign Minister and the President's son-in-law, permits an inference that this meeting was more than casual research. Additionally, the meeting occurred late at night at a private location, not in the official surroundings or during business hours of the Turkish consulate. *See* Tr. 405:9–18; *cf. United States v. Ali*, 735 F.3d 176, 188–89 (4th Cir. 2013) (reviewing circumstantial evidence of conduct that was "surreptitious and totally distinguishable from open and normal channels of business" to permit inferences of guilty knowledge). Given the circumstances of the meeting, the complete identity of topics discussed, and the Turkish minister's direct statement of interest on the goal

that was Project Confidence's "ultimate aim," the jury could well infer that this meeting showed evidence of Turkey's direction and control.

Third, the government introduced evidence showing that Alptekin's status as the nominal client was pretextual to hide his activities as the go-between with the Turkish government. For example, when Alptekin transferred monthly payments to FIG from an account in Turkey, FIG immediately transferred a 20% kickback to Alptekin's separate account under Inovo's name in the Netherlands. *See, e.g.*, Tr. 344:9–345:2, 349:4–23, 357:8–20; GXs 25A, 33C, 34, 35A, 35B, 37A, 37B, 38, 94L, 150A, 161. These payments are patently inexplicable as ordinary business transactions; there is no reason to accept payment from a client only to immediately return a portion of that money. Moreover, the co-conspirators' contemporaneous descriptions are revealing. For example, early in the engagement, defendant and Alptekin agreed to these payments as "consulting" fees. GX 19; *see also* GXs 18A, 18B. In another email, defendant directed FIG employees to prepare an engagement letter for Alptekin as an "outside advisor on the Confidence Project." GX 25B. These designations make no sense if Alptekin were truly the client: A client is neither a "consultant" nor an "outside advisor" on his own project.

And as with other lies, defendant's purportedly innocent explanations were wholly unsupported. When asked about the payments later, both Alptekin and defendant lied about their purpose, calling them "refunds" for lobbying work not done (Tr. 249:12-9; GX 93B)—a description contradicted by the invoices themselves, defendant and Alptekin's prior descriptions among themselves and others, and the complete absence of any contemporaneous emails or documents supporting the refund or reimbursement theory. *See* Tr. 780:17–782:13. In fact, Alptekin's letter stated that "the lobbying PR components [of the project] ultimately never took place" (GX 93B), when substantial evidence showed that Sphere Consulting was engaged and did perform public relations

12

and lobbying services, in addition to defendant's direct lobbying of a Member of Congress and other congressional staff. *See* Tr. 250:14–251:20, 418:22–422:20; GX 76S at 2–3, 102. Having found these explanations to be false, the jury could use such false exculpatory statements as affirmative evidence.

Likewise, the government's evidence showed that Alptekin had significant access to high-level Turkish government officials. *See, e.g.*, GX 2B (photo showing Alptekin and Cavusoglu together). Alptekin arranged a 10 p.m. meeting with two Cabinet ministers, including Cavusoglu, during their official visit to the United States. *See, e.g.*, Tr. 400:10–23, 455:10–25. Later, when Sphere Consulting presented a strategic analysis discussing "[w]hat the Turkish government would need to do" to obtain Gulen's extradition, Sphere received an email directly from the deputy chief of mission at the Turkish Embassy in D.C., inviting Sphere to present "a comprehensive communications plan for the government of Turkey." Tr. 728:15–731:9. Put differently, a plan designed for the government of Turkey and sent to Alptekin resulted in an immediate audience with the second-highest Turkish diplomatic officer in the United States. Despite defendant's repeated insistence that defendant's descriptions of Alptekin as the nominal client must be accepted at face value (*e.g.*, Def. Br. 12), the jury is not obligated to do so when other evidence calls that explanation into question. And when the jury has resolved conflicting evidence and rejected defendant's offered innocent explanation, defendant cannot then ask this Court to second-guess that resolution. The evidence here, considered as a whole, more than permitted the jury to conclude that Alptekin was merely a paper client and that he instead acted as the conduit for Turkey's direction and control.

Lastly—and critically—the jury heard evidence that:

> the United States is in possession of multiple, independent pieces of
> information relating to the Turkish government's efforts to influence

> United States policy on Turkey and Fethullah Gulen, including in-
> formation relating to communications, interactions, and a relation-
> ship between Ekim Alptekin and Michael Flynn, and Ekim
> Alptekin's engagement of Michael Flynn because of Michael
> Flynn's relationship with an ongoing presidential campaign, without
> any reference to the defendant or FIG.

DX 66. The jury, of course, is not limited by whether the evidence explicitly mentions defendant;

it can infer that the "efforts" here referred to Project Truth/Confidence, given the identical subject

matter (Gulen), the identical players (Flynn and Alptekin), and the identical time frame (the 2016

presidential campaign). *See, e.g.*, *United States v. Barsanti*, 943 F.2d 428, 439 (4th Cir. 1991)

(noting that under substantial evidence analysis, "[w]hether there is a single conspiracy depends

upon the overlap of main actors, methods and goals"). From this evidence in conjunction with

other facts, the jury could—and did—rationally infer that Project Confidence operated subject to

Turkey's direction and control.

As with any other fact, the jury may infer Turkey's direction and control "wholly by cir-

cumstantial evidence" from "a development and collocation of circumstances." *Burgos*, 94 F.3d

at 858. Defendant complains that there was no direct evidence of communications between

Alptekin and Turkish officials other than the "brief and uneventful" New York meeting. Def. Br.

12–14. But like any criminal conspiracy, a foreign government's undisclosed use of agents to in-

fluence public opinion and government policy "is clandestine and covert, thereby frequently re-

sulting in little direct evidence of such an agreement." *Burgos*, 94 F.3d at 857. Defense counsel

argued that the evidence did not show Turkey's direction and control; the jury concluded other-

wise. The evidence adduced was more than sufficient to support the rationality of that inference.

### 2.    Substantial evidence established that defendant acted with the requisite knowledge.

Defendant's second attack on this conviction comes in two parts, both dealing with the

requisite mental state. Defendant argues first that to "knowingly" engage in conduct other than a

legal commercial transaction must be to know that the conduct is illegal.[1] *See* Def. Br. 16. Next, defendant argues that to "knowingly" not register with the Attorney General, defendant had to know of the requirement to register. These arguments read a willfulness element into a statute that does not have one and, in any event, substantial evidence supports the very findings that defendant claims are absent.

The Court has already agreed with the government's argument that willfulness does not apply to the legal commercial transaction requirement. Tr. 960:13–23. Defendant attempts to skirt this prior ruling by arguing that "there is little difference between willfulness . . . and the Court's ruling that the government must prove Rafiekian knew he was not engaged in a legal commercial transaction." Def. Br. 16 n.5. This is incorrect. Under the Court's correct ruling, "knowledge" requires only that (i) the defendant know he is engaging in the conduct and (ii) the conduct itself does not fall within the definition of a "legal commercial transaction"; it does not require that defendant know that the conduct was prohibited by law. "The knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 345 (1952) (Jackson, J., dissenting)). Therefore, a knowledge element "merely requires proof of knowledge of the facts that constitute the offense." *Id.* at 193; *accord United States v. Bursey*, 416 F.3d 301, 308 n.8 (4th Cir. 2005) (holding knowledge element "requires the Government to prove only that the defendant had knowledge of the facts underlying the offense"). As applied here, to prove the conduct was not a legal commercial transaction, the government needed to show

---

[1] The government respectfully maintains its position that the "legal commercial transaction" exception is not an element of the offense and, therefore, is not an element to which a knowledge requirement attaches at all. *See* Dkt. 228, at 7–17. Nonetheless, the government addresses defendant's arguments here and under Rule 33 in accordance with the Court's contrary ruling.

that the conduct was "prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f). To prove knowledge, the government had to show that defendant knowingly performed the acts constituting the prohibited activity—*i.e.*, that defendant knew he did not register under FARA or notify the Attorney General when acting as a foreign agent.

But in any event, substantial evidence supports even the findings defendant seeks. One of the central defense themes at trial depended on defendant's claim that he knew about FARA's specific requirement to register when acting as a foreign agent but that he did not do so because he relied on the advice of counsel. *See, e.g.*, Tr. 65:23–66:15, 1154:23–1155:20; *see also* Tr. 856:19–23 (adducing evidence in defense case that defendant approached a lawyer to ask about FARA filing but ultimately did not register as an agent of Turkey); GX 173 (same). It was uncontested, therefore, that defendant was actually aware of FARA's requirements. The Supreme Court has squarely held that "[i]f the government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement." *Cheek v. United States*, 498 U.S. 192, 202 (1991). All that remains is whether the jury credited defendant's argument about his mistaken understanding or good-faith belief that he was not violating the law, and it clearly did not. *Ibid.* At the defense's request, the Court gave a specific advice-of-counsel instruction; the jury rejected that defense. Accordingly, the jury's conclusion that defendant did not have a mistaken or good-faith belief that he was complying with the law is a credibility determination that this Court cannot disturb.

