# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | : | |
| BIJAN RAFIEKIAN, et al. | : | |


## DEFENDANT RAFIEKIAN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS RULE 29 AND 33 MOTIONS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.   THE GOVERNMENT'S LEGAL ANALYSES ARE WRONG ........................................... 2

II.  THE COURT SHOULD GRANT ACQUITTAL ON COUNT TWO ................................... 7

   A.  The Government Failed to Offer Substantial Evidence That Rafiekian Agreed to Act
       Subject to Turkey's Direction and Control. ......................................................... 7

   B.  The Government Failed to Offer Substantial Evidence of Rafiekian's Knowledge of the
       Absence of a Legal Commercial Transaction ................................................... 15

III. THE COURT SHOULD GRANT ACQUITTAL ON COUNT ONE ................................. 16

   A.  Without Sufficient Proof of the Underlying Offense, The Government's Conspiracy
       Conviction Collapses Too ................................................................................. 17

   B.  The Government Failed to Offer Substantial Evidence of a Conspiracy ......................... 18

IV.  THE COURT SHOULD ORDER A NEW TRIAL ............................................................ 24

   A.  The Verdict Was Against the Weight of the Evidence ........................................ 24

   B.  The Admission of Extensive Hearsay Evidence Warrants a New Trial ........................... 25

   C.  The Government Improperly Shifted the Burden to the Defendant ................................ 27

   D.  The Superseding Indictment Was Defective ........................................................ 28

   E.  The Jury Instructions Were Incorrect .................................................................. 29

      1.  *The Instructions Inaccurately Defined "Materiality"* .................................. 29

      2.  *The Instructions Inaccurately Explained the "Knowledge" Requirement* .................. 30

CONCLUSION ....................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bryan v. United States*,
    524 U.S. 184 (1998)................................................................31

*Curley v. United States*,
    160 F.2d 229 (D.C. Cir. 1947) .................................................3

*Delli Paoli v. United States*,
    352 U.S. 232 (1957) (Frankfuter, J., dissenting) ....................26

*Eital v. Schmidlap*,
    459 F.2d 609 (4th Cir. 1972) ...................................................7

*Harris v. United States*,
    125 A.3d 704 (D.C. 2015) ........................................................4

*Haskins v. Commonwealth*,
    44 Va. App. 1 (2004) ............................................................3, 4

*Hoffman v. United States*,
    18-1049 (2019)..........................................................................5

*Jackson v. Virginia*,
    443 U.S. 307 (1979)..........................................................2, 5, 6

*Liparota v. United States*,
    471 U.S. 419, 420 (1985)....................................................30, 31

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019)............................................................15

*Taylor v. State*,
    697 A.2d 462 (Md. 1997) ..........................................................4

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008) ...............................................9, 10

*United States v. Aquart*,
    912 F.3d 1 (2d Cir. 2018)..........................................................4

*United States v. Becker*,
    230 F.3d 1224 (10th Cir. 2000) ..............................................27

*United States v. Campbell*,
   977 F.2d 854 (4th Cir. 1992) ...................................................................24, 25

*United States v. Caseer*,
   399 F.3d 828 (6th Cir. 2005) ...........................................................................3

*United States v. Cass*,
   127 F.3d 1218 (10th Cir. 1997) ......................................................................27

*United States v. Christian*,
   452 Fed. Appx. 283 (4th Cir. 2011) (per curiam) ...........................................5

*United States v. Daniels*,
   973 F.2d 272, 275 (4th Cir. 1992) ............................................................28, 29

*United States v. Dozie*,
   27 F.3d 95 (4th Cir. 1994) .............................................................................16

*United States v. Fondren*,
   417 F. App'x 327 (4th Cir. 2011) .....................................................................1

*United States v. Fowler*,
   55 F. App'x 125 (4th Cir. 2003) ....................................................................25

*United States v. Gengler*,
   No. 1:08 Cr. 12, 2009 WL 5549225 (E.D. Va. Oct 23, 2009) (Trenga, J.) ............................19

*United States v. Glantz*,
   810 F.2d 316 (1st Cir. 1987) ..........................................................................28

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014) ...........................................................................26

*United States v. Hassan*,
   742 F.3d 104 (4th Cir. 2014) ..........................................................................28

*United States v. Ince*,
   21 F.3d 576 (4th Cir. 1994) ...........................................................................26

*United States v. Johnson*,
   592 F.3d 749 (7th Cir. 2010) ...........................................................................3

*United States v. Lopez-Diaz*,
   794 F.3d 106 (1st Cir. 2015) ............................................................................3

*United States v. Louis*,
   861 F.3d 1330 (11th Cir. 2017) ........................................................................3

*United States v. Lovern*,
   590 F.3d 1095 (10th Cir. 2009) ...................................................................3, 5

*United States v. Moussaoui*,
   382 F.3d 453 (4th Cir. 2004) ........................................................................10

*United States v. Pernell*,
   No. 09-cr-452, 2014 WL 2002210 (E.D. Va. May 15, 2014).................24

*United States v. Saint Louis*,
   889 F.3d 145 (4th Cir. 2018) ........................................................................27

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015)........................................................................4, 6

*United States v. Vargas-Ocampo*,
   747 F.3d 299 (5th Cir. 2014) (en banc) .......................................................6

*United States v. Wilkerson*,
   84 F.3d 692 (4th Cir. 1996) ..........................................................................28

*United States v. Wright*,
   835 F.2d 1245 (8th Cir. 1987) ......................................................................3

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994)...........................................................................................31

*Winfield v. O'Brien*,
   775 F.3d 1 (1st Cir. 2014)...............................................................................5

*In re Winship*,
   397 U.S. 358 (1970)...........................................................................................2

## STATUTES:

18 U.S.C. App. III § 6(c)(1)...........................................................................10

18 U.S.C.
   § 951...................................................................................................... *passim*

22 U.S.C.
   § 612(a) ...........................................................................................................29
   § 618(a)(1) ......................................................................................................29

Classified Information Procedures Act ......................................................8

## OTHER AUTHORITIES:

28 C.F.R. § 73.1 .......................................................................................29, 31

O'Malley, 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.) ...................................................4

12 Cyc. of Federal Proc. § 48:179 (3d ed.) ......................................................................4

75A Am. Jur. 2d Trial § 842 ..........................................................................................4

23A C.J.S. Criminal Procedure and Rights of Accused § 1564 .......................................4

Fed. R. Crim. P.
29................................................................................................................... *passim*
33...............................................................................................................2, 24, 25, 31

Fed. R. Evid. 801(d)(2) ................................................................................................28

## PRELIMINARY STATEMENT

The government spills much ink criticizing Rafiekian's recitation of the legal standard (which it neglects to mention is the majority rule in the circuits, and reflected in the instructions given to the jury), as well as in constructing an elaborate "chain of reasoning" to support the jury's verdict.  But the simplest way to resolve Rafiekian's motion is to ask the following question:  Did the government offer sufficient circumstantial evidence from which a rational jury could infer, without speculating, that defendant Bijan Rafiekian agreed to act as an unregistered Turkish agent?  If the answer is no, then the Court should grant Rafiekian's motion for judgment of acquittal on both counts, for in that case he was neither acting as an undisclosed foreign agent (Count Two), nor conspiring to do so (Count One(a)), nor conspiring to lie about doing so (Count One(b)).

What was the evidence from which the government contends a jury could conclude that Rafiekian agreed to act illegally on behalf of Turkey, rather than legally on behalf of a private client?  The sum total of the government's evidence on that point amounts to very little:  primarily, the absence of clear evidence regarding the transition from Truth to Confidence or why certain payments were made, and a meeting in New York in which the only attending witness testified that no requests were made or instructions given.  Those categories of evidence—which did not require the jury to make any witness credibility determinations whatsoever—are a far cry from the foreign agent evidence in other Section 951 cases, including those in which trial courts have granted judgments of acquittal.  *See, e.g., United States v. Fondren*, 417 F. App'x 327, 330-31 (4th Cir. 2011) (district court granted judgment of acquittal on Section 951 and related conspiracy count, in case resulting in conviction on separate count for passing along classified information to the Chinese and Taiwanese governments in exchange for cash).  Even viewed in the light most favorable to the government, any rational jury evaluating that evidence would have no choice but

1

to speculate to conclude that Rafiekian agreed to act at the direction and control of *Turkey* rather than the private client paying his bills (let alone to do so without registering).

