1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                      Alexandria Division



------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :   Case No. 1:18-cr-457
                              :
                              :
BIJAN RAFIEKIAN,              :
               Defendant.     :
                              :
------------------------------:




                       MOTIONS HEARING


                     September 12, 2019


           Before:   Anthony J. Trenga, USDC Judge
```

APPEARANCES:


Aidan T. Grano, John T. Gibbs, and Evan N. Turgeon,
Counsel for the United States

James E. Tysse, Mark J. MacDougall, Robert P. Trout, and
Stacey H. Mitchell, Counsel for the Defendant

The Defendant, Bijan Rafiekian, in person

2

1            THE CLERK:  Criminal case 1:18-cr-457, the United

2    States versus Bijan Rafiekian.

3            Counsel, will you please note your appearances for

4    the record.

5            MR. GIBBS:  Good morning, Your Honor.  John Gibbs,

6    Aidan Grano, and Evan Turgeon on behalf of the Government.

7            And Mr. Grano will be making the Government's

8    argument this morning.

9            THE COURT:  All right, welcome.

10           MR. GIBBS:  Thank you, Your Honor.

11           MR. MacDOUGALL:  Good morning, Your Honor.  Mark

12    MacDougall, Robert Trout, Stacey Mitchell, and James Tysse for

13    the defendant, Mr. Rafiekian.

14           Mr. Rafiekian is present in the courtroom.

15           And Mr. Tysse will address the Court on the motions.

16           THE COURT:  All right, welcome to everyone.

17           We are here on defendant's motions for judgment of

18    acquittal or a new trial.  I've reviewed the briefing.  I would

19    be pleased to hear further from counsel.

20           One aspect of this that I would like counsel to focus

21    on for the Court is really the meaning of the direction and

22    control aspect of the definition of "agency" in 951, which

23    appears to adopt the common law definition of "agency" under

24    which direction and control has a rather specific meaning.

25           The Court would also be interested in hearing further

1    focussed discussion on the knowledge element with respect to

2    the legal commercial transaction aspect of the offense, which

3    the Court has ruled is an element of the offense.

4            So with that brief guidance, I would be pleased to

5    hear further from counsel.

6            MR. TYSSE:  Very good, Your Honor.  Thank you, and

7    good morning.  James Tysse on behalf of the defendant, Bijan

8    Rafiekian.

9            I am happy to address both Your Honor's points.  If

10   you will indulge me, I will give a short introduction --

11           THE COURT:  Sure.  You can do it in any order that

12   you wish.

13           MR. TYSSE:  -- and then speak to those points.

14           Defendant Bijan Rafiekian respectfully requests

15   judgment of acquittal on the reserved motion for judgment of

16   acquittal under Rule 29.

17           At the conclusion of the Government's case the Court

18   expressed substantial concerns regarding the sufficiency of the

19   Government's evidence as to elements of both counts, and it

20   described that evidence as very speculative.

21           The Court also found that the Government had failed

22   to prove a conspiracy by even a preponderance of the evidence

23   at that time, which was obviously well short of proof beyond a

24   reasonable doubt.

25           So the question now is whether that speculative

4

1    evidence was nevertheless sufficient to permit a reasonable

2    jury to find Mr. Rafiekian guilty of either charged offense

3    beyond a reasonable doubt, especially given that the jury could

4    not consider the Government's extensive hearsay evidence for

5    its truth.

6            The answer is no for the reasons I'll be happy

7    address today, including the reasons Your Honor just mentioned,

8    but no reasonable jury could conclude that Rafiekian ever

9    agreed with Turkey to take orders from it or to act under

10   Turkey's control.

11           The Government describes four categories of evidence

12   on that issue, but three of them involve no interaction between

13   Rafiekian and Turkey at all.  And the fourth was a brief

14   meeting in New York in which no requests were made or

15   instructions given.

16           In that respect, this case is far weaker than those

17   section 951 cases we cited in the briefs in which judgments of

18   acquittal were granted and which involved the transmission of,

19   for example, classified information to foreign officials in

20   exchange for cash.

21           Because the jury necessarily would have to speculate

22   to find Mr. Rafiekian guilty of acting as a foreign agent,

23   judgment of acquittal should be granted on both counts.

24           Now, let me address the two points Your Honor just

25   mentioned.  Let's first talk about direction and control and

5

1   what that means in the context of an agency relationship.  And

2   I think that's a very important question because I think it

3   gets to the heart of the problem here.

4           The Section 951 definition of "agency" is defined

5   slightly differently than the common law "agency," but for many

6   years it was determined to essentially adopt that definition.

7   What happened was in the 1980s, I think as we talked about in

8   some of our motion to dismiss briefing, the definition was

9   changed to narrow the scope of "agency" to some extent for,

10  among other reasons, it took out someone doing the legal

11  commercial transaction.

12          Now, you know, under common law "agency," obviously,

13  doing a legal commercial transaction could well be agency, but

14  I think that Congress, after getting advice from the Department

15  of Justice and others, I also believe the State Department

16  determined that essentially it was being interpreted far too

17  broadly and that they should narrow it with those statutory

18  exceptions.

19          THE COURT:  So you're suggesting this is even

20  narrower than the common law definition?

21          MR. TYSSE:  I do think so, Your Honor.  Obviously, it

22  is founded on the common law definition of "agency," so you

23  begin with that, but I think that there are essential

24  carve-outs that show congressional intent to say, we're not --

25  this should not be construed as broadly.  Okay.  So that's just

6

1    taken as a premise.

2          But let's get into what it actually means.  Okay.

3    Obviously, direction and control is a concept borrowed from the

4    common law.  And what the common law says is that for direction

5    and control, if you look at -- I think it's Restatement 2nd of

6    Agency, section number 1 focuses on the agreement of an

7    individual to act on behalf of another in a manifestation of

8    that agreement, along with consent of the principal to have the

9    agent so act.

10          So what we're talking about here is truly a two-part

11   agreement.  There needs to be an agreement by both the

12   principal and there needs to be an agreement by the agent, and

13   they need to act together.  And there also has to be some sort

14   of manifestation.  And that manifestation of assent to act on

15   behalf of the principal needs to be determined based on the

16   facts and circumstances of the case.

17          THE COURT:  Well, direction and control under the

18   common law definition though means something beyond simply

19   agreeing to what the ultimate goal of an engagement is.  It

20   relates to control and direction as to the method and means,

21   the particular method and means for accomplishing that.

22          Do you see that as incorporated into this definition?

23          MR. TYSSE:  Your Honor, if I understand the question

24   correctly, then, yes, I do.  Direction again -- so to act as an

25   agent, there needs to be an agreement on both sides.

7

1          But then beyond that, what does direction and control

2     actually mean?  What does it mean to follow those directions?

3     What does it mean to be controlled by those directions?

4          And again, I think it does incorporate those common

5     law definitions to the extent that they are -- you know, you

6     need to show a manifestation of assent.  But then also, that

7     you are, as you mentioned, accomplishing the goals the way the

8     principal has authorized you to do so in the manner and means.

9          I think we only cite a couple cases in our brief that

10    go to this particular "agency" definition of what direction and

11    control might mean in this context, but I think Your Honor,

12    again, it is -- I think that the two kind of takeaways are that

13    it is derived from the common law but narrower than it.

14          And to the extent it borrows from the common law, I

15    think that there is a requirement of mutual consent, and then

16    true control and direction as the common law would have

17    described it.  As opposed to simply, you know, one person

18    agreeing with the ultimate goals of the principal's -- the

19    alleged principal's desires.

20          I think you also asked, Your Honor, about the

21    knowledge element with regard to the legal commercial

22    transaction test.  And I think the way that the jury

23    instructions were -- or the instructions that were given to the

24    jury was that under Section -- to prove charge 2, the Section

25    951 count, the jury had to find that the defendant had

8

1    knowledge of each of the factual elements of the crime.  One of

2    the factual elements was that he was engaged in some sort of

3    conduct other than a legal commercial transaction.

4            So we believe that under the principals in the

5    X-Citement case, the Liparota case, and the Rehaif v. United

6    States case, that, therefore, that knowledge element goes to

7    whether or not someone was acting on -- you know, was doing

8    something other than a legal commercial transaction.

9            And I think you can draw that from the statute

10   itself, Your Honor, because what the statute says is not only

11   that you have to know that you're acting as an agent, that's

12   very clear, you have to know you're acting as an agent of a

13   foreign government, but also that you failed to register as

14   required in Subsection (b).

