**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 19-4803**

---

UNITED STATES OF AMERICA,

                Plaintiff - Appellant,

      v.

BIJAN RAFIEKIAN, a/k/a Bijan Kian,

                Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, District Judge. (1:18-cr-00457-AJT-1)

---

Argued:  December 11, 2020                     Decided:  March 18, 2021

---

Before NIEMEYER, KEENAN, and WYNN, Circuit Judges.

---

Reversed in part, vacated in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Keenan joined.

---

**ARGUED:**  Aidan Taft Grano, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  James Edward Tysse, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Steven L. Lane, Evan N. Turgeon, National Security Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, James P. Gillis, Assistant United States Attorney, John T. Gibbs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Robert P. Trout, TROUT CACHERIS & SOLOMON PLLC, Washington, D.C.; Mark

MacDougall, Stacey H. Mitchell, John C. Murphy, Adam A. Bereston, Margaret O. Rusconi, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee.

———————————

WYNN, Circuit Judge:

A jury convicted Bijan Rafiekian of acting as an unregistered foreign agent and conspiring to do the same. But the district court later acquitted him of all charges and, in the event we disagreed with that decision, conditionally granted a new trial. The Government appeals. For the reasons that follow, we reverse the judgment of acquittal, vacate the conditional grant of a new trial, and remand for further proceedings.

I.

A.

In late July 2016, the Turkish government made a request to the Department of Justice ("DOJ") for the extradition of Fetullah Gulen, a Turkish preacher and scholar living in Pennsylvania. Once an ally of Turkish president Recep Tayyip Erdogan, Gulen had since become a dissident. And after an attempted coup against Erdogan failed, Turkey blamed Gulen and sought his extradition. DOJ declined to immediately arrest Gulen, but the State Department placed the extradition request under review.

At that time, Rafiekian was an executive at the now-dissolved Flynn Intel Group—an eponymous consulting and lobbying firm that he co-founded with retired Lt. Gen. Michael T. Flynn. Within ten days of the failed coup—and just six days after DOJ rebuffed Turkey's initial demand for Gulen—Rafiekian and Flynn began dialoguing with Ekim Alptekin, a Turkish businessman. Alptekin claimed to have pitched high-ranking Turkish officials on hiring Flynn Intel Group for a project related to Turkey's "security and

stability." J.A. 2176.[1] The project was informally referred to as "Truth." *See, e.g.*, J.A. 2178.

The dialogue with Alptekin progressed quickly. For instance, Rafiekian sent Alptekin a list of initial action items for Project Truth on July 30, 2016. A few days later, Alptekin reported that he had shared the "proposed approach" with Turkey's Foreign Affairs and Economic Ministers, who were receptive. J.A. 2184, 2187. Rafiekian responded that the project would be given "priority." J.A. 2191. And on August 10, Alptekin messaged Rafiekian and Flynn to say that he had received "a green light" to discuss "confidentiality, budget[,] and the scope of the contract." J.A. 2201. The next day, Rafiekian notified Alptekin that he and Flynn had "activated" Flynn Intel Group's "investigative laboratory" and were "ready to push the start button." *See* J.A. 2207, 2221.

Thereafter, neither Rafiekian nor Flynn made any further references to Project Truth. Instead, Rafiekian informed Flynn Intel Group employees that the firm had been engaged by a Dutch company—Inovo BV—on a project he called "Confidence." J.A. 2212. Per a separate agreement, Alptekin would consult on the project as a paid "outside advisor"—an unusual arrangement, given that he was also Inovo's lone shareholder and employee. J.A. 2240, 2571–72.

Project Confidence's broadly stated mission was to "restore 'confidence through clarity' in [Turkey's] trade and investment climate." J.A. 2207. But as the record here shows, the project's primary objective was to investigate and publicly disparage Gulen, so

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

as to foster his extradition. According to an early "playbook" circulated by Rafiekian, Project Confidence's "end product" would be a documentary-style video highlighting "Gulen's network of loyalists and his influence over them" and comparing him to Iran's Ayatollah Khomeini. J.A. 2226–30.

On September 19, 2016, Alptekin hosted a late-night meeting between Rafiekian, Flynn, and Turkey's Energy and Foreign Affairs Ministers at a hotel in New York ("the New York meeting"). The topic of conversation at the meeting was Gulen—specifically whether he had broken any U.S. laws or could be labeled a terrorist. After the meeting, Rafiekian emailed Flynn to say that he had received positive "feedback," but that Alptekin had also conveyed "very specific expectations" from "their side." J.A. 2249. Rafiekian thought some of those "expectations" were borderline "unreasonable," but he assured Alptekin that Flynn Intel Group would "deliver what [it had] promise[d]." *Id.*

Work on Project Confidence ramped up in the fall. Flynn Intel Group hired a public relations firm, Sphere Consulting, to help investigate Gulen, conduct media outreach, and produce the aforementioned video.[2] Meanwhile, Rafiekian lobbied at least two members of Congress to push for public hearings on Gulen and his activities.[3] Alptekin was kept in the loop via weekly conference calls.

---

[2] Sphere also created a mock board game called "Gulenopoly" that depicted a cartoonish version of Gulen presiding over a "clandestine network of followers" and "shady enterprise." J.A. 2400.

[3] Rafiekian first met with the national security advisor to Representative Michael McCaul, who was then serving as Chairman of the House Committee on Homeland Security. They discussed Project Confidence, and Rafiekian expressed his desire to see

On November 2, 2016, Alptekin went to Flynn Intel Group's headquarters for an update and presentation on Project Confidence. He was apparently disappointed with the firm's progress, stating that he had been "expecting congressional hearings . . . [,] big news stories . . . [, and] the Department of Justice to be involved," but was "not seeing anything." J.A. 1290.[4] That evening, however, Rafiekian emailed Alptekin a draft of an op-ed he had composed. The piece—which was deeply critical of Gulen—was published in *The Hill* on November 8 under Flynn's name. Alptekin praised it as "right on target." J.A. 2320.

The op-ed evidently caught the Government's eye. On November 30, DOJ sent an inquiry letter to Flynn to probe whether Flynn Intel Group (or related persons or entities) might have a "possible obligation to register under the Foreign Agents Registration Act," 22 U.S.C. § 611 *et seq.* J.A. 2421–23 (capitalization altered). The letter noted that, in the wake of the op-ed's publication, "numerous media reports ha[d] suggested" that either Flynn, personally, or Flynn Intel Group "may have engaged in activities on behalf of the Government of Turkey through [their] affiliation with [Alptekin]." *Id.* It also sought clarifying information.

Despite their formal agreements with Inovo and Alptekin—both foreign partners— Rafiekian and Flynn had debated how (or whether) to disclose their work on Project

---

"public hearings on Mr. Gulen." J.A. 1048–50. Rafiekian also approached Representative Dana Rohrabacher about an "urgent matter" regarding Gulen. J.A. 988–89. But that effort appears to have ended abruptly.

[4] Witnesses further testified that Alptekin was "visibly upset" and "dismissive" during the meeting. J.A. 1002, 1292.

