```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,   )  Case 1:18-cr-00457
                            )
            Plaintiff,      )
                            )
       v.                   )  Alexandria, Virginia
                            )  December 15, 2021
BIJAN RAFIEKIAN,            )  3:00 p.m.
                            )
            Defendant.      )
_____)  Pages 1 - 18


   TRANSCRIPT OF DEFENDANT RAFIEKIAN'S RENEWED MOTION FOR

                        A NEW TRIAL

           BEFORE THE HONORABLE ANTHONY J. TRENGA

              UNITED STATES DISTRICT COURT JUDGE
```

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1  APPEARANCES:

 2  FOR THE UNITED STATES OF AMERICA:

 3       JAMES P. GILLIS, ESQUIRE
         EVAN N. TURGEON, ESQUIRE
 4       JOHN T. GIBBS, ESQUIRE
         AIDAN GRANO-MICKELSEN, ESQUIRE
 5       OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
 6       Alexandria, Virginia  22314
         (703) 299-3700
 7
    FOR DEFENDANT BIJAN RAFIEKIAN:
 8
         MARK J. MACDOUGALL, ESQUIRE, PRO HAC VICE
 9       STACEY H. MITCHELL, ESQUIRE, PRO HAC VICE
         SAMANTHA J. BLOCK, ESQUIRE, PRO HAC VICE
10       ADAM A. BERESTON, ESQUIRE, PRO HAC VICE
         JAMES E. TYSSE, ESQUIRE
11       AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
         Robert S. Strauss Building
12       1333 New Hampshire Avenue, N.W.
         Washington, D.C.  20036-1564
13       (202) 887-4000

