TED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA     )
    )
v.     )
    )
BIJAN RAFIEKIAN, *et al.*,     )     Case Number 1:18-cr-457-AJT-1
    )
Defendants.     )
_____ )

## NEW TRIAL ORDER

By Order dated September 24, 2019, [Doc. No. 373], following a jury verdict finding the

Defendant guilty on Counts One and Two of the Superseding Indictment, the Court entered a

judgment of acquittal in favor of Defendant Bijan Rafiekian on both counts and conditionally

granted Rafiekian's motion for a new trial should its judgment of acquittal be vacated or reversed

on appeal.  On March 18, 2021, the Court of Appeals for the Fourth Circuit reversed and vacated

the Court's judgment of acquittal, vacated its conditionally granted new trial order and remanded

this case for further proceedings.  In vacating the Court's conditional grant of a new trial, the

Fourth Circuit found the Court's explanation justifying a new trial insufficient because "it simply

pointed back to its acquittal analysis without further elaboration," [Doc. No. 378] (hereinafter the

"Opinion") at 35, and could not "say whether the court appreciated [the applicable] limit on its

discretion and therefore cannot affirm on weight of the evidence grounds." *Id.* at 36 (internal

quotes omitted).  Nevertheless, the Court of Appeals recognized that "… having observed the

trial in the flesh, the District Court may have additional justifications for its decision [granting a

new trial]." *Id.*

Upon remand, Rafiekian renewed his motion for a new trial [Doc. No. 387] (the

"Renewed New Trial Motion"), on which the Court has received supplemental briefing [Doc.

No. 387, 390, 405],[1] and oral argument at a hearing held on December 15, 2021. Upon consideration of the decision of the Fourth Circuit, the weight of the evidence, the limits on the Court's discretion in granting a new trial, the parties' supplemental briefing and the arguments of counsel, and for the following reasons in further support of its previous Order conditionally granting a new trial, Defendant's Renewed New Trial Order is GRANTED.

## I. BACKGROUND

A six-count indictment [Doc. No. 1] was issued against Rafiekian and Kamil Ekim Alptekin[2] on December 12, 2018, and a superseding indictment [Doc. No. 141] was issued against them on May 23, 2019. Count One of the superseding indictment charged Rafiekian and Alptekin under 18 U.S.C. § 371 with conspiracy to (1) act as an agent of the Turkish government without prior notification to the Attorney General in violation of 18 U.S.C. § 951; and (2) file a materially false filing under the Foreign Agents Registration Act ("FARA") in violation of 22 U.S.C. § 618(a)(2). Count Two charged both Defendants under 18 U.S.C. § 951 ("Section 951" or § 951 ) with knowingly acting and causing others to act in the United States as agents of the Turkish government without prior notification to the Attorney General, as required by law.

Beginning on July 15, 2019, the case against Rafiekian was tried before a jury. On July 23, 2019, the jury found Rafiekian guilty on Counts One and Two of the Superseding Indictment.

---

[1] Rafiekian's Renewed New Trial Motion is based, in part, on the United States' alleged inadequate disclosure of classified information, which was provided to Rafiekian during pretrial proceedings in a court approved summary admitted at trial as DEX 66. In response to the United States' opposition to the Renewed New Trial Motion [Doc. No. 390], which included an *ex parte, in camera* supplemental filing based on that classified information, [Doc. No. 39], Rafiekian renewed his motion for unrestricted access to that classified information. [Doc. No. 392] ("Motion to Compel Disclosure of Classified Material and Ex Parte Statement and for an Extension of Time to File Reply in support of Rafiekian's Motion for a New Trial") (hereinafter "Motion to Compel"). By Order dated October 8, 2021 [Doc. No. 404], the Court denied Rafiekiean's Motion to Compel without prejudice to his position that the United States improperly argued DEX 66 to the jury. On October 18, 2021, Rafiekian filed his reply to the United States' opposition to his Renewed New Trial Motion. [Doc. No. 405].

[2] Alptekin resides in Turkey and has not appeared in this action except for the limited purpose of opposing the Government's Motion to Establish the Crime-Fraud Exception as to him. *See* [Doc. Nos. 188, 216]. He was also charged with four additional counts of making false statements in violation of 18 U.S.C. § 1001(a)(2).

The Defendant moved for a judgment of acquittal at the close of the Government's case in chief, renewed that motion at the close of all the evidence and following the verdict, and filed a Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29 [Doc. No. 342] (the "Motions for Acquittal") and Motion for a New Trial [Doc. No. 361].  By Order dated September 24, 2019 [Doc. No. 372], the Court granted the Motions for Acquittal, vacated Defendant's convictions on both counts of the Superseding Indictment, entered a judgment of acquittal as to both counts, and dismissed the Superseding Indictment.  The Court also conditionally granted Defendant Bijan Rafiekian's Motion for a New Trial [Doc. No. 361].

The United States appealed and on March 18, 2021, the United States Court of Appeals for the Fourth Circuit reversed and vacated the judgment of acquittal, vacated the conditional grant of a new trial and remanded the case for further proceedings. *United States v. Rafiekian, et. al.*, 991 F.3d 529 (4th Cir. 2021) [Doc. No. 378].  The Appeals Court mandate issued on May 5, 2021.  [Doc. No 383].

Overall, the Fourth Circuit concluded that "[i]n conditionally granting a new trial, . . . the court failed to 'adequately . . . take into account judicially recognized factors constraining' its authority and rested its decision on 'erroneous . . . legal premises[]'" and therefore "abused its discretion."  Opinion at PageID# 40.  More specifically, the Court of Appeals concluded that none of the Court's four grounds for conditionally granting a new trial were sufficient.  The Court of Appeals found three of those grounds erroneous as a matter of law[3] and with respect to the Court's conclusion that the verdict was against the great weight of the evidence, the Court of Appeals observed and concluded as follows:

---

[3] Those three rejected grounds related to what the Court thought were inadequate jury instructions on the use of the large number of hearsay statements introduced into evidence, the role of Michael Flynn and the *mens rea* element of the "legal commercial transaction" exception under § 951.

The court carefully explained its decision to acquit Rafiekian, parsing the Government's evidence before finding it insufficient to support the convictions. But in ordering a conditional new trial based on the weight of the evidence, the court simply harkened back to its acquittal analysis: "[G]iven the great weight of the evidence, as detailed above, the Court also . . . conditionally orders a new trial. . . ."

That explanation is insufficient. As we recently held, we will not affirm the grant of a new trial on weight-of-the-evidence grounds where the district court "offered only a single sentence to explain its decision . . ., and its reasoning on th[e] issue rested entirely on its reasoning [in support of] a judgment of acquittal." [*United* States *v.*]*Millende*r, 970 F.3d [523,] 531-32 [4th Cir. 2020].

Indeed, Federal Rule of Criminal Procedure 29 requires a court to "specify [its] reasons for" conditionally granting a new trial. Fed. R. Crim. P. 29(d)(1). Here, however, in conditionally granting a new trial based on the "great weight of the evidence" the district court simply pointed back to its acquittal analysis without further elaboration. As described above, we conclude that the evidence *was* sufficient to support the verdict. Consistent with that determination, we reject those same reasons, standing alone, as a proper basis for granting a new trial. *See Millender*, 970 F.3d at 531-32; *United States v. Wood*, F. App'x 910, 911-12 (4th Cir. 2009) (per curiam).

To be sure, the "criteria for a judgment of acquittal and for a new trial" are distinct. *Arrington*, 757 F.2d at 1486; *see United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) (noting that "[i]n determining the necessity of a new trial" a trial court is allowed to 'draw inferences . . . unfavorable to the Government . . . from the evidence"). And having observed the trial in the flesh, the district court may have additional justifications for its decision. *E.g., Campbell,* 977 F.2d at 860 (trial court may weigh witnesses' credibility). But new trials should only be granted "sparingly." *Millender*, 970 F.3d at 531. "[O]n the record as it comes to us, we cannot say whether the court appreciated th[is] limit[] on its discretion" and, therefore, cannot affirm on weight-of-the-evidence grounds. *Id.* at 531-31; *see also United States v. Paulus*, 894 F.3d 267, 278-79 (6th Cir. 2018).

Opinion at PageID# 35-36.

Based on the Court of Appeals' decision, it is now decided that Rafiekian's convictions are supported by sufficient evidence and the only remaining issue is whether a new trial is warranted based on weight-of-the evidence grounds.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  But in

considering whether to grant a new trial, "the district court should only overturn a jury verdict in the 'rare circumstance' when the verdict is against the great weight of the evidence." *United States v. Garcia*, 855 F.3d 615 (4th Cir. 2017) (internal citation omitted).  Nevertheless, the court's authority is "much broader than when it is deciding a motion to acquit" because it is no longer "constrained by the requirement that it view the evidence in the light most favorable to the Government[]" and may "evaluate the credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  And in that regard, a court is allowed to draw inferences unfavorable to the Government, *see United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992), as the district court has the "advantage of observing the witnesses as they testif[y]," *United States v. Shipp*, 409 F.2d 33, 36 (4th Cir. 1969).  Nevertheless, the standard for jettisoning a jury verdict in favor of a new trial remains "demanding;" and courts must exercise their discretion to do so "sparingly," *Millender*, 970 F.3d at 531–32, and only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485.

In assessing the weight of the evidence, the Court has also considered not only the propriety, and necessity, of drawing inferences from circumstantial evidence, particularly as to a conspiracy, but also the limits on drawing inferences based on circumstantial evidence.  In that regard, courts recognize that "[b]y its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement," *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc), *cert. denied*, 519 U.S. 1151 (1997) (citing *Blumenthal v. United States*, 332 U.S. 539, 557) (1947)), and may even be proved "wholly by circumstantial evidence," *id.* at 857-58 (citing *Ianelli v. United States*, 420 U.S. 770, 777 n.10 (1975)).  But courts have also recognized and cautioned with respect to inferences, whether favorable or

unfavorable, that while all evidence, whether direct or circumstantial, may serve as the basis for

a reasonable inference, upon which other reasonable inferences may be drawn, the line between

permitted inferences and impermissible speculation increasingly blurs as inferences stack upon

each other.  *See, e.g., Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (articulating that a

triable issue of fact cannot be based on "the building of one inference upon another"); *see also*

*Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908

(1958) (holding that an inference is not "permissible" when it "is so tenuous that it rests merely

upon speculation and conjecture").  This is particularly so when these principles are applied to a

conspiracy charge*.  See United States v. Gengler*, 2009 WL 5549225, at *8 (E.D. Va. Oct. 23,

2009) (citing *Harms v. United States*, 272 F.2d 478, 483 (4th Cir. 1959)) (stating the conspiracy

and the defendant's participation in it "must be more than mere speculation and conjecture," and

a conspiratorial agreement may not be established through unreasonable inferences or

speculation based on an attenuated series of speculative inferences).

## III. ANALYSIS

### A. Defendant's Conviction under Section 951(a) (Count Two)

Section 951(a) provides that "[w]hoever, other than a diplomatic or consular officer or

attaché, acts in the United States as an agent of a foreign government without prior notification

to the Attorney General . . . shall be fined under this title or imprisoned not more than ten years,

or both."  Subsection (d) defines an "agent of a foreign government" as "an individual who

agrees to operate within the United States subject to the direction or control of a foreign

government or official, except that such term does not include," in relevant part, "any person

engaged in a legal commercial transaction."[4]  Applicable DOJ regulations define "agents" for

---

[4] Under 18 U.S.C. § 951(e), the legal commercial transaction exemption in 18 U.S.C. § 951(d)(4) does not apply to those acting on behalf of certain designated foreign governments, which do not include the government of Turkey.

purposes of Section 951 as "all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official, and who are not specifically excluded by the terms of [Section 951] or the regulations thereunder."[5]  28 C.F.R. § 73.1(a).  As reflected in these definitions, for a person to be an agent for purposes of Section 951, it is not enough to be acting as "a representative of" or "on behalf of" a foreign principal.  Similarly, as discussed below, it is not enough that a person is "financed," subsidized," or "supervised" by a foreign principal.[6]  Rather, that person must have agreed to "to operate within the United States subject to the direction or control of a foreign government."  18 U.S.C 951(d).

In deciding to acquit Rafiekian, the Court reviewed the meaning to be ascribed to the word "agent" in Section 951.  In that regard, the Court concluded that "[t]he word "agent" has a well-established common law meaning, as does the term "direction or control" within the context of agency, citing, *inter alia*, Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) (providing that an agency relationship arises "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); *see also* Restatement (Second) of Agency § 14 cmt. a (Am. L. Inst. 1958) ("[T]he agent is subject to a duty not to act contrary to the principal's directions."); *id.* cmt. b (noting that the principal "has power to give lawful directions which the agent is under a duty to obey . . .").