### C.     Substantial evidence established that defendant engaged in a criminal conspiracy.

To prove defendant guilty of the conspiracy charged in Count One, the United States was required to prove "(1) an agreement between two or more persons to engage in conduct that violates a federal . . . law, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's

knowing and voluntary participation in the conspiracy." *United States v. Kellam*, 568 F.3d 125, 139 (4th Cir. 2009) (quoting *United States v. Strickland*, 245 F.3d 368, 384–85 (4th Cir. 2001)). Defendant's challenge to his criminal conspiracy conviction focuses on the purported lack of an agreement between defendant and at least one other person to perform one of the conspiracy's unlawful objects.

"The existence of a 'tacit or mutual understanding' between conspirators is sufficient evidence of a conspiratorial agreement." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (quoting *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)). "Such proof need not be direct, but may be inferred from circumstantial evidence." *Ibid.* Evidence is sufficient to support the existence of a conspiracy "if the circumstances reveal two or more persons acting in concert to commit a criminal act." *United States v. Caudle*, 758 F.2d 994, 997 (4th Cir. 1985); *see also United States v. Chambers*, 985 F.3d 1263, 1270 (4th Cir. 1993); *United States v. Carmichael*, 685 F.2d 903, 909 (4th Cir. 1982). For example, with no direct evidence, the Fourth Circuit has found that individuals' separate submissions of false hours logs were sufficient to support the inference of a conspiratorial agreement among them to make false statements. *See United States v. Gunther*, No. 96-4804, 1998 WL 29259, at *5 (4th Cir. Jan. 28, 1998).

Using a special verdict form, the jury here convicted defendant of conspiring both to act as an undisclosed foreign agent (18 U.S.C. § 951) and to willfully make false or misleading material statements on a FARA filing (22 U.S.C. § 618(a)(2)). *See* Dkt. 355. Considered under the correct standard and in light of the entire record, the jury could rationally conclude that defendant had conspired with Flynn or Alptekin or both to commit those crimes. If substantial evidence supports the jury's verdict on either object, the Court may not enter a judgment of acquittal on Count One. *See United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003).

### 1.   Defendant's sufficiency challenges conflate a conspiracy conviction with its underlying substantive offense.

As an initial matter, defendant adopts an erroneous premise for his challenges to his conspiracy conviction. For both objects, defendant argues that if an element of the underlying substantive offense is not present, the evidence is insufficient to convict for conspiracy. On the § 951 object, defendant argues that a lack of evidence regarding Turkey's direction and control also undercuts the jury's verdict on this count. *See* Def. Br. 18. On the material-misstatements object, defendant suggests that "the ultimate question for the jury" was "whether the FARA form 'failed to provide the information requested.'" Def. Br. 32. Both of these arguments are wrong.

A conspiracy—*i.e.*, an *agreement* to commit an unlawful act—is criminal, even if the object of the conspiracy is factually impossible or never completed. *See United States v. Jimenez Recio*, 537 U.S. 270, 274–75 (2003) (citing with approval *United States v. Belardo-Quinones*, 74 F.3d 941, 944 (1st Cir. 1995)); *see also United States v. Min*, 704 F.3d 314, 321–22 (4th Cir. 2013) ("[F]actual impossibility is not a defense to the inchoate offense of conspiracy."). For example, a defendant may be guilty of conspiring to distribute drugs "even if no illegal substance was ever involved." *United States v. Diaz-Calderon*, 216 F. App'x 331, 338 (4th Cir. 2007). As applied here, if Rafiekian *believed* he (or FIG) was working under Turkey's direction and control, through Alptekin, and agreed to keep that activity hidden from the United States government, he agreed to commit the objects of the conspiracy, whether or not Turkey was in fact directing or controlling the engagement and whether or not the statements that eventually made onto the FARA forms were, in fact, materially misleading.

Critically, therefore, under Count Two, all the limited-use co-conspirator statements are relevant and admissible as evidence of defendant's belief and intent to commit unlawful acts. Even if Alptekin's statements cannot be taken to prove that Turkey *in fact* directed FIG's engagement,

they are admissible to prove that Rafiekian and Flynn *believed* that was the case. *See United States v. Leake*, 642 F.2d 715, 720 & n.6 (4th Cir. 1981); *see also* Dkt. 292, at 31–32; *infra* Part II.B. And if defendant harbored even a mistaken belief that he was working on behalf of a foreign government and agreed with another person to act as such without notifying the Attorney General or agreed to make material misstatements and omissions in a FARA filing, he is guilty of the conspiracy. Defendant's contrary approach collapses a conspiracy charge into its substantive corollary. *Contra Iannelli v. United States*, 420 U.S. 770, 777 & n.10 (1975).

Here, the government proved the actual facts of Turkey's direction and control and the materiality of defendant's misleading statements and omissions on the FARA forms, but these conclusions are not necessary to sustain a conspiracy conviction. The critical question is whether the jury could rationally infer the existence of that agreement from the total evidence at trial. It could.

### 2.    Substantial evidence established that defendant conspired to act as an undisclosed foreign agent.

Defendant contends that the evidence did not permit the jury to infer that he agreed not to disclose that he was acting as an agent of a foreign government. To the contrary, the collective body of evidence at trial permitted the jury to conclude that defendant and his co-conspirators agreed not only to act as agents of Turkey but to do so covertly and without required notifications to the United States government.[2]

Specifically, the jury could draw rational inferences in a chain of reasoning that led to the existence of a criminal agreement. As described above, the jury could rationally infer that Turkey

---

[2] Defendant suggests that general groups of evidence, "whether considered alone or collectively," are "equally or more consistent with legal behavior" and thus insufficient. Def. Br. 20; *see also* Def. Br. 28 ("Whether each category is viewed in isolation or all the categories are viewed cumulatively, the result is the same . . . ."). This is again the wrong standard. *See supra* Part I.A.

directed and controlled the FIG engagement or, at minimum, that defendant, Flynn, and Alptekin believed that to be the case. Having reached that conclusion, the jury then heard substantial evidence that defendant, Flynn, and Alptekin consistently told others—their own employees, their lawyers, and the targets of their political advocacy—that Turkey was not involved. *See Hughes*, 716 F.2d at 240 ("Secrecy or openness in the involved transaction are clear indicators of guilty intent or its absence."). Indeed, specific evidence was introduced that defendant sought to file under the Lobbying Disclosure Act expressly to avoid filing under FARA. *See* Tr. 414:1–4.

Defendant argued to the jury that he went to several lawyers purportedly to obtain advice on the FARA registration requirement he knew might apply. But the jury also heard substantial evidence that defendant lied to or mislead his lawyers, including about his knowledge of Alptekin's conversations with Turkish foreign ministers, the business purposes of an engagement solely focused on carrying out Turkey's goal of obtaining Gulen's extradition, the characterizations of payment schemes unsupported by the evidence, and so on. In fact, the jury necessarily adopted this view by rejecting defendant's advice-of-counsel defense, finding the requisite specific intent to sidestep FARA's requirements. *See Burgos*, 94 F.3d at 867–68. And finally, when public scrutiny forced defendant and Flynn to make retroactive FARA filings, the three co-conspirators again gave substantially identical explanations that the jury plainly deemed false and used as further evidence of a concerted agreement to lie. *See Wright*, 505 U.S. at 296; *Hughes*, 716 F.2d at 240–41. That the defendant and the others repeatedly lied in concert about Turkey's involvement supports the inference of an agreement to do so. *See Caudle*, 758 F.2d at 997.

None of defendant's specific counterarguments renders the jury's conclusions irrational.

Except as to Turkey's direction and control, defendant does not contest the existence of an agreement. *See* Def. Br. 18–19 (stating that the evidence showed an agreement "to act on behalf

20

of Inovo/Alptekin"). But as discussed above, the jury had substantial evidence from which it could infer that Turkey, not Alptekin, was the actual client with Alptekin as intermediary. *See supra* Part I.B.1. Defendant's own exhibit provides substantial evidence of an agreement between Flynn and Alptekin to act on Turkey's behalf (*see* DX 66), and once the existence of that agreement is established, the government need only prove defendant had a "slight connection" to it to prove participation in it. *E.g.*, *United States v. Allen*, 716 F.3d 98, 103 (4th Cir. 2013). That slight connection is more than satisfied by defendant's principal role in Project Truth/Confidence, which occurred at the same time, on the same subject, and involving the same players as the agreement described in DX 66, permitting the inference that they were a single conspiracy. Moreover, when coupled with Alptekin's numerous statements to Flynn and defendant—considered solely for their effect on the listeners—there is no question that the jury could rationally infer that Flynn and defendant believed they were working on behalf of Turkey, not merely Alptekin as a private actor. *See also, e.g.*, Tr. 229:4–230:15 (defendant's admission to Kelner that "Truth" was a project for the Turkish government).