That may be why the government now contends that, "critically," the jury relied on a new piece of evidence:  namely, a summary of classified CIPA intelligence, given to the defense without explanation on the eve of trial, at the conclusion of a series of *ex parte* hearings, and read to the jury *as evidence for the defense*.  Presumably the defense received this evidence not because the government thought it was "critical" in proving guilt, but because the court recognized it to be potentially exculpatory.  The government's reliance on that statement—which does not evidence an agency relationship by anyone, and specifically *excludes* Rafiekian and FIG from its scope— betrays the weakness in the government's case.  Even worse, the government's reliance has also invited a new trial on yet another ground.  For if the jury necessarily relied on this evidence to support its guilty verdict (as the government now admits), then the jury and Rafiekian should have been afforded access to the underlying classified materials themselves, not a vague summary supporting guilt by innuendo.

For those and many other reasons, this Court should grant a judgment of acquittal or, at a minimum, a new trial.  The weakness of the government's case is even more apparent under the Rule 33 standard, under which this Court enjoys wide discretion.  And the legal errors prejudicing Rafiekian only confirm that a new trial is warranted.  Either way, this verdict should not stand.

## I.      THE GOVERNMENT'S LEGAL ANALYSES ARE WRONG

The constitutional requirement that the government prove "beyond a reasonable doubt . . . every fact necessary to constitute the crime" is foundational to our criminal justice system.  *In re Winship*, 397 U.S. 358, 364 (1970).  Unfortunately, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  Thus, under Rule 29, a trial court must

evaluate the record evidence to ascertain "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  Rafiekian cited that classic formulation of the standard, repeatedly.  *E.g.*, ECF No. 360 at 2-3 ("Even drawing all inferences in the government's favor, no reasonable jury could have found Rafiekian guilty beyond a reasonable doubt."); *see also id.* at 9, 10, 17, 28.  He also emphasized that the "the Court must examine the evidence as a whole," not in isolation, and "look to all the evidence."  *Id.* at 2 (internal quotations omitted); *see id.* at 28 (evidence insufficient even if "viewed cumulatively").

The government nevertheless spends over six pages arguing that "Defendant's legal analyses are wrong."  Opp'n, ECF No. 365 at 2-8.  Its primary contention is that Rafiekian relied on "simply bad law" in citing the well-accepted proposition that a conviction may not stand if, after granting the government all favorable inferences, the evidence nevertheless gives "equal or nearly equal circumstantial support to a theory of guilt as it does to a theory of innocence."  *Id.* at 3.

The government is wrong, not Rafiekian.  It neglects to mention that what it characterizes as "bad law" is actually the *majority rule* in the circuit courts of appeal.  The First, Sixth, Seventh, Eighth, Tenth, Eleventh, and D.C. Circuits—along with many (perhaps most) states—explicitly adopt it.  *See United States v. Lopez-Diaz*, 794 F.3d 106, 111 (1st Cir. 2015) ("[I]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction.") (quotation omitted).[1]  Contrary to the government's argument (Opp'n, ECF No. 365

---

[1] *See United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005); *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010); *United States v. Wright*, 835 F.2d 1245, 1249 n.1 (8th Cir. 1987); *United States v. Lovern*, 590 F.3d 1095, 1107 (10th Cir. 2009); *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017); *Curley v. United States*, 160 F.2d 229, 233 (D.C. Cir. 1947).  Many states have adopted the rule too.  *See, e.g., Haskins v.*

at 4), the Second Circuit continues to rely on the rule in appropriate cases.[2] Although the Third and Fifth Circuits—neither of which Rafiekian cited—no longer follow the rule, that hardly makes it "bad law."

Indeed, the Court need look no further than the government's *own proffered jury instructions*, which were read to the jury, to see why the government's claim is off-base. Those instructions, drawn verbatim from O'Malley, 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.), provide that "[i]f the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury *must, of course*, adopt the conclusion of innocence." Jury Instruction No. 7 (emphasis added). If the jury "must" find the defendant "not guilty" when the evidence is in equipoise, it cannot be "directly contrary to binding Supreme Court and Fourth Circuit precedent" (Opp'n, ECF No. 365 at 2) to ensure that the jury followed that instruction.

To Rafiekian's knowledge, the Fourth Circuit has not opined on the equipoise rule in any published case. But earlier this year, the Solicitor General of the United States approvingly cited the Fourth Circuit's application of the rule as consistent with Supreme Court precedent: "The

---

*Commonwealth*, 44 Va. App. 1, 9 (2004) (if after resolving all factual inferences in the government's favor "the evidence of guilt or innocence remains anywhere near equipoise—that is, the facts are "equally susceptible to two or more constructions"—then reasonable doubt exists as a matter of law"); *Harris v. United States*, 125 A.3d 704, 709 (D.C. 2015) ("Where evidence of guilt is in equipoise with evidence of innocence, it is perforce insufficient for conviction by the constitutional standard, beyond a reasonable doubt."); *Taylor v. State*, 697 A.2d 462, 465 (Md. 1997) ("[W]hen the evidence equally supports two versions of events, and a finding of guilt requires speculation as to which of the two versions is correct, a conviction cannot be sustained."). So have many treatises. *See, e.g.*, 12 Cyc. of Federal Proc. § 48:179 (3d ed.) ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury necessarily must entertain a reasonable doubt."); 75A Am. Jur. 2d Trial § 842 (similar); 23A C.J.S. Criminal Procedure and Rights of Accused § 1564 (similar).

[2] The government contends that "[t]he Second Circuit has repeatedly rejected the reading of *Glenn* that defendant advances here." Opp'n, ECF No. 365 at 4. But *Glenn* has never been overruled, and in fact, the government's cited case acknowledges that the Circuit continues to apply the rule in cases like this one: "[T]he equipoise rule [may] apply only where evidence 'is nonexistent or so meager' as to preclude the inferences necessary to a finding favorable to the government." *United States v. Aquart*, 912 F.3d 1, 44-45 (2d Cir. 2018); *see United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (applying rule).

4

equipoise rule is not necessarily inconsistent with *Jackson* so long as a reviewing court first construes all conflicting inferences 'in the light most favorable to the Government' before evaluating whether the sum total of prosecution-favoring inferences and defendant-favoring inferences are 'in equipoise.'"   Brief, *Hoffman v. United States*, No. 18-1049 (2019) (quoting *United States v. Christian*, 452 Fed. Appx. 283, 287 n.2 (4th Cir. 2011) (per curiam)).

That sensible application of the rule is all Rafiekian seeks.  After all, the equipoise rule is just a way to conceptualize the classic Rule 29 inquiry from *Jackson,* and embodies the commonsense notion that guilt beyond a reasonable doubt requires more than "speculation and conjecture."  *United States v. Lovern*, 590 F.3d 1095, 1109 (10th Cir. 2009).  As then Judge-Gorsuch explained, the rationale is straightforward:  If a wholly circumstantial case, viewed in the government's favor, nevertheless gives essentially equal support to guilt and innocence, the court "must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt."  *Id.* at 1107; *see, e.g.*, *id.* (holding "the jury simply had no non-speculative reason to favor" the guilty explanation over the others); *see also Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014) (describing "simple" rationale to be that "[a] criminal trial ought not be an arbitrary exercise").  If this proposition were truly "bad law," then there would be no difference between the venerable "beyond a reasonable doubt" standard and the laxer "preponderance of the evidence" standard this Court employed under Evidence Rule 104(a).

The government argues that Rafiekian is really asking "the Court to re-weigh evidence as if it were another factfinder sitting alongside the jurors."  *See, e.g.*, Opp'n, ECF No. 365 at 5.  That mischaracterizes Rafiekian's motion, which repeatedly acknowledged that the Court must "draw[] all inferences in the government's favor," *e.g.*, ECF No. 360 at 3, 7, 8, 10, 18—including on the very page that the government selectively quotes.  *Compare id.* at 2 ("*When the evidence viewed*

*in the light most favorable to the prosecution* calls for speculation—*i.e.*, if it gives equal or nearly equal circumstantial support to a theory of guilt as it does to a theory of innocence—then a reasonable jury must necessarily entertain a reasonable doubt."), *with* Opp'n, ECF No. 365 at 2-3 (quoting Rafiekian's brief while omitting the first clause).  But in this case, the Court can assume the truth of every word that every witness spoke and still find the verdict based on "speculation and conjecture."