15           Well, Subsection (b) is the provision setting forth

16   all of the regulations.

17           So that the statement of the offense incorporates

18   both that you have to know you're an agent -- and we know that

19   part of being an agent, one of the elements of that is acting

20   in a manner other than a legal commercial action; and, two, you

21   have to know that you are doing so without registering as

22   required by law.

23           And again, that as "required by law" brings in the

24   definition of "legal commercial transaction," which is whether

25   you're doing something without -- in violation of any federal

9

1    or state regulation or law.

2            And again, I think that's where the Government's

3    proof was totally lacking.  As Your Honor noted in its July 9

4    order, the fact that he sought legal -- my client sought legal

5    advice from two separate attorneys substantially undercuts any

6    allegation that he was somehow knowingly violating these laws.

7            And again, there is no -- there is also absolutely no

8    evidence whatsoever that there was an agreement with anyone

9    else to not register.  If anything, the evidence suggested the

10   opposite.  There was a conversation involving McCauley where he

11   said, General Flynn says to file under FARA.

12           The evidence was that Rafiekian went to several

13   attorneys to ask about that.  The only reason why he didn't get

14   the advice from Covington in the first place was because was

15   one of the -- the evidence came in undisputed, one of the

16   attorneys was a Democrat, and the other one was a Never

17   Trumper.  And so, he ended up going to his friend Kelley, who,

18   unfortunately, gave him bad advice.  I think if he had gone --

19   you know, stuck with Covington in the first place, we would

20   never have been in this situation at all.  I mean, that's the

21   way it is, undisputed evidence of what came in.

22           I'm happy to answer any particular questions about

23   that, Your Honor.  I definitely want to make sure I'm

24   answering --

25           THE COURT:  You have.

10

1          MR. TYSSE:  Okay.  And in general, if you have any

2     other questions or things you would like me to focus on -- I

3     know we've put a lot of paper in front of you, and I appreciate

4     your indulgence in allowing us to do so.  We do think there are

5     a number of important issues here.

6          If you don't have any specific questions, I will make

7     I think three points and sit down.

8          THE COURT:  All right.

9          MR. TYSSE:  But the first, I just very briefly want

10    to touch on the legal standard point.  I don't want to belabor

11    this point because I think ultimately we agree with the

12    Government at the end of the day about what the standard is.

13          But I do think that there is one, notwithstanding the

14    fact that they think this Court can't consider whether or not a

15    jury, even when viewing all the evidence in the light most

16    favorable, you know, could still speculate, essentially,

17    between innocence and guilt, we think that is completely

18    contradictory to the jury instructions that the jury got, as

19    well as the majority rule.

20          But regardless, at the end of the day I think we

21    understand that, essentially, you understand what the Rule 29

22    standard is.  But I do think there is one difference, which is

23    that we think because of the constitutional underpinnings, that

24    standard has real teeth.  And it is not simply, you know,

25    whether or not a jury could -- a reasonable jury could find he

1    is probably guilty or likely guilty, but whether he is guilty

2    beyond a reasonable doubt.  And that requires more than just

3    saying, well, there is some circumstantial evidence, maybe

4    someone could make some inferences.  It requires a more

5    searching inquiry than that.

6           You know, it cannot be based on speculation and

7    conjecture, as a number of courts have held.  Or, you know,

8    building inference -- speculation upon speculation, inference

9    upon inference, as the Supreme Court has said.

10          With regard to that point too, I don't think this is

11   a case where credibility determinations play a major role, Your

12   Honor.  I think there wasn't testimony from Michael Flynn,

13   there wasn't testimony from Alptekin, you know, that we're

14   asking the jury or the Court to disbelieve in evaluating the

15   jury's verdict.  This is, you can agree with everything all the

16   witnesses say and -- you know, or not doubt the veracity of it,

17   and still find that the conclusions that the Government asked

18   the jury to draw were far too speculative, all of them.

19          The second point is, and this touches a little bit on

20   what we just talked about, but I do think the key question in

21   this case is what does direction and control mean, and what

22   does an agreement for direction and control mean.

23          And I think that given that this is not a case where

24   my client is accused of doing something espionage related,

25   passing along classified information, reporting back to foreign

1   governments, sharing intelligence, and it's not a case where

2   there is any evidence of any requests by Turkey to do anything

3   at all, the question really is, you know, how would you look at

4   the evidence that was presented and say, this was not too

5   speculative to assume that this behavior was done on behalf of

6   a foreign government rather than on behalf of the paying

7   client.  Which everyone assumed was the correct paying client,

8   and that there was no evidence of any interaction between

9   Turkey and my client at all.

10          With one exception, which was that New York meeting.

11   But I think, as we have discussed at length in the brief, the

12   way that testimony came in was that nothing was asked, nothing

13   was instructed.

14          And accordingly, it would be pure speculation to say,

15   well, maybe there was a wink and a nod there and they were

16   secretly telling him to do something or another.

17          With regards to the other evidence of direction and

18   control from Turkey, particularly a meeting of the minds, an

19   agreement on my client's part and a request on Turkey's part,

20   there was almost nothing.  I would say nothing at all.  There

21   was the fact that Alptekin was allegedly an intermediary, but

22   the proof of that was largely that there wasn't enough evidence

23   showing the contrary.  There wasn't evidence showing a clear

24   delineation between Truth and Confidence.

25          But that just seems absolutely immaterial to us, Your

1    Honor.  It was that the project's name changed at some point

2    for unspecified reasons, but it had nothing to do with -- there

3    is no evidence that it did so in order to hide a Turkish

4    control relationship.

5           Similarly, with respect to the payments, is another

6    example of that, Your Honor.  Okay.  This Court has already

7    held that with respect to those payments, no inference can be

8    drawn, one cannot sufficiently infer a conspiratorial

9    agreement.

10          And finally, the Government relied on the CIPA

11   evidence, Your Honor.  And we think that's telling for a number

12   of reasons.  We think, first of all, it was very surprising for

13   us to see that.  We understood that that information was given

14   to us because it was meant to be either beneficial to the

15   defense or relevant to the claims of the defense.  Otherwise,

16   we don't understand why we were given -- it was given to us on

17   the eve of trial with no explanation.

18          And to see that the Government now says not only that

19   the jury could have, and in fact I think the Government says

20   that the jury did rely on that evidence to support the

21   inference of guilt, I think that absolutely goes to show,

22   again, not only that their evidence in their case in chief was

23   weak, but that there was no way for us to properly defend

24   ourselves against the insinuation in that summary if it was

25   actually meant to be inculpatory rather than exculpatory, as it

14

1    plainly seemed to be.

2            I will make one other point on that, Your Honor, too.

3    Which is that at the time this Court ruled under Rule 29, it

4    was at the close of the Government's evidence.  And according

5    to the plain text of Rule 29(b), it says the Court should

6    resolve this motion based on the evidence at the time the

7    motion was reserved.

8            THE COURT:  Right.

9            MR. TYSSE:  So it's not -- I don't think it would be

10   appropriate to rely on that evidence in general.  But again, I

11   think it's inappropriate for the Government to have done so in

12   a way that, you know, kind of proves our point that when we

13   objected originally and demanded that classified evidence, to

14   say that this summary does not allow us to properly make our

15   defense.  It's either inculpatory, in which case we need the

16   classified information to understand how it relates; or it's

17   exculpatory, in which case we need to be able to put on the

18   evidence to prove that there was some secret side deal that our

19   client was not involved in.

20           But either way, we think it was very inappropriate to

21   rely on that.

22           Finally, Your Honor, I think there was, even aside

23   from the direction -- that we need to act under the direction

24   and control, we think that there is even greater problems with

25   the conspiracy count for similar reasons.  I know that with

1    the -- the other counts sort of crumble once you determine that

2    it's too speculative for the -- for the 951 count to be

3    sustained.

4           I think the Government relies on what it calls a

5    chain of inferences, but, obviously, the thing about chains is

6    that they are composed of links.  And if some of the links in

7    that chain are too speculative, then the chain falls apart.

8           And we think that's obvious in a number of respects.

9    One of them is a lack of evidence that he knew that he was

10   doing something other than a legal commercial transaction.

11   There is a number of others.  But, you know, fundamentally, I

12   think the main one is the total lack of non-speculative

13   evidence that a jury could use to find beyond a reasonable

14   doubt that he agreed to act at Turkey's direction and control.

15          If there are no further questions, Your Honor, I will

16   sit down.