Confidence to American authorities. Early on, Rafiekian suggested to Flynn that the firm register its activity "under [the] Lobbying Disclosure Act representing a Dutch entity."[5] J.A. 2226. Flynn was apparently of the mind that their work should be "file[d] with DOJ" instead.[6] J.A. 984. But Rafiekian worried that doing so would expose the project to "members of Congress who were favorable to Gulen." *Id.* And so, on September 30, 2016, Flynn Intel Group registered under the Lobbying Disclosure Act, explaining in a single sentence that it would be "advis[ing] [Inovo] on U.S. domestic and foreign policy." J.A. 2581–82.

In its inquiry letter sent two months later, DOJ requested information far in excess of that provided in Flynn Intel Group's Lobbying Disclosure Act filing: descriptions of any agreements, written or otherwise, between the firm and "the Government of Turkey," Alptekin, the Turkish–American Business Council, or Inovo; details of any activities performed on their behalves; copies of emails pertaining to the op-ed; and answers to several specific questions. J.A. 2422.

---

[5] The Lobbying Disclosure Act generally requires federal lobbyists to register with Congress. *See* 2 U.S.C. § 1601 *et seq.* A person who registers under that statute need not also register under the Foreign Agents Registration Act, so long as the "principal beneficiary" of his activity is not a foreign government or political party. *See* 22 U.S.C. § 613(h); 28 C.F.R. § 5.307.

[6] As discussed in detail below, this case involves two distinct notification statutes— 18 U.S.C. § 951 and the Foreign Agents Registration Act. The prescribed manner of satisfying § 951's notification requirement is laid out in 28 C.F.R. § 73.3. Registering under the Foreign Agents Registration Act is one way to meet that requirement, but it is not the only way. *See* 28 C.F.R. § 73.3(a), (e). It is unclear from the record which method(s) Flynn may have contemplated when he suggested "fil[ing] with DOJ." J.A. 984.

Flynn Intel Group hired the law firm of Covington & Burling LLP ("Covington") to help craft a response. Covington conducted extensive fact-gathering—collecting emails, interviewing Flynn Intel Group personnel, and reviewing "work product generated under the Inovo contract." J.A. 793. During the investigation, Rafiekian was adamant that Project Truth and Project Confidence were "completely separate"; that although the client for Project Truth "would have been the government of Turkey," the project "never came to fruition"; and that, "after [Turkey] backed out," Alptekin sought to engage Flynn Intel Group for a distinct venture, Project Confidence, in which "the Turkish government played no role." J.A. 799–801. Rafiekian also insisted that the New York meeting with Turkish officials and the op-ed were both "unrelated to Project Confidence"—even though the meeting took place and the op-ed was published while work on Project Confidence was ongoing. J.A. 802, 805.

At the conclusion of its investigation, Covington submitted a Foreign Agents Registration Act filing for Flynn Intel Group. According to that filing, the op-ed "was not written or published at the request of, or under the direction or control of, Inovo, the Republic of Turkey, or any other party." J.A. 2350. And more generally, it stated that "Flynn Intel Group d[id] not know whether or the extent to which the Republic of Turkey was involved with its retention by Inovo." J.A. 2334.

B.

Unassuaged by the Foreign Agents Registration Act filing, DOJ continued its probe of Flynn Intel Group's activities. In December 2018, a federal grand jury indicted Rafiekian

on two counts.[7] In Count One, the grand jury charged Rafiekian with criminal conspiracy under 18 U.S.C. § 371. The conspiracy charge had two objects: (a) acting as an undisclosed Turkish agent, in violation of 18 U.S.C. § 951; and (b) making a materially false Foreign Agents Registration Act filing, in violation of 22 U.S.C. § 618(a)(2). In Count Two, the grand jury charged Rafiekian with a substantive § 951 violation—*i.e.*, for acting as a foreign agent in the United States without first notifying the Attorney General.

Before trial, Rafiekian filed a motion *in limine* to exclude all out-of-court statements by any alleged co-conspirators. At a hearing on that motion, the district court asked whether the Government was alleging that Flynn "was part of this conspiracy," and, if so, whether it intended to introduce any statements by him under Federal Rule of Evidence 801(d)(2)(E), the hearsay exception for statements made by co-conspirators.[8] J.A. 157. The Government responded that it did *not* consider Flynn a part of the charged conspiracy, and that, therefore, it would not seek to introduce his out-of-court statements under Rule 801(d)(2)(E). Instead, the Government planned to call him as a witness as part of its case-in-chief pursuant to Flynn's promise to testify against Rafiekian, if needed, under a plea agreement in an unrelated case.

---

[7] A superseding indictment was issued on May 23, 2019.

[8] The Rule provides that a statement is "not hearsay" if it is "offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

But not long after the hearing, Flynn changed his mind about testifying against Rafiekian. In response, the Government changed course and sought to introduce certain of Flynn's out-of-court statements under Rule 801(d)(2)(E)'s co-conspirator exception.

The district court ruled on Rafiekian's motion *in limine* on July 9, 2019. Based on the evidence presented at that time, the court concluded that the Government had failed to establish, even by a preponderance of the evidence, "the existence of a conspiracy in which Rafiekian was a participant." J.A. 309. Without sufficient proof of a conspiracy involving Rafiekian, the court found that neither Alptekin nor Flynn's out-of-court statements qualified for the co-conspirator exception. Accordingly, the court limited the use of those statements, allowing them "as evidence of what information [Rafiekian] was provided concerning Turkish involvement in the project," but not as evidence of the truth of the matters asserted therein. J.A. 312–13, 564–65.

The trial began on July 15, 2019, and after the Government rested its case, Rafiekian moved for acquittal under Federal Rule of Criminal Procedure 29. The district court expressed strong misgivings about the sufficiency of the evidence against Rafiekian at that point, but it reserved deciding the motion. Rafiekian again moved for acquittal at the close of all evidence. But the court again reserved its decision and sent the case to the jury. After four hours of deliberation, the jury returned a guilty verdict on both counts, including on both objects of the conspiracy charge.

## C.

Notwithstanding the jury's guilty verdict, on September 24, 2019, the district court granted Rafiekian's motion for acquittal in full. Integral to its decision was the court's

interpretation of the term "agent" in § 951 and related regulations. In the court's view, "for a person to be an agent for purposes of [§] 951, it is not enough to be acting as 'a representative of' or 'on behalf of' a foreign government"; rather, a person must have agreed "to operate subject to the direction or control of that foreign government." *United States v. Rafiekian*, No. 1:18-cr-457-AJT-1, 2019 WL 4647254, at *9 (E.D. Va. Sept. 24, 2019). With that understanding, the court held that there was insufficient evidence to convict Rafiekian on either count related to § 951, because no rational juror could conclude that Rafiekian had acted "on behalf of the Turkish government," much less "subject to Turkey's direction or control." *Id.* at *13–14. The court further determined that there was "no evidence of discussions or suggestions, let alone an agreement, express or implied, to either avoid filing under [the Foreign Agents Registration Act] or to cause the filing of a false . . . registration statement." *Id.* at *15.