14

15

16

17

18

19

20

21

22

23

24

25
```

 1  THE CLERK: Criminal Case 1:18-cr-457, *United
 2  States v. Bijan Rafiekian.*
 3  Counsel, will you please note your
 4  appearances for the record.
 5  MR. GRANO-MICKELSEN: Good afternoon, Your
 6  Honor. Aidan Grano-Mickelsen for the United States.
 7  I'm joined today by Jim Gillis and John Gibbs, also of
 8  the U.S. Attorney's Office --
 9  THE COURT: Welcome.
10  MR. GRANO-MICKELSEN: -- as well as Mr. Evan
11  Turgeon from the National Security Division and Special
12  Agent Bryan Alfredo, the case agent.
13  THE COURT: All right.
14  MR. MACDOUGALL: Good afternoon, Your Honor.
15  Mark MacDougall with Akin Gump for the defendant, Bijan
16  Rafiekian. With me is my partner, James Tysse, and
17  Stacey Mitchell. Also with us are Samantha Block and
18  Adam Bereston.
19  THE COURT: All right. Welcome to everybody.
20  Mr. Rafiekian noticed the hearing on the
21  Court's current under consideration motion for a new
22  trial following the Fourth Circuit's remand. Having
23  noticed the hearing, I assume you need to tell the
24  Court something that you haven't already told the
25  Court.

1               MR. MACDOUGALL:  Yes, Your Honor.  I'll do
2    that briefly and outside the scope of what's already
3    been filed.
4               THE COURT:  Yes.
5               MR. MACDOUGALL:  Thanks, first, for
6    scheduling this up.  As the Court noted, it's
7    absolutely true the matter has been fully and
8    extensively briefed.  So we're not going to visit any
9    of that again.
10              I just want to discuss briefly a couple of
11   things for context.  It's been a while since the case
12   was tried, since the evidence was heard.  With the
13   passage of time, things come into focus.  I think what
14   we'd like to just ask the Court to consider in looking
15   at this renewed motion for a new trial, in particular,
16   not surprisingly, is Defense Exhibit 66.  The Court
17   reserved on that before it went up to the Circuit.  It
18   was not considered on appeal.  We believe it's still
19   ripe for --
20              THE COURT:  Well, let me ask you this -- and
21   I'll ask both sides:  What remains open for decision by
22   the Court?  Obviously, a new trial motion.  But also,
23   there were issues raised as to DX-66 and also the
24   government's jury argument that defense claimed was
25   shifting the burden.  The Fourth Circuit in a footnote

1  referenced that those were raised within the context of
2  the new trial motions.  Other than those issues, what
3  else is there?
4              MR. MACDOUGALL:  The only other thing
5  pending, Your Honor, in addition to the burden-shifting
6  would be the weight of the evidence.
7              THE COURT:  Well, that's basically the
8  context for consideration of the other two issues,
9  correct?
10             MR. MACDOUGALL:  We believe you're referring
11 to the Court of Appeals' reference to having observed
12 the trial in the flesh.  The district court may have
13 additional justifications.
14             THE COURT:  Right.  That's what they remanded
15 for the Court to look at.
16             MR. MACDOUGALL:  Yes, Your Honor.
17             So with regard to Defendant's Exhibit 66,
18 that was a pivotal piece of evidence.  When it was
19 given to us on the eve of trial, as the Court may
20 recall -- I'm not breaching any privilege -- Mr. Trout,
21 Ms. Mitchell, Mr. Tysse, and I thought the case was
22 over because it essentially told a story that was new
23 to us and took the entire narrative to Michael Flynn.
24 And if you recall, Defendant's Exhibit 66 specifically
25 said Mr. Rafiekian was not involved in that other

1 scheme.

2 Michael Flynn was everywhere in this case,
3 Your Honor. He was a government witness, and then he
4 was not. He was a nonconspirator, and then he was a
5 conspirator. His lawyer, Ms. Powell, before she became
6 really famous, was in the court throughout the entire
7 trial. This was the Flynn Intel Group. The meeting in
8 New York was all about introducing Mr. Flynn.

9 Defendant's Exhibit 66 was drafted by the
10 government. It was the government speaking. Because
11 under the Court's analysis of CIPA, the underlying
12 evidence and the underlying documentation could not be
13 produced. We're not here to question that. The Court
14 has ruled on that, and we're moving on.

15 But in closing, the government argued to the
16 jury after the defense -- I'm sorry -- after defense
17 argued the essence and really the context of DX-66 in
18 rebuttal, the bank robber analogy. And essentially,
19 when you read the transcript and, you know,
20 retrospective a couple of years essentially saying, you
21 know, we gave you that statement. We, the government,
22 gave defense that statement in lieu of --

23 THE COURT: Your position is they basically
24 argue that it has inculpatory as opposed to
25 exculpatory.

1    MR. MACDOUGALL:  Both, Your Honor.  That
2 proves he's guilty of some other crimes, some other