---

[5] This definition was promulgated pursuant to 18 U.S.C. § 951(b), which provides that "[t]he Attorney General shall promulgate rules and regulations establishing the requirements for notification."
[6] In these respects, § 951 differs fundamentally in scope from § 611(c)(1) of FARA, which includes "any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, finance, or subsidized in whole or in major part by a foreign principal…"

In its decision, the Court of Appeals "largely agree[d] with [this Court] that, similar to common-law agency, § 951's definition of 'agent' envisions a mutual agreement to operate subject to foreign direction or control."  Opinion at PageID# 5313.  However, the Court of Appeals "part[ed] ways with [this Court] as to the degree of foreign involvement required to violate § 951."  *Id*.  In that regard, the Court of Appeals concluded that the agency required under § 951 is not limited to "something akin to an employer-employee relationship, with a foreign government dictating both a desired end *and* the more granular means of performance." *Id*. at 5416 (emphasis in Opinion).  Rather, "an independent contractor may also be an agent— while still retaining significant discretion over the particulars of performance—so long as he 'contracts to act on account of the principal.'"  *Id*. at 5416-17.  Nevertheless, "[o]ne thing is clear right off the bat: To fall within section § 951's ambit, a person must do more than act in parallel with a foreign government's interest or pursue a mutual goal.  An 'agent' further 'agrees to operate . . . subject to the *direction or control*' of that government."  *Id.* at PageID# 5413 (emphasis in Opinion).  On that point, the Fourth Circuit rejected, as did this Court, the Government's broad expansive reading of § 951, comparable in scope to § 611(c)(1) of FARA, under which reading of § 951 "a person becomes an 'agent' for the purposes of § 951 whenever he 'is willing to do something the foreign principal requests,'" *id.* at PageID# 5415, as well as the Government's contention that for the purposes of § 951 "it's possible to 'agree[] to operate' subject to foreign authority (and therefore become an agent) 'unilaterally'—that is, without a foreign government's participation and assent," *id.* at PageID# 5417.  On those issues, the Court of Appeals cited with approval Restatement (Second) § 1, which states that "agency results from the manifestation of consent by one person to another that the other shall act on his behalf . . . and consent by the other so to act."  *Id*.  The Court of Appeals continues, explaining

8

"given the stiff penalties for a § 951 violation, we decline to infer a congressional intention to depart from that foundation [in Restatement (Second) § 1] and impose the statute's disclosure requirement on every wannabe emissary in the absence of explicit language to that effect. Whether an agent-principal relationship is established by direct contact or via an intermediary, § 951 requires a foreign government or official on one end of the line." *Id.*  It also cited with approval *United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011), for the proposition that "to prove a § 951 violation, the Government must establish *both* that the defendant intended to operate subject to a foreign government's direction or control and 'also . . . that a [foreign] official directed or controlled [his] actions." *Id*. at PageID# 5417-18 (emphasis in original). "In sum," the Court of Appeals concluded, …[t]hat agreement [to operate subject to foreign direction or control] cannot be one-sided, and a person does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests or by privately pledging allegiance." *Id.* at PageID# 5418.  On the other hand, "a foreign principal's involvement does not need to mirror an employer's control over the workings of an employee; a lesser degree of 'direction' is sufficient, as it would be under the common law." *Id*. at PageID# 5418.[7]

Briefly summarized, the Government's theory of the case was that Rafiekian was recruited by Alptekin to be a secret Turkish agent, Project Truth was created for that purpose, and Project Confidence, ostensibly on behalf of Alptekin's company, Inovo, BV ("Inovo") ,was simply a continuation of Project Truth under a different name in order to conceal Rafiekian's operating as an undisclosed Turkish agent, as evidenced most clearly by the Flynn Intel Group's

---

[7] The Court of Appeals further observed that "[t]he line between an 'agent' who works under a foreign government's 'control' and one who, instead, agrees to operate subject to a more hands-off form of 'direction'—as an agent-independent contractor could—might be a hazy one. Still, we find no reason to believe that Congress sought to exclude the latter variety of agency from § 951's reach."  Opinion at PageID# 5417.  Nevertheless, in assessing the weight of the evidence for the purposes of § 951, the strength of any inculpatory inferences to be drawn from a "more hands-off form of direction" must take into account the often attenuated, ambiguous nature of that type of "direction or control," particularly in the absence of more direct evidence of the required agreement.

("FIG") singular focus on discrediting Gulen, which the Government claimed had nothing to do with the stated purpose of Project Confidence, promoting tourism and investment in the Turkish economy. *See e.g.*, Trial Tr. [Doc. No. 324] at 43:24-44:3 (Opening Statement); Trial Tr. [Doc. No. 351] at 1129:17-1130:2 (Closing Summation); *id.* at 1132:18-25 (Closing Summation); *id.* at 1136:20-22 (Closing Summation). In short, the Government alleged Turkey was, in fact, the real client, acting through Inovo and Alptekin, and the contract with Inovo was essentially cover for Rafiekian to operate subject to Turkish direction and control. As discussed below, in making that case, the Government essentially argues that all of the exculpatory direct evidence the Government introduced pertaining to who was FIG's client, the nature of the relationship between FIG and that client, the purpose and objectives of Project Confidence, and how the investigation into Gulen related to that Project Confidence should be disbelieved in favor of inculpatory inferences drawn from ambiguous aspects of circumstantial evidence viewed within a limited context.

In finding the evidence sufficient to sustain Rafiekian's conviction on Count Two, the Court of Appeals recognized that:

> The list of evidence that the Government did *not* produce at trial is long. No emails or phone calls between Rafiekian and any Turkish official. No bank records tracing the flow of funds back to governmental accounts. No direct evidence clarifying Alptekin's role vis-à-vis Turkey. No live testimony from Rafiekian, Flynn, or Alptekin.

Opinion at PageID# 5425-26.[8] Nevertheless, the Court of Appeals concluded based on the evidentiary record that did exist "[t]hat arrangement [with FIG and Rafiekian] strongly suggests

---

[8] In looking for such evidence, the Government seized and searched Rafiekian's and Alptekin's email and Skype communications, consisting of hundreds of thousands of items. *See* Trial Tr. [Doc. No. 333] at 769:20-770:18 (Alfredo). The Government also requested through the MLAT process financial records from the Netherlands pertaining to Inovo and Alptekin, but did not attempt to obtain through the MLAT process information from Turkey. *See* Trial Tr. [Doc. No. 330] at 384:22-385:11 (Smith); Trial Tr. [Doc. No. 333] at 790:17-25 (Alfredo).

that an entity other than Alptekin was actually financing Project Confidence, albeit through Alptekin's bank account[]" and "a reasonable inference—one a rational juror could embrace in light of the other evidence of Turkey's involvement—is that Turkey was that entity, with the 'kickback' payments serving as Alptekin's commission for acting as a go-between." *Id.* at PageID# 5428-29. Similarly, the Court of Appeals concluded that "a rational juror could conclude that Project Truth was synonymous with Project Confidence; that the Turkish government was, in fact, behind the project; that, through Alptekin, Turkey communicated both general and specific instructions; and that Rafiekian hewed to those directions over the life of the engagement—all without notifying the Attorney General[,]" *id.* at PageID# 5430, and that "a rational juror could infer that Rafiekian 'agree[d]' to perform work for Turkey, and that the assent was mutual," *id.* at PageID# 5427.[9]

For the purpose of determining whether a new trial is warranted based on the weight of the evidence, the Court has reviewed in detail the entire evidentiary trial record relative to the essential elements of the offense, as explained by the Fourth Circuit.[10] That determination rests ultimately, not on the relationship between Project Truth and Project Confidence or who retained or funded FIG's engagement, but rather on whether under whatever arrangement was in place, "the defendant intended to operate subject to a foreign government's direction or control and

---

[9] Those inferences supporting Rafiekian's conviction were drawn from: (1) Rafiekian's communications with Alptekin and the FIG team, including the periodic reporting to Alptekin; (2) the payments from and to Alptekin; (3) Rafiekian's statements to FIG's lawyers concerning the identity of FIG's client and the nature and extent of Turkish involvement; (4) a meeting with officials from the Turkish government in New York City on September 19, 2016, attended by Rafiekian; (5) Rafiekian's post meeting statements; (6) Rafiekian's praising President Erdogan as the only Muslim head of state capable of 'lead[ing] the campaign against Radical Islam;'" (7) Rafiekian's statement to one of his employees that "if they played their cards right, [FIG] might garner 'a *follow-on* contract worth $5 million'—the implication being that the firm had already been engaged, if only preliminarily, by Turkey;" and (8) the publication of Flynn's op-ed in *The Hill* on November 8, 2016. *See* Opinion at PageID# 5426-30.

[10] In its Memorandum Opinion dated September 24, 2019, [Doc. No. 372], the Court reviewed the evidence in detail and restates that evidence here only to the extent pertinent to the pending Renewed Motion for a New Trial.

'also . . . that a [foreign] official directed or controlled [his] actions." *Id*. at PageID# 5417-18. As discussed in detail below, when assessed, not solely in a light most favorable to the Government, but as a whole, including witness credibility, the evidence and inferences that support Rafiekian's convictions lose much of their strength; and the evidence as a whole weighs heavily in favor of much more persuasive competing exculpatory inference with respect to the dispositive issue of "direction or control," *viz.*, that Rafiekian did not intend to operate, agree to operate, or in fact, operate, subject to Turkey's direction or control, even though Rafiekian had notice that Inovo entered into its contractual relationship with FIG with Turkey's knowledge and at least its implicit approval.

In assessing the overall weight of the evidence, the Court begins with Rafiekian's communications and interactions with Alptekin and the FIG team leading up to Flynn's signing the Independent Advisory Services Agreement with Inovo on September 8, 2016 (the "Agreement"), which communications are the evidentiary heart of the case.[11]

The first contact in the record between Rafiekian and Alptekin, who appear to have been previously acquainted,[12] was on July 26, 2016, GEX 67 at 1, followed by a written exchange on July 27, 2016, GEX 8A.  In that written exchange, which suggests Rafiekian and Alptekin had already spoken, Rafiekian stated that "[w]e are ready to engage" and "[a]t the right time, I will

---

[11] In its Memorandum Opinion and Order dated July 9, 2019 [Doc. No. 292] (the "July 9 Order"), the Court concluded that the out-of-court hearsay statements of Alptekin and Flynn were not admissible under the co-conspirator exception to the hearsay rule set forth in Fed. R. Evid. 801(d)(2)(E); and these documents were admitted for the limited purpose of showing what information was received by Rafiekian, not for the truth of the matters asserted in those statements. *See e.g.*, Trial Tr. 154:6-9, [Doc. No. 325] (Rosecrans) (admitting GEX 9 "solely for the purpose of establishing what Mr. Rafiekian received, the information he received, and not for the truth of what's stated in this email").  Those rulings were not disturbed on appeal.

[12] By way of background, Rafiekian was the Vice-Chairman, Director, Secretary, and Treasurer of the Flynn Intel Group ("FIG"), which he co-founded and co-owned with retired Lt. Gen Michael Flynn, FIG's Chairman and CEO. Rafiekian, a U.S. citizen, has also held a variety of public-sector positions, including serving on the board of directors of the Export-Import Bank of the United States, a position for which he was nominated by President George W. Bush and confirmed by the Senate. *See* Trial Tr. [Doc. No. 334] at 911:22-25 (Chatham).  Alptekin, who resides in Turkey, had served as Chairman of the Turkish-American Business Council and is the owner of Inovo, BV, a Dutch corporation, located in the Netherlands.

include our partners in the communications." GEX 8A.  On July 29, 2016, Alptekin reported

that he had met with the Foreign Minister ["MC"], "who asked [Alptekin] what kind of output

we can generate on the short and mid-term as well as an indicative budget." GEX 9.  On July 30,

2016, Rafiekian emailed Alptekin, with a copy to Flynn, that he and Flynn had discussed the

broad contours of the "truth" campaign and outlined a "PHASE ZERO" for planning purposes.

GEX 10.  He further advised that they needed to discuss "a more expanded design and

implementation of selected path" and "execution now at a managed cost and time frame." *Id*.

Flynn responded that same day thanking Rafiekian for "putting these thoughts and plans

together" and stating that "there must be a sense of urgency in execution." GEX 10A.  On

August 2, 2016, Rafiekian emailed Alptekin that "[w]e have high confidence on the direction of

the work" and "[w]e will need to bring in other specialists which I will talk to you about when

we can Skype." GEX 11.  On August 4, 2016, Rafiekian reported that "[w]e [Rafiekian and

Flynn] are arranging key pieces needed for operationalizing our plan." GEX 13.  That same day,

Alptekin thanked Rafiekian and responded that he had "met with the MFA [Foreign Minister]

and explained *our proposed approach*." *Id.* (emphasis added).

On August 8, 2016, Alptekin reported that his discussions had shifted from the Foreign

Minister to the Minister of Economy, to whom he explained "what we can offer." GEX 14.  On

August 10, 2016, Alptekin reported that he had several more meetings with the Minister of

Economy and the Foreign Minister and he has "a green light to discuss confidentiality, budget

and *the scope of the contract.*" GEX 16 (emphasis added).  Then on August 11, 2016, Rafiekian

responded to Alptekin in advance of a scheduled phone call and proposed a "confidence through

clarity" project as follows:

> MF [Michael Flynn] and I spent some time on *the campaign design and end product*
> as well as resource allocation. We have decided to press the cost down through the

design of an effective "end product" that is portable, durable and easily distributed through the net. If you have some time on Skype, I can go over some details with you. Bad news is that I could not squeeze enough to fit the figures you mentioned. The good news is that I was able to stay in the neighborhood. The challenge was in the cost of specialist that I mentioned to you. So, our cost will not include PR. I did not touch the advisory support we discussed at 20%.

Mike and I have activated the FIG LAB as of tonight and ready to push the start button immediately.

Engagement purpose: the business community is engaging FIG to restore "*confidence through clarity*" in the trade and investment climate.