In light of that rational inference, the jury heard substantial evidence that defendant, Flynn, and Alptekin each told the same lies to obscure Turkey's involvement. First, they agreed to treat Alptekin as the nominal client, despite substantial evidence showing they viewed him as an intermediary to the Turkish government. Early in the relationship, defendant responded to Alptekin informing him that Alptekin would see the Turkish Foreign Minister in Ankara, stating:

> We are ready to engage on what needs to be done. Turkey's security and stability is extremely important to world security. RTE can lead the campaign against Radical Islam to protect the image of Islam. No other leader in the world of Islam has the power to lead this campaign.
>
> I just wanted to let you know we are all on the same page.

GX 8B. The jury could easily infer from this statement that defendant viewed himself as speaking to an intermediary for the Turkish government, expressing his support for that government's position against Gulen. Notably, defendant vowed to keep the conversations confidential, noting that "[a]t the right time, I will include our partners in the communications." GX 8B. Moreover, defendant understood the need for secrecy to be a direct request from the Turkish Foreign Minister, as Alptekin had written him an email stating that "MC" had "asked me to tell you not to read in anyone else for the time being and keep this confidential." GX 9.

But when defendant, Flynn, and Alptekin did include others, they lied. Overnight—with no contemporaneous evidence regarding the purported loss of Turkey as a client or the change in the project's name—defendant, Flynn, and Alptekin rebranded "Truth" as "Confidence" and emailed other FIG employees that FIG would be engaged by a "Dutch client." GX 18A. This same email used the identical action points defendant had sent Alptekin about "Truth" (GX 10) and attached a budget that included $120,000 in payments back to Alptekin, whom the email called a "SENIOR ADVISOR." GX 18B. Subsequently, defendant, Flynn, and Alptekin made statements to FIG employees, to external consultants at Sphere, and to Members of Congress and their staff that Alptekin or Inovo was the client. *See, e.g.*, Tr. 397:7–14 (statement to McCauley); Tr. 420:2–6, 477:13–479:13 (statements to congressional personnel); Tr. 449:1–450:11, 476:22–477:3 (statements to Boston); Tr. 603:14–19 (statements to Miller).

The August 11 email and budget was also the first time any of the co-conspirators characterized Confidence as a project aimed at restoring investment confidence in Turkey. *See, e.g.*, GX 18B. Shortly after sending that email, defendant sent Alptekin an email without additional recipients, reporting to him that his budget "did not touch the advisory support we discussed at 20%" and that he had given the FIG employees the "engagement purpose" as "[t]he business community

is engaging FIG to restore 'confidence through clarity' in the trade and investment climate.'" GX 17. The jury could rationally conclude that this abrupt switch, unexplained by any contemporaneous documentation, was the result of an agreement to hide the Turkish government's involvement using Alptekin as a pretextual client. After all, it would be irrational for a consulting company to pay "consulting" or "advisor" fees back to its own client.[3] And it would be irrational for defendant to report to Alptekin what the "engagement purpose" was if Alptekin was the origin of the engagement purpose. Moreover, the jury heard evidence that none of the thousands of emails related to Confidence in defendant's or Alptekin's email accounts linked Confidence with the Turkish economy or investment climate. *See* Tr. 774:10–777:5. In light of this evidence, the jury could properly infer that defendant was reporting back to Alptekin to reaffirm the cover story they had created to obscure Turkey's role as the true driving force behind the engagement.

Defendant also argues that encrypted communications are "commonplace and unremarkable given the importance of cybersecurity" and "mere secrecy does not permit a reasonable inference of an unlawful conspiracy." Def. Br. 20. While mere secrecy *alone* may not prove conspiracy, when the relevant question is whether an object of the conspiracy included the secrecy itself, the

---

[3] In fact, defendant has never offered a rational explanation for this payment structure. Defendant's brief calls it "purely speculative to assume that this was evidence of an illegal kickback rather than a refund or consulting fee." Def. Br. 23; *see also* Def. Br. 26–27. But what the jury heard was that, despite defendant and Alptekin both calling the payments refunds when under FARA scrutiny (Tr. 249:12–19; GX 93B), there was no corroborating documentation that they were refunds for anything (Tr. 778:25–781:17), and Sphere and FIG actually performed the lobbying and media relations work that defendant and Alptekin claimed was not done (Tr. 250:14–251:20). Defendant argues that there was no evidence that "Alptekin and the Defendant would have any motive to lie about the characterization of these payments." Def. Br. 27. The government made quite clear the motive: the kickback structure to Alptekin shows that Alptekin was the go-between for the true client, Turkey, and that defendant and Flynn both knew it. Lying obscured Turkey's involvement by contributing to the false narrative that Alptekin was the true client. In light of the other evidence of Turkey's involvement and Alptekin's role, the jury adopted the government's rational interpretation.

co-conspirators' actions to keep things secret are unquestionably evidence of that. *See Hughes*, 716 F.2d at 240. And when contemporaneous and subsequent evidence shows that the co-conspirators adopted a false explanation or story in order to keep something secret, the jury is fully entitled to infer that they agreed to do so. *See Caudle*, 758 F.2d at 997. Defendant argues that his desire to keep the project confidential and closely held was innocent because he sought legal advice, first from Robert Kelley and second from Covington & Burling. *See* Def. Br. 20–21. The jury rejected that interpretation of the evidence. Notably, the evidence established defendant's meeting with Kelley lasted "15 minutes," that defendant told him the client was a "foreign private company," and that Kelley asked no further questions, did no additional research, and simply "took [defendant's] word for it." Tr. 874:9–14, 877:8–24. And because the jury rationally inferred that defendant did not actually believe Alptekin or Inovo was the true client, it could then infer that this comment to Kelley was an attempt to create a legal smokescreen for not disclosing Turkey's role publicly, rather than a good-faith effort to comply with the law.

Defendant argues, of course, that Inovo *was* the true client and the project *was* focused on the investment climate. *See* Def. Br. 22–23. Quite simply, this question is a straightforward matter of credibility, which is "within the sole province of the jury and [is] not susceptible to judicial review." *United States v. Wilson*, 484 F.3d 267, 283 (4th Cir. 2007) (quoting *Burgos*, 94 F.3d at 863). Defendant argued to the jury that Alptekin was—and that defendant genuinely believed he was—the client. The jury disagreed. Defendant also suggests that just because "the government never understood the linkage between a focus on Gulen and the political and economic stability of Turkey does not mean that Alptekin or Rafiekian did not see such linkage." Def. Br. 23 n.8. But Special Agent Alfredo's unrebutted testimony shows that neither Alptekin nor Rafiekian ever even discussed that linkage, with others or between themselves.

24

Defendant appeals to the contrary inference by arguing that one witness testified to having a mental connection between "economic stability in Turkey" and Gulen. *See* Def. Br. 30 (citing Tr. 635:24–636:7). But to overcome the jury's contrary conclusion, this evidence would have to make it *irrational* for the jury to find that the stated "business" purpose was merely a smokescreen to obscure Turkey's direct involvement. Based on the lack of *any* contemporaneous documentation or work product during Confidence that addressed Turkey's economy, business climate, or tourism and the uncontradicted evidence that having Gulen extradited was the ultimate aim—an odd goal for any business-focused enterprise—the jury reasonably resolved the conflict and saw this cover story for what it was: a thin pretext to disguise the covert character assassination of a Turkish dissident by the Turkish government.