In reality, it is the government's cramped conception of the standard—which it summarizes as whether there was "*some evidence* from which the jury could rationally infer the existence of a fact," [Opp'n, ECF No. 365 at 6]—that misconstrues the standard, by watering it down to a meaningless rubber stamp.  But *Jackson*'s holding makes clear that the Constitution does not permit a court to affirm a conviction merely upon concluding that the jury was properly instructed, *see* 443 U.S. at 316-17, or that *some* evidence supported conviction, *id.* at 320 ("[I]t could not seriously be argued that . . . a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt.").  Whatever the contours of the Rule 29 standard, it surely cannot "mean that if there is any evidence that arguably could support a verdict" the verdict must stand, for "[i]n any criminal trial there is always *some* evidence of guilt, otherwise there could not have been a prosecution."  *Valle*, 807 F.3d at 515 (emphasis added); *see id.* ("probably guilty" is not enough).

In any event, the result is the same under the traditional *Jackson* formulation of the standard that Rafiekian *also* cited.  *E.g.,* ECF No. 360 at 17 ("no rational jury").  Whether this Court applies the "equipoise" rule, or simply asks "whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable," *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc), the result is the same:  the government failed to meet its trial burden.

## II.     THE COURT SHOULD GRANT ACQUITTAL ON COUNT TWO

### A. The Government Failed to Offer Substantial Evidence That Rafiekian Agreed to Act Subject to Turkey's Direction and Control.

The government was required to prove beyond a reasonable doubt that Rafiekian "agreed to operate within the United States subject to the direction or control of a foreign government or official." Final Jury Instruction No. 41. The government now concedes, as it must, that it lacks any *direct* evidence of Rafiekian's agreement to do so—such as testimony from Michael Flynn, Ekim Alptekin, or any other alleged conspirator, or evidence of any Turkish command or request. *See* Opp'n, ECF No. 365 at 14; *cf. Eital v. Schmidlap*, 459 F.2d 609, 614 (4th Cir. 1972) (because common-law agency based on "consent of the parties," "the intention of the parties is the significant element in determining whether the relationship exists"). Instead, the only direct evidence pointed in the opposite direction: that Rafiekian agreed to take direction from Alptekin and Inovo. *See* ECF No. 342 at 7-13; ECF No. 362 at 12.[3]

The proper resolution of Rafiekian's Rule 29 motion thus largely hinges on whether a rational jury faced with the government's circumstantial case could infer, without speculating, that Rafiekian *agreed* to act as an unregistered Turkish agent. Tellingly, the government modifies that standard to omit the "agreement" requirement, implying instead that it was sufficient that "[t]he jury heard substantial evidence from which to conclude that *Project Confidence was subject to the direction and control of Turkey*, with Alptekin acting as the intermediary." Opp'n, ECF No. 365

---

[3] Before trial, the Court asked the government a hypothetical going directly to the missing evidence of Rafiekian's *agreement* to operate as a Turkish agent:

> Q:  Let's assume the evidence were nothing more than that the Turkish government hired Company B and gave a general view of what it wanted Company B to do and Company B then hired Company A *** and with no further involvement of the Turkish government. Is that, under the government's view, sufficient to establish the offenses in this indictment?

Hr'g Tr. at 19 (June 13, 2019), ECF No. 213. The government responded that, because the offense "requires direction or control by the foreign government," the answer "would depend upon what the agreement was between the Turkish government and Alptekin and what he conveyed to FIG." *Id.* at 19-20.

at 9 (emphasis added).  But that is not the test.  Even if one accepts that Alptekin was a Turkish intermediary with respect to the project, "one cannot sufficiently infer from this evidence that *Rafiekian* was conspiring to act as an undisclosed Turkish agent."  July 9 Order, ECF No. 292 at 29.  "Moreover," any such inference is "substantially undercut" by Rafiekian's contemporaneous solicitation of legal advice concerning FARA.  *Id.*

With the proper standard in mind, the question becomes what evidence was there from which such an agreement could rationally be inferred.  The answer is "none."  The government's brief boils down its evidence to just four categories:  (1) the government's summary of classified documents pertaining to communications involving Alptekin and Flynn (but not Rafiekian or FIG); (2) the "switch" from Truth to Confidence; (3) Alptekin's alleged role as an intermediary; and (4) the September 19 meeting in New York.  Only the last item even involves an actual link between Rafiekian and Turkey; none come close to establishing Rafiekian's agreement to operate at Turkey's direction and control.

**Summary of Classified Flynn-Alptekin Communications**.  Rafiekian will begin where the government ended—with the government's summary of classified information pertaining to Flynn and Alptekin.  That exhibit, DX66, was given to the defense on the eve of trial, following a series of *ex parte* hearings about which Rafiekian remains in the dark.  The reason the information was offered only in summary fashion is apparently that the government invoked national security concerns under the Classified Information Procedures Act ("CIPA") to prevent public disclosure of the underlying evidence.  Rafiekian immediately sought access to the classified information because "[i]t goes right to the question of what happened and what he knew and what statements were made and who was making them," and "[i]f Mr. Rafiekian is convicted without his counsel having access to this exculpatory evidence, we believe it will go right to the heart of his due process

8

and confrontation rights."  Hr'g Tr. 30-31 (July 12, 2019), ECF No. 309.[4]  The Court took the request under advisement, but noted that "[o]bviously, as the case develops, the Court understands the defense's concern and will continue to consider whether additional disclosure of information bear on this."  *Id.* at 31-32.

The government now contends that, "critically," this summary permitted the jury reasonably to "infer that Project Confidence operated subject to Turkey's direction and control." Opp'n, ECF No. 365 at 14.  That is an astonishing assertion.  As Rafiekian understands it, the only reason the defense received the meager one-sentence summary is that the Court "determine[d] that the information is helpful to the defense of [the] accused, or is essential to a fair determination of a cause."  *United States v. Abu Ali*, 528 F.3d 210, 247–48 (4th Cir. 2008) (internal quotations omitted).  Yet the government now cites that defense exhibit as "critical[]" evidence supporting the guilt, even acknowledging that "the jury could—and *did*—rationally infer" Rafiekian's guilt beyond a reasonable doubt based partly on that summary.  *See* Opp'n, ECF No. 365 at 14 ("[F]rom this evidence in conjunction with other facts, the jury could—and did—rationally infer" guilty on Count Two.).

In light of the government's concession that the jury "did" rely on a summary of information that the government ensured neither the defendant nor the jury could see, Rafiekian is entitled to a new trial.  Whether the underlying information supports Rafiekian's guilt (as the government now argues), or is exculpatory *Brady* material (as Rafiekian reasonably had assumed),

---

[4] That summary provided in full:

[T]he United States is in possession of multiple, independent pieces of information relating to the Turkish government's efforts to influence United States policy on Turkey and Fethullah Gulen, including information relating to communications, interactions, and a relationship between Ekim Alptekin and Michael Flynn, and Ekim Alptekin's engagement of Michael Flynn because of Michael Flynn's relationship with an ongoing presidential campaign, without any reference to the defendant or FIG.

DX66.

it is clear that the summary failed to "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information."  18 U.S.C. App. III § 6(c)(1).  A "criminal defendant's right to confront witnesses necessarily encompasses his right to also see any documentary evidence that such witnesses offer at trial as evidence to support a conviction."  *Abu Ali*, 528 F.3d at 245.  "While the court must take into account the government's interest in protecting national security," the Fourth Circuit has "made clear that this interest cannot override the defendant's right to a fair trial."  *Id.* at 248. (internal quotations omitted); *see also United States v. Moussaoui*, 382 F.3d 453, 466 n.18 (4th Cir. 2004) ("There is no question that the Government cannot invoke national security concerns as a means of depriving [the defendant] of a fair trial.").  Rafiekian was unable to effectively rebut the government's statement in closing arguments that the classified materials actually supported guilt.[5]  Now that the government has admitted that the jury necessarily "did" rely on this evidence to find him guilty, Rafiekian's prejudice is clear.  He is entitled to a new trial.