17          THE COURT:  All right, thank you.

18          Counsel.

19          MR. GRANO:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. GRANO:  I will follow Mr. Tysse's lead and

22   address your two questions first before moving into the rest of

23   it.

24          THE COURT:  All right.

25          MR. GRANO:  I think on the meaning of "direction and

1    control," it's important to read those words in their statutory

2    context.  It's not merely that someone acted subject to a

3    government's direction and control.  It's that someone agreed

4    to operate subject to direction and control.

5              THE COURT:  Right.

6              MR. GRANO:  So I think the plain text of the statute

7    imports some of the common law meaning, but it's not just

8    narrower than the common law definition.  It's also broader

9    because it doesn't bring in all of the same agency principles

10   that ordinarily attach to a pure agent/principal relationship.

11             THE COURT:  Well, it adds to requirement, in a sense.

12             MR. GRANO:  It adds to the requirement in certain

13   instances.  For example, excluding legal commercial

14   transactions, as Mr. Tysse pointed out, under this Court's

15   ruling deeming that portion an element of the offense.

16             However, it also expands it beyond the ordinary

17   meaning of direction and control, which involves things like

18   day-to-day operational control.  Because the requirement is

19   that someone agrees to operate subject to direction and

20   control.

21             THE COURT:  Well, that's inherent in the concept of

22   agency, isn't it?

23             MR. GRANO:  It is, Your Honor.  But as Mr. Tysse

24   pointed out, normally in common law agency principles, the

25   duality of purpose, that an agent agree to act on behalf of a

1    principal and that the principal agree that the person becomes

2    their agent --

3                THE COURT:  Right.

4                MR. GRANO:  For situations other than apparent or

5    assumed authority, sticking strictly to actual agent authority,

6    it is slightly different in 951 because of the way the statute

7    is worded.  It requires much more, that someone agree to

8    operate subject to that direction and control.  It doesn't

9    actually require that day-to-day operational control be in fact

10   exercised.

11               So I think the distinction to be drawn is that --

12               THE COURT:  Well, even the common law definition

13   really doesn't require that you have to exercise direction and

14   control so long as you have the ability and the authority and

15   the agreement to do so.

16               MR. GRANO:  Yes, Your Honor.  I am trying to

17   distinguish between the requirement that the Government prove

18   that there were actual day-to-day control exercised over the

19   agent as opposed to the existence of the capacity to do so.

20               THE COURT:  Right.

21               MR. GRANO:  And I think in those situations, to

22   understand whether Mr. Rafiekian agreed to operate subject to

23   Turkey's direction and control, his own statements expressing a

24   desire to work for the Government of Turkey, to work for

25   President Erdogan, saying that he's the only one who can lead

1  the Islamic nation in its fight against radical Islam, things

2  like that.

3          So that he clearly manifested a belief that that's

4  what he was doing.  In those contexts, he's agreeing to operate

5  subject to Turkey's direction and control.

6          And on top of that, we have the instance of the

7  September meeting where Turkey actually gives the direct order,

8  what we want out of this is Gulen's extradition.

9          THE COURT:  Well, wasn't that the ultimate aim as

10  opposed to -- I mean, that's part of the undertaking and the

11  contract itself between Inovo and FIG.

12          MR. GRANO:  Yes, Your Honor.  In conjunction with the

13  evidence that Alptekin is the intermediary between the Turkish

14  government and --

15          THE COURT:  I guess my question is, let's assume --

16  let's assume the jury could have inferred that Alptekin was

17  acting on behalf of the Turkish government when it entered into

18  this contract between Inovo and FIG.

19          Do you think that in and of itself is sufficient to

20  establish that the defendant agreed to operate subject to the

21  direction and control of the Turkish government?

22          MR. GRANO:  I think it is a link in the chain.  I

23  think that the --

24          THE COURT:  Well, my question is, do you think that

25  in and of itself is sufficient?

19

1          MR. GRANO:  No.  I think you would need as evidence

2     that the defendant knew that Turkey was operating behind

3     Alptekin and agreed to operate in that context.

4          So if, for example, Alptekin had never said anything

5     about Turkey's involvement, there had been no interactions with

6     Turkey, the defendant had no knowledge that Turkey was at all

7     involved in this project --

8          THE COURT:  Well, the only evidence here of what the

9     defendant knew or believed or could have -- would have believed

10    about Turkish involvement is what Alptekin was telling him.

11         And the question -- one question is, what was it that

12    Alptekin told Rafiekian that would allow a jury to conclude

13    beyond a reasonable doubt that he had agreed based on what he

14    was being told to operate subject to the direction and control

15    of the Turkish government?

16         MR. GRANO:  So I believe the statement from Alptekin,

17    things like, I've just left the Prime Minister's office, I will

18    send over the agreement, now we have the green light to discuss

19    budget --

20         THE COURT:  Right.

21         MR. GRANO:  -- all of those things --

22         THE COURT:  And the agreement is what was embodied in

23    the FIG/INOVA contract?

24         MR. GRANO:  Right.

25         THE COURT:  Which specifically disclaims agency,

1   specifically disclaims all the elements that you would normally

2   have in an agency relationship.

3           MR. GRANO:  Yes, Your Honor, except I think, again,

4   the evidence would allow the jury to discard that as

5   pretextual.

6           THE COURT:  Why?

7           MR. GRANO:  Because it's clear from the collocation

8   of circumstances, the way that Alptekin was paid, that he was

9   an intermediary.  The fact that they actually went to a meeting

10  with Turkey where they received their instructions.

11          I think probative of the --

12          THE COURT:  Well, I guess the question I have is,

13  let's assume that instead of Inovo, there was a direct

14  contract -- there was exactly the same contract between the

15  government of Turkey and FIG.  Why would that establish the

16  requisite agency relationship without more?

17          MR. GRANO:  Your Honor, I think with the same words

18  in the FIG contract --

19          THE COURT:  With everything the same.  Everything the

20  same.  After the contract, FIG went out and hired consultants

21  who did all the research and developed the video as they deemed

22  appropriate for the purpose of achieving the ultimate objective

23  of the engagement, which in and of itself doesn't establish the

24  necessary agency control and direction.

25          MR. GRANO:  I think the specificity of what FIG was

21

1    hired to do goes that this is beyond just, this is what we

2    want, you're on your own to figure out how to implement that.

3            I also think 951, if that's Your Honor's question, I

4    think 951 then is slightly broader.

5            THE COURT:  Well, let me ask you this.  Let's put

6    this in a commercial context for a minute, since we are dealing

7    with common law agency concepts.

8            Let's assume FIG hadn't been paid.  Let's assume

9    Inovo didn't pay FIG.  Do you think FIG had a claim for

10   compensation against the government of Turkey?  How do you

11   think that lawsuit would have turned out?

12           MR. GRANO:  Your Honor, I don't know.

13           THE COURT:  Or Sphere.  If FIG hadn't paid Sphere, do

14   you think Sphere could have sued the Turkish government for

15   compensation?

16           MR. GRANO:  I think given -- I think it depends upon

17   whether you believe Alptekin is an intermediary for the

18   government of Turkey or whether he is a separate entity.  If he

19   is a separate entity, I think the issue becomes slightly more

20   muddy.

21           But here, the jury could rationally infer that

22   Alptekin was essentially the Turkish handler of FIG.  And that

23   the --

24           THE COURT:  Well, handler has a very specific

25   context.  Intermediary can be very far from being a handler.

1          Let's assume that you could infer that Alptekin was

2     acting at the request of and on behalf of the Turkish

3     government.  Again, I think you've indicated, that in and of

4     itself doesn't establish the elements of "agency" under 951 as

5     opposed to perhaps the definition, much broader definition of

6     "agency" under FARA.

7          MR. GRANO:  I think that is true, Your Honor.  There

8     is a difference between the definition of "agent" for FARA and

9     951 purposes.  And so -- but specific to 951, I again think in

10    the statutory context of the way the words "direction and

11    control" are used, it is both narrower and broader than common

12    law "agency."

13         So when you are agreeing to operate subject to the

14    direction and control of a foreign government as your

15    principal, that is sufficient to meet the requirements.  Even

16    if it wouldn't be sufficient at common law to say you are in

17    fact an agent operating under the direction and control,

18    because the words are different in the statute versus the words

19    that are normally used for an agency relationship.

20         THE COURT:  I guess I'm getting back to -- there is

21    no evidence of any direct agreement.  So what is it that --

22    what is it in evidence that the jury could infer the agreement,

23    the required agreement to operate subject to the direction and

24    control of the Turkish government?  As opposed to engaging in,

25    participating in an engagement that may have been known to the

23

1    Turkish government, wanted by the Turkish government, requested

2    by the Turkish government.