The district court also conditionally granted a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, in the event its judgment of acquittal was overturned on appeal.[9] It did so on four bases: (1) that, "given the great weight of the evidence," a new trial was warranted in the interests of justice; and that the jury was inadequately instructed as to (2) the "limited proper use" of admitted hearsay statements; (3) Flynn's role in the

---

[9] *See* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."), 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.").

alleged conduct; and (4) the *mens rea* required to violate § 951. *Id.* at \*16–18. The Government timely appealed.

## II.

Because the United States has a strong interest in identifying people acting at the behest of foreign governments within its borders, § 951 provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . . shall be fined . . . or imprisoned not more than ten years, or both." 18 U.S.C. § 951(a).

That section has its roots in the Espionage Act of 1917. But despite its vintage, the statute has rarely been at issue before this Court.[10] And so, before proceeding to the case against Rafiekian, we address two questions regarding the contours of the offense: (1) whether § 951's definition of "agent" corresponds to the familiar common-law meaning of that term, as understood and applied by the district court; and (2) whether the "legal commercial transaction" exception found in § 951(d) constitutes an element of the crime or, instead, provides for an affirmative defense.

---

[10] Though amended over the years, the provision has been on the books in some form or fashion since its 1917 enactment. *See* Pub. L. No. 65-24, tit. VIII, sec. 3, 40 Stat. 217, 226 (codified at § 233). Yet research has revealed only a single published Fourth Circuit case (and no Supreme Court precedent) involving § 951: *United States v. Truong*, 629 F.2d 908 (4th Cir. 1980). Against that dearth of authority, the district court did yeoman's work in interpreting § 951—which we appreciate, even as we reach somewhat different conclusions.

A.

First, we largely agree with the district court that, similar to common-law agency, § 951's definition of "agent" envisions a mutual agreement to operate subject to foreign direction or control. But we part ways with the district court as to the degree of foreign involvement required to violate § 951.

In its current incarnation, § 951 defines "agent of a foreign government" as follows:

(d) For purposes of this section, the term "agent of a foreign government" means an individual who *agrees to operate* within the United States *subject to the direction or control* of a foreign government or official, except that such term does not include—

   (1) a duly accredited diplomatic or consular officer . . . ;

   (2) any . . . official or representative of a foreign government;

   (3) any . . . [non-American] member of the staff of, or employee of, an officer, official, or representative described in paragraph (1) or (2) . . . ; or

   (4) any person engaged in a legal commercial transaction.

18 U.S.C. § 951(d) (emphases added).

One thing is clear right off the bat: To fall within § 951's ambit, a person must do more than act in parallel with a foreign government's interests or pursue a mutual goal. An "agent" further "agrees to operate . . . subject to the *direction or control*" of that government.[11] *Id.* (emphasis added).

---

[11] DOJ regulations promulgated under § 951(b) similarly define "agents" as "individuals acting as representatives of, or on behalf of, a foreign government or official, who are *subject to the direction or control* of that foreign government or official, and who

If that formulation rings a bell, it's because, under the common law, an agent is someone who agrees to "act on [another's] behalf[,] subject to his control," or at least not "contrary to [his] directions." *See* Restatement (Second) of Agency §§ 1, 14 cmt. a (Am. L. Inst. 1958). And "[i]t is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under the common law," as it appears to have done with "agent" here, "a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)) (quotation marks and ellipses omitted).

Of course, there are bound to be some aspects of common-law agency that don't jibe with § 951's language and purpose, and we must not "force term-of-art definitions into contexts where they plainly do not fit." *Johnson v. United States*, 559 U.S. 133, 139 (2010) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 282 (2006) (Scalia, J., dissenting)). We therefore agree with the district court that "[t]here is no need . . . to consider whether the definition of 'agent' in [§] 951 embraces the *entirety* of the term's common law meaning in *all* contexts and circumstances." *Rafiekian*, 2019 WL 4647254, at *11 (emphases added). But for purposes of this case, we are persuaded (as the district court was) that § 951's definition at least resonates with the common law's in important respects. Those

---

are not specifically excluded by the terms of [§ 951] or the regulations thereunder." 28 C.F.R. § 73.1(a) (emphasis added).

similarities counsel us to reject two of the Government's proffered interpretations of the statute.

The first relates to the degree of necessary direction or control envisioned by Congress. The Government contends that Congress "intended to paint with a broad brush" when it enacted § 951. Opening Br. at 39. "Direction *or* control," it notes, is phrased in the disjunctive, which suggests that the two words "are to be given separate meanings" that, together, "reach more broadly than either alone." *Id.* at 35 (quoting *Loughrin v. United States*, 573 U.S. 351, 357 (2014)). Fair enough. But there is little practical daylight between the definition the Government offers for "direction"—"guidance or supervision of action, conduct, or operation"—and the one it offers for "control"—"power or authority to guide or manage," both of which resemble the common-law meaning of agency anyhow. *See id.* at 35–36 (citing *Direction*, Webster's Third New International Dictionary 640; *Control*, *id.* at 496 (2002)).

It does appear that the Government advocated for a substantially more expansive construction below: that a person becomes an "agent" for the purposes of § 951 whenever he "is willing to do something the foreign principal requests." *Rafiekian*, 2019 WL 4647254, at *10. That interpretation *is* broad, and the district court rightly rejected it—not just on the bases of § 951's plain language and common-law likeness, but because Congress utilized a more sweeping definition of "agent" in the Foreign Agents Registration Act,

which includes far-reaching verbiage that § 951 lacks.[12] To the extent the Government still advocates for that construction on appeal, we decline to adopt it.

But that does not mean we share the district court's view in every respect. Reading the statute's definition of "agent" against a common-law backdrop, the district court apparently understood § 951 as requiring something akin to an employer-employee relationship, with a foreign government dictating both a desired end *and* the more granular means of performance. *See, e.g.*, *Rafiekian*, 2019 WL 4647254, at *10–11, *13 (faulting the Government for failing to show that the Turkish government channeled instructions "concerning the day-to-day operational details of th[e] work"). That is undoubtedly one kind of agency relationship covered by § 951 and the common law. But an independent contractor may also be an agent—while still retaining significant discretion over the

---

[12] For instance, the term "agent of a foreign principal" is defined under the Foreign Agents Registration Act as

(1) any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person [engages in certain political or financial activities];

. . . [and]

(2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.

22 U.S.C. § 611(c)(1)–(2).

particulars of performance—so long as he "contracts to act on account of the principal." Restatement (Second) §§ 2 cmt. b, 14N, 220 cmt. e; *see also Smith v. United States*, 346 F.2d 449, 453 (4th Cir. 1965) ("An independent contractor too may be an agent; the terms are not mutually exclusive."). The line between an "agent" who works under a foreign government's "control" and one who, instead, agrees to operate subject to a more hands-off form of "direction"—as an agent–independent contractor could—might be a hazy one. Still, we find no reason to believe that Congress sought to exclude the latter variety of agency from § 951's reach.