3 activity, and it may not mean anything.  You know,
4 having lived with the rules of evidence, as the Court
5 has, for as long as we all have, one thing you learn
6 along the way is why they've evolved over several
7 hundred years, because that's how you get at the truth.
8    CIPA is the one place in the U.S. Code that I
9 know of that stymies the rules of evidence.  So all we
10 had was that statement.  The Court reserved on the
11 government's treatment of that statement in closing
12 essentially saying that it really meant he was guilty
13 of another crime and the Tom, Dick, and Harry metaphor
14 that was used.  And we believe that alone -- and that
15 evidence alone, Your Honor, was sufficient to get to
16 reasonable doubt to the jury.
17    And at the last minute, in rebuttal, without
18 the opportunity to address it, that was taken off by
19 the government, having used that as the substitution
20 for the CIPA evidence.  That's the context we ask the
21 Court to consider in looking into the Rule 33 motion.
22    THE COURT:  All right.
23    MR. MACDOUGALL:  I take it from the Court's
24 comments the other two issues are not of -- you feel
25 like the Court has everything it needs to know about

those.

THE COURT: I think so.

MR. MACDOUGALL: Thank you, Your Honor.

THE COURT: All right, Counsel.

MR. GRANO-MICKELSEN: Good afternoon, Your Honor. I will try to be similarly brief.

I think the biggest piece of evidence that the Exhibit 66 was not the sort of watershed moment where the government sandbagged was that defense counsel didn't object at that time. They raised objections to other parts of the government's closing, but there was no contemporaneous objection to the government's use of the exhibit during that rebuttal. And I think that's because the government's closing was pretty innocuous. It just said the exhibit says nothing at all.

THE COURT: Don't you think the Court can still consider how the government argued that exhibit in considering whether the jury may have been distracted from what otherwise would have been the weight of the evidence?

MR. GRANO-MICKELSEN: I think the Court can consider it, Your Honor. I think the Court should consider it. But I don't think it changes the balance of the evidence. You know, I would point the Court

1  back to the *DeChristoforo* quote that the Fourth Circuit
2  relied on.
3          (Reporter clarification.)
4          MR. GRANO-MICKELSEN:  The *DeChristoforo*
5  quote.  It's a case from the Supreme Court about
6  ambiguous remarks in prosecution closings, that they
7  should not be construed to have their most damaging
8  meaning.
9          I think read in context, particularly the
10 comments about DX-66, simply said the fact that the
11 government might have information showing two
12 individuals are engaged in some activity does not
13 preclude the fact that a third person could also be
14 involved in that activity.  It was simply a statement
15 of negation, that the exhibit was not as inculpatory as
16 the defense thought it was.
17         THE COURT:  All right.  It's here on a
18 remand, and the Court is evaluating the weight of the
19 evidence issue in light of the clarifications that the
20 Fourth Circuit has made with respect to what the
21 statute really means.  I'd like you to address, if you
22 would, what effect, if any, you think the Fourth
23 Circuit's pronouncements on the scope of that statute
24 has with respect to the Court's analysis as to the
25 weight of the evidence.

1              For example, the Court made clear that it's
2    simply not enough for someone to be acting on behalf of
3    a foreign government and that they really have to be
4    operating at direction and control and recognize that
5    even in that context, at some point, the direction or
6    control becomes so hands-off as to remove the defendant
7    from the scope of the statute.
8              Would you agree that the Court needs to
9    consider all of those pronouncements in assessing the
10   weight of the evidence?
11             MR. GRANO-MICKELSEN:  Definitely, Your Honor.
12   I think the Court is sort of conducting a different
13   weight of the evidence now than it was originally when
14   it construed the statute for the first time.
15             THE COURT:  Right.
16             MR. GRANO-MICKELSEN:  I would point out,
17   however, that the Fourth Circuit's discussion of the
18   evidence, particularly how all of the pieces fit
19   together, demonstrates that there was sufficient
20   evidence to meet that threshold, obviously, as the
21   Fourth Circuit held.
22             THE COURT:  Right.
23             MR. GRANO-MICKELSEN:  But I think for the
24   weight of the evidence purposes, it's important to note
25   that -- the standard is that the evidence of innocence

1  or that the evidence weighing against guilt
2  preponderates heavily over the evidence of guilt.
3              THE COURT:  Right.
4              MR. GRANO-MICKELSEN:  And I think here, where
5  there are so many pieces stacked up indicating that