GEX 17 (emphasis added).

That same day, in an email with the subject line "CONFIDENCE THROUGH CLARITY CAMPAIGN-Operation Confidence," Rafiekian reported to Mike Flynn and Phil Oakley, another member of FIG, that "[w]e are about to be engaged by a Dutch client for the above campaign" and that he "ha[s] been given high confidence that this engagement is imminent."  He then repeated the Phase Zero outline circulated on July 30, and stated that "[t]he end 'product' is a video production (We have a success record with a similar effort)" and that "[t]he product will be credible, effective and durable in validity with maximum case for distribution and broadcast." GEX 18A.  He proposed that he "clarify roles and execution" and in that regard stated that "[t]his campaign will be led by Mike [Flynn]."  *Id*.  Attached was a detailed budget with a detailed allocation of costs, which was labelled "A FIG Initiative," with the following description of what was being budgeted:

> **Confidence through Clarity**
> The business community is interested in bringing back business confidence[.]
> A Dutch business consulting firm is engaging FIG to lead the campaign[.]
> The duration of Phase Zero will be 90 days.
> The final product will be a 30-45 minute video.
> Write scenario, direct production, produce video.

GEX 18B.

Two weeks later, on August 25, 2016, Alptekin notified Rafiekian that "[w]e are confirmed to go." GEX 20.  He also advised Rafiekian that he was "[m]eeting him [presumably President Erdogan][13] tomorrow for details . . . on [Foreign Minister] "mc's request . . . for final instructions." *Id.*

There is little evidence of further communications between Alptekin and Rafiekian concerning the proposed engagement between August 11 and August 25, 2016.[14]  Nevertheless, over those two weeks, Rafiekian continued to work with others within FIG and its team in anticipation of the engagement to define precisely the work to be performed, as outlined to Alptekin on August 11.  For example, on August 13, 2016, Rafiekian reported to Alptekin that he had contacted Jim Courtovich of Sphere, GEX 67B, and confirmed on August 14 that Courtovich was "onboard." GEX 67C.

On August 16, 2016, FIG met with Sphere.  *See* GEX 96A (referencing on August 18 a meeting on August 16).  Two days later, on August 18, 2016, Sphere submitted a proposal to FIG titled "Partnership to Promote a Prosperous and Stable Turkey."  GEX 96A; 96B.  That proposal contained a detailed "Plan of Action," which listed the "Objectives" of the engagement and its "Strategic Approach."  GEX 96B; *see also* Trial Tr. [Doc. No. 333] at 701:24-702:3 (Courtovich); Trial Tr. [Doc. No. 331] at 602:22-604:5 (Miller).  As Sphere's members explained, when called as government witnesses, their proposal, built around the identified "Objectives" and "Strategic Approach," reflected what they understood was the purpose of Project Confidence as explained to them by Rafiekian, namely, to restore confidence in the

---

[13] Alptekin in that same Skype message referred to "him" as "No. 1" and "mc's boss[,] not direct boss but u know who." GEX 20.

[14] For those few communications, see GEX 67B and 67C (two Skype messages dated August 13 and 14, 2016, in which Rafiekian informs Alptekin that he has reached out to and connected with Courtovich) and GEX 67D (a third Skype message in which Rafiekian tells Alptekin that he is available to speak with him).

Turkish government, and derivatively, the Turkish economy and investment environment.  Those objectives would be addressed by "[t]hwart[ing] negative attacks from opponents, and expos[ing] any efforts to disrupt the nation's stability for political purposes," GEX 96B at 1, as well as "improv[ing] public understanding of the root causes of Turkey's political turmoil and expos[ing] the vast network and organization of the nation's adversaries," GEX 111 at 1.  They also explained that they understood the central connection between those objectives and their focus on exposing Gulen's activities.[15]  Concerning the video, Sphere insisted that it *produce* as well as promote the Gulen video in order to maintain control over its "fact-based and unbiased" content in order to withstand scrutiny and be "credible, effective and durable in validity."  Trial Tr. [Doc. No. 331] at 603:22-604:5 (Miller); and GEX 18A.

Once Rafiekian received Alptekin's August 25 confirmation, Rafiekian thanked Alptekin "for informing us of your decision to engage Flynn Intel Group on Operation 'CONFIDENCE,'" GEX 19, and advised Alptekin that he had mobilized the team that he has assembled in anticipation of the engagement in order to execute on the work that had been defined by FIG and its team, *see* GEX 20 ("I [Rafiekian] will engage the film crew now. All good to go. Looking forward to catching up on Skype. I will send you an email on the virtru channel."); *see also* GEX

---

[15] *See* GEX 96B (August 18, 2016 memo from Courtovich to Flynn confirming that "this effort would be funded directly by private businesses seeking to improve investment in business to drive a stronger economy" and one objective was to "[p]roduce and promote a documentary style video that uses fact-based, unbiased information and research to 1) highlight [Gulen]'s network of loyalists and his influence over them and 2) showcase a resilient investment climate in the wake of the recent attempted coup"); Trial Tr. [Doc. No. 331] at 635:3-636:7 (Miller) (understanding from Sphere's first meeting with Rafiekian was that there was a connection between Gulen, the coup and economic stability in Turkey); Trial Tr. [Doc. No. 333] at 705:4-20 (Courtovich) (Rafiekian explained "private investors around the world are not understanding the Gulen role in trying to drive instability in Turkey and, therefore, can't understand or put in context the reaction by the Erdogan administration" and that the insurgency and the activities to destabilize Turkey were being funded by Gulen with dollars generated by his charter schools in the United States); Trial Tr. [Doc. No. 333] at 682:12-14; 682:18-25; 685:l3-7 (Lowman) (stating Rafiekian explained the need to explain why the coup occurred, why Turkish business interests, including elements of travel and tourism, were concerned about the perception of Turkey at the time and their needs to balance that perception by "inform[ing] people of the actors involved so that perception wasn't that Erdogan's actions [in reaction to the coup] were out of thin air").

19 (confirming that he had "activated our 'FIG LAB', placed our principal team members in

formation and engaged the film crew in preparation for launching this engagement").  He then

outlined the following schedule of actions:

- Send draft engagement letter between your company in the Netherlands and Flynn Intel Group (Please send us the full legal name of your Dutch entity and address"). We will send our draft engagement letter by no later than Sunday, August 28, 2016.
- Finalize the allocation of cost for Sphere ($50K or $30K per month for 3 months) and let us know at your earliest convenience so that we can prepare the engagement letter accordingly.
- Along with the draft engagement agreement, . . . issue an invoice for the first month in the amount of $180K or $200K (depending on the allocation for Sphere) payable with the execution of the engagement letter (target execution/launch date of September 1, 2016).

GEX 19.

Towards the end of August and early September 2016, Rafiekian sought out legal counsel

from the Covington law firm concerning what he thought was a need to file under the Foreign

Agents Registration Act ("FARA"), and when Covington declined the representation because of

political alignments in the firm, he consulted with Robert Kelley, Esq., who advised that because

Rafiekian, when asked, identified the client as Inovo, a private company, and that some lobbying

was contemplated, a filing under FARA was not required and a filing, instead, could be made the

Lobbying Disclosure Act ("the LDA"), which he subsequently made on behalf of FIG.

In a Skype message to Rafiekian on August 30, 2016, Alptekin advised "We

are . . . scheduling a meet with MF [Flynn] and MC [Foreign Minister] and perhaps even RTE

[Turkish President Erdogan] in third week of NY. Will keep you posted."  GEX 21 (referring to

the meeting that ultimately took place in New York on September 19, 2016).

On September 1, 2016, Rafiekian advised Alptekin as follows:

Our team formation is complete. Brian McCauley a FIG principal former Deputy Assistant Director of FBI is on board with two of his best former officers. I have not sent you the engagement document because I have hired a law firm and they

17

are reviewing for compliance. We will absorb this extra cost. No impact on your firm. Can you please send me the name and address of your company who will be our client?

GEX 67H.

On September 2, 2016, Alptekin confirmed the identity of the client as follows:

INOVO BV
Adriaanstraadt 47
3581 SC Utrecht
The Netherlands
VAT NL8146.45.756B02

*Id.*

On September 3, 2016, Rafiekian forwarded to Alptekin the proposed Agreement between FIG and Inovo and stated that "[t]ime is of the essence and we would like to execute this agreement as we planned together. *We need every single day of this 90 days scope to execute our precision plan.*"  GEX 22A (emphasis added).  On September 4, 2016, Alptekin responded the "[o]nly comment is that we need to make it more explicit agreement min. period is 3 month. Subsequently contract can we [sic] renewed for another year and each party can cancel with a month's notice?"  GEX 67I.

On September 5, 2016, to facilitate the execution of FIG's "precision plan," Rafiekian prepared a "draft playbook" (the "Playbook"), which he sent to Flynn along with Sphere's Plan of Action, proposed assignments, and a proposed schedule, together with the suggestion that "**the playbook and assignments go out from [Flynn's] office with instructions to the team setting target dates and delivery of their expected products.**"  GEX 23A (boldface in original). Towards that end, the Playbook identified a team of nineteen persons, none of whom other than Rafiekian the Government contends was acting as a Turkish agent,[16] the "Mission" of the

---

[16]  Following its in-court admission that Flynn was not part of the alleged conspiracy and that it would not rely upon his testimony to establish the foundation for the admission of Alptekin's hearsay statements under Fed. R. Evid.

engagement[17] and the "[e]nd product" of the engagement, which was confirmed as "[a] 60 minutes video production documenting the investigations."  GEX 23B.  The project was to be carefully budgeted; and even the extent of FIG's progress reports to Alptekin was to be defined, including that Flynn would participate in one hour (later reduced to 30 minute) "weekly briefings with [Inovo]/client."  GEX 23A at 1, 3.

On September 8, 2016, Flynn signed the Agreement on behalf of FIG.  That same day, in a Skype message to Rafiekian, Alptekin advised that he "will send the agreement," "just left pm's office." GEX 67J.  On September 9, 2016, a $200,000 wire transfer from Alptekin's bank account was deposited into FIG's account, as required under the Agreement.  *See* GEX 25A at 3.

Based on what Alptekin explained to Rafiekian, as recited above, it would have likely appeared to Rafiekian as of the time FIG entered into an Agreement with Inovo that Alptekin, not Turkish officials, first came up with the idea of an engagement with FIG, and a strong inference is easily drawn that Alptekin first contacted Turkish officials on his own initiative for a variety of possible reasons and then lobbied Turkish officials for their blessings.[18]  In short, Alptekin appears to be very much the kind of "wannabe emissary" whose conduct the Fourth

---

801(d)(2)(E), *see* June 13, 2019, Hearing Tr. 65:9-22, [Doc. No. 213]; *see also* [Doc. No. 109] (Government's Bill of Particulars not listing Flynn as a co-conspirator whose statements would be used at trial), the Government filed on July 3, 2019, a Notice of Correction to the Record, [Doc. No. 261], in which it advised the Court that it no longer planned to call Flynn as a witness in its case in chief and now considered Flynn a co-conspirator, whose out-of court statements it would seek to introduce pursuant to Fed. R. Evid. 801(d)(2)(E).

[17] The "Mission" was defined as the investigation and documentation of the activities of "X," known to be Fethullah Gulen, including his ideology, influence, and relationships with American political leaders.  *See* GEX 23B at 1-2; *see also* Trial Tr. [Doc. No. 330] 472:9-12 (Boston) (confirming that "X" referred to Gulen);  GEX 23B at 1 (listing as a "Mission" task "[r]egister[ing] under [the] Lobbying Disclosure Act representing a Dutch entity," a task that was assigned to Bob Kelley, a lawyer who was to fill the Legal & Compliance role on the team for the engagement).

[18] Without discounting that Alptekin may have acted out of more altruistic motives, there is a reasonably strong inference that Alptekin's objective was to drum up business for himself through commissions or consulting fees or to ingratiate himself with the Turkish leadership by arranging for services consistent with Turkey's efforts to have Gulan extradited.  In that regard, Alptekin's role as a promoter/facilitator is also reflected in his efforts to facilitate Sphere's bidding on an RFP issued by the Turkish government.  *See* Trial Tr. [Doc. No. 331] at 650:4-11 (Miller); Trial Tr. [Doc. No. 333] at 751:13-752:21; 753:16-17 (Courtovich); *see also* DEX 51.

Circuit cautioned should not quickly be attributed to a foreign government.  *See* Opinion at PageID# 5417.

On the other hand, as the Court of Appeals emphasized, those communications also placed Rafiekian on notice that Alptekin was discussing FIG's engagement with the highest levels of the Turkish government, and that the Turkish government had given its blessings or even approval before FIG's agreement with Inovo was consummated.  They also show that Rafiekian had expressed sentiments supportive of Turkey's President and their efforts to have Gulen extradited back to Turkey.  But, as the Court of Appeals also observed, there was "[n]o direct evidence clarifying Alptekin's role vis-à-vis Turkey."  Opinion at PageID# 5426.  Rather, Alptekin was Rafiekian's sole source of any information concerning Alptekin's role, what was being requested of FIG and Rafiekian, and by whom; and Alptekin also provided to others involved in Project Confidence the information Alptekin provided to Rafiekian.[19]  In that regard, the only evidence directly addressing the identity of FIG's client, nearly all of which was introduced by the Government, was that Inovo was, in fact, the client FIG contracted with, Inovo was a real company, owned by Alptekin, who consistently told Rafiekian and others within FIG and its team that Inovo was the client, funded by Turkish businessmen, and Rafiekian never received any information otherwise.  There are no statements or suggestions to or by Rafiekian in his communications with Alptekin leading up to the Agreement that Rafiekian would be acting subject to the direction or control of the Turkish government, that any such direction was needed or expected or that directions would, in fact, be forthcoming from Turkey through Alptekin.