Lastly, defendant argues that the parallel lies that defendant, Flynn, and Alptekin told to Covington do not support the jury's verdict.[4]

Defendant argues that there were no parallel lies regarding the New York meeting. This is false. Defendant, Flynn, and Alptekin all made false statements to Covington that Turkey was not involved in Confidence and falsely claimed that the meeting had little or nothing to do with Confidence, when evidence clearly showed to the contrary. *See* Tr. 231:13–21 (Flynn); Tr. 231:23–232:6 (defendant); GX 93B (Alptekin); *see also* Dkt. 341, at 35–36. Defendant asserts that the

---

[4] Defendant argues that these statements are "out-of-court statements that cannot be considered for their truth" in an apparent suggestion that the Court should not consider them. Def. Br. 24 & n.9. But it is precisely the fact that the government is not offering them "to prove the truth of the matter asserted in the statement" that renders them admissible. *See* Fed. R. Evid. 801(c)(2). Rather, by introducing the individual's statement—and then introducing evidence to show that the statement was false—the government gave the jury sufficient evidence to conclude that the declarant intended to lie. *See United States v. Vidacak*, 553 F.3d 344, 353 (4th Cir. 2009) (citing *Anderson v. United States*, 417 U.S. 211, 219–20 (1974)).

government "begs the question by assuming those statements were lies." Def. Br. 27. To the contrary: the government adduced substantial evidence showing that Turkey did in fact direct and control the engagement and that the co-conspirators believed that to be the case. Whether facts are "innocent" or inculpatory is quintessentially for the jury to resolve, based on its view of the credibility of the explanations and the circumstances surrounding the statements that were made. *See Wilson*, 484 F.3d at 283. The jury drew rational inferences to find that Turkey, in fact, directed and controlled the engagement; that defendant and his co-conspirators believed that to be the case; and that they made false statements to hide that direction and control or their knowledge of it. The concerted action of all three co-conspirators and their parallel lies permit the inference that they agreed to do so, particularly given the continuous course of conduct and intentional choices they made throughout the engagement to obscure these facts.

Defendant argues that there was no overlap in the individuals' specific lies about the nature of the New York meeting. But even there, the jury could rationally infer coordinated attempts to mislead. First, Flynn's statement that there was "a brief discussion or—or a bit of discussion of the Inovo contract" (Tr. 231:13–21) is substantially misleading, given that the *entirety* of the thirty-minute meeting discussed the "ultimate aim" of Project Confidence: extraditing Gulen to Turkey. *See* Tr. 407:22–409:11. Defendant's statement that the meeting was "*unrelated* to Project Confidence" (Tr. 231:25–232:6 (emphasis added)) is blatantly false.[5] *Cf.* GX 24B (defendant's email describing meeting as "related to 'CONFIDENCE'"); GX 34, at 1176 (defendant's check to

---

[5] Defendant splits the hair extremely thin by asserting that "the undisputed evidence at trial was that Project Confidence *was not* a topic at the meeting." Def. Br. 24. First, a lack of a mention of the name of the project is not the same as "unrelated." Second, the evidence shows that defendant himself viewed the meeting as related to Confidence. His subsequent explanation—in words directly contrary to those used contemporaneously and when there is a substantial motive to lie—is highly probative evidence that the statement is false.

McCauley to pay for attendance at the meeting with memo line "For: Confidence"). And Alptekin's opinion letter—the entire thrust of which was distancing him as an agent of the Turkish government—completely omits *any* mention that the meeting even existed. *See* GX 93B. When the relevant question is an individual's status as an agent of a foreign government, the omission of a meeting with two senior Cabinet ministers of that government is a notable absence of a material fact.

Next, defendant attempts to reframe the relevant question when addressing whether defendant and his co-conspirators lied about the op-ed's relationship to Confidence. The question is not whether "[t]he evidence at trial . . . supports Rafiekian's statement that the op-ed was not part of FIG's work for Inovo." Def. Br. 25. The question is whether the evidence supports the *jury's* conclusion that it was. It does.

On October 7, 2016, defendant, Flynn, and Alptekin all discussed an op-ed along exactly the lines of the one that was ultimately published. *See* Tr. 488:25–489:21. On November 2, 2016, defendant, Flynn, FIG employees, and Sphere Consulting met with Alptekin at FIG headquarters to provide "the final product of what [FIG] had come up with at that point." Tr. 430:22–431:6. Alptekin was "visibly upset during the meeting" and complained about the quality of FIG's product. Tr. 722:3–11; *see also* Tr. 431:14–432:6, 433:5–434:6, 720:3–8. At 10:36 p.m. that night, defendant sent the draft op-ed to Alptekin, stating "A promise made is a promise kept" and soliciting Alptekin's "thoughts at your earliest convenience." GX 45A. Two days later, defendant sent Alptekin a new draft of the op-ed in an email that repeatedly discusses "our work" and assures Alptekin that "MF and I are as dedicated to this effort as you are" and that they "understand the intensity of this mission." GX 48A. Alptekin expressed satisfaction with the op-ed and offered

minor corrections to spelling. GX 49. Moreover, defendant used the outside media consultants specifically hired to work on Confidence to place the op-ed for publication. Tr. 235:19–236:16.

Thus, there was ample evidence for the jury to rationally infer that in an effort to provide better results after a disastrous presentation on November 2, Flynn and defendant provided the op-ed to fulfill a "promise made" in connection with the work on Project Confidence. Defendant's argument that an op-ed was "outside the scope of the engagement" on October 7, 2016, does nothing to rebut the rational inference that the draft op-ed and the communications surrounding it on November 2–5 were part of Confidence. Having reached that permissible inference, the jury correctly concluded that defendant, Flynn, and Alptekin each told substantially the same lie to Covington to hide the op-ed's connection. *See* Tr. 235:2–12, 236:20–237:4; GXs 49, 93B, at 3.

Defendant's attempts to carve up the evidence piecemeal and impose an erroneous legal standard for sufficiency do not undermine defendant's conviction. Under the proper standard, the jury had substantial evidence to make a series of rational inferences from the evidence:

1) that Turkey in fact directed and controlled FIG's engagement through Alptekin;

2) that defendant and his co-conspirators believed they were taking direction and control from the government of Turkey;

3) that defendant and his co-conspirators created a false explanation for the engagement and falsely portrayed Alptekin as the nominal client, when in fact he was an intermediary between FIG and the government of Turkey;

4) that the defendant lied to several attorneys to obtain "legal advice" that he could later use as a shield; and

5) that when faced with potential discovery of their work for Turkey, the co-conspirators again lied in concert to avoid revealing the truth.

28

Because all three co-conspirators participated in a continuous course of concerted lies, starting from the first switch from "Truth" to "Confidence" all the way through their false and misleading statements to Covington, the jury had substantial evidence from which to infer an agreement, tacit or explicit, among them to act as Turkish agents without disclosing that agency, including to the Attorney General.

> **3.**   **Substantial evidence established that defendant conspired to make materially false and misleading statements and omissions in FIG's FARA filings.**

As discussed above, defendant's challenge to the material misstatement object of the conspiracy appears to focus on whether any statements on the form were actually materially misleading or false. *See, e.g.*, Def. Br. 29 ("[T]here was no substantial evidence offered to demonstrate that the FARA filing failed to provide [the requested information]."). Again, the actual existence of a material misstatement or omission is not necessary to sustain a conviction on this count and object. *See United States v. Feola*, 420 U.S. 671, 694 (1975) (recognizing that a conspiracy may be proved "regardless of whether the crime agreed upon actually is committed"). What matters is whether there is sufficient proof that defendant and at least one other person *agreed* that at least one of them would make materially misleading statements or omissions. *See, e.g.*, *Ocasio v. United States*, 136 S. Ct. 1423, 1429–30 (2016).

The evidence supporting defendant's conviction on the § 951 object of the conspiracy equally demonstrates factual inferences sufficient to support the jury's verdict on the FARA object. The government's trial brief has also already described a number of these false statements. *See* Dkt. 341, at 33–39. And once the jury concluded that these coordinated statements were false, it could conclude that the co-conspirators had reached an agreement—implicit or explicit—to willfully make false or materially misleading statements or omissions in the FARA filing that Covington was preparing. *See Caudle*, 758 F.2d at 997. Indeed, an email sent shortly after public scrutiny

fell on the op-ed shows defendant and Alptekin coordinating their responses. *See* GX 83. None of defendant's arguments to the contrary undermine the rationality of the jury's factual inferences supporting the necessary elements.

As outlined in the previous section, the evidence amply demonstrated that defendant, Flynn, and Alptekin gave substantially similar, overlapping explanations to Covington that the jury could infer they knew were false and thus, the jury could take this coordinated action as evidence of an agreement to lie. In their interviews with Covington, defendant and Flynn repeatedly downplayed—if not outright denied—any connection between the Turkish government and Confidence, despite their numerous communications with each other and Alptekin evincing the belief that Alptekin was acting on behalf of the Turkish government. *See* Tr. 230:22–231:22. Defendant and Flynn both told Covington that the purpose of Confidence was improvement of the business and economic climate (Tr. 243:18–244:7), when the uniform testimony and documentary record showed that the project was exclusively and exhaustively focused on obtaining Gulen's extradition (Tr. 243:1–14, 415:16–22, 453:2–21, 563:7–564:1, 578:3–16). Likewise, Alptekin's Arent Fox letter stated that Inovo had hired FIG as a result of consulting for a private Israeli company (DX 60, at 31)—the first and only time *any* reference to this Israeli company appears and unsupported by any contemporaneous document during the engagement process. To the contrary, on the sole occasion Alptekin obliquely suggested to McCauley that he represented other individuals, he described them as "[s]ome wealthy Turkish businessmen [that] were concerned about the future of Turkey, and they were interested in possibly hiring FIG to look at Gulen." Tr. 397:7–22.