The government's arguments are particularly galling because no rational jury should have made such inferences.  First, the government's contention that it involves the "identical time frame" (Opp'n, ECF No. 365 at 14) is baseless:  the summary mentions no beginning or end dates, and Flynn was publicly connected to the Trump campaign as early as February 2016.[6]  Second, the summary does not say or imply that even *Flynn* agreed to operate at Turkey's direction and control,

---

[5] That was the strong implication of the government's closing argument, in which it described fictional bank robbers "Tom," "Dick," and "Harry," and then drew an analogy between DX66 and a bank robbery conspiracy, suggesting that all DX66 showed was that even "Harry" [*i.e.*, Rafiekian] was not mentioned, that simply meant he "joined the bank robbery scheme" later.  Trial Tr. 1182:14-1183:25 (July 22, 2019), ECF No. 351.  Although Rafiekian could not effectively rebut the government's insinuation then (because he had not, and still has not, seen the underlying material), at least this statement was ostensibly designed to discount Rafiekian's argument.  What the government is now suggesting is far more problematic:  that the evidence was used *affirmatively* to support the jury's inference of guilt.

[6] *Trump's Veepstakes: Who is Michael Flynn?*, CNN (May 27, 2016), *available at* https://www.cnn.com/2016/05/26/politics/michael-flynn-donald-trump-vp-search/ ("Flynn told CNN in February [2016] that he has been advising Trump 'on a range of issues'").

10

referring instead to "communications, interactions, and a relationship" between Alptekin and Flynn, and an engagement that *Alptekin* pursued.  Finally, and needless to say, the statement certainly does not say or imply that *Rafiekian* agreed to operate at Turkey's direction and control, but rather the exact opposite:  the government possessed multiple pieces of information *making no* "*reference to the defendant or FIG*."  The only rational implication of that statement is that Flynn and Alptekin had some understanding or relationship to which Rafiekian was *not* party.  The government's argument that the jury "can infer that the 'efforts' here referred to Project Truth/Confidence" (Opp'n, ECF No. 365 at 14), is the very definition of speculation:  it suggests that the jury could ("and did") infer guilt based on a vague summary of "communications" on an unspecified timeline involving people other than Rafiekian—evidence that neither Rafiekian nor the jury were even permitted to see.

**"Switch" from Truth to Confidence**.  The government's argument about "Truth" and "Confidence" is a red herring.  FIG changed the name of its project proposal from "Project Truth" to "Project Confidence."  There is no evidence who made that decision or why.  While Rafiekian understood that the project that FIG was proposing was being marketed to the government of Turkey, there is no evidence that Turkey actually agreed to the proposal.[7]  Instead, the record showed that Alptekin and his company, Inovo, decided to go forward with the proposal themselves.  The only evidence of actual payments to FIG shows that the payments came from Alptekin/Inovo, not from Turkey, and there is no evidence of any money flowing from Turkey to Alptekin/Inovo.

---

[7] The government falsely contends that the "defendant's own statements admit[] that the government of Turkey was the client."  Opp'n, ECF No. 365 at 9.  But the Kelner testimony the government cites is that Rafiekian told him about a *potential* project in which the client "*would have been*" the government of Turkey—and that this potential project "never came to fruition."  Trial Tr. 229:4-230:15 (July 16, 2019), ECF No. 326 (Kelner).  That is the opposite of an "admission."  Consistent with what Rafiekian had told Kelner, the evidence at trial (which the government ignores) revealed that Flynn and Rafiekian told McCauley that they were still hoping to be retained by Turkey on the Gulen-related project at the time of the September 19 New York City meeting.  Trial Tr. 410-411 (July 17, 2019), ECF No. 330 (McCauley).

That what FIG agreed to do for Inovo was no different from what FIG had originally proposed to do for the government of Turkey, or that the name of the project changed, are unremarkable facts that certainly do not permit the rational inference that FIG was really working for Turkey.

**Alptekin's Alleged Role as "Intermediary."**   The government argues that there was substantial evidence showing "that Alptekin's status as the nominal client was pretextual to hide his activities as the go-between with the Turkish government."  Opp'n, ECF No. 365 at 12.  But the government offered no admissible evidence that Alptekin actually acted as a go-between with the Turkish government with respect to this project.  ECF No. 362 at 12-13.  Its primary evidence is that payments flowed both to and from him to FIG.  The government contends those are "patently inexplicable" as business payments because "there is no reason to accept payment from a client only to immediately return a portion of that money," Opp'n, ECF No. 365 at 12.   But the government never responds to Rafiekian's point that these are also inexplicable as "kickbacks," as the money was both coming from and going to accounts controlled by Alptekin.  As this Court has already held, "*one cannot reasonably infer* an agreement or understanding that Rafiekian would act as an undisclosed Turkish agent" based on that payment arrangement.  July 9 Order, ECF No. 292 at 31 (emphasis added).

The only other evidence the government relies on to show that Alptekin acted as an intermediary is the fact that "Alptekin had significant access to high-level Turkish government officials."  Opp'n, ECF No. 365 at 13 (citing a photograph of Alptekin with a high-level Turkish individual, Alptekin's relationship with a public project with Sphere, and the fact that Alptekin organized the New York meeting).  But that is no secret; the record showed that Rafiekian *himself* voluntarily told the U.S. government in September 2016 about Alptekin's "senior level contacts in the Turkish government."  Trial Tr. 1009:6-1010:5 (July 22, 2019), ECF No. 350.  The fact that

12

the government is stuck arguing that the jury rationally could infer from such generic and public evidence that Alptekin must therefore have been *conveying orders from the Turkish government* is a revealing admission of how speculative their case really is.  Surely the government is not suggesting that it is rational to infer that anyone with a relationship to a senior government official is necessarily acting on behalf of those governments when advocating on an important issue of public policy.

**The September 19 Meeting**.  Finally, the government claims that evidence that Rafiekian must have agreed with Turkey to do something can be derived from the September 19 meeting between FIG and Turkish officials in New York.  But the government's own proffered testimony from McCauley could not be clearer on this point—Turkey never made any request to FIG during the meeting, and indeed, FIG's work was not even discussed:

> Q:  And at this meeting, there was really no discussion at all of FIG and any work that FIG was doing, correct?
>
> A:  No, sir, there wasn't.
>
> ****
>
> Q:  But there was no request from any Turkish official for Flynn Intel Group to do anything?
>
> A:  No, sir.

Trial Tr. 440:14-17, 442:1-3 (July 17, 2019), ECF No. 330.  This is not a matter of McCauley's credibility on the stand, or drawing one factual inference over another.  McCauley was the lone witness who attended this meeting, and his testimony was uncontradicted.

Ignoring McCauley's testimony on this point entirely, the government posits that the jury could "infer"—*i.e.*, speculate—that the Turkish government nevertheless gave "direction" at this meeting because (1) "the Turkish government wanted Gulen deported from the United States," and (2) "[t]he extradition of Gulen was the 'ultimate aim' of FIG's work on Confidence."  Opp'n, ECF

13

No. 365 at 11.  Again, McCauley was there—he heard Turkey's discussion of Gulen, and his uncontroverted testimony was that it did not amount to a "request" for FIG to do anything.  The government also mischaracterizes McCauley' testimony to suggest that Rafiekian admitted FIG was already working on Turkey's behalf at the time of the New York meeting and was only seeking a $5 million "follow-on" contract, (*id.* at 11), when McCauley's actual testimony was that Rafiekian had not yet gotten *any* contract.  Trial Tr. 410:5-8 (July 17, 2019), ECF No. 330 (McCauley) ("Q:  Did the defendant say anything about the value of the project?  A:  The defendant, Bijan, told me. He said: Brian, *if we get this contract*, our budget is $330,000.") (emphasis added).  On that score, whether the September 19 meeting was "related to Confidence" is beside the point:  Even if it "related to Confidence" (in a broadly defined sense), no evidence permitted the rational inference that Turkey was directing and controlling that work.

The government speculates a covert "wink and nod" between Turkey and FIG at the meeting, but such speculation is unreasonable in light of McCauley's unrebutted testimony.  More broadly, the mere fact that FIG's work was *consistent* with Turkish policy goals does not remotely establish that Rafiekian agreed to act as subject to Turkey's *direction and control*.  Countless organizations operate in the United States that share policy agendas that are partially or fully aligned with governments, politicians, or political parties—the Federalist Society, for example, and many advocacy or political PACs—but that does not mean these organizations have necessarily agreed to act under the *direction and control* of the political entities.  And it is hardly remarkable that a prominent, well-connected Turkish businessman like Alptekin would seek to promote policies aligned with the policies of the Turkish government as a whole.