3            MR. GRANO:  So I think there is a series of

4    situations that show that Alptekin was not just doing something

5    at the request of the Turkish government, but was actually the

6    conduit of the Turkish government to communicate to FIG.

7            So one is the timing.  The arrangement started -- the

8    conversation started between FIG and Alptekin immediately after

9    the extradition request for Gulen was denied by the United

10   States.  And immediately you see a flurry of e-mails between

11   them saying, this is a crisis, we have to get working on this

12   immediately.

13           Once that is followed, again focusing on what the

14   defendant understood and believed to be true, there is a lot of

15   statements saying, I am meeting with the Prime Minister, he has

16   giving us the green light.

17           THE COURT:  Right.

18           MR. GRANO:  I am meeting with his boss tomorrow,

19   things like that.

20           On the flip side, sort of the external evidence

21   outside of the communications between Alptekin and the

22   defendant, you have instances where Turkey is actually directly

23   involved in the project by meeting at 10 p.m. in a private

24   hotel, explaining --

25           THE COURT:  Well, other than that meeting, how are

1   they directly involved?

2          MR. GRANO:  So again, I think it comes down to

3   Alptekin being the conduit, the other evidence of Alptekin

4   being the conduit.  Is once Sphere -- once the hubbub about the

5   op-ed and everything is crazy, Sphere goes to Alptekin and

6   says, we have a plan for the government of Turkey to run a PR

7   campaign for Gulen --

8          THE COURT:  But that was on something different.

9   That was clearly a separate conversation between Sphere and the

10  government of Turkey where it was mediated by Alptekin, but

11  what was -- what struck me was that when Turkey wanted to have

12  a direct involvement or wanted to hire somebody, they dealt

13  directly with who they wanted to hire, albeit one arranged

14  through Alptekin.

15         MR. GRANO:  Your Honor, I would say there is no

16  difference between the September 16 meeting and the meeting

17  that was set up in the D.C. mission, both were coordinated by

18  Alptekin, both were pitches to the government of Turkey about

19  what they were doing.

20             In this situation, I think that whether or not you

21  agree that the Sphere project was a part of Confidence or not,

22  and I think the evidence permits an agreement that it was a

23  continuation, the Sphere consultants expressly testified that

24  we considered this to be part of our work for Confidence, we

25  were worried about our representation because we hadn't

25

1    produced what they wanted.  So we pitched to him, hey, we could

2    do this thing.  And then immediately they get a meeting with

3    number 2, the diplomatic head of the mission.

4              THE COURT:  All right.

5              MR. GRANO:  So regardless of whether you consider it

6    a continuing part of Confidence --

7              THE COURT:  So again, how does that provide an

8    evidentiary basis for inferring that Rafiekian was acting at

9    the direction and control?

10             Even if the jury could infer that he was acting on

11   behalf of the Turkish government, that in and of itself isn't

12   sufficient, is it?

13             MR. GRANO:  Your Honor, I don't think that if it was

14   simply --

15             THE COURT:  The definition, in fact I think in the

16   regulations itself it defines "agency" as someone acting on

17   behalf of a foreign government and at the direction and control

18   of that government.  Simply acting on behalf of someone doesn't

19   satisfy the definition, does it?

20             MR. GRANO:  No, Your Honor.  I think given that,

21   really this argument turns on whether or not you think Alptekin

22   is a conduit for instructions from the Turkish government or an

23   independent actor.

24             THE COURT:  But again, what was he instructing?  What

25   was the evidence that he was instructing Rafiekian to do that

1  establishes direction and control other than conveying the

2  ultimate objective of the engagement?

3          MR. GRANO:  I understand, Your Honor.  I apologize, I

4  was missing the point of your question earlier.

5          THE COURT:  Yeah.

6          MR. GRANO:  So for example, there were weekly update

7  meetings between Alptekin and the principals at FIG in which he

8  was mediating the establishing the private and media

9  interactions.

10          THE COURT:  Right.

11          MR. GRANO:  So it turns on whether you believe

12  those -- or whether the jury believed that those instructions

13  were the result of Turkey's direction and control.  That he, in

14  a sense, was communicating Turkey's instructions to FIG.  And I

15  think there is plenty of evidence to establish that he was the

16  mouthpiece of Turkey in this engagement.

17          THE COURT:  But there was nothing in terms of the

18  substance of those conversations, was there, that evidenced any

19  direction and control as to the details of what they were

20  supposed to be doing?  It was a reporting meeting where they

21  were reporting to Alptekin the progress of what they were doing

22  on achieving the ultimate objective.

23          And then you had the meeting where Alptekin

24  apparently was upset when he found out the details of what they

25  were doing.  Which would evidence the lack of direction and

1    control over a period of time, wouldn't it?

2              MR. GRANO:  I don't believe so, Your Honor.  And I

3    have sort of two responses.  One is, I think if you review the

4    testimony related to the weekly update calls, it was a two-way

5    street.  It was both updates and discussions of next steps.

6              For example, Boston testified about the discussion of

7    the op-ed and saying, maybe this should be part of our PR

8    campaign.  And Alptekin said, I would like an op-ed.  And the

9    defendant's response was, that would go beyond our engagement,

10   we need more money to do that.

11             And then later on there are discussions in the

12   meeting at FIG headquarters about, I want DoJ investigations, I

13   want congressional hearings --

14             THE COURT:  Well, as I recall, the evidence was that

15   Alptekin said that he had been requested by the Turkish

16   government to do an op-ed.  And he said that didn't make any

17   sense or he wasn't going to do it.  It was in that context that

18   the op-ed was discussed, wasn't it?

19             MR. GRANO:  Slightly different context, Your Honor.

20   That was, I believe, a Skype chat between the defendant and

21   Alptekin.  But there was separate testimony about the

22   discussions of the op-ed from Boston's participation in the

23   weekly update calls about whether or not an op-ed would be part

24   of the project.

25             THE COURT:  What was that testimony?

1          MR. GRANO:  That was Michael Boston's testimony

2    related to that Alptekin requested or proposed the idea of

3    doing an op-ed.  And there was discussion that it would require

4    more money to do so.

5          THE COURT:  Okay.

6          MR. GRANO:  There is also testimony, I believe from

7    McCauley, that said that Alptekin wanted to obtain specific

8    dirt on people supporting Gulen who were meeting with

9    congressional leaders.  And McCauley said, I don't do that.

10   And Alptekin said, I will spend $30,000 of my own money to get

11   it.

12          And all of these things show --

13          THE COURT:  Doesn't that evidence the lack of

14   direction and control?

15          MR. GRANO:  I don't think so, Your Honor.  I mean, an

16   agency relationship isn't displaced in disagreements between

17   the agent and the principal about how to go on.  It's

18   manifested in the fact that FIG is agreeing to operate subject

19   to the direction and control.

20          So the ultimate goal is set.  They have arguments

21   about what the best strategy is.  FIG proposes their strategy.

22   Alptekin proposes his strategy.  And ultimately Alptekin's

23   strategy won the day, they did write an op-ed, it was to sooth

24   Alptekin's concern over the fact that there weren't enough

25   projects.  The defendant himself personally lobbied members of

1    Congress and their staff in order to obtain these results.

2          So I don't think the existence of disagreements

3    displaces an agency relationship.

4          THE COURT:  Refresh my recollection on the testimony

5    concerning lobbying.  As I recall, there was testimony that

6    there was a meeting set up.  Mr. Rafiekian and others went to

7    the meeting, saw who was there, and left.

8          MR. GRANO:  Yes, Your Honor.  There is one.  And then

9    there was another -- there was testimony, I believe, from

10   McCauley about a phone call with a member of Congress' chief of

11   staff related to the issue, related to Gulen and obtaining

12   extradition.

13         THE COURT:  Okay.  And that was it, that was it on

14   the lobbying side?

15         MR. GRANO:  Those two instances, yes, Your Honor.

16         THE COURT:  And there really was no evidence as far

17   as who actually requested the op-ed that ultimately was issued,

18   was there?  You had a meeting.  Alptekin was upset.  The next

19   thing we know, Rafiekian is sending a draft of an op-ed saying,

20   here is what we're going to do?

21         MR. GRANO:  I would disagree slightly, Your Honor.

22   Because when the defendant sent the e-mail, he said, a promise

23   made is a promise kept.