The second of the Government's agency arguments goes to the meaning of the verb "agrees." The Government contends that it's possible to "agree[] to operate" subject to foreign authority (and therefore become an agent) "unilaterally"—that is, without a foreign government's participation and assent. *See* Opening Br. at 36 n.5; Reply Br. at 6–7. But mutual assent undergirds all agency relationships. *See* Restatement (Second) § 1 ("[Agency] results from the manifestation of consent by one person to another that the other shall act on his behalf . . . and consent by the other so to act."). And given the stiff penalties for a § 951 violation, we decline to infer a congressional intention to depart from that foundation and impose the statute's disclosure requirement on every wannabe emissary in the absence of explicit language to that effect. Whether an agent-principal relationship is established by direct contact or via an intermediary, § 951 requires a foreign government or official on one end of the line. *See United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011) (explaining that, to prove a § 951 violation, the Government must establish *both* that

the defendant intended to operate subject to a foreign government's direction or control and "also . . . that a [foreign] official directed or controlled [his] actions").

In sum, to be an "agent of a foreign government," a person must "agree[] to operate . . . subject to [foreign] direction or control." 18 U.S.C. § 951(d). That agreement cannot be one-sided, and a person does not become an "agent" for purposes of § 951 simply by acting in accordance with foreign interests or by privately pledging allegiance. Nonetheless, a foreign principal's involvement does not need to mirror an employer's control over the workings of an employee; a lesser degree of "direction" is sufficient, as it would be under the common law.

## B.

Our second preliminary question goes to the character of the "legal commercial transaction" exception found in § 951(d)—whether it constitutes an element of the crime or, instead, provides for an affirmative defense.

After articulating a general definition of "agent," § 951 lays out four distinct exceptions. *See* 18 U.S.C. § 951(d)(1)–(4). As noted, the first three pertain to diplomats, officials, and their staffs, while the fourth excludes those "engaged in . . . legal commercial transaction[s]."[13] In a pretrial order, the district court concluded that the fourth exception constitutes a substantive element of the offense, such that the Government must allege and

---

[13] Applicable DOJ regulations provide that, for the purpose of § 951(d), the term "legal commercial transaction" means "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f).

prove that a defendant engaged in conduct *other than* a "legal commercial transaction" in order to make out a § 951 violation. *See United States v. Rafiekian*, No. 1:18-cr-457-AJT-1&2, 2019 WL 3021769, at *8–12 (E.D. Va. July 9, 2019). The Government posits that this was error, and that the "legal commercial transaction" exception instead provides for an affirmative defense. We agree.

Determining whether an exception in a criminal statute creates an element or an affirmative defense is not an exact science. *See generally United States v. Cook*, 84 U.S. 168, 174–75 (1872). But as a rule of thumb, an indictment "founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause." *McKelvey v. United States*, 260 U.S. 353, 357 (1922). Rather, the initial burden of claiming such an exception generally falls to the defendant. *See id.* "That longstanding convention is part of the backdrop against which the Congress writes laws, and we respect it unless we have compelling reasons to think that Congress meant to put the burden of persuasion on the other side." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92 (2008).

We most recently applied this principle in *United States v. Royal*, 731 F.3d 333 (4th Cir. 2013), to hold that 18 U.S.C. § 921(a)(3)'s "antique firearm" exception operates as an affirmative defense to a felon-in-possession charge. Per 18 U.S.C. § 922(g)(1), it is generally unlawful for a felon to possess "any firearm or ammunition" that has traveled in interstate commerce. The term "firearm" is then defined in § 921(a)(3) to include a variety of weapons, but to exclude "antique firearm[s]":

19

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. *Such term does not include an antique firearm.*

18 U.S.C. § 921(a)(3) (emphasis added). The statutory scheme that was before us in *Royal*, then, is comprised of a substantive offense provision (§ 922(g)(1)); a general provision defining an element of that offense (§ 921(a)(3)); and an "exception" to that definition, written in the same subsection, but framed as a "distinct clause." *See McKelvey*, 260 U.S. at 357. Given that structure—an offense provision, a definitional provision, and a separate exception—we joined our sister circuits in "plac[ing] the burden on defendants to raise [the antique-firearm exception] as an affirmative defense." *Royal*, 731 F.3d at 338.

Section 951 is set up the same way. The substantive offense provision is found in § 951(a). To establish criminal liability, the Government must prove that someone "other than a diplomatic or consular officer or attaché" acted in the United States as an "agent of a foreign government," and did so without first notifying the Attorney General. 18 U.S.C. § 951(a). A separate subsection, § 951(d), provides a general definition of the term "agent": "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." *Id.* § 951(d). And the four exceptions to that broad definition are then listed under a proviso ("except that such term does not include . . ."), albeit one offset by a comma, rather than a period. *Compare id.*, *with* 18 U.S.C. § 921(a)(3).

The district court found several reasons to distinguish *Royal* from the case at hand.[14] In its view, § 951's "legal commercial transaction" exception is best read as "part and parcel" of the substantive offense because "it would be impossible to frame the actual statutory charge . . . without an allegation showing that the accused was not within the exception." *Rafiekian*, 2019 WL 3021769, at *9, 11 (quoting *Royal*, 731 F.3d at 338–39; *Cook*, 84 U.S. at 175). That's a hard perspective to square with *Royal*, given the statutes' similar structures. And regardless, we cannot agree with the district court's analysis. The offense here "may be accurately and clearly defined without any reference to the ['legal

---

[14] Rafiekian adds two others, neither of which we find compelling. He first highlights the fact that the "antique firearm" exception is "nested" several "degrees" away from § 922(g)'s substantive offense provision, whereas all of § 951's components— including the "legal commercial transaction" exception—are housed close together. Response Br. at 90. However, the exception recognized as an affirmative defense in *McKelvey*—the case articulating the "settled rule" of statutory construction we now apply—was set out in even closer proximity to its corresponding offense provision than the exception here. *See* 260 U.S. at 356–57 (recognizing affirmative defense contained within the same section as offense language).

Rafiekian also notes that *Royal* distinguished the "antique firearm" exception to § 921's definition of "firearm" (which a defendant must prove) from the "designed for use in any firearm" portion of the statute's definition of "ammunition" (which the Government must prove). Response Br. at 91 (quoting *Royal*, 731 F.3d at 338–39 (comparing § 921(a)(3) with § 921(a)(17)(a))). We did so because the "antique firearm" exception "stands alone as a separate sentence," whereas the "designed for use" language is "part and parcel of the definitional sentence." *Royal*, 731 F.3d at 338–39. But the same is true of § 951: the four exceptions in § 951(d) "stand alone" in contrast to other language that is "part and parcel" of the definition of "agent"—*i.e.*, a person "who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951.

commercial transaction'] exception."[15] *Cook*, 84 U.S. at 173–74; *see also United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997) ("[W]here one can omit the exception from the statute without doing violence to the definition of the offense, the exception is more likely an affirmative defense."). Were the exception stricken, § 951 would still "define[] a perfectly cogent offense."[16] *McArthur*, 108 F.3d at 1354.