6  there was actually a meeting of the minds between the
7  Turkish government on one hand and Mr. Rafiekian on the
8  other, that there simply isn't the kind of exculpatory
9  evidence in this case that has been found in other
10 cases where the Fourth Circuit has sustained a weight
11 of the evidence new trial.
12             For example, one of the main cases is *Souder*
13 in the Fourth Circuit, which is an unpublished
14 decision, but it's one of the few times we see the
15 Fourth Circuit uphold the sufficiency of the evidence
16 but also grant a weight of the evidence -- also affirm
17 the weight of the evidence new trial finding.  There
18 the government's argument was that there were material
19 misrepresentations and omissions in investor
20 presentations.
21             The reason that weight of the evidence new
22 trial happened was because certain government witnesses
23 testified that they didn't know this information, but
24 there was also an audio recording and transcripts of
25 the meeting and other government witnesses who said,

1  yes, we actually were told all of that information.  So
2  when there's that kind of contradicting evidence to
3  suggest that there really weren't the kind of material
4  misstatements or omissions, the Court said that's a
5  sufficient basis to do weight of the evidence.  We
6  don't have that here.
7         The defense's case about the defendant's
8  attempt to disclose what was supposed to be done is
9  actually fully consistent with the government's
10 statements that he was, in fact, hiding Turkey's
11 involvement in the project.  So I don't think you have
12 the kind of -- even if the Court is conducting sort of
13 a new weight of the evidence analysis under the revised
14 legal standard, I simply don't think you have the
15 counterweight that we see in many of the other weight
16 of the evidence cases.
17        THE COURT:  Well, even if that were the case,
18 doesn't the case really come down to the direction and
19 control issue?  Even if the weight of the evidence was
20 not so great as to find that Turkey wasn't involved or
21 they weren't acting on behalf of Turkey, don't you have
22 to then consider the weight of the evidence as to the
23 direction and control issue?
24        As we've all pushed ourselves away from this
25 case, what I guess strikes me to a certain extent is

1  how ill-suited the whole context of the agreement was
2  for Turkey to enlist Mr. Rafiekian as a secret agent.
3  It's still hard to articulate why they would want
4  Mr. Rafiekian to be a secret agent within the context
5  of an agreement with a scope of work that was basically
6  to develop a video, as opposed to what would appear to
7  be their real interest, which is Mr. Flynn and what
8  Mr. Flynn could do for them.
9           MR. GRANO-MICKELSEN:  Your Honor, I think the
10 evidence demonstrates with respect to the conspiracy
11 that it was Flynn Intel Group that was sort of
12 effective, and Mr. Rafiekian, obviously, was the
13 project leader on it and wasn't the main part of that.
14          THE COURT:  Right.
15          MR. GRANO-MICKELSEN:  And I think some of the
16 evidence that demonstrates Turkey's direction or
17 control -- we can look at the emails that were
18 exchanged after the September 19 meeting where
19 Mr. Rafiekian is reporting to Mr. Flynn his
20 conversations:  We deliver what we promise.
21          And then later there's an op-ed with the
22 line, "A promise made is a promise kept."
23          Right.  So we have evidence demonstrating
24 that the Turkish government through Alptekin was
25 pushing Mr. Rafiekian and Flynn Intel Group to make --

1          THE COURT:  There's also a lot of evidence
2    that those kinds of overtures were rejected during the
3    relationship.
4          MR. GRANO-MICKELSEN:  I think that might go,
5    Your Honor, to the distinction in the legal standards
6    that the Fourth Circuit identified.  There didn't need
7    to be the kind of operational day-to-day control over
8    the methods of accomplishing a goal.  But the
9    September 19 meeting was extremely clear that the goal
10   of the Turkish government was to obtain Gulen's
11   extradition.  Then you have subsequent notes --
12         THE COURT:  But the agreement was really
13   collateral of that; wasn't it?  It, obviously, was
14   related.  They had the whole effort.  They had hired
15   Amsterdam and so on.  It was more directly engaged for
16   that purpose.  But the scope of the agreement was
17   really fairly obliquely related to extraditing Gulen;
18   wasn't it?
19         MR. GRANO-MICKELSEN:  I don't think so, Your
20   Honor.  And I think it's important to distinguish
21   between --
22         THE COURT:  And what was Rafiekian able to do
23   with that?  He wasn't in a position to get him
24   extradited.
25         MR. GRANO-MICKELSEN:  Yes, Your Honor.

1  There's evidence, though, about lobbying that occurred.
2  Mr. Rafiekian made calls to members of Congress.