---

[19] *See* Trial Tr. [Doc. No. 330] at 396:20-397:17 (McCauley) (describing his first call with Alptekin in which he described a "potential project" involving "[s]ome wealthy Turkish businessmen . . . concerned about the future of Turkey, and they were interested in possibly hiring FIG to look at Gulen").

Nor can one easily infer from the "rebranding" of Project Truth to Project Confidence, *see* Opinion at PageID# 5428, that Rafiekian was really working for Turkey, with Alptekin as its intermediary, or, more importantly, that Rafiekian understood that he was expected to operate subject to Turkish direction and control.  As discussed above, there is no dispute that Alptekin was Rafiekian's only source of information concerning who the client was; and the move from "Truth" (a name that appears to have originated with Rafiekian when he thought that Turkey might be the client) to Project Confidence (which Rafiekian also seems to have come up with on his own when he was ostensibly told that the client might be other than Turkey) played out over more than "12 hours" or "overnight" as the Government argued[20]; rather, it appears to have emerged over a period of more than two weeks, from September 8, when Alptekin's discussions shifted from the Foreign Minister to the Minister of Economy, to August 25, when Alptekin confirmed the engagement.  Moreover, while Phase Zero of Project Truth and Project Confidence were essentially the same, *compare* GEX 10 *with* GEX 18A, that initial outline appears generic to any project.

Central to the Government liability theory is that investigating Gulen necessarily pertained to Project Truth (with Turkey as the client) and had nothing to do with Project Confidence's purported purpose of restoring confidence in the Turkish trade and investment climate, and that Rafiekian and Alptekin concocted Project Confidence as a "cover story" and a "fig leaf" to continue actually representing the Turkish government as the client.[21]  But the

---

[20] *See* Trial Tr. [Doc. No. 351] at 1129:20-24 (Closing Summation) ("You're supposed to believe that in 12 hours, that magically appeared without them saying a word about it, and then mysteriously out of the mist comes this other project, completely unrelated, another project, and that all happens overnight.").

[21] *See* Trial Tr. [Doc. No. 324] at 44:1-3 (Opening Statement) ("[I]t was always the same project, a project focused on discrediting Fethullah Gulen in the eyes of the American public."); Trial Tr. [Doc. No. 351] at 1128:16-22 (Closing) ("And what you've heard from all the [] witnesses is while this [confidence in investment] may have been some sort of fig leaf that they came up with to get their story straight, never was that  a serious objective of this project. It was always about getting dirt on Gulen and getting him extradited and making sure that Erdogan was viewed favorably by the United States government and – and the people of the United States."); 1129:24-1130:10

evidence was quite the opposite.  As confirmed by the Government's witnesses, everyone on the

FIG team understood that investigating and disclosing Gulen's activities was viewed as central to

achieving the objectives of Project Confidence—restoring stability in the Turkish government

and economy, including Sphere, who proposed producing the video for that purpose and

developed its action plan based on the centrality of Gulen to Project Confidence's objectives.[22]

Given the totality of the evidence, the language of Agreement itself, while certainly not

dispositive, cannot be easily dismissed as simply an effort to "commoditize[e] . . . otherwise non-

commercial endeavors"[23] or to paper over an illicit relationship.  Rather, it reflects precisely the

kind of agreement that would be put in place for the kind of contemplated short term project

intended to insulate an independent contractor from outside influence, direction or control and

---

("[Defendant says] ...this new project [Project Confidence] has got nothing to do with the government of Turkey, nothing to do with Gulen.  What it's about is restoring confidence in the investment climate."); 1130:4-10 ("… we're not all obliged to show you a smoking gun or an actual written agreement, but this is about as close as you're going to get, because what this is is a cover story. You replace engagement purpose with cover story, and that is what this is. Ekim, Bijan here, cover story, the business community is engaging FIG to restore confidence through clarity."); 1132:18-25 ("Now, the end product of the whole engagement is going to be this video, as you've heard from the witnesses, including videographer who took it, this was all about dirtying up Gulen. This had nothing to do with the investment climate or the financial picture or the finance investments, whatever, tourism, whatever. It was single-mindedly focused on dirtying up Gulen, portraying him as a terrorist and a fraud and getting him extradicted."); 1136:8-22 ("[T]his playbook that the defendant drafts, and you'll see in there the mission. . . .All about X, who you now know is Gulen. And this has nothing to do with foreign investment in Turkey. Nothing at all. . . . And Kelley [the lawyer Rafiekian consulted] says: Who's the client? And the Defendant says: It's a private entity. Lie. You know it's a lie.  But it's a lie.").

[22] *See* Trial Tr. [Doc. No. 331] (Miller of Sphere) at 598:2-8 (stating the purpose of Project Confidence "was to show that the root causes . . . of the coup [in Turkey], specifically the influence that Fethullah Gulen and his network of followers might have had in orchestrating the coup . . . [and Rafiekian] discussed the negative impact it was having on the economy of Turkey" and "[Defendant] described how Fethullah Gulen and [] his followers were responsible for the [] coup which caused the instability that resulted in the negative economic impact"); *see also* Trial Tr. [Doc. No. 331] (Miller) at 635:24-636:7; Trial Tr. [Doc. No. 333] (Courtevich) at 704:15-706:6 ("[T]hrough the whole process, Gulen was mentioned because of the nature of the video and the concern that the – – then the clients we did not know, the business people, of how the private sector was looking at the actions of the Erdogan administration and not understanding it in full context, which would slow private investment in Turkey, the Turkey businesses, more importantly it was explained to us that private investors around the world are not understanding the Gulen role in trying to drive instability in Turkey and, therefore, can't understand or put in context the reaction by the Erdogan administration. . . .").

[23] *See* Opinion at PageID#5424 (rejecting the "legal commercial transaction" exception as an affirmative offense element in order to not "encourage would-be agents to sidestep disclosure by commoditizing their otherwise non-commercial endeavors").

overall reflects the lack of any intent to operate subject to the direction or control of others.[24]
Similarly, Rafiekian composed FIG's Independent Advisory Service Agreement with Alptekin
so that it could be "operationalized with task orders," GEX 25C, *viz.*, that FIG would provide
instructions to Alptekin, and specifically stated that "the goals of the engagement" were to be
"defined by [FIG]." GEX 127B at 1.

Overall, when Rafiekian's above communication with Alptekin and others are considered
in their entirety, there is a strong exculpatory inference to be drawn, which heavily outweighs
any contrary inferences, that Rafiekian's understanding of what Alptekin was suggesting to him
was not an agreement that he operate subject to the direction or control of Turkey, but rather an
arms-length, short-term research project, summarized in usable form for distribution, with some
limited lobbying, memorialized in a formal agreement that spelled out the contracting parties'
independent relationship.[25]

With respect to post-Agreement events and communications, the Fourth Circuit in
support of Rafiekian's convictions pointed to (1) the periodic reporting and payments to and
from Alptekin; (2) the September 19, 2016, New York meeting (the "September 19 New York

---

[24] The Agreement recited that "[Inovo] is desirous of engaging [FIG] for a specified scope of work aimed at design
and delivery of a series of results in discovery, analysis, packaging and presentation of findings in a credible,
durable and easy to disseminate format over a period of three months from the execution of this agreement."
GEX151B. With regard to the nature of the relationship between FIG and Inovo, the Agreement stated:

   [FIG] is not an employee or agent of [Inovo]. [FIG] is an independent contractor engaged for specific
   purpose of providing advice relating to assisting the client with accomplishing the objectives of this
   engagement. *[Inovo] expects [FIG] to act with complete objectivity in the design and execution of
   its investigative mission pertaining to this engagement. Further, [Inovo] is by no means dictating to
   [FIG] a specific pre-determined outcome or a particular result.* [FIG] acts in good faith and on the
   basis of best effort to obtain the goals of the engagement. *The parties to this agreement recognize
   that [FIG] is not in a position to guarantee results in matters outside of [FIG]'s control.*

*Id.* (emphasis added).

[25] As evidence of Rafiekian's agency with the Turkish government, the Government points to Rafiekian's lack of
disclosure to Sphere and other consultants concerning his discussions with Alptekin concerning Turkish
involvement or that Tukey was contemplated originally as the client; but whatever interest those consultants would
have had in that information, the work they in fact defined and performed was based on the information that
Rafiekian did provide.

meeting" or "New York meeting") and post-meeting statements; (3) Flynn's Op-ed published on November 8, 2016 (the "November 8 Op-ed" or "Op-ed"); (4) Rafiekian's statements to Covington; and (5) Covington's FARA filings on behalf of FIG, Flynn and Rafiekian.  The Court has therefore also assessed the strength of inculpatory inferences drawn from that evidence in light of all the evidence, briefly summarized below, and when so considered, they lose much of their strength and are heavily outweighed by the same competing, more persuasive inferences drawn from the pre-Agreement events.

On September 13, 2016, Rafiekian contacted Alptekin to "brief [him] on what Sphere has been doing following our plan" and "the activities of Sphere since August 15, 2016 under our direction." GEX 67R.  On September 15, 2016, Flynn disclosed to a U.S. Government agency that he planned on meeting with high level Turkish Officials, perhaps even President Erdogan, DEX 6, and on September 19, 2016, Rafiekian, Flynn, and their consultants McCauley and Woolsey met with Turkish officials in New York.  From Rafiekian and FIG's perspective, the meeting was an opportunity to discuss issues and raise questions concerning Gulen and his activities in the United States.[26]  From Turkey's perspective, the purpose of the meeting was to meet with Flynn.[27]  Following that meeting, Alptekin stated to Rafiekian that "their side" has "very specific expectations," and in response Rafiekian told Alptekin that his expectations were "unreasonable," "dismissed [them] immediately" and said that "we deliver what we promise." GEX 29.  On September 28, 2016, Rafiekian voluntarily met with a U.S. Government agency and described FIG's involvement in raising awareness of Gulen's charter schools and his interaction with Alptekin, whom he described as having "senior level contacts in the Turkish government."  DEX 14.

---

[26] *See* GEX 26A, 26B; GEX 103A, 103B; GEX 104A, 104B.
[27] *See* GEX 21.

As contemplated in the Agreement, FIG conducted weekly 30 minute progress reports to Alptekin beginning on October 7, 2016, with reporting sessions thereafter on October 14, 21, 28 and November 3.  In advance of each meeting, FIG (principally FIG's Mike Boston) would prepare "talking points" with respect to the progress of the work and also would take notes of what was discussed.  For the last progress report on November 3, 2016, which occurred with Alptekin in person, FIG prepared a comprehensive PowerPoint of what had been done and other materials that were forwarded to Alptekin on November 4, 5 and 7, 2016.  GEX 71, 73A, 73B, 78A, 78B (Assessment Report); *see also* GEX 128A,128B (PowerPoint).

With respect to payments, Inovo paid FIG $200,000 on September 9, 2016, $185,000 on October 11, 2016 (ostensibly holding back $15,000 from the contractually required $200,000 installment), and $145,000 on November 14, 2016 (holding back $55,000).  *See* GEX 61 at item 14.  Out of the payments, FIG paid Alptekin $40,000 on September 9, 2016 and October 11, 2016 for a total of $80,000.  *See id*. at item 15.

On November 2, 2016, before his meeting with Alptekin on November 3, Rafiekian sent to Alptekin what he referred to as "a 1000 word article" titled "Getting Turkey Wrong," with a copy to FIG's compliance counsel Kelley, and the comment "[a] promise made is a promise kept," with the request that "[he] take a look and give me your thoughts at your earliest convenience."  *See* GEX 45A; GEX 45B.  On November 3, 2016, Rafiekian sent to Flynn a draft of a document titled "Our Ally Turkey Is In Crisis and Needs Our Support," which appears to be a re-write of the article sent to Alptekin under a different title, with the request that Flynn "make any changes you see necessary and let me know if we can release this to Sphere so that they can place it too."[28]  GEX 70A.  On November 4, 2016, Rafiekian sent that same document to

---

[28] He also advised Flynn that "Hank Cox cleaned up my draft and added about 150 words [and] [i]t now stands at 1147 words."  GEX 70A.

Alptekin, with the comment, "I just left MF [Flynn].  The arrow has left the bow. The attached article will be published on Monday [November 7, 2016]."  On November 5, 2016, Alptekin responded that "the general is right on target," suggesting as edits only the misspelling of Erdogan and Fethullah's names.  On November 5, 2016, Flynn e-mailed Rafiekian that "I am doing some editing of the OPED but will have it ready tomorrow," GEX 72; and on November 6, 2016, Flynn forwarded his edited Op-ed to Rafiekian with the request to "please review the OPED one more time.  I made substantive changes…don't worry about the length.  This is an important article that will get a reaction." GEX 76A.  On November 7, 2012, Donald Trump was elected president of the United States.  On November 8, 2016, Flynn's Op-ed was published in *The Hill* newspaper.  Soon thereafter, Flynn was designated President Trump's national security advisor, and shortly thereafter work on Project Confidence stopped and FIG ceased operating. *See* GEX 61 at items 11-12, Note; *see also* Trial Tr. [Doc. No. 331] (Miller) at 633:8-110; 655:24-2 (Project Confidence had "fizzled out" and ultimately ended within a couple weeks of the Op-ed's publication).