Similarly, both Flynn and defendant Both told Covington that the New York meeting was "simply not related" to Confidence (Tr. 260:13–19 (defendant)) or involved only "a bit of a discussion" about Confidence (Tr. 231:15–21 (Flynn)), despite the evidence showing that the meeting

concerned Gulen exclusively and that the Turkish Foreign Minister had expressly stated to them what the Government of Turkey wanted: Gulen's extradition (Tr. 408:20–409:14). In an opinion letter purporting to address his status as an agent of Turkey related to FIG's engagement, Alptekin never even disclosed the existence of the meeting. *See* GX 93B. Defendant and Flynn both told Covington that the op-ed that sparked the FARA inquiry in the first instance was "not part of Project Confidence" (Tr. 235:2–237:4), despite substantial evidence showing that the op-ed had been discussed previously and that defendant and Flynn both viewed the op-ed as a deliverable to Alptekin and Turkey as part of Confidence to compensate for a lack of results to date (GXs 45A, 48A, 49). Alptekin falsely stated that Flynn had not "announced[d] that he had any intentions or writing an article" and had "*never* consulted Mr. Alptekin" on his op-ed "or asked his opinion." GX 93B, at 3 (emphasis added). Moreover, defendant, Flynn, and Alptekin also knew that the op-ed had sparked the scrutiny leading to the FARA Unit's inquiry in the first instance; thus, it was obviously material to FIG's registration. *See, e.g.*, GXs 83, 84, 90.

Finally, both defendant and Alptekin told the same cover story regarding FIG's payments back to Alptekin, describing them as refunds for lobbying and PR work not done. *See* GX 93B, at 3; Tr. Tr. 249:12–19. But—as the jury could and did infer—defendant knew that the payments to Alptekin were not "refunds" (lacking any contemporaneous documentation) but fees paid to Alptekin for his work as an intermediary with Turkey. Notwithstanding Alptekin and defendant's attempts to mislead, Covington even declined to accept this characterization because it "did not believe there was any evidence to support [it]"; indeed, Covington was not "even completely convinced that they were consulting payments." Tr. 330:15–331:11.

Three individuals acting in concert to tell false and misleading cover stories can alone permit a rational inference that they agreed to tell the same lies. *See Caudle*, 758 F.2d at 997. And

here, the evidence goes further given the direct evidence of coordination between defendant and Alptekin to transmit Alptekin's lie-filled letter to Covington for inclusion on the FARA filing. The jury could quite easily infer that defendant knew that Alptekin's letter contained false and materially misleading statements and omissions. For example, defendant believed that Alptekin had been in active discussions with the Turkish government to direct the engagement. Defendant knew Alptekin's statements about the op-ed were false because he himself had transmitted the draft to and from Flynn and Alptekin, with requests to "give me your thoughts at your earliest convenience." GX 45A; *see also* GXs 48A, 49. Defendant knew Alptekin's statements about refunds for lobbying and PR work that was not done were false, because he *had* hired Sphere Consulting, it had in fact engaged in lobbying and PR, and defendant *himself* had conducted lobbying as part of the engagement. *See* Tr. 250:14–251:20, 418:2–422:20; GXs 76S, at 2–3; GX 102. Moreover, defendant had discussed the 20% kickbacks to Alptekin at the *beginning* of the engagement, long before any "refunds" could have been contemplated. GX 17. Notwithstanding the blatant lies he knew were contained in Alptekin's letter, defendant personally passed along those lies to Covington, clearly intending them to make an impact on their investigation. *See* Tr. 238:22–239:3; GXs 93A, 93B. That *alone* could sustain the jury's inference that there was an agreement—tacit or explicit—to make false statements on a FARA filing.

Defendant repeatedly comes back to arguing that the forms disclosed all material information. *See* Def. Br. 31 & n.13 (discussing form's disclosure of the op-ed); *id.* at 32 (citing Kelner's testimony). But defendant's own chart undermines that position: as defendant admits, the form states that the engagement "*could be construed* to have principally benefitted the Republic of Turkey," that FIG employees met with "officials of the Republic of Turkey" on one occasion, and that "Alptekin consulted with officials of the Republic of Turkey *regarding potential work*

by" FIG. Def. Br. 29 (quoting DX 60, at 31) (emphasis added); *see also* Def. Br. 31 (arguing the FARA forms "disclosed Alptekin's contacts with Turkish officials"). The material omission is clear: that the Republic of Turkey was not just "principally benefitted" or consulted regarding "potential" work but that it *actually directed and controlled* the engagement through Alptekin. Ultimately, however, whether the statements were in fact materially misleading is beside the point. To prove the charge that defendant conspired to violate 22 U.S.C. § 618(a)(2), as opposed to a charge that defendant *substantively* violated § 618(a)(2), the government need only prove that defendant agreed with one other person to engage in the unlawful conduct and one of them took an overt act in furtherance of that goal. That Covington disbelieved some of defendant's false stories and disclosed more information does not absolve defendant of criminal responsibility for his unlawful agreement.

In attempting to argue that he did not alter certain disclosures related to these issues, defendant fails to look at all the evidence before the jury. Defendant did request alterations to the statement based on the payments to Alptekin, in an attempt to make them sound more innocuous. *See* Tr. 254:12–255:4. And Kelner testified that defendant was particularly "not happy about the suggestion that FIG's work principally benefited the government of Turkey." Tr. 252:6–14. Nor does it matter that defendant did not challenge *every* potentially disclosing statement in Covington's proposed filings. The government need not prove that defendant was exhaustive in his attempts to mislead. Rather, the government adduced evidence sufficient to show that defendant agreed to provide materially false or misleading information to Covington —including information from Alptekin that he knew was false—knowing it would influence the contents of the FARA form, which he and Flynn would sign. That coordinated action to lie—in addition to the substantial evidence showing that Flynn, defendant, and Alptekin had *always* agreed to adopt a fictitious cover

story regarding the engagement—more than provides a basis from which the jury could draw rational inferences of the necessary facts and find defendant guilty.

* * *

Defendant asks this Court to substitute its view of his guilt or innocence for the jury's, by re-weighing the evidence and making new credibility assessments. Moreover, defendant argues using an improper legal standard, one that requires the Court to find—contrary to Supreme Court precedent—that the jury's inferences are the *most* likely of those that are available. That is not the law. Rather, under well-established principles, the Court must ask only whether the jury's inferences fall "below the threshold of bare rationality" and, once all rational inferences are drawn in the government's favor, ask whether those established facts meet the elements of the offense. *See, e.g.*, *Coleman*, 566 U.S. at 655–56; *Burgos*, 94 F.3d at 859.

At its core, this case is about fundamental disagreements over the credibility of defendant's explanations. Defendant argued that the jury should take his statements and conduct at face value. The jury plainly rejected this interpretation, instead adopting the government's view that defendant and his co-conspirators created pretextual smokescreens to obscure their conduct in violation of the laws prohibiting undisclosed activity on behalf of a foreign government. Against a factual record that included numerous proven lies, suspicious financial arrangements, late-night meetings with high-level Turkish officials, unsupported explanations, and the mountain of inculpatory evidence summarized above, the jury's guilty verdict rests on more than adequate foundation.

## II.     A new trial is unwarranted.

### A.     The Court should not order a new trial on weight-of-the-evidence grounds.

Although a district court may order a new trial under Rule 33 even when a judgment of acquittal is not permissible under Rule 29, the Fourth Circuit has instructed district courts that such

power is to be used "sparingly," because "a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008); *see also United States v. Garcia*, 855 F.3d 615, 620 (4th Cir. 2017) (noting verdict must be "against the great weight of the evidence" to warrant a new trial).[6] Indeed, the Circuit requires that to warrant a new trial, the evidence must not only weigh heavily against the verdict, it must weigh "so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985); *see United States v. Boddy*, 622 F. App'x 219, 221–22 (4th Cir. 2015) (noting "the district court must show deference to the jury's verdict").

More recently, the Fourth Circuit has reiterated that motions for a new trial based on the weight of the evidence are "disfavored," that courts "do not lightly disturb jury verdicts," and that "even disagreement with the jury's verdict would not mandate a new trial." *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018). *Arrington* itself affirmed a district court that found a new trial not in "the interests of justice" after having previously granted a motion for acquittal that was reversed. *See* 757 F.2d at 1486. Courts in this district have noted that the "interest of justice" standard codified in Rule 33 permits a new trial only where "it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt." *E.g.*, *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), *aff'd*, 496 F.3d 344 (4th Cir. 2007). Accordingly, to order a new trial on a weight-of-the-evidence ground, the district court must not only disagree with the jury's verdict of guilt but must find that the verdict itself constitutes a miscarriage of justice.