Grasping at straws, the government argues that a nefarious inference can be drawn from the fact that the post-dinner meeting did not take place during business hours at the Turkish

consulate.  Again, it is pure speculation.  There are countless innocent reasons why such a meeting would have taken place outside of normal business hours.  Here is one:  the Turkish officials had a full day scheduled with official business.  That the government would rely on such an argument suggests that the evidence of guilt is not just meager and inadequate, it is totally absent.

### B.  The Government Failed to Offer Substantial Evidence of Rafiekian's Knowledge of the Absence of a Legal Commercial Transaction

 The government also failed to offer substantial evidence that Rafiekian knew he was engaged in conduct that was not a "legal commercial transaction."  The government argues that it was only required to prove that "(i) the defendant know he is engaging in the conduct, and (ii) the conduct itself does not fall within the definition of a 'legal commercial transaction.'"  Opp'n, ECF No. 365 at 15.  But that argument is contrary to the Court's jury instructions, which required the government to prove that Rafiekian *knew* he was engaged in conduct other than a legal commercial transaction.  *See* Final Jury Instruction No. 41 (requiring that the government prove that Rafiekian "knew he was a person who agreed . . . to engage in conduct other than a 'legal commercial transaction'"); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (presumption in favor of scienter element applying to each statutory element applies "even when Congress does not specify any scienter in the statutory text").  In other words, while the government argues that the knowledge element "merely requires proof of knowledge of the facts that constitute the offense," [Opp'n, ECF No. 365 at 15], one of the "facts that constitute the offense" is whether Rafiekian's conduct was otherwise "legal."  *See* July 9 Order, ECF No. 292 at 2 (holding that "[i]n order to prove a violation of 18 U.S.C. § 951, an essential element of the offense is that the defendant engaged in conduct that was not an excluded legal commercial transaction.").

The government claims it is "uncontested" "that defendant was actually aware of FARA's requirements."  Opp'n, ECF No. 365 at 16.  But Rafiekian, who is not a lawyer, was aware only

of FARA's existence, not its "requirements"; it is undisputed that he contacted two attorneys—first Covington then Kelley—for the specific purpose of assisting with FARA registration, until told by Kelley that such registration was not required.  *See* Trial Tr. 270:12-272:23 (July 16, 2019), ECF No. 326 (Kelner); *id.* at 858:4-8 (July 18, 2019), ECF No. 334 (Kelley).  As such, the government failed to offer substantial evidence that Rafiekian knew he was engaged in conduct other than a legal commercial transaction.

The fact that the jury did not accept Rafiekian's proffered advice of counsel defense is of no consequence.  That defense deals with a standard more exacting than whether Rafiekian had actual knowledge that he was doing something illegal—namely, whether he (1) "made a full and accurate report or disclosure to [his] attorney of all important and material facts," and (2) "acted strictly in accordance with the advice his attorney gave following this report or disclosure."  Final Jury Instruction No. 31.  That the jury declined to find one or both of those elements satisfied does not make its determination regarding Rafiekian's "knowledge" rational.

## III.   THE COURT SHOULD GRANT ACQUITTAL ON COUNT ONE

To prove a conspiracy, the government was required to submit substantial evidence not only of the *existence* of a conspiracy to commit a specific criminal object, but that Rafiekian was both aware of those criminal ends and specifically agreed to join in that conspiracy.  *See United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994) ("To prove a conspiracy, the government must show an agreement to do something illegal.").  In light of this Court's ruling at the close of all the evidence that the government failed to prove conspiracy by a preponderance of the evidence, the government faces a significant uphill battle in demonstrating that it nevertheless offered substantial evidence of Rafiekian's guilt *beyond a reasonable doubt*.  It cannot make that showing.

### A.  Without Sufficient Proof of the Underlying Offense, The Government's Conspiracy Conviction Collapses Too

The government leads off by arguing that Rafiekian "conflates" his conspiracy conviction with its underlying substantive offense—that it makes no difference if the underlying offenses were "never completed" because it was enough if he simply agreed to commit them.  That is somewhat surprising coming from the government, which has not previously suggested that Rafiekian had a "mistaken belief" that Turkey was the true principal (Opp'n, ECF No. 365 at 19), or that the FARA statement was, in fact, possibly *true, cf.* Superseding Indictment ¶ 55 (Rafiekian "caused to be made the following false statements of material fact in documents filed with and furnished to the Attorney General under the provisions of FARA[.]").

In any event, the government misses the point.  It is of course true as a general matter that the government need not prove a completed offense to support a conspiracy conviction.  But if it was too speculative for the jury to believe that Rafiekian *actually* agreed to act as an agent of Turkey, it was even more speculative for the jury to conclude that he *tried and failed* to do so, especially in light of the government's consistent theory.  For similar reasons, if Rafiekian never agreed to operate as Turkey's agent, then the statements that the government contends are lies— such as that Turkey "could be construed" to have been principally benefitted—are not lies at all. In other words, if no rational jury could conclude that Rafiekian ever agreed to act at Turkey's direction and control, the government's entire case crumbles.[8]

---

[8] For similar reasons, it is irrelevant whether Alptekin's hearsay statements are considered for the purpose of establishing what Rafiekian "believed."  Although the jury could rationally conclude from these statements that Rafiekian knew Turkey was aware of FIG's work, they stop far short of permitting a rational jury to conclude beyond a reasonable doubt that Rafiekian was agreeing to operate as an unregistered Turkish agent.  Indeed, most of the proffered hearsay statements were made before FIG was engaged by Inovo and thus are at least equally consistent (drawing all inferences in favor of the government) with the notion that Turkey was the original target client but that the Turkish engagement never materialized.

17

The government's brief makes clear that all of its conspiracy evidence ultimately stems from the jury's ability to draw from circumstantial evidence "rational inferences in a chain of reasoning that led to the existence of a criminal agreement." Opp'n, ECF No. 365 at 19. The first link in that chain of reasoning is the same proposition underlying Count Two: that the "jury could rationally infer that Turkey directed and controlled the FIG engagement or, at a minimum, that defendant, Flynn, and Alptekin believed that to be the case." *Id.* at 20. But if no rational jury could draw that first inference from the evidence before them without speculating—and they cannot (*see supra* at 7-15)—then the entire chain of reasoning is broken, and *both* Counts must fall.

### B.  The Government Failed to Offer Substantial Evidence of a Conspiracy

At the close of all the evidence, this Court found that, even considering the hearsay statements for their truth, the government failed to prove the existence of a conspiracy even by a preponderance of the evidence. This Court also held that "what was disclosed in the FARA statement is not sufficient to allow any inference of the alleged conspiracies." July 9 Order, ECF No. 292 at 29. For those reasons, and because Rafiekian has already addressed the conspiracy evidence at length (ECF No. 342 at 17-29; ECF No. 360 at 17-33), Rafiekian will not attempt to address every assertion made by the government. But a few specific arguments deserve a response.

*First*, the government contends that "the jury could rationally conclude that defendant had conspired with Flynn or Alptekin or both to commit [the conspiracy] crimes." Opp'n, ECF No. 365 at 17. As an initial matter, it is difficult to give credence to the government's contention that Flynn was a co-conspirator, given that the government contended otherwise until a month before trial when forced to change course for tactical reasons and not because of any newly discovered evidence. Hr'g Tr. 65:13-22 (July 13, 2019), ECF No. 213. But even crediting the government's belated contention, the government presented zero evidence that Flynn had any involvement in

Rafiekian's decision to register or not.  The government presented no evidence that Rafiekian ever communicated with Flynn about filing requirements or keeping the matter from relevant authorities; instead, the only evidence related to Flynn and filing was McCauley's testimony that Rafiekian and Flynn did not agree on whether FARA registration was necessary.  Trial Tr. 414:1-2 (July 17, 2019), ECF No. 330.  For Alptekin's part, the government offered no evidence that Rafiekian communicated with him about filing at all.