24         THE COURT:  He doesn't say who made the promise.

25   That doesn't say who requested the op-ed, does it?

1          MR. GRANO:  Specifically to the op-ed, no.  Although

2    I would look back to the conversation where Alptekin wanted an

3    op-ed originally.  And so, that would show that this was

4    something that he wanted and this was a way the defendant

5    thought he could provide what Alptekin wanted.

6          Additionally, if you look at the e-mail that the

7    defendant sent to Michael Flynn following the September 16

8    meeting with the Turkish officials, he related a conversation

9    that he had with Alptekin.  And he said, I told him, we deliver

10   what we promise.  Laid out, I think there are some unrealistic

11   expectations in here, so I wanted to reset, but I told him, we

12   deliver what we promise.

13         THE COURT:  Right.

14         MR. GRANO:  And in conjunction, I think the jury can

15   infer that that is a request from Alptekin that then FIG and

16   the defendant fulfilled in order to placate them after not

17   getting the congressional hearings that he wanted, after not

18   having a more robust PR campaign --

19         THE COURT:  Okay.

20         MR. GRANO:  -- in those situations.  Unless the Court

21   has further questions on this, I will move to the knowledge of

22   a legal commercial transaction.

23         THE COURT:  All right.

24         MR. GRANO:  I think this just illustrates the

25   difference between a knowledge requirement and a willfulness

31

1    requirement.  In Bryan, and as recently as Rehaif, the Supreme

2    Court has made clear that what a knowledge requirement is, it's

3    just knowledge that you have performed the conduct.  That you

4    have committed the acts that add up to the elements of the

5    offense.  Not that you knew the nature of the conduct itself,

6    that it was illegal, that it was prohibited, et cetera.

7         THE COURT:  I guess the defendant's position, as I

8    understand it, is that there are really two mens rea elements

9    of this.  The first is what's necessary to establish that it's

10   not a legal commercial transaction.  And the Court ruled that

11   for that purpose, you don't have to show a willfulness aspect

12   by the defendant.  All you need to show is facts that made it

13   illegal.  Which means facts that show that the person acted

14   without registering it.

15        I mean, they're focused on the other piece of it.

16   And that is, if that element is -- if that's an element of the

17   offense, an affirmative element of the offense, it has to be

18   proven.  That is, that they have to prove that there was

19   something other than a legal commercial transaction.

20        The knowledge requirement as a general intent crime

21   would attach to that.  And in order to show that you had

22   knowledge that something was other than a legal commercial

23   transaction, you have knowledge that it was illegal.

24        MR. GRANO:  That's the part I disagree with, Your

25   Honor, that last half.

1          THE COURT:  All right.

2          MR. GRANO:  To know that you have taken steps that

3   add up to conduct that is not a legal commercial transaction is

4   not necessarily to know that the conduct was illegal.  And

5   that's the bridge that the Supreme Court refused to draw in

6   Bryan.  Saying, we're not going to require that when you have

7   knowledge of something, that you know the ultimate legal status

8   of that conduct.  Just that you knowingly committed the acts,

9   not that you knew they were illegal.

10          And so, to knowingly engage in conduct other than a

11   commercial legal transaction just means you had to knowingly

12   commit the conduct as opposed to inadvertently or mistakenly

13   or --

14          THE COURT:  Right, I understand.

15          MR. GRANO:  That kind of distinction.

16          THE COURT:  Right.

17          MR. GRANO:  And then under Liparota, whether or not

18   you have to have knowledge of the illegality because of the

19   danger of bringing in tons of innocent conduct.  Liparota and

20   X-Citement, and even Rehaif, are cases that are far away from

21   this kind of context because they occur in sort of

22   quintessentially innocent behavior, that people can

23   inadvertently stumble into it.  This was using food stamps in

24   Liparota, or just possessing guns in Bryan and Rehaif.

25          And the difference is when there is such a broad

1   danger of people going about their ordinary lives with no idea

2   that they may be doing something illegal, then it may require a

3   heightened mens rea.

4           THE COURT:  Right.

5           MR. GRANO:  And here, we're talking about working on

6   behalf of a foreign government and taking political action in

7   the United States --

8           THE COURT:  Right.  Well, the statutory

9   interpretation issues in this case are pretty challenging, I

10  think, particularly given the structure of 951.  Which says

11  that you are not an agent if you're engaged in a legal

12  commercial transaction, unless you are an agent of certain

13  specified countries.

14          And in interpreting -- and then "legal commercial

15  transaction" has been defined by regulation as a commercial

16  transaction that is not prohibited by law.

17          And if you incorporate, essentially, the FARA

18  definition of illegality for that purpose, you have basically

19  eliminated the very narrow exemption to the -- the exception to

20  the exemption in (e).

21          And I think someone could argue, the Court ruled one

22  way, and the Court is confident that's correct, I think it's

23  open to debate whether importing that -- making a legal

24  commercial transaction -- evaluating whether a commercial

25  transaction is legal based on the status of the person,

34

1    basically eliminates (e).  I mean, there is a narrow window for

2    some remaining residual effect of (e), but it basically

3    rewrites the statute.

4          MR. GRANO:  Your Honor, I wouldn't forgive myself if

5    I sat down without saying, that's why we think the Government's

6    interpretation of the statute is much more cohesive of the

7    statutory framework as a whole that this isn't an element.

8          However, taking that as a given, I don't think it

9    reads the statute out of existence because what's printed under

10   FARA is being the agent of a foreign government, is taking the

11   action of getting yourself into that agency relationship.  It's

12   slightly different than --

13         THE COURT:  No, I understand.

14         MR. GRANO:  -- just like being a person who is a gun

15   owner or is a felon.  It's not the same kind of status analysis

16   that I think exists in other status oriented cases.

17         And even in those cases, the general rule is that we

18   don't require knowledge of an individual's status.  That rule

19   changed in Rehaif, but only because, again, of the danger of

20   the innocent conduct.  Which is just not present in this case.

21         So when you're dealing with this kind of a hyper-

22   technical specific activity that the ordinary citizen is not

23   going to be stumbling around acting as an agent of a foreign

24   government, I don't think you have the same concerns that you

25   would ordinarily have with things like Food Stamps or gun

1    ownership.

2              THE COURT:  All right.

3              MR. GRANO:  If the Court has no further questions on

4    those two, I will move to just some of the other points that

5    Mr. Tysse raised.

6              THE COURT:  All right.

7              MR. GRANO:  I think that, as we've discussed, the

8    idea that there was no request or instruction from Turkey at

9    the September 16 meeting, is sort of a question for the jury.

10             The defendant relied on their brief and the fact that

11   McCauley testified that he did not perceive a request or an

12   instruction to be received.  But McCauley hadn't been read into

13   the government of Turkey's role at that point.  And it's a very

14   different question whether Flynn and Rafiekian, sitting on one

15   side of the table and knowing Alptekin's statements about the

16   government of Turkey's participation in their project, heard

17   that the same way McCauley did.  And I think that's an

18   inference that the jury is more than capable of drawing as a

19   rational fact.

20             If we go next to the standard for Rule 29.  I agree

21   with Mr. Tysse that I think we end up in the same place, but I

22   want to be clear about what the Government believes is the

23   process that attaches.

24             I think that there is two steps in sufficiency

25   review.  There is drawing all rational inferences in favor of

36

1    the Government.  And then there is taking all of those facts as

2    established, whether the facts meet the elements of the crime.

3            And whereas the first step, the equipoise rule

4    clearly has no applicability -- and this is <u>Coleman</u>'s entire

5    point, that a court is unable in sufficiency review to say, I

6    think this inference is more probable than this inference, or

7    equally likely, or less likely.  The Court's only question is,

8    is the inference the jury could have drawn in favor of the

9    Government irrational?

10           Once those inferences are drawn and established, then

11   the question becomes, can the jury go down the list of elements

12   required for the statute and tick the boxes for each of them.

13   That is an entirely different question where the equipoise rule

14   does have some impact in circuits.  Most circuits cited by the

15   defendant, all circuits by the defendant in his brief are very

16   clear that the equipoise rule triggers only at that second

17   step.  And they say it exists in instances where, for example,

18   there is no inference -- inferred fact supporting a particular

19   element, like knowledge or something like that.

20           So it's not that we look at all of the evidence taken

21   together and we say, do we feel like this is equally

22   susceptible to guilt or innocence?  We say, are inferences in

23   favor of the Government rational?  If so, do those facts

24   satisfy the elements of the crime?

25           THE COURT:  Well, articulate precisely for me what

1    you think the standard is.  It has to be substantial evidence

2    for what?