The district court also focused on the fact that the "legal commercial transaction" exception excludes a large category of potential defendants—those engaged in legal commerce. The "antique firearm" exception at issue in *Royal* is undoubtedly more limited.[17] But we are unconvinced that this distinction makes a difference. Affirmative defenses can be—and often are—expansive. *See, e.g.*, *United States v. Taylor*, 686 F.3d 182, 194 (3rd Cir. 2012) (holding that the phrase "without just cause or excuse" in federal assault statute created an affirmative defense, rather than an element); *cf. Meacham*, 554

---

[15] To the extent any exception is truly interwoven with the terms of the offense, a better candidate would be the blanket omission of "diplomatic or consular officer[s] or attaché[s]" from the scope of the statute, which, unlike the three exceptions in § 951(d)(2)–(4), sits front and center in § 951(a)'s substantive offense provision. *See* 18 U.S.C. § 951(a).

[16] Read together, § 951(a) and the general definition of "agent" stated at the outset of § 951(d) would provide that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government[, that is, an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official,] without prior notification to the Attorney General . . . shall be fined . . . or imprisoned not more than ten years, or both."

[17] An "antique firearm" is generally defined as any firearm "manufactured in or before 1898," a replica thereof, or a "muzzle loading" gun which "cannot use fixed ammunition." 18 U.S.C. § 921(a)(16).

U.S. at 87 (classifying exemption for employer actions otherwise prohibited by the Age Discrimination in Employment Act but based on "reasonable factors other than age" as an affirmative defense); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120, 126 (1953) (treating statutory exception in Securities Act of 1933 for "transactions by an issuer not involving any public offering" as an affirmative defense). And while the legislative history does suggest that Congress revised § 951's definition of "agent" to address concerns about vagueness and overbreadth,[18] it did so by adding a series of exceptions under a distinct proviso, rather than tweaking § 951(a)'s substantive offense provision.[19] Redefining elements is one way to delineate a criminal provision's reach. But affirmative defenses, too, may "serve to define the scope of [a] prohibition." *United States v. Mayo*, 705 F.2d 62, 74 (2d Cir. 1983).

We add one more consideration. To obtain a criminal conviction, the Government must prove "beyond a reasonable doubt . . . every fact necessary to constitute the [charged] crime." *In re Winship*, 397 U.S. 358, 364 (1970). Were the "legal commercial transaction"

---

[18] *See, e.g.*, S. Rep. No. 98-225, at 415 (1983) (explaining that § 951 was not "intended to cover . . . routine commercial matters," and that "[b]y excluding from the notification requirement several classes of individuals" who were previously covered, the exceptions in subsection (d) "limit[] the coverage of the statute by focusing only on those in whom the United States government has a necessary interest").

[19] We can imagine, for example, an amended § 951(a) that reads: "Whoever, other than a diplomatic or consular officer or attaché, [*or a person engaged in a legal commercial transaction*], acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . . shall be fined . . . or imprisoned not more than ten years, or both." *Accord United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993) (construing an exception in a substantive offense provision as an element).

exception an element of the offense, the Government would need to allege and ultimately prove either (a) that the defendant acted subject to foreign direction or control, but by way of conduct *not* couched in a commercial transaction, or (b) that the defendant's actions, though part of a commercial transaction, were otherwise illegal. That burden allocation strikes us as being at odds with § 951's broad, overarching purpose—serving as a "catch-all statute that would cover all conduct taken on behalf of a foreign government." *United States v. Duran*, 596 F.3d 1283, 1294–95 (11th Cir. 2010).

On the front end, such an interpretation might encourage would-be agents to sidestep disclosure by commoditizing their otherwise non-commercial endeavors. And in many cases, the Government would have to prove the commission of crimes it chose not to charge—beyond a reasonable doubt—in order to establish that the exception did not apply. This case is illustrative. Rafiekian was never charged with a substantive violation of the Foreign Agents Registration Act. Yet because the district concluded that the "legal commercial transaction" exception was an offense element, the Government was forced to prove that Rafiekian's "lobbying activities and [the] op-ed . . . violated [22 U.S.C. § 612]"—a provision of the Foreign Agents Registration Act "not separately charged." J.A. 1848–50, 1857–58. We find no sign in the text or legislative history that Congress intended to make prosecutions under § 951 so unwieldy.

In short, the "legal commercial transaction" exception provides for an affirmative defense—which must be raised first, if at all, by a defendant—rather than an essential element of the offense.

III.

Now that we have our bearings, we turn to the propriety of the district court's grant of acquittal. We review that ruling de novo. *See United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). In doing so, we ask whether "substantial evidence" supports the convictions; that is, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Fall*, 955 F.3d 363, 375 (4th Cir. 2020). Our review of the evidence is comprehensive, with a focus on "the complete picture." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc). And we "allow the [G]overnment the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Savage*, 885 F.3d 212, 219–20 (4th Cir. 2018) (internal quotation marks omitted).

A.

We begin with Count Two—the substantive § 951 charge.[20] As explained above, the Government's burden was to prove that Rafiekian acted as an "agent" by agreeing to operate subject to Turkey's "direction or control" without first notifying the Attorney General.

The list of evidence that the Government did *not* produce at trial is long. No emails or phone calls between Rafiekian and any Turkish official. No bank records tracing the

---

[20] Our review is limited to the evidence presented in the Government's case-in-chief, after which Rafiekian first moved for acquittal, and the district court reserved decision. Fed. R. Crim. P. 29(b); *see United States v. Bonner*, 648 F.3d 209, 212–13 (4th Cir. 2011).

flow of funds back to governmental accounts. No direct evidence clarifying Alptekin's role vis-à-vis Turkey. No live testimony from Rafiekian, Flynn, or Alptekin.

But in a § 951 case, such evidence can be hard to come by. *Cf. United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945) (looking beyond a lack of direct evidence to find "the hall-marks" of a foreign government's involvement in a "web of . . . evasion"). Savvy operatives cover their tracks. So, if the prosecution is to prove that a defendant acted as an "agent of a foreign government," it may need to rely on circumstantial evidence and reasonable inferences to make its case—as it is entitled to do. *See Jackson*, 443 U.S. at 319; *Holland v. United States*, 348 U.S. 121, 140 (1954). And here, the Government lassoed enough stars to reveal a distinct constellation.

For starters, a rational juror could infer the existence of an agreement between Rafiekian and Turkish officials, facilitated by Alptekin, to initiate Project Truth. The evidence at trial showed that Rafiekian and Alptekin began corresponding less than a week after Turkey's extradition request was first denied. In their early exchanges, Alptekin conveyed that Turkey's Minister of Foreign Affairs was "interested in exploring [Flynn Intel Group's services] seriously" and would likely "want to meet with [Rafiekian and Flynn]." J.A. 2176; 2184. Alptekin soon claimed to have Turkey's Minister of Economy on board, too, and expected him to run the project higher up the flagpole. J.A. 2187 ("He agreed to discuss [Project Truth] at the council of ministers . . . and subsequently with [Prime Minister] Yildirim in more detail."). Ultimately, "after several meetings" with those ministers, Alptekin reported that he had received "a green light to discuss confidentiality, budget[,] and the scope of the contract." J.A. 2201.