3              THE COURT:  They registered for that, and he
4  wasn't prosecuted for it.
5              MR. GRANO-MICKELSEN:  I disagree that he
6  registered for it, Your Honor.  The lobbying disclosure
7  named two bills, two omnibus spending bills that were
8  not the subject of any of those lobbying calls.  So I
9  don't think it's accurate to say that he registered for
10 that particular lobbying.
11             I'd also point out that the op-ed was a prime
12 example of a call for Gulen's extradition.  It called
13 for the end of his asylum in the United States.  And I
14 don't think the Court should be limited to what the
15 text of the actual engagement contract between Alptekin
16 and Flynn Intel Group said.
17             THE COURT:  Well, they had earlier asked for
18 an op-ed, and it was rejected; wasn't it?
19             MR. GRANO-MICKELSEN:  It was, Your Honor.
20 And then they changed course after the November 3 -- or
21 the November 4 meeting in which they presented sort of
22 a product of their work so far to Mr. Alptekin and he
23 threw the presentation across the table and said, "What
24 am I going to tell Ankara?  This isn't good enough."
25 And then the op-ed appeared as an attempt to smooth

1  over the fact that they weren't producing what he
2  wanted.
3             THE COURT:  Right.  But was there in evidence
4  a request for the op-ed?  I can't specifically recall.
5             MR. GRANO-MICKELSEN:  There was discussion of
6  an op-ed on a call between Alptekin, Mr. Flynn, and
7  Mr. Rafiekian.
8             THE COURT:  When?
9             MR. GRANO-MICKELSEN:  October 29.
10            THE COURT:  I'm talking about at the
11 November 3 meeting.
12            MR. GRANO-MICKELSEN:  No, Your Honor.  I
13 believe --
14            THE COURT:  Right. That was rejected.  The
15 earlier request for an op-ed was rejected.  Rafiekian
16 said it wasn't within the scope of what we were hired
17 to do, so we're not doing that.
18            MR. GRANO-MICKELSEN:  Yes, Your Honor.  But
19 contrary to that, when he sends the op-ed over, the tag
20 line is, "A promise made is a promise kept."  I mean,
21 that clearly demonstrates that he at least viewed it as
22 being a follow-on to a representation or a promise or
23 something related to that engagement to Mr. Alptekin.
24 Mr. Alptekin then made edits, corrected spelling, and
25 said, "Looks right on track."

1          I don't think that being outside the scope of
2    the agreement being discussed on the October 29 call
3    defeats the idea that, in fact, Turkey had asked for
4    this ultimate goal of obtaining Gulen's extradition,
5    and all of FIG's efforts following that were directed
6    at discrediting Gulen in the eyes of the American
7    public, in the eyes of legislators.  They were
8    producing documentaries about how terrible he was, and
9    I think that falls squarely within the legal bounds
10   that the Fourth Circuit set out for acting as an agent
11   for a foreign government.
12            THE COURT:  All right.
13            MR. GRANO-MICKELSEN:  Thank you, Your Honor.
14            THE COURT:  Thank you.
15            Mr. MacDougall.
16            MR. MACDOUGALL:  Your Honor, just very
17   briefly.  In response to the general question about the
18   weight of the evidence, obviously, for Rule 33 the
19   standard is quite different from Rule 29.  And the
20   presumptions that fall in favor of the government fall
21   away.  As the Court is well aware, just simply the
22   interest of justice.
23            Finally, with regard to the narrative that
24   counsel just gave in response to the Court's questions,
25   that really highlights Defense Exhibit 66, the critical

```
 1  aspect of it.  They were interested in Flynn.  The
 2  Court knows the background.  The government does.  We
 3  don't, and the jury certainly didn't.
 4            Flynn and Alptekin and the Turkish government
 5  had something to do with the Trump campaign, were all
 6  doing something that Bijan Rafiekian, according to the
 7  government's own words, didn't know about.  That was
 8  evidence, Your Honor, that we believe standing on its
 9  own and left alone and allowed to go to the jury
10  unfettered would have resulted in a different verdict.
11            Thank you.
12            THE COURT:  All right.  Thank you.
13            As you know, I do have it under
14  consideration.  I'll try to get something to you just
15  as soon as I can.
16            All right.  Anything else?
17       (No response.)
18            THE COURT:  Great.  Thank you.
19            MR. MACDOUGALL:  Thank you, Your Honor.
20            MR. GRANO-MICKELSEN:  Thank you, Your Honor.
21       -----------------------------------
                     Time:  3:17 p.m.
22

23     I certify that the foregoing is a true and
24   accurate transcription of my stenographic notes.
                                     /s/
25                           Rhonda F. Montgomery, CCR, RPR
```

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599