By letter dated November 30, 2016, DOJ's FARA unit advised Flynn that it wanted additional information about the November 8 Op-ed.  GEX 90.  Flynn did not learn of that letter until December 24, 2016, *see* GEX 92 at 1, and on March 7, 2017, Covington, after an extensive investigation, filed FARA filings on behalf of FIG, Flynn and Rafiekian.  *See* GEX 61, 64, 65.

Following Flynn's signing of the Agreement on September 8, it appears the only communications to Rafiekian from Alptekin reflecting any additional contact with Turkish officials are (1) communications between Rafiekian and Alptekin concerning the scheduling of the New York meeting with Turkish officials, *see* GEX 67O, 67P (2), Alptekin's statement to Rafiekian after the New York meeting that "the feedback was good," GEX 29; and (3) possibly

Alptekin's reference to a conversation he had to author an Op-ed under his name.  *See* GEX 67 at 29 (September 15, 2016).  As best as the Court can tell, the last communications in the record between Rafiekian and Alptekin were a November 11, 2016 email from Rafiekian forwarding to Alptekin a "Recommended Statement by Sphere," GEX 83, and a January 18, 2017 email from Alptekin forwarding his lawyer's opinion letter to Rafiekian. *See* GEX 93A, 93B.

With respect to either FIG's contractually required periodic reports to Alptekin or the September 19 New York meeting, only a weak inference can be drawn that Rafiekian agreed to operate subject to the requisite Turkish direction and control or that Turkey gave or attempted to give direction and control to Rafiekian.

Periodic reporting within the context of a commercial services contract is hardly surprising or suspicious; and there is little about these reporting sessions that would allow an inference that these sessions were simply subterfuge for Turkey's directing or controlling FIG's work.  Those pre-arranged, contractually required weekly updates took place beginning on October 7, 2016, did not involve any Turkish officials, and involved persons in addition to Rafiekian, including Flynn, the engagement lead, Brian McCauley, the lead investigator, and Mike Boston, the project coordinator, none of whom the Government has charged or contends was operating as Turkish agents; and neither McCauley nor Boston who participated in those reporting sessions provided any support for an inculpatory inference when called as government witnesses.  As Boston testified, Inovo was considered the client, Alptekin was viewed as the embodiment of the client and the purpose of these weekly sessions was to inform the client "where we were with the project" and have the client ask questions.  Trial Tr. [Doc. No. 330] at 465:1-3, 17-21 (Boston).

The lack of any agreement to operate subject to Turkey's direction or control is also reflected in how Rafiekian and FIG's consultants treated requests or suggestions for work outside of the identified and budgeted scope of the work and Alptekin's overall dissatisfaction with the final work product. *See* Trial Tr. [Doc. No. 330] at 442:13-443:20 (McCauley); *id.* at 444:6-16 (McCauley). For example, when the subject of an op-ed was discussed at the October 7, 2016 meeting, Rafiekian stated that it would require additional funding; and it was viewed as outside the scope of the engagement. *See* Trial Tr. [Doc. No. 330] at 483:20-486:11 (Boston). When Alptekin wanted "dirt" on Gulen and surveillance on "Gulenists," he was told "[w]e don't do that." Trial Tr. [Doc. No. 330] at 442:24-443:20 (McCauley); *id.* at 444:6-22 (McCauley). When he inquired about a financial fraud investigation into Gulen, he was told to go elsewhere and pursue that separately outside of FIG. *See id.* at 435:15-24; 436:11-19. When Alptekin said that he was looking for a terrorism investigation into Gulen, he was told he should pursue such an investigation through the Turkish government, which subsequently invited Sphere, independently of FIG or Rafiekian, to bid on its already publicly issued RFP. *See* Trial Tr. [Doc. No. 333] at 724:6-10 (Courtovich); *id.* at 724:17-22 (Courtovich); *id.* at 729:17-730:1 (Courtovich); *id.* at 729:1 (Courtovich) (referring to GEX 129). When following the September 19 New York meeting, in response to Alptekin's "we have certain expectancies" comment, Rafiekian rejected those as unreasonable and essentially told Alptekin that that FIG would deliver what had been contracted for. *See* GEX 29 ("We deliver what we promise.").[29] And

---

[29] Although not mentioned by the Court of Appeals, not much "direction or control" can be drawn from Alptekin's "what do I tell Ankara" comment following FIG's presentation on November 3, 2016. *See* Trial Tr. [Doc. No. 333] at 723:3-11. The comment is ambiguous as to who "Ankara" is referring to, particularly given his having advised Rafiekian and others that Turkish businessmen were funding the engagement and that the comment appears to have been made within the context of Alptekin's repeatedly saying "Is this what I paid for." *See* Trial Tr. [Doc. No. 333] at 723:3-9 (Courtovich); Trial Tr. [Doc. No. 330] at 431:23-432:4, 444:6-8 (McCauley). In any event, regardless of who he was referring to, the comment, reflecting as it does Alptekin's dissatisfaction with the end product, most evidences *the lack*, not the fact, of direction or control on his part or by anyone on whose behalf he may have been acting.

when the final "deliverables" were presented to Alptekin at the final November 3, 2016 meeting, Alptekin was unhappy. *See* Trial Tr. [Doc. No. 326] at 238:1-9 ("Alptekin was not happy with it . . . ."). Any inference that Turkey was, in fact, the undisclosed client, giving directions to Rafiekian through Alptekin, is further undercut by the lack of any evidence of any contact between Rafiekian and Turkish officials outside of the September 19 New York meeting and the precipitous drop-off in Alptekin's reported interactions with Turkish officials after the Agreement was entered into, and FIG and its consultants' insistence on the use of open source research and independence in determining the content of the contemplated video, as reflected in the action plans and the formal agreements entered into. Their independence is also reflected in at least one recommendation fundamentally at odds with Turkey's stated position, that Turkey withdraw its request for Gulen's extradition. *See* GEX 43B; 73B at 3-4. In short, there is little, if any, evidence other than the fact that these contractually required periodic reports to Alptekin took place to support any inference that Alptekin, on the occasion of these periodic reports, or on other occasions, conveyed general or specific instructions on behalf of Turkey.

With respect to the September 19 New York meeting, the Fourth Circuit concluded that the inference could be drawn that rather than for the purpose of obtaining "background" for Project Confidence, as Rafiekian repeatedly told his team before the meeting, the meeting was for the purpose of giving Rafiekian his "marching orders" and that "in alignment with the Foreign Minister's wishes, Flynn Intel Group 'focus[ed] [its] efforts on 'boxing'/'framing' [Gulen] as a terrorist,' with an 'ultimate aim' of 'gain[ing] a criminal referral." Opinion at PageID# 5429. But when the September 19 New York meeting is viewed in light of all the evidence, any such inference from that meeting is weak, greatly outweighed by contrary inferences.

29

As reflected in the documents submitted into evidence by the Government, from Rafiekian's and FIG's perspective, the September 19 New York meeting was an opportunity to ask questions about the current situation in Turkey as further background for Project Confidence. *See* GEX 103A, 103B, 104A, 104B.  From Turkey's perspective, as conveyed to Rafiekian by Alptekin, the September 19 New York meeting was for the purpose of getting visiting Turkish officials together with Flynn, *see* GEX 21 (Alptekin's telling Rafiekian that "[w]e are also scheduling a meet[ing] with [Flynn] and MC [Foreign Minister] and perhaps even [President Erdogan] in third week of NY. Will keep you posted"), and the scheduling of the meeting was predicated on Flynn's availability, *see* GEX 67O.  Even the seating at that meeting reflected the Turkish officials' focus on Flynn.  *See* Trial Tr. [Doc. No. 330] at 407:1-8 (McCauley).  From the perspective of one of FIG's participants, McCauley, the purpose of the meeting was for Alptekin and Rafiekian to demonstrate to the Turkish officials that they had the ability to bring to the meeting some "bigshots," i.e, Flynn and former CIA director Woolsey.  *See Id.* at 442:4-12.

Likewise, when considered in light of what actually happened at the September 19 New York meeting, any inference that the meeting was used to deliver directions is weak.  Rafiekian played no role in that meeting other than to introduce himself, and there is no evidence that any attending Turkish official ever directly spoke to Rafiekian, had previously met him, or knew anything about him.  *See* Trial Tr. [Doc. No. 330] at 441:3-5 (McCauley); *see also id.* at 440:14-17, 442:1-3 (McCauley).  FIG's engagement was not mentioned or acknowledged; and no one on the Turkish side made any request of any one on the FIG side to do anything.  *Id*. [Doc. No. 330] at 441:21-441:3 (McCauley).  Rather, the agenda for the 25-to-30 minute meeting turned out to be little more than the Foreign Minister's narrative concerning Turkey's perspective on Gulen as a threat.  *Id*. at 440:18-441:2. That narrative simply reflected Turkey's already well known

30

publicly stated views that had figured into the already defined work scope for the already formulated engagement.

Long before the September 19 New York meeting, Rafiekian expressed the view that Gulen should be viewed as a jihadist comparable to Ayatollah Khomeini who had "vulnerabilities" to be highlighted and exploited for that purpose.[30]  Indeed, the Agreement, as it was initially proposed and as it was ultimately signed, specifically referenced obtaining findings supportive of a criminal referral.  *See* GEX 22B; GEX 151B ("[Inovo] expects and [FIG] is prepared to deliver findings and results including but not limited to making criminal referrals if warranted and supported by the findings.").  In fact, the Government told the jury that "after the New York meeting, nothing changed. The focus remained on discrediting Fethullah Gulen." Trial Tr. [Doc. No. 324] (Opening Statement) at 54:9-11.

Moreover, as mentioned above, any inference that Rafiekian had received his "marching orders" at the September 19 New York meeting is fundamentally at odds with his explicit rejection of Alptekin's "expectations" beyond what had been contracted for.  *See* GEX 29 (stating that while "[Alptekin] shar[ed] some very specific expectations with [him]" with respect to the engagement, Rafiekian "told him that the expectations are unreasonable" and "dismissed [them] immediately").  In sum, the relied upon comments by the Turkish Foreign Minister at the September 19 meeting simply reflected views that paralleled already held views, opinions and

---

[30] Those "vulnerabilities" included "illegal political contributions," "strong indications that [Gulen] is very likely conducting the first phase of Jihad by slowly building a global loyal force to be activated at the right time" and that "[t]he resemblance of [Gulen's] activities to Ayatollah Khomeini who duped the west in believing that he was a man of the cloth and a benevolent servant of the people serves as a basis to uncover and unmask the subject's ultimate goal of destabilizing his home country and the region." [Doc. No 28-1] at 3-4; *see also* Trial Tr. [Doc. No. 330] at 404:19-20 (McCauley's testimony that before the September 19 meeting he and Rafiekian discussed producing "[a] documentary [video] that would expose Gulen in violation of law and how he got into the U. S."). *See* GEX 23B at 1-2 (the already developed Playbook, which identified the "[m]ission" of the engagement as the "[i]nvestigat[ion] and document[ation] of the activities of [Gulen]," including his "ideology," "influence," and "relationship[s]" with American political leaders and the "[e]nd product" of the engagement was identified as "[a] 60 minutes video production documenting the investigations").

objectives that were the basis for and reflected in the work scope that FIG had already formulated on its own; and there is no evidence that Rafiekian dictated any changes in the scope of that work after the September 19 meeting.  For the same reasons, not much of an inculpatory inference can be inferred from the comment about "'boxing'/'framing'" Gulen as a terrorist reflected in the meeting note dated October 7, 2016, GEX 43B at 6, given the scope and purpose of the work already formulated.[31]

When the September 19 New York meeting is viewed in a light of all the evidence, including why it was scheduled, who attended, what was said, or what was not said, before, during and after that meeting, and the already defined work scope, any inference of the required agency on the part of Rafiekian is heavily outweighed by contrary inferences, and the most generous inference to the Government to be fairly drawn from all the evidence is that FIG and/or Sphere took notice of the comments of the Turkish Officials or "act[ed] in parallel with a foreign government's interests or pursue[d] a mutual goal," none of which goes very far, given the totality of the evidence, in establishing that  Rafiekian knowingly acted as a Turkish agent subject to its direction or control.  *See* Opinion at PageID# 5413, 5418 ("[A] person must do more than act in parallel with a foreign government's interests or pursue a mutual goal" to be deemed an agent under § 951); *see also id.* at PageID# 5415 (rejecting the view that "a person becomes an 'agent' for the purposes of § 951 whenever he 'is willing to do something the foreign principal requests'"); *id.* at PageID# 5418 (stating that "simply by acting in accordance with foreign interests" does not make someone an agent under § 951).  Similarly, Rafiekian's "if they played their cards right, [FIG] might garner *a 'follow-on* contract worth $5 million'"

---

[31] It also appears that the comments pertained to a possible future lobbying effort after the expiration of the Agreement.  *See* GEX 43B at 6 ("Optimistic timeline is before Christmas recess.  Realistic timeline is January, 2017"); *id.* ("We will engage specific members of Congress to highlight [Gulen's] activities and focus our efforts on 'boxing'/'framing' [Gulen] as terrorist.").

comment, *see* Opinion at PageID# 5427, allows only a weak inference that Rafiekian had already been engaged by Turkey, as opposed to Inovo, given that FIG already had a contract with Inovo that contemplated follow-on work.  GEX 78A (forwarding to Alptekin Sphere's analysis and suggestions for further investigation titled "Fethullah Gulen: A Primer for Investigators.").  In any event, only a weak, if any, inference with respect to Turkish direction or control can be drawn from that comment.