---

[6] *See also United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018); *United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006); *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003); *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997).

That standard is not met here. Defendant's sole argument is that the Court—acting as an evidentiary gatekeeper—determined that the evidence "did not support a conspiracy by a preponderance of the evidence." Def. Br. 34. But the Court's evidentiary ruling is not the same as a conclusion that the evidence weighs "*so* heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485 (emphasis added). As outlined above, the jury weighed the credibility of defendant's purportedly innocent explanations against the evidence showing that these explanations were pretextual and unanimously concluded that defendant had committed the crimes charged. There is no indication that the "fundamental fairness or integrity of the trial result" is sufficiently in doubt to meet the "interests of justice" standard. *Jennings*, 438 F. Supp. 2d at 642.

Defendant will likely argue that entering a judgment of conviction when the Court does not believe defendant is guilty is manifestly unjust. But that re-definition of the standard would swallow the rule and require a district court to grant a new trial whenever it disagreed with the jury's verdict, in derogation of the language in Rule 33 and the Fourth Circuit's decisions. Given the "deference" owed to a jury's verdict (*Boddy*, 622 F. App'x at 221–22) and the fact that courts "do not lightly disturb jury verdicts" (*Chavez*, 894 F.3d at 608), this case lacks any additional indicia that something has gone manifestly wrong. Even if the Court does disagree with the jury's verdict, that alone "would not mandate a new trial." *Chavez*, 894 F.3d at 608. Because nothing about the jury's resolution of the evidence impaired the fairness or integrity of the trial defendant received, the Court should decline to order a new trial.

### B.    The Court's admission of hearsay evidence for a limited purpose was appropriate.

Defendant argues that the jury likely disregarded the Court's numerous limiting instructions on considering Alptekin's statements for their truth and the resulting prejudice warrants a new trial. But the admitted evidence was properly probative of defendant's intent. There is no

evidence that the jury disregarded its instructions and considered these statements for the truth, nor was the risk of prejudice so high that it outweighed the statements' probative value.

As the Court correctly held, evidence showing what Alptekin said to defendant is squarely admissible to prove what information defendant received, what defendant believed, and the context in which he made his own clearly admissible statements. *E.g.*, *Leake*, 642 F.2d at 720 & n.6; *see also United States v. Fowler*, 55 F. App'x 125, 127 (4th Cir. 2003). Defendant is wrong, therefore, when he argues that the statements were not shown "to actually have had any effect on Rafiekian." Def. Br. 35. The jury could quite properly consider all these statements to defendant as a ground for inferring what he believed to be true and the intent behind acts he took subsequently, which is not usually susceptible to direct proof. *See, e.g.*, *United States v. Browning*, 390 F.2d 511, 512 (4th Cir. 1968) (noting that intent "rarely can be shown by direct evidence" and thus "can be inferred from the acts of the parties and the facts and circumstances of the case"). And contrary to defendant's characterizations, that purpose is precisely how the government argued this evidence in closing.

For example, defendant claims that the government invoked the emails for the truth by stating "what the emails show you is that Alptekin is the conduit to the defendant from the ministers of the Turkish government." Tr. 1122:6–7. But on either side of that single statement, context clearly shows that the government was arguing what defendant *believed* to be the case: "Now, this string of emails shows you that the defendant understood just how high in the Turkish government Alptekin's connections went, that he understood that Alptekin was reporting to the defendant about his conversations with Turkish ministers just days after the coup." Tr. 1121:16–20. "It shows you again that the defendant understood that the Turkish foreign minister was taking this very, very seriously." Tr. 1122:19–21. Defendant then selectively quotes language describing that "[t]here's

a bunch of emails that show that he's in contact through Alptekin with the foreign ministers of Turkey" but leaves out the context: "and the lawyers have it." Tr. 1123:23–25. There, the government invoked these communications to explain how *defendant* could not have believed the story he told Covington about the "Truth" emails and the project being abandoned. *See* Tr. 1123:21–1124:5. Similarly, the references to the "Ankara" statement were made while arguing that *defendant* believed the op-ed was part of Project Confidence (in contrast to his lies on the FARA form) and that he believed he was doing it to placate the Turkish government. *See* Tr. 1144:10–1146:11. Indeed, the government made it explicit: "When you've got those kind of lies going on, *that tells you the intent of the defendant*. It tells you what's going on inside his head, and that is, to work as an undisclosed agent for the foreign government." Tr. 1146:8–11. Defendant's claim that the government argued outside the bounds of admissibility are simply not supported by context. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47 (1974) (holding courts must consider closing arguments in context and "not lightly infer" that "an ambiguous remark [has] its most damaging meaning" or that the jury "will draw that meaning" instead of "less damaging interpretations").

Defendant admits that Court "repeatedly (and properly) instructed the jury not to consider the hearsay for its truth." Def. Br. 36; *see* Tr. 1087:15–20.[7] Defendant also admits that juries are presumed to follow their instructions but then asserts that "it is highly likely that the practical limitations of the jury were strained" in *this* case, arguing that they must have considered the limited-use evidence for the truth. Def. Br. 36. That unsupported assertion does not warrant a new trial. The Fourth Circuit has made clear that to overcome the "'almost invariable assumption of the law that juries follow their instructions,'" a defendant must show "some *specific* reason to doubt that the jury adhered to the district court's directive." *United States v. Runyon*, 707 F.3d 475,

---

[7] *See also, e.g.*, Tr. 130:21–131:2, 154:6–9, 169:23–170:3, 178:16–20, 783:20–24.

497 (4th Cir. 2013) (emphasis added) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). Defendant has not met that burden.

Defendant cites two Tenth Circuit cases, both of which addressed testimony by investigating officers about informant statements that began their investigation. *See United States v. Becker*, 230 F.3d 1224 (10th Cir. 2000); *United States v. Cass*, 127 F.3d 1218 (10th Cir. 1997). Critically, in both cases, the court concluded that the government had actually *used* the statements to argue their truth and to bolster their investigator's credibility, not for the limited purpose on which they were admitted (explaining the origin of the investigation). *See Becker*, 230 F.3d at 1229; *Cass*, 127 F.3d at 1223-24. And in *Cass*, substantial portions of the evidence had been admitted "without limiting instructions, notwithstanding the defendant's objection." 127 F.3d at 1223. Further, *Cass* explained that the analysis is properly conducted under Rule 403's balance between the probity of the evidence and its potential prejudicial impact. *Ibid.* These cases are simply inapposite.

Here, the government did not introduce minimally probative "background" as a way of bolstering its witnesses or sneaking in additional out-of-court witnesses testifying to defendant's guilt. Rather, the government introduced defendant's own conversations with a named co-conspirator to show that defendant had the requisite information, knowledge, and intent to commit the crimes charged. Lastly, contrary to defendant's argument, the government's evidence on defendant's "connections to the Turkish government" was not thin. Indeed, throughout this memorandum, the government has not referenced these conversations at all in discussing the sufficiency of evidence except as to defendant's knowledge. Other than broad assertions that it is "highly likely," defendant has not given any specific reason why the jury could not have followed the Court's repeated instructions and considered this evidence only for its relevance to defendant's mental state. Absent the showing necessary to overcome the "almost invariable" presumption that is "so

essential to the efficient functioning of the criminal justice system," the Court should deny defend-ant's motion for a new trial on this ground. *Runyon*, 707 F.3d at 497.

**C.    The government never shifted the burden to defendant.**

Defendant contends that the government improperly shifted the burden through the testi-mony of its final witness and in closing argument. *See* Def. Br. 37–41. To the contrary, neither the testimony nor the remarks were improper, and defendant certainly cannot show any prejudice.

First, defendant asserts—without authority—that it was "plainly improper" for the prose-cutor to refer to the lack of documents presented supporting the defense theory while simultane-ously reminding the jury that it was "[the government's] burden to prove him guilty beyond a reasonable doubt." Def. Br. 39–40 (quoting Tr. 1180:20–1181:17). But the Fourth Circuit has squarely held that prosecutors may "comment on the weaknesses of the defense's case" and, in-deed, that "[t]o view such general comments on the inadequacies of an opponent's case as improper is to strike at the heart of the adversary system." *United States v. Jones*, 471 F.3d 535, 543 (4th Cir. 2006); *see also United States v. Williams*, 479 F.2d 1138, 1140 (4th Cir. 1973) ("[T]he over-whelming weight of the authority . . . is to the effect that the prosecutor may point out that the defense did not offer evidence to contradict the government's case . . . ."); *United States v. Davis*, 63 F. App'x 76, 79 (4th Cir. 2003). Likewise, numerous federal circuits have concluded that when the defense presents a case, a prosecutor may permissibly comment on the lack of supporting evi-dence so long as he does not call attention to defendant's decision not to testify or suggest that the defendant bears the burden to prove himself innocent. *See, e.g.*, *United States v. Zitron*, 810 F.3d 1253, 1259–60 (11th Cir. 2016); *United States v. Lyons*, 740 F.3d 702, 730 (1st Cir. 2014); *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991); *United States v. Bright*, 630 F.2d 804, 825–26 (5th Cir. 1980).