*Second*, the government misleadingly suggests that "[e]xcept as to Turkey's direction and control, defendant does not contest the existence of an agreement," and then cites the parties' agreement "to act on behalf of Inovo/Alptekin."  Opp'n, ECF No. 365 at 20-21.  Obviously, the question is not whether the parties "agreed" to do *anything* (like agree to act on behalf of a private company/ individual); rather, it is whether they agreed to do anything *illegal*.  The undisputed existence of *non-conspiratorial* agreements do not bolster the government's case.  Moreover, the government's effort to make the "slight connection" between that legal agreement using the same classified summary exhibit (DX66) is just as inappropriate here as it was in relation to Count Two, and only underscores the highly speculative nature of its case.[9]

*Third*, the government argues that issues such as whether Inovo was the true client, or whether Project Confidence was truly focused on the investment climate, is simply a "straightforward matter of credibility" within the jury's province.  Opp'n, ECF No. 365 at 24.  That is wrong.  It is only a matter of credibility if there was sufficient evidence for a rational jury to make the contrary conclusions without resorting to "mere speculation and conjecture."  *United States v. Gengler*, No. 1:08 Cr. 12, 2009 WL 5549225, at *8 (E.D. Va. Oct 23, 2009) (Trenga, J.).

---

[9] The government also relies on a vague reference to "Alptekin's numerous statements to Flynn and defendant" that would permit the rational inference that "Flynn and defendant believed they were working on behalf of Turkey," but cites no particular statement.  Opp'n, ECF No. 365 at 21.

Rafiekian is not asking the Court to make credibility determinations, but rather to evaluate whether as a matter of law the jury could infer guilt from the evidence presented.

*Fourth*, the government focuses on the fact that Rafiekian, Flynn, and Alptekin all purportedly lied about Turkey's control of the project.  Opp'n, ECF No. 365 at 22.  But that argument is circular:  the government cannot rely on the fact that the parties "lied" in denying that they had agreed to act as Turkish agents to prove that they had, in fact, agreed to act as Turkish agents.  That tautology is not substantial evidence from which a rational jury could infer a conspiracy.

It is also wrong.  The government's declassified evidence conclusively refuted that Flynn or Rafiekian were trying to hide either Turkish contacts or their Confidence work from the U.S. Government.  That evidence revealed that, on September 15, 2016, Flynn voluntarily reported to the Department of Defense that he planned to meet with Turkish officials, including "the Turkish foreign minister," in New York on September 19.  In addition, "[h]e also mentioned that his company was supporting a Dutch company (NFI) to assist in renewing the confidence of the international community in the Turkish government," which he referred to as the "confidence project."  Trial Tr. 1007:10-1008:13 (July 22, 2019), ECF No. 350.  A separate piece of declassified evidence revealed that, in a "meeting with a U.S. government agency on September 28, 2016," Rafiekian voluntarily disclosed that he had "been asked to consult on a documentary-style commercial to raise awareness about" Gulen's charter schools, and "identified Ekim Alptekin, a Turkish-Dutch du[a]l national, as a business contact," who had "senior level" Turkish connections and was "the sole owner of Inovo, a Dutch company."  *Id.* at 1008:16-1010:5.  That Rafiekian and Flynn both voluntarily provided this information to the U.S. government is irreconcilable with the notion that they were simultaneously lying to keep the Confidence Project a *secret* from the U.S.

20

government.  Put another way, if Rafiekian and Flynn were conspiring to act as secret foreign agents, they were wildly reckless to *voluntarily disclose their contacts with Turkey, Inovo, and Alptekin to the U.S. government* in September 2016.

*Finally*, in support of both objects of the conspiracy count, the government argues that Rafiekian, Flynn, and Alptekin told parallel "lies" to the Covington lawyers.  But the fact that the FARA filing disclosed extensive and accurate facts relating to FIG's engagement by Inovo—including the September 19 meeting in New York and Alptekin's pre-engagement communications with Turkish officials—substantially undercuts any suggestion that Rafiekian engaged in a conspiracy.  *See* July 9 Order, ECF No. 292 at 29 (statements "not sufficient to allow" such an inference).  That is presumably why the government makes little effort to argue that the FARA statement was actually false, and instead focuses on supposedly parallel "lies" told by Rafiekian, Alptekin, and Flynn.

Rafiekian has addressed this topic at length in prior briefing (ECF No. 362 at 24-27) and will not retread all of that ground here.  Taken as a whole, however, none of the supposed "lies" provide substantial evidence of a conspiracy:

**<u>Statements regarding the September 19 New York Meeting</u>**.  Contrary to the government's insistence that Rafiekian, Alptekin, and Flynn told "parallel lies" regarding the New York meeting, (i) Rafiekian (allegedly) told Covington that the meeting was "unrelated to Project Confidence" (Trial Tr. 231:25-232:6 (July 16, 2019), ECF No. 326), (ii) Flynn told Covington there *was* a relationship between the meeting and Confidence (*id.* at 231:6-21 (Kelner testifying that Flynn told him there was "a brief discussion or—or a bit of discussion of the Inovo contract"

21

at the meeting)), and (iii) Alptekin did not even mention the New York meeting in his letter (GEX 93B).  These non-parallel statements are not substantial evidence of a coordinated conspiracy.[10]

**Statements Relating to Ratio Oil Company**.  The government relies on Alptekin's statements that Inovo hired FIG as a result of Inovo's consulting work for a private Israeli company.  Opp'n, ECF No. 365 at 30.  But that statement is not "parallel" either; neither Rafiekian nor Flynn are alleged to have made any similar statement, and indeed, the government itself acknowledges that Alptekin's statement is the "first and only time any reference to this Israeli company appears."  *Id.*  Nor did the government even prove this statement (which was peculiarly within Alptekin's knowledge) to be a lie; the government undisputedly offered no evidence at all about the source of Inovo's money.  *See* Trial Tr. 385:18-20 (July 17, 2019), ECF No. 330 (government did not seek Turkish banking records).

**Statements Relating to the Purpose of the Engagement**.  Contrary to the government's suggestion that only "one witness testified to having a mental connection" between Gulen and the business climate in Turkey (Opp'n, ECF No. 365 at 25), multiple independent—and more importantly, entirely uncontroverted—pieces of evidence supported that precise linkage.  For example, the "Project Confidence Playbook" states that the project's objectives included a video that would *both* "highlight Fethullah Gulen's network of loyalists and his influence of them and (2) showcase a resilient investment climate in the wake of the recent attempted coup."  GEX 23B

---

[10] The government broadly describes Alptekin's letter as being about Alptekin's "status as an agent of a foreign government," but more accurately it was about whether Alptekin's "TAIK [Turkish-American Business Council] position could be construed as a Turkish government position or an independent position for purposes of the Foreign Agents Registration Act."  GEX 93B at 1.  That topic was far afield from the issues that Covington was actually considering, and the memorandum delves into considerable detail on topics that have no bearing on Covington's investigation, like the inner workings of the Turkish-American Business Council.  The record is also devoid of the context in which Rafiekian passed along the letter to Verderame (who later passed it to Covington herself).  Trial Tr. 238:22–239:3 (July 16, 2019), ECF No. 326.  For those reasons, the government's assertion that Rafiekian's involvement with the letter is "direct evidence of coordination between defendant and Alptekin" (Opp'n, ECF No. 365 at 32), is purely speculative.

at 1575.  In addition, the evidence showed that Rafiekian discussed this connection with multiple others involved in the project.  *Id.*; *see also* Trial Tr. 705:4-7 (July 18, 2019), ECF No. 334 (Courtovich: "[I]t was explained to us [by Rafiekian] that private investors around the world are not understanding the Gulen role in trying to drive instability in Turkey[.]"); *see also* Trial Tr. 597:24-598:13 (July 17, 2019), ECF No. 331 (Miller) (describing connection between Gulen and economic stability in Turkey); Trial Tr. 449:1-12 (July 17, 2019), ECF No. 330 (Boston) (describing connection between the coup and tourism industry in Turkey).  The government's suggestion that the project ultimately focused on Gulen *instead of* Turkey's economic and business climate is a false dichotomy because the two issues were linked.  And given that uncontroverted evidence, it would be irrational for a jury to speculate that this linkage was a mere "cover story." Opp'n, ECF No. 365 at 31.