3              MR. GRANO:  There has to be substantial evidence that

4    a jury could find the elements satisfied beyond a reasonable

5    doubt.

6              THE COURT:  Would it be accurate to say that it's

7    substantial evidence for a rational juror to reasonably

8    conclude beyond a reasonable doubt?

9              MR. GRANO:  I would say a rational jury.  I think

10   reasonableness, because of the way it is used in some other

11   areas of the law, can be taken to have a different meaning than

12   rational.

13             So a rational jury would need to be able to conclude

14   that all of the elements are met beyond a reasonable doubt.

15             THE COURT:  All right.

16             MR. GRANO:  I think in the context of -- as you see

17   from Aquart from the Second Circuit when they are discussing

18   the equipoise rule from Glenn, they're saying, essentially,

19   this comes into play only when there is a complete absence of

20   evidence for an element or when the evidence is so meager on a

21   particular element that no rational inference can be drawn

22   whatsoever.

23             So I think that is a different analysis than the

24   defendant's brief goes through.  There are multiple times where

25   the defendant will say, this piece of evidence is equally

38

1 consistent to an innocent interpretation and a guilty

2 interpretation; therefore, the jury could not use it to find

3 guilt beyond a reasonable doubt.

4        And I think that is erroneously importing the

5 equipoise rule into the first step of the process as opposed to

6 keeping it in the second step of the process.

7        THE COURT:  All right.

8        MR. GRANO:  The defendant has argued that there

9 aren't credibility determinations here.  I think that's a

10 narrow view of the evidence.  A lot of the evidence is

11 essentially uncontested about what people said when and what

12 actions they took when --

13        THE COURT:  Right.

14        MR. GRANO:  -- but at the core of the case is whether

15 or not those were pretextual or made in good faith.  And those

16 are credibility determinations.  Those are inferences that 12

17 ordinary citizens sat there and said, do I think someone who

18 knew X and Y and Z could at a later point say A and be acting

19 in good faith?  And they concluded that he is not.

20        That's the kind of weighing of pretext versus good

21 faith that I think is squarely in the jury's wheelhouse and is

22 not the kind of thing that the Court disrupt on a Rule 29

23 motion.

24        Let's see.  I want to address briefly defendant's

25 argument about Defense Exhibit 66.  First about whether or not

1    it can be considered at all.  And second, about whether or not

2    it is appropriate for the Government to rely on it.

3            First, I think it depends which point in time the

4    Court is analyzing the Rule 29 motion.

5            THE COURT:  At the end of the Government's case,

6    isn't it?

7            MR. GRANO:  Yes, Your Honor.  Although the defendant

8    then renewed their Rule 29 motion.

9            THE COURT:  Right.

10           MR. GRANO:  And so, the distinction is, if the Court

11   wants to consider any of the defense evidence, the Court has to

12   consider all of the defense evidence.  So the Court can either

13   consider the evidence only as it existed at the point in time

14   where the Government closed its case in chief and taking none

15   of the defense's evidence into consideration in the totality.

16           THE COURT:  I understand.

17           MR. GRANO:  Versus doing -- including the defense's

18   case in chief, and then they would have to -- and then the

19   Court would have consider 66 as well.

20           About whether it is inappropriate for the Government

21   to rely on this evidence.  I don't think this is a real issue

22   given the fact that the defendant introduced the evidence.

23   This is not the Government putting forward evidence and saying,

24   this is inculpatory that the defendant lacked some opportunity

25   to comment on.

40

1          It was the defendant's choice to put this in because

2     they thought it would be exculpatory.  Once the evidence is in,

3     the evidence is fair game.  And the Government squarely has the

4     prerogative to comment on the evidence to say -- to suggest to

5     the jury, this is what we think the evidence shows, this is

6     what we think the evidence doesn't show.

7          And if it is being considered by the Court in the

8     totality of the circumstances, it has to be considered however

9     the jury could have rationally drawn inferences from it.

10          So this isn't a situation in which the Government is

11     sandbagging someone with surprise evidence on the weekend of

12     trial.  The defendant had the option to not include the

13     evidence at all.  But when he does, the adversarial process

14     allows the Government to comment on the weight that the jury

15     should give that evidence, what inferences should be drawn from

16     it.

17          THE COURT:  So what reasonable inferences do you

18     think could be drawn from it?

19          MR. GRANO:  I think that evidence can support the

20     existence of Turkey's direction and control.  If the jury reads

21     this and it says, well, there is multiple pieces of independent

22     evidence suggesting that Turkey controlled Alptekin's

23     engagement of Flynn related to this issue during this time

24     period, and there is substantial other circumstantial evidence

25     about the Confidence Project occurring at the same time

41

1    involving the same parties, I think the jury could rationally

2    infer that it's talking about the same project.

3             THE COURT:  Well, doesn't that position require the

4    Court to consider and rule on whether the Government is bound

5    by its earlier judicial admission that Flynn was not part of

6    this conspiracy?  Doesn't that inference require the jury to

7    conclude that Flynn was part of a conspiracy?

8             MR. GRANO:  I don't think so, Your Honor.  I think

9    because of the nature of conspiracy, it would be possible for

10   Rafiekian and Alptekin to agree to something without Flynn.

11   But the existence of any agreement between any of the three

12   individuals would be sufficient to sustain the conspiracy

13   charge.

14            I also think that if the evidence is used solely to

15   show Turkey's direction and control of Confidence, other

16   evidence comes in to show the defendant knew of that direction

17   and control, agreed to operate under it, agreed to take steps

18   that came from the government of Turkey through Alptekin, and

19   so forth and so on.  Again, sort of the totality of the

20   evidence using a chain of inferences.

21            THE COURT:  Right.

22            MR. GRANO:  It doesn't necessarily have to be used

23   for the purpose that Flynn was a member of the conspiracy,

24   although it can be.

25            THE COURT:  All right.

42

1              MR. GRANO:  Lastly, I want to address the defendant's

2      point that the conspiracy charges crumble if 951 as a

3      substantive count falls away.

4              And I think this is just fundamentally

5      misunderstanding the distinction elements between the

6      substantive count -- the conspiracy count for 951 -- or the

7      conspiracy object for 951 and the conspiracy object for the

8      FARA violation.

9              So with conspiracy, the requirement is not, as

10     defendant put it in his brief, that he tried and failed to do

11     something.  That is an attempt.  Conspiracy requires that he

12     agree with one other person to do something and one of them

13     took an overt act in furtherance of that.

14             And then again, the standard is sort of lower for

15     both 951 and the FARA violation because it doesn't require that

16     the actual substantive offense has been committed.  So the FARA

17     filing didn't need to be false or materially misleading, and

18     Rafiekian didn't need to actually be Turkey's agent in the

19     United States.  He had to merely agree that that was the case

20     with one other person and take an overt action in furtherance

21     of doing that.

22             THE COURT:  All right.

23             MR. GRANO:  And I think the difference between the

24     951 object and the FARA violation object is distinct because

25     all that is required for the FARA violation is that the

1    defendant agreed with someone to make a statement that he knew

2    to be false or that he believed to be false and materially

3    misleading.

4           Statements like mischaracterizing the refunds -- the

5    kickbacks as refunds, statements that Alptekin had no

6    involvement in the op-ed, that it was completely separate from

7    Confidence, all of those are sufficient to sustain the FARA

8    object of the conspiracy even if they are not sufficient to

9    show actual direction and control under the substantive count

10   of 951.

11          So there are sort of three layers for each of the two

12   counts and then each of the two objects.

13          THE COURT:  So where is the evidence though of the

14   agreement as opposed to the fact of misstatement?

15          MR. GRANO:  So I think there is two answers to that.

16   The first is that the Fourth Circuit has held multiple times in

17   cases like Caudle and Chambers, that when you show concerted

18   action towards criminality, that is sufficient to allow a jury

19   to infer at least a tacit agreement to commit that crime.

20          THE COURT:  So where was the concerted action here?

21          MR. GRANO:  The coordinated lies told between

22   Alptekin and Rafiekian and Flynn with respect to the nature of

23   the project.

24          THE COURT:  What was the evidence of coordination?

25          MR. GRANO:  I think one of the biggest pieces of

44

1    evidence of coordination is that Alptekin sent a letter filled

2    with statements that the jury could infer to be falsehoods to

3    the defendant, and then the defendant passed it along to

4    Covington.  I mean, that is actual conjoined action between the

5    two of them to feed false statements to Covington.