Alptekin's statements were not admitted for their truth. But the jury was permitted to consider their effect on Rafiekian, who clearly (and eagerly) understood Turkey's involvement to be bona fide. Covington attorney Robert Kelner testified that Rafiekian told him that Project Truth was conceived for the Turkish government. In early emails, Rafiekian appeared to be courting not just Alptekin, but Turkey—praising President Erdogan as the only Muslim head of state capable of "lead[ing] the campaign against Radical Islam." J.A. 2174; 2183. And Rafiekian and Flynn eventually met with Turkish officials in New York—just as Alptekin had suggested at the outset—to discuss Gulen. After that meeting, Rafiekian told one of his employees that, if they played their cards right, Flynn Intel Group might garner "a *follow-on* contract worth $5 million"—the implication being that the firm had already been engaged, if only preliminarily, by Turkey. J.A. 980–81 (emphasis added). From these facts, a rational juror could infer that Rafiekian "agree[d]" to perform work for Turkey, and that the assent was mutual.

Despite his admission to Covington investigators that Turkey "would have been" the client for Project Truth, Rafiekian insisted that Project Confidence was a "completely separate" endeavor—one involving Inovo and Alptekin, and no other foreign entities. J.A. 799–801. But the Government presented substantial evidence that Project Truth and Project Confidence were, in fact, one and the same.

Rafiekian, Flynn, and Alptekin began working on Project Truth in late July 2016. They continued emailing under a "[Project] Truth" subject heading until August 10, the date of Alptekin's "green light" message. J.A. 2201. The very next day, Rafiekian presented the firm's plan for Project Confidence to Flynn Intel Group employees. J.A.

27

2212. But Project Confidence's "Phase Zero" action items—a bulleted to-do list outlining essential first steps—were virtually identical to those previously circulated for Project Truth. *Compare* J.A. 2178, *with* J.A. 2212. The initial Project Confidence budget also provided that Alptekin would receive a 20% "advisory support fee" for his services as point man—an apparent holdover from earlier discussions related to Project Truth. *See* J.A. 2178, 2207, 2212–13. And in a September 3 email to Alptekin regarding Project Confidence, Rafiekian wrote, "We have been at work on this engagement since July 31st"—the time when Project Truth was first hatched. J.A. 2219. From that evidence—the timing and structure of the two projects, Alptekin's consistent participation, and Rafiekian's apparent acknowledgement of the projects' relation—a rational juror could have found that Project Confidence was just a rebranding of Project Truth.

The Government also produced substantial evidence that Alptekin served as Turkey's intermediary. By way of weekly phone calls, emails, and at least one in-person update, Alptekin was kept apprised of Flynn Intel Group's work on Project Confidence. Alptekin facilitated and was present at the New York meeting with Turkish officials. And his role was further evidenced by the "advisory support fees" that Flynn Intel Group paid him in connection with the project. Each month, Alptekin (the project's nominal "consultant") would pay Flynn Intel Group's fee from a Turkish bank account in his name. Flynn Intel Group would then immediately transfer a set percentage of that payment into a Dutch account owned by Inovo, the project's nominal "client" which was wholly owned by Alptekin.

28

That arrangement strongly suggests that an entity other than Alptekin was actually financing Project Confidence, albeit through Alptekin's bank account. And a reasonable inference—one a rational juror could embrace in light of the other evidence of Turkey's involvement—is that Turkey was that entity, with the "kickback" payments serving as Alptekin's commission for acting as a go-between.

Finally, the Government showed that Rafiekian carried out Project Truth/Confidence subject to Turkish "direction" conveyed through Alptekin. Take the New York meeting. The Turkish Foreign Minister spoke exclusively about Gulen—calling him a "terrorist" and "the Osama bin Laden of Turkey," and blaming him for the attempted coup—and emphasized the Turkish government's desire to have him extradited from the United States. J.A. 978–79. Afterwards, Alptekin reiterated to Rafiekian that "their side" had "very specific expectations" for Project Confidence, and Rafiekian responded that Flynn Intel Group would "deliver" what it had "promise[d]." J.A. 2249. Then, in alignment with the Foreign Minister's wishes, Flynn Intel Group "focus[ed] [its] efforts on 'boxing'/'framing' [Gulen] as a terrorist," with an "ultimate aim" of "gain[ing] a criminal referral." J.A. 2289–90; *see also* J.A. 980 (goal after meeting was to "show . . . that Gulen was, in fact, violating . . . U.S. law"). Flynn Intel Group's Foreign Agents Registration Act filing characterized the New York meeting as "background" for Project Confidence—a chance for Flynn and Rafiekian to "understand[ ] better the political climate in Turkey at the time." J.A. 2349–50. But there's another rational way to view the meeting and subsequent conduct: Turkey's Foreign Minister stated a directive (portray Gulen as a

criminal and terrorist to achieve extradition), which Alptekin later echoed; Rafiekian got the memo; and Project Confidence was executed accordingly.

There's also the op-ed. Notes from an October 7, 2016 conference call show that Alptekin urged Flynn Intel Group to author an opinion piece linking "funding, Islamists[,] and [Gulen]." J.A. 1058–59, 2290. When it became clear in November that Flynn Intel Group was not meeting "expectations," Rafiekian assuaged Alptekin by composing an op-ed, just as discussed, and having it published under Flynn's name. "[A] promise kept," in Rafiekian's words—and further evidence that he adhered to Turkish "direction" during the engagement. J.A. 2306.

Viewing the above facts holistically, as we must, we are convinced that the jury heard sufficient evidence that Rafiekian acted as "an agent of a foreign government." Under our deferential standard of review, we must uphold the jury's verdict if "*any* trier of fact could have found that the evidence—either direct, circumstantial or a combination of both—along with any reasonable inference[s]" established the essential elements of the crime beyond a reasonable doubt. *Fall*, 955 F.3d at 377 (emphasis added). Based on the evidence presented, a rational juror could conclude that Project Truth was synonymous with Project Confidence; that the Turkish government was, in fact, behind the project; that, through Alptekin, Turkey communicated both general and specific instructions; and that Rafiekian hewed to those directions over the life of the engagement—all without notifying the Attorney General. That is enough to make out a § 951 violation. We therefore reverse the district court's grant of acquittal on Count Two.

30

B.

We now turn to Count One—the conspiracy charge. To garner a conviction, the Government had to prove (1) an agreement between two or more people to violate federal law; (2) Rafiekian's knowing and willing participation; and (3) an overt act in furtherance of the conspiracy. *See United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018).

Recall that the alleged conspiracy here had two distinct objects: (1) acting as an undisclosed foreign agent; and (2) making a false or misleading Foreign Agents Registration Act filing. The jury found that Rafiekian conspired to further both objectives. But in reviewing a conviction for a dual-object conspiracy, we sustain the jury's verdict "if the evidence shows that the conspiracy furthered [either] of the objects alleged." *United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) (citing *Griffin v. United States*, 502 U.S. 46, 56 (1991)). Because we find sufficient evidence that Rafiekian conspired with Alptekin to further the first alleged object—acting as an undisclosed foreign agent—we reverse the grant of acquittal on Count One.[21]

It is well established that "[t]he existence of a 'tacit or mutual understanding' between conspirators is sufficient evidence of a conspiratorial agreement." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (quoting *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)). Direct proof is therefore not required, and conspiracy "may be

---

[21] The Government argues that it "introduced substantial evidence showing that Rafiekian agreed with *both* Flynn and Alptekin, or at least one of them," to act as an undisclosed foreign agent. Opening Br. at 54–55 (emphasis added). Because we find sufficient evidence of such a conspiracy between Rafiekian and Alptekin, we refrain from drawing conclusions with respect to Flynn's alleged participation.

inferred from the facts and circumstances of the case, i.e., circumstances indicating that two or more persons acted in concert to achieve an illegal goal." *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir. 1980).