Flynn's November 8 Op-ed, coupled with Rafiekian's "a promise made is a promise kept" comment is also a thin reed upon which to infer Turkish direction or control over Rafiekian.  There was no claim or contention that Flynn was acting as Turkey's agent when he published the November 8 Op-ed; and the only evidence directly addressing how the November 8 Op-ed came to be published, introduced by the Government, was that the drafting of the November 8 Op-Ed began before the November 3 meeting with Alptekin, the November 8 Op-ed was Flynn's idea (which Flynn himself confirmed to Covington), that it was based in part on research conducted by FIG under the Agreement, that it was not written or published at the request of, or under the direction or control of Inovo, the Turkish government or any other party, no compensation was received, neither Alptekin or Turkey participated in its drafting, it was one in a long string of public statements and positions by Flynn related to terrorism and the Islamic State in Iraq and Syria[32] and Alptekin later expressed unhappiness with aspects of the November 8 Op-ed, specifically the critical assessment of the Muslim Brotherhood.[33]  As for the ambiguous and unexplained "promise made promised kept" comment, the only evidence as to its meaning, again introduced by the Government, is that it reflected Rafiekian's promise to share a draft of

---

[32] *See* DEX 111(April 18, 2016); 106 (May 23, 2016); 107 (July 9, 2016), 110 (August 3, 2016); 109 (October 6, 2019); and 112 (November 2, 2016); *see also* Trial Tr. [Doc. No. 331] (Miller) at 645:14-648:5.
[33] *See* GEX 60 (FARA filing, at US_v_Kian_00000357); GEX 92 at 2; *see also* Trial Tr. [Doc. No. 326] (Kelner) at 235:5-12; 236:20-237:4; 238:1-9; 259:10-25.).

33

the Op-ed with Alptekin before its publication as a matter of client relations.  *See* Trial Tr. [Doc. No. 326] (Kelner), 237:18-25.  When considered within the context of the evidence as a whole, the strongest inference to be drawn from the publication of the Op-Ed, as the Fourth Circuit also mentioned, is that Rafiekian worked to have Flynn's November 8 Op-ed published in order to "assuage[]" Alptekin" after he has expressed unhappiness with the work that had already been done.  *See* Opinion at PageID# 5430.

As discussed, *infra*, with respect to the alleged conspiracy in Count One, the remaining relied upon evidentiary bases for any inculpatory inferences are similarly weak in light of all the evidence, including any adverse inference to be drawn from Rafiekian's statements (whether facially inconsistent or consistent with others' statements) or the FARA filings.  And given the highly structured and defined nature of the work to be performed, how it was developed and by whom, and how it would be performed, as well as the unqualified, unconditional contractually required periodic payments to FIG, only a very weak inference of direction or control can be drawn from the source of funding.  Likewise, the payments to Alptekin, however characterized, do not allow much of an inference, if any, that Rafiekian had acted or agreed to act subject to the direction or control of the Turkish government.

In sum, the Agreement was an ill-suited mechanism through which to install Rafiekian as a Turkish agent subject to its direction or control.  It was far from an open-ended, ill-defined arrangement that would allow Turkey, acting through Alptekin, to direct and control what work would be performed.  In fact, Rafiekian throughout the engagement looked to his consultants in deciding how to proceed,[34] not Alptekin; and the Agreement was entered into only after FIG and its consultants developed and proposed a well-defined scope of work, with well-defined

---

[34] *See e.g.*, Trial Tr. [Doc. No. 330] (McCauley) at 403:2-11 (Rafiekian asked McCauley "[W]hat would be the strategy in the event we did get this contract[?]").

"deliverables," at a defined cost, allocated to those who would perform the work, without any expectation, need, or even opportunity (given the sense of urgency), for outside "direction or control."  The Agreement was then performed mostly by individuals other than Rafiekian according to a plan of execution that was developed internally by FIG's team in what appears to have been pain-staking detail over a period of weeks in order to allow the work to be performed quickly, without any "direction or control" by an outside party.  And once the Agreement was in place, there was no evidence that any work, other than Flynn's November 8 Op-ed, was performed outside the scope of work initially adopted and contracted for by FIG.  In short, there is little support for any inference from Alptekin and Rafiekian's communications or the activities leading up to or during the Agreement that the Agreement was viewed as simply "cover" for Rafiekian's covert activities as a Turkish agent acting at Turkish direction or control.  Similarly weak is any inference that FIG's agreement with Inovo would be viewed by Turkey as a mechanism through which Rafiekian, but no one else, including all the people actually doing the work, would operate as an agent subject to its direction or control.

Overall, the Government's theory of agency also substantially undercuts any inference that Rafiekian was enlisted to act at the direction or control of the Turkish government. According to the Government, Turkey wanted Flynn's support on extradition and Flynn's support on extradition would be more effective if Turkey were not disclosed as his benefactor or sponsor; and for that reason, Turkey would not have had the same willingness to have disclosed its relationship with Flynn as it had with respect to its other consultants, such as Amsterdam & Partners.[35]  But even if that were so, it says little about why Turkey would be likewise motivated

---

[35] *See* Trial Tr. [Doc. No. 350] at 976:25-977:4 (Gov.) ("What[] it's about and what the statute [§ 951] is intended to prevent is getting Lieutenant General Michael T. Flynn, as the national security advisor to the [R]epublican candidate for president, for him to get out there and say that this guy [Gulen] has got to go."); *id.* at 995:10-16 (Gov.) ("[T]here is no secret that the government of Turkey wanted Gulen back. The secret is that they were hiring

to recruit Rafiekian as its agent; and the strongest inference to be drawn from the evidence as a whole is that to the extent Turkey had recruited anyone as its agent, it was not Rafiekian, but Flynn because of his stature and his connections to then Presidential candidate Donald Trump. In fact, the recruitment of Flynn, to the exclusion of Rafiekian, is precisely what is reflected in DEX 66, as well as the almost overnight ending of Project Confidence and the dissolution of FIG upon Flynn's elevation to national security advisor.  *See* GEX 61, Attachment at US_v_Kian_00000356, Items 11-12 (stating "[FIG] closed its operations in November 2016"); Trial Tr. [Doc. No. 331] at 633:8-11 (Miller); *id.* at 648:18-24 (Miller); *id.* at 523:23-524:5 (Boston).  Indeed, it is difficult to reasonably infer from the evidence any real reason why Turkey would recruit as its agent Rafiekian (but, as the Government contended, no one else associated with FIG, including Flynn) through what was predominantly a short term research project whose pre-determined work scope addressed only obliquely Turkey's goal of extraditing Gulen.[36]  While one could argue that Turkey might view FIG as a useful conduit through which to influence or funnel and conceal money to Flynn in exchange for his services, the Government never made that contention and in any event, that purpose would not require enlisting Rafiekian as an agent; and there was no evidence that Rafiekian and Flynn ever discussed using FIG in that fashion or that FIG was used for that purpose.  In fact, the Government never claimed that Flynn,

---

FIG, Flynn Intel group, headed by General Flynn and General Flynn himself to publicly proclaim the very same position [as Amsterdam & Partners] but without revealing that it was being done at the behest of the Turkish government."); *id.* at 996:2-8 (Gov.) ("[I]t's an entirely different thing to have . . . General Michael T. Flynn say the same thing [as Amsterdam & Partners] but without revealing that it's being done, paid for, and asked for and approved by the government of Turkey through Alptekin, who was having these very high-level discussions with the government of Turkey.").

[36] The Government appears to rely on Rafiekian's lobbying activities as evidence of his agency.  Rafiekian's lobbying, limited as it was, was within the defined scope of work and nothing of significance materialized substantively from it.  *See* Trial. Tr. 111:4-17 [Doc. No. 325] (Olsen) (Rafiekian never lobbied or otherwise approached the Department of Justice personnel dealing with Turkey's request for Gulen's extradition.); *see also* Trial Tr. at 251:12-20 [Doc. No. 326] (Kelner) (The subject of Rafiekian's lobbying was "research regarding Gulen.").

who was identified as the lead on the FIG engagement, was acting as a Turkish agent subject to its direction or control.  Whatever may have been the relationship between the Government of Turkey, Alptekin and Flynn, on which there is no evidence other than DEX 66, the evidence as a whole allows only the weakest inference that Rafiekian had agreed to operate as a Turkish agent subject to its direction or control.  Overall, the great evidentiary weight is that Rafiekian did not agree to act, or would not have understood that Alptekin was proposing that he act, or that he would be seen as having agreed to act, subject to the direction or control of Turkey, acting through Alptekin or otherwise.

For the above reasons, when considered in light of all the evidence, Rafiekian's conviction on Count Two is against the great weight of the evidence, it would be unjust to enter judgment of conviction based on the totality of that evidence, and it is in the interest of justice to set it aside and order a new trial on Count Two.

### B. Conspiracy Conviction (Count One)

Rafiekian was convicted of conspiracy (1) to act as an unregistered agent of a foreign government in violation of § 951; and (2) to make willful and material false statements and omissions in a FARA filing in violation of 22 U.S.C. § 618(a)(2).  In order to convict Rafiekian of this charge, the Government was required to prove beyond a reasonable doubt that: (1) the conspiracy, agreement, or understanding to violate §§ 951 and 618(a) was formed, reached, or entered into by two or more persons; (2) at some time during the life of the conspiracy, Rafiekian knew its purpose; (3) Rafiekian deliberately joined the conspiracy with knowledge of its purpose; and (4) at some time during the life of the conspiracy, one of its members knowingly performed an overt act to further or advance its purpose.  [Doc. No. 354-5 at 38] (Jury

Instruction No. 33).  The superseding indictment alleges that the alleged conspiracy began from

at least July 2016.  [Doc. No. 141].

In finding the evidence sufficient to sustain Rafiekian's conviction on Count One,[37] the

Fourth Circuit concluded that a reasonable jury could conclude that Rafiekian and Alptekin

conspired to act subject to Turkey's direction without first notifying the Attorney General based

on evidence that (1) "Rafiekian and Alptekin engaged in a multi-month effort to facilitate Project

Truth/Confidence," which "joint conduct easily establishes that the two agreed to operate—if not

explicitly, then implicitly—subject to Turkish direction," and (2) "considerable evidence in the

record indicating that Rafiekian and Alptekin together sought to avoid disclosing Turkey's

involvement to the Attorney General, as § 951 requires."[38] Opinion at PageID# 5432.  The Court

has considered the strength of those inferences when considered in light of all the evidence,

including the credibility of the witnesses, and for essentially the same reasons as those discussed

---

[37] In concluding that the evidence was sufficient to sustain the conspiracy charge in Count One, the Fourth Circuit limited its consideration to the sufficiency of the evidence for conviction based on the first alleged object of the conspiracy—to have Rafiekian act as an undisclosed foreign agent in violation of Section 951—without considering the sufficiency of the evidence with respect to the alleged second object of the conspiracy.  Opinion at PageID# 5431.  It also "refrain[ed] from drawing conclusions with respect to Flynn's alleged participation [in that alleged conspiracy]."  *Id.* at PageID# 5431, fn. 21.

[38] That "considerable evidence" is:

    (1) "From the project's inception, confidentiality was of paramount concern," as evidenced by (a) the lack of any mention of Turkish involvement in any of the agreements between FIG, Inovo and Alptekin; (b) the agreements "specifically provide[d] that 'no public announcement of the scope or details of this engagement shall be made without written approval of [the] parties during the course of the engagement;'" and (c) "Rafiekian['s] caution[ing] his employees not to reveal [FIG]'s work on Project Confidence or use Inovo's name in external discussions" and advised Sphere Consulting not to disclose Inovo's name except "as a last resort;"

    (2) "[W]hen pressure mounted to make *some* kind of public disclosure, Rafiekian balked at notifying DOJ, opting instead to keep things—as he put it—'under the radar' by filing a barebones lobbying-registration form with Congress."  Opinion at PageID# 5432 (citing J.A. 982–84, 2581–8); and

    (3) Efforts continued to hide Turkey's involvement from DOJ after the Op-ed drew scrutiny. With respect to this last category of evidence, the Court of Appeals pointed to (a) "Rafiekian['s] assert[ion] that the New York meeting was 'unrelated to Project Confidence' (despite having told his own employees that it was) and that Alptekin's fees were just 'refunds' for incomplete lobbying work (despite having described them as 'consulting fees' in virtually all contemporaneous communications);" (b) "[c]onsistent with Rafiekian's statements, Alptekin had his attorney draft an opinion letter disclaiming any formal relationship between Inovo and Turkey; characterizing his payments as 'refunds'; dismissing the notion that he had asked for or approved the op-ed; and conspicuously omitting any mention of the New York meeting"; and (c) "Rafiekian['s] deliver[ing] that [opinion] letter to Covington investigators himself—further evidence of at least a 'tacit' agreement between Rafiekian and Alptekin to prevent disclosure DOJ."  Opinion at PageID# 5432-33.

with respect to Rafiekian's § 951 conviction on Count Two, there is only a weak inference of any conspiratorial agreement to operate subject to Turkish direction or control, which is heavily outweighed by the evidence that Rafiekian did not contemplate any relationship other than an arms-length, highly defined and focused engagement that the FIG team had developed, consisting mostly of open source research, which would be performed with a sense of urgency over a short period according to a detailed plan of execution, also developed internally, with no outside direction or control.