Here, the witness testimony and the prosecutor's arguments were directed at a specific defense theory: that Project Truth and Project Confidence were completely separate, and the latter did not involve the government of Turkey in any way. To the contrary, not *one* email contemporaneous with the "end" of Truth and the "beginning" of Confidence even mentioned the loss of the Turkish government's business or discussed them as separate engagements. *See* Tr. 784:15–785:7 (Alfredo). When addressing this lack of evidence corroborating defendant's proffered innocent explanation, the prosecutor made certain the jury understood the placement of the burden of proof. In the paragraphs immediately preceding those quoted by defendant (*see* Def. Br. 39), the prosecutor discussed the burden of proof at length, beginning, "Now, we do have the burden of proof, and we wear it like a mantle." Tr. 1180:8–19. Immediately after discussing the lack of documents, the prosecutor again reminded the jury: "To be clear, our burden is to prove him guilty beyond a reasonable doubt, but if they put on a case, you can expect that it would be the best one they can, and it certainly wasn't much." Tr. 1181:14–17.

This type of argument—arguing the absence of evidence showing an innocent explanation for defendant's actions—falls firmly within the bounds of permissible argument. In fact, in the only Fourth Circuit case defendant cites, the prosecutor made a similar argument about absent phone records, stating "What evidence that exists on a physical level is available to both parties. Why didn't [defense counsel] introduce it? She doesn't bear the burden, I do, but my point is consider the context." *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018). The Fourth Circuit concluded that this statement was a permissible attack on the defense theory. *See id.* at 156–57. And in *Jones*, the Fourth Circuit approvingly cited a decision in which the First Circuit expressly recognized that "the government is entitled, to some extent, to comment on a defendant's failure to produce evidence supporting the defense theory of the case"—specifically, the lack of

records supporting the defense's characterization of certain payments as legal fees instead of kick-backs. *United States v. Glantz*, 810 F.2d 316, 321 (1st Cir. 1987); *cf. Jones*, 471 F.3d at 543. That is identical in kind to the argument made here.

Second, defendant cannot show that the comment prejudiced him in any way. Again, *Saint Louis* supports the government, not defendant: The court there found that the prosecutor's "isolated" remarks were "made only to counter the argument of defense counsel, not to divert the jury's attention" and that "the prosecutor's immediate clarification that '[defense counsel] doesn't bear the burden, I do,' mitigated any potential that the jury would be misled." *Saint Louis*, 889 F.3d at 157 (4th Cir. 2018). So too here: the prosecutor made his remark in rebuttal, bookending it with crystal-clear reminders to the jury about the proper allocation of the burden of proof. Coupled with the Court's post-argument reminder to the jury to adhere to their instructions, not the arguments of counsel (*see* Tr. 1189:19–1190:3), there is no credible fear that the jury was misled about the correct burdens.

### D.     The superseding indictment is not defective.

Defendant contends that a new trial is necessary because the superseding indictment fails to state a necessary element. *See* Def. Br. 41–44. Defendant's sole new argument is that the Court's prior decision conflicts with *United States v. Daniels*, 973 F.2d 272 (4th Cir. 1992). This is incorrect: If anything, *Daniels* supports the government's position, and the Fourth Circuit has held that alleging a statutorily defined term in the indictment necessarily alleges the component parts of that definition.

The statute in *Daniels* rendered it unlawful to transfer firearms "in violation of the provisions of" 26 U.S.C. chapter 53, which regulated machine guns, destructive devices, and firearms. *See* 973 F.2d at 274. The amended indictment did not state that the subject transfer had occurred in violation of *any* provision; instead, it merely described the transfer and listed 26 U.S.C.

§ 5812(a) among the violated statutes that followed the allegation. *See id.* at 273–74. The court held that where the indictment neither "tracked the statutory language"—*i.e.*, that the transfer was "in violation of the provisions of" chapter 53—nor specifically "charged that [defendant] had transferred the sawed-off shotgun in violation of 26 U.S.C § 5812," it was defective. *See Daniels*, 973 F.2d at 275. Defendant asserts that *Daniels* entitles him "to an indictment before a grand jury that specifically named the statutory provision he allegedly violated" (Def. Br. 43), but it did the exact opposite. *Daniels* expressly left open the possibility that the indictment would be sufficient if it alleged only that the transfer had occurred "in violation of the provisions of *this chapter*" without ever specifying the exact statutory section violated. 973 F.3d at 275 (citing *United States v. Mayo*, 705 F.2d 62, 78 (2d Cir. 1983)) (emphasis added). In other words, the *Daniels* Court refused to adopt the exact requirement that defendant advocates here. At most, the decision holds that an indictment that does not use the prescribed statutory language and relies solely on a mere statutory reference in the closing citation is insufficient.

Here, by contrast, the superseding indictment did track the statutory language and its defined terms by alleging that defendant "knowingly acted and caused others to act in the United States as *an agent of a foreign government*, that is, the Government of Turkey, without prior notification to the Attorney General, as required by law." Dkt. 141, at 20 (emphasis added). The absence of a reference to a "legal commercial transaction" is of no moment. The Fourth Circuit has squarely held that where an indictment charges "a term of art defined by statute," it necessarily charges the component parts of that definition. *United States v. Wicks*, 187 F.3d 426, 428 (4th Cir. 1999). In *Wicks*, a defendant challenged the sufficiency of an indictment because it charged him with forging the security of an "organization" without specifically alleging that the organization operated in or affected interstate commerce. *Id.* at 427–28. The court rejected his challenge because

the statute in question defined "organization" as an entity "which operates in or the activities of which affect interstate commerce"; accordingly, "the interstate commerce element was charged adequately in the indictment through the use of the term 'organization.'" *Id.* at 428. So too here: If a non-legal commercial transaction requirement is "part and parcel of the definitional sentence of 'agent'" as the Court has concluded (Dkt. 292, at 20)), it is adequately alleged when the indictment charges defendant with being "an agent of a foreign government."

The superseding indictment thus charged defendant with acting as an agent of a foreign government without proper notification and provided the specific conduct across seventeen pages of allegations. *See* Dkt. 141, at 1–17. Defendant's motion for a new trial on this ground should be denied.

### E.      The jury instructions were not erroneous.

The Court appropriately rejected both defendant's challenges to the jury instructions during trial, and defendant offers no additional reason to deviate from those rulings.

### 1.      The instructions appropriately defined materiality.

Defendant argues that the Court's definition of materiality to the jury was prejudicially misleading. In doing so, defendant argues for an abstract dictionary definition and ignores the plain text of the statute in question.

Section 612(a) of FARA requires the filing of a registration statement and explicitly defines what information is material to that statement: "The registration statement shall include the following, *which shall be regarded as material for the purposes of this subchapter*." 22 U.S.C. § 612(a) (emphasis added). Among the eleven categories that follow are such things as the identity of every foreign principal for whom the registrant is acting and the extent to which each such foreign principal is supervised or directed by a foreign government (§ 612(a)(3)); copies of each

written agreement, the terms and conditions of each oral agreement, and the activities to be engaged in as for the foreign principal (§ 612(a)(4)); receipts of money from any foreign principal (§ 612(a)(5)); activities that would benefit a foreign principal (§ 612(a)(6)); expenditures in connection with registrable activities (§ 612(a)(8)); any other statements or documents necessary to make the submissions not misleading (§ 612(a)(11)); and, importantly, anything else required to be listed on the FARA forms (§ 612(a)(10)). Accordingly, by specifically defining material information and then imposing penalties for willfully making a "material" false or misleading statement or omission, FARA supplies the meaning of materiality for its own statute.

Defendant is therefore wrong to look for any definition of materiality outside FARA. The Supreme Court has repeatedly made clear that when a statute defines a term, that definition controls over other definitions, even if they are more common. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *see also Schwab v. Reilly*, 560 U.S. 770, 783 (2010) ("Although we may look to dictionaries and the Bankruptcy Rules to determine the meaning of words the Code does not define, the Code's definition . . . in this case is clear."). Indeed, Congress gave explicit notice *exactly* what information would be deemed material for purposes of FARA filings: *all* the information required by § 612(a)—including additional pertinent information deemed necessary by the Attorney General and required by the forms (§ 612(a)(10)). The Court instructed the jury, using plain language, that materiality asked only whether "the filed FARA registration statement and associated forms that have been received into evidence failed to provide the information requested." Tr. 1104:2–7. Accordingly, there was no error in the instruction. *See United States v. Schrader*, 675 F.3d 300, 309 (4th Cir. 2012).