**Statements Relating to the Op-ed**.  The government finally relies on supposed parallel "lies" relating to the publication of the op-ed.  But unrebutted testimony showed that the idea of an op-ed was considered outside the scope of the engagement.  ECF No. 362 at 25-26.  As such, the fact that both Rafiekian and Flynn both told Covington that the op-ed was not "a part of" Project Confidence does not provide substantial evidence of a conspiracy.  Nor is there evidence that Alptekin communicated with Flynn about the op-ed or asked him to write it, or that Rafiekian and Flynn coordinated stories.  And even if the jury could conclude the statements were false, the government offered no evidence of an *agreement* to make them:  the FARA filing accurately disclosed that Alptekin reviewed a draft of the op-ed prior to filing, and neither Rafiekian nor Flynn objected to this disclosure.  *Id.* at 26.

## IV.   THE COURT SHOULD ORDER A NEW TRIAL

### A.  The Verdict Was Against the Weight of the Evidence

Rafiekian already explained in his last brief why, for all the reasons that the motion for a judgment of acquittal should be granted, the motion for a new trial should be granted, too.  *See* ECF Nos. 360 and 362 at 34-35.  That is because the Court's "much broader" power under Rule 33 allows it to "draw inferences, unfavorable to the Government, from the evidence," and its new-trial decision is reviewed for "abuse of discretion."  *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992).

The government's main response is that such relief is confined to the "rare circumstance when the evidence weighs heavily against" the verdict.  Opp'n, ECF No. 365 at 34-35.  This is that "rare" case.  In deferentially evaluating the evidence after the government rested, the Court already recognized that the government's case was "very, very circumstantial" and "very speculative."  Its co-conspirator hearsay ruling found that the evidence did not prove a conspiracy by even a *preponderance* of the evidence.  Although the Court is more than capable of deciding for itself whether the evidence weighs "heavily" against the verdict, these statements suggest more than a simple "disagreement" (*id.* at 35) with the jury's beyond-a-reasonable-doubt verdict.

The case for a new trial is especially compelling in light of the numerous irregularities in the government's presentation of the evidence in this case—for example, its last-minute tactical shift making Flynn a co-conspirator; its newfound reliance on a summary of classified information to support the jury's guilty verdict; the overwhelming volume of limited-purpose hearsay statements admitted for their "effect" on Rafiekian; and the legal errors described below.  Such irregularities weigh especially heavily when the government's evidence was circumstantial and its case close. *United States v. Pernell*, No. 09-cr-452, 2014 WL 2002210, at *6 (E.D. Va. May 15, 2014) (denying judgment of acquittal but granting new trial based on introduction of inadmissible

24

evidence where "evidence offered to support the conviction was circumstantial," and "[a]lthough the evidence was sufficient to send the case to the jury, the verdict could have gone either way").

Finally, the government attempts to impose a heightened standard that would require this Court to make a specific finding that "the fundamental fairness or integrity of the trial result is sufficiently in doubt." Opp'n, ECF No. 365 at 36 (internal quotations omitted). But the plain language of Rule 33 permits the Court to "grant a new trial if the interest of justice so requires"— *i.e.*, if "it would be unjust to enter judgment." *Campbell*, 977 F.2d at 860. Indeed, a conclusion that "the verdict was against the cumulative weight of the evidence . . . is a proper ground upon which to grant a new trial," and falls within this Court's "discretion." *Id.* This exceptional case meets that standard.

### B.  The Admission of Extensive Hearsay Evidence Warrants a New Trial

A new trial is also warranted based on the admission of a large number of out-of-court statements by Rafiekian's alleged co-conspirators for a limited purpose. Although the government contends that these statements were "squarely admissible," it relies on cases involving the admissibility of a single hearsay statement or conversation. *See, e.g., United States v. Fowler*, 55 F. App'x 125, 127 (4th Cir. 2003). If out-of-court statements can be admitted as freely as the government suggests, it would swallow the rules against hearsay, as *every* out-of-court statement made or email sent to a defendant reveals "what information defendant received, what defendant believed, and the context" of his own statements. Opp'n, ECF No. 365 at 37.

The government worsened the problem by repeatedly referencing these statements for their truth, notwithstanding the Court's limiting instructions. *See* ECF No. 362 at 36. Although the government tries to put these statements in "context," the government's repetitive references to those statements are clear enough and could easily have misled the jury. *See, e.g.*, Trial Tr. 1127:20-1129:11 (July 22, 2019), ECF No. 351 (referring to "green light" statement four times in

25

3 pages).  The government has shown laudable restraint in largely declining to rely on those statements in its post-trial briefing, but it pursued a very different strategy during closing argument.

The government claims that it only argued what Rafiekian "believed," but before the jury it phrased the evidence as what Rafiekian "understood" or "knew" to be true—words that imply that the statements were, in fact, true.  *See, e.g.*, *id.* at 1121:16-20 ("Now, this string of e-mails shows you that the defendant understood just how high in the Turkish government Alptekin's connections went, that he understood that Alptekin was reporting to the defendant about his conversations with Turkish ministers just days after the coup, folks."); *id.* at 1126:14-16 ("[A]ll of these e-mails show you that he knew who was pulling the strings with respect to this.").  It is a very fine line (if there is a line at all) between stating that Rafiekian "knew" a fact versus stating that the same fact is true.  *See United States v. Ince*, 21 F.3d 576, 584 (4th Cir. 1994) (reversing conviction where "it seems probable here that the jury was unable to follow the [limiting] instruction," and where prosecutor argued the truth of an out-of-court statement in closing, "thus vitiating any possible curative function that the judge's limiting instruction might have otherwise served"); *United States v. Gupta*, 747 F.3d 111, 131 (2d Cir. 2014) (affirming district court's decision to exclude hearsay statements as evidence of state of mind where "the jury would likely be unable to comprehend that the statement could be considered only to show [the defendant's] belief and not to show the truth of what he believed").  Parsing the "truth" of a fact versus "knowledge" of a fact is exceedingly difficult and fertile ground for confusion.  *See Delli Paoli v. United States*, 352 U.S. 232, 247 (1957) (Frankfuter, J., dissenting) (describing following a limiting instruction as "a mental gymnastic which is beyond, not only [the jury's] powers, but anybody else's").

The fact that the jury's verdict was contrary to the weight of the evidence is also a compelling reason to conclude that the jury did not follow the Court's limiting instructions. Despite the weaknesses of the government's case, the jury returned a guilty verdict on both counts within a matter of hours.  Especially given the enormous volume of admitted hearsay, and the government's repeated reference to these statements in argument, it is logical to assume that the jury was influenced by the apparent truth of those "scores of out-of-court statements."  *United States v. Cass*, 127 F.3d 1218, 1223-24 (10th Cir. 1997) (district court erred in admitting out-of-court statements for effect on listener where "scores of out-of-court statements were admitted," the evidence went directly to the defendant's guilt, and the government used the evidence in opening statement and closing argument for the truth of the matters asserted); *United States v. Becker*, 230 F.3d 1224, 1229 (10th Cir. 2000) (similar).  A new trial excluding those statements as unduly prejudicial is the only way to ensure that Rafiekian receives a fair trial.

### C.  The Government Improperly Shifted the Burden to the Defendant

The government argues that it did not improperly shift the burden of proof to Rafiekian because it is entitled to "comment on the weaknesses of the defense's case."  Opp'n, ECF No. 365 at 40.  But the government does not deny its duty to "refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."  *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018).  Here, the government did much more than simply "comment on the weaknesses of the defense's case."  Rather, faced with a situation in which the jury could only speculate as to the import of a lack of evidence, the government repeatedly urged to the jury that Rafiekian failed to come forward with evidence of his innocence.  *E.g.,* Opp'n, ECF No. 365 at 23 ("[T]he jury heard evidence that none of the thousands of emails related to Confidence in defendant's or Alptekin's email accounts linked Confidence with the Turkish economy or investment climate.").