6            THE COURT:  Well, there is no evidence other than the

7    fact that Alptekin's lawyer -- I am not sure -- I guess it was

8    Alptekin, passed on a letter to Rafiekian, who passed it on to

9    his lawyer, who passed -- Verderame, who passed it on to

10   Covington.

11           MR. GRANO:  Well --

12           THE COURT:  Right, that was the evidence?

13           MR. GRANO:  Yes, Your Honor, there was evidence to

14   that, but specifically --

15           THE COURT:  And there is no evidence of any

16   discussions, nothing, other than those facts?

17           MR. GRANO:  I think there is also the discussion at

18   the beginning of the fire storm following the op-ed where

19   Rafiekian and Alptekin are coordinating on the public story.

20   That they are going to say that Alptekin is not working for a

21   foreign government, that he is an independent businessman, and

22   so forth and so on.

23           So again, the jury can infer that because Alptekin

24   offered, here is my explanation for these things, statements

25   that Rafiekian knew to be false, and Rafiekian said, here you

45

 1    go, here's Alptekin's statements about whether --

 2              THE COURT:  Well, that was -- putting aside whether

 3    you can draw inference from that, that was weeks before DoJ

 4    ever raised the FARA issue, correct?

 5              MR. GRANO:  Yes, it was after the -- the initial

 6    e-mail was after the sort of public --

 7              THE COURT:  Right.

 8              MR. GRANO:  -- outcry about the op-ed and the

 9    reporting that followed.  And then the FARA Unit sent its

10    inquiry letter.

11              But again, it shows sort of the agreement between the

12    parties throughout the process that they were going to mislead

13    the Government.

14              THE COURT:  Well, but there was nothing in there that

15    was different than what everybody had been saying about the

16    nature of the relationship ever since it began, correct?

17              MR. GRANO:  Yes, Your Honor, except that, again, the

18    jury can infer that they were lies.  So it all goes to the jury

19    did not believe the cover stories that he was not working on

20    behalf of the government of Turkey, that it was just about the

21    investment climate, that the government of Turkey was not

22    involved, that Alptekin was representing, as he told McCauley,

23    a group of wealthy Turkish businessmen, or as he said in his

24    letter from Arent Fox, an Israeli company for the first when no

25    supporting documentation supported any of that

1    contemporaneously.  I think the jury can then infer these are

2    false statements.  Your continued coordination of your false

3    statements showed that you had agreed to lie.

4              And then when the FARA inquiry comes and you are

5    preparing to respond to the FARA inquiry, the concerted action

6    between the defendants to tell overlapping lies gives evidence

7    at least of a tacit agreement, if not an openly explicit one.

8              THE COURT:  All right.

9              MR. GRANO:  With that, unless the Court has any

10   further questions, I will sit down.

11             THE COURT:  All right, thank you.

12             MR. GRANO:  Thank you, Your Honor.

13             THE COURT:  Counsel.  I will give you the last word

14   on this.

15             MR. TYSSE:  Sure.  Thank you.  Thank you, Your Honor.

16             I will try to take those points in reverse order

17   because that's how my notes are.  Starting with the conspiracy

18   count, Your Honor.

19             I think, obviously, to the extent that someone agrees

20   to take an illegal action, that is the consummation of the

21   crime.  The point that we're making is that the Government's

22   argument misses the point.  Which is that all along their

23   theory has been that this was, you know, an actual direction --

24   acting under the direction and control of a foreign government

25   and willfully, I think the Government just said they had to

1  agree to make false statements, they had to agree to willfully

2  make false statements on a FARA form.  All along that has been

3  their theory.

4        And the idea that it -- if it was too speculative to

5  find that they -- that Rafiekian actually did any of the

6  conspiracy objects, the idea that, therefore, he would still be

7  liable for conspiracy, I think is both inconsistent with the

8  Government's theory all along, but also we're asking the same

9  question, it's still going to be too speculative in either

10 case.

11       In terms of the concerted action with respect to the

12 FARA count, you know, I think we have gone over this

13 extensively in our briefs, Your Honor, but, obviously, to the

14 extent it was concerted, it was -- I don't understand where

15 they get the concerted from.

16       They were contradictory statements.  It was clearly

17 no -- there was no uniform message that they all were trying to

18 convey.  They had slightly different memories of how different

19 things happened, which is what you would expect in sort of a

20 privileged communication with your own lawyers, spending

21 hundreds of thousands of dollars on to try to respond to a

22 government inquiry.

23       They are all giving their lawyer different -- giving

24 the lawyer their recollections of how these things worked.  And

25 the lawyers used their best judgment to provide that

1    information to the Government.

2            Kelner testified that he believed that at the end of

3    the day all the information came in accurately after reviewing

4    all of it.  And the evidence was that with very few exceptions,

5    Mr. Rafiekian did not ask to change any of the information that

6    the Government now says was a willful false statement or

7    omission that ended up on the form.  Things like the fact that

8    they had a meeting with Turkey, or the fact that the focus of

9    their project was on Gulen.

10           With respect to the letter, Your Honor, I think that

11   is absolutely a red herring.  Bijan didn't write the letter.

12   There is no evidence that he read the letter.  There is no

13   context, as you pointed out, surrounding how the letter got

14   from him to anyone else other than that he gave it to

15   Verderame.  He could have handed it to her and said, hey, I

16   don't know what you're talking about.

17           It is just absolutely speculative to say that's part

18   of the coordinated conspiracy when there is no evidence that he

19   adopted those statements, that he agreed with them.  It can't

20   be that just forwarding a along a letter to a lawyer in a

21   privileged communication, somehow that is evidence of a

22   concerted conspiracy to make -- to willfully make false

23   statements.  Which, again, is a heightened standard of proof

24   undisputedly for this element of the crime.

25           The next point I will make, again going in reverse

49

1    order, is on the CIPA evidence.  Now, a couple of points.

2           With respect to whether it could come in

3    notwithstanding the fact that, you know, we renewed the motion,

4    I think the purpose of that rule -- and we cited a case, U.S. v

5    Hammond from the Eleventh Circuit, the purpose of the rule is

6    meant to be defense protective.  It is supposed to be that when

7    -- that Your Honor is allowed to reserve judgment on the

8    question without having to make a hasty decision.  And that the

9    defendant can then put on evidence without fear that the

10   Government is then going to use that against it or that the

11   Court will rely on that evidence to rule against us.

12          So it's certainly true that the Government, and this

13   is what the Hammond case essentially says, and there is some

14   case law in the Fourth Circuit as well, some District Court

15   cases that essentially say this as well, put the purpose of the

16   rule is to ensure the defendant is not penalized if the Court

17   decides to reserve judgment on the motion.

18          THE COURT:  Right.

19          MR. TYSSE:  So to the extent that Your Honor chooses

20   to look at all the evidence, it is free to do so.  But if it is

21   going to look at all the evidence, it can't do that in order to

22   penalize the defendant.  In that case, it would have to rely on

23   the evidence at the time the Government --

24          THE COURT:  Well, the Government's position is

25   that -- I don't think they dispute that the rule is that you

1    judge the evidence as of the close of the case.  But if the

2    Court is going to consider evidence that the defense entered

3    after that, then in ruling on -- and is going to rely on that

4    evidence, it should rely on all the evidence that comes in.

5            Do you disagree with that portion of it?

6            MR. TYSSE:  I do, Your Honor, to the extent that,

7    again, this is supposed to be a defense protective rule.  It is

8    not supposed to be --

9            THE COURT:  So under your view, the Court can

10   consider -- or should decide the evidence -- should decide the

11   motion based on all the evidence as of the close of the

12   Government's case plus what, the defendant's additional

13   evidence --

14           MR. TYSSE:  To the extent that it is going to rely on

15   any defense evidence that came out, it can't do so in order to

16   deny the motion.

17           THE COURT:  I see.

18           MR. TYSSE:  That's what the Hammond case said.

19           THE COURT:  I see.

20           MR. TYSSE:  Again, if Your Honor is not willing to do

21   that, we did renew the motion at the end.  To the extent the

22   Government wants --

23           THE COURT:  All right, I understand your position.

24           MR. TYSSE:  We would be, obviously -- you know, to

25   the extent the Court is going to want to rely on that, then we

51

1   prefer you don't look at any of the evidence elicited in the

2   defense case either, but --

3           THE COURT:  I understand.

4           MR. TYSSE:  But as far as whether this was invited

5   error, I think, again, that's a pretty astonishing thing to

6   say.  The Government says this was not sandbagging, but the way

7   this happened was on the eve of trial we got handed the

8   summary.  We don't know where it came from.  The obvious,

9   logical inference was that the Government had to provide this

10  to us because it was beneficial to the defense in some way.