As detailed above, the Government's evidence showed that Rafiekian and Alptekin engaged in a multi-month effort to facilitate Project Truth/Confidence. That evidence of joint conduct easily establishes that the two agreed to operate—if not explicitly, then implicitly—subject to Turkish direction. But beyond that, we also find considerable evidence in the record indicating that Rafiekian and Alptekin together sought to avoid disclosing Turkey's involvement to the Attorney General, as § 951 requires.

From the project's inception, confidentiality was of paramount concern. The written agreements between Flynn Intel Group, Inovo, and Alptekin make no mention of Turkish involvement, and specifically provide that "no public announcement of the scope or details of this engagement shall be made without written approval of [the] parties during the course of the engagement." J.A 2222–23, 2243. Along those lines, Rafiekian cautioned his employees not to reveal Flynn Intel Group's work on Project Confidence or use Inovo's name in external discussions. He likewise advised Flynn Intel Group's public relations firm, Sphere Consulting, to disclose Inovo's name only "[a]s a last resort." J.A. 2252.

The desire to keep sensitive matters private is understandable. But when pressure mounted to make *some* kind of public disclosure, Rafiekian balked at notifying DOJ, opting instead to keep things—as he put it—"under the radar" by filing a barebones lobbying-registration form with Congress. J.A. 982–84, 2581–82.

Moreover, the evidence showed that efforts to hide Turkey's involvement from DOJ persisted after the op-ed drew scrutiny. For example, under direct questioning from Covington investigators, Rafiekian asserted that the New York meeting was "unrelated to Project Confidence" (despite having told his own employees that it was) and that Alptekin's fees were just "refunds" for incomplete lobbying work (despite having described them as "consulting fees" in virtually all contemporaneous communications).[22] *See, e.g.*, J.A. 802, 901, 2233, 2256. Consistent with Rafiekian's statements, Alptekin had his attorney draft an opinion letter disclaiming any formal relationship between Inovo and Turkey; characterizing his payments as "refunds"; dismissing the notion that he had asked for or approved the op-ed; and conspicuously omitting any mention of the New York meeting. J.A. 2428–30. Rafiekian delivered that letter to Covington investigators himself— further evidence of at least a "tacit" agreement between Rafiekian and Alptekin to prevent disclosure to DOJ.[23] *Chorman*, 910 F.2d at 109.

---

[22] At the conclusion of its investigation, Covington "did not believe that there was any evidence to support the proposition that [Alptekin's] payments were refunds." J.A. 900–01. So, notwithstanding Rafiekian's urgings, it described the payments as "consulting fees" in the ultimate filing. *Id.*

[23] After determining that there was insufficient evidence of an actual § 951 violation, the district court found the evidence of conspiracy lacking "[f]or substantially the same reasons." *Rafiekian*, 2019 WL 4647254, at *15. However, it went on to highlight "uncontradicted evidence . . . concerning Rafiekian's efforts to comply with any registration or notification requirements" that it felt "underscored" its conclusion. *Id.* at *15–16. To the extent that evidence was presented as part of the defense's case, it falls outside of our scope of review. *See id.* at *15 (citing Defense Exhibit 14); *Bonner*, 648 F.3d at 212–13. But in any event, a rational juror could conclude that Rafiekian's disingenuous statements to his lawyers and his efforts to file under the Lobbying Disclosure Act instead

On these facts, a reasonable jury could conclude that Rafiekian and Alptekin conspired to act subject to Turkey's direction without first notifying the Attorney General. No more is required to sustain the verdict on Count One. *See Bolden*, 325 F.3d at 492.

IV.

Having restored Rafiekian's convictions, we address the district court's conditional grant of a new trial. We review for abuse of discretion. *Millender*, 970 F.3d at 531. Although that standard "accords deference to the district courts, it does not insulate them from review," and a court errs when it "(1) acts 'arbitrarily, as if neither by rule nor discretion,' (2) fails to 'adequately . . . take into account judicially recognized factors constraining its exercise' of discretion, or (3) rests its decision on 'erroneous factual or legal premises.'" *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (quoting *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993)). We conclude that the district court abused its discretion in conditionally granting a new trial here.

A district court may order a new trial if doing so is in "the interest of justice." Fed. R. Crim. P. 33(a). In this posture, a court's authority is "much broader than when it is deciding a motion to acquit," because it is no longer "constrained by the requirement that it view the evidence in the light most favorable to the government." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir.1985). Nevertheless, the "standard for jettisoning a jury verdict in favor of a new trial" remains "demanding," and courts must exercise their

---

of § 951 or the Foreign Agents Registration Act were consistent with an agreement to avoid disclosing his status as a foreign agent to the Attorney General.

discretion to do so "sparingly." *Millender* 970 F.3d at 531–32 (quoting *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017)).

The district court gave four reasons for granting a new trial, but we find none to be a sufficient justification. The first was that the verdict went against "the great weight of the evidence." *Rafiekian*, 2019 WL 4647254, at *16. The court carefully explained its decision to acquit Rafiekian, parsing the Government's evidence before finding it insufficient to support the convictions. But in ordering a conditional new trial based on the weight of the evidence, the court simply harkened back to its acquittal analysis: "[G]iven the great weight of the evidence, as detailed above, the Court also . . . conditionally orders a new trial . . . ." *Id.*

That explanation is insufficient. As we recently held, we will not affirm the grant of a new trial on weight-of-the-evidence grounds where the district court "offered only a single sentence to explain its decision . . . , and its reasoning on th[e] issue rested entirely on its reasoning [in support of] a judgment of acquittal." *Millender*, 970 F.3d at 531–32.

Indeed, Federal Rule of Criminal Procedure 29 requires a court to "specify [its] reasons for" conditionally granting a new trial. Fed. R. Crim. P. 29(d)(1). Here, however, in conditionally granting a new trial based on the "great weight of the evidence," the district court simply pointed back to its acquittal analysis without further elaboration. As described above, we conclude that the evidence *was* sufficient to support the verdict. Consistent with that determination, we reject those same reasons, standing alone, as a proper basis for granting a new trial. *See Millender*, 970 F.3d at 531–32; *United States v. Wood*, 340 F. App'x 910, 911–12 (4th Cir. 2009) (per curiam).