Likewise weak is any inference that Rafiekian conspired with Alptekin to file a false FARA statement, the second object of the alleged conspiracy.[39]  The DOJ first raised the specter of a need for a FARA filing by letter to Flynn dated November 30, 2016 (which did not become known to Flynn until December 24, 2016), by which time FIG had ceased operations and was not performing any work for Inovo or anyone else.  *See* GEX 90, 92,GEX 61, Attachment at US_v_Kian_00000356, Items 11-12 (stating "[FIG] closed its operations in November 2016"); Trial Tr. [Doc. No. 331] at 633:8-11 (Miller); *id.* at 648:18-24 (Miller); *id.* at 523:23-524:5 (Boston); GEX 167 (LDA report dated December 1, 2016 listing termination date of November 16, 2016).  Other than Alptekin's email to Rafiekian on January 18, 2017, forwarding him a copy of his lawyer's opinion letter dated January 18, 2017, there is no evidence of any communications between Rafiekian and Alptekin after DOJ's FARA related inquiry.  Moreover, Rafiekian's participation in a conspiracy to file a false FARA statement also appears strained given Covington's role, investigation, and control over the substance of the FARA filing, the FARA's disclosures themselves, which included the New York meeting, the substance of FIG's

---

[39] The Fourth Circuit did not decide the sufficiency of the evidence as to Rafiekian's conviction on Count One based on the second object of the alleged conspiracy.  Nevertheless, the Court has also considered whether a new trial is warranted as to that aspect of Count One.

engagement with Inovo and Alptekin's role; and Turkey as a primary beneficiary of FIG's engagement with Inovo, as well as the peripheral and arguably immaterial nature of some of Rafiekian's relied statements from which an adverse inference could be drawn. [40]

With respect to Rafiekian's confidentiality concerns, which the Fourth Circuit recognized were "understandable" but nevertheless sufficient to allow a conspiracy to be inferred, *see* Opinion at PageID# 5432, the evidence most strongly reflects that they were motivated, not by a concern over Executive Branch knowledge of the engagement, but by a concern that publicity would make its contracted for investigation more difficult by alerting Gulen supporters. *See* Trial Tr. [Doc. No. 330] at 414:11-13 (McCauley) ("The purpose of keeping it [Project Confidence] under the radar was to avoid detection by Tony Podesta and other members of Congress who were favorable to Gulen."). That more persuasive inference is substantially strengthened by Flynn's disclosure on September 15, 2016, to a U.S. Government agency that he planned on meeting with the Turkish Foreign Minister and also possibly the Turkish President Erdogan on September 19, 2016, that FIG was supporting a Dutch company in reviewing the confidence of the international community in the Turkish government, referencing a Strategic Approach and Project Confidence, DX 6 (Stip. Of Fact No.2); Trial Tr.[Doc. No. 350] at 1007:10-11,25 -1008:13, and also Rafiekian's voluntary disclosure on September 28, 2016, in a meeting with a U.S. Government agency that he had "been asked to consult on a documentary-style commercial to raise awareness about" Gulen's charter schools and identified Alptekin "as a business contact" who had "senior level contacts in the Turkish government" and was "the sole owner of Inovo, a Dutch company." DX 14; Trial Tr. [Doc. No. 350] at 1009:6-1010:5.

---

[40] While there is evidence that Rafiekian was unhappy with FARA's statement that Turkey was the primary beneficiary of the FIG's engagement, *see* Trial Tr. [Doc. No. 326] (Kelner) at 252:11-14, there is no evidence that Rafiekian attempted to change that disclosure or any other aspect of the FARA filing or to prevent the FARA filing.

Finally, any inference of conspiracy is further undercut not only by the extent of Rafiekian's actual contact with Turkish officials, as discussed above, but also by the undisputed evidence that, in fact, Turkey had a long history of registering openly under FARA with respect to its use of consultants, such as FIG, including with respect to contracts related to Gulen;[41] and from late 2015, early 2016 through March 2017, Turkey had been actively and openly meeting with State Department personnel, including the Attorney General, about the extradition of Gulen, whom it identified as a terrorist. *See* Trial Tr. [Doc. No. 325] at 87:8-24 (Olsen); *id.* at 104:13-25 (Olsen); *id.* at 105:1-10 (Olsen). Rafiekian expressed sentiments clearly sympathetic and aligned with the well-known publicly stated views, goals, and objectives of the Turkish government as well as admiration for the Turkish President and was no doubt motivated by those sentiments. But as the Fourth Circuit made clear, a person must do more than act in parallel with a foreign government's interest, pursue a mutual goal, or privately pledge personal alliance, *see* Opinion at PageID# 5413, and for that reason, there is only a weak inference bordering on speculation that once the work scope was defined and the Agreement executed, Rafiekian had agreed to abide by and operate according to the directions of Turkey with respect to the work to be performed under the contract.

Likewise, the inference of conspiracy based on the lack of any reference to Turkey in the written agreements between FIG, Inovo, and Alptekin is weak. That inference is based on the presumption that Turkey, acting through Alptekin and Inovo, was, in fact, the client for the

---

[41] *See* Trial Tr. [Doc. No. 326] at 211:14-20 (Gilday) (stating there is on file in the Department of Justice's FARA office 17 different registrations on behalf of Turkey with respect Turkey's use of consultants); GEX 148, 149 (FARA filings by Amsterdam and Partners listing its client as Turkey with respect work pertaining to Gulen); Trial Tr. [Doc. No. 334] at 897:12-21 (Durkovic) (testifying that Turkey hired Amsterdam & Partners to "expose Fethullah Gulen and his criminal network in the United States" and that it worked directly with Turkish officials through its Washington, D.C. embassy); *id.* at 900:20-901:17 (testifying that Amsterdam & Partners publicly disclosed in a FARA filing the engagement with Turkey as the client, that Turkey made no attempt to prevent that disclosure, and Turkey did not request that it have any contact with FIG).

purposes of those agreements.  But given that the evidence most strongly supports the inference

that Rafiekian would not have thought he had entered into a contract with Turkey, as discussed

above, it is hardly surprising or probative of an illicit conspiracy that there is no mention of

Turkey in the agreements; and no persuasive inference of conspiracy can be drawn simply from

the fact that the Agreement between FIG and Inovo did not mention any Turkish involvement.

Similarly weak in light of all the evidence is the inference of a conspiracy drawn from

Rafiekian's "filing a barebones lobbying-registration form" only after "pressure mounted to

make some kind of public disclosure."  *See* Opinion at PageID# 5432 (citing J.A. 982–84,

2581–8).  In that regard, ostensibly shortly after Rafiekian received Alptekin's confirmation of

the engagement with Inovo on August 25, 2016, Flynn raised the subject of disclosure and

Rafiekian began his efforts to comply with any applicable disclosure requirements.  There is no

evidence that at that point Rafiekian disagreed, "balked" or resisted doing what was required, but

on the other hand, and without any evidence of mounting pressure, contacted Covington in late

August in order to file what he thought was a required FARA filing and told Covington that he

thought a FARA filing was needed; and in fact, delayed sending the proposed Agreement to

Alptekin pending legal review for compliance.  *See* GEX 67H.  When Covington declined the

representation because of political alignments in the firm, he contacted Robert Kelley, who held

himself out as an experienced national security lawyer, to whom Rafiekian also said "[we] have

to . . . register at the Foreign Agents Registration Act."  Trial Tr. [Doc. No. 334] at 857:16-19

(Kelley).  In response, Kelley asked whether the client was a foreign government or political

party, as opposed to a foreign private entity, and after Rafiekian said that the client, Inovo, was a

private Dutch company, Kelley, with no further inquiry, advised that a filing under FARA was

not necessary and showed him the Federal Register that says it is not necessary for a private

company to register under FARA, and that because Rafiekian contemplated some lobbying under the engagement, FIG could file under the Lobbying Disclosure Act ("LDA").  *Id.* [Doc. No. 334] at 858:4-8 (Kelley).[42]  Thereafter, Kelley prepared the LDA filing based on his experience of what was adequate, without any further consultation with Rafiekian.  *See* GEX173 (Kelley Decl.), ¶¶ 7-11.  Whatever may be said about the adequacy of Kelley's legal representation or inquiry, or the adequacy of the LDA filing that he prepared,[43] and notwithstanding that Rafiekian had notice of Turkish interest in FIG's engagement, the uncontradicted evidence, introduced by the Government through documents and witnesses who credibly testified without impeachment, is that Rafiekian provided all the information asked of him by Kelley, the information he provided was the information he had received from Alptekin, as confirmed in the Agreement, he acted in conformity with Kelley's advice, and Kelley, and Kelley alone, was responsible for filing the "barebones" LDA filing.[44]  Nor can much of an inference of criminality be drawn from Rafiekian's "keep it under the radar" comment, given that it came weeks after Rafiekian was advised by counsel that only an LDA filing was necessary and his and Flynn's disclosures to a government agency about FIG's engagement and their contact with Turkish officials.

There is likewise only a weak inference that "at least a 'tacit' agreement between Rafiekian and Alptekin to prevent disclosure to DOJ" can be drawn from Rafiekian's facially

---

[42] Kelley's advice that a FARA filing was not required without further inquiry upon learning that FIG's client was a private company appears to reflect the view in some legal quarters that registration under FARA is not required for an engagement with a private company, even if  a foreign government is the primary beneficiary.  *See* Trial Tr. [Doc. No. 326] (Kelner) (agreeing that this issue is a "murkey area.").

[43] The Government criticizes in particular the reference to two funding bills in the LDA filing, "S.1635 and House counterpart and H.R. 1735 and Senate counterpart."  GEX 166.  That filing, however, also mentioned "U.S. domestic and foreign Policy" as the topic of current and anticipated lobbying issues, which more directly covered the extradition of Gulen.  *See Id.*

[44] Presumably based on the information Rafiekian received concerning Turkish interest in FIG's engagement, when viewed most favorably to the Government, the Fourth Circuit referred to Rafiekian's disclosures to Kelley as "disingenuous."  *See* Opinion at PageID# 5433, n. 23.  When Rafiekian's disclosures are considered within the context of Kelley's inquiry and Rafiekian's other disclosures, such a characterization weakens.

inconsistent statements.  Opinion at PageID# 5432-33.[45]  With respect to Rafiekian's statement

concerning the relationship between Project Truth and Project Confidence, as discussed above,

the only direct evidence, introduced principally by the Government, is that, as Rafiekian

consistently stated based on what Alptekin told him, FIG entered into a contract concerning

Project Confidence with a client different than the client first contemplated for Project Truth, and

given that evidence, his describing the two projects as "completely separate" does not allow for

much of an inference of agency with the Turkish government.  Similarly, that investigating

Gulen was ostensibly at the heart of both projects says little about who the actual client was,

given the central role Gulen expressly played with respect to the identified Objective and

Strategic Approach developed by FIG's consultants for Project Confidence.  Similarly,

Rafiekian's ostensibly conflicting statements pertaining to the New York meeting and the

payments to Alptekin are not so unsupported by the evidence so as to allow a strong inference of

mendacity or conspiracy.  In that regard, the September 19 meeting in New York had not been

budgeted or identified as an action item for Project Confidence and as reflected in FIG's

preparation for the New York meeting, the meeting was viewed as an opportunity to obtain

additional background information on the situation in Turkey through a series of questions.

However, as it turned out, the 25-to-30 minute New York meeting provided no opportunity for

questions, no discussion of FIG's engagement or what information would be helpful to FIG in

performing the contracted for work.  Rather, it turned out to be simply an opportunity for Turkish

---

[45] That inference is based on Rafiekian's statements to Covington investigators that (1) Project Confidence, with Inovo as the client, was "completely separate" from what was first contemplated as "Truth" with Turkey as the client; (2) the New York meeting was unrelated to Project Confidence; (3) Alptekin's fees were refunds for incomplete lobbying work; and (4) Alptekin's opinion letter, which, "consistent with Rafiekian's statements, …disclaim[ed] any formal relationship between Inovo and Turkey, characterize[ed] his payments as 'refunds;' dismiss[ed] the notion that he had asked for or approved the op-ed; and conspicuously omitt[ed] any mention of the New York meeting[,] and 'Rafiekian['s] deliver[ing] that [opinion] letter to Covington investigators himself.'" Opinion at PageID# at 5408, 5433.