Moreover, even if some more heightened showing of materiality were required, defendant cannot show the prejudice necessary to warrant a new trial. As described above, the government argued that defendant had conspired to make numerous materially false or misleading statements and omissions in the FARA filings, including: the involvement of Turkish government officials in the project (*see* §§ 612(a)(3), 612(a)(11)); the connection of the New York City meeting to the project (*see* §§ 612(a)(3); 612(a)(11)); the purpose of the project (*see* §§ 612(a)(4); 612(a)(6)); the relationship of the op-ed to the project (*see* §§ 612(a)(4); 612(a)(6)); and the purpose of the $40,000 payments to Alptekin (*see* §§ 612(a)(4); 612(a)(5); 612(a)(8)). These disclosures go directly to the heart of what FARA requires: information about what activities defendant undertook to influence the American public and the United States government and for whom he did so. Put simply, the government did not argue any hypertechnical omissions that could be "minor and unimportant" Def. Br. 45. The trial centered on the omission of information key to the entire FARA regime.

Put simply, the Court's instructions were correct, and even under defendant's requested instructions, the arguments presented to the jury demonstrate that they would have reached the same conclusion. *See United States v. Hager*, 721 F.3d 167, 185–86 (4th Cir. 2013).

### 2.   The instructions on defendant's knowledge were correct.

Finally, the defendant claims that he was prejudiced because the jury instructions did not require the government to prove that the defendant had knowledge of § 951's registration requirement. This claim lacks merit.

As both courts of appeals that have addressed the issue have held, knowledge of § 951's registration requirement is not an element of the offense. *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010); *United States v. Campa*, 529 F.3d 980, 999 (11th Cir. 2008); *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005). As the Eleventh Circuit held in *Campa*,

> The government was required to prove a mens rea of general intent. The district court instructed the jury that the defendants must have acted "knowingly," and that they must have known "that [they] had not provided prior notification to the Attorney General," to be found guilty under section 951. The defendants' request for an instruction that requires the government to prove that the defendants knew that they were required to register is not an argument for a mens rea requirement but an argument for a heightened mens rea requirement.

529 F.3d at 999.

*Liparota v. United States*, 471 U.S. 419 (1985), is inapposite. In *Liparota*, the Supreme Court interpreted a statute that said that "[w]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [law]" is subject to imprisonment. *Id.* at 420 n.1. The question before the Court was whether the word "knowingly" applied to the phrase "in any manner not authorized by [law]," and the Court held that it did. *Id.* at 423, 433. Section 951 does not contain similar language and does not even contain the word "knowingly." Moreover, the provision defendant relies on to invoke *Liparota*—the legal commercial transaction—is a category of person excluded from the definition of an "agent of a foreign government." § 951(d)(4). Unlike *Liparota*, defendant's interpretation of § 951 would go far afield from the statutory text and distort its plain meaning.

Indeed, the Supreme Court later confirmed that *Liparota*'s holding turned on the specific language of that statute. *See Bryan,* 524 U.S. at 193 n.15 (explaining that the structure of the statute at issue in *Liparota* compelled the holding that the term "knowingly" in *Liparota* "referred to knowledge of the law as well as knowledge of the relevant facts"). *Bryan* explained that absent that specific language, the normal rule is that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." 524 U.S. at 192. The *Bryan* Court held that "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Id.* at 193. In contrast,

the *Bryan* Court noted, establishing a *willful* violation of a statute would require the government "prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 191–92; *accord United States v. Wilson*, 133 F.3d 251, 262–63 (4th Cir. 1997) (finding *Liparota* inapposite because "interpreting the phrase 'knowingly violate' to mean violation with knowledge of an act's illegality would require us to ignore the distinction between a knowing and a willful violation.").[8]

Defendant is also incorrect that the statute would criminalize otherwise innocent conduct if knowledge of the notification requirement were not required. In *Liparota*, the Supreme Court was concerned because the statute swept so widely as to criminalize casual, passive, or ordinary behavior. *See Liparota*, 471 U.S. at 436-27 (giving examples of innocent individuals who "'altered' [stamps] by tearing them up, and "'transferred' them by throwing them away"); *see also Staples v. United States*, 511 U.S. 600, 615 (1994) (giving example of individual who "inherited a gun from a relative and left it untouched in an attic or basement . . . despite absolute ignorance of the gun's firing capabilities"). Here, by contrast, § 951 applies only when an individual has affirmatively "agree[d] to operate within the United States subject to the direction or control of a foreign government." This uncommon, out-of-the-ordinary conduct is not the kind of traditionally lawful behavior that the Court has been worried about criminalizing. *See, e.g.*, *Liparota*, 471 U.S. at 436-27 (using or mailing food stamps); *Staples*, 511 U.S. at 615 (gun ownership). Individuals who knowingly agree to take action on behalf of a foreign government in the United States are not engaging in inadvertent or casual behavior. In such circumstances, knowledge of the acts themselves is sufficient.

---

[8] Additionally, *Bryan* held that even to prove a *willful* violation, the government need not prove that the defendant knew about the specific legal requirement at issue; "knowledge that the conduct is unlawful is all that is required." 524 U.S. at 196.

Nothing in the text of § 951 suggests that Congress intended to punish only those who acted as undisclosed agents of a foreign government only if they knew their conduct was prohibited by some other provision of law. To the contrary, the entire point of a statute like § 951 that punishes undisclosed behavior is to compel individuals who satisfy the criteria to disclose. Section 951 thus properly falls under the general rule that knowledge of the facts constituting the offense is sufficient.

In any event, even if the law were as the defendant wishes it to be, he would still have no valid claim of prejudicial error. The evidence at trial was undisputed that defendant had actual knowledge of FARA and the requirement to register when operating as an agent of a foreign government. *See* Tr. 65:23–66:15, 1154:23–1155:20; *see also* Tr. 856:19–23. And the jury's verdict on the FARA object of the conspiracy charge shows that the jury concluded defendant had the requisite willfulness and knowledge to conspire to violate that statute. The jury clearly rejected defendant's good-faith argument about his lack of registration.

The jury had good evidence to do so. Contrary to the defendant's claim, he did not consult experienced attorneys and then follow their advice; he acted on Turkey's behalf for over a month before he took any steps toward registration. *Compare* GX 22A (September 3, 2016 email from the defendant, stating, "We have been at work on this engagement since July 31st"), *with* Tr. 856 (defendant first reached out to Kelley in the first week of September 2016); GX 173 (same); Tr. 271 (defendant first reached out to Covington in late August/early September 2016). Finally, the LDA registration that FIG eventually filed (almost two months after work on the project began) contained numerous false statements. *See* GX 166. On these bases, among others, the jury clearly rejected defendant's advice-of-counsel defense. It had ample basis to do so, and defendant can show no prejudice from the Court's instructions.

**CONCLUSION**

Defendant engaged in an elaborate scheme with others to hide the role of the Turkish government in directing political activities in the United States to influence the American public and lawmakers. The jury heard multiple days of witness testimony and reviewed hundreds of pages of exhibits. It unanimously and decisively found defendant guilty on all counts charged. Defendant's challenges to the sufficiency of the evidence ask the Court to take on an improper role and re-weigh evidence that, considered under the proper standard, amply supports the verdict. None of defendant's asserted trial errors have merit. The government's evidence and argument was proper, the indictment adequately stated the charges, and the jury was properly instructed on the law. The Court should deny defendant's motion for acquittal or a new trial.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

_____/s/_____                    By:  _____/s/_____
Evan N. Turgeon                                Aidan Taft Grano
Trial Attorney                                 New York Bar No. 5216585
Counterintelligence and Export                 John. T. Gibbs
   Control Section                             Virginia Bar No. 40380
National Security Division                     James P. Gillis
United States Department of Justice            Virginia Bar No. 65055
950 Pennsylvania Avenue NW                     Assistant United States Attorneys
Washington, DC 20530                           United States Attorney's Office for the Eastern
(202) 353-0176                                     District of Virginia
evan.turgeon@usdoj.gov                         2100 Jamieson Avenue
                                               Alexandria, VA 22314
                                               Tel.: (703) 299-3700
                                               Fax: (703) 299-3981
                                               aidan.grano@usdoj.gov
                                               james.p.gillis@usdoj.gov
                                               john.gibbs@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2019, I electronically filed the foregoing using the

CM/ECF system, which will send a notification of such filing to all counsel of record.

<u>   /s/                        </u>
Aidan Taft Grano
Assistant United States Attorney