27

That tactic was particularly improper because Rafiekian was prohibited from introducing exculpatory out-of-court statements on hearsay grounds. *See United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996); *United States v. Hassan*, 742 F.3d 104, 135 (4th Cir. 2014). Indeed, the government moved to exclude Rafiekian from introducing such evidence before trial. ECF No. 291 at 1 ("[T]he government intends to introduce into evidence a number of Rafiekian's inculpatory statements pursuant to Federal Rule of Evidence 801(d)(2), but no rule permits Rafiekian to introduce his own out-of-court statements without subjecting himself to cross-examination."). In other words, the government moved to exclude Rafiekian from introducing out-of-court statements without being subject to cross-examination, and then told the jury Rafiekian's failure to do so was probative of his guilt. *Cf.* Opp'n, ECF No. 365 at 40 (acknowledging that government may "not call attention to defendant's decision not to testify"). That, coupled with the weaknesses of the government's case, entitles Rafiekian to a new trial. None of the cases cited by the government involved similar facts, in which the absence of evidence was not probative of guilt, and the jury could only speculate as to the correct version of events.[11]

### D.  The Superseding Indictment Was Defective

The superseding indictment is fatally defective because it failed to identify the specific statute or regulation that Rafiekian violated that would make his conduct something other than a legal commercial transaction. Just like *United States v. Daniels*, in which an indictment was found defective that failed to allege which linked statutory provision the defendant violated, the indictment here failed to specify the laws that made Rafiekian's otherwise First Amendment-

---

[11] *United States v. Glantz*, 810 F.2d 316, 321 (1st Cir. 1987) is not to the contrary. There, the jury was asked to determine whether certain payments to the defendant were kickbacks or legal fees, and the government relied on the fact that the defendant, an attorney, failed to introduce evidence that he actually performed any legal work for the payer of the "fees." A reasonable inference of guilt could be drawn from the absence of written records because an attorney would be likely to maintain records (invoices, notes, work product, etc.) of all legal work performed. No similar inference can be drawn here, where the evidence showed that Rafiekian regularly communicated by phone.

protected activity something other than a "legal commercial transaction"—namely, the substantive FARA provisions the government claims he violated, 22 U.S.C. §§ 612(a), 618(a)(1).  973 F.2d 272, 274 (4th Cir. 1992).  That failure means that the indictment fails to "fairly inform [him] of the charge," *Daniels*, 973 F.2d at 274, or "ensure that the grand jury . . . considered and found all essential elements," *id.* (quotation omitted).

The government responds that *Daniels* left open the possibility that merely tracking the statutory language would be sufficient.  *See id.* at 275 ("An argument *could be made* . . . that Count Two of Daniels' indictment would have been sufficient if it had charged that Daniels' transfer of the sawed-off shotgun had been made 'in violation of the provisions of this chapter,'" but declining to address that question).  Here, however, the indictment failed to specify what made his conduct something other than a legal commercial transaction—*i.e.*, which specific "federal or state legislation or implementing regulations" (28 C.F.R. § 73.1) he supposedly violated.  That raises questions not only "as to the sufficiency of the notice provided to the defendant," *Daniels*, 973 F.2d at 275 n.2, but also as to whether the grand jury actually determined that he committed all the elements of the offense, as the Constitution requires, *see id.* at 274.  In fact, the grand jury almost certainly did not, considering that at the time of the indictment, the government took the position that the legal commercial transaction element was an affirmative defense and an "exception to the definition," not a part of the definition itself, *see* ECF No. 227 at 7-8.  Rafiekian is thus entitled to a new trial on Count Two, without further inquiry.  *See Daniels*, 973 F.2d at 275 (noting that prejudice is "irrelevant").

### E.  The Jury Instructions Were Incorrect

#### 1.  *The Instructions Inaccurately Defined "Materiality"*

The jury instructions inaccurately defined "materiality" because they failed to inform the jury that a misrepresentation or omission must have had some degree of importance, significance,

or ability to influence.  Although the government observes that FARA provides a list of eleven categories of statements that are regarded as "material" for the purposes of the statute, that hardly ends the inquiry.  The instructions did not actually encapsulate the statute's list of "material" statements, but rather simply asked whether the statement "failed to provide the information requested"—begging the question of what was "requested" in the first place.  Even if the jury instructions *had* listed those categories, moreover, there is nothing in the statute to suggest that Congress intended to criminalize trivial or insignificant misstatements as "material" ones.

The government argues that its case was not built on "hypertechnical omissions," and that Rafiekian therefore cannot establish any prejudice.  But as this Court has observed, "what was disclosed in the FARA statement is not sufficient to allow any inference of the alleged conspiracies."  July 9 Order, ECF No. 292 at 29-30 (listing six categories of disclosures, including that "Turkey could be viewed as the primary beneficiary of FIG's work").  That the government nevertheless maintains that the FARA filing was false and misleading, notwithstanding these robust disclosures, underscores the "hypertechnical" nature of its case.

## 2.  *The Instructions Inaccurately Explained the "Knowledge" Requirement*

The jury instructions also failed to inform the jury that the government was required to prove that Rafiekian knew he was acting in a manner not authorized by FARA or Section 951.  In *Liparota v. United States*, the statute at issue made it a crime to "use[], transfer[], acquire[], alter[], or possess[] coupons or authorization cards in any manner *not authorized by statute*," 471 U.S. 419, 420 (1985) (emphasis added); similarly here, Section 951 makes it a crime to act as an agent of a foreign government without prior notification to the Attorney General "if required in subsection (b)," *i.e.*, under the attorney general's regulations, 18 U.S.C. § 951.  In *Liparota*, the Supreme Court held that the knowledge requirement applied to the fact that the conduct was "not authorized by statute"; so too here, the knowledge requirement should apply to whether

30

Rafiekian's conduct was "required" by the Attorney General's regulation set forth in 28 C.F.R. § 73.1 *et seq*. Thus, this is not a case like *Bryan v. United States*, 524 U.S. 184, 193 n.15 (1998), in which the Court observed that "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Id*. This is a case where the text of the statute "dictates a different result."

The government also attempts to distinguish *Liparota* by arguing that "the Supreme Court was concerned [in *Liparota*] because the statute swept so widely as to criminalize casual, passive, or ordinary behavior." Opp'n, ECF No. 365 at 48. This distinction is of no consequence given the Supreme Court's clear statement that "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994). As in *Liparota*, it is inherently "innocent" conduct that is only made criminal through a statutory registration scheme. Indeed, by requiring registration only in the absence of the exceptionally broadly defined term "legal commercial transaction," Section 951 itself makes clear that acting as an agent of a foreign government *is* inherently innocent conduct in most circumstances. Because Rafiekian was prejudiced by the Court's failure to specifically inform the jury that the government was required to prove that Rafiekian knew he was acting in a manner not authorized by FARA or Section 951, he deserves a new trial on this ground as well.

## CONCLUSION

The Court should grant Defendant's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 as well as conditionally grant him a new trial. In the alternative, the Court should grant Rafiekian's motion for a new trial under Federal Rule of Criminal Procedure 33.

Dated: September 10, 2019                    Respectfully submitted,

                                             /s/ _____
                                             Mark J. MacDougall (*Pro Hac Vice*)
                                             Stacey H. Mitchell (*Pro Hac Vice*)
                                             James E. Tysse (VA Bar #73490)
                                             John C. Murphy (*Pro Hac Vice*)
                                             Adam A. Bereston (*Pro Hac Vice*)

                                             *Counsel for Bijan Rafiekian*
                                             Akin Gump Strauss Hauer & Feld LLP
                                             2001 K Street, NW
                                             Washington, DC 20006
                                             Telephone:  (202) 887-4000
                                             Fax:  (202) 887-4288
                                             E-mail:  mmacdougall@akingump.com
                                                          shmitchell@akingump.com


                                             /s/ _____
                                             Robert P. Trout (VA Bar # 13642)
                                             *Counsel for Bijan Rafiekian*
                                             Trout Cacheris & Solomon PLLC
                                             1627 Eye Street, NW
                                             Suite 1130
                                             Washington, DC 20006
                                             Telephone:  (202) 464-3311
                                             Fax:  (202) 463-3319
                                             E-mail:  rtrout@troutcahceris.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 10th day of September 2019, true and genuine copies of

Defendant Rafiekian's Reply Memorandum of Law in Further Support of His Rule 29 and 33

Motions were sent via electronic mail by the Court's CM/ECF system to the following:

> James P. Gillis
> John T. Gibbs
> Evan N. Turgeon
> U.S. Attorney's Office (Alexandria-NA)
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> Telephone:  (703) 299-3700
> Email:  james.p.gillis@usdoj.gov
> john.gibbs@usdoj.gov
> evan.turgeon@usdoj.gov

*/s/*_____
Robert P. Trout (VA Bar # 13642)