11          So the idea now -- and they said, by the way, you

12  can't look at it.  And we objected at that time.  We said, we

13  need to look at the underlying information, whether it is

14  inculpatory, we need to know.  Whether it is exculpatory, we

15  need that evidence so we make our best defense.

16          And I think you can see what happens during closing

17  argument, the Government stands up and says, no, don't worry

18  about that, just imagine that there is bank robbery, we know

19  tons about it, but there is no evidence -- you know, your

20  client just joined the bank robbery scheme later.

21          Well, that insinuates, again, that there was some

22  back story behind this evidence that showed that the

23  Government's classified information was really true.  It's

24  absolutely sandbagging for us.  And what were we supposed to do

25  in that situation?  We could not rely on it.

52

```
1            But it was given to us to show that there was some
2     other evidence out there proving that our client was not -- or
3     at least strongly indicating -- I mean, that's the plain
4     reading of the summary, strongly indicating that our client was
5     not involved in some other understanding with the Turkish
6     government.
7            THE COURT:  All right.
8            MR. TYSSE:  So I think it is absolutely sandbagging
9     in that respect.  And to the extent that the Court declines to
10    grant judgment of acquittal, we think it's a very strong case
11    for a motion for a new trial as well, in which we get a chance
12    to actually look at that evidence and properly prepare a
13    defense.
14           Turning to the knowledge elements of the legal
15    commercial transaction.  I will just touch briefly -- you know,
16    the Liparota case and others, they talk about criminalizing a
17    broad range of otherwise innocent conduct.
18           I think notwithstanding what the Government submits,
19    this statute does cover an incredibly broad range of possibly
20    innocent conduct, and that's any legal commercial transaction
21    in the United States.
22           I mean, if you look at the actual regulation, it
23    says, any exchange of any good, any service on behalf of any
24    government for any -- you know, for any commercial reason.  It
25    is just incredibly broad.  It happens constantly in this
```

1    country.

2          So the idea that notwithstanding the fact that the

3    statute carves out this huge, huge swath of behavior, that

4    people can accidentally be prosecuted if the Government later

5    tells you that, by the way, we believe that there was some

6    separate FARA violation you didn't comply with, that's a more

7    broad -- it's a broader and more complicated statute, as we

8    have discussed in the motion to dismiss briefing.  That would

9    just really sweep in a ton of conduct in the same way that

10   Liparota rejects.

11         I would also point out, Your Honor, that if the

12   Government didn't like the way that it would have to try to

13   prove the 951 violation, it could have brought a substantive

14   FARA violation and saying, you violated the provisions of FARA.

15   Instead they tried to do it through this backdoor way and say,

16   you were an agent, and the reason why you were an agent is

17   because you violated FARA.

18         Now, there is a much simpler way for the Government

19   to do this that would not have invited these problems that the

20   Government's argument has absolutely invited.

21         Finally, turning back to the first question Your

22   Honor asked, which was about agency and the purpose of the

23   statute.  I think it is a very important admission that the

24   Government said, in and of itself, acting -- if all the

25   evidence was that Alptekin was working with the Turkish

54

1    government, that that would not be enough for the jury to

2    convict.  I think that's the way that that evidence came in.  I

3    apologize if I misunderstood it.

4            I think that really goes to the problem here.  As we

5    have emphasized before, there was extremely thin evidence of

6    Alptekin acting as an intermediary at all, never mind a

7    handler, as this Court pointed out.

8            I think the Government today, as opposed to in its

9    briefs, the Government says, well, the evidence of Alptekin

10   acting as an intermediary were all these conversations.  But I

11   don't think that's appropriate for Count 2, Your Honor, which

12   is a substantive count.  On the substantive count, there needs

13   to be an agreement between both Turkey and Rafiekian.  It's not

14   enough that Rafiekian mistakenly believed that he might have

15   been acting on a foreign government's behalf.

16           I don't think the Government could prosecute someone

17   for believing he was acting on behalf of Turkey, but instead he

18   was not.  I don't think that would be -- that would constitute

19   a crime under 951 as opposed to a separate issue of whether it

20   constitute a crime under Count 1.

21           So I don't think you can even look at that evidence

22   for Count 2.

23           But regardless, on the evidence that my friend

24   pointed to, the fact that Mr. Alptekin had senior contacts in

25   the Turkish government, so what?  The fact that there was a

55

1   late night meeting, I mean, how could that be -- how could that

2   provide a jury a rational inference that he had, therefore,

3   agreed to act under their direction and behalf?  There is a

4   million speculative -- I mean, you have to speculate either way

5   to believe the Government's evidence there.

6           The weekly calls.  As the Your Honor points out,

7   there is so absolutely no evidence of the substance of those

8   calls, those weekly update calls for one paying client talking

9   to the people that were doing work for him.

10          And then in terms of whether or not there was

11  evidence of Turkish actual direction and control.  I mean, I

12  think Your Honor has nailed it, which is that there is no

13  evidence in a classical agency sense of the Turkish government

14  actually directing and controlling this in terms of the manner

15  and means in which the work was being done.

16          In the contrary, the things that came in were that

17  FIG was not even following Alptekin's direction, let alone some

18  phantom Turkish direction.

19          I think in out brief, Document 342, it was our first

20  Rule 29 brief, footnote 2, we talk about some of that evidence

21  where it shows that Alptekin and Inovo were -- they were

22  clients, and actually specifically rejecting a lot of the very

23  same instructions that Alptekin was giving.  Things like, you

24  know, recommending against extradition.  Putting together the

25  monopoly presentation.  Clearly Turkey was not directing and

1    controlling them to put together a fake monopoly board.

2           There is -- you know, the McCauley testimony was that

3    he was asked to do things, and he said, no, we can't do that.

4           So again -- and I think that kind of goes to getting

5    dirt.  I think that kind of goes to a broader point, Your

6    Honor, which is that if you take a step back, what was going on

7    here was a kind of classic commercial relationship.  Okay.

8    They were a consulting firm that was for money operating on

9    behalf of a paying client.  Okay.

10          And then you think about what Section 951 is about.

11   And it's about agents.  We're talking about foreign agents

12   here.  People who, as many of the prosecutions we cite -- and

13   we acknowledge that, you know, that there are all sorts of

14   prosecutions under section 951.  But if you look at the mine

15   run of these types of case, and if you look at the cases we

16   cited in our motion to dismiss briefing, and you look at the

17   cases we cite in the Rule 29 briefing in this circuit where

18   judgments of acquittal were granted, these were situations

19   where it was not commercial -- ordinary commercial conduct

20   where somebody might have screwed up on the registration

21   scheme, they got some bad legal advice about how to register.

22          But these were situations where there was passing

23   along of classified information.  Where there was actually

24   people working for foreign governments and providing

25   information to foreign governments in exchange for clandestine

1    transactions of money.

2           It's not what's going on here.  And it kind of

3    suggests again, Your Honor, that to the extent this is an

4    "agency" definition, although it may be at one point the

5    statute was broadly as defined as "agency" was meant to be in

6    terms of the common law, this is actually even narrower.

7           I think the common law definition has some

8    restrictions, as Your Honor pointed out, it is not even clear

9    that Alptekin was acting as an agent -- or it was not even

10   clear that Alptekin was acting as an agent of the Turkish

11   government.  As you said, there was a direct contract.

12          But the idea that the jury could permissibly make all

13   of these inferences and all of these speculative leaps of logic

14   just -- I think would be absolutely unjust in this case.

15          And on that point, Your Honor, finally, for all the

16   reasons why the evidence was so weak and so speculative with

17   respect to whether or not the judgment of acquittal should be

18   granted, it is even more so with respect to whether a new trial

19   should be granted where this Honor -- where Your Honor enjoys

20   broad discretion and to do so if it feels that the sentence was

21   unjust.

22          And so, for all these reasons, we absolutely grant --

23   or we request that this Court grant the motion for judgment of

24   acquittal and conditionally grant a new trial as well.

25          THE COURT:  All right, thank you.

58

1          The Court is going to take it under advisement.  I

2   will get a decision to you just as soon as I can.  All right?

3   Thank you.

4          Counsel is excused.

5          Court will stand in recess.

6   -------------------------------------------------

7

8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23

                       /s/  Norman B. Linnell
24                  Norman B. Linnell, RPR, CM, VCE, FCRR

25