To be sure, the "criteria for a judgment of acquittal and for a new trial" are distinct. *Arrington*, 757 F.2d at 1486; *see United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) (noting that "[i]n determining the necessity of a new trial," a trial court is allowed to "draw inferences . . . unfavorable to the Government . . . from the evidence"). And having observed the trial in the flesh, the district court may have additional justifications for its decision. *E.g.*, *Campbell*, 977 F.2d at 860 (trial court may weigh witnesses' credibility). But new trials should only be granted "sparingly." *Millender*, 970 F.3d at 531. "[O]n the record as it comes to us, we cannot say whether the court appreciated th[is] limit[] on its discretion" and, therefore, cannot affirm on weight-of-the-evidence grounds. *Id.* at 531–32; *see also United States v. Paulus*, 894 F.3d 267, 278–79 (6th Cir. 2018).

The district court next concluded that a new trial was warranted because "the jury was not adequately instructed as to the use of the admitted hearsay statements." *Rafiekian*, 2019 WL 4647254, at *16. The Government introduced around a hundred pages worth of Alptekin's emails and Skype messages at trial. All were deemed hearsay and admitted "solely for the purpose of establishing what information was conveyed to Mr. Rafiekian," rather than for their truth. J.A. 700–01, 748. And the court clearly instructed the jury as to that limited purpose—both at the time the statements were admitted, and again before deliberation.

In hindsight, the district court worried that the "volume and use" of Alptekin's statements created a "substantial danger" that the jury would rely on them for an improper purpose. *Rafiekian*, 2019 WL 4647254, at *16. Accordingly, the court conditionally granted a new trial on that ground. We disagree.

Hearsay can be a challenging concept. But save for "*extraordinary* situations," we "adhere to the crucial assumption . . . that jurors carefully follow instructions." *Francis v. Franklin*, 471 U.S. 307, 324–25 n.9 (1985) (emphasis added). And on review of the record here, we find no "specific 'reason to doubt that the jury'" followed the directions it was given. *United States v. Runyon*, 707 F.3d 475, 497 (4th Cir. 2013) (quoting *United States v. Castillo-Pena*, 674 F.3d 318, 322 (4th Cir. 2012)).

The district court thought the Government's reference to Alptekin's hearsay statements in its closing argument might be construed as "an invitation to consider the truth of those statements." *Rafiekian*, 2019 WL 4647254, at *16; *see also, e.g.*, J.A. 1692–93 ("What these e-mails also tell you is that Alptekin is the conduit to [Rafiekian] from the ministers of the Turkish government."). But throughout its closing, the Government relied on Alptekin's messages for their effect on Rafiekian and his subjective understanding— both permissible purposes. *See, e.g.*, J.A. 1692 ("It shows you again that [*Rafiekian*] *understood* that the Turkish foreign minister was taking this very, very seriously." (emphasis added)), 1698–99 ("[*Rafiekian's*] *been told* . . . by Alptekin that the Turkish foreign minister . . . has given us the green light." (emphasis added)). Importantly, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). Further, over the broader trial, the Government presented ample evidence *other than* Alptekin's statements from which the jury could infer the nature of his connections to Turkey.

It thus appears that the district court gave insufficient deference to the "almost invariable assumption of the law" that the jury was capable of following its multiple limiting instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). That assumption— and the lack of a sufficient reason to depart from it—necessarily constrained the district court's discretion here. We conclude that the district court's departure from that bedrock principle was an abuse of discretion.

As a third basis for ordering a new trial, the district court concluded that "the jury was not adequately instructed as to the role of Michael Flynn" in the alleged conspiracy. *Rafiekian*, 2019 WL 4647254, at \*17. However, Rafiekian did not raise the lack of an instruction regarding Flynn in his Rule 33 motion.[24] That omission is fatal to Rafiekian's argument on this point.

Nearly forty years ago, we expressed doubts about whether Rule 33 permits a judge to grant a new trial "on a ground not set forth in the defendant's motion." *United States v. Steed*, 674 F.2d 284, 290 (4th Cir. 1982) (en banc). And since that time, a consensus has emerged among our sister circuits that, "even if a defendant moves for a new trial, a trial judge may not grant a new trial on a ground not raised in the motion." *United States v. Wright*, 363 F.3d 237, 248 (3d Cir. 2004); *see also United States v. Howard*, 815 F. App'x

---

[24] Rafiekian's Rule 33 motion did mention the Government's "last-minute tactical shift making Flynn a co-conspirator" and its discussion of "a summary of classified information" that referenced Flynn and Alptekin, but not Rafiekian. J.A. 2043. However, he did so in support of his argument that the verdict was against the weight of the evidence. *Id.*; *see also* J.A. 2048–50 (contending that jury instructions "inaccurately defined 'materiality'" and "inaccurately explained the 'knowledge' requirement," but never arguing that the jury was inadequately instructed as to Flynn's role).

69, 80 (6th Cir. 2020); *United States v. Nguyen*, 507 F.3d 836, 838–40 (5th Cir. 2007); *United States v. Quintanilla*, 193 F.3d 1139, 1148 (10th Cir. 1999). We agree with that consensus.

Notably, Rule 33 only permits a court to grant a new trial "[u]pon the defendant's motion." Fed. R. Crim. P. 33(a). But such a limitation is not present in the Rule's civil analogue, Federal Rule of Civil Procedure 59, which authorizes trial courts to grant a new trial *either* upon a party's motion *or* by the court's own initiative—including "for a reason not stated in the motion." Fed R. Civ. P. 59(d). We are persuaded that the Rules' drafters "would have inserted comparable language in the Criminal Rules" had they meant to empower a court "to grant a new trial for its own reason not stated in the motion for new trial" in a criminal case, as they did in the civil context. *United States v. Newman*, 456 F.2d 668, 669–70 (3d Cir. 1972). And accordingly, we find that the district court improperly based its grant of a new trial on the insufficiency of its instructions regarding Flynn—a ground not raised in Rafiekian's Rule 33 motion.

Finally, having previously reasoned that § 951's "legal commercial transaction" exception constituted an offense element, the district court concluded that it had inadequately instructed the jury as to that element's necessary *mens rea*. *Rafiekian*, 2019 WL 4647254, at *17–18 ("[T]he Government must prove not only that the commercial transaction the defendant was engaged in was illegal but also that the defendant knew it was illegal. The jury was not so instructed.") However, because we hold that the "legal commercial transaction" exception refers to an affirmative defense rather than an offense element, there was no need to instruct the jury on such an "element" at all.

In conditionally granting a new trial, therefore, the court failed to "adequately . . . take into account judicially recognized factors constraining" its authority and rested its decision on "erroneous . . . legal premises."[25] *Alvarado*, 840 F.3d at 189 (quoting *James*, 6 F.3d at 239). It thus abused its discretion, and we vacate its decision. *See id.*

## V.

For the above reasons, we reverse the district court's grant of Rafiekian's motion for a judgment of acquittal, vacate the conditional grant of a new trial, and remand for further proceedings consistent with this opinion.

*REVERSED IN PART, VACATED IN PART,*
*AND REMANDED*

---

[25] Rafiekian also posits that, even if we "disagree with each of the four independent new-trial justifications standing on its own," we should nonetheless affirm based on the "cumulative effect" of the alleged "errors." Response Br. at 97–98. But Rafiekian did not make this aggregation argument in his Rule 33 motion, nor did the district court raise the prospect.