Officials to complain about Gulen.  Against that background,  Rafiekian's reference to the New York meeting in advance of that meeting as "background" and related to their engagement and then several months after that meeting, when asked by Covington's investigation, as "unrelated" to Project Confidence,[46] which it apparently turned out to be, when measured against what Rafiekian had hoped to get out of the meeting, does not allow a strong inference that he was attempting to hide Turkey's involvement, particularly given his other extensive disclosures to Covington, through his e-mails and otherwise, of his communications with Alptekin concerning Turkish interest.  *See, e.g.* GEX 26A, 26B.  Similarly, the evidence is mixed as to how the payments to Inovo could be reasonably viewed by the end of the engagement, and in fact was extensively debated within Covington.[47]

With respect to Alptekin's opinion letter received on January 18, 2017, other than the letter itself, the only communications in evidence between Rafiekian and Alptekin about legal compliance appear to have taken place on September 1, 2016 [48] and September 3, 2016,[49] and no

---

[46] The evidence of the "unrelated" comment comes from Kelner's testimony that Rafiekian told him that at the New York meeting "there wasn't discussion of the Inovo contract and . . . the meeting was not related to Project Confidence."  Trial Tr. [Doc. No. 326] at 260:18-19 (Kelner).

[47] The Agreement with Inovo was a "firm, fixed price" contract for $600,000, to be paid in three $200,000 installments. GEX 151B at 2.  The $600,000 price tag was set based on what appears to be $330,00 for FIG, $120,000 for Alptekin and $150,00 for Sphere.  *See* Trial Tr. [Doc. No. 330] (McCauley) at 410:7-8.  As it turned out, Sphere did not engage in the lobbying effort originally contemplated (FIG paid Sphere only $30,000, later increased to $40,000, rather than the budgeted $150,000).  *See* GEX 61, Attachment at US_v_Kian_00000358, Item 15; Trial Tr. [Doc. No. 222] at 734:15-19 (Courtovich).  Alptekin was ostensibly aware of Sphere's limited lobbying effort, in light of which the parties appear to have modified the second installment payments from $200,000 to $185,000, which effectively reduced the allocated Sphere payment to $35,000 (after the payment of $40,000 back to Alptekin) and the third installment from $200,000 to $145,000, which ostensibly reflected a holdback of $40,000 for Alptekin and an additional $15,000.  As Kelner of Covington testified, the firm spent a lot of time considering how to characterize the payments, with those payments being characterized in early drafts as "refunds due to reduction in scope," which reflected the views of some of the Covington lawyers working on the issue.  *See* Trial Tr. [Doc. No. 326] at 296:9-12 (Kelner); *id.* at 297:4-18.

[48] *See* GEX 67H (Rafiekian advising Alptekin that he was delaying sending the proposed engagement letter "because I have hired a law firm and they are reviewing for compliance. We will absorb this extra cost. No impact on your firm [Inovo]".).

[49] See GEX 67 at 12 ("[W]e have now added Bob Kelley our General Counsel to the team. We concluded our talk with him and he is now fully briefed and focused on the mission. He has also already advised on the composition of our engagement letter with INOVO BV. His advice is to stay very brief on the language of the agreement. No need to discuss methods and sources in the agreement. He is also advising that we do register as LDA (Lobbying

reasonable inference of the alleged conspiracy can be drawn from either exchange.  There is also

no evidence that Rafiekian or FIG's lawyers had any knowledge of Alptekin's efforts to obtain

the opinion letter or what the opinion letter would say until he received Alptekin's e-mail on

January 18, 2017, with the opinion letter enclosed.  *See* Trial Tr. [Doc. No. 326] at 240:21-241:1

(Kelner).  As Alptekin explained to Rafiekian in that letter, without any hint of a prior

discussion, he obtained the opinion letter for primarily reputational concerns[50] and was

forwarding it to Rafiekian because "[he] hope[d] you [Rafiekian] will take the time to read the

opinion."  GEX 93A.  In any event, not much can be drawn from any "[c]onsisten[cy] with

Rafiekian's statements," *see* Opinion at PageID# 5433, as any "consistency" simply reflected the

evidence that the Government offered.  *See Bell Atlantic v. Twombly*, 550 U.S. 544, 564-66

(2007) (stating parallel conduct by itself does not plausibly allege a conspiratorial agreement).

As discussed above, only Alptekin knew the relationship between Inovo and Turkey, nothing

Alptekin ever said to Rafiekian suggested "a formal relationship between Inovo and Turkey,"

there is no evidence of such a "formal relationship," Rafiekian described that relationship to

Covington as it was conveyed to him by Alptekin, and the FARA statement prepared by

Covington said as much.  *See* GEX 61, 65.  The Government presented multiple witnesses that

credibly and consistently testified that Inovo was regarded as FIG's client, that Alptkin said to

them personally that Inovo was the client, funded by Turkish businessmen, and that Project

Confidence was developed and executed with that understanding; and there was no evidence that

---

Disclosure Act) with some outreach to congress (limited) just to satisfy the requirements of LDA at optimum
level.").

[50] Alptekin stated he obtained the opinion letter "as my integrity was questioned" (presumably referencing the news
reports that followed Flynn's Op-ed), and "my good name has suffered a blow for no reason whatsoever." GEX
93A.  The Opinion letter dealt primarily with whether the regulations of the Foreign Economic Relations Board of
Turkey applied to "his election as Chairman of The Turkish-American Business Council (TALK) one of the
Business Councils of the Foreign Economic Relations Board of Turkey" and "if TALK Chairman position could be
construed as a Turkish government position or an independent position for the purposes of the Foreign Agents
Registration Act (FARA)."  GEX 93B at 1.

Rafiekian had information about Alptekin's role, Inovo's status or funding other than as explained by Alptekin.  Nor does "Rafiekian['s] deliver[ing] that [opinion] letter to Covington investigators himself " allow much of an inference of conspiracy, particularly since he didn't give it directly to Covington, but rather to lawyer Verdame, who gave it to Covington, without any evidence whether she did that at Rafiekian's request.  *See* Opinion at PageID# 5433; Trial Tr. [Doc. No 326] at 238:22-239:3 (Kelner).  With respect to the "refund" characterization, Alptekin's view summarized in his lawyer's opinion letter was that "INOVO should be reimbursed for part of the retainer since both the Lobbying and PR components never materialized. INOVO never hired Sphere Consulting."  GEX 93B at 3.  That view appears to be reasonably related to the facts.  *See supra* n. 49.  And while Alptekin's opinion letter did not mention the New York meeting, Rafiekian certainly did.  And for essentially the same reasons, only weak inferences of any conspiracy to violate FARA can be inferred from the statements in the FARA filing itself.[51]

---

[51] The allegedly false statements that Rafiekian told Covington for the purpose of the FARA filing are the following, set forth in Paragraph 53 of the Superseding Indictment:

    1. The September 19, 2016 New York meeting had nothing to do with project confidence and instead was in furtherance of an abandoned Project Truth that was distinct from Project Confidence;

    2. There were no other contacts with Turkish government officials regarding the project;

    3. The op-ed was Flynn's own idea, and he rewrote it and he wrote it on his own behalf, and unrelated to the project.

    4. Alptekin did not want the op-ed to be published; and

    5. Payments to FIG from Inovo were refunds for lobbying and publicly relations work that FIG did not perform.

*See* [Doc. No. 141] ¶ 53.

    The Superseding Indictment also alleges in Paragraphs 55-63 that "Rafiekian and Alptekin caused to be made the following false statements of material fact in documents filed [under FARA] and omitted the following material facts necessary to make the statements therein not misleading [and] Rafiekian reviewed the filings and provided comments to [FIG]'s attorneys before the filings were submitted, but did not request that any of the false statements be changed":

    1. Inovo was listed as the only foreign principal for whom the registrant is acting or has agreed to act.

    2. During the course of the engagement and thereafter, FIG's officials, particularly Flynn, in his capacity as a public figure, separate from FIG, frequently wrote, spoke, or provided interviews relating to national security; and although not undertaken at the direction of any foreign principal, including but not limited to Inovo, it is possible that such activities may have had indirect benefit to Inovo.

    3. FIG does not know whether or the extent to which the Republic of Turkey was involved with its retention by Inovo for the three-month project.

The great weight of the evidence against Rafiekian's conspiracy conviction is also reflected in the Government's own assessment of the evidence relative to Flynn's involvement. As mentioned above, until shortly before trial, and after years of investigation, and with the benefit of all of the evidence it presented against Rafiekian, as well as the classified information summarized in DEX 66, the Government admitted in court that Flynn was not a member of the charged conspiracy, even though Flynn was designated the lead on the engagement, had direct contacts with Turkish officials, participated in almost all of the communications and meetings in evidence, including the September 19, 2016, meeting with Turkish officials, wrote the published Op-ed and corroborated Rafiekian's statements which the Government claimed were knowingly false concerning who FIG's client was, the purpose of Project Confidence, the relationship Gulen had to that purpose and how the November 8 Op-ed came to be written.  Moreover, the Government's relabeling of Flynn as a co-conspirator on the eve of trial was not based on any new evidence, but rather its assessment that Flynn's testimony would not advance its case against Rafiekian.

Overall, all of the evidence that dealt most directly with the central issues in the case (*viz.*, who was FIG's client, what was the stated purpose of Project Confidence and the relationship between investigating Gulen and that purpose, how the work scope was developed

---

4. FIG was not supervised by a foreign government or other foreign principal.

5. Because of his expertise, FIG's officials write, speak, and give interviews relating to national security; and although not undertaken at the direction or control of foreign principal, it is possible that such activity may have an indirect benefit to a principal.

6. On his own initiative, without a request or direction from Inovo or any other person, Flynn published an op-ed in The Hill on November 8, 2016, that related to the same subject matters as FIG's work for Inovo.

7. FIG understood the engagement to be focused on improving US business organizations' confidence regarding doing business in Turkey, particularly with respect to the stability of Turkey and its suitability as a venue for investment in commercial activity.

8. The September 19, 2016 New York meeting was "for the purpose of understanding better the applicable climate in Turkey at the time, as background for the project."

and who exercised direction or control over the Project) all points to Rafiekian's innocence. Rafiekian's convictions, on the other hand, are based on weak inferences, many built upon one another, drawn from narrowly framed circumstantial evidence, without regard to a broader context that substantially undercuts any inculpatory inferences.

For the above reasons, Rafiekian's conviction on Count One is against the great weight of the evidence and a new trial on Count One is warranted in the interests of justice and to avoid a miscarriage of justice.

Although the Court concludes that a new trial is warranted as to both Counts based on the above weight of the evidence analysis, that decision is further supported by the Government's argument pertaining to DEX 66 in its closing summation, which, in the Court's judgment, distracted the jury's attention from the great weight of the evidence in favor of acquittal.

DEX 66 was the Government's court approved summary of classified information that was either exculpatory or of assistance to the defendants; and, by definition, it was a summary that "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *See* Classified Information Protection Act, 18 U.S.C. app. 3, § 6(c)(1)(B). That summary evidences conversations between the Turkish government, Flynn and Alptekin for the purpose of enlisting Flynn to essentially lobby Donald Trump, then a candidate for President, to support the extradition of Gulen, all without any reference to Rafiekian. That lobbying of Donald Trump was nowhere mentioned or suggested within the context of FIG's engagement by Inovo. Moreover, there was no evidence that Rafiekian knew or was on notice of those summarized contacts between Alptekin and Flynn, who, it appears, did not disclose those contacts even to his Covington lawyers. *See* Trial Tr. [Doc. No. 323] at 323:1-24 (Kelner).

49

When viewed in light of all the evidence, DEX 66 evidences, at most, an uncharged conspiracy involving Flynn to the exclusion of Rafiekian.  Nevertheless, and despite the facial exculpatory nature of DEX 66, the Government in essence argued to the jury, based on presumed facts nowhere reflected in either DEX 66 or elsewhere in evidence, that DEX 66 simply evidenced a conspiracy between Flynn and Alptekin that Rafiekian had not yet, but ultimately joined.[52]  The Government now argues that what it told the jury about what DEX 66 means falls within fair comment on the evidence, its "[a]rguing the exhibit [DEX 66] 'says nothing at all'[as to Rafiekian's innocence] is not the same as arguing that it constitutes substantive evidence of guilt[]" and its "offering a hypothetical to show how an exhibit has no exculpatory value is not the same thing as arguing it affirmatively proves guilt.  [Doc. No. 390] at PageID#5547.  But the Government's "hypothetical" argued implicitly (if not explicitly) that DEX 66 implicated Rafiekian's guilt, albeit with respect to an uncharged conspiracy; and the jury could have easily attributed that "hypothetical" guilt, as explained by the Government, to the charged conspiracy, despite the lack of support for such an attribution in DEX 66, and the government's judicial admission that Flynn was not part of the alleged conspiracy against Rafiekian.

## IV. CONCLUSION

The Court recognizes that a new trial is to be granted sparingly, with great deference to be accorded to the judgment of the jury; and the Court has centrally considered whether it should defer to the judgment of the jury.  After a thorough consideration of all the evidence, and after giving great deference to the jury's assessment of the evidence, the Court finds and concludes that Rafiekian's convictions on Counts One and Two were so against the great weight of the

---

[52] *See* Trial Tr. [Doc. No. 351] at 1182:18-1183:9.

evidence that it would be unjust to convict him on either Count and a new trial is warranted in the interests of justice on both Counts to avoid a miscarriage of justice.

Accordingly, it is hereby

ORDERED that Defendant Rafiekian's convictions as to Counts One and Two be, and the same hereby are, VACATED; and his renewed motion for a new trial [Doc. No. 387] be, and the same hereby is, GRANTED; and it is further

ORDERED that a status conference be, and the same hereby is, SCHEDULED on April 20, 2022, at 9:00 a.m., to set a trial date, should the United States elect to proceed with a new trial.

The Clerk is directed to forward a copy of this Order to all counsel of record.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 25, 2022